# Exhibit 5

(<u>September 2021 Polygraph Showing that Dorworth Did not Commit Obstruction</u>)



# Curtis E. Holleman Polygraph Services, LLC

P.O. Box 2241  
Valrico, FL 33595-2241

(813) 766-2000  
holleman1@verizon.net

tampabaypolygraph.com

---

**CHRISTOPHER ERICKSON DORWORTH**  
**POLYGRAPH EXAMINATION REPORT**  
**POLYGRAPH EXAMINATION DATE: SEPTEMBER 22, 2021**  
**DATE PREPARED: SEPTEMBER 23, 2021**

---

REPORT BY:

CURTIS E. HOLLEMAN  
SEPTEMBER 23, 2021

CASE ID: DORWORTH 20210922

Member of the American Polygraph Association (APA)  
Member of the Florida Polygraph Association (FPA)

## TABLE OF CONTENTS

| | |
|---|---|
| Page 2............................................................. | Table of Contents |
| Page 3............................................................. | Request for Polygraph Examination |
| Page 3............................................................. | Previous Examination(s) |
| Page 3............................................................. | Background |
| Page 4............................................................. | Emotional Suitability |
| Page 4............................................................. | Physical Suitability |
| Page 4............................................................. | Consent and Interview |
| Page 4............................................................. | Relevant Questions |
| Page 5............................................................. | The Polygraph |
| Page 5............................................................. | Methodology |
| Page 6............................................................. | Examination Techniques |
| Page 6............................................................. | Chart Evaluation |
| Page 6............................................................. | Empirical Scoring System (ESS) |
| Page 8............................................................. | Test Results |
| Page 8............................................................. | Instrumentation |
| Page 8............................................................. | Examiner Signature |
| Page 9............................................................. | Examiner's Credentials |
| Attachment A................................................. | Empirical Scoring System Scoresheet |
| Attachment B................................................. | Objective Scoring System - Version 3 |
| Attachment C................................................. | PolyScore for Windows Version 7.2 |

**REQUEST FOR POLYGRAPH EXAMINATION**

Richard E. Hornsby, P.A., 1217 E. Robinson Street, Orlando, Florida, 32801-2115, requested that a polygraph examination be administered to his client, Christopher Erickson Dorworth. The polygraph would focus on whether Dorworth had asked                         to discourage anyone from cooperating with the U.S. Government and whether he had directed or asked                         to lie to a Federal Grand Jury.

**PREVIOUS EXAMINATION(S)**

Dorworth received a polygraph examination on April 30, 2021 by this Examiner, which he passed.

**BACKGROUND**

On September 22, 2021, Dorworth met with the examiner at the offices of his attorney, Richard E. Hornsby. Through review of prior information provided by Mr. Hornsby and Mr. Dorworth and the pre-test interview, Dorworth affirmed the following information:

Dorworth was born in Fort Lauderdale, Florida, on July 17, 1976 and he is 45 years old. His address is 1520 Whitstable Court, Lake Mary, Florida, 32746. He has been married to Rebekah Dorworth since November 5, 2016,

In 1998, Dorworth obtained his B.A. in Political Science from the University of Florida and in 2006 earned a M.B.A. from Duke University. From December 1, 2012 to April, 2021, Dorworth worked as a lobbyist for Ballard Partners. Prior to this, he held elected office from 2007 to 2012 as a Florida State Representative for Seminole and Orange Counties. Dorworth also operates the River Cross Land Company and Strawberry Lane LLC, real estate development firms from his home. Dorworth thereafter provided the following regarding this matter:

On September 28th, 2020, Dorworth was having dinner with Kyle Jones at Fish Bones Seafood Restaurant in Lake Mary, Florida, when he received a phone call from U.S. Congressman Matt Gaetz. Jones is a real estate developer that Dorworth has known for twenty five years. During the call, Gaetz said " Hey, just to put it on your radar, that he (Gaetz) just talked to                         and that she had called Gaetz to give him a heads up and that a bunch of people were mentioned during a Federal Grand Jury and that you (Dorworth) were one of them."

Dorworth advised he trusted Gaetz but wanted to verify this information, therefore, stepped away from the dinner table and called                         to confirm whether or not he had been mentioned by the Grand Jury, as Gaetz had said. During their brief conversation,           said she could not provide any details, but "a bunch of people were mentioned and you were one of them."           could not provide any specifics when he asked her "where he was at in

this thing?" Dorworth advised it was _____ feeling that Dorworth was not the subject of an investigation, therefore, he was not concerned. Dorworth advised he took a photo a couple of hours later at the restaurant which depicts him in a jovial mood.

