# Exhibit 1

<u>(June 23, 2022 Interview With State Prosecutors at Jail)</u>
(Redactions by Government, Unredacted Copy Requested)

```
 1
 2        (INTERVIEW OF JOEL GREENBERG, #EI-32-0087, 6/23/22)
 3
 4    (The following may contain unintelligible or misunderstood
 5    words due to the recording quality. The audio was poor and
 6     broken up, and the parties continually talked over each
 7    other drowning out many words, and voices were very garbled
 8                          in places.)
 9
10        TC = INSPECTOR TROY COPE
11        LM = SA SUPERVISOR LOUIS NEGRET
12        SS = CHIEF ASA STACEY SALMONS
13        JG = JOEL GREENBERG
14        FS = FRITZ SCHELLER, ESQ.
15
16   TC:  Okay.  The date is Thursday, June 23rd, 2022; the
17        time is approximately 1039 hours.  My name's
18        Inspector Troy Cope with the Florida Department of
19        Law Enforcement, Office of Executive Investigations,
20        Public Corruptions Unit.
21
22        This is in reference to case number EI-32-0087.
23        We're currently here at the Orange County Jail in
24        the F Wing in the visitation area.  Um, and for the
25        record, I want to introduce everybody before we go
26        further so I'm going to turn it over to you, Louis.
27
28   LM:  Special Agent Supervisor Louis Negret with the
29        Florida Department of Law Enforcement, Office of
30        Executive Investigations.
31
32   SS:  Chief Assistant State Attorney Stacey Salmons with
33        the Seminole County State Attorney's Office, 18th
34        Judicial Circuit.
35
36   FS:  Uh, Fritz Scheller.  I'm Joel Greenberg's defense
37        attorney.
38
39   TC:  Okay.  And -- and Mr. Greenberg, could I get you to
40        state and spell your name?
41
42   FS:  Take your mask off.
43
44   JG:  Joel Greenberg, J-O-E-L, G-R-E-E-N-B-E-R-G.
45
46   TC:  And what's your date of birth?
47
48   JG:  February 4th, 1985.
49
50   TC:  Okay.  And for the record, are you here speaking to
```

```
 1        us free and voluntarily?
 2
 3   JG:  I am.
 4
 5   TC:  Do you understand that FDLE is conducting a criminal
 6        investigation regarding, uh, the Senate District 9
 7        election and campaign finance violations?
 8
 9   JG:  Yes.
10
11   TC:  Okay.  With that I'm going to turn it over to Stacey
12        for the preamble.  And what I'm going to do is move
13        the recorder and just give it a second 'cause it
14        kind of cuts out.
15
16   SS:  Mr. Greenberg, as I said, my name is Stacey Salmons.
17        I'm an assistant state attorney.  Pursuant to
18        Florida State Statute and case law, what we are
19        conducting here today is called a State Attorney
20        investigative interview.  In a minute I'm going to
21        place you under oath.
22
23        When an assistant state attorney puts an individual
24        under oath, what you're doing is technically
25        testifying before me, which means that this becomes
26        an official proceeding for purposes of the perjury
27        statute.  If you lie to a prosecutor under oath in
28        this type of environment, even though it's somewhat
29        relaxed -- we're conducting an interview, and it's
30        with regard to a material matter; you could be
31        charged with a third-degree felony of perjury.  Do
32        you understand that?
33
34   JG:  I do.
35
36   SS:  I say that not because I think you're going to lie
37        to me, but because I want you to understand that
38        although this is a somewhat relaxed environment by
39        way of the interview, what you are doing is
40        tantamount to testifying in court before a judge.
41        Do you understand that?
42
43   JG:  I do.
44
45   SS:  So it becomes very critical that you tell us the
46        truth at all stages of the interview in response to
47        any questions that I ask, any questions that the
48        inspectors ask or any questions even that your
49        attorney asks in the context of this.  Do you
50        understand?
```

```
 1
 2   JG:   I do.
 3
 4   SS:   Um, I have had this conversation with your attorney
 5         telephonically.  I want to make sure I put it on the
 6         record with you.  Since this is a voluntary
 7         interview that you are giving us as it relates to
 8         this investigation, we are making no promises.  We
 9         are giving you no assurances as it relates to any
10         type of implications for any pending sentence or
11         consequence that you may have in your federal case
12         in the U.S. Middle District.  Do you understand
13         that?
14
15   JG:   I do.
16
17   SS:   Okay.  In a moment I'm going to place you under
18         oath.  The oath that you take to me is the same type
19         of oath that you would take before a judge or a
20         clerk of the court in open court.  Do you have any
21         questions before I do that?
22
23   JG:   I don't.
24
25   SS:   Inspectors, anything to add?
26
27   TC:   No, ma'am.
28
29   SS:   Mr. Scheller, anything to add?
30
31   FS:   No, thank you.
32
33   SS:   Very good.  If you would please, sir, raise your
34         right hand.  And for purposes of the record I've
35         confirmed your identity because I know what you look
36         like, sir, when you've taken your mask down.  Do you
37         solemnly swear or affirm that the testimony you're
38         about to give is the truth, the whole truth and
39         nothing but the truth so help you God?
40
41   JG:   I do.
42
43   SS:   Very good.
44
45   TC:   Okay.  I'm going to move the recorder here so it's
46         between us and -- there we go.  Okay.  What -- what
47         I want to do, just, um -- can you tell me -- and --
48         and -- what you know about the arrest that we
49         alluded to with the campaign financing with Senate
50         District 9 that you've been exposed to in the news,
```

Page 4 redacted for the following reason:

```
 1
 2   JG:   With either                So a number of years I
 3         would -- would say.
 4
 5   TC:   So would you say it's more than acquaintance; they
 6         might have been best friends or -- or very friendly
 7         with each other?
 8
 9   JG:   Close friends, yeah.
10
11   TC:   Close friends.  Okay.
12
13   JG:   Yeah.
14
15   TC:   Do you know who Benjamin Paris is?
16
17   JG:   I do.
18
19   TC:   Can you please describe how you became acquainted
20         with him.
21
22   JG:   I met Ben Paris in 2017 when he, um, became -- was
23         elected either mayor or commissioner of Longwood.  I
24         met him through
25
26                 And, uh, we both -- we both were in -- in
27         government so we both kind of knew each other
28         afterwards, and we remained friendly and cordial and
29         stayed in contact.  But I met him in 2017.
30
31   TC
32
33
34   JG
35
36   TC
37
38   JG
39
40   TC
41
42   JG
43
44
45   TC
46
47   JG
48
49   TC:   -- the -- the -- I'm sorry.  Did I -- I interrupted
50         you.  I'm --
```

```
 1
 2   JG:   No, no, no.
 3
 4   TC:   -- okay.  And the last individual related to -- to
 5         our case was Jestine Iannotti.  Do you have any --
 6         do you know who she is?
 7
 8   JG:   No.
 9
10   TC:   All right.  Have you ever seen her before?
11
12   JG:   No.
13
14   TC:   Have you saw pictures or anything?
15
16   JG:   (No audible response).
17
18   TC:   Okay.  Had you ever heard of her name, uh, ever come
19         up?
20
21   JG:   No.
22
23   TC:   Okay.  And again, I know this is --
24
25   JG:   I don't believe so.  I don't believe I've met her.
26
27   TC:   Oh, sure.  Okay.  And then I know another name
28         that's commonly associated, obviously because of the
29         candidates that were in Senate District 9, do you
30         know current State Senator Jason Brodeur?
31
32   JG:   Yes.
33
34   TC:   How do you know him?  What's your relationship?
35
36   JG:   I met Jason at -- during the 2016 campaign season is
37         when I initially met Jason.  You bump into people
38         who were running for office and -- and who hold
39         office in the Republican circle in Seminole County,
40         and initially I met him there.
41
42
43
44
45   TC:   Uh, would it be safe to say that Jason Brodeur is
46         close with                    ?
47
48   JG:   Yes.
49
50   TC:   Acquaintances, friends?
```

```
1
2    JG:  Yes.  Very close.
3
4    TC:  Okay.  All right.  And I'm -- for right now I want
5         to stay pretty specific to -- to our case and -- and
6         -- and going from there.  So in 2020 there was a
7         primary and general election, and you were running
8         at some point to also continue your term as a tax
9         collector; is that correct?
10
11   JG:  Yes.
12
13   TC:  Okay.  So at any time did you, um, discuss
14        campaigning with Eric Foglesong?
15
16   JG:  When you say campaigning?
17
18   TC:  In general.  Like you said, you know, he's a
19        political operative.
20
21   JG:  Yeah.
22
23   TC:  Were you party to any discussions that talked about
24        Eric Foglesong being involved in Seminole County
25        elections?
26
27   JG:  Yes.  I want to -- yes.  Yes, I was.  Um, to the
28        extent that he was involved, wasn't exactly sure.
29        But the conversations that we would have wouldn't
30        just be a one-time conversation.  Any time we were
31        at the back porch over at              house
32        having drinks or whatever, I mean, we would -- we
33        would -- we would shoot the shit over all sorts of
34        stuff.  Um, stuff that he's done in previous
35        elections and stuff that, you know, we'd be working
36        on for current elections.  And some of it I would
37        pay attention and -- and retain information, some of
38        it I wouldn't.  But, yeah, so on and off about just
39        the overall campaign season and what's going on.
40
41   TC:  Okay. Um --
42
43   JG:  In 2018 we -- we were up against each other.
44
45   TC:  Okay.
46
47   JG:  He ran the -- the sheriff's race down here.
48
49              .  Um, so that's where we initially kind of
50        butted heads in -- in the political world.
```

```
 1
 2   TC:   Okay.  And so specifically, um, as we hone in
 3         with -- with Mr. Foglesong, do you recall
 4         discussions that you were party to or that you had
 5         with him regarding Jason Brodeur's campaign?
 6
 7   JG:   Not specific conversation, no.  And, um, he was
 8         present at            house when the topic would be
 9         brought up of one of the strategies used was
10         throwing in a third-party candidate.
11
12   TC:   Okay.
13
14   JG:   And I remember talking to          about it and
15         asking him -- and this would have been either late
16         2019 or early 2020 -- about Jason's race and what
17         they were going to do for it.
18                                    .
19
20   TC:   Okay.
21
22   JG:                .
23
24   TC:   Did he expand on why -- what -- what he was having
25         handled?
26
27   JG:   No.
28
29   TC:   Did -- and was -- was this Dorworth saying this to
30         you or Jason Brodeur saying it to you?
31
32   JG:
33
34   TC:   Okay.
35
36   JG:   Brodeur was there, uh, present in the conversation,
37         just like he'd be sitting around this table.  Yeah.
38         And Ben Paris was there.
39
40   TC:   Okay.
41
42   JG:   Ben Paris was there very frequently.
43
44   SS:
45
46   JG:
47
48   SS:
49
50   JG:
```

```
 1
 2   SS:
 3
 4   JG:
 5
 6   SS:
 7
 8   JG:
 9
10   SS:
11
12   JG:
13
14   SS:
15
16   JG:   The people -- people present at the table, Jason and
17         -- and Foglesong and Paris.
18
19   SS:   Thank you.
20
21   TC:   And were there any other discussions for any other
22         races about running third-party candidates?
23
24   JG:   Mine.
25
26   TC:   And what -- what did that discussion entail?  Now --
27         and would it be during the same time that this "we"
28         comment, that, "We have it handled," or is this --
29
30   JG:   I was -- was -- I was -- I'd planned to do the same
31         thing.  I did eventually have a third-party
32         candidate get in.  It was a -- a female.  Their
33         strategy was -- and this goes back to the
34         conversation in 2000 -- late 2019 at the Reagan Day
35         dinner where it was myself, Bob Cortez, um -- what
36         was her name?  The lady running against Val Demings
37         last time.
38
39   TC:   Was --
40
41   JG:   Francois.
42
43   TC:   Okay.
44
45   JG:   Vennia Francois.
46
47
48
49
50
```

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10  TC:  All right.  You just mentioned Frank Artiles.
11
12  JG:  Yeah.
13
14  TC:  Can you expand on that?  'Cause that may be of
15       interest to other investigators or it could be
16       connected.  We -- we don't know yet.
17
18  JG:  My -- okay.  My humble opinion, it's absolutely
19       connected.  These guys are, for the most part,
20       extremely organized with what they do.  They're very
21       intelligent.  And they operate as a little -- little
22       Mafia type.  I mean, you know the guys.  So, yeah,
23       it's absolutely connected.  But anyway, um, so the
24       conversation in 2019 with -- in front of Francois
25       and Bob Cortez focused on -- I don't know if he had
26       too much to drink, but he's just overly saying what
27       -- what he was gonna do.
28
29       Um, so there's two other people that could
30       corroborate what I'm saying.  And meetings at
31                     house, we'd be hanging out, just shooting
32       the shit, having drinks or whatever.  I mean, we --
33       we always were talking political strategies, so it's
34       hard for me -- had I known, like, I was going to
35       need to retain all that stuff, I would have taken
36       notes.  But it's -- it was just -- it was something
37       a lot of times we would just talk about.
38
39  TC:  Okay.  So what was --
40
41  LM:  The -- the question was about Artiles.
42
43  JG:  Oh, Artiles?  Again, I mean, they could have been
44       having the conversation directly in front of me
45       about what they were going to do and who they were
46       going to use.  And I just had --
47
48  LM:  Well, go back to, say, before Artiles was there at
49                     house.
50
```

```
 1   JG:  Yeah, Artiles.  So he was there --
 2
 3   LM:  Answer the question.
 4
 5   JG:  What was specifically the question?
 6
 7   TC:  Okay.  So let -- let's start it this way.  How often
 8        was Artiles there?  A few times?  A couple?  Or are
 9        we talking, uh, multiple times a month or --
10
11   JG:  Over -- over a four-year period, three-year period,
12        I probably saw Frank up there 20 times.
13
14   TC:  Okay.
15
16   JG:  And --
17
18   TC:  And is he friends with
19
20   JG:  Yes.  And this was, uh -- was mainly more so after
21        he left the U.S. Senate.  I mean, U.S. -- I'm sorry,
22        the Florida Senate.  He resigned.  Yeah.  He was up
23        there more often than that.
24
25   TC:  Was he present, um -- again with that, "We got it
26        taken care of," comment, was he there that night?
27
28   JG:  He could -- he could have been.  And I think it was
29        during the day that we had that --
30
31   TC:  Okay.
32
33   JG:  -- during the -- it was -- it was getting dark.  Put
34        it that way.  Um, he could have been.  I mean, it
35        was people coming in and out of his house all the
36        time.
37
38   TC:  Okay.  Do you have any firsthand knowledge of Frank
39        Artiles' involvement in the Miami Senate District
40        races?  Do you remember any discussions that you
41        were a party to?
42
43   JG:  I want to say that I heard them -- I heard      and
44        Frank.  The -- the guys in general, um, talking
45        about using Frank in some sort of fashion like that.
46        But specifically, like, I -- I can't --
47
48   TC:  Okay.  Were you aware if Frank Artiles assisted Eric
49        Foglesong, Ben Paris or anybody with Senate District
50        9?  Were you party to any --
```

```
 1
 2   JG:   No.
 3
 4   TC:   -- firsthand information?
 5
 6   JG:   No.  Um, not that I remember.  Again, I -- I
 7         remember names being thrown about.  I don't know the
 8         context they were used in.  Um, a Grow PAC that's
 9         used.  A Grow PAC that's used, I remember hearing
10         that for something that's used for Wilton Simpson, I
11         believe.  And then also was used in the Iannotti,
12         who --
13
14   TC:   Well, the --
15
16   JG:   -- the same name or same PAC?
17
18   TC:   So Iannotti was not part of any PACs.
19
20   JG:   I thought there was money that came from a PAC that
21         went --
22
23   TC:   Okay.  So there was -- are -- are -- well, let me
24         start it this way.  Are you aware of money moving
25         from PACs to assist these third-party candidates?
26
27   JG:   No.
28
29   TC:   Okay.
30
31   JG:   No.  But I could speculate.
32
33   TC:   Right.
34
35   JG:
36
37
38
39
40   TC:   Okay.  So -- so your -- what you're -- the one thing
41         you are sure with -- with Brodeur is that he had
42         first-hand knowledge that the plan was to run a
43         third-party candidate in his race?
44
45   JG:   Absolutely.
46
47   TC:   Okay.  So if he's saying to the media, which again,
48         is not under oath or anything, that he --
49
50   JG:   He -- yeah.
```

13

1
2   TC:  -- had no idea and he wasn't a part of it -- and
3        again, I'm paraphrasing.  I'm not quoting directly
4        from there so I don't want to put words in his
5        mouth.  But if he's saying he was not involved,
6        you're saying that's not true?
7
8   JG:  That is absolutely not true.  I mean, he's the type
9        of person that knows exactly what's going on.
10       Exactly what's going on.  They're not going to leave
11       it to chance.  I mean, they're running a
12       multi- million dollar operation with his campaign
13       and raising 10, $15 million.
14
15       You don't leave some -- something like that to
16       chance.  And they won by, you know, a very, very
17       thin margin.  And those things just don't happen by
18       chance.
19
20  LM:  Are you aware of any instance where it was actually
21       discussed that you can remember that he was present
22       and his involvement in it?
23
24  JG:  No.  No.  He was -- no, not specific like, Hey,
25       we're going to do this at this day and this person
26       will be used.  It was more put together based upon a
27       series of -- of meetings and -- and occurrences that
28       I was present of them discussing strategies.  'Cause
29       I'd be discussing my own strategy.  I would throw in
30       some of my own ideas.
31
32
33  TC:  Okay.  So let me try to narrow down a time frame.
34       Um, in 2020, qualifying began, I think, around June
35       -- the week of June 12th through, you know -- June
36       12th, 14th, in that area of 2020.  So let's talk about
37       prior to mid June.
38
39  JG:  Uh-huh.
40
41  TC:  Can you approximate or -- how many meetings were at
42       -- or get-togethers.  Let's not call them meetings
43       necessarily, if you guys were partying or whatever.
44
45  JG:  Yeah.
46
47  TC:  Just get-togethers in which          , Brodeur, Ben
48       Paris were there together discussing strategy.
49
50  JG:  Um, so Ben Paris would come over and provide a lot

