UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

CHRISTOPHER E. DORWORTH,

      Plaintiff,

v.

JOEL MICAH GREENBERG, ANDREW
W. GREENBERG, SUE GREENBERG,
ABBY GREENBERG, AWG, INC.,
GREENBERG DENTAL ASSOCIATES,
LLC, GREENBERG DENTAL &
ORTHODONTICS, P.A., GREENBERG
DENTAL SPECIALTY GROUP, LLC, and
A.B.,

      Defendants.

Case No.: 6:23-CV-00871

## OMNIBUS MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS VERIFIED AMENDED COMPLAINT

## PRELIMINARY STATEMENT

Plaintiff Christopher E. Dorworth ("Dorworth") respectfully submits this Omnibus Memorandum of Law in opposition to the Motions to Dismiss the Verified Amended Complaint (the "VAC") filed by Defendants (a) Joel Greenberg ("Joel"); (b) Andrew Greenberg ("Andrew"), Sue Greenberg ("Sue"), and AWG, Inc. ("AWG" and, collectively with Andrew and Sue, the "Greenbergs"); (c) Greenberg Dental Associates, LLC, Greenberg Dental & Orthodontics, P.A., and Greenberg Dental Specialty Group, LLC (collectively, "Greenberg Dental"); (d) Abby Greenberg ("Abby"); and (e) A.B. The motions each attack a "Strawman Complaint," a pleading existing only in the motion papers, lacking many allegations of the VAC. Defendants resort to this tactic because their arguments are inapplicable to the real VAC. This Memorandum first addresses pleading issues, then addresses RICO issues, and then addresses matters raised by the remaining counts of the VAC.

## FACTS

Joel is one of the most corrupt politicians in Florida history. As County Tax Collector, Joel stole more than $1.3 million through cryptocurrency theft, bribery of public officials, and kickbacks. According to Joel, Andrew was involved in these crimes. ¶¶ 86, 331–335. Once Joel was indicted, he, his wife Abby, along with Andrew and Sue, embarked upon a conspiracy to avoid justice. First, they tried to convince Dorworth, a well-known figure in Florida politics, ¶ 14, and Congressman

Matt Gaetz to obtain a pardon from then-President Trump. ¶¶ 83 *et seq.* When Dorworth refused, Joel threatened him: "Dorworth, Gaetz, and others would be falsely implicated by Greenberg if Dorworth and Gaetz did not help Joel mitigate his liability by obtaining a pardon." ¶¶ 88 *et seq.* Dorworth still refused. Joel then unsuccessfully tried to induce Dorworth and Gaetz to lobby for the firing of the prosecutor. ¶ 106. Finally, in response to Dorworth's and Gaetz' continued refusals, Joel set about fulfilling his threat to falsely accuse Dorworth and Gaetz of various crimes, ¶¶ 118–123, 142, 146, 151, 155, 157, 163, 164, 170–175, 180), in the hope of obtaining from the AUSA "cooperation credit." ¶¶ 7, 183. As was widely reported at the time, those efforts eventually collapsed, but only after causing both Dorworth and Gaetz considerable embarrassment and harm.

The VAC further alleges that each of the other Defendants conspired with Joel to defame Dorworth. It recites the specific ways in which they conspired and describes the events of July 19, 2020, where Abby lured Dorworth's wife Rebekah to a resort, whereupon Joel threatened her. Joel then described the plot in detail and threatened Dorworth that Joel would falsely accuse Dorworth of complicity in Joel's crimes unless Dorworth assisted him. ¶¶ 71–108. The VAC further recites how Joel and Abby involved A.B.,[1] the Greenbergs, and Greenberg Dental, in this scheme. *Id.*

---

[1] In her Introduction, A.B. describes herself as a "victim." Judge Presnell, who sentenced Joel, described her otherwise. ¶ 372.

Tellingly, none of the moving papers mention any of the events that occurred on July 19, 2020, the first of many ways the motions ignore or mischaracterize the VAC. The Defendants prefer to contest a Strawman Complaint instead of the real VAC.

## POINT I: THE COMPLAINT SATISFIES THE PLEADING STANDARD

As held in *Bell Atl. v. Twombly*, 550 U.S. 544, 555–56 (2007)(internal quotations and citation omitted), "a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations" and is sufficient "even if it appears that a recovery is very remote and unlikely." Commenting on *Twombly*, the Eleventh Circuit stated in *Watts v. FIU*, 495 F.3d 1289, 1295–96 (2007), the "Supreme Court's most recent formulation of the pleading specificity standard is that 'stating such a claim requires a complaint with enough factual matter (taken as true) to suggest' the required element." Continuing to quote *Twombly*, *Watts* does not "impose a probability requirement at the pleading stage." *Id*. Instead, the standard "simply calls for enough fact to raise a reasonable expectation that discovery[2] will reveal evidence of the necessary element. … It is sufficient if the complaint succeeds

---

[2] Although Defendants complain that Dorworth states a reasonable basis that discovery will reveal additional information, this all he is required to show. Dorworth occasionally references allegations that he has made that have been confirmed in discovery. Dorworth is neither referencing "matters outside the four corners of the complaint," nor seeking any "conversion" of the Motions to summary judgment. Instead, Dorworth is demonstrating that even the meager discovery provided to date has confirmed many allegations Defendants claim are "conclusory," "speculative," or otherwise improperly pleaded. That discovery has confirmed key allegations, including previous assertions by Joel, is obviously relevant to showing that there was "a reasonable expectation that discovery will reveal evidence..."

in identifying facts that are suggestive enough to render [the element] plausible." *Id.* at 1296; *Blair v. Philips Elecs.*, 16-cv-3529, 2017 WL 770960 at *2 (M.D. Fla. Feb. 28, 2017)("Plaintiff need not provide evidentiary support or even detailed information...He need only provide Defendant with notice.")

Nonetheless, in dozens of paragraphs, the VAC sets forth in detail the ways in which the Greenbergs participated in the conspiracy by knowingly financing Joel's criminal activities. Twelve of those paragraphs are alleged upon information and belief. Another two dozen paragraphs are not so delimited. Most importantly, in his July 19, 2020 conversation with Dorworth, Joel confessed that he and his parents had agreed to work together to commit misconduct. ¶¶ 92–94, 102–108. In short, the VAC contains some three dozen paragraphs specifying what the Greenbergs did and why they did it. Defendants claim the VAC fails to adequately allege they assisted Joel in his scheme to avoid justice. *Twombly*, *Watts*, and common sense require rejection of the motions.

<u>The Greenbergs' Argument, Not the VAC, Is "Teeming with Inconsistencies"</u>

The Greenbergs claim "a close chronological reading of Plaintiff's allegations shows that his entire theory is implausible and teeming with internal inconsistencies."[3] Doc. 77, Page 6. However, it is the Greenbergs' recitation that is "inconsistent" with the VAC. The Greenbergs claim (*id.*) that Joel was charged on

---

[3] Of course, these "inconsistency" contentions are, at best, credibility issues for the factfinder.

July 19, 2020, when Abby lured Rebekah Dorworth to the resort. ¶ 71. Joel was charged a month before, on June 17, 2020. ¶ 65. The Greenbergs then incredibly claim that "Soon after—**Plaintiff does not say how soon**—Joel cornered Plaintiff and demanded that Plaintiff help him secure a preemptive pardon. *Id.* ¶¶ 72–90." Doc. 77, Page 6 (emphasis added). The exact date of this encounter, July 19, 2020, the date the Greenbergs incorrectly use for Joel's charges, appears in the paragraph immediately preceding the range cited by the Greenbergs claiming Dorworth did not provide the date. ¶ 71. Further, it was Rebekah Dorworth, not Plaintiff, who was cornered by Joel. ¶ 82.

The Greenbergs continue to misconstrue the VAC as it relates to A.B. The Greenbergs claim that A.B. testified "about Joel" to a grand jury in August 2020. Doc. 77, Page 6, citing ¶¶ 152 and 235. The cited paragraphs, however, state that A.B. met with prosecutors (¶ 152), and that Joel tried to stop A.B. from testifying before the grand jury. ¶ 235 (claiming obstruction). The distinction is important. According to Joel, the authorities learned about his misconduct with A.B. from electronic records, and not from A.B. ¶ 122 (citing Exhibit 3, Joel's text message to Dorworth.)[4] Thus, there is nothing inconsistent with the Greenbergs paying A.B.[5]

---

[4] The Greenbergs acknowledge all of this, but in a footnote. Doc. 77, Page 6, n.5.
[5] Nor is the fact that A.B. recruited a friend to implicate others inconsistent with the Greenbergs' corrupt inducements to A.B. In fact, it shows the lengths that the Greenbergs and A.B. went to implicate Dorworth and others.

Nor is there anything inconsistent with (1) Joel first attempting to keep the authorities from speaking to A.B. to prevent her from being forced to corroborate his misconduct, in an effort to avoid indictment for his crimes with A.B., and then, after he was indicted for that conduct based upon electronic records, (2) switching tactics and deciding to implicate Dorworth and others to obtain cooperation credit. In fact, this is exactly what the VAC alleges. ¶¶ 118-120. The Greenbergs call Dorworth's allegations "muddled," possibly because the Greenbergs juxtapose events in reverse order, citing to ¶ 122 before ¶ 118, Doc. 77, Pages 7-8, despite the intervening ¶ 119 explaining Greenberg switched tactics once he was indicted for sex crimes with A.B. on August 19, 2020. Although the Greenbergs claim that Joel was trying to prevent A.B. from cooperating with the authorities "around the same time" that she began to frame Dorworth, Doc. 77, Page 7, this ignores the intervening indictment and Joel's change of strategy. ¶ 119. The VAC alleges that in the late summer,[6] *i.e.,* after Joel's indictment, Joel began to falsely implicate Dorworth and others. ¶¶ 119 et seq. [7]

---

[6] The summer ended on September 21, 2020. "Late summer" (¶ 122), obviously refers to activities after August 19, 2020. ¶ 118.

[7] The Greenbergs' note 5 engages in far more speculation than the VAC and continues to mischaracterize the VAC. First, they "surmise" that A.B. implicated and testified *against* Joel, despite no allegation or implication that she did. The paragraph they cite (¶ 153) states that A.B. "testified or *was requested to testify*" (emphasis added) at various times from 2020–2022. This does not mean that she testified *against* Joel before he was indicted for crimes with her. In fact, from Joel's text messages to Dorworth, it appears she did not. VAC, Exhibit 3. Further, even if A.B. was compelled by the Government to testify against her wishes, and did so, this is not inconsistent with her later conspiring with the Greenbergs to frame Dorworth and others.

Greenbergs claim Joel could not mitigate his federal sentence by interviewing with state authorities who are "without jurisdiction to help Joel with his federal charges." Doc. 77, n.6.[8] They are plainly wrong. *E.g., United States v. Love*, 985 F.2d 732, 734–35 (3rd Cir. 1993)(holding "substantial assistance" credit under USSG 5K1.1 not limited to assistance to federal authorities). Of course, this also ignores the bulk of the allegations, all of which involve proffers with federal authorities.

Finally, not only do the Greenbergs mischaracterize the VAC, they also mischaracterize the caselaw. For example, their quotation from *Hopkins v. Hosemann*, No. 19-60662, 2023 WL 4990543, at *12 (5th Cir. Aug. 4, 2023), omits the full quote and substitutes "Plaintiff's theory of the case" (outside quotes) for "the dissent's argument." *C.f.* Doc. 77, Page 9, and *Hopkins* at *12 (upholding the "Plaintiff's theory of the case," but disagreeing with the dissent).

Joel also attempts to create inconsistencies where there are none. Doc. 82, Page 4. Joel does not explain why his own texts stating "Venmo was the link," indicating that A.B. did not wish to speak to the authorities, and that Joel was paying her lawyer,[9] do not support the proposition that the authorities learned of Joel's

---

[8] Abby repeats this argument verbatim. Doc. 79, Pages 10-11. Further, in a confusing passage, Abby also inverts the chronology, claiming that Joel, A.B., and Abby began cooperating with the authorities before the superseding indictment, not after. Doc. 79, Page 8. The fact that Abby cites ¶¶ 109, 122, and then 118, in that order, shows that the chronology has been distorted to paint a confusing picture of the VAC. Id.

[9] A.B. claims that she had not agreed to participate in Joel's scheme at the time that Joel told Dorworth he was paying her lawyer. Doc. 80. Page 14. However, this is not what the VAC alleges

activity with A.B. from Venmo rather than A.B. Doc. 62-3.[10] Nor is it inconsistent that A.B. would implicate Dorworth at the "behest" of both Joel and the authorities. C.f. Doc. 82, Page 5 citing ¶¶ 120-121. Joel encouraged A.B. to falsely implicate Dorworth, but, unlike the authorities, had no ability to elicit grand jury testimony. Lastly, Dorworth does not suggest Judge Presnell was concerned about Joel's lies at the time of sentencing.[11] Judge Presnell was concerned about the amount of time the supposed "cooperation" took. ¶¶ 186 et seq. As became apparent shortly thereafter, much of the supposed "cooperation" was not only lengthy but, with one or two exceptions, fruitless. Id. The delays to the investigation and Greenberg's sentencing were caused by Greenberg's lies about Dorworth and others. ¶ 189. The Greenbergs' Motions, not the VAC, are "teeming with inconsistencies."

---

or what Joel told Dorworth and others. Nor does A.B. dispute that she accused Dorworth of crimes. (In fact, she does so on this docket.)  Dorworth's allegations of falsity, like all other allegations, are entitled to the presumption of truth at the pleading stage, and are in any event well-documented.
[10] As several defendants note, Joel would not pay A.B.'s lawyer if she was informing on him. Joel later inexplicably misconstrues the VAC, to claim that A.B. implicated Greenberg, Doc. 82, Page 13, even though Greenberg cites a passage asserting otherwise. Doc. 82, Page 4. (stating that "authorities learned of Greenberg's misconduct with A.B. from electronic and other records, not from A.B.") Abby makes nearly identical arguments. Doc. 79, Pages 7-9.
[11] If Judge Presnell thought at the time of the sentencing that Greenberg had lied during the proffers, he would have applied an obstruction of justice enhancement. U.S.S.G. § 3C1.1. The investigations were ongoing at the time, and nobody at that time suggested Greenberg had lied. Nor would either Greenberg (who lied) or the Department of Justice, (whose time Greenberg wasted but which had not yet finished the investigation, and which was still using Greenberg for other legitimate prosecutions and investigations e.g., Michael Shirley, ¶ 46), have any knowledge or reason at the time to alert the Court to any lies by Greenberg.

### The Pertinent Allegations

The Greenbergs argue that the VAC makes no "non-conclusory" allegations of wrongdoing against them.[12] Doc. 77, Page 11. As detailed below, the VAC includes dozens of non-conclusory allegations, beginning on June 17, 2020, when Joel was indicted. ¶ 39. On July 19, 2020 (32 days later) Joel's wife Abby lured Dorworth's wife Rebekah to a resort, assuring her "Joel would not be present" ¶ 74, which was a lie. ¶¶ 77, 82. Later, Joel told Dorworth that he was concerned about "his exposure for sexual misconduct with A.B." ¶ 91. Joel then explained his parents' role in his initial scheme (emphasis added):

> 92. Greenberg told Dorworth that he was paying for A.B.'s attorney's fees[13] in an attempt to shape her testimony so that he could avoid charges.

