# EXHIBIT 1

**In the Matter Of:**

DORWORTH vs JOEL MICHAH GREENBERG

6:23-cv-00871-CEM-DCI

---

**REBEKAH DORWORTH**

*July 23, 2024*

---



800.211.DEPO (3376)
EsquireSolutions.com

1                UNITED STATES DISTRICT COURT
                 MIDDLE DISTRICT OF FLORIDA
2                     ORLANDO DIVISION

3

   CHRISTOPHER E. DORWORTH,
4
         Plaintiff,
5
   vs.                    Case No: 6:23-cv-00871-CEM-DCI
6
   JOEL MICHAH GREENBERG
7  ANDREW W. GREENBERG, SUSAN
   GREENBERG, ABBY GREENBERG,
8  AWG, INC., GREENBERG DENTAL
   ASSOCIATES, LLC, GREENBERG
9  DENTAL & ORTHODONTICS, P.A.,
   GREENBERG DENTAL SPECIALTY GROUP, LLC,
10 AND A.B.,

11       Defendants.

12 _____/

13 VIDEOTAPED/VIDEOCONFERENCE
   DEPOSITION OF:     REBEKAH DORWORTH
14
   DATE:             TUESDAY, JULY 23, 2024
15
   TIME:             9:14 A.M. – 9:31 P.M.
16
   PLACE:            200 SOUTH ORANGE AVENUE
17                   SUITE 10000
                     ORLANDO, FLORIDA 32801
18
   STENOGRAPHICALLY
19 REPORTED BY:      AMBER PORTELLO

20

21

22

23

24

25



```
 1  A P P E A R A N C E S:

 2  MICHAEL BELTRAN, ESQUIRE
    OF: Beltran Litigation
 3      4920 West Cypress Street
        Suite 104
 4      PMB 5089
        Tampa, FL 33607-3837
 5      Office: 813-870-3073
        Mike@beltranlitigation.com
 6      APPEARING ON BEHALF OF THE PLAINTIFF
        (Via Zoom)
 7
    LAURA B. WOLF, ESQUIRE
 8  OF: Spark Justice Law, LLC
        3435 South Inca Street
 9      Suite C-113
        Englewood, CO 80110
10      Office: 303-802-5390
        Laura@spark-law.com
11      APPEARING ON BEHALF OF THE DEFENDANT A.B.

12  CHRISTOPHER W. FORD, ESQUIRE
    ASHLYN HARE, ESQUIRE
13  OF: Hutchinson, Black, and Cook, LLC
        921 Walnut Street
14      Suite 200
        Boulder, Colorado 80302
15      Office: 303-442-6514
        Chris.ford@hbcboulder.com
16      Ashlyn.hare@hbcboulder.com
        APPEARING ON BEHALF OF THE DEFENDANT A.B.
17
    JASON PERKINS, ESQUIRE
18  OF: Carlton Fields, PA
        200 South Orange Avenue
19      Suite 1000
        Orlando, FL 32801-3456
20      Office: 407-244-8250, Fax: 407-648-9099
        Jperkins@carltonfields.com
21      APPEARING ON BEHALF OF THE DEFENDANT ABBY GREENBERG

22  DUSTIN MAUSER-CLAASSEN, ESQUIRE
    FRITZ WERMUTH, ESQUIRE
23  QUINN RITTER, ESQUIRE
    OF: King, Blackwell, Zehnder & Wermuth, PA
24      PO Box 1631
        Orlando, FL 32802-1631
25      Office: 407-422-2472, Fax: 407-648-0161
        Dmauser@kbzwlaw.com
```



```
 1       Fwermuth@kbzwlaw.com
         Qritter@kbzwlaw.com
 2       APPEARING ON BEHALF OF THE DEFENDANTS ANDREW
         GREENBERG, SUSAN GREENBERG, AWG, INC.
 3

    MICHAEL FURBUSH, ESQUIRE
 4  OF: Dean Mead
         420 South Orange Avenue
 5       Suite 700
         Orlando, FL 32801-4911
 6       Office: 407-841-1200, Fax: 407-423-1831
         Mfurbush@deanmead.com
 7       APPEARING ON BEHALF OF THE DEFENDANT GREENBERG
         DENTAL
 8       (Via Zoom)

 9  FRITZ SCHELLER, ESQUIRE
    OF: Fritz Scheller, P.L.
10       200 East Robinson Street
         Suite 1150
11       Orlando, FL 32801-1970
         Office: 407-792-1285, Fax: 407-649-1657
12       Fscheller@flusalaw.com
         APPEARING ON BEHALF OF THE DEFENDANT JOEL GREENBERG
13       (Via Zoom)

14  WILLIAM PETERS, ESQUIRE
    OF: Wicker, Smith, O'Hara, McCoy & Ford P.A.
15       515 East Las Olas Boulevard
         Suite 1400
16       Fort Lauderdale, FL 33301-4250
         Office: 954-847-4800
17       Wpeters@wickersmith.com
         APPEARING ON BEHALF OF THE DEFENDANT ANDREW AND
18       SUSAN GREENBERG
         (Via Zoom)
19

    ALSO PRESENT:
20       Fred Gartrell, Videographer
         Abby Greenberg (Via Zoom)
21       Lisa Di Filippo (Via Zoom)
         Christopher Dorworth (Via Zoom)
22       Anastasia Wagner (Via Zoom)

23

24

25
```



```
 1                    I N D E X

 2   TESTIMONY OF REBEKAH DORWORTH

 3       DIRECT EXAMINATION BY MR. FORD              8

 4       FURTHER DIRECT EXAMINATION BY
         MR. MAUSER-CLAASSEN                       300
 5
         FURTHER EXAMINATION BY MR. PERKINS        317
 6
         FURTHER DIRECT EXAMINATION BY MR. FURBUSH  399
 7
         CROSS-EXAMINATION BY MR. BELTRAN          416
 8
         REDIRECT EXAMINATION BY MR. FORD          438
 9
         FURTHER REDIRECT EXAMINATION BY
10       MR. MAUSER-CLAASSEN                       455

11   CERTIFICATE OF OATH................................474

12   CERTIFICATE OF DEPOSITION TRANSCRIPT..............475

13

14                    INDEX OF EXHIBITS

15   EXHIBIT 77      11
     (Confidentiality Agreement Governing Lawsuit)
16   EXHIBIT 78     149
     (Messages in Chronological Order)
17   EXHIBIT 79     156
     (Twin Peaks Promotional Photos)
18   EXHIBIT 80     209
     (Entries Report)
19   EXHIBIT 81     209
     (Heathrow Ledger Entries Report)
20   EXHIBIT 82     266
     (Letter From Richard Hornsby, 10/4/21)
21   EXHIBIT 83     289
     (Letter From Richard Hornsby, 5/7/21)
22   EXHIBIT 84     389
     (Text Messages Between Rebekah and Abby)
23   EXHIBIT 85     421
     (Text Messages from June 6th)
24   EXHIBIT 86     421
     (Email Concerning HOA Lawsuit)
25   EXHIBIT 87     424
     (Bates 82993, Text Messages)
```



```
 1   EXHIBIT 88      442
     (Messages in Chronological Order, 6/16/20)
 2
     REPORTER'S NOTE:  Exhibit 84 mentioned above was
 3   retained by Jason Perkins, Esquire.  Exhibits 85, 86,
     and 87 mentioned above were retained by Michael Beltran,
 4   Esquire.

 5                         ------

 6                 S T I P U L A T I O N S

 7        It is hereby stipulated and agreed by and between

 8   the counsel for the respective parties and the deponent

 9   that the reading and signing of the deposition

10   transcript be reserved.

11                         ------

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



1              P R O C E E D I N G S

2                    * * * * * * * * *

3         THE VIDEOGRAPHER:  Good morning.  We are now on

4    the record.  Today is Tuesday, July 23, 2024.  The

5    approximate time, 9:14 a.m.  This is the deposition

6    of Rebekah Dorworth being taken in the matter of

7    Christopher Dorworth versus Joel Micah Greenberg, et

8    al.  Counsel's appearance will be noted on the

9    transcript record.  Our court reporter today is

10   Ms. Amber Portello.  Ms. Portello will now

11   administer the oath to the witness.

12        COURT REPORTER:  Would you raise your right

13   hand, please?

14        Do you solemnly swear or affirm that the

15   testimony you're about to give in this cause is the

16   truth, the whole truth and nothing but the truth?

17        THE WITNESS:  I do.

18 THEREUPON

19                    REBEKAH DORWORTH

20 was called as a witness and, having first been duly

21 sworn, testified as follows:

22                  DIRECT EXAMINATION

23        MR. FORD:  Ready for appearances?  Chris Ford

24   and Laura Wolf present on behalf of the defendants,

25   AB.  Also participating by Zoom is our associate,



 1   Ashlyn Hare.  She is attending remotely in Boulder
 2   Colorado.
 3        MR. PERKINS:  Jason Perkins here on behalf of
 4   Abby Greenberg, and Abby Greenberg is in attendance
 5   as well by Zoom.
 6        MR. MAUSER-CLAASSEN:  Dustin Mauser-Claassen on
 7   behalf of Susan Greenberg, Andrew Greenberg, and
 8   AWG, Inc., along with Fritz Wermuth and Quinn Ritter
 9   who is appearing remotely.
10        MR. FURBUSH:  Mike Furbush for Greenberg
11   Dental.
12        MR. SCHELLER:  Fritz Scheller on behalf of Joel
13   Greenberg.
14        MR. PETERS:  Bill Peters on behalf of Andrew
15   and Susan Greenberg.
16        MR. BELTRAN:  Good morning.  Mike Beltran on
17   behalf of the plaintiff and the witness.  With me is
18   Anastasia and my client Chris Dorworth.
19        MR. FORD:  And for the record, Mr. Beltran, are
20   you and Mr. Dorworth in the same room, or are you
21   attending in different locations?
22        MR. BELTRAN:  I don't know if that is any of
23   your business.
24        MR. FORD:  Yeah, it is so we can get a record
25   of where you are since you're not here.



```
 1          MR. BELTRAN:  I don't need to tell you where I

 2     am.

 3          MR. FORD:  Excuse me?

 4          MR. BELTRAN:  I said I'm not going to tell you

 5     where I am.

 6          MR. FORD:  And you're not going to tell me

 7     whether you're with your client?

 8          MR. BELTRAN:  No.  My client is not even being

 9     deposed.  I don't see what that has to do with

10     anything.

11 BY MR. FORD:

12     Q.   Let's go ahead and get started.  Ms. Dorworth,

13 if you could spell your name for the record.

14     A.   Rebekah, R-E-B-E-K-A-H; D, as in David,

15 O-R-W-O-R-T-H.

16     Q.   Good morning, Ms. Dorworth.  We met off the

17 record.  My name is Chris Ford.  I represent the

18 defendant who is referred to as AB.  She's also known as

19 AB in this case.  Her name has been changed to initials

20 AB.  We're going to ask the court reporter throughout

21 the deposition in the transcript if we mention her name

22 to convert it to AB.  It's nice to meet you.  Thank you

23 for coming today.

24          Can you please give us your address?

25     A.   1520 Whitstable, W-H-I-T-S-T-A-B-L-E, Court.
```



1  Heathrow, Florida 32746.

2      Q.   I'll represent to you that I asked yesterday

3  for a copy of your signed confidentiality agreement in

4  this case.  I asked Mr. Beltran for that.  I have not

5  received it.

6          Have you signed a confidentiality agreement in

7  this case?

8      A.   I have not signed a confidentiality agreement

9  in this case.

10     Q.   Have you looked at any documents in this case?

11     A.   I have not looked at any documents in this case

12  other than the ones you asked me to produce -- or one of

13  you asked me to produce.

14     Q.   So the documents that were produced to us last

15  night a few minutes before midnight.  And you probably

16  don't know when they were produced, but I'll represent

17  to you they were produced last night a few minutes

18  before midnight.  They consist of text messages between

19  you and various friends.

20          Those are the only documents you have seen in

21  this case?

22          MR. BELTRAN:  Object to the form.

23  BY MR. FORD:

24     Q.   Go ahead.  You need to answer.

25     A.   I didn't know if you were asking him to go



 1  ahead.
 2      Q.   No.  I'm asking you are those the only
 3  documents you have seen in this case?
 4          MR. BELTRAN:  Same objection.
 5          THE WITNESS:  I don't -- when you say
 6      documents, like have I read the public court filing
 7      of the case?  Like are you asking have I seen
 8      documents that have been in the newspaper?  What are
 9      you asking?
10  BY MR. FORD:
11      Q.   So I'm asking -- so separate anything that
12  you've read online or anything that you have seen in
13  the --
14      A.   I have been subpoenaed, so I have read those
15  documents.
16      Q.   Hang on just a second.  And we're going to get
17  into the ground rules; but before we start, I want to
18  make sure that you haven't seen any documents that have
19  been marked confidential or attorney eyes only?
20      A.   I don't know what documents are attorney -- I
21  don't -- I don't know what you're referring.
22      Q.   Okay.  So let me clarify it for you, and you
23  let me know if you understand this.  So I don't want to
24  know about pleadings that have been filed in this case.
25  I don't know what you have read in the papers.  I want



 1  to know if you have seen any documents that Mr. Dorworth

 2  or Mr. Beltran may have provided to you separate from

 3  those two categories.

 4      A.   Not being shown documents.

 5      Q.   So I'm going to need you to sign this

 6  confidentiality agreement.  Unfortunately, Mr. Beltran

 7  did not have you do this last night.  We are going to be

 8  referring today to documents that have been marked as

 9  confidential.  We are also going to be referring today

10  from excerpts that Mr. Beltran has designated in their

11  entirety as confidential.  So in order for me to ask you

12  questions about those things, I need you to sign this

13  confidentiality agreement governing lawsuit.  This

14  confidentiality agreement governing lawsuit requires you

15  to acknowledge that you have been provided confidential

16  information and to keep that information confidential.

17           So for the record, I'm going to go ahead and

18  have this marked --

19           MR. FORD:  Should we proceed sequentially?  Do

20      you know what exhibit number --

21           MR. PERKINS:  77.

22           (Defendant's Exhibit 77 was marked for

23  identification.)

24  BY MR. FORD:

25      Q.   That's deposition Exhibit No. 77.



 1      A.   Okay.  Well, I would like the opportunity to

 2  read through it because I have not seen this document.

 3      Q.   Yeah, and that's unfortunate because we were

 4  trying to avoid time.  So we're going to go off the

 5  record so this is not on the record time for you and

 6  give you an opportunity --

 7           MR. BELTRAN:  We're not going --

 8  BY MR. FORD:

 9      Q.   Yeah, we're going off the record, and you have

10  the time to --

11           MR. BELTRAN:  We're not going off the record.

12      She's --

13  BY MR. FORD:

14      Q.   -- review the agreement?

15           MR. BELTRAN:  Excuse me.  Excuse me.  Let me

16      make my objection now.  First, I'm going to object

17      to the form.  I don't think you have asked a

18      question.  Second of all, you didn't send us the

19      agreement.  You sent us an email saying for her to

20      sign the agreement.  There is no authority that she

21      has to sign this or any other agreement, and you

22      didn't provide any -- in fact, I think the law in

23      the Middle District is that you can't make somebody

24      sign an agreement.  She doesn't need to see

25      transcripts of other people in the case, and so



1    we're not under any obligation to sign any

2    agreement, and we're not going to have you talk to

3    her about it off the record.  You get your seven

4    hours, and that's what you get.

5         MR. FORD:  Can the videographer mark what time

6    on the record we are at this point, please, and then

7    we will -- and I'm going to ask you to mark the time

8    when she's done reading the confidentiality

9    agreement and signing it.

10        And, Mr. Beltran -- Mr. Beltran, for the

11   record, this is an agreement that you signed that

12   requires witnesses to execute if they're going to be

13   shown any confidential information, and she is going

14   to be shown that today and she is going to sign this

15   agreement.  If you have a problem with that, we can

16   get the court on right away.

17        MR. BELTRAN:  Yeah, get the court.  She is

18   not -- what is the obligation of a third-party

19   witness to sign the agreement?  If there is a

20   provision in the agreement or provision of rules

21   that she is required to sign the agreement, then

22   she'll sign the agreement.

23        MR. FORD:  Let me read it to you because it

24   sounds like you haven't reviewed it recently; but

25   paragraph nine says, Permitted disclosure of



 1  confidential materials.  Confidential materials

 2  produced pursuant to this agreement may be disclosed

 3  or made available only to, and it talks about

 4  witnesses and their counsel -- this is subparagraph

 5  D -- to the extent reasonably necessary to prepare

 6  for or give deposition, hearing, or trial testimony

 7  in the lawsuit.

 8       That's what I'm doing today.  And it further

 9  notes, Prior to a receiving party disclosing

10  confidential material to persons identified in

11  subparagraphs D and others, those persons must

12  review this agreement and, one, sign the

13  acknowledgment and agreement to be bound and

14  attached as Exhibit A to this agreement or, two,

15  agree on the record at a deposition to be bound by

16  the terms of this agreement.

17       So you can either have Ms. Dorworth review and

18  sign this, or you can have her agree on the record

19  to treat confidential information consistent with

20  this agreement.  It's your choice.  It's an

21  agreement that you signed on behalf of your client.

22       MR. BELTRAN:  I signed it on behalf of my

23  client.  I didn't sign it on behalf of her.  If you

24  are going to show her the materials that have to

25  sign the agreement before you show her the



 1  materials, it doesn't -- I can't obligate a third

 2  party nor can you to sign an agreement if they don't

 3  want to sign it.

 4       MR. FORD:  Are you instructing your client not

 5  to sign the confidential agreement that you are

 6  bound to and your client is bound to?

 7       MR. BELTRAN:  I'm not instructing her to do

 8  anything.  She can do what she wants.  I'm not

 9  instructing her to convey your email yesterday to

10  her and when I received it and --

11       MR. FORD:  For the record, I'm handing

12  Ms. Dorworth what has been marked as deposition

13  Exhibit No. 77.  This is the confidentiality

14  agreement.  I would like you to review it.  Let me

15  know if you have any questions, or you can confer to

16  Mr. Beltran if you have any questions, and then I

17  would like you to sign it.

18       THE WITNESS:  Mike, are you okay with me

19  reading it?

20       MR. BELTRAN:  I'm sorry, what did you say,

21  Rebekah.

22       THE WITNESS:  I said are you okay with me

23  reading it?

24       MR. BELTRAN:  Yeah, of course.  Yeah, you can

25  read it.



1        Rebekah, how are you coming along?  Do you need
2   another few minutes?
3        THE WITNESS:  I'm second to last page.
4        MR. BELTRAN:  Okay.
5        THE WITNESS:  I'll call you when I'm done.
6        MR. FORD:  It doesn't sound like that's going
7   to happen because Mr. Beltran wants to stay on the
8   record.
9        THE WITNESS:  We can stay on the record.
10   That's fine.
11        MR. FORD:  And we're going to note how long
12   this is taking on the record.
13        MR. BELTRAN:  Okay.  Again, I don't know if
14   there is any obligation to sign it or demand that
15   she review it or sign it.  I don't know if -- that's
16   your time if you want to spend it this way.
17        Rebekah, just call me on the phone when you're
18   done with it.
19        Okay?
20        THE WITNESS:  Okay.
21        MR. BELTRAN:  All right.  Yeah, just call me on
22   the phone before you do anything.  All right,
23   thanks.
24        THE WITNESS:  Last page, guys.
25        MR. SCHELLER:  This is Fritz.  We're still on



1    the record apparently.  Why don't we -- I don't have

2    the confidentiality agreement.  If she's going to

3    refuse to sign it, why don't we just designate the

4    deposition confidential?

5         MR. FORD:  I don't think we can do that because

6    I have to show her material.  If she doesn't sign

7    it, we're going to get the judge on the line.

8         MR. SCHELLER:  I misread the provision.  I

9    thought you said we can treat the deposition as

10   confidential.  I thought that was in the provision.

11        MS. WOLF:  No.

12        MR. FORD:  No.  I mean, someone can designate a

13   deposition as confidential in good faith, but -- but

14   in order for me to show her material that has been

15   designated confidential, almost all of which

16   Mr. Beltran has designated, she has to sign this

17   before I can do that.

18        MR. SCHELLER:  Oh, I understand.  I was just

19   trying to get around the apparent chicanery that

20   we're dealing with right now.

21        MR. FORD:  Yeah, it's not apparent.

22        So are you requesting to confer with

23   Ms. Dorworth, now, Mr. Beltran?  Hello?

24        THE WITNESS:  He's not on there.  Oh, there he

25   is.  Mike?



```
 1   BY MR. FORD:
 2       Q.   Wait a minute.  Who are you calling?
 3       A.   My attorney.
 4            MR. FORD:  Okay.  So for the record,
 5       Ms. Dorworth has reviewed the agreement, and she is
 6       calling her counsel.
 7   BY MR. FORD:
 8       Q.   My question to you before -- before you have
 9   that conversation --
10            THE WITNESS:  Hey.
11   BY MR. FORD:
12       Q.   -- my question to you is are you willing to
13   sign this agreement?
14       A.   I'm going to talk to my attorney and let you
15   know.
16       Q.   So are you refusing to answer my question?
17       A.   I'm not refusing to answer your question.  I'm
18   talking to my attorney, Mr. Ford.
19       Q.   Okay.  So you're going to confer with your
20   counsel while a question is pending as to whether you're
21   going to sign this agreement; is that correct?
22            THE WITNESS:  Can you hear on the Zoom because
23       you are not responding?
24            MR. BELTRAN:  All right, guys?  What's going
25       on?
```



```
1            MR. FORD:  I have no idea.  Ms. Dorworth is
2       trying to call you while a question is pending.
3            MR. BELTRAN:  Okay.  Well, yes.  Since she's
4       going to review the record -- the document.
5            Rebekah, do you want to talk to me about
6       whether to sign the document?
7            THE WITNESS:  I'm fine with signing the
8       document.
9            MR. BELTRAN:  Okay.  Well, then sign the
10      document.  That's fine.
11           MR. FORD:  Okay.  Can the videographer tell me
12      how much time has passed from when I asked it to be
13      marked as well?
14           THE VIDEOGRAPHER:  Approximately 13 minutes.
15           THE WITNESS:  My name is not on here.
16 BY MR. FORD:
17      Q.   There is an acknowledgment page.
18      A.   Oh --
19           MR. PERKINS:  Or I can get it if it's not on
20      there.
21           THE WITNESS:  Oh, signature and acknowledgment
22      page.  Just for the plaintiff, that side.
23           MR. PERKINS:  Let me see it, please.  It's
24      right here.
25           MR. FORD:  It's right here.  So for the record,
```



 1      I'm handing the deponent Exhibit A of deposition

 2      Exhibit 77 which is the acknowledgment and agreement

 3      to be bound.  Ms. Dorworth took 13 minutes to review

 4      this agreement.  She has agreed to sign it.  I'm

 5      handing it to her now for signature.

 6           MR. BELTRAN:  If you guys can produce that to

 7      me, please.  Thank you.

 8           THE WITNESS:  What's the date?

 9  BY MR. FORD:

10      Q.   The 23rd of July?

11      A.   It says 2023 on it, just so you are all aware.

12      Q.   Just go ahead and strike that, please.

13           MR. FORD:  So for the record, Ms. Dorworth has

14      executed Exhibit A which is attached to deposition

15      Exhibit No. 77.  Deposition Exhibit No. 77 is the

16      confidentiality agreement governing lawsuit and she

17      has executed the acknowledgment and agreement to be

18      bound as of this date, July 23, 2024.

19           MR. BELTRAN:  Great.  You guys are going to

20      scan me a copy I guess.

21           MR. FORD:  Yeah, we'll do that in due course.

22  BY MR. FORD:

23      Q.   So, Ms. Dorworth, let's start.  I want to go

24  over some rules of a deposition to make sure that we're

25  on the same page for the day.  You've started the



1  deposition by taking an oath.

2       What does that oath mean to you?

3  A.   To tell the truth.

4  Q.   And are you going to do that today?

5  A.   Yes.

6  Q.   One of the little glitches we had in the

7  beginning was that as opposed to normal conversation

8  where we may interrupt each other, today it is

9  especially important that you let me finish my question

10 before you answer so that the court reporter can make a

11 clear record.

12      Does that make sense to you?

13 A.   Yes.

14 Q.   Very good.  And it's also important that you

15 give verbal answers today as opposed to shakes of the

16 head or uh-uh or uh-huh because that is hard for the

17 court reporter to get down.

18      Does that make sense to you?

19 A.   Yes.

20 Q.   What will you do if I ask a question to you

21 that is unclear?

22 A.   I will ask you to make it clear.

23 Q.   Okay.  And if you answer a question that I've

24 asked, is it fair for me to assume if you answer it that

25 you understood the question?



1      A.   Could you repeat the question?

2      Q.   Sure.  So you just said that if I ask you a

3  question that's unclear, you will let me know, correct?

4      A.   Yes.

5      Q.   And so if you answer a question that I've asked

6  you, is it fair for me to assume that you understood

7  that question?

8      A.   Yes.

9      Q.   If during the course of the deposition you

10 think about an answer that you gave me earlier to an

11 earlier question and you think, Oh, I have more

12 information I want to give or I need to add to that,

13 will you feel free to do that today?

14          MR. BELTRAN:  Object to the form.

15          THE WITNESS:  Probably not because you will be

16     peppering me with questions, so I don't know that I

17     will have the ability to do that.

18 BY MR. FORD:

19     Q.   Okay.  Well, I want to make sure that you do.

20 So if you have more information that comes to mind in

21 response to an earlier question, I want to make sure

22 that you give me that information.  So I will not pepper

23 you with questions so that you can't give me that

24 information.

25          Do you understand that?



```
 1      A.   I will try to --

 2           MR. BELTRAN:   Object to the form.

 3  BY MR. FORD:

 4      Q.   Is there anything going on for you personally

 5  today that will make it difficult for you to give

 6  anything but complete and truthful answers?

 7      A.   No.

 8      Q.   You see that we have plenty of water, coffee,

 9  things to drink.

10           If you need anything to drink, will you let me

11  know?

12      A.   Yes.

13      Q.   Okay.  Would you like any water to start?

14      A.   Yes.

15      Q.   Okay.  Feel free.

16      A.   I haven't been offered some, so that would be

17  great.  Thank you.

18      Q.   You're welcome.

19      A.   Thank you so much.

20      Q.   We'll take breaks throughout the day.  This is

21  not meant to be an endurance marathon.  My only request

22  to you is before we take a break, if I have a question

23  that's pending, that you answer that question before we

24  take a break.

25           Does that sound fair?
```



1      A.   I will do my best.

2      Q.   Great.  And if you need a break at any time

3  between when we've started and where we are, will you

4  feel free to let me know?

5      A.   Yes.

6      Q.   I'm going to refer to this case or the case

7  today.  And by that, I mean a case that has been filed

8  by your husband, Christopher Dorworth, in federal court

9  against multiple defendants.

10          MR. BELTRAN:  Object to the form.

11          MR. FORD:  I haven't asked a question.

12          MR. BELTRAN:  Well, we didn't file in federal

13      court.  You guys were removed.  I'm objecting to the

14      form.

15          MR. FORD:  Okay.  Mr. Beltran, if you could

16      actually wait until I finish my question, and then

17      you can object away.  That would be a professional

18      curtesy that we've granted you.

19          MR. BELTRAN:  That's fine.  I thought you were

20      done, and I objected to the form.

21  BY MR. FORD:

22      Q.   So, Ms. Dorworth, your husband filed a

23  complaint in state court that was removed to federal

24  court, and all I want to ask you is I'm going to refer

25  to that as the case or this case.



 1          I take it you're familiar with the case; is
 2    that right?
 3        A.   Yes.
 4        Q.   Okay.  And you understand that the case right
 5    now is pending in federal court in Orlando, correct?
 6        A.   Yes.
 7        Q.   I want to ask you if you know any of the
 8    defendants.  First of all, let me ask you, do you know
 9    off the top of your head who your husband sued?
10        A.   Yes.
11        Q.   Who did he sue?
12        A.   He sued various companies that are held by the
13    Greenbergs and their family business.  He has sued Joel
14    Greenberg.
15          Do you want me to say why he's sued each
16    person?
17        Q.   No.  I just want to know who you know was sued
18    in the case?
19        A.   So let's go through the family.  Joel
20    Greenberg, Abby Greenberg, Andy Greenberg, Sue
21    Greenberg, AWG, and I don't know whether more companies
22    that have been appropriate and also the funding
23    organization, Greenberg Dental.  And the -- you wanted
24    me to refer to her by AB.
25        Q.   We're going to have the deposition -- any time



1  anyone refers to her name, the court reporter will

2  insert her initials.  So you can refer to her as you're

3  most comfortable referring to her.

4      A.   Can I refer to her the way that Judge Presnell

5  referred to her as essentially a prostitute, or would

6  you prefer that I keep to AB?

7      Q.   I'm not sure what that gratuitous statement

8  means --

9      A.   You think that a statement by a judge is

10 gratuitous?

11     Q.   So my question is how would you like to proceed

12 with her name?

13     A.   I'll go with for this particular portion A, B,

14 AB.

15     Q.   Do you know Andrew Greenberg?

16     A.   I have met him, I believe.

17     Q.   Do you know whether you have met him, or do you

18 have a vague recollection?

19     A.   I met him at a children's birthday party or

20 something.

21     Q.   When was that?

22     A.   I don't know.  One of Madison's birthday

23 parties.  That is the child of Joel Greenberg.  One of

24 the children of Joel Greenberg.

25     Q.   So you went to --



1     A.   I don't think -- I'm not sure if I was complete
2   with my first answer you asked me to make sure that --
3   I'm not -- I believe that's everyone that has been sued.
4   I don't know if there are additional companies or
5   holdings or groups of the Katzers or the Greenbergs that
6   have been included in this, but that is from what I
7   remember reading of the complaint.  That is what I
8   remember.
9     Q.   So your memory as you sit here today is that
10  your husband sued Andrew Greenberg, Sue Greenberg, AWG,
11  Inc., Joel Greenberg, Abby Greenberg, our client, AB,
12  and Greenberg Dental; is that right?
13    A.   You included A in that.  Yeah, I think that's
14  it, but I don't -- I wouldn't -- I'm not 100 percent on
15  that, but I believe that's what I've read.
16    Q.   And are you aware of what Greenberg Dental
17  entities were sued?
18    A.   Which Greenberg Dental entities --
19    Q.   Correct.
20    A.   -- I'm not -- I don't know what their various
21  legal names are.
22    Q.   But you're generally aware that the Greenberg
23  Dental group or some group of companies was sued in this
24  case; is that correct?
25    A.   Yes.  Because Andy Greenberg was the



1  president -- was president -- is president.

2      Q.   You said that you met -- you recall meeting

3  Andrew Greenberg at a party for Madison Greenberg; is

4  that correct?

5      A.   I don't -- I don't remember.  I feel like I

6  have met him at something, I just don't remember where.

7      Q.   Do you have any recollection of talking with

8  Mr. Greenberg?

9      A.   No.  I have spoken with Sue quite a bit, but

10  not -- I don't remember any conversations with Andrew

11  Greenberg.

12      Q.   So sitting here today, you may have met -- and

13  we'll call him Dr. Andrew Greenberg but you don't have

14  any specific recollection of any communication you have

15  with him; is that fair?

16      A.   I don't have any specific --

17          MR. BELTRAN:  Object to form.  Go ahead.

18          THE WITNESS:  I don't have any specific

19      memories at this time; but as you said, throughout

20      this day, if I remember something, I'll try to bring

21      it.  If there was a specific memory, I'll try to

22      bring it back up to for you.

23  BY MR. FORD:

24      Q.   You said that you have spoken several times

25  with Sue Greenberg; is that correct?



1      A.    Yes.  Uh-huh.

2      Q.    And tell me generally about the conversations

3  that you've had with Sue Greenberg.

4      A.    Typically about her grandchild and my child,

5  you know, a number of times at the park or at a -- I

6  forgot the name of it, but it's like where babies

7  practice on instruments and with noise and stuff.

8  Birthday parties, general events.  Typically more

9  children-related activities.

10     Q.    So you've attended various events that have

11  involved children.

12           Is that a fair summary?

13     A.    Yes.

14     Q.    And you've talked about general family

15  children, grandchildren issues with Sue Greenberg,

16  correct?

17     A.    Yes.

18     Q.    Have you ever spoken with Sue Greenberg about

19  any of the allegations that you have verified in the

20  amended complaint?

21     A.    No.

22     Q.    When's the last time you have spoken with Sue

23  Greenberg?

24     A.    I saw her after her son's arrest.  I can't

25  remember which arrest or which indictment.  There were



1  so many, but there were two separate main incidents, and

2  I saw her at the park after that.

3      Q.   Did you speak with her then?

4      A.   I believe I said something to -- I think I

5  asked how she was doing or something.  It was very

6  brief.  It was distanced.  It was not an extensive

7  conversation.

8      Q.   Do you have any recollection of that

9  conversation at all?

10     A.   I remember seeing her, yes.  So -- but, I mean,

11 extensive more than, you know, unspoken dismay at her

12 son's actions in her eyes, no, I don't have any, you

13 know, thorough conversation with her about that.  I

14 think it was probably very difficult for her to see me,

15 you know, after that.  I think she was very embarrassed

16 publicly.

17     Q.   So my question is not so much about your

18 perception of what she seemed like.  My question is what

19 you remember about the -- hang on.  About what you

20 remember about that conversation that you had with Sue

21 Greenberg.

22     A.   Again, it wasn't an -- I wouldn't describe it

23 as a conversation.

24     Q.   So you don't have any recollection of --

25     A.   No, I asked -- you know, I think I asked how



1  she was doing which, you know, obviously at the time

2  probably a little gauche to ask how someone is doing

3  when their son has committed so many crimes.

4      Q.   Other than asking her how she was doing, do you

5  have any recollection of that conversation with Sue

6  Greenberg?

7      A.   No.  There was -- I don't believe there was

8  much more to that.

9      Q.   What is your knowledge of AWG, Inc.?

10     A.   They are the family business of Joel and Abby

11 and Andy and Sue Greenberg.  I don't know if it still

12 exists today, but it used to exist.

13     Q.   What is the -- what's the source of the

14 understanding that you have that it's the business for

15 Joel Greenberg, Abby Greenberg, Andy Greenberg, and Sue

16 Greenberg?

17     A.   That's the family business funding arm.  I read

18 the complaint, and it states it in the complaint.

19     Q.   Do you have any other understanding?

20     A.   Other than Abby or, you know, Joel talking

21 about that.

22     Q.   And when you say that, what do you mean?

23     A.   Talking about their funding sources.  There was

24 a lot of -- to them it seemed in the times that we were

25 together -- again, this may have changed so I'm not



 1  saying this is present day information, but that

 2  Greenberg Dental and AWG, I think that that was used

 3  very interchangeably by Joel in talking about how much

 4  money he had or who was paying for things.

 5      Q.   So it sounds like your understanding of AWG,

 6  Inc., comes from the verified complaint, true?

 7      A.   Uh-huh.

 8           MR. BELTRAN:  Object to the form.

 9      Q.   True?

10      A.   Well, that is a portion of it.  That wasn't all

11  that I said.

12      Q.   Understood.  So part of your information about

13  specifically AWG, Inc., comes from the verified

14  complaint that you read, correct?

15      A.   Correct.  Part of my information, correct.

16      Q.   And then the other part of your information

17  specifically about AWG, Inc., comes from communications

18  that you had with Abby Greenberg and Joel Greenberg; is

19  that correct?

20           MR. BELTRAN:  Object to the form.  Go ahead.

21  BY MR. FORD:

22      Q.   Just tell me if that is correct.

23           THE WITNESS:  Did you want to say anything

24      else, Mike?

25  BY MR. FORD:



1    Q.   He can't.  Go ahead.  Go ahead.

2    A.   Would you please repeat the question?

3         MR. FORD:  Can you please repeat the question?

4         (The question was read back.)

5         THE WITNESS:  Statements made by Joel Greenberg

6    and Abby Greenberg about family business funding,

7    quarterly payments, things like that.

8  BY MR. FORD:

9    Q.   Specifically from AWG, Inc.?

10    A.   Oh, I don't --

11        MR. BELTRAN:  Object to the form.

12        THE WITNESS:  Just a reference to their family

13   business.  The complaint states that that's like

14   what that entity is.  It was more -- it wasn't that

15   formal in how conversations were -- statements were

16   made about funding sources.

17  BY MR. FORD:

18    Q.   So your understanding of AWG, Inc., comes from

19  the verified complaint, correct, in part?  Yes?

20    A.   And privileged conversations.

21    Q.   Privileged conversations with whom?

22    A.   My husband.

23    Q.   And why are those privileged?

24    A.   Because we're married.

25    Q.   So your understanding of AWG, Inc., comes from



 1  the verified complaint, conversations that you've had

 2  with your husband, and then general conversations that

 3  you've had with Abby and Joel about the Greenberg

 4  business.

 5         Is that a fair summary?

 6    A.   I don't know if it's complete, but that is a

 7  fair summary of what I've stated.

 8    Q.   I want to make sure that you have a chance to

 9  give complete answers today, so do you have anything to

10  add to that?

11    A.   Not at this time; but if I -- I will come back

12  as you requested if I need to give you more information.

13    Q.   We're in a deposition room right now at Carlton

14  Fields, and you are in this room with us.  Mr. Beltran

15  and your husband are attending by video; is that

16  correct?

17    A.   Well, I know that Mr. Beltran is, and it looks,

18  yes, that my husband is also on the screen.

19    Q.   And you can tell that because we see Chris

20  Dorworth on the screen?

21    A.   His name, yeah.

22    Q.   Is there a reason why they're not here today?

23         MR. BELTRAN:  Object to the form.  You don't

24     have to answer that.

25  BY MR. FORD:



 1      Q.   Go ahead and answer my question.

 2           MR. BELTRAN:   I don't think she has to answer

 3      that.  That's like -- that is her conversations with

 4      me and Chris, so she doesn't have to answer that.

 5           THE WITNESS:   So we'll call it privileged

 6      conversation.

 7   BY MR. FORD:

 8      Q.   So are you refusing to answer my question?

 9      A.   No.  I'm saying that the answer is privileged

10   information.

11      Q.   So either you're refusing to answer my question

12   based on privilege, or you're going to answer my

13   question.  So is there a reason why Mr. Beltran and your

14   husband are not here today?

15           MR. BELTRAN:   Chris, I have made an objection.

16      You are asking the question.

17           MR. FORD:   She has to answer whether she's

18      going to follow your advice.

19           MR. BELTRAN:   Okay.  Well, I think she said it

20      was privileged on her own.

21           THE WITNESS:   I'm following his advice, and I'm

22      telling you that I -- this is a privileged

23      conversation with my attorney and my husband.

24   BY MR. FORD:

25      Q.   Okay.  And so you're refusing to answer my



```
 1  question based on privilege; is that correct?
 2      A.   I'm telling you that the answer is privileged.
 3           MR. BELTRAN:  Also, I'm going to object because
 4      it's not calculated to lead to discovery of
 5      admissible evidence --
 6  BY MR. FORD:
 7      Q.   Is Mr. Beltran your personal counsel?
 8      A.   Yes.
 9      Q.   How long has he been your personal counsel?
10      A.   I guess since we began the case.
11      Q.   And when did you begin the case?
12      A.   When I was asked to -- when I was asked to
13  verify --
14           MR. BELTRAN:  Hold on, Rebekah.  You don't need
15      to discuss our discussions.  He's asking you --
16           MR. FORD:  I'm asking -- I'm asking --
17           MR. BELTRAN:  Excuse me.  Excuse me.
18           MR. FORD:  You don't get to make speaking
19      objections.
20           MR. BELTRAN:  I'm not making a speaking
21      objection.  I'm telling her -- counseling her about
22      the privilege.  You don't -- you should not divulge
23      the content of communications that you've had with
24      me or Chris or any other privileged conversations.
25      You can say when the case started or when you spoke
```



1    to me, but you should not divulge the contents of

2    that communication.

3         THE WITNESS:  Okay.  So the case began -- I'm

4    not positive when the case began, but we'll just say

5    generally from the beginning of the case and the

6    filings.

7  BY MR. FORD:

8    Q.   So I think you were starting to say that your

9  involvement with Mr. Beltran began when you executed the

10  verified complaint; is that accurate?

11   A.   That's --

12        MR. BELTRAN:  I'm going to object to --

13  BY MR. FORD:

14   Q.   Go ahead.

15        MR. BELTRAN:  Hold on.  I'm going to -- I would

16    to object to the contents of any communications.

17    You can testify about when you started speaking to

18    me, so not --

19        MR. FORD:  So this is not -- this is not asking

20    for privileged communications, Mr. Beltran.  It's

21    putting it at a place and time, and she said that

22    her involvement with you began with the verified

23    complaint.  She's not --

24  BY MR. FORD:

25   Q.   I don't want to know what you talked to



 1  Mr. Beltran about the verified complaint.  I just want

 2  to confirm that that's when you started to consider

 3  Mr. Beltran as your personal counsel.  And so my

 4  question doesn't ask for any -- hang on.  It doesn't ask

 5  for any privileged communications.  It just asks for a

 6  point in time.  Is it --

 7      A.   We spoke prior to that --

 8           MR. BELTRAN:  Hold on.  Hold on.  Rebekah, let

 9      me make my objection.  You said what she said

10      because you have already asked that question, so

11      you've got your answer.  If --

12           MR. FORD:  Hey, Mike, you need to keep your

13      objections to form.  You cannot -- you cannot do

14      what you're doing as it's against the rules in the

15      middle district.  You cannot --

16           MR. BELTRAN:  We're making a privilege -- I'm

17      making a privilege objection.

18           MR. FORD:  You cannot -- then just say

19      privilege.

20           MR. BELTRAN:  Excuse me.  Excuse me.  You can

21      tell him the time.  You can tell him that I was

22      representing your counsel and you don't divulge the

23      contents of any privilege communications with me or

24      Chris or anyone else.  With that, if you want to ask

25      the question again, I kind of think you got your



1    answer but go ahead.

2            MR. FORD:  I don't have my answer.

3    BY MR. FORD:

4    Q.  So when did you first consider Mr. Beltran as

5    your personal counsel?

6    A.  I don't know.  I think prior to the beginning

7    of this.  I'm not -- I'm not really sure.  I don't have

8    a timeline for you.  I don't know when I would have

9    considered him, you know, my personal attorney.  You

10   know, he was clearly always my husband's attorney, but,

11   you know, I was asked to verify the --

12           MR. BELTRAN:  Hold on.  Rebekah -- Rebekah, you

13       can tell him -- don't divulge the contents of the

14       communication.  So I would move to strike that, and

15       just try to try to answer his question because we --

16       he's entitled to certain things.  He's not entitled

17       to other things.  He's not entitled to contents of

18       communications.  So just answer his question.

19           THE WITNESS:  I don't remember an exact date.

20   BY MR. FORD:

21   Q.  So let me see if I can help you.

22   A.  Okay.

23   Q.  So the verified complaint that you signed is --

24   was filed on August 8, 2023, and that is the date that

25   you verified it.  I'll just make that representation to



 1  you.  The verified complaint that you signed was filed

 2  on August 8, 2023, and you signed it on that date.

 3          So was it as of that date that you considered

 4  Mr. Beltran your personal counsel?

 5          MR. BELTRAN:  Object to the form.  You can

 6     answer.

 7          THE WITNESS:  You said to answer?

 8  BY MR. FORD:

 9     Q.   Yes.

10     A.   No.  I mean, obviously I would have had

11  conversations with him prior to signing, you know, the

12  things specific to me in there.

13     Q.   How much before August 8th --

14     A.   I don't remember.

15     Q.   Can I -- let me ask my question.  Remember that

16  is one of the ground rules we had for you to wait --

17     A.   You said how much before --

18     Q.   I haven't finished my question.  So I just want

19  to make sure we have the same understanding of the

20  ground rules which is if you can try to wait until I

21  finish my question.

22          Does that make sense to you?

23     A.   Yes.  Please make clear when you're question is

24  over.

25     Q.   I will.  And I --



 1      A.    If you could maybe say, My question is
 2   complete, that would be great.
 3      Q.    I'm not going to do that.  So I just want you
 4   to wait until I'm done with my --
 5           MR. BELTRAN:  Hold on, Chris, a lot of times --
 6   BY MR. FORD:
 7      Q.    Ms. Dorworth -- so, Ms. Dorworth --
 8           MR. BELTRAN:  Excuse me, Chris, a lot of times
 9      we think you're done because you're asking compound
10      questions, and it has happened with my objections.
11      It's happened with Ms. Dorworth's answers.  So if
12      you can avoid compound questions, that will also
13      smooth things.  Thank you.
14   BY MR. FORD:
15      Q.    How much prior to August 8, 2023, did you
16   consider Mr. Beltran your personal counsel?
17      A.    I do not --
18           MR. BELTRAN:  Object to the form.  Go ahead.
19           THE WITNESS:  I do not know.
20   BY MR. FORD:
21      Q.    Was it weeks?
22           MR. BELTRAN:  Same objection.  Go ahead.
23           THE WITNESS:  You're saying -- I'm sorry, you
24      said the date was August?
25   BY MR. FORD:



1      Q.    You verified the complaint on August 8, 2023.

2      A.    Oh, no.  I think months.  I mean...

3      Q.    How many months?

4      A.    Many months.  I don't know.  It would have been

5  much earlier that year.  I just don't remember.

6      Q.    Did you consider him -- well, let me ask you

7  this question first:  Did you ever review the complaint

8  that was filed in state court, the first complaint that

9  you did not verify but your husband did?

10         MR. BELTRAN:  I'm going to object to that.

11     Yeah, I'm going to object to that, and you're asking

12     did she review -- I think that would be

13     communications because someone would have to send

14     that to her.  So, yeah, I think that would be

15     communications.

16  BY MR. FORD:

17     Q.    Did you review the original complaint in this

18  case --

19         MR. BELTRAN:  Hold on.  Don't ask it again.  I

20     think that's privileged.

21         MR. FORD:  So are you instructing her not to

22     answer that question, whether she reviewed the

23     original complaint?

24         MR. BELTRAN:  If she reviewed the original

25     complaint.



1          MR. FORD:  Are you instructing her not to
2      answer, Mr. Beltran?
3          MR. BELTRAN:  Yeah.  How does that not get
4      in -- implicate communications?
5          MR. FORD:  Are you instructing her not to
6      answer?
7          MR. BELTRAN:  I'm asking you how does not
8      implicate communications?
9          MR. FORD:  If she reviewed a document, that's
10     not a privileged communication.  If she reviewed a
11     document.  She said that she's reviewed public
12     pleadings, she's reviewed media stories.  If she
13     reviewed the first verified complaint in the case,
14     that is not privileged.
15         MR. BELTRAN:  Okay.
16         MR. FORD:  Are you instructing her not to
17     answer that question?
18         MR. BELTRAN:  I mean, if you can confine it to
19     whether she reviewed it.  I --
20         MR. FORD:  I'm pretty sure that was my
21     question, Mr. Beltran.  So I'm taking these
22     objections that are not in good faith.
23 BY MR. FORD:
24     Q.   My question to you, Ms. Dorworth, is did you
25 review the original complaint that was verified by your



1  husband and filed in state court?

2          MR. BELTRAN:   I'm going to instruct the witness

3      to confine to whether she reviewed it and not any

4      communications regarding the complaint and anything

5      else.

6  BY MR. FORD:

7      Q.   And so, Ms. Dorworth, to try of cut through

8  these back and forths that I'm having with Mr. Beltran,

9  I don't want to know communications that you've had with

10  Mr. Beltran while he was acting as your counsel.  I

11  don't want to know that today.  Okay?  So I'm not asking

12  for that, and my question wasn't asking for that.

13          My question was did you review the verified

14  complaint that was verified by your husband and filed in

15  state court?

16      A.   I would not have reviewed it in full if I

17  didn't sign it, so I may have.  I'm not sure whether I

18  reviewed it in full.

19      Q.   Have you ever reviewed it in full?

20      A.   The original complaint, yes, I believe that

21  I've read it.

22      Q.   When did you read it last?

23      A.   It would have -- I would have read it when he

24  filed it just so I knew what was in it.

25      Q.   And did you read it in its entirety?



 1       A.    Well, I think I answered the question earlier.
 2  I don't think that I have read it in the entirety.
 3       Q.    Sitting here today, have you read it --
 4            MR. BELTRAN:  I'd like to -- I'd like to take a
 5       break.
 6  BY MR. FORD:
 7       Q.    Sitting here today, have you reviewed the
 8  original complaint in its entirety as of today?
 9       A.    Well, my understanding is we refiled, so I'm
10  trying to make sure that this isn't some gotcha question
11  of what you're trying to say, Oh, this complaint or that
12  complaint, and you all throw all these different motions
13  of what I have read, what I haven't read, and things I
14  have been subpoenaed on.  I'm just trying to make sure
15  that I'm answering completely and truthfully for you.
16  I've read -- you say -- like which complaints or this
17  complaint?  If it's been filed publicly -- well, other
18  than, I mean, the -- like, you know, the first document.
19  I'm not a lawyer, so I apologize for not understanding
20  all of the legal terms of this; but, yes, I would have
21  reviewed that document -- or not reviewed.  Reviewed is
22  the wrong word.  I would have read that document at some
23  point, yes.
24       Q.    When was that?
25            MR. BELTRAN:  I'd like to take a break.



```
 1          THE WITNESS:  I'd like to go to the bathroom.
 2          THE VIDEOGRAPHER:  If there are no
 3     objections --
 4          THE WITNESS:  -- because it's been an hour.
 5          THE VIDEOGRAPHER:  The approximate time is
 6     10:08 a.m.
 7          (A break was had.)
 8          THE VIDEOGRAPHER:  On record.  The approximate
 9     time is 10:19 a.m.
10  BY MR. FORD:
11     Q.   Ms. Dorworth, we are back on the record.  You
12  had an opportunity to take a break and use the bathroom;
13  is that correct?
14     A.   That's correct.
15     Q.   Do you need anything else to proceed?
16     A.   No.  I made my request for things that I need
17  to proceed.  Thank you.
18     Q.   Okay.  So you're ready to go?
19     A.   Yes.
20     Q.   Before we took a break, I was asking you
21  questions about your review of the original complaint,
22  and you started to talk about different pleadings.  So I
23  just want to make clear for you there was an original
24  complaint that was filed in state court --
25     A.   Yes.
```



1    Q.    -- by your husband?

2    A.    Yes.

3    Q.    Verified by your husband on April 7th that was

4  filed 2023 in state court.

5          Are you aware of that complaint?

6    A.    Yes, I am aware of the -- yes, I'm aware of the

7  first complaint.

8    Q.    Okay.  Not confusing to you what that document

9  is, correct, what we're referring to -- what we're

10 referring to in this discussion, that makes sense to

11 you, the original complaint?  Let's call it that.

12         Okay?

13   A.    Yes.

14   Q.    And then there was a second what was called an

15 amended complaint that was filed on August 8, 2023, that

16 you verified.  We're going to call that the amended

17 complaint.

18         Does that make sense to you?

19   A.    Yes.

20   Q.    And you are now aware that those -- of those

21 two documents that we're going to talk about, correct?

22   A.    Correct.

23   Q.    And it sounds like, but you tell me if I'm

24 wrong, that you have a general recollection of reviewing

25 the original complaint, but you did not, as you sit here



1   today, ever read it in its entirety; is that true?

2            MR. BELTRAN:  Object to the form.  Go ahead.

3            THE WITNESS:  I would -- when I say that, I

4      just -- I have read it.  I contributed to it.  I --

5      what I'm trying to say is that I was more thorough

6      in my reading of the -- what you're referring to as

7      the amended complaint because I signed it.  And

8      obviously, when you sign something like it took me a

9      little bit today and I'm sorry that that bothered

10     you all but I wanted to read through something that

11     I was going to sign.  So that's all I meant was

12     that -- but, yes, there's clearly things in that

13     original document about threats that were made

14     against me and my family.  And so that's what --

15     that was in the complaint, and I obviously made sure

16     I read those thoroughly.

17  BY MR. FORD:

18     Q.   And I'll represent to you that that was filed

19  in state court on April 7, 2023.

20          As of that date, was Mr. Beltran your personal

21  counsel?

22     A.   Prior to that, yes.

23     Q.   Did you sign a separate retention agreement for

24  Mr. Beltran to act as your personal counsel?

25     A.   I've signed things with them, so -- several



1  things with them, so I'm not sure.  I don't have that

2  document with me, but I don't -- I have signed a number

3  of things.

4       Q.   And my question specifically is do you

5  recall --

6       A.   I do not know.

7       Q.   So sitting here today, you do not know whether

8  you signed a separate retention agreement for

9  Mr. Beltran to act as your personal counsel; is that

10  fair?

11       A.   Like as a personal attorney apart from this

12  case?

13       Q.   Let me clarify.  What is your understanding of

14  Mr. Beltran's role vis-à-vis you?

15       A.   That he is my counsel in this case and

16  deposition.

17       Q.   So he is your attorney for purposes of this

18  case and your deposition, correct?

19       A.   Well, not just the deposition but the case,

20  yes.

21       Q.   That's what I said.  He is your attorney for

22  this case and the deposition, and that was your

23  testimony; is that accurate?

24       A.   Yes.

25       Q.   Is he your attorney for anything else other



1 | than this case and your deposition?

2 |     A.   No.

3 |     Q.  And you -- did you retain him separately from

4 | your husband prior to April of 2023 --

5 |         MR. BELTRAN:  Object.  It's been asked and

6 |     answered, but you can go ahead and answer.

7 |         THE WITNESS:  I understand him as separately

8 |     representing me.

9 | BY MR. FORD:

10 |     Q.  And so did you sign a retention agreement with

11 | him at any point on your behalf?

12 |         MR. BELTRAN:  Asked and answered.  Same

13 |     objection.

14 | BY MR. FORD:

15 |     Q.  Go ahead.

16 |     A.  I have signed several things with them, so I

17 | apologize.  I just don't -- if you -- I don't have all

18 | the documents in front of me of the things I've signed.

19 |     Q.  So sitting here today, it sounds like you can't

20 | say one way or the other whether you signed a separate

21 | retention agreement with Mr. Beltran for him to act as

22 | your attorney; is that correct?

23 |         MR. BELTRAN:  Asked and answered.  Same

24 |     objection.  Go ahead.

25 | BY MR. FORD:



```
 1      Q.   You need to answer.
 2      A.   I'm sorry, I thought I answered the question,
 3 that he acts as my counsel and that I believe I have
 4 signed many documents by his firm and that I believe a
 5 retention agreement is in there, but I do not know 100
 6 percent sure for.
 7      Q.   Okay.  So that is different than what you said
 8 earlier.  You now are recalling that you signed a
 9 retention agreement.
10      A.   This isn't different.  You keep asking the
11 question --
12           MR. BELTRAN:  Object to form.
13           THE WITNESS:  -- because you don't like my
14      answer.  And if you don't like my answer, I'm trying
15      to assist you in getting to something that
16      apparently satisfies you.  But my answer to the
17      question is that I have signed multiple documents
18      for them.  I assume that a retention agreement is in
19      there, and that was many, many months ago prior to
20      the -- or many months prior to the situation, the
21      filings.  But I couldn't -- I don't -- I couldn't
22      tell you for sure.
23 BY MR. FORD:
24      Q.   Are you paying for Mr. Beltran's representation
25 of you?
```



1          MR. BELTRAN:  Object to -- you are asking you
2     wouldn't let me ask your client, but --
3          MR. FORD:  You've put it in your complaint, Mr.
4     Beltran --
5          THE WITNESS:  Do you mean are we married and do
6     we --
7          MR. BELTRAN:  Hold on.  Hold on.  What did I
8     put in the complaint?
9          MR. FORD:  You made allegations about how our
10    clients' attorney's fees were paid, so I'm perfectly
11    entitled to ask this question about how her
12    attorney's fees are being paid.
13         MR. BELTRAN:  You guys refused to answer those
14    types of questions.
15         MR. FORD:  No, we didn't.  No, we didn't.
16         MR. BELTRAN:  Refused --
17         MR. FORD:  No, we did not.  We did not refuse
18    to answer, but I'm not going to debate that with
19    you.
20  BY MR. FORD:
21    Q.   My question, Ms. Dorworth, is are you paying
22  Mr. Beltran for his personal representation?
23    A.   It's -- we're married, and it's our money.  So,
24  yes, I am paying for it.
25    Q.   Are you paying for it out of a separate



 1  account, or is it --

 2      A.   We don't have -- we don't have separate

 3  accounts.  Like are we...

 4      Q.   Do you get separate billings for Mr. Beltran's

 5  representation of you as opposed to your husband?

 6      A.   I don't think so.  I don't know if it's sent

 7  together or not.

 8      Q.   Sitting here today, have you ever seen a

 9  separate billing for Mr. Beltran's representation of you

10  in this case or for your deposition today?

11      A.   Would that be communications with an attorney?

12  Would that be privileged?

13      Q.   No, it's not.

14          MR. BELTRAN:  Well, hold on a second.

15      You're --

16          MR. FORD:  I have just asked her whether she

17      has seen, I'm not asking for content.

18          THE WITNESS:  Have I seen a bill, yes.

19  BY MR. FORD:

20      Q.   To you personally?

21      A.   I don't remember whether it said my name at the

22  top or not.

23      Q.   So you have seen attorney's bills, but sitting

24  here today you don't know whether that is for

25  Mr. Beltran's representation of you or your --



 1    A.    I'm --

 2    Q.    Hang on --

 3    A.    I --

 4    Q.    -- or your husband --

 5    A.    I'm assuming it represents --

 6    Q.    Or is --

 7    A.    Compound questions.  Remember, you said you

 8  were going to keep it to one question at a time.

 9    Q.    So I really need you to focus on the basic rule

10  which is to allow me to finish my question, okay.  It's

11  not -- it's not your function to object.  That's

12  Mr. Beltran's.  So I'm going to ask my question.

13         MR. BELTRAN:  Sir --

14  BY MR. FORD:

15    Q.    So did you --

16         MR. BELTRAN:  Sir, you need to let her -- sir,

17    you need to let her answer the question.

18  BY MR. FORD:

19    Q.    Have you seen a bill --

20         MR. BELTRAN:  Sir --

21         MR. FORD:  I didn't even ask a question, Mike.

22         MR. BELTRAN:  You need to let her answer the

23    question, and she needs to let you ask the question.

24         MR. FORD:  Right, when I finish my question --

25         MR. BELTRAN:  It goes both ways, sir, and



1        you're cutting her off.  So let her answer.  She'll
2        let you ask your questions and then I'll object and
3        then she'll answer.
4              Mr. Ford:  And that'd be great.  Let's proceed
5        exactly that way.
6    BY MR. FORD:
7        Q.   Does that make sense to you?  I'll ask a
8    question, you'll wait for me to finish it, and then
9    you'll answer.  Does that make sense to you?
10       A.   It does.
11       Q.   And Mr. Beltran can object if needs to.  Does
12   that make sense to you?
13             MR. BELTRAN:  And please give me a --
14   BY MR. FORD:
15       Q.   Ms. Dorworth, the question to you that I have
16   is have you seen a bill to you individually as opposed
17   to you and your husband or just your husband?
18       A.   I don't recall.
19       Q.   What did you do to prepare for today's
20   deposition?
21       A.   Prayed a lot.
22       Q.   What else did you do besides prayer?
23       A.   I exercised.  I ate a healthy breakfast.
24       Q.   What else?
25             MR. BELTRAN:  Rebekah, just go ahead and don't



 1        tell him the contents of any communications, just

 2        tell him just generally what you did.

 3             MR. FORD:  Mike, that is coaching a witness.

 4        So she is in the middle of her answer.  I'm going to

 5        ask you not to do that anymore today.

 6             Okay?

 7             MR. BELTRAN:  I'm trying to help you.

 8             MR. FORD:  I don't need your help.  Let's just

 9        have -- I don't need your help.

10             MR. BELTRAN:  Apparently you do.

11  BY MR. FORD:

12        Q.   Go ahead, Ms. Dorworth.

13        A.   I prepped with my husband and with my attorney

14  separately.

15        Q.   What else did you do?

16        A.   When you say prepped for today, you mean in

17  receiving the directions to come here?  Are you talking

18  prepping for the contents of today?  Like I'm just -- I

19  really am trying to answer your question.  I'm just

20  trying to understand.

21        Q.   Okay.  Let me see if I can help you.  So for

22  today's deposition, the way you prepared for it was you

23  engaged in prayer, you exercised, you ate a good

24  breakfast, you prepared separately with your husband,

25  and you prepared separately with your attorney,



 1  Mr. Beltran; is that right?
 2      A.   That's correct.
 3      Q.   Anything else to add to that for preparation
 4  today?
 5      A.   No, but if I recall something I will come back
 6  and add it per your request.
 7      Q.   When did you prepare with your husband
 8  separately?
 9      A.   Well, I don't -- I'm trying to say how -- you
10  know, I mean, you know, preparation has been a
11  lifetime -- or, you know, 12 years together preparation.
12  If you mean like specific to the contents of this, it
13  wasn't -- I mean, we haven't gone over a lot of things
14  other than, again, I think a lot of these are privileged
15  communications, so I'm just trying not to...
16      Q.   Do you remember what my question was,
17  Ms. Dorworth?
18      A.   You said how did you prepare for this?
19      Q.   That wasn't my question.
20      A.   I'm sorry.
21      Q.   My question was when did you prepare separately
22  with your husband?
23      A.   Oh, when?
24      Q.   Correct.
25      A.   Last night.  Last night with my husband and



1  last night with the attorney.

2      Q.   And those were separate discussions?

3      A.   Yeah.  My husband had a business meeting that

4  he went out for and came back.

5      Q.   How long did you talk with your husband last

6  night about your deposition today?

7      A.   I don't know.  Not a super long -- not a super

8  long time, but we have talked about this obviously, you

9  know, throughout intermittently.

10     Q.   So in preparing with your husband last night

11 for your deposition today, did that last more than an

12 hour?

13     A.   With my husband?  Probably right around then.

14     Q.   What time did that discussion begin last night?

15     A.   Well, again, it was -- it was more broken up.

16 So like we talked about it earlier, he had a business

17 meeting, and then I talked to him when he got home just

18 for a couple of minutes.

19     Q.   What times were those?

20     A.   I don't know.

21     Q.   After 5:00 in the evening?

22     A.   Yes.

23     Q.   After 8:00 in the evening?

24     A.   When he came back, yes.

25     Q.   So between 5:00 and 8:00, did you have a



 1  conversation?

 2     A.   What time did he leave?  No.  No, I spoke to

 3  Mr. Beltran while he was gone to his -- he had a

 4  business meeting.  He left the house.

 5     Q.   What was the business meeting?

 6     A.   I don't remember.

 7     Q.   You don't remember what business meeting your

 8  husband had last night?

 9     A.   Yeah, he was with -- it was with a couple of

10  friends and -- like friends --

11        MR. BELTRAN:  Hold on.  You don't -- if you

12     know other than what your communications were with

13     Chris, then you can answer.  I don't know see what

14     this has to do with the case.

15        THE WITNESS:  Yeah, I don't know either, but

16     they want to spend time with this.  That's fine.  He

17     went to see Jason Brodeur, and he went to see -- and

18     I don't know if Jason was introducing him to

19     business people or if there was other people that

20     were there, but one of their old college friends was

21     there.  I think he was in town because he doesn't

22     live in Orlando.  So I don't know.  I just -- that's

23     just the names that I just -- what I remember.  I

24     don't know if it was actually a business meeting or

25     if it was just a friendly meeting.



```
 1  BY MR. FORD:
 2      Q.   Mr. Brodeur and your husband were fraternity
 3  brothers at the University of Florida; is that correct?
 4      A.   That's correct.
 5      Q.   Do you know who else was at that meeting?
 6      A.   I think they were meeting a guy named Clay who
 7  was also -- I'm not sure if he was in their fraternity,
 8  but he was also at the University of Florida.
 9      Q.   So I'm still trying to understand.  It sounds
10  like you talked with your husband about an hour total to
11  prepare for today's deposition.
12      A.   I don't know that it was strictly an hour.  I
13  wasn't checking the clock when I was speaking to him.
14      Q.   I'm just trying to understand what you've told
15  me.  So are you changing the amount of time you spent
16  talking with your husband?
17      A.   No --
18           MR. BELTRAN:  Object to form.
19  BY MR. FORD:
20      Q.   Go ahead.
21      A.   No.  I'm saying I would love to be more
22  specific with you, but I can't -- I cannot be more
23  specific with you.
24      Q.   Can you be more specific as to whether it was
25  less than or more than an hour that you spoke with your
```



1  husband last night?

2      A.   If you're talking about overall prep time, you

3  know, like, you know, have we discussed, you know,

4  things just overall throughout, you're just talking

5  about last night?

6      Q.   Yep.

7      A.   Yeah, I think that's accurate then.  About an

8  hour, yeah, because we really didn't talk about it after

9  he came home.

10     Q.   Okay.  And --

11     A.   He just told me -- well, that is privileged.

12     Q.   And sitting here today, the very next day, you

13  can't recall at what points in the evening you spoke

14  with him?

15     A.   No.  I told you I spoke with my attorney after

16  he left.  I remember that his meeting was around -- I

17  think around 5:30 because he needed to go, and so I was

18  going to prep at that point, and that's what I did.  I

19  prepped with my attorney at that point in time.

20     Q.   At 5:30 last night?

21     A.   At 5:00 -- around -- yes.

22     Q.   How long did that preparation last?

23     A.   Maybe until after 7:00, maybe.

24     Q.   Was that in person?

25     A.   No.



1    Q.   Was it by Zoom?

2    A.   It was just a Google -- I think I had a Google

3  link.

4    Q.   Like a video call?

5    A.   Yes -- no, not a video because it was like a

6  link, but I didn't use any video.  It was a phone -- it

7  was just a conversation.

8    Q.   So last night you prepared for your deposition

9  today with Mr. Beltran from 5:30 to 7:00; is that

10 correct?

11   A.   It was just a conversation.

12   Q.   You had a phone call with Mr. Beltran that

13 lasted from 5:30 to 7:00 last night to prepare for your

14 deposition, correct?

15   A.   As -- yes.

16   Q.   And was anyone else on that call besides

17 Mr. Beltran and you?

18   A.   The other -- our other attorney.

19   Q.   And who is that?

20   A.   Anastasia.

21   Q.   Anastasia Wagner?

22   A.   Yes.

23   Q.   And can you remember last night whether you

24 talked with your husband before 5:30 about your

25 deposition?



```
 1      A.   Yes.

 2      Q.   You did?

 3      A.   Uh-huh.

 4      Q.   That's a yes?

 5      A.   Yes.

 6      Q.   How long was that conversation?

 7      A.   I don't know, a few minutes maybe.  Again, kind

 8  of asked questions as they popped into my head.

 9      Q.   And then you had another conversation when you

10  came home from this meeting with Mr. Brodeur; is that

11  correct?

12      A.   It wasn't a substantive conversation, more of a

13  form conversation.

14      Q.   Did you look at any documents to prepare for

15  your deposition today?

16      A.   I was trying to get the subpoena documents in

17  so, it was capturing those.  I was trying to have them

18  for you today even though they're not due for three

19  weeks.  So I was looking at those documents.  I mean, I

20  don't know if I think those are considered documents in

21  this case, so I was looking at those documents.

22      Q.   Any other documents that you have looked at

23  other than the text messages that were produced to us

24  shortly before midnight?

25      A.   I think I reread the complaint.
```



1    Q.   Which one?

2    A.   The amended complaint.

3    Q.   You reread the --

4    A.   The one I signed.

5    Q.   You reread the amended complaint to prepare for

6  your deposition; is that correct?

7    A.   Not to -- well, I mean, just -- yeah, I reread

8  the amended complaint to prepare.

9    Q.   When did you do that?

10   A.   I don't know, last night.

11   Q.   How long did that take you?

12   A.   I don't know.  I mean, I know it very well, so

13 I wasn't trying to do like a thorough reading of it.  I

14 was just, you know, scanning over it.

15   Q.   How long did it take you?

16   A.   I don't know.  I don't know.  I wasn't checking

17 the clock before and after.

18   Q.   What time did you review the amended complaint

19 last night?

20   A.   Pretty late.  I think I did it right before I

21 was trying to go to bed.  I don't know, maybe 10:00.

22   Q.   Do you think it took less than 15 minutes to do

23 a review of it?

24   A.   No.  I mean, maybe.  I don't know.  I was just

25 again refreshing.



1    Q.   Did you review the amended complaint last night
2  in its entirety?
3         MR. BELTRAN:  What was the answer, or what was
4     the question?  What was the last word?
5         MR. FORD:  In its entirety.
6         THE WITNESS:  I told you I scanned the
7     document.  I didn't -- I wasn't -- I didn't read
8     word for word.  I didn't read the document.
9  BY MR. FORD:
10    Q.   Do you know how many times you've reviewed the
11 amended complaint from when you signed it on August 8,
12 2023, until today?
13    A.   Well, just -- I mean, just when I -- when we
14 filed it and then last night.  I don't think I've seen
15 it.  I don't think I've -- no, I think I looked at it
16 because it was linked in a couple of the articles.  And
17 so if I've clicked on a link, you know, to see what it
18 went to or something like that, but not -- I haven't --
19 I haven't thoroughly read it since I signed it.
20    Q.   And you reviewed it last night before the
21 deposition today, correct, or scanned it?
22         MR. BELTRAN:  Objection, asked and answered.
23 BY MR. FORD:
24    Q.   Scanned it, correct?
25    A.   Scanned it, yes.

1      Q.   Was there anything in the amended complaint

2   when you read it last night that you thought to yourself

3   was no longer accurate?

4      A.   Actually, when I read the amended complaint, I

5   was concerned that there should be more information

6   there.  I understand there is, you know, page limits and

7   things like that, but my concern was it was -- it

8   needed -- it should be more thorough.

9      Q.   So let me ask you this question first, and you

10  tell me if you don't understand the question.  Was there

11  anything in the amended complaint when you read it last

12  night that no longer is accurate in your mind?

13         MR. BELTRAN:  Objection, asked and answered.

14         THE WITNESS:  I don't believe so, no.

15  BY MR. FORD:

16     Q.   So everything in the amended complaint as of

17  your review last night is accurate and truthful; is that

18  correct?

19     A.   That's my understanding --

20         MR. BELTRAN:  Asked and answered.  Go ahead.

21         THE WITNESS:  That's my understanding, yes.

22  BY MR. FORD:

23     Q.   And you said there should be have actually been

24  additional information in the amended complaint?

25     A.   Just more thorough; but again, I understand



 1  limits and page numbers and space and time.  You know,
 2  this is what a trial or depositions would be for more
 3  thorough information.
 4      Q.   Speaking of depositions and trials, have you
 5  ever been deposed before?
 6      A.   I have.
 7      Q.   And when have you been deposed?
 8      A.   In 2000 -- it's been a long time -- '13 or '14.
 9      Q.   Was that in association with the grand jury
10  indictment that you received?
11      A.   That's correct.  I was deposed at that time.
12      Q.   So in 2014, you were indicted by a grand jury,
13  correct?
14      A.   That's correct.
15      Q.   And you gave testimony in that case; is that
16  correct?
17      A.   That is correct.
18      Q.   And to whom did you give testimony?
19      A.   I gave testimony to investigators and to the
20  state attorney, Jeff Ashton.
21      Q.   And was that recorded?  Do you know?
22      A.   It was recorded.
23      Q.   Do you have a copy of that?
24      A.   I don't.  The state attorney requested that it
25  would be sealed because it really damaged his case.



1  Q.   What were the topics of that deposition?

2       MR. BELTRAN:   Hold on a second.   You're asking

3  her to divulge the grand jury testimony?

4       MR. FORD:   She didn't say she testified to the

5  grand jury.

6       MR. BELTRAN:   I thought she did.   I thought she

7  said...

8       MR. FORD:   She said she gave a deposition.

9       MR. BELTRAN:   Okay.   All right.   Because you're

10  objecting to our questions about the grand jury --

11       MR. FORD:   Yeah, yeah, yeah.   Focus on the

12  witness' testimony if you could.

13       MR. BELTRAN:   I'm sorry.

14  BY MR. FORD:

15       Q.   You said that you gave a deposition, so what

16  were the topics of that deposition?

17       A.   There is a law in Florida called the Sunshine

18  Law.   I don't know how familiar you are if you're from

19  out of state.

20       Q.   I'm very familiar with that law and your case,

21  so go ahead.

22       A.   Okay.   So the Sunshine Law is about the court

23  of -- everything must be done in the sunshine.   So

24  people who sit on boards have to discuss votes out in

25  the open.   And in that case, they -- I worked for



 1  someone who sat on the board, and I also had direct

 2  conversations with the Secretary of Transportation who

 3  was Ananth Prasad.  At the time, they wanted to know the

 4  contents of my conversations with my boss and

 5  additionally with board members to see if I had

 6  coordinated any votes between them.  My role was

 7  informational.  Many people called me.  They were

 8  concerned about all these people calling me even though

 9  that was my actual role and job, and I shared with them

10  what information I shared when I was called.

11       Q.   And is that what you discussed in your

12  deposition?

13       A.   Yes.  I mean, it was -- there were multiple

14  parts to the -- I mean there were multiple parts to the

15  deposition, but that is the general theme of what they

16  were asking me, yes.

17       Q.   And your husband, Mr. Dorworth, was also

18  indicted in that case?

19       A.   He is a constitutional law case for -- because

20  it was illegal what they did.  They could not indict a

21  private citizen.

22       Q.   So my question was formally indicted, wasn't

23  he?

24       A.   He was formally indicted wrongfully, and that

25  happens, doesn't it?



1    Q.   Yeah.  So just try to focus on my question if

2  you can instead of adding information.  So I have to ask

3  it again.

4         Mr. Dorworth was also indicted in that case,

5  wasn't he?

6    A.   That's correct.

7         MR. BELTRAN:  Objection, asked and answered.

8    She gave you an answer, and it was a perfectly

9    adequate answer.  So go ahead.

10        MR. FORD:  Thanks for the coaching, Mike.

11        MR. BELTRAN:  It's not coaching.  You're

12   comments on answers --

13 BY MR. FORD:

14   Q.   And so at that time, that was in 2014, correct?

15 Does that sound about right?

16   A.   When was I indicted?

17   Q.   Yes.

18   A.   I was indicted in June of 2014, yes.

19   Q.   Right.  And at that time you were dating

20 Mr. Dorworth; is that correct?

21   A.   We had been together for quite some time, over

22 almost two years at that point.

23   Q.   You were dating, right?

24   A.   We were in a -- yes, in a monogamous

25 relationship, dating.  We were not married yet, if



1  that's what you're asking.

2      Q.   And that case was about whether certain

3  discussions about a deal were properly held in public or

4  not, correct?

5      A.   Not a deal.  A deal, no.  It wasn't about a

6  deal.  It was just about a particular -- it was about

7  votes and how people were voting on particular

8  information.

9      Q.   And what were the votes?

10     A.   I don't know.  It's been so long.  I haven't

11 thought about this in a long time.  The -- they just

12 wanted to know what information I had shared.  I was 25

13 years old.  I wasn't coordinating votes or telling

14 people how to vote.  I just picked up the phone and

15 answered information, anything -- any government

16 information that was requested.  That was my role, to

17 answer questions for government officials.

18     Q.   And the allegation in that case is you were

19 acting as an intermediary, correct?

20     A.   For -- yes.  I believe they used the term

21 conduit.

22     Q.   So you gave deposition testimony in 2014 in the

23 matter involving alleged violations of the Florida

24 Sunshine Law.

25          Have you given deposition testimony in any



1  other case?

2      A.    No.

3      Q.    Did you give any sworn testimony in the case

4  that River Cross brought against Seminole County?

5      A.    No, I don't -- no, I don't think so.

6      Q.    Your husband did.  You're aware of that?

7      A.    Oh, yes.

8      Q.    And have you ever given any sworn testimony

9  other than the deposition that we've been talking about?

10     A.    No.

11     Q.    So I want to ask you some questions about your

12  background.

13     A.    Okay.

14     Q.    What is your current age?

15     A.    I am 35 years old.

16     Q.    And born on December 27, 1988?

17     A.    That's correct.

18     Q.    You have one child; is that right?

19     A.    I have three children.  I have two stepchildren

20  and one biological child.

21     Q.    Grace is your biological child?

22     A.    My biological child is Grace.

23     Q.    And she's six years old right now?

24     A.    She's six years old.

25     Q.    And in the summer of 2017, were you pregnant



 1  with Grace?

 2      A.   I was.  Beautiful time.

 3      Q.   When was she born?

 4      A.   She was born October 12, 2017.

 5      Q.   Are you currently employed?

 6      A.   I am not.  I'm a stay-at-home mom.

 7      Q.   You used to work for Kyra Solutions; is that

 8  correct?

 9      A.   It's pronounced Kyra.  Kyra Solutions.

10      Q.   When did you leave Kyra?

11      A.   I left Kyra October of this past year, 2023.

12      Q.   Why did you leave Kyra?

13      A.   It's confidential.  I haven't -- I have signed

14  a very extensive nondisclosure agreement, and I think I

15  have to state that I -- I resigned with mutual.

16          MR. BELTRAN:  Hold on, Rebekah.  Let's -- do

17      you want to review your agreement?

18          MR. FORD:  I just -- if she's not going to

19      answer it, that's fine.  I just wanted to know why

20      she left Kyra.

21          MR. BELTRAN:  Okay.  Well, we're happy to

22      answer your question.  I just want to review the

23      agreement with her and make sure she's sticking to

24      it.

25          MR. FORD:  Okay.  We'll come back to that later



 1      because I really don't want to waste time on that --
 2          THE WITNESS:  It's -- there is -- there is a
 3      confidentiality agreement, so I -- I would give them
 4      the opportunity to object to that.
 5          MR. BELTRAN:  And I'm just going to say you
 6      have asked a lot -- you've been skirting privilege
 7      for about the last hour.  So the comment about
 8      wasting time I disagree with, but you're asking
 9      about her employment.  Okay.
10  BY MR. FORD:
11      Q.   Kyra Solutions was started by the Patel family;
12  is that correct?
13      A.   That's correct.
14      Q.   And you were president from January of 2021
15  through October of 2023?
16      A.   That's correct.
17      Q.   And prior to that, you were the senior vice
18  president from January 2020 to January 2021?
19      A.   I do not know what the exact dates are, but I
20  was previously senior vice president prior to my role of
21  president.
22      Q.   Does that sound about right, those dates,
23  January 2020 to January 2021, senior vice president?
24      A.   It would have been longer than that, but that
25  seems relatively accurate.



1    Q.    Did Prashant Mehta take your position?

2    A.    No, he did not.

3    Q.    Who took your position?

4    A.    The -- no one took my position.

5    Q.    Was your position eliminated?

6    A.    That position was eliminated, yes -- or yes.

7    Q.    The president position was eliminated?

8    A.    No, no, no.  The -- oh, I'm sorry.  I thought
9  you were talking about the senior vice president because
10 that was the last question that you asked.  So you're
11 talking about the president position?

12   Q.    Correct.

13   A.    No.  Prashant Mehta did not take my position.
14 He is currently, at least from the website -- I have not
15 had a personal conversation with him on this, is
16 currently the interim -- I haven't checked it lately,
17 but the last time that I saw it that they put him in as
18 the interim division president over the sales force
19 systems integration practice.

20   Q.    Without violating any nondisclosure agreement,
21 so with that caveat, can you tell me why you left Kyra?

22   A.    I cannot do that without violating the
23 settlement agreement.

24   Q.    And you said there is a settlement agreement?

25   A.    It's a confidentiality agreement or whatever



1  you call it.

2      Q.   Have you tried to find any employment outside

3  the home since October of 2023?

4      A.   I have not.

5      Q.   And why is that?

6      A.   Because I want to stay at home with my

7  daughter.

8      Q.   So you have no plans to pursue employment

9  currently outside the home?

10     A.   I am not actively pursuing with a headhunter or

11  otherwise employment outside of the home right now.

12     Q.   Do you participate in any volunteer activities?

13     A.   Yes.

14     Q.   What are those?

15     A.   The Orlando Union Rescue Mission.  It's a

16  homeless shelter.  My daughter was very concerned about

17  the homeless problem in Orlando, and we drove by them

18  each day to her school.  And she wanted us to get

19  involved, and so we became member -- or I went through

20  the volunteer training for us earlier this year.

21     Q.   And when you say your daughter, you're talking

22  about Grace or Madison?

23     A.   I'm talking about Grace although Madison would

24  be very concerned about the homeless problem as well.

25     Q.   Because she's a public school teacher?



1      A.    Because she's a public school teacher.

2      Q.    So what is your role with the Orlando Union

3  Rescue?

4      A.    Just a volunteer.

5      Q.    What does that involve?

6      A.    Well, it just started, so I have served meals,

7  but I haven't -- my role that I want to perform with

8  Grace is to work with the children's area because I work

9  with the children at our church.  And so -- and Grace

10  would be able to come with me to that.  And since this

11  is important to her, it's going to be part of the --

12  we're going to home educate this year.  We have already

13  started home educating and civics and service are going

14  to be a big part of that.  So that is going to be a

15  part.

16      Q.    So it sounds like part of what you'll being

17  doing at the Orlando Union Rescue is participating with

18  Grace focusing on children?

19      A.    They have a daycare center because they're

20  trying to get these parents back on their feet.  It's a

21  long program.  They educate them with teaching.  They

22  have mentor programs.  They have all sorts of programs

23  for the children.  They have great financial classes,

24  parenting classes, marriage classes, but where I can

25  take Grace is into the daycare because she's not -- she



 1  can't be in all areas of the -- because of her age
 2  because she can't go through the volunteer training
 3  appropriately, but that's just a recent thing.  I've
 4  done other volunteer things in the past.
 5      Q.   What other volunteer have you done?
 6      A.   Well, through our company, we have done a
 7  number of different volunteer opportunities.  We serve
 8  public sector clients, so that has been important to us,
 9  and then I have worked in the past with the juvenile
10  detention center with the girls at the juvenile
11  detention center in Orange County.  I have worked
12  with -- I volunteered with Samaritan's Village which is
13  a long term residential care facility for victims of
14  human trafficking, and I've previously served as a
15  guardian ad litem in Seminole County.  I currently
16  volunteer with my church.  I have been an assistant
17  Sunday school teacher for some time.  I'm sorry, my mic
18  fell.
19      Q.   Any other volunteer activities?
20      A.   I serve -- I was in a program called youth and
21  government when I was in high school, so as an adult I
22  serve as a graduate advisor, and so I'll assist with
23  that.  If folks need help with things regarding civic
24  organizations, I assist with that.  Any time I can help
25  participate with my daughter, her school does a number



1  of -- the school she previously went to does a number of

2  service activities.  There is a lot of focus on service.

3  So we like to, as a family, participate in that as well.

4      Q.   And does Mr. Dorworth participate in any of

5  those activities?

6      A.   He has separate non-profits that he works for.

7  He provides funding for a number of different

8  organizations.  He serves as a volunteer judge.  He was

9  a debate champion in high school, and he served as a

10  chair of the civics committee for the Florida Education

11  Foundation, and he started -- I'm very proud.  He

12  started the debate program because there is a lot of

13  children that are not able to spend the money to travel

14  and do debate and so -- in Florida because they thought

15  civics and civic discussion was so important that they

16  started a debate league, and my husband is incredibly

17  involved in that, countless hours with that.  And he

18  gives -- he feeds meals to some local football team

19  where he went to high school because it's not an -- it's

20  a rougher public school.  And so a lot of the kids don't

21  have meals, and so he's done that.

22      Q.   I appreciate all that, but my question was does

23  he participate in any of the organizations that you

24  listed that you do?

25      A.   In the organizations that I'm listing?



1    Q.   Correct.

2    A.   No -- or, well, no.  He has assisted with

3 things at church, but that's -- we're together, but the

4 rest have been organizations through women's

5 organizations, so he wouldn't have that opportunity.

6    Q.   Such as the Heathrow Women's Club, you're a

7 member of that?

8    A.   I'm not a member of the Heathrow's Women's

9 Club.

10    Q.   You were at one point?

11    A.   At one point I was, but, yeah.

12    Q.   But not currently?

13    A.   I am not currently.

14    Q.   Have you given me all the organizations for

15 which you volunteer?

16    A.   No, but those are the ones I can recall at this

17 point.  I'm not thinking about -- I haven't reviewed my

18 resume or my pictures or cards lately, but this is what

19 I can -- what I remember.

20    Q.   It sounds like one of the things that's

21 important to you is children, true?

22    A.   Of course.  I have children, yes.

23    Q.   So volunteer work is centered around children

24 for you?

25    A.   Women and children.



800.211.DEPO (3376)
EsquireSolutions.com

1      Q.   Teenagers?

2      A.   Uh-huh.

3      Q.   Yes?

4      A.   And civics, yes.

5      Q.   One of the organizations that you previously

6   volunteered for was Pace, correct?

7      A.   Yes.

8      Q.   And you did that through Kyra?

9      A.   Correct -- no, I did not do that through Kyra.

10  I can't even believe I forgot that.  I sat on the board

11  of Pace.

12     Q.   You did?

13     A.   And also volunteered with them.  Like I said, I

14  wasn't -- I hadn't reviewed things lately, but, yes, I

15  sat on the board at Pace.

16     Q.   And the Pace Center, there is a local office or

17  local service for teenage girls in Orlando, correct?

18     A.   Yes.  So if somebody is at risk for not

19  graduating high school, maybe they've been in some

20  physical altercations, or they're struggling at home

21  that they can go to Pace and they provide a lot of extra

22  services that a public school wouldn't necessarily

23  provide.  More therapy, small classes, there is a closet

24  on campus where people can go get food and like a pantry

25  and clothing and things like that.  So it just has a lot



1  of extra services right there to help the girls.

2      Q.   And it serves teenage girls specifically,

3  correct?

4      A.   Yes.

5      Q.   And it tries to keep those teenage girls out of

6  delinquency?

7      A.   The goal is to graduate them, yes.

8      Q.   So one of Pace's functions is to try to get

9  girls to stay in school and graduate from high school?

10     A.   Yes.

11     Q.   And you were on the board of Pace?

12     A.   Yes, I was asked to be on the board.

13     Q.   How long were you on the board?

14     A.   A couple of years.  I joined during Covid, so I

15  wasn't able to get, I think, as involved at the

16  beginning I think I joined right before -- I think I

17  joined in like March 1, 2020, or something around

18  those -- close to those lines.  And -- but it was

19  when -- then it was kind of a crazy -- obviously the

20  world, global issue.

21     Q.   One of the things that Pace talks about and

22  promotes is being trauma informed.

23          As a board member, I presume you would know

24  what that means?

25     A.   Yes, and I have been through trauma informed.



1  I've been through trauma informed -- a workshop, you

2  know, about being trauma informed.  It's been a long

3  time though.  They usually -- if you participate in

4  those types of organizations or you volunteer with

5  organizations that deal with that, you know, there is a

6  lot of refresher.  It's been a long time since I've done

7  that.

8      Q.   And what are the pillars of being trauma

9  informed, if you know?

10     A.   I can't remember -- oh, you know what, I didn't

11 even remember that I also I was a volunteer at YMCA

12 basketball coach this past year, undefeated season.

13     Q.   Congratulations.

14     A.   Get that on the record.  Make sure that gets in

15 there.

16     Q.   Yeah, it's on the record.

17     A.   And so in the YMCA, we also do -- I wouldn't

18 call it trauma informed care, but there is child abuse

19 training as far as rules and things to report.  Again

20 that's a more recent one, but they have rules revolving

21 contact, things you need to report, not -- how not to

22 touch children, doing high-fives and handshakes, special

23 attention, things like that.  Things that would be

24 specific to child abuse.

25     Q.   So going back to Pace and your training at Pace



1  being trauma informed --

2      A.   Just I think this might help you.

3      Q.   Sure, go ahead.

4      A.   I served as a board member which dealt with

5  funding.  I didn't -- it wasn't as -- I wasn't a

6  volunteer with the girls.  I often supplied things to

7  the pantry when they needed it, but my role was mostly

8  in fundraising and in, you know, obviously voting on

9  things like finances, how we were going to do events, in

10 that capacity.  In other capacities, I have been

11 involved directly with the children; but in this

12 capacity, I served as a board member.  The reason I

13 brought up Covid was because the interaction of

14 volunteers even with those girls was very limited.

15     Q.   I appreciate that, and it sounds like you have

16 done a lot of really amazing volunteer work over the

17 years at some really impressive organizations, and I'm

18 not asking this as a quiz question.  But I'm just

19 wondering what your knowledge is in terms of being

20 trauma informed and what you remember about your

21 training of being trauma informed.

22     A.   I would have to review my -- I'd have to

23 review.  Again, I believe we went through trainings

24 on -- when I was a guardian ad litem, but that was a

25 very long time ago as well.  I can't list the pillars.



1    Q.   So --

2    A.   If there are specific pillars.

3    Q.   Okay.

4    A.   But not about -- for instance, when we worked

5  in the juvenile detention center, it was very clear you

6  were not supposed to ask somebody what their charges

7  were, right, or to be sensitive to things you would be

8  bring up.  Again, no contact, things like that.

9    Q.   So it sounds like -- you tell me if this is a

10 fair assessment.  It sounds like for your volunteer work

11 you have focused on homelessness; is that true?

12   A.   That is recent.  That is the -- that is the

13 desire of my six year old who I'm very proud of that she

14 cares about that issue.

15   Q.   And presumably you do to?

16   A.   Of course I care about that issue.  It affects

17 all of us.

18   Q.   And one of the things you focus on in your

19 volunteer work is at-risk teenage girls; is that true?

20   A.   Yes, particularly with the juvenile detention

21 center I have in the past.  Uh-huh.

22   Q.   And then --

23        MR. BELTRAN:  Guys, I'd like to take a break.

24        MR. FORD:  Let me just finish these couple

25   questions.



 1  BY MR. FORD:
 2      Q.   And then with Pace, you were actually on the
 3  board raising money for that organization which serves
 4  at-risk teenage girls, correct?
 5      A.   That's correct.
 6      Q.   And obviously that was another way to try to
 7  help the at-risk teenage girls?
 8      A.   I think it's a good cause, yes.
 9      Q.   It's important to you?
10      A.   It's a good cause, yes.
11      Q.   Was it important to you?
12      A.   Is it important to me to help at-risk youth?  I
13  think it should be important to all of us.
14      Q.   And specifically what Pace did was to keep
15  young, teenage girls in school.  That was important to
16  you?
17      A.   Yes, because we have seen when girls drop out
18  of high school that we don't want that to happen.
19      Q.   And what could happen if someone dropped out of
20  high school?
21      A.   They end up in jail, you know, they end up on
22  the streets.  Whether it's prostitution or whether
23  it's -- you know, just committing crimes or particularly
24  just not having the best living up to their potential.
25  It's not that they couldn't go into a trade school or



 1  something like that, you know, or a trade or retail or

 2  hospitality.  All jobs have dignity regardless of

 3  whether they require a college education or not, but,

 4  you know, it it's just better to complete high school.

 5  There is a lot of statistics regarding your economic

 6  worth later and the availability of jobs, but all jobs

 7  have dignity.

 8      Q.   And so part of your work as a volunteer has

 9  been --

10      A.   I was a board member.

11      Q.   Hang on, let me finish.

12      A.   I'm sorry.

13      Q.   That's all right.  Part of your work as a

14  volunteer in various capacities has been to try to help

15  young girls get all the way through high school,

16  correct?

17      A.   That's what these organizations do.  I help

18  support those organizations.

19      Q.   And you're supporting those organizations

20  because you recognize how important it is to get kids

21  through school, how important it is to make sure that

22  they don't have lives that can involve things like crime

23  or homelessness; is that right?

24      A.   Yes.

25          MR. FORD:  Let's go ahead and take a break.



```
 1            MR. BELTRAN:  Okay.
 2            THE VIDEOGRAPHER:  Barring any objection, we're
 3       going off record.  The time 11:08 a.m.
 4            (A break was had.)
 5            THE VIDEOGRAPHER:  On record with media unit
 6       two.  The approximate time, 11:22 am.
 7  BY MR. FORD:
 8       Q.   Ms. Dorworth, we've had a chance to take
 9  another break.
10            Are you ready to proceed?
11       A.   I am ready to proceed.
12       Q.   Very good.  I want to ask you some more
13  questions about your more general background.  Your
14  mother is Polly Hammond; is that correct?
15       A.   That's correct.
16       Q.   And she shows up as visiting you from time to
17  time at your residence.
18            Does she visit you from time to time?
19       A.   That's correct.
20       Q.   And you have five siblings; is that right?
21       A.   Yes.
22       Q.   Ruth Hammond, yes?
23       A.   Yes.
24       Q.   Aaron Hammond?
25       A.   (Witness nods head.)
```



1       Q.    Yes?

2       A.    Yes.  Sorry, verbal responses for you.  Yes.

3       Q.    You're good.  You're good.  Rachel Rocco; is

4    that right?

5       A.    Correct.

6       Q.    Sarah Bijoy?

7       A.    That's correct.

8       Q.    And Joshua Hammond?

9       A.    That's correct.

10      Q.    Have you discussed with any of those family

11   members any of the allegations that are in the -- either

12   the complaint or the amended complaint?

13      A.    I have shared with my brother, Aaron, about --

14   I share -- I've shared with him articles of what's going

15   on, but he doesn't like to talk about it.

16      Q.    What about your mother, Polly?

17      A.    As you're aware, this is a very expansive case,

18   so, no, I don't share details with her of this case, but

19   she is aware that it's going on, and she is my big

20   prayer warrior.

21      Q.    It's nice to have a mom like that.  So have you

22   talked with her about any of the specific allegations in

23   the case?

24      A.    I have spoken with my mother about -- yes, I

25   have spoken with her about that, and -- yes, I have.



 1     Q.   And can you tell me what you've spoke with her

 2   about?

 3     A.   I have spoken with her about the fact that even

 4   though Chris isn't at the home that there is a woman

 5   saying that she came to our home when Chris was there

 6   who works as a sex worker, and I have shared with her

 7   that she says that she gave my husband a blow job in a

 8   hotel.

 9     Q.   What else have you talked with your mom about

10   the case?

11     A.   I mean, it's been very limited.  This isn't

12   something I burden my family with, but, you know, I've

13   shared, you know, with her -- I've just shared with her

14   that it's been a very difficult time period.

15     Q.   So it sounds like with your mother you talked

16   with her about an incident where a young woman was at

17   the home when he wasn't there; is that correct?

18     A.   Yes.

19     Q.   And you've talked with your mother about an

20   incident involving a young women and alleged oral sex

21   with your husband; is that correct?

22         MR. BELTRAN:  I can't hear.  Did the audio cut

23     out?  What was the end of the question?

24         MR. FORD:  Can you reread it?

25         (The question was read back.)



1              THE WITNESS:   That's correct.

2    BY MR. FORD:

3       Q.   And then you've talked with her generally about

4    how hard the allegations that are in the complaint and

5    amended complaint have been on your family; is that

6    correct?

7       A.   Yes, I have talked about how difficult being

8    falsely accused is.

9       Q.   Do you feel like you're being falsely accused?

10      A.   No, I feel that Chris is being falsely accused.

11      Q.   What is he being falsely accused of?

12      A.   He's being falsely accused of stepping out on

13   our marriage, cheating on me in a very precious time in

14   our marriage.  He's being accused of a criminal act with

15   a minor.  He's being accused of having sex in front of

16   another man, and I think these are all gross allegations

17   and false.

18      Q.   What do you mean by gross?

19      A.   I think my husband is not the type of man who

20   would have sex in front of another man.  I find that

21   disgusting.  I find that having sex with a child, even a

22   lying one, who says she's not her age or whatever the

23   paper said about her Seeking Arrangements profile where

24   she incorrectly stated her age and whether her friends

25   who knew got her involved or not that I think that's --



1  yeah, I think that mostly, you know, regardless of age

2  all of the criminal nature surrounding a child is

3  horrific.  As a wife, you know, regardless of the

4  person, if the person was 55, 25, or 17, to do that to a

5  wife is pretty abhorrent.

6      Q.   So going back to the conversations you've had

7  with your mom, your prayer warrior as you describe her,

8  so it sounds like you've talked with her about your

9  husband, Chris Dorworth, being falsely accused, and then

10 you gave me what you considered the false accusations.

11          Is that true about the conversations you've had

12 with your mother?

13     A.   Yes, very limitedly.

14     Q.   Okay.  And included with that that you've

15 talked with your mother about would be the allegations

16 regarding him cheating on you; is that right?

17     A.   Yes.  I mean, that would be during the time

18 period where we were -- you know, we weren't together.

19 We have been together for 12 years.

20     Q.   And the conversations with your mother about

21 Chris being falsely accused, I think you said stepping

22 out on your marriage, you talked with her about that as

23 well?

24     A.   It's just a colloquial term.  If you're not

25 familiar with the phrase, that just means cheating on



 1  your spouse.

 2      Q.   And you talked with your mother about the

 3  allegation that he had been involved in a criminal act;

 4  is that correct?

 5      A.   The 17 year old, yes.

 6      Q.   The sex with a minor allegation?

 7      A.   The allegation that -- yes.

 8      Q.   And then that there was another false

 9  accusation with a woman in front of another man; is that

10  right?

11      A.   No, same incident.

12      Q.   Got you.

13      A.   You said that -- yes.

14      Q.   Anything else that you have talked with your

15  mom about?  For instance, have you talked to her about

16  the impact of these allegations on your marriage?

17      A.   I mean, we've talked about, you know, just the

18  stress surrounding these allegations, you know, to the

19  horrific nature of seeing your husband accused of --

20  being called -- you know, being referenced to rape in a

21  headline.  Such, you know, just baseless evidence is

22  horrifying.  You know, I hurt for him so bad because,

23  you know, to be an innocent man who has been a wonderful

24  husband, it's very hard to read.  It's horrible to read.

25  He doesn't deserve this, and I don't justify anyone



1  else's acts in any of this, you know, if you have been
2  put in prison or you who have admitted to doing these
3  kinds of things.  But regarding my husband, you know, I
4  know him, and; beyond the FBI clearing him, I assure you
5  that I have far more information to make that
6  determination and he has been cleared by me of any wrong
7  doing.
8      Q.   And so my question was have you talked with
9  your mother about the impact of the allegations in the
10 complaint or amended complaint in your marriage?
11     A.   Well, it's impact on me and, you know, just my
12 burden of, you know, just everything that you would
13 think.  I'm sure -- well, I don't know if any of you are
14 married in here, but how horrific, you know, allegation
15 of infidelity would be in your marriages, it's pretty
16 horrific about that impact.
17     Q.   You said you talked with your mom about the
18 impact on you.  And what I want to know is have you also
19 talked about the impact on your marriage?
20     A.   Not -- the impact on me is the impact on the
21 marriage.  You know, having a wife that is very stressed
22 about things that you feel like you can't defend.  And
23 when I say that, I mean, you know, not being able to
24 send out a press release about all of the things that I
25 know that they couldn't possibly know, you know, about



 1  the things that were occurring at this time.  I think
 2  it's very difficult, and it's a very stressful
 3  situation.
 4      Q.   And so that would have been things you would
 5  have talked to your mom about?
 6      A.   Uh-huh.
 7      Q.   Yes?  I just need it for the record.
 8      A.   Yes.
 9      Q.   Thank you.  You mentioned that you had some
10  email communications with Aaron Hammond; is that right?
11      A.   I did not say I had email communications with
12  Aaron.
13      Q.   I thought you said you sent him some links --
14      A.   I didn't do it via email.
15      Q.   You did it through texts?
16      A.   It's from texts, and I think you all should
17  have those texts.
18      Q.   Between you and Aaron?
19      A.   Uh-huh.
20      Q.   Yes?
21      A.   Yes.
22      Q.   I'll represent to you I don't think we do.
23      A.   Okay.  Well, they were in what I have sent over
24  to produce.  So she's shaking her head yes for the
25  record they do have them.



 1    Q.   It's part --

 2         MR. BELTRAN:  Chris, just for the record, we

 3    produced early response to Mr. Wermuth's subpoena on

 4    behalf of his clients just so you have it for today.

 5    We produced those early.  I think we produced 49 or

 6    50 pages last night, so you should have got that

 7    from Anastasia.

 8         MR. FORD:  Yeah.  And I'll just put on the

 9    record that we got those shortly before midnight

10    last night, and I have not had a chance to review

11    them --

12         THE WITNESS:  I'm sorry.

13         MR. FORD:  -- carefully.

14    BY MR. FORD:

15    Q.   It's not your fault.  That's on Mr. Beltran.

16         MR. BELTRAN:  Stop.  Excuse me.  It's not on

17    me --

18         THE WITNESS:  The due date is not for many

19    weeks.  I was trying to get them to you beforehand.

20         MR. FORD:  I understand.  I understand.

21         MR. BELTRAN:  We -- excuse me, we produced them

22    early so you could have them for today.  Whether you

23    reviewed them or not, you can review them at

24    lunchtime, but we have produced them early.  We were

25    under no obligation to do so.  We did so as a



```
 1      courtesy.
 2  BY MR. FORD:
 3      Q.   So other than these text messages that you've
 4  had with your brother and the conversations that we've
 5  talked about that you had with your mother, have you had
 6  any other conversations, text exchanges, emails with
 7  anyone else in your family about the allegations in the
 8  complaint or the amended complaint?
 9      A.   No, I don't believe most of my family has any
10  idea what's going on.
11      Q.   Does anyone besides your mother and Aaron know
12  that a lawsuit has been filed?
13      A.   It's been in the paper, so, yes, lots of people
14  know.
15      Q.   And so my question was specific to your family.
16      A.   To my family?
17      Q.   Correct.
18      A.   They may know.  It's not something that they
19  discuss or bring up with me.  I don't try to -- this is
20  an incredibly embarrassing situation.  I don't try to
21  burden other people with this kind of thing.  I am
22  very -- I am very close do my siblings, and this is not
23  something -- we have a lot of other things going on that
24  is not this.
25      Q.   And I'm just trying to understand.  So the only
```



 1  people in your close family that you've discussed this
 2  case with are your mother and Aaron; is that correct?
 3      A.   And it's been so limited.
 4      Q.   Just focus on my question.  Is there anyone
 5  else other than Aaron and your mother that you have --
 6      A.   What I'm telling you -- you're talking about
 7  discussing the case, and I'm telling you I haven't
 8  discussed this case with them.  It's -- I'm not
 9  discussing this case.  If I have sent an article to my
10  brother, that's it.  He doesn't like to talk about these
11  things.  If I have shared things with my mom about being
12  stressed about its impacts, it's not substantive
13  information.  It's simply that, you know, this is --
14  clearly has an impact.  I don't discuss details with my
15  mother.
16      Q.   So just trying to understand, I -- it sounds
17  like you have had the discussions that we've talked
18  about with your mother.  You've had some text exchange
19  with Aaron Hammond.  And as for your other siblings, you
20  have had no communication whatsoever about this case.
21           Is that a fair summary?
22      A.   Yes, I don't -- I don't think that I've ever
23  spoken with them about it.
24      Q.   Do you have any other written communications
25  whether emails, texts, Snapchats, letters with anyone in



1   your family other than what you've produced with -- hang

2   on just a second -- with respect to Aaron?

3       A.   No.  I produced -- I was advised -- I was told

4   that those were -- it doesn't matter if they're family.

5   It's not confidential, I had to turn those over.  I did

6   not want to turn over obviously confidential

7   communications with my brother or family communications

8   with my brother, but I was told to -- that I had to

9   produce those.

10          MR. BELTRAN:  Hold on, Rebekah.  You just

11      testify to conversations --

12          THE WITNESS:  Sorry.

13          MR. BELTRAN:  -- that you've had with counsel,

14      but okay.  It is what it is.

15          THE WITNESS:  I'm sorry.

16          MR. BELTRAN:  You produced them.  Okay.

17  BY MR. FORD:

18      Q.   So you have two stepchildren, correct?

19      A.   That's correct.

20      Q.   Madison Shale Dorworth?

21      A.   That's correct.

22      Q.   And Christopher Dorworth, Jr., correct?

23      A.   That's correct.

24      Q.   Madison went to the University of Florida?

25      A.   That's correct.



1    Q.   She got her Bachelor's in elementary education?

2    A.   That's correct.

3    Q.   And got her Master's last year in education,

4    correct?

5    A.   That's correct.

6    Q.   Currently a public school teacher?

7    A.   She is.

8    Q.   In Alachua?

9    A.   Alachua.

10   Q.   Alachua, thank you.  What year did -- and does

11   she go by?

12   A.   Mady.  She goes by Mady.

13   Q.   What year did Mady Dorworth graduate from high

14   school?

15   A.   She graduated in --

16   Q.   Was it 2018?

17   A.   That sounds about right, yes, because she would

18   have been -- she's been out -- she only spent three

19   years in college because she was advanced, and then she

20   did a one year Master's program and then she has been

21   out.  So it would have been five years ago, so I think

22   it actually would have been '19 because -- yeah, because

23   she only did -- it's '24.  She just finished her first

24   year teaching.  She would have -- Master's, it -- was

25   five years ago.



1    Q.   So graduated from high school in 2019 to the

2  best of your memory?

3    A.   To the best of my memory, yes.

4    Q.   So she would have been, in the summer of

5  2017 --

6    A.   Sixteen.

7    Q.   Hang on just a second.

8    A.   I'm sorry.

9    Q.   You thought I was going somewhere, I'm going

10 somewhere different.  In the summer of 2017, she would

11 have been between her sophomore and junior year; is that

12 correct?

13   A.   Her birthday -- yes -- in March, so, yes.  She

14 would have been -- she's 16 years old.  She would have

15 been going into her junior year.

16   Q.   And how old is Christopher, Jr.?

17   A.   He's 21 years old.

18   Q.   What's his date of birth?

19   A.   May 19, 2003.

20   Q.   And what about Mady Dorworth's date of birth?

21 What's that?

22   A.   It's March 15, 2001.

23   Q.   It sounds like you think of them as your own

24 children?

25   A.   I'm not their mother, but I do consider them



1  family and I would say that we would both -- all three

2  of us would say we're very close.

3      Q.   Do you have any communication with

4  Mr. Dorworth's exwife?

5      A.   I do not.  I have not in a long time.  I mean,

6  when I see her at events, I have communications with

7  her, yes.

8      Q.   Events that would involve the children?

9      A.   Right, but limited.

10     Q.   And what about Mr. Dorworth?  Does she have any

11  communication with his exwife?

12     A.   Now that they're 18, very limited but some.

13     Q.   I take it you haven't had any conversations

14  with her about this case?

15     A.   I have not, no.

16     Q.   Do you know if anyone else has had

17  conversations with her about this case?

18     A.   Yes.

19     Q.   Who is that?

20     A.   My stepson.

21     Q.   Christopher, Jr.?

22     A.   Uh-huh.

23     Q.   Yes?

24     A.   Yes.

25     Q.   What do you know about those communications?



1      A.   He said when the news broke his mom sat him
2   down and told him your dad would never do this.
3      Q.   Is that what Christopher, Jr., told you?
4      A.   That's what.
5      Q.   Anything other than that general conversation?
6      A.   No.  I believe -- well, it's privileged, so...
7      Q.   What's privileged?
8      A.   I believe she had a conversation with Chris,
9   and Chris shared with me that conversation.
10     Q.   So Mr. Dorworth had a conversation with his
11  exwife about something that you're not going to tell me;
12  is that correct?
13     A.   My understanding is that she was contacted by a
14  reporter who asked if he had used escorts ever in the
15  past.  They had a very contentious relationship, and so
16  they assumed that, you know, it might be a good one to
17  get you, and obviously the answer is no.
18     Q.   And what's her name?
19     A.   Elizabeth Dusinberre.
20     Q.   How do you spell that?
21     A.   D-U-S-I-N-B-E-R-R-E.
22     Q.   And there was pretty protracted litigation
23  involving the divorce between Mr. Dorworth and his
24  exwife; is that correct?
25     A.   That's correct.



1   Q.   And the litigation was still going on when you
2   were dating him; is that correct?
3   A.   She had moved out two and a half years prior to
4   me meeting Chris, yes.
5   Q.   But the divorce was not final for many years;
6   is that correct?
7   A.   That's correct.
8   Q.   When were you married to Mr. Dorworth?
9   A.   November 5, 2016.
10   Q.   When did you start dating?
11   A.   We started dating in 2012, spring.  I think
12   February 18th is the day we first started texting, so
13   that is the date we use typically, but it would -- it
14   was about a couple months after that that we went on our
15   first date.
16   Q.   So February 18, 2012, is like a first text
17   anniversary?
18   A.   Yeah.
19   Q.   Okay.  He graduated from college in 1998; is
20   that correct?
21   A.   '98 or '99.  I can't remember.
22   Q.   And you graduated in 2010?
23   A.   2010, yes.
24   Q.   Is he 12 years older than you?
25   A.   Yes.



1    Q.   And so in 2017 he would have been 41, does that
2  sound right?
3    A.   He -- I think he was 40 when we got married, so
4  you'll have to do the quick math.
5    Q.   What's his date of birth?
6    A.   I'll take your word it.  July 17, 1976.  I know
7  he just had his 48th birthday last week.
8    Q.   Did you celebrate that with him?
9    A.   I did.
10   Q.   What did you do?
11   A.   Well, when he came home.
12   Q.   When he came home from?
13   A.   He was at the RNC.  He's a lobbyist.
14   Q.   He's currently a lobbyist?
15   A.   Yes.
16   Q.   Who is he a lobbyist for?
17   A.   He is a lobbyist for -- he has a few clients.
18 I don't know if he's a consultant or a lobbyist.  Like I
19 don't know if there -- there is a legal difference
20 between the two, and that's why it's important.
21   Q.   Because you were a registered lobbyist at one
22 point, weren't you?
23   A.   I was a registered lobbyist at one point.
24   Q.   For a year?
25   A.   For the company; but once I became president,



1  you're just automatically -- you know, you can lobby for

2  your own company.

3      Q.   And you were a lobbyist for a year, correct?

4      A.   No, not as an -- if you're asking if I'm a

5  contract -- if I was ever a contract lobbyist, no.  In

6  my position as government affairs VP, that part of the

7  role is speaking to electives on behalf of the company

8  so, yes, you register as a lobbyist.

9      Q.   And you did that with the State of Florida,

10 correct?

11     A.   I registered with the State of Florida, yes.

12 Well, I didn't register, my -- our chief operating

13 officer -- or director of operator, but I had to sign

14 paperwork.

15     Q.   In other words, you were registered with the

16 State of Florida?

17     A.   I was a registered lobbyist, yes.

18     Q.   Okay.  You said that, whether he's a registered

19 lobbyist or a consultant, that he has clients.

20          Who are those?

21     A.   Florida Power and Light and Florida Justice

22 Association -- or it's not the Florida Justice, it's

23 like a subset of the Florida Justice.  Again, I want

24 don't want to get this wrong, but it has to do with

25 fighting -- I believe fighting insurance companies I



1  think.  Again, I don't want to get it wrong, but he's

2  involved with the trial bar.

3      Q.   Any other clients other than those two?

4      A.   Yes, but I can't think of what they are or

5  if -- sometimes, you know, lobbyists are contracted for

6  a short period of time.  So -- versus like a continual

7  contract if you understand what I'm saying.

8      Q.   Right.  Special project versus long term?

9      A.   Right.  Like for a session or for a particular

10 six months or...

11     Q.   So we've talked about those two clients.  You

12 think there might be others, but they're not coming to

13 mind right now?

14          MR. BELTRAN:  Object to the form.

15          THE WITNESS:  I know those two for sure.  You

16      know, some I think he's in process of.

17 BY MR. FORD:

18     Q.   Which ones are those?

19     A.   I'm not sure.  He has been -- you know, he's

20 obviously been out there attempting to get work.

21     Q.   And sitting here today, you don't know who

22 those other potential clients are?

23     A.   No.

24     Q.   Going back to --

25     A.   But if I remember, I will let you know.



1      Q.    I appreciate you following the ground rules.

2  Going back to some personal background questions, you

3  graduated --

4      A.    Oh --

5      Q.    Go ahead.

6      A.    I was just thinking about back, you know.  I

7  was just thinking back because you were asking me about

8  payments, and I -- there have been -- I have made

9  payments on my Amex to Mike Beltran.

10     Q.    Okay.  Is that something you remembered on a

11 break?

12     A.    I just recall while we're talking.

13     Q.    Just now in this moment?

14     A.    Yeah.

15     Q.    Did you talk with Mr. Beltran on any of the

16 breaks today?

17     A.    I did.  I spoke with him on break.

18     Q.    And what about your husband?

19     A.    No, I did not speak to my husband on this

20 break.

21     Q.    And we've had two breaks so far.  Have you

22 spoken to your husband on that time?

23     A.    Yeah, I spoke to him earlier.

24     Q.    And then you spoke to Mr. Beltran on both

25 breaks?



 1     A.    Yes.

 2     Q.    So you're recalling now for the first time that

 3  you paid Mr. Beltran on your American Express card?

 4     A.    Yes.

 5     Q.    And that was for his representation of you or

 6  for Mr. Dorworth or for both?

 7     A.    I just -- for our representation.

 8     Q.    Our meaning yours and Mr. Dorworth's?

 9     A.    Separate, collectively.  I don't know -- I

10  can't remember on the bill if they're split up.

11     Q.    Going back to your personal background, you

12  graduated Florida State University in 2010; is that

13  right?

14     A.    That's correct.

15     Q.    And you had majors in economics and political

16  science?

17     A.    That's correct.

18     Q.    Any other majors?

19     A.    No other majors.

20     Q.    And then you got your MBA from the University

21  of Florida in 2015; is that right?

22     A.    Yes, 2015.

23     Q.    And then so in between those two periods you

24  met Mr. Dorworth, correct?

25     A.    Yes.



1    Q.   Did you have any specialty in your MBA program?

2    A.   I did not.

3    Q.   Just a general MBA?

4    A.   Business administration.

5    Q.   Okay.  So you've been married to Mr. Dorworth

6  for eight years?

7    A.   We've been together 12, and this will be --

8  this November will be our eighth year.

9    Q.   Your eighth year anniversary?

10   A.   Yes.

11   Q.   So you've been married for seven?

12   A.   Seven and a half, seven plus.

13   Q.   Have you ever seen Mr. Dorworth's answers to

14 any of the discovery requests that have been made in

15 this case?

16   A.   I've not reviewed any documents.  What do

17 you -- like his texts that he would have had to produce?

18   Q.   No.  These are formal pleadings in the case

19 that -- where various of the lawyers ask questions, and

20 he provides the answers.

21       Have you seen anything like that?

22   A.   I have not reviewed any of those.

23   Q.   So you haven't seen any of them?

24   A.   I have not seen them.

25   Q.   Okay.  I'll just represent to you in his



1    answers to Abby Greenberg's first set of interrogatories

2    and second set of interrogatories he describes himself

3    as a very happily married man.

4           Is that true that he's a very happily married

5    man?

6        A.   I would say that he is a very happily married

7    man.

8        Q.   Why is that?  Why do you say that?

9        A.   I think we have a very warm and loving

10   relationship.  We have a very warm home.  Chris is a

11   very joyful, optimistic person.  He's just a very --

12   he's a very loving husband.  He's a very dutiful

13   husband.  He's very supportive of my dreams and goals.

14   He's just he's wonderful -- he's just always been a

15   wonderful husband and a wonderful boyfriend before that.

16       Q.   Any other reasons you would say that he's a

17   very happily married man other than what you described?

18       A.   Well, I think the reasons that any man would be

19   a happily married man, you know, ███████████

20   ███████████.  We're best friends.  We spend a lot of

21   time together.  We're transparent with each other.  We

22   have a lot of laughs together.  We enjoy good things

23   together.  So that's why.  And Chris is always able to

24   find the joy in any hardship.

25           He's a real estate developer.  We went through



1   the crash come back I guess together.  We've gone

2   through all sorts of allegations.  Since you brought up

3   my indictment, you know that we've gone through pretty

4   challenging, difficult things together, and we've really

5   been able to maintain a wonderful relationship.

6        Q.   So it sounds like you would say he's a very

7   happily married man for the following reasons.  Let me

8   know if I have left anything out.  ███████████

9   █████████████  that you are transparent with each other,

10  you spend time together, you laugh a lot together, he's

11  warm, he's loving, he's joyful and optimistic, he's

12  dutiful, he's supportive, you do things together, and he

13  finds joy in hardship.

14        Is there anything else that you would add to

15  that?

16        MR. BELTRAN:  I'm going to object to the form,

17        but go ahead.

18        THE WITNESS:  How about this:  If I think of

19        other things about my husband, I will -- that I

20        would like to put on the record, I will share with

21        you; but overall I would say that Chris'

22        characteristic as a very happy man, a happily

23        married man, and happily -- and happy boyfriend and

24        all of those things.  I think Chris is a happy

25        person.



1  BY MR. FORD:

2      Q.   And did my summary incapsulate basically what

3  you were trying to tell me?

4      A.   I think so.

5      Q.   Have you ever had any problems with your

6  marriage?

7      A.   Of course.  We're two married people.  What are

8  you talking about?  I ran a company.  I'm an intense

9  personality.  You know, I'm a pretty demanding person,

10  so I think, you know, we've experienced challenges.

11      Q.   What have those challenges been?

12      A.   Well, for starters, you know, we had

13  stepchildren going back and forth.  We were in a very

14  big custody battle regarding Chris' children.  You know,

15  I think we've just been through -- we've been through a

16  lot of things.  Again, financially, when I first met

17  Chris, he experienced, you know, great challenges, and

18  we were able to build a life together through those

19  challenges.

20          You know, obviously being called a -- being

21  accused of rape in a headline has been a really horrific

22  experience particularly when you feel that you can't --

23  when I can't defend him, and that's been really hard,

24  and I can certainly defend his actions on how he has

25  treated me or the evidence, but I just mean that I can't



1  shout it really from the rooftops about what I know.

2         And so I think those things cause a lot of

3  challenges.  When you have a criminal enterprise that

4  is -- how many do we got?  One, two, three, four five,

5  you know, here and how many on the phone people who are

6  hell bent on making up things about you, you've got a

7  criminal in jail willing to coordinate with other

8  people, but no one is suing him.  I think it's -- it

9  causes a lot of hardship on a marriage just to stress

10 that situation, but we do our best to communicate.  We

11 do our best to work through it.  We do our best to keep

12 it external and limit our conversations on it.

13    Q.   So it sounds like the problems that you've had

14 in your marriage have involved the stepchildren, custody

15 of the --

16    A.   That is a long time ago.  We're -- that is --

17 that is not like a relevant factor today.

18    Q.   Okay --

19         MR. BELTRAN:  I'm just going to caution if

20    you're talking about issues in the marriage, you can

21    talk about the custody and all that, but don't

22    divulge marital communications.  But with that, you

23    can go ahead.

24 BY MR. FORD:

25    Q.   So it sounds like -- my question was a general



1  one which is have you ever had problems in your

2  marriage, and you responded by saying, of course, we're

3  married, doesn't everyone, or words to that effect, and

4  then I asked --

5          MR. BELTRAN:  Form.

6  BY MR. FORD:

7     Q.    And then I asked what those problems were, and

8  I just want to make sure that I understood.  And I

9  understand that the children are grown now, I just want

10 to understand what you identify as the problems in the

11 marriage have been.  So just let me know if this is

12 accurate.  So historically, you have had problems in the

13 marriage related to stepchildren custody, financial

14 issues, and then the allegations of rape in this case;

15 is that correct?

16    A.    I mean --

17          MR. BELTRAN:  Object to the form.  Go ahead.

18          THE WITNESS:  I'm sure that -- that's certainly

19     not conclusive, you know, just like anybody's

20     communication issues.  Obviously we've dealt with a

21     lot.

22 BY MR. FORD:

23    Q.    So I am actually looking for an inclusive list

24 of what have been the marital problems between you and

25 Mr. Dorworth.



1        So is there anything else other than those
2  things that I just identified that you would say have
3  been problems in the marriage?
4      A.   I think specifically, again, there is a lot of
5  stress around -- you know, really, I mean, Chris losing
6  his job creating great stress in our marriage.  That
7  creates stress in any marriage, and so him losing his
8  job, losing his reputation in many circles, that was
9  pretty horrific.
10        Again, my job is to be supportive.  I'm not
11  trying to make this about me.  You know, this is about
12  the damage that you all have done to him.  So, yes, you
13  all.  You can write you all down.  Include your names.
14  So I think that's been very difficult for us.
15      Q.   Anything else you would add that have been
16  problems in the marriage other than what you have just
17  talked about?
18      A.   For the most part, we have a really, really
19  wonderful marriage.  We have different personalities,
20  and like anybody, you know, we have communication
21  issues, how we communicate.  Things like that.
22      Q.   But nothing else to add in terms of what we
23  have talked about?
24      A.   If I think of more problems, I will let you
25  know.



1    Q.   Thank you.

2    A.   But generally speaking, I would still describe

3  our marriage as very happy.

4    Q.   Of those problems that you identified, have you

5  ever talked with anyone outside the marriage about

6  those -- any of those issues?

7    A.   Yes.

8    Q.   And who have -- with whom have you discussed

9  those issues?

10   A.   My pastor.

11   Q.   Who's that?

12   A.   Burk Parsons.

13   Q.   Anyone else?

14   A.   Yes.  We have a marriage counselor.

15   Q.   Who is that?

16   A.   Cathy Gibson.

17   Q.   Anyone else?

18   A.   No.  I mean, I'm a relatively private person,

19  so I try to keep -- you know, again, as I stated

20  earlier, I keep my communications to very much so a

21  minimum in this case due to the nature of the

22  allegations and the damage that it has already done.

23   Q.   So my question was about problems in the

24  marriage, not necessarily just this case.

25   A.   Well, this is a major problem in the marriage.



1    Q.   I understand.  So stay with me.

2    A.   I'm with you.

3    Q.   Okay.  So what I want to know is with whom you

4  have discussed these problems in the marriage that you

5  have described for me, and you said your pastor and your

6  marriage counselor?

7    A.   Uh-huh.

8    Q.   Is there anyone else that you have discussed

9  problems in your marriage with?

10    A.   My husband, and that's privileged

11  communications.  So I'm not going to share with you.

12    Q.   Understood.  So --

13    A.   And I have talked to my attorney about those

14  things.

15    Q.   Okay.  So the people with whom you have

16  discussed your marital problems include your attorney,

17  your husband, your pastor, and your marital counselor;

18  is that correct?

19    A.   That's correct.

20    Q.   And there isn't anyone outside of that group

21  with whom you have discussed your marital problems?

22    A.   Just making sure that I understand your

23  question.  You're talking about --

24    Q.   Is it confusing to you?

25    A.   No.  The -- what -- I'm trying to make sure



1  that I'm clear.  Are you saying have I talked with
2  anybody about things that have impacted marriage which I
3  have turned those over to you all, the text messages
4  about things that have impacted based on things that
5  your clients have done to my husband.  So if that's what
6  you're saying, like have I discussed this with anyone.
7  It's more those things that caused the impact.  But
8  actual problems, no, I don't talk about -- I don't
9  talk -- like as I said, I'm a pretty private person.
10      Q.   So for instance, you don't talk with your
11  friends about problems you're having within your
12  marriage because you're a private person?
13      A.   Yes.
14      Q.   And the same thing, you don't talk to family
15  members about problems in your marriage because you're a
16  private person?
17      A.   My family considers me a rock for them, so I
18  try not to burden people with my issues.  So, no, I
19  don't speak to my family about these problems.
20      Q.   And by these problems, I'm being inclusive of
21  the ones you --
22      A.   You can be inclusive of the ones I identified,
23  but what is impacting us is, you know, a myriad of lies
24  from the Greenberg enterprise as well as your client.
25      Q.   Okay.  And so just to be clear for the record,



```
 1  it sounds like you haven't talked about problems in your
 2  marriage with anyone in your family; is that true?
 3      A.   No.  I shared with you earlier --
 4      Q.   Other than what you told me about your
 5  discussions --
 6      A.   Very minimal.  Yes, minimal impacts.
 7      Q.   Okay.  So other than the discussions that
 8  you've had with your mother, Polly Hammond, and the
 9  exchange that you had with your brother, Aaron, you
10  haven't talked with any family members about any
11  problems you've had in your marriage; is that true?
12      A.   No, I'm the voice for others.
13      Q.   So just to make sure I get that right on the
14  record, it is true my statement because you have started
15  by saying no --
16      A.   What?  Can you --
17           MR. BELTRAN:  Can you read the question back,
18      please?
19           THE WITNESS:  Yeah, I think -- I'm unclear with
20      your question.  If you could repeat the question.
21           MR. FORD:  Go ahead.
22           (The previous question was read back.)
23           THE WITNESS:  I mean like the listening ear for
24      others.  That's what I meant.  I just want to make
25      sure that's clear because voice sounded -- would be
```



1    proactive, but I don't share with my family members.

2  BY MR. FORD:

3    Q.   How long have you been in marital counseling?

4    A.   With who I mentioned, Cathy Gibson, it was

5  earlier this year that we started going.  I think -- I

6  just don't want to get this wrong.  December or January.

7  I think January -- January or February.  February maybe,

8  early this year.

9    Q.   So you started --

10   A.   Winter of 2023, 2024.

11   Q.   Fair enough.  So you --

12   A.   I think that when I produced -- I just -- I

13  think when I produced things for logs of just payments

14  that were made, I think earlier this year.

15   Q.   So you started seeing Cathy Gibson as a marital

16  counselor end of 2023, beginning of 2024, somewhere in

17  that period; is that correct?

18   A.   Yes.

19   Q.   Have you ever had marital counseling with any

20  other person?

21   A.   Our pastor.

22   Q.   What about any other therapist other than your

23  pastor?

24   A.   Just Cathy.

25   Q.   And I'm going to let your lawyer object, but I



1  want to get it on the record.

2      A.   Okay.

3      Q.   Okay.  Because I need to get it on the record.

4  We have been produced what's called a privileged log on

5  your behalf, and in that privilege log there are

6  communications that have not been provided to us that

7  have been explained as not going to be provided to us

8  based on therapist privilege or a priest/parishioner

9  privilege.  And so I want to make sure that I have an

10 opportunity to ask you about communications that you've

11 had with them but to let your lawyer object if he wants

12 to so I have it on the record.  Okay?

13      So what communications have you had with Cathy

14 Gibson in your marital counseling sessions?

15      MR. BELTRAN:  Well, I mean, we gave you a log.

16    We logged the communications.  I don't know what

17    you're -- we stand on our objection.

18      MR. FORD:  So are you instructing --

19      THE WITNESS:  I'm --

20      MR. FORD:  Hang on --

21      THE WITNESS:  No, I don't understand your

22    question though so I can't even answer you.  Is

23    it --

24 BY MR. FORD:

25      Q.   What are you talking with Ms. Gibson about?



1     A.    Are asking about within the marriage counseling

2   session --

3     Q.    Yes.  Correct.

4     A.    -- or in documents?

5     Q.    In marital counseling sessions, what have you

6   talked to Ms. Gibson about?

7     A.    Well, I would object to that on marital and

8   counselor privilege.

9     Q.    So you're not going to answer that question?

10    A.    I'm refusing to answer that question, but it

11  would be typical of what you would think about marriage

12  counseling communications, things of that nature.

13    Q.    With respect to the conversations that you've

14  had with your priest, has it just been limited to the

15  one priest?

16    A.    There are communications with a second pastor.

17    Q.    And so what are the names again of the two

18  priests with whom you've communicated with about your

19  marriage?

20         MR. BELTRAN:  Object to the form.  Go ahead.

21         THE WITNESS:  That is a mischaracterization.

22  BY MR. FORD:

23    Q.    How is it a mischaracterization?

24    A.    I don't -- these logs are just about asking for

25  a recommended counselor.



1    Q.   Okay.  So you have gone to your priest to ask

2    for recommendations for marital counselors?

3              MR. BELTRAN:  I'm going to object to that.

4         That's the content of the communication.

5              MR. FORD:  Well, she just said what it was, so

6         I'm clarifying.

7              MR. BELTRAN:  I know.  She shouldn't have, but

8         that's -- she shouldn't have divulged that.  You

9         have been spending almost the entire morning asking

10        about depo prep and priests and counseling.  You're

11        skirting back and forth cross the line of privilege

12        all morning.  So you wouldn't let me ask like one

13        question about a demand letter during your client's

14        deposition, so I think this is completely

15        inappropriate.  And, yes, you have elicited -- this

16        is exactly why the questioning is inappropriate

17        because not withstanding my instructions and my

18        client's knowledge of her privileges, you have still

19        elicited privileged communications.  So please stop.

20   BY MR. FORD:

21        Q.   So what are the names of the two priests?

22        A.   Are there names privileged?

23        Q.   They are not.

24             MR. BELTRAN:  You can give him the names.

25             THE WITNESS:  Burk Parsons and Dawn Bailey.



```
 1   BY MR. FORD:
 2       Q.   And again, I'm just going to ask you on the
 3   record what communications you've had with them about
 4   your marriage, and Mr. Beltran can object if he wants
 5   to?
 6            MR. BELTRAN:  I think I need to -- I think she
 7       has made her own objection.  You have asked that
 8       already.
 9            THE WITNESS:  I'm refusing to answer based on
10       marital privilege.
11   BY MR. FORD:
12       Q.   And privilege with your priest?
13       A.   Or priest/parishioner privilege.
14       Q.   Do you believe that your husband has ever had
15   sexual relations with another woman during your
16   marriage?
17       A.   No.
18       Q.   Why do you believe that?
19       A.   Well, for many reasons, but we have a very open
20   and transparent relationship.  We have an open phone
21   policy, have even since we were dating.  We have very
22   high trust with each other.  I know his character.  I
23   know his love and loyalty to me.  ███████████████████
24   █████████████████████████████████████████████
25   █████████████████████.  Not that people that have good
```



1   relationships can't cheat, but my husband had been

2   through a lot with his previous marriage.  He has

3   been -- and I think it's -- I just -- I have no reason

4   to believe it.  He is the most open and transparent

5   person about where he is.  He always picks up the phone,

6   tells me where he's going.  He's pretty open.  He's

7   just -- not pretty, he's a very open and transparent

8   person.  We have a loving, warm relationship.  I don't

9   think anybody would do anything to harm that.

10       Q.   Any other reason that you believe your husband

11  has not had sexual relations with another woman during

12  your marriage?

13       A.   Well, there has been only one accusation of

14  that, and that has been your client and Joel Greenberg

15  who is in prison for lying about things that people were

16  doing with a minor.  And now we have someone who -- the

17  only person, you know, it happens to be a minor of all

18  these women that Joel was involved in, this is the one

19  that he's saying that this happened with.  And no one

20  has ever accused my husband of that other than Joel and

21  Abby Greenberg are the only two people who have made any

22  allegations about my husband not being faithful to me.

23  No one has ever made that allegation to me, and I have

24  never suspected anything of that sort.

25       Q.   Anything else to add?



```
 1    A.    No.

 2    Q.    Okay.  Mr. Dorworth, does he consume alcohol?

 3    A.    He does.

 4    Q.    How would you describe his alcohol use?

 5    A.    He's a world class drinker.

 6    Q.    What does that mean?

 7    A.    What that means is whether my husband is having

 8 one drink or a number of doubles that his behavior does

 9 not change.  He acts the same regardless of alcohol.

10 That's what a world class drinker is.  Because of his

11 role in lobbying and in consulting and the roles he has

12 in business deals and stuff that there is a lot of

13 drinking in those environments, and you have to keep

14 your whits about you and I think that he does that very

15 well.

16    Q.    How much does your -- how much alcohol does

17 your husband consume on a weekly basis?

18          MR. BELTRAN:  Object to the form.

19          THE WITNESS:  I don't know.

20 BY MR. FORD:

21    Q.    Is it more than seven drinks a week?

22    A.    Probably.  He -- I don't really drink, and so

23 he doesn't drink really when he's with me.  So a lot of

24 his drinking is work based, you know, or out with his

25 friends.  Although I am present often when he is
```



1  drinking socially which is how I know he keeps his whits

2  about him and because people talk about that, about that

3  he's great in those environments.  People have said that

4  they should pay him to host dinner parties and to be

5  entertainment there.  He is such a great story teller.

6  It is never an issue with alcohol.

7      Q.   Does he drink more than 15 drinks a week?

8      A.   I don't know.  I wouldn't say so, but I don't

9  know.

10     Q.   So you said he probably has more than seven

11 drinks a week, but you don't know whether he has more

12 than 15 drinks a week --

13     A.   It depends on the week.

14     Q.   -- is that a fair summary?

15         MR. BELTRAN:  Object to the form.  Go ahead.

16         THE WITNESS:  No.  I said that it depends on

17     the week.  If he's got a lot of business going on

18     that week or, you know, it would be very different.

19     If he's with me and the kids he may not drink at all

20     for a week.  He frequently goes on, you know, where

21     if he's doing a fast, you know, or if he just did

22     like -- I don't know 27 or something days without

23     alcohol.  The other week he went like six or seven

24     days without alcohol.  I mean, he does this

25     intermittently, so I can't give you -- anyway.  I



1    could not quantify it for you.  I apologize.

2  BY MR. FORD:

3    Q.   Okay.  What's the most number of drinks you've

4  seen him consume in one evening?

5    A.   I don't know.  A lot.  You know, if we've had a

6  get together at our home or cookout or something where

7  that would occur.  Again, he's a world class drinker, so

8  a lot.

9    Q.   Is that more than ten drinks?

10   A.   Well, maybe if we're talking about seven drinks

11 or seven doubles or whatever you're saying, you know, so

12 I don't know if seven doubles equals 14 drinks.  I'm not

13 sure; but, yes, I don't think there is a question that

14 my husband is a very adept drinker.

15   Q.   So you've seen him on occasion have as many as

16 14 drinks, seven doubles, something like that?

17        MR. BELTRAN:  Object to the form.

18        THE WITNESS:  Yeah.

19 BY MR. FORD:

20   Q.   Have you ever seen him consume more than that?

21        MR. BELTRAN:  Object to the form.  I will need

22    to take a break if we're not -- it can be a quick

23    one or lunch or whatever, but I'd like to take a

24    break soon.

25        THE WITNESS:  I'm not -- I'm just a little bit



1    unclear.  I'm trying to -- have I counted the number

2    of drinks that my husband has had, no.  Have I seen

3    him where we've been on vacation, you know, and we

4    started -- he started drinking or we started

5    drinking early because it was an event, you know, or

6    something like that and he was drinking all day?  So

7    I don't know what that number would be.  I was just

8    trying to get the point across that regardless of

9    the amount of drinking even if it would be

10   considered an excessive amount for the normal

11   person, my husband is a big man and he has a very

12   high alcohol tolerance.

13 BY MR. FORD:

14       Q.   Has your husband ever used drugs?

15       A.   My husband has a medical marijuana card, and he

16 is a medical marijuana user.

17       Q.   When did he get that?

18       A.   I don't know.  I don't know when they made that

19 legal in this state.

20       Q.   Do you know whether he was a medical marijuana

21 user in 2017?

22       A.   Yes, my is a -- my husband is a weed user.

23       Q.   Do you know whether he was a medical marijuana

24 user in 2017?

25       A.   I don't know.  Again, I don't know whether he



1  had his card at that point, but I think it's a great way

2  to deal with this type of anxiety.

3      Q.   What was the condition for which he got the

4  medical marijuana?

5      A.   I do not know, but I assume that it was

6  probably anxiety related, but I don't know.

7      Q.   You don't know why your husband has medical

8  marijuana?

9      A.   I would say it was because of anxiety.

10     Q.   Is that something he has struggled with?

11     A.   No.  I think when you're under a lot of stress.

12     Q.   So in 2017, were you under a lot of stress?

13         MR. BELTRAN:  Object to the form.

14         THE WITNESS:  Yes.

15 BY MR. FORD:

16     Q.   What was the stress in 2017?

17     A.   We were in the middle of a major custody

18 battle.

19     Q.   And was he using marijuana then?

20     A.   I can't remember if he took certain breaks;

21 but, yes, he would have been using marijuana back then.

22     Q.   Does he have a medical marijuana vaporizer or

23 machine at home, a volcano I think it's called?

24     A.   He's had that for decades.  Over -- yeah, a

25 long time.



1      Q.    So he has that, and you've seen him use that at

2   home?

3      A.    Yes.

4      Q.    Has his alcohol use impacted your marriage?

5            MR. BELTRAN:  Object to the form.  Go ahead.

6            THE WITNESS:  I guess I'm trying to understand.

7   BY MR. FORD:

8      Q.    Has it been a problem in your marriage, his

9   alcohol use?

10     A.    Has it been a problem?  From a health

11  standpoint, yes.  I would like him to drink less.

12     Q.    What about just from a quality of the marriage

13  standpoint?

14     A.    My husband is a great drinker.  He is not

15  violent.  He's still very loving.  He keeps his -- his

16  personality does not change when he drinks, and I would

17  say that he is a really, really good drinker.

18     Q.    So it sounds like alcohol use has not had a

19  negative impact on your marriage --

20     A.    No.  I said that I have been concerned about it

21  from a health standpoint for him just because there has

22  been a lot of studies recently.  I'm sure you all have

23  seen the New York Times articles regarding that even one

24  glass of alcohol is not --

25     Q.    Ms. Dorworth, I'm talking about your marriage



```
 1   specifically.  I don't need to know about the --
 2          MR. BELTRAN:  Let her answer -- finish her
 3      answer.  That is part of your ground rules.  Let her
 4      finish her answer.
 5   BY MR. FORD:
 6      Q.   Has his alcohol use impacted your marriage?
 7          MR. BELTRAN:  Rebekah, were you done with your
 8      previous answer?
 9          THE WITNESS:  I've got it.
10          MR. BELTRAN:  Okay.
11          THE WITNESS:  I think that when somebody is
12      concerned about their partner's health because of
13      new data that has arisen in the New York Times and
14      others, a number of studies that have been out
15      there, that those things come up as concerns.  As
16      you stated, my husband is 12 years older than I am,
17      and I'm very particularly concerned about things
18      that would impact his health.  So, yes, alcohol use
19      is something that I would consider a marital problem
20      because of its impact on his health, and I'd like
21      him to be able to be, you know, in great health for
22      us for a long time.  But his personality, it is not
23      an impact on his personality.
24   BY MR. FORD:
25      Q.   Other than being the impact on his health, has
```



1   the alcohol had any impact on your marriage?

2       A.   No.

3            MR. BELTRAN:  I'd like to take a break.

4            MR. FORD:  That's fine.

5            MR. PERKINS:  We've got lunch here.  So I'll

6       have that brought in.  And, Ms. Dorworth, if you

7       want toot have a separate room, you can have a --

8            MR. BELTRAN:  Rebekah, how long do you need?

9       Are you going to eat a sandwich there?  Are you

10      going to go out?  How long do you need?

11           THE WITNESS:  I don't know.  I ate a really big

12      breakfast.  I'm fine.

13           MR. BELTRAN:  Okay.  Well, how long does

14      everyone need?  I'll just grab something to eat and

15      be back whenever you guys want.

16           MR. FORD:  Let's go off the record and talk

17      about lunch.

18           THE VIDEOGRAPHER:  Going off record.  The

19      approximate time, 12:19 p.m.

20           (A break was had.)

21           THE VIDEOGRAPHER:  On record.  The approximate

22      time, 1:06 p.m.

23  BY MR. FORD:

24      Q.   Okay.  Ms. Dorworth, we've had an opportunity

25  to take a lunch break, and we are now starting again.



1              Were you able to take a break?

2       A.    I took a break, yes.

3       Q.    Are you ready to proceed?

4       A.    I'm ready to proceed.

5       Q.    Okay.  Ms. Dorworth, what do you know about my

6  client's situation in the summer of 2017, if anything?

7       A.    I know that she came through the Heathrow

8  access gate on our log.  I know what I've read in the

9  papers about her activities what she does for her work

10 as a sex worker.

11      Q.    So I want to focus on 2017, the summer of 2017.

12 What --

13      A.    What did I know at that time?

14      Q.    No.  Sitting here today, what do you know about

15 her life situation in the summer of 2017?

16      A.    That she was a sex worker in 2017.  She was on

17 Seeking Arrangements in order to find sex work.  I don't

18 believe she lived at home.  I don't know much more than

19 that about her lifestyle situation.

20      Q.    Okay.  You know she was 17 in the summer of

21 2017?

22 ████████████████████████████████████████

23 ██████████████████████████████████████████

24 ████████████

25 ████████████████████████████████████



1 ████

2 █████

3 ███████

4 ██████████

5      Q.   So she -- and I'll represent to you that she

6 was 17 years old in the summer of 2017.  And so sitting

7 here today, you know that in the summer of 2017 or what

8 you think you know is that she was a sex worker, she had

9 been on Seeking Arrangements, and that she did not live

10 at home; is that correct?

11      A.   That's correct.

12      Q.   Okay.  Anything else that you know sitting here

13 today?

14      A.   I don't know.  I thought that I heard and I

15 can't remember where that she was a roommate of a girl

16 named Kaley who was a part of the lifestyle with her.

17      Q.   Anything else you know about her life situation

18 other than that?

19      A.   No.  I mean, I assume given her line of work

20 that it is pretty terrible.

21      Q.   What's the basis for your knowledge about these

22 facts that you've just described for us?  How do you

23 know of these things?

24      A.   Conversations with my husband.

25      Q.   So the source of your knowledge about --



 1      A.   And the newspaper.  I apologize for my pause.

 2   The newspaper, you know, conversations with my husband.

 3   Obviously --

 4           MR. BELTRAN:  I'm going again caution the

 5        witness not to testify as to marital conversations.

 6   BY MR. FORD:

 7      Q.   Okay.  So the basis for your knowledge about

 8   our client is conversations that you've had with your

 9   husband and information that you have read in the press;

10   is that correct?

11           MR. BELTRAN:  Object to the form.

12           THE WITNESS:  Yes.

13   BY MR. FORD:

14      Q.   Okay.  Did you know that in the summer of 2017

15   that Ms. B was homeless for a period of time?

16           MR. BELTRAN:  Object to the form.

17           THE WITNESS:  I didn't know that.  Not

18        surprised.

19   BY MR. FORD:

20      Q.   Did you know that she had to live in a shelter

21   with her mother and siblings for a portion of the summer

22   of 2017?

23      A.   Didn't know that.

24           MR. BELTRAN:  Object to the form.

25           THE WITNESS:  Not surprised.



```
 1  BY MR. FORD:
 2      Q.   And did you know that she was in between her
 3  junior and senior year of high school in 2017, the
 4  summer of 2017?
 5      A.   That would make sense with a 17 year old, but I
 6  don't know.  I mean, I don't know.  I'm not familiar
 7  with her life.
 8      Q.   Did you know that she attended three separate
 9  high schools in Florida by the summer of 2017?
10      A.   I did not know that.
11      Q.   Did you know that she worked at McDonalds in
12  the summer of 2017?
13      A.   I did not know that she had additional
14  employment other than sex work.
15      Q.   So knowing that she was homeless for a period
16  of time, knowing that she had a low paying job at
17  McDonalds, knowing that she attended three different
18  high schools in three years, now that you know that, is
19  she the kind of young woman that an organization like
20  Pace would want to try to help in order to try to
21  complete high school?
22          MR. BELTRAN:  Object to the form.  Go ahead.
23          THE WITNESS:  They often help indigent
24      criminals, yes.
25  BY MR. FORD:
```



1    Q.   And nothing about what I just described is
2  criminal, so I just want you to --
3    A.   Well, you asked what I knew about her, and that
4  was that she does sex work and that is criminal, so yes.
5    Q.   And is it your opinion that a 17 year old who
6  is engaged in what you called sex work that she's
7  committing a crime as a juvenile at 17 --
8    A.   She committed the crime as -- she was 19 years
9  old --
10         MR. BELTRAN:   Object to the form.
11         THE WITNESS:   She was 19, right?   I mean -- or
12     she was representing herself as 19.
13  BY MR. FORD:
14    Q.   So I want you to stay with me for a minute.   I
15  want to --
16    A.   We'll stay with you --
17         MR. BELTRAN:   Object to the form.
18  BY MR. FORD:
19    Q.   I want you to take it true what I'm telling
20  you.
21         Okay?
22    A.   Okay.
23         MR. BELTRAN:   Object to the form.
24  BY MR. FORD:
25    Q.   I want you to assume that in the summer of 2017



1  that Ms. B was 17 years old.  Based on my representation

2  to you that her birthday when she turned 18 was December

3  28th of that year, can you assume that for me?

4      A.    Uh-huh.

5      Q.    Yes?

6            MR. BELTRAN:  Object to the form.  Go ahead.

7  BY MR. FORD:

8      Q.    Yes?

9      A.    Yes.

10     Q.    I want you to assume that for a period of time

11 in June of 2017 that she was homeless.

12            Do you understand that?

13            MR. BELTRAN:  Object to the form --

14            THE WITNESS:  Are you stating that she was

15     living on her own, providing for herself, an

16     independent person?

17 BY MR. FORD:

18     Q.    No.  She just finished her junior year in high

19 school.

20            Do you understand that as I represented it to

21 you?

22     A.    A number of people live by themselves post

23 junior year of high school particularly if they're

24 indigent.

25     Q.    Ms. Dorworth, I want you to focus on my



 1  question, and you have a duty to give me answers to my

 2  question.

 3           Okay?

 4           MR. BELTRAN:  I'm going to object to the form.

 5      You have asked the same question a few times.  Go

 6      ahead and answer.

 7           THE WITNESS:  17 year olds are often charged as

 8      adults.

 9  BY MR. FORD:

10      Q.   Okay.  Ms. Dorworth --

11      A.   Are you asking is it a crime --

12      Q.   No, I'm not.

13      A.   You can --

14      Q.   No, I'm not.  So stay with me.

15           Okay?

16           MR. BELTRAN:  You're talking over each other.

17      You have got to speaking --

18  BY MR. FORD:

19      Q.   So I want you to assume that --

20           MR. BELTRAN:  Excuse me.  Excuse me.

21  BY MR. FORD:

22      Q.   Mr. Dorworth is --

23           MR. BELTRAN:  You need to let the witness

24      answer the question.  You need to let the witness

25      answer the question and you can ask your question



1    and then she'll let you ask your question and then

2    I'll make my objection and then she can answer.

3          MR. FORD:  She needs to answer my question.

4          MR. BELTRAN:  You guys can't be talking over

5    each other.  You need to let me make my objection.

6          MR. FORD:  Your objections need to be limited

7    to form which you're completely violating throughout

8    the course of this day --

9          MR. BELTRAN:  You're not --

10         MR. FORD:  And the transcript is going to show

11   that you are, that you're trying to coach the

12   witness on multiple occasions.

13         MR. BELTRAN:  I'm not coaching the witness, I'm

14   asking you to let her finish her answer.

15   BY MR. FORD:

16   Q.   So, Ms. Dorworth, I want you to stay with me --

17         MR. BELTRAN:  I need to make my objections.

18   BY MR. FORD:

19   Q.   -- and assume the following facts.  I want you

20   to assume these facts that --

21   A.   You're asking me a hypothetical?

22   Q.   I'm not.  So I'm --

23   A.   You're asking me to assume facts that I don't

24   know.  So --

25   Q.   Okay.  So I'm going to make representations to



 1  you, and I want you to accept them as true for purposes

 2  of my question --

 3          MR. BELTRAN:  Object to form.

 4  BY MR. FORD:

 5      Q.   -- that Ms. B was 17 in the summer of 2017.

 6  Okay, I want you to assume that.

 7      A.   Okay.

 8          MR. BELTRAN:  Same objection.

 9  BY MR. FORD:

10      Q.   I want you to assume that she had just finished

11  her junior year of high school.  I want you to assume

12  that.

13          Okay?

14          MR. BELTRAN:  Same objection.

15  BY MR. FORD:

16      Q.   Okay?

17      A.   Okay.  I will go --

18      Q.   I want you to assume that she was living in a

19  shelter for homeless persons in the summer of 2017 with

20  her mother and her sisters.

21          Okay?

22          MR. BELTRAN:  Object to the form.

23          THE WITNESS:  Okay.

24  BY MR. FORD:

25      Q.   And I want you to assume that she had attended



1  three different high schools in three years.  I want you

2  to assume that by that time.

3        Okay?

4     A.   Okay.

5        MR. BELTRAN:  Object to the form.

6  BY MR. FORD:

7     Q.   Is that the type of person that Pace Center

8  would try to support, the organization on which you

9  served the board?

10    A.   There are a number of organizations including

11 Pace that would support women that are homeless.  If

12 you're representing that she is homeless and that she

13 moves from school to school, yes.

14    Q.   Do you know whether she completed high school?

15       MR. BELTRAN:  Object to the form.

16       THE WITNESS:  It sounds like no.

17 BY MR. FORD:

18    Q.   Do you know one way or the other whether she

19 completed high school?

20    A.   I have heard of a reference of a high school

21 dropout, so I assume she did not complete high school.

22    Q.   Where did you hear that?

23    A.   Marital privilege.

24    Q.   Did you sit in on any of the depositions?  Did

25 you observe any of the --



 1      A.   I did not.

 2      Q.   Have you reviewed the transcripts of the

 3  depositions?

 4      A.   I have not.  I didn't know those were

 5  available.  Just for complete -- because you want truth,

 6  I have walked out to my husband listening and asked

 7  like, give me a thumbs up or thumbs down just how he

 8  thought that it was going and walked back in --

 9           MR. BELTRAN:   I'm going to --

10           THE WITNESS:   Sorry, marital privilege.  I

11      apologize.  I just wanted to be truthful in my

12      answer.

13  BY MR. FORD:

14      Q.   You -- when I asked you in the beginning of the

15  deposition, we were having a discussion about how to

16  refer to my client, whether by initials or her name, and

17  you said, Well, I know your client as a prostitute.

18           Remember how we started the deposition that

19  way?

20      A.   Because of Judge Presnell's statement.

21      Q.   So what do you call a man who offers to pay

22  women money for sex?  What do you call that person?

23      A.   Well, now I call that Joel Greenberg.

24           MR. BELTRAN:   Objection to form.

25  BY MR. FORD:



1    Q.   Do you have any other general name other than

2  Joel Greenberg?

3          MR. BELTRAN:  Object to the form.

4          THE WITNESS:  It would be a John.

5  BY MR. FORD:

6    Q.   A John.  If your husband offered to pay someone

7  for sex with a man, would you call -- what would you

8  call him?

9          MR. BELTRAN:  Object to the form.

10         THE WITNESS:  If my husband offered to have --

11     offered to pay for sex with a man?

12  BY MR. FORD:

13    Q.   No.  If your husband offered to pay to a woman

14  to have sex with another man, what would you call him?

15    A.   Well, this is a ridiculous question because my

16  husband never would; but if he did, I would think you

17  call him a John.

18    Q.   You'll call him a John?

19    A.   Right.

20    Q.   Would you call him anything else?

21         MR. BELTRAN:  Object to the form.

22         THE WITNESS:  I'm trying to think of what

23     they -- I'm not sure what the name that they use.

24  BY MR. FORD:

25    Q.   How about a criminal?

1      A.   Criminal, yeah.  Absolutely.  I would agree

2  that would be a criminal.

3      Q.   And you would find that morally reprehensible,

4  wouldn't you?

5           MR. BELTRAN:  Object to the form.

6           THE WITNESS:  I think the exchange of cash for

7      sex, yes, I find that morally objectionable.

8  BY MR. FORD:

9      Q.   Morally reprehensible, isn't it?

10     A.   Reprehensible --

11          MR. BELTRAN:  Objection, asked and answered.

12 BY MR. FORD:

13     Q.   Go ahead.  I didn't hear your answer.

14     A.   Yes.

15     Q.   Are you aware of your husband ever doing that,

16 offering to pay money for a woman to have sex with

17 another man?  Go ahead.

18     A.   To have -- what you said was to have sex with

19 another man.  That is a weird --

20     Q.   A woman to have sex with another man.

21     A.   With him?  I don't -- can you repeat the

22 question?

23     Q.   Sure.  Are you aware of your husband ever

24 offering to pay money for a woman to have sex with

25 another man?  Have you ever heard of that?



 1     A.   Of --

 2     Q.   Not with your husband but with another man, a

 3   third party?

 4     A.   I mean, I've heard about it in this case in the

 5   papers.

 6     Q.   What did you hear?

 7     A.   I've heard that -- and from Abby.  I've heard

 8   that -- Abby told me that Joel had paid over 140

 9   something women while they were married.  I don't know

10   if they were different women, and I don't know specific

11   to women or specific to payments to women, for sexual

12   acts.  I don't -- prior to this case, that is not

13   something I have been exposed to, like personally

14   exposed to people who exchanged cash for sexual favors.

15     Q.   And you certainly have never heard of your

16   husband offering to do such a thing, correct?

17     A.   Correct.

18          MR. BELTRAN:  Well, let's take a break if

19      they're going to take a pause.

20          MR. FORD:  No, I'm not taking a pause.

21          MR. BELTRAN:  You're definitely taking a pause.

22          MR. FORD:  I'm handing out exhibits.

23          MR. BELTRAN:  Okay.  Are you going to send me a

24      copy or --

25          MR. FORD:  Yep.



 1              MR. BELTRAN:  Okay.

 2              MR. FORD:  We're going to put it up on the

 3         display for you.

 4              MR. BELTRAN:  Well, I want you to email me a

 5         copy or give me a file share or something like that.

 6         Is this the Joel comp one or just tell me what

 7         you're showing her.

 8              (Defendant's Exhibit 78 was marked for

 9    identification.)

10    BY MR. FORD:

11         Q.   I'm handing you what's been marked as

12    deposition Exhibit No. 78.

13         A.   This is for me?

14         Q.   It's for you.

15              MR. FORD:  And for purposes of the record for

16         you to access the document for those attending

17         remotely, this is a composite of text messages

18         starting with JG082952, 953, 954, 955, 956, 957,

19         958, 959, and then jumping to 82960, 961, and then

20         82978, 979 and then 82993.

21              THE WITNESS:  I'm sorry, what are --

22    BY MR. FORD:

23         Q.   This is just for the record.

24         A.   Oh, okay.

25         Q.   82995 and then 83033 and then 83038, 83039,



1   83040.

2          MR. BELTRAN:  Okay.  Can you email or file

3      share this composite that you have made so I can

4      review it, please?

5          MR. FORD:  Laura is going to send it to you,

6      Mike.

7          MR. BELTRAN:  Perfect.  Thank you.

8   BY MR. FORD:

9      Q.   Okay.  So this deposition Exhibit No. 78 is a

10  composite exhibit of text messages that have been

11  produced in this case between Joel Greenberg and CD,

12  Chris Dorworth.

13         Okay?

14     A.   Okay.

15     Q.   Several pages are attached to it, and so I'd

16  like you to start with what's been marked as -- it's the

17  third to the last page 83038.

18         MR. BELTRAN:  Which page are we on now?

19         MR. FORD:  Joel Greenberg 8383.

20         MR. BELTRAN:  That is what page, the second to

21      last you said?

22         MR. FORD:  It's the third to last.

23         MR. BELTRAN:  83033?

24         MR. FORD:  38.

25         MR. BELTRAN:  038?



1          MR. FORD:  Yes.

2          MR. BELTRAN:  Okay.  All right.  Perfect.

3     Thank you.

4  BY MR. FORD:

5     Q.   Do you have that in front of you, Ms. Dorworth?

6     A.   No, not yet.

7     Q.   Can I help you with that?

8     A.   No, you're handing me an entire document, and I

9  assume you're going to reference that entire document.

10 I'd like to look through the document, please.  Thank

11 you.

12         What page am I on now?  Which page do you want

13 me on?

14    Q.   So I asked you to look at 83038, and I think

15 your response was you wanted to look at the whole

16 document before I asked you questions.

17    A.   83038?

18    Q.   Correct.

19    A.   Oh, so sorry.  One last page.

20    Q.   Done?

21    A.   I'm done.

22    Q.   Okay.  Great.  Let's take a look at towards the

23 bottom of 83038 there is a message from Joel Greenberg,

24 June 6, 2020, at 2:41 p.m.  He writes, Are you home?

25 I'm right down the street.



1          Do you see that?

2          MR. BELTRAN:  Object to the form.

3          THE WITNESS:  I see it on the document.

4  BY MR. FORD:

5     Q.   And then the next line is -- says, CD, and then

6  it has Chris Dorworth, and then there is a number that

7  says (407) 310-7375.

8          Do you see that?

9     A.   I do see that.

10    Q.   And then there is text that follows.  It says,

11 Twin Peaks with Setzer, Yapo, Richard, and Rudisill if

12 you want to join.  Be back later and will hit you up.

13         Do you see that?

14    A.   I see that.

15         MR. BELTRAN:  Object to form.

16 BY MR. FORD:

17    Q.   And that is 12 minutes at 2:52 after that first

18 message from Joel Greenberg.

19         Do you see that?

20    A.   I see that.

21    Q.   What is Twin Peaks?

22    A.   Twin Peaks is a sports bar.

23    Q.   It's a sports bar where women are waitresses

24 kind of like Hooters, right?

25    A.   It's -- they have good looking women as their



 1  waitresses, yes.  I think that is a part of their brand

 2  that would be the name Twin Peaks.  I'm sure it's a

 3  double entendre for that.

 4      Q.   Double entendre for what?

 5      A.   Probably for breasts.

 6      Q.   Have you been there before?

 7      A.   Yes.

 8      Q.   Okay.  Have you taken your children there

 9  before?

10      A.   My stepson has been there before.  I don't

11  know -- not with me but with his dad.  He's 21.

12      Q.   Yeah.  Have you taken Grace there?

13      A.   No, I have not taken Grace there.

14      Q.   What about Madison?

15      A.   I don't know.  I have not taken her there.

16      Q.   How many times have you been there?

17      A.   Maybe once or twice.

18      Q.   What did you think about it?

19      A.   Well, they are very positively affirming.  When

20  I walked in, they asked me if I was here for the

21  interview, and I thought that was a kind statement

22  although I told them I was gainfully employed.

23      Q.   So do you think that's an -- is that a family

24  restaurant?

25      A.   No.  I mean, well it's not a family restaurant,



 1  but I would classify it more as a sports bar.  I would

 2  classify it where kind of guys go and hang out.

 3      Q.   Okay.  So when you went to Twin Peaks before,

 4  how many times have you been there?

 5      A.   I think once or twice --

 6           MR. BELTRAN:  Object to the form.

 7  BY MR. FORD:

 8      Q.   And is that in Altamonte?  Is that how you say

 9  it?

10      A.   Altamonte.

11      Q.   Altamonte.  Is that the one in Altamonte?

12      A.   I don't -- I think that's the only one around

13  here.  I don't know if there is any other.  That's the

14  one where Chris would go.

15      Q.   And so you knew he went there?

16      A.   Yes.

17      Q.   Okay.  Did you have any objection to that?

18      A.   Objection to him going to a restaurant, no.

19      Q.   An objection --

20      A.   A restaurant with good looking women?  You're

21  asking me if I have an objection to my husband going

22  places where there are good looking women present.

23  That's what you're asking me?

24      Q.   No, that's not what I'm asking.

25      A.   You're asking do I have an objection to Twin



1  Peaks?

2          MR. FORD:  Can you reread my question?

3          (The previous question was read back.

4          THE WITNESS:  I don't have an objection to

5      where -- you know, it's not a place that I enjoy

6      frequenting, but I have never told my husband,

7      You're not allowed to go to Twin Peaks, if that's

8      what you're asking.

9  BY MR. FORD:

10     Q.   Right.  So it was fine for you that he went to

11 Twin Peaks?

12     A.   It's fine that he goes to Twin Peaks or Hooters

13 or any type of restaurant.

14     Q.   Do you know how often that he frequented Twin

15 Peaks in 2017?

16     A.   I think it's on his regular circuit with his

17 guy friends, so I wouldn't be surprised if it was a

18 number of times.

19     Q.   Same thing in 2020?

20     A.   Correct.

21     Q.   Okay.  So there are individuals listed in the

22 messaging from Chris Dorworth.  It says Setzer, Yapo,

23 Richard, and Rudisill.

24          Do you know who those individuals are?

25     A.   I know who all of those individuals are.



1     Q.   Can you tell me who they are?

2     A.   Setzer would refer to Alex Setzer.  Yapo would

3   refer to John Yapo.  Richard -- well, I assume -- well,

4   I would have to make a conjecture that it would be

5   Richard Anderson, but I don't know.  And Rudisill would

6   be Mike Rudisill.

7     Q.   And he's a judge?

8     A.   That's correct.

9          (Defendant's Exhibit 79 was marked for

10   identification.)

11  BY MR. FORD:

12    Q.   So I'm going to go ahead and mark deposition

13   Exhibit 79 is what you see on the screen, and I'd like

14   you to take a look at what is up on the screen while I

15   find the document.

16         MR. BELTRAN:  Are you going to email me a copy

17      I guess?  If not, I need a copy of this because I

18      don't know what you've got.  You can send it to me,

19      please.

20         MS. WOLF:  Mike, I already emailed it to you.

21         MR. BELTRAN:  Okay.  Thank you.

22  BY MR. FORD:

23    Q.   The court reporter has handed you what's marked

24   as deposition Exhibit No. 79 which is a two-page

25   document, and its it says, Twin Peaks Altamonte,



1  Florida, on the left and then it has a couple of

2  pictures from Twin Peaks.

3         Do you recognize this as the Twin Peaks

4  Altamonte?

5         MR. BELTRAN:  Object to the form.

6         THE WITNESS:  I don't know where these

7     promotional photos were taken.  I don't have any

8     idea.

9  BY MR. FORD:

10    Q.   You have been to the restaurant before though,

11 correct?

12    A.   But -- no, I don't -- that looks different.

13    Q.   That looks different than the one you went to?

14    A.   Yeah.  There is like a bar in the middle of the

15 Altamonte one.

16    Q.   Okay.  So --

17    A.   I don't know if they have renovated since I

18 have been there.  I can't remember the last time I was

19 there, but I thought there was a bar kind of in the

20 middle like when I walked in kind of middle back, but --

21 and then there is high tops when you first walk in

22 straight ahead.  There is like a hostess stand when you

23 walk in, and then to the left there is tables.

24    Q.   You'll see that there are women in deposition

25 Exhibit No. 79 on both pages, and they're dressed in



 1  shorts and shirts that show their -- the middle part of
 2  their body unclothed.
 3          Do you see that?
 4          MR. BELTRAN:  Object to the form.
 5          THE WITNESS:  I see the photo, yes.
 6  BY MR. FORD:
 7     Q.   Yeah.  And are those the kind of women that you
 8  saw when you went to Twin Peaks?
 9          MR. BELTRAN:  Object to the form.
10          THE WITNESS:  I don't remember what uniforms
11     they wear at the Altamonte one.  I'm not -- I'm not
12     positive, but it would be of similar style if that's
13     what you're asking.  These exact ones, I don't know;
14     but if you're asking is it a similar style where
15     they would show their midriffs and have exposed
16     cleavage, yes, that is a what they would wear.
17  BY MR. FORD:
18     Q.   If you could turn to the first page of
19  deposition Exhibit 78, these text messages or electronic
20  messages that we were looking at.  So the first two we
21  looked at were on June 6th.
22     A.   I'm sorry, where am I at right now?
23     Q.   The first page.  The very first page.
24     A.   The front that you've given me.
25     Q.   Yeah.



1          MR. BELTRAN:  This is 82952?

2    BY MR. FORD:

3       Q.   Okay.  So we have gone from page 83038 where we

4    looked at the two messages between Mr. Greenberg and

5    Mr. Dorworth on June 6, 2020, now we're going to the

6    first page which is bates number 82952.

7             And do you have that in front of you?

8       A.   I do.

9       Q.   Okay.  So you'll see that there is a message

10   from Joel Greenberg June 6, 2020 at 7:34 p.m. where he

11   writes, Are you at FishBones?

12            Do you see that?

13      A.   Yes.

14      Q.   And then Mr. Dorworth responds, Not yet, also

15   at 7:34.

16            Do you see that?

17      A.   Yes.

18      Q.   And then there is some kind of link to an

19   attachment and an article from Mr. Dorworth at the same

20   time, 7:34.

21            Do you see that?

22      A.   Yes, but I can't see the attachments.

23      Q.   Right.  And then Mr. Greenberg responds one

24   minute later, and it says, Oh, my, my, my.

25            Do you see that?



```
 1      A.   Yes.

 2           MR. FURBUSH:  Hey, I'm sorry to interrupt.  Do

 3      you mind putting the messages back up on the screen,

 4      please?

 5  BY MR. FORD:

 6      Q.   And then he further writes, We're ready, where

 7  you at, question mark, right?  Right, you see that?

 8      A.   Yep.

 9      Q.   Okay.  And then Mr. Dorworth responds, Rudisill

10  is OTW to get me.  Meet there in like 20, question mark.

11           Do you see that?

12      A.   I see that.

13      Q.   And again, that is Judge Rudisill as far as you

14  know?

15      A.   No, I know him, yes.

16      Q.   But that's your understanding who your husband

17  is referring to?

18      A.   Yes.

19      Q.   Okay.  And then Joel Greenberg writes two

20  minutes later on the next page which is bates label

21  82953 of deposition Exhibit 78, and is down for

22  whatever.  I'll update as needed.

23           Do you see that?

24      A.   Sorry, I just want to make sure I'm following

25  what's being said.  Okay.
```



1     Q.   You see that?

2     A.   Yes, I see that.

3     Q.   Okay.  That's at 7:37.

4          Do you see that?

5     A.   Yes.

6     Q.   And then Mr. Dorworth responds at 7:58, If you

7     haven't left yet, I would wait out the tornadoes.

8          Do you see that?

9     A.   Yes.

10    Q.   And he says the same minute, This is no

11    bullshit.

12         Do you see that?

13    A.   It sounds like bad weather.

14    Q.   And then five minutes later at 8:03, We can

15    come over, and he says, They.  Do you see that?

16    A.   I see that.

17    Q.   Then one minute later Mr. Dorworth writes, I

18    want to go to FishBones.

19         Do you see that?

20    A.   Yes.

21    Q.   And then if you go to the next page which is

22    82954 Mr. Greenberg responds at the same minute, 8:04,

23    There.

24         Do you see that?

25    A.   Uh-huh.



```
 1      Q.   Yes?

 2      A.   I see that, yes.

 3      Q.   And then the same minute he writes, Me too.

 4           Do you see that?

 5      A.   That doesn't make sense.  There must be a

 6  missing text.

 7      Q.   But that is what you see there, right?

 8      A.   Yes.

 9      Q.   Me too, is the next text that we have?

10      A.   Oh, he wants to go to FishBones and then Joel

11  is saying, Me too.  Sorry.  Just want to make sure I was

12  following the conversation.  Texts sometimes are

13  different.

14      Q.   Then Mr. Greenberg writes, I'm hammered, the

15  same minute.

16           Do you see that?

17      A.   I see that.

18      Q.   And then he says, But hungry.

19           Do you see that?

20      A.   I see that.

21      Q.   And then Mr. Dorworth writes the same minute,

22  Just reading social media about fucking tornadoes

23  touching down in Orlando and WP heading our fucking way.

24           Do you see that?

25      A.   Yes.
```



1    Q.   And then if you go to the next page 82955.

2         Do you see that?

3    A.   The messages in chronological order?  No

4    display?  Which messages are you referring to.

5    Q.   Yeah, just that we're on the next page, 82 --

6    A.   I'm on 82955, yes.

7    Q.   Okay.  We're on the same page.  And then

8    Mr. Greenberg writes, And want more pussy or sustenance,

9    and then he writes, Roe both.

10        Do you see that?

11   A.   Yes.

12        MR. BELTRAN:  Object to the form.

13   BY MR. FORD:

14   Q.   And that is at 8:04 p.m.?

15   A.   I see that it is says 8:04 p.m., yes.

16   Q.   And then Joel Greenberg writes, I will gladly

17   put myself in harms way for the chance that Abby gets

18   hit by a twister.

19        Do you see that?

20   A.   I do see that.

21   Q.   At 8:05 p.m.?

22   A.   Yes.

23   Q.   And then Chris Dorworth writes, Yes, but

24   Rebekah is in North Carolina, or NC, so quit being

25   selfish.



 1          Do you see that?

 2          MR. BELTRAN:  Object to form.  Go ahead.

 3          THE WITNESS:  I see that.

 4  BY MR. FORD:

 5      Q.  At 8:05?

 6      A.  Uh-huh.

 7      Q.  Were you in North Carolina?

 8      A.  I have no idea.

 9      Q.  Do you have any reason to doubt you were in

10  North Carolina?

11      A.  Oh, if Chris --

12          MR. BELTRAN:  Object to the form.

13          THE WITNESS:  -- I'm in North Carolina, I

14      wouldn't doubt him, no.

15  BY MR. FORD:

16      Q.  And were you probably in your home in North

17  Carolina, the second home?

18      A.  Probably.  I mean --

19          MR. BELTRAN:  Object to the form.

20          THE WITNESS:  Again, I don't know, so I

21      can't...

22  BY MR. FORD:

23      Q.  That was a typical time of year for you to go

24  in the summer to the North Carolina home?

25          MR. BELTRAN:  Object to the form.



1          THE WITNESS:  Yes, but I was working, so it
2      just really depends.  I could have been in -- I
3      could have been in -- it could have been a client
4      meeting in North Carolina as well.  I really don't
5      know.  I'd have to go check documents for you.
6  BY MR. FORD:
7      Q.   Do you know what he means when he writes, Yes,
8  but Rebekah is in North Carolina so quit being selfish,
9  in response to Mr. Greenberg's message saying, I will
10  gladly put myself in harms way for the chance that Abby
11  gets hit by a twister?
12      A.   I think that he's saying Rebekah is gone, so
13  please come hang out.  I'm by myself.
14      Q.   Okay.  And then at 8:05 p.m. --
15      A.   I'm not commenting on Joel Greenberg's comments
16  on his wife.  That -- I am not commenting on that.  I
17  think that's, you know, very unkind although, you know,
18  who knows whether he was joking or not.
19      Q.   And I wasn't asking you anything about Joel
20  Greenberg --
21      A.   Well, you referenced -- repeated that text
22  message, so I didn't know whether your question was all
23  inclusive.
24      Q.   Fair enough.  So let me ask you this question:
25  Yes, but Rebekah is in North Carolina so quit being



1  selfish.

2          And what's your understanding of that?

3    A.    They're hanging out with a bunch of guys, they

4  want to hang out.  That's my understanding of that.

5    Q.    Okay.  And you've never seen this before,

6  correct?

7    A.    I have never seen this before, no.

8          MR. BELTRAN:  Object to the form.

9  BY MR. FORD:

10   Q.    So then one minute later Joel Greenberg writes,

11 LOL.

12         Do you see that?

13   A.    Yes.

14   Q.    And then three minutes later, Chris Dorworth

15 writes, Do I know Jenn, question mark.

16         Do you see that?

17   A.    Yes.

18   Q.    Do you know who he's referring to?

19   A.    I don't, and neither does he apparently.

20   Q.    That is how you would interrupt it?

21   A.    Yes.

22   Q.    And the next page is 82956.

23         Do you see that?

24   A.    Uh-huh.

25   Q.    That's a yes?



1     A.    Yes.

2     Q.    And this is a text message the same minute that

3  Joel Greenberg writes, Likely.

4          Do you see that?

5     A.    Yes.

6     Q.    And then he writes your -- Mr. Dorworth writes

7  at 8:11 Johnny's Filling Station was hit by a tornado.

8          Do you see that?

9     A.    I see that, yes.   That's terrible.

10    Q.    Yeah.   And then one minute later, Joel

11 Greenberg responds, Oh, well, that's really far.

12         Do you see that?

13    A.    Yes.

14    Q.    And then Joel Greenberg writes, I now have two

15 girls coming at 8:13 p.m.

16         Do you see that?

17    A.    Yep.

18    Q.    And then he writes the same minute, Lauren and

19 Jenn.  You have known them for years, LOL.

20         Do you know who he's referring to there?

21    A.    No, and it doesn't sound like my husband does

22 either.

23    Q.    And that's your interpretation even though

24 Mr. Greenberg writes, You have known them for years,

25 LOL?



1     A.   Do I know Jenn, and he says, You have known

2   them for years.  Well, it sounds like Joel's trying to

3   make a joke, like, Oh, you've known them for years, LOL,

4   trying to cover his -- I'm sure -- I don't know.  I'm

5   not even going to comment on Joel's behavior at that

6   point.  I have no idea who these women are.

7     Q.   Have you ever heard of your -- of Mr. Dorworth

8   spending any time with a woman named Lauren?

9     A.   No.

10    Q.   Have you ever heard of your husband spending

11  any time with a woman named Jenn?

12    A.   When you say spending time with, like do we

13  have any friends with the name of Lauren or Jenn?

14    Q.   Sure.

15    A.   Alex Setzer was dating a woman during this time

16  named Jenn Ashton.

17    Q.   Anyone else named Lauren or Jenn?

18    A.   Lauren, I'll think about -- I'm sure we have --

19  Lauren is such a regular name.  I'm sure we have a

20  friend named Lauren, but I doubt -- again, I don't know

21  that Jenn Ashton -- this was -- I don't -- what I'm

22  telling you on the record is I do not believe this is

23  referring to that Jenn.

24    Q.   Okay.  So you know one woman by the name of

25  Jenn and her name is Ashton and she was involved in a



1  relationship with Mr. Setzer; is that correct?

2      A.   They lived --

3           MR. BELTRAN:  Object to the form.  I think they

4      lived together at the time.

5  BY MR. FORD:

6      Q.   But you're reading of this is that

7  Mr. Greenberg is not referring to that person as far as

8  you know?

9      A.   As far as I know, that's correct.

10     Q.   Do you know a woman by the name of Lauren

11 Phillips?

12     A.   I don't think so.

13     Q.   Have you ever heard that name?

14     A.   I have not heard that name.

15     Q.   All right.  So continuing with the deposition

16 Exhibit No. 78, let's go to the next page which is

17 82957.

18          Do you see that?

19     A.   I see that.

20     Q.   And then Mr. Greenberg writes, FishBones.

21          Do you see that?

22     A.   Uh-huh.

23     Q.   And then he writes, We're heading.

24          Do you see that?

25     A.   Yes.



1    Q.   And then Chris Dorworth writes, OTW.

2         Do you see that?

3    A.   Yes.

4    Q.   And do you understand that to mean on the way?

5    A.   Yes.

6    Q.   And then Joel Greenberg writes, Word.

7         Do you see that?

8    A.   Yes.

9    Q.   And then he writes, Your two are in route.

10        Do you see that?

11   A.   Yes.

12   Q.   And that is at 9:18 p.m.?

13   A.   Yes.

14   Q.   Do you know who he's referring to there?

15   A.   I have no idea who he's referring to there.

16   Q.   Do you know whether he's referring to women

17   that have been invited to FishBones?

18   A.   I don't know whether -- I don't know who he's

19   referring to.

20   Q.   Okay.  And then Mr. Greenberg on the next page,

21   82958, of deposition Exhibit No. 78 has some kind of

22   text message screenshots?

23   A.   I can't read it.

24   Q.   That's fine, but do you see it?  Do you see the

25   screenshot?



1     A.   Yes.

2     Q.   And I'll just represent to you that the next

3  page which is 82959 is that screenshot?

4     A.   Oh, is the -- is 82959, is that the screenshot?

5     Q.   It is.  And I don't have any questions about

6  that.

7     A.   Okay.

8     Q.   So after the screenshot Mr. Greenberg writes,

9  Five minutes till they are here.

10         Do you see that?

11    A.   Yes, I do.

12    Q.   And then he writes, Go get the girls from the

13  front.

14         Do you see that?

15    A.   I do see that.

16    Q.   And then he writes -- Mr. Dorworth writes, What

17  girls?

18         Do you see that?

19    A.   Yes.

20    Q.   And then Mr. Greenberg, Jenn and Lauren.

21         Do you see that?

22    A.   Yes.

23    Q.   And then if you skip to 82960 --

24    A.   I just want to make sure that I'm clear.

25         MR. BELTRAN:  Well, what page are we on now?



 1      I'm totally --

 2            MR. FORD:  We're going to 82960.

 3   BY MR. FORD:

 4      Q.   So I haven't asked you any questions.  My only

 5   question was whether you saw that?

 6      A.   No.  My husband is only asked questions at this

 7   point not knowing who these girls are.  Understood.

 8      Q.   Yeah.

 9      A.   Okay.  Let's keep going.

10      Q.   Yeah, that's not what I asked.  82960 is the

11   next page I want to ask you about.

12      A.   Okay.

13      Q.   And Mr. Greenberg writes, They know what's up.

14            Do you see that?

15            MR. BELTRAN:  Object to the form.

16            THE WITNESS:  I see that.

17   BY MR. FORD:

18      Q.   And that is at 10:11?

19            Do you see that?

20            MR. BELTRAN:  Object to the form.

21            THE WITNESS:  Yeah.

22   BY MR. FORD:

23      Q.   And then Mr. Greenberg writes, Your house after

24   this, at 10:32 p.m.

25            Do you see that?



1    A.   I do.

2    Q.   And then he writes -- Mr. Dorworth writes, Yep,

3  at 10:34 p.m.

4         Do you see that?

5    A.   I do.

6    Q.   Do you have any understanding of whether your

7  husband had any women come to your home on June 6, 2020,

8  in the evening with Mr. Greenberg?

9    A.   I don't know if he had any women at our home;

10  but if he had a ton of people there or if they had a

11  cookout or they were going there afterwards, that

12  wouldn't be unusual.  But I don't see any.  I'm not

13  aware whether or not they would be at my home.

14    Q.   Yeah.  Do you know whether two women by the

15  name of Lauren and Jenn went with Mr. Greenberg and

16  Mr. Dorworth back to your house on June 6, 2020, after

17  10:34 p.m.?

18    A.   If they -- I don't know although when I was

19  doing my own investigations during all of this

20  information, I viewed all of the gate logs of my home.

21  I guess this is 2020, I don't know.

22    Q.   We don't have those logs.  I'll just represent

23  to you --

24    A.   You --

25    Q.   Did you look at logs?



1    A.   Well, I kind of looked at -- like since then, I

2    think I would have -- I think I would have -- I would

3    have been receiving notifications at that point, so I

4    would have seen that.  So I don't think that it would --

5    what my point is if people were coming into our gate, my

6    husband would have already informed me.  If people were

7    coming to our home or I would have seen -- or if they

8    road separately, I would have been made aware of that.

9    Q.   Was that always your practice?

10   A.   Chris and I, neither of us had notifications

11   set up with the gate until -- honestly until this

12   investigation started.  We didn't even know how to

13   access the gate logs, and so -- but after that we both

14   now have -- get notifications for who is coming in and

15   out of our...

16   Q.   When did that begin?

17   A.   It would have been in 2021, so I guess I

18   wouldn't have had -- I wouldn't have had -- I wouldn't

19   have had a notification yet at this point.  I'm

20   wondering if they would have called me.  I'm not sure.

21   Q.   Right.  So as I'm following what you're saying,

22   it sounds like at some point in time in 2021 you started

23   to get some kind of notification when someone was at the

24   gate and wanted to come to your house; is that correct?

25   A.   Chris and I started to get notifications at



REBEKAH DORWORTH                                    July 23, 2024
DORWORTH vs JOEL MICHAH GREENBERG                          175

1  that point together.  We both downloaded the app, and it

2  goes right to text messages.

3      Q.   And as of June 2020, you did not have such

4  notifications, correct?

5      A.   Neither Chris nor I had those notifications.

6          MR. BELTRAN:  Objection to form.

7  BY MR. FORD:

8      Q.   So as far as you know, you don't have any

9  knowledge about whether Mr. Greenberg and Mr. Dorworth

10 brought any women back to your home on June 6, 2020,

11 correct, as far as you know?

12     A.   That's correct.

13         MR. BELTRAN:  Object to the form.

14 BY MR. FORD:

15     Q.   You mentioned that you looked at some Heathrow

16 logs.

17         Did I understand that correctly?

18     A.   Yes.

19     Q.   And you know that the Heathrow logs from May,

20 June, July, and August of 2017 have been produced in

21 this case, correct?

22     A.   Right.

23     Q.   And how do you know that because I thought you

24 said you didn't look at any documents in the case?

25     A.   I was the one who --



1            MR. BELTRAN:  Object to the form.

2            THE WITNESS:  I was the one who found the logs.

3    BY MR. FORD:

4       Q.   How did you find them?

5       A.   I went to the HOA and asked how to access the

6    logs for us.

7       Q.   Why did you do that?

8            MR. BELTRAN:  I'm just going to --

9            THE WITNESS:  A marital conversation occurred

10       post an FBI interview, and we were trying to figure

11       out where Chris was and what was happening at our

12       home.  So Chris asked me to -- well, sorry.

13           MR. FORD:  I'm not going to ask her.  You don't

14       need to object.

15   BY MR. FORD:

16      Q.   So at some point then you had the logs produced

17   from the HOA; is that right?

18      A.   I viewed the logs, yes.

19      Q.   Okay.  And was that just for 2017, or was it

20   for any other period of time?

21      A.   I think I just went through everything at that

22   point.

23      Q.   What do you mean everything?

24      A.   Well, I just started going through all of the

25   months because we didn't know because we weren't getting



1   notifications.  Chris didn't get emails.  I didn't get

2   emails, so I just wanted to see -- we both wanted to

3   see, you know, just who -- just to look through.  I

4   never looked at it before.  It was the first time that I

5   saw our gate logs and the first time Chris had seen our

6   gate logs, and obviously there was a lot going on at the

7   time and we wanted to view them.

8       Q.   What periods of time did you review the gate

9   logs?

10      A.   I mean, obviously we were narrowed in on

11  specific events around 2017, so I looked at those summer

12  months that you're referring to, but I think I just kept

13  looking through the whole thing up to present day just

14  to see.

15      Q.   Do you still have nose?

16      A.   No, I said I viewed them.

17      Q.   How did you view them?

18      A.   I viewed them on -- I don't remember if it was

19  the app or laptop or something, but I just -- I just

20  looked at them.  It wasn't like -- I didn't print them

21  out or anything if that's what you're asking.  I don't

22  have documents.  The HOA didn't give me anything.  It

23  was just something I had to -- they were in a viewer

24  form, and I -- I don't know if they still exist today.

25  I don't know what their policy is on how long they keep



 1  them.

 2      Q.   Got you.  So staying with deposition Exhibit

 3  78, page 82960, the next entry Joel Greenberg writes,

 4  Yo, can I scoop those two campaign checks before you

 5  head to NC?

 6           Do you see that?

 7      A.   Yes.

 8      Q.   Does that help refresh your recollection that

 9  you were in North Carolina and that Mr. Dorworth was in

10  Florida as of June 6th, June 7th?

11      A.   Well, if Chris was heading to North Carolina.

12           MR. BELTRAN:  Form.

13           THE WITNESS:  -- or again it's Joel saying it

14      so -- and he's saying he flew out.  So I don't know

15      if I met him after a work trip or if -- like if I

16      would have met him at our home or if I was already

17      there.  So I don't want to represent to you that I

18      was definitely at my home.

19  BY MR. FORD:

20      Q.   And then he writes, he being Mr. Dorworth

21  writes at 7:38 p.m. on June 7th, Flew out hungover as

22  fuck at 11:00.

23           Do you see that?

24      A.   I see that.

25      Q.   And then the next page of deposition Exhibit



1   No. 78, bates label 82961, Mr. Greenberg responds, Word.

2   I'm still hungover.  Wild day.

3         Do you see that.

4      A.   Yes.

5      Q.   Do you know what he's referring to there?

6      A.   No.

7      Q.   Did you ever have --

8      A.   It sounds like Joel had a wild day.

9      Q.   Do you think your husband also had a wild day

10  that day?

11     A.   I don't know what people consider a wild day.

12     Q.   How about hungover as fuck?  Is that wild?

13     A.   To be hungover?

14     Q.   Hungover as fuck, is what Mr. Dorworth wrote.

15     A.   Yeah.  They -- it sounds like they were

16  drinking at multiple places.  So...

17     Q.   Do you know anything else about what happened

18  at your home on June 6th or June 7th of 2020?

19         MR. BELTRAN:  Object to the form.

20  BY MR. FORD:

21     Q.   Other than what we talked about in these text

22  messages?

23     A.   I don't.

24         MR. BELTRAN:  Object to the form.

25  BY MR. FORD:



1    Q.   Okay.  If you would take a look at deposition

2   Exhibit 78 as 82993.

3         Do you have that in front of you?

4    A.   82993?

5    Q.   Yeah.

6    A.   All right.  Okay.

7         MR. BELTRAN:  82993?

8         MR. FORD:  82993.

9   BY MR. FORD:

10   Q.   Do you see -- this is June 17, 2020, at 5:33

11   p.m.

12        Do you see that?

13   A.   I do.

14   Q.   And Joel Greenberg sends some kind of

15   attachment.

16        Do you see that?

17   A.   I can't see the attachment.

18   Q.   Yeah.  I said he sends some kind of attachment.

19        Do you see that?

20   A.   Do we not have a copy of the attachment?

21   Q.   We do not.

22   A.   Okay.

23   Q.   Do you see that?

24   A.   I see that.

25   Q.   Okay.  And then Chris Dorworth writes, She is



1  so hot, at 5:34 p.m.

2          Do you see that?

3     A.   I do see that.

4     Q.   And then Joel Greenberg responds, That's so

5  dope.  Yes, she is.  Ultimate score, at 5:34, same

6  minute as the previous message.

7          Do you seat that?

8     A.   I see that.

9     Q.   Do you know who your husband is referring to

10  as, She is so hot?

11     A.   I don't know who he is referring to, but it

12  sounds like she's hot.

13     Q.   And that's okay with you?

14     A.   I think my husband would tell you that if we're

15  together and I see someone that's good looking, I'd be

16  like, That's a hot chick.  You know, I think that's

17  not -- in our relationship, that would not be considered

18  something that would be really disrespectful.  It might

19  be in yours, and I respect that; but in our relationship

20  commenting on the way that somebody was attractive, I

21  think you get to a certain point in a marriage that, you

22  know, that's not a -- that's not -- that wouldn't be

23  really odd for us.  It would be odd I think if, I mean,

24  Joel Greenberg saying that he's -- Ultimate score.  I

25  don't know if he's referring to himself or a buddy or

1  somebody who's hooked up with him.

2      Q.   Do you make comments to your husband about men

3  being so hot?

4      A.   Typically I limit those to actors on TV; but,

5  you know, I've told him that I think certain women are

6  hot if that's what you're asking.

7      Q.   That's not what I was asking.

8      A.   I don't typically do that, but that is not

9  typically something that I would do.

10      Q.   And then if you turn to the next page of

11  deposition Exhibit 78, bates number 82995, do you see

12  that?

13      A.   Yes.

14      Q.   And then Chris Dorworth writes, Yum, with

15  several explanation points, right?

16      A.   Sorry, I'm trying to follow.  Yes.

17          MR. BELTRAN:  Did you include 82994 in your

18      packet?  Are you going to show that to her?

19          MR. FORD:  I did not.

20          MR. BELTRAN:  Okay.  Well, I'll represent to

21      her they didn't attach that --

22  BY MR. FORD:

23      Q.   And deposition exhibit --

24          MR. FORD:  I'm not representing anything,

25      Michael.



1        MR. BELTRAN:  No, she asked you if you had the

2    attachment, and I think that's going to be 82994

3    because it went from 82993 to 995, and you told her

4    you didn't have the attachment when she asked about

5    the attachment.

6        MR. FORD:  Well, I don't have the movie.

7        Do you?  Do you want to put it up, Michael?  Do

8    you got the movie there?

9        MR. BELTRAN:  No, I don't have the movie.  It

10   is your exhibit.  I'm just -- you omitted a page,

11   but you said there is no attachment.

12       MR. FORD:  Yeah.  This is correspondence with

13   your client.  Do you have the movie?

14       MR. BELTRAN:  I don't have any movie, but I

15   don't know what's 82994 and why that wasn't part of

16   this packet.

17       MR. FORD:  You just said you knew what it was,

18   so do you have the movie.

19       MR. BELTRAN:  I don't know what it is.  I'm

20   saying there is a page missing that you didn't

21   include in the packet.

22       MR. FORD:  I think you said that was the

23   attachment.

24       MR. BELTRAN:  Well, it could be because the

25   other one's the attachment when you had 82958,



1    the -- then the attachment is 82959.  You see that

2    screenshot that Joel Greenberg sent.  You made this

3    exhibit.  I'm just asking if you're going to show

4    her 82994 --

5         MR. FORD:  I'd love for you to show the movie.

6    So if you want to look for that while I'm examining,

7    that would be great.

8         MR. BELTRAN:  Sir --

9 BY MR. FORD:

10   Q.  So on deposition Exhibit 78, 82995, after

11 Mr. Dorworth writes, Yum.

12        Do you see that?

13   A.  Yes.

14   Q.  And then Mr. Dorworth writes, Getting drunk at

15 Liam's again, that same minute.

16        Do you see that?

17   A.  I see that.

18   Q.  And then Mr. Greenberg writes, Word, I'll see

19 if I'm allowed to come up.

20        Do you see that?

21   A.  Yes.

22   Q.  And do you have any knowledge about on June

23 17th what your husband was doing?

24   A.  I don't know if I was with him at Liam's, if

25 that's what you're asking.  I don't know if that was us.



1    Q.   I was asking do you have any knowledge of what

2  your husband was doing on June 17, 2020?

3    A.   I don't.  I don't.

4    Q.   And is that a place where your husband would go

5  to get drunk?

6    A.   Well, he would -- I mean --

7         MR. BELTRAN:  Objection to form.

8         THE WITNESS:  I mean, we take the kids there.

9      That was a place that we would go.  We listen to

10     live music there.  He would also get drunk with his

11     buddies there, but he also did business there.  He

12     is at Liam's all the time.

13 BY MR. FORD:

14   Q.   If he were to go to Liam's and get drunk, how

15 would he get home?

16   A.   I'd pick him up sometimes.  Sometimes he would

17 Uber.  You know, sometimes he's walked.  We don't live

18 that far from there.  I mean, it's not close, but

19 it's -- he has walked home before from Liam's, but he's

20 pretty responsible -- I would say very responsible -- in

21 that regard.  You know, he's -- again, I talked about

22 this earlier -- a world class drinker.  He doesn't get

23 into a state where he can't really function, so he would

24 call me or make another good decision hopefully.

25   Q.   You described earlier in your marriage one of



REBEKAH DORWORTH                                    July 23, 2024
DORWORTH vs JOEL MICHAH GREENBERG                         186

1  the reasons that Mr. Dorworth is happily married is

2  because the two of you are transparent.

3        Do you remember that?

4     A.   Yes.

5     Q.   That was one of the reasons.  Did he ever

6  discuss this in being transparent with you what was

7  happening in June of 2020 with Mr. Greenberg at

8  FishBones or Liam Fitzpatrick's?

9     A.   Oh, I'm sure he did, but it was just so

10 commonplace.  I wouldn't even notice if he called and

11 was, Hey, I'm going to Liam's, you know, this is who is

12 coming or -- because he knows that I would show up there

13 at any point in time.  It wouldn't be something -- it

14 wouldn't be unusual for me to show up to -- like, Hey,

15 I'm going to come up too.  That wouldn't be an odd

16 thing.

17    Q.   But you wouldn't show up if you were in North

18 Carolina, would you?

19    A.   No, I wouldn't show up if I was in North

20 Carolina obviously, but we have a lot of friends in the

21 neighborhood.  It's a very easily viewed place by people

22 in our neighborhood or people -- you know, people in the

23 community.  Also, again, Chris does business there.

24 It's not like a secretive place.  Chris is very open

25 there.



1    Q.   Okay.  So in other words, he was transparent
2  with everything in these text messages or emails,
3  whatever the form is between Mr. Greenberg and himself
4  with you?

5    A.   No.  What I'm saying is that it would not be
6  atypical for my husband to say -- if I said, What are
7  you doing tonight?  He says, This is what I'm doing
8  tonight.  He -- that wouldn't be atypical:  Hey, I'm
9  going out drinking with the guys at Liam's.  That's not
10  atypical at all.

11    Q.   Would it be typical for your husband to tell
12  you that, I'm meeting a friend and having two women meet
13  us and going back to the house together, while you were
14  out of town?  Would that have been typical?

15    A.   He doesn't do that, so, no, that would not be
16  typical.

17    Q.   You say that he doesn't do that.  How do you
18  know that?

19    A.   What do you mean how do I know that?  Because
20  we're transparent with each other.  I have never
21  observed that.  He's bringing people over to our home or
22  saying, Come meet me at the home, that's -- that's
23  typical, but typically they're always attached to a
24  specific guy.  It is not unusual in our relationship for
25  a guy to bring his girlfriend to our home.  My



 1 | husband -- lots of cookouts, hangouts, things like that.
 2 | As I mentioned earlier, he's an extremely social person.
 3 | He is very hospitable, and so it would not be unusual at
 4 | all for people to be at our home with me there or with
 5 | me not there.
 6 |    Q.   And certainly --
 7 |    A.   But there is no -- we have no reason to
 8 | think -- I have no reason to think that these two women
 9 | even came to my home.
10 |    Q.   And certainly your husband would never bring
11 | women into your home who were there for sex with other
12 | men at your home, correct?  That would never happen?
13 |    A.   My husband would never bring a woman home to
14 | have sex with somebody in my home, no.
15 |    Q.   You mean that's correct, he would never do
16 | that?
17 |    A.   He would never bring women to have sex with
18 | himself in my home.  Absolutely not.
19 |    Q.   Or what about would he ever --
20 |    A.   My husband would not bring home anybody, and in
21 | this particular case, he would never bring home women to
22 | have sex with Joel at my home.  He would not have done
23 | that to Abby, and he would not have done that to me.  He
24 | knows -- he would not have done that.
25 |    Q.   And then I take it's also true that your



1  husband never would have brought women home to your home

2  while you were gone to have sex with men other than

3  himself or with Joel Greenberg; is that true?

4      A.   My husband that I am -- since we have been

5  dating, so I can't opine on things of the past, but my

6  husband is not going to get girls for other men if that

7  is your suggestion.  Introducing a friend -- and I'm not

8  talking about these paid for women, but introducing

9  somebody to somebody else, you know, I don't know if

10  he's ever done that although Chris has -- Chris has got

11  a lot of marriages under his belt.  He does like

12  introducing people, but not that I -- that would be news

13  to me if that was the case.

14          MR. FORD:  Can you reread my question?

15          (The previous question was read back.)

16          THE WITNESS:  I thought I answered the

17      question.  I just gave you an expanded form because

18      I thought it was a limited question.

19  BY MR. FORD:

20      Q.   It was a yes or no.

21      A.   It's not a yes-or-no question because if the

22  question is has my husband ever introduced anybody to

23  anybody else in my home, yeah; but, no, my husband would

24  not bring women to my home to have sex with Joel

25  Greenberg if that is your question.



1      Q.   Or any other man?

2      A.   That I am aware of, no.

3      Q.   That would be morally reprehensible, wouldn't

4  it?

5           MR. BELTRAN:  Object to the form.

6           THE WITNESS:  It would be morally reprehensible

7      to me.  I'm not saying -- I'm not representing that

8      for anyone else.

9  BY MR. FORD:

10     Q.   Has your husband, to your knowledge, ever

11  provided access to your home for anyone to have sex in

12  it -- adults while you were gone?

13          MR. BELTRAN:  Object to the form.

14          THE WITNESS:  If you're asking do people --

15     have people stayed in my home while I am gone like a

16     boyfriend and a girlfriend or a married couple or

17     something like that, people have stayed in my home;

18     and if their marriage is like mine or their

19     relationship is like mine, I'm sure they had sex in

20     our home.

21  BY MR. FORD:

22     Q.   What about unmarried people?  And just stick

23  with me for my question.  Has your husband ever allowed

24  any unmarried people to come to your home and have sex

25  at your home while you're not there?



**REBEKAH DORWORTH**                                    July 23, 2024
DORWORTH vs JOEL MICHAH GREENBERG                               191

1    A.   Have unmarried people stayed in our home that

2  have been in relationships with me there or with me not

3  there and -- I don't know whether they've had sex in my

4  home; but again, I assume people have had sex in my home

5  if they're staying in my home together, yes.

6    Q.   Who are those people?

7    A.   I mean, I've -- my family stays with us for

8  holidays and things like that.  They're all in great

9  marriages.  I hope they're all having lots of sex, and I

10  don't mind if they do it in my home.  Let's see.  I

11  don't know.  Just friends that would visit.  You know,

12  just a number of different people.  I mean, you're

13  talking about -- Chris has lived in that home for 20

14  years.

15    Q.   Who else besides your family?

16    A.   You know, if you're talking about things

17  particular to this case, Matt has stayed in our home

18  with his girlfriend, and I assume that he has had sex

19  with her in our home.  Her name was May.

20    Q.   Excuse me, her name was?

21    A.   May.

22    Q.   May?

23    A.   Uh-huh.

24    Q.   May what?

25    A.   Oh, shoot.  It's been a long time.  I don't



 1  know, she dated him for a long time.  Gosh, I can't

 2  remember her last name.  If I recall it, I will bring it

 3  back to you.

 4      Q.   So --

 5           THE VIDEOGRAPHER:  Excuse me, counsel, can we

 6      go off the record momentarily?

 7           MR. FORD:  Yes.

 8           THE VIDEOGRAPHER:  Thank you.  If there are no

 9      objections, going off record.  The approximate time

10      is 2:09 p.m.

11           (A break was had.)

12           THE VIDEOGRAPHER:  On record with media unit

13      three.  The approximate time, 2:23 p.m.

14  BY MR. FORD:

15      Q.   Ms. Dorworth, we're back on the record after

16  having another chance for a break.

17           Are you ready to proceed?

18      A.   I'm ready.

19      Q.   Do you need anything?

20      A.   I don't.  Thank you.

21      Q.   Okay.  Before we took a break, we were talking

22  about your knowledge of people who've come to your home

23  for the purposes of having sex, and you talked about,

24  well, there is my family, and I presume that they may be

25  having some sexual interaction when they're visiting --



1    A.   I hope so.

2    Q.   You hope so, you said.  And then you also said

3    that you were aware that Matt Gaetz brought his

4    girlfriend there, and you don't know whether they had

5    sex or not, but it was his girlfriend so they may have

6    had sex.

7         Do I have that right?

8    A.   Yes.  It was just that people who would bring a

9    girlfriend to our home and would stay at our home, you

10   know, I don't know what -- I have never viewed anybody

11   having sex at our home if that's what you're asking.  I

12   have not viewed anybody having sex at our home, but

13   if -- again, people bringing just boyfriend and

14   girlfriend staying with us, that would not be -- I

15   would -- again, I would have no reason to think they're

16   not having sex.

17   Q.   Are you aware of any parties that occurred at

18   your home while you have been out of town?

19        MR. BELTRAN:  Object to the form.  Go ahead.

20        THE WITNESS:  Yeah.  I'm aware of people coming

21     to my home all the time while I'm out of town.

22   BY MR. FORD:

23   Q.   I'm asking specifically for purposes having

24   parties.

25   A.   Define a party.  Like you mean a cookout or a



1  get together or like -- so in our home, I would say that

2  we -- there is kind of a difference.  Chris and I both

3  worked from home.  So it served as an office, a place to

4  bring clients.  Obviously we have children, a lot of

5  friends over to our home, cookouts all the time to our

6  home.  When you -- people hanging out on the back patio

7  to our home.  That's -- our home is an incredibly social

8  place.

9           And so it would not be atypical for me to be

10 out of town and people to be over.  That's one of the

11 reasons why -- it's not the reason why, but the reason

12 that that could be the case is because we were very

13 transparent with one another about who was going to be

14 over.  We Facetime a lot.  Like at any point in time, my

15 husband picks up Facetimes at restaurants, at homes, you

16 know, like people always waving kind of thing.  It's

17 not -- none of that is atypical.  Again, he's a very

18 open, transparent person.  So even if I didn't at the

19 time had access to the gate logs in this 2020 incident

20 that you reference, again, he's just -- he's very --

21 we're just very open and transparent with each other.

22      Q.   Are you aware of any get-togethers we'll call

23 them again at your home where people have consumed

24 drugs?

25      A.   I think I stated on record that my husband



1  smokes -- or not smokes, but uses marijuana.  So, yes, I
2  would be aware of people using.
3      Q.   How about anyone other than your husband,
4  get-togethers at your home where people are using
5  illegal drugs not marijuana?  Are you aware of such
6  gatherings?
7      A.   No -- well, I have never viewed --
8          MR. BELTRAN:  Object to the form.
9          THE WITNESS:  -- and I have never been told by
10     my husband about anybody using, and I don't know
11     that he has viewed anybody ever using illegal drugs.
12     I'm not saying that that hasn't happened, I'm saying
13     that I'm not aware of it.
14 BY MR. FORD:
15     Q.   So as far as you know, sitting here today,
16 you're not aware of any gatherings that have happened at
17 your home while you're not there where people have
18 consumed illegal drugs; is that fair?
19         MR. BELTRAN:  Object to the form.  Go ahead.
20         THE WITNESS:  If you're asking me have I read
21     any newspaper articles about things occurring at
22     homes where they believe some of these things went
23     on and they're stating that there were illegal
24     drugs, club drugs, or anything else in my home, then
25     it would be a leap; but I would be aware of it, yes.



 1  BY MR. FORD:

 2      Q.   And I take it from your answer -- well, do you

 3  have an opinion as to whether or not any gatherings of

 4  people while you were not there at your home included

 5  the consumption of illegal drugs?

 6          MR. BELTRAN:  I'm going to object to the form,

 7      and you're asking the witness to speculate about

 8      what happened --

 9          MR. FORD:  Keep your objection to form,

10      Mr. Beltran.

11  BY MR. FORD:

12      Q.   Go ahead.

13          MR. BELTRAN:  No, it's not --

14          MR. FORD:  Keep your objection to form,

15      Mr. Beltran.

16          MR. BELTRAN:  I'm objecting to the form.

17          MR. FORD:  Keep your objection to form.

18          THE WITNESS:  I wouldn't know.

19  BY MR. FORD:

20      Q.   Do you have an opinion as to whether such

21  gatherings actually did happen in your home while you

22  were not there?

23          MR. BELTRAN:  Same objection.  There's no way

24      she'd know --

25          THE WITNESS:  From --



1         MR. FORD:  Mr. Beltran, keep your objections to
2     form.  You continue to abuse the local rule.
3  BY MR. FORD:
4     Q.   Go ahead.
5     A.   From what I understand that there were things
6  that took place where neither my husband nor I were home
7  where there is references to illegal drugs being used,
8  but it's not just about me not being there but also not
9  my husband being there as well.
10    Q.   So as far as you know, your husband never had
11 gatherings at home while you were gone that involved the
12 consumption of illegal drugs other than possibly your
13 husband smoking marijuana; is that true?
14        MR. BELTRAN:  Same objection, and I'm not
15     abusing any local rule.
16 BY MR. FORD:
17    Q.   Go ahead.
18    A.   It's not my understanding that people are
19 openly doing drugs in my home, no.
20    Q.   If you knew that, would that bother you?
21        MR. BELTRAN:  Object to the form.
22        THE WITNESS:  Of course.
23 BY MR. FORD:
24    Q.   If people were consuming cocaine in your home
25 while you were not there, would that bother you?



1          MR. BELTRAN:  Form.

2          THE WITNESS:  If people were using cocaine in

3      my home, yes, that would bother me.

4  BY MR. FORD:

5      Q.   And what about Molly, known as ecstasy?  Would

6  that bother you if people were using that in your home

7  while you were not there?

8          MR. BELTRAN:  Form.

9          THE WITNESS:  It's not something that I would

10     prefer anybody doing.  I would be much more upset

11     about the cocaine than the club drugs.

12  BY MR. FORD:

13     Q.   Would it bother you if people were using

14  illegal Molly, ecstasy in your home while you were not

15  there?

16     A.   Of course.

17         MR. BELTRAN:  Form.

18  BY MR. FORD:

19     Q.   Because that would be illegal activity

20  happening in your own home, correct?

21         MR. BELTRAN:  Form.

22         THE WITNESS:  Right.  That would be -- yes, I

23     would not like that.

24  BY MR. FORD:

25     Q.   I want to ask you about your memory of June



 1  17th.

 2        Do you recall going to North Carolina in June

 3  of 2017?

 4     A.   In 2017?

 5     Q.   Correct.

 6     A.   Yes --

 7        MR. BELTRAN:  Form.

 8        THE WITNESS:  -- with the kids and with my

 9     husband.

10  BY MR. FORD:

11     Q.   And I think you mentioned earlier that you

12  actually went back and looked at the Heathrow HOA master

13  gate list ledger, correct?

14     A.   Uh-huh.

15     Q.   Yes?

16     A.   Yes.

17     Q.   Okay.  When did you go to North Carolina in

18  June of 2017?

19     A.   Oh, I don't remember, but we had -- the way our

20  custody arrangement worked at the time, we had a three

21  week block in the summers so that we could travel with

22  the kids.  I know we returned the kids on, I think, June

23  22nd.  We returned them, and so it would have been three

24  weeks prior to that.  So the 1st and 2nd we would have

25  had them.  That doesn't mean that we went up there right



 1  away, it just means that that occurred during that --

 2  that block of time.  So prior to the 22nd, and then I'm

 3  not sure when it began.

 4      Q.   And when you say you brought the kids, would

 5  that include Mady, Chris, Jr., and Grace?

 6      A.   No --

 7      Q.   No, not Grace because you were pregnant.

 8      A.   It was 2017.  I was pregnant.

 9      Q.   My bad.  So you took Mady and Chris, Jr., to

10  North Carolina with you?

11      A.   Yes.  That was the first -- we had bought the

12  home the year prior, so it was kind of the first summer

13  that we were getting with the home.

14      Q.   Was -- and you said that you returned on June

15  22nd; is that right?

16      A.   No.  I said we had to return the kids back to

17  their mother on June 22nd.

18      Q.   So sitting here today, do you remember more

19  specifically when you left to North Carolina?

20      A.   When I've reviewed my own looking through our

21  bank statements and things like that, I believe that we

22  came home around the 20th.

23      Q.   So my question was when you -- when did you go

24  to North Carolina?

25      A.   I don't know.  We would have been there for a



 1  while, but I couldn't tell you.  I don't know if it was

 2  we did a ten day there or we did two weeks.  I don't

 3  know what we would have -- if we did a week, if we

 4  did -- I don't -- I'm sorry.  I can't tell you.

 5      Q.  And you think you came back to Florida on what

 6  date?

 7      A.  I think it's the 20th.

 8      Q.  And did you all come back together?

 9      A.  Yes.

10      Q.  How do you know that?

11      A.  We wouldn't -- because I was pregnant I don't

12  think we would have split.

13      Q.  You don't think you would have, but do you have

14  a definite memory of the four of you coming back

15  together from North Carolina to Florida in June of 2017?

16          MR. BELTRAN:  Object to the form.

17          THE WITNESS:  I think so because I feel like I

18      drove which was a unique situation because I was

19      pregnant I would sometimes get a little bit of

20      motion sickness, but I don't remember.  So I don't

21      think it would be appropriate for me to say that I

22      have a definite memory.  Most of it, like I said, I

23      looked for gas receipts and things like that because

24      you can't make it on a full tank.

25  BY MR. FORD:



1    Q.   Is it possible that you drove home from North

2   Carolina to Florida separate from your husband in June

3   of 2017?

4    A.   I don't think so.

5    Q.   And why do you say that?

6    A.   I just don't think -- that wouldn't have

7   occurred.

8    Q.   It would not have occurred why?

9    A.   I don't know.  I would have -- if I was

10  separate, I would have flown.  Like I wouldn't have

11  driven by myself.

12   Q.   Would you have driven with the children, the

13  stepchildren?

14   A.   I just -- I don't -- I don't think so.  We

15  would have all been together.

16   Q.   And are you certain of that?

17   A.   Pretty certain, but it was a long time ago.

18   Q.   Had you came back around June 20th, did you

19  stay in Florida the rest of the summer?

20   A.   Did I?

21   Q.   Yes.

22   A.   No.

23   Q.   Did you go back to North Carolina?

24   A.   Well, I was working at the time.  I was a

25  client executive for the company, and I -- you know, I



1 had duties around the nation as well as throughout the

2 state.  I traveled for my job, not super often, but I

3 did travel.  I was gone a couple of weekends that I

4 looked up that are of particular note to you all that I

5 have been, you know, on a work trip or with my sister in

6 North Carolina for a weekend, things like that.

7     Q.   Did you go back to your home in North Carolina

8 after June 20th from that date until the end of July of

9 2017?

10     A.   Yes.  I believe I did, yes.

11     Q.   How long were you there?

12     A.   It would have been just a weekend because I was

13 working, and we didn't have good Internet there.

14     Q.   Do you recall you just went back for one

15 weekend between June 20th and the end of July 2017?

16     A.   That sounds right just because, you know, when

17 you're pregnant, you have a lot of doctor's appointments

18 and things like that and it wasn't a big -- again, we

19 had just gotten the house the year prior.  It wasn't

20 like it is now with in-ground Internet and all of the

21 things that we've done to the home.  So we were just --

22 we were building up, you know, the area.  So it wouldn't

23 have been a place that I would have stayed a long time

24 at that point.

25     Q.   So the best of your recollection is from June



1  20, 2017, to the end of July 2017 you may have gone back

2  for one weekend to your home in North Carolina?  Do I

3  have that right --

4       A.   I definitely went back for --

5       Q.   Hang on.

6       A.   I think I definitely went back for at least one

7  weekend.

8            MR. BELTRAN:   Form.

9  BY MR. FORD:

10      Q.   And in that same time period, you may have

11 taken business trips?

12      A.   In that same time period, I definitely took a

13 business trip.

14      Q.   You took a business trip.  Did you take more

15 than one business trip?

16      A.   I don't know.

17      Q.   How long was that business trip?

18      A.   I do not know.  A few days I'm sure.  IBTTA

19 typically lasts three or four days.  I don't know if I

20 cut it short, or if I -- you know, if I was going out

21 for a particular meeting, but it's a long conference.

22 It's not like a typical one- or two-day conference.

23      Q.   Was that in Dallas?

24      A.   That's correct.

25      Q.   Did you use your credit card when you were



 1  Dallas --

 2        MR. BELTRAN:  Please let the witness finish her

 3     answer before you ask the next question.

 4  BY MR. FORD:

 5     Q.   Were you in Dallas when you -- did you use your

 6  credit card in Dallas when you went to the convention

 7  you referenced or the conference?

 8     A.   I may have.  I mean, I definitely would have

 9  for a hotel -- well, I would have -- I'm sure I would

10  have had something, an Uber or been there.  What I'm

11  saying is if I was with colleagues and I was at dinners,

12  that perhaps a more senior team member would have picked

13  up I guess if that's what -- I'm just trying to be, you

14  know, fully accurate for you; but I do have records of

15  me being there.

16     Q.   Being in Dallas, Texas in 2017?

17     A.   Yes, being at the IBTTA conference.  It's

18  International Bridge, Tunnel, and Tolling Association.

19  It discusses toll ways and things like managed lanes.

20  We have a lot of those in Orlando, as you know.

21     Q.   So to the best of your recollection, you

22  returned from North Carolina to Orlando sometime around

23  June 20th.  In between that period and the end of July

24  of 2017, you remember going back for one weekend to

25  North Carolina, and you recall one business trip where



1  you went to Dallas.

2          Do I have that right?

3          MR. BELTRAN:  Form.  Go ahead.

4          THE WITNESS:  Those are -- those are things

5      that I remember.  If I went back again, I'm not

6      sure.

7  BY MR. FORD:

8      Q.   To the best of your recollection, that's what

9  you remember?

10      A.   To the best of my recollection.

11      Q.   You said that you went through various

12  documents for the weekends because -- and then you

13  looked at all us and you said, Because I knew you'd be

14  interested in that --

15      A.   No, I meant when -- when I viewed the gate logs

16  and when I was trying to figure out where I was when

17  certain events occurred, and I was narrowing in on those

18  things.  So I was not concerned with every minute of

19  every day where I am in this month's period so I was

20  focusing in more on specific dates.

21      Q.   And what were you focusing on, what specific

22  dates?

23      A.   I was focused on when I viewed that AB had

24  entered the gate log.  I don't know whether she came in

25  my home, whether she came to pick somebody up, but that



1  she was on my gate log.  I wanted to know where I was,

2  where Chris was, what was happening because I knew that

3  she was a person of interest to the FBI.

4      Q.   What other dates were you interested in?

5      A.   At that point, I was really just interested in

6  when they were saying this underage girl was in my home.

7      Q.   Did you look at any other dates other than that

8  time?

9      A.   Yeah.  I'm sure I looked at -- I was looking

10 through that entire summer, but that was kind of the

11 main -- that was the main, and I think that was in July.

12 It was a July weekend where I was in North Carolina.

13     Q.   Is that the one weekend that you referenced

14 earlier where you went away?

15     A.   That's where I -- that's the one I definitely

16 remember because I was with my sister and a lot of her

17 sister-in-laws.

18     Q.   And do you remember that was July 15th of 2017?

19     A.   Yeah, I remember that it was -- yes, that --

20 around that weekend, yes.

21     Q.   And sitting here today, you don't remember any

22 other specific dates or time periods that you were

23 looking at other than around July 15th of 2017?

24     A.   No, I looked -- for the gate logs?

25     Q.   Yeah.



1    A.   The gate logs I was just specifically looking

2  for -- I was just specifically looking for A's name as

3  this was the only -- you know, the only thing that Joel

4  and A had suggested.

5    Q.   You said you looked through other documents

6  like bank accounts to figure out whereabouts.

7        What did you look at?

8    A.   I think my credit cards I turned over to you

9  all and --

10    Q.   What credit card was that?

11    A.   Just I looked at all -- I looked at all of the

12  credit cards that I used.

13    Q.   You said you turned your credit cards over to

14  us, and I'm not sure what you're referring to.

15    A.   I had an -- I think we had a Discover card that

16  it was requested.  I think you all requested

17  household -- any household cards.  You should have

18  those.  If you'd like me to produce those, I can produce

19  those if you don't have them.

20        Are you representing that you don't have --

21    Q.   We have one page, one transaction of a Discover

22  card, and Mr. Beltran has marked that attorney eyes

23  only, so I'm not -- according to that demarkation, I

24  can't even ask you about it.  So I'll just represent to

25  you that one page has been produced to us.



 1    A.    Okay.

 2          MR. BELTRAN:  What do you want to show her?

 3          MR. FORD:  I have nothing to show her.  You

 4    marked the document attorney eyes only.

 5          MR. BELTRAN:  I'm asking you if you wanted us

 6    to -- I can look at it and see if we can lower the

 7    designation if you want, but -- if that's what you

 8    need to --

 9          MR. FORD:  I think it was made in bad faith,

10    and I'm not going to take the time to do that right

11    now.

12          MR. BELTRAN:  Well, you haven't raised that

13    issue either.  You've raised a number of other

14    issues --

15  BY MR. FORD:

16    Q.  So, Ms. Dorworth --

17          MR. BELTRAN:  Excuse me.  If you want us to

18    consider that, lowering the designation --

19          (Defendant's Exhibit 80 and Defendant's Exhibit

20  81 were marked for identification.)

21  BY MR. FORD:

22    Q.  I want to talk further about the summer of

23  2017, and you've referenced that you reviewed the

24  Heathrow ledger, so I'm going to hand you what's been

25  marked as deposition Exhibit 80, and then I'm also going



 1  to hand you what has been marked as deposition Exhibit

 2  81.  So deposition Exhibit No. 80 is a multipage

 3  document starting with bates label HeathrowMaster01 and

 4  continuing through HeathrowMaster10.

 5          And deposition Exhibit No. 81 I'll represent to

 6  you is a spreadsheet that has the entries for when you

 7  are showing up in the Heathrow ledger log and the

 8  corresponding license plate.  And I understand

 9  deposition Exhibit No. 81 you have never seen before.

10  We have created it to correspond to deposition Exhibit

11  No. 80.  So deposition number 80 --

12          MR. BELTRAN:  Hold on, Chris.  Chris are you

13      going to email --

14  BY MR. FORD:

15      Q.  -- is a document that --

16          MR. BELTRAN:  Chris.  Chris, I need a copy of

17      the exhibit.

18          MR. FORD:  Yeah, they'll send it to you.

19          MR. BELTRAN:  Can you get it to me, send it to

20      me, because it usually takes a minute to ping

21      through.  So before we go off on asking questions,

22      I'd like a copy.

23          MR. FORD:  Do you have those, Michael?

24          MR. BELTRAN:  I think it just came in.

25  BY MR. FORD:



1    Q.   Okay.  Great.  So deposition Exhibit No. 80 is

2  a highlighted version of the Heathrow master ledger

3  which goes from May 1st to August 31st, and we have

4  highlighted in yellow the times that you show up on that

5  log.

6         Okay.  Do you see that?

7    A.   Yes.

8    Q.   And then the spreadsheet I'll represent to you

9  which is deposition Exhibit 81 has the dates

10  corresponding to when you show up in that ledger and the

11  corresponding license plate number --

12         MR. BELTRAN:  Hold on.  I don't -- I don't have

13     81.  Do you have an Excel or something you're

14     sending?  Are you e-mailing that one today?

15         MR. FORD:  Yes.

16         MR. BELTRAN:  Okay.

17  BY MR. FORD:

18    Q.   So let me ask you first, deposition Exhibit No.

19  80, have you seen --

20         MR. BELTRAN:  It's not in my email.  That's not

21     the right email.  Send it to Mike@Beltranlitigation.

22  BY MR. FORD:

23    Q.   Deposition Exhibit No. 80 is the ten page

24  Heathrow guest ledger.

25         Have you seen this document before without the



 1  highlighting?

 2      A.   I have not seen the document that you have

 3  presented me.

 4      Q.   Does this look similar to what you looked at as

 5  you described earlier --

 6      A.   It does not look like this.  The gate entries

 7  do not look like this at all.  They're single day shots.

 8  You have to go through each and every day.

 9      Q.   So I'll just represent to you that Heathrow,

10  the homeowner's association, produced this document to

11  us in the case pursuant to a subpoena.

12      A.   Okay.

13      Q.   Okay.  And you can see that when you go through

14  the gates and highlighted yellow it has your name.

15  Sometimes it's in all caps, sometimes it's just your

16  first name.

17           Do you see that?

18      A.   I see that.

19      Q.   And can you describe for us what the process

20  was as of May 1, 2017, for you to enter into the

21  community where your home is located?

22      A.   The HOA had shut off our transponders because

23  we were in a legal dispute with them, and so we -- it's

24  a FDUTPA violation what they did, but they required us

25  to go to see the guard gate each time.  Our neighborhood



 1  has very strict security, and so you have to go to the
 2  guard gate and show your driver's license or provide a
 3  code.  And -- and you provide a code, and if you provide
 4  the code, then you have to start naming people on the
 5  guest list as verification.  So there is like a two-step
 6  verification process in order to do that.
 7       Q.   Okay.  So you would have to go through the
 8  guest lane in order to be admitted to the community at
 9  this point in time; is that correct?
10       A.   At this point in time, yes.
11       Q.   And when you -- as far as you're understanding
12  was because you looked at all of the information that
13  you found online, when you went through, they would
14  record your name, they being the gate personnel, and
15  your tag number; is that right?
16       A.   Well, not when I went through, but only when I
17  was driving.
18       Q.   Okay.  So when you were driving, as the driver
19  of the vehicle, they would note that it was you,
20  correct?  That was the process?
21       A.   Yes, just the driver would be noted.
22       Q.   Okay.  So if you came in as a passenger even if
23  they recognized you, they wouldn't put your name as far
24  as you understood?  It would be whoever was driving --
25            MR. BELTRAN:  Object to the form.



1          THE WITNESS:  That's -- that is my

2     understanding.

3   BY MR. FORD:

4     Q.   Okay.  Are you aware that there were times when

5   you came into the gated community as the passenger that

6   was then not recorded on the ledger?

7     A.   I don't -- well, I don't know if they saw me in

8   the car for like an Uber or something maybe they -- but

9   I don't know.  Usually they designate that.

10     Q.   Or like with your mother, Polly, if she was

11   driving in and you were with her.

12     A.   I don't -- usually it's the driver.  Yeah, it

13   would be the driver of the vehicle.  I don't -- you'd

14   have to ask them their policies and their security

15   protocols.

16     Q.   Okay.  If you look at deposition Exhibit No.

17   81, it has license plate numbers in the column.

18          Do you see that?

19     A.   That's correct.

20     Q.   And I'll just represent to you that those

21   correspond to the column in the tag number one column of

22   deposition Exhibit No. 80, okay.  And my question is

23   pretty simple which is do you recognize these license

24   plates numbers as license plates numbers associated with

25   vehicles that you or Mr. Dorworth own ed?



1     A.    No.  Some, yes; but some of these, no.

2     Q.    Which ones do you recognize that are associated

3  with the vehicles that you or Mr. Dorworth owned?

4     A.    HX or HKXOR was his Cadillac which both of us

5  would drive.

6     Q.    Yep?

7     A.    And 639PA, that's my vehicle, and I don't know

8  if we had different tags then but I don't know if I was

9  coming back from a work trip if I had a rental or

10  something like that.  I don't know.

11     Q.    What about PF29 -- excuse me, what about

12  PF329H?  Do you recognize that?

13     A.    I don't.

14     Q.    Do you see how that shows up?

15     A.    Yeah, I do.  I'm just trying to think if we had

16  different tags back then on -- what was Mady driving?

17  And you're saying these are cars that I have driven in

18  on?

19     Q.    They were tags associated with the guest name

20  Rebekah Dorworth?

21     A.    Okay.  So I'm thinking -- I'm not sure.  Maybe

22  a rental or if I took my car into the shop, and they

23  gave me a loaner perhaps.  I can't speculate on this.

24     Q.    Okay.

25     A.    I just know two of them for sure.



1    Q.   Did you have a loaner in August of 2017?

2    A.   I might have.  I mean, or just, you know, if I

3  took it in for service for the day, they would give me a

4  car back.

5    Q.   Do you see how the license plate PF329H is

6  associated with most of the entries in August of 2017?

7    A.   With me?

8    Q.   Yes, on deposition Exhibit 81.

9    A.   Yeah, I see that.  I see that.

10   Q.   And you still don't know what car that's

11 referring to?

12   A.   It's probably a rental.  I can't -- but I don't

13 know.  I don't know which car.

14   Q.   So I want to go back to the -- your answers to

15 some of the questions about what you were doing in June

16 of 2017 with the benefit of the ledger and the

17 spreadsheet in front of us.

18       Okay?

19   A.   Uh-huh.

20   Q.   So if you turn to HeathrowMaster004, do you

21 have that in front of you, the fourth page?

22   A.   Okay.

23   Q.   And you see there is an --

24   A.   004?

25   Q.   Yeah.  Do you see there is an entry for June 8,



1  2017, towards the bottom and your just first name is

2  there?  Do you see that?  So it's June 18, 2017, at 6:58

3  p.m.?

4      A.   Oh, yes.  The lower one, yes.

5      Q.   And then if you continue to go through the next

6  several pages of deposition Exhibit No. 80, your name

7  does not show up again until August 17th of 2017.  So

8  you can look through that, but I'll make that

9  representation to you, and then you can verify that by

10  turning to HeathrowMaster0088.

11          Do you see that?

12     A.   Yes.

13     Q.   Do you have an explanation as to why there are

14  no entries with your name from June 8th all the way to

15  August 17th of 2017, in deposition Exhibit No. 80?

16     A.   Yeah.  Chris was driving a lot it sounds like,

17  and I was a passenger.  I wouldn't see -- probably that

18  Chris was a passenger.  When I was going on work trips,

19  Chris would have dropped me off at the airport.  I'm not

20  as social as my husband is.  I do spend a lot of time in

21  our home.  So me not being on the gate just means I

22  wasn't driving out of the gate, but -- and I would have

23  probably been here during our -- we had a lot of

24  renovations going on.  So...

25     Q.   Is it your testimony that you never drove as



1  the driver of a vehicle into the community after June

2  8th all the way until August 17th of 2017?

3      A.   I'm telling you I was not away from my home.

4      Q.   That's not my question.

5           MR. FORD:  Can you reread my question?

6           THE WITNESS:  If your question is did somebody

7      else drive me in the gate --

8           MR. FORD:  Go ahead, reread my question.

9           (The previous question was read back.)

10          THE WITNESS:  No, I'm not logged; but, I mean,

11      it's -- I assume that I'm with Chris because Chris

12      would drive if we were together typically.  So...

13  BY MR. FORD:

14      Q.   Do you remember what my question was?

15      A.   Is it my testimony that I didn't drive my

16  vehicle?  Well, the gate log says that I didn't drive my

17  vehicle in.

18      Q.   So that is what I'm asking.  Is it your

19  testimony that you never drove your vehicle --

20      A.   No, it is my testimony that you have provided

21  me a gate log which logs when I enter the gate, and what

22  your gate log is showing me from what I can see --

23  again, this is a new document that I haven't had a

24  chance to fully review is that I was not driving my

25  vehicle through the gate for that period of time which



1   you designated.  But if my husband was driving, that

2   wouldn't be unusual at all.

3       Q.   So if you look at deposition Exhibit No. 81 and

4   you look at the spreadsheet.

5            Do you see that?

6       A.   I see it.

7       Q.   Do you see all the entries for May of 2017?

8       A.   Yes.

9       Q.   And these are all the times that you entered

10  the community as the driver according to your testimony,

11  correct?

12      A.   Uh-huh.

13      Q.   Yes?

14      A.   That --

15           MR. BELTRAN:  Object to the form.

16           THE WITNESS:  That would have been -- you know,

17       if I'm going pretty often that is typically kids

18       going to school, and kids wouldn't have been in

19       school during the summer.  There wouldn't have been

20       a purpose for me to leave.

21  BY MR. FORD:

22      Q.   So I really want you to focus on the question,

23  okay.  So my question is according to your testimony,

24  all these May entries are entries for when you were

25  drying a vehicle into the community as the driver,



 1  correct?

 2      A.   If this document is accurate.

 3      Q.   Okay.  And then we have all the times that you

 4  drove into the community on June 2nd, three times on

 5  June 3rd, twice on June 7th, and twice on June 8th,

 6  correct?

 7      A.   I'm sorry, where are we looking?

 8      Q.   Deposition Exhibit No. 81, the spreadsheet in

 9  the middle.

10      A.   Yes -- I'm sorry, those are for -- that's where

11  my Jeep was, yes.

12      Q.   And those are the times that you came into the

13  community as the driver in June, correct?

14      A.   Uh-huh.

15      Q.   Yes?

16      A.   It sounds -- I guess so --

17          MR. BELTRAN:  Objection to form.

18          THE WITNESS:  Again, I'm not -- these are new

19      documents to me.  I don't know if they're verified

20      or not.  I don't know where you pulled them from.

21      Again, based on your representation, yes.

22  BY MR. FORD:

23      Q.   And then is it possible that you were not home

24  between June 8th and August 17, 2017?

25          MR. BELTRAN:  Object to the form.



 1        THE WITNESS:  That I never came home during
 2    that period of time?
 3  BY MR. FORD:
 4    Q.   That you were not present --
 5    A.   Absolutely no.  That is -- that would not be
 6  the case at all.  We did not -- I could not have worked
 7  from there.
 8    Q.   And so your testimony is from June 8th to
 9  August 17, 2017, you never drove a vehicle into the
10  community; is that correct?
11    A.   It appears so.
12    Q.   Is it also possible that there were times when
13  you drove into the community that the entry was not
14  logged?
15    A.   I don't know.  They were pretty big jerks to us
16  at that point, and it was -- we had -- they logged it
17  every time.
18    Q.   They logged whenever you or Chris came into the
19  community every time?
20    A.   Yes.  Heathrow is known for its logging of
21  entries.
22    Q.   Are you aware of when the entries to the
23  community stopped for your husband on the log?
24        MR. BELTRAN:  I'm sorry, what was the question?
25    I didn't even hear what you said.



```
 1            THE WITNESS:  He speaks quietly.
 2            MR. BELTRAN:  Okay.  I just didn't hear the
 3       words.
 4            THE WITNESS:  Do you mind if you just speak up
 5       a little bit?  I don't mind if you yell.
 6            MR. FORD:  Can you reread my question?
 7            (The previous question was read back.
 8            MR. BELTRAN:  I still didn't hear it.
 9            (The previous question was read back.)
10            MR. BELTRAN:  Okay.  Object to the form, but go
11       ahead.
12            THE WITNESS:  No, this is the first time I have
13       seen this document.  So if there is something you
14       want me to look at, if you could draw my attention.
15  BY MR. FORD:
16     Q.   In the summer of 2017, your husband had a bank
17  account with Wells Fargo; is that true?
18            MR. BELTRAN:  Object to the form.
19            THE WITNESS:  Yes.
20  BY MR. FORD:
21     Q.   Have you taken -- have you reviewed any of the
22  banking documents that have been produced in the case?
23     A.   It's been a long time, but previously.
24     Q.   Do you have any recollection of what you saw on
25  the banking documents?
```



1    A.   No.  I mean, of my own for things that I was

2  looking for, but I don't recall.

3    Q.   What were you looking for?

4    A.   Again, where we were, you know, trying to

5  provide information to the FBI.

6    Q.   What do you remember about what you were

7  looking for on the banking documents?

8    A.   I remember that I was in town for when Ms. B

9  was making her claim -- or, well, I guess she didn't

10  know the date or time or place.  But when Joel Greenberg

11  said it was in a particular hotel, so I looked at that

12  date just to see what was going on then to try to get a

13  picture of what was happening.

14    Q.   And specifically what documents were you

15  looking at?

16    A.   Just looking through bank stuff.  Chris was

17  looking through pictures.  Anything that would be

18  helpful because he never remembered ever meeting this

19  woman, and my husband has a wonderful memory which

20  you'll find out tomorrow.  So it would be very unusual

21  for him to not remember something.  And so we were

22  trying to figure out what was happening.

23    Q.   So just so I understand, when you were trying

24  to figure out your whereabouts, it sounds like in June

25  of 2017 you looked at bank accounts and photographs?



1    A.   Gate logs.  I already told you that I looked at

2  the gate log to see who came in.  I could see that I was

3  not there -- sorry, not for the June dates I know I was

4  there, but -- because I have got credit cards showing me

5  in the area.

6    Q.   Okay.  So I just want to make sure I

7  understand --

8    A.   You say I'm not on the gate, but I know I'm in

9  Florida, and I know that I'm in the Central Florida

10 area.  So you're telling my from this time to this time,

11 is it possible you're not here?  Well, no, because I'm

12 spending money here locally, and I would not have -- I

13 wouldn't stay anywhere other than my home.

14   Q.   I'm not saying other than what's on the ledger.

15 So --

16   A.   Okay.  I'm telling --

17   Q.   My questions have been about the ledger.  So

18 what documents did you look at, your own personal

19 documents, to demonstrate that you were in Florida after

20 June 8th of 2017?

21   A.   I looked at my credit cards and bank

22 statements.

23   Q.   And what credit card statements did you look

24 at?

25   A.   I have an Amex, I have a Discover, and I had a



 1  Fairwinds bank account at that time.

 2      Q.   Any other credit card statements that you

 3  reviewed?

 4      A.   I think those are my only -- yeah, I believe.

 5  This is 2017.  I've added some since, but during that

 6  time, that's what I reviewed.

 7      Q.   Okay.  So what about bank statements?  What

 8  bank statements did you review to determine where you

 9  were in June of 2017?

10      A.   I looked at my own to see not just where I was,

11  but, you know, if we were -- we obviously -- we're best

12  friends.  We go places together.  We go out to eat all

13  the time together.

14      Q.   My question is what bank statements did you

15  look at?  That's all I'm asking for.

16      A.   Okay.  I'm trying to provide you more

17  information, so I think that would be more helpful.

18      Q.   It's not.

19      A.   I'm sorry it's not helpful to you.  I'm not an

20  attorney.  I realize you're trying to narrow it down to

21  a very specific incident, and I'm trying to be --

22      Q.   So my question is what bank statements did you

23  look at?

24      A.   I told you my Amex, my Discover, and my

25  Fairwinds bank account.  I have already answered the



 1  question, so I'm not sure why you're continuing to ask.

 2     Q.   Okay.  So when I asked what credit card

 3  statements, I would like to know what credit card

 4  statements you looked at.  You said Fairwinds, I didn't

 5  understand that was your bank account.

 6     A.   I'm sorry.  That -- I apologize.  That is a

 7  credit union.  That's my bank account.

 8     Q.   So you looked at your American Express

 9  statement, your Discover statement, and your Fairwinds

10  statement when you were trying to look at where you were

11  in June of 2017; is that fair?

12     A.   When I was looking at where I was, yes, and

13  then I, of course --

14          MR. BELTRAN:  Finish your answer, but I want to

15      take a break.

16          THE WITNESS:  And then obviously during this

17      time because my husband knew that he didn't do this,

18      he was trying to figure out where we were together,

19      where he was.  We were putting all the information

20      we could find together, and then he would look at

21      his own statements as well.  And I can't remember if

22      I logged into his bank account or not, but I might

23      have looked at it myself as well.  We shared

24      passwords for things, so that is something I could

25      definitely do because I produced them for logs.  So



1      I -- anyway.

2    BY MR. FORD:

3      Q.   You produced all these statements for logs?  Is

4    that what you said?

5      A.   I produced them to my attorney.

6      Q.   Okay.  So when you looked at those three

7    statements, what did you conclude about where you were

8    after June 8th of 2017?

9      A.   That I was in North Carolina, and that I was

10   here.

11     Q.   And when you say here, you mean Orlando,

12   Florida?

13     A.   Yes.

14     Q.   And what did you see in those statements that

15   showed you that you were here in June of 2017 but after

16   June 8th?

17     A.   I also said that we looked at photographs, and

18   Chris showed there was a picture of us kayaking with the

19   kids here in town.  So I know that that exists.

20     Q.   Did you produce those to your attorney?

21     A.   I don't have those pictures, so I didn't

22   produce anything.

23     Q.   But you looked at them?

24     A.   I think -- I feel like somebody has got a

25   picture of that.  I don't know, but I feel like that



 1  would have occurred.  I don't have those.  I don't have
 2  those photos.
 3      Q.   I want you to focus on the statements and only
 4  the statements --
 5      A.   I took out money.  I took out money --
 6      Q.   I haven't asked you a question.
 7      A.   You asked how I knew I was here.
 8      Q.   I want you to focus on the three statements
 9  that you looked at:  Your American Express, your
10  Discover, and your Fairwinds statements.
11          What did you find in those statements that
12  showed what you were doing after June 8, 2017, in
13  Florida?
14      A.   All sorts of things:  Going to the movies,
15  going to local restaurants, going shopping here.  You
16  know, all sorts of things that, you know -- it could
17  have not just been me but with the kids or with Chris.
18  It's just that record.
19      Q.   So in looking at those three statements, you
20  saw that after June 8, 2017, to the end of June 2017
21  that you went to movies and restaurants and shopping in
22  the Orlando area; is that correct?
23      A.   That's correct.
24      Q.   Anything else that your statement showed that
25  you remember?



1      A.   It showed, I think -- I think it's -- I mean,

2   some online shopping definitely.  You know, I -- Moe's

3   was a big pregnancy meal of mine.  So I really like

4   Moe's.  Still like Moe's.  And like I said, the movies,

5   you know, baby shopping I'm sure.  I remember doing that

6   as well.  So a number of things that showed me I was in

7   town.

8      Q.   And I presume you still have all those

9   statements?

10     A.   I'm sure I could get access to them if you

11  would like them.

12          MR. FORD:  Let's go ahead and take a break.

13          THE VIDEOGRAPHER:  Going off record.  The

14      approximate time is 3:12 p.m.

15          (A break was had.)

16          THE VIDEOGRAPHER:  On record.  The approximate

17      time is 3:26 p.m.

18  BY MR. FORD:

19     Q.   Ms. Dorworth, I just want to make sure when we

20  left we were talking about the three statements that you

21  reviewed to determine your whereabouts after June 8th of

22  2017 through the end of June of 2017, and it sounded

23  like but I just want to be clear that you gave those

24  documents to Mr. Beltran; is that correct?

25     A.   Yes, but I don't think they were all relevant.

 1  Like I had -- I was clearly using one card.  I didn't

 2  typically use my debit card for anything but getting

 3  cash out of the ATM, but I -- so, yeah, but I gave

 4  everything that I had over, and it was my understanding

 5  that it was produced.  That's just my understanding.

 6      Q.   That's incorrect, but we'll deal with that

 7  later?  So from June 8th --

 8          MR. BELTRAN:  Mr. Ford, excuse me, excuse me.

 9      I'm objecting.

10  BY MR. FORD:

11      Q.   -- through the end of June 2017, is it --

12          MR. BELTRAN:  I object.  Sir.  Sir.  Sir, I --

13      you are talking about things that were handled by

14      us.  I have checked with Anastasia.  The credit card

15      was produced.  We can get you the bates stamps.

16      We're looking into that now, but that is incorrect

17      that they were the things that were relevant to this

18      case.

19          MR. FORD:  So, Mr. Beltran, I think the only

20      thing that was produced and you designated an AEO

21      was one entry of a Discover card statement.

22          MR. BELTRAN:  Well, if you want to send that to

23      me, we can see about dedesignating that.  If you

24      want to show me what you're talking about, we can

25      talk about that.



1  BY MR. FORD:

2      Q.   So, Ms. Dorworth, I want to ask you questions

3  related to events of July of 2017.

4           Okay?

5      A.   Okay.

6      Q.   And I believe your testimony earlier was that

7  you did some investigation to find out what happened at

8  your residence when you were not there in July of 2017.

9           Did I understand that correctly?

10     A.   That's correct.

11     Q.   Okay.  So do you have any understanding about

12  any get-togethers that occurred while you were not at

13  your home in July of 2017?

14     A.   Yes.  I understand that when my husband was out

15  of the home that there were -- obviously A was in or at

16  least came through the gate under our homes's gate log,

17  and I understand that there is a lot of inquiry as to

18  what occurred during that time.  My husband's birthday

19  is in July, so I think a number of his friends were

20  coming through at different points in time.  And so I

21  imagine there were a number of get-togethers in July,

22  people coming over, cookouts, you know, hanging out at

23  the pool.  That would not be unusual.

24     Q.   So I appreciate that, and I'm not asking for

25  what you imagine to have happened.  I want to know what



 1  you believe happened, and so it sounds like you're aware

 2  of July 15, 2017, where Ms. B shows up on the Heathrow

 3  ledger, correct?

 4           MR. BELTRAN:  Object to the form.

 5           THE WITNESS:  Correct.

 6  BY MR. FORD:

 7    Q.   And then are you aware of -- not imagine, are

 8  you aware of any other events that occurred in July of

 9  2017 when you were not at home?

10           BY MR. BELTRAN:  Object to the form.  Go ahead.

11           THE WITNESS:  As far as like am I aware that

12      people were over at my home during that time, yes.

13      I mean, my husband, you know, would call me and tell

14      me, you know, whether friends were coming over or if

15      I would just call and say, How was your day, oh,

16      such and such.  These people are coming over tonight

17      or this or that, he was very transparent about who

18      was in our home.  So, yeah, I would -- what I'm

19      telling you is that it is typical.  I would have

20      been aware at the time I can see from the gate logs

21      that there were a number of people around his

22      birthday, but I would have known that from just us

23      talking.  Plus I know of, you know, where my husband

24      has called me particularly around, you, know his

25      birthday if, you know, if he was calling the next



1      day to say like, Oh, such and such guys were getting

2      kind of riled up or something like that.  That would

3      not be an atypical -- I mean, it would be -- that

4      would be more atypical for him to say things were

5      rowdy, but...

6      Q.   So --

7      A.   You know, that's not.

8      Q.   I would like to focus you on what you actually

9   know.  What you actually know as opposed to what you

10   imagine happened.  So we know that you looked into July

11   15, 2017.

12           Are you actually aware of any other gatherings

13   that occurred the month of July 2017?

14           MR. BELTRAN:  Object, asked and answered.  Go

15      ahead.

16           THE WITNESS:  Well, I thought he said I asked

17      and answered.

18   BY MR. FORD:

19      Q.   You haven't answered it.  You talked about what

20   you imagined or what was atypical --

21      A.   I'm not saying what I imagine.  I viewed the

22   gate logs.  I know that there has been, you know,

23   friends over at different points in time.  That's -- you

24   know, I'm not imagining that get-togethers occurred at

25   my home.  Stop saying that I imagined it because I'm not



 1  imagining it.

 2       Q.   Well, you used that word.

 3       A.   I have seen the guest logs.  I've called.  My

 4  husband calls frequently when he has, you know, talked

 5  about -- you know, just to say, Hey, such and such is

 6  coming over.  This is such a -- it's a nonissue.

 7       Q.   So I want you to be as precise as possible in

 8  answering the following question.

 9            What other gatherings other than July 15th are

10  you aware of that occurred at your home while you were

11  gone --

12            MR. BELTRAN:  Object to the form.

13  BY MR. FORD:

14       Q.   -- in July of 2017?

15       A.   I'm aware that while my husband was not at my

16  home that there was a gathering that the FBI did a full

17  investigation on and cleared my husband.

18       Q.   And that's July 15th.  I want to know about any

19  other gatherings other than that one.

20       A.   I believe that they still investigated the days

21  around that and, you know, which people were there and,

22  you know, and what was going on.  If we had friends

23  staying there that week, I'm sure there were a number of

24  get-togethers.

25       Q.   What is your understanding of who came to your



1  home while you were gone at any time other than July 15,
2  2017?
3      A.   People would have been at my home, a number of
4  people would have.
5      Q.   Who?
6      A.   Well, let's talk about it.  I guess I've got
7  the gate log right in front of me, so let's talk about
8  it.
9      Q.   Ms. Dorworth, I don't want you to refer to that
10 document --
11     A.   You gave me the document.  So if you want me to
12 go through the document --
13     Q.   I don't.
14     A.   -- I'll go through the document.
15     Q.   I don't.  Do you understand I don't want you to
16 go through it?
17     A.   Well, you seem --
18     Q.   I want to know from your memory --
19     A.   So you only want to go through documents --
20     Q.   I want to know your memory as you sit here
21 today without looking at the document which you're
22 continuing to do.
23     A.   Yeah, I'm looking at the document you handed
24 me.
25     Q.   Can you --



1     A.   Yeah, there is a number of people at my home.
2  It wouldn't be atypical for my husband's friends to be
3  at the home.  Am I aware of any other gatherings, it's
4  just such a nonissue.  I think that you really lose the
5  distinction between throwing a party, like throwing an
6  event like a Super Bowl party.  We have thrown those, or
7  throwing a party like when the Coming to America next
8  movie came out.  We threw a watch party for that.  Those
9  are parties.
10     Q.   Ms. Dorworth --
11     A.   I'm talking about get-togethers.  And
12  get-togethers were frequent get-togethers.  So, I mean,
13  are you talking about two people?  Are you talking about
14  six people?  What are you talking about?
15     Q.   Ms. Dorworth, I'd like you to describe for me
16  what you believe happened on July 15, 2017, at your home
17  while you were gone.
18     A.   I wasn't there.
19     Q.   And do you have any understanding of what
20  happened that evening?
21     A.   I know that from what I've heard -- I do not
22  have an -- I do not know what happened at my home, and
23  my husband would not know what happened at my home
24  either because he was also not there as evidence that
25  was produced to the FBI.



1      Q.   And what is your understanding about when your
2  husband was gone from the home for -- around July 15,
3  2017?
4      A.   Evidence shows that he was with Randy, very
5  typical.  I've been on a boat with Randy.  Them going
6  out playing loud music, hanging out, telling war
7  stories, real estate war stories, I have been there when
8  they've done that.  That is a very typical thing, and
9  particularly if my husband -- you know, if guests had
10  been there for several days, there would be no need for
11  him to host.  So that would be -- it would not be
12  atypical for my husband to leave the home with guests in
13  there.
14      Q.   When did your husband leave the home?  Was it
15  on July 14th or July 15th or July 16th?  Do you know?
16          MR. BELTRAN:  Form.
17          THE WITNESS:  I -- from my recollection, he
18      left at the same -- you know, around the -- he has a
19      picture, so I don't know when he left.  He could
20      have been gone very -- who knows.  He could have
21      been gone for a longer period of time, but I guess
22      we can check the gate log right here, right?  I
23      guess we can check and see what we have got.
24  BY MR. FORD:
25      Q.   Ms. Dorworth --



1    A.   When he came in.  So he was there on the 14th

2  at the house, and then it looks -- so he would have left

3  after that.  We know he's gone on the 15th, so I don't

4  know when he would have been gone on the 15th, and then

5  he comes back on the 16th according to the evidence.

6    Q.   Do you have anything other than the ledger to

7  demonstrate when your husband left your home -- hang on,

8  I'm not done -- in 2017, July 14, 15th, 16th, and when

9  he returned?

10         MR. BELTRAN:  Object to the form.

11         THE WITNESS:  I have a picture of him not being

12     home, so I know he's gone.  So it has to be sometime

13     before that time date stamp.

14  BY MR. FORD:

15    Q.   Do you have any other information other than

16  the ledger and the photograph you mentioned?

17    A.   I don't, but that seems like a lot to me.

18    Q.   Okay.  So who do you understand was at your

19  home on July 15, 2017?

20    A.   I don't know.  I understand that there were

21  people that were coming in and out that were using my

22  home as a home base.  I understand that there was people

23  logged on the gate.  I don't know -- as we can see, we

24  don't know if they're coming here to pick people up.  I

25  don't know if they're in my home.  I know what their,



 1  you know, theories of, you know, what's going on based

 2  on a bunch of conflicting witness testimony, but --

 3      Q.   So it --

 4      A.   -- I don't really know.

 5      Q.   Okay.  So it sounds like you don't really know

 6  who was at your home on July 15, 2017.

 7      A.   No, I have a gate log of -- I can tell you who

 8  came into the gate log, but I don't know when they came,

 9  if they stayed, if they were just coming to pick

10  somebody up; but, no, I would not know.  And it was

11  very -- it is very typical for my husband if somebody

12  was staying at our home for multiple days to give them

13  the -- you call in -- at that point in time, you called

14  in and you gave a gate code and you stated the name of

15  somebody was coming in the gate.  And so my husband

16  would not have had to call somebody in.  I would not --

17  when you're saying -- I would not have had to call

18  somebody in the gate in order for them to come.  Just

19  somebody with access to the code.

20      Q.   Can you hand me that deposition exhibit and the

21  other ones too?  Thank you.

22      A.   You want the pictures?

23      Q.   Yeah, I want all of them.  Thank you.

24      A.   And at some point during that summer, I can't

25  recall when, we got our transponders back, so I just



```
 1  don't --
 2      Q.   Ms. Dorworth, do you believe ███████████ was
 3  at your home on July 15, 2017?
 4          MR. BELTRAN:  I'm going to instruct the witness
 5      to finish her answer of her last question if you
 6      weren't done.
 7  BY MR. FORD:
 8      Q.   Go ahead.  Do you know whether ███████████
 9  was at your home on July 15, 2017?
10      A.   I know that she is on the gate log, and I
11  think -- I believe that she was there over a period of
12  days.
13      Q.   Do you believe that Matt Gaetz was at your home
14  on July 15, 2017?
15      A.   I don't know about the specific date, but I do
16  know that he would have been there during a period of
17  time -- ████ wouldn't have been in our home if Matt
18  wasn't there, so that would be unusual because they were
19  dating.  I'm sorry, I didn't make that clear.  Matt, at
20  this time, was dating ████████████.  And so usually
21  when I -- the only times I saw ████ were only with Matt.
22      Q.   So you believe both ██████████████ and Matt
23  Gaetz were at your home on July 15, 2017?
24      A.   I just don't know, but, I mean, my assumption
25  is that she would not be there without him unless if he
```



 1  left.  He used, like I said, home base.  So she might

 2  have stayed there while he went out and then came back.

 3  So I just don't know.  I don't want to misrepresent.

 4      Q.   And you believe your husband was not there,

 5  correct?

 6      A.   That is correct.

 7      Q.   And that he was not there until his return the

 8  following day on July 16th?

 9      A.   That's correct.

10      Q.   Okay.  And that he left on July 14th.

11           Is that your understanding?

12      A.   I thought we said he left on July 15th?  He was

13  on the gate log on July 14th I thought.

14      Q.   Okay.  And --

15      A.   But I'm not --

16      Q.   -- when do you think he left your home?

17      A.   I believe he left my home on July 15th.

18      Q.   At what time?

19      A.   I don't know because we only have that he was

20  already on the water, so it would have to have been well

21  before his picture on the water.

22      Q.   So you have no idea when he left your home --

23      A.   No, I know that it was before that time period.

24      Q.   Okay.  So --

25      A.   No, every minute of that day is not cataloged.



 1      Q.   So for purposes of the gathering that occurred
 2   at your home, your belief is that your husband was not
 3   there on July 15th?
 4      A.   No, the FBI's belief was that he was not there.
 5   The evidence --
 6      Q.   Ms. Dorworth, I'm asking for your -- you need
 7   to stick to your knowledge.  So I'm not asking about the
 8   FBI.  So my question to you is --
 9           MR. BELTRAN:  Let her finish her answer.
10   BY MR. FORD:
11      Q.   My question is --
12           MR. BELTRAN:  Let her --
13           MR. FORD:  She's not answering my question,
14      Michael.  I don't care about the FBI.
15           MR. BELTRAN:  Let her answer the question,
16      and --
17           MR. FORD:  Mike, this is just a waste of time.
18           THE WITNESS:  You don't care about the FBI?
19   BY MS. DORWORTH:
20      Q.   I'm asking about your understanding of --
21           MR. FORD:  Can you reread my question.
22           MR. BELTRAN:  Bekah, finish your answer, and
23      then Mr. Ford can ask another question.  Go ahead.
24           THE WITNESS:  I don't even remember what the
25      question was at this point.



1         Can you read back the question?

2         (The previous question was read back.)

3         THE WITNESS:  Based on the information that was

4     provided to the FBI and that I reviewed myself that

5     he was not there that evening, no.

6  BY MR. FORD:

7     Q.   What information --

8     A.   And he would have had to be gone well before

9  that in order to be on the water at that point and

10 taking a photo.

11    Q.   Where did your husband sleep the evening of

12 July 15, 2017?

13    A.   Not at my home.

14    Q.   Do you know where he slept?

15    A.   He would have slept with Randy.  That was not

16 an atypical behavior.  He has stayed the night there

17 several times, and during that time period, they were

18 very close friends.  They told stories, they drink, I

19 wouldn't want him driving.  And particularly, if I was

20 out of town, there would be no reason for him to come

21 home.

22    Q.   So is it your testimony that Mr. Dorworth slept

23 in the same location as Randy on the evening of July 15,

24 2017?

25    A.   Yes.



1    Q.   And was that on his boat or at his home or some

2  other location?

3    A.   In his home.  He had this man cave that I have

4  been in.  It's really cool.  So they would play music

5  and, you know, hang out and tell war stories, as I said,

6  and so that -- again, it's not an atypical -- it would

7  not be an atypical practice.  It wasn't all the time,

8  but it did happen a couple of times.

9    Q.   And that's what happened on July 15th, he spent

10  the night with Randy?

11    A.   That's what I believe happened, and what he

12  believe happened.

13    Q.   And your belief is based on what information

14  that you received?

15    A.   I believe that -- I believe that if I called my

16  husband and he said, I have cleared out for the night,

17  that's kind of a -- that that would have been a typical

18  conversation for us.  I'm hanging with Randy, you know.

19    Q.   And he told you that that evening that he's

20  taking off for the night?

21    A.   I can't say that I remember that, but it would

22  be such a normal conversation for us.  Particularly if

23  people had been in our home for days on end that for my

24  husband to exit.

25    Q.   Do you have a recollection of talking with your



1  husband about where he was the evening of July 15th?

2      A.   Yeah.  Yes, I do, and that's a marital

3  privilege.

4      Q.   And what did he tell you?  Did you talk to the

5  FBI?

6      A.   I did not speak to the FBI.

7      Q.   Do you know what information was provided to

8  the FBI?

9      A.   I know some of the information that was

10  provided.  I don't know all that was asked for, but I

11  know the relevant information to be as to his

12  whereabouts at this point in time.

13      Q.   So just to be clear, your understanding is

14  that --

15      A.   I was trying to --

16      Q.   -- your husband --

17      A.   I was trying to finish that what I understand

18  that was provided to the FBI was certainly that

19  photograph with the metadata, not just -- so they could

20  analyze it and see that he was -- and geolocate because

21  it is another county.  I think that's an important thing

22  to understand that this is a -- not a close by place.

23  Second thing is that I think that they had already

24  provided -- they had already probably subpoenaed the

25  gate logs, but we also provided that so they could



1  compare the times of A entered and when my husband was

2  gone and on the water.  So I know those two things

3  specifically were provided, but I'm sure they have

4  subpoenaed far more information about his whereabouts.

5      Q.    Do you have any other information other than

6  what you told me about where your husband spent the

7  night on July 15, 2017, other than what you have told me

8  about?

9      A.    No, but I would -- I don't know if you have

10  spoken to Randy or if I -- I don't know if he's -- what

11  information that he's provided.  So that would be it.

12      Q.    Do you believe that ████████████ was at your

13  home on July 15, 2017?

14      A.    She's on the gate log.

15      Q.    Do you believe that she was at your home?

16      A.    I don't know.

17      Q.    Have you ever seen a video of her walking down

18  the stairs in your home?

19      A.    I have not.

20      Q.    Do you know who ████████████ is?

21      A.    Joe's girlfriend.  Joe Ellicott's girlfriend.

22  That was who I understood her to be.

23      Q.    Who did you have that understanding from?

24      A.    My husband, and I think Joel might have said

25  that to me at that point that Joe had a girlfriend and I



1    thought that she lived with him.

2        Q.    Do you know how old ████████████ was at the

3    time she came to your home on July 15, 2017?

4             MR. BELTRAN:  Object to the form.

5             THE WITNESS:  I don't.

6    BY MR. FORD:

7        Q.    Would it surprise you if you learned that she

8    was 19 years old?

9        A.    No.

10       Q.    ████████████████████████████████

11   ██████████████████████████████████████████

12   ████████████████████

13       A.    What do you mean would it surprise me?

14            MR. BELTRAN:  Object --

15   BY MR. FORD:

16       Q.    Would it surprise you?

17            MR. BELTRAN:  Object to form.

18            THE WITNESS:  No, I have read all the papers

19       that everybody else has that there has been a lot of

20       that going on.

21   BY MR. FORD:

22       Q.    A lot of what going on?

23       A.    A lot of sex with different people.  So it

24   would not surprise me.  If the question is am I

25   surprised, no, I am not surprised.



1      Q.   ██████████████████████████████

2   █████████████████████████████████████

3   ██████████████████████

4           MR. BELTRAN:   ████████████████

5           THE WITNESS:   ██████████████████

6     ████████████████████████████████████████

7      ████████████████████████████████████████

8      ████████████████████████████████████████

9      ██████████████████████████████████████

10     ████████████████████████████████████████

11     ████████████████████████████████████████

12     ██████████████████████████████████████

13     ████████████████████████████████████████

14     ██████████████████████████████████████

15     ████████████

16   BY MR. FORD:

17      Q.   How do you know she's a sex worker, as you say?

18      A.   ██████████████████████████████

19   ████████████████████████████████████████

20   ████████████████████████████████████

21   ████████████████████████████████

22   ███████████████████████████████████

23           THE WITNESS:   Marital privilege, can I say

24      that, Mike?   Where are you?

25           MR. BELTRAN:   I'm sorry, what do you want to



```
1    say?
2         THE WITNESS:  ████████████████████████
3    ████████████████████████████████████████████
4    ███████████████
5              ██████████████████████████████████
6         MR. BELTRAN:  And I'm trying to think how you
7    would know that.  Okay.
8         THE WITNESS:  I believe in conversations prior
9    to this going on of -- I don't know.  I would --
10        MR. BELTRAN:  If it's Ellicott or something
11   like that, you can certainly testify to that.
12        THE WITNESS:  Well, I thought she was Joe's
13   girlfriend.
14        MR. BELTRAN:  Okay.
15 BY MR. FORD:
16   Q.   Where did you get the understanding that
17   ███████████████ was a sex worker?
18   A.   Like I said, I'm sure at some point I talked to
19 my husband about it.
20   Q.   And what did he tell you?
21   A.   Marital privilege I guess.  Is that what I'm
22 saying marital privilege on the conversation?
23   Q.   Are you refusing to answer the question?
24   A.   I don't know the legal --
25        MR. BELTRAN:  Hold on a second.  Hold on a
```



1    second.  ████████████  testified a couple weeks ago

2    that she was doing the Seeking Arrangements.

3         MR. FORD:  Mr. Beltran, please don't coach this

4    witness.

5         MR. BELTRAN:  I'm not coaching the witness.

6         MR. FORD:  I asked the question.  You cannot do

7    this, and you know that.  I asked the question of

8    Ms. Dorworth, how does she know that -- that

9    Ms. ██████ is a sex worker?  She said she's a sex

10   worker.  Ms. Dorworth also testified she has not

11   reviewed the deposition.  She has no idea what the

12   depositions have said.  So for you to interject

13   testimony in response to an objection -- or as part

14   of an objection is completely inappropriate and

15   improper which you know.  So --

16        MR. BELTRAN:  She's asking me whether she

17   should answer the question --

18        MR. FORD:  But it's not up to you to start

19   quoting from deposition testimony that she has no

20   idea about.

21        MR. BELTRAN:  I don't think you have a

22   legitimate basis for trying to contest that point

23   because you were there.  You know what was said.

24        MR. FORD:  I'm asking the witness for her

25   knowledge.  Her knowledge.



1        MR. BELTRAN:  And that's -- you know the

2    situation --

3        MR. FORD:  Michael, stop.  Just stop.  Just

4    stop.

5        MR. BELTRAN:  Excuse me.

6        MR. FORD:  Just stop.

7        MR. BELTRAN:  Excuse me.  You don't have a

8    basis for contesting that.  You're not asking a

9    question in good faith.  My client is asking me

10   whether or not she should invoke marital privilege,

11   and then you're asking her whether she's refusing to

12   answer the question.  We can go off the record.  I

13   can talk to my client off the record.  We can talk

14   on the record.  You can go on to the next thing, or

15   you can just stop contesting a fact that, you know,

16   to not be a reasonable dispute.  But if the client

17   asks me, then I'm going to try to counsel her.  If I

18   have to do that on the record, then fine.

19 BY MR. FORD:

20   Q.   So how do you define sex worker, Ms. Dorworth?

21   A.   Exchange of sex for payment.

22   Q.   And your understanding is that's what ▮▮▮▮▮

23   ▮▮▮▮  did?

24   A.   Later understanding.  Joel -- you know, I'm

25 probably making an assumption there.



1    Q.   Well, you used the term that she was a sex

2  worker --

3    A.   Because Joe -- I understood that she was Joe's

4  girlfriend, and that -- you know, that -- and I think

5  that there is a lot of terminology in this case around

6  sugar babies and stuff, and I think that there is a wide

7  range of what a sugar baby is.  And some of this is --

8  you know, it seemed much more transactional like have

9  sex, get paid, versus lifestyle.  So maybe she is more

10 of a sugar baby.  Maybe that's a better term to describe

11 ██████  is Joe Ellicott's sugar baby.

12   Q.   And your understanding is that she was there

13 that evening?

14   A.   No.  My understanding is that she's on my gate

15 log.  I don't know if she came to pick somebody up or do

16 other things.

17   Q.   So I'm going to show you a video that

18 Ms. ██████  has produced in this case, and this has been

19 previously marked as deposition Exhibit No. 42.  I'd

20 like you to look at the screen while this is being

21 shown.

22        (A video clip was played.)

23 BY MR. PERKINS:

24   Q.   Did you see that video, or did you need to see

25 it again?



```
 1      A.   I don't need to see it again.  It looks like
 2   she's trying to take a picture of my beautiful
 3   chandelier that I picked up.
 4      Q.   So is this your home?
 5      A.   That is my home.
 6      Q.   Does that help you understand whether
 7   Ms. ██████ was in your home?
 8      A.   It appears that Ms. ██████ is in my home.
 9      Q.   Do you have any knowledge of what Ms. ██████
10   did that evening?
11      A.   I do not have any knowledge of what she did
12   that evening.
13      Q.   Do you have any knowledge of what Ms. ██████
14   testified her interactions with Mr. Dorworth were that
15   evening?
16      A.   Chris said that she -- no.
17           MR. BELTRAN:  Hold on.  You don't have to tell
18      what you spoke about with Chris.
19           THE WITNESS:  I know.  He keeps asking about
20      questions with Chris.
21   BY MR. FORD:
22      Q.   I actually didn't ask any question.  I just
23   asked do you have an understanding of what Ms. ██████
24   testified what her interactions were with
25   Mr. Dorworth --
```



```
 1            MR. BELTRAN:  One more time, because your
 2       answer refers -- for the rest of the day, if your
 3       answer refers to something -- your answer should not
 4       be, Chris said this, or, I said this to Chris.
 5       That's going to be marital privilege.
 6            THE WITNESS:  Okay.
 7            MR. BELTRAN:  And I don't think he was -- fair
 8       to say I don't think he was trying to illicit that,
 9       but that shouldn't be part of an answer.  Go ahead.
10            MR. FORD:  Go ahead.  Can you reread my
11       question back?
12            (The previous question was read back.)
13            THE WITNESS:  Yes.
14  BY MR. FORD:
15       Q.   What information do you have?
16       A.   My understanding is that her deposition
17  testimony differed from her affidavit.
18       Q.   How do you have that understanding?
19       A.   It's something I know.
20       Q.   How do you know that?
21       A.   Through marital privilege.
22       Q.   So your testimony is that you believe that
23  Ms. ████    testified differently from her affidavit?  Do
24  I understand that correctly?
25       A.   (Witness nods head.)
```



1    Q.   Yes?

2    A.   Yes.

3    Q.   And that understanding is based on a

4  conversation that you've had with your husband, correct?

5    A.   Yes.

6    Q.   And I presume, like all other questions that

7  I've asked today that required you to give information

8  about what you've learned from your husband with respect

9  to this case, that you're not going to answer any

10  further; is that correct?

11    A.   Remember, we share a space, so a couple times I

12  walked out, you know, to the deposition and walked right

13  back in because you guys were still going or I would

14  think he was on a break and he wasn't on a break.  So...

15    Q.   So you heard some of her testimony?

16    A.   Like a question or two, and then Chris would

17  say, Get back inside.  So...

18    Q.   And so you heard her testify about what she

19  described as her interaction with your husband?

20    A.   No, I did not.

21    Q.   What did you hear her testify to?

22    A.   I can't -- like I'm saying, like it was, Go

23  back inside.  So it was not a -- you know, like I -- not

24  a party to the case.  I was not able to listen to

25  depositions.



 1     Q.   How long did you listen to the testimony?

 2     A.   I was literally in and out.  I was trying to

 3   catch him on breaks if I could see him, you know, doing

 4   other things and not looking at the thing.

 5     Q.   So I asked you how it was that you understood

 6   that her testimony was different than her affidavit, and

 7   you said you had a conversation with your husband.  I

 8   said any other reason?  You seemed to hesitate to think

 9   about that you may have heard that part of her

10   deposition.

11          Did you hear that part of her deposition?

12          MR. BELTRAN:  Object to the form.

13          THE WITNESS:  No.

14   BY MR. FORD:

15     Q.   That's your testimony?

16     A.   That's my testimony.

17     Q.   Did you know that Mr. Beltran designated that

18   entire deposition as confidential?

19     A.   That's why Chris said, Get out of here, or, Go

20   back in.

21     Q.   And did you sign the confidentiality agreement

22   at any time prior to today?

23     A.   No.

24     Q.   Have you discussed any of the deposition

25   testimony with your husband?



```
 1              MR. BELTRAN:  That's marital privilege.
 2              THE WITNESS:  Marital privilege I guess we're
 3        going with.  Marital privilege, and I am refusing to
 4        answer, yes, on marital privilege.
 5   BY MR. FORD:
 6        Q.   Are you aware that on July 15th ███████████
 7   was at your home naked with a hula hoop?
 8              MR. BELTRAN:  Object to the form.
 9              THE WITNESS:  I was not aware.
10   BY MR. FORD:
11        Q.   Would that concern you if that was happening at
12   your home?
13              MR. BELTRAN:  Object to the form.
14              THE WITNESS:  Yes, it concerns me that it was
15        occurring at my home, but I knew she was a hula
16        hooper.
17   BY MR. FORD:
18        Q.   Did you know she was a naked hula hooper?
19        A.   I think I read about that in the paper of
20   the -- showing the videos of an ex-girlfriend hula
21   hooping naked.  I believe that was written about in the
22   paper, and I just assumed it was ███.  I don't know that
23   that's her; but now based on your question, it sounds
24   like that was ███.  ███ was very proud of that talent.
25        Q.   And you said that that would concern you if she
```



 1   was using a hula hoop naked in your home.

 2          Why would that concern you?

 3      A.   Well, it would concern me if my husband was

 4   present.  He's not present, but it would concern me just

 5   generally speaking.  I would -- those aren't the types

 6   of parties that we throw.  So, yes, that would be very

 7   concerning.

 8      Q.   So if your husband -- and I understand your

 9   testimony is that he wasn't there; but if he was there

10   and she was doing that in front of him, that would be

11   concerning to you?

12      A.   That would be concerning.

13          MR. BELTRAN:  Object to the form.

14   BY MR. FORD:

15      Q.   And would it -- are you aware whether ███████

16   ██████ was in your swimming pool naked?

17      A.   Well, it looks like she was on my stairs with

18   very little clothing on, so if she was also in my

19   swimming pool, if that's what you're testifying, that

20   would not be great.

21      Q.   I'm not testifying.  So my question is, were

22   you aware that Ms. ██████ was naked in your swimming

23   pool?

24          MR. BELTRAN:  Object to the form.

25          THE WITNESS:  I'm not aware, no.



```
 1  BY MR. FORD:
 2      Q.   Would that also concern me?
 3      A.   That would be concerning.
 4           MR. BELTRAN:  Object to the form.
 5  BY MR. FORD:
 6      Q.   Are you aware that Ms. B was also naked that
 7  evening?
 8           MR. BELTRAN:  Object to the form.
 9           THE WITNESS:  I'm not aware.
10  BY MR. FORD:
11  ██████████████████████████████████████████████
12      A.   Well, particularly given that you said she was
13  underage, that is extremely concerning and particularly
14  concerning that none of those friends would report that
15  if that's what you're saying.
16      Q.   And your understanding would be that anyone at
17  ██████████████████████████████████████████████
18  ████████████████████████████████████████████
19  ██████████████
20      Q.   And certainly anyone who observed a man having
21  sexual relations with Ms. B who was 17 at the time
22  should have reported that, correct?
23      A.   Yes.
24           MR. BELTRAN:  Object to the form.
25           THE WITNESS:  I don't know who in that room
```



```
 1        knew she was 17 and thought she was a different age
 2        based on her Seeking Arrangements profile, so
 3        obviously the person who had the knowledge that she
 4        was 17 would be the person who had the most onus of
 5        reporting it.
 6   BY MR. FORD:
 7        Q.   And you're aware that she presented her real
 8   driver's license to the gate guard when she came into
 9   the community, correct?
10             MR. BELTRAN:  Object to the form.
11             THE WITNESS:  It would not be a -- well, are
12        you suggesting that the gate guard would have to --
13   BY MR. FORD:
14        Q.   No, I'm just asking are you aware of that, that
15   she presented her real driver's license when she entered
16   the community?
17        A.   Well, she would have to.  It's required, but
18   the gate -- we have obviously a daughter that's a year
19   younger than her, so it would not be atypical for him to
20   see a teenager or her to see a teenager coming into our
21   gate.
22        Q.   Have you seen any pictures of Ms. B of what she
23   looked like at the time in the summer of 2017?
24        A.   I have not.
25        Q.   Are you aware that -- well, first of all, let
```



```
 1  me ask you this:  Do you have in your house -- in 2017,
 2  did you have a room that had a pool table in it?
 3      A.   No.
 4      Q.   Any kind of game table?
 5      A.   Uh-huh.
 6      Q.   Yes?
 7      A.   Yes.
 8      Q.   What was the game table?
 9      A.   It's an air hockey table.
10  ███████████████████████████████████████
11  ███████████████████████████████████████████████
12          MR. BELTRAN:  Object to the form.
13          THE WITNESS:  No.
14  BY MR. FORD:
15      Q.   This is the first you've heard of that?
16      A.   That's the first I've heard of it.
17  ███████████████████████████████████████
18  █████████████████████████████████████████████████
19  █████████████████████████
20      A.   I have not heard that.
21      Q.   Would that concern you?
22      A.   It would.
23          MR. BELTRAN:  Object to the form.
24  BY MR. FORD:
25      Q.   Why?
```







1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25          MR. BELTRAN:  Object to the form.



```
 1          THE WITNESS:  I'm not aware of that.
 2  BY MR. FORD:
 3     Q.   Would that trouble you if that was true?
 4     A.   Yes.
 5          MR. BELTRAN:  Object to the form.
 6  BY MR. FORD:
 7  ████████████████████████████████████████
 8  ███████████████████████████████
 9  █████████████████████
10  ███████████████████████
11  ██████████████████████████████
12  ███████████
13  █████████████████████████████
14     A.   I have not.  I have seen it on the gate log I
15  think that you showed me, but I'm not aware of her.
16     Q.   Do you remember -- did you have any discussion
17  with your husband on July 15, 2017?
18     A.   I'm sure I did speak to him.  I speak to him
19  every day, so -- but I don't have a specific
20  recollection, no.
21     Q.   Have you ever looked at your cell phone records
22  to see when you talked with your husband?
23          MR. BELTRAN:  Hold on.  I want to counsel the
24     witness, you can talk about the cell phone records,
25     the call logs.  Don't divulge contents of any
```



```
 1      communications.  Thank you.

 2           THE WITNESS:  I have not looked at my call log.

 3      I can do that.

 4  BY MR. FORD:

 5      Q.   You can do that?

 6      A.   I don't know that I can do that, but I can

 7  attempt to do that.

 8      Q.   Who is your carrier?

 9      A.   AT&T.

10      Q.   And was AT&T --

11      A.   I don't know.  Yes, AT&T has always been my

12  carrier, yes.  But I also had a -- I think I had a work

13  phone at the time which I'm no longer in possession of

14  because it's -- I'm no longer with Kyra Solutions, but I

15  could check my -- what I do have.

16      Q.   That'd be great.  But sitting here today, you

17  don't have any specific memory of talking with your

18  husband on July 15, 2017; is that correct?

19      A.   I do not.
```





1

2

3

4

5

6

7

8

9

10

11

12        MR. BELTRAN:  Are we marking an exhibit, or

13    what's going on?

14        MR. FORD:  Yeah, we are.  This is deposition

15    Exhibit No. 82.

16        (Defendant's Exhibit 82 was marked for

17  identification.)

18        MR. BELTRAN:  Okay.  Email that to me, please,

19    so I can get that.

20        THE WITNESS:  Can I get a time check?

21        THE VIDEOGRAPHER:  Five hours, 25.  Somewhere

22    in there.

23        THE WITNESS:  Do you have logged when our last

24    break was?

25        THE VIDEOGRAPHER:  Yes.



1          MR. BELTRAN:  Do you need a break?  It's -- I

2     think we are at -- do you need a break, Rebekah?

3          MR. FORD:  Let me just finish this line of

4     questioning, and then we can take a break.

5          MR. BELTRAN:  Well, you haven't started --

6          THE WITNESS:  Yeah, we haven't started a new...

7          MR. FORD:  It is -- this is the same line of

8     questioning.  This is deposition Exhibit 82.

9          MR. BELTRAN:  Is someone emailing it to me?

10         MS. WOLF:  Mike, I am getting it to you.

11         MR. BELTRAN:  Okay.

12         MS. WOLF:  Just wait a second.

13         THE WITNESS:  Do you want me to read this?

14  BY MR. FORD:

15     Q.  No.  All right.  Thank you.  Okay, deposition

16  Exhibit No. 82 is a letter from Richard Hornsby to Todd

17  Gee and Lauren Britsch, Assistant United States

18  Attorneys, at the United States Department of Justice,

19  dated October 4, 2021, and I'll just represent to you

20  that Mr. Hornsby was the attorney who was representing

21  your husband, the criminal defense attorney at that

22  time.  And I would like to direct your attention to page

23  five of deposition Exhibit No. 82, and I'm going to read

24  you an excerpt from that letter at the top?

25     A.  I'm sorry, which page are we --



1    Q.    Page five of 7 at the very top.

2    A.    Okay.

3    Q.    Mr. Hornsby writes to the Department of

4  Justice, You further mentioned several more text

5  messages between Mr. Dorworth and Mr. Ellicott the

6  morning of July 16, 2017, where Mr. Ellicott texted

7  Mr. Dorworth.  ███████████████████████████

8  ███████████████████████████████████████████

9  ███████████████████████████████████████

10 ███████████████████████

11       ████████████████████████████

12 ███████████████████████████████████████████

13 ███████████████████████████████████████████

14 ███████████████████████████████████████████

15 ███████████████████████████████████████████

16 ██████████████████

17       Have you ever seen that text message exchange

18 between Mr. Dorworth and Mr. Ellicott?

19    A.    I have not.

20    Q.    And --

21    A.    What are the few more text messages?

22    Q.    They're not referenced in this letter.

23    A.    Mr. Ellicott follows up with a few more text

24 messages.  Oh, you're saying they're not --

25    Q.    They're not in this letter.  So given --



1    A.    So Mr. Ellicott didn't provide those?

2    ████████████████████████████████████

3    ████████████████████████████████████████

4    ████████████████████████████████████████

5    ████████████████████████████████████████

6    ████████████████████████

7         MR. BELTRAN:  Object to the form.

8         THE WITNESS:  I would think my husband is

9    joking.

10   BY MR. FORD:

11   Q.    You would think he was joking?

12   A.    Yes.

13   Q.    Why would you think that?

14   A.    ████████████████████████████

15   ████████████████████████████████████████████

16   ████████████████████████████████████████

17   ████████████████████████████████████████████

18   ████████████████████████████████████████████

19   ████████████████████████

20   Q.    Okay.  So you think this is all just a joke?

21   A.    I think you'd have to ask Fish.

22   Q.    I'm asking you.

23   ████████████████████████████████████

24   ████████████████████

25   Q.    ████████████████████████████



```
 1  ███████████████████████████████████████████

 2  ██████████

 3          MR. BELTRAN:  Object to the form.

 4  ████████████████████████████████████████

 5  █████████████████████████████████

 6  ███████████████████████████████████████

 7  ██████████████████████████████████████

 8  ██████████████████████████████████

 9  BY MR. FORD:

10  ██████████████████████████████████████

11  ███████████████████████████████████████████

12  ████████████████████████████████████

13  ███████████████████████████████████████

14          MR. BELTRAN:  Object to the form.

15          THE WITNESS:  Yeah, I would not agree with

16     that.

17  BY MR. FORD:

18     Q.   You would find it morally reprehensible,

19  correct?

20     A.   I said I would not agree with it.

21     Q.   Are you saying something different than what

22  you said earlier today?

23  ██████████████████████████████████████

24  ███████████████████████████████████████████

25  ██████████████████████████████████████
```



1 ████

2 █████████████████████████

3 ████████████████████

4 █████████████████

5 ██████

6          MR. BELTRAN:  Object to the form.

7          MR. FORD:  Okay.  Let's go ahead and take a

8 break.

9          THE VIDEOGRAPHER:  If there are no objections,

10 going off record.  The time, 4:16 p.m.

11          (A break was had.)

12          THE VIDEOGRAPHER:  On record.  The approximate

13 time is 4:27 p.m.  This is media unit four.

14          MR. BELTRAN:  Okay.  This is Mike Beltran.  We

15 checked the -- Mr. Ford said that there is some

16 claim there was some financial documents that

17 weren't produced, but we went back and checked.  We

18 have produced Amex, Discovery (sic), and Wells Fargo

19 documents that are being recirculated or will be

20 recirculated shortly by Anastasia.  I counted at

21 least 37 pages of documents.

22          They were some of the Discover -- or some of

23 the Amex and one of the Discovery documents were

24 marked AEO.  I'm going to withdraw that designation

25 so you can use them with the witness, but all of



 1   these were produced in January or March of this

 2   year.  So those were produced.  So any assertion

 3   that we didn't produce is incorrect.  In any event,

 4   we'll recirculate those, and we'll take off the AEO

 5   designation.  You're free to use those pending that,

 6   you can use the reproduced version.

 7        MR. SCHELLER:  I'm sorry, Mike, how long do we

 8   have now not counting breaks?  How much time has

 9   elapsed in the depo?

10        THE VIDEOGRAPHER:  Approximately five hours, 34

11   minutes.

12        MR. SCHELLER:  Thank you.

13        MR. FORD:  And just to respond to what you've

14   said, Mr. Beltran, obviously by marking documents

15   attorney's eyes only, the confidentiality agreement

16   precludes us from showing those to anyone other than

17   who are listed in the confidentiality agreement and

18   precludes us certainly from showing it to a witness.

19   So your dedesignation towards the end of a

20   deposition is not significant.  So we're going to

21   leave the deposition open to come back to those

22   documents because I don't have time to deal with

23   those at this late point in the deposition.

24        MR. BELTRAN:  I've told you three times now

25   that you're free to use them.  I told you that



```
 1        originally this morning, and you never told me any
 2        and concern about an AEO designation.  You told me
 3        concerns about other AEO designations.  You know how
 4        to raise that concern, and you've done it on
 5        multiple occasions and you didn't do that or say
 6        that you needed to show it to the witness.  You
 7        still have plenty of time to go through this
 8        documents, and I've told you to tell me what
 9        documents you'd like to use and I'd dedesignate
10        them.  I've been telling you that for several hours
11        now.  So we're not leaving the deposition open, but
12        go ahead and use your time however you want.  If you
13        want to ask about the documents, you've got plenty
14        of time to do that.
15  BY MR. FORD:
16      Q.   So, Ms. Dorworth, I'm going to show you what's
17  been marked as deposition Exhibit No. 42 --
18           MR. BELTRAN:  The rest of the documents were
19        never marked.  Excuse me, the rest of the documents
20        were never marked AEO.  So if you want to use those,
21        those have been produced, and you have erroneously
22        said we haven't produced them.  So we looked into
23        that, so I don't know what you made that assertion
24        but go ahead.
25  BY MR. FORD:
```



1    Q.   Ms. Dorworth, you have been shown what has been
2  previously marked as deposition Exhibit 42.  This is a
3  document that was produced by Ms. ███████ in response to
4  a subpoena that was served on her, and I'd like for you
5  to look at that.
6        Do you have that in front of you?
7    A.   I can view it on the screen.
8    Q.   Okay.  Do you recognize the gentleman in the
9  upper left corner as Joe Ellicott?
10   A.   It's a really small photo.
11       MR. BELTRAN:  Chris, this is 42 or 44?
12       MR. FORD:  I'm sorry, 44.
13       MR. BELTRAN:  Okay.  Thanks.  I've got it.
14       THE WITNESS:  It looks -- I haven't seen him in
15    a long time, but it looks roughly similar to who I
16    remember.
17  BY MR. FORD:
18  ████████████████████████████████████████████████
19  ████████████████████████████████████████████████
20  ████████████████████████████████████████
21     █████████████████████
22     ██████████████████████████████
23     ████████████████████████████████████████
24   █████████
25  BY MR. FORD:





14  BY MR. FORD:



```
 1   BY MR. FORD:
 2   ███████████████████████████████████████
 3   ███████████████████████████████████████
 4   ███████████████████████████████████████
 5   ███████████████████████████████████████
 6           MR. BELTRAN:  Object to the form.
 7           THE WITNESS:  I don't see anywhere on here
 8      where my husband's number is listed.  On everything
 9      else you have shown me, my husband's number is
10      listed or his name is listed.  You've gotten these
11      from ████████.  They're her conversation with Joe.
12      My husband is not even represented here so --
13   BY MR. FORD:
14      Q.   So just stay with me.
15      A.   So Joe is saying that.
16      Q.   So assuming that that is --
17      A.   Why would I -- Why would I assume something
18   like that about my husband?
19      Q.   So --
20      A.   I wouldn't assume that because this is not what
21   it's showing.
22      Q.   But you have already seen in the letter from
23   Mr. Hornsby --
24      A.   No.  I saw in the letter from Mr. Hornsby that
25   the FBI represented that maybe there was a conversation,
```



1  but there is no text message in there from that.  And is
2  this the text message that they're telling me that they
3  used it off of?  Because if this is it, then like his
4  name's not even -- this isn't -- we don't even know that
5  it is from him.
6      Q.   Okay.  So is it your testimony that this is not
7  from him?
8          MR. BELTRAN:  Object to the form.
9          THE WITNESS:  It's my testimony that there is
10     no evidence on this document there showing that this
11     came from my husband.
12  BY MR. FORD:
13     Q.   Okay.  And I want you to assume that it did.
14         MR. BELTRAN:  Object to the form.
15  BY MR. FORD:
16     Q.   So you can dispute that whether it happened or
17  not --
18     A.   I will not answer a question of a hypothetical
19  of something that does not even show my husband's name
20  on it or his phone number.
21         Can you produce the text with the phone number
22  on it?  If you do that, okay, let's talk about that.  I
23  still think it's a joke.  ████████████████████████
24  ████████████████████████████████████████████
25     Q.   Okay.  So assuming that is from your husband,



```
 1  you would perceive it still to be a joke?
 2          MR. BELTRAN:  Object to the form.
 3          THE WITNESS:  It -- this is -- this is
 4      ridiculous.  Your other text messages, they look
 5      different.  They're captured different.
 6  BY MR. FORD:
 7      Q.   Can you answer my question, please.
 8      A.   All the sudden you have this.  I think you're
 9  misrepresenting things.
10          MR. FORD:  Can you reread my question?
11          (The previous question was read back.)
12          THE WITNESS:  It's not --
13          MR. BELTRAN:  Object to the form.
14          THE WITNESS:  I can't see that it's from my
15      husband.
16  BY MR. FORD:
17      Q.   So if you can take a look at deposition Exhibit
18  No. 82 which I handed you previously which is the letter
19  that your husband's lawyer sent the Department of
20  Justice on October 5, 2021, and if you can go toward the
21  bottom of deposition exhibits -- or page number 1079,
22  that's page five.
23          Do you see that?
24      A.   Sorry, we're on 79, bottom paragraph.
25      Q.   Yep.  And I'm just going to read it to you.
```



1    Given Mr. Fischer's medical condition and close

2    relationship with Mr. Dorworth --

3        A.    Wait, the paragraph before the bottom of the

4    page.  Okay, sorry.

5        Q.    You with me?

6        A.    Uh-huh.

7        Q.    Yes?

8        A.    I know where you are at, yes.

9    ████████████████████████████████████████████████

10   ███████████████████████████████████████████

11   ████████████████████████████  ██████████████████

12   ██████████████████████████  ████████████████████

13   █████████████████

14          So given that your husband's own lawyer wrote

15   to the Department of Justice that that was his

16   statement, do you still believe that to be a joke?

17          MR. BELTRAN:  Object to the form.

18   ██████████████████████████████████████

19   ███████████████████████████████████████████

20   ██████████████████████████████████

21   ███████████████████████████████████████

22   █████████████████████

23   BY MR. FORD:

24   █████████████████████████████

25   ████████████████████████████████



1   ████████████████████████████████████████

2   ████████████████████

3        Q.   You don't get to ask questions in the

4   deposition, Ms. Dorworth.

5             My question to you is given that your husband's

6   own lawyer represented to the Department of Justice that

7   he wrote that text that you strongly disputed was his,

8   do you still believe that that statement was just a

9   joke?

10            MR. BELTRAN:   Object to the form.

11            THE WITNESS:   I don't think the statement

12       exists.  My number's isn't on it.  My husband

13       wouldn't say that to anyone, and I'm sure, as his

14       attorney, he was trying to cover all possible angles

15       but my husband wouldn't say that.  And if you look

16       up at the top, it says, that you mentioned more text

17       messages.  They're talking about that they've

18       mentioned it.  You know, if they're talking about

19       this text message, then, no.  I mean, I wouldn't

20       even -- this is ridiculous.  ████████████████████

21   ████████████████████████████████

22   BY MR. FORD:

23       Q.   So fair to say that --

24       A.   I think that he was -- I think if he would be

25   excited about Mr. Fish --



1    Q.   Ms. Dorworth, please let me finish --

2    A.   -- having --

3    Q.   -- my question.  So from your understanding,

4    what Ms. Hornsby wrote to the Department of Justice was

5    inaccurate from the portion I just read you?

6         MR. BELTRAN:  Object to form.

7         THE WITNESS:  I don't know what -- I don't know

8    what Mr. Hornsby, what he determines as morally

9    reprehensible.  You asked me what I thought was

10   morally reprehensible.  You didn't ask me what his

11   attorney thought was morally reprehensible.

12        MR. FORD:  Can you answer -- can you reread my

13   question, please?

14        MR. BELTRAN:  Object to the form.

15        (The previous question was read back.)

16        MR. BELTRAN:  Object to the form.

17        THE WITNESS:  No -- I'm saying that these text

18   messages do you not have any information on it that

19   would lead me to believe that this is my husband

20   with any accuracy or evidence.

21   BY MR. FORD:

22   Q.   I understand.  Thank you.  I want to ask you

23   questions about a gathering that occurred one week later

24   on July 22, 2017.

25   A.   Okay.



 1    Q.   Have you done any investigation to look at what
 2   happened that evening at your home?
 3    A.   I know there was a party at my home.  I mean --
 4    Q.   Who was there?
 5    A.   -- it seemed like there was a number of people
 6   there.
 7    Q.   Was your husband there?
 8    A.   I believe so, yes.  I think because I -- I do
 9   remember him calling, and I think it was after that
10   weekend, the second weekend, just about things getting
11   rowdy.  I think someone's cell phone got taken.  It was
12   unusual.  There was just some -- it seemed like there
13   was some odd things that were occurring, but it -- you
14   know, mostly just guys, you know, and I think Megan
15   Zalonka is on the gate there.  She would be with
16   somebody.
17    Q.   So your husband was there, Megan Zalonka was
18   there, correct?
19         MR. BELTRAN:  Object to the form.
20         THE WITNESS:  She's on the gate log, so I don't
21      think if she was coming to pick someone up, but I
22      assume that she was -- I mean, I don't want to
23      assume so, but she's on the gate log.
24   BY MR. FORD:
25    Q.   Do you have any reason to believe that she was



1  not there?

2      A.   I was not there, so that would be the reason

3  that I wouldn't believe she was there but I don't have

4  any reason not to believe.  I don't have any reason to

5  believe that she would not be there.

6      Q.   Who else was there?

7           MR. BELTRAN:  Object to the form.

8           THE WITNESS:  I remember -- I just -- I don't

9       know what times people were there, but I think

10      different people came in and out.  Remember, this

11      was like kind of a week long thing.  So I don't know

12      who came the day before or after or around there,

13      but it was my husband's kind of birthday weekend,

14      and I'm sure all sorts of people stopped in that

15      were his buddies.

16  BY MR. FORD:

17      Q.   Who else was there besides your husband and

18  Megan Zalonka?

19      A.   I don't know Matt may have still been there.  I

20  don't know if he was.  Jason may have been there.  I

21  don't know if he was.  Frank or Rich or just, you know,

22  just his buddies coming in and out for his birthday.

23      Q.   Do you know whether any of those persons Matt,

24  Jason, Frank, or Rich were there?

25      A.   I don't know.



1      Q.   So as far as you know, the only people you can
2   say that were at your house on July 22nd were you
3   husband and Megan Zalonka?
4      A.   There were other people at my home.
5      Q.   But you don't --
6      A.   And Megan would not have been at my home
7   without Matt or somebody else.
8      Q.   Okay.  But you just don't know other -- you
9   know there were other people, but you don't know who
10  they were; is that fair?
11     A.   Well, I think I mentioned people who I believe
12  were there around that timeframe.
13     Q.   Okay.  So do you believe that Matt Gaetz,
14  Jason, Frank, and Rich were there?
15     A.   Yeah, but I believe that they were around that
16  time period, yes.
17     Q.   And by Frank, you're referring to Frank
18  Artiles?
19     A.   Yeah, he would have stopped in at some point
20  during that week.
21     Q.   What's your understanding of what happened the
22  night of July 22, 2017, at your home?
23     A.   A pool party.  That's kind of -- typically they
24  would have been hanging out, back patio, grilling out.
25  That would be -- I mean, just them drinking and just



1  telling stories.

2      Q.   So your understanding --

3      A.   They like to tell stories.

4      Q.   So your understanding of what happened on July

5  22, 2017, at your home when you were not there is that

6  the participants had a pool party, were drinking

7  alcohol, and telling stories?

8  ██████████████████████████████████

9  ████████████████████████████████████████

10 ████████████████████████████████████████

11 ██████████████████████████████████████████

12 ████████████████████████████████████

13 ██████████████████████████████████████████

14 ██████████████████  I don't know what else.  I don't

15 know if other things occurred there is what I'm trying

16 to tell you.

17      Q.   But those three things is what you believe

18 occurred, and there may be other things?

19           MR. BELTRAN:  Object to the form.

20           THE WITNESS:  I don't know because I wasn't

21      there.  So if other people are testifying to other

22      things that occurred, I wouldn't be able to say

23      whether or not those things were accurate.

24 BY MR. FORD:

25      Q.   I'm just asking from your personal knowledge.



1        Do you have any personal knowledge of what

2   happened that night?

3        A.   Just like I said that I remember my -- oh, I

4   think maybe there was Brady Benford.  I feel like maybe

5   he was on the gate log, maybe not.  He would have been

6   there sometime that week.  There were -- like I said,

7   there was a lot of things going on a lot of days, █████

8   ████████████████████████████████████████████████████████

9   ███████████████████████████████████████████████

10  ████████████████████████████████████████████████████████

11  ████

12  ████████████████████████████████████████████████████████

13  ████

14  ███████████████████████████████████████████████████████

15  █████████████

16       Q.   Okay.  All right.  So it sounds like what you

17  know is that July 22, 2017, there was a gathering of

18  people, alcohol was consumed, there was a pool party,

19  they were telling stories, and things got rowdy; is that

20  right?

21            MR. BELTRAN:  Object to the form.

22            THE WITNESS:  Yeah.

23  BY MR. FORD:

24       Q.   Anything else to add to that?

25       A.   Not at this time.



1   Q.   Are you aware that Megan Zalonka was running

2   around topless in your home that evening?

3   A.   I --

4        MR. BELTRAN:  Object to the form.

5        THE WITNESS:  I am certainly not aware of that.

6   BY MR. FORD:

7   Q.   Would that bother you if that were to be true?

8   A.   Yes, that would bother me.

9   Q.   Why?

10  A.   You know --

11       MR. BELTRAN:  Object to the form.

12       THE WITNESS:  If my husband hadn't gone to bed

13  yet, that is not something I would appreciate him

14  viewing.

15  BY MR. FORD:

16  Q.   Do you know whether he did view that?

17  A.   Well, since he didn't share with me and that is

18  something he would have definitely disclosed because if

19  I had heard about it from someone else other than him

20  that would have been very detrimental.  So I believe he

21  did not view that.

22  Q.   Any other information that you have about what

23  happened at your home on July 22, 2017 --

24       MR. BELTRAN:  Excuse me, I'm going to counsel

25       the witness not to discuss marital communications.



 1      Go ahead.

 2           THE WITNESS:  Okay, sorry.  I do not.

 3           (Defendant's Exhibit 83 was marked for

 4  identification.)

 5  BY MR. FORD:

 6      Q.   The court reporter has handed you what has been

 7  marked as deposition Exhibit 83 which is a letter from

 8  Richard Hornsby to Todd Gee the assistant US attorney --

 9      A.   Is this a different letter?  Okay, different

10  letter.

11           MR. BELTRAN:  Can you guys send me that,

12      please?

13           MR. FORD:  Laura is going to send it to you.

14  BY MR. FORD:

15      Q.   Deposition Exhibit No. 83 is a letter from

16  Richard Hornsby to Todd Gee dated May 7, 2021.  I take

17  it that you have never seen deposition Exhibit No. 83?

18      A.   I have not seen this letter, no.

19      Q.   Okay.  So if you could take a look at the

20  second page of that exhibit at the -- actually, let me

21  start with the first page at the last sentence.  Okay,

22  and I'm just going to read it to you.

23      A.   Oh, okay.  Second page.

24      Q.   Starting with the bottom of the first page, got

25  that?



1    A.    Uh-huh.

2    Q.    Okay.  So it says towards the bottom, Which

3    means that Mr. Dorworth could not have been home when

4    Ms. B arrived at his residence, and she likely was not

5    at his residence when he returned from boating which

6    would explain why he has no recollection of meeting her.

7    So that is a statement that your husband's attorney made

8    to the US Department of Justice.

9          Does that change your testimony about where

10   your husband was the evening of July 15th into July

11   16th?

12   A.    No, it confirms --

13         MR. BELTRAN:  Object to the form.  Go ahead.

14         THE WITNESS:  It confirms that he was, in fact,

15   out boating, but -- so I don't know why it would say

16   returned to boating or boating with Randy.  I'm

17   sure -- I don't know if that's before -- before we

18   realized -- I was the person who figured out -- I

19   couldn't figure it out at first why we were all on

20   the gate logs.  We had completely forgot about the

21   HOA lawsuit because we were trying to find out, like

22   you said, when did you come back?  That's a question

23   anyone would have, right?

24         And so -- you know, and I was the one who

25   realized, oh, the reason we're on the gate because



```
 1      of the lawsuit, and they were tracking every single

 2      move.  And so because I knew also that it's not

 3      atypical for him to have spent the night at Randy's

 4      as he had done a couple of times, several times,

 5      that -- you know, I don't know that that information

 6      was updated.  I don't.

 7   BY MR. FORD:

 8      Q.   And so it's your testimony that your husband

 9   did not return home until July 16th of 2017; is that

10   correct?

11           MR. BELTRAN:  Object to the form.

12           THE WITNESS:  I didn't hear what he said.

13           MR. BELTRAN:  I'm objecting to the form.  I

14      don't know how you'd know.

15           THE WITNESS:  I was just saying that based on

16      what I viewed and what I know to be true about what

17      was occurring with our HOA at the time that he has

18      not -- he did not return until the next day.

19   BY MR. FORD:

20      Q.   And this letter doesn't change your perspective

21   of that?

22      A.   No, not at all.

23           MR. BELTRAN:  Object to the form.

24           THE WITNESS:  Like I said, I don't know that he

25      would have known at the time, his attorney.
```



1   BY MR. FORD:

2      Q.   The following pages of the letter which has

3   been marked as deposition Exhibit 83 has an Exhibit A.

4          Do you see that?

5      A.   I'm sorry, 83?  No, we're still on 83?

6      Q.   Correct.

7      A.   What page?

8      Q.   Exhibit A, which would be page three.

9      A.   Okay.  Yes, I'm here.

10     Q.   Are these the ledger entries that you

11  collected?

12     A.   What I viewed, they look like this.

13     Q.   And did you download these and print them?

14     A.   I believe I did not.  I believe Chris would

15  have done that for his attorney.  I don't know what he

16  did with his attorney, but I just viewed them.

17     Q.   Do you recall when your husband decided to

18  resign from Ballard?

19     A.   It was in April of 2000 -- or no.  It was the

20  spring of 2021.

21     Q.   And do you have any more specific recollection

22  as to when that occurred?

23     A.   April 9th or 10th.  It was right around there

24  that he actually resigned.  It was a quick -- it was a

25  quick situation.



1     Q.   When did he decide to resign?

2          MR. BELTRAN:  Object to the form.  I'm just

3     going to -- you should not divulge any marital

4     communications.  If you know from some other source,

5     then you can tell Mr. Ford.

6          THE WITNESS:  Yeah.  He sent a tweet out that

7     he resigned on the date, and I believe it was in

8     that -- or maybe it was the 6th.  I don't know.  It

9     was in early April.

10   BY MR. FORD:

11    Q.   Had he made the decision prior to the tweet to

12   resign?

13    A.   To resign?

14    Q.   Yes.

15    A.   No.  He really -- I think they were really

16   trying to avoid that situation.

17    Q.   So is it your testimony that he had not decided

18   to resign prior to the moment he sent that tweet out?

19         MR. BELTRAN:  I'm going to object to that and

20    also counsel the witness not to divulge marital

21    communications.  If you have discussed it with other

22    people or a tweet or something, you can testify to

23    that.

24         THE WITNESS:  No, it was -- it was a very

25    abrupt situation.



 1  BY MR. FORD:

 2      Q.   That day?

 3      A.   I don't recall.  I just don't.

 4      Q.   What do you mean by abrupt?

 5      A.   Abrupt in the sense that obviously there was

 6  this information circulating.  There was a lot of news

 7  stories.  Press was getting called.  Press was calling

 8  in regards to Joel, wanting information about Joel, and

 9  you'll be able to ask Chris.  He'll know all the dates.

10  That time is really a blur, but it was, I think -- you

11  know, it was just inundation of media.  It was a

12  difficult period.

13      Q.   So you can't say specifically when he decided

14  to resign other than --

15      A.   No, you'll have to ask Chris.  I just know when

16  he sent his resignation letter out to the public.

17      Q.   Did he make that decision without speaking to

18  you?

19          MR. BELTRAN:  Object to the form.  You don't

20      have to -- why are you asking these questions?

21      You're asking marital communication.  Why are you

22      doing that?  Please stop.  You've been doing it all

23      day.  Sometimes you deliberately elicit it,

24      sometimes you don't.  This time you're specifically

25      eliciting it.  Please stop.



 1          MR. FORD:  I'm not asking for direct

 2     communications.

 3          MR. BELTRAN:  You said, Did he discuss it with

 4     you?

 5          MR. FORD:  I said --

 6          MR. BELTRAN:  Can you read that back, please?

 7          MR. FORD:  -- did he make that decision without

 8     discussing it with you?

 9          MR. BELTRAN:  Okay.  Well, whether he discussed

10     it or not, it's a marital communication.  So...

11  BY MR. FORD:

12     Q.   Go ahead.

13          MR. BELTRAN:  No.  She's -- no --

14          MR. FORD:  So, Mr. Beltran, you go on and on

15     and on, and I need to ask the witness if she's going

16     to answer the question or not.  She doesn't have to

17     answer it, but she needs to --

18          THE WITNESS:  You'll have to ask Chris.  I

19     don't remember.

20          MR. BELTRAN:  No.  You need to stop asking --

21     you don't go and ask things that you know are

22     privileged and then see if she'll answer --

23          MR. FORD:  Actually, Mike, you do, and you

24     should take my course in NITA because that is the

25     proper way to do it.



1        MR. BELTRAN:  I don't need to take courses from

2   you.

3        MR. FORD:  You actually -- you kind of do.  And

4   so the proper way to do it is there is an

5   instruction the witness has to testify that she's

6   going to follow the instruction.  That's the way you

7   do it.

8        MR. BELTRAN:  No, it's not the way you do it.

9        MR. FORD:  Yeah, it is.

10       MR. BELTRAN:  You're not supposed to

11  deliberately ask things that you know to be

12  privileged just to hope that I don't get my

13  objection in in time or she slips or something like

14  that.  It's improper, and --

15       MR. FORD:  Mr. Beltran, we're just -- as you

16  know, the issue of privilege is contested and is

17  going to be contested.  So refusing to answer my

18  questions based on a disputed privilege is the

19  proper procedure.

20       MR. BELTRAN:  I'll dispute -- I haven't heard a

21  dispute from you about it, so I guess we'll see what

22  the -- what the judge rules.  We've got our hearing

23  I guess in August, so we'll see what happens; but

24  I'll stipulate we're not going to testify to marital

25  privilege, and you've been spending a lot of time on



1       that and attorney/client and therapist.  You spent a

2       good chunk of the morning on that, so I think

3       that's...

4  BY MR. FORD:

5       Q.   The route that you followed from North Carolina

6  back to Florida, do you remember what that was -- and

7  this is -- I should be more clear.

8            Do you remember the route that you followed

9  from North Carolina back to Florida in June of 2017?

10      A.   75 is what we would have taken.

11      Q.   Did you go to South Carolina?

12      A.   I don't believe so.

13      Q.   Have you ever gone to South Carolina on your

14  way home from North Carolina?

15      A.   Yes.

16      Q.   What would be the reason you would go to South

17  Carolina?

18      A.   Because you can go down to Savannah and down

19  95.  There is two ways to go.  I don't remember which

20  way we went down.

21      Q.   Would you ever go through Greenville, South

22  Carolina?

23      A.   I'm not sure.

24      Q.   Have you ever been to Greenville, South

25  Carolina?



 1     A.   I'm not sure.

 2     Q.   You don't know?

 3     A.   I think I have been through Greenville.  I

 4  don't know if I've been through Greenville on the way to

 5  camp for Grace.

 6     Q.   So I'm talking before Grace was born.

 7     A.   No, I know, I'm just telling you.

 8     Q.   So let me focus the questioning.  Prior to

 9  Grace being born, did you ever go through -- have you

10  ever been to Greenville, South Carolina?

11     A.   I'm not sure.  You don't have -- I've not

12  stopped -- well, I don't know.  I don't know if I have

13  stopped.  I don't even know if I've stopped there.

14     Q.   You have no memory of going through Greenville,

15  South Carolina on your way home from North Carolina to

16  Florida, correct?

17     A.   No, it's possible I was asleep or wasn't paying

18  attention.  I don't know -- oh.

19     Q.   Go ahead.

20     A.   I guess I can't ask you questions.

21     Q.   If you have something to clarify your

22  testimony, feel free to add it.

23     A.   There is a college -- is there a college there?

24     Q.   Do you remember if there is a college there?

25     A.   I was just -- I'm trying to think of anything



 1  with Mady, if there was -- that was a visit or something

 2  that we took.  I don't know.

 3      Q.  Do you remember going to look at a college in

 4  Greenville?

 5      A.  We visited a college in South Carolina.  I'm

 6  not sure whether it's in Greenville though.  We visited

 7  a school called Furman, but I can't -- I'm not even sure

 8  if that was then, but it could have been around then.

 9      Q.  But sitting here today, you don't have any

10  memory of doing that?

11      A.  I remember the trip.  I don't remember the

12  exact dates of that trip.

13          MR. FORD:  Let's go off the record for a

14      second.

15          THE VIDEOGRAPHER:  If there are no objections,

16      going off record.  The approximate time, 5:00 p.m.

17          (A break was had.)

18          THE VIDEOGRAPHER:  On record, the approximate

19      time is 5:11 p.m.

20  BY MR. FORD:

21      Q.  We're back on the record.  You had a chance to

22  take a break.

23          Are you ready to proceed?

24      A.  Ready to proceed.

25      Q.  Great.  So I still have more questions, but in



1  the interest of time, I'm going to hand the baton over

2  to Mr. Broeder (sic) to start his examination.

3                 FURTHER DIRECT EXAMINATION

4  BY MR. MAUSER-CLAASSEN:

5      Q.   Good afternoon, Ms. Dorworth.  My name is --

6      A.   I'm sorry, you're going to state your name.

7      Q.   My name is Dustin Mauser-Claassen.  As I

8  mentioned earlier, I represent Susan Greenberg, Andrew

9  Greenberg, and AWG, Inc.

10          Do you understand?

11     A.   Yes.

12     Q.   So I placed for the record -- I placed in front

13 of you a binder with some exhibits.  I don't think we'll

14 need much of it, but just -- those will be the only

15 exhibits that we're going to use for my portion of the

16 examination.

17          MR. BELTRAN:  Can you give me -- if you're

18     giving all the exhibits, can you send me a link so I

19     can follow along?

20          MR. MAUSER-CLAASSEN:  Mike, it's just the

21     verified complaint.  Do you mind just grabbing a

22     copy of that?

23          MR. BELTRAN:  If you've got a copy of the

24     verified.  That's all you've got?

25          MR. MAUSER-CLAASSEN:  There is more in there,



 1     but I will -- I don't think I'm going to use them.

 2     So if I do, I'll send them to you.  I don't think I

 3     will.

 4          MR. BELTRAN:  Okay.  I can follow with the

 5     verified complaint.

 6          MR. MAUSER-CLAASSEN:  Thank you.

 7  BY MR. MAUSER-CLAASSEN:

 8     Q.   Ms. Dorworth, Mr. Ford covered with you earlier

 9  that you verified this complaint, correct?

10     A.   Is this the amended complaint?

11     Q.   Yes.

12     A.   Yes.

13     Q.   And you understand that when you verify the

14  complaint, you verify the truth of every allegation in

15  that complaint?

16     A.   My understanding from my attorney was that I

17  was verifying --

18          MR. BELTRAN:  Don't say what your

19     communications are with your attorney.

20          THE WITNESS:  Sorry, Mike.

21  BY MR. MAUSER-CLAASSEN:

22     Q.   So without stating what your attorney told you,

23  is it your understanding that you verified the truth of

24  the allegations in the verified complaint?

25     A.   Yes.  I believe that this document is true.



 1  When I was signing it, I was signing it because I had

 2  specific knowledge of actions that were taken through,

 3  you know, Joel Greenberg's threats towards me.

 4      Q.   And we describe that knowledge as personal

 5  knowledge.

 6          Do you have personal knowledge of the

 7  allegations in the complaint?

 8          MR. BELTRAN:  Object to the form.

 9          THE WITNESS:  Yes.

10  BY MR. MAUSER-CLAASSEN:

11      Q.   Do you have personal knowledge of every

12  allegation in the amended complaint?

13          MR. BELTRAN:  Object to the form.

14          THE WITNESS:  And define personal knowledge

15      again for me.

16  BY MR. MAUSER-CLAASSEN:

17      Q.   It would be knowledge that you have firsthand.

18      A.   Some of these --

19          MR. BELTRAN:  Object to the form.

20          THE WITNESS:  Some of these things I have

21      firsthand knowledge of, and -- and I'm not sure if

22      there would be things -- I'm sure there are things

23      that I do not have firsthand knowledge of.

24  BY MR. MAUSER-CLAASSEN:

25      Q.   Without stating what your husband told you,



 1  would the things that you don't have personal knowledge

 2  of, would those be things that your husband told you?

 3      A.   Things --

 4          MR. BELTRAN:  Object to the form.  You can't

 5      ask her what her husband told her.

 6          MR. MAUSER-CLAASSEN:  I said without revealing

 7      what he told her.

 8  BY MR. MAUSER-CLAASSEN:

 9      Q.   Are the things that you don't have personal

10  knowledge of, were those things that you learned from

11  your husband?

12          MR. BELTRAN:  If you can answer that without

13      divulging the content, go ahead, and I'll object to

14      the form.  Go ahead.

15          THE WITNESS:  I would have learned about these

16      things from a variety of sources.  There were things

17      that -- you know, if they came to my home, for

18      instance, letters with the Brian Beute situation

19      demand from his attorneys who believed we were

20      involved because of the segregationist comment of

21      Joel that we later found out about.  So there were a

22      couple of other sources on a number of these things.

23      Direct conversations I've had with Abby Greenberg, I

24      guess other people that were associates of Joel's

25      that talked about some of his past issues.  There



```
 1    were newspaper articles that talked about some of

 2    his troubled areas.  I did also read the

 3    jailhouse -- I think they call it the jailhouse

 4    interview and corresponding newspaper articles

 5    associated with that.  So there were a variety of

 6    sources.

 7 BY MR. MAUSER-CLAASSEN:

 8    Q.  Is it fair to say that to fully understand

 9 which allegations you have personal knowledge of we

10 would have to go line by line through the verified

11 complaint?

12         MR. BELTRAN:  Object to the form.

13         THE WITNESS:  If you would like to go line by

14    line, we can go through the complaint.

15 BY MR. MAUSER-CLAASSEN:

16    Q.  I don't have time to do it today, but I'm just

17 making sure that you -- it doesn't sound like you're

18 able to testify clearly as to which allegations you have

19 personal knowledge of; is that correct?

20         MR. BELTRAN:  Object to the form.

21         THE WITNESS:  The one I have direct personal

22    threat knowledge of is of the JW Marriott.  The

23    rest, as I told you, are source -- a variety of

24    sources.

25 BY MR. MAUSER-CLAASSEN:
```



1    Q.   Is one of those -- without revealing the

2  communication with your husband, is one of those sources

3  your husband?

4    A.   Yes.

5    Q.   Thank you.  Would you mind turning to page 44

6  of that amended complaint, please?  Please let me know

7  when you're there.

8    A.   Forty-four you stated?

9    Q.   Yes.

10   A.   Okay.

11   Q.   So I'm going to read that top paragraph to you.

12  It says, Although the foregoing provides adequate detail

13  to support the claims herein, further detail about --

14   A.   We're not on the same page, page 44.

15   Q.   I'm sorry.  Page 44 at the bottom of the --

16   A.   Which number?

17   Q.   It's paragraph number 348.

18   A.   That's not -- I do not have the same copy.

19   Q.   Am I on the wrong.  I think that's my fault.  I

20  am so sorry.

21   A.   What page would you like me on?

22   Q.   Are you on --

23   A.   I didn't touch anything until you gave it to

24  me.

25   Q.   It's not your fault, Ms. Dorworth.  If you can



 1  flip to the first tab.  I had you flip to the wrong one.

 2  I apologize.  So it's page 44 --

 3      A.   The reason, just so you know, that I asked if

 4  this was the amended complaint was because it did not

 5  say amended complaint on it, and that's why I asked.

 6      Q.   Fair observation.  Page 44 on this amended

 7  complaint.

 8           Can you verify that it is the amended

 9  complaint?

10      A.   It states verified amended complaint at the

11  top.

12      Q.   Okay.  We're on the same page.

13      A.   And this one 44?

14      Q.   Yes.  So it says, Although the foregoing

15  provides adequate detail to support the claims herein,

16  further detail about these and other schemes by

17  Greenberg and the other defendants are set forth in the

18  original complaint, doc 1, and in the indictments in the

19  federal criminal case, docs 1, 28, 51, 90 which are all

20  hereby incorporated herein by reference.

21           Do you see that?

22      A.   I see the paragraph, yes.

23      Q.   And do you agree that this paragraph purports

24  to incorporate the entire original complaint by

25  reference into the amended complaint?



1              MR. BELTRAN.  Object to the form.

2              THE WITNESS:  I'm not sure what legal language

3         is necessary to make sure something is completely

4         incorporated herein by reference.  I don't -- that

5         would not -- I don't know, but I imagine the

6         intention is that everything in the first complaint

7         was true; and that -- at the time, and that this is

8         the amended complaint.  And so that is -- again, I

9         don't understand all the legal ease of it.

10   BY MR. MAUSER-CLAASSEN:

11        Q.   When you verified the amended complaint, did

12   you understand that this paragraph was in it?

13        A.   I'm sure that I read it.

14        Q.   Did you understand this paragraph to suggest

15   that the entire previous complaint was incorporated into

16   this complaint?

17              MR. BELTRAN:  Object to the form.

18              THE WITNESS:  Again, I don't -- I don't know

19        all the legal ease, but -- you know, my

20        understanding is that the first complaint was

21        accurate.

22   BY MR. MAUSER-CLAASSEN:

23        Q.   Do you have personal knowledge of whether

24   Andrew and Sue Greenberg ever agreed to pay AB for

25   providing false information to authorities?



1     A.   We have knowledge that attorney -- the -- do I

2   have personal knowledge?

3     Q.   That's correct.

4     A.   I do not have -- I do not have personal

5   knowledge, no.

6     Q.   What knowledge do you have?

7     A.   My understanding in the complaint is that Sue

8   and Andy Greenberg pay for all of Joel's legal expenses

9   and would be paying for all of his legal associates, any

10  coordination between that, anything that was being set

11  up, that that would be funded by them.

12    Q.   Ms. Dorworth, do you understand that you are

13  the source of the information that goes into the

14  complaint?

15         MR. BELTRAN:   Object to the form.

16         THE WITNESS:   I'm not a party to -- what do you

17     mean?

18  BY MR. MAUSER-CLAASSEN:

19    Q.   You have verified the truth of the complaint,

20  correct?

21    A.   I stated earlier that personal knowledge that I

22  had regarding being threatened and extorted at the JW

23  Marriott was the reason that I believed I had to sign

24  the complaint.

25    Q.   So this is one of those situations in the



1  complaint where you don't have personal knowledge,

2  correct?

3      A.   No.

4          MR. BELTRAN:   Object to the form.

5          THE WITNESS:   That's not what I said.  I

6      said -- I thought the question -- what are you

7      referring to, or what I don't have personal

8      knowledge of?

9  BY MR. MAUSER-CLAASSEN:

10     Q.   The allegation of whether Andrew and Sue

11 Greenberg agreed to pay AB for providing false

12 information to authorities.

13     A.   I do not have personal information of that, and

14 I have not reviewed -- I think that's part of what we

15 were seeking in this deposition is to find out -- not

16 this deposition, excuse me.  In this complaint, right,

17 the point of -- I think there is a lot of statements

18 about upon information and belief --

19         MR. BELTRAN:   Rebekah, don't -- you don't have

20     to divulge your legal strategy or anything that you

21     discussed with me or Chris, but I'm not sure --

22         MR. SCHELLER:   I'm going to object to coaching

23     the witness.

24         MR. BELTRAN:   No, I'm telling her to -- I'm

25     invoking the privilege, but --



1          MR. MAUSER-CLAASSEN:  Thank you, Mike.  We're
2     moving on.
3          THE WITNESS:  Since the Greenberg's fund
4     everything --
5  BY MR. MAUSER-CLAASSEN:
6     Q.   Ms. Dorworth --
7     A.   They're funding everything that would be
8  incorporated into it, if that's what you're asking.
9     Q.   Do you have personal knowledge of whether
10  Andrew and Sue Greenberg ever agreed to pay Abby
11  Greenberg for providing false information to
12  authorities?
13     A.   I do not only that she is paid by them, by her
14  admission.
15     Q.   You understand from Abby that she was worried
16  that the Greenbergs -- it was -- pardon me, let me
17  rephrase the question.
18          Was it your understanding from Abby that the
19  Greenbergs were worried that they would lose access to
20  their grandchildren unless they helped Abby?
21     A.   Yes.  I'm saying is that understood from Abby?
22     Q.   Yes.  Is that your understanding from Abby?
23     A.   Yeah.  I think -- well, I think it was more the
24  reverse that she would use it as a leverage point that
25  she had the heir, the male heir, on the Greenbergs --



1  for the Greenbergs, Micah.

2      Q.    Thank you.  So it's your understanding that the

3  Greenbergs were providing her gifts to maintain access

4  to the grandchildren?

5      A.    Well, I don't know that it was specifically for

6  the grandchildren.  I'm sure it was a number of other

7  things because she had a lot of personal -- she has a

8  lot of personal knowledge about them covering up the

9  crimes of Joel Greenberg and participating in the crimes

10  of Joel Greenberg.

11      Q.    You have no personal knowledge of Andrew and

12  Sue Greenberg providing Abby with gifts in exchange for

13  that, do you?

14          MR. BELTRAN:  Object to the form.

15          THE WITNESS:  In exchange for what Joel was

16      doing?

17  BY MR. MAUSER-CLAASSEN:

18      Q.    In exchange --

19      A.    Well, referencing like, oh, because he's doing

20  these things, we'll provide a weekend away, or we'll

21  cover this or that.  It was kind of the way she talked

22  about things.  So, you know, do I have something saying

23  we are going to pay for this for these actions of Joel,

24  I don't have that personal -- or that direct statement,

25  no.  That was never said to me.



1    Q.   So you don't have any personal knowledge of why
2  Andrew or Sue Greenberg were paying or providing gifts
3  to Abby Greenberg?
4         MR. BELTRAN:  Object to the form.
5         THE WITNESS:  I know that it was very important
6     that -- I do not have any personal knowledge of all
7     of the reasons why they were funding -- continuing
8     to fund Joel Greenberg through today and by
9     extension Abby.
10  BY MR. MAUSER-CLAASSEN:
11    Q.   I'm sorry, I'm talking only about Abby.  You
12  don't have personal knowledge of why they were providing
13  Abby with a house or with money or with any other gifts,
14  correct?
15    A.   Not that I can think of at this time, but I
16  don't know if the same rules apply as with Chris.  If I
17  think about it later, I'll come back to it.
18    Q.   The amended complaint says that, Upon
19  information and belief, the Greenbergs received and paid
20  the bills of the lawyers and therefore knew all of the
21  activity of the case.
22         You verified the complaint in this case,
23  correct?
24    A.   I told you I signed this because I was
25  threatened about extortion, and I wanted to verify that



Case 6:23-cv-00871-CEM-DCI   Document 181-1   Filed 08/22/24   Page 315 of 577 PageID 2652

**REBEKAH DORWORTH**                                   July 23, 2024
**DORWORTH vs JOEL MICHAH GREENBERG**                            313

1  that was accurate.

2      Q.   And you're married to the plaintiff, correct?

3      A.   I am married to the plaintiff, yes.

4      Q.   Do you know all of the activity in this case?

5      A.   No, I don't.  I know what's in the complaint.

6      Q.   The complaint also alleges that Andrew
7  Greenberg, Greenberg Dental, and/or AWG knew that Joel
8  Greenberg was using his proffers and his testimony to
9  falsely implicate Dorworth and others.

10         Do you have personal knowledge of that?

11     A.   I have personal knowledge that it was very
12 important for Andy Greenberg to reduce Joel's sentence
13 because Abby shared that if -- Sue was upset about Joel
14 getting -- sorry, Andy -- sorry, Joel, after he burned
15 her clothes and went down and was threatening her and
16 she was still living with Joel because they had bought
17 her house and that is why she stated on the news that
18 that was the reason why she was still living with him
19 even after these situations, that -- I'm sorry, I'm
20 getting -- there is a lot of different players here.

21         That it was very important.  They had lost the
22 ability to -- you know, they weren't going to get him
23 out of jail.  So it became a, we're going to reduce the
24 sentence.  And we know this because Mr. Fritz Scheller
25 said to the news that they were going to keep doing



1  this.  They were going to keep coming after us year

2  after year making up lies in order to try to reduce his

3  sentence.

4      Q.   Ms. Dorworth --

5      A.   It was not said specifically like that, but it

6  was said that they would continue to try to keep going

7  proffer, and I have read the jailhouse --

8      Q.   Ms. Dorworth, I don't represent Joel Greenberg.

9  I represent Sue Greenberg and Andrew Greenberg and AWG,

10  Inc.

11      A.   Just like you're trying to connect me and Chris

12  that, oh, I'm connected to the plaintiff, well, let me

13  tell you, they're very connected to their son and they

14  pay for everything.

15      Q.   Ms. Dorworth, I'll remind you that your husband

16  sued the defendants.

17          Okay?

18      A.   We --

19      Q.   I'm asking for your specific knowledge about

20  what Andrew Greenberg knew and what Sue Greenberg knew

21  in regard to Joel's proffers.

22          Do you have any independent knowledge about why

23  he was giving his proffers and with respect to what --

24      A.   Fritz Scheller said that --

25      Q.   -- Andrew Greenberg --



1      A.    -- they were paying for Fritz Scheller.  So the

2    Greenbergs are paying for Fritz Scheller, and Fritz

3    Scheller --

4           THE WITNESS:  Are you on here, Fritz?  Fritz

5       Scheller said to the news that he was going to

6       continue to try to go back and back to get reduced

7       time.  And so, yes, I believe that they were very

8       aware of this legal strategy as they were paying for

9       it, and it was stated on the news.

10   BY MR. MAUSER-CLAASSEN:

11      Q.   So it is your understanding that because they

12   paid for Joel's legal bills that knew everything that

13   was going on in the case, correct?

14      A.   I believe they were -- I don't see how they

15   wouldn't be very well aware, and I assume because every

16   time I watch you guys all coordinate together out there,

17   they're all very well aware with what is going on with

18   one another.

19           MR. MAUSER-CLAASSEN:  Can I get how much time

20      is left?

21           THE VIDEOGRAPHER:  A little over 30 minutes.

22           MR. BELTRAN:  I'm going to need like 20 minutes

23      for my part.  So probably do what you need to do,

24      but...

25           MR. SCHELLER:  Well, I need time too.  I don't



1   think -- we've both cross-noticed this depo.  So I

2   think it's Fritz Wermuth's firm and I think it's

3   Chris Ford's firm that have the questions.

4        MR. BELTRAN:  Well, no, hold on a second.

5        MR. PERKINS:  Abby Greenberg cross-noticed it

6   as well.

7        MR. BELTRAN:  I didn't see her cross-notice.

8   Well, it doesn't matter.  About the notice for AB's

9   deposition, Laura took time at the end out of the

10  seven -- out of the seven hours.

11       MS. WOLF:  I took about three minutes, not 20.

12  It was about three.

13       MR. BELTRAN:  Excuse me.  You guys have had the

14  entire seven.  It's not like with a AB where --

15       MS. WOLF:  You can have your three minutes.

16  That's not a problem, but everyone has to finish

17  their questions first.  It's are your client.  You

18  go at the end.  Everyone else asks questions first.

19  You know how the order goes.

20       MR. BELTRAN:  Well --

21       MS. WOLF:  WHY don't we finish up because we're

22  wasting record time?

23       MR. BELTRAN:  It's a seven hour limit, and I'm

24  entitled to ask questions.

25       MS. WOLF:  You can - then you can stop before

 1      when the limit hits, and you'll lose your question

 2      time or you can wait until the end and then you can

 3      ask.

 4           MR. BELTRAN:  No, I don't understand what

 5      you're saying.  I don't agree with that.

 6           MS. WOLF:  I understand you don't.

 7           MR. MAUSER-CLAASSEN:  Mr. Perkins is going to

 8      inquire.

 9                FURTHER DIRECT EXAMINATION

10   BY MR. PERKINS:

11      Q.   I'm going to go through some questions that

12   came out in your -- this is Jason Perkins.  I represent

13   Abby Greenberg in this matter.  I'll be asking you a few

14   follow-up questions here based on your testimony given

15   earlier.  In the course of your examination with

16   Mr. Ford, you mentioned a company AWG.

17           Do you recall that?

18      A.   I do.

19      Q.   Okay.  Do you know who the members of that

20   company are?

21      A.   Abby and -- excuse me, Andy and Sue Greenberg

22   and I don't know who else is with that.

23      Q.   Do you know if Abby Greenberg is a member of

24   AWG?

25      A.   I don't.  I know she gets funding from it, but



1  I don't know her particular ownership stock.  I wouldn't

2  know the percentage of ownership stock.

3     Q.   And how do you know that Abby Greenberg gets

4  funding from --

5     A.   She talked about it.  Their marital funding was

6  from payouts.  I don't know if it actually -- actually,

7  let me correct that for the record.  I don't know

8  whether it's from Greenberg Dental directly with the

9  stock payouts, his $400,000 quarterly payments.  I don't

10  know if that's from -- I don't know if it flows from

11  AWG.  I don't know their tax structure.

12     Q.   Specifically what amount did Ms. Greenberg

13  discuss with you in terms of payments from AWG or

14  Greenberg to her?

15     A.   She talked about payments of a down payment on

16  their home which they co-owned.  When they sold their

17  home, they were going to make sure that she got the

18  commission.  So that I think was not supposed to be

19  given over to the FBI or whoever -- oh, the restitution

20  payments for a number of these things.

21        You know, obviously various trips.  She told me

22  that, you know, obviously the JW Marriott incident was

23  paid for by Abby -- excuse me, I apologize, by the

24  parents.  She said that was pretty typical of them

25  paying for those types of things, and also I assume any



1   marital assets that were bought by the -- Sue and Andy

2   Greenberg cordial for those purposes.

3       Q.   Earlier in your deposition, you mentioned that

4   last night your husband had gone out for a gathering

5   with a person named Clay; is that correct?

6       A.   I think he was just in town.  His name is Clay

7   Sweger.

8       Q.   Sweger is his last name?

9       A.   Yeah.  He is a friend -- well, I believe he was

10  there.

11      Q.   That's --

12      A.   He was in town -- he was in town visiting

13  another friend I think, so he was there.

14      Q.   And that's S-W-I-G-E-R?

15      A.   No, S-W-E-G-E-R.

16      Q.   When Mr. Ford was questioning you, you had

17  mentioned that you and your husband have an open phone

18  policy.

19          Do you recall that?

20      A.   I do recall that.

21      Q.   And can you tell me specifically what is that

22  open phone policy that you have with Mr. Dorworth?

23      A.   What I mean from a marital standpoint is that,

24  you know, either of us could grab each other's phones at

25  any point in time if we needed to take something or



1 whatever, but it's mostly about -- you know, its just

2 how we operate.  It's more of a function of being, Will

3 you charge my phone?  We're not protective of our

4 phones.  We know each others passwords.  It's not

5 something we're, you know, protective of.  Obviously

6 there is lots of personal information in there, so we

7 try to keep it open just as a marital policy.

8      Q.   Do you read Mr. Dorworth's text messages?

9      A.   Sometimes when I'm on the couch next to him and

10 I use that Beyonce meme, Who text us, boo, you know, and

11 I'll look over and he's texting his guy friends and

12 stuff like that.

13     Q.   And you look at those text messages?

14     A.   Well, he doesn't hide them from me.  They're

15 pretty funny.  They're pretty funny guys.

16     Q.   Are you aware of one point in time Mr. Dorworth

17 had an Signal account?

18          MR. BELTRAN:  Object to the form.

19          THE WITNESS:  Yeah.  I mean...

20 BY MR. PERKINS:

21     Q.   Did you ever view his messages on Signal?

22     A.   They weren't hidden from me.  I really wasn't

23 reviewing any messages.  Like I said, I gave you an

24 example of the type of viewing that I did of it, but it

25 wasn't -- it wouldn't be hidden from me.



1    Q.   Do you ever share locations with your cell
2   phones?
3    A.   We have access to find my iPhone.
4    Q.   And you can determine where he is?
5    A.   Yeah.  But like I said earlier, I Facetime, he
6   picks up the phone.  You know, usually his buddies chime
7   in.  He calls me, I pick up the phone.  It's part of
8   that open phone policy.  A high trust relationship, so
9   you pick up the phone.
10    Q.   Did you ever review his location on July 15,
11   2017, and where he was?
12    A.   No, because we had the photo.  So I did not --
13   I did not do that.  I don't believe I would have done
14   that if he had picked up the phone or said he was going
15   to Randy's.  I would have no reason to think otherwise.
16    Q.   Earlier in your deposition you made the comment
17   that Abby had made allegations to you or made
18   allegations that Mr. Dorworth was unfaithful to you.
19       Do you recall that?
20    A.   I'm sorry.
21    Q.   That Ms. Greenberg, Abby Greenberg, had made
22   allegations --
23    A.   She suggested that there were a lot of hotels
24   involved in this.  I don't know what we're calling this
25   thing in the Joel Greenberg saga that there was -- that



1  there is -- yes, that there were hotels and she was

2  making suggestions in front of other women that would

3  try to make me believe otherwise.  And that's also when

4  I believe that coordination between the Greenberg and

5  Katzers occurred was between Abby, and then later Josh

6  Katzer with my husband.

7      Q.   And who was Ms. Greenberg, Abby Greenberg,

8  making these suggestions to about your husband and

9  hotels?

10     A.   Anne Pham was one of them or just this -- she

11 was saying that there were a lot of hotels with her

12 husband, and she assumed -- seemed to assume with what

13 she was saying to her friends that we were very involved

14 in this.

15     Q.   Anyone else other than Anne Pham?

16     A.   Anne Pham is just who told me she was talking

17 about it to a lot of people.

18     Q.   And when did Mr. -- Ms. Pham tell you that?

19     A.    I'd have to review my text messages on that.  I

20 turned over those with Anne Pham.  You should have them.

21     Q.   And those text messages that were produced last

22 night?

23     A.   They were the text messages that were produced

24 three weeks early, yes.

25     Q.   And was Anne Pham at the JW Marriott?



1    A.    She was.

2    Q.    And did you go to the JW Marriott with

3  Ms. Pham?

4    A.    Not with her, no.

5    Q.    Okay.  Was she there when you arrived, or did

6  she come later?

7    A.    I believe she was already there, but not like

8  in the hotel.  I don't know if she was already down at

9  the pool.  I can't remember, but she was on the

10  premises, and Anne was there after I left for other

11  things that occurred that I was not apart of.

12    Q.    So Anne was there while you were there and

13  after you left?

14    A.    Yes.  Anne was watching my daughter because

15  after I was being threatened, I went to Abby to figure

16  out what the heck was going on and -- because remember,

17  prior to this incident, I had no idea about, you know,

18  any references to payments for women, and I didn't know

19  that Abby had been involved with a number of different

20  men.  And so -- with men that I knew.  So I was just

21  concerned -- concerned is probably -- very curious and

22  concerned again, what the heck was going on, and this

23  was a lot of new information for me as to things that

24  were going on.  As I testified earlier to Mr. Chris here

25  that I -- you know, I wasn't aware of cash payments or

 1  any kind of payment exchange to women.  So it was -- it

 2  was news to me at this point in time.

 3     Q.   You had mentioned in -- when you were being

 4  deposed by Mr. Ford that Abby Greenberg had said that

 5  Joel Greenberg had sexual relations with 147 women.

 6          Do you recall --

 7     A.   I don't know -- I don't think 147.  It was --

 8  it is something over 100 -- it was over 140.  I just

 9  remember the 140 mark.

10     Q.   And when was that statement made to you?

11     A.   It would have been I believe when Abby -- in

12  between the first indictment and the second indictment

13  when they were finding -- I am sure when they were

14  collecting a lot of information which would have been --

15  I guess first indictment was in June.

16     Q.   So between June and August?

17     A.   It would have been around that time.  It could

18  have also been after.  It is one of those things she

19  kept repeating.  I think she was like she just felt like

20  that was a lot of people to have payments to because

21  it's one thing to have hall passes and have an open

22  marriage.  It is another thing to be exchanging money.

23     Q.   And that would have been between June and

24  August of 2020?

25          MR. BELTRAN:  What was the question?



 1          THE WITNESS:  Between June and August of 2020?
 2     Yes.
 3   BY MR. PERKINS:
 4     Q.   Is that correct?
 5     A.   Again, it was not said one time.  So like it
 6   could have been after the indictment with the girls, but
 7   I believe -- because my understanding was there was a
 8   lot of collecting of information at that time.  So it is
 9   possible that it could have been after August.  Again,
10   this was a repeat thing that Abby said.  She obviously
11   was -- it was a lot.  She still may say it today to
12   people.  I don't know.
13     Q.   When was the last time that you had contact
14   with Abby Greenberg?
15     A.   I saw her at a hotel, the Bohemian.  My husband
16   and I had just left a show and she was there with some
17   guys, and it looked like some -- like a, you know,
18   friends.
19     Q.   When is the last time you have communicated
20   with Abby Greenberg?
21     A.   The last time, probably the text that I turned
22   over.  I don't -- I can't remember if those texts were
23   before or after the Stonewood Grill incident which led
24   to the Katzer incident.
25     Q.   What's the Stonewood Grill incident that you're



1  referring to?

2      A.    So when all of this was becoming public about

3  that Joel had payments to women, lots of women, not just

4  like several but a lot of different people that I don't

5  even believe I was meeting Abby.  She was there, and

6  Anne was there.  And they asked me, well, do you think

7  your husband is involved with it?  Like essentially

8  trying to be like, well, why do you think he's not

9  involved with this?

10          And one of the things that I said was my

11  husband doesn't even go to strip clubs.  I said since us

12  being together, since our first date, my husband has not

13  been to a strip club.  And they said to me, oh, do you

14  really believe that your husband doesn't go to strip

15  clubs because of the behavior of these other actors in

16  this?  And I said my husband does not go to strip clubs.

17          It was maybe a couple days after that that Josh

18  Katzer invited my husband to a -- it wasn't just like,

19  oh, let's go to the strip club.  Josh Katzer invited --

20  had this whole setup going:  Private rooms.  Like if you

21  were into strip clubs, apparently like this was the

22  thing.  And -- but I had told my husband when the

23  incident occurred with Abby the same time when she told

24  me, I know there is a lot of hotels involved, that -- I

25  had told my husband about the incident.



1          And it was -- just looked so disgusting and

2    obvious that this coordination between the Greenbergs

3    and Katzers of trying to make believe something

4    different about my husband that I knew, and, you know,

5    that like, oh, he's hiding things from you with

6    something -- as something like a strip club that they

7    knew I would not be okay with.  So any --

8          Q.   Do you recall the approximate timeframe of that

9    Stonewood Grill incident?

10         A.   No, but I can attempt to get that for you.

11         Q.   And how would you go about getting that?

12         A.   Trying to look at my text messages that I

13   produced to you with Anne or maybe Anne might know.

14         Q.   And how did this invitation from Mr. Katzer

15   come out to inviting your husband to a strip club?  How

16   was that communicated?

17         A.   You can ask Chris tomorrow or the other days.

18   That would -- he would be happy to share that

19   information of the Katzer entrance into our life.

20         Q.   And that was the last time, to your

21   recollection, that you communicated with Abby Greenberg?

22         A.   So that would have been in 2021, so it would

23   have been before it was -- it would have been in 2021,

24   yes, that I had communicated directly with Abby.  There

25   were -- I had communicated with Anne about -- it was a



1  very hard night.  She told me that Abby was going around

2  telling people that I was involved in a bunch of wild

3  sex parties at my home, that I was passing out Plan B to

4  people, that -- you know, that -- you know, I act all

5  like I don't know what is going on, that I act high and

6  mighty, but that she was saying that I was involved in

7  this when no one but Abby has even suggested that I'm

8  involved in this in any way, shape, or form.  And so

9  that was a pretty horrific thing to hear.

10     Q.   So at this evening at the Stonewood, Anne Pham

11  told you that Abby Greenberg was saying that you were

12  having sex parties at your house and passed out Plan

13  B --

14     A.   No, separate incident.  This was later.

15     Q.   Okay.  How much -

16     A.   This was --

17     Q.   How much later after this?

18     A.   I mean, it would have been -- Abby was still

19  continuing to say these things, you know, well after

20  that.  I can also look for a Stonewood Grill receipt.  I

21  can try to narrow -- I can try to get you...

22     Q.   Do you know how long after that Stonewood Grill

23  incident that Anne communicated to you that Abby was

24  saying you were hosting sex parties at your house and

25  passing out Plan B?



1    A.   It was quite some time.  I think it was

2 maybe -- not an insignificant amount of time.  This was

3 much -- this was well after Joel was in jail, and they

4 were on a mission to try to get everybody else in jail

5 to reduce his sentence.

6    Q.   In the course of your testimony with Mr. Ford,

7 you had mentioned you were talking about the tag number

8 PF325H.

9         Do you recall that?

10    A.   No, would you mind?  I'm so sorry.  Thank you.

11         Yes.

12    Q.   And you did not recognize that tag number,

13 correct?

14    A.   The PF one?

15    Q.   Correct.

16    A.   I don't know if -- I don't know if it's

17 Porsche.  I don't think so.  I'm not sure what tag that

18 is.

19    Q.   Did Mr. Dorworth also have a Porsche?

20    A.   He has a Porsche.  He has two cars.

21    Q.   And did he back in the summer of 2017?

22    A.   I don't know if he had his Porsche then.  So I

23 don't know.

24    Q.   What about a limo?  A limousine?

25    A.   Oh, is that the limo?  Oh, sorry.  I didn't --



 1  I totally -- well, I totally forgot.  We haven't had it

 2  in years.  We sold it many years ago.

 3      Q.   Back in the summer of 2017 --

 4      A.   I don't even know if that -- I can't even

 5  verify for you that that's the tag, but -- and I don't.

 6  You know what, he -- he would have had -- I don't know

 7  if we sold it at that point, but we bought it maybe

 8  in -- it was a couple of years maybe after we started

 9  dating.  '13 or '14 is when we bought that.

10      Q.   And when did you sell it?

11      A.   I don't remember.

12      Q.   What did you use the limo for?

13      A.   All sorts of things.  It was so much fun.  We

14  took it up to Gator games to tailgate.  The kids loved

15  it for birthday parties.  Like we would show up to --

16  they went to a public school district -- a public school

17  where their mom lived, and so bringing up a black limo

18  and throwing a bunch of kids in.  It was a highlight

19  because Chris would drive it, and the kids just loved

20  it.  But, yeah, tailgating, date night.  You know, it

21  was it was a fun thing.  We took it to a concert.  I

22  took it to a concert once, and the limo driver told them

23  that I was Blake Shelton's wife so that I could go up

24  close.  He didn't know that that was actually Miranda

25  Lambert.  I was like, that is not who I am because they



1  started bring all this security.  Sorry, it was a fun

2  time.  I remember the limo was a good time.

3      Q.   When you were driving in the limo and going

4  through the master gate of the Heathrow neighborhood,

5  did it guard's wave you through, or did they make you

6  show credentials?

7      A.   I don't remember if it had a transponder on it.

8      Q.   You had a portable transponder at that time,

9  correct?

10     A.   I don't know if we had it.  I don't know if we

11 had a portable transponder on the limo.  Thanks for

12 refreshing my memory.  I did not -- I'm sorry, that is

13 truthful, I did not recognize the tag on that car.  We

14 just haven't had it in some time.

15     Q.   Did you ever discuss July 15th with Randy

16 Morris?

17     A.   No.

18     Q.   You had mentioned in the course of your

19 examinations with Mr. Ford that you knew that ████████

20 ████████ was a hula hooper.

21          How did you know that or gain that knowledge?

22     A.   I've seen her.  She's really talented.

23          MR. SCHELLER:  Jason, can you speak up a little

24     bit?  I'm having trouble hearing your questions.

25          MR. BELTRAN:  Is that better?  Can you hear me?



1        THE WITNESS:  The videographer is -- too loud?

2        THE VIDEOGRAPHER:  We'll need to go off the

3   record, I believe.

4        MR. BELTRAN:  We're switching the tape or --

5        THE VIDEOGRAPHER:  No, it's a technical issue

6   with the microphone.  They moved it, so it's --

7        MR. BELTRAN:  Okay.  Give me two minutes then.

8        THE VIDEOGRAPHER:  Going off record.  The

9   approximate time 5:51 p.m.

10        (A break was had.)

11        THE VIDEOGRAPHER:  On record.  The approximate

12   time is 6:02 p.m.

13        MR. BELTRAN:  All right.  This is Mike Beltran.

14   We are -- we have 12 minutes left of record time.  I

15   have offered to allow a little bit more time for the

16   defendants to question the witness.  I intend to ask

17   my questions of the witness.  I think I said I have

18   about 20 minutes.  I'm willing to give the

19   defendants the rest of record time, and I'm willing

20   to ask my questions after record time.  We're not

21   going to agree to bring her back, and we're not

22   going to -- I'd ask if the defendants need a little

23   bit more time, then I'm willing to entertain that,

24   but everyone has indicated they need hours and hours

25   and hours to continue.



1          I don't think that's appropriate because there
2      was a lot of time in the morning that was not spent
3      on asking anything related to this case.  So I'm
4      going to allow I guess Jason or whoever wants to o
5      resume, and we'll give you a little bit more time.
6      I'm going to ask my questions before we're done, and
7      we're not waiving the seven-hour rule.  I'm not
8      agreeing to bring her back.
9  BY MR. PERKINS:
10     Q.   All right.  Back on the record, when you were
11  being asked questions by Mr. Ford, there was a
12  discussion about a July 22, 2017, party.
13          Do you recall that?
14     A.   Yes, I recall his questions.
15     Q.   In your discussion, you answered a question and
16  said it got rowdy that evening.
17          Do you recall that?
18     A.   Yeah.
19     Q.   Okay.  Do you recall having a vase broken as a
20  result of that party or any type of --
21     A.   I don't, but I'm not a big vase person.  So if
22  it was broken, it probably wasn't particularly special.
23     Q.   Okay.  Did anyone ever tell you other than, you
24  know, Mr. Dorworth that there was a fight at that July
25  22nd party between two girls?



1    A.   If he did, I don't -- I don't recall it.

2    Q.   That's not something that you recall?

3    A.   Not something he told me.  Like he said, he

4  said it got rowdy and someone stole a cell phone and he

5  was like, I just -- I know I'm not supposed to talk

6  about it, but he called me and told me that there was,

7  you know, something going on there.  That it was unusual

8  for -- it was unusual.  It was unusual.  That's why I

9  remember it.

10    Q.   Was it Mr. Benford's cell phone that was taken?

11    A.   I believe so, but I don't -- I'm not -- I

12  don't -- I wouldn't 100 percent know, but that's what I

13  remember it being.

14    Q.   Do you recognize the address 417 Sun Lake

15  Circle in Lake Mary, Florida?

16    A.   Sun Lake Circle.  417 Sun Lake Circle is -- I

17  know where Sun Lake is.  There is a shopping plaza

18  there.

19    Q.   And there is an apartment complex there too?

20    A.   There is an apartment complex behind it.

21    Q.   Did you ever rent an apartment at that

22  location, 417 Sun Lake Circle?

23    A.   On Sun Lake, no, I have never rented an

24  apartment on Sun Lake.

25    Q.   Have you ever rented an apartment in Lake Mary?



 1      A.   Yes.

 2      Q.   Okay.  What timeframe did you rent an apartment

 3  in Lake Mary?

 4      A.   Prior to us getting married.  We didn't live

 5  together until we were married.

 6      Q.   And did you keep that apartment after --

 7      A.   Yes.

 8      Q.   -- you got married?

 9      A.   About a couple -- it was just until the end of

10  the lease.  I think it was like a few months.  I was

11  moved in, but I just -- I had a roommate living with me,

12  and so, you know, I wasn't trying to kick her out.

13      Q.   Did you keep that apartment at all in 2017?

14      A.   That apartment in 2017, yes, because it we got

15  married in November.  And so I think I had it for a

16  couple of months, so I would have had that in 2017.

17      Q.   Did you have that apartment in the summer of

18  2017?

19      A.   I don't remember how long the lease lasted, but

20  I would have been out of -- I think I would have been --

21  well, the -- I don't know if -- I think Katie may have

22  stayed, but I don't know.

23      Q.   And what is Katie's name?

24      A.   Katie Farris.  Katherine Farris.  She was my

25  roommate at a couple of different locations.



```
 1      Q.   Have you ever moved into an apartment since
 2  you've been married to Mr. Dorworth?
 3      A.   No, I have not.  Again, that would have -- I
 4  don't know if Katie -- I can't remember if Katie
 5  continued living there I think one more year or not.  I
 6  can't remember.
 7      Q.   Do you see the screen there?
 8      A.   Uh-huh.
 9  ██████████████████████████████████████████████
10  ███████████████████████████████████████████████████
11  ████████████████████████████████████████████████████████
12  ██████████████████████████
13           (A video clip was played.)
14  BY MR. PERKINS:
15      Q.   Did you hear that?
16           MR. BELTRAN:  Guys, there is some kind of echo.
17      I don't know.
18           MR. PERKINS:  There is an echo.
19           THE WITNESS:  There is an echo for us as well.
20           MR. BELTRAN:  Okay.
21  BY MR. PERKINS:
22      Q.   Did you hear the question?
23      A.   Yes, I heard it.
24  ████████████████████████████████████████████████
25  ████████████████████
```



1    A.   Yes.

2    ████████████████████

3    ███████████████████████

4    ██████████████████████████████

5    ████████████████████████████████

6    ████████████████████

7    ██████████████████████████████

8    █████████████████████████

9    ███████████████████████████████

10   ███████████████████████████████

11   ██████████████████████████

12   ███████████████████████████████

13   ████████████████

14          In the summer of 2017, was there a tanning bed

15   upstairs at the Dorworth residence?

16   A.   I don't remember if we still had the --

17          MR. BELTRAN:  Object to form.

18          THE WITNESS:  -- tanning bed in 2017, but it

19      would have been in -- we had a tanning bed at some

20      point in the gym.

21   BY MR. PERKINS:

22   Q.   And where was the gym?

23   A.   At the end of the hallway.

24   Q.   And was that upstairs in the Dorworth

25   residence?



 1     A.   Uh-huh.  Yes.  We never used it, but he --
 2  somebody won it.  I can't remember.  It was like a --
 3  you know, one of those auctions or something like that.
 4  I don't even know if it was ever plugged in, but there
 5  was one that existed.
 6     Q.   And that's a tanning bed, at some point in time
 7  you had the tanning bed?
 8     A.   There was a physical tanning bed in our home,
 9  yes.
10     Q.   Do you know when you got rid of it?
11     A.   I turned the room at the end of the hall into a
12  bedroom, and so I don't know.  That would be a good
13  question for Chris.  I don't know if he sold it or what
14  we -- I don't remember what we did with it.
15     Q.   And there is also a gym.
16          Do you still have that gym today?
17     A.   No.
18     Q.   When did you cease having a gym on the second
19  story of the Dorworth residence?
20     A.   I don't -- I don't -- I don't remember.  I'd
21  have to go lack and see if I can look at remodeling
22  photos or something like that to figure out when the gym
23  existed.  The gym did exist.  I know that the gym
24  existed during that summer because I just remember -- I
25  remember that.  I remember that.  The gym existed during



1   that --

2        Q.    During the summer of 2017?

3        A.    Uh-huh.

4        Q.    Okay.

5   ████████████████████████████

6   █████████████████████████████████

7   █████████████████████████████████

8   ████████

9        Q.    Do you have the master ledger in front of you

10  that we have been talking about today, Exhibit --

11       A.    I do not.

12             MR. PERKINS:  If you could hand that to the

13       witness.

14  BY MR. PERKINS:

15       Q.    If you can go to June 21st of 2017 for me.

16  It's on page five of ten.

17       A.    June -- sorry, June 21st?

18       Q.    Correct, at the top there.

19       A.    Just a second.  Yes.

20       Q.    Do you see the entry there at 2:35 in the

21  morning for Christopher Dorworth?

22       A.    I do.

23       Q.    Okay.  And that's his Cadillac; is that

24  correct?

25       A.    Yes, that's his Cadillac.



1    Q.   And is that the car that you would have driven

2   back from the Carolinas in?

3    A.   Yes.

4    Q.   Okay.  And is it possible that you arrived home

5   from the Carolinas on June 21, 2017, at 2:30 in the

6   morning?

7    A.   Yes.  Chris is a -- he's very much so a road

8   warrior which is why I also believe that, you know, just

9   that we were all together because I would not have

10  driven back that late in the morning -- or sorry, that

11  late at night.

12   Q.   There is an entry there at 4:48 p.m.

13        Do you see that?

14   A.   Same date?

15   Q.   Yeah, June 21, 2017.

16   A.   Yes.

17   Q.   And it's a Rose Marie Wallace.

18        Do you see that?

19   A.   Yes.

20   Q.   Do you recognize that name?

21   A.   The last name I recognize.  I don't recognize

22  the first name.

23   Q.   And can you tell me how you recognize that last

24  name?

25   A.   Chris, Jr., has a buddy whose name is Matthew



1  Wallace.  And if I was guessing, that would be his mom,

2  but I don't -- I shouldn't even guess, but that's -- if

3  I had to go start asking questions, that's what I would

4  ask is one of Chris, Jr.'s buddies was getting dropped

5  off to the house or picked up.  I don't -- I guess if

6  it's probably dropped off if we just gotten back that

7  early morning, but I don't know.

8  ████████████████████████████████

9  ████████████████████████████████████████████████

10 ██████████

11  ████████████████████████████████████████████

12 ████████████████████████████████████████████████

13 ████████████████████████████████████████

14     Q.   All right.  So on June 21st or June 22nd, you

15 would have driven over to the exwife's house to drop

16 off --

17  ████████████████████████████████████

18 ██████████████████████████████████████

19 ██████████████████████████████████████

20 ██████████████████████████████████████

21 ████████████████████████████████████████████████

22 ████████████████████████████████████████████████

23 ████████████████████

24     Q.   Okay.  And would you have gone with

25 Mr. Dorworth to drop off the two children from the prior



1  marriage?

2      A.   Yeah.  If we were going to breakfast afterwards

3  or just saying goodbye, that would not be atypical.

4  Sometimes I drop them off, so -- but, you know, I don't

5  know.  I cannot tell you who dropped them off that

6  morning, but it would have been -- we would have -- I

7  don't know if we were together.  I don't know if it was

8  separate or -- but they were returned on strict custody

9  times because of --

10     Q.   Would you have any record of the drop off of

11  the children?

12     A.   I don't think so.  Let's see.

13     Q.   Nothing like a text message or email or

14  anything like that that would reflect when you dropped

15  off the children in June of 2017?

16  ███████████████████████████████████████████

17     Q.   I want to talk about the JW Marriott Ritz

18  Carlton trip with Ms. Greenberg -- well, first of all,

19  you have invited Ms. Greenberg, Abby Greenberg, to the

20  home in North Carolina; is that correct?

21     A.   Yes.  She was up there for a girls' trip.

22     Q.   And that was around June 26, 2018, correct?

23     A.   I don't remember there exact date.  I could --

24  I could try to find that out for you.

25     Q.   And who was on that girls trip up to your house



 1  in North Carolina?

 2      A.   A friend named Kendall Cahill --

 3           MR. BELTRAN:  Jason -- sorry, finish your

 4      answer.  I want to -- just because you can take the

 5      video down.  I don't think you're going to use that

 6      anymore.  Thanks.

 7  BY MR. PERKINS:

 8      Q.   Kendall?

 9           THE WITNESS:  Thank you, Mike.  Kendall Cahill,

10      a high school friend of mine, and Sydney Miller, and

11      I don't remember if anybody else was on that trip.

12      Those were childhood friends of mine.

13  BY MR. PERKINS:

14      Q.   Do you recall on that trip Abby Greenberg

15  showing you notifications that were coming from the

16  Heathrow master association about a party that was going

17  on at the Greenberg residence?

18      A.   I remember that she was upset because -- I do

19  remember her being upset, and she was -- because she had

20  gotten a notification, and I think I even said to her, I

21  didn't even know that you could get emails from the

22  gate.  Chris didn't know that either.  And she was

23  upset, and she tried to call -- I feel like she tried to

24  call Joel, and he wasn't answering.  So I called Chris,

25  Facetimed him.  My husband answered, and I just said,



1  Hey, Abby's upset.  Can you have Joel answer?  And he's

2  like, What?  You know, like, I don't know why, and

3  somebody was dropping off drugs for Joel at his house.

4  I think some news channel lady.  I don't know her name,

5  but I remember that either she figured that out or based

6  on the name.  Maybe looked up the name, but I do

7  remember that.

8      Q.   When Abby Greenberg was showing you the

9  notifications that were coming in --

10     A.   She didn't show me the notifications.  She just

11  said that she got a notification.

12     Q.   She got them.  At that point in time, did you

13  ask or inquire as to whether you could get similar

14  notifications for the Heathrow Master Association back

15  in 2018?

16     A.   No, because remember I had access to my

17  husband's emails as I shared with you previously.  And

18  so, like, I would have known if he was getting, you

19  know, emails or something from the gate, and I don't

20  even remember whether she said it was an email or not.

21  She may have, but I just didn't -- I was just -- I don't

22  know.  I didn't think about it at the time.

23     Q.   And it's your testimony you didn't get email

24  notifications of guests or text notifications of guests

25  until 2021?



1    A.   Yes.   We did not set them up until that point.

2    I mean, we got notifications in the sense that if

3    somebody came that we didn't know that they would call.

4    You know, they would phone call and say, This person's

5    at the gate.   But if we didn't answer, they would just

6    get denied.   So that was a big part of the reason -- I

7    don't keep my phone on me as often.   Chris keeps his

8    phone on him all the time.   So that's just not something

9    that I was interested in.

10   Q.   Going to the JW Marriott Ritz Carlton trip, how

11   did you get invited to go to the JW Marriott?

12   A.   Abby had invited me.   I think I had checked on

13   her, if I can -- just everything was going on.

14   Obviously her husband was indicted.   This was prior to

15   anything with women or underage girls.   This was during

16   the first indictment, and that's -- so I think I was --

17   checked in on her.

18        She was doing -- they're paying for a get away

19   with us or for her and the kids and everything.   Joel

20   wasn't supposed -- from what she told me, Joel wasn't

21   supposed to be there.   It was just her, and then I found

22   out, oh, yeah -- he's going to -- he's there because my

23   husband was very concerned about that with Joel being

24   there.

25        And I -- we had not been speaking.   Now, when I



 1  say we hadn't been speaking, we hadn't been hanging out

 2  in quite some time.  There was an incident that occurred

 3  where Abby had offered me cocaine, and I was not -- that

 4  was not -- she referred to it as it could be a good

 5  bonding -- post baby bonding thing for us.  And after

 6  that, you know, I'm -- after that it wasn't something

 7  that I really wanted to be around.  So we kind of

 8  stopped -- you know, stopped hanging out a lot.

 9      Q.   When did Abby Greenberg offer you cocaine?

10      A.   It was at a republican event.

11      Q.   And was anybody present when Abby Greenberg

12  offered you cocaine other than yourself and Abby

13  Greenberg?

14      A.   My husband, and I asked him to leave with me.

15  I don't know if anybody else --

16      Q.   Did Mr. Dorworth encourage you to do cocaine at

17  that point in time?

18      A.   No.  Absolutely not.

19      Q.   Has Mr. Dorworth ever encouraged you to do

20  cocaine?

21      A.   Absolutely not.

22      Q.   How did you get to the JW Marriott.  Did you

23  drive?

24      A.   I drove.

25      Q.   When did you get notice from Abby Greenberg



1  that Joel would be present there, that he was going to

2  be at the resort?

3      A.   Well, we already packed up.  I was leaving.  I

4  was getting on the way, and she said that Joel was going

5  to be there.  So I like hesitated.  I can't remember if

6  I turned around or I was in the neighborhood, and she

7  said he wasn't going to be anywhere -- he wasn't going

8  to be near us though because I think I specifically said

9  if this is a family day, if this is family time you need

10 because of what you're going through, then I don't need

11 to be there.  And so anyway, that's how that occurred.

12     Q.   Who did you go with?

13     A.   My daughter, Grace.

14     Q.   Your daughter?

15     A.   Uh-huh.

16     Q.   Did you intend to stay the night at the JW or

17 just a day visit?

18     A.   No.  I'm not a staycatino person.

19     Q.   What kind of activities did you engage in with

20 Abby Greenberg at the JW Marriott?

21     A.   We met up in the hotel room.  We had our kids.

22 They were playing.  Our daughters were very close --

23 they're six months apart in age, and they were -- they

24 were just super close, and that's -- that was a lot of

25 Abby and I's connection just as moms, mom's group.  So



 1  Abby and I had -- our girls were close, so they were

 2  playing around.  So we went down to the pool.

 3      Q.   And what, if anything, happened at the pool at

 4  the JW Marriott?

 5      A.   So a number of different things happened, most

 6  notably obviously was Joel came down because he wasn't

 7  supposed to come down and be there with us.  He was

 8  acting erratic in the room, that he was going to beat

 9  it.  Again, remember, at this time I had no idea about

10  all of these other charges.  That he seemed very

11  cavalier about it.  He wasn't worried that he --

12  although Abby seemed to really believe he was definitely

13  going to jail because she said so.  And anyway, so we

14  went down, we were playing -- you know, playing with our

15  kids in the pool.  Anne was there.  Anne was there with

16  her kids and everything.

17      Q.   What time did Anne arrive in this?

18      A.   I believe she was already there.

19      Q.   And was it your understanding that she was

20  there to visit Abby?

21      A.   I don't know.  She may have been there

22  separately but just hanging out together.

23      Q.   Was it the meeting by happenstance, or was it a

24  coordinated meeting with Ms. Pham?

25      A.   I do not know.  You would have to ask Anne.



 1      Q.   So you go down to the pool with Abby, correct?

 2      A.   With our kids, yes.

 3      Q.   And Anne Pham is there?

 4      A.   And Anne's there.  I don't remember if Anne had

 5   come back up with us, and then we all went down

 6   together.  I don't -- I don't remember that specific

 7   detail, but when I was down at the pool, Anne was there

 8   with her two children, and we swam.  At one point, Joel

 9   shows up.  He is -- Abby was putting sunscreen on my

10   back, and he starts filming it.  And I said -- I was

11   like, Joel, what are you doing?  Stop that.  He sent the

12   video to Matt Gaetz and my husband.  Again, at the end

13   of the video it shows me saying, Stop filming me.

14      Q.   Do you still have that video?

15      A.   I don't.  Again, he took the video and sent it.

16   It was at that point that Joel started talking about

17   various things.  He was talking about -- he just kept

18   going from different parts.  He said, Okay, we're going

19   to go swim.  There is the rock -- there was a rock

20   formation at the time.  I don't know if it still exists

21   inside of the pool.  It's very well done --

22      Q.   Is this the Ritz Carlton side or the JW

23   Marriott side?

24      A.   This is the JW Marriott.

25      Q.   So it's the lazy river that runs through there?



1     A.   The lazy river runs through, but there is a

2 walk in portion because remember our kids are very

3 little.  And so we were there, and Joel was talking.

4 Abby was there.  I had asked Abby, I thought he wasn't

5 going to be here.  Oh, he's not supposed to be here and

6 such.  Anyway, the -- Joel had started talking to me

7 about his situation.  Remember, at the time, you know,

8 I'm, Are you okay?  You know, How are you doing with

9 this?  He was very cavalier.

10          Prior to this incident, just so you know that

11 my husband, myself, and Matt Gaetz had sat down with

12 Joel and Abby Greenberg at FishBones and specifically

13 told Joel, If you run for office, you will be indicted.

14 It had -- at the time, again, I had no knowledge about

15 payments to women, to underage women girls, or anything

16 of that nature.  We had been -- we were aware, however,

17 that he was under investigation from the Secret Service

18 because he brought the subpoena to my home.

19     Q.   And this meeting at FishBones, that was for his

20 reelection campaign?

21     A.   For his reelection.  This was prior to his

22 reelection, and Abby wanted to run for office at that

23 point.  She wanted -- I believe it was county

24 commissioner at the time.  Abby is very involved

25 politically, has gotten even more so involved



1  politically post Joel being in office.  But -- so we

2  had -- we just -- the way Joel talked about things, it

3  seemed that he -- it was starting to become clear that

4  he was -- that the stuff he was saying wasn't just jokes

5  or offhand things, its' that he was actually in some --

6  he was in some trouble.

7      Q.   Where did --

8      A.   And so --

9      Q.   This conversation with Joel Greenberg, was it

10  just the two of you?  Was anybody else present

11  overhearing?

12      A.   Are you talking about the FishBones

13  conversation?  I listed the people there.

14      Q.   The JW Marriott conversation.

15      A.   It was Joel and I.  I mean, other people would

16  have come around, but it was just Joel and I.

17      Q.   And physically, where was it?  Was it in the

18  pool?  On the side of the pool?

19      A.   There is -- it was like at the edge of the

20  pool.  So there was in and out.  Joel is acting erratic,

21  so he was in, he was out.  He was kind of walking

22  around.  Again, he is talking confidently that he is

23  going to beat this.  Like this is ridiculous.  He's got

24  this, but his behavior, his physical behavior, was

25  nervous, erratic.  I don't know if he was on something



1  or not.  I'm not probably a good person to tell drug --

2  drug use, but it --

3      Q.   How long did this conversation with Joel

4  Greenberg last --

5      A.   It was multipart.  So because I had exited at

6  one point, and then came back from the lazy river.

7  Joel, again -- I know it's difficult to look back to

8  context, but at the time, I wasn't aware that there were

9  payments to women or things like this.  And so I --

10 although I was a hallmark of my husband and I is that we

11 stick with people through bad times.

12         And so I think people -- you may wonder.  Not

13 people, you may wonder, why did you go down there if

14 he's been indicted?  I was there to support Abby.  I was

15 there because I wanted, you know, to just be there and

16 support her.  And instead, Joel corners me multiple

17 times.  He tells me that it would be better for everyone

18 if he got a pardon.

19         At first I kind of chuckled, and then I was

20 just like, well, Ballard Partners does pardons.  That is

21 part of their practice.  That was known.  They were

22 Donald Trump's lobbyists before he was in office.  Brian

23 Ballard and Chris represented -- they represented the

24 organization.  So -- and they did pardon work.  And so

25 that was a known thing that they did.  In addition, Matt



 1  Gaetz was very -- was speaking very regularly to the

 2  president at that point.

 3          So while it sounds -- I'm sure sounds crazy to

 4  you that it was not -- it was not a crazy suggestion.

 5  And so he said it would be better for everyone if he got

 6  a pardon, and we wouldn't want payments to women coming

 7  out and he talked about Andy Greenberg, and he said we

 8  don't want his Bitcoin payments coming out.  Again, his

 9  behavior was erratic.  Although his threats were clear,

10  but it was very clear to me that there was a lot more

11  going on that I clearly had no idea about.

12     Q.   And you said this was a multipart conversation.

13          Was it two separate conversations that you had

14  with Joel Greenberg?

15     A.   Yes.  Again, well, we had the conversation up

16  in the hotel room.  We came down.  This was the rock

17  conversation, and then the conversation on the sunscreen

18  situation that I just told you.  He was hanging out on a

19  lounge chair with an umbrella.  It was at that point

20  when I was inquiring about payments to women, at no

21  point did he tell me that my husband had made any

22  payments to women.  He was specifically referencing

23  Matt's payments to women getting out, although it was

24  clear that my husband needed to help him get this

25  pardon.



```
 1            And when I was sitting there, he started
 2   talking about -- I said, Payments to women, I don't know
 3   what you're talking about.  And he started talking
 4   about, yeah, there is a lot of girls.  We don't want
 5   girls -- information about girls getting out.  And I
 6   said, I don't know anything about girls.  I don't know
 7   what you're talking about.
 8            And he proceeded to share with me that there
 9   was a number of trips and swinger type things going on.
10   He had suggested to me that Abby was very much so
11   engaged with this.  He mentioned a couple of people.
12       Q.   Who were the people that he mentioned
13   specifically in that regard?
14       A.   Jason Pirozzolo and Matt Gaetz.
15       Q.   Have you ever discussed a pardon with Abby
16   Greenberg?
17       A.   I may have mentioned it, he is talking about a
18   pardon after I went back into the bar.  It was an
19   extended conversation.  Abby just talked about
20   parents -- you know, just -- they were obviously very
21   upset about it.  I think -- obviously this is a hard
22   thing for a family to go through, a horrible thing for a
23   family to go through.
24       Q.   Have you ever discussed AB with Abby Greenberg?
25       A.   I have not discussed -- AB?
```



 1     Q.    AB.

 2     A.    Yes, thank you.   By name, no.

 3     Q.    What about by initials, AB or anything like

 4   that?

 5     A.    No.   I just meant like.

 6     Q.    Sex with a minor.

 7     A.    About her, period.

 8     Q.    Right.

 9     A.    I don't remember if every discussed sex with a

10   minor.

11     Q.    With Abby?

12     A.    I don't remember.

13     Q.    What about have you ever had any discussions

14   with Abby about trying to get the US attorney or

15   assistant US attorney on Joel Greenberg's case

16   terminated?   Is that anything you ever discussed with

17   Abby Greenberg?

18     A.    I never discussed that with Abby.

19     Q.    Did that come up in your conversation with Joel

20   Greenberg?

21     A.    No.   He did not ask me.   He was specifically

22   asking to get pardoned so that specific information

23   wouldn't come out.

24     Q.    And you also mentioned that there was a

25   statement made about Andy Greenberg and Bitcoin?



1      A.    Yes.

2      Q.    Who made that statement to you?

3      A.    About Andy Greenberg's involvement with Bitcoin

4  that day was Joel Greenberg, but Abby had previously

5  discussed with me at length the Bitcoin tax collector

6  situation.

7      Q.    Okay.  So that day was the day you're

8  referencing is the JW Marriott day?

9      A.    That day --

10      Q.    That's when you had your conversation with Joel

11  Greenberg, right?

12      A.    Yes, that's the conversation I had with Joel

13  Greenberg.

14      Q.    And earlier you said you had a conversation

15  with Abby Greenberg about them that was prior to the JW

16  Marriott visit?

17      A.    Are you speaking about the Bitcoin?

18      Q.    The Bitcoin.

19      A.    Yes, this would have been prior to the JW

20  Marriott incident.  This was prior to Joel Greenberg

21  being indicted.

22      Q.    Do you recall a rough timeframe for that

23  conversation?

24      A.    I don't.  We were at the park, I know that.

25  We -- when she lived in Heathrow that's in our



1   neighborhood, that there is a -- there is a park, and we
2   would take our girls to it.
3       Q.   And what do you recall about that conversation
4   with Abby Greenberg?
5       A.   What I recall is that Abby was upset at the
6   parents for enabling Joel because he, from what --
7   again, I'm hearing this from Abby, was that Abby had
8   shared that Joel had taken tax collector money and put
9   it into Bitcoin.  And then I think Bitcoin dropped or
10  something happened to it, but the money was no more.
11          And so we asked his parents to cover it because
12  he obviously took it from the tax collector's office,
13  and they gave him the money which was intended to pay --
14  I believe -- I don't know, but I believe to -- based on
15  Abby's representation to me to cover this crime that
16  Joel had committed or this act we'll call it.  I don't
17  know if he was charged for this particular one, but that
18  also then -- but then it happened a second time.
19          She made it seem like he had went and sports
20  gambled or gambled or Bitcoin.  I don't know exactly how
21  the crypt o situation works, but it seemed to me that he
22  had lost it a second -- he was like trying to take
23  additional money that was supposed to be to fix the
24  problem and went and did something that he wasn't
25  supposed to do with it and then they fixed it again.



1          And I think Abby was, well, they keep doing
2    this.  Like they keep covering up his mistakes.  It was
3    very -- I think it was very stressful for her to have a
4    relationship where she felt like, you know, that there
5    was a lot of money being used to cover up problems.
6        Q.   Is that the only conversation you had with Abby
7    Greenberg regarding Bitcoin?
8        A.   No.  I think we talked about it a couple of
9    times.  That one is just pretty -- that one is just very
10   vivid because I remember being so shocked by it the
11   first time she said that because I was surprised that it
12   hadn't -- that somebody inside hadn't reported it.  I
13   think she was saying that they were making it whole.  I
14   think there was an attempt to make this whole, but I
15   don't know if Joel at the JW Marriott was referencing
16   Andy Greenberg covering up the Bitcoin incident at that
17   point in time or if there were other things going on
18   with Bitcoin.
19          Again, Joel was not specific.  He just said
20   that he specifically did not want payments from Andy
21   Greenberg -- Bitcoin payments from Andy Greenberg, and I
22   wish I had more for you.  I do not have more.  That's
23   what I've got is that he just said -- and I just was
24   like maybe he's referring to that or not.  I don't know.
25       Q.   Do you have any recorded statements of Abby



 1 | Greenberg?

 2 |          MR. BELTRAN:  Object to the form.

 3 |          THE WITNESS:  No.

 4 | BY MR. PERKINS:

 5 |     Q.   Have you heard any recorded statements of

 6 | conversations between Abby Greenberg and Joel Greenberg

 7 | when Joel Greenberg was in jail?

 8 |     A.   I have not personally, no.  I've just seen

 9 | jailhouse testimony where he referenced his

10 | conversations with Abby Greenberg.

11 |     Q.   Did Joel Greenberg ever make any type of

12 | statement to you that he was concerned about Abby

13 | Greenberg's participation in his conduct being revealed

14 | if the investigation by the federal government

15 | continued?

16 |     A.   Of -- well, he was concerned about who these

17 | other people that were involved sexually with her.  He

18 | was concerned about that getting out.  He specifically

19 | said that at the JW Marriott.

20 |     Q.   And that was the two people that we were

21 | discussing --

22 |     A.   I -- if they were consenting adults, and I

23 | don't know if money exchanged hands, but I don't know

24 | why -- I -- you know, other than embarrassed, that she

25 | might be embarrassed by that.  But I don't know



1  anything -- I was -- I don't know that he was trying to

2  tell me at that point in time that he was trying to

3  cover up criminal, but I do -- criminal works of Abby,

4  but I don't know it was specific to -- I think he was

5  trying not to embarrass her which I realize which is

6  quite the irony in this situation.

7      Q.   And that was the conversation about

8  Mr. Pirozzolo and Mr. Gaetz that we discussed earlier?

9      A.   And other people, but I don't -- I don't know

10 if -- I don't know who else was involved, but they would

11 have been there -- while Mr. Pirozzolo is a private

12 citizen he is a political person involved in the

13 political sphere, and obviously Matt is a public person.

14     Q.   Do you know Mr. Pirozzolo?

15     A.   I do.

16     Q.   Have you attended parties at his house?

17     A.   I attended a fundraiser at his home.  Think I

18 have attended a couple of fundraisers for various

19 political candidates throughout.  I wonder if I have

20 been there -- I'm sure -- I'm sure I have been to

21 something there with Chris, but typically -- it's

22 typically around political things, not...

23     Q.   I notice some of your text messages with

24 Ms. Pham talk about --

25          THE VIDEOGRAPHER:  Mr. Perkins, I hate to



 1      interrupt you.  I think you dropped the microphone.

 2  BY MR. PERKINS:

 3      Q.   I notice some of your text messages with

 4  Ms. Pham talk about partie at JP's house.

 5           Is that Mr. Pirozzolo?

 6      A.   That's -- yeah, that's who I was referencing

 7  there.

 8      Q.   And what knowledge do you have about parties at

 9  his house?

10  ████████████████████████████████████████████

11  ████████████████████████████████████████████████

12  ██████████████████████████████████████

13  ████████████████████████████████████████████████

14  ████████████████████████████████████████████████████

15  ████████████████████████████████████████████████████

16  ████████████████████████

17    ████████████████████████████████████████

18  ████████████

19           MR. BELTRAN:  Form.

20           THE WITNESS:  I don't know if that is well

21    known, but I knew that.

22  BY MR. PERKINS:

23      Q.   And how did you know that?

24      A.   I'm sure somebody's talked about it at some

25  point.  I don't remember who, but when I -- so that's



1  when I say it was known, you know, consenting adults.  I

2  ████████████████████████████████████████

3  ███████████████████████████████████████

4  ███████████████████████████████████████████

5  ██████████████████████████████████████

6  ████████

7  ████████████████████████████████████████

8  █████████████████

9      A.   I don't think so. I think too there was a lot

10 of I would call them rumor in Tallahassee essentially of

11 kind of what they were known for.  So, I mean, you would

12 have to ask specific people about that.  I really don't

13 know about when I had first heard that information.

14     Q.   What about drug use?  Was it well known that

15 there was drug use going on at parties at JP's house?

16 ███████████████████████████████

17 remember it -- I don't -- I -- if -- I don't remember

18 ████████████████████████████████████████

19 █████████████████████████████████████████

20 are drugs and alcohol involved, but I do not -- I don't

21 have any -- I certainly don't have any firsthand

22 knowledge of it, but it was something that was a little

23 bit more well known.

24 ████████████████████████████████

25 ████████████████████████████████



1  ████

2  ████████████████

3  ██████████████████

4  ████████████████████

5  ███████████

6  ████████████████████████

7  █████████████████

8          MR. BELTRAN:  Once again --

9          THE WITNESS:  I know.  I know.

10          MR. BELTRAN:  All right.  Let's talk about

11     privileged information.

12  BY MR. PERKINS:

13     Q.  How long collectively were you at --

14          THE VIDEOGRAPHER:  I'm sorry, Mr. Perkins, to

15     interrupt you.  Can we go off the record

16     momentarily?

17          MR. PERKINS:  Right.

18          THE VIDEOGRAPHER:  If there are no objections,

19     going off record the 6:45 p.m.

20          (An off-the-record discussion was had.)

21          THE VIDEOGRAPHER:  On record with media unit

22     five.  The approximate time is 6:56 p.m.

23          MR. BELTRAN:  This is Mike Beltran.  We're at

24     seven hours of 30 minutes of record time I'm

25     informed by the videographer.  At this point, we're



1  allowing some additional questioning as a courtesy,

2  but we're not waiving the seven hour rule.

3  Mr. Perkins has asked to finish his questioning

4  about the JW Marriott incident.  I'm going to permit

5  that.  Mr. Scheller has said that he's deferring to

6  Mr. Perkins.

7       MR. SCHELLER:  I --

8       MR. BELTRAN:  Let me finish, and then you can

9  say --

10       MR. SCHELLER:  I apologize.

11       MR. BELTRAN:  Mr. Furbush has said he has about

12  ten minutes, and I have about 20 minutes of cleanup

13  with my client.  So that's what I'm willing to do

14  tonight.  So that's what I'm willing to do tonight,

15  and we're going to proceed on that basis.

16       And I just want to say it seems, according to

17  my client, the counsel for AB have been passing

18  things to Jason.  I don't know that he is continuing

19  questioning on her behalf or if there are things

20  about Pirozzolo that I don't think are relevant to

21  this case.  And some of that has veered in after we

22  have passed seven hours after record time.

23       So we're giving you guys extra time.  I haven't

24  been afforded that extra time, but we're giving you

25  extra time and I'm not sure that we're required to



1    do that.   There is absolutely no basis to bring her

2    back, so we're going to allow a little bit more

3    questioning.

4         MR. FORD:   I'll just respond to that question

5    because you're not in the room.   Ms. Dorworth has

6    made some extraneous comment about documents.   We've

7    talked about exhibits, courtesy exhibits being

8    provided to counsel, and that's what lawyers

9    provide.

10        MR. BELTRAN:   I don't know what's happening.   I

11   spoke to my client --

12        MR. PERKINS:   I have my own outline, Michael.

13        MR. BELTRAN:   Okay.   That's fine.   I'm just

14   saying I think -- you know, I think there are things

15   that were asked today that don't really have to do

16   with the case, and we're already over record time.

17        MR. SCHELLER:   Just so since we're all making

18   records, I -- you haven't told me how much time

19   you're allotting me to go.   You said you're giving

20   me a little bit of time, so how much time is that?

21        MR. BELTRAN:   I thought you said you were

22   deferring to Mr. Perkins.

23        MR. SCHELLER:   Well, no, because you're not --

24   if you could just tell me how much time you're going

25   to allow me to question.



**REBEKAH DORWORTH**                                      July 23, 2024
**DORWORTH vs JOEL MICHAH GREENBERG**                          366

 1      MR. BELTRAN:  Well, Mr. Furbush needs ten
 2   minutes.
 3      Mr. Perkins, how long do you need?
 4      MR. PERKINS:  Well, I'm going to finish up the
 5   JW Marriott.  Like 15 minutes.  And so if
 6   Mr. Scheller is going to tee his time to me to do
 7   other topics, then I'll take it.
 8      MR. BELTRAN:  You guys have no more time.
 9   We're at seven hours.  Mr. Scheller, I thought you
10   were deferring to Mr. Perkins.
11      MR. SCHELLER:  Well, I still want to know how
12   much time you're allowing us -- allowing me.
13      MR. BELTRAN:  Okay.  I have 20 minutes,
14   Mr. Perkins has 15, Furbush has 10.  So that's --
15   that's 45.
16      How long do you need?
17      MR. SCHELLER:  Remember I said before 45.
18      MR. BELTRAN:  Okay.  You want to negotiate?
19   I'm not staying for another hour and a half.
20      MR. SCHELLER:  I'm not negotiating.  I have a
21   right to ask questions.
22      MR. BELTRAN:  Well, I have a right to invoke
23   the seven hour rule.
24      MR. SCHELLER:  Okay.  Well, then invoke it now.
25   I mean, this is -- I mean, this is -- you know, it's



1   what's good for the goose is good for the gander.

2       MR. BELTRAN:  So we're stipulating we're going

3   to go -- you need 45, Perkins needs 15, Furbush

4   needs 10, I get 20, and we're going to be done.

5   We're not going to come back.

6       MR. FORD:  Well, we're going to have additional

7   questions based on your questions, Michael.  You

8   don't just get to ask the last questions and

9   preclude our ability --

10      MR. BELTRAN:  That's why I want to go now, and

11  then --

12      MR. FORD:  We're not doing that either, but

13  we're not going to agree on the record that your

14  questions of your client are the last questions that

15  get asked in this deposition.  I don't anticipate

16  we'll have much if you only have 20 minutes, but

17  we're not going to agree with that on the record.

18      MR. BELTRAN:  I'll let you ask within the scope

19  of my questions.  I mean, that's fine, but we're now

20  at 7:00.  We have got a depo at 9:00 tomorrow.  I

21  don't know.  You guys have already gone over.  I'm

22  not required to give you more time.  You guys

23  haven't given me more time on either B or ████,

24  and I only had like three hours on either of them.

25      MR. SCHELLER:  Jason, you can have my time.



1          MR. BELTRAN:  I don't know what that means, but

2      go ahead and ask your JW Marriott --

3          MR. SCHELLER:  Well, it means exactly what I

4      said.  Jason, you can take my time then, all right,

5      to make this -- to expedite this.

6          All right?

7          MR. PERKINS:  All right.  Let's go.

8          MR. SCHELLER:  It better be good, Jason.

9  BY MR. PERKINS:

10     Q.   On the record, we were talking about the JW

11  Marriott resort.

12          Collectively, how long were you there that day?

13     A.   Hours.  I don't know how long.

14     Q.   And it's your testimony that when you left,

15  Abby Greenberg was there and Anne Pham was there; is

16  that right?

17     A.   As well as Joel was there, and there were other

18  people coming.

19     Q.   Do you know who the other people were that were

20  coming?

21     A.   I think Sam Arms.  I think, but I don't -- I

22  can't -- I don't want to be held to that.  I'm not --

23  I'm stating that so you can only do that.

24     Q.   In the verified complaint it states, When

25  informed of Greenberg's demands and threats, Gaetz



1   responded to Rebekah Dorworth that it appears that

2   Greenberg is trying to making his, referring to

3   Greenberg, problems everybody else's problems.

4           At some point in time after this JW Marriott

5   discussion with Joel Greenberg, did you reach out to

6   Mr. Gaetz?

7       A.   Yes, I called him directly.

8       Q.   And where did that conversation take place?

9       A.   In my car on the way home.

10      Q.   How long did that conversation last?

11      A.   I'm not sure -- well, I asked about a couple of

12  things.

13      Q.   What did you ask about specifically?

14      A.   Well, I asked him if he had sex with Abby

15  Greenberg because I thought that was a pretty uncool

16  thing to do.

17      Q.   What, if anything, did Mr. Gaetz say in

18  response?

19      A.   He said that it was on her bucket list.  And

20  just so you know, I had verified that with Abby that

21  that had occurred.

22      Q.   That she had sexual relations with Mr. Gaetz?

23      A.   Yes.

24      Q.   What else did you ask Mr. Gaetz?

25      A.   I said, what is he talking about?  He's talking



1  about -- I said he doesn't want payments from women to

2  get out about you, and I said what is he talking about?

3  He was talking about, and so -- and that's when he said,

4  He's trying to extort me, trying to extort a

5  congressman.

6          I was like, well -- you know, I was trying to

7  figure out what was going on, but Matt didn't divulge a

8  lot of information.  Matt didn't actually seem

9  particularly worried.  I was like -- he was upset about

10 the extortion, but he wasn't panicked, like, you know,

11 that he was going to call him and talk to him or fix

12 this or anything that -- I think Matt seemed to give the

13 impression more of an embarrassment versus anything

14 criminal.  But again, I -- that would be me speculating

15 on the tone and tenor of our conversation.

16     Q.   What did Matt say in response when you were

17 talking about payments and girls?  Did he deny those

18 allegations?  Did he confirm them?

19     A.   He didn't confirm or deny the...

20     Q.   He didn't say anything in response to that when

21 he brought that up?

22     A.   No, he didn't.

23     Q.   Did you call anybody else on your way home from

24 the JW Marriott back to the Dorworth residence?

25     A.   I called my husband.



1   Q.   Did you call your husband before Mr. Gaetz or
2   after Mr. Gaetz?
3   A.   I can't -- I think I called him before that I
4   called my husband.
5        MR. BELTRAN:   And I'm just going to provide --
6        THE WITNESS:   They were right -- they were
7      right together, but it wasn't -- no one told me to
8      call Gaetz.   I just -- I proactively called him.
9        MR. BELTRAN:   I'm going to remind the witness
10      about the marital privilege and not to.
11        THE WITNESS:   Thank you.
12  BY MR. PERKINS:
13   Q.   It's your recollection you called Mr. Dorworth
14   first followed by Mr. Gaetz?
15   A.   Yes.   I would have -- it seems I would have.   I
16   would have called my husband first.
17   Q.   Anything else that you discussed with Mr. Gaetz
18   other than sexual activity with Ms. Greenberg and talk
19   about payments for sex with women?
20   A.   Told him that he wanted a pardon, told him
21   about the Andy Greenberg thing.   He didn't seem to have
22   any knowledge of that, but I was more focused directly
23   on the very specific thing that he wouldn't want
24   payments with Matt to come out or that he was having sex
25   with certain people.   I'm assuming at that -- he was



1  talking about his -- maybe he didn't want that his wife

2  had engaged in a relationship with him.

3       Q.   Other than this conversation with Mr. Gaetz,

4  have you ever had another subsequent discussion with him

5  regarding payments for sex with women?

6       A.   I asked him directly if he had had sex with a

7  17 year old that they are claiming he had sex with, and

8  he told me no.

9       Q.   And when was that discussion?

10      A.   It would have been -- it would have been after

11 this obviously when -- after the indictment.  Once they

12 started -- once the news media started talking about it.

13 I wouldn't have known until the news media started

14 talking about it.  I didn't know -- again, I started

15 based on Joel's representations.  You know, I didn't

16 know if it was like a sugar baby type situation.  I

17 wasn't as familiar -- or I was more familiar I guess

18 with the sugar baby situation versus a direct cash

19 payment -- you know, a direct cash payment.

20      Q.   When's the last time you have had

21 communications with Mr. Gaetz?

22      A.   Last week maybe.

23      Q.   Would you consider Mr. Gaetz a friend?

24      A.   Yes.

25      Q.   Did you ever voice any displeasure to Abby



1 Greenberg about what transpired at the JW Marriott?

2    A.   Yes.  I think there verbally, like why is Joel

3 here?  Why is he around us and everything?  Because she

4 said she didn't him there, but her behavior was

5 different towards that, but I'm not -- you know, I don't

6 know again.

7    Q.   Any other times that you voiced displeasure

8 with what happened at the JW Marriott to Abby Greenberg?

9    A.   No.  I think at that point it was I'm being

10 threatened, I'm being extorted, and I was starting to

11 shut down all communications at that point with -- or at

12 least limiting any interaction.  But I believe -- like I

13 said, I believe we interacted after that.

14    Q.   Right.  You have text messages --

15    A.   Well, a stone wall -- sorry, the Stonewood

16 Grill in Heathrow.

17    Q.   And you continued to talk with Abby Greenberg

18 by text, correct?  We have text messages --

19    A.   I don't have -- I don't have text messages with

20 her.  I produced all the text messages -- I produced all

21 the text messages I have.

22    Q.   And some of them postdate the JW Marriott

23 visit, correct?

24    A.   Yes.  They -- this was after her clothes were

25 burned by Joel, and when she was living with him at the



1   house her parents bought for her -- or them.  The new

2   house.  So there were some things that happened.  Again,

3   I had distanced myself, but I also -- listen, I'm not

4   trying to, you know, have a revisionist history.  Abby

5   and I were very close.  We were very close friends, and

6   I really believed what she was trying to -- what she was

7   trying to do with her life and be as supportive -- I'm

8   talking about before all the indictments.  Be a

9   supportive stay at home spouse and support him in his

10  endeavors and change her life and her path and really be

11  a supportive spouse to her husband.

12          And we had -- we did a lot of events in our

13  moms group together.  Most of our events involved

14  children.  Joel and Abby would come over with the kids

15  in the pool.  You know, we -- like I said, there is a

16  number of moms events that we would do together, you

17  know, before I knew anything about how truly corrupt the

18  situation was and those supporting him that I wanted to

19  be there for her.

20      Q.   So it's fair to say that after the July 19,

21  2020, visit to the JW Marriott you continued

22  communicating with Abby Greenberg?

23      A.   Like I said, I believe far more limitedly.

24      Q.   But it continued despite the fact that you were

25  unhappy with how that visit turned out?



1      A.   Well, the Stonewood Grill incident, I believe I
2  was invited by someone else and she was there.  I don't
3  know if it was a planned arrangement or something like
4  that.  And there were a couple of instances I also felt,
5  again, like, hey, you know extorting your friends -- you
6  know, I think there was an element too of -- I don't
7  want to say keeping tabs, but like what is going on?
8  You're threatening people.  You're husband is
9  threatening people.

10          You're continuing -- you know, she visited him
11 in prison obviously in his jailhouse cell interview.
12 There was a number of things that went on afterwards
13 that Abby Greenberg was still having contact with the
14 Greenbergs, still assisting with the investigation,
15 obviously providing information.  So I think there
16 was -- again, all the knowledge we have now was not the
17 knowledge we had at the time.  And I also started
18 finding out more about Abby being involved in some of
19 the sexual lifestyle things that Joel was involved in
20 although later you'll see in our text messages she
21 claims, you know, that she didn't want the hall pass but
22 she did it anyway.

23          So I don't know what kind of situation was
24 going on between them, what kind of -- what he was
25 asking her to -- what she wasn't okay with, but these



1 things started coming out, you know, more and more about

2 what they were engaged in together.

3     Q.   So if you were so unhappy about what transpired

4 at the JW Marriott, why did you continue communicating

5 with Abby Greenberg after --

6          MR. BELTRAN:   I can't hear the question.

7 BY MR. PERKINS:

8     Q.   If you were so unhappy about a what transpired

9 at the JW Marriott, why did you continue communicating

10 with Abby --

11    A.   Abby was a consistent leak for the Greenberg

12 family.  She consistently told on her husband and the

13 parents, so I think that it wasn't -- it wasn't unusual

14 if I shot that she was now extorting -- that their

15 family was now going to be extorting us.  If she was

16 continuing to communicate with them, it would not be odd

17 for me to stay into contact to receive information, but

18 I just knew what the situation was at that point.

19    Q.   Do you have any information that Abby Greenberg

20 discussed Christopher Dorworth with the press?

21    A.   Let me try to say this correctly.  I can't

22 quite recall how, but we were informed by the press, a

23 member of the press, that we had a Dave Webster problem

24 who was Abby Greenberg's attorney in the criminal

25 situation.  And as you're well aware, press sources are



1  not allowed to -- press is typically very unable to

2  reveal their sources, but that was -- it started to

3  become evident I think to my husband based on the type

4  of information that he was being questioned about by the

5  press that whether it was Fritz or Dave Webster, that

6  there was information being given over to the press

7  specifically to target my husband.  Press members were

8  telling my husband you are being -- you know, you have

9  people targeting you.  That was being said to my

10  husband.  And so you can ask him directly about those

11  things.

12      Q.   But I'm asking you specifically.  Do you have

13  any information personally that links Abby Greenberg to

14  any statement made to the press about Christopher

15  Dorworth?

16      A.   You'll see in my text messages that Abby

17  references being very angry at Megan Zalonka, and the

18  text messages that I received from -- and she's an

19  adult, so this wasn't -- this wasn't an underage girl,

20  that she was very angry at Megan Zalonka.  She had

21  mentioned that multiple times.

22          And the questions the press was asking me about

23  was in reference -- you'll see that I turned those over

24  as well, was really related around Megan Zalonka.  And

25  so, you know, I would say that that would be my



 1  conclusion that there was a lot of information that is
 2  given to the Daily Beast that comes from Abby Greenberg
 3  based on the fact too that they said that the person
 4  talking to them was someone I would trust.  And as you
 5  know, as I have made clear, we were friends.
 6      Q.   Who is Megan Zalonka?
 7      A.   Megan Zalonka, I met her through Matt.  She was
 8  a bathing suit model and a -- like fashion model.
 9      Q.   And what was the nature of your relationship
10  with Ms. Zalonka?
11      A.   I -- she had come to my home with her
12  boyfriend, not Matt.  This was after that.  She's come
13  to my home for a party.  We're -- we don't have like a
14  close relationship, but I'm very friendly to anybody who
15  walks in my home.  I'm now probably a very paranoid
16  person about anybody who walks in my home.  But at the
17  time, I was just very hospitable.  It was a date.  I
18  don't remember -- I don't think I ever asked Matt how he
19  met her.  She was definitely an adult, but she -- I
20  don't know what her age is, but she is -- she
21  attended -- Matt talked about her on the -- I think that
22  is the one on the Tucker Carlson interview as somebody
23  that Tucker Carlson met.  I think so.  I hope I don't --
24  I have not misspoken on that, but Matt -- but she
25  attended events with him as a date.



1    Q.   When was the party with Ms. Zalonka came to

2   your house and you greeted her?

3    A.   It was -- I want to say it was a watch party

4   for a documentary on -- there was a number of

5   conservatives.  There was this documentary -- again, you

6   can ask Chris about this.  There was a documentary about

7   Thomas Massie, Matt Gaetz, a couple of conservatives.

8   What was the name of that?  I don't remember, but I

9   believe she came for that.  I think she was at my home

10  for that, but I was there is my point.  And she's on the

11  gate log we talked about on --

12   Q.   What kind of questions did the press ask you

13  about Ms. Zalonka?

14   A.   They asked me about cocaine.  They asked me

15  about if -- they were really focused on -- they said

16  they had photos of me with her.  I have -- I think Abby

17  turned over photos or I'm turning over -- I don't know

18  if anybody.  Nobody has asked me for photos.  I have

19  photos of me and Abby and Megan Zalonka together at

20  an -- I can't remember the name of the political event.

21   Q.   And when was that rough timeframe where there

22  is a photo of you, Abby, and Megan Zalonka?

23   A.   I don't remember.  Joel was not indicted yet.

24  This was before indictments.  So I don't remember if he

25  was under investigation with the Secret Service at this



1  time.  I don't remember how early this was, but it was

2  not -- oh, no, it was '19.  I would want to say October

3  November of '19.  I probably shouldn't speculate, but I

4  remember because when the stuff started happening to

5  Abby, I had felt bad because I had distanced myself.

6  This was the same party where Abby had offered me

7  cocaine, and -- well, I don't believe it was her

8  cocaine.

9      Q.   Whose cocaine was it?

10     A.   I don't know who brought the cocaine, but it

11 was not hers, and I just remember it being there.

12     Q.   And what, if anything, did you say to Abby when

13 she offered you this cocaine?

14     A.   I said, I don't do drugs.  I just -- I don't.

15 I don't.  I wouldn't.  I wouldn't try drugs in public,

16 and I don't do drugs.

17     Q.   Have you talked to the press about --

18     A.   I have not.

19     Q.   -- AB at all?

20     A.   No, I have not.

21     Q.   You haven't talked to the press about any type

22 of ghost political scheme?

23     A.   I have not.

24     Q.   What is your understanding of what a ghost

25 political scheme means, that term?



1     A.    Well, ghost candidate I think is probably not a
2  correct terminology for it.  It's a third-party
3  candidate, and so a third-party candidate would be that
4  you place -- both democrats and republicans do this.  As
5  long as you do it correctly and file the paperwork
6  correctly, it's perfectly legal.  That you would file an
7  NPA to pull -- to attract votes from particular
8  demographics or from, you know, your republican voters
9  or your democratic voters depending on what side you
10  were on.
11        The ghost candidate scheme, the third-party
12  candidate scheme that you're referring to, that the
13  paper talks about with my husband, that election was not
14  impacted by a third-party candidate meaning that the
15  votes that were for the winning candidate were more than
16  the -- more than a difference if the losing candidate
17  had received 100 percent of all of those votes.
18     Q.    And are you referring to the Ben Paris, Lee
19  Constantine election?
20     A.    No.
21     Q.    District three, or the Jason Brodeur election?
22     A.    The one my husband was questioned about was
23  about Jason Brodeur.
24     Q.    Jason Brodeur, okay.  Do you know Ben Paris?
25     A.    Yes.



1    Q.   And how would you describe your relationship

2  with Mr. Paris?

3    A.   We're very friendly.  I -- we Ben and Morgan

4  Paris hang out on our boat.  You know, I was -- I sat

5  with Morgan at the trial, Ben's trial.

6    Q.   Have you ever donated to any campaign of

7  Mr. Paris?

8    A.   I don't know, but I would not be surprised if I

9  donated to it.  That wouldn't surprise me, but I can't

10  remember writing a check.  That would be publicly -- we

11  could find that.

12    Q.   Have you done any fundraising for him or host

13  events for him when he ran against Lee Constantine in

14  the Seminole County district three race in August of

15  2021?

16    A.   Did I specifically, no.

17    Q.   Did Mr. Dorworth?

18    A.   I can't -- I can't remember.  You can ask him

19  about that.  We would -- Ben was a friend, and Lee

20  Constantine is not.  So we would have been very

21  supportive of Ben in that.  I just don't remember any

22  particular or specific details.

23    Q.   And you say Lee Constantine is not a friend.

24         Why do you say that?

25    A.   He was political rival of Chris' for quite some



 1  time.  He has been very active against -- he's an

 2  environmentalist and very active against Chris' real

 3  estate projects.

 4      Q.   Have you ever discussed ghost political schemes

 5  with Abby Greenberg?

 6      A.   No, I did not discuss political things with

 7  Abby Greenberg.  I did not discuss my husband with Abby

 8  Greenberg in conversation, particularly business.

 9      Q.   Have you discussed ghost political schemes with

10  Anne Pham?

11      A.   No.  I don't talk about -- no.

12      Q.   Have you had any discussions with the Daily

13  Beast about your husband?

14      A.   No, I have not -- I have not spoken to --

15      Q.   Any press?

16      A.   Any press.

17      Q.   Including the New York Times, you've never

18  talked to them?

19      A.   Correct, I have not spoken to any press.  No, I

20  have not.  You'll see from my text messages, I do not

21  respond to Daily Beast, and I think -- I will affirm

22  that I did not call anyone about those, but I obviously

23  did watch my husband spend days dealing with continuos

24  press calls.

25      Q.   On the weekend of July 15th, you were at the



```
 1   IBTTA conference in Dallas?

 2       A.   That is what records indicate, yes.

 3       Q.   Do you recall how long you were there in

 4   Dallas?

 5       A.   I don't remember.

 6       Q.   Do you recall when you got back to Florida?

 7       A.   I don't remember.

 8       Q.   Don't remember at all?  Would you have

 9   records --

10       A.   I could look at flight records, yes.  I can

11   give you a flight record.  I might be able -- I think I

12   would be able to find a flight record unless it was

13   booked through my company, but if I booked it myself, I

14   would be able to find a flight record or I can -- I will

15   look for you.

16           MR. PERKINS:  I want to play another clip from

17       Ms. B's deposition that I took, and I think we all

18       have to mute I think including Mr. Beltran.  I think

19       you need to mute so this works properly.

20           MR. BELTRAN:  All right.  I'll do that.

21           (A video clip was played.)

22   ████████████████████████████████████████████████

23     ███████████████████████████████████████

24   BY MR. PERKINS:

25       Q.   So you heard that -- you heard that line of
```



```
 1   questioning?

 2       A.   No.  I mean, I --

 3            MR. BELTRAN:  Is that the part where -- hold

 4       on.  Go ahead, Rebekah.  I didn't --

 5            THE WITNESS:  I said, no, I have not heard this

 6       line of questioning.

 7   BY MR. PERKINS:

 8       Q.   Did you hear it clearly though just now when I

 9   asked her does Mr. Dorworth have any distinguishing

10   features --

11       A.   And she said he had no birthmarks.

12   ██████████████████████████████████████████████

13   ██████████████████████████████████████████████

14   ████████

15            Did you hear that?

16       A.   I did.

17       Q.   Okay.  Does Mr. Dorworth have any

18   distinguishing features like a birthmark or a tattoo?

19       A.   No, he does not have any tattoos at all.

20       Q.   And no birthmarks?

21       A.   No.  He has no birthmarks there in that space.

22       Q.   What about anywhere else?

23       A.   He has other distinguishing features on his

24   back and things like that.

25       Q.   What would you describe as a distinguishing
```



1  feature?

2  ████████████████████████████████████████

3  ████████████████████████████████████████

4  ████████████████████████████████████████

5  ████████████████████████████████████████

6      Q.   Back in 2017, did Mr. Dorworth have a belly?

7      A.   Yes.  He has a belly now.

8      Q.   Has his appearance changed at all from the

9  summer of 2017 to as we sit here today?

10     A.   Yes.  He is still a big guy though.  He's a big

11  guy.

12     Q.   Has he lost any weight since the summer of

13  2017?

14     A.   Yeah, he's lost some weight; but, I mean, like

15  I said, he's still a pretty big guy.

16     Q.   Do you know Mike Fischer?

17     A.   Yes, I do.

18     Q.   Would you consider him a friend?

19     A.   I would consider us friend friendly, yes.

20     Q.   Have you ever discussed the July 15, 2017,

21  party with Mike Fischer?

22     A.   I did not discuss -- I have not asked him any

23  questions about that.

24     Q.   What about Mr. Ellicott?  Have you had any

25  discussions with Mr. Ellicott about that July 15, 2017,



1  party?

2      A.   I have not, but I don't have Joe's number and I

3  think he's in jail.  So I don't -- I'm not...

4      Q.   Did Megan Zalonka ever offer you cocaine?

5      A.   I don't think she ever offered it to me

6  directly.

7      Q.   Did you ever observe Megan Zalonka doing

8  cocaine?

9      A.   I observed -- I don't know if I observed.  I

10 don't know that I saw it, but I think that was what was

11 going on.  Like she wasn't like looking at me doing it

12 kind of thing.

13     Q.   Okay.  And why do you think that was what was

14 going on?

15     A.   Because she was talking about how drugs keep

16 you skinny.

17     Q.   And this was where?

18     A.   In the bathroom with Abby and Megan.

19     Q.   And this was at a political rally of some kind?

20     A.   Yes.

21     Q.   And was Mr. Gaetz involved with that?

22     A.   Oh, I don't know.  I have never seen Matt Gaetz

23 use cocaine, and he was not in the lady's restroom.  And

24 just for the statement, I have not seen Abby do cocaine

25 either.  She asked about it, but I did not observe her



 1 | doing cocaine.

 2 |    Q.   Before Mr. Dorworth resigned from Ballard, was

 3 | he getting calls from the press about sexual misconduct?

 4 |    A.   About Joel.  It was -- I think a lot of --

 5 | there was information.  I think there was girls talking

 6 | to the press about parties.  There was inquiries on

 7 | parties.

 8 |    Q.   What about his own sexual misconduct with

 9 | women?  Was that a press inquiry before he resigned

10 | from --

11 |        MR. BELTRAN:  Object to the form.

12 |        THE WITNESS:  I don't -- I can't -- I can't

13 |    quite remember the timeline on who the inquiries

14 |    were about.  I think that was -- I believe that was

15 |    a part of it, but I think more -- it was not about

16 |    him.  You know, it was about what was going on with

17 |    Joel, that there was all this information going out

18 |    about Joel and particularly Matt.  Matt's what made

19 |    it a story.

20 |        Matt was -- I did ask Matt specifically about

21 |    the third party because Matt is listed as somebody

22 |    who was there during the third party.  And Matt's

23 |    like, We never had a conversation about it.  Matt's

24 |    in congress.  He wouldn't -- he wouldn't care or be

25 |    involved or -- I mean he would care, but he wouldn't

```
 1      be involved in a third-party race on a state senate
 2      anyway.
 3  BY MR. PERKINS:
 4      Q.   You're talking about --
 5      A.   That's all conjecture, but I'm telling you that
 6  I asked him about it, and he wasn't involved.  The
 7  conversation didn't happen because there were two
 8  witnesses, anonymous.  That's what the press keeps
 9  using, these two anonymous witnesses, for a number of
10  various acts.
11      Q.   I'm going to ask you -- I think the next
12  exhibit here is -- where are we at?
13          MR. BELTRAN:  Is this one we have had before?
14          MR. PERKINS:  These are text messages between
15      Rebekah and Abby.  We have not marked these
16      previously.
17          MR. BELTRAN:  Okay.  Are you going to send an
18      email on that?
19          THE COURT REPORTER:  84.
20          (Defendant's Exhibit 84 was marked for
21  identification.)
22  BY MR. PERKINS:
23      Q.   Was it your understanding that Mr. Dorworth
24  resigned from Ballard because of his affiliation with
25  Joel Greenberg?
```



1      A.    Matt and Joel.

2      Q.    With Matt Gaetz and Joel Greenberg?

3      A.    Well, I think Matt is what made -- Joel

4   extorting Matt, Joel threatening Matt, Joel saying

5   whatever he was saying about Matt and Chris made the

6   story bigger.  And, you know, if you have a pardon --

7   when you're getting more people into it, if you're

8   trying to make everybody else's problems your

9   problems --

10      Q.   And so I just want to be clear, the resignation

11   from Ballard Partners, your understanding is it had

12   nothing to do with allegations of sexual misconduct on

13   the part of your husband?

14      A.    No, that's not what I said.  You know, members

15   of Ballard, particularly his boss, Brian Ballard who is

16   very keyed in to top level media at all levels, and so

17   he would know more about what questions were being asked

18   regarding Chris, regarding Matt, regarding Joel, whether

19   Chris was being referenced, whether parties at our home

20   were being referenced.

21          And so in -- I don't -- I was not in those

22   conversations with Brian and Chris, so I cannot tell you

23   for sure.  You'd have to ask Chris directly, but it was

24   certainly a -- you know, third-party candidates are a

25   part of politics.  My husband was not involved in this



1  one, but my husband has been involved in all sorts of

2  election things previously, and this would -- it's a

3  lobbyist job -- part of the reason why he has a

4  constitutional law case that beat his previous

5  indictment was because a lobbyist's job is to talk to

6  people and to be involved in votes, to be involved in

7  things.  And that's a private citizen's right.

8      Q.   I think our air has gone off.

9      A.   I think so too.

10         MR. BELTRAN:  How about sending me that

11     exhibit?  Are we still using --

12         MR. PERKINS:  I am.  I can email it to you.

13         MR. BELTRAN:  Why don't you do that if we're

14     going to spend more time on it?

15 BY MR. PERKINS:

16     Q.   All right.  So we're at bates number Abby

17 Greenberg 15, and in that text message you state to

18 Abby, He was so disrespectful to you publicly.

19         What are you referring to there?

20     A.   I'm talking about -- when I say publicly, I

21 don't mean a grandstand in like a speech or something.

22 I mean when he was out with friends and she wasn't

23 around that I thought that he was disrespectful to her.

24     Q.   And how would he be disrespectful to her?

25     A.   He wouldn't call her when he was -- they'd get



 1  in fights, he would call her names to other people about
 2  how she was acting.  He would say the C word, and he'd
 3  say some other things.  And he used to -- when she was
 4  pregnant, he would talk about how disgusting her body
 5  was, and I thought that that was just a horrible thing
 6  to say about the mother of your child.  And my husband
 7  snapped at him and told him you should never say that
 8  about the mother of your child.  And he was like, It's
 9  true, I think she's disgusting.  He was just pretty
10  gross.  He could be gross.  He was very unkind.
11      Q.   Let's go to Abby Greenberg 16 here.  You state
12  to her that, Dozens of reporters have reached out to us.
13  We have not been responding to anything, but they
14  said --
15          MR. BELTRAN:  I haven't received that exhibit.
16      Have you sent it to me?
17          MR. PERKINS:  Yeah.  You should have it.
18          MR. BELTRAN:  What email did you send it to?
19      No, that's not it.  Send it to
20      Mike@Beltranlitigation.com.
21          MR. PERKINS:  Yeah, I did.
22          MR. BELTRAN:  Well, I don't have it here.
23          MR. PERKINS:  Okay.  These have been produced
24      for awhile now, and they're in the interrogatory
25      answers too.



```
 1            MR. BELTRAN:  Well, where -- which
 2       production -- all right.  Just keep it up on the
 3       screen.
 4    BY MR. PERKINS:
 5       Q.   You see that there?
 6       A.   Uh-huh.
 7       Q.   You're saying, Dozens of reporters have reached
 8    out to us.  We have not been responding to anything, but
 9    they said today -- they emailed today that they're going
10    to run a story that there are allegations that Joel
11    Greenberg offered --
12            MS. WOLF:  Fritz, you're not muted.  Fritz,
13       you're not on mute.  Fritz, you're not on mute.
14            MR. PERKINS:  Back on the record, Michael
15       Beltran you there?
16            MR. BELTRAN:  Yeah, I've been here the whole
17       time.  I don't know what's going on.
18    BY MR. PERKINS:
19       Q.   So, Dozens of reporters have reached out.
20            Who are those reporters that you're referring
21    to?
22            MR. BELTRAN:  I just got your exhibit, by the
23       way.
24            MR. PERKINS:  Okay.  Abby Greenberg 16,
25       Michael.
```



1          THE WITNESS:  No, I was sharing, you know, just
2      me seeing my husband nonstop listening to reporters,
3      whether it was from like voicemails that were being
4      sent or text messages.
5  BY MR. PERKINS:
6      Q.   Do you recall any of the press outlets that
7  were reaching out that day?
8      A.   I know the New York Times, he had
9  conversations -- I don't know if it was that day, but
10  the New York Times was one that -- that they -- they
11  seemed to have the most information about the story
12  gathered from other sources.
13      Q.   Were there stories ever run around this time
14  about your husband and sexual misconduct?
15          MR. BELTRAN:  Object to the form.
16          THE WITNESS:  There were a lot of allegations.
17      I think my husband was working to stop the people
18      that were saying these things were occurring.
19  BY MR. PERKINS:
20      Q.   But was a press of any kind, any type of media
21  attention, in April of 2021, did a story ever come out?
22      A.   I don't know.  I don't know the timeline on
23  those things.  So you -- Chris will have a better memory
24  of those things.
25      Q.   As you sit here today though, you don't recall



1  a story coming out around that time about sexual

2  misconduct of your husband?

3      A.   I don't remember the specifics.  I think,

4  again, a lot of reference of parties, and, you know,

5  they didn't designate which house or whose house they

6  were at.  You know, a lot -- you know, there was things

7  that we saw, we weren't getting asked about things.  We

8  had no knowledge that there was this party with A at our

9  home at the time.  And so we had no reason to think --

10 you know, Chris can obviously -- which I'm sure he would

11 respond about things that were going on at our home.

12 But at this point in time, you know, he was able to say

13 with clear conscious because as we now know he was not

14 the home when A was at the home.

15          And so, like, he -- you know, responding

16 that -- trying to refute allegations, he would have been

17 doing so with the knowledge that he had.  And remember,

18 we do not receive gate notifications via email or things

19 like that.  And I have previously warned that if my

20 husband had turned over our gate code to someone else,

21 that he would not have had to pick up the phone for the

22 security folks and probably would not have on Lake

23 Maitland.

24      Q.   But to allow someone in the neighborhood,

25 somebody would have to give authorization to --



 1      A.    That's correct.

 2      Q.    And that would be done by a phone call from the

 3   guardhouse, correct?

 4      A.    No.

 5            MR. BELTRAN:   Form.

 6            THE WITNESS:   You could call the guard gate.

 7      The way it worked at the time is you would say the

 8      name or you could say, All in.  If you were just

 9      like, Hey, there is a blanket.  There is a party

10      coming, all in, and then they just log everyone who

11      comes in.  You could also -- like I said, somebody

12      else could call and say the name.  You would have to

13      get that information from the guard gate to -- you

14      would call, they would wait, you say a name, and

15      then they would click through at the time.  And then

16      it would say like, Rebekah Dorworth, and they would

17      hear that name, and then they would let you in.

18   BY MR. PERKINS:

19      Q.    At some point in time you purchased or Chris

20   purchased the Friendly Confines in Altamonte Springs?

21      A.    Yes.

22      Q.    And do you still own that restaurant?

23      A.    We do not.

24      Q.    When did you get rid of that restaurant?

25      A.    Last year I think.  I don't know.  The timeline



1 | is a little hazy on it.

2 |     Q.   And why --

3 |     A.   I try to block it out.

4 |     Q.   Why did you get rid of that Friendly Confines

5 | restaurant?

6 |     A.   You know, I think you shouldn't make your

7 | hobbies your work, and so it was just becoming a lot of

8 | work.  We loved -- my daughter and I loved doing karaoke

9 | there.  It was a lot of fun.  We spent a lot of time

10 | there, but we are not restaurant people and we found

11 | that out.  It was a dream my husband always wanted to

12 | try.  We tried it, that dream has now been done.  There

13 | were also a lot of structural issues with the Altamonte

14 | Mall that we found in engineering plans, and it appeared

15 | that they there were going to be a significant amount of

16 | real issues for -- structural issues for the foreseeable

17 | future.  Again, headaches that just because you enjoy

18 | going to bars and restaurants doesn't mean you should

19 | own one.

20 |     Q.   One more clip here from Ms. B's deposition.

21 | Hopefully you can hear it.

22 |     (A video clip was played.)

23 |     THE WITNESS:  I can't hear.  Are you able to

24 |   replay?

25 |     MR. PERKINS:  I think we're good.  With that,



1    I'll just turn over the deposition to Mr. Furbush.

2              THE WITNESS:  I didn't --

3              MR. BELTRAN:  Sorry, go ahead, Rebekah.  You

4    had something to say.

5              THE WITNESS:  Well, there is a video playing on

6         the screen, and I can't hear it, and I don't know if

7         there was a question.

8  BY MR. PERKINS:

9         Q.   I was going to play you that clip of Ms. B.

10  She was describing the home in the Dorworth residence

11  and there being an upstairs guest room that overlooks a

12  pool, and I was going to ask you after you had a chance

13  to listen to that clip, and I'll ask you back in the

14  summer of 2017 did you have an upstairs guest bedroom on

15  the second floor of the Dorworth residence that kind of

16  overlooked the pool?

17       A.   You can see the pool out of a couple of

18  bedrooms, yes.

19       Q.   And would you describe those as guest bedrooms?

20       A.   At that time, yes.

21       Q.   Okay.  And at that time is referring to the

22  summer of 2017; is that correct?

23       A.   Yes.

24            MR. PERKINS:  All right.  Thank you.

25            MR. BELTRAN:  Let's take a quick break.



 1          THE VIDEOGRAPHER:  If there are no objections,
 2     going off record.  The time, 7:51 p.m.
 3          (A break was had.)
 4          THE VIDEOGRAPHER:  On record.  The approximate
 5     time is 8:00 p.m.
 6                 FURTHER DIRECT EXAMINATION
 7  BY MR. FURBUSH:
 8     Q.   Ms. Dorworth, my name is Mike Furbush.  I
 9  represent Greenberg Dental in this case.  Are you -- and
10  I don't know if you can see me in the dark.
11          Can you see me there?
12     A.   I can see you now.
13     Q.   All right.  Have you ever been a patient of
14  Greenberg Dental?
15     A.   One second, I've got to go back on the mic.  I
16  am not a patient nor have I ever been a patient of
17  Greenberg Dental.
18     Q.   Has your husband ever been a patient of
19  Greenberg Dental?
20     A.   Not that I'm aware of.
21     Q.   Have your stepchildren or your child ever been
22  patients of Greenberg Dental?
23     A.   My biological child, Grace, definitely not.  I
24  do not know regarding my stepchildren's very young
25  years.



1    Q.   The complaint you verified alleges that

2    Greenberg Dental was part of a racketeering conspiracy.

3         Do you have any evidence to support the

4    allegation that Greenberg Dental was part of a

5    racketeering conspiracy?

6         MR. BELTRAN:   Object to the form.   Go ahead.

7         THE WITNESS:   Joel's -- Joel's discussion about

8    it.   He was pretty open about where the money came

9    from in his family, that they funded everything, his

10   life, others.   He was pretty open about talking

11   about getting pills from there.   I don't know, you

12   know -- I don't know much more than that, simply his

13   statements about funding, but I have no additional

14   knowledge beyond that.

15 BY MR. FURBUSH:

16   Q.   Okay.   So the only evidence that you're aware

17 of that Greenberg Dental is part of a racketeering

18 conspiracy are things that Joel Greenberg has said to

19 you?

20   A.   Yes.   Obviously Joel -- when I say that, Joel

21 and Abby collectively as where their money comes from.

22   Q.   The complaint you verified alleges that Joel

23 Greenberg worked with Greenberg Dental.

24        What facts are you basing that allegation on?

25   A.   So I'm not sure exactly how their tax structure



 1  works, but he would represent that he was an owner in

 2  Greenberg Dental.  He would represent that he was a

 3  stockholder, shareholder.  I don't know -- again, I

 4  don't know how their -- what is it called -- estate

 5  planning or Greenberg's payout and stock.  I don't know.

 6  I would have -- we would have to find out more

 7  information about that.

 8      Q.  Well, the complaint you verified and swore to

 9  be true said that Joel Greenberg worked for Greenberg

10  Dental.

11          Do you know that to be true?

12          MR. BELTRAN:  Object to the form.  And if you

13      want to show her the document, I don't know what

14      you're referring to but...

15          MR. FURBUSH:  Your complaint, and I don't want

16      to show it to her.  So I'm just going to keep asking

17      questions.

18          THE WITNESS:  What page?  What page?

19  BY MR. FURBUSH:

20      Q.  Ma'am, I'm reading it to you.  The complaint

21  you verified says, and I will quote --

22      A.  Well, if you're reading it then you can tell me

23  what number it is.

24      Q.  Joel also worked with Greenberg Dental.  It's

25  paragraph 271.



 1    A.   Yeah, worked with Greenberg Dental.  If he's a
 2  stock owner, the representations he made was that it was
 3  all together.  That's -- again, that was where -- I
 4  wasn't aware of other businesses that the Greenbergs
 5  had.  That is the only one that Joel consistently talked
 6  about.
 7    Q.   Well, he is not a dentist is he, Joel
 8  Greenberg?
 9         MR. BELTRAN:  Object to the form.
10         THE WITNESS:  I'm not a technologist, and I ran
11    a systems integration firm.
12         What does that mean?  Investors or the money
13    people or board shares or board members or stock
14    owners do not have to be the specific trade of an
15    entity, do they?  Sorry, I don't ask.  I'm not
16    asking the question.  That's not a question.
17  BY MR. FURBUSH:
18    Q.   So is Joel Greenberg a board member of
19  Greenberg Dental?
20    A.   I do not know.  I only know that he was a stock
21  owner.  He had ownership that he represented that he was
22  an owner, that he had ownership.
23    Q.   But you don't know one way or the other if Joel
24  Greenberg had stock in Greenberg Dental, do you?
25         MR. BELTRAN:  Object to the form.



1          THE WITNESS:  He would talk about his payments

2     that he would receive from them, quarterly payments

3     for stock ownership that he told me -- talked -- was

4     pretty open about it.

5   BY MR. FURBUSH:

6     Q.   So you swore that was true based on something

7   that was told to you by someone that your husband calls

8   a pathological liar?

9          MR. BELTRAN:  Object to the form.

10  BY MR. FURBUSH:

11    Q.   Is that right?

12    A.   That's right, but Abby was there, and Abby

13  didn't disagree with it.  So I assumed that where he was

14  getting money from -- you know, it's not like -- again,

15  it wasn't that he was saying this in isolation about his

16  role, you know, his ownership, how he got paid

17  quarterly.  So to the best of my.

18    Q.   You don't --

19    A.   No.  To the best of my knowledge -- I'm not

20  finished.  To the best of my knowledge, he was a very

21  invested and owner party of Greenberg Dental.

22    Q.   You don't have any idea if he was making that

23  up, do you?

24    A.   Well, he would flash his phone when he would

25  get his payment.  Like I -- again, you know, who knows



1  if that was on it or not, but that was a fun thing

2  that -- that's a very Joel thing to do.

3      Q.   So you don't know if he was making it up, do

4  you?

5          MR. BELTRAN:   Object to the form.  Go ahead.

6          THE WITNESS:   Again, based on the information

7      that Joel and Abby shared -- because it was one of

8      the things that Abby sometimes complained about

9      because it would go into a separate account from

10     her, and then he would have to transfer the money

11     over.  And she wanted, you know, obviously the money

12     to come directly to them, but I don't know their

13     interworkings of prenuptial agreements or anything

14     like that.

15  BY MR. FURBUSH:

16     Q.   The complaint you verified alleges that

17  Greenberg Dental agreed to provide and Abby Greenberg

18  and AB agreed to accept compensation in exchange for

19  participating in the process crimes intended to falsely

20  implicate Dorworth and others.

21          What evidence do you have that Greenberg Dental

22  made any payments to Abby Greenberg or AB in exchange

23  for anything?

24     A.   Well, there are payments that flow through

25  Greenberg Dental, right, to AWG.  That's where they



1  state they get their money from.  So, I mean, that's

2  what I'm telling you was told to me.  And if Joel is

3  paying the lawyers, there is a financing trail here that

4  was very clear when Joel talked about it.  So...

5      Q.   Are you aware of any direct payments made from

6  Greenberg Dental to Abby Greenberg, yes or no?

7      A.   I am not aware of a Greenberg employee, but I'm

8  aware of Greenberg owners and people who have stock

9  ownership that have provided -- that I've been told have

10  been providing legal -- telling, I think -- I think

11  there were text messages that I became aware of where

12  she was sent to an attorney from Joel Greenberg, and the

13  funds were handled.  And that money from Joel, because

14  Joel is out of a job and quite frankly obviously he made

15  much less as a tax collector than he made from Greenberg

16  Dental and from AWG, whatever the flow through process

17  is.  I'm sure that will be discovered by the plaintiff

18  in this case or when the documents are coming out from

19  Greenberg Dental.  But the representation that Joel and

20  Abby made were about where the money came from.  So any

21  actions by Joel were funded through the funding source

22  of the Greenbergs.

23      Q.   Are you aware of any direct payments having

24  been made by Greenberg Dental to AB?

25      A.   I am not aware.



 1      Q.    So the complaint you verified alleges that

 2   Greenberg Dental paid Joel Greenberg's to facilitate

 3   Greenberg's defense.

 4           MR. BELTRAN:  Object to the form.

 5   BY MR. FURBUSH:

 6      Q.    What facts are you basing that allegation on?

 7           MR. BELTRAN:  Object to the form.

 8           THE WITNESS:  I'm basing it on the fact of

 9      where Joel and Abby stated their money came from.

10   BY MR. FURBUSH:

11      Q.    Are you basing it on anything else?

12      A.    I am not.

13      Q.    How did you find out about the July 15, 2017,

14   party at your house?

15      A.    My husband called me.

16      Q.    When --

17      A.    No, sorry.

18      Q.    -- did he do that?

19      A.    I'm sorry.  I thought you were talking about

20   the July 22nd one.  You're talking about when AB was

21   there?

22      Q.    Yes, the party where there was a minor being

23   served alcohol and drugs at your house.

24      A.    I found out at about that when I looked at the

25   gate logs for my home.  My husband and I both found out



1  about that party at that time.

2      Q.   Did you invite those people over to your house?

3      A.   Neither my husband nor I invited those people

4  over to my home.

5      Q.   Did you personally give anyone permission to

6  have a party at your house?

7      A.   Did anybody ask me if they could have a party

8  at my home, no.

9      Q.   I said did you give anyone permission to have a

10 party at your house?

11         MR. BELTRAN:  Object to the form, asked and

12     answered.

13         THE WITNESS:  Yeah, that's -- I have answered

14     that.  No one asked me for permission to have a

15     party at my house.

16 BY MR. FURBUSH:

17     Q.   And you did not give anyone permission to have

18 a party at your house?

19         MR. BELTRAN:  Object to the form.  It's been

20     asked and answered twice.

21         THE WITNESS:  I did not --

22         MR. FURBUSH:  That's not the same -- that is

23     not the question, and you know it.

24         MR. BELTRAN:  No, I don't know it.  It sounds

25     like the same question three times, but go ahead and



 1     answer it one more time.

 2          THE WITNESS:  I did not give anyone permission

 3     to have a party at my home.

 4  BY MR. FURBUSH:

 5     Q.   Did you husband, to your knowledge, give anyone

 6  permission to have a party at your home?

 7          MR. BELTRAN:  Form.

 8          THE WITNESS:  Not that I'm aware of.

 9  BY MR. FURBUSH:

10     Q.   So if neither you nor your husband gave people

11  permission to have a party at your home, why was there a

12  party at your home?

13          MR. BELTRAN:  Form.

14          THE WITNESS:  As I previously stated -- I don't

15     know if you've been listening of if you've been off,

16     but my husband, if he gave gate access to somebody

17     else, if they said, Hey, I'm going to invite a

18     friend over, I'm going to have Uber Eats in and they

19     misused my home, or, you know, when you say party,

20     if they were having a friend or two over, you know,

21     I don't know how to define --

22  BY MR. FURBUSH:

23     Q.   How did they get into your house?

24          MR. BELTRAN:  I'm going to object to the form.

25          THE WITNESS:  They got into my house through



1       the gate, and I did not have to give them access --
2  BY MR. FURBUSH:
3       Q.   Not the actual --
4       A.   -- nor did my husband have to give them access
5  in order for any of these people to come to my gate.  As
6  I stated previously that it would not be am uncommon if
7  someone was staying for multiple days at my home for us
8  to give them the gate code.  I assure you we don't do
9  that anymore.
10      Q.   Was there anyone staying at your home on July
11  15, 2017?
12           MR. BELTRAN:  Object to the form.  It's been
13      asked and answered all day long, but go ahead.
14           THE WITNESS:  As I said, you know, I think
15      during that -- I don't know the specifics of who was
16      there for -- there was two weekends.  We've
17      discussed two weekends, and there were people in and
18      out.  I'm sure people stayed for a day or two or
19      multiple days.  I've obviously -- I have referenced
20      that I thought that Matt had been there for a couple
21      of days.  I don't know how long Fish was there.  I
22      don't know how long anybody else came into town for,
23      if they came for a couple days or not.  But, again,
24      a lessen we have learned, you know.
25  BY MR. FURBUSH:



1     Q.   Did anyone other than you or your husband have

2  a key to your house?

3     A.   I don't think my husband has a key to our

4  house.  So we live in a gated neighborhood with patrol

5  from Ramco as well as the sheriff's office.  Us locking

6  the door would not -- you know, especially if people

7  were in the home when my husband left, he wouldn't have

8  locked the door, and I'm not sure that he would have

9  given a key to anyone.  I don't know that.  You can ask

10  him.

11     Q.   Have you talked to your neighbors about the

12  party at your house on July 15, 2017?

13          MR. BELTRAN:  Object to the form.

14          THE WITNESS:  No.  These are all -- everyone

15     who lives around us did not live there in 2017 I

16     don't believe, but I'm not positive on that.

17  BY MR. FURBUSH:

18     Q.   Do you know how many people were in your house

19  for the party on July 15, 2017?

20     A.   I don't.  I can only see the gate log, and I

21  don't know if other people -- if people brought -- you

22  know, I don't know if anybody brought a guest in with

23  them or not.

24     Q.   Were you happy when you found out that people

25  had a part y at your house?



1          MR. BELTRAN:  Object to the form, asked and

2      answered.  Go ahead.

3          THE WITNESS:  No, I was absolutely mortified

4      that there was a minor in my home or at least on my

5      gate log being discussed about the fact that it was

6      in my home.  Both my husband and I were mortified

7      because we didn't -- up until -- up until that gate

8      log, I didn't know and my husband didn't know that

9      this minor was supposedly in our home.  So you need

10     to understand that, that we did not know.  My

11     husband did not know.  My husband is somewhere else.

12     He's provided evidence to multiple parties on this.

13     So that's the answer is that, no, we did not know,

14     and clearly I am not happy about the fact that there

15     was a minor in the home.

16  BY MR. FURBUSH:

17     Q.   Are you still friends with the people who had

18  the party in your house when you weren't there?

19         MR. BELTRAN:  Object to the form.

20         THE WITNESS:  I don't -- I have -- I was never

21     friends with A.  I was never friends with ████████.

22     I don't --

23  BY MR. FURBUSH:

24     Q.   What about the men who were there?

25     A.   I have not seen Fish since Matt's wedding.  I



1  don't have an -- I'm friendly with Fish.  I don't have

2  a -- I -- we're not close.  So that's -- it's not really

3  like are you friends with him?  You know, I'm a friend,

4  but, yes, we are friends with Matt.  And quite frankly,

5  after seeing that this is all about my house and my

6  husband wasn't there and what she's saying that --

7  saying that my husband was there, so while I'd really

8  like to believe her testimony -- unfortunately -- or

9  whatever she's stating about my home that you all played

10  and stuff about being there, you know, any acts that she

11  performed there because I know she's lying about my

12  husband.  I don't -- I can't say that she's telling the

13  truth about anybody else.

14      Q.   But you also can't say that she isn't, can you?

15           MR. BELTRAN:  Object to the form.

16           THE WITNESS:  I can say that she is -- she is

17      clearly mistaken about whoever she talked to in my

18      home because my husband wasn't there.

19  BY MR. FURBUSH:

20      Q.   You testified earlier that you and your husband

21  have gone to marital counseling.

22           When did you start going to marital counseling?

23      A.   We've gone a couple of times throughout our

24  marriage to our pastor, just like a one off thing here

25  and there, and then we started going to marital



 1  counseling with a licensed -- I don't know how you say
 2  that.  A licensed person in -- around January of this
 3  year.
 4       Q.  Did you go together and separately or --
 5       A.  We go both together, and I go separately.
 6       Q.  And you said you started seeing a licensed
 7  marriage counselor this year?
 8       A.  Yes.
 9       Q.  Had you and your husband ever seen a licensed
10  marriage counselor before this year?
11       A.  No, we had inquired about it several times, but
12  we had not, and I -- we had inquired about it several
13  times, but I had not -- we had not gone.
14       Q.  You mentioned earlier Justin Katzer invited
15  your husband to go to a strip club.
16           Do you remember that testimony?
17           MR. BELTRAN:  Object to form.
18           THE WITNESS:  There is no Justin Katzer.
19       Katzer -- you're client, his name his -- son is
20       named Josh Katzer.
21  BY MR. FURBUSH:
22       Q.  Excuse me, Josh Katzer?
23       A.  Unless Justin is his legal name.  You would
24  know better than I would.
25       Q.  Okay.  Well, do you remember talking about Josh



1  Katzer inviting your husband to go to a strip club?

2      A.   I do.

3      Q.   When was that?

4      A.   That was in early 2021.

5      Q.   And when is the last time you saw Josh Katzer?

6      A.   As soon as -- I can't remember exactly when the

7  last time.  Maybe in '22 he was in -- I think 2021.

8  I'll have to -- you can ask Chris about the timeline.  I

9  wasn't around him as much.  I've only -- he's come to my

10 home a couple of times where I've interacted with him,

11 where I've spoken to him.  But my interaction with him

12 has been -- well, actually, that's not true.  I have

13 been at a party at his home.  I have been out to dinner

14 with him, and it was a woman he was living with at the

15 time.  So I'm not positive on the -- it was once things

16 started going real south for Joel and things started

17 coming out, we no longer heard from him.

18     Q.   And you think that was some time in 2022?

19     A.   No.  I'm not sure on the timeline.

20     Q.   When is the last time you actually saw him in

21 person?  Do you know?

22     A.   I don't.  I don't know the when on that.  But

23 again, Chris will have good -- you'll be able to ask him

24 good questions on that.

25     Q.   Where is the last place you saw him in person?



1          MR. BELTRAN:  Object to the form.  Asked and

2      answered.  Go ahead.

3          THE WITNESS:  I think in a party in my home.

4      He brought a bunch of friends.  He brought a bunch

5      of friends with him, men and women.

6  BY MR. FURBUSH:

7      Q.   And you don't know who that that was?

8          MR. BELTRAN:  Object to the form, asked and

9      answered.  Go ahead.

10         THE WITNESS:  It was when that Coming to

11     America movie came out, that new one.  My husband

12     had a watch party for it.  Josh was there.

13  BY MR. FURBUSH:

14     Q.   And that was the last time you saw him?

15     A.   No, I don't know.  I may have seen him after

16  that.  I don't know if that was the last time.  Like I

17  said, I saw him a number of different -- a number of

18  different times.  I can't remember if he came back over

19  to our house afterwards, or we went to any parties to

20  his house after that incident.

21         MR. FURBUSH:  I have no other questions.  Thank

22     you.

23         MR. BELTRAN:  What's the record time, please?

24         THE VIDEOGRAPHER:  Approximately eight hours,

25     46 minutes.



 1                    CROSS-EXAMINATION

 2  BY MR. BELTRAN:

 3      Q.   Thanks for your patience, Ms. Dorworth.  I'm

 4  just going to go over a couple of things we discussed or

 5  that you discussed with counsel today.  You discussed my

 6  depo prep in the morning.  I guess there was a -- there

 7  was a call we had like in the late morning, early

 8  afternoon yesterday, and I think you were on that or

 9  part of that with Mr. Dorworth, correct?

10          MR. FORD:  Object to the form.  Go ahead.

11          THE WITNESS:  Yeah.  I was on for a part of

12      that, but the bulk of my prep was all alone and the

13      times I stated; but, yes, I mean -- I...

14  BY MR. BELTRAN:

15      Q.   Okay.  And then we reconvened I guess in the

16  late afternoon, and Mr. Dorworth was on for awhile and

17  then he went to his party and then you and I carried on

18  for awhile?

19      A.   Yeah --

20          MR. FORD:  Object to the form.

21          THE WITNESS:  -- it was a separate meeting.

22  BY MR. BELTRAN:

23      Q.   All right.  You mentioned that Mr. Dorworth --

24  I think you called him a world class drinker.

25          Is that what you had you -- how you described



1  him?

2      A.   Yes.  My point was that his behavior does not

3  change when he has a lot to drink or a little to drink

4  is what I meant by that.

5      Q.   And you said he holds his alcohol well?

6          MR. FORD:  Object to the form.

7          THE WITNESS:  I -- yes.  I think I stated about

8      that people wanted to hire him out for dinner

9      parties.  That, again, I used the world class

10     drinker and all that goes with that, that he is --

11     keeps his whits about him.  He doesn't change his

12     behavior towards me when he drinks.

13  BY MR. BELTRAN:

14     Q.   Does that translate to the sexual performance,

15  that he's able to drink and not have a drop off in the

16  sexual performance?

17     A.   Yes, that translates to that.  He was -- he was

18  drinking last night, and I blew him last night and he

19  had no problem getting up.  So if that's what you're

20  asking and you want that for the record, then that's

21  what I'll put on the record.

22     Q.   Okay.

23     A.   I know marital privilege, I don't know about

24  that.

25     Q.   Well, that wasn't a communication.  I'm going



 1  to share the screen.  Anastasia is circulating some

 2  documents, so -- okay.  So those have been circulated

 3  now.  I'm going to show you this.

 4          Do you recognize this document?

 5  A.    It's a gate long.

 6  Q.    Okay.  What's the date for that?

 7  A.    It looks like 6/6/20.

 8  Q.    Okay.  And what happened at 8:02 p.m.?

 9          MR. FORD:  Hey, Mike, have you produced what

10      you're showing us right now?

11          MR. BELTRAN:  We pulled this today.  We just

12      emailed it to you.

13          MR. FORD:  So just for the record, you're

14      showing your client a document that you're just

15      emailing to us right now that's not been previously

16      produced; is that correct?

17          MR. BELTRAN:  I don't think it's been

18      requested.  You questioned her on June 6th, and so I

19      asked my clients to pull the June 6th log and they

20      have done that.  We haven't talked about June 6th

21      before, and I don't think you asked about it.  I

22      think you -- you got the log.  You guys subpoenaed

23      whatever log you wanted from Heathrow.  I'm showing

24      this to her now because you were questioning her

25      about Rudisill and whatever it was on June 6th.



```
 1            MR. FORD:  Okay.  We're going to object to you
 2       using a previously nondisclosed exhibit that you've
 3       accessed in the middle of a deposition without
 4       previously disclosing it.
 5            MR. BELTRAN:  Okay.  Well, you didn't -- again,
 6       you didn't ask for it.  It's based on your
 7       questioning this morning, and we're -- we circulated
 8       that to you and we have pulled it today in response
 9       to your questioning.
10            MR. FORD:  My objection stands.
11   BY MR. BELTRAN:
12       Q.   Well, what happened at 8:02 p.m.?
13       A.   At 8:02:44 it looks like Michael Rudisill
14   enters the gate.
15       Q.   Okay.  And then what happened at 11:39 p.m.?
16       A.   It looks like Mike returns to -- into the gate.
17       Q.   Okay.  And you know what Mr. -- or Judge
18   Rudisill was doing that night coming in those two
19   entries?
20       A.   Well, based on the questions I was previously
21   asked and because Mike was in those text messages, he
22   came to our house twice which means either came and
23   picked somebody up and they went out and then they came
24   back to the house.
25       Q.   And based upon those text messages, who did he
```



 1  bring in and out of the house?

 2          MR. FORD:  Objection, form.

 3          THE WITNESS:  Mike Rudisill.

 4  BY MR. BELTRAN:

 5      Q.  No, I'm saying who was he picking up or then

 6  dropping off?

 7          MR. FORD:  Objection, form.

 8          THE WITNESS:  Oh, you're saying -- I don't

 9      know, but based on the fact that my husband says he

10      was with him later, he probably came to get my

11      husband, but I -- I do not know.

12  BY MR. BELTRAN:

13      Q.  Is there any basis that anyone else came in or

14  out, any other guests came in or out, during, you know,

15  any time during any time after the midafternoon?

16          MR. FORD:  Object, form.

17          THE WITNESS:  No.

18  BY MR. BELTRAN:

19      Q.  Okay.  And let's see.  I'm going to share this

20  with you --

21          MR. BELTRAN:  And let's mark the June 6th -- is

22      it 85?

23          THE COURT REPORTER:  Yes.

24          MR. BELTRAN:  So we'll mark that as Exhibit 85.

25      Anastasia can get that to you if you need it, Madame



 1      Reporter, if you need it or we can forward it.

 2          MR. FORD:  Can you send us an email of that

 3      exhibit?

 4          MS. WOLF:  He did.

 5          MR. BELTRAN:  We sent them all to you.  You're

 6      on the email.  All right.  Let's mark this as 86

 7      then.

 8          (Plaintiff's Exhibit 85 and Plaintiff's Exhibit

 9   86 were marked for identification.)

10   BY MR. BELTRAN:

11      Q.   Do you recognize this document?

12          MR. FORD:  Is this a new document?

13          MR. BELTRAN:  Do you see the email up on the

14      screen?  Does everyone see that?

15          MR. FORD:  Okay.

16          THE WITNESS:  Oh, this about our lawsuit with

17      the HOA.

18   BY MR. BELTRAN:

19      Q.   Right.  And you see that the bates stamp at the

20   bottom, it's HeathrowMaster 129?

21      A.   Yes.  Okay.  So we would have gotten our -- we

22   would have gotten our transponders -- we would have

23   gotten our transponders back.

24      Q.   Right.  So you remember discussing why -- you

25   were spending some time with Mr. Ford earlier today



1  discussing I guess why your plate didn't show up in July

2  and August, during certain times in July and August?

3       A.   Right.  Well, yeah.  Yes, so we would have

4  gotten our transponders back that summer.  We would have

5  gotten our -- yeah we would have gotten our transponders

6  back that summer.  And as I stated, I was there that

7  summer much of the time.

8       Q.   Okay.  When were the transponders reinstated?

9       A.   I'm not sure, but it looks like July.  It looks

10 like it was on his birthday.

11      Q.   Okay.  And that was July 17th of 2017?

12      A.   July 17th, yes.

13      Q.   I guess 16:37 which would be I guess the late

14 afternoon on that Monday?

15      A.   Correct.

16      Q.   In fact, going back to the log which I could --

17 let's put the log back up.  This is the log that

18 Mr. Ford had marked as exhibit 80.  If we go down to

19 July 17th, you see from 17 at 1:36:08 p.m. in the

20 afternoon, you don't show up -- neither you nor

21 Mr. Dorworth show up again on the log until 8/17 when

22 you're in that plate, the PF3298 plate that you didn't

23 recognize.

24      A.   Yes, the limo.  Uh-huh.

25      Q.   All right.  And --



```
 1              MR. FORD:  Object.
 2  BY MR. BELTRAN:
 3      Q.   Okay.  Was that because you're transponder was
 4  reinstated; and, therefore, you didn't show up on this
 5  gate log?
 6              MR. FORD:  Object to the form.
 7              THE WITNESS:  If my transponder was working
 8      again, yes, I wouldn't show up.  I would not show up
 9      on the gate log.
10  BY MR. BELTRAN:
11      Q.   On the -- I guess the -- this particular type
12  of gate log, correct?
13      A.   The guest entries report, yes, that's correct.
14  I don't know -- you would have to ask them about a
15  transponder log at that...
16      Q.   Okay.  All right.  Let's look at -- do you
17  remember the texts that we looked at before that you
18  looked at with Mr. Ford before?
19      A.   Which ones?
20      Q.   Okay.  So there was a text, and then I noted
21  that there was a text that was 82994 was missing and it
22  went --
23      A.   Oh, yes, the ones with Joel and my husband?
24  Are you referring to those texts about FishBones, and I
25  believe Twin Peaks and some other things that he
```

 1  referenced?

 2      Q.   Yeah.  I'm going to show you the -- do you

 3  remember looking at those texts?  This is 822993.  We'll

 4  mark this as Exhibit 86, please.

 5           Do you see that?

 6      A.   Are you -- are you -- where he says she is so

 7  hot?

 8      Q.   Yeah, among other things.  You remember looking

 9  at this document earlier, right?

10      A.   Yes.

11           MR. FORD:  Mike, are you making this a new

12      exhibit?

13           MR. BELTRAN:  Yeah, I'm making this a new

14      exhibit.

15           MR. FORD:  So this is 87.

16           MR. BELTRAN:  This is 87, and 86 was the -- was

17      86 was the transponder, and 85 was the gate log?

18           MR. FORD:  Yep.

19           MR. BELTRAN:  All right.  Perfect.

20           (Plaintiff's Exhibit 87 was marked for

21  identification.)

22  BY MR. BELTRAN:

23      Q.   So you remember looking at this page, right,

24  82993?

25      A.   Yes, I remember looking at this page.



1   Q.   And then you looked at 82995, you remember

2   looking at that with Mr. Ford?

3   A.   Yes, I remember that.

4   Q.   Okay.  And that would be -- the exhibit that

5   Mr. Ford showed you skipped from 82993 to 82995, do you

6   remember that?

7   A.   Yes.

8   Q.   What I'm showing you, 82994, you see Chris

9   Dorworth said, Unreal.

10       Do you see that?

11  A.   Yes.

12  Q.   And then you see he's asked Joel, How do you

13  work this out.

14       Do you see that?

15  A.   Yes.

16  Q.   And Joel Greenberg responds, My Jew magic and

17  Jew law, at 7:23.

18       Do you see that?

19  A.   I see that, yes.

20  Q.   And then Dorworth responds, he says, Is that a

21  flavor of White Claw that tastes like gefilte Fish?

22       Do you see that?

23  A.   I see that.

24  Q.   And then Joel Greenberg responds, And matzo

25  balls, don't forget those.



```
 1            You see that at 7:24?

 2      A.    I see that.

 3      Q.    Okay.  And then at 7:25 Chris Dorworth

 4 responds, Yum.

 5            Do you see that?

 6      A.    I do see that now.  Thank you for sharing.

 7      Q.    And so Chris Dorworth was referring, I guess,

 8 to the matzo balls; is that correct?

 9            MR. FORD:  Object to the form.

10            THE WITNESS:  It appears that that is in fact

11      what he was referring to.

12 BY MR. BELTRAN:

13      Q.    When Mr. Dorworth said, Yum, at 7:25 p.m., he

14 was referring to Joel Greenberg's 7:24 text referring to

15 matzo balls; is that correct?

16            MR. FORD:  Object to the form.

17            THE WITNESS:  That's what it appears.

18 BY MR. BELTRAN:

19      Q.    Okay.  And it was not referring to anything

20 about any women that might have been discussed on 82993?

21      A.    Based on --

22            MR. FORD:  Object to the form.

23            THE WITNESS:  Based on the sequence of text

24      messages without the deleted texts from before.

25 BY MR. BELTRAN:
```



 1    Q.   Is that a yes?

 2    A.   Yes.

 3    Q.   All right.  So now going to June 2020 -- what

 4  was happening in June 2020?

 5         MR. FORD:  Object to the form.

 6         THE WITNESS:  Joel -- I think Joel was indicted

 7    in June of 2020.

 8  BY MR. BELTRAN:

 9    Q.   Okay.  And --

10    A.   He was running for reelection -- or he was

11  going to run for reelection.  Qualifying is typically in

12  June.  He would have had to qualify.

13    Q.   So Joel Greenberg was qualifying, and then he

14  was indicted, correct?

15    A.   Shortly after, yes.

16    Q.   Was there any discussion in I guess in early

17  June or that spring that Joel Greenberg might be in

18  trouble or might be liable to be indicted?

19         MR. FORD:  Object to the form.

20         THE WITNESS:  Yes.  He was under investigation

21    from the Secret Service.  He brought the subpoena to

22    my home.

23  BY MR. BELTRAN:

24    Q.   Based upon your review of the text message

25  which was -- what was the Exhibit No.?  I think it was



 1  Exhibit 78, the packet that Mr. Ford showed you earlier,

 2  do you remember that whole packet?

 3      A.   Is this --

 4      Q.   It's a packet that --

 5      A.   The text messages, yes.

 6      Q.   Okay.  What is your -- well, we could put it

 7  back up.

 8          Based upon your review of the text messages

 9  earlier today with Mr. Ford, what was Joel Greenberg

10  doing with these texts in June of 2020?

11          MR. FORD:  Object to the form.

12          THE WITNESS:  I don't know if he was attempting

13      to include my husband in his payments scheme or

14      anything else because it's clear that these women

15      did not come to my home as was attempted to be

16      represented to me.

17  BY MR. BELTRAN:

18      Q.   And what was Joel Greenberg's purpose -- do you

19  know what Joel Greenberg's purpose was in doing that?

20          MR. FORD:  Object to the form.

21          THE WITNESS:  His purposes stated to me have

22      been continuously dragging us into their problems,

23      and this would be no different than that.  And thank

24      you for showing me the gate log.

25  BY MR. BELTRAN:



1    Q.   And in terms of when Mr. Dorworth was texting

2  and referring to Rudisill and texting with Joel

3  Greenberg, what was he -- what was his plan for the

4  evening that night?

5          MR. BELTRAN:   Object to the form.

6          THE WITNESS:   He was hanging out with Mike

7      Rudisill which is a totally typical thing for him to

8      do.

9  BY MR. BELTRAN:

10   Q.   And was he going to go to a restaurant with a

11 Judge Rudisill?

12         MR. FORD:   Object to the form.

13         THE WITNESS:   That's what it looks like.  He is

14     going out with his friends.

15 BY MR. BELTRAN:

16   Q.   Does that look like anything else to you?

17         MR. FORD:   Object to the form.

18         THE WITNESS:   Now that there are completed text

19     messages, no, it does not look like anything else to

20     me.

21         MR. FORD:   Hey, Michael, I just need one

22     second.  If you'll just give me 30 seconds.

23         MR. BELTRAN:   Okay.  I'll give you 30 seconds,

24     I'm going to take 30 seconds.

25         Chris, you reedy?



```
 1              MR. FORD:  Yep.
 2   BY MR. BELTRAN:
 3      Q.   All right.  So now when -- you reviewed the
 4   amended complaint, correct?
 5      A.   That's correct.
 6      Q.   And when you did your verification, you never
 7   said that you had personal knowledge of every last fact
 8   in the complaint, correct?
 9              MR. FORD:  Object to the form.
10              THE WITNESS:  Correct.
11   BY MR. BELTRAN:
12      Q.   And, in fact, a lot of things were admissions
13   from Abby or Joel or things you read in the paper or
14   things you sourced from elsewhere, correct?
15              MR. FORD:  Object to the form.
16              THE WITNESS:  Correct.
17   BY MR. BELTRAN:
18      Q.   But what you said was you believed everything
19   in the complaint to be true, correct?
20      A.   What I believe is that there was nothing in the
21   complaint that was false.
22      Q.   And that is what you meant when you did the
23   verification, correct?
24      A.   That's correct.
25      Q.   In fact, nobody could know -- could have
```



 1  personal knowledge of every -- firsthand personal

 2  knowledge of every last thing in that complaint or any

 3  other complaint, correct?

 4           MR. FORD:  Object to the form.

 5           THE WITNESS:  I do not know the answer to that

 6       question, but I do not --

 7  BY MR. BELTRAN:

 8       Q.   Okay.  Well, certainly, in this particular --

 9  let me ask you a better question.  In this particular

10  complaint, no one person is going to know -- have

11  personal, firsthand knowledge of every last fact --

12       A.   No, it's a very --

13           MR. FORD:  Objection, excuse me --

14           THE WITNESS:  -- extensive complaint that it

15       requires a lot of different sources.

16           MR. FORD:  I just need to make my objection.

17       Object to the form.

18  BY MR. BELTRAN:

19       Q.   Okay.  All right.  So now -- now,

20  Mr. Claassen -- I'm sorry if I messed up your surname,

21  sir -- but Mr. --

22           MR. MAUSER-CLAASSEN:  It's Mauser-Claassen,

23       Mike.

24           MR. BELTRAN:  Thank you, sir.  Sorry.

25  BY MR. BELTRAN:



1    Q.   When you spoke to Mr. Mauser-Claassen he asked

2  you about the statements in the complaint that the

3  Greenbergs paid all the legal bills and knew what was

4  going on in the case.

5         Do you remember that?

6    A.   Yes.

7    Q.   Okay.  Now, you have not paid all of the legal

8  bills in this case, correct?

9         MR. BELTRAN:  Object to the form.

10        THE WITNESS:  That's correct.

11 BY MR. BELTRAN:

12   Q.   And you have reviewed all of the legal bills in

13 this case, correct?

14   A.   Correct --

15        MR. FORD:  Object to the form.

16        THE WITNESS:  Correct.

17 BY MR. BELTRAN:

18   Q.   And so that would be why you would not know

19 about every last thing that has happened in this case,

20 correct?

21        MR. FORD:  Object to the form.

22        THE WITNESS:  That's correct.

23 BY MR. BELTRAN:

24   Q.   And but somebody who did read all those bills

25 would at least know about all the case activities,



1    correct?

2             MR. FORD:  Object to the form.

3             THE WITNESS:  Yes.  I think I stated multiple

4        times in this interview that they should speak to

5        the plaintiff.

6    BY MR. BELTRAN:

7    ███████████████████████████████████████

8    ████████████████████████████████████████████

9    ██████████████

10   ██████████████████

11   ███████████████████████

12   ██████████████████████████████████████████████

13   ████████████████████████████████████

14   ████████████████████████████████████████████

15   ██████████████████████████████████████

16   ███████████████████████████████

17   ██████████████████████████████████████████████

18   █████████████████████████████████████████

19   ████

20   █████████████████████████████████████████

21   ███████████████

22   ████████████

23        Q.   Did the court reporter get that down?

24             THE COURT REPORTER:  Yes, sir.

25   BY MR. BELTRAN:

ESQUIRE
DEPOSITION SOLUTIONS





1
2
3
4
5  BY MR. BELTRAN:
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1 ████████████████████████████████

2 ████████████████████████

3 ██████████████████████████████

4 ███

5 ███████████████████████████████

6 ████████████████████████████

7 ████

8 ██████████████████████████████

9 ████████████████████████

10 ███████████████████████

11 ████████████████████████████████

12 ████

13     Q.   Or give you a basis to doubt his fidelity to

14 you?

15     A.   No, he would...

16     Q.   Anything that you want to share about that or

17 anything else you discussed today?

18         MR. FORD:  Object to the form.

19         THE WITNESS:  I have never once suspected my

20     husband of cheating.  I have seen every -- I have

21     far more information than the FBI to make that

22     determination, and I have cleared him.  And I know

23     that he didn't know that she was in our home, and I

24     know that he would never have sex in front of

25     another man.  And --



```
 1  BY MR. BELTRAN:
 2      Q.    Go ahead.  Sorry.
 3      A.    I'm not saying that she knew she was lying
 4  then, but I'm saying I know she knows she was lying now
 5  with I hope the information that you have presented to
 6  her that my husband was not there and she thinks he's
 7  somebody else.  And I don't know if she thinks he's
 8  another big guy around, Joe Ellicott, or she thinks that
 9  he's somebody else or it's -- or it truly is at worst --
10  that she is truly -- she's not suing Joel so -- when we
11  know that he dragged her into all this horribleness, and
12  based on what you shared about her past, very
13  challenging past, and the people she's involved in.
14          That she would lie about my husband -- and
15  again, I don't think she knew maybe that she was lying
16  then, but maybe she did.  Maybe Joel told her what to
17  say.  I don't know, but I know she knows she's lying
18  now, and it's very insulting to me and it's very
19  insulting to my husband and I can't believe he's had to
20  go through this.
21          MR. BELTRAN:  Okay.  Well, thank you.  I'm
22      sorry to have to go through all that with you, but
23      thank you for your time and patience with us today.
24          MR. FORD:  I have some follow-up questions, not
25      many, but I have some.
```



1                    REDIRECT EXAMINATION

2    BY MR. FORD:

3         Q.   In response to that last question, you

4    understand that it was your husband who sued the

5    defendants in this case, correct?

6         A.   Everything that we had to respond to the FBI,

7    to -- I mean.

8         Q.   Do you remember my question --

9         A.   No.  No because it's repeated lies from Joel

10   Greenberg.  Remember, this isn't just about the

11   infidelity.  The infidelity clearly is what -- this

12   allegation is what impacts me from a marital standpoint,

13   but all of these other things, all of these other

14   lies -- Fritz is still on.  All of these other lies

15   impacted us as well.

16             Joel made other allegations about infidelity,

17   about women, other women.  Tara Tedrow that had to

18   answer questions to her lawyers -- she's a lawyer, and

19   to answer lawyers because he made an allegation multiple

20   times in a jailhouse interview that he was having an

21   affair with his attorney.  You know, just lies upon

22   lies.  Taking cash from someone who was indigent when he

23   died and barely left his wife any money, and I was at

24   that funeral.  To say that he was taking cash from that

25   man who was at my father's funeral, that -- I mean, just



1  lie after lie after lie.

2        We had no choice because the damage that was

3  done with husband losing a seven-figure job -- and quite

4  frankly, you talk about, oh, your husband sued.  You're

5  extorting us.  Hornsby told you all what we turned over

6  to the FBI.  He told you that he wasn't in the home.  I

7  don't know how many sex workers that you represent, I'm

8  sure you do good work in many cases, but my husband did

9  not do this.

10        And it's offensive -- I understand that you

11  have to believe your client, but now I'm finding out

12  you're trying to lead me to belive my husband was

13  bringing women to my home.  Leaving out text messages

14  when he's referring to matzo balls.  Y'all are sick.  I

15  apologize.  I don't know what the rules are on that.

16        MR. BELTRAN:  You're fine.  Do you need a

17     break?

18        THE WITNESS:  Yes, I would like a minute,

19     please, and then I'll just stay for the rest of your

20     questions, sir.

21        THE VIDEOGRAPHER:  If there are no objections,

22     going off record.  The approximate time, 8:52 p.m.

23        (A break was had.)

24        THE VIDEOGRAPHER:  On record with media unit

25     six.  The approximate time is 8:59 p.m.



1  BY MR. FORD:

2      Q.    So, Ms. Dorworth, the document that you were

3  talking about that you seemed upset about and the text

4  that you were talking about, I just want to be clear

5  that these documents have been produced and bates number

6  ranges that have been -- as you can see that are hard to

7  decipher.  So my questioning earlier in relation to what

8  was going on on June 16, 2020, was in part due to the

9  way that these documents have been produced, and it's

10 hard to follow with the bates numbers what the actual

11 chronology is.

12          So at any rate, I just wanted to let you know

13 that, that it wasn't intentional to leave out a page.

14 The pages have been produced, and it's hard to follow in

15 a way that it's hard to follow the chronology of the

16 discussion, but since that --

17          MR. BELTRAN:  Chris, I asked you about the

18     page, and you declined to provide it at the time.

19     So --

20          MR. FORD:  Well, you have it, and I don't have

21     it.

22          MR. BELTRAN:  I had to pull it, and I didn't

23     have it then.

24          MR. FORD:  And I didn't have it either in my

25     packet.



1          MR. BELTRAN:  Okay.  Well, you prepared the
2      composite document.  So I don't know if you asked
3      the question, I mean --
4          MR. FORD:  Okay, I'm asking a question.
5  BY MR. FORD:
6      Q.   Since Mr. Beltran asked you questions about
7  other text messages from June 16, 2020, I want to ask
8  you about some additional ones that he did not ask you
9  about.
10         MR. BELTRAN:  I'm going to object to that,
11     outside of the scope.  We asked about June 6th
12     not -- well, whatever date I asked about, but we're
13     not going to expand the scope at 9:01 p.m.  So ask
14     about the three bates pages that I asked about
15     that's within the scope.
16  BY MR. FORD:
17     Q.   So I want to go back to the email exchange
18  between Mr. Dorworth, Mr. Greenberg, and Mr. Rudisill,
19  and I just want to show you --
20         MR. BELTRAN:  I'm going to object to form.  I
21     don't know what email --
22         MR. FORD:  The text exchange.  And just so you
23     have this, Mr. Beltran, it's 82936 and 82935.
24         MR. BELTRAN:  Is that in the packet that you
25     had before?



```
 1            MR. FORD:  It's not.

 2            MR. BELTRAN:  Okay.  Then why don't you email

 3       it to me so I have it?  I don't know --

 4            MS. WOLF:  I'll get it to you, Mike.  Just give

 5       me one second.

 6            MR. BELTRAN:  This was not in the exhibit that

 7       you showed her before but you feel like it's within

 8       the scope?

 9            MR. FORD:  Yeah, I do.  This is Exhibit 88.

10            (Defendant's Exhibit 88 was marked for

11   identification.)

12            MR. BELTRAN:  And you're saying it's on the

13       same day?

14            MR. FORD:  It's on June 16, 2020.

15            MR. BELTRAN:  Okay.  Those weren't the ones --

16       there was one at the top of 82993 that is June 16th,

17       but that is not the one we talked about, you and I

18       questioned Ms. Dorworth, so I don't think it's

19       within the scope.

20            MR. FORD:  Are you going to object to me asking

21       her questions about it?  Are you not going to let me

22       ask questions about it?

23            MR. BELTRAN:  Why don't you send me the

24       document, and then we'll figure out the scope.  It

25       usually takes a few minutes.
```



```
 1          Do you have other questions you want to ask
 2    her?
 3          MR. FORD:  I do.
 4  BY MR. FORD:
 5     Q.   So Mr. Furbush asked you questions whether you
 6  had any evidence that you were aware of whether
 7  Greenberg -- that Greenberg Dental entity made any
 8  payments to AB, and you said you were not aware.
 9          Are you aware of anyone making any payments to
10  AB in connection to this case?
11     A.   I'm aware --
12          MR. BELTRAN:  Object to the form.
13          THE WITNESS:  I'm aware that she was connected
14    to lawyers from Joel.
15  BY MR. FORD:
16     Q.   And are you aware of anyone making any payments
17  to her?
18     A.   I understood that it was paid for, but I don't
19  know.
20     Q.   You don't know?
21     A.   I do not know.
22     Q.   Okay.  You said that you were friends with Matt
23  Gaetz, and the last time you talked to him was last
24  week; is that correct?
25     A.   That is correct.
```



1    Q.   And what did you talk about?

2    A.   The -- it was at the RNC.

3    Q.   And what did you talk to him about?

4    A.   I just asked him how -- just about my husband's

5    birthday.  My husband was at the RNC on his birthday,

6    and Matt was there.  Matt was -- Matt's working or --

7    you know, he's -- he was speaking at the RNC.

8    Q.   And do you have any anything else that you have

9    talked about with Mr. Gaetz?

10   A.   No.

11   Q.   Have you ever talked with him about this case?

12   A.   I do not talk to him about this case.

13   Q.   And you never have?

14   A.   I do not talk to Mr. Gaetz about this case.

15   Q.   And my question is have you ever?

16   A.   No -- well, I asked him -- I stated on the

17   record that I asked him about the newspaper articles

18   that are -- I believe -- I think some are cited in this

19   case.  I'm not sure, but things that have been produced

20   in this case, newspaper articles, I have asked him

21   about -- I have asked him about the particular --

22   specifically because I -- as I stated to you, I thought

23   that was very distressing that he -- you know, that

24   there was the insinuation that the allegation that he

25   was having sex with a 17 year old, and I was very upset



 1  about that.
 2      Q.   And you've talked about that today.  Have you
 3  talked about anything else with Mr. Gaetz?
 4      A.   Well, I just asked him about -- no, I just
 5  asked him about the -- about the girl because obviously,
 6  as you know, it was on my gate logs.  I told it was very
 7  mortifying and very upsetting.
 8      Q.   Anything else?
 9      A.   No, I don't talk to him about this case.
10      Q.   Okay.  Do you have any personal knowledge that
11  Ms. B ever talked to the press about any of the
12  allegations in your complaint?
13      A.   I do not have any personal knowledge, no.
14      Q.   You said that you're not aware of your
15  husband --
16      A.   But I -- actually, I don't know.  I'm trying to
17  remember whether they reference the underage girl when
18  they spoke to my husband.  You'll have to ask him
19  specifically.  I don't have specific knowledge.
20      Q.   Okay.  So just to be clear, you don't have any
21  knowledge that AB talked to the press, correct?
22      A.   I do not have personal knowledge.
23      Q.   Okay.  And you said that as far as you know
24  your husband has never complained about the sexual
25  relation ship that you have with him, true?



1    A.    That -- that is true.

2    Q.    Do you know whether he has ever complained to

3  anyone about your marriage generally?

4    A.    I don't -- I don't know.  I mean, I don't know

5  if he has said something to a buddy about, you know,

6  just all the -- you know, all the stress we've been

7  under.  I don't know.

8    Q.    So --

9    A.    But my husband typically, he knows how

10  important it would be to not run me down publicly, so I

11  doubt that he would be discussing that.  That's not a

12  part of our marriage.

13    Q.    So you doubt that he would discuss with anyone

14  any problems that you had in your marriage?

15    A.    He might.  He might talk about it.  I mean, you

16  know, if he -- as I said, you know, I ran a company.  I

17  became president of a company when I was 32 years old.

18  I'm an intense personality.  So I'm sure he probably has

19  complaints about me; but whether I'm -- you know,

20  whether he is complaining about me is not on -- I don't

21  think is an issue because sexually, as I stated, there

22  was no issue.  We have a very warm relationship.

23        MR. FORD:  So do you have the two pages that we

24    submitted, Mike?

25        MR. BELTRAN:  No, I've been pinging my email.



1     It's not coming through.  I don't know where you

2     sent it.

3          MS. WOLF:  I sent it to your email, Mike.

4          THE WITNESS:  I have not --

5          MS. WOLF:  At 9:02 p.m. it got sent.

6          THE WITNESS:  Just, Mike, so you know, I don't

7     have any documents in front of me.

8          MR. BELTRAN:  Okay.  Well, why don't you send

9     it -- did you send it to Mike@Beltranlitigation.com.

10         MS. WOLF:  Yep.

11         MR. BELTRAN:  I've been pinging it the whole

12    time, so I don't --

13         MS. WOLF:  I just resent it again.

14 BY MS. FORD:

15    Q.   While we're waiting for that, you said in

16 response to Mr. Furbush's questions that you don't know

17 how any of the people got into your home on July 15th.

18         Do you remember that?

19    A.   Well, I gave you ideas about how that could

20 have happened.

21    Q.   And I think you said that your husband never

22 carries a key to the house?

23    A.   That's correct.

24    Q.   Do you leave your house unlocked?

25    A.   We have a keypad.  We have a keypad now.



 1      Q.   And did you in 2017?

 2      A.   I don't think so, no.

 3      Q.   Did you keep your house unlocked in 2017?

 4      A.   If people were -- not at night when I went to

 5   bed; but if people were in our home throughout the day,

 6   we don't -- we haven't previously locked our home.

 7   Because of these situations, I've been a little bit more

 8   diligent about those things.

 9      Q.   So again you're not sure how anyone got into

10   your house on July 15, 2017; is that correct?

11      A.   That's correct.

12           MS. WOLF:  Mike, did you get the exhibit?

13           MR. BELTRAN:  Yes, it just came over.  This is

14      referencing a different day, so it's not -- it's not

15      within the scope.

16           MR. FORD:  It's referencing I believe the

17      women.  So can I ask her questions about it, or are

18      you not going to let her?

19           MR. BELTRAN:  I think it's referencing the --

20      first of all, I don't think she has personal

21      knowledge of it, first of all.  Second of all, it's

22      9:10 p.m.  Third of all, it's referencing a day, and

23      it's outside the scope.  I think -- we have been

24      here for -- well, we've been doing this for over 12

25      hours.  We've had at least nine going on ten hours



1    of record time.  You had an opportunity to ask her

2    about this is the afternoon.  It references a

3    different date because this is a different day, and

4    I don't see how the -- I don't see how it's in the

5    scope of anything I asked about.

6  BY MR. FORD:

7    Q.   So I'm handing you what's been marked as

8  deposition Exhibit No. 88, and I just have a few

9  questions related to it.

10        MR. BELTRAN:  No, I told you we're -- it's

11    outside of the scope.

12        MR. FORD:  So are you --

13        MS. WOLF:  It's not.

14        MR. FORD:  Are you refusing to let me ask

15    questions and instructing her not to answer.

16        MR. BELTRAN:  You're way over record time.  You

17    have taken up the majority of the record time today

18    going into the late afternoon.  You -- it's outside

19    the scope, and I don't know what the purpose of

20    asking about this.  She's not on this text message,

21    so I don't even know -- I let you -- gave you a lot

22    of leeway when you were within record time, but I

23    don't know what this has to do or why we're sitting

24    here at 9:10, 9:11 p.m. doing something that could

25    have been done all day long.



```
 1         MR. FORD:  You're taking more time talking.
 2     Are you going to instruct her not to answer
 3     questions about this exhibit?
 4         MR. BELTRAN:  I mean, it's outside of the
 5     scope, so we're not going to do that at 9:10 p.m.,
 6     and it's -- she doesn't have personal knowledge of
 7     it and it's -- it's outside the scope.  You had
 8     plenty of time earlier, and she's not even on this
 9     text chain.
10         MR. FORD:  Okay.  And she wasn't on the text
11     exchanges you asked about.  So I'm going to ask the
12     question, and you can instruct her not to answer and
13     then we'll deal with it if we have to.
14 BY MR. FORD:
15     Q.  So you've been handed deposition Exhibit No. 88
16 which is a two page --
17     A.  I don't have it.  It's sitting next to the
18 court reporter.
19         THE WITNESS:  Are you handing this to me?
20 BY MR. FORD:
21     Q.  It's a two-page document, messages between
22 Chris Dorworth, Mike Rudisill, Joel Greenberg.
23         Do you see that?
24         MR. BELTRAN:  I'm going to object to -- we're
25     not answering questions about this.  It's outside
```



```
 1      the scope of the direct.  You are over record time.

 2      And she doesn't --

 3   BY MR. FORD:

 4      Q.   Do you see that?  Do you see that?

 5      A.   See what?  What am I looking at?  What day?

 6   What time?

 7      Q.   This is a two-page document.

 8      A.   I know it's a two-page document, but where am I

 9   looking?

10      Q.   It starts at the top, June 16, 2020, at 8:27.

11           Do you see that?

12      A.   Are these all of the text messages in this

13   chain, or is this like earlier where we're leaving

14   things out?

15      Q.   Those are the two pages I wanted to ask you

16   about.

17           MR. BELTRAN:  Are you -- you're going to ask --

18      first of all, do you have any other questions for

19      Ms. --

20           MR. FORD:  No, I don't.

21           MR. BELTRAN:  Does anyone else have any other

22      questions for Ms. Dorworth?

23           MR. FORD:  I think there's just a couple.

24           MR. BELTRAN:  There's just a couple.

25           MR. FORD:  But not by me.
```



 1      MR. BELTRAN:  If you ask this, you're not going
 2  to keep the deposition open?
 3      MR. FORD:  I mean, we still have the marital
 4  privilege issue, but I'm not asking anymore
 5  questions.
 6      MR. BELTRAN:  So you are going to try to bring
 7  her back if --
 8      MR. FORD:  We have a hearing on the marital
 9  privilege, so I'm not asking anymore questions other
10  than this document.
11      MR. BELTRAN:  The parties on the case on the
12  marital privilege.  You haven't said anything about
13  marital privilege or communicated with me at all
14  about the marital privilege.  We logged stuff ages
15  ago.  So unless you're assuring me that you're not
16  bringing us back -- you're going to try to leave
17  this open to bring her back, and it's 9:13 and
18  you're going to try to come back anyway.
19      MS. WOLF:  Hey, Mike.  We have to be back here
20  in less than 12 hours, could he just please ask the
21  questions so we can move on and so your client can
22  go home and your other client can get some sleep
23  before his deposition because I personally would
24  appreciate it.  And I've got to say, I still have to
25  finish things now for tomorrow.  I'm pregnant.  I'm



1    in my third trimester.  I'd like to go to bed.  So

2    maybe you could just stop, and we could just ask the

3    questions and we'll be done in less than two

4    minutes.  Thank you.

5         MR. BELTRAN:  You're complaining because I have

6    let you go two hours over --

7         MS. WOLF:  No, because you won't stop talking,

8    Mike.  Stop speaking.  It's not your time.

9         MR. BELTRAN:  It is --

10        MS. WOLF:  Object to the form --

11        MR. BELTRAN:  All of this is my time because

12   I'm giving you this time.  Every time since 6:00

13   it's been --

14        MS. WOLF:  Do you want to do this off the

15   record and --

16        MR. FORD:  No, let's just -- let me just ask

17   the question.  These are my last questions.

18   BY MR. FORD:

19   Q.  So, Ms. Dorworth, have you seen this text

20   exchange before from June 16, 2020?

21   A.  I have not seen this text exchange.

22   Q.  Okay.  So on June 16, 2020, there is a text

23   message from Chris Dorworth.  It says, Greenberg and

24   Rudisill, Joe believes you owe him a thank you.  I

25   agree.



1        Do you see that?

2        MR. BELTRAN:  Okay, guys.  We're done.  We're

3    done.  We're not doing this.  If someone else wants

4    to ask questions or you want to ask other questions

5    that are within the scope, we can do that.

6        MR. FORD:  Okay.  So you're instructing her not

7    to answer.

8        MR. BELTRAN:  Go ahead and ask you other

9    questions or if other people have questions that are

10   legitimately within what I asked her then go ahead.

11       MR. FORD:  Okay.  So you're -- just to be

12   clear, you're instructing her not to answer that

13   question?

14       MR. BELTRAN:  I'm not doing this with you, sir.

15   We're over record time.  You guys -- you guys cut me

16   off before record time in two different depositions.

17   You have threatened to mute me on the line when you

18   guys were in Colorado.  I have given you every

19   courtesy tonight.  It's 9:15.  Laura says she's

20   tired.  You have gone way over record time.  You

21   wasted basically the whole day.  We didn't really

22   get down to business until 5:00 or 6:00 p.m.

23       MS. WOLF:  Mike, you've been talking nonstop

24   for ten minutes.  If you just stop talking we could

25   finish and all of us could go home.



1      MR. FORD:  So I'll -- just for the record, I'm

2   just going to take that as an instruction not to

3   answer, and I'll hand it over to other counsel and

4   we'll keep the deposition open.

5      MR. BELTRAN:  We're not keeping the deposition

6   open.  We have gone over record time, and you won't

7   even agree to not try to come back even if I let you

8   ask more questions.

9      MR. MAUSER-CLAASSEN:  This is Dustin

10  Mauser-Claassen.  Mike, can I have the floor,

11  please?

12     MR. BELTRAN:  Yeah, if it's within the scope,

13  fine.

14     MR. MAUSER-CLAASSEN:  Well, I'm just going to

15  say, the scope was kind of blown wide open toward

16  then end there when the witness went on for awhile

17  about the allegations generally against the

18  plaintiff regarding women at the house.  So I feel

19  like a lot of things are on the table.  That being

20  said, I have got one document to talk about and only

21  a couple questions.

22     MR. BELTRAN:  Well, what is the document?

23     MR. MAUSER-CLAASSEN:  I -- it will get emailed

24  to you right now.

25              FURTHER REDIRECT EXAMINATION



 1  BY MR. MAUSER-CLAASSEN:

 2      Q.   Ms. Dorworth --

 3           THE WITNESS:  I do not have the document, Mike.

 4  BY MR. MAUSER-CLAASSEN:

 5      Q.   I'll instruct you to open up your folder in

 6  just one second, but I want to start by asking you,

 7  Mr. Dorworth claims that he was -- that he first learned

 8  about the allegations by AB in the complaint when he met

 9  with Joel at Another Broken Egg.

10           Does that sound familiar?

11           MR. BELTRAN:  That's outside the scope.  That

12      hasn't been discussed since the last question, sir.

13      So we're not going --

14           MR. MAUSER-CLAASSEN:  I'm laying foundation for

15      the document.  Will you just let me get into it,

16      please?

17           MR. BELTRAN:  No we're not going into the

18      Broken Egg.  You guys had all day to ask --

19           MR. MAUSER-CLAASSEN:  I'm not going to -- 3.

20           MR. BELTRAN:  It's 9:17 a.m.  We're not doing

21      this.  I have let you guys go past record time.  I

22      let you guys go a little bit --

23           MR. MAUSER-CLAASSEN:  Excuse me, let me just --

24      let me just tell you why what I'm about to say is

25      within the scope.  Your witness described that



 1 | Mr. Dorworth did not have any relation with AB,
 2 | doesn't know her, has nothing to do her, her
 3 | testimony was inaccurate, he doesn't know her.  What
 4 | I'm about to ask her --
 5 |     THE WITNESS:  No, I said she was not at my
 6 | home.
 7 |     MR. MAUSER-CLAASSEN:  What I'm about to ask her
 8 | involves his knowledge of AB --
 9 |     THE WITNESS:  He was not home when she was at
10 | my home.
11 |     MR. MAUSER-CLAASSEN:  I'm -- will you let me
12 | please ask a couple questions, and I will be out of
13 | your hair and then we will close the deposition at
14 | least as to my clients?
15 |     MR. BELTRAN:  Well, hold on.  What was in the
16 | scope of anything that has been discussed since you
17 | had your questioning?
18 |     MR. MAUSER-CLAASSEN:  I asked one question of
19 | foundation.  I haven't gotten into it.
20 |     MR. BELTRAN:  Ask one more question, and if
21 | it's not within the scope then we're going to go
22 | home because this is --
23 |     MS. WOLF:  Mike, do you need us to read back
24 | her testimony that she just gave to you?  Did you
25 | forget the testimony she just gave in your



1    questioning because this goes to that testimony?

2         MR. BELTRAN:  Go ahead and ask your question.

3         MR. MAUSER-CLAASSEN:  Thank you.

4  BY MR. MAUSER-CLAASSEN:

5    Q.   So --

6         MR. BELTRAN:  No, I'm going to object, but I'll

7    listen to your question and see if it's legitimate.

8    Go ahead.

9  BY MR. MAUSER-CLAASSEN:

10   ████████████████████████████████████████████

11   ████████████████████████████████████████████

12   A.   I am aware of that because the newspaper talks

13  about that, yes.

14        MR. BELTRAN:  This is not within the scope.

15   So --

16        MR. MAUSER-CLAASSEN:  How is that possible that

17   you could know that, Mike?  How is it possible for

18   you to know that from that question?

19   ████████████████████████████████████

20   ████████████████████████████████████████

21   ████████████████████████████████

22   ████

23   ████████████████████████████████

24   ████████████████████████████████████████

25   ████████████████████████████████████████



1  from your witness about the entire case and the

2  women being that went to her house?  This is -- this

3  is in the scope to challenge that proposition.

4       MR. BELTRAN:  No, I don't think it's within the

5  scope, guys.

6       Does anyone have anything within the scope of

7  something that I asked during my examination?

8       MR. MAUSER-CLAASSEN:  Mike, you're not the --

9       MR. BELTRAN:  You are never going to -- you're

10  going to let me take Sue until 9:20 at night?

11  You're going to do that?

12       MS. WOLF:  Just let him ask the question, Mike.

13  My god.

14       MR. MAUSER-CLAASSEN:  You represented to us

15  that you would allow us to ask additional questions

16  after you if it was fairly in the scope.  I am

17  making -- I'm making a representation to you that

18  this is within the scope.  I am not trying to go

19  outside of the scope of the questions regarding AB,

20  and you're not even allowing me to get more than two

21  questions into my questions.

22       MR. BELTRAN:  No, we're not -- this is not

23  within the scope.

24       Does anyone else have questions?  Anyone else?

25       MS. WOLF:  No, Dustin has his questions.  He's



1   going to ask them, and then we can all go home.

2        MR. BELTRAN:  No, we're going to go home now

3   because we're --

4        MS. WOLF:  Fine, then I'll ask the question.

5   Do you want me to ask it, Mike?  I mean, I can ask

6   it if you need.  If you need a different human

7   asking the question, I can be that different human

8   for you.  Does that work?  I mean, it just sounds

9   like you need a different person to ask; is that

10  correct?

11       MR. BELTRAN:  No, I don't need a different

12  person.

13       MS. WOLF:  So you're charging your client time

14  right now.  What is your hourly rate you're charging

15  her to sit here and literally talk at infinitum?

16  What is your hourly rate?

17       MR. BELTRAN:  I want to go to sleep --

18       MS. WOLF:  Great, then stop talking, Mike, so

19  we can too.

20       MR. BELTRAN:  It's 9:21.  We're over record

21  time.  I'm going to ask one more time, does

22  Mr. Furbush, Mr. Scheller, or Jason have questions

23  that are within the scope of the questions that I

24  asked my client when we were like two or three hours

25  over record time?



1          MS. WOLF:  It's within the scope of her

2     testimony that she gave to you.

3          MR. MAUSER-CLAASSEN:  Right, you opened the

4     door.

5          MR. BELTRAN:  I didn't open any door.  It's not

6     within the scope.  I mean, we're over record time.

7     ██████████████████████████████████████

8     ███████████████████████████████████████

9     ███████████████████████████

10    ██████████████████████████████████████

11    █████████████████████████████████████

12    ████████████████████████████████████████

13    █████████████████████████████████████

14    ██████████████████████████████████████████

15    ███████████████████████████████████████████

16    ███████████████████████████████████████████

17    ███████████████████████████████████████████

18    ███████████████████████████████████████████

19    ██████████████████████████████████████████████

20    ████████████████████████████████████

21         THE WITNESS:  She described it very well.

22         MR. BELTRAN:  What now?

23         MR. FURBUSH:  This is in like in Porkies when

24    they asked the police sketch artist.

25         MR. MAUSER-CLAASSEN:  Mike, can I ask my



1  question, please?

2  ██████████████████████████████

3  ██████████████████████████████

4  ███████████████████████

5       MR. MAUSER-CLAASSEN:  No, because if you'll

6  allow me to get to it I think if there is

7  evidence --

8       THE WITNESS:  We clearly knew who she was

9  because I was looking for her name.

10      MR. BELTRAN:  Guys, I'm going to tell you two

11 things, okay:  Number one, Mr. Dorworth has texted

12 me he is ill.  He's not -- he's -- he is having a

13 back problem, and he has a crushing headache and

14 he's been vomiting.  He's not going to be able to be

15 deposed tomorrow.  The second thing is it's 9:23.

16      MR. MAUSER-CLAASSEN:  What?

17      MR. BELTRAN:  I've been asking you guys if you

18 have --

19      MS. WOLF:  Hold on, Mike.  You're all the

20 sudden canceling a deposition less than 12 hours

21 before it takes place knowing we flew out here for

22 the deposition?

23      MR. BELTRAN:  I told you not to fly out here.

24      MS. WOLF:  I don't care what you told me.  We

25 should go off the record because this is going to --



1       MR. BELTRAN:  No, we're not going to go off the

2    record.  Mr. Dorworth just texted me that he is not

3    going to be able to make it tomorrow.

4       MS. WOLF:  You're going to need to file an

5    emergency motion for protection, Mike, and we will

6    be asking for all of our costs for flying out.  We

7    will be asking him to fly to Denver because I'm in

8    my third trimester, and I won't be able to fly as I

9    will be taking this deposition, and we'll be asking

10   for it to be reset within a couple of days.  I'm

11   just letting you know that right now, or he can show

12   up tomorrow.  Your client has been sitting in this

13   deposition the whole day, Mike, but suddenly he's

14   too ill to appear tomorrow for his deposition after

15   hearing his wife's testimony today?  Okay.  That's a

16   new one I've never heard before, Mike.

17      MR. BELTRAN:  Okay.  I'm telling you what my

18   client has asked me to convey to you.  I am --

19      MS. WOLF:  Great.  He's still in the

20   deposition.  He's still listening, but he's

21   apparently too ill to show up but he's on the Zoom.

22      MR. BELTRAN:  He's listening to --

23      MS. WOLF:  He's here.

24      MR. BELTRAN:  Okay.  What does that have to do

25   if he's been listening to --



1        MS. WOLF:  Apparently he's too ill to function,

2    but he's sitting in a toilet bowl vomiting but he's

3    on the Zoom.

4        MR. BELTRAN:  Excuse me, it's now 9:24 p.m.

5    Listen, I have been more than indulgent with all of

6    you.

7        MR. SCHELLER:  Either terminate the deposition

8    or let people finish asking the questions.

9        MR. FURBUSH:  This is ridiculous.  If you want

10   to terminate it, go on the record and terminate it.

11   Just say it.  Say the magic words --

12       MR. BELTRAN:  And we will --

13       MR. FURBUSH:  Or let people finish.

14       MR. BELTRAN:  No, I'm going to respond to -- I

15   told you that it wasn't necessary for you to fly.

16       MS. WOLF:  I don't care, Mike.  To me, it is

17   necessary to be here in person.  I will absolutely

18   be asking for a sanction.  I will absolutely ask

19   that your client fly out to Denver next week because

20   I will not be flying again in my third trimester,

21   and I will make it very clear to the court that your

22   client was here the entire day of this deposition.

23   He is still on the record right now, but you're

24   telling he is able to text you.  You're telling us

25   he's too sick to appear.



1        That's fine.  He is apparently a very wealthy

2    man, and he can come to Denver and have his

3    deposition taken in Denver next week.  That is not

4    an issue for me.  You don't get to cancel a

5    deposition last minute because your client didn't

6    like listening to his wife's testimony.  That's not

7    how it works.

8        MR. BELTRAN:  This is not -- that is not the

9    case.

10       MS. WOLF:  You will not be canceling a

11   deposition less than 12 hours before it takes place,

12   Mike, or wasting my client's time and money or mine,

13   to be quite frank with you.

14       MR. BELTRAN:  I didn't ask you to travel.

15       MS. WOLF:  I don't care if you asked me to

16   travel, Mike.  I took depositions in person.  You

17   can take depositions however you would like, but I

18   am telling you what I will be asking from the court

19   so you're aware that your client can make a

20   decision.  I will be making that request, and I will

21   seek sanctions for this.  I'm letting you know right

22   now.  So he better have a doctor's note.

23       MR. BELTRAN:  Well, we'll get that --

24       MS. WOLF:  I'm happy you'll get that doctor's

25   note because he's been sitting in the depo all day



1   long.

2       MR. BELTRAN:  He can listen to a depo and be

3   sick; but, anyway, look, I didn't tell you to

4   travel.  Pregnant or not, I didn't --

5       MS. WOLF:  I don't care what you tell me to do,

6   Mike.  I have got to take depositions in person.

7       MR. BELTRAN:  All right, guys.  That's enough.

8       MR. SCHELLER:  I want to -- since we're

9   terminating the deposition with questions I would

10  have asked, I --

11      MR. BELTRAN:  Guys, it's 9:30.  Like --

12      MR. SCHELLER:  Well, I have got to make a

13  record.  I haven't spoken --

14      MR. BELTRAN:  No, you yielded to Mr. Perkins,

15  and it's --

16      MR. SCHELLER:  I yielded my 45 minutes, and I

17  think he used --

18      MR. BELTRAN:  He used well over an hour.  You

19  gave up your time plus additional time.

20      MR. SCHELLER:  I was going to be -- I was going

21  to ask depositions -- I obviously was going to ask

22  about the Rudisill text.  I was also going to ask

23  about the 2019 party which was actually at a

24  Republican fundraiser at Westgate with multiple

25  witnesses there.  I was going to ask about --



```
1        MS. WOLF:  I'm sorry that your attorney is
2   wasting your time.
3        MR. SCHELLER:  I was going to ask about --
4   well, thank you.  The one time I talk, and you
5   interrupt me.
6        THE WITNESS:  And you all can thank the lovely
7   Greenbergs.
8        MS. WOLF:  Sorry, Fritz.  Sorry, Fritz.
9        MR. SCHELLER:  It's all right.
10        MS. WOLF:  That's me.
11        MR. SCHELLER:  Can I finish or --
12        MS. WOLF:  Yeah, that was me, Fritz.  I
13   apologize.  Go for it.
14        MR. SCHELLER:  You know what, I was going to
15   bring something for your ride back to the airport,
16   and that is off the table now.  All right?  And then
17   I was going to go into the meeting with ███████
18   ████████, the first time she met ███████████████ and
19   how ████████████████ met Mr. Gaetz and his
20   relationship with Megan Zalonka.  So that's it.  Was
21   that that painful, Ms. Wolf?
22        MS. WOLF:  No, I'm sorry for interrupting you,
23   Fritz.
24        MR. MAUSER-CLAASSEN:  Mike, I have one matter
25   before we close.  We -- we'll be moving to have the
```



1  deposition considered in regards to the -- the

2  deposition transcript considered in regards to our

3  pending motion to compel on the issue of spousal

4  privilege.  So seeing as you have designated the

5  transcript as confidential, we're going to have to

6  file a motion to seal.

7       Will you oppose that motion?

8       MR. BELTRAN:  No, I'll -- I don't oppose the

9  seal.

10      MS. WOLF:  I'll not that we're objecting to the

11 confidential designation.  So if you want to

12 maintain it, you have ten days to file your motion

13 with the court, and I'm happy to confer on that.

14 And I'll also note, again, that if your client does

15 not show up tomorrow for his deposition, I will be

16 seeking that he come to Denver for his deposition,

17 and I will note why with the court.

18      MR. BELTRAN:  There are like 30 professionals

19 on this case.  I don't know why you think

20 Congressman Gaetz or my client would need to travel

21 to --

22      MS. WOLF:  That's actually a great point.

23 Congressman Gaetz was more than happy to accommodate

24 when he needed to change his schedule understanding

25 that I am pregnant and can't fly out when he would



1 | need me to.  So I will note that he was more than
2 | happy to accommodate that.
3 |     MR. BELTRAN:  I object to that.  I don't think
4 | that was an appropriate summation.
5 |     MS. WOLF:  Well, that is your problem, Mike.
6 | It's my witness.  So I'm just letting you so you can
7 | talk to your client about whether he wants to show
8 | up tomorrow that I will be making that request and
9 | explaining it to the court.  So just so you're
10 | aware.
11 |     MR. FURBUSH:  Wait, is he definitely not
12 | showing up tomorrow?
13 |     MS. WOLF:  I have no idea.  We will be here
14 | tomorrow.  So we'll see if he shows up, Mike; and if
15 | he doesn't, I'm telling you what I'll be asking from
16 | the court in addition to sanctions and in addition
17 | to fees and costs for our travel and our time
18 | preparing and appearing.  So I will be seeking for
19 | the full day of the deposition and fees.
20 |     MR. BELTRAN:  You're saying he's here, so I'm
21 | sure he has heard everything you've said.
22 |     MS. WOLF:  He is there.  He's apparently been
23 | texting you all day.  So someone who is very sick,
24 | it's impressive.  When I'm really sick, I can't eve
25 | do those things.



1        MR. BELTRAN:  You can't text when you're sick,

2    okay.

3        MS. WOLF:  No, I like to sleep; and if I'm

4    throwing up, I can't usually text at the same time.

5    I'm not that impressive.

6        MR. SCHELLER:  Just for the record --

7        THE WITNESS:  When I was giving birth, I was

8    still doing work.

9        MR. SCHELLER:  -- Mr. Ford --

10       MS. WOLF:  I am still doing work, Ms. Dorworth.

11   I don't appreciate your gratuitous comment.  I'm

12   here doing work.

13       THE WITNESS:  You keep using pregnancy as an

14   excuse.

15       MS. WOLF:  To travel, yes.  There are

16   limitations to travel when you're this pregnant,

17   Ms. Dorworth.  I hope you'd know that.  I'm sure you

18   do since you've been pregnant as well.  I'm sure you

19   recall that.

20       THE WITNESS:  He had a pretty bad sinus

21   infection earlier this week so, I don't know what --

22   he did.  He had a sinus infection earlier this week,

23   so I don't know what his current state is.

24       MR. FORD:  Let's go off the record.

25       THE VIDEOGRAPHER:  Just so that you know, just



 1 | before we go off the record, my mixer was

 2 | inadvertently unplugged at about 9:21 --

 3 |      MR. BELTRAN:  Hold on, before we go off the

 4 | record, I was at the RNC last week where

 5 | Mr. Dorworth was and I have been battling a head

 6 | cold the whole entire time since.  I felt like shit

 7 | today, and I defended a deposition.  So I'll just

 8 | put that on the record.

 9 |      MS. WOLF:  So you were able to work through

10 | your sickness.  Sounds -- thank you for putting that

11 | on the record, Mike --

12 |      MR. BELTRAN:  Well, he was able to text me.  I

13 | think if I can defend the depo, he was able to text

14 | me.

15 |      MS. WOLF.  Well, maybe don't choose to go to

16 | such a large event right before your deposition.

17 |      MR. BELTRAN:  At the RNC -- I was a delegate to

18 | the RNC.  If you want to watch I was in the front

19 | row on Thursday night --

20 |      MS. WOLF:  I have no interest in watching the

21 | RNC, but thank you for the option.

22 |      MR. BELTRAN:  I'm sure you don't.  I was one of

23 | the Florida 14 who called Trump before anyone --

24 |      THE WITNESS:  Are we done?

25 |      MR. FURBUSH:  Did you enjoy the Hulk Hogan



1   speech?

2       MS. WOLF:  No, your attorney has to agree to go

3   off the record.

4       MR. BELTRAN:  He tore his shirt off about 20

5   feet from me.  It was awesome.

6       THE WITNESS:  Mike, are we done?

7       MR. FURBUSH:  Classic.

8       MR. BELTRAN:  Yep.  I guess so.

9       THE VIDEOGRAPHER:  Once again, this is the

10  videographer --

11      MR. PERKINS:  Yeah, the videographer lost the

12  last ten minutes, but it was all argument.

13      THE VIDEOGRAPHER:  Not ten minutes.  Like 10 or

14  15 seconds.  Going off the record.  The approximate

15  time is, 9:31 p.m.

16      THE COURT REPORTER:  Did anyone want to order

17  the transcript?

18      MR. FORD:  Yes.

19      MS. WOLF:  Yes.

20      MR. PERKINS:  Yes.

21      MR. BELTRAN:  She'll read.  If you guys order,

22  she'll read.

23      THE COURT REPORTER:  Mr. Beltran, did you want

24  to order the transcript?

25      MR. BELTRAN:  Not at this time.



1        THE COURT REPORTER:  And you wanted it

2   expedited and a rough copy?

3        MR. WERMUTH:  Yes, please.

4        (The deposition concluded at 9:31 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



```
 1                    CERTIFICATE OF OATH

 2

 3    STATE OF FLORIDA:

 4    COUNTY OF ORANGE:

 5

 6        I, AMBER PORTELLO, Notary Public, State of Florida,

 7    do hereby certify that REBEKAH DORWORTH personally

 8    appeared before me on July 23, 2024, and was duly sworn

 9    and produced a Florida driver's license as

10    identification.

11        Signed this 26th day of July, 2024.

12

13

14

15

16    _____

17        AMBER PORTELLO

18        Notary Public, State of Florida
          My Commission No.:  HH124775
19        Expires:  MAY 4, 2025

20

21

22

23

24

25
```



```
 1                   CERTIFICATE OF REPORTER

 2    STATE OF FLORIDA:

 3    COUNTY OF ORANGE:

 4

 5        I, AMBER PORTELLO, Notary Public, State of Florida,

 6    certify that I was authorized to and did

 7    stenographically report the deposition of REBEKAH

 8    DORWORTH; that a review of the transcript was requested;

 9    and that the foregoing transcript, pages 8 through 473,

10    is a true and accurate record of my stenographic notes.

11        I further certify that I am not a relative,

12    employee, or attorney, or counsel of any of the parties,

13    nor am I a relative or employee of any of the parties'

14    attorneys or counsel connected with the action, nor am I

15    financially interested in the action.

16

17        DATED this 26th day of July, 2024.

18

19

20    _____

21        AMBER PORTELLO

22

23

24

25
```



```
 1    Reference No.: 11164213

 2

 3    Case:  DORWORTH vs JOEL MICHAH GREENBERG

 4

          DECLARATION UNDER PENALTY OF PERJURY
 5
          I declare under penalty of perjury that
 6    I have read the entire transcript of my Depo-
      sition taken in the captioned matter or the
 7    same has been read to me, and the same is
      true and accurate, save and except for
 8    changes and/or corrections, if any, as indi-
      cated by me on the DEPOSITION ERRATA SHEET
 9    hereof, with the understanding that I offer
      these changes as if still under oath.
10

11          _____

12          Rebekah Dorworth

13

14          NOTARIZATION OF CHANGES

15              (If Required)

16

17    Subscribed and sworn to on the _____ day of

18

19    _____, 20_____ before me,

20

21    (Notary Sign)_____

22

23    (Print Name)                     Notary Public,

24

25    in and for the State of _____
```



```
 1   Reference No.: 11164213
     Case:  DORWORTH vs JOEL MICHAH GREENBERG
 2

 3   Page No._____Line No._____Change to:_____

 4   _____

 5   Reason for change:_____

 6   Page No._____Line No._____Change to:_____

 7   _____

 8   Reason for change:_____

 9   Page No._____Line No._____Change to:_____

10   _____

11   Reason for change:_____

12   Page No._____Line No._____Change to:_____

13   _____

14   Reason for change:_____

15   Page No._____Line No._____Change to:_____

16   _____

17   Reason for change:_____

18   Page No._____Line No._____Change to:_____

19   _____

20   Reason for change:_____

21   Page No._____Line No._____Change to:_____

22   _____

23   Reason for change:_____

24
     SIGNATURE:_____DATE:_____
25   Rebekah Dorworth
```



```
 1   Reference No.: 11164213
     Case:  DORWORTH vs JOEL MICHAH GREENBERG
 2

 3   Page No._____Line No._____Change to:_____

 4   _____

 5   Reason for change:_____

 6   Page No._____Line No._____Change to:_____

 7   _____

 8   Reason for change:_____

 9   Page No._____Line No._____Change to:_____

10   _____

11   Reason for change:_____

12   Page No._____Line No._____Change to:_____

13   _____

14   Reason for change:_____

15   Page No._____Line No._____Change to:_____

16   _____

17   Reason for change:_____

18   Page No._____Line No._____Change to:_____

19   _____

20   Reason for change:_____

21   Page No._____Line No._____Change to:_____

22   _____

23   Reason for change:_____

24
     SIGNATURE:_____DATE:_____
25   Rebekah Dorworth
```



```
─────────────────        217:6,15      $500            10:32           140
                         422:18          277:4          172:24          148:8
   Exhibits                                                             324:8,9
─────────────────        11164213 Re  ─────────────    10:34
                         bekah.                          173:3,17       147
11164213 Re              Dorworth.     ─────────────                    324:5,7
bekah.                   EXHIBIT81          0           10th
Dorworth.                 4:19         ─────────────     292:23         14th
EXHIBIT77                 209:19,20                                      237:15
   4:15                   210:1,2,     004             11:00            238:1
   11:22,25              5,9 211:9      216:24          178:22          241:10,13
   15:13                  214:16,17
   20:2,15                216:8        038             11:08            15
                          219:3         150:25          88:3            64:22
11164213 Re              220:8                                          101:22
bekah.                                 ─────────────   11:22           128:7,12
Dorworth.                11164213 Re                    88:6            232:2
EXHIBIT78                bekah.        ─────────────                    233:11
   4:16                  Dorworth.          1          11:39            235:1
   149:8,12              EXHIBIT82     ─────────────     419:15         236:16
   150:9                  4:20                                          237:2
   158:19                 266:15,16    1              12               238:19
   160:21                 267:8,16,     82:17           57:11          239:6
   169:16                23             212:20          73:4           240:3,9,
   170:21                 279:17,18     306:18,19       92:19          14,23
   178:2,3,                                             104:24         243:12,23
   25 179:1              11164213 Re   10               110:7          246:7,13
   180:2                 bekah.         366:14          133:16         247:3
   182:11                Dorworth.      367:4           152:17         263:24
   184:10                EXHIBIT83      472:13          332:14         264:17
   428:1                  4:21                          434:14         265:18
                          289:3,7,     100              448:24         321:10
11164213 Re              15,17          27:14           452:20         366:5,14
bekah.                    292:3         51:5            462:20         367:3
Dorworth.                               268:8           465:11         386:20,25
EXHIBIT79                11164213 Re    269:25                          391:17
   4:17                  bekah.         275:16         129             406:13
   156:9,13,             Dorworth.      280:11          421:20         409:11
   24 157:25             EXHIBIT88      324:8                           410:12,19
                          5:1           334:12        12:19            448:10
11164213 Re              442:9,10       341:13          134:19         472:14
bekah.                    449:8         381:17
Dorworth.                 450:15                       13             1520
EXHIBIT80                              1079             19:14          8:25
   4:18                 ─────────────   279:21          20:3 67:8
   209:19,25                                            330:9         15th
   210:2,10,            ─────────────  10:00                           207:18,23
   11 211:1,                 $         64:21           14             234:9,18
   18,19,23             ─────────────                   67:8           237:15
   214:22                              10:08            129:12,16
                        $400,000        46:6            238:8
                         318:9                          330:9
                                       10:11            471:23
                                        172:18

                                       10:19
                                        46:9
```



238:3,4,8
241:12,17
242:3
244:9
245:1
257:6
290:10
331:15
383:25
447:17

**16**
101:14
268:6
392:11
393:24
440:8
441:7
442:14
451:10
453:20,22

**16:37**
422:13

**16th**
237:15
238:5,8
241:8
290:11
291:9
442:16

**17**
92:4 93:5
105:6
135:20,23
136:6
138:5
139:5,7
140:1
141:7
143:5
180:10
185:2
220:24
221:9
259:21
260:1,4

262:7
263:20
372:7
422:19
444:25

**17th**
184:23
199:1
217:7,15
218:2
422:11,
12,19

**18**
102:12
104:16
140:2
217:2

**18th**
104:12

**19**
100:22
101:19
139:8,11,
12 247:8
374:20
380:2,3

**1976**
105:6

**1988**
72:16

**1998**
104:19

**1:06**
134:22

**1:36:08**
422:19

**1st**
199:24
211:3

————————

**2**

————————

**20**
160:10
191:13
204:1
315:22
316:11
332:18
364:12
366:13
367:4,16
472:4

**2000**
67:8
292:19

**2001**
101:22

**2003**
101:19

**2010**
104:22,23
109:12

**2012**
104:11,16

**2014**
67:12
70:14,18
71:22

**2015**
109:21,22

**2016**
104:9

**2017**
72:25
73:4
101:5,10
105:1
130:21,24
131:12,16
135:6,11,

15,16,21
136:6,7
137:14,22
138:3,4,
9,12
139:25
140:11
143:5,19
155:15
175:20
176:19
177:11
199:3,4,
18 200:8
201:15
202:3
203:9,15
204:1
205:16,24
207:18,23
209:23
212:20
216:1,6,
16 217:1,
2,7,15
218:2
219:7
220:24
221:9
222:16
223:25
224:20
225:5,9
226:11
227:8,15
228:12,20
229:22
230:11
231:3,8,
13 232:2,
9 233:11,
13 234:14
235:2
236:16
237:3
238:8,19
239:6

240:3,9,
14,23
243:12,24
246:7,13
247:3
260:23
261:1
263:24
264:17
265:18
268:6
282:24
285:22
286:5
287:17
288:23
291:9
297:9
321:11
329:21
330:3
333:12
335:13,
14,16,18
337:14,18
339:2,15
340:5,15
341:8
342:15
386:6,9,
13,20,25
398:14,22
406:13
409:11
410:12,
15,19
422:11
434:2
435:7
448:1,3,
10

**2018**
100:16
342:22
344:15



**2019**
101:1
466:23

**2020**
74:18,23
82:17
151:24
155:19
159:5,10
173:7,16,
21 175:3,
10 179:18
180:10
185:2
186:7
194:19
324:24
325:1
374:21
427:3,4,7
428:10
440:8
441:7
442:14
451:10
453:20,22
461:15

**2021**
74:14,18,
23
174:17,22
267:19
279:20
289:16
292:20
327:22,23
344:25
382:15
394:21
414:4,7

**2022**
414:18

**2023**
20:11
39:24

40:2
41:15
42:1
47:4,15
48:19
50:4
65:12
73:11
74:15
76:3
121:10,16

**2024**
20:18
121:10,16

**20th**
200:22
201:7
202:18
203:8,15
205:23

**21**
101:17
153:11
340:5,15
435:7

**21st**
339:15,17
341:14
434:1

**22**
282:24
285:22
286:5
287:17
288:23
333:12
414:7

**22nd**
199:23
200:2,15,
17 285:2
333:25
341:14,
22,23

406:20

**23**
20:18

**23rd**
20:10

**24**
100:23

**25**
71:12
92:4
266:21

**26**
342:22

**27**
72:16
128:22

**271**
401:25

**28**
306:19

**28th**
136:3
140:3

**2:09**
192:10

**2:23**
192:13

**2:30**
340:5

**2:35**
339:20

**2:41**
151:24

**2:52**
152:17

**2nd**
199:24
220:4

—————

**3**

—————

**3**
456:19
461:15

**30**
315:21
363:24
429:22,
23,24
468:18

**31st**
211:3

**32**
446:17

**32746**
9:1

**34**
272:10

**348**
305:17

**35**
72:15

**37**
271:21

**38**
150:24

**3:12**
229:14

**3:26**
229:17

**3rd**
220:5

—————

**4**

—————

**4**
267:19

**40**
105:3

**407 310-
7375**
152:7

**41**
105:1

**417**
334:14,
16,22

**42**
252:19
273:17
274:2,11

**44**
274:11,12
305:5,14,
15 306:2,
6,13

**45**
366:15,17
367:3
466:16

**46**
415:25

**48th**
105:7

**49**
96:5

**4:16**
271:10

**4:27**
271:13

**4:48**
340:12

—————

**5**

—————

**5**
104:9



279:20

**50**
96:6

**500**
276:7

**51**
306:19

**55**
92:4

**5:00**
58:21,25
61:21
299:16
454:22

**5:11**
299:19

**5:30**
61:17,20
62:9,13,
24

**5:33**
180:10

**5:34**
181:1,5

**5:51**
332:9

---

**6**

**6**
151:24
159:5,10
173:7,16
175:10

**6/6/20**
418:7

**639PA**
215:7

**6:00**
453:12

454:22

**6:02**
332:12

**6:45**
363:19

**6:56**
363:22

**6:58**
217:2

**6th**
158:21
178:10
179:18
293:8
418:18,
19,20,25
420:21
441:11

---

**7**

**7**
48:19
268:1
289:16

**75**
297:10

**77**
11:21,22,
25 15:13
20:2,15

**78**
149:8,12
150:9
158:19
160:21
169:16
170:21
178:3
179:1
180:2
182:11

184:10
428:1

**79**
156:9,13,
24 157:25
279:24

**7:00**
61:23
62:9,13
367:20

**7:23**
425:17

**7:24**
426:1,14

**7:25**
426:3,13

**7:34**
159:10,
15,20

**7:37**
161:3

**7:38**
178:21

**7:51**
399:2

**7:58**
161:6

**7th**
47:3
178:10,21
179:18
220:5

---

**8**

**8**
39:24
40:2
41:15
42:1
47:15

65:11
216:25
228:12,20

**8/17**
422:21

**80**
209:19,25
210:2,11
211:1,19,
23 214:22
217:6,15
422:18

**81**
209:20
210:2,5,9
211:9,13
214:17
216:8
219:3
220:8

**82**
163:5
266:15,16
267:8,16,
23 279:18

**822993**
424:3

**82935**
441:23

**82936**
441:23

**82952**
159:1,6

**82953**
160:21

**82954**
161:22

**82955**
163:1,6

**82956**
166:22

**82957**
169:17

**82958**
170:21
183:25

**82959**
171:3,4
184:1

**82960**
149:19
171:23
172:2,10
178:3

**82961**
179:1

**82978**
149:20

**82993**
149:20
180:2,4,
7,8 183:3
424:24
425:5
426:20
442:16

**82994**
182:17
183:2,15
184:4
423:21
425:8

**82995**
149:25
182:11
184:10
425:1,5

**83**
289:3,7,
15,17
292:3,5

**83033**
149:25



150:23

**83038**
149:25
150:17
151:14,
17,23
159:3

**83039**
149:25

**83040**
150:1

**8383**
150:19

**84**
389:19,20

**85**
420:22,24
421:8
424:17

**86**
421:6,9
424:4,16,
17

**87**
424:15,
16,20

**88**
442:9,10
449:8
450:15

**8:00**
58:23,25
341:21
399:5

**8:02**
418:8
419:12

**8:02:44**
419:13

**8:03**
161:14

**8:04**
161:22
163:14,15

**8:05**
163:21
164:5
165:14

**8:11**
167:7

**8:13**
167:15

**8:27**
451:10

**8:52**
439:22

**8:59**
439:25

**8th**
40:13
217:14
218:2
220:5,24
221:8
224:20
227:8,16
229:21
230:7

——————

**9**

——————

**90**
306:19

**95**
297:19

**953**
149:18

**954**
149:18

**955**
149:18

**956**
149:18

**957**
149:18

**958**
149:19

**959**
149:19

**961**
149:19

**979**
149:20

**98**
104:21

**99**
104:21

**995**
183:3

**9:00**
341:21
367:20

**9:01**
441:13

**9:02**
447:5

**9:10**
448:22
449:24
450:5

**9:11**
449:24

**9:13**
452:17

**9:15**
454:19

**9:17**
456:20

**9:18**
170:12

**9:20**
459:10

**9:21**
460:20
471:2

**9:23**
462:15

**9:24**
464:4

**9:30**
466:11

**9:31**
472:15

**9th**
292:23

——————

**A**

——————

**A's**
208:2

**a.m.**
46:6,9
88:3
341:21
456:20

**Aaron**
88:24
89:13
95:10,12,
18 97:11
98:2,5,19
99:2
120:9

**AB**
6:25
8:18,19,
20,22
25:24
26:6,14
27:11
206:23
307:24

309:11
316:14
354:24,25
355:1,3
364:17
380:19
404:18,22
405:24
406:20
443:8,10
445:21
456:8
457:1,8
458:10,11
459:19
461:9

**AB's**
316:8
433:8

**Abby**
7:4 25:20
27:11
31:10,15,
20 32:18
33:6 34:3
111:1
126:21
148:7,8
163:17
165:10
188:23
303:23
310:10,
15,18,20,
21,22
311:12
312:3,9,
11,13
313:13
316:5
317:13,
21,23
318:3,23
321:17,21
322:5,7
323:15,19



324:4,11
325:10,
14,20
326:5,23
327:21,24
328:1,7,
11,18,23
342:19
343:14
344:8
345:12
346:3,9,
11,12,25
347:20,25
348:1,12,
20 349:1,
9 350:4,
12,22,24
352:14
354:10,
15,19,24
355:11,
14,17,18
356:4,15
357:4,5,7
358:1,6,
25 359:6,
10,12
360:3
368:15
369:14,20
372:25
373:8,17
374:4,14,
22
375:13,18
376:5,10,
11,19,24
377:13,16
378:2
379:16,
19,22
380:5,6,
12 383:5,
7 387:18,
24 389:15
391:16,18

392:11
393:24
400:21
403:12
404:7,8,
17,22
405:6,20
406:9
430:13

Abby's
344:1
357:15

abhorrent
92:5

ability
22:17
313:22
367:9

abrupt
293:25
294:4,5

absolutely
147:1
188:18
221:5
346:18,21
365:1
411:3
464:17,18

abuse
83:18,24
197:2

abusing
197:15

accept
143:1
404:18

access
135:8
149:16
174:13
176:5
190:11

194:19
229:10
239:19
310:19
311:3
321:3
344:16
408:16
409:1,4

accessed
419:3

accommodate
468:23
469:2

account
53:1
222:17
225:1,25
226:5,7,
22 320:17
404:9

accounts
53:3
208:6
223:25

accuracy
282:20

accurate
37:10
49:23
61:7
66:3,12,
17 74:25
115:12
205:14
220:2
286:23
307:21
313:1

accusation
93:9
126:13

accusations

92:10

accused
91:8,9,
10,11,12,
14,15
92:9,21
93:19
113:21
126:20

acknowledge
11:15

acknowledgm
ent
14:13
19:17,21
20:2,17

act
48:24
49:9
50:21
91:14
93:3
328:4,5
357:16

acting
44:10
71:19
348:8
351:20
392:2

actions
30:12
113:24
302:2
311:23
405:21

active
383:1,2

actively
76:10

activities
29:9
76:12

78:19
79:2,5
135:9
347:19
432:25
436:3

activity
198:19
312:21
313:4
371:18

actors
182:4
326:15

acts
51:3 94:1
127:9
148:12
389:10
412:10

actual
69:9
119:8
409:3
440:10

ad
78:15
84:24
339:5

add
22:12
34:10
57:3,6
112:14
116:15,22
126:25
287:24
298:22

added
225:5

adding
70:2



addition
  352:25
  469:16

additional
  27:4
  66:24
  138:13
  357:23
  364:1
  367:6
  400:13
  441:8
  459:15
  466:19

additionally
  69:5

address
  8:24
  334:14

adept
  129:14

adequate
  70:9
  305:12
  306:15

administration
  110:4

admissible
  36:5

admission
  310:14

admissions
  430:12

admitted
  94:2
  213:8

adult
  78:21
  377:19
  378:19

adults
  141:8
  190:12
  359:22
  362:1

advanced
  100:19

advice
  35:18,21

advised
  99:3

advisor
  78:22

AEO
  230:20
  271:24
  272:4
  273:2,3,
  20

affair
  438:21

affairs
  106:6

affects
  85:16

affidavit
  254:17,23
  256:6

affiliation
  389:24

affirm
  383:21

affirming
  153:19

afforded
  364:24

afternoon
  300:5
  416:8,16
  422:14,20

449:2,18

age
  72:14
  78:1
  91:22,24
  92:1
  260:1
  347:23
  378:20

ages
  452:14

agree
  14:15,18
  147:1
  269:4
  270:15,
  20,25
  306:23
  317:5
  332:21
  367:13,17
  453:25
  455:7
  472:2

agreed
  20:4
  307:24
  309:11
  310:10
  404:17,18

agreeing
  333:8

agreement
  9:3,6,8
  11:6,13,
  14 12:14,
  19,20,21,
  24 13:2,
  9,11,15,
  19,20,21,
  22 14:2,
  12,13,14,
  16,20,21,
  25 15:2,

5,14 17:2
  18:5,13,
  21 20:2,
  4,16,17
  48:23
  49:8
  50:10,21
  51:5,9,18
  73:14,17,
  23 74:3
  75:20,23,
  24,25
  256:21
  272:15,17
  341:12

agreements
  404:13

ahead
  8:12 9:24
  10:1
  11:17
  20:12
  28:17
  32:20
  33:1 35:1
  37:14
  39:1
  41:18,22
  48:2
  50:6,15,
  24 55:25
  56:12
  60:20
  66:20
  68:21
  70:9 84:3
  87:25
  108:5
  112:17
  114:23
  115:17
  120:21
  123:20
  128:15
  132:5
  138:22

140:6
  141:6
  147:13,17
  156:12
  157:22
  164:2
  193:19
  195:19
  196:12
  197:4,17
  206:3
  218:8
  222:11
  229:12
  232:10
  233:15
  240:8
  242:23
  254:9,10
  271:7
  273:12,24
  289:1
  290:13
  295:12
  298:19
  303:13,14
  368:2
  385:4
  398:3
  400:6
  404:5
  407:25
  409:13
  411:2
  415:2,9
  416:10
  437:2
  454:8,10
  458:2,8

air
  261:9
  391:8

airport
  217:19
  467:15



**Alachua**
  100:8,9,
  10

**alcohol**
  127:2,4,
  9,16
  128:6,23,
  24 130:12
  132:4,9,
  18,24
  133:6,18
  134:1
  286:7
  287:18
  362:20
  406:23
  417:5

**Alex**
  156:2
  168:15

**allegation**
  71:18
  93:3,6,7
  94:14
  126:23
  301:14
  302:12
  309:10
  400:4,24
  406:6
  438:12,19
  444:24

**allegations**
  29:19
  52:9
  89:11,22
  91:4,16
  92:15
  93:16,18
  94:9 97:7
  112:2
  115:14
  117:22
  126:22
  301:24

  302:7
  304:9,18
  321:17,
  18,22
  370:18
  390:12
  393:10
  394:16
  395:16
  438:16
  445:12
  455:17
  456:8

**alleged**
  71:23
  90:20

**alleges**
  313:6
  400:1,22
  404:16
  406:1

**allotting**
  365:19

**allowed**
  155:7
  184:19
  190:23
  377:1

**allowing**
  364:1
  366:12
  459:20

**Altamonte**
  154:8,10,
  11 156:25
  157:4,15
  158:11
  396:20
  397:13

**altercation
  s**
  81:20

**amazing**

  84:16

**amended**
  29:20
  47:15,16
  48:7
  64:2,5,8,
  18 65:1,
  11 66:1,
  4,11,16,
  24 89:12
  91:5
  94:10
  97:8
  301:10
  302:12
  305:6
  306:4,5,
  6,8,10,25
  307:8,11
  312:18
  430:4

**America**
  236:7
  415:11

**American**
  109:3
  226:8
  228:9
  337:3

**Amex**
  108:9
  224:25
  225:24
  271:18,23

**amount**
  60:15
  130:9,10
  318:12
  329:2
  397:15

**analyze**
  245:20

**Ananth**
  69:3

**Anastasia**
  7:18
  62:20,21
  96:7
  230:14
  271:20
  418:1
  420:25

**and/or**
  313:7

**Anderson**
  156:5

**Andrew**
  7:7,14
  26:15
  27:10
  28:3,10,
  13 300:8
  307:24
  309:10
  310:10
  311:11
  312:2
  313:6
  314:9,20,
  25

**Andy**
  25:20
  27:25
  31:11,15
  308:8
  313:12,14
  317:21
  319:1
  353:7
  355:25
  356:3
  358:16,
  20,21
  371:21

**angles**
  281:14

**angry**
  377:17,20

**Anne**
  322:10,
  15,16,20,
  25
  323:10,
  12,14
  326:6
  327:13,25
  328:10,23
  348:15,
  17,25
  349:3,4,7
  368:15
  383:10

**Anne's**
  349:4

**anniversary**
  104:17
  110:9

**anonymous**
  389:8,9

**answering**
  45:15
  234:8
  242:13
  343:24
  450:25

**answers**
  21:15
  23:6 34:9
  41:11
  70:12
  110:13,20
  111:1
  141:1
  216:14
  392:25

**anticipate**
  367:15

**anxiety**
  131:2,6,9

**anybody's**
  115:19



anymore
   56:5
   343:6
   409:9
   452:4,9

apartment
   334:19,
   20,21,24,
   25 335:2,
   6,13,14,
   17 336:1

apologize
   45:19
   50:17
   129:1
   137:1
   145:11
   226:6
   306:2
   318:23
   364:10
   439:15
   467:13

app
   175:1
   177:19

apparent
   17:19,21

apparently
   17:1
   51:16
   56:10
   166:19
   287:9
   326:21
   461:14
   463:21
   464:1
   465:1
   469:22

appearance
   386:8

appearances
   6:23

appeared
   397:14

appearing
   7:9
   469:18

appears
   221:11
   253:8
   269:5
   369:1
   426:10,17

apply
   312:16

appointment
s
   203:17

appropriate
ly
   78:3

approximate
   46:5,8
   88:6
   134:19,21
   192:9,13
   229:14,16
   271:12
   299:16,18
   327:8
   332:9,11
   363:22
   399:4
   439:22,25
   472:14

Approximate
ly
   19:14
   272:10
   415:24

April
   47:3
   48:19
   50:4
   292:19,23

293:9
   394:21
   461:15

area
   77:8
   203:22
   224:5,10
   228:22

areas
   78:1
   304:2

argue
   275:22

argument
   472:12

arisen
   133:13

arm
   31:17

Arms
   368:21

arrangement
   199:20
   375:3

Arrangement
s
   91:23
   135:17
   136:9
   250:2
   260:2

arrest
   29:24,25

arrive
   348:17

arrived
   290:4
   323:5
   337:8
   340:4

article

98:9
   159:19

articles
   65:16
   89:14
   132:23
   195:21
   304:1,4
   444:17,20

Artiles
   285:18

artist
   461:24

Ashlyn
   7:1

Ashton
   67:20
   168:16,
   21,25

asks
   38:5
   251:17
   316:18

asleep
   298:17

aspect
   436:6,9

assertion
   272:2
   273:23

assessment
   85:10

assets
   319:1

assist
   51:15
   78:22,24

assistant
   78:16
   267:17
   289:8

355:15

assisted
   80:2

assisting
   375:14

associate
   6:25

associates
   303:24
   308:9

association
   67:9
   106:22
   205:18
   212:10
   343:16
   344:14

assume
   21:24
   22:6
   51:18
   131:5
   136:19
   139:25
   140:3,10
   141:19
   142:19,
   20,23
   143:6,10,
   11,18,25
   144:2,21
   151:9
   156:3
   191:4,18
   218:11
   263:8
   277:17,20
   278:13
   283:22,23
   315:15
   318:25
   322:12
   362:19



assumed
  103:16
  257:22
  262:12
  263:1,4
  322:12
  403:13

assuming
  54:5
  277:16
  278:25
  371:25

assumption
  240:24
  251:25
  262:14

assure
  94:4
  409:8

assuring
  452:15

astonishing
  280:12

AT&T
  265:9,10,
  11

at-risk
  85:19
  86:4,7,12

ate
  55:23
  56:23
  134:11

ATM
  230:3

attach
  182:21

attached
  14:14
  20:14
  150:15
  187:23

attachment
  159:19
  180:15,
  17,18,20
  183:2,4,
  5,11,23,
  25 184:1

attachments
  159:22

attempt
  265:7
  327:10
  358:14

attempted
  428:15

attempting
  107:20
  428:12

attendance
  7:4

attended
  29:10
  138:8,17
  143:25
  360:16,
  17,18
  378:21,25

attending
  7:1,21
  34:15
  149:16

attention
  83:23
  222:14
  267:22
  298:18
  394:21

attorney
  10:19,20
  18:3,14,
  18 35:23
  39:9,10
  49:11,17,

21,25
  50:22
  53:11
  56:13,25
  58:1
  61:15,19
  62:18
  67:20,24
  118:13,16
  208:22
  209:4
  225:20
  227:5,20
  267:20,21
  281:14
  282:11
  289:8
  290:7
  291:25
  292:15,16
  301:16,
  19,22
  308:1
  355:14,15
  376:24
  405:12
  438:21
  467:1
  472:2

attorney's
  52:10,12
  53:23
  272:15

attorney/
client
  297:1

attorneys
  267:18
  303:19

attract
  381:7

attractive
  181:20

atypical

187:6,8,
  10 194:9,
  17 233:3,
  4,20
  236:2
  237:12
  243:16
  244:6,7
  260:19
  291:3
  342:3

auctions
  338:3

audio
  90:22

August
  39:24
  40:2,13
  41:15,24
  42:1
  47:15
  65:11
  175:20
  211:3
  216:1,6
  217:7,15
  218:2
  220:24
  221:9
  296:23
  324:16,24
  325:1,9
  382:14
  422:2

authorities
  307:25
  309:12
  310:12

authority
  12:20

authorizati
on
  395:25

automatical
ly
  106:1

availabilit
y
  87:6

average
  433:14

avoid
  12:4
  41:12
  293:16

aware
  20:11
  27:16,22
  47:5,6,20
  72:6
  89:17,19
  147:15,23
  173:13
  174:8
  190:2
  193:3,17,
  20 194:22
  195:2,5,
  13,16,25
  214:4
  221:22
  232:1,7,
  8,11,20
  233:12
  234:10,15
  236:3
  257:6,9
  258:15,
  22,25
  259:6,9
  260:7,14,
  25
  263:15,
  17,22
  264:1,15
  265:25
  288:1,5
  315:8,15,



17 320:16
323:25
350:16
352:8
376:25
399:20
400:16
402:4
405:5,7,
8,11,23,
25 408:8
443:6,8,
9,11,13,
16 445:14
458:10,12
465:19
469:10

**awesome**
472:5

**AWG**
7:8 25:21
27:10
31:9
32:2,5,
13,17
33:9,18,
25 300:9
313:7
314:9
317:16,24
318:11,13
404:25
405:16

**awhile**
392:24
416:16,18
455:16

───────────
**B**
───────────

**B's**
384:17
397:20

**babies**

29:6
252:6

**baby**
229:5
252:7,10,
11 346:5
372:16,18
436:1

**Bachelor's**
100:1

**back**
28:22
33:4
34:11
44:8
46:11
57:5
58:4,24
73:25
77:20
83:25
90:25
92:6
107:24
108:2,6,7
109:11
112:1
113:13
120:17,22
124:11
131:21
134:15
145:8
152:12
155:3
157:20
160:3
173:16
175:10
187:13
189:15
192:3,15
194:6
199:12
200:16

201:5,8,
14
202:18,23
203:7,14
204:1,4,6
205:24
206:5
215:9,16
216:4,14
218:9
222:7,9
238:5
239:25
241:2
243:1,2
254:11,12
255:13,
17,23
256:20
271:17
272:21
279:11
282:15
285:24
290:22
295:6
297:6,9
299:21
312:17
315:6
329:21
330:3
332:21
333:8,10
340:2,10
341:6,8
344:14
349:5,10
352:6,7
354:18
362:18
365:2
367:5
370:24
384:6
385:24
386:6

393:14
398:13
399:15
415:18
419:24
421:23
422:4,6,
16,17
428:7
441:17
452:7,16,
17,18,19
455:7
457:23
462:13
467:15

**background**
72:12
88:13
108:2
109:11

**bad**
93:22
161:13
200:9
209:9
352:11
380:5
470:20

**Bailey**
124:25

**Ballard**
292:18
352:20,23
388:2
389:24
390:11,15

**balls**
425:25
426:8,15
439:14

**bank**
200:21
208:6

222:16
223:16,25
224:21
225:1,7,
8,14,22,
25 226:5,
7,22

**banking**
222:22,25
223:7

**bar**
107:2
152:22,23
154:1
157:14,19
354:18

**barely**
438:23

**Barring**
88:2

**bars**
397:18

**base**
238:22
241:1

**based**
35:12
36:1
119:4
122:8
125:9
127:24
140:1
220:21
239:1
243:3
244:13
255:3
257:23
260:2
291:15
296:18
317:14
344:5



357:14
367:7
372:15
377:3
378:3
403:6
404:6
419:6,20,
25 420:9
426:21,23
427:24
428:8
433:21
437:12

**baseless**
93:21

**basic**
54:9

**basically**
113:2
454:21

**basing**
400:24
406:6,8,
11 433:13

**basis**
127:17
136:21
137:7
250:22
251:8
364:15
365:1
420:13
436:13

**basketball**
83:12

**bates**
159:6
160:20
179:1
182:11
210:3
230:15

275:5
391:16
421:19
440:5,10
441:14

**bathing**
378:8

**bathroom**
46:1,12
387:18

**baton**
300:1

**battle**
113:14
131:18
341:18

**battling**
471:5

**Beast**
378:2
383:13,21

**beat**
348:8
351:23
391:4

**beautiful**
73:2
253:2

**bed**
64:21
286:11,12
287:11,
13,14
288:12
337:13,
14,18,19
338:6,7,8
448:5
453:1

**bedroom**
338:12
398:14

**bedrooms**
337:10
398:18,19

**began**
36:10
37:3,4,9,
22 200:3

**begin**
36:11
58:14
174:16

**beginning**
21:7 37:5
39:6
82:16
121:16
145:14

**behalf**
6:24 7:3,
7,12,14,
17 14:21,
22,23
50:11
96:4
106:7
122:5
364:19

**behavior**
127:8
168:5
243:16
326:15
351:24
353:9
373:4
417:2,12

**Bekah**
242:22

**belief**
242:2,4
244:13
309:18
312:19

**believed**
303:19
308:23
374:6
430:18

**believes**
453:24

**belive**
439:12

**belly**
385:13
386:6,7
435:2

**belt**
189:11

**Beltran**
7:16,19,
22 8:1,4,
8 9:4,22
10:4
11:2,6,10
12:7,11,
15 13:10,
17 14:22
15:7,16,
20,24
16:4,7,
13,21
17:16,23
18:24
19:3,9
20:6,19
22:14
23:2
24:10,12,
15,19
28:17
32:8,20
33:11
34:14,17,
23 35:2,
13,15,19
36:3,7,
14,17,20

37:9,12,
15,20
38:1,3,8,
16,20
39:4,12
40:4,5
41:5,8,
16,18,22
42:10,19,
24 43:2,
3,7,15,
18,21
44:2,8,10
45:4,25
48:2,20,
24 49:9
50:5,12,
21,23
51:12
52:1,4,7,
13,16,22
53:14
54:13,16,
20,22,25
55:11,13,
25 56:7,
10 57:1
59:3,11
60:18
62:9,12,
17 65:3,
22 66:13,
20 68:2,
6,9,13
70:7,11
73:16,21
74:5
85:23
88:1
90:22
96:2,15,
16,21
99:10,13,
16 107:14
108:9,15,
24 109:3
112:16



| | | | | |
|---|---|---|---|---|
| 114:19 | 166:8 | 234:12 | 287:21 | 18 368:1 |
| 115:5,17 | 169:3 | 237:16 | 288:4,11, | 371:5,9 |
| 120:17 | 171:25 | 238:10 | 24 289:11 | 376:6 |
| 122:15 | 172:15,20 | 240:4 | 290:13 | 384:18,20 |
| 123:20 | 175:6,13 | 242:9,12, | 291:11, | 385:3 |
| 124:3,7, | 176:1,8 | 15,22 | 13,23 | 388:11 |
| 24 125:4, | 178:12 | 247:4,14, | 293:2,19 | 389:13,17 |
| 6 127:18 | 179:19,24 | 17 248:4, | 294:19 | 391:10,13 |
| 128:15 | 180:7 | 25 249:6, | 295:3,6, | 392:15, |
| 129:17,21 | 182:17,20 | 10,14,25 | 9,13,14, | 18,22 |
| 131:13 | 183:1,9, | 250:3,5, | 20 296:1, | 393:1,15, |
| 132:5 | 14,19,24 | 16,21 | 8,10,15, | 16,22 |
| 133:2,7, | 184:8 | 251:1,5,7 | 20 | 394:15 |
| 10 134:3, | 185:7 | 253:17 | 300:17,23 | 396:5 |
| 8,13 | 190:5,13 | 254:1,7 | 301:4,18 | 398:3,25 |
| 137:4,11, | 193:19 | 256:12,17 | 302:8,13, | 400:6 |
| 16,24 | 195:8,19 | 257:1,8, | 19 303:4, | 401:12 |
| 138:22 | 196:6,10, | 13 | 12 | 402:9,25 |
| 139:10, | 13,15,16, | 258:13,24 | 304:12,20 | 403:9 |
| 17,23 | 23 197:1, | 259:4,8, | 307:1,17 | 404:5 |
| 140:6,13 | 14,21 | 24 260:10 | 308:15 | 406:4,7 |
| 141:4,16, | 198:1,8, | 261:12,23 | 309:4,19, | 407:11, |
| 20,23 | 17,21 | 262:5 | 24 311:14 | 19,24 |
| 142:4,9, | 199:7 | 263:25 | 312:4 | 408:7,13, |
| 13,17 | 201:16 | 264:5,23 | 315:22 | 24 409:12 |
| 143:3,8, | 204:8 | 266:12,18 | 316:4,7, | 410:13 |
| 14,22 | 205:2 | 267:1,5, | 13,20,23 | 411:1,19 |
| 144:5,15 | 206:3 | 9,11 | 317:4 | 412:15 |
| 145:9,24 | 208:22 | 269:7 | 320:18 | 413:17 |
| 146:3,9, | 209:2,5, | 270:3,14 | 324:25 | 415:1,8, |
| 21 147:5, | 12,17 | 271:6,14 | 331:25 | 23 416:2, |
| 11 | 210:12, | 272:14,24 | 332:4,7, | 14,22 |
| 148:18, | 16,19,24 | 273:18 | 13 | 417:13 |
| 21,23 | 211:12, | 274:11, | 336:10, | 418:11,17 |
| 149:1,4 | 16,20 | 13,22 | 16,20 | 419:5,11 |
| 150:2,7, | 213:25 | 275:12,24 | 337:17 | 420:4,12, |
| 18,20,23, | 219:15 | 276:3,11, | 343:3 | 18,21,24 |
| 25 151:2 | 220:17,25 | 16,18,25 | 359:2 | 421:5,10, |
| 152:2,15 | 221:24 | 277:6 | 361:19 | 13,18 |
| 154:6 | 222:2,8, | 278:8,14 | 363:8,10, | 423:2,10 |
| 156:16,21 | 10,18 | 279:2,13 | 23 364:8, | 424:13, |
| 157:5 | 226:14 | 280:17 | 11 | 16,19,22 |
| 158:4,9 | 229:24 | 281:10 | 365:10, | 426:12, |
| 159:1 | 230:8,12, | 282:6,14, | 13,21 | 18,25 |
| 163:12 | 19,22 | 16 283:19 | 366:1,8, | 427:8,23 |
| 164:2,12, | 232:4,10 | 284:7 | 13,18,22 | 428:17,25 |
| 19,25 | 233:14 | 286:19 | 367:2,10, | 429:5,9, |



15,23
430:2,11,
17 431:7,
18,24,25
432:9,11,
17,23
433:6,25
435:5,11
437:1,21
439:16
440:17,22
441:1,6,
10,20,23,
24 442:2,
6,12,15,
23 443:12
446:25
447:8,11
448:13,19
449:10,16
450:4,24
451:17,
21,24
452:1,6,
11 453:5,
9,11
454:2,8,
14 455:5,
12,22
456:11,
17,20
457:15,20
458:2,6,
14,19
459:4,9,
22 460:2,
11,17,20
461:5,10,
22 462:2,
10,17,23
463:1,17,
22,24
464:4,12,
14 465:8,
14,23
466:2,7,
11,14,18

468:8,18
469:3,20
470:1
471:3,12,
17,22
472:4,8,
21,23,25

**Beltran's**
49:14
51:24
53:4,9,25
54:12

**Ben**
381:18,24
382:3,19,
21

**Ben's**
382:5

**benefit**
216:16

**Benford**
287:4

**Benford's**
334:10

**bent**
114:6

**Bethany**
263:22
264:11

**Beute**
303:18

**Beyonce**
320:10

**big**
77:14
89:19
113:14
130:11
134:11
203:18
221:15
229:3

333:21
345:6
385:13
386:10,15
433:13
435:2
437:8

**bigger**
390:6

**Bijoy**
89:6

**bill**
7:14
53:18
54:19
55:16
109:10

**billing**
53:9

**billings**
53:4

**bills**
53:23
312:20
315:12
432:3,8,
12,24

**binder**
300:13

**biological**
72:20,21,
22 399:23

**birth**
101:18,20
105:5
435:24
470:7

**birthday**
26:19,22
29:8
101:13
105:7

135:22
136:4
140:2
231:18
232:22,25
284:13,22
330:15
422:10
444:5

**birthmark**
385:18

**birthmarks**
385:11,
12,20,21

**bit**
28:9 48:9
129:25
201:19
222:5
331:24
332:15,23
333:5
362:4,23
365:2,20
448:7
456:22

**Bitcoin**
353:8
355:25
356:3,5,
17,18
357:9,20
358:7,16,
18,21

**black**
330:17

**Blake**
330:23

**blanket**
396:9

**blew**
417:18

**block**
199:21
200:2
397:3

**blow**
90:7
434:7,9,
13,15,18,
25 435:3

**blown**
455:15

**blur**
294:10

**blush**
434:17

**board**
69:1,5
81:10,15
82:11,12,
13,23
84:4,12
86:3
87:10
144:9
402:13,18

**boards**
68:24

**boat**
237:5
244:1
382:4

**boating**
290:5,15,
16

**body**
158:2
392:4
436:1

**Bohemian**
325:15

**bonding**
346:5







7:23
25:13
31:10,14,
17 33:6,
13 34:4
58:3,16
59:4,5,7,
19,24
110:4
127:12
128:17
185:11
186:23
204:11,
13,14,15,
17 205:25
383:8
454:22

businesses
402:4

_____

C

_____

Cadillac
215:4
339:23,25

Cahill
343:2,9

calculated
36:4

call
16:5,17,
21 19:2
28:13
35:5
47:11,16
62:4,12,
16 76:1
83:18
145:21,
22,23
146:7,8,
14,17,18,
20 185:24

194:22
232:13,15
239:13,
16,17
264:25
265:2
304:3
343:23,24
345:3,4
357:16
362:10
370:11,23
371:1,8
383:22
391:25
392:1
396:2,6,
12,14
416:7

called
47:14
68:17
69:7,10
78:20
93:20
113:20
122:4
131:23
139:6
174:20
186:10
232:24
234:3
239:13
244:15
294:7
299:7
334:6
343:24
369:7
370:25
371:3,4,
8,13,16
401:4
406:15
416:24

471:23

calling
18:2,6
69:8
232:25
283:9
294:7
321:24

calls
234:4
321:7
383:24
388:3
403:7
434:12

camp
298:5

campaign
178:4
350:20
382:6

campus
81:24

cancel
465:4

canceling
462:20
465:10

candidate
381:1,3,
11,12,14,
15,16

candidates
360:19
390:24

capacities
84:10
87:14

capacity
84:10,12

caps

212:15

captured
279:5

capturing
63:17

car
214:8
215:22
216:4,10,
13 269:18
331:13
340:1
369:9

card
109:3
130:15
131:1
204:25
205:6
208:10,
15,22
224:23
225:2
226:2,3
230:1,2,
14,21

cards
80:18
208:8,12,
13,17
224:4,21

care
78:13
83:18
85:16
242:14,18
388:24,25
462:24
464:16
465:15
466:5

carefully
96:13

cares
85:14

Carlson
378:22,23

Carlton
34:13
342:18
345:10
349:22

Carolina
163:24
164:7,10,
13,17,24
165:4,8,
25 178:9,
11
186:18,20
199:2,17
200:10,
19,24
201:15
202:2,23
203:6,7
204:2
205:22,25
207:12
227:9
297:5,9,
11,13,14,
17,22,25
298:10,15
299:5
342:20
343:1

Carolinas
340:2,5

carried
416:17

carrier
265:8,12

carries
447:22

cars



215:17
329:20

**case**
  8:19 9:4,
  7,9,10,
  11,21
  10:3,7,24
  12:25
  24:6,7,25
  25:1,4,18
  27:24
  36:10,11,
  25 37:3,
  4,5 42:18
  43:13
  49:12,15,
  18,19,22
  50:1
  53:10
  59:14
  63:21
  67:15,25
  68:20,25
  69:18,19
  70:4
  71:2,18
  72:1,3
  89:17,18,
  23 90:10
  98:2,7,8,
  9,20
  102:14,17
  110:15,18
  115:14
  117:21,24
  148:4,12
  150:11
  175:21,24
  188:21
  189:13
  191:17
  194:12
  212:11
  221:6
  222:22
  230:18

252:5,18
255:9,24
306:19
312:21,22
313:4
315:13
333:3
355:15
364:21
365:16
384:22
391:4
399:9
405:18
432:4,8,
13,19,25
438:5
443:10
444:11,
12,14,19,
20 445:9
452:11
459:1
465:9
468:19

**cases**
  439:8

**cash**
  147:6
  148:14
  230:3
  323:25
  372:18,19
  438:22,24

**cataloged**
  241:25

**catch**
  256:3

**categories**
  11:3

**Cathy**
  117:16
  121:4,15,
  24 122:13

**caused**
  119:7

**caution**
  114:19
  137:4

**cavalier**
  348:11
  350:9

**cave**
  244:3

**caveat**
  75:21

**CD**
  150:11
  152:5

**cease**
  338:18

**celebrate**
  105:8

**cell**
  264:21,24
  283:11
  321:1
  334:4,10
  375:11

**center**
  77:19
  78:10,11
  81:16
  85:5,21
  144:7

**centered**
  80:23

**Central**
  224:9

**cerebral**
  266:6
  269:18
  270:24

**chain**
  450:9

451:13

**chair**
  79:10
  353:19

**challenge**
  459:3

**challenges**
  113:10,
  11,17,19
  114:3

**challenging**
  112:4
  437:13

**champion**
  79:9

**chance**
  34:8 88:8
  96:10
  163:17
  165:10
  192:16
  218:24
  268:13
  299:21
  398:12

**chandelier**
  253:3

**change**
  127:9
  132:16
  277:3
  290:9
  291:20
  374:10
  417:3,11
  468:24

**changed**
  8:19
  31:25
  386:8

**changing**
  60:15

**channel**
  344:4

**character**
  125:22

**characteris
tic**
  112:22

**charge**
  320:3

**charged**
  141:7
  357:17

**charges**
  85:6
  348:10

**charging**
  460:13,14

**charismatic**
  269:17

**cheat**
  126:1

**cheating**
  91:13
  92:16,25
  436:20

**check**
  165:5
  237:22,23
  265:15
  266:20
  337:6
  382:10

**checked**
  75:16
  230:14
  271:15,17
  345:12,17

**checking**
  60:13
  64:16

**checks**



178:4

chicanery
17:19

chick
181:16

chief
106:12

child
26:23
29:4
72:18,20,
21,22
83:18,24
91:21
92:2
392:6,8
399:21,23

childhood
343:12

children
26:24
29:11,15
72:19
77:9,18,
23  79:13
80:21,22,
23,25
83:22
84:11
101:24
102:8
113:14
115:9
153:8
194:4
202:12
341:12,25
342:11,15
349:8
374:14

children's
26:19
77:8

children-
related
29:9

chime
321:6

choice
14:20
439:2

choose
471:15

Chris
6:23  7:18
8:17
34:19
35:4,15
36:24
38:24
41:5,8
59:13
90:4,5
91:10
92:9,21
96:2
103:8,9
104:4
111:10,23
112:24
113:17
116:5
150:12
152:6
154:14
155:22
163:23
164:11
166:14
170:1
174:10,25
175:5
176:11,12
177:1,5
178:11
180:25
182:14
186:23,24

189:10
191:13
194:2
200:5,9
207:2
210:12,16
217:16,
18,19
218:11
221:18
223:16
227:18
228:17
253:16,
18,20
254:4
255:16
256:19
274:11
275:21
276:6
292:14
294:9,15
295:18
309:21
312:16
314:11
316:3
323:24
327:17
330:19
338:13
340:7,25
341:4
343:22,24
345:7
352:23
360:21
379:6
390:5,18,
19,22,23
394:23
395:10
396:19
414:8,23
425:8
426:3,7

429:25
440:17
450:22
453:23

Chris'
112:21
113:14
382:25
383:2

Christopher
24:8
99:22
101:16
102:21
103:3
339:21
376:20
377:14

chronologic
al
163:3

chronology
440:11,15

chuckled
352:19

chunk
297:2

church
77:9
78:16
80:3

Circle
334:15,
16,22

circles
116:8

circuit
155:16

circulated
418:2
419:7

circulating
294:6
418:1

circumcised
336:11,24
337:2

circumstanc
ed
337:4

cited
444:18

citizen
69:21
360:12

citizen's
391:7

civic
78:23
79:15

civics
77:13
79:10,15
81:4

Claassen
431:20

claim
223:9
271:16

claiming
249:3
372:7

claims
305:13
306:15
375:21
456:7

clarify
10:22
49:13
298:21

clarifying



124:6

**class**
127:5,10
129:7
185:22
416:24
417:9

**classes**
77:23,24
81:23

**Classic**
472:7

**classify**
154:1,2

**Claw**
425:21

**Clay**
60:6
319:5,6

**cleanup**
364:12

**clear**
21:11,22
40:23
46:23
85:5
119:1,25
120:25
171:24
229:23
240:19
245:13
297:7
351:3
353:9,10,
24 378:5
390:10
395:13
405:4
428:14
433:15
435:6
440:4

445:20
454:12
464:21

**cleared**
94:6
234:17
244:16
436:22

**clearing**
94:4

**cleavage**
158:16

**click**
396:15

**clicked**
65:17

**client**
7:18 8:7,
8 14:21,
23 15:4,6
27:11
52:2
119:24
126:14
137:8
145:16,17
165:3
183:13
202:25
251:9,13,
16 263:19
316:17
364:13,17
365:11
367:14
413:19
418:14
439:11
452:21,22
460:13,24
463:12,18
464:19,22
465:5,19
468:14,20

469:7

**client's**
124:13,18
135:6
465:12

**clients**
78:8 96:4
105:17
106:19
107:3,11,
22 119:5
194:4
418:19
457:14
461:8

**clients'**
52:10

**clip**
252:22
336:9,12,
13
384:16,21
397:20,22
398:9,13

**clock**
60:13
64:17

**close**
82:18
97:22
98:1
102:2
185:18
243:18
245:22
280:1,9
330:24
347:22,24
348:1
374:5
378:14
412:2
457:13
467:25

**closet**
81:23

**clothes**
313:15
373:24

**clothing**
81:25
258:18

**club**
80:6,9
195:24
198:11
326:13,19
327:6,15
413:15
414:1

**clubs**
326:11,
15,16,21

**co-owned**
318:16

**coach**
83:12
142:11
250:3

**coaching**
56:3
70:10,11
142:13
250:5
309:22

**cocaine**
197:24
198:2,11
346:3,9,
12,16,20
362:18
379:14
380:7,8,
9,10,13
387:4,8,
23,24
388:1

**code**
213:3,4
239:14,19
395:20
409:8

**coffee**
23:8

**cold**
471:6

**colleagues**
205:11

**collected**
292:11

**collecting**
324:14
325:8

**collectivel
y**
109:9
363:13
368:12
400:21

**collector**
356:5
357:8
405:15

**collector's**
357:12

**college**
59:20
87:3
100:19
104:19
298:23,24
299:3,5

**colloquial**
92:24

**Colorado**
7:2
454:18

**column**



214:17,21

**comfortable**
26:3

**comment**
74:7
168:5
303:20
321:16
365:6
470:11

**commenting**
165:15,16
181:20

**comments**
70:12
165:15
182:2

**commission**
318:18

**commissione
r**
350:24

**committed**
31:3
139:8
357:16

**committee**
79:10

**committing**
86:23
139:7

**commonplace**
186:10

**communicate**
114:10
116:21
376:16

**communicate
d**
123:18
325:19

327:16,
21,24,25
328:23
452:13

**communicati
ng**
374:22
376:4,9

**communicati
on**
28:14
37:2
39:14
43:10
98:20
102:3,11
115:20
116:20
124:4
265:21
276:2
286:13
294:21
295:10
305:2
417:25

**communicati
ons**
32:17
36:23
37:16,20
38:5,23
39:18
42:13,15
43:4,8
44:4,9
53:11
56:1
57:15
59:12
95:10,11
98:24
99:7
102:6,25
114:22

117:20
118:11
122:6,10,
13,16
123:12,16
124:19
125:3
265:1
269:3
288:25
293:4,21
295:2
301:19
372:21
373:11

**community**
186:23
212:21
213:8
214:5
218:1
219:10,25
220:4,13
221:10,
13,19,23
260:9,16

**comp**
149:6

**companies**
25:12,21
27:4,23
106:25

**company**
78:6
105:25
106:2,7
113:8
202:25
317:16,20
384:13
446:16,17

**compare**
246:1

**comparison**

461:8

**compel**
468:3

**compensatio
n**
404:18

**complain**
436:11

**complained**
404:8
436:5,8
445:24
446:2

**complaining**
446:20
453:5

**complaint**
24:23
27:7
29:20
31:18
32:6,14
33:13,19
34:1
37:10,23
38:1
39:23
40:1
42:1,7,8,
17,23,25
43:13,25
44:4,14,
20 45:8,
11,12,17
46:21,24
47:5,7,
11,15,17,
25 48:7,
15 52:3,8
63:25
64:2,5,8,
18 65:1,
11 66:1,
4,11,16,

24 89:12
91:4,5
94:10
97:8
300:21
301:5,9,
10,14,15,
24 302:7,
12
304:11,14
305:6
306:4,5,
7,9,10,
18,24,25
307:6,8,
11,15,16,
20 308:7,
14,19,24
309:1,16
312:18,22
313:5,6
368:24
400:1,22
401:8,15,
20 404:16
406:1
430:4,8,
19,21
431:2,3,
10,14
432:2
445:12
456:8

**complaints**
45:16
446:19

**complete**
23:6 27:1
34:6,9
41:2 87:4
138:21
144:21
145:5

**completed**
144:14,19



429:18

**completely**
45:15
124:14
142:7
250:14
290:20
307:3

**complex**
334:19,20

**composite**
149:17
150:3,10
441:2

**compound**
41:9,12
54:7

**concern**
66:7
257:11,25
258:2,3,4
259:2,11
261:21
273:2,4

**concerned**
66:5 69:8
76:16,24
132:20
133:12,17
206:18
323:21,22
345:23
359:12,
16,18

**concerns**
133:15
257:14
273:3

**concert**
330:21,22

**conclude**
227:7

**conclusion**
378:1

**conclusive**
115:19

**condition**
131:3
280:1,9

**conduct**
359:13

**conduit**
71:21

**confer**
15:15
17:22
18:19
468:13

**conference**
204:21,22
205:7,17
384:1

**confidential**
10:19
11:9,11,
15,16
13:13
14:1,10,
19 15:5
17:4,10,
13,15
73:13
99:5,6
256:18
468:5,11

**confidentiality**
9:3,6,8
11:6,13,
14 13:8
15:13
17:2
20:16
74:3

75:25
256:21
272:15,17

**confidently**
351:22

**confine**
43:18
44:3

**Confines**
396:20
397:4

**confirm**
38:2
370:18,19

**confirms**
290:12,14

**conflicting**
239:2

**confusing**
47:8
118:24

**Congratulations**
83:13

**congress**
388:24

**congressman**
370:5
468:20,23

**conjecture**
156:4
389:5

**connect**
314:11

**connected**
314:12,13
443:13

**connection**
347:25
443:10

**conscious**
395:13

**consenting**
359:22
362:1

**conservatives**
379:5,7

**considered**
39:9 40:3
63:20
92:10
130:10
181:17
468:1,2

**considers**
119:17

**consist**
9:18

**consistent**
14:19
376:11

**consistently**
376:12
402:5

**conspiracy**
400:2,5,
18

**Constantine**
381:19
382:13,
20,23

**constitutional**
69:19
391:4

**consultant**
105:18
106:19

**consulting**

127:11

**consume**
127:2,17
129:4,20

**consumed**
194:23
195:18
287:18

**consuming**
197:24

**consumption**
196:5
197:12

**contact**
83:21
85:8
325:13
375:13
376:17

**contacted**
103:13

**content**
36:23
53:17
124:4
303:13

**contentious**
103:15

**contents**
37:1,16
38:23
39:13,17
56:1,18
57:12
69:4
264:25

**contest**
250:22

**contested**
296:16,17

**contesting**



251:8,15

**context**
352:8

**continual**
107:6

**continue**
197:2
217:5
314:6
315:6
332:25
376:4,9

**continued**
336:5
359:15
373:17
374:21,24

**continuing**
169:15
210:4
226:1
235:22
312:7
328:19
364:18
375:10
376:16

**continuos**
112:9
383:23

**continuous**
111:20

**continuously**
428:22

**contract**
106:5
107:7

**contracted**
107:5

**contributed**
48:4

**convention**
205:6

**conversation**
18:9 21:7
30:7,9,
13,20,23
31:5
35:6,23
59:1
62:7,11
63:6,9,
12,13
75:15
103:5,8,
9,10
162:12
176:9
244:18,22
248:21
249:22
255:4
256:7
262:22
263:2,4,
13
277:11,25
351:9,13,
14 352:3
353:12,
15,17
354:19
355:19
356:10,
12,14,23
357:3
358:6
360:7
369:8,10
370:15
372:3
383:8
388:23
389:7

**conversations**

28:10
29:2
33:15,20,
21 34:1,2
35:3
36:24
40:11
69:2,4
92:6,11,
20 97:4,6
99:11
102:13,17
114:12
123:13
136:24
137:2,5,8
249:8
263:18
303:23
353:13
359:6,10
390:22
394:9

**convert**
8:22

**convey**
15:9
463:18

**cookout**
129:6
173:11
193:25

**cookouts**
188:1
194:5
231:22

**cool**
244:4

**coordinate**
114:7
315:16

**coordinated**
69:6
348:24

**coordinating**
71:13

**coordination**
308:10
322:4
327:2

**copy**
9:3 20:20
67:23
148:24
149:5
156:16,17
180:20
210:16,22
300:22,23
305:18
473:2

**cordial**
319:2

**corner**
274:9

**corners**
352:16

**correct**
18:21
22:3 25:5
27:19,24
28:4,25
29:16
32:14,15,
19,22
33:19
34:16
36:1
46:13,14
47:9,21,
22 49:18
50:22
57:2,24
60:3,4
62:10,14
63:11

64:6
65:21,24
66:18
67:11,13,
14,16,17
70:6,14,
20 71:4,
19 72:17
73:8
74:12,13,
16 75:12
80:1
81:6,9,17
82:3
86:4,5
87:16
88:14,15,
19 89:5,
7,9
90:17,21
91:1,6
93:4
97:17
98:2
99:18,19,
21,22,23,
25 100:2,
4,5
101:12
103:12,
24,25
104:2,6,
7,20
106:3,10
109:14,
17,24
115:15
118:18,19
121:17
123:3
136:10,11
137:10
148:16,17
151:18
155:20
156:8
157:11



166:6
169:1,9
174:24
175:4,11,
12,21
188:12,15
198:20
199:5,13
204:24
213:9,20
214:19
219:11
220:1,6,
13 221:10
228:22,23
229:24
231:10
232:3,5
241:5,6,9
255:4,10
259:18,22
260:9
265:18
270:2,19
271:4
283:18
291:10
292:6
298:16
301:9
304:19
308:3,20
309:2
312:14,23
313:2
315:13
318:7
319:5
325:4
329:13,15
331:9
339:18,24
342:20,22
349:1
373:18,23
381:2
383:19

396:1,3
398:22
416:9
418:16
422:15
423:12,13
426:8,15
427:14
430:4,5,
8,10,14,
16,19,23,
24 431:3
432:8,10,
13,14,16,
20,22
433:1,9,
10 438:5
443:24,25
445:21
447:23
448:10,11
460:10

correctly
175:17
231:9
254:24
376:21
381:5,6

correspond
210:10
214:21

corresponde
nce
183:12

corrupt
374:17

costs
463:6
469:17

couch
320:9

counsel
14:4
18:6,20

36:7,9
38:3,22
39:5 40:4
41:16
44:10
48:21,24
49:9,15
51:3
99:13
192:5
251:17
264:23
288:24
293:20
364:17
365:8
416:5
455:3

counseling
36:21
121:3,19
122:14
123:1,5,
12 124:10
412:21,22
413:1

counselor
117:14
118:6,17
121:16
123:8,25
413:7,10

counselors
124:2

counted
130:1
271:20

counting
272:8

countless
79:17

county
72:4
78:11,15

245:21
350:23
382:14

couple
58:18
59:9
65:16
82:14
85:24
104:14
157:1
190:16
203:3
244:8
250:1
255:11
291:4
303:22
326:17
330:8
335:9,16,
25 354:11
358:8
360:18
361:15
369:11
375:4
379:7
398:17
409:20,23
412:23
414:10
416:4
451:23,24
455:21
457:12
463:10

courses
296:1

court
8:20,25
10:6
13:16,17
21:10,17
24:8,13,

23,24
25:5 26:1
42:8
44:1,15
46:24
47:4
48:19
68:22
156:23
289:6
342:16
389:19
420:23
433:23,24
450:18
464:21
465:18
468:13,17
469:9,16
472:16,23
473:1

courtesy
97:1
364:1
365:7
454:19

cover
168:4
268:8
269:25
275:15
280:11
281:14
311:21
357:11,15
358:5
360:3

covered
301:8
435:19

covering
311:8
358:2,16

Covid



82:14
84:13

**crash**
112:1

**crazy**
82:19
353:3,4

**created**
210:10

**creates**
116:7

**creating**
116:6

**credentials**
331:6

**credit**
204:25
205:6
208:8,10,
12,13
224:4,21,
23 225:2
226:2,3,7
230:14

**crime**
87:22
139:7,8
141:11
357:15

**crimes**
31:3
86:23
311:9
404:19

**criminal**
91:14
92:2 93:3
114:3,7
139:2,4
146:25
147:1,2
248:5

267:21
306:19
360:3
370:14
376:24

**criminals**
138:24

**cringe**
434:16

**cross**
72:4
124:11

**CROSS-
EXAMINATION**
416:1

**cross-
notice**
316:7

**cross-
noticed**
316:1,5

**crushing**
462:13

**crypt**
357:21

**curious**
323:21

**current**
72:14
470:23

**curtesy**
24:18

**custody**
113:14
114:14,21
115:13
131:17
199:20
339:2
341:12,18
342:8

**cut**
44:7
90:22
204:20
454:15

**cutting**
55:1

————————
**D**
————————

**D-U-S-I-N-
B-E-R-R-E**
103:21

**dad**
103:2
153:11

**Daily**
378:2
383:12,21

**Dallas**
204:23
205:1,5,
6,16
206:1
384:1,4

**damage**
116:12
117:22
439:2

**damaged**
67:25

**dark**
399:10

**Darling**
276:6

**data**
133:13

**date**
20:8,18
39:19,24
40:2,3

41:24
48:20
96:18
101:18,20
104:13,15
105:5
201:6
203:8
223:10,12
238:13
240:15
293:7
326:12
330:20
340:14
342:23
378:17,25
418:6
441:12
449:3

**dated**
192:1
267:19
289:16

**dates**
74:19,22
206:20,22
207:4,7,
22 211:9
224:3
294:9
299:12

**dating**
70:19,23,
25 104:2,
10,11
125:21
168:15
189:5
240:19,20
330:9

**daughter**
76:7,16,
21 78:25
260:18

323:14
347:13,14
397:8

**daughters**
347:22

**Dave**
376:23
377:5

**David**
8:14

**Dawn**
124:25

**day**
20:25
23:20
28:20
32:1
61:12
76:18
104:12
130:6
135:25
142:8
177:13
179:2,8,
9,10,11
201:2
206:19
212:7,8
216:3
232:15
233:1
241:8,25
254:2
264:19
284:12
291:18
294:2,23
347:9,17
356:4,7,
8,9
368:12
394:7,9
409:13,18



435:24
442:13
448:5,14,
22 449:3,
25 451:5
454:21
456:18
463:13
464:22
465:25
469:19,23

**daycare**
77:19,25

**days**
128:22,24
204:18,19
234:20
237:10
239:12
240:12
244:23
287:7
326:17
327:17
383:23
409:7,19,
21,23
463:10
468:12

**deal**
71:3,5,6
83:5
131:2
230:6
272:22
450:13

**dealing**
17:20
383:23

**deals**
127:12

**dealt**
84:4
115:20

**debate**
52:18
79:9,12,
14,16

**debit**
230:2

**decades**
131:24

**December**
72:16
121:6
136:3,4
140:2

**decide**
293:1

**decided**
292:17
293:17
294:13

**decipher**
440:7

**decision**
185:24
293:11
294:17
295:7
465:20

**declined**
440:18

**dedesignate**
273:9

**dedesignating**
230:23

**dedesignation**
272:19

**defend**
94:22
113:23,24
471:13

**defendant**
8:18

**defendant's**
11:22
149:8
156:9
209:19
266:16
289:3
389:20
442:10

**defendants**
6:24 24:9
25:8
306:17
314:16
332:16,
19,22
438:5

**defended**
471:7

**defense**
267:21
406:3

**deferring**
364:5
365:22
366:10

**define**
193:25
251:20
302:14
408:21

**definite**
201:14,22

**delegate**
471:17

**deleted**
426:24

**deliberately**
294:23

296:11

**delinquency**
82:6

**demand**
16:14
124:13
303:19

**demanding**
113:9

**demands**
368:25

**demarkation**
208:23

**democratic**
381:9

**democrats**
381:4

**demographics**
381:8

**demonstrate**
224:19
238:7

**denied**
345:6
434:9

**Dental**
7:11
25:23
27:12,16,
18,23
32:2
313:7
318:8
399:9,14,
17,19,22
400:2,4,
17,23
401:2,10,
24 402:1,
19,24
403:21

**404:17,**
21,25
405:6,16,
19,24
406:2
443:7

**dentist**
402:7

**Denver**
463:7
464:19
465:2,3
468:16

**deny**
370:17,19

**Department**
267:18
268:3
269:3
279:19
280:15
281:6
282:4
290:8

**depending**
381:9

**depends**
128:13,16
165:2

**depo**
124:10
272:9
316:1
367:20
416:6
465:25
466:2
471:13

**deponent**
20:1

**deposed**
8:9 67:5,
7,11



324:4
462:15

deposition
8:21
11:25
14:6,15
15:12
17:4,9,13
20:1,14,
15,24
21:1 22:9
25:25
34:13
49:16,18,
19,22
50:1
53:10
55:20
56:22
58:6,11
60:11
62:8,14,
25 63:15
64:6
65:21
68:1,8,
15,16
69:12,15
71:22,25
72:9
124:14
145:15,18
149:12
150:9
156:12,24
157:24
158:19
160:21
169:15
170:21
178:2,25
180:1
182:11,23
184:10
209:25
210:1,2,

5,9,10,11
211:1,9,
18,23
214:16,22
216:8
217:6,15
219:3
220:8
239:20
250:11,19
252:19
254:16
255:12
256:10,
11,18,24
266:14
267:8,15,
23
272:20,
21,23
273:11,17
274:2
279:17,21
281:4
289:7,15,
17 292:3
309:15,16
316:9
319:3
321:16
336:10
337:7
367:15
384:17
397:20
398:1
419:3
449:8
450:15
452:2,23
455:4,5
457:13
462:20,22
463:9,13,
14,20
464:7,22
465:3,5,

11 466:9
468:1,2,
15,16
469:19
471:7,16

depositions
67:2,4
144:24
145:3
250:12
255:25
454:16
465:16,17
466:6,21

describe
30:22
92:7
117:2
127:4
212:19
236:15
252:10
302:4
382:1
385:25
398:19

describes
111:2

describing
398:10

deserve
93:25

designate
17:3,12
214:9
395:5

designated
11:10
17:15,16
219:1
230:20
256:17
468:4

designation
209:7,18
271:24
272:5
273:2
468:11

designation
s
273:3

desire
85:13

detail
305:12,13
306:15,16
349:7

details
89:18
98:14
382:22

detention
78:10,11
85:5,20

determinati
on
94:6
436:22

determine
225:8
229:21
321:4

determines
282:8

detrimental
288:20

developer
111:25

died
438:23

differed
254:17

difference

105:19
194:2
381:16

differently
254:23

difficult
23:5
30:14
90:14
91:7 95:2
112:4
116:14
294:12
352:7

dignity
87:2,7

diligent
448:8

dinner
128:4
414:13
417:8

dinners
205:11

direct
6:22 69:1
267:22
295:1
300:3
303:23
304:21
311:24
317:9
372:18,19
399:6
405:5,23
451:1

directions
56:17

directly
84:11
262:17
318:8



327:24
369:7
371:22
372:6
377:10
387:6
390:23
404:12

director
106:13

disability
271:4

disagree
74:8
403:13

disclosed
14:2
288:18

disclosing
14:9
419:4

disclosure
13:25

Discover
208:15,21
224:25
225:24
226:9
228:10
230:21
271:22

discovered
405:17

discovery
36:4
110:14
271:18,23

discuss
36:15
68:24
97:19
98:14

186:6
288:25
295:3
318:13
331:15
383:6,7
386:22
446:13

discussed
61:3
69:11
89:10
98:1,8
117:8
118:4,8,
16,21
119:6
256:24
293:21
295:9
309:21
354:15,
24,25
355:9,16,
18 356:5
360:8
371:17
376:20
383:4,9
386:20
409:17
411:5
416:4,5
426:20
436:17
456:12
457:16

discusses
205:19

discussing
98:7,9
295:8
359:21
421:24
422:1

446:11

discussion
47:10
58:14
79:15
145:15
263:10
264:16
333:12,15
363:20
369:5
372:4,9
400:7
427:16
440:16

discussions
36:15
58:2 71:3
98:17
120:5,7
355:13
383:12
386:25

disgusting
91:21
327:1
392:4,9

dismay
30:11

display
149:3
163:4

displeasure
372:25
373:7

dispute
212:23
251:16
278:16
296:20,21

disputed
281:7
296:18

disrespectf
ul
181:18
391:18,
23,24

distanced
30:6
374:3
380:5

distinction
236:5

distinguish
ing
385:9,18,
23,25

distressing
444:23

district
12:23
38:15
330:16
381:21
382:14

division
75:18

divorce
103:23
104:5

divulge
36:22
37:1
38:22
39:13
68:3
114:22
264:25
293:3,20
309:20
370:7

divulged
124:8

divulging

303:13

doc
306:18

docs
306:19

doctor's
203:17
465:22,24

document
12:2
19:4,6,8,
10 43:9,
11 45:18,
21,22
47:8
48:13
49:2
65:7,8
149:16
151:8,9,
10,16
152:3
156:15,25
209:4
210:3,15
211:25
212:2,10
218:23
220:2
222:13
235:10,
11,12,14,
21,23
274:3
278:10
301:25
401:13
418:4,14
421:11,12
424:9
440:2
441:2
442:24
450:21
451:7,8



452:10
455:20,22
456:3,15
461:16

**documentary**
379:4,5,6

**documents**
9:10,11,
14,20
10:3,6,8,
15,18,20
11:1,4,8
47:21
50:18
51:4,17
63:14,16,
19,20,21,
22 110:16
123:4
165:5
175:24
177:22
206:12
208:5
220:19
222:22,25
223:7,14
224:18,19
229:24
235:19
271:16,
19,21,23
272:14,22
273:8,9,
13,18,19
365:6
405:18
418:2
440:5,9
447:7
458:24

**Donald**
352:22

**donated**
382:6,9

**door**
410:6,8
461:4,5

**dope**
181:5

**Dor-girth**
433:22

**Dorworth**
7:18,20
8:12,16
11:1
14:17
15:12
17:23
18:5 19:1
20:3,13,
23 24:8,
22 34:20
41:7
43:24
44:7
46:11
52:21
55:15
56:12
57:17
69:17
70:4,20
79:4 88:8
92:9
99:20,22
100:13
102:10
103:10,23
104:8
109:6,24
110:5
115:25
127:2
132:25
134:6,24
135:5
140:25
141:10,22
142:16

150:12
151:5
152:6
155:22
159:5,14,
19 160:9
161:6,17
162:21
163:23
166:14
167:6
168:7
170:1
171:16
173:2,16
175:9
178:9,20
179:14
180:25
182:14
184:11,14
186:1
192:15
209:16
214:25
215:3,20
229:19
231:2
235:9
236:10,15
237:25
240:2
242:6,19
243:22
250:8,10
251:20
253:14,25
268:5,7,
8,18
273:16
274:1
275:21
276:22,23
277:4
280:2,10
281:4
282:1

290:3
300:5
301:8
305:25
308:12
310:6
313:9
314:4,8,
15 319:22
320:16
321:18
329:19
333:24
336:2,24
337:2,8,
13,15,24
338:19
339:21
341:25
346:16,19
363:5
365:5
369:1
370:24
371:13
376:20
377:15
382:17
385:9,17
386:4,6
388:2
389:23
396:16
398:10,15
399:8
404:20
416:3,9,
16,23
422:21
425:9,20
426:3,7,
13 429:1
433:8,20
434:1
435:6
436:5
440:2

441:18
442:18
450:22
451:22
453:19,23
456:2,7
457:1
461:9,15
462:11
463:2
470:10,17
471:5

**Dorworth's**
41:11
101:20
102:4
109:8
110:13
280:11
320:8
341:9
433:16

**double**
153:3,4

**doubles**
127:8
129:11,
12,16

**doubt**
164:9,14
168:20
436:13
446:11,13

**download**
292:13

**downloaded**
175:1

**Dozens**
392:12
393:7,19

**dragged**
437:11



**dragging**
    428:22

**draw**
    222:14

**dream**
    397:11,12

**dreams**
    111:13

**dressed**
    157:25

**drink**
    23:9,10
    127:8,22,
    23 128:7,
    19 132:11
    243:18
    417:3,15

**drinker**
    127:5,10
    129:7,14
    132:14,17
    185:22
    416:24
    417:10

**drinking**
    127:13,24
    128:1
    130:4,5,
    6,9
    179:16
    187:9
    285:25
    286:6
    417:18

**drinks**
    127:21
    128:7,11,
    12 129:3,
    9,10,12,
    16 130:2
    132:16
    417:12

**drive**
    215:5
    218:7,12,
    15,16
    330:19
    346:23

**driven**
    202:11,12
    215:17
    340:1,10
    341:15

**driver**
    213:18,21
    214:12,13
    218:1
    219:10,25
    220:13
    330:22

**driver's**
    213:2
    260:8,15

**driving**
    213:17,
    18,24
    214:11
    215:16
    217:16,22
    218:24
    219:1
    243:19
    331:3

**drop**
    86:17
    341:15,
    21,25
    342:4,10
    417:15

**dropout**
    144:21
    263:16

**dropped**
    86:19
    217:19
    341:4,6,

13 342:5,
14 357:9
361:1

**dropping**
    344:3
    420:6

**drove**
    76:17
    201:18
    202:1
    217:25
    218:19
    220:4
    221:9,13
    341:12
    346:24

**drug**
    352:1,2
    362:14,15

**drugs**
    130:14
    194:24
    195:5,11,
    18,24
    196:5
    197:7,12,
    19 198:11
    344:3
    362:20
    380:14,
    15,16
    387:15
    406:23

**drunk**
    184:14
    185:5,10,
    14

**drying**
    219:25

**due**
    20:21
    63:18
    96:18
    117:21

440:8

**Dusinberre**
    103:19

**Dustin**
    7:6 300:7
    455:9
    459:25

**duties**
    203:1

**dutiful**
    111:12
    112:12

**duty**
    141:1

——————————

            **E**

——————————

**e-mailing**
    211:14

**ear**
    120:23

**earlier**
    22:10,11,
    21 42:5
    45:1 51:8
    58:16
    76:20
    108:23
    117:20
    120:3
    121:5,14
    125:23
    185:22,25
    188:2
    199:11
    207:14
    212:5
    231:6
    264:7
    266:1
    270:22
    300:8
    301:8

308:21
317:15
319:3
321:5,16
323:24
356:14
360:8
412:20
413:14
421:25
424:9
428:1,9
433:7
434:23
440:7
450:8
451:13
470:21,22

**early**
    96:3,5,
    22,24
    121:8
    130:5
    286:12
    287:9
    293:9
    322:24
    341:7
    380:1
    414:4
    416:7
    427:16

**ease**
    307:9,19

**easily**
    186:21

**eat**
    134:9,14
    225:12

**Eats**
    408:18

**echo**
    336:16,
    18,19



economic
  87:5

economics
  109:15

ecstasy
  198:5,14

ed
  214:25

edge
  351:19

educate
  77:12,21

educating
  77:13

education
  79:10
  87:3
  100:1,3

effect
  115:3

Egg
  456:9,18

eighth
  110:8,9

elaborate
  433:11

elapsed
  272:9

election
  381:13,
  19,21
  391:2

electives
  106:7

electronic
  158:19

element
  375:6

elementary

100:1

elicit
  294:23

elicited
  124:15,19

eliciting
  294:25

eliminated
  75:5,6,7

Elizabeth
  103:19

Ellicott
  249:10
  265:21
  268:5,6,
  11,18,23
  269:1
  274:9
  276:14,
  22,24
  386:24,25
  437:8

Ellicott's
  246:21
  252:11

else's
  94:1
  369:3
  390:8

email
  12:19
  15:9
  95:10,11,
  14 149:4
  150:2
  156:16
  210:13
  211:20,21
  266:18
  342:13
  344:20,23
  389:18
  391:12

392:18
  395:18
  421:2,6,
  13
  441:17,21
  442:2
  446:25
  447:3

emailed
  156:20
  393:9
  418:12
  455:23

emailing
  267:9
  418:15

emails
  97:6
  98:25
  177:1,2
  187:2
  343:21
  344:17,19

embarrass
  360:5

embarrassed
  30:15
  359:24,25

embarrassing
  97:20

embarrassment
  370:13

emergency
  463:5

emphatic
  433:14

employed
  73:5
  153:22

employee
  405:7

employment
  74:9
  76:2,8,11
  138:14

enabling
  357:6

encounter
  247:11
  248:3
  261:11,18

encourage
  346:16

encouraged
  346:19

end
  86:21
  90:23
  121:16
  203:8,15
  204:1
  205:23
  228:20
  229:22
  230:11
  244:23
  268:10,16
  272:19
  316:9,18
  317:2
  335:9
  337:23
  338:11
  349:12
  455:16

endeavors
  374:10

endurance
  23:21

engage
  347:19

engaged
  56:23
  139:6
  354:11
  372:2
  376:2

engineering
  397:14

enjoy
  111:22
  155:5
  397:17
  434:11
  435:15
  471:25

entendre
  153:3,4

enter
  212:20
  218:21

entered
  206:24
  219:9
  246:1
  260:15

enterprise
  114:3
  119:24

enters
  419:14

entertain
  332:23

entertainment
  128:5

entire
  124:9
  151:8,9
  207:10
  256:18
  306:24
  307:15



316:14
459:1
464:22
471:6

**entirety**
11:11
44:25
45:2,8
48:1
65:2,5

**entities**
27:17,18

**entitled**
39:16,17
52:11
316:24

**entity**
33:14
402:15
443:7

**entrance**
327:19

**entries**
210:6
212:6
216:6
217:14
219:7,24
221:21,22
292:10
419:19
423:13

**entry**
178:3
216:25
221:13
230:21
339:20
340:12

**environment**
**alist**
383:2

**environment**
**s**
127:13
128:3

**equals**
129:12

**Eric**
263:23
264:10

**erratic**
348:8
351:20,25
353:9

**erroneously**
273:21

**escorts**
103:14

**essentially**
26:5
326:7
362:10

**estate**
111:25
237:7
383:3
401:4

**eve**
469:24

**evening**
58:21,23
61:13
129:4
173:8
236:20
243:5,11,
23 244:19
245:1
252:13
253:10,
12,15
259:7,17
283:2
288:2

290:10
328:10
333:16
429:4

**event**
130:5
236:6
272:3
346:10
379:20
471:16

**events**
29:8,10
84:9
102:6,8
177:11
206:17
231:3
232:8
374:12,
13,16
378:25
382:13

**eventually**
337:11

**evidence**
36:5
93:21
113:25
236:24
237:4
238:5
242:5
278:10
282:20
400:3,16
404:21
411:12
443:6
462:7

**evident**
377:3

**ex-**
**girlfriend**

257:20

**exact**
39:19
74:19
158:13
299:12
342:23
458:24

**examination**
6:22
300:2,3,
16 317:9,
15 399:6
438:1
455:25
459:7

**examination**
**s**
331:19

**examining**
184:6

**Excel**
211:13

**excerpt**
267:24

**excerpts**
11:10

**excessive**
130:10

**exchange**
98:18
120:9
147:6
251:21
268:17
311:12,
15,18
324:1
404:18,22
441:17,22
453:20,21

**exchanged**

148:14
359:23

**exchanges**
97:6
450:11

**exchanging**
324:22

**excited**
281:25
435:25

**excusable**
271:3

**excuse**
8:3 12:15
36:17
38:20
41:8
96:16,21
141:20
191:20
192:5
209:17
215:11
230:8
251:5,7
273:19
288:24
309:16
316:13
317:21
318:23
413:22
431:13
456:23
464:4
470:14

**execute**
13:12

**executed**
20:14,17
37:9

**executive**
202:25



exercised
    55:23
    56:23

exhibit
    11:20,22,
    25 14:14
    15:13
    20:1,2,
    14,15
    149:8,12
    150:9,10
    156:9,13,
    24 157:25
    158:19
    160:21
    169:16
    170:21
    178:2,25
    180:2
    182:11,23
    183:10
    184:3,10
    209:19,25
    210:1,2,
    5,9,10,17
    211:1,9,
    18,23
    214:16,22
    216:8
    217:6,15
    219:3
    220:8
    239:20
    252:19
    266:12,
    15,16
    267:8,16,
    23 273:17
    274:2
    279:17
    289:3,7,
    15,17,20
    292:3,8
    339:10
    389:12,20
    391:11

392:15
393:22
419:2
420:24
421:3,8
422:18
424:4,12,
14,20
425:4
427:25
428:1
442:6,9,
10 448:12
449:8
450:3,15

exhibits
    148:22
    279:21
    300:13,
    15,18
    365:7

exist
    31:12
    177:24
    338:23

existed
    338:5,23,
    24,25

exists
    31:12
    227:19
    281:12
    349:20

exit
    244:24

exited
    352:5

expand
    441:13

expanded
    189:17

expansive
    89:17

expedite
    368:5

expedited
    473:2

expenses
    308:8

experience
    113:22

experienced
    113:10,17

explain
    290:6

explained
    122:7

explaining
    469:9

explanation
    182:15
    217:13

exposed
    148:13,14
    158:15

Express
    109:3
    226:8
    228:9

extended
    354:19

extension
    312:9

extensive
    30:6,11
    73:14
    431:14

extent
    14:5

external
    114:12

extort
    370:4

extorted
    308:22
    373:10

extorting
    375:5
    376:14,15
    390:4
    439:5

extortion
    312:25
    370:10

extra
    81:21
    82:1
    364:23,
    24,25

extraneous
    365:6

extremely
    188:2
    259:13

exwife
    102:4,11
    103:11,24
    341:10

exwife's
    341:15

eyes
    10:19
    30:12
    208:22
    209:4
    272:15

———————————

          F

———————————

Facetime
    194:14
    321:5

Facetimed
    343:25

Facetimes
    194:15

facilitate
    406:2

facility
    78:13

fact
    12:22
    90:3
    251:15
    270:10
    290:14
    337:6
    374:24
    378:3
    406:8
    411:5,14
    420:9
    422:16
    426:10
    430:7,12,
    25 431:11
    435:23
    461:18

factor
    114:17

facts
    136:22
    142:19,
    20,23
    400:24
    406:6

fair
    21:24
    22:6
    23:25
    28:15
    29:12
    34:5,7
    49:10
    85:10
    98:21
    121:11
    128:14



165:24
195:18
226:11
254:7
281:23
285:10
304:8
306:6
374:20

**fairly**
459:16

**Fairwinds**
225:1,25
226:4,9
228:10

**faith**
17:13
43:22
209:9
251:9

**faithful**
126:22

**falls**
458:24

**false**
91:17
92:10
93:8
307:25
309:11
310:11
430:21

**falsely**
91:8,9,
10,11,12
92:9,21
313:9
404:19

**familiar**
25:1
68:18,20
92:25
138:6

372:17
456:10
458:11

**family**
25:13,19
29:14
31:10,17
33:6,12
48:14
74:11
79:3
89:10
90:12
91:5
97:7,9,
15,16
98:1
99:1,4,7
102:1
119:14,
17,19
120:2,10
121:1
153:23,25
191:7,15
192:24
347:9
354:22,23
376:12,15
400:9

**Fargo**
222:17
271:18

**Farris**
335:24

**fashion**
378:8

**fast**
128:21

**father's**
438:25

**fault**
96:15
305:19,25

**favors**
148:14

**FBI**
94:4
176:10
207:3
223:5
234:16
236:25
242:8,14,
18 243:4
245:5,6,
8,18
248:19,20
277:25
318:19
436:21
438:6
439:6

**FBI's**
242:4

**FDUTPA**
212:24

**feature**
386:1

**features**
385:10,
18,23

**February**
104:12,16
121:7

**federal**
24:8,12,
23 25:5
306:19
359:14

**feeds**
79:18

**feel**
22:13
23:15
24:4 28:5
91:9,10

94:22
113:22
201:17
227:24,25
287:4
298:22
343:23
433:14
442:7
455:18

**fees**
52:10,12
469:17,19

**feet**
77:20
472:5

**fell**
78:18

**felt**
324:19
358:4
375:4
380:5
471:6

**fidelity**
436:13

**Fields**
34:14

**fight**
333:24

**fighting**
106:25

**fights**
392:1

**figure**
176:10
206:16
208:6
223:22,24
226:18
290:19
323:15

338:22
370:7
442:24

**figured**
290:18
344:5

**file**
24:12
149:5
150:2
381:5,6
463:4
468:6,12

**filed**
10:24
24:7,22
39:24
40:1 42:8
44:1,14,
24 45:17
46:24
47:4,15
48:18
65:14
97:12

**filing**
10:6

**filings**
37:6
51:21

**Filling**
167:7

**filming**
349:10,13

**final**
104:5

**finances**
84:9

**financial**
77:23
115:13
271:16



**financially**
113:16

**financing**
405:3

**find**
76:2
91:20,21
111:24
135:17
147:3,7
156:15
176:4
223:20
226:20
228:11
231:7
270:12,
18,24
280:11
290:21
309:15
321:3
342:24
382:11
384:12,14
401:6
406:13

**finding**
324:13
375:18
439:11

**finds**
112:13

**fine**
16:10
19:7,10
24:19
59:16
73:19
134:4,12
155:10,12
170:24
251:18
365:13

367:19
439:16
455:13
460:4
465:1

**finish**
21:9
24:16
40:21
54:10,24
55:8
85:24
87:11
133:2,4
142:14
205:2
226:14
240:5
242:9,22
245:17
267:3
282:1
316:16,21
343:3
364:3,8
366:4
452:25
454:25
464:8,13
467:11

**finished**
40:18
100:23
140:18
143:10
403:20

**firm**
51:4
316:2,3
402:11

**firsthand**
302:17,
21,23
362:21
431:1,11

**Fischer**
265:22
266:5,6
269:6
270:12
271:3
277:5
386:16,21

**Fischer's**
280:1,9

**Fish**
268:7,14,
15
269:16,21
274:19
275:9
280:20,
22,25
281:25
409:21
411:25
412:1
425:21

**Fish's**
269:16

**Fishbones**
159:11
161:18
162:10
169:20
170:17
186:8
350:12,19
351:12
423:24

**Fitzpatrick
's**
186:8

**fix**
357:23
370:11

**fixed**
357:25

**flash**
403:24

**flavor**
425:21

**flew**
178:14,21
462:21

**flight**
384:10,
11,12,14

**flip**
306:1

**floor**
398:15
455:10

**Florida**
9:1 60:3,
8 68:17
71:23
79:10,14
99:24
106:9,11,
16,21,22,
23
109:12,21
138:9
157:1
178:10
201:5,15
202:2,19
224:9,19
227:12
228:13
297:6,9
298:16
334:15
384:6
471:23

**flow**
404:24
405:16

**flown**
202:10

**flows**
318:10

**fly**
462:23
463:7,8
464:15,19
468:25

**flying**
463:6
464:20

**focus**
54:9
68:11
70:1 79:2
85:18
98:4
135:11
140:25
219:22
228:3,8
233:8
298:8

**focused**
85:11
206:23
371:22
379:15

**focusing**
77:18
206:20,21

**Foglesong**
263:23

**folder**
456:5

**folks**
78:23
395:22

**follow**
35:18
182:16
296:6
300:19
301:4



440:10,
14,15

**follow-up**
317:14
437:24

**food**
81:24

**football**
79:18

**force**
75:18

**Ford**
6:23
7:19,24
8:3,6,11,
17 9:23
10:10
11:19,24
12:8,13
13:5,23
15:4,11
16:6,11
17:5,12,
21 18:1,
4,7,11,18
19:1,11,
16,25
20:9,13,
21,22
22:18
23:3
24:11,15,
21 28:23
32:21,25
33:3,8,17
34:25
35:7,17,
24 36:6,
16,18
37:7,13,
19,24
38:12,18
39:2,3,20
40:8

41:6,14,
20,25
42:16,21
43:1,5,9,
16,20,23
44:6 45:6
46:10
48:17
50:9,14,
25 51:23
52:3,9,
15,17,20
53:16,19
54:14,18,
21,24
55:4,6,14
56:3,8,11
60:1,19
65:5,9,23
66:15,22
68:4,8,
11,14
70:10,13
73:18,25
74:10
85:24
86:1
87:25
88:7
90:24
91:2
96:8,13,
14,20
97:2
99:17
107:17
113:1
114:24
115:6,22
120:21
121:2
122:18,
20,24
123:22
124:5,20
125:1,11
127:20

129:2,19
130:13
131:15
132:7
133:5,24
134:4,16,
23 137:6,
13,19
138:1,25
139:13,
18,24
140:7,17
141:9,18,
21 142:3,
6,10,15,
18 143:4,
9,15,24
144:6,17
145:13,25
146:5,12,
24 147:8,
12
148:20,
22,25
149:2,10,
15,22
150:5,8,
19,22,24
151:1,4
152:4,16
154:7
155:2,9
156:11,22
157:9
158:6,17
159:2
160:5
163:13
164:4,15,
22 165:6
166:9
169:5
172:2,3,
17,22
175:7,14
176:3,13,
15 178:19

179:20,25
180:8,9
182:19,
22,24
183:6,12,
17,22
184:5,9
185:13
189:14,19
190:9,21
192:7,14
193:22
195:14
196:1,9,
11,14,17,
19 197:1,
3,16,23
198:4,12,
18,24
199:10
201:25
204:9
205:4
206:7
209:3,9,
15,21
210:14,
18,23,25
211:15,
17,22
214:3
218:5,8,
13 219:21
220:22
221:3
222:6,15,
20 227:2
229:12,18
230:8,10,
19 231:1
232:6
233:18
234:13
237:24
238:14
240:7
242:10,

13,17,21,
23 243:6
247:6,15,
21 248:16
249:15
250:3,6,
18,24
251:3,6,
19 253:21
254:10,14
256:14
257:5,10,
17 258:14
259:1,5,
10 260:6,
13
261:14,24
262:9
264:2,6
265:4
266:14
267:3,7,
14 269:10
270:9,17
271:7,15
272:13
273:15,25
274:12,
17,25
275:14,25
276:4,5,
12,20
277:1,13
278:12,15
279:6,10,
16 280:23
281:22
282:12,21
283:24
284:16
286:24
287:23
288:6,15
289:5,13,
14 291:7,
19 292:1
293:5,10



| | | | | |
|---|---|---|---|---|
| 294:1 | 5,16,22 | 40:5 | 193:19 | 288:4,11 |
| 295:1,5, | 442:1,9, | 41:18 | 195:8,19 | 290:13 |
| 7,11,14, | 14,20 | 48:2 | 196:6,9, | 291:11, |
| 23 296:3, | 443:3,4, | 51:12 | 14,16,17 | 13,23 |
| 9,15 | 15 446:23 | 60:18 | 197:2,21 | 293:2 |
| 297:4 | 447:14 | 63:13 | 198:1,8, | 294:19 |
| 299:13,20 | 448:16 | 107:14 | 17,21 | 302:8,13, |
| 301:8 | 449:6,12, | 112:16 | 199:7 | 19 303:4, |
| 317:16 | 14 450:1, | 115:5,17 | 201:16 | 14 |
| 319:16 | 10,14,20 | 123:20 | 204:8 | 304:12,20 |
| 324:4 | 451:3,20, | 127:18 | 206:3 | 307:1,17 |
| 329:6 | 23,25 | 128:15 | 213:25 | 308:15 |
| 331:19 | 452:3,8 | 129:17,21 | 219:15 | 309:4 |
| 333:11 | 453:16,18 | 131:13 | 220:17,25 | 311:14 |
| 365:4 | 454:6,11 | 132:5 | 222:10,18 | 312:4 |
| 367:6,12 | 455:1 | 137:11, | 232:4,10 | 320:18 |
| 416:10,20 | 470:9,24 | 16,24 | 234:12 | 328:8 |
| 417:6 | 472:18 | 138:22 | 237:16 | 337:17 |
| 418:9,13 | | 139:10, | 238:10 | 359:2 |
| 419:1,10 | **Ford's** | 17,23 | 247:4,17 | 361:19 |
| 420:2,7, | 316:3 | 140:6,13 | 248:4 | 388:11 |
| 16 421:2, | **foregoing** | 141:4 | 256:12 | 394:15 |
| 12,15,25 | 305:12 | 142:7 | 257:8,13 | 396:5 |
| 422:18 | 306:14 | 143:3,22 | 258:13,24 | 400:6 |
| 423:1,6, | **foreseeable** | 144:5,15 | 259:4,8, | 401:12 |
| 18 | 397:16 | 145:24 | 24 260:10 | 402:9,25 |
| 424:11, | | 146:3,9, | 261:12,23 | 403:9 |
| 15,18 | **forget** | 21 147:5 | 262:5 | 404:5 |
| 425:2,5 | 425:25 | 152:2,15 | 263:25 | 406:4,7 |
| 426:9,16, | 457:25 | 154:6 | 264:5 | 407:11,19 |
| 22 427:5, | **forgot** | 157:5 | 269:7 | 408:7,13, |
| 19 428:1, | 29:6 | 158:4,9 | 270:3,14 | 24 409:12 |
| 9,11,20 | 81:10 | 163:12 | 271:6 | 410:13 |
| 429:12, | 290:20 | 164:2,12, | 274:22 | 411:1,19 |
| 17,21 | 330:1 | 19,25 | 275:12,24 | 412:15 |
| 430:1,9, | | 166:8 | 276:3,11, | 413:17 |
| 15 431:4, | **form** | 169:3 | 16,25 | 415:1,8 |
| 13,16 | 9:22 | 172:15,20 | 277:6 | 416:10,20 |
| 432:15,21 | 12:17 | 175:6,13 | 278:8,14 | 417:6 |
| 433:2 | 22:14 | 176:1 | 279:2,13 | 420:2,7, |
| 434:4 | 23:2 | 177:24 | 280:17 | 16 423:6 |
| 435:9 | 24:10,14, | 178:12 | 281:10 | 426:9,16, |
| 436:18 | 20 28:17 | 179:19,24 | 282:6,14, | 22 427:5, |
| 437:24 | 32:8,20 | 185:7 | 16 283:19 | 19 |
| 438:2 | 33:11 | 187:3 | 284:7 | 428:11,20 |
| 440:1,20, | 34:23 | 189:17 | 286:19 | 429:5,12, |
| 24 441:4, | 38:13 | 190:5,13 | 287:21 | 17 430:9, |



15 431:4,
17 432:9,
15,21
433:2
434:4
435:9
436:18
441:20
443:12
453:10

**formal**
33:15
110:18

**formally**
69:22,24

**formation**
349:20

**forths**
44:8

**Forty-four**
305:8

**forward**
421:1

**found**
176:2
213:13
303:21
345:21
397:10,14
406:24,25
410:24

**foundation**
79:11
456:14
457:19

**fourth**
216:21

**frank**
284:21,24
285:14,17
465:13

**frankly**
405:14
412:4
439:4

**fraternity**
60:2,7

**freckles**
386:2

**free**
22:13
23:15
24:4
272:5,25
298:22

**frequent**
236:12

**frequented**
155:14

**frequenting**
155:6

**frequently**
128:20
234:4

**friend**
168:20
187:12
189:7
319:9,13
343:2,10
372:23
382:19,23
386:18,19
408:18,20
412:3

**friendly**
59:25
378:14
382:3
386:19
396:20
397:4
412:1

**friends**
9:19
59:10,20
91:24
111:20
119:11
127:25
155:17
168:13
186:20
191:11
194:5
225:12
231:19
232:14
233:23
234:22
236:2
243:18
259:14
320:11
322:13
325:18
343:12
374:5
375:5
378:5
391:22
411:17,21
412:3,4
415:4,5
429:14
443:22

**Fritz**
7:8,12
16:25
313:24
314:24
315:1,2,4
316:2
377:5
393:12,13
438:14
467:8,12,
23

**front**
50:18
91:15,20
93:9
151:5
158:24
159:7
171:13
180:3
216:17,21
235:7
258:10
274:6
300:12
322:2
339:9
436:24
447:7
471:18

**fuck**
178:22
179:12,14

**fucking**
162:22,23

**fulfilling**
434:24

**full**
44:16,18,
19 201:24
234:16
469:19

**fully**
205:14
218:24
304:8

**fun**
330:13,21
331:1
397:9
404:1

**function**
54:11
185:23
320:2

464:1

**functions**
82:8

**fund**
310:3
312:8

**funded**
308:11
400:9
405:21

**funding**
25:22
31:17,23
33:6,16
79:7 84:5
310:7
312:7
317:25
318:4,5
400:13
405:21

**fundraiser**
360:17
466:24

**fundraisers**
360:18

**fundraising**
84:8
382:12

**funds**
405:13

**funeral**
438:24,25

**funny**
320:15

**Furbush**
7:10
160:2
364:11
366:1,14
367:3
398:1







**get-togethers**
194:22
195:4
231:12,21
233:24
234:24
236:11,12

**ghost**
380:22,24
381:1,11
383:4,9

**Gibson**
117:16
121:4,15
122:14,25
123:6

**gifts**
311:3,12
312:2,13

**girl**
136:15
207:6
377:19
445:5,17

**girlfriend**
187:25
190:16
191:18
193:4,5,
9,14
246:21,25
249:13
252:4

**girlfriends**
262:13,23
263:5

**girls**
78:10
81:17
82:1,2,5,
9 84:6,14
85:19
86:4,7,

15,17
87:15
167:15
171:12,17
172:7
189:6
325:6
333:25
342:25
345:15
348:1
350:15
354:4,5,6
357:2
370:17
388:5

**girls'**
342:21

**give**
8:24 12:6
14:6
21:15
22:12,22,
23 23:5
34:9,12
55:13
67:18
72:3 74:3
124:24
128:25
141:1
145:7
149:5
177:22
216:3
239:12
255:7
300:17
332:7,18
333:5
367:22
370:12
384:11
395:25
407:5,9,
17 408:2,

5 409:1,
4,8
429:22,23
436:13
442:4

**giving**
300:18
314:23
364:23,24
365:19
434:7,25
435:3
453:12
470:7

**gladly**
163:16

**glady**
165:10

**glass**
132:24

**glitches**
21:6

**global**
82:20

**goal**
82:7

**goals**
111:13

**god**
459:13

**good**
7:16 8:16
17:13
21:14
43:22
56:23
86:8,10
88:12
89:3
103:16
111:22
125:25

132:17
152:25
154:20,22
181:15
185:24
203:13
251:9
268:13
297:2
300:5
331:2
338:12
346:4
352:1
367:1
368:8
397:25
414:23,24
439:8

**goodbye**
342:3

**Google**
62:2

**goose**
367:1

**Gosh**
192:1

**gotcha**
45:10

**governing**
11:13,14
20:16

**government**
71:15,17
78:21
106:6
359:14

**grab**
134:14
319:24

**grabbing**
300:21

**Grace**
72:21,22
73:1
76:22,23
77:8,9,
18,25
153:12,13
200:5,7
298:5,6,9
347:13
399:23

**graduate**
78:22
82:7,9
100:13

**graduated**
100:15
101:1
104:19,22
108:3
109:12

**graduating**
81:19

**grand**
67:9,12
68:3,5,10

**grandchild**
29:4

**grandchildren**
29:15
310:20
311:4,6

**grandstand**
391:21

**granted**
24:18

**gratuitous**
26:7,10
470:11

**great**
20:19



23:17
24:2 41:2
55:4
77:23
113:17
116:6
128:3,5
131:1
132:14
133:21
151:22
184:7
191:8
211:1
258:20
265:16
299:25
460:18
463:19
468:22

**Greenberg**
7:4,7,10,
13,15
25:14,20,
21,23
26:15,23,
24 27:10,
11,12,16,
18,22,25
28:3,8,
11,13,25
29:3,15,
18,23
30:21
31:6,11,
15,16
32:2,18
33:5,6
34:3
119:24
126:14,21
145:23
146:2
150:11,19
151:23
152:18

159:4,10,
23 160:19
161:22
162:14
163:8,16
165:20
166:10
167:3,11,
14,24
169:7,20
170:6,20
171:8,20
172:13,23
173:8,15
175:9
178:3
179:1
180:14
181:4,24
184:2,18
186:7
187:3
189:3,25
223:10
300:8,9
303:23
306:17
307:24
308:8
309:11
310:10,11
311:9,10,
12 312:2,
3,8
313:7,8,
12 314:8,
9,20,25
316:5
317:13,
21,23
318:3,8,
12,14
319:2
321:21,25
322:4,7
324:4,5
325:14,20

327:21
328:11
342:18,19
343:14,17
344:8
346:9,11,
13,25
347:20
350:12
351:9
352:4
353:7,14
354:16,24
355:17,
20,25
356:4,11,
13,15,20
357:4
358:7,16,
21 359:1,
6,7,10,11
368:15
369:2,3,
5,15
371:18,21
373:1,8,
17 374:22
375:13
376:5,11,
19 377:13
378:2
383:5,7,8
389:25
390:2
391:17
392:11
393:11,24
399:9,14,
17,19,22
400:2,4,
17,18,23
401:2,9,
24 402:1,
8,18,19,
24 403:21
404:17,
21,22,25

405:6,7,
8,12,15,
19,24
406:2
425:16,24
427:13,17
428:9
429:3
438:10
441:18
443:7
450:22
453:23

**Greenberg's**
111:1
165:9,15
302:3
310:3
355:15
356:3
359:13
368:25
376:24
401:5
406:2,3
426:14
428:18,19

**Greenbergs**
25:13
27:5
310:16,
19,25
311:1,3
312:19
315:2
327:2
375:14
402:4
405:22
432:3
467:7

**Greenville**
297:21,24
298:3,4,
10,14

299:4,6

**greeted**
337:9
379:2

**Grill**
325:23,25
327:9
328:20,22
373:16
375:1

**grilling**
285:24

**gross**
91:16,18
392:10

**ground**
10:17
40:16,20
108:1
133:3

**group**
27:23
118:20
347:25
362:19
374:13

**groups**
27:5

**grown**
115:9

**guard**
212:25
213:2
260:8,12
396:6,13

**guard's**
331:5

**guardhouse**
396:3

**guardian**
78:15



84:24
339:5

**guess**
20:20
36:10
112:1
132:6
156:17
173:21
174:17
205:13
220:16
223:9
235:6
237:21,23
249:21
257:2
296:21,23
298:20
303:24
324:15
333:4
341:2,5
372:17
416:6,15
422:1,13
423:11
426:7
427:16
472:8

**guessing**
341:1

**guest**
211:24
213:5,8
215:19
234:3
261:19
398:11,
14,19
410:22
423:13

**guests**
237:9,12
344:24

420:14

**guy**
60:6
155:17
187:24,25
320:11
386:10,
11,15
437:8

**guys**
16:24
18:24
20:6,19
24:13
52:13
85:23
134:15
142:4
154:2
166:3
187:9
233:1
255:13
283:14
289:11
315:16
316:13
320:15
325:17
336:16
364:23
366:8
367:21,22
418:22
454:2,15,
18
456:18,
21,22
459:5
462:10,17
466:7,11
472:21

**gym**
337:20,22
338:15,

16,18,22,
23,25

—————————

**H**

—————————

**hair**
457:13

**half**
104:3
110:12
366:19

**hall**
324:21
338:11
375:21

**hallmark**
352:10

**hallway**
337:23

**hammered**
162:14

**Hammond**
88:14,22,
24 89:8
95:10
98:19
120:8

**hand**
209:24
210:1
239:20
300:1
339:12
455:3

**handed**
156:23
235:23
279:18
289:6
450:15

**handing**
15:11

20:1,5
148:22
149:11
151:8
449:7
450:19

**handled**
230:13
405:13

**hands**
359:23

**handshakes**
83:22

**hang**
10:16
30:19
38:4 54:2
87:11
99:1
101:7
122:20
154:2
165:13
166:4
204:5
238:7
244:5
382:4

**hanging**
166:3
194:6
231:22
237:6
244:18
285:24
346:1,8
348:22
353:18
429:6

**hangouts**
188:1

**happen**
16:7
86:18,19

188:12
196:21
244:8
268:9,10
270:1
275:16
280:12
389:7

**happened**
41:10,11
126:19
179:17
195:12,16
196:8
231:7,25
232:1
233:10
236:16,
20,22,23
244:9,11,
12 278:16
283:2
285:21
286:4,9
287:2
288:23
348:3,5
357:10,18
373:8
374:2
418:8
419:12,15
432:19
447:20

**happening**
176:11
186:7
198:20
207:2
223:13,22
257:11
365:10
380:4
427:4



happenstance
    348:23

happily
    111:3,4,
    6,17,19
    112:7,22,
    23 186:1

happy
    73:21
    112:22,
    23,24
    117:3
    327:18
    410:24
    411:14
    465:24
    468:13,23
    469:2

hard
    21:16
    91:4
    93:24
    113:23
    136:4
    328:1
    354:21
    440:6,10,
    14,15

hardship
    111:24
    112:13
    114:9

Hare
    7:1

harm
    126:9

harms
    163:17
    165:10

hate
    360:25

hazy
    397:1

he'll
    268:15
    294:9

head
    21:16
    25:9 63:8
    88:25
    95:24
    178:5
    254:25
    471:5

headache
    462:13

headaches
    397:17

headhunter
    76:10

heading
    162:23
    169:23
    178:11

headline
    93:21
    113:21

health
    132:10,21
    133:12,
    18,20,21,
    25

healthy
    55:23

hear
    18:22
    90:22
    144:22
    147:13
    148:6
    221:25
    222:2,8
    247:10

255:21
256:11
291:12
328:9
331:25
336:15,22
363:3
376:6
385:8,15
396:17
397:21,23
398:6

heard
    136:14
    144:20
    147:25
    148:4,7,
    15 168:7,
    10
    169:13,14
    236:21
    248:18
    255:15,18
    256:9
    261:10,
    15,16,17,
    20 264:13
    288:19
    296:20
    336:23
    359:5
    362:13
    363:2,4,7
    384:25
    385:5
    414:17
    463:16
    469:21

hearing
    14:6
    296:22
    331:24
    357:7
    452:8
    463:15

Heathrow
    9:1 80:6
    135:7
    175:15,19
    199:12
    209:24
    210:7
    211:2,24
    212:9
    221:20
    232:2
    331:4
    343:16
    344:14
    356:25
    373:16
    418:23

Heathrow's
    80:8

Heathrowmas
ter
    421:20

Heathrowmas
ter004
    216:20

Heathrowmas
ter0088
    217:10

Heathrowmas
ter01
    210:3

Heathrowmas
ter10
    210:4

heck
    323:16,22

heir
    310:25

held
    25:12
    71:3
    368:22

hell
    114:6

helped
    310:20

helpful
    223:18
    225:17,19

hesitate
    256:8

hesitated
    347:5

hey
    18:10
    38:12
    160:2
    186:11,14
    187:8
    234:5
    276:6
    344:1
    375:5
    396:9
    408:17
    418:9
    429:21
    452:19

hidden
    320:22,25

hide
    320:14

hiding
    327:5

high
    78:21
    79:9,19
    81:19
    82:9
    86:18,20
    87:4,15
    100:13
    101:1
    125:22
    130:12



138:3,9,
18,21
140:18,23
143:11
144:1,14,
19,20,21
157:21
263:16
321:8
328:5
343:10

**high-fives**
83:22

**highlight**
330:18

**highlighted**
211:2,4
212:14

**highlighting**
212:1

**hire**
417:8

**historically**
115:12

**history**
374:4

**hit**
152:12
163:18
165:11
167:7

**hits**
317:1

**HKXOR**
215:4

**HOA**
176:5,17
177:22
199:12
212:22

290:21
291:17
421:17

**hobbies**
397:7

**hockey**
261:9

**Hogan**
471:25

**hold**
36:14
37:15
38:8
39:12
41:5
42:19
52:7
53:14
59:11
68:2
73:16
99:10
210:12
211:12
249:25
253:17
264:23
316:4
385:3
457:15
462:19
471:3

**holdings**
27:5

**holds**
417:5

**holidays**
191:8

**home**
58:17
61:9
63:10
76:3,6,9,

11 77:12,
13 81:20
90:4,5,17
105:11,12
111:10
129:6
131:23
132:2
135:18
136:10
151:24
164:16,
17,24
173:7,9,
13,20
174:7
175:10
176:12
178:16,18
179:18
185:15,19
187:21,
22,25
188:4,9,
11,12,13,
14,18,20,
21,22
189:1,23,
24
190:11,
15,17,20,
24,25
191:1,4,
5,10,13,
17,19
192:22
193:9,11,
12,18,21
194:1,3,
5,6,7,23
195:4,17,
24 196:4,
21 197:6,
11,19,24
198:3,6,
14,20
200:12,

13,22
202:1
203:7,21
204:2
206:25
207:6
212:21
217:21
218:3
220:23
221:1
224:13
231:13,15
232:9,12,
18 233:25
234:10,16
235:1,3
236:1,3,
16,22,23
237:2,12,
14 238:7,
12,19,22,
25 239:6,
12 240:3,
9,13,17,
23 241:1,
16,17,22
242:2
243:13,21
244:1,3,
23
246:13,
15,18
247:3,12
253:4,5,
7,8
257:7,12,
15 258:1
259:17
261:19
262:11,
13,16,18
263:6,9,
12,14,24
283:2,3
285:4,6,
22 286:5

288:2,23
290:3
291:9
297:14
298:15
303:17
318:16,17
328:3
337:10
338:8
339:6,7
340:4
342:20
350:18
360:17
369:9
370:23
374:9
378:11,
13,15,16
379:9
390:19
395:9,11,
14 398:10
406:25
407:4,8
408:3,6,
11,12,19
409:7,10
410:7
411:4,6,
9,15
412:9,18
414:10,13
415:3
427:22
428:15
434:1,15
435:7
436:23
439:6,13
447:17
448:5,6
452:22
454:25
457:6,9,
10,22



460:1,2

**homeless**
76:16,17,
24 137:15
138:15
140:11
143:19
144:11,12

**homelessnes
s**
85:11
87:23

**homeowner's**
212:10

**homes**
194:15
195:22

**homes's**
231:16

**honestly**
174:11

**hook**
268:7
270:7
274:19
275:9

**hooked**
182:1

**hoop**
257:7
258:1

**hooper**
257:16,18
331:20

**hooping**
257:21

**Hooters**
152:24
155:12

**hope**
191:9

193:1,2
296:12
378:23
437:5
470:17

**Hornsby**
267:16,20
268:3
277:23,24
282:4,8
289:8,16
439:5

**horrible**
93:24
354:22
392:5

**horriblenes
s**
437:11

**horrific**
92:3
93:19
94:14,16
113:21
116:9
328:9

**horrifying**
93:22

**hospitable**
188:3
378:17

**hospitality**
87:2

**host**
128:4
237:11
382:12

**hostess**
157:22

**hosting**
328:24

**hot**
181:1,10,
12,16
182:3,6
424:7

**hotel**
90:8
205:9
223:11
323:8
325:15
347:21
353:16

**hotels**
321:23
322:1,9,
11 326:24

**hour**
46:4
58:12
60:10,12,
25 61:8
74:7
316:23
364:2
366:19,23
466:18

**hourly**
460:14,16

**hours**
13:4
79:17
266:21
272:10
273:10
316:10
332:24,25
363:24
364:22
366:9
367:24
368:13
415:24
448:25

452:20
453:6
460:24
462:20
465:11

**house**
59:4
172:23
173:16
174:24
187:13
203:19
238:2
261:1
285:2
312:13
313:17
328:12,24
341:5,15
342:25
344:3
360:16
361:4,9
362:15
363:1
374:1,2
379:2
395:5
406:14,23
407:2,6,
10,15,18
408:23,25
410:2,4,
12,18,25
411:18
412:5
415:19,20
419:22,24
420:1
447:22,24
448:3,10
455:18
459:2

**household**
208:17

**hula**
257:7,15,
18,20
258:1
331:20

**Hulk**
471:25

**human**
78:14
460:6,7

**hungover**
178:21
179:2,12,
13,14

**hungry**
162:18

**hurt**
93:22

**husband**
24:8,22
25:9
27:10
33:22
34:2,15,
18 35:14,
23 42:9
44:1,14
47:1,3
50:4 53:5
54:4
55:17
56:13,24
57:7,22,
25 58:3,
5,10,13
59:8
60:2,10,
16 61:1
62:24
69:17
72:6
79:16
90:7,21
91:19



92:9
93:19,24
94:3
108:18,
19,22
111:12,
13,15
112:19
118:10,17
119:5
125:14
126:1,10,
20,22
127:7,17
129:14
130:2,11,
14,15,22
131:7
132:14
133:16
136:24
137:2,9
145:6
146:6,10,
13,16
147:15,23
148:2,16
154:21
155:6
160:16
167:21
168:10
172:6
173:7
174:6
179:9
181:9,14
182:2
184:23
185:2,4
187:6,11
188:1,10,
13,20
189:1,4,
6,22,23
190:10,23
194:15,25

195:3,10
197:6,9,
10,13
199:9
202:2
217:20
219:1
221:23
222:16
223:19
226:17
231:14
232:13,23
234:4,15,
17 236:23
237:2,9,
12,14
238:7
239:11,15
241:4
242:2
243:11
244:16,24
245:1,16
246:1,6,
24 248:22
249:19
255:4,8,
19 256:7,
25 258:3,
8 264:17,
22
265:18,21
266:1,4,9
267:21
269:5,8,
14,23
270:25
275:21
277:12,18
278:11,
23,25
279:15
280:19,22
281:1,12,
15,20
282:19

283:7,17
284:17
285:3
286:9,11
287:8
288:12
290:10
291:8
292:17
302:25
303:2,5,
11 305:2,
3 314:15
319:4,17
322:6,8,
12 325:15
326:7,11,
12,14,16,
18,22,25
327:4,15
336:11
343:25
345:14,23
346:14
349:12
350:11
352:10
353:21,24
361:12
363:4
370:25
371:1,4,
16 374:11
375:8
376:12
377:3,7,
8,10
381:13,22
383:7,13,
23 384:23
390:13,25
391:1
392:6
394:2,14,
17 395:2,
20 397:11
399:18

403:7
406:15,25
407:3
408:5,10,
16 409:4
410:1,3,7
411:6,8,
11 412:6,
7,12,18,
20 413:9,
15 414:1
415:11
420:9,11
423:23
428:13
433:12
434:6,12,
20 435:24
436:20
437:6,14,
19 438:4
439:3,4,
8,12
444:5
445:15,
18,24
446:9
447:21

**husband's**
39:10
231:18
236:2
269:2
277:8,9
278:19
279:19
280:14
281:5
284:13
290:7
344:17
444:4

**HX**
215:4

**hypothetica
l**
142:21
278:18

---

**I**

**I's**
347:25

**IBTTA**
204:18
205:17
384:1

**idea**
19:1
97:10
157:8
164:8
168:6
170:15
241:22
250:11,20
323:17
348:9
353:11
403:22
469:13

**ideas**
447:19

**identificat
ion**
11:23
149:9
156:10
209:20
266:17
289:4
389:21
421:9
424:21
442:11

**identified**
14:10
116:2



117:4
119:22

identify
115:10

ill
462:12
463:14,21
464:1

illegal
69:20
195:5,11,
18,23
196:5
197:7,12
198:14,19
248:6

illicit
254:8

imagine
231:21,25
232:7
233:10,21
307:5

imagined
233:20,25

imagining
233:24
234:1

impact
93:16
94:9,11,
16,18,19,
20 98:14
119:7
132:19
133:18,
20,23,25
134:1
435:20,22

impacted
119:2,4
132:4
133:6

381:14
438:15

impacting
119:23

impacts
98:12
120:6
438:12

implicate
43:4,8
313:9
404:20

important
21:9,14
77:11
78:8
79:15
80:21
86:9,11,
12,13,15
87:20,21
105:20
245:21
312:5
313:12,21
446:10

impression
370:13

impressive
84:17
469:24
470:5

improper
250:15
296:14

in-ground
203:20

inaccurate
282:5
457:3

inadvertent
ly

471:2

inappropria
te
124:15,16
250:14

incapsulate
113:2

inches
433:19

incident
90:16,20
93:11
194:19
225:21
318:22
323:17
325:23,
24,25
326:23,25
327:9
328:14,23
346:2
350:10
356:20
358:16
364:4
375:1
415:20

incidents
30:1

include
116:13
118:16
182:17
183:21
200:5
428:13

included
27:6,13
92:14
196:4

including
144:10

383:17
384:18

inclusive
115:23
119:20,22
165:23

incorporate
306:24

incorporate
d
306:20
307:4,15
310:8

incorrect
230:6,16
272:3

incorrectly
91:24

incredibly
79:16
97:20
194:7

independent
140:16
314:22

indict
69:20

indicted
67:12
69:18,22,
24 70:4,
16,18
345:14
350:13
352:14
356:21
379:23
427:6,14,
18

indictment
29:25
67:10

112:3
324:12,15
325:6
345:16
372:11
391:5

indictments
306:18
374:8
379:24

indigent
138:23
140:24
438:22

indirectly
262:19

individuall
y
55:16

individuals
155:21,
24,25

indulgent
464:5

infection
470:21,22

infidelity
94:15
438:11,16

infinitum
460:15

information
11:16
13:13
14:19
22:12,20,
22,24
32:1,12,
15,16
34:12
35:10
66:5,24



67:3
69:10
70:2
71:8,12,
15,16
94:5
98:13
137:9
173:20
213:12
223:5
225:17
226:19
238:15
243:3,7
244:13
245:7,9,
11 246:4,
5,11
248:1,7,
10,13
254:15
255:7
282:18
288:22
291:5
294:6,8
307:25
308:13
309:12,
13,18
310:11
312:19
320:6
323:23
324:14
325:8
327:19
354:5
355:22
362:13
363:11
370:8
375:15
376:17,19
377:4,6,
13 378:1

388:5,17
394:11
396:13
401:7
404:6
436:21
437:5

**informational**
69:7

**informed**
82:22,25
83:1,2,9,
18 84:1,
20,21
135:23
174:6
363:25
368:25
376:22

**initials**
8:19 26:2
145:16
355:3

**initiates**
435:12,18

**innocent**
93:23

**inquire**
317:8
344:13

**inquired**
413:11,12

**inquiries**
388:6,13

**inquiring**
353:20

**inquiry**
231:17
388:9

**insert**
26:2

**inside**
255:17,23
349:21
358:12

**insignifica
nt**
329:2

**insinuation**
444:24

**instance**
85:4
93:15
119:10
303:18

**instances**
375:4

**instruct**
44:2
240:4
450:2,12
456:5

**instructing**
15:4,7,9
42:21
43:1,5,16
122:18
449:15
454:6,12

**instruction**
296:5,6
455:2

**instruction
s**
124:17

**instruments**
29:7

**insulting**
434:10
437:18,19

**insurance**
106:25

**integration**
75:19
402:11

**intend**
332:16
347:16

**intended**
357:13
404:19

**intense**
113:8
446:18

**intention**
307:6

**intentional**
440:13

**interacted**
373:13
414:10

**interaction**
84:13
192:25
255:19
263:19,23
373:12
414:11

**interaction
s**
253:14,24
263:11

**interchange
ably**
32:3

**interest**
207:3
300:1
471:20

**interested**
206:14
207:4,5
345:9

**interim**
75:16,18

**interject**
250:12

**intermediar
y**
71:19

**intermitten
tly**
58:9
128:25

**Internation
al**
205:18

**Internet**
203:13,20

**interpretat
ion**
167:23

**interrogato
ries**
111:1,2

**interrogato
ry**
392:24

**interrupt**
21:8
160:2
166:20
361:1
363:15
467:5

**interrupting**
467:22

**interview**
153:21
176:10
304:4
375:11
378:22
433:4



438:20

**interworkings**
404:13

**intimate**
263:1
270:5

**introduced**
189:22

**introducing**
59:18
189:7,8,
12

**inundation**
294:11

**invested**
403:21

**investigated**
234:20

**investigation**
174:12
231:7
234:17
283:1
350:17
359:14
375:14
379:25
427:20

**investigations**
173:19

**investigators**
67:19

**Investors**
402:12

**invitation**
327:14

**invite**
407:2
408:17

**invited**
170:17
326:18,19
342:19
345:11,12
375:2
407:3
413:14

**inviting**
327:15
414:1

**invoke**
251:10
366:22,24

**invoking**
309:25

**involve**
77:5
87:22
102:8

**involved**
29:11
76:19
79:17
82:15
84:11
91:25
93:3
107:2
114:14
126:18
168:25
197:11
303:20
321:24
322:13
323:19
326:7,9,
24 328:2,
6,8
350:24,25

359:17
360:10,12
362:20
374:13
375:18,19
387:21
388:25
389:1,6
390:25
391:1,6
437:13

**involvement**
37:9,22
356:3

**involves**
457:8

**involving**
71:23
90:20
103:23

**iphone**
321:3

**irony**
360:6

**isolation**
403:15

**issue**
82:20
85:14,16
128:6
209:13
296:16
332:5
436:2
446:21,22
452:4
465:4
468:3

**issues**
29:15
114:20
115:14,20
116:21

117:6,9
119:18
209:14
303:25
397:13,16

**its'**
351:5

_____

_____

**J**

_____

**jail**
86:21
114:7
313:23
329:3,4
348:13
359:7
387:3

**jailhouse**
304:3
314:7
359:9
375:11
438:20

**January**
74:14,18,
23 121:6,
7 272:1
413:2

**Jason**
7:3
59:17,18
284:20,24
285:14
317:12
331:23
333:4
343:3
354:14
364:18
367:25
368:4,8
381:21,
23,24

460:22

**Jeep**
220:11

**Jeff**
67:20

**Jenn**
166:15
167:19
168:1,11,
13,16,17,
21,23,25
171:20
173:15

**jerks**
221:15

**Jew**
425:16,17

**JG082952**
149:18

**job**
69:9 90:7
116:6,8,
10 138:16
203:2
391:3,5
405:14
434:9,13
439:3

**jobs**
87:2,6
434:8,15,
18,25
435:3

**Joe**
246:21,25
252:3,11
265:21
274:9
275:18
277:11,15
437:8
453:24



**Joe's**
  246:21
  249:12
  252:3
  387:2

**Joel**
  7:12
  25:13,19
  26:23,24
  27:11
  31:10,15,
  20 32:3,
  18 33:5
  34:3
  126:14,
  18,20
  145:23
  146:2
  148:8
  149:6
  150:11,19
  151:23
  152:18
  159:10
  160:19
  162:10
  163:16
  165:15,19
  166:10
  167:3,10,
  14 170:6
  178:3,13
  179:8
  180:14
  181:4,24
  184:2
  188:22
  189:3,24
  208:3
  223:10
  246:24
  251:24
  294:8
  302:3
  303:21
  311:9,10,

  15,23
  312:8
  313:7,13,
  14,16
  314:8
  321:25
  324:5
  326:3
  329:3
  343:24
  344:1,3
  345:19,
  20,23
  347:1,4
  348:6
  349:8,11,
  16 350:3,
  6,12,13
  351:1,2,
  9,15,16,
  20 352:3,
  7,16
  353:14
  355:15,19
  356:4,10,
  12,20
  357:6,8,
  16
  358:15,19
  359:6,7,
  11 368:17
  369:5
  373:2,25
  374:14
  375:19
  379:23
  388:4,17,
  18 389:25
  390:1,2,
  3,4,18
  393:10
  400:18,
  20,22
  401:9,24
  402:5,7,
  18,23
  404:2,7

  405:2,4,
  12,13,14,
  19,21
  406:2,9
  414:16
  423:23
  425:12,
  16,24
  426:14
  427:6,13,
  17 428:9,
  18,19
  429:2
  430:13
  437:10,16
  438:9,16
  443:14
  450:22
  456:9

**Joel's**
  168:2,5
  303:24
  308:8
  313:12
  314:21
  315:12
  372:15
  400:7

**John**
  146:4,6,
  17,18
  156:3

**Johnny's**
  167:7

**join**
  152:12

**joined**
  82:14,16,
  17

**joke**
  168:3
  269:20
  277:4
  278:23

  279:1
  280:16,19
  281:9

**jokes**
  351:4

**joking**
  165:18
  269:9,11
  270:11

**Josh**
  322:5
  326:17,19
  413:20,
  22,25
  414:5
  415:12

**Joshua**
  89:8

**joy**
  111:24
  112:13

**joyful**
  111:11
  112:11

**JP's**
  361:4
  362:15

**Jr**
  99:22
  101:16
  102:21
  103:3
  200:5,9
  340:25

**Jr.'s**
  341:4

**judge**
  17:7
  26:4,9
  79:8
  145:20
  156:7

  160:13
  296:22
  419:17
  429:11

**July**
  20:10,18
  105:6
  175:20
  203:8,15
  204:1
  205:23
  207:11,
  12,18,23
  231:3,8,
  13,19,21
  232:2,8
  233:10,13
  234:9,14,
  18 235:1
  236:16
  237:2,15
  238:8,19
  239:6
  240:3,9,
  14,23
  241:8,10,
  12,13,17
  242:3
  243:12,23
  244:9
  245:1
  246:7,13
  247:3
  257:6
  263:24
  264:17
  265:18
  268:6
  282:24
  285:2,22
  286:4
  287:17
  288:23
  290:10
  291:9
  321:10







174:1,23
180:14,18
194:2,16
200:12
207:10
233:2
244:17
261:4
284:11,13
285:23
296:3
311:21
324:1
336:16
341:20
346:7
347:19
351:21
352:19
362:11
375:23,24
379:12
387:12,19
394:20
398:15
455:15

**kinds**
94:3

**knew**
44:24
91:25
139:3
154:15
183:17
197:20
206:13
207:2
226:17
228:7
257:15
260:1
291:2
312:20
313:7
314:20
315:12

323:20
327:4,7
331:19
361:21
374:17
376:18
432:3
437:3,15
462:8

**knowing**
138:15,
16,17
172:7
462:21

**knowledge**
31:9
84:19
124:18
136:21,25
137:7
175:9
184:22
185:1
190:10
192:22
242:7
250:25
253:9,11,
13 260:3
265:24
286:25
287:1
302:2,4,
5,6,11,
14,17,21,
23 303:1,
10 304:9,
19,22
307:23
308:1,2,
5,6,21
309:1,8
310:9
311:8,11
312:1,6,
12

313:10,11
314:19,22
331:21
350:14
361:8,10
362:2,7,
22,24
371:22
375:16,17
395:8,17
400:14
403:19,20
408:5
430:7
431:1,2,
11
445:10,
13,19,21,
22 448:21
450:6
457:8

**Kyra**
73:7,9,
10,11,12,
20 74:11
75:21
81:8,9
265:14

━━━━━━━━━
L
━━━━━━━━━

**label**
160:20
179:1
210:3

**lack**
338:21
434:15

**lady**
344:4

**lady's**
387:23

**Lake**
334:14,

15,16,17,
22,23,24,
25 335:3
395:22

**Lambert**
330:25

**lane**
213:8

**lanes**
205:19

**language**
307:2

**laptop**
177:19

**large**
337:5
433:16
471:16

**larger**
433:13

**lasted**
62:13
335:19

**lasts**
204:19

**late**
64:20
272:23
340:10,11
416:7,16
422:13
449:18

**laugh**
112:10

**laughs**
111:22

**Laura**
6:24
150:5
289:13
316:9

454:19

**Lauren**
167:18
168:8,13,
17,18,19,
20 169:10
171:20
173:15
267:17

**law**
12:22
68:17,18,
20,22
69:19
71:24
391:4
425:17

**lawsuit**
11:13,14
14:7
20:16
97:12
290:21
291:1
421:16

**lawyer**
45:19
121:25
122:11
279:19
280:14
281:6
438:18

**lawyer's**
269:2,3

**lawyers**
110:19
312:20
365:8
405:3
438:18,19
443:14

**laying**
456:14







11 422:24

limousine
   329:24

lines
   82:18

link
   62:3,6
   65:17
   159:18
   300:18

linked
   65:16

links
   95:13
   377:13

list
   84:25
   115:23
   199:13
   213:5
   369:19

listed
   79:24
   155:21
   272:17
   277:8,10
   351:13
   388:21

listen
   185:9
   255:24
   256:1
   374:3
   398:13
   458:7
   464:5
   466:2

listening
   120:23
   145:6
   394:2
   408:15
   463:20,

22,25
465:6

listing
   79:25

litem
   78:15
   84:24
   339:5

literally
   256:2
   460:15

litigation
   103:22
   104:1
   135:24

live
   59:22
   136:9
   137:20
   140:22
   185:10,17
   335:4
   410:4,15

lived
   135:18
   169:2,4
   191:13
   247:1
   330:17
   356:25

lives
   87:22
   410:15
   434:24

living
   86:24
   140:15
   143:18
   313:16,18
   335:11
   336:5
   373:25
   414:14

loaner
   215:23
   216:1

lobby
   106:1

lobbying
   127:11

lobbyist
   105:13,
   14,16,17,
   18,21,23
   106:3,5,
   8,17,19
   391:3

lobbyist's
   391:5

lobbyists
   107:5
   352:22

local
   79:18
   81:16,17
   197:2,15
   228:15

locally
   224:12

located
   212:21

location
   243:23
   244:2
   321:10
   334:22

locations
   7:21
   321:1
   335:25

locked
   410:8
   448:6

locking

410:5

log
   122:4,5,
   15 135:8
   206:24
   207:1
   210:7
   211:5
   218:16,
   21,22
   221:23
   224:2
   231:16
   235:7
   237:22
   239:7,8
   240:10
   241:13
   246:14
   252:15
   264:14
   265:2
   283:20,23
   287:5
   379:11
   396:10
   410:20
   411:5,8
   418:19,
   22,23
   422:16,
   17,21
   423:5,9,
   12,15
   424:17
   428:24

logged
   122:16
   218:10
   221:14,
   16,18
   226:22
   238:23
   266:23
   452:14

logging
   221:20

logs
   121:13
   123:24
   173:20,
   22,25
   174:13
   175:16,19
   176:2,6,
   16,18
   177:5,6,9
   194:19
   206:15
   207:24
   208:1
   218:21
   224:1
   226:25
   227:3
   232:20
   233:22
   234:3
   245:25
   264:25
   290:20
   406:25
   445:6

LOL
   166:11
   167:19,25
   168:3

long
   16:11
   36:9
   58:5,7,8
   61:22
   63:6
   64:11,15
   67:8
   71:10,11
   77:21
   78:13
   82:13
   83:2,6



84:25
102:5
107:8
114:16
121:3
131:25
133:22
134:8,10,
13 177:25
191:25
192:1
202:17
203:11,23
204:17,21
222:23
256:1
272:7
274:15
284:11
328:22
335:19
352:3
363:13
366:3,16
368:12,13
369:10
381:5
384:3
409:13,
21,22
418:5
449:25
466:1

**longer**
66:3,12
74:24
237:21
265:13,14
414:17

**looked**
9:10,11
63:22
65:15
158:21
159:4
174:1

175:15
177:4,11,
20 199:12
201:23
203:4
206:13
207:9,24
208:5,11
212:4
213:12
223:11,25
224:1,21
225:10
226:4,8,
23 227:6,
17,23
228:9
233:10
260:23
264:21
265:2
273:22
325:17
327:1
344:6
406:24
423:17,18
425:1

**lose**
236:4
310:19
317:1

**losing**
116:5,7,8
381:16
439:3

**lost**
313:21
357:22
386:12,14
472:11

**lot**
31:24
41:5,8
55:21

57:13,14
74:6
79:2,12,
20 81:21,
25 83:6
84:16
87:5
97:23
111:20,22
112:10
113:16
114:2,9
115:21
116:4
126:2
127:12,23
128:17
129:5,8
131:11,12
132:22
177:6
186:20
189:11
194:4,14
203:17
205:20
207:16
217:16,
20,23
231:17
238:17
247:19,
22,23
252:5
266:8
287:7
294:6
296:25
309:17
311:7,8
313:20
321:23
322:11,17
323:23
324:14,20
325:8,11
326:4,24

333:2
346:8
347:24
353:10
354:4
358:5
362:9
370:8
374:12
378:1
388:4
394:16
395:4,6
397:7,9,
13 417:3
430:12
431:15
449:21
455:19

**lots**
97:13
188:1
191:9
320:6
326:3

**loud**
237:6
332:1

**lounge**
353:19

**love**
60:21
125:23
184:5
270:4

**loved**
330:14,19
397:8
434:5,6
435:2,3
436:1

**lovely**
467:6

**lovey-dovey**
262:25

**loving**
111:9,12
112:11
126:8
132:15

**low**
138:16

**lower**
209:6
217:4

**lowering**
209:18

**loyalty**
125:23

**lunch**
129:23
134:5,17,
25

**lunchtime**
96:24

**lying**
91:22
126:15
248:7,14
412:11
437:3,4,
15,17

————————

**M**

————————

**machine**
131:23

**Madame**
420:25

**made**
14:3
33:5,16
35:15
46:16



48:13,15
52:9
108:8
110:14
121:14
125:7
126:21,23
130:18
150:3
174:8
184:2
209:9
266:2
273:23
290:7
293:11
321:16,
17,21
324:10
353:21
355:25
356:2
357:19
365:6
377:14
378:5
388:18
390:3,5
402:2
404:22
405:5,14,
15,20,24
438:16,19
443:7

**Madison**
28:3
76:22,23
99:20,24
153:14

**Madison's**
26:22

**Mady**
100:12,13
101:20
200:5,9

215:16
299:1

**magic**
425:16
464:11

**main**
30:1
207:11

**maintain**
112:5
311:3
468:12

**Maitland**
395:23

**major**
117:25
131:17

**majority**
449:17

**majors**
109:15,
18,19

**make**
10:18
12:16,23
20:24
21:10,12,
18,22
22:19,21
23:5 27:2
34:8
36:18
38:9
39:25
40:19,22,
23 45:10,
14 46:23
47:18
55:7,9,12
73:23
83:14
87:21
94:5

115:8
116:11
118:25
120:13,24
122:9
138:5
142:2,5,
17,25
156:4
160:24
162:5,11
168:3
171:24
182:2
185:24
201:24
217:8
224:6
229:19
240:19
275:22
294:17
295:7
307:3
318:17
322:3
327:3
331:5
358:14
359:11
368:5
390:8
397:6
431:16
436:21
461:14
462:4
463:3
464:21
465:19
466:12

**makes**
47:10
361:16

**making**
36:20

38:16,17
114:6
118:22
223:9
251:25
304:17
314:2
322:2,8
358:13
365:17
369:2
403:22
404:3
424:11,13
434:16,17
443:9,16
459:17
465:20
469:8

**male**
310:25

**males**
337:5

**Mall**
397:14

**man**
91:16,19,
20 93:9,
23 111:3,
5,7,17,
18,19
112:7,22,
23 130:11
145:21
146:7,11,
14
147:17,
19,20,25
148:2
190:1
244:3
259:20
278:24
281:21
436:25

438:25
465:2

**managed**
205:19

**marathon**
23:21

**March**
82:17
101:13,22
272:1

**Marie**
340:17

**marijuana**
130:15,
16,20,23
131:4,8,
19,21,22
195:1,5
197:13

**marital**
114:22
115:24
118:16,
17,21
121:3,15,
19 122:14
123:5,7
124:2
125:10
133:19
137:5
144:23
145:10
176:9
245:2
248:23
249:3,21,
22 251:10
254:5,21
257:1,2,
3,4
286:13
288:25
293:3,20



294:21
295:10
296:24
318:5
319:1,23
320:7
371:10
412:21,
22,25
417:23
438:12
452:3,8,
12,13,14

mark
13:5,7
156:12
160:7,10
166:15
324:9
420:21,24
421:6
424:4

marked
10:19
11:8,18,
22 15:12
19:13
149:8,11
150:16
156:9,23
208:22
209:4,20,
25 210:1
252:19
266:16
271:24
273:17,
19,20
274:2
289:3,7
292:3
389:15,20
421:9
422:18
424:20
442:10

449:7

marking
266:12
272:14

marriage
77:24
91:13,14
92:22
93:16
94:10,19,
21 113:6
114:9,14,
20 115:2,
11,13
116:3,6,
7,16,19
117:3,5,
14,24,25
118:4,6,9
119:2,12,
15 120:2,
11 123:1,
11,19
125:4,16
126:2,12
132:4,8,
12,19,25
133:6
134:1
181:21
185:25
190:18
324:22
341:9
342:1
412:24
413:7,10
434:23
446:3,12,
14

marriages
94:15
189:11
191:9

married
33:24
52:5,23
70:25
94:14
104:8
105:3
110:5,11
111:3,4,
6,17,19
112:7,23
113:7
115:3
148:9
186:1
190:16
264:10
313:2,3
335:4,5,
8,15
336:2

Marriott
304:22
308:23
318:22
322:25
323:2
342:17
345:10,11
346:22
347:20
348:4
349:23,24
351:14
356:8,16,
20 358:15
359:19
364:4
366:5
368:2,11
369:4
370:24
373:1,8,
22 374:21
376:4,9

Mary
334:15,25
335:3

Massie
379:7

master
199:12
211:2
331:4
339:9
343:16
344:14

Master's
100:3,20,
24

material
14:10
17:6,14

materials
14:1,24
15:1

math
105:4

Matt
191:17
193:3
240:13,
17,19,21,
22 247:11
262:6
268:14
284:19,23
285:7,13
349:12
350:11
352:25
354:14
360:13
361:11
370:7,8,
12,16
371:24
378:7,12,
18,21,24

379:7
387:22
388:18,
20,21
390:1,2,
3,4,5,18
409:20
412:4
443:22
444:6

Matt's
353:23
388:18,
22,23
411:25
444:6

matter
71:23
99:4
316:8
317:13
467:24

Matthew
340:25

matzo
425:24
426:8,15
439:14

Mauser-
claassen
7:6
300:4,7,
20,25
301:6,7,
21
302:10,
16,24
303:6,8
304:7,15,
25
307:10,22
308:18
309:9
310:1,5



311:17
312:10
315:10,19
317:7
431:22
432:1
455:9,10,
14,23
456:1,4,
14,19,23
457:7,11,
18 458:3,
4,9,16,23
459:8,14
461:3,7,
13,25
462:5,16
467:24

**MBA**
109:20
110:1,3

**Mcdonalds**
138:11,17

**meal**
229:3

**meals**
77:6
79:18,21

**meaning**
109:8
381:14

**means**
26:8
82:24
92:25
127:7
165:7
200:1
217:21
290:3
368:1,3
380:25
419:22

**meant**
23:21
48:11
120:24
206:15
355:5
417:4
430:22

**measured**
433:17

**media**
43:12
88:5
162:22
192:12
271:13
294:11
363:21
372:12,13
390:16
394:20
439:24

**medical**
130:15,
16,20,23
131:4,7,
22 280:1,
9

**meet**
8:22
160:10
187:12,22

**meeting**
28:2
58:3,17
59:4,5,7,
24,25
60:5,6
61:16
63:10
104:4
165:4
187:12
204:21

223:18
290:6
326:5
348:23,24
350:19
416:21
467:17

**Megan**
283:14,17
284:18
285:3,6
288:1
377:17,
20,24
378:6,7
379:19,22
387:4,7,
18 467:20

**Mehta**
75:1,13

**member**
76:19
80:7,8
82:23
84:4,12
87:10
205:12
317:23
376:23
402:18

**members**
69:5
89:11
119:15
120:10
121:1
317:19
377:7
390:14
402:13

**meme**
320:10

**memories**
28:19

**memory**
27:9
28:21
101:2,3
198:25
201:14,22
223:19
235:18,20
265:17
298:14
299:10
331:12
394:23

**men**
182:2
188:12
189:2,6
323:20
411:24
415:5

**mention**
8:21

**mentioned**
95:9
121:4
175:15
188:2
199:11
238:16
248:22
268:4
281:16,18
285:11
300:8
317:16
319:3,17
324:3
329:7
331:18
337:12
354:11,
12,17
355:24
377:21
413:14

416:23

**mentor**
77:22

**message**
151:23
152:18
159:9
165:9,22
167:2
170:22
181:6
268:17
269:4
278:1,2
281:19
342:13
391:17
427:24
449:20
453:23
462:3

**messages**
9:18
63:23
97:3
119:3
149:17
150:10
158:19,20
159:4
160:3
163:3,4
175:2
179:22
187:2
268:5,12,
21,24
279:4
281:17
282:18
320:8,13,
21,23
322:19,
21,23
327:12



360:23
361:3
373:14,
18,19,20,
21 375:20
377:16,18
383:20
389:14
394:4
405:11
419:21,25
426:24
428:5,8
429:19
439:13
441:7
450:21
451:12

**messaging**
155:22

**messed**
431:20

**met**
8:16
26:16,17,
19 28:2,
6,12
109:24
113:16
178:15,16
347:21
378:7,19,
23 456:8
461:19
467:18,19

**metadata**
245:19

**mic**
78:17
399:15

**Micah**
311:1

**Michael**
182:25

183:7
210:23
242:14
251:3
365:12
367:7
393:14,25
419:13
429:21

**microphone**
332:6
361:1

**midafternoo
n**
420:15

**middle**
12:23
38:15
56:4
131:17
157:14,20
158:1
220:9
419:3

**midnight**
9:15,18
63:24
96:9

**midriffs**
158:15

**mighty**
328:6

**Mike**
7:10,16
15:18
17:25
32:24
38:12
54:21
56:3
70:10
108:9
150:6
156:6,20

242:17
248:24
265:22
266:5
267:10
270:12
271:14
272:7
277:5
295:23
300:20
301:20
310:1
332:13
343:9
363:23
386:16,21
399:8
418:9
419:16,21
420:3
424:11
429:6
431:23
442:4
446:24
447:3,6
448:12
450:22
452:19
453:8
454:23
455:10
456:3
457:23
458:17,23
459:8,12
460:5,18
461:25
462:19
463:5,13,
16 464:16
465:12,16
466:6
467:24
469:5,14
471:11

472:6

**Mike@
beltranliti
gation**
211:21

**Mike@
beltranliti
gation.com.**
392:20
447:9

**Miller**
343:10

**mind**
22:20
66:12
107:13
160:3
191:10
222:4,5
277:2
300:21
305:5
329:10

**mine**
190:18,19
229:3
343:10,12
465:12

**minimal**
120:6

**minimum**
117:21

**minor**
91:15
93:6
126:16,17
259:18
355:6,10
406:22
411:4,9,
15

**minute**
18:2

139:14
159:24
161:10,
17,22
162:3,15,
21 166:10
167:2,10,
18 181:6
184:15
206:18
210:20
241:25
439:18
465:5

**minutes**
9:15,17
16:2
19:14
20:3
58:18
63:7
64:22
152:17
160:20
161:14
166:14
171:9
272:11
315:21,22
316:11,15
332:7,14,
18 363:24
364:12
366:2,5,
13 367:16
415:25
442:25
453:4
454:24
458:25
466:16
472:12,13

**Miranda**
330:24







179:16
239:12
273:5
352:16
377:21
409:7,19
411:12
433:3
438:19
466:24

**music**
185:10
237:6
244:4

**mute**
384:18,19
393:13
454:17

**muted**
393:12

**mutual**
73:15

**myriad**
119:23

———————

**N**

———————

**naked**
257:7,18,
21 258:1,
16,22
259:6,17

**name's**
278:4

**named**
60:6
136:16
168:8,11,
16,17,20
319:5
343:2
413:20

**names**
27:21
59:23
116:13
123:17
124:21,
22,24
248:20
392:1

**naming**
213:4

**narrow**
225:20
328:21

**narrowed**
177:10

**narrowing**
206:17

**nation**
203:1

**nature**
92:2
93:19
117:21
123:12
350:16
378:9

**NC**
163:24
178:5

**necessarily**
81:22
117:24

**needed**
61:17
66:8 84:7
160:22
273:6
319:25
353:24
468:24

**negative**

132:19

**negotiate**
366:18

**negotiating**
366:20

**neighborhood**
186:21,22
212:25
331:4
347:6
357:1
395:24
410:4

**neighbors**
410:11

**nervous**
351:25

**news**
103:1
189:12
294:6
313:17,25
315:5,9
324:2
344:4
372:12,13
436:10

**newspaper**
10:8
137:1,2
195:21
304:1,4
444:17,20
458:12

**nice**
8:22
89:21

**nickname**
433:20

**night**
9:15,17

11:7
57:25
58:1,6,
10,14
59:8
61:1,5,20
62:8,13,
23 64:10,
19 65:1,
14,20
66:2,12,
17 96:6,
10 243:16
244:10,
16,20
246:7
285:22
286:10
287:2
291:3
319:4
322:22
328:1
330:20
340:11
347:16
417:18
419:18
429:4
448:4
459:10
471:19

**NITA**
295:24

**nods**
88:25
254:25

**noise**
29:7

**non-profits**
79:6

**nondisclosed**
419:2

**nondisclosure**
73:14
75:20

**nonissue**
234:6
236:4

**nonstop**
394:2
454:23

**normal**
21:7
130:10
244:22

**North**
163:24
164:7,10,
13,16,24
165:4,8,
25 178:9,
11
186:17,19
199:2,17
200:10,
19,24
201:15
202:1,23
203:6,7
204:2
205:22,25
207:12
227:9
297:5,9,
14 298:15
342:20
343:1

**nose**
177:15

**notably**
348:6

**note**
16:11
203:4
213:19



465:22,25
468:14,17
469:1

**noted**
213:21
423:20

**notes**
14:9

**notice**
186:10
316:8
346:25
360:23
361:3

**notificatio n**
174:19,23
343:20
344:11

**notificatio ns**
174:3,10,
14,25
175:4,5
177:1
343:15
344:9,10,
14,24
345:2
395:18

**November**
104:9
110:8
335:15
380:3

**NPA**
381:7

**number**
11:20
29:5 49:2
78:7,25
79:1,7
127:8

129:3
130:1,7
133:14
140:22
144:10
152:6
155:18
159:6
182:11
191:12
209:13
210:11
211:11
213:15
214:21
229:6
231:19,21
232:21
234:23
235:3
236:1
275:5
277:8,9
278:20,21
279:21
283:5
303:22
305:16,17
311:6
318:20
323:19
329:7,12
348:5
354:9
374:16
375:12
379:4
387:2
389:9
391:16
401:23
415:17
440:5
462:11

**number's**
281:12

**numbers**
67:1
214:17,24
440:10

—————————

—————————
**O**

**O-R-W-O-R-T-H**
8:15

**oath**
21:1,2

**object**
9:22
12:16
22:14
23:2
24:10,17
28:17
32:8,20
33:11
34:23
36:3
37:12,16
40:5
41:18
42:10,11
48:2 50:5
51:12
52:1
54:11
55:2,11
60:18
74:4
107:14
112:16
115:17
121:25
122:11
123:7,20
124:3
125:4
127:18
128:15
129:17,21

131:13
132:5
137:11,
16,24
138:22
139:10,
17,23
140:6,13
141:4
143:3,22
144:5,15
146:3,9,
21 147:5
152:2,15
154:6
157:5
158:4,9
163:12
164:2,12,
19,25
166:8
169:3
172:15,20
175:13
176:1,14
179:19,24
190:5,13
193:19
195:8,19
196:6
197:21
201:16
213:25
219:15
220:25
222:10,18
230:12
232:4,10
233:14
234:12
238:10
247:4,14,
17 248:4
256:12
257:8,13
258:13,24
259:4,8,

24 260:10
261:12,23
262:5
263:25
264:5
269:7
270:3,14
271:6
274:22
275:12,24
276:3,11,
16,25
277:6
278:8,14
279:2,13
280:17
281:10
282:6,14,
16 283:19
284:7
286:19
287:21
288:4,11
290:13
291:11,23
293:2,19
294:19
302:8,13,
19 303:4,
13
304:12,20
307:1,17
308:15
309:4,22
311:14
312:4
320:18
337:17
359:2
388:11
394:15
400:6
401:12
402:9,25
403:9
404:5
406:4,7



407:11,19
408:24
409:12
410:13
411:1,19
412:15
413:17
415:1,8
416:10,20
417:6
419:1
420:16
423:1,6
426:9,16,
22 427:5,
19
428:11,20
429:5,12,
17 430:9,
15 431:4,
17 432:9,
15,21
433:2
434:4
435:9,17
436:18
441:10,20
442:20
443:12
450:24
453:10
458:6
469:3

objected
24:20

objecting
24:13
68:10
196:16
230:9
291:13
468:10

objection
10:4
12:16

35:15
36:21
38:9,17
41:22
50:13,24
65:22
66:13
70:7 88:2
122:17
125:7
142:2,5
143:8,14
145:24
147:11
154:17,
18,19,21,
25 155:4
175:6
185:7
196:9,14,
17,23
197:14
220:17
250:13,14
296:13
419:10
420:2,7
431:13,16

objectionab
le
147:7

objections
36:19
38:13
41:10
43:22
46:3
142:6,17
192:9
197:1
271:9
299:15
363:18
399:1
439:21

obligate
15:1

obligation
13:1,18
16:14
96:25

observation
306:6

observe
144:25
387:7,25

observed
187:21
259:17,20
387:9

obvious
327:2

occasion
129:15

occasions
142:12
273:5

occur
129:7
263:5

occurred
176:9
193:17
200:1
202:7,8
206:17
228:1
231:12,18
232:8
233:13,24
234:10
242:1
282:23
286:15,
18,22
292:22
322:5
323:11

326:23
346:2
347:11
369:21

occurring
95:1
195:21
257:15
283:13
291:17
394:18

October
73:4,11
74:15
76:3
267:19
279:20
380:2

odd
181:23
186:15
283:13
376:16

off-the-
record
363:20

offensive
439:10

offer
266:2
270:11
346:9
387:4

offered
23:16
146:6,10,
11,13
280:24
332:15
346:3,12
380:6,13
387:5
393:11

offering
147:16,24
148:16
269:5
277:4

offers
145:21

offhand
351:5

office
81:16
194:3
350:13,22
351:1
352:22
357:12
410:5

officer
106:13

officials
71:17

oftentimes
361:12

older
104:24
133:16

olds
141:7

omitted
183:10

one's
183:25

one-
204:22

online
10:12
213:13
229:2

onus
260:4



open
  68:25
  125:19,20
  126:4,6,7
  186:24
  194:18,21
  262:22
  272:21
  273:11
  319:17,22
  320:7
  321:8
  324:21
  362:5
  400:8,10
  403:4
  452:2,17
  455:4,6,
  15 456:5
  461:5

opened
  461:3

openly
  197:19

operate
  320:2

operating
  106:12

operator
  106:13

opine
  189:5

opinion
  139:5
  196:3,20
  277:3

opportuniti
es
  78:7

opportunity
  12:1,6
  46:12
  74:4 80:5

122:10
134:24
449:1

oppose
  468:7,8

opposed
  21:7,15
  53:5
  55:16
  233:9

optimistic
  111:11
  112:11

option
  471:21

oral
  90:20
  435:7,10

Orange
  78:11

order
  11:11
  17:14
  135:17
  138:20
  163:3
  213:6,8
  239:18
  243:9
  314:2
  316:19
  342:16
  409:5
  472:16,
  21,24

organizatio
n
  25:23
  86:3
  138:19
  144:8
  352:24

organizatio
ns
  78:24
  79:8,23,
  25 80:4,
  5,14 81:5
  83:4,5
  84:17
  87:17,18,
  19 144:10

original
  42:17,23,
  24 43:25
  44:20
  45:8
  46:21,23
  47:11,25
  48:13
  306:18,24

originally
  273:1

Orlando
  25:5
  59:22
  76:15,17
  77:2,17
  81:17
  162:23
  205:20,22
  227:11
  228:22

other's
  319:24

OTW
  160:10
  170:1

outlets
  394:6

outline
  365:12

overhearing
  351:11

overlooked
  398:16

overlooks
  398:11

owe
  453:24

owned
  215:3

owner
  401:1
  402:2,21,
  22 403:21

owners
  402:14
  405:8

ownership
  318:1,2
  402:21,22
  403:3,16
  405:9

─────────

P

─────────

p.m.
  134:19,22
  151:24
  159:10
  163:14,
  15,21
  165:14
  167:15
  170:12
  172:24
  173:3,17
  178:21
  180:11
  181:1
  192:10,13
  217:3
  229:14,17
  271:10,13
  299:16,19
  332:9,12

340:12
363:19,22
399:2,5
418:8
419:12,15
422:19
426:13
439:22,25
441:13
447:5
448:22
449:24
450:5
454:22
464:4
472:15

Pace
  81:6,11,
  15,16,21
  82:11,21
  83:25
  86:2,14
  138:20
  144:7,11

Pace's
  82:8

packed
  347:3

packet
  182:18
  183:16,21
  428:1,2,4
  440:25
  441:24

pages
  96:6
  150:15
  157:25
  217:6
  271:21
  292:2
  440:14
  441:14
  446:23



451:15

paid
52:10,12
109:3
148:8
189:8
252:9
280:20,22
281:1
310:13
312:19
315:12
318:23
403:16
406:2
432:3,7
443:18

Pain
263:23
264:11

painful
467:21

palsy
266:6
269:18
270:24

panicked
370:10

pantry
81:24
84:7

paper
91:23
97:13
257:19,22
381:13
430:13

papers
10:25
135:9
148:5
247:18

paperwork
106:14
381:5

paragraph
13:25
279:24
280:3
305:11,17
306:22,23
307:12,14
401:25

paranoid
378:15

pardon
310:16
352:18,24
353:6,25
354:15,18
371:20
390:6

pardoned
355:22

pardons
352:20

parenting
77:24

parents
77:20
318:24
354:20
357:6,11
374:1
376:13

Paris
381:18,24
382:2,4,7

park
29:5 30:2
356:24
357:1

Parsons
117:12

124:25

part
32:12,15,
16 33:19
77:11,14,
15,16
87:8,13
96:1
106:6
116:18
133:3
136:16
153:1
158:1
183:15
250:13
254:9
256:9,11
309:14
315:23
321:7
339:7
341:11
345:6
352:21
385:3
388:15
390:13,25
391:3
400:2,4,
17 410:25
416:9,11
440:8
446:12

participants
286:6

participate
76:12
78:25
79:3,4,23
83:3

participating
6:25

77:17
311:9
404:19

participation
359:13

partie
361:4

parties
26:23
29:8
128:4
193:17,24
236:9
258:6
328:3,12,
24 330:15
360:16
361:8,18
362:8,15,
25 388:6,
7 390:19
395:4
411:12
415:19
417:9
452:11

partner's
133:12

Partners
352:20
390:11

parts
69:14
349:18

party
14:9 15:2
26:19
28:3
148:3
193:25
236:5,6,
7,8
255:24

283:3
285:23
286:6
287:18
308:16
333:12,
20,25
343:16
361:15
378:13
379:1,3
380:6
386:21
387:1
388:21,22
395:8
396:9
403:21
406:14,22
407:1,6,
7,10,15,
18 408:3,
6,11,12,
19
410:12,19
411:18
414:13
415:3,12
416:17
466:23

pass
375:21

passed
19:12
286:12
287:9
328:12
362:25
364:22

passenger
213:22
214:5
217:17,18

passes
324:21



passing
  328:3,25
  364:17

passwords
  226:24
  320:4

past
  73:11
  78:4,9
  83:12
  85:21
  103:15
  189:5
  303:25
  437:12,13
  456:21

pastor
  117:10
  118:5,17
  121:21,23
  123:16
  412:24

Patel
  74:11

path
  374:10

pathologica
l
  403:8

patience
  416:3
  437:23

patient
  399:13,
  16,18

patients
  399:22

patio
  194:6
  285:24

patrol
  410:4

pause
  137:1
  148:19,
  20,21

pay
  128:4
  145:21
  146:6,11,
  13
  147:16,24
  266:4
  269:5,14,
  23 270:8,
  11,25
  271:3
  277:4
  278:23
  280:24
  281:21
  307:24
  308:8
  309:11
  310:10
  311:23
  314:14
  357:13

paying
  32:4
  51:24
  52:21,24,
  25 138:16
  265:22
  266:10
  298:17
  308:9
  312:2
  315:1,2,8
  318:25
  345:18
  405:3

payment
  251:21
  318:15
  324:1
  372:19

403:25

payments
  33:7
  108:8,9
  121:13
  148:11
  318:9,13,
  15,20
  323:18,25
  324:20
  326:3
  350:15
  352:9
  353:6,8,
  20,22,23
  354:2
  358:20,21
  370:1,17
  371:19,24
  372:5
  403:1,2
  404:22,24
  405:5,23
  428:13
  443:8,9,
  16

payout
  401:5

payouts
  318:6,9

Peaks
  152:11,
  21,22
  153:2
  154:3
  155:1,7,
  11,12,15
  156:25
  157:2,3
  158:8
  423:25

pending
  18:20
  19:2

23:23
25:5
272:5
468:3

penis
  384:23
  385:14
  386:4
  433:9,13,
  15,16
  461:8,20
  462:2

people
  12:25
  59:19
  68:24
  69:7,8
  71:7,14
  81:24
  97:13,21
  98:1
  113:7
  114:5,8
  118:15
  119:18
  125:25
  126:15,21
  128:2,3
  140:22
  148:14
  173:10
  174:5,6
  179:11
  186:21,22
  187:21
  188:4
  189:12
  190:14,
  15,17,22,
  24 191:1,
  4,6,12
  192:22
  193:8,13,
  20 194:6,
  10,16,23
  195:2,4,

17 196:4
197:18,24
198:2,6,
13 213:4
231:22
232:12,
16,21
234:21
235:3,4
236:1,13,
14
238:21,
22,24
244:23
247:23
283:5
284:9,10,
14 285:1,
4,9,11
286:21
287:18
293:22
303:24
322:17
324:20
325:12
326:4
328:2,4
351:13,15
352:11,
12,13
354:11,12
359:17,20
360:9
362:3,4,
5,12
368:18,19
371:25
375:8,9
377:9
390:7
391:6
392:1
394:17
397:10
402:13
405:8



407:2,3
408:10
409:5,17,
18 410:6,
18,21,24
411:17
417:8
434:22
437:13
447:17
448:4,5
454:9
464:8,13

pepper
22:22

peppering
22:16

perceive
279:1

percent
27:14
51:6
268:9
270:1
275:16
280:12
334:12
341:13
381:17

percentage
318:2
337:5,6

perception
30:18

Perfect
150:7
151:2
424:19

perfectly
52:10
70:8
381:6

perform
77:7

performance
417:14,16

performed
412:11

period
90:14
92:18
107:6
121:17
137:15
138:15
140:10
176:20
204:10,12
205:23
206:19
218:25
221:2
237:21
240:11,16
241:23
243:17
285:16
294:12
355:7
434:12

periods
109:23
177:8
207:22

Perkins
7:3 11:21
19:19,23
134:5
252:23
316:5
317:7,10,
12 320:20
325:3
333:9
336:14,
18,21

337:21
339:12,14
343:7,13
359:4
360:25
361:2,22
363:12,
14,17
364:3,6
365:12,22
366:3,4,
10,14
367:3
368:7,9
371:12
376:7
384:16,24
385:7
389:3,14,
22
391:12,15
392:17,
21,23
393:4,14,
18,24
394:5,19
396:18
397:25
398:8,24
466:14
472:11,20

permission
407:5,9,
14,17
408:2,6,
11

permit
364:4

Permitted
13:25

person
25:16
61:24
92:4
111:11

112:25
113:9
117:18
119:9,12,
16 121:20
126:5,8,
17 130:11
140:16
144:7
145:22
169:7
188:2
194:18
207:3
260:3,4
290:18
319:5
333:21
347:18
352:1
360:12,13
363:7
378:3,16
413:2
414:21,25
431:10
460:9,12
464:17
465:16
466:6

person's
345:4

personal
36:7,9
38:3
39:5,9
40:4
41:16
48:20,24
49:9,11
52:22
75:15
108:2
109:11
224:18
286:25

287:1
302:4,6,
11,14
303:1,9
304:9,19,
21 307:23
308:2,4,
21 309:1,
7,13
310:9
311:7,8,
11,24
312:1,6,
12
313:10,11
320:6
430:7
431:1,11
445:10,
13,22
448:20
450:6

personaliti
es
116:19

personality
113:9
132:16
133:22,23
446:18

personally
23:4
53:20
148:13
359:8
377:13
407:5
452:23

personnel
213:14

persons
14:10,11
143:19
284:23



perspective
291:20

Peters
7:14

PF
329:14

PF29
215:11

PF325H
329:8

PF3298
422:22

PF329H
215:12
216:5

Pham
322:10,
15,16,18,
20,25
323:3
328:10
348:24
349:3
360:24
361:4
368:15
383:10

Phillips
169:11

phone
16:17,22
62:6,12
71:14
114:5
125:20
126:5
264:21,24
265:13
278:20,21
283:11
319:17,22
320:3
321:6,7,

8,9,14
334:4,10
345:4,7,8
395:21
396:2
403:24

phones
319:24
320:4
321:2

photo
158:5
243:10
274:10
321:12
379:22

photograph
238:16
245:19

photographs
223:25
227:17

photos
157:7
228:2
338:22
379:16,
17,18,19

phrase
92:25

physical
81:20
338:8
351:24

physically
263:1
351:17

pick
185:16
206:25
238:24
239:9
252:15

283:21
321:7,9
395:21

picked
71:14
205:12
253:3
321:14
341:5,9,
11 419:23

picking
420:5

picks
126:5
194:15
321:6

picture
223:13
227:18,25
237:19
238:11
241:21
253:2

pictures
80:18
157:2
223:17
227:21
239:22
260:22

pillars
83:8
84:25
85:2

pills
400:11

ping
210:20

pinging
446:25
447:11

Pirozzolo

354:14
360:8,11,
14 361:5
364:20

Pirozzolo's
362:25

place
37:21
155:5
185:4,9
186:21,24
194:3,8
197:6
203:23
223:10
245:22
369:8
381:4
414:25
462:21
465:11

places
154:22
179:16
225:12

plaintiff
7:17
19:22
313:2,3
314:12
405:17
433:5
455:18

plaintiff's
421:8
424:20

plan
328:3,12,
25 362:25
429:3

planned
375:3

planning

401:5

plans
76:8
397:14

plate
210:8
211:11
214:17
216:5
422:1,22

plates
214:24

play
244:4
336:9
384:16
398:9

played
252:22
336:13
384:21
397:22
412:9

players
313:20

playing
237:6
347:22
348:2,14
398:5

plaza
334:17

pleadings
10:24
43:12
46:22
110:18

plenty
23:8
273:7,13
450:8



plugged
    338:4

point
    13:6 38:6
    45:23
    50:11
    61:18,19
    70:22
    80:10,11,
    17
    105:22,23
    130:8
    131:1
    168:6
    172:7
    174:3,5,
    19,22
    175:1
    176:16,22
    181:21
    186:13
    194:14
    203:24
    207:5
    213:9,10
    221:16
    239:13,24
    242:25
    243:9
    245:12
    246:25
    249:18
    250:22
    272:23
    285:19
    309:17
    310:24
    319:25
    320:16
    324:2
    330:7
    337:20
    338:6
    344:12
    345:1
    346:17

    349:8,16
    350:23
    352:6
    353:2,19,
    21 358:17
    360:2
    361:25
    363:25
    369:4
    373:9,11
    376:18
    379:10
    395:12
    396:19
    417:2
    461:13,19
    468:22

points
    61:13
    182:15
    231:20
    233:23

police
    461:24

policies
    214:14

policy
    125:21
    177:25
    319:18,22
    320:7
    321:8

political
    109:15
    360:12,
    13,19,22
    379:20
    380:22,25
    382:25
    383:4,6,9
    387:19

politically
    350:25
    351:1

politics
    390:25

Polly
    88:14
    89:16
    120:8
    214:10

pool
    231:23
    258:16,
    19,23
    261:2
    285:23
    286:6
    287:18
    323:9
    348:2,3,
    15 349:1,
    7,21
    351:18,20
    374:15
    398:12,
    16,17

popped
    63:8

Porkies
    461:23

Porsche
    329:17,
    19,20,22

portable
    331:8,11

portion
    26:13
    32:10
    137:21
    282:5
    300:15
    350:2

position
    75:1,3,4,
    5,6,7,11,
    13 106:6

positive
    37:4
    158:12
    410:16
    414:15

positively
    153:19

possession
    265:13

possibly
    94:25
    197:12

post
    140:22
    176:10
    346:5
    351:1

postdate
    373:22

potential
    86:24
    107:22

Power
    106:21

practice
    29:7
    75:19
    174:9
    244:7
    352:21

Prasad
    69:3

Prashant
    75:1,13

Prayed
    55:21

prayer
    55:22
    56:23
    89:20
    92:7

precious
    91:13

precise
    234:7

preclude
    367:9

precludes
    272:16,18

prefer
    26:6
    198:10

pregnancy
    229:3
    435:20,
    22,25
    436:2
    470:13

pregnant
    72:25
    200:7,8
    201:11,19
    203:17
    392:4
    434:7,8,
    11,25
    435:1
    452:25
    466:4
    468:25
    470:16,18

premises
    323:10

prenuptial
    404:13

prep
    61:2,18
    124:10
    416:6,12

preparation
    57:3,10,
    11 61:22



**prepare**
14:5
55:19
57:7,18,
21 60:11
62:13
63:14
64:5,8

**prepared**
56:22,24,
25 62:8
441:1

**preparing**
58:10
469:18

**prepped**
56:13,16
61:19

**prepping**
56:18

**present**
6:24 32:1
127:25
154:22
177:13
221:4
258:4
346:11
347:1
351:10

**presented**
212:3
260:7,15
437:5

**president**
28:1
74:14,18,
20,21,23
75:7,9,
11,18
105:25
353:2
446:17

**Presnell**
26:4

**Presnell's**
145:20

**press**
94:24
137:9
294:7
376:20,
22,23,25
377:1,5,
6,7,14,22
379:12
380:17,21
383:15,
16,19,24
388:3,6,9
389:8
394:6,20
445:11,21

**presume**
82:23
192:24
229:8
255:6

**pretty**
43:20
64:20
92:5
94:15
103:22
112:3
113:9
116:9
119:9
126:6,7
136:20
185:20
202:17
214:23
219:17
221:15
268:13
318:24
320:15

328:9
358:9
361:15
369:15
386:15
392:9
400:8,10
403:4
470:20

**previous**
120:22
126:2
133:8
155:3
181:6
189:15
218:9
222:7,9
243:2
254:12
279:11
282:15
307:15
391:4

**previously**
74:20
78:14
79:1 81:5
222:23
252:19
270:13
274:2
279:18
344:17
356:4
389:16
391:2
395:19
408:14
409:6
418:15
419:2,4,
20 448:6

**priest**
123:14,15

124:1
125:12

**priest/
parishioner**
122:8
125:13

**priests**
123:18
124:10,21

**print**
177:20
292:13

**prior**
14:9 38:7
39:6
40:11
41:15
48:22
50:4
51:19,20
74:17,20
104:3
148:12
199:24
200:2,12
203:19
249:8
256:22
293:11,18
298:8
323:17
335:4
341:9,25
345:14
350:10,21
356:15,
19,20

**prison**
94:2
126:15
375:11

**private**
69:21
117:18

119:9,12,
16 326:20
360:11
391:7

**privilege**
35:12
36:1,22
38:16,17,
19,23
74:6
122:5,8,9
123:8
124:11
125:10,
12,13
144:23
145:10
245:3
248:23
249:4,21,
22 251:10
254:5,21
257:1,2,
3,4
296:16,
18,25
309:25
371:10
417:23
452:4,9,
12,13,14
468:4

**privileged**
33:20,21,
23 35:5,
9,20,22
36:2,24
37:20
38:5
42:20
43:10,14
53:12
57:14
61:11
103:6,7
118:10



122:4
124:19,22
248:21
295:22
296:12
363:11

**privileges**
124:18

**proactive**
121:1

**proactively**
371:8

**probative**
461:18

**problem**
13:15
76:17,24
117:25
132:8,10
133:19
249:5
316:16
357:24
376:23
417:19
462:13
469:5

**problems**
113:5
114:13
115:1,7,
10,12,24
116:3,16,
24 117:4,
23 118:4,
9,16,21
119:8,11,
15,19,20
120:1,11
358:5
369:3
390:8,9
428:22
446:14

**procedure**
296:19

**proceed**
11:19
26:11
46:15,17
55:4
88:10,11
135:3,4
192:17
299:23,24
364:15

**proceeded**
354:8

**process**
107:16
212:19
213:6,20
404:19
405:16

**produce**
9:12,13
20:6
95:24
99:9
110:17
208:18
227:20,22
272:3
278:21

**produced**
9:14,16,
17 14:2
63:23
96:3,5,
21,24
99:1,3,16
121:12,13
122:4
150:11
175:20
176:16
208:25
212:10

222:22
226:25
227:3,5
230:5,15,
20 236:25
248:19
252:18
271:17,18
272:1,2
273:21,22
274:3
275:2
322:21,23
327:13
373:20
392:23
418:9,16
440:5,9,
14 444:19

**production**
393:2

**professiona
l**
24:17

**professiona
ls**
468:18

**proffer**
314:7

**proffers**
313:8
314:21,23

**profile**
91:23
260:2

**program**
77:21
78:20
79:12
100:20
110:1

**programs**
77:22

**project**
107:8

**projects**
383:3

**promotes**
82:22

**promotional**
157:7

**pronounced**
73:9

**proper**
295:25
296:4,19

**properly**
71:3
384:19

**proposition**
459:3

**prostitute**
26:5
145:17

**prostitutio
n**
86:22

**protection**
463:5

**protective**
320:3,5

**protestant**
337:4

**protocols**
214:15

**protracted**
103:22

**proud**
79:11
85:13
257:24

**provide**
12:22

81:21,23
213:2,3
223:5
225:16
269:1
311:20
365:9
371:5
404:17
440:18

**provided**
11:2,15
122:6,7
190:11
218:20
243:4
245:7,10,
18,24,25
246:3,11
365:8
405:9
411:12

**providing**
140:15
307:25
309:11
310:11
311:3,12
312:2,12
375:15
405:10

**provision**
13:20
17:8,10

**public**
10:6
43:11
71:3
76:25
77:1 78:8
79:20
81:22
100:6
294:16
326:2



330:16
360:13
380:15

**publicly**
30:16
45:17
382:10
391:18,20
446:10

**pull**
381:7
418:19
440:22

**pulled**
220:20
418:11
419:8

**purchased**
396:19,20

**purports**
306:23

**purpose**
219:20
428:18,19
449:19

**purposes**
49:17
143:1
149:15
192:23
193:23
242:1
319:2
428:21

**pursuant**
14:2
212:11

**pursue**
76:8

**pursuing**
76:10

**pussy**
163:8

**put**
52:3,8
75:17
94:2 96:8
112:20
149:2
163:17
165:10
183:7
213:23
357:8
417:21
422:17
428:6
471:8

**puts**
248:9,10

**putting**
37:21
160:3
226:19
349:9
471:10

——————

**Q**

——————

**qualify**
427:12

**qualifying**
427:11,13

**quality**
132:12

**quantify**
129:1

**quarterly**
33:7
318:9
403:2,17

**question**
12:18

18:8,12,
16,17,20
19:2
21:9,20,
23,25
22:1,3,5,
7,11,21
23:22,23
24:11,16
26:11
30:17,18
33:2,3,4
35:1,8,
11,13,16
36:1
38:4,10,
25 39:15,
18 40:15,
18,21,23
41:1
42:7,22
43:17,21,
24 44:12,
13 45:1,
10 49:4
51:2,11,
17 52:11,
21 54:8,
10,12,17,
21,23,24
55:8,15
56:19
57:16,19,
21 65:4
66:9,10
69:22
70:1
73:22
75:10
79:22
84:18
90:23,25
94:8
97:15
98:4
114:25
117:23

118:23
120:17,
20,22
122:22
123:9,10
124:13
129:13
141:1,2,
5,24,25
142:1,3
143:2
146:15
147:22
155:2,3
160:7,10
165:22,24
166:15
172:5
189:14,
15,17,18,
21,22,25
190:23
200:23
205:3
214:22
218:4,5,
6,8,9,14
219:22,23
221:24
222:6,7,9
225:14,22
226:1
228:6
234:8
240:5
242:8,11,
13,15,21,
23,25
243:1,2
247:24
249:23
250:6,7,
17 251:9,
12 253:22
254:11,12
255:16
257:23

258:21
262:14
276:4,17
278:18
279:7,10,
11 281:5
282:3,13,
15 290:22
295:16
309:6
310:17
317:1
324:25
332:16
333:15
336:11,22
338:13
365:4,25
376:6
398:7
402:16
407:23,25
431:6,9
438:3,8
441:3,4
444:15
450:12
453:17
454:13
456:12
457:18,20
458:2,7,
18 459:12
460:4,7
461:11
462:1

**questioned**
377:4
381:22
418:18
442:18

**questioning**
124:16
267:4,8
298:8
319:16







192:17,18
299:23,24

**real**
111:25
237:7
260:7,15
383:2
397:16
414:16

**realize**
225:20
360:5

**realized**
290:18,25

**reason**
34:22
35:13
84:12
126:3,10
164:9
188:7,8
193:15
194:11
243:20
256:8
283:25
284:2,4
290:25
297:16
306:3
308:23
313:18
321:15
345:6
391:3
395:9
434:20

**reasonable**
251:16

**reasons**
111:16,18
112:7
125:19
186:1,5

194:11
264:7,8,9
312:7

**Rebekah**
8:14
15:21
16:1,17
19:5
36:14
38:8
39:12
55:25
73:16
99:10
133:7
134:8
163:24
165:8,12,
25 215:20
267:2
309:19
369:1
385:4
389:15
396:16
398:3

**rebutting**
433:8

**recall**
28:2 49:5
55:18
57:5
61:13
80:16
108:12
192:2
199:2
203:14
205:25
223:2
239:25
292:17
294:3
317:17
319:19,20

321:19
324:6
327:8
329:9
333:13,
14,17,19
334:1,2
343:14
356:22
357:3,5
376:22
384:3,6
394:6,25
458:25
470:19

**recalling**
51:8
109:2

**receipt**
328:20

**receipts**
201:23

**receive**
376:17
395:18
403:2

**received**
9:5 15:10
67:10
244:14
312:19
377:18
381:17
392:15

**receiving**
14:9
56:17
174:3

**recent**
78:3
83:20
85:12

**recently**

13:24
132:22

**recirculate**
272:4

**recirculate
d**
271:19,20

**recognize**
87:20
157:3
214:23
215:2,12
274:8
329:12
331:13
334:14
340:20,
21,23
418:4
421:11
422:23

**recognized**
213:23

**recollectio
n**
26:18
28:7,14
30:8,24
31:5
47:24
178:8
203:25
205:21
206:8,10
222:24
237:17
244:25
264:20
290:6
292:21
327:21
371:13

**recommendat
ions**

124:2

**recommended**
123:25

**reconvened**
416:15

**record**
7:19,24
8:13,17
11:17
12:5,9,11
13:3,6,11
14:15,18
15:11
16:8,9,12
17:1 18:4
19:4,25
20:13
21:11
46:8,11
83:14,16
88:3,5
95:7,25
96:2,9
112:20
119:25
120:14
122:1,3,
12 125:3
134:16,
18,21
149:15,23
168:22
192:6,9,
12,15
194:25
213:14
228:18
229:13,16
251:12,
13,14,18
271:10,12
299:13,
16,18,21
300:12
316:22



318:7
332:3,8,
11,14,19,
20 333:10
342:10
363:15,
19,21,24
364:22
365:16
367:13,17
368:10
384:11,
12,14
386:5
393:14
399:2,4
415:23
417:20,21
418:13
439:22,24
444:17
449:1,16,
17,22
451:1
453:15
454:15,
16,20
455:1,6
456:21
460:20,25
461:6
462:25
463:2
464:10,23
466:13
470:6,24
471:1,4,
8,11
472:3,14

**recorded**
67:21,22
214:6
358:25
359:5

**records**
205:14

264:21,24
365:18
384:2,9,
10

**REDIRECT**
438:1
455:25

**reduce**
313:12,23
314:2
329:5

**reduced**
315:6

**reedy**
429:25

**reelection**
350:20,
21,22
427:10,11

**refer**
24:6,24
25:24
26:2,4
145:16
156:2,3
235:9

**reference**
33:12
144:20
151:9
194:20
306:20,25
307:4
377:23
395:4
445:17

**referenced**
93:20
165:21
205:7
207:13
209:23
268:22

359:9
390:19,20
409:19
424:1

**references**
197:7
323:18
377:17
449:2

**referencing**
311:19
353:22
356:8
358:15
361:6
448:14,
16,19,22

**referred**
8:18 26:5
346:4

**referring**
10:21
11:8,9
26:3
47:9,10
48:6
160:17
163:4
166:18
167:20
168:23
169:7
170:14,
15,16,19
177:12
179:5
181:9,11,
25 208:14
216:11
285:17
309:7
326:1
358:24
369:2
381:12,18

391:19
393:20
398:21
401:14
423:24
426:7,11,
14,19
429:2
439:14

**refers**
26:1
254:2,3

**refiled**
45:9

**reflect**
342:14

**refresh**
178:8

**refresher**
83:6

**refreshing**
64:25
331:12

**refuse**
17:3
52:17

**refused**
52:13,16

**refusing**
18:16,17
35:8,11,
25 123:10
125:9
249:23
251:11
257:3
296:17
449:14

**refute**
386:3
395:16

**refuting**
386:5

**regard**
185:21
314:21
354:13

**register**
106:8,12

**registered**
105:21,23
106:11,
15,17,18

**regular**
155:16
168:19

**regularly**
353:1

**reinstated**
422:8
423:4

**related**
115:13
131:6
231:3
333:3
377:24
449:9

**relation**
440:7
445:25
457:1

**relations**
125:15
126:11
259:21
324:5
369:22

**relationshi
p**
70:25
103:15
111:10



112:5
125:20,25
126:8
169:1
181:17,19
187:24
190:19
270:6
280:2,10
321:8
358:4
372:2
378:9,14
382:1
435:13,
21,23
436:6,9,
12 446:22
467:20

**relationshi
ps**
126:1
191:2

**release**
94:24

**relevant**
114:17
229:25
230:17
245:11
364:20

**remember**
27:7,8
28:5,6,
10,20
29:25
30:10,19,
20 39:19
40:14,15
42:5
53:21
54:7
57:16
59:6,7,23
61:16

62:23
80:19
83:10,11
84:20
104:21
107:25
109:10
131:20
136:15
145:18
157:18
158:10
177:18
186:3
192:2
199:19
200:18
201:20
205:24
206:5,9
207:16,
18,19,21
218:14
223:6,8,
21 226:21
228:25
229:5
242:24
244:21
255:11
264:16
274:16
283:9
284:8,10
286:9
287:3,8
295:19
297:6,8,
19 298:24
299:3,11
323:9,16
324:9
325:22
330:11
331:2,7
334:9,13
335:19

336:4,6
337:16
338:2,14,
20,24,25
339:6
342:23
343:11,
18,19
344:5,7,
16,20
347:5
348:9
349:4,6
350:2,7
355:9,12
358:10
361:25
362:16,17
366:17
378:18
379:8,20,
23,24
380:1,4,
11
382:10,
18,21
384:5,7,8
388:13
395:3,17
413:16,25
414:6
415:18
421:24
423:17
424:3,8,
23,25
425:1,3,6
428:2
432:5
435:23
438:8,10
445:17
447:18

**remembered**
108:10
223:18

**remind**
314:15
371:9

**remodeling**
338:21

**remotely**
7:1,9
149:17

**removed**
24:13,23

**renovated**
157:17

**renovations**
217:24

**rent**
334:21
335:2

**rental**
215:9,22
216:12

**rented**
334:23,25

**repeat**
22:1
33:2,3
120:20
147:21
325:10

**repeated**
165:21
438:9

**repeating**
324:19

**rephrase**
310:17

**replay**
397:24

**report**
83:19,21
259:14

423:13

**reported**
259:18,22
358:12
461:9

**reporter**
8:20
21:10,17
26:1
103:14
156:23
289:6
389:19
420:23
421:1
433:23,24
450:18
472:16,23
473:1

**reporters**
392:12
393:7,19,
20 394:2

**reporting**
260:5

**reprehensib
le**
147:3,9,
10 190:3,
6 266:3
270:13,
18,24
280:13
282:9,10,
11

**represent**
8:17 9:2,
16 48:18
95:22
110:25
135:25
136:5
171:2
173:22



178:17
182:20
208:24
210:5
211:8
212:9
214:20
267:19
275:20
276:13
300:8
314:8,9
317:12
399:9
401:1,2
439:7

**representation**
39:25
51:24
52:22
53:5,9,25
109:5,7
140:1
217:9
220:21
275:23
357:15
405:19
459:17

**representations**
142:25
277:2
372:15
402:2

**represented**
140:20
277:12,25
281:6
352:23
402:21
428:16
459:14

**representing**
38:22
50:8
139:12
144:12
182:24
190:7
208:20
267:20

**represents**
54:5

**reproduced**
272:6

**republican**
346:10
381:8
466:24

**republicans**
381:4

**reputation**
116:8

**request**
23:21
46:16
57:6
465:20
469:8

**requested**
34:12
67:24
71:16
208:16
418:18

**requesting**
17:22

**requests**
110:14

**require**
87:3

**required**
13:21

212:24
255:7
260:17
364:25
367:22

**requires**
11:14
13:12
431:15

**reread**
63:25
64:3,5,7
90:24
155:2
189:14
218:5,8
222:6
242:21
254:10
279:10
282:12

**Rescue**
76:15
77:3,17

**resent**
447:13

**reset**
463:10

**residence**
88:17
231:8
290:4,5
337:9,13,
15,25
338:19
343:17
370:24
398:10,15

**residential**
78:13

**resign**
292:18
293:1,12,

13,18
294:14

**resignation**
294:16
390:10

**resigned**
73:15
292:24
293:7
388:2,9
389:24

**resort**
347:2
368:11

**respect**
99:2
123:13
181:19
255:8
314:23

**respond**
272:13
365:4
383:21
395:11
438:6
464:14

**responded**
115:2
369:1

**responding**
18:23
392:13
393:8
395:15

**responds**
159:14,23
160:9
161:6,22
167:11
179:1
181:4
268:8

425:16,
20,24
426:4

**response**
22:21
96:3
151:15
165:9
250:13
274:3
275:21
276:22
369:18
370:16,20
385:13
419:8
438:3
447:16

**responses**
89:2

**responsible**
185:20

**rest**
80:4
202:19
254:2
273:18,19
304:23
332:19
439:19

**restaurant**
153:24,25
154:18,20
155:13
157:10
396:22,24
397:5,10
429:10

**restaurants**
194:15
228:15,21
397:18

**restitution**
318:19



restroom
    387:23

result
    333:20

resume
    80:18
    333:5

retail
    87:1

retain
    50:3

retention
    48:23
    49:8
    50:10,21
    51:5,9,18

return
    200:16
    241:7
    291:9,18

returned
    199:22,23
    200:14
    205:22
    238:9
    290:5,16
    342:8

returns
    419:16

reveal
    377:2

revealed
    359:13

revealing
    303:6
    305:1

reverse
    310:24

review
    12:14
    14:12,17

15:14
16:15
19:4 20:3
42:7,12,
17 43:25
44:13
46:21
64:18,23
65:1
66:17
73:17,22
84:22,23
96:10,23
150:4
177:8
218:24
225:8
321:10
322:19
427:24
428:8

reviewed
    13:24
    18:5
    42:22,24
    43:9,10,
    11,12,13,
    19 44:3,
    16,18,19
    45:7,21
    65:10,20
    80:17
    81:14
    96:23
    110:16,22
    145:2
    200:20
    209:23
    222:21
    225:3,6
    229:21
    243:4
    250:11
    309:14
    430:3
    432:12

reviewing
    47:24
    320:23

revisionist
    374:4

revolving
    83:20

Rich
    284:21,24
    285:14

Richard
    152:11
    155:23
    156:3,5
    267:16
    289:8,16

rid
    338:10
    396:24
    397:4

ride
    467:15

ridiculous
    146:15
    279:4
    281:20
    351:23
    435:4
    464:9

riled
    233:2

risk
    81:18

Ritter
    7:8

Ritz
    342:17
    345:10
    349:22

rival
    382:25

river
    72:4
    349:25
    350:1
    352:6

RNC
    105:13
    444:2,5,7
    471:4,17,
    18,21

road
    174:8
    340:7

Rocco
    89:3

rock
    119:17
    349:19
    353:16

Roe
    163:9

role
    49:14
    69:6,9
    71:16
    74:20
    77:2,7
    84:7
    106:7
    127:11
    403:16

roles
    127:11

rooftops
    114:1

room
    7:20
    34:13,14
    134:7
    259:25
    261:2
    338:11
    347:21

348:8
353:16
365:5
398:11

roommate
    136:15
    335:11,25

rooms
    261:19
    326:20
    337:12

Rose
    340:17

rough
    356:22
    379:21
    473:2

rougher
    79:20

roughly
    274:15

route
    170:9
    297:5,8

row
    471:19

rowdy
    233:5
    283:11
    286:10
    287:8,10,
    12,19
    333:16
    334:4

Rudisill
    152:11
    155:23
    156:5,6
    160:9,13
    418:25
    419:13,18
    420:3



429:2,7,
11 441:18
450:22
453:24
466:22

**rule**
54:9
197:2,15
333:7
364:2
366:23

**rules**
10:17
13:20
20:24
38:14
40:16,20
83:19,20
108:1
133:3
296:22
312:16
439:15

**rumor**
362:10

**run**
350:13,22
393:10
394:13
427:11
446:10

**running**
288:1
427:10

**runs**
349:25
350:1

**Ruth**
88:22

———————

**S**

———————

S-W-E-G-E-R

319:15

S-W-I-G-E-R
319:14

**saga**
321:25

**sales**
75:18

**Sam**
368:21

**Samaritan's**
78:12

**sanction**
464:18

**sanctions**
465:21
469:16

**sandwich**
134:9

**Sarah**
89:6

**sat**
69:1
81:10,15
103:1
350:11
382:4

**satisfies**
51:16

**Savannah**
297:18

**scan**
20:20

**scanned**
65:6,21,
24,25

**scanning**
64:14

**schedule**
468:24

**Scheller**
7:12
16:25
17:8,18
272:7,12
309:22
313:24
314:24
315:1,2,
3,5,25
331:23
364:5,7,
10
365:17,23
366:6,9,
11,17,20,
24 367:25
368:3,8
460:22
464:7
466:8,12,
16,20
467:3,9,
11,14
470:6,9

**scheme**
380:22,25
381:11,12
428:13

**schemes**
306:16
383:4,9

**school**
76:18,25
77:1
78:17,21,
25 79:1,
9,19,20
81:19,22
82:9
86:15,18,
20,25
87:4,15,
21 100:6,
14 101:1

138:3,21
140:19,23
143:11
144:13,
14,19,20,
21
219:18,19
263:16
299:7
330:16
343:10

**schools**
138:9,18
144:1

**science**
109:16

**scoop**
178:4

**scope**
367:18
441:11,
13,15
442:8,19,
24
448:15,23
449:5,11,
19 450:5,
7 451:1
454:5
455:12,15
456:11,25
457:16,21
458:14,22
459:3,5,
6,16,18,
19,23
460:23
461:1,6

**score**
181:5,24

**screen**
34:18,20
156:13,14
160:3

252:20
274:7
336:7
393:3
398:6
418:1
421:14

**screenshot**
170:25
171:3,4,8
184:2
276:1

**screenshots**
170:22

**seal**
468:6,9

**sealed**
67:25

**season**
83:12

**seat**
181:7

**secondhand**
361:10

**seconds**
429:22,
23,24
472:14

**Secret**
350:17
379:25
427:21

**Secretary**
69:2

**secretive**
186:24

**sector**
78:8

**security**
213:1
214:14



331:1
395:22

**seek**
465:21

**seeking**
91:23
135:17
136:9
250:2
260:2
309:15
468:16
469:18

**segregation ist**
303:20

**selfish**
163:25
165:8
166:1

**sell**
330:10

**Seminole**
72:4
78:15
382:14

**senate**
389:1

**send**
12:18
42:13
94:24
148:23
150:5
156:18
210:18,19
211:21
230:22
289:11,13
300:18
301:2
389:17
392:18,19

421:2
442:23
447:8,9

**sending**
211:14
391:10

**sends**
180:14,18

**senior**
74:17,20,
23 75:9
138:3
205:12

**sense**
21:12,18
40:22
47:10,18
55:7,9,12
138:5
162:5
294:5
345:2
361:16

**sensitive**
85:7

**sentence**
289:21
313:12,24
314:3
329:5

**separate**
10:11
11:2 30:1
48:23
49:8
50:20
52:25
53:2,4,9
58:2 79:6
109:9
134:7
138:8
202:2,10
328:14

342:8
353:13
404:9
416:21

**separately**
50:3,7
56:14,24,
25 57:8,
21 174:8
348:22
413:4,5

**sequence**
426:23

**sequentially**
11:19

**serve**
78:7,20,
22

**served**
77:6
78:14
79:9
84:4,12
144:9
194:3
274:4
406:23

**serves**
79:8 82:2
86:3

**service**
77:13
79:2
81:17
216:3
350:17
379:25
427:21

**services**
81:22
82:1

**session**
107:9
123:2

**sessions**
122:14
123:5

**set**
111:1,2
174:11
306:17
308:10
345:1

**settlement**
75:23,24

**setup**
326:20

**Setzer**
152:11
155:22
156:2
168:15
169:1

**seven-figure**
439:3

**seven-hour**
333:7

**sex**
90:6,20
91:15,20,
21 93:6
111:20
112:9
135:10,
16,17
136:8
138:14
139:4,6
145:22
146:7,11,
14 147:7,
16,18,20,
24

188:11,
14,17,22
189:2,24
190:11,
19,24
191:3,4,
9,18
192:23
193:5,6,
11,12,16
247:23
248:6,10,
17 249:3,
17 250:9
251:20,21
252:1,9
262:7,10,
12,16,18,
23 263:3,
8,14,20
265:22
266:11
269:6,15,
24 270:11
271:3
277:5
278:24
280:20,
22,24,25
281:21
328:3,12,
24 337:11
355:6,9
361:17
362:16,19
369:14
371:19,24
372:5,6,7
434:2,5,
6,7,24
435:1,7,
10,12,15,
23,24
436:24
439:7
444:25



sexual
  125:15,25
  126:11
  148:11,14
  192:25
  247:11
  248:2
  259:21
  261:10,17
  263:11,
  19,23
  269:17
  324:5
  369:22
  371:18
  375:19
  388:3,8
  390:12
  394:14
  395:1
  417:14,16
  435:20,23
  436:2,6,
  9,11
  445:24

sexually
  359:17
  446:21

shakes
  21:15

shaking
  95:24

Shale
  99:20

shape
  328:8

share
  89:14,18
  112:20
  118:11
  121:1
  149:5
  150:3
  248:8

  255:11
  288:17
  321:1
  327:18
  354:8
  362:5
  418:1
  420:19
  436:16

shared
  69:9,10
  71:12
  89:13,14
  90:6,13
  98:11
  103:9
  120:3
  226:23
  313:13
  344:17
  357:8
  404:7
  437:12

shareholder
  401:3

shares
  402:13

sharing
  394:1
  426:6

she'd
  196:24

she'll
  13:22
  55:1,3
  142:1
  268:15
  295:22
  472:21,22

shelter
  76:16
  137:20
  143:19

Shelton's
  330:23

sheriff's
  410:5

ship
  445:25

shirt
  472:4

shirts
  158:1

shit
  471:6

shocked
  358:10

shoot
  191:25

shop
  215:22

shopping
  228:15,21
  229:2,5
  334:17

short
  107:6
  204:20

shortly
  63:24
  96:9
  271:20
  427:15

shorts
  158:1

shot
  376:14

shots
  212:7

shout
  114:1

show
  14:24,25

  17:6,14
  142:10
  158:1,15
  182:18
  184:3,5
  186:12,
  14,17,19
  209:2,3
  211:4,10
  213:2
  217:7
  230:24
  252:17
  273:6,16
  278:19
  325:16
  330:15
  331:6
  344:10
  401:13,16
  418:3
  422:1,20,
  21 423:4,
  8 424:2
  441:19
  461:16
  462:4
  463:11,21
  468:15
  469:7

showed
  227:15,18
  228:12,24
  229:1,6
  264:15
  425:5
  428:1
  442:7
  458:24

showing
  149:7
  210:7
  218:22
  224:4
  257:20
  272:16,18

  277:21
  278:10
  343:15
  344:8
  418:10,
  14,23
  425:8
  428:24
  469:12

shown
  11:4
  13:13,14
  252:21
  274:1
  277:9

shows
  88:16
  215:14
  232:2
  237:4
  349:9,13
  469:14

shut
  212:22
  373:11

siblings
  88:20
  97:22
  98:19
  137:21

sic
  271:18
  300:2

sick
  439:14
  464:25
  466:3
  469:23,24
  470:1

sickness
  201:20
  471:10

side



19:22
349:22,23
351:18
381:9

sign
11:5,12
12:20,21,
24 13:1,
14,19,21,
22 14:12,
18,23,25
15:2,3,5,
17 16:14,
15 17:3,
6,16
18:13,21
19:6,9
20:4
44:17
48:8,11,
23 50:10
106:13
256:21
308:23

Signal
320:17,21

signature
19:21
20:5

signed
9:3,6,8
13:11
14:21,22
39:23
40:1,2
48:7,25
49:2,8
50:16,18,
20 51:4,
8,17 64:4
65:11,19
73:13
312:24

significant

272:20
362:5
397:15

signing
13:9 19:7
40:11
302:1

similar
158:12,14
212:4
274:15
344:13

simple
214:23

simply
98:13
400:12

single
212:7
291:1

sinus
470:20,22

sir
54:13,16,
20,25
184:8
230:12
431:21,24
433:24
439:20
454:14
456:12

sister
203:5
207:16

sister-in-
laws
207:17

sisters
143:20

sit
27:9

47:25
68:24
144:24
235:20
386:9
394:25
460:15

sitting
28:12
45:3,7
49:7
50:19
53:8,23
61:12
107:21
135:14
136:6,12
195:15
200:18
207:21
265:16
299:9
354:1
449:23
450:17
463:12
464:2
465:25

situation
51:20
95:3
97:20
114:10
135:6,15,
19 136:17
201:18
251:2
292:25
293:16,25
303:18
350:7
353:18
356:6
357:21
360:6
372:16,18

374:18
375:23
376:18,25
434:10

situations
308:25
313:19
448:7

Sixteen
101:6

sketch
461:24

skinny
387:16

skip
171:23

skipped
425:5

skirting
74:6
124:11

sleep
243:11
452:22
460:17
470:3

slept
243:14,
15,22

slips
296:13

small
81:23
274:10
384:23
385:13
386:4
433:8,15

smokes
195:1

smoking

197:13

smooth
41:13

Snapchats
98:25

snapped
392:7

social
162:22
188:2
194:7
217:20

socially
128:1

sold
318:16
330:2,7
338:13

Solutions
73:7,9
74:11
265:14

somebody's
361:24

someone's
283:11

son
31:3
314:13
413:19

son's
29:24
30:12

sophomore
101:11

sort
126:24

sorts
77:22
112:2



228:14,16
284:14
330:13
391:1

**sound**
16:6
23:25
70:15
74:22
105:2
167:21
304:17
456:10

**sounded**
120:25
229:22
386:3

**sounds**
13:24
32:5
47:23
50:19
60:9
77:16
80:20
84:15
85:9,10
90:15
92:8
98:16
100:17
101:23
112:6
114:13,25
120:1
132:18
144:16
161:13
168:2
174:22
179:8,15
181:12
203:16
217:16
220:16

223:24
232:1
239:5
257:23
287:16
353:3
407:24
460:8
471:10

**source**
31:13
136:25
293:4
304:23
308:13
405:21

**sourced**
430:14

**sources**
31:23
33:16
303:16,22
304:6,24
305:2
376:25
377:2
394:12
431:15

**south**
297:11,
13,16,21,
24
298:10,15
299:5
414:16

**space**
67:1
255:11
385:21

**speak**
30:3
108:19
119:19
222:4

245:6
264:18
331:23
433:4

**speaking**
36:18,20
37:17
60:13
67:4
106:7
117:2
141:17
258:5
294:17
345:25
346:1
353:1
356:17
444:7
453:8

**speaks**
222:1

**special**
83:22
107:8
333:22

**specialty**
110:1

**specific**
28:14,16,
18,21
40:12
57:12
60:22,23,
24 83:24
85:2
89:22
97:15
148:10,11
177:11
187:24
206:20,21
207:22
225:21

240:15
263:3
264:19
265:17
292:21
302:2
314:19
341:17
349:6
355:22
358:19
360:4
362:12
371:23
382:22
402:14
445:19

**specificall
y**
32:13,17
33:9 49:4
82:2
86:14
116:4
133:1
193:23
200:19
208:1,2
223:14
246:3
294:13,24
311:5
314:5
318:12
319:21
347:8
350:12
353:22
354:13
355:21
358:20
359:18
369:13
377:7,12
382:16
388:20

444:22
445:19

**specifics**
395:3
409:15

**speculate**
196:7
215:23
380:3

**speculating**
370:14

**speech**
391:21
472:1

**spell**
8:13
103:20

**spend**
16:16
59:16
79:13
111:20
112:10
217:20
383:23
391:14

**spending**
124:9
168:8,10,
12 224:12
296:25
421:25

**spent**
60:15
100:18
244:9
246:6
291:3
297:1
333:2
397:9

**sphere**
360:13



**split**
109:10
201:12

**spoke**
36:25
38:7 59:2
60:25
61:13,15
90:1
108:17,
23,24
253:18
365:11
432:1
445:18

**spoken**
28:9,24
29:18,22
89:24,25
90:3
98:23
108:22
246:10
262:17,19
383:14,19
414:11
466:13

**sports**
152:22,23
154:1
357:19

**spousal**
468:3

**spouse**
93:1
374:9,11

**spreadsheet**
210:6
211:8
216:17
219:4
220:8

**spring**
104:11

292:20
427:17

**Springs**
396:20

**stairs**
246:18
258:17

**stamp**
238:13
421:19

**stamps**
230:15

**stand**
122:17
157:22

**standpoint**
132:11,
13,21
319:23
438:12

**stands**
419:10

**start**
10:17
20:23
23:13
104:10
150:16
213:4
250:18
289:21
300:2
341:3
412:22
456:6

**started**
8:12
20:25
24:3
36:25
37:17
38:2
46:22

74:11
77:6,13
79:11,12,
16
104:11,12
120:14
121:5,9,
15 130:4
145:18
174:12,
22,25
176:24
267:5,6
330:8
331:1
349:16
350:6
354:1,3
372:12,
13,14
375:17
376:1
377:2
380:4
412:25
413:6
414:16

**starters**
113:12

**starting**
37:8
134:25
149:18
210:3
289:24
351:3
373:10

**starts**
349:10
451:10

**state**
24:23
42:8
44:1,15
46:24

47:4
48:19
67:20,24
68:19
73:15
106:9,11,
16 109:12
130:19
185:23
203:2
266:8
269:17
300:6
389:1
391:17
392:11
405:1
470:23

**stated**
34:7
91:24
117:19
125:23
133:16
194:25
239:14
262:7
305:8
308:21
313:17
315:9
406:9
408:14
409:6
416:13
417:7
422:6
428:21
433:3
444:16,22
446:21

**statement**
26:7,9
120:14
145:20
153:21

226:9,10
228:24
230:21
280:11,16
281:8,11
290:7
311:24
324:10
355:25
356:2
359:12
377:14
386:4,5
387:24
433:8,12

**statements**
33:5,15
200:21
224:22,23
225:2,7,
8,14,22
226:3,4,
21 227:3,
7,14
228:3,4,
8,10,11,
19 229:9,
20 309:17
358:25
359:5
400:13
432:2

**states**
31:18
33:13
267:17,18
306:10
368:24

**stating**
140:14
195:23
301:22
302:25
368:23
412:9



Station
  167:7

statistics
  87:5

stay
  16:7,9
  76:6 82:9
  118:1
  139:14,16
  141:14
  142:16
  193:9
  202:19
  224:13
  277:14
  347:16
  374:9
  376:17
  439:19

stay-at-
home
  73:6

staycatino
  347:18

stayed
  190:15,17
  191:1,17
  203:23
  239:9
  241:2
  243:16
  335:22
  361:11
  409:18

staying
  178:2
  191:5
  193:14
  234:23
  239:12
  366:19
  409:7,10

stays
  191:7

step
  434:23

stepchildre
n
  72:19
  99:18
  113:13
  114:14
  115:13
  202:13
  399:21

stepchildre
n's
  399:24

stepping
  91:12
  92:21

stepson
  102:20
  153:10

stick
  190:22
  242:7
  352:11

sticking
  73:23

stipulate
  296:24

stipulating
  367:2

stock
  318:1,2,9
  401:5
  402:2,13,
  20,24
  403:3
  405:8

stockholder
  401:3

stole
  334:4

stone
  373:15

Stonewood
  325:23,25
  327:9
  328:10,
  20,22
  373:15
  375:1

stop
  96:16
  124:19
  233:25
  251:3,4,
  6,15
  294:22,25
  295:20
  316:25
  349:11,13
  394:17
  453:2,7,8
  454:24
  460:18

stopped
  221:23
  284:14
  285:19
  298:12,13
  346:8

stories
  43:12
  237:7
  243:18
  244:5
  286:1,3,7
  287:19
  294:7
  394:13

story
  128:5
  338:19
  388:19
  390:6
  393:10

394:11,21
  395:1

straight
  157:22

strategy
  309:20
  315:8

street
  151:25

streets
  86:22

stress
  93:18
  114:9
  116:5,6,7
  131:11,
  12,16
  446:6

stressed
  94:21
  98:12

stressful
  95:2
  358:3

strict
  213:1
  342:8

strictly
  60:12

strike
  20:12
  39:14

strip
  326:11,
  13,14,16,
  19,21
  327:6,15
  413:15
  414:1

strongly
  281:7

structural
  397:13,16

structure
  318:11
  400:25

struggled
  131:10

struggling
  81:20

studies
  132:22
  133:14

stuff
  29:7
  127:12
  223:16
  252:6
  287:10,12
  320:12
  351:4
  380:4
  412:10
  452:14

style
  158:12,14

submitted
  446:24

subparagrap
h
  14:4

subparagrap
hs
  14:11

subpoena
  63:16
  96:3
  212:11
  274:4
  350:18
  427:21

subpoenaed
  10:14



45:14
245:24
246:4
418:22

subsequent
372:4

subset
106:23

substantive
63:12
98:12

sudden
279:8
462:20

suddenly
463:13

sue
25:11,20
27:10
28:9,25
29:3,15,
18,22
30:20
31:5,11,
15 307:24
308:7
309:10
310:10
311:12
312:2
313:13
314:9,20
317:21
319:1
459:10

sued
25:9,12,
13,15,17
27:3,10,
17,23
314:16
438:4
439:4

sugar
252:6,7,
10,11
372:16,18

suggest
307:14

suggested
208:4
321:23
328:7
354:10

suggesting
260:12
271:2
280:21

suggestion
189:7
353:4

suggestions
322:2,8

suing
114:8
437:10

suit
378:8

summary
29:12
34:5,7
98:21
113:2
128:14

summation
469:4

summer
72:25
101:4,10
135:6,11,
15,20
136:6,7
137:14,21
138:4,9,
12 139:25

143:5,19
164:24
177:11
200:12
202:19
207:10
209:22
219:19
222:16
239:24
260:23
329:21
330:3
335:17
337:14
338:24
339:2
341:8
386:9,12
398:14,22
422:4,6,7

summers
199:21

Sun
334:14,
16,17,22,
23,24

Sunday
78:17

sunscreen
349:9
353:17

sunshine
68:17,22,
23 71:24

super
58:7
203:2
236:6
347:24

supplied
84:6

support

87:18
144:8,11
305:13
306:15
352:14,16
374:9
400:3

supporting
87:19
374:18

supportive
111:13
112:12
116:10
374:7,9,
11 382:21

supposed
85:6
296:10
318:18
334:5
345:20,21
348:7
350:5
357:23,25

supposedly
411:9

surname
431:20

surprise
247:7,10,
13,16,24
382:9

surprised
137:18,25
155:17
247:25
358:11
382:8

surrounding
92:2
93:18

Susan
7:7,15
300:8

suspected
126:24
436:19

sustenance
163:8

swam
349:8

Sweger
319:7,8

swim
349:19

swimming
258:16,
19,22

swinger
354:9

switching
332:4

swore
401:8
403:6

sworn
72:3,8

Sydney
343:10

systems
75:19
402:11

_____

T

_____

tab
306:1

table
261:2,4,
8,9,11
455:19



467:16

**tables**
157:23

**tabs**
375:7

**tag**
213:15
214:21
329:7,12,
17 330:5
331:13

**tags**
215:8,16,
19

**tailgate**
330:14

**tailgating**
330:20

**takes**
210:20
442:25
462:21
465:11

**taking**
16:12
21:1
43:21
148:20,21
243:10
244:20
438:22,24
450:1
463:9

**talent**
257:24

**talented**
331:22

**talk**
13:2
18:14
19:5
46:22

47:21
58:5 61:8
89:15
98:10
108:15
114:21
119:8,9,
10,14
128:2
134:16
209:22
230:25
235:6,7
245:4
251:13
263:7
264:24
278:22
334:5
342:17
360:24
361:4
363:10
370:11
371:18
373:17
383:11
391:5
392:4
403:1
439:4
444:1,3,
12,14
445:9
446:15
455:20
460:15
467:4
469:7

**talked**
29:14
37:25
58:8,16,
17 60:10
62:24
89:22

90:9,15,
19 91:3,7
92:8,15,
22 93:2,
14,15,17
94:8,17,
19 95:5
97:5
98:17
107:11
116:17,23
117:5
118:13
119:1
120:1,10
123:6
179:21
185:21
192:23
233:19
234:4
249:18
262:3,4,
15 264:22
276:7
303:25
304:1
311:21
318:5,15
351:2
353:7
354:19
358:8
361:24
365:7
378:21
379:11
380:17,21
383:18
402:5
403:3
405:4
410:11
412:17
418:20
442:17
443:23

444:9,11
445:2,3,
11,21

**talking**
18:18
28:7
31:20,23
32:3
56:17
60:16
61:2,4
72:9
75:9,11
76:21,23
98:6
108:12
113:8
114:20
118:23
122:25
129:10
132:25
141:16
142:4
189:8
191:13,16
192:21
229:20
230:13,24
232:23
236:11,
13,14
244:25
265:17
281:17,18
298:6
312:11
322:16
329:7
339:10
349:16,17
350:3,6
351:12,22
354:2,3,
7,17
368:10

369:25
370:2,3,
17 372:1,
12,14
374:8
378:4
387:15
388:5
389:4
391:20
400:10
406:19,20
413:25
440:3,4
450:1
453:7
454:23,24
460:18

**talks**
14:3
82:21
381:13
458:12

**Tallahassee**
362:10

**tank**
201:24

**tanning**
337:12,
14,18,19
338:6,7,8

**tape**
332:4

**Tara**
438:17

**target**
377:7

**targeting**
377:9

**tastes**
425:21

**tattoo**



385:18

**tattoos**
385:12,19

**tax**
248:8
318:11
356:5
357:8,12
400:25
405:15

**taxes**
248:9,11

**teacher**
76:25
77:1
78:17
100:6

**teaching**
77:21
100:24

**team**
79:18
205:12

**technical**
332:5

**technologis**
**t**
402:10

**Tedrow**
438:17

**tee**
366:6

**teenage**
81:17
82:2,5
85:19
86:4,7,15

**teenager**
260:20

**Teenagers**
81:1

**teller**
128:5

**telling**
35:22
36:2,21
71:13
98:6,7
139:19
168:22
218:3
224:10,16
232:19
237:6
273:10
275:4
278:2
286:1,7
287:19
298:7
309:24
328:2
377:8
389:5
405:2,10
412:12
463:17
464:24
465:18
469:15

**tells**
126:6
352:17

**ten**
129:9
201:2
211:23
339:16
364:12
366:1
448:25
454:24
468:12
472:12,13

**tenor**
370:15

**term**
71:20
78:13
92:24
107:8
252:1,10
380:25

**terminate**
464:7,10

**terminated**
355:16

**terminating**
466:9

**terminology**
252:5
381:2

**terms**
14:16
45:20
84:19
116:22
318:13
429:1

**terrible**
136:20
167:9

**testified**
68:4
247:11
250:1,10
253:14,24
254:23
270:13
323:24
337:8
412:20

**testify**
37:17
99:11
137:5
249:11
255:18,21
293:22

296:5,24
304:18

**testifying**
258:19,21
286:21

**testimony**
14:6
49:23
67:15,18,
19 68:3,
12 71:22,
25 72:3,8
217:25
218:15,
19,20
219:10,23
221:8
231:6
239:2
243:22
250:13,19
254:17,22
255:15
256:1,6,
15,16,25
258:9
278:6,9
290:9
291:8
293:17
298:22
313:8
317:14
329:6
344:23
359:9
368:14
412:8
413:16
457:3,24,
25 458:1,
25 461:2
463:15
465:6

**Texas**

205:16

**text**
9:18
63:23
97:3,6
98:18
104:16
119:3
149:17
150:10
152:10
158:19
162:6,9
165:21
167:2
170:22
175:2
179:21
187:2
268:4,12,
17,21,23
269:4
274:18
275:1,8
276:15,
21,22
278:1,2,
21 279:4
281:7,16,
19 282:17
320:8,10,
13
322:19,
21,23
325:21
327:12
342:13
344:24
360:23
361:3
373:14,
18,19,20,
21 375:20
377:16,18
383:20
389:14



391:17
394:4
405:11
419:21,25
423:20,21
426:14,23
427:24
428:5,8
429:18
439:13
440:3
441:7,22
449:20
450:9,10
451:12
453:19,
21,22
462:3
464:24
466:22
470:1,4
471:12,13

**texted**
268:6
275:18
462:11
463:2

**texting**
104:12
276:14
320:11
429:1,2
469:23

**texts**
95:15,16,
17 98:25
110:17
162:12
275:3,19
325:22
423:17,24
424:3
426:24
428:10

**that'd**
55:4
265:16

**theme**
69:15

**theories**
239:1

**therapist**
121:22
122:8
297:1

**therapy**
81:23

**thing**
78:3
97:21
119:14
148:16
155:19
177:13
186:16
194:16
208:3
230:20
237:8
245:21,23
251:14
256:4
284:11
321:25
324:21,22
325:10
326:22
328:9
330:21
346:5
352:25
354:22
362:16
369:16
371:21,23
387:12
392:5
404:1,2

412:24
429:7
431:2
432:19
462:15

**things**
11:12
23:9 32:4
33:7
39:16,17
40:12
41:13
45:13
46:16
48:12,25
49:1,3
50:16,18
57:13
61:4 66:7
78:4,23
80:3,20
81:14,25
82:21
83:19,21,
23 84:6,9
85:7,8,18
87:22
94:3,22,
24 95:1,4
97:23
98:11
111:22
112:4,12,
19,24
113:16
114:2,6
116:2,21
118:14
119:2,4,7
121:13
123:12
126:15
133:15,17
136:23
188:1
189:5

191:8,16
195:21,22
197:5
200:21
201:23
203:6,18,
21 205:19
206:4,18
223:1
226:24
228:14,16
229:6
230:13,17
233:4
246:2
252:16
256:4
266:9
279:9
283:10,13
286:10,
15,17,18,
22,23
287:7,19
295:21
296:11
302:20,22
303:1,2,
3,9,10,
16,22
311:7,20,
22
318:20,25
323:11,23
324:18
326:10
327:5
328:19
330:13
348:5
349:17
351:2,5
352:9
354:9
358:17
360:22
364:18,19

365:14
369:12
374:2
375:12,19
376:1
377:11
383:6
385:24
386:2
391:2,7
392:3
394:18,
23,24
395:6,7,
11,18
400:18
404:8
414:15,16
416:4
423:25
424:8
430:12,
13,14
438:13
444:19
448:8
451:14
452:25
455:19
462:11
469:25

**thinking**
80:17
108:6,7
215:21

**thinks**
437:6,7,8

**third-party**
13:18
381:2,3,
11,14
389:1
390:24

**Thomas**
379:7



thought
    17:9,10
    24:19
    51:2 66:2
    68:6
    71:11
    75:8
    79:14
    95:13
    101:9
    136:14
    145:8
    153:21
    157:19
    175:23
    189:16,18
    233:16
    241:12,13
    247:1
    249:12
    260:1
    269:15
    282:9,11
    309:6
    350:4
    365:21
    366:9
    369:15
    391:23
    392:5
    406:19
    409:20
    444:22

threat
    304:22

threatened
    308:22
    312:25
    323:15
    373:10
    454:17

threatening
    313:15
    375:8,9
    390:4

threats
    48:13
    302:3
    353:9
    368:25

threw
    236:8

throw
    45:12
    258:6

throwing
    236:5,7
    330:18
    470:4

thrown
    236:6

thumbs
    145:7

Thursday
    471:19

till
    171:9

time
    12:4,5,10
    13:5,7
    16:16
    19:12
    24:2
    25:25
    28:19
    29:22
    31:1
    34:11
    37:21
    38:6,21
    46:5,9
    54:8
    58:8,14
    59:2,16
    60:15
    61:2,19
    64:18
    67:1,8,11

69:3
70:14,19,
21 71:11
73:2
74:1,8
75:17
78:17,24
83:3,6
84:25
88:3,6,
16,17,18
90:14
91:13
92:17
95:1
102:5
107:6
108:22
109:2
111:21
112:10
114:16
131:25
133:22
134:19,22
135:13,23
137:15
138:16
140:10
144:2
157:18
159:20
164:23
168:8,11,
12,15
169:4
174:22
176:20
177:4,5,
7,8
185:12
186:13
191:25
192:1,9,
13 193:21
194:5,14,
19 199:20

200:2
202:17,24
203:23
204:10,12
207:8,22
209:10
212:25
213:9,10
217:20
218:25
221:2,17,
19
222:12,23
223:10
224:10
225:1,6,
13 226:17
229:14,17
231:18,20
232:12,20
233:23
235:1
237:21
238:13
239:13
240:17,20
241:18,23
242:17
243:17
244:7
245:12
247:3
254:1
256:22
259:21
260:23
265:13
266:20
267:22
271:10,13
272:8,22
273:7,12,
14 274:15
285:16
287:25
291:17,25
294:10,24

296:13,25
299:16,19
300:1
304:16
307:7
312:15
315:7,16,
19,25
316:9,22
317:2
319:25
320:16
324:2,17
325:5,8,
13,19,21
326:23
327:20
329:1,2
331:2,8,
14 332:9,
12,14,15,
19,20,23
333:2,5
338:6
341:13,
19,20
344:12,22
345:8
346:2,17
347:9
348:9,17
349:20
350:7,14,
24 352:8
357:18
358:11,17
360:2
361:13
363:22,24
364:22,
23,24,25
365:16,
18,20,24
366:6,8,
12
367:22,
23,25



368:4
369:4
372:20
375:17
378:17
380:1
383:1
391:14
393:17
394:13
395:1,9,
12 396:7,
15,19
397:9
398:20,21
399:2,5
407:1
408:1
414:5,7,
15,18,20
415:14,
16,23
420:15
421:25
422:7
433:17
435:2
436:1
437:23
439:22,25
440:18
443:23
447:12
449:1,16,
17,22
450:1,8
451:1,6
453:8,11,
12
454:15,
16,20
455:6
456:21
460:13,
21,25
461:6,17
465:12

466:19
467:2,4,
18 469:17
470:4
471:6
472:15,25

**timeframe**
285:12
327:8
335:2
356:22
379:21

**timeline**
39:8
388:13
394:22
396:25
414:8,19

**times**
28:24
29:5
31:24
41:5,8
58:19
65:10
132:23
133:13
141:5
153:16
154:4
155:18
211:4
214:4
219:9
220:3,4,
12 221:12
240:21
243:17
244:8
246:1
255:11
272:24
284:9
291:4
342:9

352:11,17
358:9
373:7
377:21
383:17
394:8,10
407:25
412:23
413:11,13
414:10
415:18
416:13
422:2
433:4
438:20

**tired**
454:20

**today**
8:23
11:8,9
13:14
14:8
21:4,8,15
22:13
23:5 24:7
27:9
28:12
31:12
34:9,22
35:14
44:11
45:3,7,8
48:1,9
49:7
50:19
53:8,10,
24 56:5,
16,18
57:4
58:6,11
61:12
62:9
63:15,18
65:12,21
96:4,22
107:21

108:16
114:17
135:14
136:7,13
177:24
195:15
200:18
207:21
211:14
235:21
255:7
256:22
265:16
270:22
299:9
304:16
312:8
325:11
338:16
339:10
365:15
386:9
393:9
394:25
416:5
418:11
419:8
421:25
428:9
436:17
437:23
445:2
449:17
463:15
471:7

**today's**
55:19
56:22
60:11

**Todd**
267:16
289:8,16

**toilet**
464:2

**told**
60:14
61:11,15
65:6
99:3,8
103:2,3
120:4
148:8
153:22
155:6
182:5
183:3
195:9
224:1
225:24
243:18
244:19
246:6,7
248:2
262:24
268:12
272:24,25
273:1,2,8
275:2
301:22
302:25
303:2,5,7
304:23
312:24
318:21
322:16
326:22,
23,25
328:1,11
330:22
334:3,6
345:20
350:13
353:18
365:18
371:7,20
372:8
376:12
392:7
403:3,7
405:2,9
437:16



439:5,6
445:6
449:10
462:23,24
464:15

**tolerance**
130:12

**toll**
205:19

**Tolling**
205:18

**tomorrow**
223:20
327:17
367:20
452:25
462:15
463:3,12,
14 468:15
469:8,12,
14

**ton**
173:10

**tone**
370:15

**tonight**
187:7,8
232:16
276:8
364:14
454:19

**toot**
134:7

**top**
25:9
53:22
267:24
268:1
281:16
305:11
306:11
339:18
390:16

435:3
442:16
451:10

**topics**
68:1,16
366:7

**topless**
288:2

**tops**
157:21

**tore**
472:4

**tornado**
167:7

**tornadoes**
161:7
162:22

**total**
60:10

**totally**
172:1
330:1
429:7

**touch**
83:22
305:23

**touching**
162:23

**tour**
337:9
339:7

**toured**
339:6

**town**
59:21
187:14
193:18,21
194:10
223:8
227:19
229:7

243:20
319:6,12
409:22

**tracking**
291:1

**trade**
86:25
87:1
402:14

**trafficking**
78:14

**trail**
405:3

**training**
76:20
78:2
83:19,25
84:21

**trainings**
84:23

**transaction**
208:21

**transaction
al**
252:8

**transcript**
8:21
142:10
468:2,5
472:17,24

**transcripts**
12:25
145:2

**transfer**
404:10

**translate**
417:14

**translates**
417:17

**transparent**

111:21
112:9
125:20
126:4,7
186:2,6
187:1,20
194:13,
18,21
232:17

**transpired**
373:1
376:3,8

**transponder**
331:7,8,
11 423:3,
7,15
424:17

**transponder
s**
212:22
239:25
421:22,23
422:4,5,8

**Transportat
ion**
69:2

**trauma**
82:22,25
83:1,2,8,
18 84:1,
20,21

**travel**
79:13
199:21
203:3
465:14,16
466:4
468:20
469:17
470:15,16

**traveled**
203:2

**treat**

14:19
17:9

**treated**
113:25

**trial**
14:6 67:2
107:2
382:5

**trials**
67:4

**trimester**
453:1
463:8
464:20

**trip**
178:15
203:5
204:13,
14,15,17
205:25
215:9
299:11,12
342:18,
21,25
343:11,14
345:10

**trips**
204:11
217:18
318:21
354:9

**trouble**
264:3
331:24
351:6
427:18

**troubled**
304:2

**true**
32:6,9
48:1
80:21
85:11,19



92:11
111:4
120:2,11,
14 139:19
143:1
188:25
189:3
197:13
222:17
264:3
288:7
291:16
301:25
307:7
392:9
401:9,11
403:6
414:12
430:19
445:25
446:1

**Trump**
471:23

**Trump's**
352:22

**trust**
125:22
321:8
378:4

**truth**
21:3
145:5
248:2
301:14,23
308:19
412:13

**truthful**
23:6
66:17
145:11
331:13

**truthfully**
45:15

**Tucker**
378:22,23

**Tunnel**
205:18

**turn**
99:5,6
158:18
182:10
216:20
398:1

**turned**
119:3
140:2
208:8,13
322:20
325:21
338:11
347:6
374:25
377:23
379:17
395:20
439:5

**turning**
217:10
305:5
379:17

**TV**
182:4

**tweet**
293:6,11,
18,22

**Twin**
152:11,
21,22
153:2
154:3,25
155:7,11,
12,14
156:25
157:2,3
158:8
423:25

**twister**
163:18
165:11

**two-day**
204:22

**two-page**
156:24
450:21
451:7,8

**two-step**
213:5

**type**
91:19
131:2
144:7
155:13
320:24
333:20
354:9
359:11
372:16
377:3
380:21
394:20
423:11

**types**
52:14
83:4
258:5
318:25

**typical**
123:11
164:23
187:11,
14,16,23
204:22
232:19
237:5,8
239:11
244:17
318:24
429:7

**typically**
29:4,8

104:13
182:4,8,9
187:23
204:19
218:12
219:17
230:2
285:23
360:21,22
377:1
427:11
435:12
446:9

———————

**U**

———————

**Uber**
185:17
205:10
214:8
408:18

**uh-huh**
21:16
29:1 32:7
63:3 81:2
85:21
95:6,19
102:22
118:7
140:4
161:25
164:6
166:24
169:22
191:23
199:14
216:19
219:12
220:14
261:5
280:6
290:1
336:8
338:1
339:3

347:15
393:6
422:24

**uh-uh**
21:16

**Ultimate**
181:5,24

**umbrella**
353:19

**unable**
377:1

**unclear**
21:21
22:3
120:19
130:1

**unclothed**
158:2

**uncommon**
409:6

**uncool**
369:15

**undefeated**
83:12

**underage**
207:6
259:13
262:1
345:15
350:15
362:3
377:19
445:17

**understand**
10:23
17:18
22:25
25:4 50:7
56:20
60:9,14
66:6,10,
25 96:20



97:25
98:16
107:7
115:9,10
118:1,22
122:21
132:6
140:12,20
170:4
175:17
197:5
210:8
223:23
224:7
226:5
231:9,14,
17 235:15
238:18,
20,22
245:17,22
253:6
254:24
258:8
282:22
300:10
301:13
304:8
307:9,12,
14 308:12
310:15
317:4,6
411:10
438:4
439:10

**understandi
ng**
31:14,19
32:5
33:18,25
40:19
45:9,19
49:13
66:19,21
103:13
160:16
166:2,4

173:6
197:18
213:11
214:2
230:4,5
231:11
234:25
236:19
237:1
241:11
242:20
245:13
246:23
249:16
251:22,24
252:12,14
253:23
254:16,18
255:3
259:16
265:20
282:3
285:21
286:2,4
301:16,23
307:20
308:7
310:18,22
311:2
315:11
325:7
348:19
380:24
389:23
390:11
468:24

**understood**
21:25
22:6
32:12
115:8
118:12
172:7
213:24
246:22
252:3

256:5
310:21
443:18

**unfaithful**
321:18

**unfortunate**
12:3

**unhappy**
374:25
376:3,8

**uniforms**
158:10

**union**
76:15
77:2,17
226:7

**unique**
201:18

**unit**
88:5
192:12
271:13
363:21
439:24

**United**
267:17,18

**University**
60:3,8
99:24
109:12,20

**unkind**
165:17
392:10

**unlocked**
447:24
448:3

**unmarried**
190:22,24
191:1

**unplugged**
471:2

**Unreal**
425:9

**unspoken**
30:11

**unusual**
173:12
186:14
187:24
188:3
219:2
223:20
231:23
240:18
283:12
334:7,8
376:13

**update**
160:22

**updated**
291:6

**upper**
274:9

**upset**
198:10
286:10
313:13
343:18,
19,23
344:1
354:21
357:5
370:9
440:3
444:25

**upsetting**
445:7

**upstairs**
337:10,
13,15,24
398:11,14

**user**
130:16,
21,22,24

_____

**V**
_____

**vacation**
130:3

**vague**
26:18

**vaporizer**
131:22

**variety**
303:16
304:5,23

**vase**
333:19,21

**veered**
364:21

**vehicle**
213:19
214:13
215:7
218:1,16,
17,19,25
219:25
221:9

**vehicles**
214:25
215:3

**verbal**
21:15
89:2

**verbally**
373:2

**verificatio
n**
213:5,6
430:6,23

**verified**
29:19
32:6,13
33:19
34:1



37:10,22
38:1
39:23,25
40:1 42:1
43:13,25
44:13,14
47:3,16
220:19
300:21,24
301:5,9,
23,24
304:10
306:10
307:11
308:19
312:22
368:24
369:20
400:1,22
401:8,21
404:16
406:1

**verify**
36:13
39:11
42:9
217:9
301:13,14
306:8
312:25
330:5

**verifying**
301:17

**version**
211:2
272:6

**versus**
107:6,8
252:9
370:13
372:18
461:9

**vice**
74:17,20,

23 75:9

**victims**
78:13

**video**
34:15
62:4,5,6
246:17
252:17,
22,24
336:13
343:5
349:12,
13,14,15
384:21
397:22
398:5

**videos**
257:20

**view**
177:7,17
274:7
288:16,21
320:21
336:12

**viewed**
173:20
176:18
177:16,18
186:21
193:10,12
195:7,11
206:15,23
233:21
291:16
292:12,16

**viewer**
177:23

**viewing**
288:14
320:24

**Village**
78:12

**violating**
75:20,22
142:7

**violation**
212:24

**violations**
71:23

**violent**
132:15

**vis-à-vis**
49:14

**visit**
88:18
191:11
299:1
347:17
348:20
356:16
373:23
374:21,25

**visited**
299:5,6
375:10

**visiting**
88:16
192:25
319:12

**vivid**
358:10

**voice**
120:12,25
372:25

**voiced**
373:7

**voicemails**
394:3

**volcano**
131:23

**volunteer**
76:12,20
77:4

78:2,4,5,
7,16,19
79:8
80:15,23
83:4,11
84:6,16
85:10,19
87:8,14

**volunteered**
78:12
81:6,13

**volunteers**
84:14

**vomiting**
462:14
464:2

**vote**
71:14

**voters**
381:8,9

**votes**
68:24
69:6
71:7,9,13
381:7,15,
17 391:6

**voting**
71:7 84:8

**VP**
106:6

——————————

**W**

——————————

**W-H-I-T-S-
T-A-B-L-E**
8:25

**Wagner**
62:21

**wait**
18:2
24:16

40:16,20
41:4 55:8
161:7
267:12
280:3
317:2
396:14
469:11

**waiting**
447:15

**waitresses**
152:23
153:1

**waiving**
333:7
364:2

**walk**
157:21,23
350:2

**walked**
145:6,8
153:20
157:20
185:17,19
255:12

**walking**
246:17
351:21

**walks**
378:15,16

**wall**
373:15

**Wallace**
340:17
341:1

**wanted**
25:23
48:10
69:3
71:12
73:19
76:18



145:11
151:15
174:24
177:2,7
207:1
209:5
312:25
346:7
350:22,23
352:15
371:20
374:18
397:11
404:11
417:8
418:23
440:12
451:15
473:1

**wanting**
294:8

**war**
237:6,7
244:5

**warm**
111:9,10
112:11
126:8
446:22

**warned**
395:19

**warrior**
89:20
92:7
340:8

**wasp**
337:5

**waste**
74:1
242:17

**wasted**
454:21

**wasting**
74:8
316:22
465:12
467:2

**watch**
236:8
315:16
379:3
383:23
415:12
471:18

**watching**
323:14
471:20

**water**
23:8,13
241:20,21
243:9
246:2

**wave**
331:5

**waving**
194:16

**ways**
54:25
205:19
297:19

**wealthy**
465:1

**wear**
158:11,16

**weather**
161:13

**website**
75:14

**Webster**
376:23
377:5

**wedding**
411:25

**weed**
130:22

**week**
105:7
127:21
128:7,11,
12,13,17,
18,20,23
199:21
201:3
234:23
282:23
284:11
285:20
287:6
372:22
434:12,13
443:24
464:19
465:3
470:21,22
471:4

**weekend**
203:6,12,
15 204:2,
7 205:24
207:12,
13,20
283:10
284:13
311:20
383:25

**weekends**
203:3
206:12
409:16,17

**weekly**
127:17

**weeks**
41:21
63:19
96:19
199:24
201:2

250:1
322:24

**weight**
386:12,14

**weird**
147:19

**Wells**
222:17
271:18

**Wermuth**
7:8 473:3

**Wermuth's**
96:3
316:2

**Westgate**
466:24

**whatsoever**
98:20

**When's**
29:22
372:20

**whereabouts**
208:6
223:24
229:21
245:12
246:4

**white**
337:3
425:21

**whits**
127:14
128:1
417:11

**Whitstable**
8:25

**who've**
192:22

**wide**
252:6

455:15

**wife**
92:3,5
94:21
165:16
263:8,9
330:23
372:1
438:23

**wife's**
463:15
465:6

**wild**
179:2,8,
9,11,12
328:2
361:13

**winning**
381:15

**Winter**
121:10

**withdraw**
271:24

**withstandin
g**
124:17

**witness'**
68:12

**witnesses**
13:12
14:4
389:8,9
466:25

**Wolf**
6:24
17:11
156:20
267:10,12
316:11,
15,21,25
317:6
393:12



421:4
442:4
447:3,5,
10,13
448:12
449:13
452:19
453:7,10,
14 454:23
457:23
459:12,25
460:4,13,
18 461:1
462:19,24
463:4,19,
23 464:1,
16
465:10,
15,24
466:5
467:1,8,
10,12,21,
22
468:10,22
469:5,13,
22 470:3,
10,15
471:9,15,
20 472:2,
19

**woman**
90:4,16
93:9
125:15
126:11
138:19
146:13
147:16,
20,24
168:8,11,
15,24
169:10
188:13
223:19
270:6,11
414:14

**women**
80:25
90:20
126:18
144:11
145:22
148:9,10,
11
152:23,25
154:20,22
157:24
158:7
168:6
170:16
173:7,9,
14 175:10
182:5
187:12
188:8,11,
17,21
189:1,8,
24 322:2
323:18
324:1,5
326:3
345:15
350:15
352:9
353:6,20,
22,23
354:2
370:1
371:19
372:5
388:9
415:5
426:20
428:14
438:17
439:13
448:17
455:18
459:2

**women's**
80:4,6,8

**won**
338:2

**wonderful**
93:23
111:14,
15,19
112:5
116:19
125:24
223:19

**wondering**
84:19
174:20

**word**
45:22
65:4,8
105:6
170:6
179:1
184:18
234:2
392:2

**words**
106:15
115:3
187:1
222:3
464:11

**work**
73:7 77:8
80:23
84:16
85:10,19
87:8,13
107:20
114:11
127:24
135:9,17
136:19
138:14
139:4,6
178:15
203:5
215:9

217:18
248:14
265:12
352:24
397:7,8
425:13
439:8
460:8
470:8,10,
12 471:9

**worked**
68:25
78:9,11
85:4
138:11
194:3
199:20
221:6
396:7
400:23
401:9,24
402:1

**worker**
90:6
135:10,16
136:8
248:6,10,
17 249:3,
17 250:9,
10 251:20
252:2

**workers**
439:7

**working**
165:1
202:24
203:13
394:17
423:7
444:6

**works**
79:6 90:6
357:21
360:3

362:19
384:19
401:1
465:7

**workshop**
83:1

**world**
82:20
127:5,10
129:7
185:22
416:24
417:9

**worried**
310:15,19
348:11
370:9

**worst**
437:9

**worth**
87:6

**WP**
162:23

**write**
116:13

**writes**
151:24
159:11
160:6,19
161:17
162:3,14,
21 163:8,
9,16,23
165:7
166:10,15
167:3,6,
14,18,24
169:20,23
170:1,6,9
171:8,12,
16
172:13,23
173:2



178:3,20,
21 180:25
182:14
184:11,
14,18
268:3

**writing**
274:19
382:10

**written**
98:24
257:21

**wrong**
45:22
47:24
94:6
106:24
107:1
121:6
305:19
306:1

**wrongfully**
69:24

**wrote**
179:14
280:14
281:7
282:4

_____

**Y**
_____

**Y'ALL**
439:14

**Yapo**
152:11
155:22
156:2,3

**year**
42:5
73:11
76:20
77:12
83:12

85:13
93:5
100:3,10,
13,20,24
101:11,15
105:24
106:3
110:8,9
121:5,8,
14 138:3,
5 139:5
140:3,18,
23 141:7
143:11
164:23
200:12
203:19
260:18
262:7
263:20
272:2
314:1,2
336:5
372:7
396:25
413:3,7,
10 444:25

**years**
57:11
70:22
71:13
72:15,23,
24 82:14
84:17
92:19
100:19,
21,25
101:14,17
104:3,5,
24 110:6
133:16
136:6
138:18
139:8
140:1
144:1

167:19,24
168:2,3
191:14
247:8
262:24
330:2,8
399:25
434:14
446:17

**yell**
222:5

**yellow**
211:4
212:14

**yes-or-no**
189:21

**yesterday**
9:2 15:9
416:8

**yielded**
466:14,16

**YMCA**
83:11,17

**Yo**
178:4

**York**
132:23
133:13
383:17
394:8,10

**young**
86:15
87:15
90:16,20
138:19
399:24

**younger**
260:19

**youth**
78:20
86:12

**Yum**
182:14
184:11
426:4,13

_____

**Z**
_____

**Zalonka**
283:15,17
284:18
285:3
288:1
377:17,
20,24
378:6,7,
10 379:1,
13,19,22
387:4,7
467:20

**Zoom**
6:25 7:5
18:22
62:1
463:21
464:3