The next day _____ called Dorworth back and told him that she forgot to mention " I think they asked questions about your house and they displayed drivers licenses of Dorworth, Gaetz and others." Dorworth advised he had an idea as to who the others might be, but did not know for sure. _____ told Dorworth that _____ and _____ had appeared before the Grand Jury.

Dorworth advised "he never asked anyone to say anything to these girls and that he was only in the mode of trying to obtain information." Dorworth advised he had no idea that anyone had appeared before a Federal Grand Jury until he received the phone call from Gaetz. Dorworth advised he never asked that anyone relay any type of message to _____ .

**EMOTIONAL SUITABILITY FOR POLYGRAPH EXAMINATION**

Dorworth did not appear to suffer from any emotional condition that would stop him from taking a polygraph examination. Dorworth freely volunteered information during the interview, understood the questions he was asked, and responded in a clear and concise manner. He was friendly and positive to the Examiner.

**PHYSICAL SUITABILITY FOR POLYGRAPH EXAMINATION**

Through observation and interview, Dorworth appeared to be physically suitable to take a polygraph examination. He stated that his physical condition would not preclude him from taking a polygraph examination and he stated he was in good health. He stated that he was not in any pain or discomfort and was physically able to sit for the test. He stated he'd received about six to seven hours of sleep, the evening prior.

**CONSENT AND INTERVIEW**

On September 22, 2021, Dorworth voluntarily agreed to take a polygraph examination and stated that he understood the purpose for the polygraph examination. He indicated a willingness to take the examination by signing a Consent to Polygraph form.

**RELEVANT QUESTIONS**

Based on the above, a polygraph examination was administered using the following relevant questions:

1. Did you ever make any effort to get _____ to lie to the Grand Jury?
   Answer: No

2. Did you ever do anything to get _____ to lie to the Grand Jury?
   Answer: No

3. Did you ever ask _____ to discourage anyone from cooperating with the Government?
   Answer: No

**THE POLYGRAPH**

People tell lies and deceive others for many reasons that are sometimes difficult to identify. Most often, lying is a defense mechanism used to avoid some perceived threat or danger. Any conscious effort at deception by a rational individual causes certain stressful involuntary and uncontrollable physiological responses activated by the Autonomic Nervous System (ANS). A polygraph simultaneously records a minimum of respiratory activity, galvanic skin resistance/conductivity and cardiovascular activity (blood pressure and heart rate).

Polygraphs, commonly called "lie detectors" are instruments that record the changes in a person's physiological reactions, usually from an established norm. Polygraphs do not, as their nickname suggests, detect lies. They can only detect whether deceptive behavior, stress or fear induced, is displayed.

**METHODOLOGY**

The technique used to examine Dorworth was a Utah Zone Specific Issue Probable Lie Comparison Question Test. Studies leading to its creation began in the 1970s through the efforts of Drs. Raskin, Kircher and Honts and over 30 years of research support its principals. The Utah ZCT meets the APA January 1, 2012 Validated Techniques Requirement for Evidentiary testing, Paired Testing, and Investigating Testing. When coupled with the Empirical Scoring System, it is unsurpassed in accuracy and inter-rater reliability. All questions were reviewed with Dorworth prior to the test.

The most commonly used technique for psycho-physiological detection of deception is control/comparison question tests. The control question test (CQT) assesses a person's credibility by looking primarily for a differential reaction between two questions: the relevant and control questions. When questioned during a pretest interview an examiner will assist an examinee in developing a "psychological set." The examiner will direct their attention to the question (relevant or control) that creates the greatest anxiety, concern or threat to his/her well being.

Relevant questions are those questions that have been formulated which specifically and simply address the issue in question. The questions are precise, unambiguous, unequivocal with a single meaning and thoroughly understandable to the examinee. Relevant questions are confined to a single investigative issue and can be answered yes or no.

During the pre-test interview, adequate comparison questions were developed. Comparison questions address an act of wrongdoing (that does not interfere, conflict with or over power the relevant) to which the examinee, in all probability, will lie or to which their answer will be of dubious validity in their own mind. Control or comparative questions are as broad as possible in space and time, or in scope of endeavor. It is during the pre-test interview that the examinee's psychological set is established.

The Introductory Question, derived from the Backster outside-issue question, occupies the first position in the test and serves no diagnostic purpose. Neutral/Irrelevant questions are non-threatening, known truth questions that are generally designed to prompt a "yes" response from the examinee. They are designed to absorb initial or prolonged responses, allowing the examinee's physiology to return to homeostasis. Sacrifice Relevant questions are designed to absorb initial response to the relevant issue. The sacrifice relevant question is not used in the evaluation process to determine deception or non-deception.