```
 1        of the marijuana edibles.  He would -- he was always
 2        providing          with the marijuana edibles.  I
 3        don't know what kind of arrangement they had going
 4        on.  But he seemed to have a heavy stock of them.
 5        Um, so there was some substance involved a lot of
 6        times, and it would be with alcohol or -- or
 7        marijuana.
 8
 9   FS:  Go back to the -- want him to repeat the question?
10
11   JG:  Well, sure.  Repeat the question.
12
13   TC:  Sure.  The -- I'm -- I'm interested in how many
14        times that        , Jason Brodeur, Ben Paris,
15        Foglesong, were together with you discussing
16        strategy, at          or anywhere else.
17
18   SS:  Prior to June 2020.
19
20   JG:  I was present at?  Whether it was me walking in
21        on -- on them already shooting the shit and -- at
22        least a dozen times.
23
24   TC:  Okay.
25
26   JG:  Yeah.  Whether it's at -- up at Liam Fitzpatrick's
27        or at          house.  I mean, yeah.  It was -- it
28        was always -- conversation's always politics.
29
30   TC:  Okay.
31
32   JG:                                   .
33
34   TC:  Before June of 2020?
35
36   JG:  Yeah.  Oh, yeah.  Yeah.
37
38   TC:  Um, how often?
39
40   JG:  At least a dozen times.
41
42   TC:
43                                    ?
44
45   JG:
46
47   TC:
48
49
50   JG:  (No audible response).
```

```
 1
 2   FS:
 3
 4   JG:
 5
 6   TC:  Yes.
 7
 8   FS:  I'm sorry.  Just --
 9
10   JG:  Direct involvement that I'm aware of.  No, not that
11        I'm absolutely aware of, no.
12
13   TC:
14
15
16
17   JG:
18
19
20
21
22
23   TC:  Okay.  Um, so who -- who would be able to
24        corroborate these discussions?  A list of names who
25        could corroborate these -- about third-party
26        candidates.  And really for us, specifically Senate
27        District 9 race.  Who are the best people that could
28        corroborate that these discussions between Brodeur,
29        Ben Paris, Eric Foglesong took place?
30
31   JG:
32
33   TC:  Um, any other people who were at these
34        get-togethers?
35
36   JG:                              .
37
38   TC:  Okay.
39
40   LM:  Take your time.  Just think about it.
41
42   TC:  Were there any other friends or anybody that --
43
44   JG:
45
46   TC:  I'm sorry.
47
48   JG:  -- um, Richard Anderson.
49
50   TC:  Okay.
```

```
 1
 2  SS:  Also known as Chris?
 3
 4  JG:  No.
 5
 6  SS:  No?  So was --
 7
 8  JG:  Just Richard Anderson.
 9
10  SS:  Was Gacy [phonetic] a relation to Chris Anderson?
11
12  JG:  No, no, no.
13
14  LM:  Who is he?
15
16  JG:  Richard Anderson was, uh -- he worked for the City
17       of Apopka for a number of years.  He was Nicole
18       Guillet's ex-boyfriend and looks like Colonel
19       Sanders.  He's involved in that -- that DUI a couple
20       years ago, Richard Anderson.  You know who I'm
21       talking about?
22
23  LM:  No.
24
25  JG:  Um, goodness.
26
27  LM:  Colonel Sanders?  Was it --
28
29  JG:  He looks like Colonel Sanders.  He was involved in a
30       bad DUI a couple years ago.  He got off.  Frank --
31       Frank -- his lawyer was John Morgan and Frank -- his
32       names -- I haven't used them in two years. Any --
33
34  SS:  Frank --
35
36  JG:  Who's the lawyer?  He used -- used to be the, um,
37       OIA.  He was one of my lawyers.  He was the chairman
38       of GOAA.
39
40  LM:  Chairman of who?
41
42  JG:  Kruppenbacher.
43
44  TC:  Kruppenbacher.
45
46  LM:  Oh, thank you.  Sorry.  I don't want --
47
48  JG:  Kruppenbacher was his --
49
50  LM:  -- words.  Okay.
```

```
 1
 2   JG:   -- attorney, yeah.  And they got him off with some
 3         legal theory of, you know, he wasn't there
 4         necessarily at the scene of the crash.  But Richard
 5         Anderson is -- is -- was -- is -- was involved with
 6         the conversation also.  And her -- she -- he was
 7         dating Nicole Guillet at the time.  They'd been
 8         dating for --
 9
10   TC:   I didn't catch that name.
11
12   JG:   Nicole Guillet for a number of time -- number of
13         years.  They'd been -- been dating.  Nicole was the
14         manager.  His -- his county manager.
15
16   FS:   You gotta speak up a little bit.
17
18   TC:   Which county?
19
20   JG:   Seminole.
21
22   TC:   Seminole?  Okay.
23
24   JG:   Um, maybe talk to -- yeah.  Talk to -- I cannot
25         believe I can't remember these people's names.
26         These are people I would talk to on a weekly basis.
27         Um --
28
29   LM:   Take your time.
30
31   TC:   Were there any, uh, friends, girlfriends, other
32         acquaintances?
33
34   JG:   Alex Stetzer [phonetic].
35
36   TC:   Okay.
37
38   JG:   Talk to Alex.
39
40   TC:   Stetzer?
41
42   FS:   Setzer.
43
44   JG:   Stetzer.  Setzer.
45
46   TC:   Setzer?
47
48   JG:   Yeah.
49
50   FS:   S-E-T-Z-E-R.
```

```
 1
 2  JG:  Yeah.  Yeah.  These are people who would be also in
 3       and out of his house and involved in the political
 4       scene up there.
 5
 6  TC:  Okay.
 7
 8  JG:  Who I can recall being there at least some of --
 9       would have had some knowledge of what was going on
10       if you ask them.  It may be contextual, sort of what
11       I'm able to provide, but they can -- they can help
12       corroborate some of this stuff.
13
14  TC:  Okay.  Um, Ben Paris.  Let's kind of focus on him.
15       Was he -- and he -- he's friends with
16       obviously.
17
18  JG:  Yeah.
19
20  TC:  I -- I would imagine being that he was kind of the
21       second in charge over at the Seminole Chamber.
22
23  JG:  He got that job specifically from Brodeur.
24
25  TC:  For -- because they're friends or what?
26
27  JG:  Um, maybe.
28
29
30
31
32
33
34
35  TC:
36
37
38
39  JG:
40
41
42  TC:  All right.  Would he have been present about the
43       third-party candidates?
44
45  JG:  I don't know.
46
47  TC:  Okay.  Do you recall specifics of what Ben Paris --
48       in talking about running third-party candidates, is
49       there any specifics about him assisting any of this,
50       uh, you know, to get it accomplished?
```

```
 1
 2   JG:   Specifics about Ben Paris getting it accomplished?
 3         Not that I can think of.
 4
 5   TC:   Okay.  But he was present with Brodeur?
 6
 7   JG:   Yeah.  He was kind of quiet.  But, uh, yeah.  He was
 8         definitely there.  I -- I don't remember them
 9         specifically saying what he was going to do.
10
11   TC:   Were you aware of Seminole County candidates that
12         Eric Foglesong was assisting their campaign?  Did --
13         do you remember any discussions about that?
14
15   JG:   In 2020?
16
17   TC:   Yes.
18
19   JG:   No.
20
21   TC:   Okay.  Were you -- did you have any knowledge of,
22         uh, Mr. Foglesong assisting Matt Morgan and Ben
23         Paris with their campaign?
24
25   JG:   I don't recall specifically.  I do recall him being
26         present.  I don't recall.  Not specifically, no.
27         But -- no, not --
28
29   TC:   Okay.
30
31   JG:   -- not specifically, no.
32
33   TC:   All right.  So let me get closer to the day range of
34         as qualifying's going on, campaign donations are
35         coming in.  So we're talking specifically mid June
36         of 2020.  Were you ever party to any conversations,
37         be it talking to the person, digital conversations,
38         e-mails, text messages, anything, that talked about
39         securing donations for Jestine Iannotti?
40
41   JG:   No, no.  I didn't even know her name until Fritz and
42         I were talking.  I think this was -- yeah, this was
43         before the indictments came.  I didn't even know
44         what her name was.  I remember saying to Fritz, I
45         said, "They probably used a female with a
46         Spanish-sounding name."  That's what -- that's what
47         their strategy called for.  So, no, I didn't -- I
48         didn't know anything about her.  And I didn't hear
49         any conversations about -- I wasn't involved in the
50         conversations about, you know, raising any money for
```

```
 1          her.
 2
 3   TC:    Okay.  Um, and maybe afterwards did you ever become
 4          party to information that Ben Paris assisted with a
 5          donation for Jestine Iannotti?
 6
 7   JG:    No.  No.  I -- I didn't -- I didn't have any
 8          knowledge of who the person was going to be, if they
 9          were going to use her third-party candidate.
10
11   TC:    Okay.
12
13   JG:    No.
14
15   TC:    Did you have any knowledge of Eric Foglesong, um,
16          securing funds for a donation to Jestine Iannotti
17          for the campaign contributions?
18
19   JG:
20
21
22
23   TC:    All right.  Stick with that, with the qualifying
24          fee.
25
26   JG:    Yeah.
27
28   TC:    'Cause that's the important part of getting somebody
29          on the ballot is the qualifying fee.
30
31   JG:    Yeah.
32
33   TC:    Do you recall discussions, be it June, be it prior
34          to June of 2020, about securing contributions or
35          money for qualifying fees for third-party
36          candidates?
37
38   JG:    For Senate --
39
40   TC:    Senate District 9 or any -- any discussion about
41          securing qualifying fees, where the money would be
42          coming from.
43
44   JG:    It -- well, yeah.  I -- I had assumed -- actually,
45          no.  It was -- it was the county commission race.
46          No.
47
48   FS:    Just tell them about any -- any -- or he's asking
49          the questions broad.  Any --
50
```

```
 1   JG:  For -- for Ben Paris and for
 2
 3
 4
 5
 6
 7
 8
 9   TC:
10
11   JG:
12
13   TC:
14
15   JG:
16
17   TC:
18
19
20   JG:
21
22   TC:
23
24   JG:
25
26
27   TC:
28
29   JG:
30
31   TC:
32
33
34
35   JG:
36
37
38
39
40   TC:
41
42   JG:
43
44   LM:
45
46   JG:
47
48
49
50   FS:
```

```
 1
 2   JG:
 3
 4   TC:
 5
 6
 7
 8
 9   JG:
10
11   TC:
12
13   JG:
14
15   TC:  Are you aware of anything similar to what you did
16        that occurred with Senate District 9 or with Frank
17        Artiles in South Florida or any other candidates in
18        the local Central Florida area with this group,
19        with --
20
21   LM:  Any other candidate -- well, let's stick with these.
22
23   JG:  I -- I -- no, I didn't have a conversation where
24        somebody solicited one way to me what they were
25        going to do.  Just what I had done, "Oh, that's
26        great.  You know, I should do something similar."
27        Yeah.  My asking questions about how to justify the
28        money and that was that.  But no, not specifically.
29
30   TC:
31
32
33
34
35   JG:  In 2020?
36
37   TC:  In 2020.
38
39   JG:
40
41
42
43
44   TC:  Pressured you?
45
46   JG:  Yeah.  Yeah.
47
48   TC:  Sorry.
49
50   JG:
```

```
 1
 2
 3
 4
 5
 6
 7
 8    SS:  Before we leave the topic, you had made the comment
 9         that with regard to Paris's race and
10
11
12
13
14    JG:
15
16    SS:
17
18    JG:
19         that.  I heard rumors that something similar had
20         happened with Ben Paris but --
21
22    SS:  Well, are -- understanding it's a rumor that you
23         heard --
24
25    JG:  Yeah.
26
27    SS:  What did you hear?
28
29    JG:  My wife told me that, uh, at SEC, at the Seminole
30         County Republican Executive Committee meeting, she
31         was told that Ben Paris got $25,000 cash from
32                    .  Um, to run.  So that's --
33
34    FS:  Just tell them everything you know.
35
36    JG:  That's it.  That's --
37
38    FS:  I'm sorry to interrupt.
39
40    JG:
41
42
43
44
45
46
47    SS:
48
49
50
```

```
 1
 2
 3
 4    JG:  Oh, yeah.
 5
 6    SS:  Talk to me about that.
 7
 8    JG:
 9
10
11
12
13
14
15
16
17
18
19
20                        And the same thing with
21         Anthony Sabatini.  He came in as, um, doing some
22         legal work for the office.
23         Dorworth about -- I mean, I -- I specifically hired
24
25
26
27
28    TC:
29
30
31    JG:
32
33
34    TC:
35
36    JG:
37
38    TC:
39
40    JG:
41
42
43
44
45
46    TC:  That's the point.  What's -- what was the
47         conversation to get him in the door with him?  Or
48         would anyone else, Hey, bringing you in.  This is
49         the contract.  You're not really doing anything.
50         It's your money.  I mean, what -- what was the
```

```
 1      conversation?
 2
 3   JG:
 4
 5
 6
 7
 8
 9
10
11
12
13   LM:  Like?
14
15   JG:
16
17
18
19
20
21   LM:
22
23   JG:
24
25   TC:
26
27
28   JG:
29
30   TC:
31    --
32
33   JG:
34
35   TC:
36
37   JG:  Correct.  I had even -- I had even -- I was not
38        terribly thrilled with the job as tax collector.  It
39        was really boring, and as you could tell I got bored
40        and did some things that normally I wouldn't have
41        done.  But, uh, I wanted to run for county
42        commission.
43
44
45
46
47
48
49   LM:  Um, you mentioned Sabatini.  What was --
50
```

```
 1   JG:   Yeah.  Sabatini was a -- a -- a, um, contractor
 2         doing some legal work for the office.  We didn't
 3         have him on very long.  When I got indicted a lot of
 4         those -- most of those contracts were all cut so he
 5         -- he, um --
 6
 7
 8
 9               So had I not been indicted who knows what
10         would have happened when there were people that
11         would have gone forward through the election process
12         and maybe won.  But --
13
14   LM:   Is that a conversation again you had with
15         Sabatini --
16
17   JG:   Yes.  --
18
19   LM:   -- for taking employment?  How'd that go?
20
21   JG:   I don't remember the specifics.  Um, a lot of these
22         conversations would happen up at Liam's, you know,
23         drinking beer and stuff.  But it was the
24         understanding that if somebody was coming on to do
25         work, they were going to be overpaid, and if
26         anything was needed, they would -- they would
27         remember that they're being paid too much to do a
28         job that they could be paid a lot less.  But I don't
29         remember the exact words.
30
31   FS:
32
33   JG:
34
35
36
37   TC:
38
39   JG:
40
41   TC:
42
43   JG:
44
45
46
47
48
49
50
```

```
 1
 2
 3  TC:  Sure.
 4
 5  JG:
 6
 7
 8  FS:  Just tell them everything.  Just tell them
 9       everything.  If -- they'll cut you off if it's --
10
11  JG:  Yeah.  Um, but -- so the election time -- let's see
12       here.
13
14
15
16
17
18  TC:  Were those vocal discussions, or did any of this
19       actually happen on -- through a group text or
20       electronically, that there's a -- there's a record
21       of it somewhere?
22
23  JG:  No.
24
25  TC:  Okay.  'Cause my understanding -- and talking to
26       other people, other investigators and other things,
27              deals in cash.
28
29  JG:  Yeah.
30
31  TC:  And cash and only cash.
32
33  JG:  Yeah.  Yeah.  And he needs cash that he's short of,
34       so here's -- he used to would go -- he didn't have a
35       lot at his house.  Jim Stelling kept a lot of cash
36       on hand, and he would go to Jim Stelling and ask Jim
37       for the cash, take that cash, use it for whatever
38       purpose he needed, whether it's females, drugs, fill
39       in the blank.  Jim --
40
41  LM:  Who's Jim --
42
43  JG:  -- Stelling was, um -- he -- well, Republican
44       bigwig.  Used to be the -- the chairman of the
45       Republican party in Seminole County.  Well beyond
46       his back nine, but, um, yeah,        would get cash
47       from -- from Jim.  This is the way he would also
48       hide from his wife but then he paid Jim back later.
49       Jim always kept about 20,000 in cash on him.  So --
50
```