> 93. Greenberg also told Dorworth that he **and his parents** would seek A.B.'s cooperation by "paying her off" and that he had determined that A.B. would accept such inducement.

> 94. Greenberg told Dorworth that **his family and their businesses** would pay any amount necessary to obtain a pardon.

According to Joel, at some point between June 17 and July 19, 2020, Joel and his parents agreed to induce A.B. to commit process crimes, and further to obtain a pardon by "paying" people. These allegations suffice to overcome the *Twombly* rule that a "conclusory allegation of agreement at some unidentified point**"** is inadequate.

---

[12] The Greenbergs use the word "conclusory" 26 times in their MTD. However, they ignore a plethora of non-conclusory allegations, as detailed herein.

[13] Joel did this with assistance from his parents. ¶ 300.

Doc. 77, Page 22. Even heightened pleading requirements of Rule 9(b), inapplicable here, are relaxed where the plaintiff lacks access to the exact facts of the claim. *Corley v. Rosewood*, 142 F.3d 1041, 1051 (7th Cir. 1998); *Seville Machinery v. Southmost Machinery*, 742 F.2d 786, 791 (3rd Cir. 1984)(neither "date, place or time," nor "precise words" are required, even under 9(b)).

The VAC then details how Andrew and Sue and AWG became involved. See ¶¶ 102-3, 126-7, 214, 294, 298, 306-7, 318-20, 332, 334, 335-338, 388-391, 393, 396, 459, 460, 460. Of the 30 paragraphs listed (including ¶92-94), over half (¶¶ 102, 103, 298, 306, 307, 318, 320, 332, 334, 336, 388-390, 396, 460, and 461) are not even referenced in the Greenbergs' MTD. An additional 14 paragraphs of the VAC contain allegations about the Greenbergs that are alleged upon information and belief (¶¶ 105, 154, 213, 305, 306, 307, 308, 312, 313, 314, 315, 327, 392, and 397). Comparison with the 30 paragraphs referenced above, each of which manifestly contains well-pleaded facts, shows that the facts pleaded are quite sufficient to render the I&B paragraphs plausible. *Daisy v. Pollo Operations*, 14-cv-564, 2015 WL 1418607 at *5 (M.D. Fla. Mar. 27, 2015)("The *Twombly* plausibility standard does not prevent a plaintiff from pleading facts alleged upon information and belief where the belief is based on factual information that makes the inference of culpability plausible. *See Iqbal*, 556 U.S. at 678.")(internal quotes omitted), *accord, Zausner Foods v. Blandin*, 22-22660, 2023 WL 5289238 at *4 (S.D. Fla. Aug. 16, 2023)("The

176-page Complaint features detailed and highly-specific factual allegations. … Though Plaintiff relies on information and belief to bolster its substantive allegations, this comes as no surprise given the nature of its claims. Plaintiff is requesting an equitable accounting because it suspects foul play and is not able to prove as much at the motion to dismiss stage.")[14] Unlike the Strawman Complaint, the real VAC details a conspiracy involving the Greenbergs to extort, defame, and falsely accuse Dorworth. The VAC is bolstered by documented admissions from Joel himself, evidence of aid rendered by the Greenbergs, and evidence of Defendants' knowledge and motivation to assist in the scheme.[15]

<u>Dorworth Adequately Alleges Wrongdoing by the Greenbergs</u>

The Greenbergs contend the VAC does not accuse them of wrongdoing:

> All Plaintiff can muster is that "[Joel] Greenberg...told Dorworth that he and his parents would seek A.B.'s cooperation by 'paying her off'…that he had determined that A.B. would accept such inducement," and that "[Joel] Greenberg told Dorworth that his family and their businesses would pay any

---

[14] Several Defendants rely upon *Scott v. Experian*, 18-CV-60178, 2018 WL 3360754, at *6 (S.D. Fla. June 29, 2018), for the proposition that "information and belief" allegations are not entitled to a presumption of truth, but even *Scott* recognizes that *Twombly* "does not prevent a plaintiff from pleading facts alleged 'upon information and belief' where the belief is based on factual information that makes the inference of culpability plausible."

[15] Although Joel complains that Dorworth asserts facts on information and belief 45 times, Dorworth was careful to qualify assertions from Joel and reasonable inferences therefrom. See Doc. 82, Page 4 (noting that 32 of 45 Paragraphs stated on information and belief concern Greenberg.) In any event, based upon Greenberg's count, Dorworth only qualified his allegations 10% of the time, and would have done it far less if he had the benefit of discovery at the time of filing. The limited use of information and belief contrasts with Joel's complaint about "a seemingly infinite number of paragraphs" detailing his prolific misdeeds. Doc. 82, Page 3. (In fact, the number of paragraphs is not "seemingly infinite," it is 498, which is readily ascertainable from the VAC. Doc. 62. The whole VAC, in fact, is approximately half the length of the Motions filed against it.)

amount necessary to obtain a pardon." Doc. 62 ¶¶ 93–94.[16] Neither allegation goes so far as to claim that the Greenbergs actually agreed to do anything (only that Joel said they would). And even accepting that the Greenbergs would somehow "pay off" A.B. (whatever that might mean)[17] or would pay to get their son a pardon, neither fact suggests that the Greenbergs agreed to be party to a conspiracy to defame Plaintiff.

Doc. 77, Page 15. Joel told Dorworth that his parents would support his scheme, and indeed they did. Everything Joel said would happen did happen. *See, e.g.,* ¶ 107. Some of the paragraphs of the VAC that allege the Greenbergs "agreed to be party to a conspiracy" commence with "According to Greenberg" or otherwise set forth the source. However, most do not provide such evidentiary-level support (¶¶ 214, 294 306, 307, 318, 335, 338, 459–61), nor need they. *Rotella v. Wood*, 528 U.S. 549, 560 (2000)(recognizing in the RICO context "the flexibility provided by Rule 11(b)(3), allowing pleadings based on evidence reasonably anticipated after further

---

[16] The Greenbergs claim in a footnote here that because Vladimir St. Louis did not suggest in his letter that A.B. was bribed (as opposed to tampered with) by Joel that "the exhibit controls." Doc. 77 n. 10. Of course, another exhibit clearly shows that Joel intended to pay for A.B.'s lawyer. Doc. 62-3. The Greenbergs cite *Hoefling v. City of Miami*, 811 F.3d 1271, 1277 (11th Cir. 2016), dealing with a conflict between assertions about a particular exhibit and the actual content of the exhibit, not a supposed conflict between two exhibits. In this case, any "inconsistency" is between Joel's differing accounts reflected in the exhibits. Further, there is nothing "inconsistent" with A.B. being tampered or bribed by Joel while also wishing to extract a payment from Dorworth. These motivations are well-documented. See Docs. 61-3 (Greenberg claiming he was paying A.B.'s attorney fees), and 61-7 (Inmate reporting Greenberg claimed that A.B. would try to file a lawsuit).
[17] This is but one of many misleading asides contained in the MTD. The phrase "pay off" does not appear in the VAC. ¶ 93 reads, "Greenberg also told Dorworth that he and his parents would seek A.B.'s cooperation by 'paying her off' and that he had determined that A.B. would accept such inducement." Surely, the Greenbergs' professed ignorance about what "paying someone off" means is insincere. In any event, ¶¶ 27 ("A.B. was compensated by the Greenbergs to provide false testimony") and 92 ("Greenberg told Dorworth that he was paying for A.B.'s attorney's fees in an attempt to shape her testimony so that he could avoid charges") make the meaning of the term clear to any fair reader of the VAC.

investigation or discovery"); *Nodell v. Nicky's Rest. Equipment*, 22-CV-62164, 2023 WL 185480 at *3 (S.D. Fla. Jan. 13, 2023)("As for whether Plaintiffs have evidentiary support for their allegations, that is a matter left for a later stage of this litigation."); *see also Blair id.* at *2. Moreover, it is nonsensical to suggest that, because the VAC provides sourcing ("Joel said they would") it is weaker than if it did not provide such evidence. For instance, examine how ¶ 102 (quoted above) reads both with and without the "Joel said they would" phrasing. The actual ¶ 102:

> 102. According to Greenberg, Andrew and Sue Greenberg and Greenberg Dental and AWG also agreed with Joel Greenberg and Abby Greenberg to pay any amounts necessary to obtain the pardon or firing of the prosecutor that Joel Greenberg was attempting to extort Dorworth and Gaetz to seek on his behalf.

> Here is a revised version, without sourcing:

> 102. Andrew and Sue Greenberg and Greenberg Dental and AWG also agreed with Joel Greenberg and Abby Greenberg to pay any amounts necessary to obtain the pardon or firing of the prosecutor that Joel Greenberg was attempting to extort Dorworth and Gaetz to seek on his behalf.

The Greenbergs assert that because the actual VAC provides the source (a confession by a member of the conspiracy), it is defective. Of course, without the sourcing, the Greenbergs would have branded the allegation "conclusory." Perhaps the Greenbergs' Strawman Complaint lacks sufficient allegations that they "agreed to be party to a conspiracy to defame Plaintiff," but the real VAC describes the Greenbergs' involvement. ¶¶ 294, 459, 460, and 461.

<u>The Greenbergs' Involvement and Knowledge</u>

The Greenbergs claim Dorworth offers only "conclusory claims" that "the Greenbergs provided money to Joel and Abby Greenberg with the knowledge and desire that it would be used to further" the scheme. Doc. 77, Page 19. To the contrary, the Complaint repeatedly alleges that the Greenbergs agreed to further and participate in Joel's felonious scheme. ¶¶ 93, 94, 102, 126, 127, 214, 294, 306. Many of the supposedly "Conclusory Allegations," in the Greenbergs "Appendix" are not conclusory at all. E.g., ¶ 318 (alleging that the Greenbergs purchased a home for Abby Greenberg).[18] Other allegations are sourced from reliable sources. E.g., ¶ 331 (alleging Andrew Greenberg's role in covering up the bitcoin scheme.)[19]

Any notion of an innocent explanation is rebutted by facts showing the Greenbergs' knowledge of and active involvement in the scheme. For example, the Greenbergs received bills for the work performed by the attorneys, thus showing their knowledge of Joel and the attorneys' activity. ¶ 93. Further, the Complaint shows that Joel openly discussed his scheme with anybody who would listen, including his parents. ¶¶ 204-232 (Section titled "Greenberg's Continued Attempts to Frame Others Were Well Known to Members of the Greenberg Enterprise and Even the General Public, and Greenberg Discussed this Scheme Openly and He was

---

[18] In fact, discovery confirms the Greenbergs purchased a home for Abby in late 2020.
[19] This fact has also been confirmed in discovery.

Caught Framing Others During this Time.") In fact, Dorworth has learned in discovery that the Greenbergs messaged Joel regarding legal strategy and even attended meetings and conference calls with the different lawyers who represented Greenberg. Although the Greenbergs incredibly claim there are "no non-conclusory allegations" that Defendants knew of A.B.'s existence, they of course knew of Joel's indictment for misconduct with her. ¶ 118. The Greenbergs imply that some of their actions had innocent explanations, for example, their provision of aid to Abby, but they fail to account for that fact that this aid vastly increased just after Joel was charged, ¶¶78-81, and exceeded any reasonable or necessary aid to support their grandchildren. ¶¶ 319-320. Of course, there is no innocent explanation for funding payoffs to A.B. ¶ 93, supra.

Joel also attempts to plead alternative facts in his motion. Doc. 82, Page 13. However, he fares little better, and fails to rebut Dorworth's VAC, which is in any event entitled to the presumption of truth at this stage. If numerous persons testified against Dorworth truthfully, why was he not prosecuted? If Dorworth committed these crimes, why did he take and how did he pass the lie detector test? Why did Joel acknowledge that he had done nothing wrong? Doc. 62-3, Joel Text ("You've done nothing wrong.") And if there was no plan by Joel to falsely implicate Dorworth and others, how did a random inmate know details of the scheme long before it was revealed? Doc. 62-7. Greenberg's "innocent explanations" not only contradict his

own written statements, they fail to account for the numerous facts pled. Nonetheless, Defendants would have the Court depart from the presumption of truth of the allegations on a Motion to Dismiss and instead credit a confused rehash of the VAC by, among others, a convicted felon. In short, the VAC alleges that Dorworth was innocent, but Defendants framed him. Defendants wish for the Court to instead infer that Dorworth is guilty, and Defendants are innocent. This turns the presumption of truth at the pleading stage on its head.

<u>Dorworth Need Not Negate Innocent Explanations</u>

The Greenbergs claim Dorworth is required to plead facts sufficient "to allow this Court to **rule out**...innocent explanations." Doc. 77 at 18 (emphasis added). Of course, there is no requirement that Dorworth specifically negate any "innocent explanation." Dorworth would first have to anticipate any possible "innocent explanations" for the allegations, and then preemptively rebut them. The only authority provided by the Greenbergs for this assertion is *Tan*[20] *v. Quick Box, LLC*, 20-CV-01082, 2020 WL 7226440, at *23 (S.D. Cal. Dec. 8, 2020), which relies in turn upon *Eclectic Properties v. Marcus & Millichap*, 751 F.3d 990, 999 (9th Cir. 2014), not discussed by the Greenbergs. This is not surprising: In *Eclectic,* the alleged fraud was that properties were sold to the plaintiffs at three times their value, but the Court held that real estate prices fluctuated, particularly during the recession.

---

[20] Miscited by the Greenbergs as "Ta**m**."

*Id.* at 999. Further, the Court noted that the complaint asserted defendants purchased the properties from independent parties for twice the alleged value and spent the remaining third on improvements, removing any gain to defendants. *Id.* at 999. Lastly, the "alternative explanation," that the high price was due to long-term leases enhancing property value, also appeared in the complaint. *Id.* at 998. Nowhere does *Eclectic* indicate that the plaintiff was obligated to negate any innocent explanation. The court merely noted that numerous innocent explanations "come[] from Plaintiffs' own complaint." *Id.* Nor does *Cisneros v. Petland*, 972 F.3d 1204, 1211 (11th Cir. 2020), which the Greenbergs imply supports this proposition, Doc. 77 at 17, contain the word "innocent" at all. The Petland stores followed the franchisor's model for operating profitable franchises. *Id.* at 1212.

The Greenbergs also cite *Doe v. Samford Univ.*, 29 F.4th 675, 688 (11th Cir. 2022), for the proposition that a complaint that permits "obvious alternative explanations [that] suggest lawful conduct" is insufficient. But the Greenbergs only acknowledge that they financially supported their son,[21] not that support was provided **for the specific purpose** of aiding Joel in committing crimes.

"Innocent" explanations can be provided by the Greenbergs by way of affirmative defense or denial. They need not be anticipated and negated in the VAC.

---

[21] In fact, Greenberg Dental admits as much. Doc. 81, Page 23 ("The Greenberg Dental Defendants did not assume a legal duty to protect Dorworth merely by providing income that was used for Joel's defense.")

The caselaw cited on this issue is readily distinguishable. In *Singh v. NYCTL,* 14-2558, 2016 WL 3962009 at *10 (S.D.N.Y. 2016), the plaintiff alleged that the defendant "should have known" rather than did know. Similarly, in *Parm v. National Bank*, 242 F.Supp.3d 1321, 1348 (N.D. Ga. 2017), "Plaintiff's allegations … essentially attempt to recast a contractual relationship as a RICO enterprise."