**EXAMINATION TECHNIQUES**

A stimulation test was administered as the first chart to assess the examinee's reactivity by directing the examinee to lie on a particular number in a sequence of numbers. During this process, the examinee's basic reactivity was assessed. This assessment is used to evaluate fitness for continued testing and for comparisons with the subsequent polygraph charts. The examinee's response patterns were acceptable and he reacted appropriately when he told a directed lie. A comparison question technique was utilized using probable lies. Three relevant questions were asked and three charts were collected.

**CHART EVALUATION**

Two techniques used to evaluate the recorded responses obtained during the examination, global review and spot analysis. Global review is a visual analysis of all the comparative responses to identify significant reactions. Spot analyses are made at the relevant question spots for each of the three components used: two components used to record respiratory responses, one component used to record galvanic skin response (sweat gland activity) and one component to record changes in cardio vascular activity (blood pressure and heart rate). The analysis is completed by comparing the reactions to relevant questions to the reactions to comparison/control questions (looking for the psychological set.)

Sufficient reactivity was observed and quantified, thus allowing for objective numerical scoring. There were no indications that any attempt was being made to counter-measure this examination. Manual numerical scoring is the standard for both evidentiary and investigative examinations.

**Empirical Scoring System, Multinomial (ESS-M) Report:**

The ESS-M is an evidence-based, standardized protocol for polygraph test data analysis using a Bayesian classified with a multinomial reference distribution.

Bayesian analysis treats the parameter of interest (i.e. deception or truth telling) as a probability value for which the test data, together with the prior probability, are a basis of information to calculate a posterior probability. The multinomial reference distribution is calculated from the analytic theory of the polygraph test - that greater changes in physiological activity are loaded at different types of test stimuli as a function of deception or truth-telling in response to relevant target stimuli. The reference distribution for this exam describes the probabilities associated with the numerical scores for all possible combinations of all possible test scores for all recording sensors.

These results were calculated using a prior probability of .50 for which the prior odds of truth-telling were 1 to 1. A credible-interval (Bayesian confidence interval) was also calculated for the posterior odds of truth-telling using the Clopper-Pearson method and a one-tailed alpha = .1. The credible-interval describes the variability of the analytic result by treating the test statistic (posterior odds) as a random variable for which the limits of the credible interval can be inferred statistically from the test data. A test result is statistically significant when the lower limit of the credible interval for the posterior odds has exceeded the greater value of the prior odds or the required minimum cut-ratio.

Pairwise comparison of the relevant questions showed that question subtotals varied signifcantly at the alpha = .01 level. The categorical test result was parsed from the probabilistic result using decision rules for subtotal scores. Subtotal score rules are based on an assumption of independent criterion variance for the questions. Subtotal scores are used without statistical correction for positive (deceptive) results when any subtotal score is statistically significant for deception. Subtotal scores are subject to statistical correction for multiplicity wherein all subtotal scores must be significant for truth-telling to achieve a negative (truthful) classification. The lowest subtotal score of 1 equaled or exceeded the required numerical cutscore (1). These data produced a Bayes factor of 2.8. The posterior odds of truth-telling was 2.8 to 1 (with statistical correction for multiplicity) for which the posterior was .74.for which the posterior probability was .74. The lower limit of the 1-alpha Bayesian credible interval was 1.3 to 1, which exceeded the prior odds (1 to 1). This indicates a likelihood of 90% that the posterior odds of truth exceeded the prior odds. These analytic results support the conclusion that there were **NO SIGNIFICANT REACTIONS INDICATIVE OF DECEPTION** in the loading of recorded changes in physiological activity in response to the relevant test stimuli during this examination. A copy of this ESS printout is provided as an attachment to this report.

The ESS assigns three position scores (+1,0,-1) for each physiological sensor using the bigger-is-better rule when there is any visibly discernible difference in the magnitude or intensity of physiological response and assigns positive (+) scores when there is a larger response to the comparison stimuli, assigns negative (-) scores when there is a larger response to the relevant stimuli, and doubles all EDA scores (i.e, +2 or -2) regardless of the magnitude of

difference. The No Deception Indicated cutscore is +2 or greater and the Deception Indicated cutscore is -4 or greater. This test resulted in a +10 overall score using global analysis.

**TEST RESULTS**

**Each of the relevant questions was evaluated as NO DECEPTION INDICATED.**

**INSTRUMENTATION**

A Lafayette LX4000 computerized polygraph with Software Version 11.8.6 was utilized for this examination. This instrument is pre-calibrated by the manufacturer with a stable long-term circuit design. In accordance with manufacturer recommendations, self-calibration of the various sensors was conducted prior to the examination and all were found to be acceptable. A Lafayette Activity Monitor was used during this examination.