```
 1  SS:  Let's revisit for a moment the people that you had
 2       on contract as employees on a vendor contract basis
 3       for Tax Collector's Office that were postured to be
 4       given money, as you've said, to do work, to be
 5       overpaid with the understanding that there would be
 6       money paid to them that they would then put into
 7       their own, um, campaigns moving forward.
 8
 9  JG:  Yeah.
10
11  SS:
12
13
14  JG:  Yeah.
15
16  SS:  Do you recall -- and I'm asking you questions I
17       already know the answer to, but I want to know if
18       you have a recollection of it.
19
20
21
22  JG:
23
24  SS:
25
26  JG:
27
28  SS:
29
30  JG:
31
32  SS:
33
34
35
36
37  JG:
38
39
40
41  SS:
42
43
44  JG:
45
46  SS:
47
48
49
50  JG:
```

```
 1
 2
 3
 4
 5
 6
 7
 8   SS
 9
10
11   JG
12
13   SS:  Okay.
14
15   JG:
16
17   SS:  And he lost to whom?
18
19   JG:
20
21   SS:  Okay.
22
23   JG:  Which was sort of a surprise, but, um, I wasn't
24        involved with his campaign.  Probably would have won
25        if I was.  But -- and then Ben Paris ran
26        simultaneously against Lee Constantine.
27
28   SS:  And Ben Paris --
29
30   JG:
31
32
33   SS:  And Ben Paris was not an employee of the Tax
34        Collector's Office, but rather was an employee of
35        the Seminole County Chamber of Commerce?
36
37   JG:  Correct.
38
39   SS:  And was that position that Paris had with the
40        Seminole County Chamber of Commerce facilitated by
41        Dorworth, do you know?
42
43   JG:  And -- and Brodeur, yes.
44
45   SS:  Understanding that Brodeur is the president of that
46        organization?
47
48   JG:  Yeah.
49
50   SS:
```

```
 1
 2
 3   JG:   Yes.  Because they had asked me to bring on Ben
 4         Paris in some sort of fashion and I didn't really
 5         know Ben.
 6
 7   FS:   You're talking -- slow down a little bit.  You're
 8         talking (unintelligible).
 9
10   JG:   They had -- they had approached me about hiring Ben
11         in some sort of fashion.  Even possibly having been
12         -- take over as tax collector if I didn't want to
13         run.  And I didn't know Ben, and I -- I didn't -- I
14         couldn't find a spot for him.  And then it was
15         immediately after I turned him down they announced
16         that they had a spot for him at the -- the, uh,
17         Seminole County Chamber of Commerce.  There was a
18         press release that went out immediately after.
19
20   SS:   And Ben Paris was also put up, as you've said, to
21         run for Seminole County Commission?
22
23   JG:   Correct.
24
25   SS:
26             and Ben Paris -- was that -- was that race in
27         2020, as well?
28
29   JG:   Yes.
30
31   SS:   So all these conversations that are taking place at
32                       house about installing third-party
33         candidates, engaging in these various practices with
34         the election cycle, that's all at the same time that
35                  running for office and Paris is running for
36         office with a potential direct benefit to           ;
37         is that correct?
38
39   JG:   Absolutely.
40
41   SS:   Why would Jim Stelling give           cash?
42
43   JG:   Jim Stelling and                  have a relationship
44         that's akin to like a father and son.
45
46   SS:   Who else at the Tax Collector's Office -- you talked
47         a little bit about Sabatini, understanding who he is
48         in Florida politics.  What benefit would
49         receive from Sabatini getting employment by way of
50         vendor contract for you?  Can you explain that for
```

```
 1        us?
 2
 3   JG:  Sure.  So Sabatini and other -- other, um, state
 4        legislatures [sic] were given a lot of campaign
 5        donations from
 6
 7
 8
 9
10
11
12
13               There may be an electronic record of that
14        somewhere, but putting Jason --
15
16   SS:  Brodeur.
17
18   JG:  -- not Brodeur.
19
20   TC:  Pizzarola [phonetic]?
21
22   JG:  Pirozzolo, yes.
23
24   TC:  Pirozzolo, I'm sorry.  However you say that.
25
26   SS:  Dr. -- Dr. Pirozzolo --
27
28   JG:  Yes, Dr. Pirozzolo.
29
30   SS:  -- you said?
31
32   JG:  And Randall Hunt on that board.  Um, specifically to
33        steer the contract for the -- from the Attorney's
34        Office over to Tara.
35
36   FS:  Tara.
37
38   SS:  Tedrow.
39
40   JG:  Tedrow, yeah, who he was having an affair with.  Um,
41        and a number of other things.
42                                                         t
43
44
45        Board with essentially having Jerry Demings and
46        Buddy Dyer on there as requirements was -- was, you
47        know, astronomical, the amount of money that went
48        through the GOAA.  But something blew up there.
49        They just -- they didn't end up getting it.  But
50        that's an example of how they use their
```

32

```
 1      relationships -- you know all this stuff.  I don't
 2      need to tell you -- to --
 3
 4  FS: Well, just tell them.
 5
 6  JG:
 7
 8
 9
10
11
12  SS: Preserve?
13
14  JG: Yeah.  Something like that, but I -- when you sit in
15      a cell for 23 hours a day your mind kind of goes to
16      mush.  But whatever that is that prohibits
17
18
19
20
21
22
23
24      And he knows the -- the game with Brodeur
25      and all that, how the laws are just completely
26      shaped to benefit themselves.  So that's where
27      Sabatini came in.  I don't know what, but I'm sure
28      if you look you'll see a direct line of, you know,
29      contributions to Sabatini's House races and some of
30      the legislation that he may have passed or helped
31      sponsor, fill in the blank.
32
33  SS: All right.  Two more series of questions, then I'll
34      turn it back over.  My apologies.  Anybody else on
35      staff, on contract, receiving any type of financial
36      benefit as an employee or contractor with the Tax
37      Collector's Office, other than
38      Sabatini, that -- that had this kind of arrangement
39      set up where they were getting padded and inflated
40      contract employment knowing that it was for this
41      greater good?
42
43  JG:
44
45  SS: Okay.
46
47  JG:
48
49  SS: Okay.
50
```

```
 1   JG:  So if 2020 -- yeah, it was in '18 elections, yeah.
 2
 3   SS:
 4
 5
 6   JG:
 7
 8   SS:  Or just in general.  So let me ask specifically.
 9
10
11
12   JG:  I don't know.
13
14   SS:
15
16
17
18   JG:
19
20
21
22
23
24
25
26
27
28
29
30
31
32
33
34
35   LM:
36
37
38
39   JG:
40
41   LM:
42
43   JG:
44
45
46   SS:
47
48
49   JG:
50
```

34

```
 1   SS:  Okay.  Um --
 2
 3   JG:  And I -- there -- there's gotta be a --
 4
 5   FS:  Do you mind asking that questions again if it's just
 6        towards Dorworth or in general?  Because --
 7
 8   SS:  In general.
 9
10   FS:  In general.
11
12   SS:
13
14
15
16
17   JG:
18
19   SS:
20
21   JG:
22
23   SS:
24
25   JG:
26
27
28
29
30
31
32
33
34   SS:  For Ben Paris?
35
36   JG:  For Ben Paris and            , yeah.
37
38   SS:  Yeah.
39
40   JG:
41
42
43
44
45
46
47   SS:  Scott Sturgill is currently running for Congress?
48
49   JG:  Yes.
50
```

```
 1   SS:  Tell me about him.
 2
 3   JG:  I -- I -- I don't -- I don't really have too much on
 4        Scott.  I know Scott.  I like Scott.
 5
 6   SS:  Is Scott involved in any of this?
 7
 8   JG:  Not that I know of, no.  Scott didn't really
 9        associate with this group of people.
10
11   SS:  So the last category, as I said -- I said there were
12        two.  This is the second of the two.
13
14   LM:  Uh-huh.
15
16   SS:  You mentioned GOAA, the Greater Orlando Aviation
17        Authority.
18
19   JG:  Uh-huh.
20
21   SS:
22
23
24   JG:  No.
25
26   SS:  Do you know that currently Eric Foglesong is in a
27        lobbyist position as it relates to vendors in GOAA?
28
29   JG:  No, I didn't know that.  Doesn't surprise me.
30
31   SS:  Okay.
32
33   JG:  That's somebody they would use.
34
35
36
37   SS:
38
39
40   JG:
41
42   SS:  That's all right.
43
44   JG:
45
46
47
48
49
50
```

```
 1                              .
 2
 3   SS:  Okay.  Understanding that we're going to get into a
 4        little bit more of the trail here, do you have any
 5        information about how it was that Foglesong became
 6        associated with the Greater Orlando Aviation
 7        Authority recently?  Do you know anything about
 8        that?
 9
10   JG:  How recent?
11
12   SS:  He -- it's been within the last six months or so.
13
14   JG:  First of all, I was shocked that they would, you
15        know, associate with him.  Second of all,
16
17
18
19
20
21
22
23   SS:
24
25   JG:
26
27
28
29
30
31
32
33
34
35
36   SS:  Thank you.
37
38   FS:  Um, just -- just for the record, he's been in
39        custody since last year so he hasn't been out in the
40        last six months.
41
42   SS:  I understand.
43
44   FS:  Okay.
45
46   SS:  Yes.
47
48   FS:  Just wanted to put that --
49
50   SS:  But you also have access to the news.  So that's why
```

```
 1        I was asking questions.
 2
 3   JG:  A little bit, yeah.
 4
 5   SS:  That's all right.  I will turn it back over.
 6
 7   TC:  Um, the one thing I wanted to hit so I don't forget,
 8        'cause it was stated and then I just wanna dig deep
 9        into it.  Um, what -- what is your wife's name?
10
11   JG:  Abby.
12
13   TC:  Abby.
14
15   JG:  Ex-wife, sorry.
16
17   FS:  Ex-wife.
18
19   TC:  Sorry.  Sorry.  I know how that goes.  Yeah.
20
21   FS:  Well, I was -- that's recent.  It's within the last
22        year.
23
24   TC:  Sorry.  I apologize for that.
25
26   FS:  (Unintelligible).
27
28   TC:  Your ex-wife's name is Abby.  At the time in 2020 it
29        was Abby Greenberg?
30
31   JG:  Yes.
32
33   TC:  Okay.  Um, did -- is it your understanding that she
34        witnessed the $25,000 in cash go to Paris?
35
36   JG:  No.
37
38   TC:  Okay.  How did she come to know about it?
39
40   JG:
41
42
43
44
45
46
47
48   TC:  Okay.
49
50   FS:
```

```
 1
 2
 3    JG:
 4
 5
 6    TC:   Would she have any knowledge about the third-party
 7          candidate schemes and stuff that we've discussed
 8          previously?
 9
10    JG:   Abby?
11
12    TC:   Yes.
13
14    JG:   I don't know.
15
16    TC:   Um --
17
18    JG:   Above and beyond what she would have learned from
19          being in -- in my presence with these people, I
20          don't know.  I doubt it but I don't know.
21
22    TC:   Okay.  So she -- so no direct -- she -- it was
23          something that she heard after a Seminole County
24          Republican Committee meeting?
25
26    JG:   Some sort of Seminole County --
27
28    TC:   Or get-together?
29
30    JG:   -- yeah.  Yeah.  Something like that.
31
32    SS:   You said it was an executive meeting.
33
34    TC:   The executive committee is what you had said
35          initially.
36
37    SS:   Right.
38
39    JG:   Yeah.  Yeah, yeah, yeah.
40
41    TC:   Okay.
42
43    JG:   I think it was an SEC REC meeting, yeah.
44
45    TC:   Would this be prior to June of 2020?
46
47    JG:   Oh, no.  This was, uh -- this was like six months
48          ago.
49
50    TC:   Six months ago?
```

```
 1
 2   JG:  Yeah.  She told me on the phone.
 3
 4   TC:  Okay.  Do you guys still speak?
 5
 6   JG:  Yeah.
 7
 8   TC:  Was she at all upset about kind of this crumbling in
 9        on you guys, and other people are out there that are
10        not --
11
12   JG:  Yeah.
13
14   TC:  -- getting in trouble?
15
16   JG:  Yeah.
17
18   TC:  So would she be friendly if there was something --
19        would she be friendly to talk to us?
20
21   JG:  Yeah.
22
23   SS:  Cooperative?
24
25   JG:  Yeah.
26
27   TC:  Okay.
28
29   JG:  Yeah, absolutely.  She came in on --
30
31   TC:  I didn't want to assume.
32
33   JG:
34
35
36   TC:  Okay.  Did -- did she have any interactions with Ben
37        Paris or Eric Foglesong?
38
39   JG:  I don't know.
40
41   TC:
42
43
44
45   JG:  She was.
46
47   TC:  Was?
48
49   JG:  Yeah.
50
```

```
 1   TC:   Okay.  Um, all right.  We'll just leave that for
 2         there.
 3
 4   JG:   She has -- there's no love lost.
 5
 6   FS:   There's no -- there's no allegiance.
 7
 8   JG:   There's no allegiance anymore.  She -- she doesn't
 9         want anything to do with these people, anybody we've
10         discussed.
11
12   TC:   Okay.
13
14   JG:   And yeah.  It's -- she's furious that I'm the one
15         that's taken the fall for a lot of this stuff.
16
17   FS:   She's very -- informed me that she'd be very
18         receptive to any needs.
19
20   TC:   Okay.
21
22   SS:   Is she represented by counsel?
23
24   FS:   We would call Clayton Simmons.
25
26   SS:   I know.
27
28   FS:   Yeah.
29
30   SS:   Former Judge Simmons.
31
32   FS:   Yeah.  So, uh --
33
34   SS:   Although my understanding is that he was recently
35         retired.
36
37   JG:   Retired.
38
39   SS:   Which is why the divorce was fast-tracked.
40
41   FS:   Yeah.  So -- right.  So I will call -- I will find
42         out today if she has current counsel.
43
44   SS:   If you're able to, and then just communicate that
45         with Inspector Cope.
46
47   FS:   I expect I will -- I -- I guess.
48
49   SS:   Okay.
50
```

```
 1   FS:  And Inspector Cope and I have a nice relationship so
 2        I will let him know right away.
 3
 4   SS:  Very good.
 5
 6   TC:  Absolutely.  Thank you very much.
 7
 8   SS:  I would ask that you not discuss the particulars
 9        with regard to the topics that we've talked to you
10        about with Abby Greenberg, because I don't want to
11        taint any future interview --
12
13   JG:  Got it.
14
15   SS:  -- that we potentially could have with her.  So I'm
16        instructing you not to talk to her --
17
18   JG:  Yeah.
19
20   SS:  About these topics.  Do you understand?
21
22   TC:  Or that we spoke at all, please.
23
24   JG:  Okay.  Got it.
25
26   SS:  Okay.
27
28   TC:  And that goes for anybody.  It -- 'cause it just
29        benefits that we can quietly --
30
31   JG:  I don't talk to anybody.
32
33   TC:  Where I -- okay.
34
35   JG:  Only person I talk to, my mom, my dad and then Abby
36        occasionally but --
37
38   TC:  Okay.  So you guys have a friendly relationship
39        though you're divorced and --
40
41   JG:  Yeah.  Yeah.
42
43   TC:  -- and said -- okay.
44
45   JG:  Yeah.
46
47   TC:  Got it.  Got it.
48
49   FS:  And could I just, um -- when -- when you -- so I --
50        I -- I -- I mean, I apologize.  This is my fault.
```

```
 1
 2
 3
 4
 5
 6
 7
 8   SS
 9
10   FS
11
12
13
14
15   TC
16
17   FS
18
19
20   TC
21
22   SS
23
24   TC:   So, uh, I just want to dive -- try to get a little
25         more specific.  I don't want to put -- I just want
26         to throw things out to see if there's anything that
27         jogs your memory or that we can flush out.  'Cause
28         I've got -- we -- we've got Ben Paris's -- his phone
29         tolls and phone tolls, if -- if you know this, I
30         apologize.  But just for the record, it's basically
31         communications captured by the phone company, be it
32         SMS text messages or phone calls back and forth
33         between parties that the telephone company captures
34         and stuff.  It has no content.  I have no context to
35         it, just dates and times.  On Ben Paris's phone
36         tolls, I got it from May -- May 1st, 2020, forward
37         into like September of 2021.  What was interesting
38         to me is that first -- do you remember what your
39         mobile phone number was that you used?
40
41   JG:   Yes.
42
43   TC:   Can you give that to me?
44
45   JG:   407-907-5669.
46
47   TC:   Okay.  And I just want to represent, um, these are
48         phone tolls that I've segregated out of Ben Paris's,
49         and these are communications that reflect, uh, phone
50         -- phone communications between 407-907-5669 and Ben
```