<u>The Compliant is not a Shotgun Pleading</u>

Joel argues that "each count and prayer for relief relies on all preceding general allegations in the Amended Complaint. Such a pleading represents the stereotypical shotgun pleading. *See Chudasama v. Mazda Motor Corp*., 123 F.3d 1353, 1359 n.9 (11th Cir. 1997)." Doc. 24, Page 24. Joel's quotation to *Chudasama* is unduly truncated, the Court also noted that "many of the factual allegations appear to relate to only one or two counts, or to none of the counts at all. Thus, a reader of the complaint must speculate as to which factual allegations pertain to which count." *Id*. at n.9. Here, there is no need to speculate, because each count specifies which section(s) pertain to that count. E.g., ¶ 398 (specifically incorporating RICO Pattern and RICO Enterprise sections in the RICO Claim), ¶ 444 (specifically incorporating the Defamation Allegations in the Defamation Count). Further, Joel acknowledges that "the counts do assert specific facts in support of the claim." Doc. 82, Page 24. As the Eleventh Circuit held in distinguishing *Chudasama*:

> Vujin's SAC is not a shotgun pleading…While each count of the SAC incorporates the entire facts section (paragraphs 1–27), each count does not

adopt the allegations of all preceding counts. We have held that this feature alone does not make for a shotgun pleading.

*Vujin v. Galbut*, 836 Fed. App'x. 809, 815 (11th Cir. 2020), *accord SEC v. Miami*, 988 F.Supp.2d 1343, 1354 (S.D. Fla. 2013):

> [T]he Court is not convinced the Complaint is a shotgun pleading. Each count does not incorporate every preceding allegation, including paragraphs of other counts, but rather each count incorporates only the general allegations contained in paragraphs 1 through 115.

Thus, the VAC is not a shotgun pleading. Each count stands on its own. *Vujin, id*.

Although several Defendants complain that the original Complaint and criminal indictments are incorporated into the VAC, rendering it a shotgun pleading, all necessary allegations for the VAC are stated therein, without reference to other documents. Plaintiff simply included the other pleadings by reference to provide additional context and information, and to ensure that Defendants cannot take advantage of any inadvertent omission of fact in the redrafted document. To the extent that this creates, rather than avoids, an issue with the VAC, the other documents can be disregarded. No defendant raises any omission of information from the other pleadings in their MTD.[22]

---

[22] The Greenbergs continue to complain about the incorporation of other pleadings, even after Dorworth indicated they could be disregarded, by complaining about "amendment by response." Doc. 106, Page 2. However, the relief Defendants request is that "The Court should reject Plaintiff's attempt to incorporate by reference..." E.g., Doc. 77, n.1. Dorworth has agreed that the incorporation by reference can be rejected. Thus, Defendants have obtained their relief. Oddly enough, Defendants themselves attempt to incorporate some of the same documents into consideration of their Motions. E.g., Doc. 89, Page 1 (plea agreement from criminal case), and n.3 (original complaint).

Abby claims that the VAC allegations against her are "conclusory."[23] She references Appendix A to her motion, citing 31 paragraphs supposedly containing "conclusory" allegations.[24] Missing from Appendix A (indeed, missing entirely from Abby's MTD) is any mention of ¶¶ 71–108, the extended recitation of when Abby lured Rebekah to a resort by falsely promising that Joel would not be there on July 19, 2020. In fact, Joel was there, and Abby lured Rebekah to the resort so that Joel could threaten Dorworth through Rebekah.[25] That is, Abby was involved in the conspiracy from the very outset, based upon Rebekah's verified observations.

Moreover, the argument about "conclusory" allegations is misplaced. As the Eleventh Circuit recently held in *Glynn Environmental v. Sea Island,* 26 F.4th 1235, 1240 (11th Cir. 2022)(citation omitted)*,* "[a] conclusory statement is a legal conclusion that is couched as a factual allegation." Though space precludes a paragraph-by-paragraph refutation, three paragraphs are provided for illustration:

> 123. Greenberg, A.B. and Abby agreed that they would provide false information to the authorities and the federal grand jury regarding Dorworth, Gaetz and others.
>
> 126. Andrew and Sue Greenberg, as well as AWG and Greenberg Dental, agreed to provide funding to compensate Abby Greenberg and A.B. for

---

[23] "Of the 498 paragraphs in Plaintiff's Amended Complaint, 74 of the paragraphs specifically reference Defendant, Abby Greenberg; and the vast majority of those (at least 31 paragraphs) contain conclusory allegations." Doc. 79, Page 14. Abby's analysis of these paragraphs fares no better than her math. (31/74=.41, much less than a "vast majority," and not even nearly half).

[24] While Abby claims that each of these 31 paragraphs "specifically" references her, Doc. 79, Page 14, paragraphs 9, 29, 127, 292, and 331 do not.

[25] Later, Joel told Dorworth about Abby's participation in his misconduct. ¶ 89.

> providing false reports and testimony to the authorities and the federal grand jury.
>
> 127. Andrew and Sue Greenberg, as well as AWG and Greenberg Dental, also agreed to provide funding for expenses in connection with providing false reports and testimony to the authorities and the grand jury, including legal, investigative, and other expenses.

These are all statements of fact. Totally absent is any "legal conclusion." And, under any reasonable reading of the events of July 19, 2020, related in ¶¶ 71–108, there can be no doubt that these allegations (like every other allegation in Appendix A) satisfy the "plausibility" rule set forth by the Eleventh Circuit in *Watts, supra*: Abby did exactly what Joel told Dorworth she would do if Dorworth did not cooperate. In *Omnipol v. Multinational*, 32 F.4th 1298, 1310 (11th Cir. 2022)(dismissing RICO conspiracy claim based on formulaic recitations) and *ADA v. Cigna*, 605 F.3d 1283, 1293 (11th Cir. 2010), the Court rejected mere labels with no facts or explanation whatsoever. The detail in the VAC distinguishes it from those cases.

Greenberg Dental complains about "group pleading" and cites *Pierson v. Orlando Regional,* 619 F.Supp.2d 1260, 1273–74 (M.D. Fla. 2009). However, in *Pierson*, a physician aggrieved by a medical peer review sued 26 defendants, including fifteen individual physicians and two physician groups, alleging 19 counts that asserted a wide variety of claims. *Id*. at 1272. The complaint defined and repeatedly referenced the 15 physicians and two groups as "the Peer Review Defendants." *Id*. at 1272. The complaint referred to various committees which

allegedly acted improperly but failed to state which physicians sat on which committees. *Id*. at 1273. Because the Complaint failed to identify which defendants committed which acts, the court found it insufficient. Importantly, the Court emphasized that "all the defendants" were grouped as the "Peer Review Defendants," which did not give the Defendants fair notice of the claims against them. *Id*. at 1273. Here, only the three Greenberg Dental Defendants are collectively identified at ¶ 23 of the VAC as "Greenberg Dental." Their involvement is set forth at ¶ 25: "When referring to acts performed by Joel Greenberg, Andrew Greenberg, or Sue Greenberg, any funding required for those acts came from AWG and/or Greenberg Dental with the knowledge of what the funding would be used for." The allegations against Greenberg Dental discuss those payments. (¶¶ 102, 126, 127, 276, 294, 302, 304, 305, 308–310, 312, 323, 392). The VAC groups Greenberg Dental because each entity is alleged to have done the exact same thing: provide money specifically to facilitate the illegal scheme. E.g., ¶ 312. Unlike Greenberg Dental, in *Pierson,* the individual defendants had no idea what they were being accused of having done. The touchstone of "group pleading" is lack of "fair notice." *Barmapov v. Amuial*, 986 F.3d 1321, 1331 n.6 (11th Cir. 2021)(Tjoflat, J., concurring)("not all 'lumping' is impermissible"), *citing Quality Auto v. State Farm*, 917 F.3d 1249, 1276

(11th Cir. 2019)(reversing dismissal for group pleading because complaint provided fair notice to defendants.)[26]

## POINT II: THE COMPLAINT ADEQUATELY PLEADS A RICO CLAIM

### RICO Generally

As stated in *Sedima v. Imrex*, 473 U.S. 479, 497-8 (1985):

> RICO is to be read broadly. This is the lesson not only of Congress' self-consciously expansive language and overall approach, see United States v. Turkette, 452 U. S. 576, 586-587 (1981), but also of its express admonition that RICO is to "be liberally construed to effectuate its remedial purposes," Pub. L. 91-452, § 904(a), 84 Stat. 947. The statute's "remedial purposes" are nowhere more evident than in the provision of a private action for those injured by racketeering activity.

*Id.* Defendants' arguments contrast against the background legislative intent, expounded by the Supreme Court, that courts should liberally apply the RICO statute to provide a civil remedy for racketeering injury.

### Enterprise

*Boyle v. United State*s, 129 S.Ct. 2237, 2241 (2009), is the leading Supreme Court case on the enterprise requirement but is cited only by Greenberg Dental and Joel and ignored by each other Defendant. *Boyle* holds that even a loosely organized group without a leader or long-term plan constitutes a RICO enterprise:

> RICO makes it "unlawful for any person employed by or *associated with any enterprise* [to commit RICO violations]."

---

[26] Even if the Court found "group pleading," this would be no basis to dismiss with prejudice, as Greenberg Dental and the other Defendants have requested.

The statute does not specifically define the outer boundaries of the "enterprise" concept but states that the term "includes any…group of individuals associated in fact although not a legal entity." § 1961(4). This enumeration of included enterprises is obviously broad, encompassing "*any* ... group of individuals associated in fact." *Ibid.* (emphasis added). The term "any" ensures that the definition has a wide reach, see, *e.g., Ali v. Federal Bureau of Prisons,* 552 U.S. 214, 218-219, 128 S.Ct. 831, 833, 169 L.Ed.2d 680 (2008), and the very concept of an association in fact is expansive. In addition, the RICO statute provides that its terms are to be "liberally construed to effectuate its remedial purposes." § 904(a), 84 Stat. 947, note following 18 U.S.C. § 1961; see also, *e.g., National Organization for Women, Inc. v. Scheidler,* 510 U.S. 249, 257, 114 S.Ct. 798, 127 L.Ed.2d 99 (1994)("RICO broadly defines 'enterprise'")

*Id*. at 2243. In setting forth these standards, the Court rejected the notion that any particular attributes are necessary for a RICO enterprise. *Id*. at 2245. Instead, "[a]s we said in *Turkette,* an association-in-fact enterprise is simply a continuing unit that functions with a common purpose." *Id*. Further, "proof of a pattern of racketeering activity may be sufficient in a particular case to permit a jury to infer the existence of an association-in-fact enterprise." *Id*. at 2247. Further, *United States v. Cagnina*, 697 F.2d 915, 921 (11th Cir. 1983), holds that a RICO enterprise need not have a "distinct, formalized structure," nor must an enterprise be "distinct from the evidence showing a pattern of racketeering." Furthermore, a "group of persons who had committed a variety of unrelated offenses with no agreement as to any particular crime could be convicted of a RICO offense, because they were associated for the purpose of making money from repeated criminal activity." *United States v. Hewes*, 729 F.2d 1302, 1310 (11th Cir. 1984)(*citing Cagnina*). Each member need not

participate throughout the "life of the enterprise," nor must each member know "about all its activities." *Hewes, id*. at 1311.

*Boyle* requires only that an enterprise have "three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Id*. at 2244. The Greenberg Enterprise's purpose was to falsely implicate Dorworth and others. The Greenberg Enterprise includes Greenberg family members and their businesses, and A.B. who conducted a long relationship with Joel, keeping in touch with him from when she was apparently underage in 2017 through 2020, and then beyond, as they falsely implicated Dorworth and others. The members of the Enterprise were related through family, business, and personal ties. The Greenberg Enterprise had sufficient longevity[27] to accomplish a common purpose, as it acted from mid-2020

---

[27] The VAC does not state that "that the Defendants joined the RICO Enterprise in 2020." Doc. 82, Page 12 (citing ¶ 293). The VAC states that "[e]ach Defendant joined the conspiracy no later than Summer 2020..." ¶ 293 (emphasis supplied). The VAC then describes each Defendant's role. ¶¶ 294 et seq.

through the end of 2022, and possibly beyond, to implicate Dorworth.[28] Thus, these

elements are satisfied. *Boyle* imposes no requirement that each member be related.[29]

     *Williams v. Mohawk Industries*, 465 F.3d 1277, 1283-1285 (11th Cir. 2006),

also provides valuable guidance on the enterprise requirement. First, *Williams* noted

that the common purpose may be as simple as "making money." *Id*. at 1285-85

(finding "common purpose" satisfied.); *see also Cagnina, id*. at 921. *Williams*

elaborated:

> In our circuit, however, there has never been any requirement that the
> "common purpose" of the enterprise be the sole purpose of each and every
> member of the enterprise. In fact, it may often be the case that different
> members of a RICO enterprise will enjoy different benefits from the
> commission of predicate acts. This fact, however, is insufficient to defeat a
> civil RICO claim. Rather, all that is required is that the enterprise
> have *a* common purpose.

*Id*. at 1285-6. Thus, RICO imposes no requirement that each member of the RICO

enterprise join the enterprise for the same reason, if their purpose is similar.[30] *Id*.

---

[28] Joel misconstrues the VAC in this regard. For example, Paragraph 281 states in full: "A.B. remained related to the Greenberg Enterprise as she assisted with obstruction crimes from at latest 2020 through at earliest 2022." In other words, A.B. began lying about Dorworth no later than 2020, and continued at least through 2022, id., though A.B. may have started earlier or continued into 2023. Joel claims that this is somehow inconsistent with the assertion that each Defendant was involved in the conspiracy by 2020, Doc. 82, Page 17, yet this is exactly what the two paragraphs both say. Id.

[29] Although Joel claims that many of the allegations regarding the Enterprise are conclusory, many are not. For example, the fact that Joel obtained a significant stake in AWG is not "conclusory." C.f. Motion at 12 and Para. 270. In fact, it is well-documented in Joel's Form 6 filings. Search for Financial Disclosure Forms - Florida Commission on Ethics (state.fl.us)

[30] Greenberg Dental claims that it received no benefit from the RICO violations. However, Greenberg Dental's valuable brand has been tarnished by Joel's misconduct and criminal charges. Greenberg Dental had every incentive (perhaps the strongest incentive of all) to stop the investigation or mitigate Joel's and others' liability.

Here, the purpose was to implicate Dorworth. The fact that A.B. may have wanted to bring a civil lawsuit, or that Joel's family may have wanted to help Joel, while Joel and Andrew wished to mitigate their own liability, does not diminish the existence of a RICO enterprise. *Williams* also acknowledges that a RICO enterprise may be "loose or informal." *Id*. at 1284. In fact, *Williams* imposes no stringent pleading requirement for a RICO enterprise:

> Specifically, the plaintiffs allege that:
>
> [e]ach recruiter is paid a fee for each worker it supplies to Mohawk, and some of those recruiters work closely with Mohawk to meet its employment need by offering a pool of illegal workers who can be dispatched to a particular Mohawk facility on short notice as the need arises. Some recruiters find workers in the Brownsville, Texas area and transport them to Georgia. Others, like TPS, have relatively formal relationships with the company in which they employ illegal workers and then loan or otherwise provide them to Mohawk for a fee. These recruiters are sometimes assisted by Mohawk employees who carry a supply of social security cards for use when a prospective or existing employee needs to assume a new identity.
>
> Given the Rule 12(b)(6) stage of the litigation, the plaintiffs' complaint must be taken as true, and it has sufficiently alleged an "enterprise" under RICO; that is an association-in-fact between Mohawk and third-party recruiters. This Court has never required anything other than a "loose or informal" association of distinct entities. Mohawk and the third-party recruiters are distinct entities that, at least according to the complaint, are engaged in a conspiracy to bring illegal workers into this country for Mohawk's benefit. As such, the complaint sufficiently alleges an "enterprise" under RICO.