The charts were independently quality controlled utilizing a computer-scoring algorithm software package, **"Objective Scoring System – Version 3 (OSS-3) "** developed by Raymond Nelson, Mark Handler and Donald Krapohl and supplied by Lafayette which determined that there were **NO SIGNIFICANT REACTIONS to the relevant questions and that there was less than a 0.034 probability this result was produced by a deceptive person.** A copy of the OSS printout is provided as an attachment to this report.

The charts were again quality controlled utilizing a computer-scoring algorithm software package developed by Johns Hopkins University Applied Physics Laboratory, **"PolyScore for Windows Version 7.3"** also supplied by Lafayette which determined that there was **NO DECEPTION INDICATED to the relevant questions and that there was less than a .01 probability of deception.** A copy of this printout is provided as an attachment to this report.

In the conduct of this examination, I used procedures in accordance with the Standards of Practice of the American Polygraph Association and the Florida Polygraph Association.

_____   9/23/21
Curtis E. Holleman             Date

American Polygraph Association
Full Member #7388

Florida Polygraph Association Member

**THE EXAMINER**

Curtis E. Holleman retired in 2010 after a 31 year career as a Special Agent and full-time polygraph examiner for the Tampa Division, coordinating and conducting all types of polygraph examinations in all areas of FBI responsibility in the Tampa Office, which encompasses central Florida. As a Special Agent (SA) and Polygraph Examiner, Mr. Holleman maintained liaison with office management and FBI Headquarters and coordinated examinations for himself and visiting examiners. SA Holleman traveled frequently to FBIHQ and other FBI offices and offsite facilities, to conduct examinations in support of FBI Headquarters and field divisions. investigative missions, as well in support of Department of Justice objectives. He also traveled overseas to Europe, the Middle East, Central America, South America and the Caribbean in support of the FBI's investigative missions, as well in support of Department of Justice objectives. During his tenure with the FBI, SA Holleman conducted over one thousand, five hundred polygraph examinations, each one receiving a quality control review by FBI polygraph supervisors. Upon retiring from the FBI, Mr. Holleman went into private business as Curtis E. Holleman Polygraph Services, LLC.

From January 2010 to September 2018, Mr. Holleman was employed as a Security and Compliance Officer for Amscot Financial, a major financial money-services organization based in Tampa, Florida, with over 300 branches throughout Central and South Florida. In this role, Mr. Holleman conducts investigations into financial loss matters involving branch security and personnel, and works closely with federal, state and local law enforcement officials. Mr. Holleman is also responsible for Anti-Money Laundering and Bank Secrecy Act investigations and his efforts have resulted in the identification of numerous individuals and groups involved in criminal financial activity. He has handled interrogations of these individuals, resulting in confessions and signed statements, which have been referred for prosecution.

Mr. Holleman has conducted hundreds of examinations for attorneys, state law enforcement, security firms, private businesses and private individuals. In 2017, he conducted polygraph examinations as a Contract Examiner for the Department of Homeland Security (DHS), Transportation Security Agency (TSA) and conducted many exams at TSA Headquarters in Baltimore, Maryland. He now conducts polygraphs for Customs & Border Protection (CBP), Department of Homeland Security (DHS).

Education: University of South Florida (USF), Tampa, Florida, B.A., Criminal Justice/English (1981).

- FBI -Tampa Division, 1978-1983. Special Agent Training Class 83-6, Quantico, VA.

- Numerous FBI training seminars and In-Services at the FBI Academy, Quantico, VA.

- Supervisory Special Agent assigned to the Document Section, FBI Laboratory, certified as an Expert Document Examiner in the analysis of Photographic Evidence. Testified extensively across the U.S., in state and federal courts, as an Expert Examiner in the

examination of evidence submitted to the FBI Laboratory in criminal cases.

- Mid-Atlantic Association of Forensic Scientists (MAAFS), 40 hours training.

- Numerous FBI training conferences and courses related to FBI assignments in Dallas, New York, Washington, D.C., and Tampa. Courses include, but are not limited to, Interview and Interrogation, Narcotics, Violent Crime, Organized Crime, White Collar Crime, Foreign Counterintelligence, Firearms/SWAT, Counterterrorism, Applicant/Background Investigations, etc.

- Executive Leadership Seminar, Kellogg School of Management, Northwestern University, 40 hours training.

- Department of Defense Polygraph Institute (DODPI), Fort Jackson, South Carolina, 04/05-07/05, Certificate of Graduate Study of the Forensic Psychophysiology Program (recognized as the leading polygraph training program in the world).

- Full Member of both the American Polygraph Association and Florida Polygraph Association.

- FBI Annual Polygraph Examiner's Conference, Jacksonville, Florida, May, 2006, 40 hours training.