```
 1          Paris's phone number which is 321-239-3361.  So this
 2          -- the time Eastern, 'cause I had to convert it, is
 3          here.  And I'm making a mark in blue with this arrow
 4          that these are the actual times that it occurred.
 5          But these are text messages to Ben Paris around May
 6          28th of 2020. Does anything about these
 7          communications -- 'cause there's not many, and I
 8          know you were acquaintances and stuff.  Does
 9          anything with this May 28th around May 29th jog your
10          memory about any discussions related to campaigns at
11          that time?
12
13  JG:  No.
14
15  TC:  Okay.  So -- and then I'm going to feed a little
16       more information just to see if it jogs your memory.
17
18  JG:  It would -- it would have been only about campaigns
19       so --
20
21  TC:  Okay.
22
23  JG:  -- I don't --
24
25  SS:  Before we leave it, would you -- could you please
26       mark that as -- identify --
27
28  TC:  Yes.  Item 1 --
29
30  SS:  -- Item number (unintelligible).
31
32  JG:  'Cause Ben and I -- Ben and I didn't associate as --
33       as friends.  We -- we -- I mean, if we were
34       discussing something, it was political.  I don't
35       remember what, though.
36
37  LM:  Where is this phone?  Do you know, does the FBI have
38       it?
39
40  JG:  (No audible response).
41
42  SS:  Your cell phone.
43
44  JG:  Yeah.  I think they do.
45
46  FS:  Yes.  The FBI does.
47
48  LM:  Did you ever delete the messages or would they still
49       be there?
50
```

```
 1   JG:  I have no idea.  I don't believe I deleted them.
 2
 3   FS:  If I -- they're doing a whole forensic, like, copy.
 4        So, um, there's a whole forensic copy of the phone.
 5
 6   TC:  Also here, um, I'm just going to draw just kind of a
 7        line over here in this box.  This is Item 1, again,
 8        and you'll see that it goes to June 18th.  There's
 9        several conversations, and then it goes -- the next
10        ones were in August of 2020.  And this was before
11        you were in -- indicted and arrested.  Does the June
12        18th jog your memory of any specifics about talking
13        to Mr. Paris about the campaign?
14
15   SS:  And for the record, is that also the -- those are
16        text communications between Mr. Greenberg's cell
17        phone and Mr. Paris's cell phone, correct?
18
19   TC:  Correct.
20
21   SS:  Got it.  On or about June 18th.
22
23   TC:  That's a copy of it.
24
25   SS:  Got it.
26
27   TC:  Yes.
28
29   SS:  Okay.
30
31   JG:  So the -- the two that you've --
32
33   TC:  So these -- this is the range.  The -- this appears
34        to be text communications on June 18th between these
35        lines there.
36
37   JG:  Uh-huh.
38
39   TC:  And you don't have any idea what the context was?
40
41   JG:  I -- I do and if -- if --
42
43   SS:  We have a suspicion.
44
45   TC:  We have a suspicion and --
46
47   SS:  We're not going to tell you.
48
49   JG:  I -- I thought -- I thought it was --
50
```

```
 1   TC:   -- I will see --
 2
 3   JG:   -- I'm like they obviously know what it was.  I --
 4
 5   TC:   I have never seen the actual text messages.  I'm
 6         going based off the evidence we have gathered
 7         without context, and I can -- I can posture what
 8         they could be, but I'm not going to do that until
 9         we've let you look at it to see if it jogs anything
10         in your memory.
11
12   JG:
13
14
15   TC:   Third-party candidates?
16
17   JG:   -- third-party candidates.  It had -- well, that
18         would -- that would include -- be included in the
19         race.
20
21   TC:   Okay.  When you're talking about race, you're
22         encompassing everything?
23
24   JG:   Yeah.  Everybody.  The opponents.
25
26   TC:   Okay.  I -- and again, our case is, again, a
27         campaign finance case about the Senate District 9
28         for the third-party candidate.
29
30   JG:   Yeah.  It -- it wouldn't be, Hi, how's your wife
31         doing, or none of that.
32
33   TC:   Okay.  Um, and then one more.  I'm going to label
34         this Item 2.  These were my own personal notes when
35         I was viewing a spreadsheet of Eric Foglesong's
36         phone records and yours with the same phone number.
37         It appeared on June 4th, 2020.  There was a
38         six-minute phone call.  Again, June 4th of 2020, does
39         that jog your memory about any specifics?  'Cause
40         that was really the only pertinent communication
41         between you and Foglesong that was captured by the
42         phone company.  Granted, if that was on Signal or
43         any other thing, these things aren't going to be
44         captured.  But does this date -- 'cause this is
45         by -- close to qualifying.  This -- these are
46         important dates that we're looking at.
47
48   JG:   Yeah.  There was -- there was -- there's -- he
49         called me about, um, there was some scheme that he
50         wanted to do.  And I was kind of -- oh, my God.
```

```
 1       What was it?
 2
 3  LM:  Take your time.
 4
 5  TC:  Yeah.
 6
 7  JG:  Fuck.  I do remember that.  'Cause I remember I just
 8       kind of paid him lip service.  I was doing something
 9       else and I rolled my eyes.  It was -- it was some
10       scheme he wanted to do that would involve sucking
11       money away from the office and going to him somehow.
12       I don't remember what it was, though.
13
14  TC:  Was it related to elections?
15
16  JG:  Absolutely.  Yeah.  The -- that's -- there's no
17       reason that he would have called me in June 2020
18       unless it had something to do with elections.  It
19       was some scheme.  I don't remember what the scheme
20       was.  But I remember he called me.  And I don't talk
21       on the phone that long.
22
23  TC:  Right.  Six minutes is --
24
25  JG:  Is a long conversation for me in my opinion.
26
27  TC:  For me, too.
28
29  JG:  Yeah.  And, uh, so, yeah, he was talking and that
30       was --
31
32  TC:  Okay.
33
34  JG:  -- it was some scheme.  Some scheme that he -- he
35       come up with.
36
37  TC:  I got it.  All right.  But nothing -- nothing
38       specific.  Is there anything you want to go down
39       that line before I kind of reveal more information
40       and --
41
42  SS:  No.
43
44  TC:  -- and put it through -- okay.
45
46  SS:  We've established that you -- none of this jogs your
47       memory so with that --
48
49  TC:  So -- so let me just -- and then so let me give you
50       more information.  Let's see if it jogs anything
```

1     further or gives us another -- something to follow
2     up on.  The reason these dates are important,
3     because we know now that it jogs my memory, too, you
4     know, June 4th through, like, the 12th and that, um,
5     people are -- are getting into the Department of
6     State their qualifying checks, all of their
7     candidate O forms and everything like that, also to
8     the Seminole County Supervisor of Elections.
9
10    I know that Foglesong is communicating with Jestine
11    and getting her all squared away, trying to get her
12    campaign account going on.  The key about May 28th
13    and May 29th is with all phone toll records with the
14    suspects, their first contact that's captured on
15    phone is May 29th, and it's the first introduction.
16    You know, Paris speaks to Iannotti; don't know the
17    context.  But then Foglesong -- and we have -- we
18    have Foglesong's text messages with Jestine Iannotti
19    that says, "Nice to meet you," and this is on the
20    evening of the 29th.
21
22    So do you recall any discussions, communications
23    with anybody talking about, Hey, we -- we've got our
24    third-party candidate for Brodeur.  It's on.  We're
25    rocking and rolling.  We're ready to go.  Does
26    any -- and -- and this is, again, May of 20 -- late
27    May of 2020.  Does anything jog your memory of any
28    discussions at that time?
29
30  JG:  No.
31
32  TC:  Okay.  The June 18th is interesting in the fact that
33    we know, um, Foglesong's scrambling for names to put
34    on the elections reports that are due June 19th.  So
35    I bring up the 18th as it's interesting is you have
36    texts going between you and Paris who ultimately
37    does help with that.  Does that jog your memory
38    about any discussion of helping to secure a name?
39
40  JG:  Yeah.  I think he wanted to use Abby.  Yeah.
41
42  TC:  He wanted to use Abby?
43
44  JG:  I think he asked if he could use Abby as a name.
45
46  SS:  Who's "he" asked?
47
48  JG:  Foglesong.
49
50  SS:  Okay.

```
 1
 2   JG:
 3
 4
 5
 6
 7
 8
 9
10
11
12
13   TC:   So let me just hold up real quick.  So I showed you
14         Ben Paris's phone tolls.
15
16   JG:   Yeah.
17
18   TC:   But you recall Foglesong asking to use Abby's name.
19
20   JG:   It came up at some point.
21
22   TC:   Okay.
23
24   JG:   Yeah.
25
26   TC:   You don't know the exact time period?
27
28   JG:   It -- no.  It might have been on the call that he --
29         when he called me in -- in June.
30
31   TC:   Okay.
32
33   JG:   He wanted to use Abby for something.  And I just --
34         I wasn't paying attention to him.  It was -- he was
35         throwing a lot at me and it was some sort of scheme.
36         And I remember I was at my office and I was working
37         on something.
38
39   TC:   Did -- did you discuss with Abby that he wanted to
40         use your name?
41
42   JG:   No.  I -- I wouldn't have even discussed it.
43
44   TC:   Would Ben Paris or Eric Foglesong been able to
45         contact Abby directly?
46
47   JG:   I guess, yeah, if they wanted to.
48
49   TC:   Okay.
50
```

```
 1   SS:  Did your former wife Abby Greenberg have any type of
 2        relationship, though, with Mr. Foglesong or Mr.
 3        Paris?
 4
 5   JG:  No.  No.  No.  None.
 6
 7   SS:  So given the nature of the relationship you had with
 8        those individuals, would it have been appropriate
 9        for them to go through you for a request versus
10        going straight to her?
11
12   JG:  Yes.
13
14   SS:  And I'm going to ask the question directly because
15        how you've kind of couched it is confusing to me.
16        Do you have an independent recollection of Eric
17        Foglesong asking you if he or anyone associated with
18        Brodeur's campaign could use Abby Greenberg's name
19        as a campaign contributor to the third-party
20        candidate Jestine Iannotti in the Senate 9 race?
21
22   JG:  Not as specific as you put it, no.
23
24   SS:  Okay.
25
26   JG:  But he mentioned her -- he mentioned Abby about
27        something.
28
29   SS:  And wanting to use her name in some context?
30
31   JG:  For something, yeah.
32
33   SS:  But when we drill all the way down --
34
35   JG:  I mean, no, I -- I couldn't --
36
37   SS:  -- we can't connect those dots?
38
39   JG:  -- a hundred percent, no.
40
41   SS:  Understood.  Thank you.
42
43   LM:  Was it for a campaign donation?
44
45   JG:  I don't remember.
46
47   LM:  Okay.
48
49   TC:  Um, and we'll circle back to the discussions that
50        you may have had in the presence or people discussed
```

```
 1          in front of you, because third-party candidates --
 2          and I'm going to use the slang term ghost candidates
 3          -- and maybe that helps you jog your memory, too, so
 4          if I start using the word ghost candidate --
 5
 6   JG:    Yeah.
 7
 8   TC:    -- they're not necessarily illegal.  It's the
 9          campaign financing that is the illegal part in all
10          of this.  So I just kind of want to get your mind
11          focused on campaign --
12
13   JG:    Yeah.
14
15   TC:    -- financing.  Especially around 2020 and
16          discussions with          , Brodeur or whoever.  It
17          didn't have to be Brodeur.  I know we're painting
18          those things, but again, for -- for -- for Brodeur
19          to really be involved and -- and subject to -- to
20          anything -- or were you aware of Brodeur being
21          involved in any of this campaign financing for
22          third-parties?  'Cause you talked about Frank
23          Artiles.  You talked about Dorworth sending cash and
24          this and that.  And I don't know what Brodeur's, um,
25          financial state is.  But are you -- do you have any
26          knowledge of Brodeur personally being involved in
27          these campaign financing schemes for these ghost
28          candidates?
29
30   JG:    No.
31
32   TC:    Just that he was aware that it was going on in his
33          campaign and knew who was doing it.
34
35   JG:    He was -- yeah.
36
37   TC:    And what --
38
39   JG:    It's inconceivable that he would not be aware.
40
41   FS:    No.  But --
42
43   TC:    But did you -- did you hear him?  Were you in the
44          presence when he heard that?  I understand the -- I
45          agree with you.
46
47   JG:    Yeah.
48
49   TC:    I mean, we can all sit here and agree and postulate
50          about that.  And -- and if you're at the meeting --
```

```
 1        and that's one thing, and -- and -- and it is what
 2        it is.  It's just a lie to the media if that's the
 3        case.  I'm talking about stuff firsthand you know
 4        that he directly was passed that information.
 5
 6   FS:  He was --
 7
 8   TC:  We've got a third-party candidate.  We got it taken
 9        care of, as you've framed it.
10
11   FS:  Um, can -- can I ask the -- are you asking him if
12        Brodeur was present when these conversations were
13        occurring?
14
15   TC:  I -- I'm asking --
16
17   FS:              -- sorry.
18
19   TC:  -- if he was present and can confirm that the
20        information was conveyed to Brodeur.  It's -- it's
21        easy to be vague in these circles.
22
23   FS:  Uh-huh.
24
25   TC:  But I'm curious if Brodeur knew about the financial
26        scheme of, Hey, I'm going to pay cash, but we're
27        going to make it look like legit donations and
28        things like that.
29
30   JG:  No.  If you put it like that, no.
31
32   TC:  Okay.  And then I --
33
34   JG:  Nobody -- nobody talks like that.
35
36   TC:  I agree but at -- you know, at some point if
37        somebody's worried about a campaign that's going to
38        be razor thin, somebody may slip up and actually
39        discuss, Hey, I've got this -- this, uh -- this
40        girl.  She's agreed to run this as an experience to
41        see what campaigning is like.  So we've got
42        somebody.  We just need to get the qualifying fee.
43        Um, and also to get names to -- to make it look more
44        legit.  You know, what -- what we have is people
45        reporting that checks were given when, in fact, no
46        checks were ever written as campaign donations.
47
48   JG:  Yeah.
49
50   TC:  And the same thing in your race.  You -- and this is
```

```
 1            why I was like maybe you've had these conversations,
 2            because if you gave your ghost candidate cash --
 3
 4   JG:   Uh-huh.
 5
 6   TC:   -- they had to falsely report on their campaign
 7            treasurer's report how they got that money.
 8
 9   JG:   Which they did.
10
11   TC:   Which would be a check.  But if you gave them cash,
12            they're -- you know, that's -- that's how these
13            schemes work.  So that's why I'm trying to jog your
14            memory, to see if it was discussed like that.  Like,
15            how are we going to get the funds there.  And again,
16            I understand the slang, you know, they're not going
17            to talk -- talk like it.  But if it -- I mean, if
18            you look at Brodeur's race, it was razor thin any
19            way you cut it.
20
21   JG:   Yeah.
22
23   TC:   And especially in Seminole County.  It was only
24            three -- barely 300 votes he won by, which is razor
25            thin.  It was only because of Volusia County it even
26            looks like it was not that close.
27
28   JG:   Yes.
29
30   TC:   Um --
31
32   JG:   I remember him telling me that he was going to lose.
33            He thought he would lose Seminole County.
34
35   TC:   So he was concerned and he needed something, a
36            little extra help.
37
38   JG:   Yeah.  He would -- they were -- I remember him
39            telling me that they were targeting on Facebook
40            conservative Democrats, independent voters, because
41            they were going to paint his opponent as, you know,
42            a flaming liberal, and he thought that he would win
43            his -- his race in Volusia County.
44
45   TC:   Okay.  And in -- then another coincidence -- and
46            like you said, it's inconceivable he didn't know
47            when the person who does help supply a name has been
48            Paris somebody who works for --
49
50   JG:   Yeah.
```

53

```
 1
 2   TC:  -- Brodeur as -- as he said.  Any conversation of
 3        like, oh, Ben will take care of it, or is Ben and
 4        Brodeur close?  I mean, it's one thing to give
 5        somebody a job.  It's another thing to be close
 6        outside of work and -- and have more than just a
 7        professional relationship.
 8
 9   JG:  Yeah.
10
11   TC:  Do you know about their relationship?
12
13   JG:  I don't know about their relationship.
14
15
16
17
18
19
20   TC:  Uh-huh.
21
22   JG:  Appreciation.
23
24   TC:
25
26
27
28   JG:  He wouldn't need to pay Brodeur.
29
30   TC:  Okay.  Why's that?
31
32   JG:  They have, like, a brother relationship.
33
34   TC:  Okay.
35
36   FS:  Can I just clarify that -- I just want to -- your
37        question, it just -- Brodeur -- I think you had said
38        that Brodeur was present when there was talks about
39        the third-party candidate.
40
41   TC:  Yeah.
42
43   JG:  That he -- and he was drunk, and he -- he drinks a
44        lot, and he'd always be over at          house
45        hammered so --
46
47   TC:  And -- and I get that.  And again, and just so you
48        understand, I mean, you know, 'cause I think if you
49        read in the media and look at the portrayals of it,
50        it's like, Oh, these ghost candidate schemes.  Well,
```

```
 1        those schemes happen all the time.  The campaign
 2        financing is where it's the issue so it's like I --
 3        we can confederate together and run a ghost
 4        candidate as long as they pay their own way.
 5
 6  JG:  Yeah.  Why would they do that, though?
 7
 8  TC:  That's totally legal.
 9
10  JG:  It defies the whole --
11
12  TC:  Well, if somebody wants to help their party.  I
13        mean, you could see overzealous people have got
14        $1,300 left over.  It's conceivable.  But like you
15        said, it's throwing bad money unless you're so die
16        hard to help somebody.  And actually, I'm finding
17        out, digging deeper into these things, that actually
18        happens or, you know, people screw up.  So we're
19        just going from there.  Um, anything else on that
20        line that you'd like to help out with?
21
22  SS:  Yes.  So I just want to be -- make it very clear.
23        You were present when Jason Brodeur is either
24        participating in conversations, overhearing
25        conversations with            Ben Paris and/or
26        Frank Artiles about third-party candidate running in
27        the Senate 9 race; is that correct?
28
29  JG:  Yes.
30
31  SS:  But you don't know specifics with regard to the
32        financing of that third-party candidate and the
33        Senate 9 race; is that correct?
34
35  JG:  Correct.
36
37  SS:  The direct quote that you've offered us here today
38        is that when asked about Brodeur's race --
39
40  JG:  Uh-huh.
41
42  SS:  -- the response was, "We've got it --"
43
44  JG:  Handled.  Uh-huh.
45
46  SS:  "-- handled."
47
48  JG:  Uh-huh.
49
50  SS:  And who made that comment?
```