*Id*. at 1284. The allegations of the "enterprise" in *Williams* are no less "conclusory" than those in this case. C.f. ¶¶ 264-339.

Lastly, Defendants attempt to characterize the Greenberg Enterprise as a "one man show." Doc. 77 at 18, Doc. 79 at 16, Doc. 82 at 15 all citing *Guidry v. Bank of*

*LaPlace*, 954 F.2d 278, 283 (5th Cir. 1992). This is factually and legally unavailing. First, the VAC adequately alleges each party's role, and it is not limited to Joel. ¶¶ 264-339 (detailing each party's role in the enterprise and conspiracy). Supreme Court caselaw forecloses Defendants' "one man show" argument. *Salinas v. United States*, 522 U.S. 52, 65 (1997)("an 'enterprise' under § 1962(c) can exist with only one actor to conduct it."); and *Cedric Kushner Promotions v. King*, 533 U.S. 158, 166 (2001)(applying RICO to a sole owner of an enterprise who conducted it.)

<u>Operation and Management</u>

Although Defendants claim they did not "conduct or participate" in the RICO enterprise, this is a relatively easy burden to meet, particularly at the pleading stage, and such a showing is in any event unnecessary for the RICO conspiracy claim alleged against each Defendant.[31] As stated in *Reves v. Ernst & Young*, 507 U.S. 170 (1993), "the word 'participate' makes clear that RICO liability is not limited to those with primary responsibility for the enterprise's affairs, just as the phrase 'directly or indirectly' makes clear that RICO liability is not limited to those with a formal position in the enterprise but *some* part in directing the enterprise's affairs is required." *Id*. at 179, *see also Williams, id*. at 1285.

Dorworth has adequately pleaded the participation requirement, which is not particularly suitable for resolution on a Motion to Dismiss. *Williams, id*. at 1285-86

---

[31] Only Joel is sued for substantive RICO violations, 1962(c).

(holding complaint should not be dismissed where plaintiffs might be able to establish that the defendant "played some part in directing the affairs of the enterprise"), *see also First Capital Asset v. Satinwood*, 385 F.3d 159, 176 (2nd Cir. 2004)(holding that the operation or management test poses "a relatively low hurdle for plaintiffs to clear, especially at the pleading stage.")

Further, as stated in *Salinas v. United States*, 522 U.S. 52 (1997), a defendant may be liable for 1962(d) conspiracy merely by agreeing to facilitate a 1962(c) act by somebody else. Dorworth states a claim as to each Defendant, who either had "some part in directing the enterprise's affairs," *Reve*s at 179, or "knew about and agreed to facilitate the scheme." *Id.* at 66. *Reves* notes that "[a]n enterprise also might be 'operated' or 'managed' by others 'associated with' the enterprise who exert control over it as, for example, by bribery." *Id*. at 184. Each Defendant here either offered, accepted, paid, or facilitated bribes.

## Conspiracy

*Salinas v. United States*, 522 U.S. 52 (1997), not cited by any Defendant, holds that each party need not agree to commit two predicate acts. Salinas challenged his "conviction because the jury was not instructed that he must have committed or agreed to commit two predicate acts himself. *His interpretation of the conspiracy statute is wrong*." *Salinas, id*. at 63. (emphasis supplied). Salinas notes:

The RICO conspiracy statute, simple in formulation, provides:

"It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section." 18 U. S. C. § 1962(d). There is no requirement of some overt act or specific act in the statute before us, unlike the general conspiracy provision applicable to federal crimes, which requires that at least one of the conspirators have committed an "act to effect the object of the conspiracy." § 371. *The RICO conspiracy provision, then, is even more comprehensive than the general conspiracy offense in § 371.*

…

A conspiracy may exist even if a conspirator does not agree to commit or facilitate each and every part of the substantive offense. See *United States* v. *Socony-Vacuum Oil Co.,* 310 U. S. 150, 253-254 (1940). The partners in the criminal plan must agree to pursue the same criminal objective and may divide up the work, yet each is responsible for the acts of each other. See *Pinkerton* v. *United States,* 328 U. S. 640, 646 (1946)("And so long as the partnership in crime continues, the partners act for each other in carrying it forward"). *If conspirators have a plan which calls for some conspirators to perpetrate the crime and others to provide support, the supporters are as guilty as the perpetrators.* As Justice Holmes observed: "[P]lainly a person may conspire for the commission of a crime by a third person." *United States* v. *Holte,* 236 U. S. 140, 144 (1915). *A person, moreover, may be liable for conspiracy even though he was incapable of committing the substantive offense. United States* v. *Rabinowich,* 238 U.S. 78, 86 (1915).

*Id*. at 63-64. Thus, the Court found that (1) RICO conspiracy is "even more comprehensive" than other conspiracy law, (2) supporters of a conspiracy are as guilty as the perpetrators, and (3) even people who do not commit a substantive offense may be liable for RICO conspiracy. *Id*. Further, if the conspirators "share a common purpose, they are liable for the acts of their coconspirators." *Id*. at 64. The Court notes that § 1962(d) did not require "the Government to prove each conspirator agreed that he would be the one to commit two predicate acts." Importantly, a party

is liable if they agree to facilitate commission of a crime, and they need not agree to

commit the crime. *Id*. at 65. Further, *Salinas* concluded:

> One can be a conspirator by agreeing to facilitate only some of the acts
> leading to the substantive offense…
>
> It makes no difference that the substantive offense under § 1962(c) requires
> two or more predicate acts. The interplay between subsections (c) and (d)
> does not permit us to excuse from the reach of to participate in the conspiracy
> provision an actor who does not himself commit or agree to commit the two
> or more predicate acts requisite to the underlying offense. True, though an
> "enterprise" under § 1962(c) can exist with only one actor to conduct it, in
> most instances it will be conducted by more than one person or entity; and
> this in turn may make it somewhat difficult to determine just where the
> enterprise ends and the conspiracy begins, or, on the other hand, whether the
> two crimes are coincident in their factual circumstances…
>
> In the case before us, even if Salinas did not accept or agree to accept two
> bribes, there was ample evidence that he conspired to violate subsection (c).
> The evidence showed that Marmolejo committed at least two acts of
> racketeering activity when he accepted numerous bribes and that Salinas
> knew about and agreed to facilitate the scheme. This is sufficient to support
> a conviction under § 1962(d).

*Id*. at 65-66. The VAC adequately alleges that each Defendant agreed to participate

in the conspiracy to defame Dorworth.

Nor is conspiracy liability limited to those who operated or agreed to operate

the corrupt enterprise. Instead, "in accordance with *Salinas*, liability under section

1962(d) is met by '1) knowledge[32] of the corrupt enterprise's activities and 2)

agreement to facilitate those activities.'" *Smith v. Berg*, 247 F.3d 532, 535 (3rd Cir.

2001). As such, the Third Circuit held that "in the *Salinas* case, the Supreme Court

---

[32] "[I]ntent, knowledge and other conditions of a person's mind may be alleged generally." Rule
9(b).

found that a violation of section 1962(c) was not a prerequisite to a violation of section 1962(d)." *Id*. at 537. Accordingly, "a defendant may be held liable for conspiracy to violate section 1962(c) if he knowingly agrees to facilitate a scheme which includes the operation or management of a RICO enterprise." *Id*. at 538. In *Smith*, the Court upheld RICO claims against title insurance and lending companies who agreed to facilitate real estate fraud by another defendant. *Id*. at 534-535. *See also United States v. Starrett*, 55 F.3d 1525, 1547 (11th Cir. 1995)("the Supreme Court's *Reves* test does not apply to a conviction for RICO conspiracy."); *United States v. Browne*, 505 F.3d 1229, 1264 (11th Cir. 2007)("A defendant may be guilty of conspiracy even if he did not commit the substantive acts that could constitute violations of §§ 1962(a), (b), or (c)…If the government can prove an agreement on an overall objective, it need not prove a defendant personally agreed to commit two predicate acts.") Even decisions limiting RICO so hold. *Beck v. Prupis*, 529 U.S. 494, 506-7 (2000)("a plaintiff could, through a § 1964(c) suit for a violation of § 1962(d), sue co-conspirators who might not themselves have violated one of the substantive provisions of § 1962.") Of course, this distinction is not particularly important, as each Defendant agreed to commit racketeering acts (obstruction, bribery, etc.) to facilitate the illegal scheme, with knowledge of the same. Provision of assistance with knowledge of the corrupt enterprise is sufficient. *Id*.

The reconciliation of *Reves* and *Salinas* was specifically recognized in *Brouwer v. Raffensperger*, 199 F.3d 961, 962 (7th Cir. 2000). There, the Court noted:

> one's agreement must be to knowingly facilitate the activities of the operators or managers to whom subsection (c) applies. One must knowingly agree to perform services of a kind which facilitate the activities of those who are operating the enterprise in an illegal manner. It is an agreement, not to operate or manage the enterprise, but personally to facilitate the activities of those who do.

*Id*. at 967, *see also United States v. Fernandez*, 388 F.3d 1199, 1230 (9th Cir. 2004)(noting that all circuits are now in accord that *Reves'* operation or management test does not apply to a § 1962(d) conspiracy claim.)

*Cisneros v. Petland*, 972 F.3d 1204, 1220 (11th Cir. 2020), cited by Defendants, states "RICO can be found through the conduct of the alleged participants or from circumstantial evidence of a scheme."[33] Similarly, *ADA v. Cigna*, 605 F.3d 1283 (11th Cir. 2010), relied upon extensively by Defendants, states that a "plaintiff need not offer direct evidence of a RICO agreement; the existence of conspiracy "may be inferred from the conduct of the participants." *Id*. at 1293.[34] The Greenbergs even suggest that a "tacit agreement" may be inferred from factual allegations. Doc. 77 at 11 citing *Twombly*. As the Eleventh Circuit has stated:

---

[33] A.B. cites two authorities, *Raimi v. Furlong*, 702 So.2d 1273, 1284 (Fla. 3rd DCA 1997), and *Diamond v. Rosenfeld*, 511 So.2d 1031, 1034 (Fla. 4th DCA 1987), requiring circumstantial evidence to outweigh all reasonable inferences to the contrary. Doc. 80, Page 13. Both obviously dealt with posttrial review of evidence, not the sufficiency of a pleading. A.B. does not explain their significance here. Dorworth looks forward to meeting his burden at trial.

[34] Generally, people do not explicitly agree to commit crimes, and when they do, they do not announce it to the world, and thus conspiracies are inferred from conduct of the participants.

> The existence of an agreement may be proven by circumstantial evidence, including "inferences from the conduct of the alleged participants or from circumstantial evidence of a scheme. Indeed, the government may establish knowledge of an illegal agreement by showing that the defendant "knew the essential object of the conspiracy." It is *not* necessary for the government's evidence to be inconsistent with *every* reasonable hypothesis except that of guilt in order to be sufficient. Moreover, in reviewing the prosecution's case, we draw no distinction between circumstantial and direct evidence.

*United States v. Silvestri*, 409 F.3d 1311, 1328 (11th Cir. 2005)(emphasis original).

As for the suggestion that Dorworth "offers only conclusory allegations" about the Greenbergs' agreement to the conspiracy, the litany of allegations cited includes only a single paragraph, ¶ 214, from The RICO Conspiracy Section. Doc. 77 at 9. Joel even acknowledges that "[s]pecific allegations supporting the … 'RICO Conspiracy' are found in 36 paragraphs." Doc. 82, Page 16.[35] The Greenbergs' reliance on *Twombly*, Doc. 77 at 21, as an example of a case where a complaint was dismissed for insufficiently pleading an agreement is misplaced, for there the Court held that "the complaint leaves no doubt that the plaintiffs rest their § 1 claim on descriptions of parallel conduct and not on any allegation of actual agreement." 550 U.S. at 564. Actual agreement is alleged here.

<u>The Pattern and Predicate Acts are Adequately Set Forth and Mostly Unchallenged</u>

---

[35] After calling the allegations "specific," he inexplicably asks the court to disregard those same allegations as conclusory or asserted on information and belief.

Defendants do not seriously contest the pattern requirement of RICO, or suggest the predicate acts are insufficient.[36] Dorworth therefore does not address these requirements in detail, except to note that the predicate acts extended over several years and involved the same types of acts and victims, which is more than sufficient to satisfy the pattern requirement. *Wilson v. De Angelis*, 156 F.Supp.2d 1335, 1339 (S.D. Fla. 2001)(scheme involving sales of gold coins at inflated prices lasting only eleven months satisfied closed-ended continuity), *United States v. Stodola*, 953 F.2d 266, 270 (7th Cir. 2002)(closed-ended continuity satisfied by bribery scheme that lasted twenty months), *Global Oil Tools v. Barnhill*, 2012 U.S. Dist. LEXIS 164888 at *23 (E.D. La. Nov. 19, 2012)(scheme by employees to divert customers to competing ventures and steal from employer, which lasted two years established closed-ended continuity); *Bank of America v. Touche Ross*, 782 F.2d 966, 971 (11th Cir. 1986)(holding that a scheme involving only one victim or set of victims shows a pattern); *BCBS v. Kamin*, 876 F.2d 543, 545 (6th Cir. 1989)("we do not believe that Congress intended that one could insulate himself from the reach of RICO simply by repeatedly bilking the same victim.")

---

[36] Contrary to A.B.'s suggestion, Doc. 80, Page 19, Dorworth does not assert that defamation or perjury are Federal RICO predicates. See ¶¶ 233-254. False statement and perjury are, however, Florida RICO predicates. See Fla. Stat. 772.102(1)(a)27-29.

A.B.'s misconduct is clearly set forth in the VAC.[37] Dorworth did not, as A.B. asserts, rely on any "predicate acts of defamation." Doc. 80, Page 18. Instead Dorworth asserts that A.B. conspired to aid the pattern of racketeering activity, which is sufficient, as described above. Further A.B. agreed to, and did, commit predicate acts of her own, as alleged in the VAC.[38] Thus, the VAC adequately alleges A.B.'s role in the conspiracy. Nor is the fact that A.B. may have had an additional motive for implicating Dorworth (bringing a dubious civil claim that was never filed) a basis to discount her role in the Greenberg Enterprise. *See Williams, id*. at 1286 ("In fact, it may often be the case that different members of a RICO enterprise will enjoy different benefits from the commission of predicate acts.") Not surprisingly, A.B. provides no support for this proposition. Last, A.B. suggests in a footnote she was allowed to accept legal fees as a form of charity, but that is not what is alleged. See e.g., ¶ 113 ("Greenberg had previously stated that A.B. would do what Greenberg wanted in exchange for material support and attorney fees.")