- FBI Annual Polygraph Examiner's Conference, Quantico, Virginia, June, 2007, 40 hours training.

- American Polygraph Association 42nd Annual Seminar, New Orleans, Louisiana, August, 2007, 40 hours training.

- DODPI Senior Polygraph Examiner Course, Camp Pendleton, California, January, 2008, 40 hours training.

- DODPI Federal Interagency Polygraph Seminar, Sterling, Virginia, April-May, 2008, 40 hours training.

- FBI Annual Polygraph Examiner's Conference, San Francisco, California, June, 2008, 40 hours training.

- Polygraph Electronic Signature Training, FBIHQ, October, 2008, 16 hours training.

- Florida Polygraph Association Annual Conference, Melbourne, Florida, November, 2008, 18 hours training.
- Polygraph Testing of Sex Offenders/Post Conviction Sexual Offenders Testing (PCSOT),

International Academy of Polygraph, Fort Lauderdale, Florida, January, 2009. APA Certificate received authorizing testing of sexual offenders in treatment and on probation. Psychology of a Sex Offender and countermeasures, 40 hours training.

- FBI Annual Polygraph Examiner's Conference, Boston, Massachusetts, June, 2009, 40 hours training.

- American Polygraph Association 44th Annual Seminar, Nashville, Tennessee, August, 2009, 40 hours training.

- Florida Polygraph Association Annual Conference, Lake Mary, Florida, November, 2009, 18 hours training.

- Florida Polygraph Association Annual Conference, Tampa, Florida, June, 2010, 18 hours training.

- PCSOT Recertification, June, 2011, 8 hours training.

- Florida Polygraph Association Annual Conference, Clearwater, Florida, June, 2012, 18 hours training.

- Florida Polygraph Association Annual Conference, Melbourne, Florida, November, 2013, 18 hours training.

- Lafayette Instrument Recertification, Ocala, Florida, August, 2015, 8 hours training.

- Post Conviction Sexual Offenders (PCSOT) Recertification, November, 2015, 8 hours training.

- Utah Format Training, Peak Polygraph Training Academy, Fort Myers, Florida, September, 2016, 8 hours training.

- Florida Polygraph Association Annual Conference, Crystal River, Florida, November, 2016, 18 hours training.

- Numerous examinations for the Polk County Sheriff's Office, Lakeland, FL., 2016/2017, LEPET, MGQT and Bi-Zone formats, 7 position test data analysis.

- Numerous polygraph examinations onsite for the Transportation Safety Administration (TSA) Department of Homeland Security (DHS), Baltimore, MD, Spring/Summer 2017, testing included LEPET, MGQT, ZCT and Federal Bi-Zone formats, 7 position test data analysis, countermeasures.

- Test Data Analysis, Peak Polygraph Training Academy, Fort Myers, Florida, July, 2017, 8 hours training.

- Florida Polygraph Association Annual Conference, Sarasota, Florida, June, 2018, 8 hours training.

- Defense Academy for Credibility Assessment (DACA), Senior Examiner Training, Orlando, FL, July 2018.

- U.S. Customs & Border Protection (CBP), Washington, D.C., Contract Polygraph Examiner Training, August, 2018, (40 hours training).

- American Polygraph Association 54th Annual Seminar, Orlando, Florida, August, 2019, 42 hours training.

- U.S. Customs & Border Protection (CBP), Washington, D.C., Contract Polygraph Examiner Training, August, 2018, (40 hours training).

- American Polygraph Association 54th Annual Seminar, Orlando, Florida, August, 2019, (42 hours training conference).

- U.S. Customs & Border Protection (CBP), Washington, D.C., Contract Polygraph Examiner Online Training, April, 2020, (40 hours training).

- U.S. Customs & Border Protection (CBP), Washington, D.C., Contract Polygraph Examiner Online Training, October, 2020, (40 hours training).

- National Center for Credibility Assessment, Fort Jackson, South Carolina, Interview and Interrogation Polygraph Seminar, February, 2021, (40 hours training).

- National Center for Credibility Assessment, Fort Jackson, South Carolina, Federal Interagency Polygraph Seminar, April 2021 (40 hours training).

- Conducted polygraph examinations onsite **(2018-present)** as a Contract Polygraph Examiner for Potomac Management Solutions and C3A conducting polygraphs for the Department of Homeland Security (DHS), at Tampa, Orlando, Miami, Palm Beach Gardens, and Weston, Florida; Woodbridge, Virginia; Baltimore, Maryland; San Antonio and Laredo, Texas; Charlotte, North Carolina, and Newark, New Jersey.