```
 1
 2  JG:
 3
 4  SS:
 5
 6  JG:  Yeah.
 7
 8  SS:  And that comment, "We've got it handled," was in
 9       front of Brodeur, correct?
10
11  JG:  Absolutely, yes.
12
13  SS:  As it relates to these elected officials of which
14       you were one at one time, does Jason Brodeur
15       surround himself with individuals who can take care
16       of these types of things on his behalf without him
17       having to directly do it himself?
18
19  JG:  Yes.
20
21  SS:  And who would those individuals be?
22
23  JG:
24
25  SS:  Is there anyone else within his --
26
27  JG:  Frank Artiles.
28
29  SS:  Anyone else?
30
31  JG:  Eric Foglesong.
32
33  SS:  And so even though he is a candidate, may not be
34       directly responsible for making payments or
35       providing cash, there are people within his
36       constellation of friendships and networking who are
37       postured to be able to do so; is that correct?
38
39  JG:  Without a doubt.
40
41  SS:  But you were never privy -- that's a bad question.
42       Were you ever privy to any conversations, though,
43       about those issues of financing and the money and
44       how that third-party candidate was going to be
45       supported in the race?
46
47  JG:  No.  I -- I knew the recipe but not the ingredients.
48
49  SS:  Understood.
50
```

```
 1   JG:  Yeah.
 2
 3   FS:  What about the Reagan event?
 4
 5   JG:
 6
 7
 8   SS:  But Brodeur wasn't part of that conversation,
 9        correct?
10
11   JG:  I don't know.  I don't remember if he was there or
12        not.
13
14   SS:  'Cause you've mentioned Bob Cortez.
15
16   JG:  Bob Cortez was sitting right there.  Vennia Francois
17        was standing there.  We were in a circle having a
18        conversation.
19
20   SS:  Do you remember Jason Brodeur participated in that
21        conversation?
22
23   JG:  No.
24
25   SS:  Were there specifics being detailed?
26
27   JG:  Not that time, no.
28
29   SS:  Not that time?
30
31   JG:  No.  No.
32
33   SS:  Was -- was there some other time where there were
34        specifics being detailed and Brodeur participated?
35
36   JG:  What do you mean by participated?
37
38   SS:  He's hearing it.  'Cause I -- if I -- if I'm
39        confessing to some type of scheme and it's in front
40        of the four of you and you're simply silent, Mr.
41        Greenberg, about the scheme that I'm going to
42        conduct with my fellow compatriots here, you're
43        hearing it.  You're aware of what's going on.
44
45   JG:  Yeah.
46
47   SS:  So in that way he may not have talked.  He may not
48        have offered anything.  But is he within earshot and
49        hearing about --
50
```

```
 1   JG:   I don't know if this makes sense, but we talked
 2         about political strategy so often that it's
 3         difficult to pick out a specific conversation.
 4         That's how often we talked about this sort of stuff.
 5
 6   SS:   But do you have an independent recollection, though,
 7         of them -- and I don't mean to beat a dead horse
 8         here.  But it's -- it's all -- I'm -- we're just
 9         trying to determine the facts.  Independent
10         recollection of Brodeur being present when specifics
11         were detailed about the third-party candidate in his
12         race?
13
14   JG:   Not about this specific person but the -- the -- he
15         definitely was present because I would ask questions
16         sometimes.  So I got the information to use for  my
17         -- my campaign about the apparatus on how to do it.
18
19   SS:   Sure.
20
21   JG:   And -- and the -- the thinking behind it.
22
23   SS:   Pick a female.
24
25   JG:   Spanish-sounding name.
26
27   SS:   Hispanic- --
28
29   JG:   Exactly.
30
31   SS:   -- sounding last name.
32
33   JG:   Yes.  NPA.  Goes right to the November ballot and
34         the logic behind it.
35
36   SS:   Understood.
37
38   JG:   Absolutely.  Yeah.
39
40   SS:   Okay.
41
42   TC:   There was something that you -- two names that came
43         up in the e-mails that you sent.  And it's not
44         directly related to --
45
46   FS:   Sure.
47
48   TC:   -- this but, uh, it may be related to help other
49         prosecutors.  I'm just curious.  Um, you -- 'cause
50         you had pointed out the -- the females who were put
```

```
 1        up to be the chairmans [sic] of these PACs with the
 2        Grow United and everything.  It was Sierra Olive
 3        [phonetic] and then the last name DeFilippis or --
 4
 5   FS:  Hailey DeFilippis.
 6
 7   SS:  Hailey.
 8
 9   TC:  Hailey.  That's right.
10
11   SS:  Yeah.
12
13   FS:  Hailey DeFilippis.
14
15   TC:  And so I was curious, did -- were these people you
16        personally knew?
17
18   LM:  Was this -- yeah.  Is this --
19
20   TC:  This is from the FBI e-mail.  I --
21
22   FS:  Yeah.
23
24   TC:  -- I labeled as Item 3.
25
26   FS:  Sure.
27
28   TC:  You sent it to them on Monday, April 12, 2021.  You
29        sent it to me May 25th, 2022.
30
31   FS:  Okay.
32
33   TC:  If you can just read that.
34
35   FS:  I hate reading my own -- own e-mails.
36
37   JG:  No, I don't --
38
39   FS:  Well, this is -- I mean, we --
40
41   TC:  Did you -- did you have an association with them?
42
43   JG:  No.
44
45   TC:  Okay.
46
47   JG:  Not that I -- not that I know of.
48
49   TC:  And who --
50
```

```
 1   FS:   And let me just put this on the record.  I guess I'm
 2         under oath, too.  This was independent investigation
 3         I had that I provided to the FBI --
 4
 5   TC:   Okay.
 6
 7   FS:   -- to give them investigative tools.
 8
 9   TC:   I got it.  I -- I just -- I --
10
11   FS:   Yeah.  Okay.  So I -- I just want to let you guys
12         know that and I was the one who came up with --
13
14   TC:   With the phone number and everything?
15
16   FS:   Yes.  That was --
17
18   TC:   When I was looking at it I thought that maybe it was
19         a circle and he knew them or something.
20
21   FS:   Yeah, I said I did -- I just said -- I just -- I
22         didn't -- so that was actually -- I know which --
23         exactly what you're talking about.  That was me.
24
25   TC:   Got it.  All right.
26
27   FS:   Okay.  You -- you actually have proven that your
28         lawyer works for you.
29
30   JG:   Ah.
31
32   FS:   (Unintelligible).
33
34   TC:   Well I -- I wanted to clear that up --
35
36   JG:   Yeah.
37
38   TC:   -- just because I'm aware of other things that --
39
40   FS:   Sure.
41
42   TC:   -- are not part of us, but it's kind of a courtesy
43         to other investigators --
44
45   FS:   I understand.
46
47   TC:   -- if there's information they need to know about.
48
49   FS:   Yeah.
50
```

```
 1   TC:  I got a duty to get that to them.  So that has no
 2        relevancy --
 3
 4   FS:  That was me being --
 5
 6   TC:  -- (unintelligible).
 7
 8   FS:  -- Dick Tracy.
 9
10   TC:  Understood.
11
12   FS:  Okay.
13
14   TC:  And I'll just -- and that's -- that's perfect 'cause
15        that clears that.
16
17   FS:  Uh-huh.
18
19   TC:  Um, but because you talked about Frank Artiles
20        and -- and knowing him, communicating with him, I'm
21        going to throw out a few names to see if it jogs
22        your memory.  Do you -- were you aware of anything
23        involving the PAC Floridians for Equality and
24        Justice?
25
26   JG:  I want to say so -- it sounds like a stupid name
27        they would put together as -- it's just right --
28        it's in the playbook.
29
30   TC:  They sent mailers during the primary with Sigman and
31        Ashby.  So that was all for the primary that the
32        mailers that were sent out to the Seminole County
33        voters, and, you know, the voters for District 9 for
34        that primary came from Floridians for Equality and
35        Justice.  Does that ring any sort of bell, any
36        discussions you had with anybody?
37
38   JG:  Is that an established PAC?
39
40   TC:  Define "established."
41
42   JG:  That predates the 2020 election?
43
44   TC:  No.
45
46   JG:  Okay.  That -- no.  Not that -- that's right up the
47        ball -- as some stupid corny thing they would use to
48        make it sound legitimate.
49
50   TC:  Okay.  I --
```

```
 1
 2   JG:   That's just --
 3
 4   TC:   Do you have -- does anything --
 5
 6   JG:   -- that's --
 7
 8   TC:   -- I mean, did you have discussions about how this
 9         is done?  The -- that with these PACs?
10
11   JG:   Yeah.  They use -- yeah.  They use a name like that.
12         They get outside funding.  They've got a number of
13         people -- I mean, it's not -- not a whole lot of
14         sophistication around it.  They've got a number of
15         people who do mailers.              would often
16         send me, um, mailers that were demos to see what I
17         liked.  I had a creative eye with this -- with this
18         stuff.  And he -- he would bounce ideas off of me.
19         So you get a guy that you see and you mail those
20         out.  I mean, it's just --
21
22   TC:   Sure.  But it --
23
24   JG:   -- the problem is that they're not very good at it.
25         But --
26
27   TC:   -- the Floridians for Equality and Justice, again,
28         was specifically designed for the Senate District 9.
29
30   JG:   Yeah.  I'm sure.
31
32   TC:   And that's why I asked that it could have been
33         something that came up in conversation.
34
35   JG:   Not that name, no.
36
37   TC:   Okay.
38
39   JG:   But that name is someone they would totally pick.
40
41   TC:   Frank Artiles, again, he would have been the one
42         more than likely discussing this with Floridians for
43         Equality and Justice.
44
45   JG:   Yeah.  I --
46
47   TC:   Potentially.
48
49   JG:   -- um, yeah, I can't tie him directly to that, no.
50
```

```
 1  TC:  Okay.  All right.  Um, have you ever heard the name
 2        Stafford Jones?
 3
 4  JG:  Yeah, a quarterback for the Rams.
 5
 6  LM:  Pardon?
 7
 8  JG:  Is that on -- the quarterback for the Rams?
 9
10  TC:  No.  It's -- no, not Matthew Stafford but Stafford
11        Jones.
12
13  JG:  Stafford Jones?
14
15  TC:  Or Stephen Jones.
16
17  JG:  Stephen Jones.  I could have.
18
19  TC:  Okay.
20
21  JG:  They both -- they both sound familiar, but I -- I
22        can't place them anywhere.
23
24  TC:  Specifically dealing with PACs.
25
26  JG:  Out of Tallahassee?
27
28  TC:  Uh, in some sense.  They live in Alachua or
29        Gainesville area.
30
31  JG:  Not that I can directly recall.
32
33  TC:  Lots of ties to Tallahassee.
34
35  JG:  Yeah.
36
37  TC:  And all that.  Again --
38
39  JG:  I -- I can't directly say.
40
41  TC:  -- I now know how the game works with it.
42
43  JG:  Yeah.  Yeah.  I'm sure, yeah.
44
45  TC:  Uh, and again, I'm -- I'm not --
46
47  JG:  And that probably predates 2020 and all this, too.
48
49  TC:  Some of it does.
50
```

```
 1   JG:  Yeah.
 2
 3   TC:  Yeah.  So again--
 4
 5   JG:
 6
 7
 8
 9
10
11
12
13   FS:  No.  That --
14
15   JG:  Especially with the -- with the
16        2018 --
17
18   FS:  I'm being taped so I'm not gonna say --
19
20   JG:  -- yeah.
21
22   FS:  -- anything.
23
24   JG:  All right.
25
26   TC:  Okay.  Um, I'm trying to think of any other names.
27        Do you have any?
28
29   SS:  Adam --
30
31   LM:  Associated --
32
33   SS:  -- Karvoski.  Do you recognize the name --
34
35   TC:  That's all right.
36
37   SS:  -- Adam Karvoski?
38
39   JG:  Is he out of the Panhandle?
40
41   SS:  (No audible response).
42
43   JG:  No.  I -- I --
44
45   TC:  It's Todd Karvoski.
46
47   SS:  Oh, Todd.
48
49   LM:  Todd Karvoski.
50
```

64

```
 1  SS:  Right.  I forget the -- Todd Karvoski.
 2
 3  JG:  Todd.  No.
 4
 5  TC:  Um, Adam Heath or James Adam Heath or Adam Heath?
 6
 7  JG:  I -- I can't --
 8
 9  TC:  Okay.  One more.  Stephen Smith.
10
11  JG:  God, that's not --
12
13  TC:  I know.  But this would be a cousin of Ben Paris.
14
15  JG:  Stephen Smith?
16
17  TC:  Yeah.
18
19  JG:  Possibly.  I mean, it's a very, very --
20
21  TC:  Sure.
22
23  JG:  -- general name.  Possibly.
24
25  TC:  Okay.  Um, the other two names are people who are
26       friends with Foglesong.  Mr. Karvoski -- did you
27       guys ever go to the --
28
29  SS:  Twin Peaks.
30
31  TC:  -- Twin Peaks in Altamonte?
32
33  JG:  Oh, yeah.  Oh, yeah.  All the time.
34
35  TC:  With Foglesong?
36
37  JG:  Oh, yeah.
38
39  TC:  Okay.
40
41  JG:  Yeah.
42
43  TC:  That's why -- especially Karvoski because that's
44       where he met Foglesong.  Do you -- so --
45
46  JG:  That's where I met him?
47
48  TC:  No, no, no.
49
50  JG:  Oh.
```

```
 1
 2   TC:   Foglesong and Mr. Karvoski met at the Altamonte Twin
 3         Peaks.
 4
 5   JG:   Yeah.             would have been there.
 6
 7   TC:   I believe so.
 8
 9   JG:   Yeah.
10
11   TC:   Possibly.  Um, but again, does that name ring a bell
12         with you?
13
14   JG:   Not the last name.  I mean, it would have been a
15         first name.
16
17   TC:   Todd.
18
19   JG:   Yeah.  So that's --
20
21   TC:   He had a girlfriend at the time that lived in
22         Altamonte.  Um, so that's why he would frequent
23         there and ran into Foglesong.
24
25   JG:   Can't say for certain.
26
27   TC:   Um, I think that's all the names.
28
29   SS:   I don't have any additional.
30
31   TC:   Doug Crawford's the only other name that's just
32         loosely associated.  And that's only 'cause Iannotti
33         brought it up.
34
35   JG:   Uh-uh.
36
37   TC:   Okay.
38
39   LM:   Going into the Miami one.  I can't remember the name
40         of the -- the other gentleman.
41
42   TC:   Oh, that was, um, the other candidate?
43
44   LM:   I can't remember the name.
45
46   TC:   It -- it -- I know.  It's very common.  Like a Jorge
47         Rodriguez or -- or something.  Um --
48
49   LM:   Do you have any other -- do you remember anything or
50         any discussion pertaining to the races itself in
```

```
 1          Miami where Artiles is --
 2
 3  SS:  I would say he was House 23.
 4
 5  LM:  -- being --
 6
 7  JG:  Yeah.
 8
 9  SS:  He was House 23.
10
11  JG:  Just that they used a name that would have been a
12       Spanish name and confuse people.  The -- that's --
13       but, no, not the specific -- well, that -- well,
14       I -- I remember hearing about it and laughing 'cause
15       it's just -- it's -- it's literally just something
16       we would talk about.  One of the papers had written
17       something about it, and I was -- I was laughing
18       'cause it's, like, verbatim the stuff we would talk
19       about at              house.  And --
20
21  TC:  Where -- were you, uh, in custody or on bail on
22       April 8th of 2021?
23
24  JG:  Yeah.
25
26  LM:  (Unintelligible).
27
28  JG:  I was in -- in here.
29
30  FS:  He was in custody.
31
32  TC:  You -- he was in custody?  Okay.
33
34  FS:  It's anything after February 2020.
35
36  TC:  Anything after February.  Okay.  Thank you.  Um,
37       it's just --
38
39  FS:  or late February.  It's late February.
40
41  TC:  -- it was weird because           abruptly resigned
42       from the
43
44  JG:  Yeah.  'Cause of all this stuff going on with --
45
46  TC:  On April 8th, after there was an article --
47
48  JG:  I'm gonna -- yeah, I could tell them whatever, I
49       guess.
50
```