Abby similarly challenges the enterprise and conspiracy elements. Doc. 79 at 16. *Citing Cisneros v. Petland*, 972 F.3d 1204, 1220 (11th Cir. 2020), Abby claims

---

[37] See e.g., ¶¶ 7, 27, 107, 121-23, 136, 137, 146-8, 151, 154, 168, 178-9, 190, 219-20, 236, 288-89, 324 (detailing attempts to frame Dorworth to the authorities through false testimony and accusations), and e.g., ¶¶ 239-40 (acceptance of inducements).

[38] ¶ 240 (18 U.S.C. § 201(b) and/or (c)(bribery of witness)), ¶ 244 and 245 (18 U.S.C. § 1512(c)(2)(obstructing or impeding official proceeding), ¶ 246 (18 U.S.C. § 1512(k), conspiracy to violate 18 U.S.C. § 1512), ¶ 249-251, 253 (Florida Statutes 837.012 (perjury when not in an official proceeding), 837.02 (perjury in official proceedings), 837.05 (false reports to law enforcement authorities), 837.055 (false information to law enforcement during investigation).

that "[b]efore Plaintiff can state a viable RICO conspiracy claim, he must state a viable underlying RICO claim." Doc. 79, Page 16. However, *Cisneros* merely found that, unlike here, the conduct alleged did not constitute a RICO violation. *Id*. at 1220.[39] Abby invokes the "one man show" argument addressed above, ignoring her own assistance to the scheme detailed in the VAC, and then invokes the "innocent explanation" requirement also addressed elsewhere, without providing any "innocent explanation," for example, for lying to Rebekah Dorworth to induce her to come to the resort where she was threatened by Joel.

Abby claims that Dorworth fails to plead that the Greenberg Enterprise has an illicit purpose, and claims, like the Greenbergs, that "that is where Plaintiff fails." Doc. 79, Page 17. Abby's Motion claims the Greenbergs "were related by blood and marriage,"[40] and that Joel committed crimes "for his own benefit,"[41] but ignores

---

[39] In *Cisneros*, the conspiracy claim was dismissed because "parties cannot be found guilty of conspiring to commit an act that is not itself against the law." *Id*. at 1220. However, a party need not show a substantive RICO violation for RICO conspiracy. *Edgenet v. GS1 AISBL*, 742 F.Supp.2d 997, 1020 (E.D. Wis. 2010)("RICO conspiracy does not require the predicate acts to have actually taken place.")

[40] Abby concedes the Greenberg Family is associated. See 18 U.S.C. § 1961(4)("enterprise includes any...group of individuals associated in fact although not a legal entity").

[41] Abby claims that "all Plaintiff has alleged is that Joel committed RICO predicate acts—that is, federal crimes—for Joel's benefit. Plaintiff has thus failed to plead an underlying RICO violation." Doc. 79, Page 17-18. Thus, Abby acknowledges the pattern. Dorworth has also alleged that Abby and the other Defendants also committed RICO predicates and/or assisted Joel in doing so. Thus, Dorworth has alleged the underlying RICO violations that Abby and the other Defendants agreed to facilitate, which suffices to support a RICO conspiracy. See Conspiracy Section, supra.

significant acts Abby and others performed to aid Joel and further his illegal acts.[42] Doc. 79, Pages 17-18. Abby erroneously asserts that family can never constitute a RICO enterprise because it is related by "blood and marriage." *See e.g., United States v. Leisure*, 844 F.2d 1347, 1363 (8th Cir. 1988)("structure is found in the family and social relationships between the members of the group").[43]

Abby quickly shifts into discussion of the RICO conspiracy and claims that Dorworth must show Abby "agreed to the overall objective of the conspiracy." Doc. 79, Page 18. As shown from her multiple proffers with the government in which she provided false information, ¶¶ 7, 122-126, 155, 161-2, 168, 230,[44] Joel's statements in the jailhouse interview about her motivation to implicate others, ¶ 316, Abby's assistance in luring Rebekah Dorworth to the resort, ¶¶ 71-90, her receipt of lavish compensation from the Greenbergs, ¶¶ 78-81, 319-320, among many other acts,

---

[42] ¶¶ 5, 71-89, 99-102 (luring Rebekah Dorworth to resort to be extorted, Abby concerned about her own exposure), ¶¶ 7, 122-126, 230 (false allegations), ¶¶ 18, 154 (acceptance of compensation in exchange for implicating Dorworth), ¶¶ 155-162 (false allegations about ghost candidate scandal), ¶ 287, 316 (determining that others should be implicated and directing such activity), ¶¶ 317-320 (acceptance of extravagant aid in exchange for aiding the implication of Dorworth and others), ¶¶ 244 and 245 (18 U.S.C. § 1512(c)(2)(obstruct or impeding official proceeding), ¶ 246 (18 U.S.C. § 1512(k), conspiracy to violate 18 U.S.C. § 1512), ¶ 249-251, 253 (Florida Statutes 837.012 (perjury when not in an official proceeding), 837.02 (perjury in official proceedings), 837.05 (false reports to law enforcement authorities), 837.055 (false information to law enforcement during investigation).

[43] Abby asserts that the VAC fails to show she "agreed to join in that enterprise," Doc. 79, Page 18, notwithstanding that she admits she was related by marriage. Id. Abby also agreed to facilitate and commit RICO predicates as shown herein.

[44] Abby also asserts she did not agree to commit two predicate acts, Doc. 79, Page 18, but the VAC complaint alleges otherwise. Abby admits in her interrogatory answers she sat for multiple interviews with the authorities.

Abby "agreed to the overall objective of the conspiracy." In reciting the pattern of activity, Abby conveniently leaves out one of her most important roles in the conspiracy: luring Rebekah Dorworth to the resort on false pretenses so Joel could threaten and extort her. Abby satisfies both prongs of the conspiracy inquiry: agreement to overall objective, and agreement to commit two predicates.[45]

Joel (of all defendants), asserts that RICO claims should be scrutinized "given the statute's damaging effects on the reputations of individuals alleged to be engaged in RICO enterprises and conspiracies." Doc. 82, Page 9. This is an odd argument for Joel to make, given that he indisputably committed numerous federal crimes, generated enormous publicity for his misconduct, and operated the Seminole County Tax Collector's office through a pattern of racketeering activity. See e.g., Doc. 62, Pages 1-2, 42-43.

Next, Joel asserts that Dorworth fails to plead that each defendant directed the affairs of the RICO enterprise. Doc. 82, Page 9-10. However, this is not even what Dorworth must show. Joel is the only Defendant sued under 1962(c), Count I, and he certainly conducted the affairs of the Greenberg Enterprise. ¶¶ 233-254, 264-290. Joel and the rest of the Defendants are sued under 1962(d) for conspiracy, Count II, and they assisted the enterprise with knowledge of its illegal purpose. See

---

[45] See footnote supra.

Conspiracy Section, Supra. Joel lists Defendants' illegal acts, Doc. 82, Page 10, and these are sufficient to subject the rest of the Defendants to RICO liability.[46]

Moving to the Enterprise requirement, Joel claims that the requirement is not met because different Defendants joined the enterprise at different times or because they had different purposes for implicating Dorworth.[47] Doc. 82, Pages 11-12. However, this does not defeat a RICO claim. *Williams, id*. at 1285-86 (same reason not required), *Hewes, id*. at 1311 (each member need not participate throughout the "life of the enterprise," nor must each member know "about all its activities.") Further, Joel speculates that "the false testimony provided by four separate individuals, who could have been prosecuted for lying, coincidentally matched." Doc. 82, Page 12. If anything, taken with the fact that Dorworth was not prosecuted because he did not do anything wrong, the fact that four persons' false testimony[48] "matched" is highly suggestive of a conspiracy whereby they concocted a story that they told the authorities.[49] Next, Joel continues to claim that A.B. was his victim,

---

[46] It is not clear why Joel, who certainly has the most civil and criminal liability, has spent his brief addressing matters regarding other Defendants.

[47] The VAC does not state "that the Defendants joined the RICO Enterprise in 2020." Motion at 12 (citing Paragraph 293). The pleading states "[e]ach Defendant joined the conspiracy no later than Summer 2020…" Para. 293. The VAC describes each Defendant's role. Paras. 294 et seq.

[48] If four people had provided true testimony against Dorworth, he surely would have been prosecuted. There is nothing implausible about the fact that Dorworth was falsely accused.

[49] Joel also claims that A.B. implicated Joel in sex trafficking, citing ¶ 231, which is plainly not what is alleged. Doc. 82, Page 13 c.f. Exhibit 3 Joel Text ("Likely Venmo was the link.") Joel also claims, without any citation at all, that Dorworth claims A.B. wanted to lessen her own liability, which is not asserted anywhere. Doc. 82, id. Although Joel claims A.B. had no liability ("she had

and she would not collude with her "perpetuator."[50] Doc. 82, Page 13. Joel, however, contested that position at his sentencing.[51] Lastly, again without authority, Joel asserts a lack of "nexus" between his racketeering acts and the Greenberg Enterprise. However, he merely cites to a section of the VAC entitled "The Pattern of Racketeering in This Complaint Falls Within a Broader Pattern of Systematic, Outrageous, Extensive, Continued, and Unabated Criminality." Joel does not explain why he would look for the "nexus" there rather than in the Conspiracy or Enterprise Sections of the Complaint.[52]

Although Greenberg Dental claims that it is not liable, it admits that it supplied money to the Greenbergs. Doc. 81, Page 3, n.2. Further, the VAC shows the Greenbergs had knowledge of the conspiracy. Greenberg Dental does not deny its association with the Greenbergs. Greenberg Dental claims Dorworth is required to plead RICO with specificity under Rule 9(b), because it is a "certain breed of fraud,"

---

none"), he invites the Court to infer in the next paragraph that A.B., Joel, and Abby "all made truthful statements" "to avoid criminal liability." Id. (Of course, A.B. was liable for prostitution, possibly among other things, but that is beside the point.)

[50] To the contrary, A.B. and Joel admit that A.B. would commit crimes (prostitution) with Joel in exchange for money. Even assuming A.B. is aggrieved by her relationship with Joel, which is not apparent at all, she has not sued him, sought redress, or otherwise denounced him.

[51] *United States v. Greenberg*, 20-cr-97 (M.D. Fla. December 1, 2022), Doc. 180 at 17:15-19:13 (minimizing nature of offense and detailing A.B.'s culpability), 40:24-41:1 ("to call him a trafficker of a child really mischaracterizes what happened in this case.") This position was apparently adopted by the Court. ¶ 372 (noting that the Court referred to A.B. as "essentially a prostitute.") and Sentencing Transcript, id. at 50:114-23 (court declining to impose penalties to protect minor victims).

[52] Joel ignores the substantial assistance the Greenberg Enterprise provided to his racketeering activity, as alleged throughout the Complaint.

but that provision applies only to fraud claims. Doc. 81, Page 6 (referring to "fraud-based claims.")[53] Because Dorworth does not plead any fraud-based claims, 9(b)'s fraud pleading standard is inapplicable. *Liquidation v. Renta*, 530 F.3d 1339, 1355-6 (11th Cir. 2008)("We now hold that RICO predicate acts not sounding in fraud need not necessarily be pleaded with the particularity required by [Rule 9(b).]") In fact, although Greenberg Dental denies knowledge of the illegal activity, Rule 9(b) specifically states "malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." To the extent the complaint is "conclusory" or lacks sufficient detail, Dorworth is allowed to plead generally. *Harrison v. Westinghouse*, 176 F.3d 776, 784 (4th Cir. 1999)("The second sentence of Rule 9(b) allows conclusory allegations of defendant's knowledge...") *citing* 5 Wright and Miller § 1297, at 612.[54] Even where applicable, Rule 9(b) is relaxed where a "RICO plaintiff lacks access to all facts necessary to detail" a claim. *Rotella v. Wood*, 528 U.S. 549, 560 (2000). Lastly, although Greenberg Dental claims that Dorworth is attempting to "extort" a settlement, Doc. 81, Page 4, but it is Dorworth who was extorted in this case.[55] Greenberg Dental's role is simple: it knowingly provided money to assist

---

[53] Because Dorworth is not claiming for fraud, Greenberg Dental's reference to "garden variety fraud" is even further afield. Doc. 81, Page 9. This case is neither "garden variety" nor "fraud."

[54] *Harrison* concludes that a "court should hesitate to dismiss a complaint under Rule 9(b) if the court is satisfied (1) that the defendant has been made aware of the particular circumstances for which she will have to prepare a defense at trial, and (2) that plaintiff has substantial prediscovery evidence of those facts." *Id*. at 784.

[55] ¶ 4-6, 102 (Greenberg Dental to pay for extortion), 71-108 (detailing extortion), 247, 417.

with the illegal acts alleged in the VAC.[56] Nor does Greenberg Dental explain how its activity could be described as "independent, parallel conduct," Doc. 81, Page 13, when it funded the other Defendants. Although Greenberg Dental asserts that all it did was provide financial support, this financial support was Greenberg Dental's contribution to the RICO conspiracy.[57] Lastly, the required association is shown by Defendants working together, which they did through their communications and payments. *Lockheed Martin v. Boeing*, 357 F.Supp.2d 1350, 1362 (M.D. Fla. 2005)(holding that association is satisfied by working together), cited at Doc. 81, Page 12; see also *United States v. Goldin Industries*, 219 F.3d 1271, 1275 (11th Cir. 2000)(finding that three affiliated but apparently undifferentiated family businesses liable for a RICO scheme also allegedly involving family members).

---

[56]Whether Greenberg Dental is "legitimate" or not, Doc. 81, Page 12, is beside the point. *See Sedima, id.*, at 499, *citing Turkette* (RICO applies to legitimate as well as illegitimate enterprises). Greenberg Dental is not accused of a 1962(a)(investment of proceeds derived from unlawful activity) violation. They are accused of using funds (whether lawfully or unlawfully procured) to promote unlawful activity. Abby also asserts that the RICO enterprise, apparently as distinguished from the RICO defendants, must have an "illicit purpose." Doc. 79, Page 17, *citing Almanza v. United Airlines*, 851 F.3d 1060, 1067 (11th Cir. 2017), which says nothing of the sort. *Id*.

[57] Although Greenberg Dental claims that Dorworth's "allegations do not infer that the Greenberg Dental Defendants knowingly agreed to a RICO conspiracy." Doc. 81, Page 18. Dorworth alleges provided funding knowing that it would be used to promote the predicate acts by Joel Greenberg and others. This is sufficient. See Conspiracy Section Supra. Second, Dorworth could not "infer" anything in the VAC. A writer implies, a reader infers. See, e.g., "Infer," *The Free Dictionary*, available at: http://www.thefreedictionary.com/infer.