**Empirical Scoring System, Multinomial (ESS-M) Report**   AdjustedPriorProbability: 0.5

| | |
|---|---|
| Examinee | Christopher Dorworth |
| Result | **NO SIGNIFICANT REACTIONS INDICATIVE OF DECEPTION** |
| Posterior odds | 2.8 to 1 odds of truth (.74) |
| Lower limit | 1.3 to 1 (.57, one tailed alpha = .10) |
| Prior odds | Deception 1 to 1 (.50)     Truth 1 to 1 (.50) |
| Bayes factor | 2.8 |
| Decision Rule | Subtotal-score rules (Auto-Select) |

### Questions

| | | |
|---|---|---|
| R1 | Did you ever make any effort to get | to lie to the Grand Jury? (N) |
| R2 | Did you ever do anything to get | to lie to the Grand Jury? (N) |
| R3 | Did you ever ask | to discourage anyone from cooperating with the Government? (N) |

### Test Details

| | |
|---|---|
| Dorworth 20210922 | |
| Exam Date | 9/22/2021 |
| Examiner | Curtis Holleman |
| Report Date | 9/22/2021 |

### Questions

| Questions | Lower limit | Result |
|---|---|---|
| R1 | | NDI/NSR |
| R2 | | NDI/NSR |
| R3 | 1.3 | NDI/NSR |

Pairwise significant p=<.01

### Analysis Parameters

| | |
|---|---|
| Prior probability | .5 |
| Cut ratio | 1.0 |
| CI alpha SR/DI (1 tailed) | .05 |
| CI alpha NSR/NDI (1 tailed) | .1 |
| Pairwise Alpha (1 tailed) | .01 |

### Cutscores

| | |
|---|---|
| Subtotal NSR/NDI | 1 |
| Subtotal SR/DI | -3 |

### ESS-M Scores

**Series 1, Chart 2**

| | R1 | R2 | R3 |
|---|---|---|---|
| P1 | 0 | 0 | 0 |
| P2 | 0 | 0 | 0 |
| EDA | 2 | 2 | 2 |
| Cardio | 1 | 1 | 0 |

**Series 1, Chart 3**

| | R1 | R2 | R3 |
|---|---|---|---|
| P1 | 0 | 0 | 0 |
| P2 | 0 | 0 | 0 |
| EDA | -2 | 2 | -2 |
| Cardio | 0 | 1 | 0 |

**Series 1, Chart 4**

| | R1 | R2 | R3 |
|---|---|---|---|
| P1 | 0 | 0 | 0 |
| P2 | 0 | 0 | 0 |
| EDA | 2 | 2 | 2 |
| Cardio | -1 | -1 | -1 |

### Summary of Analysis

Recorded physiological data were evaluated with the Empirical Scoring System (ESS-M). The ESS-M is an evidence-based, standardized protocol for polygraph test data analysis using a Bayesian classifier with a multinomial reference distribution. Bayesian analysis treats the parameter of interest (i.e., deception or truth-telling) as a probability value for which the test data, together with the prior probability, are a basis of information to calculate a posterior probability. The multinomial reference distribution is calculated from the analytic theory of the polygraph test - that greater changes in physiological activity are loaded at different types of test stimuli as a function of deception or truth-telling in response to relevant target stimuli. The reference distribution for this exam describes the probabilities associated with the numerical scores for all possible combinations of all possible test scores for all recording sensors.

These results were calculated using a prior probability of .50 for which the prior odds of truth-telling were 1 to 1. A credible-interval (Bayesian confidence interval) was also calculated for the posterior odds of truth-telling using the Clopper-Pearson method and a one-tailed alpha = .1. The credible-interval describes the variability of the analytic result by treating the test statistic (posterior odds) as a random variable for which the limits of the credible interval can be inferred statistically from the test data. A test result is statistically significant when the lower limit of the credible interval for the posterior odds has exceeded the greater value of the prior odds or the required minimum cut-ratio.

Pairwise comparison of the relevant questions showed that question subtotals varied significantly at the alpha = .01 level. The categorical test result was parsed from the probabilistic result using decision rules for subtotal scores. Subtotal score rules are based on an assumption of independent criterion variance for the questions. Subtotal scores are used without statistical correction for positive (deceptive) results when any subtotal score is statistically significant for deception. Subtotal scores are subject to statistical correction for multiplicity wherein all subtotal scores must be significant for truth-telling to achieve a negative (truthful) classification. The lowest subtotal score of 1 equaled or exceeded the required numerical cutscore (1). These data produced a Bayes factor of 2.8. The posterior odds of truth-telling was 2.8 to 1 (with statistical correction for multiplicity) for which the posterior probability was .74. The lower limit of the 1-alpha Bayesian credible interval was 1.3 to 1, which exceeded the prior odds (1 to 1). This indicates a likelihood of 90% that the posterior odds of truth exceed the prior odds. These analytic results support the conclusion that there were NO SIGNIFICANT REACTIONS INDICATIVE OF DECEPTION in the loading of recorded changes in physiological activity in response to the relevant test stimuli during this examination.

| | R1 | R2 | R3 |
|---|---|---|---|
| Sub-Totals | 2 | 7 | 1 |
| Grand Total | | 10 | |

| References | https://lafayettepolygraph.com/ess-11_8.pdf | Lafayette Instrument Company | LXSoftware Version: 11.8.6.384 |



A.