```
 1   FS:  You can tell them everything.
 2
 3   JG:  Yeah.  Because this --
 4
 5   TC:  Okay.
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24   JG:               And I don't -- I don't know what
25        came out to the media.  I -- I don't have access to
26        the -- to the paper or anything like that.  So only
27        thing I would know is what -- what Abby would tell
28        me.
29
30   TC:  Right.
31
32   JG:  I guess some stuff was in Politico.  I don't know
33        what was --
34
35   TC:  Sure.
36
37
38
39
40
41   TC:  Got it.
42
43   JG:  It's a significant move for him.
44
45   TC:  Yeah.  There's just -- the Sentinel put out an
46        article.  It was mostly about the ghost candidate
47        scheme and stuff.  But there was a little more
48        information that came out.  Um, and then -- then he
49        resigns.  That stuff was kind of already out there,
50        from my recollection and stuff.
```

```
 1
 2  JG:
 3
 4
 5  FS:
 6
 7  LM:  I don't --
 8
 9  FS:  -- I don't know if the -- I don't think there's ever
10       been a public --
11
12  JG:  Is -- is there -- you haven't?
13
14  TC:  I don't think anything that links --
15
16  JG:  Okay.  All right.
17
18  TC:
19
20  JG:  Then somehow he -- he was -- he was interviewed --
21
22  TC:  But there was election stuff and everything so maybe
23       he was interviewed that day and it's just a
24       coincidence --
25
26  JG:  Something, yeah.
27
28  TC:  -- on the article and stuff.
29
30  JG:  He didn't --
31
32  TC:  But if you were in here there wouldn't have been --
33       you know, 'cause it seems like there's a lot of
34       communication around the 8th because the other thing
35       that's interesting is there's -- Foglesong reaches
36       out to all the straw donors on the 8th.  That's why I
37       thought it was more so associated with the election
38       stuff than it was any possible things.
39
40  JG:  They were all probably freaking out.
41
42  TC:  Well, and the other thing I want to touch on,
43       this -- this was in, um, kind of the intelligence
44       that we're able to have access to and everything.
45       Um, and just so we know as we move forward with Mr.
46       Foglesong, he came up as being linked to the
47               basically.  Um, and some -- some intel that we
48       were able to -- to gather before we even were -- at
49       the beginning of this investigation.
50
```

69

```
 1
 2
 3    JG:
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15    TC:
16
17
18
19
20    JG:
21
22    TC:   But the -- any of these conversations with Brodeur
23          and stuff involve any of            'Cause I
24          know you're kind of vague.
25                              So when -- as we're
26          questioning people we kind of don't want to step
27          into the arena of that, but were any of these
28          political discussions that we're talking about with
29          Brodeur present with Artiles and everything, was
30          this also part of
31
32
33    JG:   He -- uh, Brodeur was never really involved in
34          anything
35                              No.  I don't --
36
37    FS:
38
39
40    JG:
41
42    FS:
43
44    JG:
45
46
47
48    TC:
49
50    JG:
```

```
 1
 2
 3
 4
 5
 6
 7    TC:
 8
 9
10
11
12    JG:
13
14    TC:
15
16    JG:
17
18
19    TC:
20
21
22
23
24    SS:
25
26
27    JG:
28
29
30    LM:
31
32    JG:
33
34
35
36    LM:
37
38    JG:
39
40
41    LM:
42
43    TC:
44
45
46
47    JG:
48
49    TC:
50
```

```
 1   JG:   Well --
 2
 3   TC:   Again, money.  That's the only way --
 4
 5   JG:         didn't trust nothing so he didn't want
 6         anything to do with Foglesong.
 7
 8   TC:   Okay.
 9
10   JG:   So that element, I would say --
11
12   LM:
13
14
15   JG:
16
17
18
19
20
21
22
23   TC:
24
25
26
27
28
29   FS:   Well, I -- I --
30
31   LM:   Any other --
32
33   JG:   Have you -- have you talked to Chris --
34
35   FS:   -- I --
36
37   JG:   -- Anderson about any --
38
39   TC:   Well, that was another one I wanted to bring up.
40         Thank you for reminding me.  Chris Anderson's the
41         current Supervisor of Elections.
42
43   JG:   Yeah.
44
45   TC:   He used to work for you.
46
47   JG:   Correct.
48
49   TC:   Was he involved in any of this?
50
```

```
 1    JG:  No.  But they may have -- they, the people we've
 2         talked about -- may have asked him for guidance on
 3         certain things, questions.  Um --
 4
 5    SS:  Who's "they"?
 6
 7    JG:  Brodeur,           If there's any questions
 8         involving any elections, they would either ask
 9         or Anderson, both of who were friends and, you know,
10         it's not uncommon -- I don't know if it was -- it's
11         not uncommon for -- you -- you'd be able to ask
12         Chris a question.  Chris would kind of understand
13         without having to say too much.
14
15    SS:  Anderson?
16
17    JG:  Yeah.  He, in no way, shape or form, was involved in
18         any of the schemes.  I don't even know how competent
19         he was at his job come 2020.  He was still learning
20         it.  He probably -- you know, he probably knew it.
21         Um, however, they -- they may have asked him
22         questions or guidance, that sort of things.  I know
23         I did.  You know, Hey, I'm going to do this.  How do
24         you do it?  Well, in theory, if you're going to do
25         this, you would have done that.            though, was
26         the only other person maybe you want to talk to,
27         'cause he knows election matters.
28
29    LM:  Any other politicians, um, elected officials in
30         these parties?
31
32    JG:  (No audible response).
33
34    LM:  From anywhere in the state.
35
36    JG:
37
38
39    SS:
40
41
42
43    JG:
44
45    SS:
46
47
48
49    JG:  Okay.
50
```

```
 1   SS:   -- let's kind of exhaust the line of questioning as
 2         it relates to Senate 9 just so we don't get
 3         confused, if that's all right.
 4
 5   TC:   Right.  And I just want to make it clear, again, you
 6         know, with what we're looking at.  With, um,
 7                                   was he partied to
 8         conversations about Senate District 9 and the ghost
 9         candidates scheme?  Firsthand knowledge that you
10         were there and he knows.  So you'd be somebody to
11         corroborate.
12
13   JG:        was at              house.  What I -- what I
14         recall, this one specific time       was on his
15         phone walking around the pool.  I don't know if
16         you've ever been to          house.  All right?  Have
17         you?
18
19   TC:   I -- no.
20
21   JG:   Okay.  There's a pool in the back yard.
22
23   TC:   Okay.
24
25   JG:   And it's an open back yard area.  So if he was
26         walking around, I remember him.  I remember sitting
27         on the couch talking to        Paris was there
28         and -- and Brodeur.  Um, I know I -- no, not
29         specifically.
30
31   TC:   Okay.
32
33   JG:   But again, it's --
34
35   TC:   But at this time there --
36
37   JG:   -- inconceivable that he would not know.  These
38         guys, they did everything as a -- as a group.
39         Everything.  They would -- initially got into the
40         Florida House together as a group and they lived
41         together.  They went to school together.  And
42         they --
43
44   TC:   Sure.  Did -- do you know if            gave money
45         to fund the qualifying fee to Eric Foglesong?
46
47   JG:   I don't.  I know that     had a -- has significant
48         influence over some of the medical marijuana people
49         specifically out of Denver that do business with
50         Florida.  Um, there's a relationship between Nikki
```

```
 1        Fried's fiancé and            and -- and
 2        fundraising.  Uh, Jacob is his name.
 3
 4   TC:  Okay.
 5
 6   JG:  So, no, not specifically --
 7
 8   LM:  There was a --
 9
10   JG:  -- I don't I -- know of a smoking gun.
11
12   TC:  Sure.
13
14   LM:  I just -- there was a check that was to have been
15        from Nikki Fried's boyfriend to the Reagan thing,
16        right?  The event, the Reagan event?
17
18   JG:  (No audible response).
19
20   LM:  Or a check that was given by Nikki Fried's boyfriend
21        to --
22
23   JG:  There was an event that I was at where -- where
24        Nikki Fried's boyfriend gave a check to        But
25        I mean, it was for his --
26
27   LM:  Okay.
28
29   JG:  -- it was, like -- it was a like 50 grand or a
30        hundred grand --
31
32   LM:  Sorry.  I just wanted to clarify that.
33
34   TC:  Right.
35
36   JG:  It was the one that Roger Stone was at and
37
38
39   TC:  Okay.  Did you fund the qualifying fee for the
40        Senate District 9?  Since you talked about cash and
41        -- and paying people.
42
43   JG:  No.
44
45   TC:  Okay.  Do you know if Jason Brodeur gave any cash to
46        Eric Foglesong to fund the qualifying fee?
47
48   JG:  No.  I don't think Jason --
49
50   TC:  Do you know --
```

```
 1
 2   JG:  -- was -- I don't think Jason is as affluent as --
 3        as someone like
 4
 5   TC:  Okay.  Do you know firsthand that          gave cash
 6        to Eric Foglesong to provide the qualifying fee for
 7        Jestine Iannotti's candidacy?
 8
 9   JG:  No, I don't know for -- I don't have --
10
11   TC:  Is that your hunch that it would have been him if
12        anybody provided money to Eric Foglesong for that?
13
14   JG:  He would have been involved.
15
16   TC:  Okay.             did he provide the money to Eric
17        Foglesong?
18
19   JG:            didn't have any money.
20
21   TC:  Okay.
22
23   JG:  No.
24
25   TC:  Frank Artiles, did he provide the money to Eric
26        Foglesong?
27
28   JG:  Could have.  Not that I'm aware of, though.
29
30   TC:  Understood.  Okay.  Stacey, I think that's as direct
31        with everything that I can possibly think at this
32        time.
33
34   SS:  Great.
35
36   TC:  Okay.
37
38   SS:  Anything else, Inspectors, as it relates to Senate
39        9?
40
41   TC:  Not at this point.  I'll rack my brain while you go
42        through.
43
44   JG:  I hope that was helpful, like, somewhat, the context
45        of everything.
46
47   TC:  Yes.  No.  Thank you.  There -- there -- there's
48        context.
49
50   JG:  It's like I know what these guys are doing.  It's
```

```
 1        like --
 2
 3   FS:  Well, let's just --
 4
 5   JG:  -- but not to have --
 6
 7   TC:  Just don't --
 8
 9   FS:  -- just -- just hold on.
10
11   TC:  -- don't -- don't worry about it.
12
13   FS:  Let them -- let --
14
15   TC:  We --
16
17   FS:  You answer the questions.
18
19   TC:  -- yeah.  There's --
20
21   FS:  So, um, I will get the -- well, we'll go off.  We'll
22        talk about this.
23
24   TC:  Yes.
25
26   FS:  But I'm going to get the -- I'm going to get the
27        phone -- to get a copy, forensic copy of the phones.
28
29   TC:  That might be very beneficial.
30
31   FS:  All right?
32
33   SS:  Yes.
34
35   TC:  More so.  Um --
36
37   FS:  Put that on my list.
38
39   TC:  -- if you've got questions, I'm going to move it
40        more to the center.
41
42   SS:  Well, I -- I -- I do.  But I'm going to pivot and
43        start talking about the tax collector's race and
44        then the                                    .  We
45        can explore that.  So are you okay to move away from
46        a Senate 9 --
47
48   TC:  Absolutely.
49
50   SS:  -- line of questioning?
```

```
 1
 2  TC:  Please.
 3
 4  SS:  Okay.  So which would you like to talk about first?
 5
 6                    or the tax collector's race?
 7
 8  JG:  We can get the tax collector's race out of the way.
 9
10  SS:  Okay.  Tell me what year.
11
12  JG:  2020.
13
14  SS:  And you were running as the incumbent, correct?
15
16  JG:  Yes.  Yes.
17
18  SS:  And who was running against you?
19
20  JG:  I had two primary candidates with the Republican
21       side, and then there was one, um, on the Democrat
22       side.  And then there was the no party affiliation
23       candidate so -- I was involved in.
24
25  SS:
26
27
28
29
30  JG:  Yes.
31
32  SS:  When were you arrested?
33
34  JG:  Today two years ago.
35
36  SS:  Really?
37
38  JG:  Yes.
39
40  SS:  Okay.  So --
41
42  FS:  Uh-huh.
43
44  SS:  -- back on June the 23rd --
45
46  JG:  Yeah.
47
48  SS:  -- of 2020 you were arrested?
49
50  JG:  Yes.
```

```
 1
 2  SS:  So that's kind of in the throes of all of the
 3       positioning as it relates to that 2020 election,
 4       correct?
 5
 6  JG:  It's right after qualifying.
 7
 8  SS:  So, um, you didn't even make it to the primary,
 9       right?
10
11  JG:  Correct.  I resigned about a week after being
12       indicted.
13
14  SS:  So talk to me then.  Understanding that we didn't
15       get to even a primary election in your race, talk to
16       me about the posturing that, um, took place with the
17       NPA candidate, no party affiliation candidate as it
18       relates to that 2020 tax collector's race for
19       Seminole County Tax Collector.
20
21  JG:
22
23
24
25
26
27
28
29
30
31
32
33
34
35
36
37
38
39
40
41
42
43
44
45
46
47
48
49
50
```

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14    SS:
15
16
17    JG:
18
19    SS:
20
21    JG:
22
23
24
25
26
27
28
29
30
31    SS:
32
33    JG:
34
35
36    FS:
37
38    JG:
39
40
41
42    SS:
43
44    JG:
45
46
47
48
49    SS:
50
```

```
 1
 2
 3    JG:
 4
 5    TC:
 6
 7    JG:
 8
 9
10
11
12    SS:
13
14
15
16    JG:
17
18    SS:
19
20
21    JG:
22
23    FS:
24
25
26
27    JG:
28
29    FS:
30
31
32    JG:
33
34
35    FS:
36
37    SS:
38
39    FS:
40
41    JG:
42
43
44
45
46
47
48    FS:
49
50    JG:
```

```
 1
 2   FS:
 3
 4   JG:
 5
 6
 7   FS:
 8
 9
10   JG:
11
12   FS:
13
14   JG:
15
16
17
18
19
20   SS:
21
22
23
24
25
26
27
28   FS:
29
30   SS:
31
32   JG:
33
34   SS:
35
36   JG:
37
38   SS:
39
40   JG:
41
42   SS:
43
44   JG:
45
46   FS:
47
48
49
50   JG:
```

```
 1
 2
 3   TC:
 4
 5
 6   JG:
 7
 8   SS:
 9
10   TC:
11
12   SS:
13
14
15
16
17   JG:
18
19   SS:
20
21   JG:
22
23   SS:
24
25   JG:
26
27   SS:
28
29   TC:
30
31
32
33   JG:
34
35   TC:
36
37   JG:
38
39
40   TC:
41
42   SS:
43
44   JG:
45
46   FS:
47
48   JG:
49
50
```

```
 1
 2  FS:
 3
 4  TC:
 5
 6  SS:  I -- I'm mindful of the category of offense as we
 7       discuss this under state statute, as well.  Be they
 8       either third-degree felonies or first-degree
 9       misdemeanors and the time frame that we are
10       discussing in terms of statute of limitations.
11
12  TC:  I have some felonies for you.
13
14  SS:  Okay, very good.
15
16  TC:  If the -- if the -- if the amount's correct and I
17       found a new statute while you were out.  So we'll
18       discuss.
19
20  SS:  Okay.  All right.  Very good.  All right.  Um, what
21       other questions as it relates to the tax collector?
22
23  LM:  Was anyone else involved in this?
24
25  JG:  (No audible response).
26
27  LM:
28
29  JG:
30
31  LM:
32
33  JG:
34
35  LM:
36
37  JG:
38
39
40  TC:
41
42
43  JG:
44
45  TC:
46
47  JG:
48
49  TC:
50
```

84

```
 1   JG:
 2
 3
 4
 5
 6
 7   TC:
 8
 9
10   JG:
11
12   TC:
13
14   JG:
15
16   TC:
17
18
19   JG:
20
21   TC:   Okay.  Um, the Anthony Sabatini, I -- if I'm
22         remembering correctly, does he not live in Lake
23         County area?
24
25   JG:   Yes.
26
27   TC:   Okay.
28
29   JG:   Yeah.
30
31   TC:   So I'm still trying to figure out why someone from
32         Lake County would be called in to help you at the
33         Tax Collector Office.
34
35   JG:   'Cause                  asked.
36
37   TC:   But was he -- was he an attorney or what --
38
39   JG:   Yeah.  Yeah, yeah, yeah.
40
41   TC:   -- what was your understanding?  Okay.
42
43   JG:   He had just --
44
45   TC:   All right.  That's different.
46
47   JG:   -- he had just passed the Bar.  And I wanted to get
48         him some experience plus --
49
50   TC:   Okay.
```

```
 1
 2   JG:   -- give him some money coming in.
 3
 4   TC:   Got it.
 5
 6   JG:   But it was another thing.  Once I got indicted, I
 7         mean, it's just -- all those things kind of --
 8
 9   TC:   Did you ever run in circles with any of the Orange
10         County Republican operatives for doing county
11         commission races and stuff like that?
12
13   JG:   Some, yeah.
14
15   TC:   Were you aware of a write-in scheme for a county
16         commission seat in 2020?
17
18   JG:   (No audible response).
19
20   TC:   For Orange County.
21
22   JG:   Only one?
23
24   TC:   Well, there could have been more.  There was one
25         that I've stumbled across that could have legs for a
26         possible criminal investigation.  Um, so I'm just --
27         I'm just throwing out the -- I'll go through how I
28         do it and then step up the information I give you to
29         see if it jogs your memory.  But did you have any
30         discussions with somebody, uh, from Orange County
31         about write -- this is a write-in ghost candidate
32         scheme in this case.
33
34   JG:   No, not -- not -- not that I can recall.
35
36   TC:   Okay.  Um, did you ever -- were you ever in
37         communication or have run-ins with former Orange
38         County Commissioner Scott Boyd?
39
40   JG:   No.
41
42   TC:   Okay.  There was a treasurer that's out of Lake
43         County but works in Apopka that's maybe pertinent to
44         this, a David Rankin, who was involved in politics.
45
46   JG:   Rankin.  I know that name.
47
48   TC:   You know the name but have you had personal dealings
49         with?
50
```

```
 1  JG:  I know the name.  But not that I recall.
 2
 3  TC:  Okay.  That's all I have on that.
 4
 5  SS:  I have nothing else to add.
 6
 7  TC:  Okay.
 8
 9  LM:  And you wanted to follow up with --
10
11  SS:  I do.  Anything else, though, as it relates to the
12       tax collector before we pivot?
13
14  LM:  Not pertaining to the race.  No.
15
16  SS:
17
18
19  JG:
20
21  SS:
22
23  JG:
24
25  SS:
26
27  JG:
28
29
30
31
32
33
34
35
36
37
38
39
40
41
42
43
44
45
46
47
48
49
50
```

```
 1
 2
 3
 4
 5    SS:
 6
 7    JG:
 8
 9    SS:
10
11    JG:
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
29
30
31
32
33
34
35
36
37
38
39
40
41
42
43
44
45
46
47
48
49
50
```