## POINT III: DORWORTH ALLEGES A CONSPIRACY CLAIM

Count VII of the VAC alleges the Defendants "conspired to create, finance, and disseminate false information about … Dorworth" (¶ 466); they all "agreed to, and knowingly did, disseminate or assist in disseminating false information about Dorworth" (¶ 467); each Defendant was aware of an overall plan to harm Dorworth's reputation, business, and livelihood (¶ 468); and each Defendant acted to further the plan to harm Dorworth's reputation." ¶ 469. The Greenbergs claim that Dorworth needs to allege a "meeting or gathering" and "identify [a] communication," Doc. 77 Page 25, even though a complaint "does not need detailed factual allegations." *Twombly*, 550 U.S. at 556. Equally importantly, *ADA v. Cigna*, 605 F.3d 1283 (11th Cir. 2010), relied upon extensively by the Greenbergs, states the existence of conspiracy "may be inferred from the conduct of the participants." *Id*. at 1293.[58] Nor is there any requirement that a plaintiff plead exact details of a conspiracy. *E.g. State Farm v. Lewin*, 535 F.Supp.3d 1247, 1266 (M.D. Fla. 2021)(finding RICO and civil conspiracy), *Gilmour v. Bohmueller*, 04-2535, 2005 WL 241181 at *9 (E.D. Pa. Jan. 27, 2005)(although the "Complaint does not identify a specific date, time or place where a conspiratorial meeting was held by Defendants,…[the] allegations if proved, would suffice to establish a claim of civil conspiracy."); *In re Chira*, 353 B.R. 693,

---

[58] The Greenbergs themselves recognize a "tacit agreement" may be inferred. Doc. 77, Page 12, *citing Twombly*.

732 (Bankr. S.D. Fla. 2006)("The agreement need not be expressed in words and may be implied and understood to exist from the conduct itself.") citing Restatement of Torts. Nor does Dorworth state that Abby is liable "because she was his wife at the time and mother of his children." Doc. 79, Page 9. Instead, Abby is liable because she helped Joel to extort the Dorworths, corroborated Joel's false story to ensure that other people would be prosecuted along with her husband, and received material support from the Greenbergs in exchange. *See e.g., Voll v. Randazzo*, 674 So.2d 892 (Fla. 5th DCA 1996)(holding wife liable for civil conspiracy for husband's fraud based upon "knowledge and general participation in the conspiracy to commit a civil wrong.")

The VAC relates Joel's assertions that sometime in the 32 days between Joel's indictment on June 17, 2020, and the July 19, 2020 encounter at the resort, the Greenbergs agreed to participate in Joel's felonious scheme. ¶¶ 93, 94, 102, 126, 127, 214, 294, 306. It also repeatedly alleges the Greenbergs were aware of A.B.'s existence. ¶¶ 93, 126, 294, 459, 460. The Greenbergs' suggestion that this is "equally suggestive of independent, parallel conduct without any collusion—and, indeed, innocent conduct" is refuted above and inconsistent with these allegations.[59] Only from the Greenbergs' Strawman Complaint can one infer "innocent conduct."

---

[59] To find "parallel conduct" rather than a conspiracy, the Greenbergs would have the Court believe that Joel, Abby, and A.B. each decided independently to falsely implicate Dorworth without any

Joel argues the conspiracy claim fails because (a) the underlying defamation claim fails (addressed elsewhere), and (b) the facts alleged are equally consistent with innocent "parallel conduct." Doc. 82, Pages 22-23. Joel appears to be reading from his Strawman Complaint, for the real VAC has lengthy allegations that Joel fails to mention: As noted above, in July 2020, Joel told Rebekah and then Dorworth that he and the other defendants would defame Dorworth if Dorworth failed to cooperate. ¶¶ 71–108. It also specifies the ways in which Joel said A.B. (¶¶ 92–93), the Greenbergs (¶¶ 93–94, 102–103, 105), and Greenberg Dental (¶ 94, 105) would participate in the conspiracy. Defendants' subsequent conduct is not "innocent."[60]

Dorworth is not asserting that Abby has "derivative" liability. Doc. 79, Pages 2-4. Abby knowingly joined in the campaign of false reports and defamation against

coordination between them or inducement. Presumably, the Court is to infer that Andrew's provision of $200,000 to cover up the bitcoin scheme was innocent (without any innocent explanation), the Greenbergs paid legal bills without reviewing them or inquiring regarding the progress of Joel's case, and Abby and A.B. provided false information to prosecutors about Dorworth for no reason.

[60] The Greenberg's entire conspiracy section essentially asks the Court to ignore the allegations of the Complaint and instead simply assume there was no conspiracy after all. However, this requires the Court to suspend common sense and a fair reading of the VAC and its exhibits, and instead draw every inference in favor of Joel and his family at the pleading stage. This is not the law. The Court would need to ignore, for example, many statements by Joel, including statements to Rebekah and Dorworth, text messages to Dorworth, letters to Trump, and jailhouse confessions, either attesting to Defendants' misconduct or stating facts inconsistent with any wrongdoing by Dorworth of which he was accused. Greenberg Dental similarly argues that "Plaintiff has not alleged any facts, much less clear, positive, and specific facts, that would infer (sic) the existence of an agreement between the Greenberg Dental Defendants and any of the other Defendants to conspire." Doc. 81, Page 24. Aside from referring to an "agreement to conspire," Greenberg Dental is obviously reading from the same Strawman Complaint as is Joel, overlooking the confession by Joel in July 2020, when Joel told Dorworth that Greenberg Dental would fund improper payments. ¶¶ 102, 126-7.

Dorworth to help her husband, obtain and retain valuable economic assistance, and take revenge on people who did not help her or her husband. Abby acknowledges she is liable if she had knowledge of Joel's tortious conduct and authorized and participated in it. Id. at 3. Abby is also obviously liable for her own torts.[61]

A.B. argues "the FAC does not include any facts to support that A.B. actually agreed to participate in this plot or even that A.B. ever spoke with Mr. Greenberg about Mr. Dorworth, much less the dates or approximate substance of such conversations." Doc. 80, Page 14. A.B. is reading the Strawman Complaint. The VAC contains multitudes of facts, all of which are plausible and satisfy the *Twombly* rule. Joel indicated to both Dorworth and a fellow inmate that he was in communication with A.B.[62] These facts are not "conclusory" because they are not legal conclusions (*see Sea Island Acquisition, supra*), and are "plausible" because they are exactly what Joel told Dorworth. A.B.'s insistence that the VAC must provide detailed evidentiary support is refuted supra.

Greenberg Dental claims it is not accused of any "single affirmative act." Doc. 81, Page 8. However, Greenberg Dental's financial support brings it before the

---

[61] Abby provides a chart that purports to detail Joel's "crimes and torts," but which simply lists eight subsections from the Defamation Section of the VAC. Id. at 2-3. Joel's transgressions neither begin nor end there. Later, Abby acknowledges over a dozen allegations of her defamation against Dorworth or facilitation thereof. Id. at 19-20.

[62] E.g., ¶¶ 91-93, 109, 113-114, 116 (Dorworth), ¶¶219-221 (describing conversation with fellow inmate where Joel indicated A.B. would "go along" with the allegations.) See also ¶¶ 27, 92, 93, 105, 107, 113, 114, 120, 121, 122, 123, 136, 151, and 154.

Court. No further allegation is necessary. They provided additional funding, over and beyond any obligation to Joel from any ownership or employment, because they knew that Joel needed funds to perform acts in furtherance of the conspiracy, including RICO predicates alleged in the Amended Complaint. ¶ 312. Greenberg Dental continuously complains that it is not mentioned enough in the VAC. Doc. 81, Pages 8 (noting they are only mentioned 22 times separately from the other Defendants) and 16 (complaining they are only mentioned twice in the section alleging the individuals' commission of RICO acts). However, these are allegations that Greenberg Dental knowingly funded the conspiracy, sufficient to state a claim.

## POINT IV: THE VAC ALLEGES AIDING AND ABETTING

Count VI (¶¶ 457–464) alleges that the Greenbergs, Greenberg Dental, and Abby aided and abetted Joel and A.B. in defaming Dorworth. The Greenbergs argue the "aiding and abetting claim … fails because … Plaintiff has not (and cannot) allege that the Greenbergs were culpable through either knowledge of Joel's alleged defamatory actions or through providing substantial assistance to advance those actions." Doc. 77, Pages 22-23. The Greenbergs are once again referring to their Strawman Complaint and not the real VAC, which alleges:

> 459. Defendants Andrew Greenberg, Sue Greenberg, Abby Greenberg, Greenberg Dental, and AWG, Inc., **each possessed knowledge of Joel Greenberg, Abby Greenberg, and A.B.'s defamation**.

460. Defendants **each provided substantial assistance** to Joel Greenberg and A.B. by providing financial resources to enable the defamatory actions, among other actions.

461. Defendants [referring to the defendants mentioned in ¶ 459] **provided these resources with the knowledge and intent that they would be used to harm Dorworth, among other things**.

(emphases supplied). See also ¶¶ 126, 127, 294, 306. Contrary to the Greenbergs' assertion, the VAC alleges both that they were "culpable through … knowledge of Joel's alleged defamatory actions," and that they "provid[ed] substantial assistance to advance those actions."

Greenberg Dental argues for dismissal because it claims it did not know of the defamation. Doc. 81, Page 32. This argument overlooks the allegations of the VAC, including the fact that "Defendant Andrew W. Greenberg is … President of Greenberg Dental Associates, LLC, President of Greenberg Dental & Orthodontics, P.A., and principal of AWG, Inc." ¶ 16. Due to Andrew's senior position with Greenberg Dental, his knowledge is imputed to them. *Hsi Chang v. JPMorgan Chase*, 845 F.3d 1087, 1095 (11th Cir. 2017)("Under Florida law, knowledge an agent or employee acquires within the scope of her authority generally may be imputed to her principal or employer.") Whatever Andrew knew, Greenberg Dental

knew.[63] The pleading is quite specific about what Andrew knew.[64] Andrew was not a passive observer, he knowingly funded illegal activity.

Defendants' "provision of compensation in exchange for participating in the process crimes," ¶ 294, distinguishes this case from *Lawrence v. BofA*, 455 F.App'x 904 (11th Cir. 2012); and *Twitter v. Taamneh*, 598 U.S. 471, 500 (2023), which involved what the Supreme Court called "passive nonfeasance."[65] In *B-Smith Enters. v. BofA*, No. 22-11383, 2023 WL 2034419 (11th Cir. Feb. 16, 2023), the complaint lacked allegations that the defendant had knowledge of wrongdoing. C.f. ¶ 459 (alleging knowledge). The VAC clearly states that each Defendant who provided funding knew what the funding would be used for. See e.g., ¶¶25, 300, 310, 311, 312, 459, 461. Defendants' authorities for the proposition that parents are not generally liable for the torts of their adult children are distinguishable. In *Carney v. Gambel*, 751 So.2d 653, 654 (Fla. 4th DCA 1999), the parents were not liable when their adult son attacked a security guard. To make the facts of Carney apposite here, the parents would have had to aid their son in attacking the security guard. Similarly,

---

[63] Thus, ¶ 25 is necessarily true: "When referring to acts performed by Joel Greenberg, Andrew Greenberg, or Sue Greenberg, any funding required for those acts came from AWG and/or Greenberg Dental with the knowledge of what the funding would be used for." See also ¶ 310: "Knowledge by individual Defendants Andrew Greenberg, Sue Greenberg, and Joel Greenberg is imputed to AWG and Greenberg Dental, as they acted as agents for the companies."

[64] See e.g., "Greenbergs Involvement in the Enterprise," Supra.

[65] Greenberg Dental's attempt to analogize itself to "passive actors like banks" fails due to its active provision of money to the Greenbergs and others with knowledge it would be used for the improper conduct alleged in the VAC.

in *K.G. v. S.B.*, 46 Cal.App.5th 625, 628 (Cal. Ct. App. 2020), the question posed was "whether a father who provides financial support for his adult son may be held liable for the death of his son's girlfriend by overdose on methamphetamine allegedly purchased or supplied by the adult son." To make K.G. apposite, the father would have had to give the son money with the intention that the son buy drugs for his girlfriend. Another important difference between K.G. and this case is that the girlfriend willingly took the drugs on which she overdosed; here, Dorworth was an innocent and unknowing victim of the Greenbergs. Lastly, in *Knight v. Merhige*, 133 So.3d 1140 (Fla. 4th DCA 2014), the Court held that a mother and father were not liable for a shooting committed by their adult son at a Thanksgiving Dinner. Importantly, the parents did not provide the firearm, help the son procure it,[66] or do anything other than invite him to the dinner, a very common thing for parents to do. Here, of course, the Greenbergs provided material support to Joel through a racketeering enterprise over an extended period of time (as opposed to a one-off shooting) when they knew that their aid was being used by Joel to commit improper acts against others. Moreover, any financial support provided by the parents in Merhige was for living and personal assistance, not for taking over a tax collector office and running an "independent investigation," or the other extraordinary aid that

---

[66] *C.f. People v. Crumbley*, No. 362210, 2023 WL 2617524, at *12 (Mich. Ct. App. Mar. 23, 2023)(holding that parents may be liable when "they provided [their child] with the weapon used to kill the victims.")

the Greenbergs rendered to Joel. In short, the Greenbergs did far more than bring Joel into the "family circle," they deliberately aided and abetted his criminal conduct for years, and then used further resources in support of an unlawful attempt to insulate themselves and Joel from liability.

Although the Greenbergs claim that "Plaintiff only offers supposition" and "inference" that they provided resources for Joel's attorney fees and other aid to the scheme, Doc. 77, Page 10, the Greenbergs have confirmed in discovery that they issued dozens of payments totaling over $2.2 million in connection with Joel's criminal charges, including attorney fees. Finally, the Greenbergs argue that Andrew's repaying money stolen by Joel from the Tax Collector's Office "does not suggest that he was a knowing party to a civil or criminal conspiracy." Doc. 77, Page 16. However, the VAC alleges the Greenbergs conspired to mitigate not just Joel's liability but also their own (¶¶ 103, 332), and that the funds were provided **with the intent** to cover up the cryptocurrency theft in which Andrew was involved. ¶¶ 332, 334, 335, 336, 391, 393, 396.[67] The VAC alleges the financial support was given with the specific intent to facilitate crime and provides the requisite basis for knowledge of the same. For this same reason, *ZP No. 54 v. Fidelity & Deposit,* 917 So.2d 368 (Fla. 5th DCA 2005), is inapposite. There, a bonding company was sued

---

[67] C.f. Doc. 17, Page 23 ("So too here, merely financially supporting a child does not carry a duty to ensure that support will never indirectly or incidentally contribute to later crime.")

as an accomplice to fraud, even though the complaint did not allege that the defendant issued the bond intending to further fraud. By contrast, Dorworth is not suing a bail bondsman, bank, communications provider, or others who provided routine services that Joel used to further his scheme. The VAC repeatedly alleges that the Greenbergs provided Joel with funds for the specific purpose of, among other things, harming Dorworth. The Greenbergs suggest no "innocent explanation" for Andrew covering Greenberg's theft. ¶ 333-34.

In context, the payment by the Greenbergs of Joel's seven-figure obligations clearly shows consciousness of guilt. First, the Greenbergs disguised the fact that they were the source of the funds, by using an intermediary. ¶ 392. Then, they insisted on receiving a general release, benefitting both themselves and their companies. ¶ 393. Finally, a week later, Joel misled the sentencing Court by gratuitously distancing himself from the family that had just provided funds for the payment of restitution. ¶ 390, "He's lost all financial support." These facts are consistent only with minds burdened with guilt, not an "innocent explanation."