## Lafayette Instrument Company
## Objective Scoring System - Version 3
By Raymond Nelson, Mark Handler and Donald Krapohl (2007)

| | |
|---|---|
| Result | **No Significant Reactions** |
| Description | **p-value: 0.034 - Probability this result was produced by a deceptive person** |
| Exam Type | Event Specific/Single Issue (Zone) |
| Scoring Method | OSS-3 Two-stage (Senter 2003) |
| Test of Proportions | None - No significant differences in artifact distribution |
| PF Name | Dorworth 20210922 |
| Report Date | Wednesday, September 22, 2021 |
| Subject | Christopher Dorworth |
| Examiner | Curtis Holleman |

### Spot Scores

| ID | p-value | Result |
|---|---|---|
| R1 | 0.023 | |
| R2 | 0.038 | |
| R3 | 0.043 | |

### Decision Alpha (1 tailed)
Cumulative normal distribution (Barland 1985)

| Setting | Value |
|---|---|
| NSR | 0.050 |
| SR | 0.050 |
| Bonferroni corrected alpha | 0.017 |
| Test of Proportions (1 tailed) | 0.050 |

### Components

| Component | Weight |
|---|---|
| Pneumo | 0.19 |
| EDA | 0.53 |
| Cardio | 0.28 |

### Relevant Questions

| ID | Question Text | Answer |
|---|---|---|
| R1 | Did you ever make any effort to get _ to lie to the Grand Jury? | No |
| R2 | Did you ever do anything to get _ to lie to the Grand Jury? | No |
| R3 | Did you ever ask _ to discourage anyone from cooperating with the Government? | No |

### Charts Scored

| Exam | Chart | Date | Time |
|---|---|---|---|
| 1 | 2 | 9/22/2021 | 11:12 AM |
| 1 | 3 | 9/22/2021 | 11:20 AM |
| 1 | 4 | 9/22/2021 | 11:27 AM |

### Remarks

B.

### Measurements
(Kircher and Raskin 1988)

**Exam 1 Chart 2**

|        | C1  | R1  | C2  | R2  | C3  | R3  |
|--------|-----|-----|-----|-----|-----|-----|
| P1     | 634 | 734 | 602 | 782 | 577 | 809 |
| P2     | 664 | 724 | 613 | 767 | 602 | 768 |
| EDA    | 321 | 113 | 199 | 92  | 302 | 212 |
| Cardio | 36  | 28  | 16  | 31  | 8   | 35  |
| A1     | 135 | 130 | 130 | 156 | 129 | 162 |

**Exam 1 Chart 3**

|        | C1  | R1  | C2  | R2  | C3  | R3  |
|--------|-----|-----|-----|-----|-----|-----|
| P1     | 539 | 719 | 645 | 654 | 637 | 694 |
| P2     | 588 | 720 | 672 | 711 | 678 | 702 |
| EDA    | 161 | 176 | 199 | 185 | 152 | 75  |
| Cardio | 39  | 46  | 7   | 30  | 39  | 37  |
| A1     | 156 | 147 | 156 | 148 | 159 | 149 |

**Exam 1 Chart 4**

|        | C1  | R1  | C2  | R2  | C3  | R3  |
|--------|-----|-----|-----|-----|-----|-----|
| P1     | 710 | 765 | 601 | 667 | 647 | 644 |
| P2     | 635 | 711 | 687 | 671 | 642 | 643 |
| EDA    | 87  | 30  | 83  | 61  | 52  | 44  |
| Cardio | 35  | 48  | 23  | 44  | 22  | 65  |
| A1     | 133 | 142 | 151 | 143 | 153 | 163 |

### Standardized Lognormal Ratios

**Exam 1 Chart 2**

|        | R1    | R2    | R3    |
|--------|-------|-------|-------|
| P      | 2.17  | 2.77  | 3.00  |
| EDA    | 1.82  | 2.23  | 0.55  |
| Cardio | -1.87 | -2.40 | -3.00 |
| WMean  | 0.85  | 1.03  | 0.03  |
| Mean   |       | 0.64  |       |