88

```
 1
 2
 3
 4
 5
 6    SS:
 7
 8    JG:
 9
10    SS:
11
12    JG:
13
14    LM:
15
16    JG:
17
18
19
20
21    SS:
22
23
24
25    JG:
26
27    SS:
28
29    JG:
30
31
32
33
34
35
36
37
38
39
40
41
42
43
44
45
46
47    SS:
48
49    JG:
50
```

1   SS:
2
3   JG:
4
5   SS:
6
7
8   JG:
9
10  SS:
11
12
13
14  JG:
15
16
17
18
19  LM:
20
21  JG:
22
23
24
25
26
27
28
29
30
31
32
33
34
35
36
37
38
39
40
41
42
43
44
45
46  SS:
47
48  JG:
49
50  SS:

```
 1
 2   JG:
 3
 4   SS:
 5
 6   JG:
 7
 8
 9
10
11
12
13
14
15
16   SS:
17
18
19
20   JG:
21
22   SS:
23
24
25
26   JG:
27
28   SS:
29
30   JG:
31
32   LM:
33
34   SS:
35
36   JG:
37
38   SS:
39
40
41   JG:
42
43
44
45
46
47   SS:
48
49
50
```

1
2
3
4     JG:
5
6     SS:
7
8
9
10    JG:
11
12    SS:
13
14    JG:
15
16    SS:
17
18
19
20
21    JG:
22
23
24
25
26
27
28
29
30
31
32
33
34
35
36    SS:
37
38    JG:
39
40
41
42
43
44
45
46
47    SS:
48
49    JG:
50

```
 1   LM:
 2
 3
 4   JG:
 5
 6
 7
 8
 9   SS:
10
11
12   TC:
13
14
15   JG:
16
17   TC:
18
19
20   JG:
21
22   TC:  Okay.
23
24   SS:  So with that, Inspectors --
25
26   TC:  I think he's got some.
27
28   LM:  It kind of was just general -- now that you're
29        sitting there, honestly.
30
31   TC:  Did you want to -- Kruppenbacher?
32
33   LM:  Um, on a couple of names, just kind of pick your
34        brains to see if anything flares up.  A lot of them
35        you just mentioned along the way.  I  mean that it
36        seems that
37
38   JG:  Uh-huh.
39
40   LM:  Is that pretty much where everyone just gathered and
41        just --
42
43   JG:  Yes.  Yes.  He had a big house and it's -- anything
44        went, kind of.
45
46   SS:  Where was his wife?
47
48   FS:  That's -- that's what I was just going to tell you.
49        And -- yeah.
50
```

```
 1   JG:  Out.  She would spend time at their place up in
 2        North Carolina.
 3
 4   SS:  Okay.
 5
 6   JG:  They have a house up in North Carolina.
 7
 8   SS:  So gone for extended periods of time?
 9
10   JG:  Correct.  With a -- with a -- then toddler and --
11        yeah.
12
13   SS:  Was she ever present for any of these meetings?
14
15   JG:  No.
16
17   SS:
18
19   JG:
20
21
22
23
24   SS:  Was she present for any of the meetings with the
25        principals that we've discussed?
26
27   JG:  When I was there, not that I recall.  Her not being
28        present during some of those I was not at would be
29        also inconceivable to me.
30
31   FS:                                   That's --
32
33   JG:  No, no.
34
35   LM:  Um, and again, it's more of a general -- anything
36        that comes to mind that would be -- you would
37        consider illegal that occurred.  And if it's not,
38        we'll stop you and we'll move on.  And it's not a
39        problem.  Um, let's -- just throwing names out
40        there, Mr. Bob Cortez.
41
42   JG:  Bob.  Um, no.  Nothing that I know of.
43
44   LM:  Okay.  Just because you just made -- Kruppenbacher.
45
46   JG:  Kruppenbacher, I mean, he -- I was introduced to
47        Frank the end of '17.  Um,           introduced him
48        to me.  Frank said that he wanted to do some legal
49        work for the office.  And I said okay.  So I tried
50        to find -- a lot of times I found myself trying to
```

94

```
 1        accommodate people, and I shouldn't have been.
 2
 3        And Frank drew up a contract that paid him, I think,
 4        $6,000 a month for a period of time to help with
 5        some legal matters.  He really oversold what he
 6        could do.  Um, he was supposed to set up -- he was
 7        supposed to set up some sort of either political
 8        action committee or something to help me in the 2020
 9        election.  And that -- that's another thing he never
10        got around to doing.  But I paid him a lot of money
11        for very little.  I mean, he was paid a lot of money
12        from the office and he didn't -- didn't really do
13        anything.
14
15  LM:   What time period was that?
16
17  JG:   Um, all 2018, '19 into 2020.
18
19  LM:   So was there an agreement like not necessarily
20        political but an agreement that, I'm gonna overpay
21        the hell out of you, uh, for you to do nothing?  You
22        know, was it just to give you money or was it actual
23        -- for actual work that he just underdelivered?
24
25  JG:   I think probably both.
26
27  SS:   What was the benefit to you?
28
29  JG:   He, Frank, would always say, Oh, I'm going to get
30        you this, I'm gonna get you -- I'm gonna get you a
31        political action committee and we'll raise a bunch
32        of money for your, you know, re-election, or we'll
33        have -- he would promise that he would do certain
34        things at the office like set up some sort of a
35        children's day.  You know, we had kids come in and
36        learn about the -- so he would sell me on the idea
37        of something that would sound legit and just never
38        follow through on anything.  He did get me to a
39        couple of events with -- with then Governor Rick
40        Scott, some dinners, you know, with just, like, four
41        or five people.  But other than that, I mean, he was
42        just getting paid to do nothing.
43
44  SS:   So access?
45
46  JG:   Yeah.
47
48  SS:   He provided you access?
49
50  JG:   Correct.  Yeah.
```

```
1
2   LM:  Was he paid by billing hours or was it -- was it
3        just a kind of a --
4
5   JG:  It was -- it was a -- a monthly amount.
6
7   LM:  Monthly amount?
8
9   JG:  And then -- yeah.  Then -- and then I believe he
10       also had an amount in escrow.
11
12  FS:  An amount?
13
14  JG:  He had, like, 50,000 in escrow that he was -- at the
15       beginning of the year he had like 40 or $50,000 or
16       something.
17
18  LM:  Okay.  But (unintelligible) technically his
19       employment with your office was -- I hate to put it
20       this way, somewhat legit.  He was paid to do some
21       work.  But was it, again, an agreement from the get
22       go, This is just to give you money?
23
24  JG:  I don't believe he did any work for the office.  He
25       said he was -- he had a lot of good ideas and their
26       access to certain things that he'd provide.  But --
27       okay, now I do remember.  Richard Anderson told
28       me -- so Richard Anderson told me that the original
29       -- so this is -- this was done behind my back, and I
30       didn't learn about it till after the fact, that the
31       amount of money that I paid him monthly to Frank
32       Kruppenbacher was supposed to be split behind the
33       scene 50/50 with Richard Anderson.
34
35  LM:  For --
36
37  JG:  Just because I was known to give out contracts to
38       people and not follow up.
39
40  LM:  All right.  Was there a contract with Kruppenbacher?
41
42  JG:  Yes.
43
44  LM:  That I believe you said he did himself?
45
46  JG:  Correct.
47
48  LM:  Okay.  Um, what was his involvement with GOAA?
49
50  JG:  Well, he was the chairman for a while.
```

```
 1
 2    LM:   How did he get the spot?
 3
 4    SS:   Was he chairman or was he legal counsel?
 5
 6    JG:   No, he was chairman.
 7
 8    FS:   I don't know, honestly.  So --
 9
10    JG:   He was chairman.  Legal counsel was Marchena.
11
12    SS:   Marchena.
13
14    JG:   There was a lad -- so, uh, how did he get the spot?
15          From Rick Scott.  Yeah.  It's -- I don't -- I don't
16          know the --
17
18    LM:   Particulars.
19
20    JG:   I came on to the scene.  I mean, you know,
21          (unintelligible) he did not win anything, anybody.
22          So, yeah.  That's -- but there -- there was -- Frank
23          would allude to certain things that there was a lot
24          of overflow between UCF and GOAA board as far as
25          vendors and different people.  I know Marchena was
26          involved as legal counsel, right?  Yeah.  Both.  I
27          think.  But I don't -- I don't -- this stuff was
28          over my head.
29
30    LM:   Okay.  Anything else you know about Mr.
31          Kruppenbacher?
32
33    JG:   Nothing criminal.
34
35    LM:   Okay.  All right.  Oh.  Um, have you had any
36          dealings with elected officials like outside the
37          county?  Just throw out a name.  Charles Culp.
38
39    JG:   Charles Culp?
40
41    LM:   Culp.
42
43    JG:   No.  I don't think so.
44
45    LM:   No?  Okay.  Um --
46
47    JG:   There would be times -- not often, but there were
48          times where I was asked to donate to a campaign,
49          some nominal amount, and I would.
50
```

```
 1   LM:  All right.  Janet Cohen [phonetic]?
 2
 3   JG:  No.
 4
 5   LM:  No?  All right.  You mentioned something in
 6        Gainesville pertaining to          and him wanting
 7        to -- I wish I would have asked at that point 'cause
 8        I don't remember.  Him wanting to get something
 9        passed.
10
11   JG:  There were different legislators that he would know
12        who would file bills on his behalf, pretty much.
13        One of them was out of Gainesville.  I don't know
14        the guy's name.
15
16   SS:  Is it Baxter?
17
18   JG:  Yeah.
19
20   LM:  Anything particular about --
21
22   SS:  Dennis Baxter?
23
24   JG:  Yeah.
25
26   SS:  He's out of Ocala, I believe.
27
28   JG:  There you go, yeah.
29
30   LM:  Okay.
31
32   JG:  So that's one of the people he would use.
33
34   SS:  I don't want to testify, either.  But if that's your
35        recollection --
36
37   JG:  That's -- that's -- that's one of the names that I
38        remember coming up as far as people he knew.
39
40   SS:  And there was legislation, just to flesh out the
41        topic, a few years ago -- within the last two to
42        four years -- as you said, that would have limited
43        the creation of either a preserve or some type of
44        state or county-recognized --
45
46   JG:  Yeah.
47
48   SS:   -- land from being within a certain --
49
50   JG:  Yeah.
```

98

```
 1
 2   SS:   -- distance of a university.  And I think it was
 3         even a public university.
 4
 5   JG:   Correct.  Yes.
 6
 7   SS:   And was that --
 8
 9   JG:   Yes.
10
11   SS:   Was it your understanding that that was specifically
12         because the land that          ad hoped to develop
13         that was that Seminole County area east of Oviedo
14         moving towards Orange County, was so close to UCF --
15
16   JG:   Correct.
17
18   SS:   -- that had the legislation passed, it would have
19         been a benefit to          and his development
20         project?
21
22   JG:   Correct.  And I remember him talking to        about
23         that one, yeah.  Yeah.
24
25   LM:   Anything --
26
27   JG:   Just something like, "Nice try," or, "That was
28         slick," or something or -- he'd just -- he -- he
29         couldn't catch a break with that development.  You
30         know, what he did, it just --
31
32   LM:   Did he ever get the Oviedo stuff passed that he
33         want --
34
35   SS:   That's what that --
36
37   JG:   That's what we're talking about.
38
39   SS:   -- that's what that --
40
41   LM:   Oh, that is that -- it --
42
43   SS:   Yeah.
44
45   JG:   Yeah.
46
47   LM:   Okay.  That is pertaining to that, also?
48
49   JG:   That's what I'm talking about, yeah.
50
```

```
 1   SS:  Yeah.  Yeah.
 2
 3   LM:  Okay.  Okay.
 4
 5   SS:  And what's the name?
 6
 7   JG:
 8
 9   SS:
10
11   LM:
12
13   SS:  And as a matter of fact, there's been protracted
14        litigation from Seminole County.  Seminole County
15        has since won, um, and he's vowed --          has
16        vowed an appeal.  Tedrow was his attorney on some of
17        it.
18
19   JG:  Uh-huh.
20
21   SS:  Trying to claim that it was a violation of, um --
22
23   JG:  Civil rights.
24
25   SS:  Correct.
26
27   JG:  Yeah.
28
29   SS:  'Cause there was an unfair -- a disproportionate
30        number of certain --
31
32   JG:  They're racist.
33
34   SS:  -- in some housing out here and --
35
36   JG:  Yeah.
37
38   SS:  -- his development would have -- would have included
39        a certain element of low-income housing.  And so the
40        fact that he wasn't permitted to develop -- hearing
41        I'm on record, this is just my understanding.  But
42        that -- but there's been protracted litigation.
43
44   FS:  Yeah, he was (unintelligible).
45
46   SS:  So far he's lost.
47
48   TC:  Yeah.  He's got a --
49
50   FS:  He does --
```

```
 1
 2   TC:  -- $500,000 fee on him now, too.
 3
 4   SS:  Judgment.
 5
 6   TC:  Judgment.
 7
 8   SS:  Against him for the trial fees for the county.
 9
10   TC:  According to the media so I don't --
11
12   FS:  Yeah.
13
14   JG:  He's got a lot of --
15
16   FS:  That was Judge --
17
18   JG:  -- he got a lot --
19
20   FS:  -- it was Judge Conway's.
21
22   SS:  Yeah.
23
24   JG:  -- he does, yeah.  A lot invested in it.
25
26   FS:  Those -- yeah, she's a great judge.  Judge Conway.
27
28   TC:  Now, this is Tedrow and          Was Tedrow -- was
29        Tara -- Tedrow, right?
30
31   FS:  Yeah.
32
33   TC:  Was she present at any of            where these
34        discussions took place?
35
36   JG:  No.  I saw her at a couple of fundraisers but not --
37        no.
38
39   TC:
40
41
42   JG:  Yeah.  Yeah.  And I know he had an intimate
43        relationship with her.
44
45   TC:  Okay.  But she was not present, somebody that was
46        present --
47
48   JG:  No.
49
50   TC:  -- when that -- okay.  Just to cover that.
```

```
 1
 2   SS:   But she engages in the marijuana litigation on
 3         behalf of Lowndes, Drosdick.
 4
 5   JG:   Yes.
 6
 7   SS:   She's kind of considered a local expert as it
 8         relates to those issues.
 9
10   JG:   Correct.
11
12   SS:   So how does that tie into the issues of Pirozzolo
13         who also is on the short list, right, for having
14         been medical director as it relates to some of
15         these --
16
17   JG:   Yeah.  He would form the companies and --
18
19   SS:   Correct.  So what about all that?  Do you know
20         anything about all that?
21
22   JG:   I mean --
23
24   SS:   Tara Tedrow, Pirozzolo,      with the cannabis.
25
26   JG:   Yeah.  It's all intertwined.
27
28   SS:   Of course it is.
29
30   JG:   Yeah.
31
32   SS:   But what can you tell us about it?
33
34   JG:   From memory?  I mean, what do you -- what do you
35         want to know?  I mean, specifically.  I don't -- a
36         lot of the stuff was done -- it was discussed some
37         of it in front of me.  I -- I didn't really
38         understand a whole lot of it.  It was a lot of
39         legalese.  But they -- they'd game the system.  I
40         mean, you know that.  They -- they -- with the way
41         the current process works with marijuana,
42         essentially.  The involvement was, um, from A to Z.
43
44   SS:   The farm licenses and --
45
46   JG:   Yeah.  You gotta be involved from the --
47
48   SS:   Right.
49
50   JG:   -- the whole -- the whole shebang.  Um, yeah, it's
```