## POINT V: THE VAC ALLEGES A CLAIM FOR DEFAMATION

Count V alleges that Joel, A.B. and Abby each issued false and defamatory statements accusing Dorworth of felonious conduct. ¶¶ 444–456. These statements

each obviously constitute slander per se. Joel, Abby, and A.B. nevertheless each argue that a claim for defamation has not been made against them.

Citing *Bezeau v. Cable Equip.,* 14–24538, 2015 WL 3540009, at *4 (S.D. Fla. May 27, 2015), Joel and Abby argue that to "assert a cause of action for defamation, a plaintiff must "set out the substance of each allegedly defamatory statement...; the date, place, and manner of publication; to whom the statement was made; and facts showing the damages flowing from each statement."[68] Doc. 79, Page 7; Doc. 82, Pages 17-18. However, the pleading standard is not so demanding. As stated in *Walter v. Jet Aviation,* 16-CV-81238, 2016 WL 7116641 at *1 (S.D. Fla. Dec. 7, 2016):

> A claim for oral defamation need not set out the defamatory statements verbatim. … A claim for oral defamation need not set out the defamatory statements with particularity. … Rather, as Defendants emphasize, a claim for defamation must "give the defendant fair notice of what the claim is and the grounds upon which it rests" and must contain enough factual allegations to "raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 545, 555 (2005). Plaintiff has done so. While … certain areas of the complaint do lack specificity, Plaintiff's Complaint must be viewed in its entirety and it must be viewed with all inferences taken in Plaintiff's favor. Viewed in that light, Plaintiff's Complaint establishes a cohesive narrative. … While certain portions of Plaintiff's narrative lack specificity, the Plaintiff has also explained in the Complaint by implication why that is so. … In sum, Plaintiff has alleged enough factual content to raise his right to relief above a speculative level and, as a result, Defendants' arguments pertaining to specificity are rejected.

---

[68] In *Bezeau*, it was not even clear that the party had asserted a defamation claim, as it was not denominated as a separate count and the term "defamation," or the like was never used in the pleading. *Id*. at *3. Further, unlike here, the party asserting defamation had not pled damages. *Id*. at *4. The Court therefore ordered a repleader. *Id*. at *4.

*Walter* cites *Nezelek v. Sunbeam TV,* 413 So.2d 51, 55 (Fla. 3rd DCA 1982):

> The general rule in Florida is that allegedly defamatory words should be set out in the complaint … That a plaintiff "set out" allegedly defamatory words, does not necessarily require that the statements be set out verbatim. This is particularly true where the statements may not easily be retained because they were made orally. … Accordingly, we hold that when the cause of action for defamation is based on oral statements, it is sufficient that the plaintiff set out the substance of the spoken words with sufficient particularity to enable the court to determine whether the publication was defamatory.

*See also Clarke v. Phelan*, 16-25217, 2017 WL 4326522 at *9 (S.D. Fla. Sep. 28, 2017)("Clarke has alleged oral defamation, which need not set out the allegedly defamatory statements verbatim. … Nor must a claim for oral defamation set out the defamatory statements with particularity.") The statements described in detail summarized in ¶ 446 are sufficiently particular to show they are defamatory.[69] A.B. claims the allegation that A.B. defamed Dorworth to the New York Times lacks sufficient detail,[70] an argument foreclosed by *Blandin, supra* at *4. A.B. obviously

---

[69] Joel argues correctly that spousal communications are privileged. However, the VAC does not allege that any spousal communications are defamatory. Dorworth is not claiming any defamation for communications between Abby and Joel. Instead, Dorworth is claiming defamation for communications to third parties.

[70] A.B. initially argues that "Dorworth appears to identify only two statements that were potentially made by A.B. after April 7, 2021 and outside of the litigation context, such that they could possibly support a defamation claim against her." Doc. 80, Page 9. Apparently, she refers to statements made by A.B. to CNN that resulted in a republication by CNN, ¶¶ 367–368, and statements made by A.B. to the New York Times. ¶ 357. By "litigation context," it appears A.B. seeks to exclude statements made to state and federal prosecutors, which is incorrect under *Fridovich*. Three such statements were made by her, all after April 7, 2021. ¶¶ 148, 151, 152. Regarding the statements made to CNN that resulted in a published article, A.B. argues that "First, the cited article nowhere mentions or identifies Mr. Dorworth or A.B." Doc. 80, Page 9. This argument suffers from two problems. First, the VAC alleges that A.B. was the **source** for that article, ¶¶ 368–369, and the statements made by A.B. to CNN are actionable. Second, under Florida law a statement (here, CNN's republication of A.B.'s slander) can be libelous even if it does not name the plaintiff.

falsely implicated Dorworth to the authorities because she is the alleged victim and they investigated Dorworth for several years.[71]

Abby also claims lack of knowledge of the defamatory statements and that she did not render substantial assistance in disseminating them. Abby references a "table," Doc. 79, Page 19-20, which quotes ¶¶ 156–162, 373–376,[72] and 448. However, Abby's Strawman Complaint (and table) omits 14 highly relevant paragraphs of the VAC (¶¶ 5, 7, 18, 89, 99–102, 122–126, 155) that clearly show Abby's knowledge of (and participation in) the defamation. Had Abby included the foregoing in her "table," she could not have claimed the VAC does not adequately allege her knowing participation in the conspiracy to defame Dorworth—

---

*Wolfson v. Kirk*, 273 So.2d 774, 779 (Fla. 4th DCA 1973)("The defamed person need not be named in the defamatory words if the communication as a whole contains sufficient facts or references from which the injured person may be determined by the persons receiving the communication.") The CNN article quotes the accusation made by Greenberg's lawyer about "other individuals, including public figures, who were also involved in Greenberg's offenses." Any Floridian familiar with the situation would readily understand that one of the public figures being referenced was Dorworth. A.B. also claims that a prior CNN article linked by CNN in the article quoted supposedly contains inconsistencies with the quoted article. (Both links cited in A.B.'s brief are broken when undersigned counsel attempted to access them, yet the link in Plaintiff's Complaint works.) A.B. thus claims that she could not have been a source for the quoted article. It does not follow that A.B. was not the source, merely because a news story contains "inconsistencies." In fact, the whole basis for Dorworth's defamation claim is that the statements were false. In any event, A.B. spends much energy on a single article, provided merely as an example of the many articles including derogatory information about Dorworth and others that were based upon information supplied by Defendants. Dorworth can easily provide other examples in any amended pleading.

[71] If A.B. had not accused Dorworth, or had denied an allegation by Joel when questioned, the authorities would not have investigated. No prosecutor would spend years investigating an offense if the alleged victim did not corroborate it.

[72] Abby inserts a typographical error into ¶ 374, to allege facts on "information and belie**ve**." Doc. 79, Page 19.

participation that included providing false information. ¶ 122. Nor would she have claimed that the VAC seeks to "impose derivative liability on Abby Greenberg for the actions of her ex-husband," Doc. 79, Page 24, for these paragraphs show that the VAC seeks to impose liability on Abby for her **own** actions. Although Abby cites a dozen paragraphs providing particulars of her defamation, she claims she lacks sufficient detail to rebut the claims. Although Abby claims that the dissemination of the false claims were limited to Joel and the grand jury, her table alone shows the allegations were also disseminated to state investigators, Joel's lawyers, the New York Times, the Daily Beast, other media sources and the press. See Table, Doc. 79, Pages 19-20. The cited paragraphs also show that Joel in turn conveyed these allegations to others. Id.

Dorworth adequately pleads his damages, which are mainly his loss of employment with Ballard, and his subsequent vilification in the press, and the continued impairment of his business opportunities. ¶¶ 358 et seq. Further, Dorworth has adequately pled that Abby aided and abetted Joel's defamation because she supplied false information to him for dissemination to the authorities, sat with the

authorities and provided false information, and disseminated information herself to the press to bolster the investigation. Table, id.[73]

Defendants invoke the statute of limitations, but this argument fails for several reasons. First, this case was filed in state court on April 7, 2023, and, as this Court can observe, the defamatory statements set forth in the VAC were made after April 7, 2021 (¶ 148, 156, 157, 163, 164, 180, 191, 378(d), (f), (g), [g]) and are thus not time-barred. In any event, Dorworth did not learn of any defamation or suffer damage until April 8, 2021. ¶ 355 et. seq. Although A.B. cites *Wagner, Nugent v. Flanagan*, 629 So.2d 113, 114-15 (Fla. 1993), to defeat application of the discovery rule, that case was distinguished in *Musto v. Bell South*, 748 So.2d 296, 298–99 (Fla. 4th DCA 1999). In *Musto*, a creditor reported a consumer to the credit bureau, which then released reports over a period of years. *Id*. at 297. The Court reversed the trial court for applying the "single publication rule" instead of the "multiple publication rule." *Id*. at 298. The Court noted that when a report is issued in confidence, "the plaintiff may not learn of the dissemination...until well after the initial inaccurate report issues." *Id*. at 298. The Court distinguished *Wagner* on the basis that the case did not concern a single defamatory statement, and the "endless liability" envisioned

---

[73] Even assuming Abby did not know about or discuss A.B. (which is not the case, according to both the VAC and discovery received showing she discussed A.B. with others), she need not have rendered assistance to every aspect of the conspiracy to be liable. Voll, id. at 895 (knowledge and participation sufficient, even if wife did not make fraudulent misrepresentations herself).

in *Wagner* would not occur because there was no "mass communication." *Id*. at 298-99. In this case, there were many instances where A.B. falsely accused Dorworth, Dorworth did not learn of the defamation until after it began, and any "mass communication" occurred within the limitations period. *Id*.[74]

In *Kinsman v. Winston*, 15-CV-696, 2015 WL 12839267 at \*1 (M.D. Fla. Sept. 15, 2015), as here, a woman asserted a false charge of sexual misconduct against a wealthy football player "for the purpose of damaging...reputation and coercing him into paying her a substantial sum of money." As here, the case involved numerous false reports to the authorities and the media, but no criminal charges were ever filed. *Id*. As here, the "single publication rule" was inapplicable, and *Wagner* was distinguished, due to "a number of separate defamatory statements to several different kinds of audiences (among them the police, the State Attorney's Office...various media outlets, [over several years.]" *Id*. at \*3. The Court also suggested the woman waived the statute of limitations by, as here, asserting claims. *Id*.[75]

---

[74] The statute of limitations is cognizable on a motion to dismiss only if "it is apparent from the face of the complaint that the claim is time barred." *See e.g., Palaxar v. Williams*, 14-CV-758, 2014 WL 5059286, at \*6 (M.D. Fla. Oct. 2, 2014). In this case, Defendants complain that the defamation claims vague and lack detailed dates. The claims cannot be both too vague to state a claim and yet specific enough to show that they are time barred.

[75] In this case, A.B. improperly seeks dismissal with prejudice on immunity and statute of limitations grounds for a claim that would necessarily be revived were she to file suit. *See Kinsman, id*. Presumably, A.B. wishes to delay her own action as long as possible while waiting out any statute of limitations on Dorworth's claims, while seeking a dismissal with prejudice here, so that

Further, as Joel notes, Dorworth did not suffer damages, an element of defamation, from the interviews themselves, Doc. 82, Page 26, until after the information was disseminated to the media and he lost his job at Ballard Partners. ¶ 359.[76] See 95.031(1)("A cause of action accrues when the last element constituting the cause of action occurs.")[77] Because the damages that Dorworth suffered occurred from the republication of prior statements, including to and by the news media,[78] they come within the statute of limitations.[79] *See Musto* at 299.[80] Defendants' false accusations to investigators and the media compelled Dorworth to repeat the

---

she can bring her own dubious claims with impunity and immunity from countersuit. If the court dismisses the claims against A.B., any dismissal should be without prejudice to prevent such a tactic.

[76] Joel erroneously claims "the Amended Complaint shows no facts demonstrating the damages flowing from each of these unknown statements made during the interviews." Doc. 82, Page 19. In any event, the VAC alleges special damages including loss of Dorworth's job at Ballard. ¶¶ 453–454.

[77] Florida Statute 770.07, cited by *Wagner*, appears similarly distinguishable because it concerns a single utterance.

[78] Contrary to A.B.'s n.3, Dorworth has attached a text from the New York Times, Doc. 62-8, which shows that he was first contacted by the New York Times within the statutory period. This contact was Dorworth's first knowledge that he was going to be defamed in the media, and in turn occurred before Dorworth lost his job with Ballard due to the impending release of derogatory information. ¶¶ 353-365. Any suggestion that Dorworth needed A.B. to inform him of the "legal consequences" of the statute of limitations is belied by the fact that Dorworth intentionally filed the complaint as soon as possible, in fact, on the afternoon on Good Friday (April 7), to eliminate any argument that the statute of limitations would apply, given the date his damages occurred.

[79] A.B. acknowledges that damages are an element that must occur within the limitations period. Doc. 80, Page 16 (erroneously claiming that Plaintiff lacks any injury because "Mr. Dorworth has failed to identify any defamatory statement by A.B. that *caused him injury within the statute of limitations*.") Dorworth's injury, and his damages, an essential element of his claim, occurred less than two years before the filing of the Complaint.

[80] Importantly, *Musto*, as here, involved liability by the original sources of the information, Bell South and Recovery Specialist, and not the party that later disseminated the information. Nonetheless, the sources were held liable for later republication. *Id*. at 299.

allegations to Ballard to mitigate damages and harm to his colleagues.[81] By doing so, Defendants caused "compelled self-defamation," during the statutory period, which lead to Dorworth's massive damages. *See e.g., Brown v. Suncoast Beverage*, 09-CV-498, 2010 WL 555675, at *2 (M.D. Fla. Feb. 10, 2010)(recognizing compelled self-defamation when coupled with third party publication by defendant); *Sirpal v. UM*, 684 F.Supp.2d 1349, 1361 (S.D. Fla. 2010)(same, and noting that "each repetition of a defamatory statements is a publication").[82] In any event, Defendants' detailed statute of limitations arguments are completely unsuited to adjudication on a motion to dismiss. *Akin v. Miami*, 65 So.2d 54, 56 (Fla. 1953).

Only a qualified privilege attaches to statements made to law enforcement, which does not extend to false statements issued with improper motive. *Fridovich v.*

---

[81] A.B. also suggests that the inquiry from the New York Times reporter concerned the investigation, not whether Dorworth had committed misconduct with A.B. However, the fact that the FBI was investigating Dorworth necessarily implies there was a basis for such investigation, which necessarily had to have originated or have been corroborated by A.B. *Jews for Jesus v. Rapp*, 997 So.2d 1098, 1106 (Fla. 2008)("literally true statements can be defamatory where they create a false impression.") Indeed, the New York Times and other publications published much derogatory information about Dorworth and others that was leaked or initiated by Defendants, much of it within two years of the filing of the lawsuit, and all of which Dorworth can document in any amended pleading.

[82] Lastly, Florida Statute 95.015(a) tolls the statute of limitation during "[a]bsence from the state of the person to be sued." A.B. lives in Colorado. ¶ 26. Thus, the statute of limitation was likely tolled during the two years preceding the filing of this lawsuit. Although the statute states that "Paragraphs (a)-(c) shall not apply if service of process or service by publication can be made in a manner sufficient to confer jurisdiction to grant the relief sought." A.B. however, was not served with process or service by publication, nor has she shown that she was amenable to such service. (Instead, all Defendants waived service.)