**Exam 1 Chart 3**

|        | R1    | R2    | R3    |
|--------|-------|-------|-------|
| P      | 1.94  | 1.26  | 1.61  |
| EDA    | -0.02 | -0.12 | 1.69  |
| Cardio | -2.65 | -0.40 | -1.50 |
| WMean  | -0.38 | 0.07  | 0.78  |
| Mean   |       | 0.16  |       |

**Exam 1 Chart 4**

|        | R1    | R2    | R3    |
|--------|-------|-------|-------|
| P      | 1.84  | 0.59  | 0.23  |
| EDA    | 1.85  | 0.43  | 1.08  |
| Cardio | -3.00 | -2.73 | -3.00 |
| WMean  | 0.49  | -0.43 | -0.22 |
| Mean   |       | -0.05 |       |

### Channel Contributions

| Component | Proportion | Area  |
|-----------|------------|-------|
| Pneumo    | 0.293      | 0.935 |
| EDA       | 0.680      | 0.928 |
| Cardio    | 0.027      | 0.001 |

Note: Non-normal values

| Chart          | Proportion | ID | Proportion |
|----------------|------------|----|------------|
| Exam 1 Chart 2 | 0.405      | R1 | 0.349      |
| Exam 1 Chart 3 | 0.308      | R2 | 0.329      |
| Exam 1 Chart 4 | 0.286      | R3 | 0.322      |

### Results

**Weighted Mean**

| 0.32 | 0.22 | 0.19 |

**Grand Total Mean**

0.25

(Without Visual Inspection)

| Advanced Options - OSS-3 v1.9 | |
|---|---|
| **General Scoring Settings** | |
| Delete all zero measurements | Yes |
| Zero Threshold value | 1 |
| Allow a single CQ to score result (not for DLST) | No |
| Replace missing values with mean values | No |
| Check Extreme Contributions | No |
| Allow SR Result when extreme contributions | Yes |
| **Alpha Values (one-tailed)** | |
| Kruskal-Wallis | 0.1 |
| Non-Significant Response (NSR) | 0.05 |
| Significant Response (SR) | 0.05 |
| **Test of Proportions** | |
| Test of Proportions alpha value (two-tailed) | 0.1 |
| Use Test of Proportions | Yes |
| Allow significant reaction result | Yes |
| Use all questions | No |
| Score neutral questions as control | No |
| **Event Specific/Single Issue (Zone)** | |
| Use Bonferroni | Yes |
| Use Kruskal-Wallis | No |
| Minimum number of useable presentations for RQs | 2 |
| **Measurement Periods** | |
| P1 | 15 |
| P2 | 15 |
| EDA | 15 |
| Cardio | 15 |
| All other | 15 |

PolyScore® Version 7.3

# No Deception Indicated--
## Probability of Deception is Less Than .01

### Zone/MGQT  Zone/MGQT  Zone/MGQT

### Charts Used
EXAM1\CHART2-- SDG UTAH 3Q.Dorworth  2021/09/22  11:06  Christopher Dorworth  Curtis Holleman (Curtis Holleman)    (77, 89;  19, 92, 5.3)
EXAM1\CHART3-- SDG UTAH 3Q.Dorworth  2021/09/22  11:06  Christopher Dorworth  Curtis Holleman (Curtis Holleman)    (83, 93;  19, 91, 5.0)
EXAM1\CHART4-- SDG UTAH 3Q.Dorworth  2021/09/22  11:06  Christopher Dorworth  Curtis Holleman (Curtis Holleman)    (67, 95;  18, 91, 3.7)`"

### Spot/Vertical Scores
0.12    R1  Did you ever make any effort to get           to lie to the Grand Jury?
0.04    R3  Did you ever ask         to discourage anyone from cooperating with the Government?
0.02    R2  Did you ever do anything to get          to lie to the Grand Jury?

### Approximate Signal Weights
Respiration    +0.42
Electrodermal  +0.39
Pulse          +0.13
Blood Volume   -0.06

### Signal Quality Indices
Electrodermal     Cardiovascular
77  Useable    89  Useable    EXAM1\CHART2-- SDG UTAH 3Q.Dorworth 2021/09/22 11:06 Christopher Dorworth  Curtis Holleman (Curtis Holleman)    (77, 89;  19, 92, 5.3)
83  Useable    93  Useable    EXAM1\CHART3-- SDG UTAH 3Q.Dorworth 2021/09/22 11:06 Christopher Dorworth  Curtis Holleman (Curtis Holleman)    (83, 93;  19, 91, 5.0)
67  Useable    95  Useable    EXAM1\CHART4-- SDG UTAH 3Q.Dorworth 2021/09/22 11:06 Christopher Dorworth  Curtis Holleman (Curtis Holleman)    (67, 95;  18, 91, 3.7)