102

```
 1        all public record, though.
 2
 3   SS:  Do you have any indication that Tara Tedrow's
 4        engaged in anything illegal?
 5
 6   JG:  No.  But I mean, she was involved -- and they had
 7        conversations, I mean, that's Sunshine Law violation
 8        but back when they tried to have her law firm
 9        appointed as the legal counsel for GOAA.
10
11   SS:  I was the prosecutor assigned to that investigation
12        that was conducted by the Florida Department of Law
13        Enforcement.  So I'm aware of --
14
15   JG:  So you know what I'm talking about.
16
17   SS:  -- those allegations.
18
19   JG:  So there's stuff -- I'm sure there's a lot of stuff
20        in there you can't prove but you know it was there.
21        You know?
22
23   LM:  Anything pertaining to Mr. Bergmann as a --
24        Bergmann?  Nikki Fried's --
25
26   JG:  Oh, no.  I've met him a couple of times.  I know
27        he's thrown a lot of money to        and the -- been
28        involved in some stuff that I just wasn't privy to.
29
30   LM:  All right.  Um, just out of -- you were going to
31        say?
32
33   TC:  If you just got a basic one --
34
35   LM:  Yes, I did.
36
37   TC:  -- I -- there was something I realized I wanted to
38        cover.
39
40   LM:  Yeah, go ahead.
41
42   TC:  Regarding the Tax Collector's Office.  The
43        curiosity, um -- 'cause we look into a lot of
44        government officials and things like that and a lot
45        of times it's -- it's difficult because when
46        somebody gets a count -- a budget as an elected
47        official, a constitutional officer, they kind of get
48        a blank check in some senses.
49
50   JG:  Some more than others.
```

```
 1
 2   TC:  So with your tax -- where's the money to -- coming
 3        from?  What bucket is it comes out of where you can
 4        get this money to your friends to help out?
 5
 6   JG:  Yeah.
 7
 8   TC:  Is that coming out of the department of Revenue or,
 9        like, you know, for the -- the --
10
11   JG:  No.
12
13   TC:  -- firearms licenses, the -- the --
14
15   JG:  No.  Not coming -- not from that.
16
17   TC:  -- the (unintelligible).
18
19   JG:  So --
20
21   TC:  Okay.  So how -- can you kind of explain to us --
22
23   JG:  Yeah.  So a lot of the stuff I learned from -- from
24        -- from how Ray would operate.
25
26   TC:  Right.
27
28   JG:  And -- and -- and you guys really want to get some
29        stuff, you need to look at Ray Valdes.  Um, anyway,
30        I'm just going to say this most frustrating part is
31        not getting anybody to look at stuff that he did and
32        stuff that I had evidence of, international money
33        laundering.
34
35   FS:  Okay.  Okay.  Okay.  Okay.  Just --
36
37   JG:  I just -- I just wanted to say that.
38
39   FS:  -- just go on to the --
40
41   JG:  Okay?  I'm talking like with the world's largest
42        money launderer had correspondence --
43
44   FS:  Okay.  Joel.  Joel.
45
46   JG:  -- with (unintelligible) talking about how they're
47        gonna --
48
49   FS:  Just stick to the question.
50
```

 1   JG:   -- anyway, I had to say that.  Okay?
 2
 3   FS:   All right.  Just stick to the question.
 4
 5   JG:   Been sitting on that for a while.  Um, so the Tax
 6         Collector's Office, I mean, a lot of the money that
 7         comes in to it from fees associated with the DMV,
 8         that's all money that it is generated not really
 9         from the County, per se.  So that money -- and
10         there's, I don't know, 10 to 20 Tax Collector's
11         Offices that are, like, fee-based, meaning they
12         don't get their budget approved in the county.  It's
13         approved from the Department of Revenue.  So they're
14         self-sufficient to an extent.
15
16         I mean, on the operational side you would have
17         certain buckets that are just filled up too much
18         with, you know, your vendors, your -- your other --
19         other items.  Or you can move money around anywhere
20         you want without having to have DOR approval, as
21         long as you don't mess with the personnel side.
22
23   TC:   Okay.
24
25   JG:   And then some of the FRS comes into play and all
26         that.  Um, in addition to that, if we budgeted to
27         purchase a $1.5 million, $2 million property and we
28         don't spend that money, the money goes back to the
29         County and it's not earmarked for anything.  Um, and
30         they can spend it however they want.
31
32         But more importantly, the next year, the tax
33         collector can put that same $1.5 million in there,
34         and it shows a zero percent increase to the budget.
35         So if you do decide to spend that, you just move the
36         money over from buying land to doing whatever you
37         want with it.  You can, I mean, buy a Ferrari if you
38         want.  And it's just not -- and that's the
39         (unintelligible) office do whatever you want.
40
41   TC:   Now, and certain departments have auditors and stuff
42         come through and then you gotta set budgets and
43         stuff.
44
45   JG:   The auditing's a joke there.
46
47   TC:   Okay.
48
49   JG:   And especially the firm they use.  God.
50

105

```
 1   TC:   All right.  Did -- did you have to pay anybody off
 2         to say, Look over here?
 3
 4   JG:   No.  I didn't.  I mean, I -- no, I didn't pay them
 5         off.  They're already paid off.  They already, you
 6         know -- they get these lucrative contracts.  I think
 7         for the first time reasonably they maybe bid for
 8         them.  But, you know, and then Dan O'Keefe and all
 9         these guys, they make political donations to all the
10         people on the board.  And I could have used a
11         different firm if I wanted to, but, you know,
12         they -- they -- they bring in people straight out
13         of, you know, college.
14
15   TC:   Uh-huh.
16
17   JG:   And they'd sample some things but, no.  I mean,
18         there's a million ways to hide stuff.  But they --
19         they just didn't -- they didn't -- they weren't paid
20         to catch stuff.
21
22   SS:   So it's not that they were paid off to do an
23         incomplete or bad job.  It's just that they did a
24         bad job?
25
26   JG:   Why mess up something that's good?  They're making
27         so much money.  Why rock the boat?  They don't want
28         to catch anything.  They didn't care.  Yeah.
29
30   SS:   But you didn't take proactive measures to pay them
31         off?
32
33   JG:   No.
34
35   SS:   To ensure that.
36
37   JG:   No.  No, I didn't have to.
38
39   TC:   So the -- so the basic accounting function, you
40         didn't have to do anything to hide what was going
41         on?
42
43   JG:   No.
44
45   TC:   Okay.
46
47   JG:   No.  I -- I was -- I would overload -- I mean, yeah,
48         you said it.  Especially as a -- as a constitutional
49         officer, you know, you get the money first.
50
```

```
 1   TC:   Uh-huh.
 2
 3   JG:   Then you're like, Here you go.  County had no
 4         control over it, pretty much.
 5
 6   TC:   Right.
 7
 8   JG:   But as long as the office was operating efficiently,
 9         which it -- it was -- I mean, Ray was so cheap with
10         certain things that I could -- I increased the
11         amount that we spent the first couple of years on
12         legitimate things, and there was still money left
13         over that I could play with.
14
15   TC:   Okay.
16
17   JG:   And then nobody would ever notice.  I mean, at the
18         end of the day you're the constitutional officer.  I
19         mean, if you say it's for something, unless it's
20         just grossly negligent and -- and felonious, then
21         that's what it's for.
22
23   TC:   Understood.
24
25   LM:   Anyone else like Kruppenbacher that you were just --
26         contracts like that that --
27
28   SS:
29
30   LM:
31
32   JG:
33
34   LM:
35
36   JG:
37
38   LM:
39
40   SS:
41
42   FS:
43
44   JG:
45
46   SS:
47
48   JG:
49
50   SS:
```

```
 1
 2   JG:
 3
 4   SS:
 5
 6   JG:
 7
 8   SS:
 9
10   JG:
11
12   SS:
13
14   JG:
15
16   FS:
17
18   JG:
19
20   FS:
21
22   JG:
23
24   SS:
25
26
27   JG:
28
29
30   TC:
31
32
33   JG:
34
35   TC:
36
37   JG:
38
39   TC:
40
41   JG:
42
43
44
45
46
47
48   FS:
49
50
```

```
 1   JG:
 2
 3   FS:
 4
 5
 6
 7
 8   JG:
 9
10   FS:
11
12   SS:
13
14   JG:
15
16
17
18   FS:
19
20
21
22   JG:
23
24   FS:
25
26
27   JG:
28
29   FS:
30
31
32
33
34
35   JG:
36
37   FS:
38
39   JG:
40
41   FS:
42
43   JG:
44
45   FS:
46
47   JG:
48
49   FS:
50
```

```
 1    JG:
 2
 3
 4    FS:
 5
 6    JG:
 7
 8
 9
10
11
12
13
14    TC:
15
16
17    FS:
18
19    TC:
20
21    JG:
22
23    FS:
24
25    JG:
26
27
28
29
30    FS:
31
32
33    JG:
34
35    TC:
36
37    FS:
38
39    JG:
40
41    FS:
42
43
44    SS:
45
46    LM:
47
48    SS:
49
50
```

```
 1
 2
 3    FS:
 4
 5    SS:
 6
 7
 8    FS:
 9
10    SS:
11
12    FS:
13
14    SS:
15
16
17    JG:
18
19    FS:
20
21    SS:
22
23    FS:
24
25    JG:
26
27
28    FS:
29
30    SS:
31
32    FS:
33
34    SS:
35
36    FS:
37
38
39    SS:
40
41    FS:
42
43    SS:
44
45
46
47    JG:
48
49    SS:
50
```

```
 1
 2
 3
 4
 5    JG:
 6
 7    SS:
 8
 9
10    FS:
11
12    SS:
13
14    FS:
15
16    SS:
17
18
19
20
21
22    FS:
23
24    SS:
25
26    FS:
27
28
29    SS:
30
31    FS:
32
33    SS:
34
35
36    JG:
37
38    FS:
39
40    SS:
41
42    FS:
43
44
45
46    SS:
47
48    FS:
49
50    SS:
```

```
 1
 2    FS:
 3
 4
 5    SS:
 6
 7    FS:
 8
 9    SS:
10
11    FS:
12
13    SS:
14
15    FS:
16
17    SS:
18
19    JG:
20
21    FS:
22
23    SS:
24
25    FS:
26
27
28
29    SS:
30
31    FS:
32
33    SS:
34
35    FS:
36
37
38
39
40    SS:
41
42    FS:
43
44    SS:
45
46    FS:
47
48    SS:
49
50
```

113

```
 1   FS:
 2
 3   SS:
 4
 5   FS:
 6
 7
 8
 9
10
11   SS:
12
13   TC:
14
15   FS:
16
17   SS:
18
19
20   FS:
21
22   SS:
23
24   FS:
25
26   SS:
27
28   FS:
29
30   TC:
31
32   SS:
33
34   FS:
35
36   SS:
37
38
39   TC:
40
41   SS:
42
43   FS:
44
45   TC:   Now, um, I think I'm -- I mean, you're -- Mr.
46         Scheller knows how to get in touch with me if
47         anything comes to mind as you get time to reflect on
48         it.  Again, we're looking for specifics on things,
49         but we're also the people that look into government
50         officials statewide and the elected officials,
```

```
 1        representatives specifically, you know, the -- the
 2        higher-ups of the higher-ups.  But again, specifics.
 3        And it all boils down to the money.  I mean, people
 4        can postulate all they want --
 5
 6   JG:  Yeah.
 7
 8   TC:  -- about ghost candidates and schemes.
 9
10   JG:  Yeah.
11
12   TC:  It all boils down to the money.
13
14   JG:  Yeah.
15
16   TC:  And any way we can show from that angle.  So --
17
18   JG:  The only -- the only other individual that I would
19        say that -- that would -- was involved at
20        request, um, that would do anything        said, and
21             would use for a lot of -- there was some
22        schemes he told me that was the St. John Water
23        Management District Chair.
24
25   TC:  Miklos?
26
27   JG:  Yes.
28
29   LM:  Miklos.
30
31   JG:  Yes.  Yes.  That's another person that
32        would --
33
34   LM:  What did he say?
35
36   JG:       kind of would tell me some of the schemes that
37        they had where they would go in and have -- again,
38        I'm not an expert at what -- like what he did, but
39        let's say building is not approved to be built
40        because there are environmental issues.  Miklos
41        would get greased off or something, and then they
42        would all magically be approved.  And this was rinse
43        and repeat, what they would do.  And Miklos would
44        write checks a lot to be where        would ask him
45        to write checks to.
46
47   LM:  Anything specific?
48
49   JG:  (No audible response).
50
```

115

```
 1   LM:  No specific instances of that and when?
 2
 3   JG:  Not stuff I can remember.  I mean,      did tell me
 4        about some stuff, but I just don't -- some of the
 5        stuff that he would tell me I -- I was unfamiliar
 6        with a lot of it.  It was Latin to me.
 7
 8   LM:  Did he actually ever do any lobbying work for you,
 9        for the -- or was it just like a -- I'm giving you
10        money contract?
11
12   JG:  I didn't know him really well at the time to --
13
14   LM:  Do that?
15
16   JG:  -- do that.  So he said he was going to do this and
17        that.  A lot of the problems I think he created
18        himself to be able to justify having a contract.
19        So --
20
21   LM:  Anything else you have on
22
23   JG:  What do you want to know?
24
25   LM:  Anything concrete.
26
27   SS:
28
29
30
31
32   JG:
33
34   SS:
35
36   FS:
37
38   JG:
39
40   SS:
41
42   JG:
43
44   FS:
45
46   JG:
47
48   FS:
49
50   TC:
```

```
 1
 2
 3
 4
 5
 6
 7
 8    JG:
 9
10    TC:
11
12
13    JG:
14
15    TC:  Okay.
16
17    JG:  Um, most of our conversations, though, were verbal.
18
19    TC:  Okay.
20
21    JG:  Yeah.
22
23    LM:  Um, I mean, other than general, what other type
24         of -- I know.  I know.
25
26    FS:  We'll be here -- we'll be -- you have the rest of
27         the --
28
29    LM:  It's -- hey, man, I'm here.  I'm here --
30
31    FS:  -- you've got the rest of the month?
32
33    LM:  -- (unintelligible).
34
35    TC:  Come back some other time?
36
37    LM:  No, specifically about campaigns and --
38
39    FS:  I'm teasing you.  I'm sorry.
40
41    LM:  -- um, campaign donations, straw donations, acts.
42         You've mentioned that, you know, a lot of things
43         were by the playbook like the names and everything.
44         Anything else that -- that you guys discussed that
45         would kind of cross over on the -- the illegal
46         realm?  Not just like, you know --
47
48    FS:  Sure.
49
50    LM:  -- I'm -- we're going to find a -- a write-in
```

```
 1          candidate that has a Spanish name as a female.
 2
 3   JG:    No.
 4
 5   LM:    Okay.  Anything else that you can think of just pops
 6          up?
 7
 8   JG:    There's nothing that pops up.
 9
10   LM:    Okay.
11
12   FS:    I --
13
14   JG:    It was helpful with the questions that were asked,
15          I've been able to confirm.  But sitting in here for
16          so long it's kind of --
17
18   FS:    I don't know about -- since I've gotten carte
19          blanche approval from the government yesterday, I'm
20          just going to send you all the e-mails I've sent
21          over.  Everything.
22
23   LM:    Okay.
24
25   FS:    You know?  And I'll -- and I'll -- to avoid -- and I
26          -- I'll avoid, like -- I'll clarify if there's
27          anything that came from my dependent --
28
29   TC:    Sure.  Okay.
30
31   FS:    -- you know, work as opposed, you know, to --
32
33   TC:    Yeah.
34
35   FS:    Yeah.  Okay?
36
37   TC:    I -- no, that makes sense.  I think there was just a
38          lost communication in that one.  Just, you know --
39
40   FS:    Yeah.
41
42   TC:    I see the names.  I'm familiar with it so --
43
44   FS:    Yeah.  And I'm --
45
46   TC:    -- so --
47
48   FS:    Yeah.  And I'm -- I'm --
49
50   TC:    Sounds good.  Okay.
```

```
 1
 2   JG:  What was -- what was the date on the, uh, August
 3        there?
 4
 5   FS:  Phone calls.
 6
 7   TC:  So -- okay.  So there is -- the other communications
 8        with Mr. Paris -- and again, this was after you were
 9        taken into custody.
10
11   JG:  Uh-huh.
12
13   TC:  And I think you were out at this point.  Um, it was
14        August 18th of 2020.
15
16   JG:  Yeah.  That would have been the primary date and
17        that would have just been probably like, Good luck.
18
19   TC:  Gotcha.
20
21   JG:  Yeah.
22
23   TC:  Okay.  Thank you.
24
25   JG:  Yeah.
26
27   SS:  All right.
28
29   TC:  All right.  Well, with that --
30
31   JG:  I hope this was helpful.
32
33   FS:  Joel, unintelligible).
34
35   TC:  Yeah.  Okay.
36
37   JG:  I -- I mean, sometimes I've been --
38
39   FS:  Okay.  Okay.  (Unintelligible).
40
41   JG:  -- to so many meetings, I just don't know --
42
43   FS:  Joel.  Joel.  They're still on the recording. Let's
44        just --
45
46   TC:  We -- yeah.  We -- we'll go on the --
47
48   FS:  -- we're done.  We're done.
49
50   TC:  -- with that said, um, we're going to end this
```

```
1        interview here at 1350 hours still Thursday, June
2        23rd, 2022.
3
4                      (CONCLUSION OF INTERVIEW)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
29
30
31
32
33
34
35
36
37
38
39   Transcribed by: slw/slw/ms
```