*Fridovich*, 598 So.2d 65, 69 (Fla. 1992).[83] ¶¶ 122, 148, 156, 157, 163, 164, 180, 191, and 378 each allege statements made by Joel to prosecutors with improper motive. Joel even bragged about lying to investigators in a conversation he had with a fellow prisoner on April 5, 2021. ¶¶ 217–226. Because these (and other Defendants')[84] defamation was committed with improper motive, they are not immune under *Fridovich*, *see also Kinsman, id.* at *6 (finding claims "replete with allegations of malice, ill will and extortion" sufficient to withstand motion to dismiss).

Abby's spousal privilege claim is, presumably, a reference to ¶ 160, but Dorworth does not reply upon this statement in his defamation claim. Dorworth is not complaining about Abby and Joel discussing Dorworth amongst themselves, he is complaining about them both asserting Dorworth committed crimes to the authorities and media. *See Fridovich v. Fridovich*, 598 So.2d 65 (Fla. 1992), which allows only a qualified privilege for reports to law enforcement. Id. at n.3 (distinguishing *Buchanan*). Further, the application of any privilege between Joel and Abby is dubious: they filed for divorce in 2021, and were divorced long before the Jailhouse Interview in 2022. ¶ 18, 61.[85] Nor does Dorworth allege any statement

---

[83] Although several defendants cite *Fridovich*, none acknowledge that it limited the privilege for statements to law enforcement. Instead, Defendants focus exclusively on a defamation privilege for false grand jury statements.

[84] Abby's false statements to the authorities are not privileged, either. ¶¶ 161–162.

[85] Defendants provide no authority for the proposition that the privilege applies in Florida (citing only the Restatement) or that it survives divorce. It certainly does not apply to post-divorce communications. *See e.g., United States v. Singleton*, 260 F.3d 1295 (11th Cir. 2001).

to the grand jury in his defamation claim.[86] ¶¶ 378 and 446 (listing defamatory statements). In fact, Dorworth mentions the grand jury only once in the entire defamation section, and that statement refers to A.B., not Abby.

## POINT VI: DORWORTH IS ENTITLED TO DECLARATORY RELIEF

A.B. threatened Dorworth with legal action and false allegations. ¶ 479. "Dorworth respectfully requests this Court issue a Judgment declaring that Dorworth has not had sexual contact with A.B. at any time; that Dorworth has not solicited, paid, or otherwise compensated A.B. for sexual acts; and that he is not liable to her for any allegations described in the [VAC]." ¶ 496.[87] A declaratory judgment is appropriate when, as here, an adversary threatens litigation but fails to file any claim:

> The remedy made available by the Declaratory Judgment Act and Rule 57 is intended to...*to afford one threatened with liability an early adjudication without waiting until an adversary should see fit to begin an action after the damage has accrued. It relieves potential defendants "from the Damoclean threat of impending litigation which a harassing adversary might brandish, while initiating suit at his leisure — or never.*

10B Wright, Miller & Kane, *Federal Practice and Procedure* § 2751 (1998 ed.).

Here, Dorworth is threatened with litigation A.B. fails to initiate, despite continued

---

[86] Some RICO predicates, however, do rely upon statements to the grand jury or attempts to thwart, divert, distract, or deceive the grand jury. 18 U.S.C. § 201(b) and/or (c), 18 U.S.C. § 1503, 18 U.S.C. § 1512(b)(1) and/or (c)(2), Florida Statute 837.02 (perjury in official proceedings), and Florida Statute 914.22 (tampering with a witness). These acts have been made part of Civil RICO by the Congress and the Florida Legislature and are actionable as RICO predicates, not as "defamation." In any event, Dorworth has alleged both sufficient defamation and sufficient RICO predicates to survive dismissal even if grand jury testimony is disregarded.

[87] A.B.'s quotation of the phrase "he is not liable to [A.B.] for any allegations described in this pleading," Doc. 80, Page 21, is but a snippet taken from ¶ 496. Count VIII, and the rest of the VAC, set for the controversy in detail.

threats to do so. ¶ 479-485. Dorworth seeks to reestablish his good name and move on with his personal and professional pursuits, which have been severely disrupted by false allegations against him regarding A.B. ¶ 493-495. As such, Dorworth is entitled to relief from A.B.'s "Damoclean threat." *See e.g., GTE Directories v. Trimen America*, 67 F.3d 1563, 1569 (11th Cir. 1995)(citing the "Damoclean threat" language and remanding for adjudication of declaratory judgment based upon events that had occurred "by the time the case went to trial.")

Though A.B. claims "declaratory judgment was not intended for tortfeasors to preemptively seek absolution for their past actions,"[88] she cites no authority for this proposition, but then immediately claims the opposite: that the action is unripe and that Dorworth lacks "standing." Doc. 80, Pages 21-22. As Wright and Miller state in the context of "Requirements for a Declaratory Judgment:"

> There is little difficulty in finding an actual controversy if all of the acts that are alleged to create liability already have occurred. The court is then merely being asked, as in any litigation, to determine the legal consequences of past events and it is immaterial that it may be the one allegedly liable, rather than the person to whom the actor would be liable, who asks for the judicial determination.

§ 2757 Existence of Actual Controversy. Moreover, "there is no outright prohibition in the Declaratory Judgment Act against the hearing of tort actions." *United Insurance v. Harris*, 939 F.Supp. 1527, 1532 (M.D. Ala. 1996).

---

[88] In this case Dorworth does not seek any "absolution," he seeks a declaration that he did not do anything wrong.

In *MoMA v. Schoeps*, 549 F.Supp.2d 543 (S.D.N.Y. 2008), as here, New York museums received demand letters from an heir questioning a Nazi-era artwork transaction. Noting the "hanging[]threat" over the museums and citing the "Damoclean threat" language from Wright, the Court concluded that the museums "need not be obliged to sit on their hands while Schoeps decides when next to attack." *Id*. at 547-48. Importantly, the court noted that because the defendant threatened the plaintiff with litigation, "it is difficult to take [its] argument [for dismissal] seriously." *Id*. at n.8. Further, the court noted that, as here, there was no "typical advantage" of winning a "race to the courthouse" to obtain a "forum unfavorable to the defendant." *Id*. at n.6.[89] Contrary to A.B.'s claim that a declaration is inappropriate for events that "occurred years ago," Doc. 80, Page 21, *Schoeps* found a declaration appropriate for events nearly a century before. *Id*, *see also Continental v. ASAP Hauling,* 20-cv-04063, 2021 WL 150017 at *4 (W.D. Mo. Jan. 15, 2021)("District courts entertain declaratory judgment actions brought for the determination of tort claims."), *citing Gopher Oil v. Bunker*, 84 F.3d 1047, 1051 (8th Cir. 1996)(adjudicating declaratory judgment claim for release of hazardous substances in the 1960s); *Ditzler v. Spee*, 180 N.W.2d 178, 183 (1970)(allowing declaratory relief for tort action to avoid multiplicity of suits).

---

[89] A.B. selected this forum by removing from state court. Doc. 1. Based upon A.B.'s claims that any claim arose in Seminole County, jurisdiction and venue exist in no other forum.

A.B. complains that Dorworth fails to specify "a particular theory or relief" that A.B. might assert. Doc. 80, Page 21. This is because A.B. fails to specify what, if any, legal theory she would rely upon: A.B. claims she "could potentially bring any number of claims against Mr. Dorworth were she to pursue her legal rights," but does not specify one. Doc. 80, Page 21. For that matter, even assuming the veracity of A.B.'s allegations, undersigned counsel is unaware (and A.B.'s counsel did not enlighten him during a conferral) of any cause of action for a prostitute to sue an alleged client after lying about her age. ¶¶ 370-372. Under A.B.'s theory, Dorworth's entitlement to a declaration is lessened due to the nebulous and dubious nature of A.B.'s demand letter and possible claim(s). Although A.B. cites *Developers v. Archer Contractors*, 16-cv-1875, 2017 WL 6947785, at *3 (M.D. Fla. Apr. 17, 2017), for the proposition that "the parties' dispute is not yet ripe for determination," Doc. 80, Page 22, *Archer*, discussed below, has nothing to do with whether the plaintiff had adequately specified the dispute or theory of relief, or whether the dispute was ripe. Indeed, the Court specifically noted, "DSIC does not move to dismiss Archer's counterclaim for declaratory judgment on grounds that there is no actual controversy." *Id.* A.B. argues that the declaratory judgment claim "appears to be duplicative of the rest of this lawsuit." Doc. 80, Page 22. A.B. cites no authority for dismissal on this basis and Rule 57 provides the "existence of another adequate

remedy does not preclude a declaratory judgment." The notes state "any fact upon

which such legal relations depend...may be declared." 1937 Note. *Archer* held:

> "motions to dismiss made under Rule 12(b)(6) only test the validity of a
> claim, not its redundancy; a redundant claim should not be dismissed as long
> as it is valid." …
>
> In this case, Archer's declaratory judgment claim is not entirely redundant
> with its breach of contract claim. Notably, although DSIC argues that the
> prayers for relief in Counts I and II are largely identical, they are not
> completely identical.
>
> At this stage of the proceedings, it appears that Archer has sufficiently
> alleged its claim for declaratory judgment. Whether that claim is subsumed
> by the breach of contract claim is a question best resolved at the summary
> judgment stage, particularly as there is no indication that allowing Count I to
> travel with Count II will prejudice DSIC. If, as DSIC claims, Count I is so
> redundant as to be identical to Count II, then I can deduce no harm in
> allowing both claims to proceed. … If, as plaintiff argues, the counterclaims
> are truly repetitious, then plaintiff will not have to expend much time on any
> additional discovery or briefing.

2017 WL 6947785 at *4. Here, the claims are not completely identical. For example,

A.B. defends on grounds unrelated to the veracity of her claims, ranging from

pleading issues to the statute of limitations and qualified or absolute immunity. Were

one of these defenses adopted, Dorworth would still need a declaration.

A.B. argues that a declaratory judgment is a "prior restraint" but fails to

explain how the declaratory judgment sought would "block expressive activity."[90]

Dorworth seeks no gag or injunctive relief, merely a declaration that he is not liable

---

[90] This Court has found that such relief is, in fact, available. *See e.g., Ward v. Triple Canopy*, 17-
CV-802, 2017 WL 3149431, at *5 (M.D. Fla. July 25, 2017)("narrowly tailored injunction
prohibiting speech already found defamatory by the jury is not an invalid prior restraint.")

to A.B. See Count VIII, ¶ 496. If A.B. continues to defame him after the declaration, she will be subject to a defamation action, as she is now, with facts established as collateral estoppel. A.B. can say anything she wants, subject to liability for defamation.

A.B. argues the Court should exercise discretion to dismiss the declaratory judgment claim because she deems that it "would not meaningfully assist in determining issues in this broader litigation." Doc. 80. Page 24. However, a district court's "discretion should be exercised liberally in favor of granting such relief in order to accomplish the purposes of the Declaratory Judgment Act." *Cincinnati Insurance v. Holbrook*, 867 F.2d 1330, 1333 (11th Cir. 1989).[91] This litigation turns on the veracity of A.B.'s claims against Dorworth and adjudication of her allegations is therefore useful to all the parties. The declaratory judgment claim is highly relevant to determining the other issues.[92]

A.B. also asserts that "there is no need for Plaintiff to litigate these issues in the present suit. He could alternatively file a motion to dismiss or motion for summary judgment in any potential future action by A.B. asserting the same

---

[91] *Volvo v. CLM*, 386 F.3d 581, 594 (4th Cir. 2004) explains that "[t]he exercise of such discretion, however, is not without bounds. [A] district court must have good reason for declining to exercise its declaratory judgment jurisdiction. … [A] district court is obliged to rule on the merits of a declaratory judgment action when declaratory relief will serve a useful purpose in clarifying and settling the legal relations in issue, and will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding."

[92] Further, Rule 18(a) provides that a "party asserting a claim … may join, as independent or alternative claims, as many claims as it has against an opposing party."

arguments he anticipates making here." Doc. 80, Page 24. A.B. fails to address Dorworth's legitimate need to clear his reputation instead of waiting until she sues him (she provides no assurance she will, calling such action "potential"), and only to then counterclaim. Dorworth is entitled to seek vindication now. *See e.g., Manuel v. Convergys*, 430 F.3d 1132 (11th Cir. 2005)("party objecting to jurisdiction in the first-filed forum carries the burden of proving 'compelling circumstances' to warrant change of venue."); *accord Volvo, id*. at 594-5 (refusing to defer to filed action.)

Lastly, A.B.'s argument is not supported by her caselaw. In *Angora Enterprises v. Lakeside Village*, 796 F.2d 384 (11th Cir. 1986)*,* the Eleventh Circuit remanded to determine whether the lower Court should refuse to accept jurisdiction over a declaratory judgment action because Angora was a defendant in another case involving the same parties, in which it has raised **the exact same** issue. *Id*. at 386. Here, the "alternative remedy" suggested by A.B. is a hypothetical case that might or might not be brought at some indefinite time in the future, raising currently unspecified claims. *Penn Tank v. Jackson*, 17-CV-1018, 2018 WL 465977 (N.D. Ala. Jan. 18, 2018), refused a declaratory judgment about a state-law affirmative defense due to lack of standing over a dispute between third parties where it appeared the court lacked even subject matter jurisdiction. *Id*. at * 3-5. Here, the declaration is part of Dorworth's claims against A.B., will advance the merits of his claims against the other Defendants, and the Court would otherwise have jurisdiction (diversity and

federal question) over other claims in a separate lawsuit between Dorworth and A.B. Finally, in *Methelus v. Collier County*, 16-cv-379, 2017 WL 3421470 at *2 (M.D. Fla. Aug. 9, 2017), the Court dismissed a declaratory judgment counterclaim because it sought a determination regarding the general applicability of a federal statute "outside the context of Plaintiffs' claims" (*Id.* at *5). Here, Count VIII does not seek to litigate any claims "outside the context" of the other claims raised in the VAC, and it alleges an ongoing injury that began in the past and continues.

## <u>CONCLUSION</u>

The Court should deny Defendants' motions. Should the Court find the VAC deficient in any respect, Dorworth requests leave to replead, to correct any remaining shortcoming. For example, in *ADA v. Cigna*, 605 F.3d 1283 (11th Cir. 2010), relied upon extensively by the Greenbergs, the plaintiff was given two opportunities to replead after seriatim court orders dismissing the complaint for failure to state a claim. *Id.* at 1287–88. Finally, if the Court dismisses the Federal RICO claims without leave to replead, it should decline supplemental jurisdiction over the balance of the case, including the Florida RICO claim, and remand the state law claims to the 18th Circuit, from which they were removed, for further proceedings. *See, e.g., Carlsbad Technology v. HIF Bio*, 129 S.Ct. 1862, 1869 (2009)(dismissing removed RICO claim and remanding state law claims to state court).

Filed: October 16, 2023.                               Respectfully Submitted,

/s/ Michael Paul Beltran
Michael P. Beltran
Fla. Bar No. 0093184
Beltran Litigation, P.A.
4920 West Cypress St.
Suite 104 PMB 5089
Tampa, FL 33607
813-870-3073 (o)
mike@beltranlitigation.com
*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I will file a copy of the foregoing on the Court's electronic system, which will send a copy to all counsel of record.

/s/Michael Paul Beltran
Michael P. Beltran