# EXHIBIT 5

**In the Matter Of:**

DORWORTH V. GREENBERG

6:23-cv-00871-CEM-DCI

---

**CHRISTOPHER DORWORTH**

*August 06, 2024*

---



800.211.DEPO (3376)
*EsquireSolutions.com*

```
 1                    UNITED STATES DISTRICT COURT
                      MIDDLE DISTRICT OF FLORIDA
 2                         ORLANDO DIVISION

 3
      CHRISTOPHER E. DORWORTH,
 4
            Plaintiff,
 5
      vs.                          Case No: 6:23-cv-00871-CEM-DCI
 6
      JOEL MICAH GREENBERG
 7    ANDREW W. GREENBERG, SUSAN
      GREENBERG, ABBY GREENBERG,
 8    AWG, INC., GREENBERG DENTAL
      ASSOCIATES, LLC, GREENBERG
 9    DENTAL & ORTHODONTICS, P.A.,
      GREENBERG DENTAL SPECIALTY GROUP, LLC,
10    AND A.B.,

11          Defendants.

12    _____/

13    VIDEOTAPED/VIDEOCONFERENCE
      DEPOSITION OF:        CHRISTOPHER DORWORTH
14
      DATE:                 TUESDAY, AUGUST 6, 2024
15
      TIME:                 9:04 A.M. - 5:21 P.M.
16

17    PLACE:                200 SOUTH ORANGE AVENUE
                            SUITE 10000
18                          ORLANDO, FLORIDA 32801

19    STENOGRAPHICALLY
      REPORTED BY:          AMBER PORTELLO
20

21

22

23

24

25
```

```
 1   A P P E A R A N C E S:

 2   ALEX ANDRADE, ESQUIRE
     OF: Moore, Hill & Westmoreland, P.A.
 3       350 West Cedar Street
         Suite 100
 4       Pensacola, FL 32502-4911
         Office: 850-434-3541, Fax: 850-435-7899
 5       Aandrade@mhw-law.com
         APPEARING ON BEHALF OF THE PLAINTIFF
 6

 7
     JASON PERKINS, ESQUIRE
 8   OF: Carlton Fields, PA
         200 South Orange Avenue
 9       Suite 1000
         Orlando, FL 32801-3456
10       Office: 407-244-8250, Fax: 407-648-9099
         Jperkins@carltonfields.com
11       APPEARING ON BEHALF OF THE DEFENDANT ABBY GREENBERG

12   FRITZ WERMUTH, ESQUIRE
     QUINN RITTER, ESQUIRE
13   OF: King, Blackwell, Zehnder & Wermuth, PA
         PO Box 1631
14       Orlando, FL 32802-1631
         Office: 407-422-2472, Fax: 407-648-0161
15       Fwermuth@kbzwlaw.com
         Qritter@kbzwlaw.com
16       APPEARING ON BEHALF OF THE DEFENDANTS ANDREW
         GREENBERG, SUSAN GREENBERG, AWG, INC.
17
     KATIE CHOMIN, ESQUIRE
18   MICHAEL FURBUSH, ESQUIRE
     OF: Dean Mead
19       420 South Orange Avenue
         Suite 700
20       Orlando, FL 32801-4911
         Office: 407-841-1200, Fax: 407-423-1831
21       Mfurbush@deanmead.com
         Kchomin@deanmead.com
22       APPEARING ON BEHALF OF THE DEFENDANT GREENBERG
         DENTAL
23       (Via Zoom)

24   FRITZ SCHELLER, ESQUIRE
     OF: Fritz Scheller, P.L.
25       200 East Robinson Street
         Suite 1150
```

```
 1          Orlando, FL 32801-1970
            Office: 407-792-1285, Fax: 407-649-1657
 2          Fscheller@flusalaw.com
            APPEARING ON BEHALF OF THE DEFENDANT JOEL GREENBERG
 3          (Via Zoom)

 4   WILLIAM PETERS, ESQUIRE
     OF: Wicker, Smith, O'Hara, McCoy & Ford P.A.
 5          515 East Las Olas Boulevard
            Suite 1400
 6          Fort Lauderdale, FL 33301-4250
            Office: 954-847-4800
 7          Wpeters@wickersmith.com
            APPEARING ON BEHALF OF THE DEFENDANT ANDREW AND
 8          SUSAN GREENBERG
            (Via Zoom)
 9
     ALSO PRESENT:
10          Fred Gartrell, Videographer
            Abby Greenberg (Via Zoom)
11          Lisa Di Filippo (Via Zoom)

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                        I N D E X

 2   TESTIMONY OF CHRISTOPHER DORWORTH

 3        DIRECT EXAMINATION BY MR. PERKINS                7

 4   CERTIFICATE OF OATH................................383

 5   CERTIFICATE OF DEPOSITION TRANSCRIPT...............384

 6

 7                     INDEX OF EXHIBITS

 8   EXHIBIT  94          19
     (Petition For Dissolution of Marriage)
 9   EXHIBIT  95          20
     (Timesharing Agreement)
10   EXHIBIT  96          61
     (Severance Agreement and General Release)
11   EXHIBIT  97          70
     (Email from Shanna Kaye Crawley April 9, 2021, 4:53
12   p.m.)
     EXHIBIT  98          76
13   (Email from Shanna Kaye Crawley April 9, 2021, 5:54
     p.m.)
14   EXHIBIT  99          87
     (Covenant not to Compete)
15   EXHIBIT 100          92
     (Text Message with Katie Benner)
16   EXHIBIT 101         106
     (Newsweek Article)
17   EXHIBIT 102         123
     (Interrogatory Answers)
18   EXHIBIT 103         132
     (2021 Tax Return)
19   EXHIBIT 104         138
     (Ballard Pay Slips)
20   EXHIBIT 105         167
     (Heathrow Gate Ledger)
21   EXHIBIT 106         167
     (Wells Fargo Records)
22   EXHIBIT 107         173
     (Heathrow Masters Association's Gate Ledger - Excel
23   Spreadsheet version)
     EXHIBIT 108         177
24   (Wells Fargo Summary)
     EXHIBIT 109         200
25   (Text Messages: Between Joel Greenberg, Matt Gaetz,
     Christopher Dorworth)
```

```
1   EXHIBIT 110          246
    (Hornsby Letter Dated May 7, 2021)
2   EXHIBIT 111          257
    (Declaration of Randall Morris)
3   EXHIBIT 112          264
    (Text Messages Matt Gaetz, Joel Greenberg)
4   EXHIBIT 113          268
    (Matt Gaetz, Christopher Dorworth Texts)
5   EXHIBIT 114          284
    (Plaintiff's Rule 26 Disclosure)
6   EXHIBIT 115          287
    (Richard Hornsby Letter Dated 10/4/21)
7   EXHIBIT 116          290
    (Texts with E▓REDACTED▓ G▓REDACTED▓)
8   EXHIBIT 117          316
    (Notice of Removal)
9   EXHIBIT 118          330
    (Photo of Ralph Anthony Arruzza)
10  EXHIBIT 119          333
    (Video of K▓REDACTED▓ M▓REDACTED▓)
11  EXHIBIT 120          339
    (Snapchat Message)
12  EXHIBIT 121          346
    (Video Details of Dorworth Residence)
13  EXHIBIT 122          355
    (Photos of Various People and Girls)
14  EXHIBIT 123          357
    (Lyft Records)
15  EXHIBIT 124          362
    (Text Message Chain Regarding A.B.)
16  EXHIBIT 125          364
    (Website: R▓REDACTED▓ R▓REDACTED▓ Porn Videos)
17  EXHIBIT 126          368
    (Abby Greenberg's Answers to Interrogatories)
18  EXHIBIT 127          370
    (Text Messages: Joel Greenberg and Christopher Dorworth)
19

20                       ------

21            S T I P U L A T I O N S

22       It is hereby stipulated and agreed by and between

23  the counsel for the respective parties and the deponent

24  that the reading and signing of the deposition

25  transcript be reserved.
```

1                   P R O C E E D I N G S

2                      * * * * * * * * *

3          THE VIDEOGRAPHER:  Good morning.  We are now on

4     the record.  Today is Tuesday, August 6, 2024.  The

5     approximate time, 9:02 a.m.  This is the deposition

6     of Christopher E. Dorworth being taken in the matter

7     of Christopher E. Dorworth versus Joel Micah

8     Greenberg, et al.

9          Will counsel please state their appearance for

10    the record?  After which, our court reporter,

11    Ms. Amber Portello, will administer the oath to the

12    witness?

13         MR. ANDRADE:  Alex Andrade on behalf of the

14    plaintiff, Chris Dorworth.

15         MR. PERKINS:  Jason Perkins on here on behalf

16    of the defendant, Abby Greenberg.

17         MR. WERMUTH:  Fritz Wermuth on behalf of Andrew

18    Greenberg, Susan Greenberg, and AWG, Inc.

19         MR. RITTER:  Quinn Ritter on behalf of Andrew

20    Greenberg, Susan Greenberg, and AWG, Inc.

21         MR. PERKINS:  It looks like the folks on Zoom,

22    go ahead and enter your appearances.

23         MR. ANDRADE:  I think we may be muted.

24         MR. PERKINS:  Okay.  We have entered our

25    appearances, so if the folks on Zoom, the attorneys

1    on Zoom can enter their appearances.

2         MR. SCHELLER:  This is Fritz Scheller on behalf

3    of Joel Greenberg.

4         MS. CHOMIN:  This is Katie Chomin on behalf of

5    the Greenberg Dental defendants.

6         MR. FOSTER:  James Fosters with Wicker Smith on

7    behalf of Andrew Greenberg and Sue Greenberg.

8         MR. PERKINS:  All right.  Very good.

9         COURT REPORTER:  Would you raise your right

10   hand, please?

11        Do you solemnly swear or affirm that the

12   testimony you're about to give in this cause is the

13   truth, the whole truth and nothing but the truth?

14        THE WITNESS:  I do.

15   THEREUPON

16                    CHRISTOPHER DORWORTH

17   was called as a witness and, having first been duly

18   sworn, testified as follows:

19                    DIRECT EXAMINATION

20   BY MR. PERKINS:

21   Q.   Good morning, Mr. Dorworth?

22   A.   Morning.

23   Q.   My name is Jason Perkins.  We met briefly

24   before.  I represent the defendant, Abby Greenberg, in

25   this matter.  I'm going to be asking you some questions

```
 1   first today.
 2           Could you please state and spell your name?
 3       A.   Sure.  It's Christopher E -- Erickson Dorworth.
 4   It's C-H-R-I-S-T-O-P-H-E-R; middle name is Erickson,
 5   E-R-I-C-K-S-O-N; last name is Dorworth, D, as in David,
 6   O-R-W-O-R-T-H.
 7       Q.   Very good.  And your date of birth is REDACTED
 8   1976, correct?
 9       A.   Correct.
10       Q.   Your current cell phone number is REDACTED
11   REDACTED, correct?
12       A.   Yes.
13       Q.   Have you had any other cell phone numbers since
14   January 1, 2017, other than    REDACTED ?
15       A.   No.
16       Q.   What is your current business address?
17       A.   My home 1520 Whitstable Court, Lake Mary,
18   Florida 32746.
19       Q.   And is 1520 Whitstable Court, is that your
20   homestead?
21       A.   It is.
22       Q.   And who currently lives with you at that
23   address?
24       A.   Myself, my wife, Rebekah, my daughter, REDACTED,
25   and my son,      REDACTED      .
```

1    Q.   And what kind of security do you have at 1520

2  Whitstable Court?

3    A.   Could you be a little more clear with that?

4    Q.   Do you have like doorbell cameras or anything

5  like that?

6    A.   Yeah, we have Ring cams and the Ring

7  thermostat.  There is something that's done through the

8  neighborhood; but we have something like 80 windows in

9  the house or something, and the odds that one doesn't --

10  it was just constantly going off, so we haven't used

11  that since -- I have lived there for 19 years.  Probably

12  haven't used it for 15 of them.

13    Q.   What is the name of the security company that

14  furnishes security for your home?

15    A.   I have no idea.  It's all done through the

16  neighborhood.  We don't --

17    Q.   It's through the Heathrow Master Association?

18    A.   Yes, sir.

19    Q.   In 2017, in the summer of 2017, did you have

20  Ring cameras that were operational on the house?

21    A.   No.  I don't think they existed yet, but no.

22    Q.   Other than 1520 Whitstable Court, do you own --

23  personally own any other real property?

24    A.   Yes.

25    Q.   And would that be the 30 Buena Vista Drive in

1  Highlands --

2      A.   It's technically two houses.  It's 26 and 30

3  Buena Vista Drive.  It's platted somewhat strangely, but

4  there is a main house that's about 3,000 square feet.

5  The second house is 1,200 square feet, and it's a

6  two/two.  So it's 26 and 30 Buena Vista.  It's on one

7  unified tract of land, but it's two houses.

8      Q.   And that's in Highlands, North Carolina?

9      A.   Yes, sir.

10     Q.   And are both of those properties owned by the

11 Christopher E. Dorworth living trust?

12     A.   I don't know.  We went through a -- we did our

13 will -- whatever we did, whatever they said to do, I

14 did; but, yes, I believe so.  I haven't checked that

15 lately.

16     Q.   And then so those two properties would be

17 owned -- it sounds correct it's owned by the Christopher

18 E. Dorworth living trust, the two Highland properties?

19     A.   I think so.  I mean, it was I bought it myself,

20 and then I did my will a couple years back and I think I

21 transferred it there, but I don't remember honestly.  I

22 think so.  It sounds right, but I don't...

23     Q.   And is 1520 Whitstable Court owned by yourself

24 and your wife, Rebekah?

25     A.   Yes.

1    Q.   So this litigation that we're here about today
2  was filed on April 7th, correct?
3    A.   That sounds right.
4    Q.   That sounds right.  Other than the instant
5  litigation that we're here about today, what other
6  litigation have you been involved in personally?  And I
7  know about your divorce with your exwife --
8    A.   Yeah, I got divorced in 2013.  We just -- you
9  want to go through all the legal things?  Is that it?
10   Q.   Correct.  Yeah.
11   A.   This could take a few...  So we'll go back.
12  There was the -- we'll just talk about everything going
13  on right now.  I have this litigation against all of
14  you.  I have -- I am in a dispute over my airplane.  The
15  guy who maintained it didn't maintain it, so there is
16  litigation going there.  And I don't know if it's
17  considered litigation or not, but I filed an intent to
18  sue my insurance company over a roof.  I think you just
19  file a notice of intent.  I'm not sure that that's a
20  litigation process, but we're at the umpire so it would
21  probably ben enough where I should at least mention it.
22        So there is -- that is what -- I guess that's
23  not -- well, I guess it is personal because they listed
24  me individually, but that is done through a company.  So
25  then there was the Expressway Authority stuff in 2013

1  when I was charged with my second -- I think it was a

2  first or second degree misdemeanor for violating the

3  Sunshine Law.  That took a couple years.  There is an

4  appeal of that.  I feel like I have other stuff right

5  now that's not...

6      Q.   The Heathrow Master Association?

7      A.   Yeah.  Yeah, the Heathrow Master Association.

8  They -- they -- we had a dispute, and we sued on that

9  one.  There's been some business stuff that -- like I

10 don't think that would be personal.  I feel like I'm

11 missing something right now.  That -- it's kind of -- I

12 don't think I used Mike Sasso for that.  I'm sure there

13 has been other stuff too, but I'm sorry.  There is quite

14 a bit of it --

15     Q.   If something comes to mind --

16     A.   Yeah, sure.  Yeah.

17     Q.   -- just let me know in the course of the

18 deposition.

19          The 2013 divorce proceedings, that was in

20 Seminole County, correct?

21     A.   Kind of.  I filed in Seminole County, but all

22 the judges in the county recused themselves.  So it

23 wound up going over to Volusia County -- oh, also River

24 Cross I guess would be the other big, prevalent lawsuit,

25 but it's not a personal thing.  Although I think I did

1  actually sue them as an individual, so that would be

2  personal.  So River Cross would be the other --

3      Q.   River Cross you have a state court action, and

4  a federal court action for that?

5      A.   I did.  Yeah, they're both put away.

6      Q.   And River Cross is currently in bankruptcy,

7  correct?

8      A.   Yes.  It has no assets, and it has a judgment

9  against it -- or award of attorneys' fees against it, so

10 it is Chapter 7.

11     Q.   And that award of attorney fees is for

12 approximately $400,000?

13     A.   I think 422.  Somewhere in there.

14     Q.   And in the divorce proceedings, the Seminole

15 County judges recused themselves, so I think it was a

16 Brevard County judge that --

17     A.   I want to say Turner, but I don't know.  I can

18 see his face, but I don't know.

19     Q.   You also had the fraudulent transfer

20 litigation --

21     A.   Right.  Right.

22     Q.   -- pending in Seminole County?

23     A.   I thought you were referencing that with this

24 one when you said the immediate action, but, yes.

25     Q.   And then this airplane action that somebody

 1  didn't maintain your airplane, where is that pending?

 2      A.    Seminole County.

 3      Q.    Seminole County?

 4      A.    He filed the suit; we filed a countersuit.

 5      Q.    What's the name of the person that filed the

 6  suit?

 7      A.    The lawyer or the plaintiff?

 8      Q.    The entity.

 9      A.    His name is Joe Lamiroult.  I think I want to

10  say the name of his company is Key West Air Transport or

11  something like that.  Key West something or other.

12      Q.    And what kind of plane do you own?

13      A.    A Cessna 421c Golden Eagle.

14      Q.    And when did you purchase the Cessna?

15      A.    I want to say maybe 2019.  It all kind of

16  blends together now.

17      Q.    Are you a pilot?

18      A.    No.

19      Q.    Do you hire a pilot to take you around?

20      A.    I do, yes.

21      Q.    Is the plane operational currently?  Can you

22  fly it?

23      A.    No, that's why we're suing.

24      Q.    When was the last time your plane, the Cessna,

25  has been operational?

CHRISTOPHER DORWORTH                                    August 06, 2024
DORWORTH V. GREENBERG                                                15

1          MR. ANDRADE:  Object to form.  Just curious how

2      much this type of financial information you can

3      inquire about.

4          THE WITNESS:  Do I answer the question?

5          Yeah, you're --

6  BY MR. PERKINS:

7      Q.   Go ahead and answer.

8      A.   Well, this is going to take me a second to

9  figure out.  So I want to say 2021, later 2021.  That is

10 when the maintenance was due, and the guy didn't do it

11 and so I have not flown it since then.

12     Q.   How many times have you been deposed

13 previously?

14     A.   I couldn't count them on one hand.  Probably

15 five or six times.

16     Q.   Five or six times.  When was the last time you

17 were deposed?

18     A.   I believe that would be in the River Cross

19 case, the federal case.

20     Q.   The federal case?  And approximately what

21 timeframe was that that you were deposed with River

22 Cross?

23     A.   Well, when was the pandemic, 2021?

24     Q.   February 2020, March 2020 is when it started.

25     A.   So around that.

1       Q.   Around that time?

2       A.   It was before that, but it was around then.

3       Q.   Just a few ground rules for today.  If you need

4   a break, let me know, and I'll be happy to accommodate

5   you.  Just answer the question before we --

6       A.   I subscribe to the Dr. Katsur philosophy.  If I

7   don't need a breaks.  We'll go as short as we possible

8   can and just go through it.

9       Q.   All right.  Very good.  And if you don't

10  understand my question, ask for clarification.  I'll be

11  happy to clarify it.  If we can make sure our answers

12  today are audible.  A lot of time during the course of

13  the deposition people will do shoulder shrugs and

14  whatnot.  If you could make sure you're audible.  Avoid

15  talking over each other.  I know you're going to

16  anticipate my questions and want to answer, but if you

17  could let me finish my question, then sometimes of

18  course your counsel will object to the question and then

19  you can go ahead and answer unless your attorney

20  instructs you otherwise.

21          Do you understand those ground rules?

22      A.   Yes.

23      Q.   What did you do to prepare for today's

24  deposition, and I don't want to know about discussions

25  with your attorney?

1    A.   I reread the amended complaint and the original
2  complaint.
3    Q.   And when did you do that?
4    A.   Yesterday.  I wouldn't say I deep dived them.
5  I read over them.
6    Q.   And when -- what day did you retain Moore, Hill
7  & Westmoreland?
8    A.   What day was that?  Last week.  The day after
9  the deposition.
10   Q.   Okay.  The day after Rebekah Dorworth's
11 deposition?
12   A.   Yes.
13   Q.   And does Moore, Hill & Westmoreland also
14 represent Rebekah Dorworth?
15   A.   I don't know the answer to that question.  I
16 don't know.
17        MR. ANDRADE:  So I'm not under oath or being
18    deposed today, so I can't --
19        THE WITNESS:  I don't know.  I don't know.
20        MR. ANDRADE:  I would like to help you, but --
21        THE WITNESS:  I got you.  That's a
22    transactional thing.  I just don't know if she's
23    covered or not.
24        MR. ANDRADE:  It's up to your personal
25    knowledge.  I don't want to --

CHRISTOPHER DORWORTH                                August 06, 2024
DORWORTH V. GREENBERG                                            18

1          THE WITNESS:  I got you.  I got you.  I got

2     you.

3   BY MR. PERKINS:

4     Q.   As you sit here today, you don't know the

5   answer to that question, correct?

6     A.   I assume she's protected and covered by it, but

7   I don't -- I'm not a lawyer, so I don't know if there is

8   official paperwork you have to fill out or whatever that

9   is.  I think she is looking -- Alex here is looking out

10  for myself and the Dorworth family as a whole.

11    Q.   And how are you feeling physically today?

12    A.   Good.

13    Q.   I know that the day after your wife's

14  deposition you weren't feeling well --

15    A.   All day I was trying to muscle through on that

16  one, but it was just not meant to be.

17    Q.   Okay.  So you're not currently suffering from

18  any ailments or infections, is that a correct statement?

19    A.   I feel good.

20    Q.   Okay.  Are you currently on any medications

21  that would affect your testimony?

22    A.   No.

23    Q.   Your exwife's name was Elizabeth Dunzenberry?

24    A.   Dusinberre.

25    Q.   Dusinberre.  And Ms. Dusinberre is an attorney,

1   correct?

2       A.   Correct.

3       Q.   And my understanding is that she currently

4   lives and works in the metropolitan Jacksonville area?

5       A.   Correct.

6       Q.   And she practices estate and family law?

7       A.   I think so, yes.  We have never real discussed

8   her practice.

9       Q.   And you got married to Ms. Dusinberre on August

10  26, 2000, correct?

11      A.   Yes.

12      Q.   You had two children with Ms. Dusinberre,

13  correct?

14      A.   Correct.

15      Q.   REDACTED and REDACTED.?

16      A.   Yep.

17      Q.   REDACTED was born REDACTED, 2001, and REDACTED,

18  REDACTED., was born on REDACTED 2003?

19      A.   Correct.

20           (Exhibit 94 was marked for identification.)

21  BY MR. PERKINS:

22      Q.   I want to put some documents up on the...  I'll

23  share it here.  All right.  And this will be the first

24  exhibit we'll mark for the day, Exhibit 94.

25           And this is the petition for dissolution of

1  marriage with Ms. Dusinberre, correct?

2      A.   It looks like it.

3      Q.   And it looks like from this document you

4  separated on or about July 17, 2009, is that a fair

5  statement?

6      A.   That was the day she asked me for a divorce,

7  yes.

8      Q.   And you filed -- it looks like you verified

9  this petition on September 7, 2010?

10     A.   It sounds about right.

11     Q.   And it looks like from the docket that you got

12 a final judgment of divorce on September 24, 2013.

13         Does that sound correct?

14     A.   That sounds about right.

15     Q.   And in this case, there has been some

16 discussion about the timesharing agreement with your

17 exwife.  You have sat through a bunch of these

18 depositions, correct?

19     A.   Yes, sir.

20         (Exhibit 95 was marked for identification.)

21 BY MR. PERKINS:

22     Q.   And I'm going to put that timesharing agreement

23 up on the screen next, and I'm going to mark it as

24 Exhibit 95.

25         All right.  Exhibit 95, timesharing agreement

1  with Ms. Dusinberre?

2      A.   That's right.

3      Q.   All right.  And do you recognize this document?

4      A.   Yes.

5      Q.   And this is a document that apparently governs

6  summer timesharing with your two eldest children in the

7  summer of 2017; is that correct?

8      A.   It appears to be, yes.

9      Q.   And it says that you would get the children

10 from June 2, 2017, 9:00 a.m. to June 22, 2017, at 9:00

11 a.m., correct?

12     A.   Correct.

13     Q.   And is that what happened in the summer of

14 2017?

15     A.   Yes.  As a general rule, we were incredibly

16 compliant with whatever these documents were because any

17 sort of -- at the time, it was more of a tense thing, so

18 there would be no deviation from this.  It would be very

19 if this is what it said, this is what we did.

20     Q.   And do you recall where you would pick up your

21 children from the prior marriage?

22     A.   One of the idiosyncrasies of that divorce is

23 100 percent of the time I had to pick them up at their

24 mom's house.

25     Q.   And she lived in College Park at the time?

```
 1      A.   She lived off of Smith Street in College Park.

 2      Q.   Specifically she lives at    REDACTED

 3  REDACTED  --

 4      A.   Correct.

 5      Q.   Does that sound right?

 6      A.   Yes.

 7      Q.   And would you drop the kids off in College Park

 8  as well?

 9      A.   Yes.

10      Q.   At your exwife's residence?

11      A.   Yes.

12      Q.   Do you recall what specific time you would have

13  dropped off your kids pursuant to this stipulated order

14  back in the summer of 2017?

15      A.   I mean, plus or minus ten minutes.

16      Q.   Plus or minus ten minutes of 9:00 on Thursday,

17  June 22, 2017?

18      A.   Yes.

19      Q.   Would you have any records reflecting when you

20  would have dropped the children off at your exwife's

21  house at        REDACTED           ?

22      A.   Working backwards, I don't know a record there

23  would be.  We didn't do like an official receipt signoff

24  for the kids or anything.  They were 14 and 16 at the

25  time.  My wife did not -- my exwife did not live in a
```

1  gated community, so there would be no security gate to

2  go through, so no.  At first blush, I could think of

3  none.

4       Q.   Would there be any like Epass records or any

5  type of toll roads that you would have taken?

6       A.   Well, I live in Heathrow --

7       Q.   So all I4?

8       A.   You would go from Exit 98 and Exit 82 I want to

9  say it was maybe, or whatever the Princeton one was.  I

10 could do that one as well.  So no, the -- now that there

11 are the Lexus lanes or whatever they call them, but they

12 didn't back then.

13      Q.   Was there any type of parental coordination

14 like a parenting assistant that helped you facilitate

15 disputes with your exwife?

16      A.   No.

17      Q.   Nothing like that?

18      A.   No.  It would have been a good idea, but no.

19      Q.   You sat through your current wife, Rebekah

20 Dorworth's, deposition; is that correct?

21      A.   Yes.

22      Q.   Did you sit through the entire thing?

23      A.   I was not well that day, but I sat in front of

24 a computer screen the entire day but I really wasn't --

25 I was not -- I don't think I missed any of it, but there

1  was plenty of time that I was not zoned in on it.

2      Q.   And when you say you were not feeling well, can

3  you describe that for me?

4      A.   Well, I had gone to the Republican National

5  Convention the week before in Milwaukee and got one of

6  those RSV, norovirus type things where it basically

7  wipes out your entire -- my sinuses were messed up.  My

8  stomach was messed up.  Couldn't keep food down.  I

9  gagged.  It was pretty unpleasant.

10     Q.   And when did you first experience those

11 symptoms coming back from the RNC?

12     A.   Well, the first time I experienced those

13 symptoms was at the RNC.  I didn't know what it was.  I

14 went to bed one night and woke up on my birthday and

15 felt like hell warmed over.  And that was not due to any

16 sort of partying or anything, it was just a general

17 sickness.  But it kind of kept -- it stayed together for

18 a few days, and then it just -- for two or three days,

19 it was very unpleasant.

20     Q.   Ms. Dorworth testified that you two started

21 dating in the spring of 2012; is that correct?

22     A.   Yes.

23     Q.   Ms. Dorworth testified that you first started

24 texting her on February 18, 2012 --

25     A.   That was the date.

```
 1      Q.   -- is that correct?
 2      A.   Yes.  I was in the Chick-fil-A drive thru.
 3      Q.   You got married to Ms. Dorworth on November 5,
 4  2017; is that correct?
 5      A.   Correct.
 6      Q.   You have one child with Ms. Dorworth, correct?
 7      A.   Correct.
 8      Q.   And her name is REDACTED, and she was born on
 9  REDACTED, 2017; is that correct?
10      A.   That's her, yes.
11      Q.   Ms. Dorworth testified that you have an open
12  and transparent relationship.
13           Do you recall that testimony?
14      A.   Yes.
15      Q.   Is that a true statement?
16      A.   Very true statement.
17      Q.   What does that mean to you?
18      A.   You know, a lot of couples, they kind of
19  keep -- they separate their lives.  You know, there
20  is -- people -- there is like a whole thing on the
21  internet about people who don't keep their phones open,
22  you know, if someone else can do it.  My wife and I
23  don't do that.  She has all my emails.  She -- you know,
24  we leave our phones unlocked and in front of each other
25  all of the time.  We have very open and clear
```

1 relationship, very based on trust.  It's my second

2 marriage, so I learned some things that were -- that

3 didn't go well the first time around.  I have just tried

4 to make that part of our policy.

5     Q.   And when you say that Ms. Dorworth has access

6 to your emails, can you be more specific in that regard?

7 Does she get your emails that come into you?

8     A.   I mean, I don't route them to her computer, but

9 Rebekah pays our bills.  So she's in charge of the

10 financial stuff.  So, you know, it would not be uncommon

11 for her to go in my e-mail to see if there was a bill.

12 I'll even say sometimes, Hey, babe, we just got

13 something from Landscape Architect, can you take care of

14 it?

15     Q.   Does she have your passcode to get into your

16 emails?

17     A.   I think she's just logged in.  I think it's

18 just one of those things where you go on the computer.

19 I don't know if she -- I don't know my own passcode, so

20 she might, but I couldn't tell you what it is.  Just

21 generally, you just log in.  Do you want to log in as

22 Chris?  Do you want to log in as Rebekah?  She can do it

23 either way.  So I guess that's the same thing, but I

24 don't know if she knows my e-mail password because I

25 truly don't.

CHRISTOPHER DORWORTH                                        August 06, 2024
DORWORTH V. GREENBERG                                                    27

1      Q.    Okay.  But she can log into the computer and

2   see your emails?

3      A.    Yeah.  On her computer, yeah.

4      Q.    And that would be your Yahoo emails and Gmail?

5      A.    Gmail, yeah.  I don't really use Yahoo and have

6   not for awhile.

7      Q.    Your primary account is a Gmail account?

8      A.    Sure.  Yeah, I find e-mail to be generally

9   un-useful these days.  You get about 700 spam messages

10  for every one that matters.  I tell people if you send

11  me an email that you need me to see, there should be a

12  text so I can look for it because it's just the spam

13  universe has gotten overwhelming.  So I don't -- I guess

14  that would be my primary email, but I don't -- I'm not

15  much of an email guy.

16     Q.    What is your main course of communication?

17  What vehicle do you use?

18     A.    My phone.

19     Q.    Texting?

20     A.    Yeah.  I mean, sometimes.  I have lived -- I

21  have been in public affairs for a long time, and I

22  worked for Ballard Partners which was a multinational --

23  it was all over the world.  You know, so we were -- we

24  were highly versed on cyber threats, and we were

25  basically told to never put that you didn't expect to

CHRISTOPHER DORWORTH                                          August 06, 2024
DORWORTH V. GREENBERG                                                    28

 1  see on the front page of a newspaper.  So if I've got

 2  something to say, I usually make a phone call.  But,

 3  yeah, just casually, like, Hey, can you pick me up?

 4  Sure.  What time, what's your address, that kind of

 5  stuff, that would be the most I'd say cell phone.

 6      Q.   Do you have a Snapchat account?

 7      A.   No.  I've never had a Snapchat.

 8      Q.   Do you have -- in the summer of 2017, it

 9  appeared that you had a Signal account; is that true?

10      A.   I have a Signal account.  I've never had a

11  Snapchat account.

12      Q.   Okay.  You still have a Signal account --

13      A.   Yeah.

14      Q.   -- as we sit here today?

15      A.   Yes.  It's kind of -- that is how a lot of

16  people communicate and in the political realm.

17      Q.   And why do people in the political realm use

18  Signal?

19      A.   You'd have to ask them.  It's just very

20  popular.

21      Q.   Why do you use Signal?

22      A.   Because other people in the political realm use

23  Signal.  I meet them where they are.

24      Q.   Are there any distinct features of Signal --

25      A.   I am not an expert on --

1   Q.   -- that makes it more palatable than other

2   apps?

3   A.   I like it because it looks like iMessage.  It's

4   blue --

5   Q.   Do the messages disappear after a certain

6   amount of time.

7   A.   I think you can set that standard, but I'm not

8   really much of an IT guy.

9   Q.   Is that standard set on your phone where the

10  messages disappear after a certain amount of time?

11  A.   For some people but not for others.

12  Q.   For some of the people that you're texting

13  with, they disappear; is that correct?

14  A.   Yes.

15  Q.   And then for others they don't disappear?

16  A.   Correct -- well, you're talking about Signal or

17  text messages?

18  Q.   Signal?

19  A.   Yeah.  I think iMessage -- with iMessage you

20  can basically say delete my messages after a month or a

21  year, and I think with Signal you can go through

22  everyone and do it differently if I'm not mistaken.  But

23  I do not hold myself out as an any sort of expert on

24  messaging apps.

25        MR. ANDRADE:  I'm sorry, Jason, I think this

1     power strip might be off, and I think it's powering
2     his laptop.  I'm just going to press this and hope
3     nothing explodes.
4          MR. PERKINS:  Okay.
5          MR. ANDRADE:  We're good.
6          MR. PERKINS:  Is it on?
7          MR. ANDRADE:  I was just worried that it would
8     somehow --
9          MR. PERKINS:  Very good.
10   BY MR. PERKINS:
11        Q.   On your iPhone with iMessage is it set for
12   after a year the messages --
13        A.   It was for a very long time.  I don't think it
14   is anymore.  I think we got rid of that as a function of
15   when the feds reached out to us in the Greenberg matter.
16        Q.   Okay.  And when did the feds first reach out to
17   you in the Greenberg matter?
18        A.   When did Joel get -- Joel got indicted in June
19   2020, so I think -- whenever Joel went to jail after he
20   burned all Abby's stuff is when all of it started
21   happening.  I want to say that was at the end of 2020.
22   Yeah, that sounds about right.  I'm sorry, the time
23   blurs together.  It's hard for me to believe that was
24   four years ago.
25        Q.   And who specifically from the federal

1  government reached out to you?

2      A.   A guy named Todd Gee.

3      Q.   And how did he reach out to you?

4      A.   I think my attorney actually reached out to

5  him.  We had gotten some word that we had showed up in

6  some other subpoenas, so I called him and Richard

7  Hornsby called Todd.

8      Q.   Did you ever personally meet with Todd Gee?

9      A.   Yes.

10     Q.   On how many occasions?

11     A.   Once.

12     Q.   And where was that meeting?

13     A.   FBI headquarters in Maitland.

14     Q.   And it was at that interview?

15     A.   Yes.

16     Q.   Besides yourself, Mr. Hornsby, Mr. Gee, who was

17 there?

18     A.   There was -- a very memorable moment.  It was

19 about half the size of this room.  There was no air

20 conditioning.  There was me, Richard, we're both big

21 guys, and then six of them total, two of whom were from

22 the Department of Justice, whatever the corruption

23 unit -- public integrity unit, and then the other four

24 were FBI.  One of them was Alexander Duda.  He's the

25 only name I remember because I know his family, and then

1  I remember one guy said -- I don't know his name, but he

2  said he was from the violence against children unit or

3  something like that.  I don't know who the other ones

4  were.

5      Q.    How long did this in-person interview last?

6      A.    Three hours, give or take.

7      Q.    And what was the subject matter of the

8  interview?

9      A.    Joel and Matt.

10     Q.    Did any -- was there any discussion about "AB"

11  at this --

12     A.    Yes.

13     Q.    -- meeting?

14           And you understand "AB" to be "AB"?

15     A.    I do.

16     Q.    Was there any discussion about ghost political

17  schemes at this interview?

18     A.    I don't remember if they -- probably.  Yeah, I

19  think so, but it was a very brief thing.  I'm not sure

20  they understood what a ghost thing was at the time.  I

21  think it was more of trying to get me to explain the

22  nature of it.

23     Q.    What's your understanding of what a ghost

24  political scheme is?

25     A.    Well, I think the term got made up last year.

1  I mean, it's fairly commonplace in Florida Politics both

2  for Republicans and Democrats to close down primaries by

3  getting either an NPA or sort of the lazy way to do it

4  would be to have someone file as a write-in.  I think

5  they -- I'm sorry, no.  The ghost party scheme is --

6  whatever they call that is you get someone to run in the

7  race to sort of siphon off votes in the general

8  election.

9       Q.   And you pay them to do that?

10      A.    I've never heard of that.  I think that's a

11  crime.  I mean, I think typically, when people run for

12  office, a lot of times you'll have people who are

13  realtors who are trying to get their name out.  You'll

14  have people who are -- you know, want to run for office

15  later, and they're -- they just -- you know, they're

16  members of the local democratic executive committee or

17  republican executive committee or they don't like one of

18  the people.  Yeah, there is all manners for it.

19           I don't think it's -- I mean, I think the legal

20  part is the paying them portion.  I think people do this

21  all the time throughout the state of Florida and the

22  country.  I don't think it -- it's not uncommon at all.

23  I think the notion -- I think what got them in trouble

24  here in South Florida, the Artiles case was there was an

25  allegation that money was paid to the guy.

1      Q.   Money was paid to a ghost political

2   candidate --

3      A.   To a candidate.  And again, from what I

4   understand, that's not been tried in court and I think

5   there is some serious questions about I think the guy's

6   business partners.  But the allegation, from my

7   understanding, is that Mr. Artiles, Senator Artiles, had

8   paid some meaningful sum of money to whoever the

9   opponent was down there, and it was a slightly different

10  situation.

11         There was an incumbent democrat that went to

12  Harvard and would wear like rubber boots to the capitol

13  every day to like raise profile of global warming, and

14  he wound up losing his seat.  His name was -- they

15  called him JJR.  It was something something Rodriguez, I

16  want to say.  And Jose Javier Rodriguez, they got

17  another guy by the name of Rodriguez to run as an

18  independent, and I don't really know what the rationale

19  is, but I guess they think they siphoned or stole those

20  votes away.  The allegation is by paying this person to

21  do it then they somehow stole the votes.  That is very

22  different from what I think happened up here, the

23  allegations that I read about.  Just to be very clear, I

24  didn't have anything to do with either one of them and

25  never did.  But --

1      Q.    And the two you're talking about are the Jason

2  Brodeur race and the Lee Constantine race, correct?

3      A.    Correct -- no, not Lee Constantine.  Jason --

4  there is -- there was an opponent with Lee Constantine.

5  That was the republican primary challenge.

6      Q.    With Ben Paris?

7      A.    That is not a ghost candidate.  That is just an

8  opponent to the person.  The ghost candidate -- and

9  again, I think ghost candidate is a bullshit term.  I've

10  never heard of it before.  It's just made up by the

11  Orlando Sentinel to try to make something sound more

12  dramatic than it really is.  But the reality is there is

13  absolutely nothing illegal at all about filing someone

14  to run against another candidate for the purpose of

15  siphoning votes.

16         In these particular circumstances, again the

17  first one was Artiles, the second one was that that the

18  guy, Eric Foglesong, who they've gone after.  They

19  claimed that he raised $1,200 for the qualifying fee and

20  that he paid for it with I guess his own cash or -- and

21  then attributed to other people.  I don't really

22  understand that because he could have just written a

23  check for 1,000 bucks and then one from his company and

24  there would be no news.

25         So it never really made a lot of sense to me,

1  but I don't -- I think that was the nature of what that

2  was, and I think Ben Paris got in trouble because -- and

3  I think he was convicted of it, having his cousin be one

4  of the -- more or less agree to be one of the donors.  I

5  don't know why you would do that because you don't have

6  to have multiple donors and Eric was already a donor.

7           But anyway, that was the allegation was that

8  Ben's cousin did something, and I think they charged the

9  girl -- the woman who I have never met as -- because I

10  think she was her own treasurer.  But I think that is

11  the totality of it, and none of those have to do with

12  Lee Constantine.

13      Q.   Do you have a specific date when this interview

14  with Mr. Todd Gee occurred in person?

15      A.   No.  I want to say it was like around April.

16  The number that pops into my head for no good reason

17  whatsoever is April 3, 2001 (sic), but I don't -- that

18  just jumped into my head, but it's around that time.

19      Q.   April 3, 2021?

20      A.   2021, yeah I guess.  Yeah.  Yes -- you know,

21  well, it might have been February because we got the

22  subpoena right before or after New Years.  I don't feel

23  like we waited three months, so it might have been

24  February but it was the early part of the year of that

25  year.

1    Q.   Okay.  And in connection with this three-hour

2  interview, did they ask you at all about the July 15,

3  2017, gathering at your house?

4    A.   Yes.

5    Q.   And did the government also ask you about the

6  alleged interaction with "AB" at a hotel in Lake Mary,

7  Florida?

8    A.   Yes and no.  There was some confusion.  When my

9  attorney first talked to them, they thought something

10  happened at the house.  So Richard told me that the kind

11  of most extreme thing that I could do to demonstrate

12  that I really just didn't do this was go get a polygraph

13  test.  So we went to the polygraph.

14        The FBI -- former FBI guy of 35 years came in

15  and sat down and administered it.  And I think at first

16  it was like, Did something happen at the hotel or the

17  house?  I think I said just nothing happened.  So it was

18  sort of a blanket statement that nothing happened that

19  somebody -- it was an overall thing.  When we got there,

20  there was some confusion on the government's side

21  whether something happened at the house or something

22  happened at a hotel room, and I just positively said I

23  have never met the woman.

24    Q.   So it's your testimony that you have never met

25  "AB" --

1     A.    No, not "AB".

2     Q.    Were there questions about other women other

3   than Ms. "B" and yourself at this three-hour meeting?

4     A.    No.

5     Q.    Was pretty much the sole focus of this meeting

6   Ms. "B"?

7     A.    Really it was about Matt Gaetz and about -- at

8   this point in time, Joel was in, and again, he had

9   broken bail and burned your client's clothing and bags

10  and stuff, and he was stuck in jail.  So they weren't

11  really focused on him.  I think they kind of had him

12  dead to rights.  Most of this was trying to figure out

13  if Matt Gaetz was there or, you know, whatever I knew

14  about that.

15    Q.    And when you say if Matt Gaetz was there, if he

16  was at the July 15, 2017, gathering?

17    A.    Yes.

18    Q.    Did you feel like the questioning was focused

19  on you and your interaction with "AB" at this three-hour

20  meeting?

21    A.    I did not.  At the end of it, my attorney,

22  Richard, said like, You haven't asked my client if he's

23  broken any laws yet; and the guy said, All right, fine.

24  Did you ever have any relationship with "AB"?  I said,

25  No, I did not.  And then we handed them a copy of the

1  polygraph and she said, Thank you for it.

2      Q.   When did you feel like you were first a target

3  from the federal government's investigation with respect

4  to "AB" and yourself?

5      A.   Again, I'm not an attorney, but I think target

6  actually has legal meaning.  What they told us -- the

7  way it was described to me I think in the meeting itself

8  was that there are targets, subjects, and witnesses.  If

9  you are on the street and you see a bank robbery, you're

10  a witness.  If you're in the bank, you're probably a

11  subject.  And if they think you robbed it, you're the

12  target.

13          And he said, in this kind of case, basically

14  nobody can be a pure witness because of the very nature

15  of whatever statutory -- whatever the language is of

16  that.  But everyone's sort of -- you know, you're -- and

17  he said -- they told us we were on the witness side of

18  subject was the language I recall.  And I don't remember

19  who told me that, but that was -- I think somebody

20  relayed that to Richard who relayed it to me.

21      Q.   Going back to the open phone policy with

22  Rebekah, we talked about that previously, did

23  Ms. Dorworth have access to your text messages back in

24  the summer of 2017?

25      A.   Yes.

1    Q.   Okay.  And she could just freely look through

2  your phone and see your texts?

3    A.   Correct.

4    Q.   Okay.  And that would include your text

5  messages with Matt Gaetz?

6    A.   Yes.

7    Q.   And that would include your text messages with

8  Joel Greenberg?

9    A.   Yes.

10    Q.   And that would include text messages with Joe

11  Ellicott?

12    A.   Yeah.  I didn't have a whole lot of texts

13  messages with Joe Ellicott; but, yeah.  I texted those

14  other guys.

15    Q.   Let's talk about Mr. Ellicott for a second.

16    A.   Sure.

17    Q.   When did you first meet Joe Ellicott?

18    A.   Well, for me to give you a good answer to that

19  I'm going to have to tell you when I first met Joel and

20  then -- because they were tied together.  I first met

21  Joel -- is that okay if I do that?

22    Q.   That's okay.

23    A.   Because I don't know the answer to it.  I can

24  back into it if I do it this way.

25    Q.   Yeah.  So just tell me --

1     A.   So Joel and I met after the primary election.

2  He had already won the tax collector primary.  He had a

3  write-in, so he was going to win the general election.

4  I met him at a fundraiser for Donald Trump at Bobby

5  Dello-Russo's house on Markham Woods Road.  At the time,

6  I represented the Orange County Tax Collector, Scott

7  Randolph, before the legislature in Tallahassee, and

8  Abby and Rebekah had gotten to know each other from

9  junior league and from the Heathrow mom's club.

10        So I got to know Joel shortly after that but

11  before he was in office, and then I think I met then Joe

12  who I generally considered to be Joel's best friend --

13  came and worked for him, so it would have been probably

14  sometime early in 2020 -- I'm sorry, 2017.  Somewhere in

15  that, but I don't know exactly, but early on.  Basically

16  what Joel would do is he had this sort of entourage that

17  would travel around, and Joe was part of it and Abby

18  would be part of it and then Abby's best friend, CK,

19  would be part of it and sort of a posse and Joe sort of

20  emerged on that front.

21     Q.   What does CK stand for?

22     A.   I think C REDACTED  C REDACTED, if I'm not mistaken.

23  It was Abby's best friend who had an affair with Joel,

24  moved to Texas.

25     Q.   How many times has Mr. Ellicott been to your

 1  home?

 2      A.   A couple maybe.  I don't know.  He's -- he's

 3  been there.  I don't remember - he's not been there all

 4  an awful lot, but he's been there.

 5      Q.   And what were the occasions that brought

 6  Mr. Ellicott to your home in Heathrow?

 7      A.   Probably just -- I have a little grill area out

 8  back and a pool, and I like to call myself the grill

 9  master.  So I would make burgers and invite people over,

10  so probably for that sort of situation.

11      Q.   Have you ever been to Mr. Ellicott's house?

12      A.   I don't know where Joe Ellicott lives.  It was

13  always a subject of great curiosity.  I think he made

14  like 100,000 bucks a year and living with his mom, so I

15  really didn't understand that.

16      Q.   Do you believe that you look like Mr. Ellicott?

17      A.   I mean, I think we're both the same size, give

18  or take.  Both of our weight can fluctuate.  Similar

19  hair color.  Both have facial hair.  I mean, I don't

20  make a habit of comparing myself to other men

21  physically, but, I mean, if size, weight, hair color,

22  complexion, facial hair, I think there would be enough

23  there where if somebody was on the appropriate amount of

24  ecstasy they might get confused.

25      Q.   Has anybody ever told you that you look like

1  Mr. Ellicott?

2     A.   No.

3     Q.   Do you have reason to believe that this is a

4  case of mistaken identity where --

5     A.   I do.

6     Q.   -- "AB" mistook you for Mr. Ellicott?

7     A.   Yes.  What I don't know is if it was

8  intentional or whether it was accidental, but I do

9  believe that's what happened.

10    Q.   Okay.  And what facts and circumstances lead

11 you to believe that this is a case of mistaken identity?

12    A.   Well, most of it consists of the fact that my

13 knowledge of what Joe and Joel's relationship was like.

14 They lived together, they were best friends, they would

15 frequently engage in sexual activities with women in the

16 presence of each other.  Abby kicked Joel out -- I'm

17 sorry, kicked Joe out of the house because she thought

18 he was a bad influence on Joel.  So when I read

19 Ms. "B"'s interrogatories that said that they were

20 chatting during the 15 minute sexual encounter, it

21 sounded very much like something that and Joe and Joel

22 would do and nothing at all like something I would do.

23 So that would be -- that would be the thought.

24    Q.   And you said that Joel Greenberg and Joe

25 Ellicott lived together?

CHRISTOPHER DORWORTH                                    August 06, 2024
DORWORTH V. GREENBERG                                                44

1      A.   I believe so, yeah, for years.

2      Q.   And then you mentioned that Abby kicked

3  Mr. Ellicott out of the house.

4           Do you have a rough timeframe on that?

5      A.   I don't.  Here is what was my understanding of

6  it, and I don't think I ever had a timeframe, but it was

7  basically when they decided to get engaged.  She said

8  that's fine, but Joe has got to move out.  We have to

9  move in together and do our own thing.  So I think --

10  Joel was already married when I met him, so it would

11  have predated any of that by me by a good bit.  But my

12  understanding is basically, you know, all right, we're

13  going to do this, and we're going to get married, but

14  the first thing you have to do is get rid of your

15  friend.

16     Q.   Has anybody ever told you that they believe

17  that this is a case of mistaken identity where "AB"

18  mistook you for Mr. Ellicott?

19     A.   I don't -- again, I have never met "AB" before

20  of this I am certain.  I have had a chance to review the

21  internet, look at her, see who she was.  I have never

22  seen that person.

23     Q.   And you sat through her entire deposition?

24     A.   Sat through her entire deposition, although she

25  looked very different in that deposition than she did on

1  the internet.  She had a cardigan sweater on, and it was

2  very different from what you would find on the worldwide

3  web.  But I have never seen -- never met that person.

4       Q.   Do you have a prenuptial agreement with

5  Ms. Dorworth?

6       A.   No.

7       Q.   Can you briefly outline for me your educational

8  background?

9       A.   Sure.  Graduated from -- well, I'll go back all

10  the way to the beginning.  Kindergarten through eighth

11  grade at Lake Highland, high school at Colonial High

12  School, University of Florida, Duke.  I got my MBA at

13  Duke.

14       Q.   And when did you graduate the University of

15  Florida?

16       A.   1998, August.

17       Q.   And what was the degree that you obtained

18  from --

19       A.   Political science.

20       Q.   And then you went to Duke?

21       A.   I did.

22       Q.   And what did you study at Duke?

23       A.   Business.

24       Q.   What year did you graduate?

25       A.   2006 -- no.  2006.

1    Q.   So Florida, graduated in 1998; Duke, 2006?

2    A.   Yes.

3    Q.   Any other education beyond that?

4    A.   No.

5    Q.   Do you hold any professional licenses?

6    A.   No.

7    Q.   Any special certifications?

8    A.   No.

9    Q.   Are you a registered lobbyist?

10   A.   Right now, no.

11   Q.   When is the last time you were a registered

12   lobbyist?

13   A.   I guess the moment I quit my job in 2000 --

14   2021, yeah.

15   Q.   April of 2021?

16   A.   Yeah, when the New York Times story broke.

17   Q.   And you said that was when you quit your job

18   from Ballard Partners?

19   A.   Well, I mean, we represented the Major League

20   Baseball, the PGA and with these allegations out there,

21   even the allegations of the third party which was

22   actually what they wrote about, just you go to the

23   commissioner of Major League Baseball and say that you

24   know your lobbyist is under investigation for, you know,

25   participating in a third party?  They'd say, well, get

1  rid of that firm.  So I wasn't going to do that to my

2  coworkers, and I stepped away but it would have been

3  necessary if I hadn't done that, if I had fought it, it

4  would have happened sooner or later.  I would have had

5  to quit.  I would have been pushed out.

6      Q.   And when you say the third party, you're

7  referring to the ghost political allegations?

8      A.   Yeah, whatever you call it.  The ghost party,

9  yes.  That was what actually made the New York Times for

10 Katie Benner.

11     Q.   And did anything about "AB" make the New York

12 Times around that timeframe in April of 2017 --

13     A.   Well, I threatened to sue everybody involved if

14 they ever mentioned it, so I did not.  We were able to

15 keep it back.  I spent five or six hours a day on the

16 phone with basically -- everybody -- I can't even

17 remember the names.  It's been years.  But it is the

18 Wall Street Journal, Washington Post, New York Times

19 every single day because of the interest around Gaetz.

20     Q.   So back in April of 2021, your understanding is

21 the ghost political allegations got out and were

22 published in the New York Times but not the AB and

23 yourself allegations?

24     A.   Well, I mean, I was in that article, but Katie

25 Benner who was the Pulitzer Prize winning person said,

 1  you know, We've gotten -- we've been told more or less

 2  by somebody allied with the Greenbergs.  She did not

 3  make any pretense at this gate from the Department of

 4  Justice at all, and she was pretty clear that this

 5  information was being pushed out by you guys and

 6  suggested that I was there.  I said I was not there.  I

 7  have never met the woman, and I will litigate like hell

 8  if anyone says I have.  She said, Well, I have to put

 9  something in here.  What if I put this about the third

10  party?  I said, It's not true either, but, you know,

11  it's better than the other one.  I can't control what

12  the New York Times writes.  If anyone could do that,

13  they would make a lot of money.

14      Q.   And that third party issue was the Jason

15  Brodeur election with Justin --

16      A.   I believe the exact suggestion was that Joel

17  said that he observed a conversation between me and Matt

18  Gaetz about the Jason Brodeur third-party race.

19      Q.   And that would have been Patricia Sigman as a

20  democratic candidate and then Iannotti ran as an

21  independent or nonparty affiliation?

22      A.   Yeah.  I mean, at the time, I was a very

23  controversial figure in Seminole County because of River

24  Cross.  So, you know, I probably would have been

25  involved in something like finding a candidate to do

1  that, but Jason Brodeur came to me and said, Listen, you

2  know, with what you've got going on, if anyone tries to

3  drag you into this, do us all a favor and steer far away

4  from it.  I said, That sounds like a great plan, and

5  never thought about it again.  I don't think -- no, it's

6  Jason was not interested in that kind of game and didn't

7  think it was necessary to win.  It turned out he was

8  right.  He won by a larger margin.

9      Q.    And Jason, you're friends with Jason, correct?

10     A.    Yes.  Very close.

11     Q.    How long have you been friends?

12     A.    Since about January 1995.

13     Q.    And the night before Rebekah's deposition, you

14 had gone out with Mr. Brodeur, correct?

15     A.    Yes.

16     Q.    And you also went out with somebody named Clay;

17 is that correct?

18     A.    Craig Sweger.  I think we'll have that changed.

19 I have a fraternity brother named Clay Sweger, and I met

20 with Craig Sweger.  My wife heard me say Craig Sweger,

21 but that was my fraternity brother.  So his name was

22 Craig Sweger.

23     Q.    So you went out with Jason and Craig, anybody

24 else?

25     A.    No.

CHRISTOPHER DORWORTH                                                   August 06, 2024
DORWORTH V. GREENBERG                                                              50

1      Q.    And where did you go then?

2      A.    Grafton.  Grafton Street Pub up in Lake Mary.

3      Q.    Is that the old Liam Fitzpatrick's?

4      A.    It is.

5      Q.    Is it the same owners or different?

6      A.    The same owners.

7      Q.    They just rebranded?

8      A.    They bought the Applebee's, spent a bunch of

9   money rebranding it because they were paying like 35,000

10  a month in rent at their old location.

11     Q.    And how long did you hang out with Jason and

12  Craig?

13     A.    It was short.  They had a meeting, and Craig is

14  just a friend of mine.  He was is an old Clear Channel

15  billboard group for like 19 years, and I just hadn't

16  seen him in awhile.  So I went and had a drink or two

17  with him and came back.  I wasn't feeling real well, so

18  it wasn't like a real heavy night as you can imagine.

19     Q.    Can you give me a rough estimate?  Like an

20  hour?

21     A.    Yeah, probably an hour.

22     Q.    Are you currently working?

23     A.    I have some clients.  I mean, I have two

24  consulting clients.

25     Q.    Okay.  And is it a lobbyist relationship?

1     A.   More strategic consulting.  I anticipate this

2  session I will probably delve back into the official

3  process of lobbying, but lobbying is -- it's -- many

4  people don't really understand what it is.  It is

5  probably most simply articulated as the seeking

6  grievance from your government for money, but it's -- it

7  speaks very specifically to asking for votes and

8  representing people, and I have as of yet not done that

9  yet, but I anticipate that will become part of what I do

10  in the near future.

11     Q.   In the summer of 2017, you were working at

12  Ballard Partners, correct?

13     A.   Yes, sir.

14     Q.   And what was your job title there?

15     A.   I think it was maybe the managing director of

16  the Central Florida office.  I don't know.  I'm not a

17  big title guy.  I mean, you work there.  You were -- I

18  think managing director would be the title, but I don't

19  exactly know.

20     Q.   Was that office in Orlando?

21     A.   We never -- I mean he always wanted an office

22  down here, but we never found one that we did.  So it

23  was just me and then for awhile it was a guy named

24  Richard Anderson and then another guy named Don Payton

25  who specialized in the college stuff.  And we just had

1  very different things.  So we had an office in

2  Tallahassee, and it's not uncommon -- like I think there

3  was an office in Miami, there is an office in Fort

4  Lauderdale, an office in Tampa, but we just -- to me

5  managing an office did not seem like a particularly good

6  use of time so we didn't have a local office but we had

7  one in Tallahassee.

8       Q.   How many people reported to you when you were

9  at Ballard Partners?

10      A.   I mean, it didn't really work that way.

11  Ballard Partners -- Ballard owns 100 percent of Ballard.

12      Q.   And that's Brian Ballard?

13      A.   That's Brian Ballard.  He owns 100 percent of

14  Ballard Partners.  He is the president of Ballard

15  Partners and everybody works for Brian.  But, I mean,

16  obviously there is some sort of pecking order.  There is

17  people who specialize in transportation stuff.  So to

18  answer the question is zero direct reports, but, I mean,

19  again, I was considered somebody in that firm who was --

20  you know, I had big clients.  I handled large issues.  I

21  mean, we would -- I was sent to do a lot of jobs.

22      Q.   What kind of job duties did you have at

23  Ballard?

24      A.   I mean, you -- lobbying.  Lobbying the

25  legislative branch.  Lobbying the Florida House.

1  Lobbying the Florida Senate.  Lobbying the governor's

2  office.  Lobbying the chief financial officer, and

3  lobbying the attorney general in some circumstances

4  probably.

5       And then there is all the agencies of

6  government.  There's the DPR.  There is department of --

7  office of insurance regulation.  There is AHCA.  There

8  is Department of Health which that was medical

9  marijuana, and I dealt with all of them.  I mean, they

10  were -- like we had certain people that were really,

11  really dialed in on transportation, but I'd still help

12  out because I was good on that.  So basically a jack of

13  all trades kind of stuff.  So in terms of the management

14  structure, it all went to Brian.

15     Q.   Does Ballard Partners, are they in the business

16  of working on pardons?

17     A.   Yes.

18     Q.   Have you ever done anything like that, worked

19  on a pardon for --

20     A.   I have not.  I have never done federal lobbying

21  work.

22     Q.   Do they do federal lobbying for pardons and

23  state lobbying for pardons, both?

24     A.   Oh, yes.

25     Q.   The governor and the president?

CHRISTOPHER DORWORTH                                    August 06, 2024
DORWORTH V. GREENBERG                                              54

1      A.    Yes.

2      Q.    Who's the --

3      A.    Well, what you said is not exactly right.  In

4  Florida it's a cabinet.  You have to go -- like the

5  president can just pardon whoever they want.  There is a

6  bunch of laws they put around that, and I think under

7  Trump there was a lot of scrutiny of that which kind of

8  shut the whole process down.  But that's a very large

9  part of what a lot of federal practices will do.  I

10  don't have any firsthand knowledge of what we do.

11         If you said, like, give me an example of who we

12  got pardoned, I don't know, but I know that that was

13  very much something that was discussed.  Brian did not

14  like pardon work because he thought it just was the kind

15  of work that even if you make a lot of money doing it

16  you bring scrutiny on yourself because every time the

17  president pardons there tends to be a very big level of

18  interest and curiosity as to why and if it shows up in

19  politics.  So I think on a few occasions I had people

20  make general inquiries.  I ran it up to Brian who was

21  not particularly enthused about it, but it is was

22  definitely something that the firm did.

23      Q.    Who was the point person at Ballard for federal

24  pardons?

25      A.    Probably Brian and Pam Bondi.

CHRISTOPHER DORWORTH                                    August 06, 2024
DORWORTH V. GREENBERG                                                 55

1      Q.   Pam Bondi and what, Brad?

2      A.   Brian.

3      Q.   Brian Ballard?

4      A.   Brian Ballard and Pam Bondi.  And again, I

5  assume that.  I don't know.  I don't know who -- if

6  there was other people that were involved in that.

7  Again, I was never a federal lobbyist.  It is a very

8  different sandbox.

9      Q.   Have you ever discussed obtaining a pardon for

10  Joel Greenberg with anybody at Brian Partners?

11      A.   No.  He asked me to, but I politely refused.

12      Q.   When did Mr. Greenberg first ask you to work on

13  getting him a pardon?

14      A.   So I don't -- it was -- Rebekah went to the

15  Marriott.  Joel threatened her.  I told Joe I wanted to

16  meet him.  I said, If you ever threaten my wife again,

17  you and I have -- it's going to be a real problem, and

18  he basically -- we were at Another Broken Egg.  And at

19  the time, I was not pleased with Joel because he had --

20  when he did that stuff to Brian Beute which I find to be

21  utterly reprehensible when he created the Facebook

22  account and then mailed the letter to Trinity Prep.

23           He put on the Facebook ad that Brian Beute was

24  a segregationist, and that was a very clear attempt and

25  it worked because it actually pursued Beute's attorneys

1  that I was the one that was doing it.  But because he

2  said that, I was suing Seminole County for a fair

3  housing act segregative effect lawsuit.  So I was really

4  pissed off at Joel for putting my name -- putting

5  segregation in there, to do it in the first place.

6          So when I saw him, I was already pissed at him.

7  And he had just threaten my wife, and so I was even more

8  pissed at him.  And when I -- when we got to breakfast

9  there, he was just -- he was crazy, and he was -- he had

10  only been charged with two crimes, just started

11  blabbering on on how they know about the girls.  And I

12  said, Joel, I don't know what you're talking about.  I

13  think I used the F word.  I said, I don't know what the

14  F you're talking about.

15          He goes, We're going -- I'm going to get

16  charged.  I need a pardon.  I mean, he was -- at this

17  moment in time, Joel truly believed that he thought that

18  he could stop all of the horrible things that happened

19  to him by getting pardoned.  First he thought it was

20  going to be Gaetz.  I broke it to him, I said, Matt is

21  not going to help you try to get a pardon.  If Matt

22  wanted to help you get a pardon, he could not help you

23  get a pardon.

24          Joel did not believe that.  Joel was -- he

25  said, No, Trump loves him like a son.  He can do it.  I

1  said -- then he pointed out -- Joel pointed out that

2  Roger Stone had been pardoned.  I said, Okay, Joel let's

3  take a second and talk about that because Roger Stone

4  and Donald Trump have known each other and worked with

5  each other for 40 or 50 years.  The -- they have worked

6  together on projects.

7          When Roger Stone was investigated by the

8  federal government it was because there was -- it was

9  part of an investigation that -- I think it was that

10  Ukraine was influencing elections.  Roger wound up going

11  to prison for like threatening a federal judge's dog's

12  life and I think saying some things, but even though

13  Trump let him be tried, let him be convicted, let him go

14  through an appeal, spend an absolute fortune along the

15  process.  And then the day he was supposed to go into

16  jail, he commuted his sentence.

17          I said to Joel, Now, Joel, Donald Trump doesn't

18  know who you are.  You are not being investigated for

19  some BS claims of Ukraine trying to influence the

20  election for Donald Trump for president.  This is you

21  doing dumb shit, And I don't know how you think this is

22  going to somehow get bailed out.  And I just told him, I

23  said, like, you know -- and he -- I do think he got the

24  Stone analogy that the fact that Trump had made Roger

25  Stone go through all those things before commuting his

1  sentence, you know, it seemed to resonate.

2       So then he immediately turned over to Ballard

3  Partners and said, What would it cost to get a pardon?

4  And I said, I am -- I said very clearly, I said, you

5  know, If this was about the other stuff which was you

6  doing the sending a note to a private school suggesting

7  that a music teacher was having sex with a male underage

8  classmate, I could not get you pardoned for that.  There

9  is just certain things.

10       You see -- I think in that world, you sort of

11  think like white collared crimes, didn't pay their taxes

12  or had some -- they didn't file some five percent thing

13  with the SEC.  You see those people get a lot of

14  pardons.  You don't see a lot of people are out there

15  for stalking and who falsified other people's

16  identifications.

17       I said, So, Joel, if that was the reality, I

18  couldn't do it for you.  It would be beyond what Ballard

19  Partners or the firm could do.  If you're telling me

20  that you have numerous women that are going to come out

21  and say that you were paying them or trafficking them or

22  anything -- and I didn't know about "AB" being underage.

23  It's all new to me at this point in time.  I didn't know

24  who she was, and a few weeks later he threatened me via

25  text message on that stuff.  But I told him, I said --

CHRISTOPHER DORWORTH                                    August 06, 2024
DORWORTH V. GREENBERG                                              59

1  he threw out the number, he said his parents would pay

2  $5 million if he could get a pardon.

3      Q.   And this was at the Broken Egg?

4      A.   It was at the Broken Egg.  I said --

5      Q.   When was that meeting at the Broken Egg?

6      A.   Find out whenever that Marriott meeting was and

7  it was probably three or four days after that I bet.

8      Q.   So the Marriott meeting was in July.

9      A.   Yeah.  Again, I'm sorry, I don't have that

10 calendar in front of me.  If you say so, but, I mean, it

11 was -- I think it was in August that they started

12 sending me the text claiming that his attorney told him

13 that everybody would have to get lawyered up.  So that

14 was after Another Broken Egg.

15     Q.   Do you recall who paid for the meal at the

16 Broken Egg?

17     A.   I do not.

18     Q.   Whether there would be a receipt or anything

19 like that?

20     A.   I don't know.  I don't think Joel had any

21 money.  He needed a ride home.  I told him I couldn't be

22 friends with him anymore because of the allegations that

23 were coming forward and the idea that you trafficked a

24 child.  That I had an 18 year old -- I had a daughter at

25 the time who was -- yeah, I think she was 18 in 2000 --

1    well, she was born in 2001, so she would have been 19 or

2    20.  I said, The fact that I had a daughter who is about

3    the same age, I cannot -- now, you've seen me.  I take

4    it very seriously.  I cannot be known as being someone

5    who hung around a dude that did the shit that you did,

6    Joel.  He said, I understand, but can I have a ride

7    home?  I don't have a car.  So I drove him home, and

8    that was the last time that I saw Joel.

9        Q.  And when is the first time that you heard the

10   name "AB"?

11       A.  Via -- well, I think via the text message where

12   he -- the WhatsApp or whatever he said, Everyone needs a

13   lawyer.  And I said, What?  And he said, They have our

14   texts.  Who?  V REDACTED 99 or something.  I have never

15   been on those websites.  I have never -- I have never

16   been on a social media dating site ever.  I just missed

17   that window when I was elected office.  So I wasn't.  If

18   I had been, I probably wouldn't have been on it anyway,

19   but I didn't know V REDACTED 99 was.  I didn't know who

20   "AB" was.  I sure as hell didn't know she was underage

21   when he had this issue with her.

22       Q.  When is the first time that you learned that

23   "AB" was underage in the summer of 2017?

24       A.  I don't know.  Probably throughout the course

25   of the investigation here.  My first question was who

1    are you talking about?  Like I don't know who "AB" is.

2        Q.    So your testimony is that the first time you

3    heard the name "AB" is when Greenberg reached out to you

4    and referenced her Seeking Arrangements name, V`REDACTED`

5    `REDACTED`?

6        A.    Well, the name made -- there is a text message.

7    He sent a picture that is our part of our discovery here

8    that says something like she -- I think she had just

9    become like a -- some porn star.  I don't know here.

10       Q.    And that's, `REDACTED` destined for greatness; and

11   you responded, LOL?

12       A.    Yeah.  It was just a typical response for me.

13   I don't know what I'm supposed to say to, `REDACTED`

14   destined for greatness.  I have no cognitive

15   counterpoint to that that would be better than LOL.  He

16   was -- I mean, I think Joel and Abby -- I'm sorry, I

17   think just Joel and "AB", they hung out for many years.

18   I think he continued to be friends with her, I just

19   never met her.

20       Q.    You stopped working at Ballard Partners on

21   Friday, April 9, 2021, correct?

22       A.    Sounds right.

23             (Exhibit 96 was marked for identification.)

24   BY MR. PERKINS:

25       Q.    And I'm going to put the severance agreement up

 1  next on the screen here.  All right, the next exhibit

 2  will be 96.  This is the severance agreement and general

 3  release between yourself and Ballard.

 4          Do you see that up on the screen?

 5      A.   I do.

 6      Q.   Okay.  And this document was executed by Brian

 7  Ballard and yourself on April 9, 2021; is that correct?

 8      A.   It looks like it.

 9      Q.   Where did you physically execute this?  Where

10  were you when you did it?

11      A.   My house.

12      Q.   If we go to page three, do you see the

13  voluntary resignation paragraph there?

14      A.   Yeah.

15      Q.   It states, In consideration of the mutual

16  promises of the employee and employer contained in this

17  agreement, the parties agree that employee's personnel

18  file will reflect his voluntary resignation effective

19  April 9, 2021 --

20      A.   Correct.

21      Q.   Did I read that correctly?

22      A.   Yes.

23      Q.   Was your resignation voluntary?

24      A.   I mean, define voluntary.  I mean, it's -- I

25  have been around for too long.  I have been part of

1  crisis communication for the better part of 20 years in
2  my life, and I know that there's certain things that you
3  can beat back and certain things you can't beat back.
4  And my instinct was very quickly on this one that if
5  I -- and by the way, Brian was willing to let me stay
6  and fight for a little bit.  But we both had been
7  through this sort of thing before.
8          We have seen just through politics -- I mean,
9  obviously there is no quite perfect comparison to this,
10 but we have just seen too many times that once the press
11 gets ahold of these things, they become a piranha like
12 feeding frenzy.  I think that was done very
13 intentionally, and I think the leak of the information
14 was definitely done in an attempt to get time off the
15 jail sentence from -- for Joel Greenberg.  We knew that.
16         And so I think that the -- you know, I think
17 that they were going to keep the pushing the press, so I
18 made a resignation because I think otherwise what would
19 have happened is I would not have had the choice of a
20 voluntary resignation.  So on a scale of how voluntary
21 it was, I would say it was not terribly voluntary.  It
22 was done -- it was an option that I had at that moment
23 in time to move on and to -- you know, to attempt to
24 fight these things but not to do it in a place where one
25 day we start using big clients and other people in the

1  firm get upset because we're getting dragged through

2  things and we start to have staff and morale problems.

3         I just saw that happening, and I said, Listen,

4  if we do this now, that's that.  I didn't want to.  I

5  loved that job.  I love the people there, everyone of

6  them.  It was a wonderful job, and I think this is a

7  real horrible thing that happened.

8     Q.   Who brought up the idea of you resigning?  Was

9  it you or Mr. Ballard?

10    A.   That sort of thing, I mean, we were grownups.

11 We were professionals.  You know, he's got a lot of

12 employees.  I have managed things.  We're not -- when

13 you read -- first of all, I'm tied to Matt Gaetz in the

14 first place.  Second of all, when you read the Gaetz and

15 the Greenberg stuff and then you see allegations that

16 I'm under investigation for some ridiculous third party

17 stuff that I never had anything to do with.

18        I mean, it was just -- it was all Joel trying

19 to -- because at this point in time, they knew the only

20 way he was going to get out of jail was by getting as

21 many people convicted as possible.  And I -- the story

22 that came out was -- and the fact that I was spending

23 several hours a day on the phone told me that this was

24 not going away.  So voluntary was the way I could do it,

25 and I don't know that we ever -- I don't remember me

 1  saying, What about me resigning, Brian, or Brian saying,
 2  What about you resigning?  But it would just be the sort
 3  of thing -- if a plane crashed and it was you and a
 4  business partner saying, well, should we get off the
 5  plane?  I mean, that was sort of more the conversation.
 6  I wasn't saying, Oh, should we stay we on the plane?  At
 7  that moment in time, we knew that this was coming, and I
 8  pretty much had to go.
 9      Q.   Did Brian ask you to leave?
10      A.   Brian was very anguished by this.  Brian was a
11  good friend, but this was -- I was very happy.  I was
12  good at my job.  I was successful at my job.  Things
13  were going great.  The only reason anything went wrong
14  was because Joel Greenberg went and burned all of your
15  client's stuff, and then Andy Greenberg threatened --
16  again, this is so weird because we were there.  I mean,
17  Rebekah was friends with Abby.  And after burning all of
18  Abby's bags and burning her clothes except for her
19  workout clothes and maternity clothes.
20          And after having a thing where he had to be
21  like literally lured out where they did a hostage
22  response thing, after all that, Abby talked to Rebekah
23  and relayed the information that Andy was still trying
24  to get Joel out of jail.  And at the time, Sue said,
25  Well, if you do that, I'm taking Abby and I'm taking the

1  kids and I'm moving to the California because this --

2  our son is a lunatic.

3          And but that did not stop them from then going

4  to plan B which was to make up a bunch of bona fide lies

5  trying to implicate other people in the things that Joel

6  had done wrong for the purpose of getting him off.  And

7  I don't have to question that because Fritz Scheller

8  over there, he actually went to the newspaper and said

9  it.  So, I mean -- he said, We want more time off for

10 Joel in exchange for all this testimony.  So he knew

11 what was going on.

12     Q.   When did you first contemplate resigning from

13 Ballard Partners?

14     A.   When I saw the New York Times story.

15     Q.   And that story came out on what day?

16     A.   I don't remember, man.  A couple days before.

17     Q.   Ms. Benner had texted you on April 8th.

18     A.   Yeah, I think that was about that time.  This

19 all happened pretty quickly.

20     Q.   Did you retain outside counsel to review the

21 severance agreement?

22     A.   No.

23     Q.   Do you know if Ballard had outside counsel?

24     A.   Yes.

25     Q.   Do you know who they used to facilitate the

1  severance agreement?

2      A.   Tom Panza probably if I had to bet.

3      Q.   How do you spell that last name?

4      A.   P-A-N-Z-A.

5      Q.   Out of Tallahassee?

6      A.   Broward and then Tallahassee.  He's a -- I

7  think Mr. Panza kind of looked at this for me too.  I

8  had other lawyers who were doing other stuff at Lowndes

9  Drosdick.  I said, Does this look good to you?  And they

10 said it was -- it was fine.

11     Q.   Who would you have reached out to at Lowndes?

12     A.   Either Rebekah Rhoden or Tara Tedrow.  I think

13 both of them -- I think I texted them both and said,

14 Does this look okay?

15     Q.   When did you first get your hands on the

16 severance agreement to look at?

17     A.   I don't -- it all happened very quickly.

18 Whatever those days were, like we -- basically the story

19 came out, Brian and I said, Hey, let's sleep on this.

20 You know, like, let's talk tomorrow morning because, you

21 know, a lot of information to process.  The next

22 morning, he called me and asked what I was thinking.  I

23 told him what I was thinking.

24          He took about two seconds and he said, All

25 right, let's do it.  I think it was a very quick

1  process.  I think later that day I got a draft of this.

2  I think they had been used for other ones.  I think this

3  was like kind of a standard document.  I didn't have to

4  make any edits.  Nothing was objectionable.  I mean,

5  it's very -- I think the one change I made was -- there

6  was language in there originally that said the

7  non-disparagement thing.

8          I said, I have nothing bad to say about Ballard

9  Partners, and we love you.  So I think the language was

10  tweaked a bit to say that -- I mean, I have never said a

11  bad word about Ballard Partners, and I don't think

12  they've ever said about word about me.  If they have, I

13  have never heard it.  But we basically made it so that

14  we could make public comments about each other because

15  when you have a non-disparagement, non-discussion that

16  you kind of make it sound like it was a more hostile

17  thing.

18      Q.   Was Ballard Partners getting contacted by the

19  press before you resigned?

20      A.   I'm sure.  I don't know that, but I'm sure.

21      Q.   Do you know for sure if they were?

22      A.   I would wager large sums of money that they

23  had, but I don't know.  I mean, the press would call and

24  say -- Yeah, I'm sure Brian got phone calls about it.

25      Q.   But you can't state with certainty that he did?

1    A.    I remember him referencing, he was, We're
2  getting calls, but what he never did was like log the
3  calls and be, I have heard from so and so.
4    Q.    Do you know what the calls were about in that
5  regard?
6    A.    Probably just checking in, like how's
7  everything going?  I mean, it's kind of a big thing to
8  show up in the New York Times that you're -- one of your
9  guys is being dragged into this sort of stuff.
10    Q.    And that would be the ghost political scheme?
11    A.    Yes.
12    Q.    Do you know if Ballard ever got inquiries from
13  legal authorities regarding you, law enforcement
14  contacted them, the federal or state authorities?
15    A.    I think they subpoenaed them.  I don't know.  I
16  don't know the answer to that question.  No, I don't.
17  It's a very official unit.  I mean, I don't talk to
18  Brian about it.  There is a managing director for the
19  Tallahassee office.  Every time something has happened,
20  I always talk to her.  So, you know, there is -- I don't
21  call Brian to discuss this.  It's all done, and it's
22  been years since I had any conversation with her.  I
23  mean, I see her in like a restaurant, but I mean about
24  this.
25    Q.    One more exhibit and then we'll take a quick

1  break here.  All right.  This will be Exhibit 97, and

2  this is an email from a Shanna Crawley; is that right?

3      A.   Shanna Kaye Crawley.

4           (Exhibit 97 was marked for identification.)

5  BY MR. PERKINS:

6      Q.   Shanna Kaye Crawley at Ballard; is that right?

7      A.   Yes.

8      Q.   What was her role there?

9      A.   Shanna Kaye is Brian's personal assistant and

10 sort of the nerve center of the firm.  She's the one who

11 does all the scheduling, planning.  If you need a

12 contract, she does it.  She's an incredible woman.

13     Q.   And it looks like Ms. Crawley is sending you a

14 draft of the general release and severance agreement

15 here?

16     A.   Yeah.  I don't know who Catherine Tetter is,

17 but...

18     Q.   Is this the first time you got a copy of the

19 general release and severance agreement?

20     A.   I think so, but, I mean -- yeah, this was a

21 very compacted period of time.  Probably.  I might have

22 seen one before like when somebody else left, but I...

23     Q.   And how would you have seen one before?

24     A.   I don't think he ever signed it, but when -- we

25 had a guy from Central Florida who was in our office who

1  wound up getting in a -- he got arrested for a hit and

2  run.

3      Q.   Was that Anderson?

4      A.   Yeah.  And when he left the firm, I think there

5  was some discussion about whether to do a severance and

6  general release, but I think he just said, I'm good.

7  And there was -- so I think I might have seen a draft of

8  this sort of thing back then, but I don't know for sure.

9  I know we talked about it.  I don't remember actually

10 seeing the document itself.

11     Q.   When did Mr. Anderson resign because of that

12 hit and run?

13     A.   Whenever it took place.

14     Q.   So you recall seeing some type of severance

15 agreement and general release at that time?

16     A.   I think -- what happened was, out of nowhere

17 one day, I land in -- I was on an airplane somewhere,

18 and Richard called me and said, Hey, I've got some bad

19 news.  And I said, What?  He said, I'm getting arrested.

20 I did this; and I said, Excuse me what?  There had been

21 an accident I think maybe a year before, and they had

22 actually come and asked me and I was like, I don't know

23 what -- I have no idea.

24         But -- so it was all very sudden.  Like he

25 literally went and turned himself in, and I think that

1  night I had some conversation with Brian.  I said, Do

2  you want me to get a release or anything?  He said, Do

3  you think we need one?  I said, I don't know.  Do you

4  want one?  I mean, I'm sure Richard would sign one.  I

5  don't think there's -- there wasn't going to be any

6  payments or anything like it would just be like to sort

7  of tidy this up.  I think it would up being don't worry

8  about it.  So we never -- didn't act on it, but I do

9  think there was some discussion of that at least at some

10 point.  I don't that it's relevant to anything but...

11     Q.   How did you negotiate the $1.2 million

12 severance?

13     A.   Well, I mean, part of it is I was going to make

14 a lot more than that, but I was going to have to go do

15 work.  I was going to have to go and actually lobby and

16 everything else, and I didn't think it was fair to say

17 that Ballard should just front the totality of

18 everything.  So it was sort of -- it was just a round

19 number.  It was certainly a decrease from where we had

20 been; but, you know, again, at the time I hoped this

21 thing would go a lot faster than it did.  Just time

22 tends to drag out.

23         MR. PERKINS:  All right.  Let's take a quick

24     break.  It's 10:16.

25         THE VIDEOGRAPHER:  If there are no objections,

1    going off record.  The approximate time, 10:16 a.m.

2        (A break was had.)

3        THE VIDEOGRAPHER:  On record with media unit

4    two.  The approximate time is 10:29 a.m.

5        MR. ANDRADE:  All right.  So before we go back

6    into questions, the parties were discussing timing

7    and I guess air traffic control on the deposition

8    timeline for today and tomorrow.  I noted that

9    plaintiff's counsel and plaintiff did not object to

10   the setting of -- scheduling of this deposition over

11   the course of two days with the hope and

12   understanding that this deposition would not run

13   significantly over, you know, seven hours today and

14   approximately four, four and a half hours tomorrow.

15   It's just our sincere hope that the questioning can

16   be completed by then and that the counsel that has

17   already asked questions coordinates to avoid a run

18   of time in this deposition.

19       MR. WERMUTH:  I'll just note that there's a

20   raffle of defendants in this case, each of whom are

21   separately represented by counsel who each have a

22   right to question the plaintiff on the extensive

23   complaints that he has asserted -- he has alleged in

24   this case and verified in this case.  And so I

25   think, you know, obviously we'll do our best to not

CHRISTOPHER DORWORTH                                    August 06, 2024
DORWORTH V. GREENBERG                                              74

```
1        duplicate each other; but at the same time, we need
2        to get our questioning in.  And so I expect that
3        we'll be able to do that to defend ourselves.
4             MR. ANDRADE:  And not as a retort, but I'll
5        just note that I don't see a citation or a reference
6        to any exception related to the length of a
7        complaint in Federal Rule of Civil Procedure 30.
8        And with that, I don't want to waste any more time.
9   BY MR. PERKINS:
10       Q.   All right.  Back on the record.  Ready
11  Mr. Dorworth?
12       A.   Yes.
13       Q.   All good?  All right --
14       A.   I'd just point out that my microphone is muted
15  on this, and I don't know if that matters.
16       Q.   We have these in the middle.
17       A.   Okay.  Got it.
18       Q.   All right.  Back on the record, we were talking
19  about Exhibit 97 which is this email from Ms. Crawley to
20  yourself dated April 9, 2021, at 4:53 p.m.  Ms. Crawley
21  sent you a draft of the general release and severance
22  agreement.  In response I guess you run this by some
23  attorneys at Lowndes.
24            Did you have any changes to this agreement?
25       A.   The only -- again, it was a boilerplate
```

1   document.  The only change that I wanted to was to the

2   positive had to do the with non-disparaging language.  I

3   don't remember exactly what it was, but it was basically

4   just -- I think the language before said something to

5   the effect of we will not speak of each other.  Well, I

6   don't -- I'm leaving here to avoid that.

7          I don't want to be separate -- you know, I

8   don't want there to be like a bright line and Brian

9   agreed with that and the language that is reflected here

10  is -- I think I have read it today, but it should

11  basically say there is nothing that stops me from saying

12  nice things about them or them from saying nice things

13  about me.

14     Q.  So in the initial draft, there was a voluntary

15  resignation provision, and that provision stayed in the

16  final draft, correct?

17     A.  I don't remember anything to do with the edits.

18  I don't -- I don't -- I think this is very boilerplate.

19  I recall very minimal changes to it.  I do not remember

20  whether voluntary resignation was there or not.  I --

21  that's beyond me.  I think -- well, if this is the one

22  that she sent you --

23     Q.  This was the one that was sent at 4:53 --

24     A.  There was no negotiation I think before that,

25  and it's possible the one I actually executed has

1  language different than that one if this is her email.

2  So we might have made the change after that.

3          (Exhibit 98 was marked for identification.)

4  BY MR. PERKINS:

5      Q.   All right.  The next exhibit will be 98, and

6  this is an email from Ms. Crawley again to yourself

7  approximately an hour later.

8          Do you see that up on the screen?

9      A.   Is it different from the last one?

10     Q.   Yeah.  The last one was 4:53.

11         Do you recall that?

12     A.   Yeah.

13     Q.   And this one's 5:54.

14     A.   That might be the difference in the -- whatever

15 the -- I don't remember what the language was, but it

16 was basically a non-disparagement, but I think the

17 change might be in there.

18     Q.   Okay.  And there is still -- the voluntary

19 resignation still remains in this one?

20     A.   Yes.

21     Q.   You didn't attempt to take that out, correct?

22     A.   Well, I mean, why would I take that out?  It

23 is -- I was confronted with I believe a defamatory,

24 slanderous news story that threatened to drag me and my

25 lobbying firm into it which would then do damage to my

1  coworkers.  And so recognizing the damage that had been

2  done to me, I made the decision to not inflict damage on

3  my coworkers by stepping away.  I don't -- you say

4  voluntary resignation.  I wasn't like to the hell with

5  it I'm done here, free me.  It was that there was a

6  situation that was sort of around us, and I was

7  responding to that situation.

8          And so in that sense, it was a voluntary

9  resignation as far as I was not fired and driven out of

10  the building with my stuff; but, I mean, the reality was

11  there was very bad things that were being said that were

12  going to drag my reputation and the firm through the

13  mud, and we submitted this versus having to take some --

14  me being fired or anything.  And that's all there is too

15  it.

16     Q.   You had mentioned before that Brian and you

17  discussed staying to fight it for a little bit.

18          Did you have those discussions before you

19  resigned on April 8th?

20     A.   I did.

21     Q.   And what when were those discussions?

22     A.   Well, to be clear, what I told you earlier was

23  that I said, Why don't we sleep on this and talk about

24  it tomorrow morning?  So that night, I just made a flow

25  pad of how things were, and the nature of lobbying is a

CHRISTOPHER DORWORTH                                    August 06, 2024
DORWORTH V. GREENBERG                                              78

1  business.  I mean, it's cutthroat.  And with this out
2  there, people would use it to try to -- you know, to try
3  to affect Brian Ballard's firm and my coworkers there.
4  And, you know, it's not fair that I had to go, but it
5  was a reality that the -- I think there was actually a
6  quote that was in Newsweek or something that I said it's
7  not fair to my coworkers for me to do this.  It's not
8  fair for the -- if we have a wealthy family like the
9  Greenbergs out there trying to buy down time for their
10 son and they're willing to lie and do all sorts of
11 things to do that, it's not fair to my coworkers that I
12 subject them to that degree of psychosis which I have
13 become quite familiar with.
14      Q.   You said you used a flow pad?
15      A.   Like a notepad.
16      Q.   Did you save the notes from that?
17      A.   No.  I had that notepad for many years.  I'm
18 sorry.  It might have just been a piece of paper even,
19 just writing down the pros and the cons.
20      Q.   Back to the severance agreement, the one that
21 was executed here.  See that back up on the screen,
22 Exhibit 96?
23      A.   Sure.
24      Q.   Okay.  There is a release of claims in this
25 agreement.

CHRISTOPHER DORWORTH                                  August 06, 2024
DORWORTH V. GREENBERG                                              79

1              Do you see that?  It's paragraph two here.

2        A.   Sure.

3        Q.   So you got -- the consideration paid for this

4   release was $1.2 million paid $50,000 a month, correct?

5        A.   Yes.

6        Q.   Okay.  And then what claims did you have, if

7   any, against Ballard when you executed this release for

8   you --

9        A.   I'm fairly certain this was boilerplate

10  language.  I had no claims against Ballard.  I think the

11  point is that when people separate, they don't want you

12  to leave and then come back -- you know, get some lawyer

13  and come back and sue years later.  I would not have

14  done that, but I think that's fairly boilerplate

15  language for most severance deals.

16       Q.   You would have been at your house in Lake Mary

17  when you executed this?

18       A.   Yes, sir.

19       Q.   Okay.  And then you would have scanned it back,

20  is that how you would have done it?

21       A.   Yes, sir.

22       Q.   And would you have done that through your

23  Ballard email address?

24       A.   I have no idea what email I used to do this.

25  It could have been either which one.  I have no clue.

1  Well, I guess -- you sent the email from Shanna Kaye.  I
2  don't know.
3      Q.   We issued a subpoena to Ballard and got their
4  emails, and that was what we got.
5      A.   I don't know.  They would email me at Gmail.
6  They would email me at Ballard.
7      Q.   There is a revocation period in here for seven
8  days on page three.
9           Did you contemplate revoking this at all?  Do
10 you see that there?
11     A.   No.  Again, I'm sure that is boilerplate
12 probably because somewhere else in the state of Florida
13 someone in court had that happen, and he gives the same
14 thing there.
15     Q.   Going back to the amount, the 1.2 million, how
16 did you come to that amount?  Did you propose that
17 amount?  Did Mr. Ballard?
18     A.   I honestly don't remember.  That is a good
19 question.  I think it was just, you know, in
20 consideration for my good work at the firm, something
21 that's fair.  I didn't -- I don't recall trying to
22 like -- I don't remember any conflict between us about
23 what the number was.  I just think it was, is this fair
24 share?  That is very fair.  Again, Brian Ballard didn't
25 do anything wrong.  The Greenberg family did things

1  wrong to me here.  Ballard did not.  So this was a very

2  sad time in my life.  It was a horrible thing to have

3  happen, and, you know, he was very fair as he always

4  would be.

5      Q.   Is it your testimony that there was no back and

6  forth over that amount, that you just came to an

7  agreement?  1.2 million sounds fair --

8      A.   Well, I think the idea was how long it would

9  be, and there might have been some back and forth.  I

10 just don't remember it.  It was not long.  It was -- I

11 think it might have been just verbal, like how does this

12 sound?  All right, let's do it.  It was kind of one of

13 those things where I'm sure -- not to speak for Brian,

14 but I'm sure he was also thinking the fact that I was

15 willing to not try to, you know, fight and bring all the

16 bad wrath on there.  He probably found some value in

17 there.

18     Q.   Who did you discuss the resignation with other

19 than Mr. Ballard and your attorneys?  And I don't want

20 to know what you discussed with your attorneys, and then

21 of course we have that hearing tomorrow about your

22 discussions with Rebekah.  So anybody else other than,

23 you know, Rebekah Dorworth, your attorneys at Lowndes,

24 and Mr. Ballard that you would have discussed this with?

25     A.   Probably, but I don't remember who.  At the

1  time, I wasn't in a lockdown mode.  It was just like

2  this is happening, oh, my god.  But again, this is

3  confidential.  I would not have shared the agreement

4  itself with anybody, but I might have shared with people

5  I'm leaving.  If you want to clarify your question a bit

6  there.  I mean, in terms of who I shared this agreement

7  with, it would just be those people.

8       Q.   What about your departure from Ballard?

9       A.   I tweeted about it.

10      Q.   The voluntary --

11      A.   And Newsweek.

12      Q.   And this resignation took place after your

13  meeting with -- in-person meeting with Todd Gee?

14      A.   No, months before -- no, I'm sorry.  I don't

15  know.  I don't know -- no, actually --

16      Q.   Because you said you had met Todd --

17      A.   The Gee meeting was after this.

18      Q.   Okay.  So you resigned in early April then from

19  Ballard Partners, and then your recollection is that the

20  Gee -- meeting in-person meeting with Mr. Hornsby was

21  subsequent to this?

22      A.   I honestly -- I think so, but I do not -- I

23  don't think -- when I left the firm, I had not yet --

24  the news story had not -- I'm sorry, when I -- when I

25  went to go visit with the DOJ and the FBI, I was no

 1  longer with Ballard Partners.

 2      Q.   Okay.  So it would have been after then April

 3  9th when you met with them?

 4      A.   Yeah.  You have to forgive me with the time

 5  schedule here because I don't exactly remember, but I

 6  think -- I think maybe -- I think what it was is the

 7  first thing -- I think what we got in December was here

 8  is the list of all these documents we want from you.  So

 9  we did that, turned them in, a month or two passed.  We

10  called back up, and the FBI guys said, Yeah, we need to

11  get something scheduled.  And then this all happened,

12  and then that got scheduled.  Because I remember

13  referencing the fact that I lost a job I loved.  I'm

14  sorry, give me one second here.

15      Q.   You remember referencing it to the FBI in the

16  in-person interview that you had lost your job at

17  Ballard?

18      A.   Lost a job that I loved, yes.

19      Q.   And you also had mentioned that you got a

20  subpoena from the government around December of 2020; is

21  that right?

22      A.   Yeah, that is what I was just referring to.

23  The first one, I was trying to figure out the dates on

24  that, and I think the first one was just a request for

25  documents and this production.  It wasn't a let's go

1  chat, and I think that took some amount of time to

2  compile, and Richard Hornsby sent them all those

3  documents and we didn't hear anything for a period of

4  time.  But I think all this stuff took place, and then

5  finally they said, all right, let's come in and chat

6  with us.

7      Q.   Okay.  How many subpoenas for documents did you

8  get from law enforcement?

9      A.   On this matter?

10     Q.   On this matter.

11     A.   I think just the -- there was one -- one

12  definite one, and then Richard Hornsby -- again, we

13  provided them with all the stuff they wanted and then I

14  got the polygraph test done and then I brought that with

15  me when I went and interviewed -- when I had the

16  interview.

17          I'm sorry, what was the question?

18     Q.   I asked how many subpoenas --

19     A.   I think just that one.  So I was going to say

20  after that, Richard called up and said, Hey, we haven't

21  heard anything from you guys, and we provided the data

22  that he was on a lake and not at the house.  And at the

23  time, I didn't know the girls were ever on the gate.  It

24  was news to me.  So when I got back from that thing, I

25  said, they claimed that they were there.

1         So that was the first time that Rebekah and I
2    ever figured out that you could go online, and we
3    searched back for it.  And I found that, and I found the
4    day that they were there and pulled my phone out.  I'm
5    not great for taking pictures, but my buddy just bought
6    the boat, and I had just took a picture of him driving
7    the boat with metadata.  Just one of those things in my
8    life that I'm very grateful for because it showed that I
9    wasn't there.  But we then provided that information to
10   the feds and said, listen, you asked questions about
11   that, if she came into the gate at this time or
12   whatever.  You can say, here is a photograph with
13   metadata taken from my client's phone showing that he
14   was miles away.
15        Q.   And that was Mr. Morris, Randy Morris?
16        A.   Yes.
17        Q.   So in the course of the in-person meeting with
18   the government, they specifically asked you about the
19   July 15, 2017, gathering at your house?
20        A.   Yeah, which I said I wasn't at.
21        Q.   Okay.  And did you tell them that you weren't
22   there the entire day?
23        A.   I told them I was on a boat, and that -- at the
24   time, I didn't have the benefit of the car record
25   showing anything.  So I just said like, listen, I was

1  there.  I was not at a party that day, did not meet that

2  girl.  I have never met "AB".  I think I met K█REDACTED

3  M█REDACTED one time when she was Joe Ellicott's girlfriend.

4      Q.    And on July 15, 2017, you're out on a boat with

5  Mr. Morris around the 6:00 hour that evening --

6      A.    Randy's birthday is July 13th.  My birthday is

7  July 17th.  So, you know, what we would do is get

8  together at the midpoint on the 15th, and we would

9  usually -- typically a day with Randy consisted of a lot

10 of bourbon.  Usually we would pick up Publix and get

11 some fried chicken from Publix or something like that.

12 Go out on the boat, hang out.  There is a chain of lakes

13 in Winter Park which I'm sure you're familiar with.

14         We go do that for awhile, maybe get a bite to

15 eat, maybe not.  Go back to his place, and he had a lot

16 of vinyls and stuff and we would watch movies.  Just a

17 good buddy of mine.  It was a birthday celebration.  My

18 wife was out of town, and I hung out with him.

19     Q.    And is it your testimony that you spent the

20 night at Mr. Morris' house?

21     A.    I don't -- this is beyond what I have in terms

22 of my own recollection.  I know I fell asleep.  When you

23 say spent the night, that causes some consternation for

24 me because I probably wouldn't spend the night there.

25 What could very well happen is I could fall asleep and

1  wake up at 1:00 in the morning or something like that

2  and go home.  That is -- that was fairly -- you know,

3  that would be pretty typical because I wouldn't want to

4  drink and drive.

5           (Exhibit 99 was marked for identification.)

6  BY MR. PERKINS:

7      Q.   The next exhibit is the covenant not to

8  compete, Exhibit 99, and this was a covenant not to

9  compete that you executed with Ballard Partners on or

10 about December 5, 2012.

11          Do you see that?

12     A.   Yes.

13     Q.   Okay.  And this was also produced by Ballard

14 Partners in response to our subpoena.  This document,

15 paragraph three, page two, talks about a noncompete for

16 two years.

17          Do you see that, following --

18     A.   Yes.

19     Q.   -- your leaving Ballard Partners?

20          Did this still apply after you voluntarily

21 resigned from Ballard Partners on April 9, 2021?

22     A.   Yeah.  So the noncompete was -- I actually

23 asked -- you just jogged my memory.  I actually asked if

24 I could have this waived, and he said, no, I don't -- I

25 think they wanted me to come back at the time, and, you

1  know, he just said, Listen -- if you read this

2  noncompete, I think it was the only one the firm had had

3  this, and he wouldn't do them anymore.  It basically

4  said, let's say you have a client.  The client leaves --

5  or you leave the firm and the client wants to come with

6  you.  If it does not impact what the firm was making, it

7  does not affect me.  So if they're making $10,000 a

8  month and I get hired and they're still making $10,000 a

9  month, there is nothing there.  It was contemplated that

10  way, so, I mean, it was a soft a noncompete as you could

11  have.  So, yeah, I think it was still in effect.

12      Q.   Okay.  You asked to get out of the noncompete,

13  and Brian said no?

14      A.   I think -- that's probably an overstatement.

15  It was more one of those things I said, What about the

16  noncompete?  He said, I want to keep that.  If you have

17  anything, just talk to me.  It was -- our relationship

18  with Brian is such it was not at all antagonistic.  It

19  was kind of like, hey, if you need something, let me

20  know.  But, I mean, I don't -- I'm not in the business

21  of waiving out of those things.  I got the impression it

22  was more -- not so much a me specific thing, but just

23  like we don't make a habit of people leaving and doing

24  that.

25      Q.   When is the last time you have had contact with

 1  Mr. Ballard?

 2      A.   Probably last year.

 3      Q.   And what were the circumstances of that

 4  contact?

 5      A.   Just calling to check in.

 6      Q.   This noncompete would have been in place then

 7  from April 9, 2021, through April 9, 2023?

 8      A.   Sure.

 9      Q.   For two years.  And that would mean you could

10  not work for any client of Ballard during that

11  timeframe?

12      A.   Yeah.  I don't really agree with your

13  characterization of what this agreement says.  The

14  noncompetition element of this was designed to protect

15  Ballard Partners from people robbing the firm -- leaving

16  the firm and taking clients with them.  It was not

17  designed and it does not necessarily -- it doesn't stop

18  me from working for a Ballard Partners client.  If you

19  read it, it says, During the term -- excuse me, Unless

20  the fee -- unless the fees paid to the firm remain

21  unchanged from a client of the firm who retained the

22  firm before the employee's hiring and regarding any new

23  client brought to the firm by the employee, the firm

24  shall receive 30 percent of the gross fee.  So it says

25  if they don't change the fees then it doesn't matter.

1  Every client I ever worked with, no one would be like,

2  We're going to give you this.  It's just not the way

3  that works.  I mean, they would -- so I mean, it is a --

4  Brian did not like this noncompetition agreement because

5  he said I will never sign another one of these again.

6      Q.  After departing Ballard, did you in fact work

7  with any clients of Ballard?

8      A.  No.

9      Q.  None whatsoever?

10     A.  Well, not as a lobbyist, no.

11     Q.  What about as a consultant?

12     A.  Florida Power and Light.

13     Q.  Any others?

14     A.  I don't think they have ever represented -- the

15  two I represent are Florida Power and Light and the

16  Taxpayers Against Insurance Bad Faith, and I don't

17  believe Ballard ever worked for Tax Payers Against

18  Insurance Bad Faith.  So I think that would be just

19  FP&L.

20     Q.  When did you pick up FP&L as a client for

21  consulting purposes?

22     A.  I think this year.

23     Q.  2024?

24     A.  I think I signed the agreement last year and

25  FP&L had a -- they had some involvement -- there were

 1  allegations surrounding the ghost party thing in South
 2  Florida, so they're very removed from that kind of
 3  political stuff now.  So I gave them my contract, and it
 4  took a few weeks for them to come back and say it's all
 5  good.
 6      Q.   And what's the scope of your arrangement with
 7  FP&L?
 8      A.   Strategic advisory stuff.  When you have
 9  regulated industries, a big part of it is just
10  understanding your regulatory framework, and I have
11  insights in those things.
12      Q.   What about Taxpayers Against Insurance Bad
13  Faith?  When did you pick up that client?
14      A.   It would have been last year.
15      Q.   What's the scope of your arrangement with them?
16  What type of services are you providing them?
17      A.   Right now, strategic advisory stuff, reading --
18  relandscapes.  I was very involved in the transition of
19  Ron Desantis, so a lot of times people will seek out and
20  want to understand how I think certain things might --
21  might be received by the governor and his team.
22      Q.   Are you running this through your name
23  personally, or do you have an LLC that you have created?
24      A.   I have an LLC called IBW Public Affairs.
25      Q.   And that's who has the contract with Florida

1  Power and Light and the Taxpayers Against Insurance Bad

2  Faith?

3      A.   Correct.

4          (Exhibit 100 was marked for identification.)

5  BY MR. PERKINS:

6      Q.   All right.  The next exhibit will be the text

7  message with Ms. Benner.  This is Exhibit 100, and this

8  was in your document production that you made.  It's

9  Dorworth 642, and it looks like Ms. Benner reaches out

10  to you on April 8, 2021 --

11      A.   Yes.

12      Q.   -- at 9:34 a.m. --

13      A.   Correct.

14      Q.   -- is that right?

15      A.   Yes.

16      Q.   Was this the first time the press reached out

17  to you regarding Joel Greenberg?

18      A.   No.

19      Q.   When was the first time that the press reached

20  out to you regarding Joel Greenberg?

21      A.   Can you be a little more specific in that

22  regard?  What element of Joel Greenberg?

23      Q.   His involvement with sexual misconduct.

24      A.   That was the first time.

25      Q.   Okay.  That was the first time?

CHRISTOPHER DORWORTH                                   August 06, 2024
DORWORTH V. GREENBERG                                              93

1    A.   Yes.

2    Q.   What about Joel Greenberg and ghost political

3 schemes?  When's the first time that press reached out

4 to you in that regard?

5    A.   I never had a conversation with Joel Greenberg

6 about ghost political schemes.  That's just total

7 bullshit.

8    Q.   What about the press reaching out to you and

9 asking you though about --

10   A.   This conversation.

11   Q.   So April 8, 2021, was the first time the press

12 had contacted you regarding anything about Joel

13 Greenberg and sexual misconduct and ghost political

14 schemes.

15        Is that a fair statement?

16   A.   Yes.  I don't recall -- that was the big one.

17   Q.   Is this text message what prompted you to start

18 contemplating your resignation?

19   A.   Yes.

20   Q.   So April 8th, you get this text message from

21 the New York Times reporter, and then you turn around a

22 severance agreement and release within 24 hours and

23 execute it on the 9th?

24   A.   Absolutely.

25   Q.   It happened that quickly?

1      A.    Absolutely.

2      Q.    Now, when Ms. Benner sent you this text message

3  on April 8th, did you reach out to her?

4      A.    I did.

5      Q.    Okay.  And how did you reach out to her?  Was

6  it text message?  A telephone call?

7      A.    A phone call.

8      Q.    How long did you speak with Ms. Benner?

9      A.    It was not a short conversation.  Probably an

10  hour.

11      Q.    And what did Ms. Benner share with you in the

12  course of this hour-long conversation?

13      A.    That -- well, I mean, basically everything.  I

14  mean, basically that the -- they had been provided

15  documents that showed the feds were looking into me,

16  Halsey Beshears, Joel Greenberg, Joe Ellicott, and Matt

17  Gaetz.  I had -- I believe I provided her although I

18  don't -- I'm not sure about this, I think I gave her a

19  copy of the screenshots where Joel threatened me and

20  said that -- you know, that everyone needed to lawyer up

21  or that Vince Citro said, Oh, Joel said you wanted

22  lawyers.  I think I shared that.

23          And, you know, she said that -- I guess at the

24  time, I mean, listen, this was all new and none of it's

25  true.  When this short of thing happens, you picture how

1  are you going to act when that happens?  I just wanted

2  to know what details.  Like what are you talking about?

3  I was at a party where there was a 17-year-old girl and

4  had sex.  It was -- this was the first time anyone ever

5  sort of fleshed a lot of these details out as to what

6  the allegation was.

7          And so I spent a lot of time asking her

8  questions.  I was very vehement in my denial that I was

9  not at the party.  I was very vehement in my denial that

10 I never met "AB", sure as hell never had any sexual

11 interaction with "AB", and that -- you know, that this

12 was -- and my statement was, you know, when I shared

13 everything about Joel, she said, Well, that's consistent

14 with what I know that I think his lawyers -- I believe

15 it was Dave Webster.  I'm about 90 percent sure of that

16 because it was -- she said it was not one of Joel's

17 lawyers, but it was -- basically she made statements.  I

18 don't remember exactly what they were, basically

19 intimated to me that it was somebody or affiliate with

20 the Greenberg family that had dropped this documents.

21 It was not -- and I asked her, Did this come from DOJ?

22 She said, We don't share that, but in this case I can

23 tell you it's not.  We didn't get these documents from

24 them.

25     Q.   And what was your understanding of what David

1  Webster was doing back in April of 2021, who he was

2  representing?

3      A.   Well, I mean, he identified himself as Abby's

4  attorney at one point in time.  A journalist -- I can't

5  remember who.  I really wish I could, but one of the

6  journalist told me I have a Dave Webster problem because

7  Dave was going around and trying to pedal stories to get

8  the Greenberg -- to get more people indicted so that

9  Joel could spend less time in prison funded by the

10 Greenbergs.

11     Q.   What media outlet said that you had a Dave

12 Webster --

13     A.   I truly do not -- I talked to dozens of people

14 at the time it was just nonstop conversations.  I would

15 love to know the answer to that question.  I do not

16 recall.  I remember someone telling me very clear that I

17 had a Dave Webster problem.  I remember where I was

18 sitting when I had the conversation, but I don't

19 remember -- it was on the phone.

20     Q.   Do you recall the rough timeframe of that when

21 you --

22     A.   It was whenever it was going on.

23     Q.   Was it around April of 2021?

24     A.   No, it was later.

25     Q.   Do you have a ballpark for how much longer it

CHRISTOPHER DORWORTH                                   August 06, 2024
DORWORTH V. GREENBERG                                              97

 1  was?

 2      A.   No.  Months later -- well, it was after Joel

 3  burned all of Abby's stuff, and Daven and John Morgan

 4  talked him out of the house.

 5      Q.   And what was your understanding of the scope of

 6  Dave Webster's engagement with Abby Greenberg, what he

 7  was doing for it?

 8      A.   I have no understanding of the scope.  I'm just

 9  telling you what I was told.

10      Q.   And who told you that?

11      A.   Well, that, I believe -- I think some

12  journalist said that he had reached out to Abby.  I

13  said, I don't know.  At the time I didn't realize

14  exactly how integral she was until the 117-page lie

15  thing that Joel did trying to get his prison sentence

16  down.  But at the time, I didn't know that Abby had

17  gone -- had -- basically what Abby does is she'll do

18  whatever the Greenberg family says because they pay for

19  her life, and she -- she told me wife that she'd never

20  been happier in her marriage after they -- after she got

21  caught -- after Joel got in trouble for this because it

22  gave her total authority over him and the parents.  That

23  was the kind of the dynamic of the relationship, and I

24  remember at the time someone saying that the Dave --

25  that they reached out to Abby, and she sent them to Dave

1  Webster.  Again, it was another journalist, and I
2  don't -- I'd love to tell you.  I just don't know.  If I
3  gave a name, it would be a guess.  But then at one of
4  the trials, the final thing -- maybe the sentencing or
5  the plea guilty or whatever it was, Webster entered
6  into -- came in, showed up, and signed on as a lawyer
7  for Joel.
8      Q.   For Joel Greenberg?
9      A.   Yes.  So he wasn't a lawyer back then for him
10  but whatever this time was.  It was --
11      Q.   When he was sentenced?
12      A.   I don't think it was the sentencing.  I think
13  it's when he pled guilty, but again, I...
14      Q.   Ms. Benner mentioned she's gotten, you know,
15  you said documents that she was given to look at.
16         Do you know what those documents are?
17      A.   I assume it's a copy of the subpoena, but that
18  is a true assumption.
19      Q.   Did you discuss her sources of information at
20  all on the call?
21      A.   Not surprisingly, the Pulitzer Prize winner
22  from the New York Times would not share her sources.  I
23  mean, she -- I asked her.  I think at one point in time
24  I said, Just tell me is this a leak from the government?
25  And she didn't come right out and say no, but she gave

1  me an answer that led me to believe that this was given

2  from outside.

3      Q.   Did you take notes of this conversation?

4      A.   No.

5      Q.   Did you record it?

6      A.   No.  It's against the law.

7      Q.   Do you have any recordings of conversations

8  with Abby Greenberg?

9      A.   No.

10     Q.   Do you have any jailhouse recordings of

11  conversations between Joel Greenberg and Abby Greenberg?

12     A.   No.  I'd like to get those though.

13     Q.   Was a story -- this text to you, do you know

14  how Ms. Benner got your cell phone?

15     A.   No.

16     Q.   Did you ask her how?

17     A.   I don't remember.

18     Q.   Ms. Benner said she's working on a story today

19  related to the Greenberg hearing that will include the

20  expansion of the government inquiry beyond Greenberg and

21  Gaetz.

22          Did she, in fact, run a story on that day?

23     A.   I don't know.  Probably.  Katie was very

24  much -- she was ahead of the curve.

25     Q.   And what do you mean she was ahead of the

1  curve?

2      A.    I mean, she figured the story out.  She broke

3  the story, first of all, and then I think she pretty

4  quickly figured out that the Greenbergs were fueling

5  this and it was, you know, an attempt to drag Matt into

6  it and then lost interest in it.  I think she put her

7  reputation to a certain degree -- a story about a tax

8  collector in the 13th largest county in Florida is not

9  really worthy of the New York Times.

10          The Matt Gaetz stuff is, and I think she --

11  again, I can't speak for her, but the impression I got

12  was I think she talked to everybody and talked to

13  everybody involved, and I don't know what led to the

14  calculus for her believing this, but she at some point

15  in time stopped believing that there was -- that Matt

16  was ever going to get charged and it was kind of a

17  nothing for her.  That's why the Times stayed away from

18  it for a very long time.

19      Q.    And you said that Katie broke the store, that's

20  the story of "AB" and July 15th?

21      A.    No, I'm referring to the Gaetz being in trouble

22  story, the one that sort of got the whole -- the first

23  story did not mention me.  It was just Matt Gaetz is

24  subject to investigation for -- it involves child

25  trafficking with Joel Greenberg.  That was the first

CHRISTOPHER DORWORTH                                    August 06, 2024
DORWORTH V. GREENBERG                                            101

1  one.  Then that day, I was in Tallahassee.  I was
2  actually having dinner with my friend, our attorney,
3  Alex, and then Matt went on Tucker Carlson and had an
4  interview.  And after, that it was like I looked up and
5  there was about 25 people that wanted to talk to me, and
6  I said I'm going home.  Go home to my condo in
7  Tallahassee, woke up the next day, called Brian and said
8  it was probably better for me to clear out while this
9  was going and went home.
10         So when I went home, then the followup story
11  came.  That's where this all came, where the suggestion
12  that there was -- that she was going to write this, and
13  the story that she wound up writing said that I -- that
14  somebody had witnessed me have a conversation about
15  third parties.
16     Q.   And that was the ghost political stuff?
17     A.   Yes.
18     Q.   There was nothing in there about you and "AB"
19  or sex trafficking minors --
20     A.   Again, 90 minutes of me being I have been met
21  this human being.  This is a lie.  I think this is -- I
22  was steadfast enough in my denial and not equivocating
23  what she decided that that was not worthy to -- she said
24  I need to mention the fact that a major lobbyist was,
25  you know, having a conversation with a substantial US

CHRISTOPHER DORWORTH                                    August 06, 2024
DORWORTH V. GREENBERG                                              102

1  congressman about whether or not to interject themselves

2  into a state senate race that has attracted attention.

3  I said, well, I don't love it, but there is not much I

4  can do about that.  If you write that, you write that.

5       Q.   How many times have you spoken with Ms. Benner?

6       A.   Three or four.

7       Q.   When was the other times other than April of

8  2021?

9       A.   I don't know when, but, yeah, I mean I have

10  talked to her three or four times.  Usually typically

11  around when major things in the case would happen like

12  when Joel pled guilty or got sentenced -- or he was

13  getting sentenced.  I think she asked -- we had a

14  conversation where she asked me what I thought he was

15  going to get, and she busted out her own little

16  calculation tool.  It would be just little things around

17  the court case.  We're not friends, if that's what

18  you're asking.  We don't check in.

19       Q.   And how would you go about contacting her?

20  Would she text you and say, Hey --

21       A.   Call.  Usually she's pretty good about phone

22  calling.  I just told people, I'm like, listen, I

23  don't -- I just assume that all my text messages are

24  going to wind up as being part of a deposition or other

25  things.  So if you want to talk to me, call me.  Let's

1  not have a bunch of long...

2      Q.   Would she call you, or would you call her?

3      A.   I think she was the one who would initiate

4  basically every conversation.

5      Q.   So if something would come up, she would give

6  you a ring and get your insight on it?

7      A.   Yes.

8      Q.   And you think this occurred three to four

9  times?

10     A.   Maybe three times, maybe four times, maybe five

11  times.  Just a handful of times.  Nothing ever like the

12  first conversation.  The first conversation was a very

13  long, intense conversation.  The New York Times was

14  writing an article about you, like that, it has a way

15  of -- I mean time slows down, and I went through it with

16  her, and was vehement -- at the time I had no idea what

17  the location was.  I didn't know anything.  They're

18  saying it was -- I mean, they said I also had sex and

19  even these allegations are that I had something other

20  than sex.  I mean, a lot of this information kind of

21  came out, and I was like, what are you talking about?

22  Where did this supposedly happen?  Who is it that -- at

23  the time I'm trying to figure out who.

24     Q.   What did she say specifically about you and

25  sexual relations with "AB"?

1      A.   Well, Joel Greenberg had alleged that Gaetz had

2   done it, and he was expanding the allegation to say that

3   I was doing it.  I had done it as well.

4      Q.   And with respect to you, what did she say?  Did

5   she say that it occurred on such and such date --

6      A.   She didn't have any dates at that time.  I

7   don't think there was any level of detail that I was

8   presented in terms of there was a party at my house, she

9   was there, she claimed I was there -- somebody claimed I

10  was there, and I said, well, that doesn't really pencil

11  because I don't have huge parties at my house when I'm

12  not there.  It would not be uncommon to have five or six

13  or seven people over.  It would not be uncommon to have

14  Joe Ellicott and his girlfriend over.  It would be weird

15  to have another random person kind of just over at the

16  house especially with my wife not there.

17           So I just said it's easy to remember.  I have

18  young kids at the time too, so I'm pretty good about

19  remembering who I met and be good with faces, try to

20  know your kids' friends' names.  I think that speaks

21  well of a parent to do that.  So, I mean, I'm tuned into

22  those things, and I never met the woman.  So I shared

23  with Katie Benner, I said, I don't know who that is.  I

24  have never met her.  We have never spoken, never texted,

25  never had a phone conversation, not Facebook friends,

1  not Instagram friends.  I sure as hell don't have a

2  money trail to her.  I don't have any history with this

3  human being at all.  Never met her.

4      Q.   Did Ms. Benner show you pictures of "B" at this

5  point in time?

6      A.   No.

7      Q.   When was the first time you were shown pictures

8  of "AB"?

9      A.   I think somebody gave me the name, and I looked

10 her up.  Like V REDACTED 99, REDACTED , I think -- you can't

11 even find her.  You have to actually go find her porn

12 star name or whatever it is.

13     Q.   Have you gotten paid the entire amount of the

14 severance all 1.2 million?

15     A.   Yes.

16     Q.   And did you get paid 50,000 each month?

17     A.   Yes, I did.

18     Q.   So it would have been 450,000 in 2020, and then

19 600,000 in 2021, and 150,000 in 2022?

20     A.   It sounds good to me.

21     Q.   Does that sound right?

22     A.   I don't have pencils.

23     Q.   The severance agreement says that you were to

24 maintain Ballard's health insurance until April 15,

25 2023?

CHRISTOPHER DORWORTH                                August 06, 2024
DORWORTH V. GREENBERG                                            106

1      A.   Yes.

2      Q.   Did that take place?

3      A.   Yes.  Everything pertaining to that contract

4  went as according.

5      Q.   Did you have any other benefits from Ballard

6  after you voluntarily resigned?

7      A.   No.

8           (Exhibit 101 was marked for identification.)

9  BY MR. PERKINS:

10     Q.   The next exhibit will be 101, and this is

11 the -- I think it's a Newsweek article then, Florida

12 Politics article.  I don't think it's fair, longtime

13 Matt Gaetz associate resigns from lobbying firm amid

14 probe?

15     A.   I believe that is a Newsweek article.

16     Q.   And this is Dorworth one, you produced this.

17          Do you recognize this article?

18     A.   Sure.

19     Q.   It was published shortly after you resigned

20 from Ballard, correct?

21     A.   Yes.  I don't know -- is that the complete

22 article.

23     Q.   It goes on to have your texts, your tweet is

24 embedded in there.

25     A.   Yeah.

CHRISTOPHER DORWORTH                                    August 06, 2024
DORWORTH V. GREENBERG                                              107

1      Q.   It looks like there is a tweet from you from?

2      A.   Yes.

3      Q.   And you posted it on the date that you

4   resigned, April 9, 2021?

5      A.   Yes.

6      Q.   Friday.  It says, I always loved working for

7   Ballard.  Best boss, best coworkers, best clients.  The

8   current political environment is nasty, and as I told

9   Brian, I didn't think it's fair for the recent media

10  storm to take away from their missions.  A classier or

11  and more affective group I couldn't imagine.

12          Did I read that correctly?

13     A.   Yes.

14     Q.   And what's that media storm that you're

15  referring to there in your tweet?

16     A.   The fact that Joel decided to start trying to

17  implicate myself and Matt Gaetz into his wrong doings

18  that led to the media storm.

19     Q.   Did you run this tweet by anyone before you

20  posted it?  Did you run it by Brian Ballard?

21     A.   I doubt it.  I can't tell you that positively,

22  but, I mean, Brian, he would go to me to go write the

23  tweets.  That was kind of part of my communication.  So

24  I might have sent it to him and said, Hey, are you cool

25  with this?  I might have posted it and said, Is this all

1 right?  I can change it.  I don't know, but, I mean, I
2 don't think for a thing like that.  That's kind of a
3 personal message.  I don't think I would have had to get
4 an approval for that.  Also, what's he going to object
5 to?  It's not at exactly burning the ships.
6      Q.   Other than email, how would you communicate
7 with Brian?  Did you guys text?
8      A.   Phone.
9      Q.   All phone calls, no texts?
10      A.   Oh, no, we text.
11      Q.   You text him too?
12      A.   Brian is one of those people who is a one-day
13 Signal person.
14      Q.   And he resides in Tallahassee?
15      A.   He's got -- I think -- I believe he's a Florida
16 resident based out of Tallahassee.  He has got a house
17 in Austin, Texas, and a condo in New York City too --
18 well, at least he did.  I haven't talked to him about
19 his real estate holdings lately.
20      Q.   In the article it says that you left the
21 lobbying firm because you didn't want press reports to
22 harm the company.
23           Do you see that?
24      A.   Yes.
25      Q.   And was that the New York Times article that

1  you were referring to there?  Because the day before you

2  had just talked with Ms. Brenner, right?

3      A.    Dorworth confirmed to Florida Politics that he

4  had very amicably left the lobbying firm because he

5  didn't want press reports to harm the company.

6          What's your question?

7      Q.    The press reports that you're referring to

8  there, bad press reports --

9      A.    Yeah, there was a bona fide ton of press

10  reports.  There was the New York Times, Tucker Carlson.

11  I mean, for Tallahassee, Florida that's considered -- I

12  mean, for any place.  Any place in the world, that's a

13  big deal.

14      Q.    Staying on Exhibit 101, page two of four it

15  says, On Thursday Dorworth's name was mentioned in a New

16  York Times article which reported that Joel Greenberg, a

17  Gaetz associate and former Orlando county tax collector,

18  is expected to plead guilty to charges related to the

19  alleged scandal in a plea deal agreement with federal

20  investigators.

21          Then it goes on to say, Two unnamed people

22  familiar with the inquiry told the Times that

23  investigators were told Gaetz and Dorworth had discussed

24  potentially putting a sham third-party ballot forward in

25  the 2020 state senate race to hinder the campaign of an

1  opponent to Jason Brodeur, a Gaetz ally.

2          Did I read that correct?

3      A.   Yes.

4      Q.   Did you ever figure out who those unnamed

5  people were?

6      A.   I believe it was Joel and Abby, and it was a

7  lie.

8      Q.   And why?

9      A.   Excuse me.

10     Q.   What facts and circumstances lead you to

11  believe that it's Joel and Abby Greenberg that were the

12  source of the article about the ghost political opponent

13  for Jason Brodeur?

14     A.   Well, first and foremost, that conversation

15  never happened between me and Matt Gaetz.  So when --

16  down the road a bit when Joel had sort of run out of all

17  his options to lie about people, try to get them charged

18  with crimes, when that didn't work and Joel finally got

19  his sentence, at that point, I'm -- at that point in

20  time, he did the courthouse -- it was in the Seminole

21  County courthouse.  It was with FDLE, and it was with

22  Stacy Sammons.  I want to say it was like 117 pages or

23  122 pages.  It was just chalked full of absolute BS.

24          It was kind of -- Joel clearly what happened is

25  he had been hired -- he had hired -- for example, he

1  hired -- his family hired Patricia Sigman who was the

2  person who lost the democratic race to be their

3  employment attorney, and they did that like one month

4  before Joel went in there.  And Joel was an idiot.

5  Nobody that ever listened to Joel Greenberg talk was

6  like, We should get his thoughts on things, because he

7  was known to be highly undisciplined.  He had a big

8  mouth.  He was stupid.  I mean, he would make bad

9  decisions and get himself dragged in the papers all the

10  time.

11         The idea that I would ever have any

12  conversations -- anything that he detailed in that 122

13  pages is just a pure work of absolute fiction, and it's

14  funded by the Greenbergs who obviously hired Patricia

15  Sigman to try to give some sort of internal color.  But

16  I thought the entire thing came off as Joel sounding as

17  stupid and untuned as I generally think he is in person.

18  But in that document he does say that he saw me and Matt

19  Gaetz talking about this.  So that is why I believe it

20  was Joel Greenberg, and I think the person that would

21  lie with him is Abby Greenberg because the Greenbergs

22  pay her.  That's why I think it was that way.

23     Q.   That is the only basis for your including Abby

24  in there --

25     A.   No.  Abby was very active with the press.  She

1   would talk to Jose Pagliery at the Daily Beast.  Abby

2   was upset, and the first time I ever met Joel Greenberg

3   he like literally the first time I met him -- well, the

4   first time I met him was a the Trump rally.  The next

5   time we met, I think we met for a cocktail, and the

6   third thing out of his mouth was he had just -- he had

7   an open marriage with his wife.  Which I kind of giggled

8   at because I was like, who leads with this?

9          If this is the way that your life has worked

10  out, that's okay.  Do your own thing, but before the

11  breadsticks get there, he's already saying, yeah, we're

12  in an open marriage.  And I jokingly said, Well does

13  Abby know that?  And he said, Yeah, yeah.  We're

14  totally -- all those things.  And then years later, Abby

15  would get mad at a girl she believed Joel had sex with.

16  I don't know if she did or didn't.  I have no firsthand

17  knowledge of that or even secondhand knowledge.

18          But Abby then started bashing M REDACTED  Z REDACTED ,

19  trashing her all around town because she did this.  So,

20  you know, Abby was a source to the Daily Beast about a

21  bunch of stuff, and the journalist even texted my wife.

22  I think we provided that to you.  Saying, like I can be

23  trusted.  It's very clear that the person who is saying

24  all this stuff is Abby probably at the behest of the

25  Greenbergs.  I don't know how it works.  I just know she

1  does whatever they say because they pay for her life,

2  and she's more than happy to -- you know, to do whatever

3  but just for the money.

4      Q.   And what do you know about the Greenbergs

5  paying for her life?

6      A.   Again, my intel with her stops when we

7  stopped -- when Rebekah and her stopped being friends.

8      Q.   And when was that?

9      A.   That would have been a great question for

10 Rebekah, but at some point in time Abby -- this

11 narrative came to be that Joel was really a victim in

12 all this, and this is very classic Greenberg family.

13 They would say, well, you know, many people have done

14 these things, and Joel was just one of them.  I'm here

15 to warrant to you that is garbage.  That is not true.

16 Joel Greenberg did this stuff.  He even did this stuff

17 back to like 2012 to 2013 according to Joel, maybe

18 before that.  None of us were into this stuff.  Nobody

19 else had any of these things.  I had just gotten married

20 the year before.  My wife was pregnant.  I was not into

21 any sort of weird stuff.  Joel was, and he was very open

22 about it and Abby was.  So they're just a very different

23 bunch of people.  I forgot what the question was.

24      Q.   You had mentioned that -- I asked you about

25 when the friendship broke off with Abby Greenberg.

CHRISTOPHER DORWORTH                                      August 06, 2024
DORWORTH V. GREENBERG                                                114

1     A.    I think Abby was going around, she was

2  basically -- she had told Rebekah that she had never

3  been happier because the Greenbergs had bought her a

4  house, and they had told her that she did not have to

5  let Joel move into it with them.  And Abby and Joel are

6  both kind of dysfunctional humans to start with.  And so

7  in a situation like that, it became a game of will Abby

8  let Joel move into the house?

9         And at this point in time, I think we were

10  still talking.  I think they were still friends.  And

11  they were still friends because when Joel went down

12  there -- basically I think -- I don't know this for a

13  fact, but I'm about 95 percent sure happened, I know

14  this because of the dates, and I learned that from

15  Rebekah was that they had said, we don't care if Joel

16  moves in with you or not.  That's your decision.  You

17  get to make that decision.  You don't have to do it.

18         So then Joel and Abby get into this weird thing

19  at the time -- this is just all so tabloid, and I hate

20  telling it.  The story's ridiculous.  But Joel had

21  persuaded to start having ses with one of the tax

22  collector employees, a guy by the name of Sam Armes.

23  And Sam is a very interesting guy.  Like in the J6

24  stuff, like he was the guy that wrote the plan on how to

25  take the Capitol.  Just sort of very interesting things,

1  but she was having frequent sex with Sam Armes, and Joel

2  insisted that it be in front of Joel.

3          And Abby I guess at some point in time decided,

4  no, I kind of like Sam, so we're going to start having

5  sex not around you.  So then Joel would handle that by

6  doing things like cutting off her credit card and

7  cutting off her cell phone, swapping out or sim card

8  because that's just what these weird people do.

9          But that happened, and then finally leading up

10 to the move in date because they bought the house I want

11 to say it was 600 grand, but my memory could be wrong on

12 that one but it was in the 600s.  It was in that

13 ballpark, and they had committed to doing $200,000 in

14 renovations for Abby before she could move in.  So it

15 became that sort of weird thing where she's in a

16 relationship but Joel's not mad but he wants to watch

17 and she won't let him watch.

18         So finally she is going to move in on Monday.

19 On Thursday she goes and drops her kids at Sue and

20 Andy's house, and then heads south with a friend.  Goes

21 to Stuart where her mom was.  Joel, I think, probably

22 figured out that the game was over, that on Monday his

23 wife and kids were moving to a new house, he would not

24 be allowed there.  I'm sure he was aware of all of those

25 things and more or less realized that his life as he

1  knew it was probably over, jumps in the car, breaks

2  bail -- or breaks pretrial release or whatever it was.

3  Goes down, shakes -- brakes into the mom's house, does

4  this.  I have seen the video.  It's actually -- there is

5  a video where the transcription is Abby saying, The only

6  reason I live with him is his parents paid for my house.

7  It's a -- one of those things.

8          But there was a body cam where the cop was

9  talking to Joel.  Again, let me paraphrase here.  He

10  said something to the effect of, right now the US

11  Marshals have to flip a switch.  When that switch gets

12  flipped, I don't have any choice but to take you into

13  custody.  Until that switch gets flipped, I can't take

14  you into custody because who knows what is going on

15  here.  So you might want to go home.

16          So then Joel jumps in his car, drives back to

17  Orlando, takes all of your client's belongings, all of

18  her shirts, pants, dresses, sweater, Burberry bags.  It

19  was a very extensive list.  I remember when Rebekah

20  relayed the story to me.  Took it out back, doused it in

21  gasoline, and set it on fire.

22          Then there came a cop standoff I guess because

23  Abby figured out -- I don't know how this all happened,

24  but I know there was a cop standoff.  And at one point

25  in time, Joel opened the front door and threw a bag of

1  what he claimed to be munitions out of there.  And I

2  think the story as I heard it was John Morgan, the trial

3  lawyer, and Dave Webster talked him out and finally got

4  him to sit himself.  So that's how it went.

5       Q.   You had mentioned a Jose from the Daily Beast?

6       A.   Yes.

7       Q.   And you said that you have reason to believe

8  that Abby was corresponding with Jose from the Daily

9  Beast?

10      A.   Yes.

11      Q.   What facts and circumstances --

12           MR. ANDRADE:  I would just object if it

13      solicits any marital privilege communication between

14      my client and his wife, but --

15           THE WITNESS:  I don't think it does.  I don't

16      mind.  Well, I mean, like all of the stories from

17      the Daily Beast paint Abby as like this -- like for

18      example, they called the girl an escort.  I don't

19      think she was an escort.  I think these were all

20      terms and these were things that Abby decided to do

21      because she was mad.

22  BY MR. PERKINS:

23      Q.   Call who an escort?

24      A.   In the Daily Beast story it refers to -- you

25  know, I think there is a commercial out right now about

1   Gaetz that says, According to unknown sources two -- you

2   know like people said that Matt did cocaine with an

3   escort.  Well, like the people in that room I think were

4   Matt, Abby, and the girl, M[REDACTED] Z[REDACTED], who she would

5   later share with Rebekah she did not like because she

6   found out that she believes -- and I don't know if it's

7   true or not -- that M[REDACTED] Z[REDACTED] had had sexual

8   relations with her husband.

9        Of course, you know, they were in an open

10  marriage but that sort of got -- she tried to rewrite

11  that later after everything happened to make it seem

12  like she was a victim in all this.  And I think she was

13  just a participant in the lifestyle.

14      Q.   And what other facts and circumstances lead you

15  to believe that Abby was talking with the Daily Beast

16  about these events?

17      A.   I mean, referencing people that you trust.

18  Again, I think I provided it to you, but all of the

19  Daily Beast articles were highly reflective of Abby

20  Greenberg's view of reality which is not reality.  You

21  know, it was Abby's way of saying, Oh, they were doing

22  this and that, and I believe that she's just part of

23  this thing.  I think the Greenbergs -- and again, Andy

24  Greenberg was hell bent on getting his son out of jail.

25  And when it became no longer something he could do via

1    legal channels, the entire goal -- we don't have to

2    question this because, again, Mr. Scheller is in the

3    news saying, Matt's going to be more scared, and we want

4    more people to get prosecuted.  And it doesn't even

5    occur to anybody that Joel lies about everything.  And

6    it's like, oh, well now he is telling the truth.  It's

7    just amazing to me the Greenberg family is perpetually

8    willing to believe that Joel is not lying when all he

9    ever does is lie.

10       Q.   You had mentioned that there is a -- a story

11   about Matt Gaetz doing cocaine with an escort.

12       A.   Yes.

13       Q.   And you said the only other person in the room

14   with those two was Abby Greenberg.

15            What are you referring to there?

16       A.   I think there was a party after a Lincoln Day,

17   and my wife and I were there.  Randal Hunt and his wife

18   were there.  I never saw any cocaine there.  Although I

19   guess they said that was in the bathroom, but I mean,

20   like, Abby and M**REDACTED** were there, and none of the other

21   people said anything.  It was all Abby.  She's the one

22   that said it.

23       Q.   Have you seen Matt Gaetz do cocaine before?

24       A.   I have never seen Matt Gaetz do cocaine before.

25       Q.   This 117-page document you are referring to,

1  what is that called?

2      A.   It's a good -- let's come up with a name for it

3  now.  I guess it would be the jailhouse testimony of

4  Joel Greenberg --

5      Q.   The jailhouse transcript?

6      A.   The jailhouse transcript of Joel Greenberg with

7  Stacey Sammons, I believe the guy from FDLE's name was

8  Troy Cope, T-R-O-Y, C-O-P-E.  And I think Mr. Scheller

9  was there on behalf of Mr. Greenberg.

10     Q.   And that is attached to your amended verified

11 complaint?

12     A.   It is.  The last I checked, they were still not

13 un-redacting it, although I think we probably need to

14 follow up on that.

15     Q.   And when did you first become aware of that

16 transcript?

17     A.   When it was released as part of the prosecution

18 of Ben Paris.

19     Q.   And who gave it to you?

20     A.   I believe a journalist.

21     Q.   Do you recall a rough timeframe that you became

22 aware of that transcript?

23     A.   I don't know the date, but I can tell you

24 exactly what was going on.  It was the week before Ben

25 Paris had his trial for whatever that was.

1    Q.   Going back now to Exhibit 101 that we have up

2  on the screen.  There is a few more quotes that I want

3  to ask you about in this article.  On page three of

4  four, Mr. Dorworth, you say, I never met the woman who

5  did run, Dorworth added, never spoke to her,

6  communicated by any written device, gave her money, or

7  anything else.

8        Do you see that there?

9    A.   Yes.

10   Q.   Is that referring to Jestine Iannotti?

11   A.   Yes.

12   Q.   And is it true that you never met her?

13   A.   No.

14   Q.   Never communicated with her?

15   A.   No, I was specifically asked by one of my very

16  best friends in the world to stay clear of this.  Now, I

17  didn't want to -- these are not fun things to do.  I

18  didn't want to do it in the first place, but I was more

19  than happy just do say, yep, sounds good to me.  So I

20  never met her, never had anything to do with any of her

21  campaign.

22   Q.   Jason Brodeur --

23   A.   Directly or indirectly.

24   Q.   Jason Brodeur is your best friend?

25   A.   One of my best friends, yes, for 29 years.

1    Q.   So it is your testimony that Ms. Iannotti would

2   not be in your phone contacts?

3    A.   Yes.

4    Q.   And it is your testimony that you have never

5   communicated with her via text, email, or any other way?

6    A.   I will be as expansive as I could be.  I have

7   never communicated with her written, oral, or messenger

8   pigeon, smoke signals.  I have never had any

9   communication with her.

10   Q.   In the race with Jason Brodeur and Patricia

11  Sigman, that took place in November of 2020?

12   A.   Yes.

13   Q.   And do you recall when Jestine got involved in

14  that race?

15   A.   I mean, I don't recall, but I can impute.  I

16  mean, I know the qualifying is typically -- just say

17  from back in napkin purposes, probably the third week of

18  June.  So probably like June 20th when she got in -- all

19  the stuff happened, but I don't know the exact date.

20  And I wasn't paying a particular amount of attention to

21  her.  Oftentimes, I mean, I think like if you look at

22  the race in South Florida, if you kind of use that as a

23  paradigm for this new existence of things, they had two

24  people who had the exact same sounding name, literally

25  Rodriguez.  It was an NPA named Rodriguez, a democrat

1  named Rodriguez, and a Republican who I don't remember

2  who was in that race.

3        But the point is it was -- the similarities

4  were such where a reasonable person could look and

5  think, okay, Rodriguez versus Rodriguez, which one do I

6  like?  And maybe have some language barrier, who knows;

7  but Brodeur -- what's the -- Patricia Sigman, and

8  Jestine Iannotti, I don't think there is any similarity

9  in the Jestine Iannotti.  I don't really -- I didn't

10  find that, so I was like, well, that's odd; but again,

11  people run for office.  They run as an NPA.  They do

12  it -- there is just all sorts of things.  So it's not --

13  I mean, it happens all the time, but I have never met

14  her.

15        (Exhibit 102 was marked for identification.)

16  BY MR. PERKINS:

17     Q.   The next exhibit here will be 102.  These are

18  some interrogatory answers that were given in this case

19  to Andrew and Susan Greenberg.  Now, keeping on the

20  theme of Ballard, I wanted to ask you a question about

21  your answer to interrogatory number six on page four of

22  ten here.

23        Do you see that up on the screen?

24     A.   Yes.

25     Q.   And these are your interrogatory answers,

CHRISTOPHER DORWORTH                                    August 06, 2024
DORWORTH V. GREENBERG                                              124

1  correct?

2       A.   Yes.

3       Q.   Okay.  And you state in 2023 you had a

4  discussion with Brian Ballard about rejoining Ballard

5  Partners; is that right?

6       A.   I don't really like the way that's

7  characterized, but it's mostly right.  I talked to him

8  about my future, and we talked briefly about potentially

9  me moving back -- going back to Ballard.  He said that

10 he wanted to talk with his coworkers to see -- just

11 basically talk to everybody else to make sure -- and a

12 lot of that, by the way, we like Chris or we don't like

13 Chris.  I think it's more there is a critical mass of

14 business in the firm, and if I come back, it's not like

15 there is all of a sudden a new swot of business that

16 just shows with me.

17           So it would probably necessarily involve other

18 people's compensation being affected.  And so if you

19 want to chat with him about that, he did, came back and

20 said to, man, everybody in the firm wanted me back, was

21 excited for it, but that the inn was full and that I

22 would basically start rebuilding my professional

23 practice from scratch.

24      Q.   Who brought up the idea of you coming back?

25 Was it something that you reached out to Brian and

1    looked into or --

2        A.   It was quite literally a conversation of what

3    are you up to?  Because at that point in time, we had

4    some -- we had the completion of the federal case, and I

5    think it was more of a check-in.  I mean, I had gone and

6    over a period of nine years a very extensive client

7    roster that got taken from me in a day and to go back

8    and get it was going to take several years.

9        Q.   Was this discussion over the phone?

10       A.   The first time I saw him was in -- actually was

11   in Tallahassee.  I came back to go visit him in his

12   office, and the second time was on the phone.  A follow

13   up conversation.

14       Q.   So it was over the course of two conversations?

15       A.   Yes.

16       Q.   And if you had come back, your guaranteed

17   compensation would be between 180 and $200,000?

18       A.   I mean, the word guaranteed is yours.  The way

19   Ballard Partners works is you assign fee credits based

20   on client work.  So say hypothetically you bring a

21   client in for $10,000, you get a certain percentage of

22   that.  Brian, as the head of the firm, has the right to

23   take some of your fee credits and give it to other

24   people.  So there is multiple people covering it, what

25   you intend to do is if I brought a client in, they

CHRISTOPHER DORWORTH                                    August 06, 2024
DORWORTH V. GREENBERG                                              126

1  were -- if I brought a client in, he might take some of

2  my fee credits and give it to somebody else, but then he

3  would take some of theirs and give it to me.  So you

4  made a little bit more money, but it was more work.

5       Q.   Well, when I looked at your -- the pay slips

6  from Ballard, it looks like you had been getting like

7  $300,000 a year.  That is kind of what I would call

8  guaranteed compensation, and the rest was bonuses.

9       A.   I understand what you're saying.  So it's not

10  really the way -- that's not the way it works.  It

11  wasn't a guaranteed anything.  That was the draw.  And

12  so if the theoretically I think my bonus -- my base was

13  300, and that was through your monthly paycheck.

14       Q.   You got 12,500 twice a month?

15       A.   Twice a month.

16       Q.   And how was your draw set?  Was it set like --

17       A.   Well, if I made -- and I never did this, but if

18  I ever made less than $300,000, I would have had to pay

19  it back.  I don't think it was -- I think like the

20  first -- I mean, the first 300 I want to say it was sort

21  of like to me, and then after that there was an

22  overheard number which was about 4,000 a month, would be

23  32, 33 a month.  And then from there, there was a share

24  where Brian got -- it was all basically a formula.  But

25  the way it practically worked was Brian had it all

1  worked out.  And I bring in clients, and there would be

2  certain issues.

3          I mean, a lot of lobbying is very politician

4  and issue specific.  If there is somebody that you know

5  who have a good relationship with somebody else and they

6  need your help, and that is the case for me.  I mean, I

7  don't know everybody in the town.  I know a lot of

8  people there, but there are certain -- for example, the

9  Department of Transportation.  Ballard probably has the

10  best practice for that in the state of Florida.

11          So people at my firm, I'm good at DOT stuff,

12  but there are people who would be better.  So I might go

13  to them and say, I have this client.  Let's go ahead and

14  work on that together.  So it's based on a fee credit

15  share arrangement.  And the key is -- I'd liken it to

16  farming.  You know, you plant the seeds, the crops grow

17  up, you gather them.  And, you know, what this was to me

18  was I went from a place where I was generating over a

19  million dollars a year to being -- it's like, all right,

20  basically back to scratch.  And Brian -- I think the

21  number would have been under 200 for the first year.

22      Q.   When were your draws set?  So if they were

23  going to say, Hey, you're going to get 300,000 this year

24  in draws, 12,500 twice a month, when would that be done?

25      A.   I only had two ever -- draw salaries

1  negotiations ever.  When I first got there it was 13 a

2  month, and then 2019 it went to 25 a month.

3      Q.   Right.  It was 156,000 year, and then it bumped

4  to 300,000 a year, correct?

5      A.   But I never -- there was a never -- I don't

6  know -- the truth is I don't know what would happen

7  because it never happened where -- like by the time I

8  bumped my base to three, a big part of that was my book

9  was so big that you would never get below $300,000.

10     Q.   But that was set in advance of that calendar

11 year, right?  Correct, like in December perhaps you

12 would come in --

13     A.   No.  This was not a very -- there is no HR.

14 There was an HR, but the person you had a conversation

15 with was him.  And I think at some point in time, I was

16 like, Hey, man, I understand when we had a $13,000 base

17 the draw d-- guaranteed amount, whatever -- for the

18 first two years it was guaranteed.  So when I first took

19 the job in say December 1, 2012, through -- so I think

20 maybe it was 18 months, whatever it was, maybe 18 months

21 guaranteed, and there was 360 a year.  That was the

22 total compensation was.  After that, it was just my base

23 salary plus quarterly true ups for amounts.  It was

24 based on fee credits.

25     Q.   And when I'm looking at this interrogatory

CHRISTOPHER DORWORTH                                    August 06, 2024
DORWORTH V. GREENBERG                                                129

1  answer and I see 180 to 200,000, that would have been

2  your draw?

3      A.   No, that's -- before that would have been the

4  case.  This -- yeah, I mean, it probably would have been

5  taken in the form of something like that.  We never got

6  to the point of negotiations.  It was like is this

7  guaranteed, we have to pay that out.  We never got to

8  that.  It was just basically like, Hey, you have to

9  start back and rebuild this.  He said, You know what

10  goes into this.

11      Q.   And at the time, you believe you could have

12  made more money outside of Ballard?

13      A.   No.  At the time, I don't know.  I don't know

14  if I would -- I mean, I haven't -- I make 15,000 a month

15  right now, so I don't know that it would be more money.

16  You know, it's a different lifestyle.  When you work at

17  a firm, the first time through, I had a lot of respect

18  for my peers and for my peers.  It was a very good

19  working environment.  I felt truly loved when I had to

20  leave.  People called me, and people were very upset and

21  it was a big deal to the firm.  It was -- and I'm just

22  like I had nothing to do with this stuff.  I have no

23  idea how I'm even dragged into it.

24          And so the conversation would have been with

25  Brian, and we never got to a point where I was saying

1  like, Hey -- I don't even know what a 200,000 breakdown

2  would be.  16,600 a month or something like that.  So I

3  think that would be -- I think basically the idea was I

4  was going to have to start from scratch, which this was

5  my impression of what scratch was based on the

6  conversation, and we would have to go from there.

7       Q.   What do you currently do for a living?

8       A.   Lobbying.

9       Q.   Is that the two clients --

10      A.   Or not lobbying, consulting.

11      Q.   That's the two clients we talked about?

12      A.   Yes.

13      Q.   And is it your testimony that you're making

14  about 15,000 a month right now?

15      A.   Yes.

16      Q.   What are your current earnings in 2024?

17      A.   15,000 a month.

18      Q.   15K a month?

19      A.   Rebekah left her job as the president of her

20  company last year, that obviously -- we had -- she had a

21  very -- I don't think I can talk about it, but she got a

22  very nice payout.  That eased up a lot of the pressure

23  in that regard.

24      Q.   She got a severance or something?

25      A.   Yes.

CHRISTOPHER DORWORTH                                    August 06, 2024
DORWORTH V. GREENBERG                                             131

 1      Q.   And that's a confidential amount?

 2      A.   Yes.

 3      Q.   And the 15K comes from the two clients we

 4   previously discussed; is that right?

 5      A.   Yes.

 6      Q.   Nothing else, no other sources; is that right?

 7      A.   That is correct.

 8      Q.   What about 2023?  What were your earnings from

 9   2023?

10      A.   I haven't done my taxes for '23 yet.  I still

11   have to get those out.  Not much.  I want to say

12   whatever I got paid to finish out the severance plus

13   maybe like two or three months, a month or two of

14   Taxpayers Against Insurance of Bad Faith.

15      Q.   And when do you plan to file your tax return

16   for 2023?

17      A.   Well, before the end of August.  Hopefully

18   September.  Hopefully by September 1st.

19      Q.   What were your earnings in 2022?

20      A.   It would have been the 50 from Ballard every

21   month.  That was it.  I think I made $50,000 from one

22   other client.

23      Q.   What was the name of that client?

24      A.   I don't remember the name of the client, but it

25   was a development issue over in Winter Springs.  It

1  would be an LLC kind of thing.

2       Q.   And have you filed your tax returns for 2022?

3       A.   No.  Those are both getting done right now.

4       Q.   Okay.  And do you anticipate that one in

5  September as well?

6       A.   I hope so.

7       Q.   So those two need to be filed?

8       A.   Yes.

9            (Exhibit 103 was marked for identification.)

10  BY MR. PERKINS:

11      Q.   All right.  The next exhibit here would be 103.

12  This is your 2021 tax return.

13           Do you see that up on the screen?

14      A.   I do.

15      Q.   And on this page we have a reference to the

16  140,217 in income there?

17      A.   Yes.  It's blocked on my screen, but I can see

18  it on that one.

19      Q.   Okay.  And that would have came from Ballard,

20  correct?

21      A.   Correct.

22      Q.   Okay.  And then if I go down to page ten of

23  this tax return, here I have this CED Strategies, LLC.

24           Do you see that?

25      A.   Yes.

1    Q.   And what is CED Strategies, LLC?

2    A.   It's a holding company, LLC, that I have that I

3  have done consulting work over the years and purchased

4  land and other things.  Sort of my catchall company.

5    Q.   Are you the managing member of that?

6    A.   I am.

7    Q.   A sole member?

8    A.   No.

9    Q.   LLC?

10    A.   No.

11    Q.   Who's the other member?

12    A.   Rebekah.

13    Q.   Just two members?

14    A.   I think we might have -- yeah, I think so.

15    Q.   Holding company in the business of doing what?

16    A.   Well, again, I do all my principal business

17  through my LLCs.  CED Strategies was a mother ship for a

18  long period of time, but it owns a piece of land that is

19  worth several million dollars over in Oviedo.  You know,

20  I do consulting in it.  I purchased and bought and sold

21  and tracts of land.  I bought it from buyers, and sold

22  it to home builders.  So that company's, it's been doing

23  many things.

24    Q.   And it looks like you have put the severance

25  amount from Ballard, that 450, on your income for CED

1  Strategies; is that correct?

2      A.   I did whatever -- I had the same accountant

3  since 2004, and he had a very massive stroke, was no

4  longer able to function.  So I went to -- it's a pretty

5  simple return, so I went down to the -- not Turbo Tax,

6  but the green -- anyway, just a guy in the strip center.

7  So, yeah, whatever -- I gave him all the stuff, and he

8  did it this way.

9      Q.   What was the name of the accountant that had

10  the stroke?

11     A.   Pop Scott.

12     Q.   And where was his location?

13     A.   Ormond Beach.

14     Q.   And is he still alive?

15     A.   I don't believe he's functional.  I think

16  he's -- he had a very, very massive stroke; and then

17  after that, he could -- he -- his mind was okay, but I

18  think it was very labored for him when he talked.  You

19  see somebody that just struggles.  And from what I

20  heard, he had another health incident, but I'm not privy

21  to his current health care.

22     Q.   Who is your current accountant that you're

23  working on with your taxes for 2022 and 2023?

24     A.   Marcia Babione.

25     Q.   And where she is geographically located?

1      A.   Orlando.

2      Q.   And will she be filing the '22, '23 tax returns

3  on your behalf?

4      A.   Yes.

5      Q.   And do you have any idea how you're going to

6  claim the 600,000 in severed payments that were made by

7  Ballard in 2022 on your taxes?

8      A.   I do not.

9      Q.   What about in 2023, the $150,000 worth of

10  severance payments?  Any idea how that is going to be

11  claimed?

12      A.   Again, I'm not an accountant.  I hire

13  accountants.  I rely upon them for their advice and

14  counsel, and I will rely upon them for their advice and

15  counsel.

16      Q.   Do you know why the Ballard payments of 450,000

17  in 2021 was reported on the profit and loss statement of

18  CED Strategies and not your own personal?

19      A.   I would -- I rely upon the person who did the

20  taxes, but I think -- and again, I don't know.  Probably

21  what I told them was, this was my holding company.  It

22  is where all my stuff goes, but that would -- I don't

23  know.  I would just follow whatever the accountant told

24  me.  There's -- I don't glean a benefit from doing it

25  one way or the other.  I don't think there would be some

1  particular benefit to that.

2      Q.   You did have significant losses from CED in

3  2021, correct?

4      A.   Yes.

5      Q.   So it looks like if you netted it out, then you

6  had 289,649 for an income.

7           Do you see that?

8      A.   Yes.

9      Q.   When you left Ballard, your monthly draw was --

10 you have two payments of 12,500 twice a month and 25,000

11 a month?

12     A.   I don't -- yeah, it was either 25 once a month

13 or 12,500 twice a month.  I don't remember.  I know we

14 got quarterly bonuses the first of every quarter.

15     Q.   And how were you bonuses calculated?  Was there

16 some type of objective formula?

17     A.   That's what I was telling you about was it's

18 the fee credits.  You show up -- I mean, the language of

19 our agreement with Brian basically said that you trust

20 Brian, bring the clients, he is the president, and you

21 sort of -- and the way that would function, Jason, is he

22 would say like, Do you have this, or, Do you need help?

23         And a lot of times, yeah, I can do it, but I

24 just don't feel like dealing with it.  So I would give

25 some fee credits to somebody else.  And again, Brian had

1  a very -- I don't think we have ever lost anybody in
2  that firm's history for -- you know, to make more money
3  somewhere else.  He is very good about it, very fair,
4  and never had had an issue, never had anything.  So you
5  bring in the credits, and it -- listen, there would be
6  some times you'd be like this doesn't seem right.  He'd
7  say, Let's break it open, get the paperwork out, and
8  look at all your fee credits.
9          A lot of times -- a few times I was like, Hey,
10 man, I don't think I'm getting paid everything I should
11 be, and then we would find out one of my clients hadn't
12 paid a bill on time or something like that.  So there
13 would just be little things like that, but it was very
14 rare.  And again, I think in the nine or ten years I
15 worked for the guy, I think we might have had that
16 conversation three or four times.  And it was almost
17 always about something that, oh, that's what's going on.
18 There was no -- I mean, he was very fair, and I don't
19 know anyone that has ever worked for him that said
20 anything else.
21         To answer your specific question, it was all
22 done based on fee credits.  And a lot of it was -- you
23 know, again, if you signed a contract for a certain
24 amount of money, sometimes he would go to you and say,
25 okay, listen, this is going to take a lot of work.

1  We're going to give two people $3,000 worth of fee

2  credits each, but then somehow some way I'd wind up

3  getting some more from somebody.  It was just always --

4  it's a bizarre thing.  I can just only tell you there

5  was never a problem.  It was always very good, always

6  worked well for me.

7      Q.   Was there any type of compensation committee,

8  or was it all Brian decided?

9      A.   No.  And there is no bonuses either.  There is

10 no -- I'm sorry, like no end of year bonus, no Christmas

11 gift or anything like that.  His thing is you should

12 know what you're going to make based on what your

13 clients are and what your client roster is.  It was a

14 very transparent thing.  I mean, everybody -- pretty

15 much everybody in the entire firm, if you were working

16 there, you are probably smart enough to know, okay, I

17 have this client and this much in fee credits.

18          (Exhibit 104 was marked for identification.)

19 BY MR. PERKINS:

20     Q.   The next exhibit will be the Ballard pay slips

21 here, 104.  These were produced by Ballard in response

22 to our subpoena, and I'm just going to walk through your

23 compensation for your history at Ballard here.

24          Have you -- you're familiar with these

25 documents?

1      A.    I'm not.

2      Q.    Okay.  You're aware that we subpoenaed them?

3      A.    Yeah, I know what they're are, but I'm not

4   familiar.  I have never seen this document before.  It

5   says attorney's eyes only, so I guess you wouldn't give

6   that to me.

7      Q.    We can because you're a witness --

8      A.    But I'm just saying I haven't seen it which

9   would seem atypical, but I usually read all my

10  paperwork.

11     Q.    So we have the -- the way I'm reading this is

12  for 2013, I have 156,000 in which I'll call base

13  compensation and 189,000 in bonuses for a collective

14  total of 345,000; is that correct?

15     A.    Well, it should have been 360, so that's the

16  only thing I'm having a bit of a moment with.

17     Q.    And why do you say it should have been 360?

18     A.    Because I think my guarantee for the first 18

19  months was 30,000 a month.  So, yeah, I feel like you're

20  missing a $15,000 unit in there somewhere, but --

21  because what he would do is I would get my normal 13,000

22  a month, and then in the quarterly bonus I would get

23  whatever the reconciliation was to 90.  So it should

24  have been 65, 65 twice a month, and then like a $51,000

25  hit at the quarter I think.  That is how I remember it

 1  being, but it doesn't really -- yeah, it seems a little

 2  off but not a lot.  It's just that -- from January to

 3  December --oh, there's a week -- there is another

 4  week -- well, no, because 12/20 would be the end of

 5  the -- I don't know what to tell you about that.

 6      Q.   You think it should be 360 though?

 7      A.   I'm very sure that's what the deal was.  Again,

 8  what I don't know is maybe some of this went somewhere

 9  else.  You know, I think health care was paid for out

10  of -- it's a mystery, I don't know; but, yeah, it should

11  have been 360.

12      Q.   Okay.  Now, if I go to page 23, here I've got

13  the 2014 returns.

14           Do you see that?

15      A.   Yeah.

16      Q.   And I have again 156,000 in what I'll call base

17  compensation, and then 134,200 for bonuses, quarterly

18  bonuses.

19           Do you see that?

20      A.   Yeah.

21      Q.   For a collective total of 292,200.  Is it your

22  testimony it was still guaranteed at this point?

23      A.   No, it was 18 months that it was guaranteed

24  from, and that started from December 1st -- and my

25  theory behind it was that as a former legislator, I was

1  banned from lobbying the legislature for the next two

2  legislative sessions.  So I think the deal I cut with

3  Brian was at the time -- I think that might have been

4  right before they changed it to -- the session now ends

5  in early March.  Back then it was May.  So I think my

6  theory was December 1st through May, at that point in

7  time, I should be good, and Brian agreed with that.  So

8  it would have stopped in May of that year.

9       Q.   So is this an accurate depiction then --

10      A.   Yes.

11      Q.   -- of your compensation for 2014?

12      A.   Again, Jason, I can't speak to that because the

13  first one doesn't look right so I'm not going to warrant

14  that that's all right.  It looks generally speaking

15  right because my income went down a little bit because

16  of the expressway stuff.

17      Q.   And that expressway stuff was the public

18  records --

19      A.   Yes.

20      Q.   And then we go then up to 2015 here.  I have

21  again 156,000 on page 22 of 35.  156,000 base

22  compensation, $112,175 in bonuses for a collective total

23  of 268,175?

24      A.   Again, '13 and '14 were the expressway stuff,

25  so yeah.

CHRISTOPHER DORWORTH                                        August 06, 2024
DORWORTH V. GREENBERG                                                  142

1      Q.   So that sounds right?

2      A.   Again, not warranting these numbers are right

3  because the one I have firsthand knowledge of is not

4  right, but it looks ballpark right.

5      Q.   Page 21 getting into 2016, it looks like,

6  again, your base compensation was 156, and then you had

7  bonuses of 182,398.59, a collective total 338,398.59?

8      A.   Sounds about right.

9      Q.   And then in 2017, your income goes up.  It

10  looks like for 2019 your salary again.

11          Can you read that?

12     A.   No.

13     Q.   156 here?

14     A.   Yeah, that would be about -- yeah.

15     Q.   And bonuses are $553,228.64.  Do you see that?

16     A.   Yes.

17     Q.   For a collective total for 709,228.64; is that

18  correct?

19     A.   Yes.

20     Q.   What happened in 2017 where it caused such an

21  increase?

22     A.   I mean, honestly, the more appropriate question

23  is what happened in 2014 and '13 that kind of led to the

24  problem, and it was when you are a member of a lobbying

25  firm and you go through a public investigation, even if

CHRISTOPHER DORWORTH                                      August 06, 2024
DORWORTH V. GREENBERG                                                143

1  you get charged with a misdemeanor that -- and the judge

2  says in there that you're the first person in the

3  history of the United States of America to ever be

4  charged with this kind of crime as a private citizen, it

5  still takes some time to sweat it off.  And there is

6  still people saying, oh, you have to do this.

7          I think it would have been a lot more than that

8  a lot faster if it had not been for the expressway

9  stuff.  But the answer is that during the campaign of

10 Ron Desantis, I was very involved.  And after he got

11 elected, I was viewed as one of the people in the town

12 who was probably -- I was tasked with leading key

13 negotiations on big things, and with that is going to

14 come a lot more money.

15     Q.   Now, when you were involved in this Expressway

16 Authority investigation and the public records issue,

17 did you contemplate resigning from Ballard?

18     A.   No.

19     Q.   Why not?  What was the distinction of what

20 happened here versus what happened with the public

21 records request and the Sunshine law?

22     A.   Well, in one of them, there was a misdemeanor

23 charge where they basically said I was more or less

24 conspiring to commit the Sunshine Law which was clearly

25 ridiculous.  I mean, it was people who looked at me --

1  like really people who do not like me are like this is

2  really odd that you would punish someone for this.  It's

3  very personal.  The guy -- the prosecutor and I, we had

4  a pretty big feud, and I wound up -- he was -- it was a

5  very personal thing, and he is a destructive, horrible

6  human being and did this and charged my wife with a

7  crime which was just complete nonsense and then dropped

8  the charges just a few weeks later.  His whole role was

9  just to cost her her job.

10        But, I mean, when you go through things like

11  that, it reflects on you.  If you're asking why that

12  wouldn't do it, well, I mean, that was done during the

13  course of my job.  I represented HNTB.  I had clients

14  who were in the space.  So it was a ridiculous claim.

15  I'm sure if it had been a felony or something, it would

16  have been a different outcome, but it was -- you know,

17  it was a misdemeanor charge.

18        It was equivalent I think to like whatever the

19  lowest level of misdemeanor was.  I mean, it was like a

20  60 days maximum thing, and -- but it still does damage.

21  Nowhere near as much damage as being accused of being

22  involved in statutory rape does.  I don't think I have

23  to explain that, but, I mean, the size and scope of this

24  is much larger.  And the Orlando Sentinel and Channel 9

25  caring about this is very different than the New York

1  Times and the Washington Post and the Wall Street

2  Journal.

3      Q.   Who was the prosecutor that brought the --

4      A.   Jeff Ashton.

5      Q.   All right.  Let's go on to 2018 here.

6      A.   I thought we were just on 2018.

7      Q.   We did 2017.

8      A.   Got it.

9      Q.   All right.  Can you see the 2017 numbers here?

10     A.   Sure.

11     Q.   All right.  And we have a salary of 156,000?

12     A.   Yes.

13     Q.   And then bonuses of 433,183.30?

14     A.   Yes.

15     Q.   And then we have a collective total of

16  589,182.30, correct?

17     A.   Yes.

18     Q.   Does that sound accurate to you for 2018?

19     A.   Not to be difficult with you, but, again, it

20  looks about right, but I do not warrant that this is

21  totally correct.  The one thing that I do have a

22  firsthand knowledge of I don't think has got it right.

23     Q.   And that is the $15,000 off the first year?

24     A.   Yeah.

25     Q.   Let's move on to page 11 of this document,

1  records for 2019.  You have a salary of 300,000 there

2  for your draw?

3      A.   Yes.

4      Q.   And then bonuses of 941,850.35.  Do you see

5  that?

6      A.   Yes.

7      Q.   Does that sound correct for your compensation

8  for 2019?

9      A.   Yes, and I was also partner with Brian in a

10  medical marijuana deal and made some money off of that.

11      Q.   Was that reflected in this?

12      A.   No, it was separate.

13      Q.   What was the entity that you were involved in

14  in that regard?

15      A.   It was one of the nurseries that became a

16  medical marijuana dispensary.

17      Q.   And were you a managing member or LLC member?

18      A.   No.  I was just a guy that was associated with

19  the governor's office to issue the permits.

20      Q.   And how much money did you make off that deal?

21      A.   It was several -- I don't remember the exact

22  amount.  It got messed up because the price of medical

23  marijuana licenses took a big hit, so a series of

24  factors.  But I think the deal that we wound up

25  originally agreeing to contemplated -- again, this is

1  going to ballpark.  I had ten percent of it, so it was

2  going to be like $18 million cash.  $18 million in a

3  note that was personally guaranteed by the family that

4  was buying it, and then give or take $18 million in

5  stock, but you couldn't trade the stock for a period of

6  time.  So you were awarded stock, but you had to hold

7  it.  And at the time, we were awarded -- and please

8  forgive me if I get this fractionally wrong, but I think

9  you'll get the gist.  I think the stock was maybe like

10  $2.15 a share when we got it.  But by the day you could

11  actually sell it, it was a penny share.  So that lead to

12  a restructuring of the deal because we didn't really

13  want to have anything to do with that, but the people

14  agreed to other things and said they we weren't going to

15  pay us.  So we wound up getting out of it.  I think I

16  made about two and a half or $3 million.

17       Q.   And in 2019 your base salary went up, almost

18  doubled, correct?

19       A.   Yes.

20       Q.   It went from 156 to 300,000.

21       A.   Yeah, but at the time I was the only lobbyist

22  that was involved in debate prep for Ron Desantis.  I

23  was the -- Matt Gaetz was in the middle of his

24  transition.  Most -- much of that transition was carried

25  out on my back patio, and we would identify and research

1  good people for various jobs.  And I wasn't involved in

2  all of it, but I was just very involved and had a lot of

3  friends throughout there.  So it would have been an

4  optimal, peek earning time for me.

5      Q.   And that was your best year ever at Ballard,

6  correct?

7      A.   Yes.

8      Q.   2019?  If you go to page seven of 35 of the

9  PDF, it looks like your salary remained the same, the

10  base salary in 2020, 300,000, correct?

11     A.   Yes.  But I remember -- I think this is the

12  year that I got most of the money from the weed.

13     Q.   From the marijuana deal?

14     A.   Yeah.

15     Q.   Okay.  And then your bonuses went to

16  406,233.75, correct?

17     A.   Right.

18     Q.   For a collective total of 706,233.75?

19     A.   Again, I can't warrant that.  That's -- this is

20  the first time that I have seen this, but it sounds

21  about right.

22     Q.   So you had one year over the course of your

23  career at Ballard where your compensation exceeded a

24  million dollars, correct?

25     A.   Well, I had commission.  I had several years of

1  it.  There is the Ballard W2 money, and then there was

2  the money that came from the deal.

3      Q.   From the marijuana?

4      A.   And that came in an increment of million, a

5  million, and maybe I think after that there was smaller

6  amounts.  I don't remember-

7      Q.   Was the marijuana money paid through Ballard?

8      A.   Not through the firm, no.  Ballard owned ten

9  percent of it, I owned ten percent of it.

10     Q.   So it was paid outside of the Ballard payroll?

11     A.   Yeah.

12     Q.   So strictly looking at the Ballard payroll, you

13 had one year where you made more than $1 million

14 because --

15     A.   Yeah.  I would have continued having more of

16 those be it because Desantis was there had I not had to

17 leave.

18     Q.   And that year that you made more than a million

19 was 2019, correct?

20     A.   That's what the report says.

21     Q.   And you understand you're seeking damages

22 against the defendants in this case for $1 million in

23 wages per year from Ballard?

24     A.   I think I would have made more than that.

25     Q.   And what's the basis for you to believe that

1  you would have made a million or more per year after you

2  departed given historically you made a million in one

3  year, 2019?

4      A.   Well, the only thing that matters is the

5  governor's administration that your under.  Lobbying is

6  a profession.  It is about who knows folks that are in

7  or around the scope of power.  I was not particularly

8  close with Rick Scott or his administration.  I was very

9  close with the Desantis administration.  I'm not

10 particularly close with the governor, but I know him.  I

11 was very involved in any of the people who are his top

12 folks were friends of mine.

13      I was the guy that recruited the chief of

14 staff, Shane Strum.  That was somebody I found and

15 identified who was a good friend.  So, I mean, I was in

16 a peek mode.  It would be like -- to use an analogy for

17 you, it would be like an athlete who just came out --

18 had a big free agency year, and there was a chance for

19 him to really ramp things up.  That is what the Desantis

20 years should have been for me that Joel and his family

21 took away.

22      Q.   And who was the person that you were working

23 with in the Desantis administration?  Who was the point

24 of contact with you when you were doing this debate

25 prep?

1    A.   Oh, I mean, that was actually just the campaign

2    team.  I mean, it was like during his campaign for the

3    governor, 2018.  There's a Showtime show called The

4    Circus.  You can see yours truly there with Congressman

5    Gaetz and Desantis and other folks from the Ballard

6    firm, Susie Wiles and some of that crew.

7         Q.   Is it your testimony then the bulk of your

8    income would have come from working with the Desantis

9    administration had you been staying at Ballard?

10        A.   Yes.

11        Q.   Any other big, large clients that you would

12   have had the opportunity to generate income from?

13        A.   Yeah.  When you have good relationships with

14   the governor, people find you.  Lobbying is a little

15   different than a law firm.  Typically there is many

16   different law firms that do things, but typically there

17   is -- you know, if you were to ask people who are

18   familiar with the process and say, I'm interested in

19   someone here, there is a few schools of thought.

20             One is do you want the biggest?  We were the

21   biggest.  We were the largest in the state of Florida by

22   a good, large part.  We were very close with the Trump

23   administration which made -- I think the last time I

24   checked, I think the last year Trump was president, I

25   think we were like -- we were in top in terms of what

1   revenues were lobbying for them there.  And then Brian

2   would have offices in places like Miami-Dade and in

3   Tampa.  I mean Miami-Dade is about the size -- the size

4   of like -- larger than 11 U.S. states.  So there is an a

5   huge concentration of revenue down there.

6          And again, Matt -- Brian never validated this,

7   but I think there were people that were making the

8   argument that we were the biggest lobbying firm in the

9   world.  By virtue if you take our Tallahassee, our DC,

10  and, you know, our local government offices -- and now

11  they're all over the place.  They're literally all over

12  the world.  At the time it was just those.  They were

13  making the argument it was the largest lobbying firm in

14  the world.

15         So there is a lot of people that just go and

16  say, Okay, we want the firm that is -- we want the

17  people that are close to the governor.  That's typically

18  how the search process goes I think for lobbyists.  You

19  know, it's not -- people don't use the Yellow Pages.

20  They typically call somebody and say this or there is a

21  few firms.  And ours was always one of the -- typically

22  every year I was there, the largest firm in Tallahassee

23  and a huge presence in DC.

24         And so we were very well known to be close to

25  them.  I was known to be close to them.  And, again, I

1   placed a chief of staff.  I had a lot of friends

2   throughout.  I was -- and again, I did well.  I mean,

3   the governor's office came to us and said they wanted to

4   settle the marijuana case which is how I became the lead

5   negotiator on that.  And when I tell you these were the

6   prime earning years, these were the prime earning

7   years.

8       Q.    This alleged ghost political scheme with

9   Jestine Iannotti, have you ever discussed that

10  allegation with Abby Greenberg?

11      A.    I don't believe so, no.

12      Q.    Have you ever discussed a ghost political

13  scheme with Joel Greenberg?

14      A.    No, although he claims we did.

15      Q.    He claims that he saw you talking with

16  Mr. Gaetz about that?

17      A.    Yes.

18      Q.    Do you know -- do you have reason to believe

19  that anyone else published that statement other than

20  Mr. Greenberg, somebody else --

21      A.    Sorry, could you ask that again?

22      Q.    Do you have any facts or circumstances that

23  another person, another defendant, published that

24  statement that Mr. Greenberg made?

25      A.    Published what statement?

1    Q.   That he observed you and Mr. Gaetz having a

2  discussion about a ghost political scheme with respect

3  to Jason Brodeur?

4    A.   Well, my -- from what I was told by the

5  journalist, I mean, it was pushed by people who were

6  close to Mr. Greenberg.  So if not you, Mr. Wermuth or

7  Mr. Scheller.  I mean, just somebody -- or Dave Webster

8  who I came to believe it was.  It was all paid for by

9  Greenberg family money.  If but for the Greenberg family

10 money, Joel would have very few resources.

11       Instead they have a whole panel of attorneys

12 which fill the screen here and are all dedicated to

13 trying to get their kid out of jail.  They don't care if

14 it hurts other people.  I do care because it hurt me,

15 and I think they lied about Matt Gaetz.  I think that

16 Joel is the person who did these things.  I think the

17 Greenbergs would like to spread that blame around.  I do

18 not find it noble, and I do think it is wrong.

19    Q.   What do you think they lied about Matt Gaetz

20 regarding?

21    A.   I don't think that Matt Gaetz ever had sex with

22 an underage person either.

23    Q.   You're referring to "AB"?

24    A.   I am.

25    Q.   Have you discussed that with Mr. Gaetz?

1    A.    Back in the day.  Like the first this ever

2  happened, the first I ever heard of this, I said -- he

3  said, No, of course I didn't do that.  It was...

4    Q.    Was Mr. Gaetz at your house on July 15, 2017?

5    A.    I have no idea.  He wasn't on the gate log, and

6  I wasn't there.

7    Q.    You have never discussed that with him, whether

8  he was there or not?

9    A.    I haven't, no.

10    Q.    You sat through the deposition of Mike Fischer,

11  correct?

12    A.    I did.

13    Q.    Mr. Fischer said that Mr. Gaetz was there?

14    A.    I saw that, but again, I'm happy to tell you

15  that he said that.  The thing about you have to

16  understand how Matt would travel, Matt would kind of

17  use -- he would come into town.  He's a congressman.

18  He's constantly doing news skits.  He's constantly doing

19  speeches and things.

20        So he would come, be there for a day or two, go

21  off to Tampa, be gone for a few days, come back, be

22  there for a day or two, and then go give a speech in

23  Jacksonville, and he'd fly back.  It's just sort of one

24  of those things, just sort of a hub and spoke model

25  where he had all these things going on throughout the

1  state.  So I have no idea.  I mean, when Mike Fischer

2  said he was there, I don't know if he was there all day.

3  I don't know if he was there early in the day and left

4  somewhere else.

5          I know Eric Foglesong is on the gate log that

6  day, and I know that Matt Gaetz would never be alone in

7  a house or in a small room with Eric Foglesong because

8  Eric was a preeminent national democratic consultant who

9  just elected the governor of Louisiana.  So I know

10 that -- that Matt's -- Matt did not like being around a

11 national democratic consultant.  I can tell you that.  I

12 see Eric on the gate long too with Fish, so I don't

13 know.  The answer is I don't know if he was there.  I

14 don't know if he was there when the girl got there.

15 Mike Fischer said he was there, so I would take Mike at

16 his word.  I don't know any more than that.

17      Q.   Do you remember when I asked Mr. Fischer if he

18 spent the night at your residence, and he said, yeah.

19 He said Matt Gaetz did spend the night at your house --

20      A.   Very possible.  He could have come and gone.

21 Again, it's not -- he's not on the gate log, so, I

22 mean -- again, you're asking me to determine things that

23 I cannot do.  I was not there.

24      Q.   When you returned to your house on either July

25 15th or July 16th, was Mr. Fischer there?

1      A.    I don't remember.  I have no idea and like --

2      Q.    And he has cerebral palsy?

3      A.    He has cerebral palsy.

4      Q.    So he struggles to go up stairs, right?

5      A.    Mike has -- he struggles to go up stairs.  He

6  had to have a hip replacement.  Prior to this he was

7  in -- I mean, Mike is a labored walker.  He -- to watch

8  him walk out to the car is not an easy task for him.  So

9  I do not believe he ever went upstairs.  I'll put it

10 that way.

11     Q.    When Mike would come to your house and stay the

12 night, where would you put him?  Did you have a

13 downstairs bedroom?

14     A.    Mike sleeps on the couch at his own house, and

15 I think he'd sleep on the couch at my house.  It was

16 just basically what he would do.  He would just -- he is

17 one of those guys that when he decides it's time to go

18 to bed, he would throw a pillow on there and he'd fall

19 asleep.  It didn't matter if he had to turn the TV or

20 anything.  It's sort of how he works.

21     Q.    Do you have a downstairs bedroom at the

22 Dorworth residence?

23     A.    I don't now, but I think I might have then.

24     Q.    Back in the summer of 2017?

25     A.    I wish I could tell you.  I have lived there

1  for 19 years now.  I don't -- I think it was an office

2  back then, so don't think -- I believe it was -- I don't

3  believe we had a bedroom back then.  So he probably

4  would have been on the couch.  I think if you gave Mike

5  Fischer a room at the Four Seasons, he would rather

6  sleep on the couch.  It's -- at his home, he sleeps on

7  the couch.  I think from a logistics point of view, it's

8  easier than getting in a bed, getting out of the bed and

9  all that stuff.

10      Q.   Is there a couch on the first floor back in the

11  summer of 2017 that was kind of away from the pool area

12  and the game -- air hockey table that you could have

13  some quiet time?

14      A.   The air hockey table was in a room, and there

15  was no chairs or tables in that room.  There would have

16  been two couches, very uncomfortable couches, in the

17  living room, and then probably -- yeah, a -- two chairs

18  and a couch in the -- I think it's still the same thing

19  I have now.  Yeah, so there would have been -- no very

20  comfortable couches, but Fish wouldn't have cared.

21      Q.   Let's go back to the ghost political scheme

22  here and Mr. Brodeur and his 2020 election against

23  Patricia Sigman.

24           Did you assist Mr. Brodeur at all in that?

25      A.   No.

CHRISTOPHER DORWORTH                                    August 06, 2024
DORWORTH V. GREENBERG                                              159

1        Q.   No monetary donation?

2        A.   I might have gave him a check.  Like -- again,

3    I don't mind telling you.  I don't expect my friends'

4    problems to become my problems.  That's one place I

5    differ greatly from Joel.  But at the time, I was part

6    of a very contentious lawsuit.  There was a part of a

7    development was trying to basically make a plan and

8    annex it so I could -- annex it to Oviedo.

9             I had the press on me every day.  I was --

10   there were Facebook chat groups that were designed to

11   talk about what an evil bastard I was.  So Jason and I

12   would have -- I had a pretty simple understanding of I

13   was really not what you need around your campaign right

14   now and let the professionals do it.  That would just be

15   how a conversation like that would work.

16       Q.   So you didn't do any fundraising for Jason or

17   any assistance for the campaign?

18       A.   I don't think so.  Listen, we are -- it is a

19   fair statement to say that Jason and I are very known to

20   be friends.  There is probably nobody I could call that

21   Jason couldn't call himself.  Jason has a very highly

22   accomplished fundraising team.  If you told me that I

23   told somebody that Jason was great and he'd be awesome

24   in the senate and please help him, I would not be

25   surprised.  I probably did that.  I probably did that

CHRISTOPHER DORWORTH                                    August 06, 2024
DORWORTH V. GREENBERG                                              160

1  with my firm.  I probably did that with a bunch of

2  things.  I'm a hug backer of Jason Brodeur because I

3  think he's a wonderful human being.  He's a great state

4  senator.  So I -- all I was doing was not trying to have

5  any of my unpopularity from the fact that I was trying

6  to do a land deal hurt him in his senate race.

7      Q.   And that land deal was River Cross?

8      A.   Yes, sir.

9      Q.   All right.  I think lunch is here.  Let's take

10  a lunch break.  It's 12:10?

11          THE VIDEOGRAPHER:  If there are no objections,

12      going off record.  The approximate time is 12:10

13      p.m.

14          (A break was had.)

15          THE VIDEOGRAPHER:  On record with media unit

16      three.  The approximate time 12:45 p.m.

17  BY MR. PERKINS:

18      Q.   All right.  Back on the record, Mr. Dorworth,

19  for the afternoon session here.  A couple follow-up

20  questions I had.

21          When you resigned from Ballard Partners, was it

22  because of the allegations of sexual misconduct or the

23  ghost political scheme or a combination of both?  What

24  was the rationale?

25      A.   If there was only the ghost political scheme, I

1  would not have quit.  That was what was reported; but, I

2  mean, again that was after I spent hours on the phone

3  with her deploying quite literally ever tactic I could

4  to persuade her that I had never met this woman, and any

5  allegation of this was not true because I viewed just

6  the mere publishing of that as being -- we'll call

7  irrevocably damaging to happen in that paper, that

8  subject material especially with Matt Gaetz there.

9          So the answer to the question is the sexual

10  stuff is the thing that was damaging.  The other thing

11  was enough where, I mean, again, if that was all there

12  was, there's probably ways I could have maybe taken a

13  leave of absence.  There is other things that would have

14  taken the place of just having to completely fall out.

15          So it was the sexual stuff that was the most

16  important stuff.  That was just the one that they landed

17  the punch on because they had some allegation, and I

18  don't know what that was in the form of.  I don't know

19  what that was.  I don't know what Katie Benner had.  But

20  if you read the article, she said that she had some, you

21  know, knowledge or somebody was accusing me of saying

22  that I was discussing a third-party candidate with Matt

23  Gaetz which just never happened.  That never happened.

24  It was falsified.  They made it up just trying to tag

25  people, as many as they could, because as Mr. Scheller

1  has said to the press on multiple occasions, their goal

2  was to get as many convictions as the can against

3  people.  Really, I don't -- there has been very little

4  concern that people might be hurt who are not guilty.

5  That's been their public stated perspective, and I

6  think -- I spent the entire time, and that's just what

7  you deal with.  And so if it had just been the third

8  party thing, I don't know that I would have resigned.  I

9  might have taken a leave of absence; but the reality is

10 I added together and made it an easy choice.

11     Q.   Did you discuss the sexual allegations with

12 Mr. Ballard?

13     A.   I did.

14     Q.   You alerted him that you were being accused of

15 statutory rape?

16     A.   I did.

17     Q.   Okay.  Was there a press story around this time

18 of you being accused of statutory rape?

19     A.   No.  I mean, I was able to hold it -- I had

20 five to six phone calls a day, a whole lot of threats, a

21 lot of righteous indignation because I had never met

22 these people.  And again, what I basically had to do was

23 every single time is I had to present a case of this is

24 what Joel Greenberg's in jail for.  This is what he did

25 with Brian Beute at Trinity Prep trying to cause a

CHRISTOPHER DORWORTH                                    August 06, 2024
DORWORTH V. GREENBERG                                              163

1  political opponent of his to do -- to have problems.

2  This was a text exchange where he tells me that -- you

3  know, basically says, Hey, everyone is going to need

4  lawyers.  To which I say, Why would I need a lawyer?  I

5  don't know these people.  I have never known these

6  people.  Why would I have anything to do with that?  So

7  I would have to present this information to them to say

8  like, Listen, I don't -- Joel here says I -- says you've

9  doing nothing wrong.  He's clearly trying to threat to

10  say I'm going to -- I'm making this happen.  By him

11  telling, Everyone is going to need lawyers, that was his

12  way of saying that he -- he was going to tell everybody

13  whatever he had to say to save his skin.

14       Q.   Is it your testimony that the primary reason

15  you resigned from Ballard Partners is because of these

16  sexual allegations between you and "AB"?

17       A.   I mean -- can you please repeat that question?

18       Q.   Is it your testimony that the primary reason

19  that you resigned from Ballard Partners is because of

20  the allegations of sex between you and "AB"?

21       A.   The primary reason for my resignation from

22  Ballard Partners was the fact that I was being dragged

23  into something that I had nothing to do with; but, yes,

24  did it include sex with "AB", that that would implicate

25  me into a great many other things just to claim that I

1  was -- just to stir up the investigation in the first

2  place in some sick attempt to like save your own -- it's

3  just really disgusting behavior, but I think Joel did

4  it, and I think he did it with the funding of his

5  parents and with Greenberg Dental.

6      Q.   Was there ever a story in the press that you

7  had sex with "AB"?

8      A.   Yes, during the Daily Beast.

9      Q.   When was the first time that you read an

10 article about you potentially having sex with "AB" as a

11 minor was reported to the press?

12     A.   I don't know the date.

13     Q.   But it was the Daily Beast?

14     A.   I believe so, yes.

15     Q.   Any other media outlets other than the Daily

16 Beast --

17     A.   Yeah, I mean, there is some -- I'm sorry to cut

18 you off there.  I thought you were done and you had a

19 little bit more of a question there.  Just following the

20 rules.  Just following the rules and just making sure

21 that we were good.

22     Q.   Yeah, you talked about the Daily Beast, and I

23 was saying any other media outlets that would have

24 reported that you had sex with "AB" other than the Daily

25 Beast?

1    A.    There are a series of websites, things like

2    republicans, where they target republicans who've been

3    involved in scandals of a sexual nature.  My name shows

4    up a few places; but, I mean, we have been very

5    judicious about protecting it despite the Greenberg

6    family's best wishes.  We were able to -- despite a lot

7    of it -- you know, again, I believe that he's -- what we

8    know from the interrogatories is that Joel told "AB" to

9    come -- go to this attorney's office.  The bill has

10   already been taken care of.

11          We know he went to that office.  Laura Wolf

12   would not let "A" shed any light as to what information

13   was given there.  So -- and I believe very early on that

14   Joel -- he told me, he said, I'm having to pay for their

15   lawyers.  He said that.  And, you know, listen, I think

16   that I have had a chance to review the professional work

17   of "AB."  I can tell you there's really nothing she

18   won't do for $1,000.  And it is some of the most

19   disgusting, depraved things I have ever seen in my life.

20          And I think that Joel Greenberg told her,

21   Listen, sue them.  You'll make money.  And there is

22   evidence to support that too because in the jailhouse

23   letter that -- I think his name is Vladimir St. Louis I

24   believe his name was.  He was the guy that was in the

25   cell next to -- or he was with Joel when they were

1   transported in from the jail for one period of time.  I

2   think we provided this letter to you, so it should be in

3   there, but he basically -- Joel in that letter said,

4   Yeah, these guys really didn't do anything.  And he

5   said, They'd do the same thing to me if the shoe was on

6   the other foot.  I just think Joel is a real degenerate

7   piece of garbage.  I would never find myself in that

8   position, and I would sure as hell never lie about

9   people to save my own skin especially if I did as much

10  bad stuff as Joel did.

11       Q.   Do you know how many times the Daily Beast has

12  reported that you had sexual relations with "AB" as a

13  minor?

14       A.   I think once or twice.  Twice maybe.  I don't

15  know.  No, I don't.  The answer is I do not know off the

16  top of my head.

17       Q.   Once or twice?

18       A.   A couple times.  It might be more.  I try not

19  to dwell on the press.  It's an unfortunately part of

20  life because of the Greenberg family and the things that

21  they have done, I have to deal with this.  I mean, it's

22  not something -- I don't spend a lot of time on my

23  Google search right now.

24       Q.   Can you give ballpark timeframe for when that

25  occurred, when they published a story about you having

1  sex with --

2      A.   You'd have to look it up.  It's on the

3  internet.  I don't know what it was.

4      Q.   And is it your testimony that Jose would have

5  been the author of those?

6      A.   I think it was Jose and another guy too.  Chuck

7  Sollenberger -- Roger Sollenberger.  Absolute scumbags.

8      Q.   All right.  I want to transition now to the

9  events of June 21, 2017.  You're aware that the

10 allegations are that there was a hotel interaction

11 between you and "AB" on or around June 21st or June

12 22nd?  Are you aware of that?

13     A.   I'm aware of that.

14          (Exhibit 105 and Exhibit 106 were marked for

15 identification.)

16 BY MR. PERKINS:

17     Q.   I'm going to mark some exhibits here that I'm

18 going to be using frequently and going to put them up on

19 the screen as well, but I think it's helpful to have

20 Exhibit 105 which is the Heathrow gate ledger and in

21 everybody's hands here.  And also the Wells Fargo

22 checking records I have marked as 106, Mr. Dorworth.

23          And you're familiar with the gate ledger,

24 correct?

25     A.   I am.

CHRISTOPHER DORWORTH                                    August 06, 2024
DORWORTH V. GREENBERG                                              168

1      Q.   All right.  And the -- I'll pull it up for the

2  folks at home so they can kind of see what they're

3  talking about here.  On Exhibit 105, the Heathrow

4  ledger, I want to turn to page five of ten of that

5  document.  We're at June 21st there.  And the first

6  entry there is at 2:35 in the morning.

7           Do you see that?

8      A.   It is.

9      Q.   Okay.  And there is a reference there to a

10  license plate tag number of HKXOR.

11          Do you see that?

12     A.   Yes, I do.

13     Q.   Is that the tag for your Cadillac?

14     A.   Not anymore, but it was.

15     Q.   When did you switch tags?

16     A.   I don't know.  On my birthday a couple years

17  ago.

18     Q.   Okay.  But in the summer of 2017, that was the

19  tag for your Cadillac, correct?

20     A.   Yeah.

21     Q.   Okay.  Now, at 2:35 a.m. you were coming into

22  the community.  Is it true that you were coming in in

23  all likelihood from a trip to Highlands?

24     A.   Yeah.  There is some confusion, but I think

25  that's what happened.  I think we -- my wife was very

1    pregnant at the time -- well, she was four months away

2    from giving birth, give or take.  And until her last

3    trimester, she would frequently get sick.  She would

4    get -- she would throw up.  I don't know what other way

5    to put it.  So a lot of times what we'd try to do is

6    we'd try to drive at night when there is less traffic.

7    Just easier on her.

8         Q.   All right.  And so in that vehicle at 2:35 a.m.

9    would have been Rebekah Dorworth, REDACTED, and REDACTED

10        A.   Yes, and probably more people.  Probably

11   REDACTED, probably REDACTED -- although I

12   don't -- yeah, probably REDACTED because I see REDACTED

13   on the 23rd.  They were my kids' friends.

14        Q.   Okay.  So REDACTED was your son's

15   friend?

16        A.   Yes, and a kid named -- a guy named REDACTED

17   REDACTED was there too I believe.  I think he was there.

18   I'm pretty sure.

19        Q.   And they would have all been riding in your

20   Escalade?

21        A.   Yes.

22        Q.   Okay.  So we have Rebekah, yourself, REDACTED,

23   REDACTED REDACTED, REDACTED, and REDACTED

24   REDACTED?

25        A.   Probably, yeah.

1     Q.    Okay.  And were REDACTED and REDACTED your son's

2     age?

3     A.    Yes.

4     Q.    And then REDACTED was your daughter's age?

5     A.    Yes.

6     Q.    Okay.  And if I -- if we look at the Wells

7     Fargo records that I have marked as Exhibit 106 and I

8     will pull those up on the screen as well here, and these

9     are your Wells Fargo records, correct?

10    A.    Yes.

11    Q.    Is that just an account that you have access

12    to, REDACTED ?

13    A.    No.  It's my --

14    Q.    Who else had like a card and access to --

15    A.    Rebekah and I both.

16    Q.    Okay.  So it would just --

17    A.    Actually maybe not.  I don't know which Wells

18    Fargo.  I don't know if she had a card or not.

19    Q.    Because it just says your name here on the

20    first --

21    A.    Very possible.  Again, I don't know.  We were

22    married at the time.  We might have migrated to another

23    bank shortly thereafter.  I don't know.

24    Q.    And on page eight of this document, there is a

25    reference there up on the screen.  You can see it.  I

1  have highlighted it to this Furman on -- the entry is

2  for June 19th.

3          Do you see that?

4      A.   Yeah.  That was several days before.  We took

5  my daughter on a campus tour for Furman.

6      Q.   Okay.  So you went down to Furman and looked

7  at --

8      A.   And from there, we probably went over to Mellow

9  Mushroom Pizza.

10     Q.   I see an entry for Furman, and then I see an

11 entry for Greenville, South Carolina Mellow Mushroom.

12 Furman's in Greenville, correct?

13     A.   Yeah.  Total separate trip.  My daughter was 16

14 years old at the time, was evaluating where to go to

15 school we went and did a day campus tour of Furman, and

16 then we went and got some pizza.  Then I went back, and

17 I think that was several days before anything else

18 happened.

19     Q.   So Furman and Mellow Mushroom would have been

20 the same trip?

21     A.   Yeah -- no, no, no.  Two days before.  I mean

22 again --

23     Q.   6/19 --

24     A.   My house is approximately, I don't know, an

25 hour and a half away from Furman in North Carolina.  So

1  when we just woke up, took a day trip.  I think we had a

2  preset tour, say, like maybe some period of time.  We

3  went there.  We spent two or three hours looking around,

4  went and got some food, and came back and spent at least

5  a day, I think two days, and then headed -- I think we

6  had the back the 20th.  So there was a block back at my

7  house in North Carolina between 6/19 and 6/20 when we

8  left.

9      Q.   Okay.  So you went to Furman and went back to

10 the house in the Highlands; and them from the Highlands

11 house you departed to Lake Mary?

12     A.   Yes.  That's what it looks like based on the

13 gas receipts.  I truthfully -- I mean, you have to

14 understand.  This was seven years ago.  I don't have any

15 particular recollections of this trip home, but I can...

16     Q.   I see two entries here for Valdosta, Georgia.

17          Do you see that?

18     A.   Yeah.

19     Q.   Okay.  And that's on 6/20 for the Raceway Gas

20 Station.

21          Would you typically go through Valdosta to get

22 home?

23     A.   There is multiple ways home, and I usually do

24 it based on GPS.  But Valdosta is I believe the route

25 the I75 way.  So that would be the way we take about 95

```
1    percent of the time.  The reason -- if we go any other
2    way than that it's probably because there is horrible
3    traffic in Atlanta.
4              (Exhibit 107 was marked for identification.)
5    BY MR. PERKINS:
6         Q.   The next exhibit will be 107.  This was a
7    spreadsheet that was shown to your wife in the course of
8    her deposition.
9              Do you recall that?
10        A.   Yes.  I'm not going to be real helpful on this
11   stuff because I just don't remember license plates.  I
12   remember HKX was mine.  I couldn't tell you what any of
13   my kids are or ever was.  I couldn't tell you anything.
14   So I dont' know.
15        Q.   Right.  I was going to ask if you recognize
16   REDACTED?
17        A.   I do not.
18        Q.   REDACTED?
19        A.   No.  But that -- I do think Rebekah had -- for
20   some period of time she got hit, rear-ended on I4 I want
21   to say, and that might have been a rental car because
22   hers was in the shop for a period of time.  I think it
23   was around then.  If I found out that was two years
24   before or after this, I wouldn't be shocked, but I
25   suspect that that might be it.
```

1    Q.   What about REDACTED?

2    A.   I have no idea.

3    Q.   And there was some discussion in the course of

4 your wife's deposition about why she doesn't appear on

5 the --

6    A.   Yeah.

7    Q.   -- ledger from June 8th to August 17th.

8         Do you recall that line of --

9    A.   I do.

10   Q.   Okay.  And do you have any insight on that?

11   A.   Yeah.  We got our things back on my birthday,

12 July 17th.  So the final 21 days we were gone, and I

13 think she was just gone.  She was up in North Carolina

14 doing stuff or work or whatever -- I think you asked her

15 all those questions as to where she was.  I just think

16 she was out of town.  It wasn't -- this year I think she

17 was gone for six or seven weeks.  It is not atypical for

18 Rebekah to pack up and go to North Carolina during the

19 hot part of the summer.

20        But, I mean, I think to answer your specific

21 question, I think that the situation was remedied on or

22 about my birthday, July 17th.  So the -- her not showing

23 up on the log for a few days ahead of that really

24 reflects the fact that I think she was in Dallas for

25 IBTTA or whatever conference she was at.  She was simply

1    not in town.  But my wife -- since we have been

2    together, we've never been separated.  We have never

3    been -- there has never been anything like that.

4        Q.   She's in North Carolina or home --

5        A.   The temperature in Highlands, North Carolina

6    never goes above 80 degrees over the summer.  It's

7    average daily temperature is -- the highest one is in

8    mid July and it's 79 degrees.  It's much more pleasant.

9    She likes to go and get far away.  Take the dogs and

10   just go spend time up there.  I suspect that's what she

11   was doing this summer.

12       Q.   Now, let me ask you, you mentioned that trip to

13   Dallas, Texas on the weekend of July 15, 2017?

14       A.   Yes, sir.

15       Q.   On that Saturday morning, did you take her to

16   the airport?

17       A.   I don't know.  Probably.

18       Q.   Okay.  Was it typical for you to take her to

19   the airport when she would travel?

20       A.   It was unless she was coming back at some

21   bizarre time.  Rebekah is a -- she will make travel

22   decisions I don't make, and sometimes, for example, she

23   has to fly out at 5:00 in the morning, she'll say, I'll

24   drive.  Although the last few times I wind up driving

25   her; but, I mean, I would say as a general policy it was

1  probably the case.  This was for work travel.  She could

2  have written it off.  We as a couple typically take each

3  other to the airport.  So I don't know the answer to

4  that question, but it's probable.

5       Q.   And if you went to the airport, and I was going

6  to look at like Epass receipts or something like that,

7  would you have taken the 417 to the Beeline?

8       A.   So where I live in Heathrow, based on just a

9  very small permutation of traffic, it routes you down I4

10  to 408 to 436 to 417 all the way around.  So depending

11  on when her flight was, depending on if it was rush

12  hour, I would likely have pulled my GPS out and made a

13  decision based on that.  So the answer is it could be

14  either way.  I suppose in either one of those scenarios

15  that would probably likely reflect some Sunpass because

16  the 417 requires it.  And if I went down the 408, it

17  would have been on there too.

18       Q.   Now, after you dropped her off at the airport,

19  is that when you would have gone to meet with

20  Mr. Morris?

21       A.   I have no idea.

22       Q.   And done the boat trip?

23       A.   Typically -- I mean, it was summer in Orlando

24  or Winter Park, so it would be brutally hot.  Randy is a

25  little older.  We typically would probably -- I think --

1  the impression I got from my photo was probably right

2  about the time when we got on the boat is probably about

3  when I did that.  And I think, if my memory serves me

4  correctly, I also went to Publix that day or something.

5  I think that was in July.

6      Q.   Yeah, there is a Publix entry on there.

7      A.   Yeah, and that was probably me picking up the

8  fried chicken at the Publix.

9      Q.   All right.

10     A.   But it's in Maitland right next to his house.

11 So I would have gone there first, to answer your

12 question.

13         (Exhibit 108 was marked for identification.)

14 BY MR. PERKINS:

15     Q.   All right.  And I'm going to mark another

16 exhibit which is a summary of the Wells Fargo billings.

17 I'll mark that as Exhibit 108.  I'll bring that up on

18 the screen now for -- I've got the summary up on the

19 screen here.  And if I look at June 30th, it looks like

20 there is a trip up to Darien, Georgia.

21         Do you see that?

22     A.   I have no idea.

23     Q.   And this is a summary of your Wells Fargo

24 records.

25     A.   My guess is that's probably like driving down

1  the highway, got to get gas, pull off, and get some.  So

2  I have no idea where Darien, Georgia is.

3       Q.   Okay.  And then I see another entry there for

4  the Highlands, North Carolina, and McDonough, Georgia.

5            Do you see that?

6       A.   Yeah.

7       Q.   So it looks like there was another trip back up

8  to the Highlands.

9       A.   I dont' know where McDonough, Georgia is but I

10 can tell you sometimes when we go to Highlands, I will

11 drive down into Georgia to go to Walmart or to go to

12 grocery shopping.  So I don't know where McDonough,

13 Georgia is.  But, I mean, again, what I would assume is

14 all of those things are like just me pulling off the

15 side of the road to get gas if I need gas.

16      Q.   Do you recall going back up to the Highlands

17 after --

18      A.   All the time.  All the time.  I mean, like it

19 is a -- if we can get four days, we'll go.  Sometimes we

20 fly, sometimes we drive.  Rebekah was pregnant, so we're

21 probably not flying.  The drive does make this much

22 worse.  It is an eight and a half-hour drive.  We have

23 dogs, kids.  It's just all manners of things.  I guess

24 at the time the kids were a little older, so yeah, we

25 would run back and forth all the time.  And still do.

CHRISTOPHER DORWORTH                                    August 06, 2024
DORWORTH V. GREENBERG                                              179

1      Q.   I'll represent to you that Darien is on the

2   coast.  Darien, Georgia is on the coast like near

3   Savannah area.

4           Have you ever gone up 95 --

5      A.   Oh, yeah.  There is really -- there's -- the

6   fastest way -- and again, I have owned the place now for

7   eight years, so I can speak to this.  But if you pull

8   your phone out right now and type in my house address in

9   North Carolina, you're probably going to get routed

10  through -- you go up 95 'til you get to I16.  You go

11  over I16, and then you just get off the road and you

12  sort of drive north like at a diagonal up through the

13  gut.

14          You go through Clemson, and then you get to

15  drive up the mountain to get to my house.  It says it's

16  faster, but in practice, you know, I find that eight and

17  a half hours on a highway tends to go faster than eight

18  and a half hours involving back roads.  And I also had a

19  little spin where I got speeding tickets.  I never get

20  speeding tickets and I got two on that trip -- on that

21  road.  So I don't -- I mean, yeah, we go that way.  It

22  happens.

23     Q.   Is it possible that you went back up to your

24  house in the Highlands from June 30th to July 8th?

25     A.   Sure.  Actually, probably likely.

CHRISTOPHER DORWORTH                                          August 06, 2024
DORWORTH V. GREENBERG                                                    180

1      Q.   For the Fourth of the July holiday?

2      A.   That's our big one up there.

3      Q.   There was some discussion in your wife's

4  deposition about the weekend of July 22nd --

5      A.   Yep.

6      Q.   -- and partying at your house --

7      A.   Yes.

8      Q.   -- that weekend.

9           Do you know where Rebekah was on the weekend of

10 July 22nd?

11     A.   I think she might have been in North Carolina.

12 I watched the deposition on this.  I mean, Rebekah was a

13 very prominent woman.  She would -- often had to travel

14 for work.  I typically would know where she was going,

15 but I didn't ask a ton of questions.  You know, she

16 was -- proprietary work, and we were not -- it was --

17 so, I mean, when -- and then I think around the same

18 time her sister was getting married.  So I think they

19 had their bachelorette party at the house in North

20 Carolina.  So I don't know which ones I was at and which

21 ones I wasn't, but if my credit card was there I was

22 probably there.

23     Q.   Were you at the party at your house on July

24 22nd?

25     A.   Yes.

1    Q.   And were you there when K[REDACTED] L[REDACTED] and L[REDACTED]

2  P[REDACTED] got in a fight and knocked over a vase?

3    A.   I was not -- I was asleep for that.  I woke up

4  because K[REDACTED] L[REDACTED] got upset and stormed out with a

5  friend of mine's cell phone.

6    Q.   And she took Brady Benford's cell phone?

7    A.   Yes.

8    Q.   Do you know why she took Brady's cell phone?

9    A.   She thought it was Joel's.  K[REDACTED] was -- I only

10  met K[REDACTED] once, but she was very loud and very

11  boisterous, but I think she was very much in love with

12  Joel Greenberg.

13    Q.   Were you sleeping at the time they had this

14  fight?

15    A.   I never saw L[REDACTED] P[REDACTED] so -- L[REDACTED]

16  P[REDACTED] was it?

17    Q.   L[REDACTED] P[REDACTED]?

18    A.   I have --

19    Q.   Blonde.

20    A.   I have never -- I don't -- I was not there for

21  that, but I remember waking up because she had left, and

22  Brady was particularly not pleased that his phone was

23  gone.  And it was like 4:30 in the morning, and I had

24  been sleeping for probably five or six hours.

25    Q.   Did you -- when the fight happened, did you

```
 1  kick everybody out and say, Party's over?
 2      A.   Yes.   That was the end of the party.   And by
 3  the way, I really -- there are more people at this table
 4  than there were at the house.   I mean, it's not really
 5  like a party.   It is a I had some friends in town.   I
 6  don't even know how L█████ and K█████ -- I don't know
 7  anything about that.   That is the first I ever heard
 8  that until now, and I don't remember any vases getting
 9  broken either.
10      Q.   You just remember K█████ L█████ taking the cell
11  phone of Benford?
12      A.   Well, to be very specific, she had just left
13  with the cell phone, and I think Brady came to wake me
14  up to say, I think some girl stole my cell phone.   I
15  said, Which girl?   He said, K█████ L█████.   I said, I don't
16  know who that is.   He said, It was the brown-haired one.
17  And I think gone Joel had gone home, and she got pissed
18  off, or I don't even know.   I mean, I was...
19      Q.   And who else was there?   It was Brady Benford,
20  K█████ L█████.   M█████ Z█████ was there?
21      A.   Again, I never saw M█████.
22      Q.   Never saw M█████?
23      A.   No.
24      Q.   Who did you see there on the 22nd?
25      A.   I think I went to bed around 8:00.   I mean, it
```

```
 1   was -- on a day of intense day drinking, I'm not -- I'm
 2   going to be asleep pretty early.  I figure that was the
 3   case that day.  So I think probably about the time the
 4   sun went down, I was out.
 5        Q.   So the only people you can recall are Brady and
 6   K[REDACTED]?
 7        A.   Yes.  And I think maybe Eric Foglesong, but I
 8   don't know.
 9        Q.   How many times has K[REDACTED] L[REDACTED] been to your
10   house?
11        A.   I just think the one time.  Any more than that
12   would be news to me.
13        Q.   Were you involved at all in getting the phone
14   back from K[REDACTED]?
15        A.   She FedExed back.
16        Q.   Did she have some type of letter in that FedEx
17   package?
18        A.   Yes.
19        Q.   And was that a love letter of some kind?
20        A.   I don't know.
21        Q.   Did you read it?
22        A.   No.
23        Q.   Do you know who the letter was addressed to?
24        A.   Joel.
25        Q.   Did you deliver that letter to Joel Greenberg?
```

1     A.    Yes.

2     Q.    Okay.  How did you deliver it to him?

3     A.    Take your fucking letter, and don't ever do

4  this at my house again.  I was like, Please, Joel, do

5  not bring your crazy shit into my life, were my words to

6  him.

7     Q.    Was it your understanding that Joel Greenberg

8  is the one who brought K REDACTED to that party?

9     A.    Yes.

10     Q.    And where did you get that understanding?

11     A.    Well, the fact that she got so upset and

12  stormed off and took his cell phone was a large

13  indication of that.

14     Q.    Where is the master bedroom in the Dorworth

15  residence?  Is it upstairs?

16     A.    Yes.

17     Q.    Do you keep that locked so the guests don't go

18  in there?

19     A.    Yes.

20     Q.    How many other bedrooms do you have upstairs in

21  the Dorworth residence?

22     A.    Five.

23     Q.    Five bedrooms plus one for the master for a

24  collective total of six?

25     A.    Yes.

CHRISTOPHER DORWORTH                                          August 06, 2024
DORWORTH V. GREENBERG                                                     185

1      Q.   In the summer of 2017, did you own a limousine?

2      A.   I think I still had it then.  I stopped --

3  basically Uber killed the limousine business like any --

4  it was so much cheaper just to go via Uber especially in

5  the early days of it.  The limousine was fine, and we

6  used it for a couple years; but every single time we

7  used it, it would cost several hundred dollars to get it

8  up and running.  It's like an old boat on steroids, and

9  so we had it for several years where I don't I think

10  even registered it anymore.  We just kind of kept there

11  and then finally sold it.

12      Q.   When did you buy the limousine?

13      A.   2013.

14      Q.   And what year did you sell it?

15      A.   I don't know.  2020.  I don't know, it was

16  years ago.  Like I said, I didn't drive it for about the

17  last two years of its ownership, so I don't know.  I

18  mean, it was -- I don't think it was even operational

19  around this time.  It might have been, I don't know.

20  That would be very near the end.

21      Q.   And you sat through the deposition of the

22  Heathrow Master Association person, correct?

23      A.   Yes.

24      Q.   How many permanent transponders did you have

25  back in the summer of 2017?

CHRISTOPHER DORWORTH                                    August 06, 2024
DORWORTH V. GREENBERG                                              186

1        A.    Zero.

2        Q.    Because they took them?

3        A.    We had a dispute over things, and the way they

4    would sort of effectuate their displeasure with their

5    people is to turn off your transponder.  I think that's

6    supposed to incite some sort of response.  And I just

7    said, All right, well, do that.  I mean, it was no big

8    deal, and they -- I don't -- it wasn't -- it was just --

9    again, we sued them.  And the guys at the gate are

10   really nice at the neighborhood.  The lady up front, she

11   was -- she -- she's an unpleasant human.

12       Q.    Did the guys at the gate, did they just ever

13   waive you through without checking your credentials?

14       A.    They'd lose their job if they did that.  They

15   take it very seriously.

16       Q.    So it's your testimony that every time they

17   would take down your name and your tag number when you

18   went through the gate?

19       A.    It's my testimony that every time I went

20   through, they would take some -- they would go and type

21   things on the computer and say -- and I couldn't just

22   pull up.  There was a few times that over the time this

23   would go on there would be a long line, and I would just

24   pull up to the front of it and they'd still go get my

25   phone and -- they'd still do the thing and type it in

CHRISTOPHER DORWORTH                                  August 06, 2024
DORWORTH V. GREENBERG                                              187

1 there.  And they were not just -- it was real serious.

2 I mean, like that neighborhood takes security very

3 seriously.  It's one of the things I like about it.

4     Q.   When you got your transponder privileges back

5 on your birthday in 2017, how many transponders did you

6 have?

7     A.   I don't know.

8     Q.   You had one for your Porsche?

9     A.   Well, I mean, I had one for the car.  But it

10 might have been --

11     Q.   You had a Porsche --

12     A.   But you're asking on the day I got -- I don't

13 know if I got them back that day or what.  I don't know.

14     Q.   In the summer of 2017 --

15     A.   Yeah, I got -- all my cars got their

16 transponders back that summer.

17     Q.   Your Cadillac had a transponder?

18     A.   Yes.

19     Q.   Your Porsche had a transponder?

20     A.   Yes.

21     Q.   Rebekah's vehicle had a transponder?

22     A.   Yes.

23     Q.   And then did you have a mobile one that

24 could --

25     A.   I did not have the Porsche yet.  I didn't get

1  the Porsche until -- I didn't get the Porsche until I

2  think 2018.  So there was no Porsche, and I think that

3  the Cadillac had a mobile one.  Maybe not.  I don't

4  know.  It had a transponder.

5      Q.   The Cadillac had a mobile --

6      A.   I don't know that I ever got on the

7  transponder.  I think by the time that happened, I'm not

8  sure I ever took the Cadillac again.  So I think when

9  they went down, I never got a replacement transponder

10  because they were like 50 bucks a piece.  If you're not

11  going to use it, you wouldn't just...

12      Q.   Did the limo have its own transponder?

13      A.   I don't remember.  It did with a question

14  whether it was the mobile one or whether it was embedded

15  in there, I just truthfully don't remember that.

16      Q.   But you had probably four transponders amongst

17  and between the different vehicles?

18      A.   Probably.

19      Q.   When your transponders were deactivated, did

20  you ever use the transponder of a friend or a

21  neighbor --

22      A.   No.

23      Q.   And you had two drivers for the limo, Jeff

24  Onest and John Trion; is that right?

25      A.   Yes.

CHRISTOPHER DORWORTH                                     August 06, 2024
DORWORTH V. GREENBERG                                                189

1      Q.   When did Jeff drive for you?

2      A.   He was the first -- I mean, the two of those

3   guys never drove at the same time.  I knew Jeff from

4   political stuff.  Jeff -- I don't remember exactly when

5   he -- I'm sorry, Jason.  I can't help you with the dates

6   on this.  He was the first guy for a couple years, and

7   the rest of that was John.  But I couldn't tell you with

8   any specificity whatsoever when that was.

9      Q.   Would you have taken a limo to go meet

10  Mr. Morris?

11     A.   No.

12     Q.   Would you have taken an Uber?

13     A.   No.

14     Q.   You would have driven your Cadillac?

15     A.   Well, I would not have -- I might have taken an

16  Uber home, but I was not -- I mean, listen, I think the

17  sort of highest end of the pyramid of people who are

18  responsible when drinking and driving is people that

19  Uber out and then Uber home.  I am more of the type that

20  with drive and then Uber home.  I'm not a big drunk

21  driver.  I think it's -- the odds are -- you getting

22  having a problem sooner or later are just such that I

23  wouldn't do that, but I don't know that I would -- take

24  an Uber there.  I might take one back.

25     Q.   Do you have an Uber app on your cell phone?

CHRISTOPHER DORWORTH                                    August 06, 2024
DORWORTH V. GREENBERG                                                190

1      A.    I do.

2      Q.    Has it been active since 2017?

3      A.    Yeah.  We looked it up.  By the time I tried

4  doing this, the dates were already gone.

5      Q.    Yeah, so the 2017 dates are gone, and you can't

6  check?

7      A.    I tried.  I wish they were there.

8      Q.    You can't check?

9      A.    I tried.  I couldn't.

10     Q.    John Trion was your second driver?

11     A.    He was.

12     Q.    Okay.  And we talked about Mr. Richard Anderson

13  before, the Apopka city administrator who got in some

14  trouble with that hit-and-run accident?

15     A.    Yep.

16     Q.    There has been some allegations, are you aware,

17  that you asked Mr. Trion to go gather belongings from

18  Mr. Anderson's car that included a computer, firearms?

19     A.    No, I never asked John to do that stuff.

20     Q.    Are you aware that somebody made that

21  allegation --

22     A.    Yeah, I've heard something about that.  I think

23  the -- I want to say the highway safety people -- I mean

24  Johnny knew Richard from -- so I think the assumption

25  that I was the one who would do that probably came from

CHRISTOPHER DORWORTH                                    August 06, 2024
DORWORTH V. GREENBERG                                           191

1  the fact that Johnny drove my car, but I didn't -- I

2  mean, first of all, if Richard called me up and said,

3  Hey, would you mind sending your guy, I would have done

4  it.  I wouldn't have been thinking like, I wonder what's

5  going on here.  I would have responded to my friend

6  affirmatively like that, but I don't recall ever having

7  him do that.  But again, Johnny was a driver.  He would

8  go do things like that.  So, I mean, if you tell me that

9  happened, I would totally believe it, but I did not -- I

10 was not part of that.

11      Q.   Did law enforcement ever question you about the

12 hit-and-run accident?

13      A.   Yes.

14      Q.   What did they ask you?

15      A.   If I knew where Richard Anderson was that

16 night.

17      Q.   And did you?

18      A.   I had seen him earlier, like five hours before.

19      Q.   Were you ever questioned about Mr. Trion going

20 to gather belongings from Mr. Anderson's vehicle?

21      A.   I don't think so.  I think they might have -- I

22 read that somewhere, but I don't think I was ever asked

23 that question by them.  Because I -- Johnny, as I

24 recall, got very nervous and just basically -- I don't

25 know what the deal was.  I honestly do not remember,

CHRISTOPHER DORWORTH                                August 06, 2024
DORWORTH V. GREENBERG                                            192

1  but, I mean, first of all, there would be nothing

2  untoward about saying if a friend bumped into you and

3  said, Hey, do em a favor, can you send your driver to

4  come pick me up, that would not be uncommon.

5          I probably would have done it if I had been

6  asked.  If it was an impound lot, I might have a few

7  more questions.  But, I mean, again it was -- it is just

8  not my nature to stop and think I wonder why this guy

9  would want my driver to go pick something up.  I

10  wouldn't -- my mind probably would not go to that.

11      Q.   Did you understand the car was in an impound

12  lot?

13      A.   I found out later.

14      Q.   Yeah, and did you understand it got broken into

15  and some things were taken out of the vehicle?

16      A.   No, I did not know that.  That is new

17  knowledge.

18      Q.   And you don't have any knowledge of Mr. Trion

19  being involved in that one way or the other?

20      A.   No, absolutely not.  Johnny wouldn't do that.

21  As I recall, Johnny telling me the way it went down that

22  basically he went there, and they were like, Who are

23  you?  He was like, I'm -- like, Never mind.  I think he

24  just left.  So I don't know anything that happened more

25  than that.  I remember Johnny just telling me that there

1  was -- he went there, they asked him some questions, and

2  just like don't worry about it.  That was kind of the

3  conclusion of it.

4      Q.   And when you say he went there, he went to the

5  impound lot?

6      A.   Or he was at -- again, I don't recall asking

7  Johnny, and I'll be the first to say if I had done that,

8  I'd say, yeah, I did that.  I just don't remember ever

9  asking him; but, again, everyone knew Johnny.  It would

10  not be atypical and it is possible that Richard said,

11  Hey, can you do me a favor, can you give me his number

12  and just let him know.  I just don't recall any of that,

13  but, I mean, I did not facilitate Johnny doing anything.

14  Although, I'm just going to say again, I mean, part of

15  having a driver is people call you up and say, Hey, can

16  we use your car for this or that?  Can you do this or

17  that?  I wouldn't -- I probably would not like raise any

18  sort of red flags for that.

19      Q.   All right.  So going back to the Heathrow

20  master gate ledger which we have previously marked as an

21  exhibit and you have in front of you, 105, the next

22  entry on June 21, 2017, is at 1:25 p.m., and it looks

23  like you came back in in your Cadillac at that point in

24  time.

25      A.   I mean, I have no idea.

1      Q.   You see that --

2      A.   Yeah, I see the name, but I -- yeah, it looks

3   like probably lunch.  I don't know.

4      Q.   And I do notice that in your Wells Fargo

5   records --

6      A.   Sonny's and then Liam's.

7      Q.   Sonny's Barbecue is on page eight of 19 of that

8   ledger.  It looks like you went to Sonny's and spent

9   about $50 there on that day?

10     A.   Yes.

11     Q.   Could it have been the case that you picked up

12  Sonny's and brought it home or took your kids to Sonny's

13  for lunch or something along those lines?

14     A.   Well, mathematically -- yeah.  I'm just trying

15  to figure out what would total up to 50 bucks.  It

16  sounds like -- yeah.  I don't -- I sometimes pick it up

17  and bring it home.  I sometimes eat there.  I don't --

18  there's no -- I cannot glean any sort of -- I don't

19  know.  Probably had Sonny's, probably ate it there,

20  might have come home with it.  I don't know.

21     Q.   Going back to the gate ledger here, it looks

22  the next entry there is at 4:48?

23     A.   Yes.

24     Q.   That is a [REDACTED], do you see that?

25     A.   I do.

```
 1        Q.   Okay.  And that was probably Ms. ██REDACTED██
 2   picking up her son?
 3        A.   ██REDACTED██, yes.
 4        Q.   Were you home at the time that Ms. ██REDACTED██ came
 5   to your residence?
 6        A.   I don't know.
 7        Q.   Are you certain that you dropped your kids off
 8   on the 22nd and not the 21st?
 9        A.   Well, yeah.  Yes.
10        Q.   Okay.  Because the custody agreement said that
11   you would have your kids until the 22nd at 9:00 a.m.
12        A.   Right.
13        Q.   I'm just wondering if it could have been the
14   case that you dropped them off earlier?
15        A.   We would not do that because my exwife, being
16   as you pointed out a family attorney, was incredibly --
17   she would love to have it more -- she would have loved
18   to have more overnights, we would have never done that.
19   Just very precise and on -- whatever the equation was is
20   what we did.  There would not be they go back a day
21   early or anything.
22        Q.   All right.  Going back to the Wells Fargo
23   records here, I want to go to page nine of 19.  There is
24   a reference here to Twin Peaks in Altamonte Springs.
25             Do you see that?
```

```
 1        A.    Yes.
 2        Q.    And it looks like you went there on the 21st
 3   which would have been -- you still would have had
 4   your -- REDACTED and  REDACTED  correct?
 5        A.    Yes.
 6        Q.    And do you recall going to Twin Peaks on that
 7   June 21, 2017?
 8        A.    I don't.
 9        Q.    Would you have taken your kids there, REDACTED
10   and REDACTED .?
11        A.    REDACTED ., possibly.  Probably not REDACTED .
12   It's not that I wouldn't do it, she just wouldn't.  She
13   doesn't really like that kind of food.
14        Q.    Do you recall anything about your visit to Twin
15   Peaks on June 21, 2017?
16        A.    No.
17        Q.    Do you recall like who you would have met there
18   or --
19        A.    No.
20        Q.    Is there a typical group that you meet there?
21        A.    I mean, I have -- I have friends who I see
22   there, but no.  I mean, what appears to be a $59 --
23   probably what -- I mean, I know that that day went to
24   the movies with Rebekah.  I think we went to Buy Buy
25   Baby to do some clothes shopping; but, I mean, again, I
```

1  had just been gone for some period of time and probably

2  said like -- based on $55 -- I'm sorry, $59 on that one

3  and --

4      Q.   And then on the next day you went for a little

5  bit --

6      A.   Yeah, that's more typical.  Listen, I'll be the

7  first to admit -- my wife, I think she used a certain

8  phrase for it, but I -- yeah, that would be more

9  typical -- that would be a more typical trip for me than

10  a $59 one.

11      Q.   All right.  And you said that on the 21st you

12  had gone to the movies and Buy Buy Baby?

13      A.   Yes.

14      Q.   And what facts and circumstances lead you to

15  believe that you did the movies and Buy Buy Baby?  What

16  type -- some type of record --

17      A.   No, just got back from vacation, and she

18  wanted.  My wife was real pregnant.  She wanted to get

19  some clothes for it.  We had been gone, and women grow

20  as their pregnant.  I think she decided that she was

21  entering the phase where she wanted to go get some stuff

22  so we went and got it.

23      Q.   Is there a credit card receipt or something

24  that you saw that refreshed your recollection that --

25      A.   Maybe.  I think I did see something like that,

1    but my -- it might have been hers.

2        Q.    And she had an Amex, right?

3        A.    Yes.

4        Q.    And was it just her spending money on the Amex,

5    and you used Wells Fargo at this point in time?

6        A.    No.  We would use her credit card to bag points

7    for anything, any travel and anything.  Again, I don't

8    like paying bills.  My wife does it.  I'll be the first

9    to admit, paperwork is not my strong suit.  She's very

10   good at it, so she's -- since we've been dating, I'd say

11   probably six months into us dating, she more or less

12   just took over those things and then...

13       Q.    And do you recall what timeframe you went to

14   the movies?

15       A.    No.

16       Q.    And do you recall what movie you saw?

17       A.    No.

18       Q.    Do you recall what timeframe you went to Buy

19   Buy Baby?

20       A.    No.

21       Q.    Was it before or after your son -- or

22   Ms. REDACTED came?

23       A.    I have no idea.  I really don't know.  And by

24   the way, at that point in time, my kids were 13 -- 14

25   and 16.  So, I mean, like, yeah.  I don't know.  I don't

 1  know.

 2      Q.   So that day, referring to the 21st, you get

 3  home in the wee hours of the morning?

 4      A.   Yes.

 5      Q.   And then you get up and go to Sonny's Barbecue

 6  for lunch?

 7      A.   It sounds like me.

 8      Q.   And then you go to a movie, Buy Buy Baby, and

 9  Twin Peaks?

10      A.   All in Altamonte.

11      Q.   And then get to Liam Fitzpatrick's that day

12  too, correct?

13      A.   For another 50 bucks.  Probably a drink or

14  maybe lunch.  I don't know.  I have no idea.  I think we

15  tried to find that from them, and they didn't even have

16  the record at the restaurant.

17      Q.   No, I've issued subpoenas too, and I haven't

18  been able to --

19      A.   I would love to know.  The answer is if you

20  look on the -- I'm sure you have -- my Liam's tabs or

21  more reminiscent of that second Twin Peaks tab and not

22  the first one.  That is probably a day where I was just

23  back and, you know, just...

24      Q.   Twin Peaks, how long does it take you to get

25  from your home to Twin Peaks?

1    A.   Fifteen minutes.

2    Q.   And Liam's is just around the corner, right?

3    A.   Liam's is 3.3 miles from my house.

4    Q.   So 15 minutes to Twin Peaks.  Liam's, what does

5  it take you?

6    A.   I think -- you know, you go down a road that is

7  25, 30 miles an hour, I'm not in a huge rush, probably

8  10, 15 minutes.  But if you wanted to haul, you could

9  probably make it a little faster.  Again, it's

10  International Parkway which is a winding road, and it's

11  not the fastest.

12    Q.   How often do you go to Twin Peaks?

13    A.   It's one of about five restaurants that I visit

14  with frequency.

15    Q.   Would you say you go there once, twice a week?

16    A.   Sure.

17    Q.   Do you continue to go there today?

18    A.   Yes.

19    Q.   Did Mr. Greenberg ever join you at Twin Peaks?

20    A.   Probably.  I don't remember, but probably.

21         (Exhibit 109 was marked for identification.)

22  BY MR. PERKINS:

23    Q.   The next exhibit will be 109, and these are

24  text messages that you produced, texts between yourself

25  and Mr. Greenberg.

CHRISTOPHER DORWORTH                                    August 06, 2024
DORWORTH V. GREENBERG                                                201

1            Do you see the bates stamp at the bottom?

2      A.    No, I don't see that yet.

3      Q.    Okay.  One second.  Do you see it now, text

4  messages between yourself and Mr. Greenberg?

5      A.    Yes.

6      Q.    Okay.  And you see a bates range there?

7      A.    What's that?

8      Q.    The bates range at the bottom there?

9      A.    What's the bates range?

10     Q.    These bates numbers at the bottom 2271, for

11 example, Dorworth?

12     A.    Sure.

13     Q.    Okay.  So let's go to page nine here.  There is

14 a reference here, This was just texted to me by a Twin

15 Peaks waitress.

16           Do you see that?

17     A.    Yeah.

18     Q.    And that's you sending that.  Do you know who

19 that was, who that waitress was?

20     A.    I don't know.

21     Q.    Do you have -- how many waitresses from Twin

22 Peaks do you have their contacts in your cell phone?

23     A.    None right now.

24     Q.    What about back when this text string was sent?

25 I think this is October of 2019.

1      A.   Without knowing more, I don't know who that

2   would be.  But, I mean, let me put it this way:  If --

3   it is not uncommon for people in my life to say, You

4   should -- if you are having a problem or somebody just

5   got fired, call Chris.  That happens quite regularly.

6   In fact, like one of the waitresses at Grafton was like,

7   Hey, you know, one of my friends has some problems.

8           It would not be uncommon for someone to send me

9   something saying that they lost their job.  I just don't

10  know what that is referring to.  That would be very

11  typical.  I have had like five people this year call me

12  and say, I've got a DUI.  I'm just somebody who a lot of

13  people would -- they find themselves in a circumstance

14  like losing their job.  Maybe it's that, but I don't

15  know what that's referencing, and I don't have any idea

16  what the Miami thing would be.

17     Q.   This doesn't refresh your recollection as to

18  who this would have been?

19     A.   No, sir.

20     Q.   Do you know a K█████ B█████ from Twin Peaks?  Does

21  that name ring a bell at all?

22     A.   No.  K█████?

23     Q.   K█████████.

24     A.   No.

25     Q.   In the course of your deposition -- or your

1  wife's deposition, there was some discussions about

2  strip clubs.

3          Do you recall that?

4      A.   Yes.

5      Q.   And your wife was asked if you had been to a

6  strip club since you were married in 2016.

7          Do you recall that line of questioning?

8      A.   Yes.

9      Q.   And her answer was that no, you had not been to

10 a strip club.

11         Do you recall that?

12     A.   Yes.

13     Q.   And is that a true statement?

14     A.   Yes.

15     Q.   And then there was some discussion that --

16 about some type of invitation that came from Josh

17 Katsur.

18         Do you recall that?

19     A.   Correct.

20     Q.   And can you tell me about that?

21     A.   I mean, I didn't -- at the time, I didn't think

22 it was anything particularly sinister.  Josh, who is

23 Dr. Katsur's son, had reached out to me, and we had met

24 through a mutual friend.  At the time, I didn't really

25 know what was going on, but Joel I think was in jail at

1  this point in time.  He had already damaged all of

2  Abby's stuff and was in there.  Then Josh showed up

3  through a mutual friend of mine named Scott Miller.

4  Scott asked if we could all get lunch together at

5  Hillstone.

6           And when we got there, I met him, and he

7  basically told me, My dad's kind of one of the Greenberg

8  Partners at the dental place.  And with all the Joel

9  stuff, you know, I just wanted to meet you and kind of

10  used that as his entre to come in.  And we became

11  friends, and, you know, Josh just told me his favorite

12  thing to do was to go to the strip club.  He loved -- he

13  loved being there.  He loved the -- you know, loved all

14  the attention that you got.  He said people are just so

15  nice.  You can drink and have a great time.  He was kind

16  of in love with one of the waitress's there.  He would

17  ask if I wanted to go.

18       Q.   And when was the first time that he asked you

19  to go?

20       A.   I don't know.  I couldn't even tell you when

21  the meeting was.  Whenever Joel was in jail after

22  destroying Abby's stuff, shortly after that, I got

23  there.  He also hired my attorney, the Katsurs did, over

24  at Lowndes Drosdick for just a short period of time.

25  Same time, same introduction, also through Scott Miller,

1  and -- I'm sorry, what was the question?

2      Q.   When was the first time that he asked you to go

3  to a strip club because there was some -- if you recall,

4  there was an assertion in the deposition that maybe Abby

5  or Joel Greenberg was behind the invitation.

6      A.   I believe Joel Greenberg was in jail.  I don't

7  think Abby or Joel Greenberg were behind anything.  I

8  think Dr. Katsur might be behind that.  But again, I

9  know that -- I know this because Josh told me this.  He

10  said he was basically sent to meet me obviously with all

11  the stuff with the Greenbergs.  He kind of came almost

12  like I'm a friend.  We're -- and the way he talked was

13  very like the Katsurs did not have a lot of respect for

14  the Greenbergs because of all of the problems that had

15  come from Joel.

16      Q.   And this first meeting was at Hillstone?

17      A.   Yeah, that wasn't just the first meeting.  We

18  had a lunch at Hillstone.

19      Q.   And it was you, Josh, and Mr. Miller?

20      A.   Scott Miller, yes.

21      Q.   The three of you?

22      A.   Correct.

23      Q.   And the best geographic -- the timeframe that

24  you can give me best for that is after Joel was in jail?

25      A.   Yes.

CHRISTOPHER DORWORTH                                    August 06, 2024
DORWORTH V. GREENBERG                                               206

1      Q.   And why do you believe that Dr. Katsur was

2  behind the invitation to you to go to a strip club?

3      A.   I don't know.  I can't speak for Dr. Katsur.

4  Dr. Katsur didn't answer a lot of questions when we did

5  ask him.  He just sort of decided what was private and

6  what wasn't, but I think the point was just that we had

7  had a conversation or we sort of made the statement that

8  I don't like strip clubs.  I don't like strip clubs.

9           I took a human sexuality class at the

10  University of Florida.  There's some pictures on there

11  that scarred me to this day.  I'm just not a -- I'm a

12  clean person, and I don't -- the idea of it is just not

13  attractive to me, and I think we had made that comment.

14  We had sort of had a conversation.  I -- Rebekah

15  remembered this better than I did, but it was basically

16  to the effect of they -- Anne Pham had asked her, Do you

17  really think your husband doesn't go to strip clubs?

18  And she said, No, my husband does not go to strip clubs.

19  That is a factual statement.

20           And at that moment in time, then like two days

21  later there is an invite to come.  Hey, we're going to

22  go there.  The way it was made out to me, I wish had

23  taken more attention to this, but it was basically if

24  you were someone who likes strip clubs, if you are

25  someone who Rachel's North which is the one in

 1  Casselberry that Josh Katsur was real big on, if this
 2  was your -- he had it basically like the best of
 3  everything.  The best booze, the best girls, the best
 4  all this stuff, and I politely declined.
 5      Q.   And did that invitation come by text or --
 6      A.   I don't know.
 7      Q.   You don't know?
 8      A.   I don't know.  Probably a phone call.  It could
 9  have been a text.  I don't know.
10      Q.   And you said that Josh did not have kind things
11  to say?
12      A.   Yes.
13      Q.   And what -- can you elaborate on that?
14      A.   I mean, there -- probably had two dozen
15  conversations on the subject, and it was basically just
16  about how the Greenbergs, they've screwed everything up
17  with Joel, and his dad is going to come in and fix it.
18  And, you know, the -- at first he was kind of like, Hey,
19  are you -- I believe in retrospect he was just searching
20  for information because they had decided they were going
21  to go and start lying about me and Gaetz and others to
22  try to get us wrapped into the thing so that Joel could
23  get less time.  And so I think probably what they were
24  trying to do is just sort of keep track on me.
25           But, you know, I met Josh, and we socialized

1  frequently.  He threw a party for me at his house, had a

2  DJ, and a full dinner.  And I reciprocated by having --

3  when the movie Coming to America 2 came out, I hosted a

4  party at my house.  This was a real party.  Probably had

5  30 people at it, 40 people at it.  Josh and a bunch of

6  his friends, I considered them -- at the time I had no

7  idea that Joel was out doing this scumbag stuff trying

8  to drag people in there.  So I just -- I took it at face

9  value.

10          To be very clear, the day that Joel got

11  arrested where his house got raided, Sue and Abby called

12  me.  I'm the one that called and got -- made sure the

13  governor's office knew he was going to resign.  I wrote

14  Joel's resignation letter.  I mean, it was me and Vince

15  Citro.  I made sure that the staff was made aware of

16  what was going on.  I did a lot of things, and I didn't

17  do it because they paid me any money.  I did it because

18  I was trying to look out for Abby and Sue.

19          But as soon as Joel got stuck in there, they

20  just said the hell with you.  Everybody -- and again, I

21  do believe that Joel tries to persuade the world that he

22  is somehow not too blame for this, and this is other

23  people's thing.  I think the Greenbergs are just

24  pathologically stupid when it comes to believing Joel's

25  stuff.  So my guess is that my -- in retrospect, I just

1  assume that it was the Katsurs that wanted to keep track

2  because they knew the strategy of what Joel was doing,

3  trying to lie to --

4      Q.   What motivation would Dr. Katsur have to get

5  information -- be searching for information so that he

6  could lie about you and Matt Gaetz?

7      A.   Well, all I can do is tell you this much:  Out

8  of nowhere, I get invited to a lunch through a mutual

9  friend.  I was told by that mutual friend that the

10 Greenbergs were highly desirous to being helpful to me.

11 I was encouraged to go along and start an insurance

12 company that would have all the providers for Greenberg

13 Dental.  That was done from Josh Katsur.  I went so far

14 as to actually consult with lawyers, Tim Mead and

15 others, in Tallahassee about what goes into creating an

16 insurance practice for a dental practice.

17        So I can tell you they came and they had a real

18 high level of interest.  And Josh specifically told me

19 his dad was the one who would sort of encouraging of it

20 all happening which was very surprising when Dr. Katsur

21 denied that in the deposition.  But I met Josh, I met

22 Josh's best friend who was the lawyer for Dr. Katsur who

23 I believe was in a -- nice guy.  Was in a car crash, and

24 I want to say he was quadriplegic, and -- but he was

25 their attorney.  Josh said, My dad takes -- Josh always

1  tried to make this point out of it.  Like -- I was like,

2  I don't know what you're talking about.  I don't have an

3  issue with Greenberg Dental because I didn't realize

4  they were out trying to get me and my friend jailed for

5  things we didn't do.

6      Q.   And what evidence do you have that Dr. Katsur

7  was lying about you or Matt Gaetz to the authorities and

8  the press?

9      A.   I don't think I said -- I don't know that he

10  ever said anything to the authorities or the press.  I

11  think that he was keeping track because he has a

12  multimillion dollar investment, and he knew that his

13  partners, the Greenbergs, and their kid were out there

14  trying to mess around with me, mess around with Matt

15  Gaetz for the purpose of getting us in criminal trouble

16  so that their son could get out of jail faster.  I do

17  think that Dr. Katsur was aware of that.

18          And listen, nobody says that the Greenbergs are

19  stupid.  I think they're probably aware of the fact that

20  lying about a U.S. congressman and somebody who is a

21  lobbyist probably carries with it some risk because --

22  you know, and so my guess is Dr. Katsur was keeping

23  close track on that.

24      Q.   So as you sit here right now, you have no

25  recollection of who this waitress was from Twin Peaks?

CHRISTOPHER DORWORTH                                    August 06, 2024
DORWORTH V. GREENBERG                                              211

```
 1      A.   No.  I don't really understand what the text
 2  is.  Why would the -- why did I lose my job because some
 3  jerks...
 4      Q.   In Miami weren't following the rules.
 5      A.   I don't even know what that means.  I mean, I
 6  can't follow -- I don't know.  No idea.
 7      Q.   Let's go back to the Wells Fargo.  We have this
 8  Liam Fitzpatrick entry for 6/21.
 9           Do you see that?
10      A.   Yes.
11      Q.   55 bucks.  Do you have any recollection for
12  what that was for, and who you were with?
13      A.   No.
14      Q.   Is there a place you typically sat at Liam
15  Fitzpatrick's or --
16      A.   Typically in the back at a place called The
17  Snug.
18      Q.   And was there a bartender or person that waited
19  on you that you typically dealt with there in The Snug?
20      A.   I mean, I would go to Liam's some months 20
21  times.  You know, there would be different bartenders in
22  there.  I don't have an office/office, so oftentimes I
23  will have meetings, and my direct location was always
24  Liam's.  During the day, I would go to Twin Peaks or
25  Hillstone, and typically afternoon/evening at Grafton.
```

1   And also walk home.

2        Q.   You would walk home from Liam's?

3        A.   I mean, Liam's is 3.3 miles from my house.

4   Twin Peaks was a long distance from my house.  Usually I

5   would drive.  I don't know -- but, I mean, if there ever

6   came a time where I had too much to drink, I might walk

7   home.  It took about an hour.

8        Q.   On June 21st, I have gone through your AT&T

9   phone records and had a couple of questions about some

10  of the calls that were placed on June 21, 2017.  One was

11  with a Mr. Luke Classon, C-L-A-S-S-O-N, on June 21,

12  2017, at 8:53 eastern time.

13           Who was Mr. Classon?

14       A.   He's my civil engineer for my development

15  business.

16       Q.   And what development business is that?

17       A.   Well, it would be through CED Strategies.  I

18  don't have like one corporation that I use for

19  everything, but Luke was my project engineer for

20  probably ten different deals.

21       Q.   And then another call was made -- or a text,

22  I'm sorry, with a Ben Christine Morales of Elite Options

23  on June 21, 2017, at 9:41.

24           Do you know a Mr. Morales?

25       A.   9:41 at night or 9:41 in the morning?

1      Q.   9:41 at night.

2      A.   I don't think I know a Ben Morales.

3      Q.   Ben M. from Elite Options, that name doesn't

4   ring a bell?

5      A.   I don't know what Elite Options is.  I mean,

6   it's possible that I know him from Uber Eats or

7   something, but I don't think I know a Ben Morales.  If I

8   do, I don't know how...  Remind you, I was in politics

9   for a long time, so sometimes I will have -- like I'll

10  be Facebook friends with somebody, and I don't know who

11  they are.  It just goes back to that time.  So I don't

12  know a Ben Morales?

13     Q.   And then at 10:39 p.m. that night, you had a 30

14  second call with a Holloway Credit Solutions from a

15  number out of southern Alabama (334) 396-3000.

16          Does that ring a bell?

17     A.   No.  What's it called?

18     Q.   Holloway, H-O-L-L-O-W-A-Y?

19     A.   No, I don't know what that is.  10:40 at night?

20     Q.   This was 10:39 on June 21, 2017.  And if you

21  look at the gate code going back to 105 on that day

22  which is page five, you come into the neighborhood at

23  10:59 p.m.

24          Do you see that night?

25     A.   What time am I looking for?

CHRISTOPHER DORWORTH                          August 06, 2024
DORWORTH V. GREENBERG                                      214

1       Q.    June 21st.

2       A.    Okay.

3       Q.    You come into the neighborhood that night 20

4    minutes after you made that call to Holloway, and I was

5    just curious if that name rang a bell at all.  Nothing?

6       A.    (Witness shakes head.)

7       Q.    Do you know where you were coming in from on

8    June 21st at 10:59?

9       A.    I do not.  It was the end of the day, but I

10   might have left and come back.  I just don't know.

11      Q.    Okay.  And it was a Wednesday night.

12      A.    Yeah, I had a real pregnant wife.  I mean, she

13   might have been hungry and wanted something.  It doesn't

14   take much to figure out what it probably was, but I was

15   probably just going to get something for her.

16      Q.    And your two kids, 14 and 16, were at your

17   house that night?

18      A.    Yes.

19      Q.    You're absolutely certain of that?

20      A.    I mean, I will tell you this much that as a

21   general rule because of the fact that my exwife was a

22   divorce attorney, because of the fact that we were in --

23   as this was all going on right now in the middle of a

24   guardian ad litem argument over me wanting more custody

25   of my kids than I had, and that I had already signed the

1  agreement with the guardian ad litem and that they could

2  do a status check at any point in time, I mean, I can

3  tell you this much:  I was keeping my kids every day

4  until -- if it was 9:00, I would probably sit with them

5  until 8:59 when I pull up.  I was very desirous of

6  spending as much time with my children as I could.

7  Especially at this point in time because of the guardian

8  ad litem report, the custody case, and everything else.

9       Q.   And you're aware of the allegation that you met

10  with "AB" either on the night of the 21st or the 22nd?

11      A.   I thought it was the 21st.  I thought that was

12  the day she designated I met with her.  I never met

13  "AB."  I never went to a hotel room with Joel.

14  That's --

15      Q.   Have you ever been to the Orlando Marriott Lake

16  Mary where --

17      A.   Yes.

18      Q.   Where it was identified by Ms. "B"?

19      A.   Yes.

20      Q.   On how many occasions?

21      A.   I mean, I had my victory party there when I won

22  my elections back in 2007, 2008, 2010.  So, I mean,

23  yeah.  It is the convention hotel in the area.  It's

24  where all the dinners are.  They opened a Westin a few

25  years back, and that has split that up.  But, I mean, I

CHRISTOPHER DORWORTH                                    August 06, 2024
DORWORTH V. GREENBERG                                              216

1  have been to that thing -- probably been to a 150 events

2  at that hotel over the years.

3      Q.   And as you sit here today, you believe it's a

4  case of mistaken identity?

5      A.   I'm almost certain it is.  The way that -- the

6  way that "A" -- either "AB" is just outwardly lying at

7  the encouragement of Joel which, you know, could be, or

8  more likely that there was somebody else who and maybe

9  they introduced him as Chris, maybe they didn't.  I

10  don't know.  I never met the woman.  She can't identify

11  really my accent.  She couldn't tell me anything we

12  talked about.  I mean, I'm a talker, and, I mean, the

13  idea that she would just have no idea about anything, I

14  don't think she met me.  I think she probably -- it was

15  probably Joe Ellicott or somebody else, but I know it

16  was not me.

17      Q.   She had mentioned -- you sat through her

18  deposition, Ms. "B", correct?

19      A.   Yes.

20      Q.   And she had mentioned that you had expressed

21  that you were at an event that night.

22          Do you recall that testimony?

23      A.   Yeah, she did say that.

24      Q.   Were you at any type of event on --

25      A.   I don't think so.

1      Q.   -- on June 21st?

2      A.   I believe I was with my wife and my kids that

3  day.

4      Q.   What about on the 22nd?  Was there any type of

5  event that you --

6      A.   Again, I don't know, but I don't think so.

7  I -- the 21st is a zero percent chance of that stuff

8  because I would probably not go to an event if I had my

9  kids that night.  I mean, I would, I was not the type of

10 parent that would have the kids but not be the with

11 kids.  It just wouldn't happen.  Of course, Joel's

12 testimony in his interrogatories, he says we went to

13 Liam's right beforehand.  She says that I came from a

14 party.  So I think they're just making this stuff up as

15 they go along.  What did not happen is I did not meet

16 with Joel Greenberg and "AB" at a hotel that day or

17 ever.

18          My belief is pretty simple.  I think that he

19 knew that he had to -- in order for there to be a crime,

20 there had to be somebody underage.  I think it's made

21 up.  He probably knew he had a day like this with her

22 and just worked backwards on that.  I don't think there

23 is any -- there is no -- I don't remember any events at

24 the time.  I probably wouldn't have gone to them even if

25 there had been.  So, no, I don't think so.

1    Q.   Let's move on to June 22nd then.  Do you see

2    that?  Going back to the gate ledger, Exhibit 105 up on

3    the screen.

4         Do you see that?

5    A.   Yes.

6    Q.   Okay.  And I have two entries there, both for

7    Uber.

8         Do you see that?

9    A.   Yes.

10   Q.   One for 6:46 p.m. and then one for 11:04 p.m.

11        Do you see that?

12   A.   Yes.

13   Q.   Would that have been you coming into the

14   neighborhood in an Uber?

15   A.   I have no idea.  My kids were 16 and 13 at the

16   time, and they were -- my daughter didn't have her

17   driver's license yet.  She waited like a year after she

18   turned 16 to do that.  So that could have been them.

19   That could have been me.

20   Q.   Let me stop you right there.  The custody

21   agreement says you had to drop your kids off by 9:00

22   a.m. --

23   A.   So in that case they were gone.

24   Q.   So in all likelihood, this was you coming into

25   the neighborhood in an Uber?

CHRISTOPHER DORWORTH                                    August 06, 2024
DORWORTH V. GREENBERG                                          219

1    A.   Probably getting picked up and then dropped

2  off.

3    Q.   Okay.  Because we did see evidence that you

4  were at Twin Peaks and Liam's on this day, correct?

5    A.   And you saw how much I spent.  The odds are

6  good that I was probably not in a good place to drive

7  home, so I Ubered there and back.

8    Q.   Now, you had mentioned that you looked for your

9  Uber receipts back in 2017, and your app didn't go back

10  that far?

11   A.   Yeah.  The feds asked me to provide my Uber

12  stuff.  Actually, Uber got turned off on my phone for

13  awhile as a function of this.  I was able to get it back

14  on; but, yeah, I was unable to do that.

15   Q.   Did you have to give the feds your phone?  Did

16  they take it?

17   A.   No.  I think they only took the phones from

18  people who wouldn't comply with their discovery

19  requests.

20   Q.   Have you asked informally Uber, Hey, do you

21  have my receipts from back in the summer of 2017?

22   A.   I don't really have a means by which to ask

23  informally those questions.  I believe I called and

24  asked them -- I think we called and said, you know --

25   Q.   Well, I've subpoenaed them --

CHRISTOPHER DORWORTH                                    August 06, 2024
DORWORTH V. GREENBERG                                                 220

1      A.    Yeah.  Well, I couldn't subpoenaed them because

2   it was a criminal investigation back then, but you have

3   them.  I just don't.

4      Q.    I don't have them yet, but I'm working on it.

5      A.    Good luck.

6      Q.    I was just curious if you've had any contact

7   with Uber --

8      A.    No.

9      Q.    Now --

10     A.    We turned over basically every record -- I

11  think they asked for it, and I was able to produce a

12  bunch of it, but I think on the dates in question here,

13  it was...

14     Q.    Now, you do you recall testifying that when the

15  FBI was asking you some questions, you went back into

16  your gate ledger and were able to find some of these

17  names?

18     A.    Well, I didn't know there was a gate ledger

19  until we got to that thing, and they said when we were

20  at the thing, they said, like, We know she was at your

21  house.  I said, Well, how do you know she was at my

22  house?  They said, Well, she's on the gate log.  So I

23  went home and my wife was there, and I said, Honey, we

24  need to find apparently some way to get the gate logs.

25          So Rebekah is the one that actually went into

1  the room.  She called up the HOA and figured out the

2  deal, got our log and everything.  So after I got back

3  from the FBI interview, as soon as I walked in my front

4  door, I told her this, she -- they call up, we find

5  those things, and we see -- I find out that this "AB"

6  woman has been at my house.  I'm like, I have never met

7  her.  I don't know what to tell you.  And so I go into

8  my phone and see it's the same time I was on the water.

9  I think it was like nine or ten minutes apart or

10  whatever it was.

11      Q.   I notice that the gate ledger, the snapshots

12  that you were able to pull, had another category in them

13  that identified the person riding in an Uber.

14      A.   All I do is just log into my thing.  It's just

15  there.

16      Q.   If you were to go into that today, could you

17  figure out -- could you go all the way back to 2017?

18      A.   No, that doesn't go back that far.  You can go

19  back further on the computer, but you can't do it on

20  your phone.  But we have done that.  I've gone through.

21      Q.   Because I've asked Heathrow to identify the

22  riders in these Ubers.  Apparently there is another

23  category that I can get.  I'm waiting on that to come in

24  too, but I'm assuming that this was --

25      A.   That's not done every time.  I think that's

1  sort of how they do it.  There is plenty of times if

2  it's just an Uber driver, they let you right in and ask

3  where you're going.  But, yeah, I don't know.  Like I --

4  they do weird things too.  Like one time on those things

5  I want to say it was Mike Fischer and then Eric

6  Foglesong was in the passenger seat.  So I'm not

7  terribly clear how that was known to anybody because

8  they don't ask you.  It's like who are you in the

9  driver's seat?  Who are you in the passenger seat?  They

10  don't do that.

11      Q.   Going back to the summary of Wells Fargo

12  records which was Exhibit 108, I have that back up on

13  the screen, and we have been talking about the 22nd.

14          Do you see that up there?

15      A.   Yes.

16      Q.   And it looks like I have two entries for Twin

17  Peaks, one for 234.73 and one for 31.29, and then I have

18  a Liam Fitzpatrick's for 260, correct?

19      A.   I'm just confused because I could have sworn

20  you guys -- somebody said that Joel was only at that

21  hotel for one day, so I don't know how on the -- I

22  didn't have it on the 21st either, but on the 22nd, I

23  know the evening things.  You'd think they'd take them

24  out at 3:00 or something, noon, whatever the checkout

25  is.  But anyway, I was at Twin Peaks obviously that day.

1    Q.   Okay.  Do you recall anything about your visit

2  to the Twin Peaks on the 22nd?

3    A.   No.  That was -- that would probably be a

4  drinking session.

5    Q.   With somebody?

6    A.   Probably my buddies, yeah.

7    Q.   Jason Brodeur and --

8    A.   Jason doesn't love those places.  He's not a --

9  I mean, he's a state senator, so he can't go to -- there

10  is nothing wrong with Twin Peaks, but I just think -- he

11  has been there before, but I don't think he's a -- he

12  doesn't frequently...

13    Q.   Who would be a buddy that you would go to Twin

14  Peaks with?

15    A.   I've got a bunch of buddies that go.  Eric

16  Foglesong would be one of them.

17    Q.   Okay.  Do you have any idea why there'd be two

18  entries there?

19    A.   Well, because one person got off and asked that

20  we close the tab, and we stayed and paid a second tab.

21    Q.   And then your standard operating procedure

22  would be Twin Peaks in the day and Liam Fitzpatrick's in

23  the evening?

24    A.   Could be -- well, I don't know there is -- we

25  don't have a standard operating procedure; but in

CHRISTOPHER DORWORTH                              August 06, 2024
DORWORTH V. GREENBERG                                        224

 1  general, at nighttime I just don't like to be too far

 2  away from my house in that regard.

 3       Q.   Would you ever take an Uber to Twin Peaks and

 4  then take an Uber from Twin Peaks to Liam Fitzpatrick's

 5  and then Liam Fitzpatrick's to home?  Would that be --

 6       A.   Sure.  It doesn't sound like something I'd do,

 7  but it could be.

 8       Q.   There is a Peach Valley Cafe referenced there

 9  in Heathrow.

10            When would you have done that, the Peach Valley

11  Cafe?

12       A.   It's a breakfast place.  They're open until

13  2:00 in the afternoon, 2:30 in the afternoon.

14       Q.   Would it be possible that you went there to eat

15  breakfast with your kids to say goodbye and then dropped

16  them off at your exwife's house in College Park?

17       A.   Highly possible.

18       Q.   Now, do you recall in the course of the

19  deposition of Ms. "B" I asked her if you had any

20  distinguishing features?

21       A.   I do.

22       Q.   A tattoo or birthmark, and her response to that

23  was big belly and small penis.

24            Do you recall that?

25       A.   Yeah.  If I ever met her before, that would

CHRISTOPHER DORWORTH                                August 06, 2024
DORWORTH V. GREENBERG                                            225

 1  have really bothered me, but I have never met her so I

 2  don't take it personally.

 3       Q.   In the summer of 2017, was your appearance any

 4  different than it is now in terms of weight?

 5       A.   My weight fluctuates.  The most I ever weighed

 6  was 340.  I'm probably around 285 now.  So, I mean,

 7  that -- around that time I was probably around 3 -- I

 8  have no idea.  I could not -- you have got a picture of

 9  me, and that's what it is, and I don't know what my

10  weight was.

11       Q.   You were heavier than you are now?

12       A.   I mean, I gain or lose 20 pounds in a few

13  weeks.  It doesn't take long.  I'm a big guy.

14       Q.   And do you have a tattoo or birthmark --

15       A.   No.

16       Q.   -- or anything like that?

17            And you're circumcised, correct?

18       A.   Yeah, like 81 percent of people I think.  Yeah.

19       Q.   There was some discussion in the course of your

20  wife's deposition about measuring your penis.

21            Do you recall that?

22       A.   Yes.

23       Q.   And she said she measured it?

24       A.   Yes.

25       Q.   And it was eight inches long; is that right?

CHRISTOPHER DORWORTH                                   August 06, 2024
DORWORTH V. GREENBERG                                            226

1     A.    Yes.

2     Q.    When did she measure it?

3     A.    Well, she did again that night --

4           MR. ANDRADE:   I'm going to object to --

5           THE WITNESS:   I don't mind answering.  That

6     night we got back and she said, I want to make sure,

7     and it was the exact same.

8  BY MR. PERKINS:

9     Q.    And one of the theories you have in this case

10 is mistaken identity, correct?

11    A.    Listen, I am not -- I have never met "AB."  As

12 I have never met her, I can have no insight to her

13 thoughts because I haven't talked to her.  I don't know

14 what she thinks.  I know she obviously went and told her

15 lawyers who threatened to sue me that this happened.

16 She couldn't even list details like what the hotel was

17 when we first sued her.  Not terribly clear to me why

18 she would be sending demand letters to me when they

19 didn't have anything on that.

20         Joel told me this was going to happen.  If I

21 didn't get him pardoned, either the Ballard firm or

22 through Matt Gaetz, he said he was going to make them my

23 problem.  He did that.  He told me he had to pay her

24 attorneys.  She lied about that in an interrogatory and

25 said that it never happened.  And we said, What about

1  this?  And she said, Oh, I did go to that one, but I

2  never retained him, or nothing became, some semantical

3  thing.

4        The reality is that Joel Greenberg sent her to

5  a lawyer, the bill was already taken care of, that was

6  conveyed as part of the discovery that was given via

7  K██REDACTED██ M██REDACTED██, I believe.  She went there and met with

8  a lawyer, and then she refused to discuss what they

9  talked about.  So my general operating thought is that

10 the Greenbergs told her what to do and sent her along

11 this path and told her that they're probably going to

12 pay money.  And she and he said as much -- Vladimir St.

13 Louis said as much when he claimed that Joel had told

14 him that.

15 Q.   What evidence do you have that the Greenbergs

16 paid any legal bills for "AB"?

17 A.   I mean, Joel.  I think -- I have evidence that

18 Joel -- they paid for Joel's life because he lost his

19 job, they took away his $5 million in the AWG stock

20 without compensation.  I mean, they're the ones that did

21 all this stuff.  What do you mean?  That is...

22 Q.   Well, do you have evidence that they were

23 paying the legal bills for "AB"?

24 A.   I mean, I know that Joel said, Go to this

25 attorney.  The attorney bill has already been paid for.

1     Q.   That is Andrew Searle?

2     A.   That's the name, Andrew -- it's S-E-A-R-L-E,

3  Searle.  And then she lied about that, and then in a --

4  later she says, Oh, I did go there, but I didn't retain

5  him.  And then I think the question was like, Do you

6  know who paid the bill?  She didn't know.  So, I mean,

7  the Greenbergs -- or Joel Greenberg sent her to an

8  attorney, and she did not get a bill for it.  And then

9  they refused to answer what they talked about in that

10  conversation.

11         I am highly suspicious that they were giving

12  her strong encouragement to go down a path and --

13  because otherwise, why would she send me a demand

14  letter?  She literally didn't have any sort of -- as

15  soon as we sued, this and that, but the reality was she

16  was put up to do that by somebody.

17     Q.   Did you ever talk to the attorney that sent you

18  the demand letter on behalf of "AB"?

19     A.   No.  My attorney did, Richard Hornsby.

20     Q.   Going back to the mistaken identity, Ellicott

21  versus you, have you ever had a discussion with

22  Mr. Ellicott about the possibility of a mistaken

23  identity here?

24     A.   I haven't talked to Joe Ellicott in years.  I

25  think the last time I spoke to Joe Ellicott is when I

 1  told you that Abby and Sue called me crying because Joel

 2  had been arrested.  I called and gave Joe a heads up.  I

 3  think that was the last time we talked.

 4      Q.   Do you have any sense of the dimensions of

 5  Mr. Ellicott's penis?

 6      A.   I have no idea.  I'm not surprised to know that

 7  I do not know the answer to that question.

 8      Q.   Going back to the guest ledger now, let's go to

 9  July 15th, page six of ten.  I have that up on the

10  screen for everybody, Exhibit 105.  The first entry

11  there is a Michael Fischer.  We talked about him.  He

12  works up in Tallahassee; is that right?

13      A.   Yes.

14      Q.   And he has cerebral palsy, correct?

15      A.   He does.

16      Q.   How do you know Mr. Fischer?

17      A.   I have known Fish for a very long time.  Mike

18  was the executive director of an organization called the

19  Florida Student Association which is the student

20  governments of the public universities of the state of

21  Florida.  And when I was student body president at the

22  University of the Florida in 1997 and 1998, I was the

23  two-term chairman of that organization.

24           So after that, I mean, I wasn't particularly

25  involved in stuff, and it wasn't like once you graduate

1  and move on you don't stick around the student

2  government stuff.  But to this day, I meet people who

3  are FSA executive directors or chairs.  So I met him

4  through that, and then he and Matt Gaetz are close

5  friends.  I got to know him better through that, but he

6  has become one of my dear friends.

7      Q.   When was the last time you had contact with

8  Mr. Fischer?

9      A.   We text exchanged stuff yesterday.  Not about

10  this case.

11      Q.   Now, were you home when he got there --

12      A.   I don't know.  I mean --

13      Q.   -- at 3:20?

14      A.   I remember Fish being there, but I think it was

15  the next day.  I think I was already gone by that point

16  in time.

17      Q.   And gone by that point in time would have been

18  dropping Rebekah off at the airport and then going out

19  with Mr. Morris?

20      A.   Again, you've conflated those two.  I don't

21  know when Rebekah flew.  I'm telling you my wife is big

22  on things like flying out at 6:00 in the morning, do

23  certain things to get ahead of things.  If that is the

24  case, she does not usually drag me into that.  If it's a

25  2:00 flight, I definitely taken her.  I would have

1  probably offered if it's 6:00 in the morning flight.

2  She's pregnant.  I don't really love the idea of my wife

3  there.  My guess is she probably had a midmorning

4  flight.  I do not know.  I do not know if I went back

5  home.  I don't show myself on the gate, so I don't think

6  I was, but I don't know.  And I think I went to Publix,

7  then I went to my buddy's house and stayed on the boat

8  and drank a lot of booze.

9      Q.   Have you discussed the July 15, 2017, gathering

10  with Mr. Fischer?

11      A.   No.  I think in the testimony he said -- his

12  testimony, if I remember, he said I was not there, so I

13  don't...

14      Q.   Yeah.  He said you were not there.  He did say

15  that Mr. Gaetz was there, and he did say that Mr. Gaetz

16  spent the night.

17      A.   Again, I mean, Matt and Fish are friends, very

18  good friends.  That is -- they would know.  I just -- I

19  don't think I saw him and definitely didn't see any of

20  those girls.

21      Q.   And the girls you're referring to would be

22  K[REDACTED] M[REDACTED] and "AB"?

23      A.   Yes.

24      Q.   Did you see B[REDACTED] G[REDACTED] at your home on July

25  15, 2017?

1     A.    I don't think I did.   She would have got there

2   at 4:42, and I was gone by then so no.

3     Q.    Do you know who was hosting this party on July

4   15, 2017, if you were gone?

5          MR. ANDRADE:   Object to form.

6          THE WITNESS:   I mean, again, I take tremendous

7       exception to the idea that it was a party.   You

8       know, again, there is seven of us.   I count here --

9       even if you count Gaetz which I don't -- Fish said

10      he did.   Mike Fischer, Gaetz, B[REDACTED], "AB," K[REDACTED]

11      M[REDACTED], Joe Ellicott.   That's -- it's not a big

12      group.   It's a small group of folks.

13          I never met "AB."   I do believe -- I believe I

14      met K[REDACTED] M[REDACTED] one time.   I believe that was out

15      at a bar or something like that because Joe -- Big

16      Joe Ellicott was totally in love with K[REDACTED] and

17      wanted to marry her, thought that he had sort of

18      found this tremendous gem via this -- I guess via

19      Seeking Arrangement or whatever it was.   But he was

20      very much in love.

21          If you read some of the interrogatories or some

22      of the stuff I think we turned over from the feds,

23      some of the stuff they had there, he described her

24      as his girlfriend.   He was very much in love with

25      her.   If I had met her at my house at this point in

1    time, I probably would have made a big deal out of

2    her because my friend was deeply in love with her.

3         Then about two weeks later, as I recall --

4    well, he called me up one day and asked me if I

5    could come join him at Duffy's, and I wasn't really

6    particularly close with Joe.  I mean, that was sort

7    of out of the -- we had never been for food before.

8    And I said, Sure.  You know, again, he was a client

9    of mine, and he worked for Joel and he was high up

10   in the tax collector's office and I really didn't

11   know what it was about.

12        I got there and Joe was in tears.  It was

13   basically had a bunch of food on the table, and

14   like, you know, had to stop and lower his head.  I

15   mean, it was very serious, and I asked him what was

16   wrong.  And he said he found -- picked up K REDACTED

17   phone and found a series of what would be very --

18   we'll call it not positive images of a woman if you

19   thought she was the love of your life and you were

20   together, finding her having group sex and being on

21   the receiving end of things that I don't think most

22   people want to see happen to a woman that they love.

23        But he was just beside himself, and he also

24   kind of acknowledged.  He said like, Listen, you

25   meet somebody the way I met her, I knew that she

1     wasn't some pristine thing, but I just didn't think

2     she would do this.  Joe was -- he thought that she

3     really loved him, and he finds a video full of not

4     a -- I didn't ask the details.  I wasn't like, Hey,

5     let me see the phone or anything.  He didn't have

6     the phone.  I think she was in the shower and he

7     picked up the phone, saw somebody text there,

8     started scrolling through the texts to see who it

9     was and saw all the videos exchanged back and forth

10    and stuff like that and he was just morose.

11  BY MR. PERKINS:

12    Q.   When was that meeting at Duffy's with

13  Mr. Ellicott?

14    A.   I think it was around August 1st, August 2nd,

15  August 3rd, somewhere around there.  I mean, again, just

16  to be totally clear on that one.  In the thing that I

17  turned over, it said something to the effect of --

18  something about August -- as of August 1st that she --

19  she basically denied ever having a relationship with him

20  which I will tell you was news to him, but, you know,

21  she -- I think she basically said, Listen, you're not

22  going to do this.  So after that stayed and became real

23  good friends.  I want to say it was around early August.

24    Q.   Of 2017?

25    A.   Yeah.  It was whatever -- and again, to be

1  totally clear, it is not my total recollection.  It's

2  aided by the thing that I got from the feds.

3      Q.   And you had mentioned the things that you got

4  from the feds on several occasions.  Those would be the

5  proffers that Mr. Ellicott made?

6      A.   Yes.

7      Q.   And how did you get your hands on them?

8      A.   Mike Shirley.

9      Q.   And did Mr. Shirley give you anything else from

10  that exhibit list that has all those proffers that

11  everybody's been looking for?

12      A.   Everything I got I gave to you.  Every single

13  document.

14      Q.   And you know there is a bunch of text messages

15  on that exhibit list between "AB" and Ellicott?

16      A.   I do not know that.

17      Q.   Did he give you any -- have you seen any --

18      A.   I don't think I have, no.

19      Q.   -- texts between "AB" and Ellicott?

20      A.   No.

21      Q.   And how did Mr. Shirley give you those

22  documents?

23      A.   We met at Grafton Street, and he would air drop

24  them.

25      Q.   And Mr. Shirley, did you discuss with him at

1  all if he did have the text messages from "AB" that is

2  on that exhibit list?

3       A.   There was not like some folder of stuff.  You

4  want this, you want -- I didn't get to peruse all his

5  stuff, but just basically everything he had.  Everything

6  he gave me I passed on.  I am not aware of anything

7  more.  It wasn't a great number of things.  It was just

8  a handful of things.  It was real simple.  He said, Hey,

9  I think I have some things that might be helpful to you.

10       Q.   And that's how you got those proffers that were

11  produced right before Mr. Ellicott's deposition?

12       A.   Yes.

13       Q.   Have you seen the government's exhibit list in

14  the Mike Shirley case?

15       A.   No.

16       Q.   Do you have an understanding that there's text

17  messages on there between Mr. Ellicott and "AB"?

18       A.   I don't know why Joe Ellicott would have text

19  messages in a lawsuit against Mike Shirley.  I'm not

20  following.

21       Q.   Well, the government's exhibit list has those

22  on there, and they have the proffers of Joe Ellicott on

23  there too.  So I was just curious as to whether

24  Mr. Shirley had access to all the government's exhibits

25  or -- and how you were able to select which ones --

1    A.    He -- again, I was not selecting.  He -- look,

2  again, it was an affirmative thing.  I always got along

3  fine with Mike Shirley.  I thought he was a reasonably

4  nice guy.  He was -- he was getting paid some crazy

5  amount of money by Joel Greenberg from the tax

6  collector's office.  I want to say it was like 25 to

7  $30,000 a month.

8    Q.    To do what?

9    A.    I don't know.  And the only conversation I ever

10 had with him, I think we were in person; but I said,

11 Listen, you need to know something that you're talking

12 about Joel Greenberg.  You're talking about the tax

13 collector's office.  You are talking about a lot of

14 money.  So be prepared because soon or later you're

15 going to have to come answer that question.  That was

16 about the only conversation I had with him, but Mike

17 Shirley appreciated the fact that I was affirmatively

18 looking out for him and that was years ago when that

19 happened.  It turns out he was giving that money back to

20 Joel and certainly wound up having the stuff.  But after

21 that, he said, Hey, listen, I have some things that I

22 think would be helpful to you.  Can you meet up?

23    Q.    And then he just air dropped them to you?

24    A.    Yes, sir.

25    Q.    And then you just turned around and produced

CHRISTOPHER DORWORTH                                    August 06, 2024
DORWORTH V. GREENBERG                                               238

1  them in this case?

2      A.   Very shortly thereafter.

3      Q.   How long have you known Mr. Morris?

4      A.   Since 2001.

5      Q.   What where the circumstances of you meeting

6  Mr. Morris?

7      A.   I told you.  It's halfway between his birthday

8  and my birthday.

9      Q.   No, meeting back in 2001.

10     A.   Oh, he appointed me to the planning and zoning

11  commission in 2002-ish, 2003 maybe.  He was a county

12  commissioner at the time.  We had a mutual friend in Jim

13  Stelling.  Jim was kind of like a mentor to both of us.

14  Jim passed away last year.  So I met him through Jim.

15     Q.   And you said he's older than you, Mr. Morris?

16     A.   Yes.

17     Q.   Approximately what is his age?

18     A.   If I had to guess -- see, I haven't talked to

19  Randy.  Randy and I had a bit of a falling out because

20  he was the county commissioner that put the rural

21  boundary in Seminole County.  So when I decided to do

22  River Cross, he got kind of cross with me over that.  It

23  wasn't like a -- I don't want to be overdramatic, but he

24  basically said, You're trying to take down my legacy,

25  and I don't want to be part of it.  So, but, yeah, I

1   mean we would socialize.  I want to say he's maybe 75,

2   73.  I want to say he was born around 1950, I want to

3   say.  If I found out he was 70, I wouldn't be shocked.

4   Somewhere between 70 and 75.

5       Q.   And where did you meet Mr. Morris on July 15,

6   2017?  Was it on a dock?  Was it on a boat ramp?

7       A.   He lived in Maitland off a canal.  So what I

8   would do is -- well, typically what would happen is I

9   would go -- he brought the boat and had the gas, so I

10  would have brought the food and he would have had the

11  booze probably.  That's typically how we do that.  So I

12  would go to his house on West Trotters.  I want to say

13  it was 323 West Trotters at the time, park, go knock on

14  the door.  We'd hang for a little bit.  He had a golden

15  retriever.  I like golden retrievers.  So I usually

16  spend some time with his dog just rubbing its head, and

17  then we would have probably headed out to the boat.

18  Maybe depending on what time of the day it is, might

19  have eaten lunch.  Might have brought the food on the

20  boat.  I don't really like bringing the food on the boat

21  because it gets nasty and attracts bugs.

22      Q.   So 323 Trotters is the location where you would

23  have gone?

24      A.   I believe it was 320 -- it's been awhile, but I

25  think it was 323 West Trotters.

CHRISTOPHER DORWORTH                          August 06, 2024
DORWORTH V. GREENBERG                                      240

1    Q.   Okay.  Is that where you would have, you know,

2  stayed until 1:00 morning or whatever and you got up and

3  left?

4    A.   Yeah.  Whatever -- that was pretty much par for

5  the course.  Randy was older than I was, so a lot of

6  times what would happen is we would -- I'd go there.

7  We'd have dinner drinks.  A lot of times Randy would

8  fall asleep in his big chair, listen to music.  By that

9  point in time, I would either Uber home or have Rebekah

10  come get me if she was in town which she wasn't this

11  time, or pass out myself usually on the couch.  Like he

12  had like a man cave.  So I would usually go downstairs,

13  and there was a -- I had a bedroom there if I wanted it

14  or there was a couch.  And I typically -- I would go

15  crash on the couch.  If I woke up at whatever hour of

16  the morning and then drive home.

17    Q.   And did he have access to the lakes from the

18  canal that was on his property, 323?

19    A.   Yes.

20    Q.   So you just went in his backyard, got on the

21  boat, and took it --

22    A.   Parking lot, house, backyard, boat, back to

23  that, upstairs to man room, probably passed out on the

24  couch.

25    Q.   Back in the summer of 2017, did you ever use

1  Lyft, or were you an Uber guy?

2      A.   No.  I was purely -- you know, I was Uber's

3  lobbyist.

4      Q.   Okay.  How long were you Uber's lobbyist?

5      A.   Well, until we passed their bill.  I think -- I

6  want to say we got them maybe -- I think '14 or '15

7  probably.  There was a conflict because Andy Gardner who

8  was the senate president at the time was very good

9  friends with Roger Chapin from Boone High School days,

10  and Roger was in charge of Mears Transportation.  So

11  Andy in his role as senate president would kill the Uber

12  bill every year.

13           And the Uber bill is if you drive from Lake

14  Mary to here, you pass through Lake Mary, Longwood,

15  Maitland, Winter Park, all these things with different

16  sets of rules.  So we passed one uniform set of

17  standards for the state in terms of insurance and

18  answering questions like some cities said that if you

19  had the little Uber transponder on but you hadn't picked

20  a ride up yet you were a driver.  Other ones said you

21  actually had to have an ride in the car before you were,

22  and that mattered for your insurance and Uber's

23  insurance.  We passed one statewide law that sort of

24  took care of all that.  It took several years to do.  I

25  think we finally passed it in 2017.  So after that they

1    would've -- they didn't need a lobbyist.

2        Q.    Okay.  2014 to 2017?

3        A.    That sounds about right.

4        Q.    All right.  Back to the Wells Fargo ledger, I

5    have that up on the screen again.  This is Exhibit 106.

6    There is an entry there for Publix.

7              Do you see that?

8        A.    (Witness shakes head.)

9        Q.    For $57.52.  That would have been you

10   purchasing things to go on the boat?

11       A.    Fried chicken, banana pudding, stuff like that.

12       Q.    Do you have any recollection whatsoever of

13   going into that Publix in Maitland?

14       A.    Yes.

15       Q.    You do.  Was it with Mr. Morris or by yourself?

16       A.    No.

17       Q.    Just by yourself?

18       A.    By myself.

19       Q.    And that would have been you'd go to the Publix

20   then and then go to Mr. Morris' house?

21       A.    I get off at the Lake Mary -- I'm sorry,

22   Maitland Boulevard, take Maitland Boulevard all the way

23   down to 17-92, 17-92 to Publix.  Publix is probably a

24   half a mile to his house but not far.  Very close.

25       Q.    Do you recall how long you were on the boat?

 1      A.   No.   I mean, there is a chain of lakes.   We

 2   typically would hit all the chain of lakes.   A lot of

 3   times you go to Dog Island which is the center of Lake

 4   Maitland.   I don't think we went to the racket club that

 5   day.   I don't really think Randy was a racket club guy;

 6   but, yeah, it would have been that kind of stuff.

 7   Probably until the sun went down, give or take.   Maybe a

 8   little earlier.   I don't know if we spent three hours

 9   out there.   Also would not be atypical for us to go,

10   come back, and go back out.   I mean, it's a couple of

11   middle-aged guys chilling out.   It's not -- bathroom

12   breaks were probably factored into it.

13      Q.   And then you hung out at his house?

14      A.   Yes.

15      Q.   You didn't go into any restaurants any bars?

16      A.   I dont' think so.   We normally -- again,

17   Randy -- we were drinking.

18      Q.   And what were you drinking that night?

19      A.   Bourbon.

20      Q.   Is he a bourbon guy?

21      A.   Yes.

22      Q.   Are you a bourbon guy?

23      A.   I am.

24      Q.   Any idea how much bourbon you had that night?

25      A.   A lot.

1    Q.   Did you guys knock out a bottle amongst you?

2    A.   Probably.  Again, I don't -- over the course of

3  what was probably seven or eight hours, I would imagine

4  he and I put quite a hurting on 1.75 of Maker's Mark.

5    Q.   Do you have any idea what time you would have

6  gone back to 1520?

7    A.   I don't.

8    Q.   Would it have been in the wee hours of the

9  morning?

10   A.   It could very well have been.

11   Q.   Could it have been before the sun went down?

12   A.   No.

13   Q.   Okay.  So it would be after dark?

14   A.   No, I mean, my expectation is that I probably

15  got back.  We would listen -- like Randy would put on

16  like early -- just all sorts of Grateful Dead albums

17  or -- but he would bust out like Neil -- was it Neil

18  Young Live At the Seller Door, playing albums and stuff

19  like that.  He was sort of into stuff like that.

20  Oftentimes, if there was a sporting event on -- it was

21  the middle of the summer.  He was a baseball fan.  I'm

22  not a huge baseball fan.  Baseball could have been on.

23  Like it was -- maybe a movie.  Again, it was my wife's

24  out of town.  It's my buddy.  He's kind of a mentor of

25  mine, friend of mine.  And we were -- his wife was out

CHRISTOPHER DORWORTH                                    August 06, 2024
DORWORTH V. GREENBERG                                                245

1   of town.  We're throwing it back, having a few

2   cocktails, and hanging out.

3            Typically what would happen is Randy would fall

4   suit before I did.  I would -- had to go through some

5   sort of deliberative process of whether I want to Uber

6   home or whatever else it was going to be.  And then I

7   would most likely probably go lay down and sleep for a

8   couple hours and wake up because throughout the night I

9   usually don't sleep more than two or three hours in a

10  row.  And I would just wake up after a few hours and go

11  home.  That is typically what I would do, but, again...

12       Q.   Do you think you went back to your house before

13  midnight?

14       A.   I don't think so.  I don't think so.  I mean,

15  it would probably be -- again, it could be early morning

16  hours, but I don't know.  If you told me I did, I --

17  normally what would happen is I would -- at the end of

18  that, I would have -- I would -- I would -- I would need

19  Randy -- when we would hang out, the odds are good that

20  I was probably very content to not go anywhere and just

21  sort of sit back, enjoy myself, get some sleep, and then

22  head home whenever.

23       Q.   Do you recall having to go back to Randy's

24  house to pick up your car?

25       A.   I don't remember that.  Not to say it didn't

1  happen, I just don't remember that.

2          (Exhibit 110 was marked for identification.)

3  BY MR. PERKINS:

4      Q.   All right.  The next exhibit will be 110, a

5  letter from Mr. Hornsby to Mr. Gee dated May 7, 2021.

6          Do you that up on the screen?

7      A.   Yes.

8      Q.   And this is talking about the gate ledger and

9  Ms. "B."

10         Do you see that?

11     A.   Yes.

12     Q.   You're familiar with this letter, correct?

13     A.   I am.

14     Q.   Okay.  And you retained Mr. Hornsby, correct?

15     A.   I did.

16     Q.   And that was in connection with the feds'

17 investigation into Ms. "B"?

18     A.   It was.

19     Q.   Okay.  And here we have you saying, While out

20 on the Winter Park chain of lakes, Mr. Dorworth took a

21 picture of his friend captaining his new boat.  The

22 timestamp of which shows the picture was taken on July

23 15, 2017, at 6:04, correct?

24     A.   I'm reading what you're reading.

25     Q.   Okay.  It says, Which means that Mr. Dorworth

1  could not have been home when Ms. "B" arrived at his

2  residence.  That he was likely not as his residence when

3  he returned from boating which would explain why he had

4  no recollection of meeting her.

5         Did I read that correctly?

6    A.   I read what you read.

7    Q.   Okay.  It says here, When he returned from

8  boating.

9         Do you see that?

10   A.   Yes.

11   Q.   It doesn't say anything about spending the

12 night at Mr. Morris' house?

13   A.   I mean, I was there at 6:00.  If I got back at

14 1:00 in the morning, that would not be spending the

15 night at 2:00 or 3:00.  I mean, spending the night would

16 be the sun came up, and I was somewhere else.

17   Q.   So we know that it was dark out when you came

18 home?

19   A.   Yes.

20   Q.   But we don't know time it was?

21   A.   I don't know.

22   Q.   Sometime after 9:00 but before the sun came up

23 on July 16th?

24   A.   That would be my best guess.

25   Q.   Did you send that picture of Mr. Morris to

1  anyone?

2      A.   What?

3      Q.   You took that picture of Mr. Morris on the

4  boat?

5      A.   Probably Mr. Morris.

6      Q.   That's it, nobody else?

7      A.   No.  Nobody else would care.  My guess is it

8  was is probably one of those things where he said, Take

9  a picture of me so I can send it to my wife, or

10 something like that.  Just of us out on the bode boat.

11 I'm not much of a photographer.

12     Q.   When you got back home to your house, do you

13 have any recollection of who was there?

14     A.   I don't think anybody was there.  If they

15 were -- I don't think anybody was awake.  If people were

16 asleep, they were asleep.  I don't have any recollection

17 of them at all.  I didn't have any interaction with

18 people there.

19     Q.   You just came in and nobody was up?

20     A.   Probably just went to bed.  I -- if it's in the

21 middle of the night and I just came back and I'd just

22 been drinking all day out on a boat, I was probably a

23 rocket ship to go to my bed.  That would be the best,

24 likely...

25     Q.   You don't recall seeing Mr. Ellicott?

CHRISTOPHER DORWORTH                                    August 06, 2024
DORWORTH V. GREENBERG                                               249

```
 1      A.   No.

 2      Q.   You don't recall seeing Mr. Gaetz?

 3      A.   No.

 4      Q.   Don't recall seeing Mr. Fischer?

 5      A.   No.

 6      Q.   Don't recall seeing any females?

 7      A.   No.

 8      Q.   And your bedroom is upstairs in the Dorworth

 9  residence, and it's locked?

10      A.   It is.

11      Q.   Do you have a key that you use?

12      A.   No.

13      Q.   How do you get in?  Is it a keypad?

14      A.   No.  Yeah, there was a lock on my door, but I

15  mean --

16      Q.   Okay.  So guests can get in --

17      A.   Yeah, yeah.

18      Q.   -- when you're not there?

19      A.   Yeah, yeah.

20      Q.   But then when you're in there, you lock the

21  door?

22      A.   Yeah.  There is a latch on the door.  I don't

23  have a lock on my bedroom door on the outside with a

24  key.

25      Q.   There was a reference here on page two of two
```

1    that says, What I suspect occurred is that Mr. Ellicott

2    had asked Mr. Dorworth if Ms. M REDACTED roommate, "AB,"

3    could come over, and Mr. Dorworth said yes.  And when

4    she arrived at the gate, Mr. Dorworth received a call

5    from the gate and he let her in while still out on the

6    boat with his friend.

7            Did I read that correctly?

8        A.   That's what he wrote.

9        Q.   Did you have an understanding that Ms. "B" was

10   a roommate of Ms. M REDACTED

11       A.   I did.

12       Q.   Okay.  Where did you get that understanding

13   from?

14       A.   Years later I said, How do these people know

15   each other, and they told me they lived together.

16       Q.   And who told you that?

17       A.   I don't remember.  Maybe Joel.  I don't know.

18   Joe, I don't know.  I have no clue.

19       Q.   And did you get a call from the gate about

20   Ms. "B"?

21       A.   Well, Mr. Hornsby's explanation -- first and

22   foremost, I don't know if I got a phone call from the

23   gate.  It would not be atypical to say like, Hey, you

24   have people at the gate.  I had teenage kids.  Believe

25   me when I tell you that you can see the traffic in and

1  out of my house.  I think they said I had more visitors

2  than anyone in the neighborhood for like five years in a

3  row because of politics and everything else.  Obviously

4  we have a lot of children, kids who were coming through

5  there.

6         So I'm sure they would have known my gate code.

7  You just had to call up and you can call anybody you

8  want in.  Or, alternatively, if they did not do that,

9  there is a possibility that I could have received a

10 phone call that would have gone something like this:

11 Hi, this is Mike calling from Heathrow security.  You

12 have so and so at the gate.  Do you want to let them in?

13 And I would say yes or no.  And if I had people over and

14 if people were at the house, I would probably just say,

15 yeah, let them in.

16    Q.    Anybody else have authority to let people in in

17 the summer of 2017 other than yourself?

18    A.    Rebekah.

19    Q.    Just the two of you?

20    A.    My kids had stuff.  I mean, my kids had a login

21 and stuff too.

22    Q.    So your kids could let somebody in --

23    A.    I mean --

24    Q.    For Ms. "B" it would have likely been a call to

25 you, correct?

1    A.   Well, but the other thing that you have to very

2   seriously contemplate is the most -- and they don't

3   really reflect it like this on here is that I would call

4   and just say, All in.  And I think Deanna Sims from

5   Heathrow did say that, that I would just say, All in.

6   You know, Party all in.

7    Q.   But, you know -- and I remember her saying

8   that.  But if you recall and if you look at the gate

9   ledger for July 15, 2017, remember Mr. Ellicott was

10  denied access, right?

11   A.   Yeah.

12   Q.   Okay.  So it couldn't have been all in

13  otherwise he would have been --

14   A.   Well, that's close to midnight.  I don't --

15  that's -- well, let's see what time it was.

16   Q.   He came in at 11:15, correct?

17   A.   11:15?

18   Q.   Yeah.

19   A.   Yeah.  So, I mean --

20   Q.   And it says, Denied, not on list.  And then

21  11:16 you let him in.

22   A.   Yeah.  So somehow -- again, that or somebody at

23  the house said, Oh, we've got to call into the gate.

24  You dial (407) 333-1313, then you type in a four number

25  code.  Mine would have been 1424, and everybody at the

CHRISTOPHER DORWORTH                                    August 06, 2024
DORWORTH V. GREENBERG                                              253

 1  house knew.  My kids, it's just, you know, people want
 2  to get into the neighborhood.  And then at the time, we
 3  actually learned this from Abby.  She was the one that
 4  told us.  She would get a little notice on her phone.
 5  We never had that.  I never had that.  And we got that
 6  after I had the meeting with the feds, and I've had that
 7  ever since then.
 8       Q.   And that was in 2020?
 9       A.   2021.
10       Q.   Now, when Mr. Ellicott gets to the gate, do you
11  recall having a conversation at all with the guards
12  about whether he should be allowed in or not?
13       A.   No.  That's not really how it works.  First of
14  all, they call.  And if -- if he's not let in, that
15  means I didn't answer it because I'm probably sleeping.
16  You know, figuring out what that is, but he probably
17  then called somebody else there and said, I can't get
18  in, and then they called and let him in.  They added him
19  on the gate, and he got let in a minute later.  That's
20  probably what happened here.
21       Q.   Somebody else at the party?  Somebody else
22  where?
23            MR. ANDRADE:  Object to form.
24            THE WITNESS:  Again, this is not a party.
25  BY MR. PERKINS:

CHRISTOPHER DORWORTH                                    August 06, 2024
DORWORTH V. GREENBERG                                               254

1     Q.    Somebody else at the gathering?

2     A.    Yes.

3     Q.    Okay.  And he would have called the landline at

4 your house?

5     A.    There's no landline at my house -- well, there

6 is a landline, but there is no phone attached to it.

7     Q.    Who would he have called?

8     A.    It would have come to my phone.  But as I said,

9 it says here I did not let him in, then it says he goes

10 back a few minutes later.  That he called me, I answered

11 the phone, I said, Hello, let him in.  It could be that

12 I didn't answer the phone, I was asleep, and he called

13 somebody there and said, Hey, Chris isn't letting me in.

14 Can someone let me in, and they called and added him to

15 the thing.  He goes back up to the list.  Says, Here I

16 am.  I'm on the list now.  They let him in.  That very

17 possibly could happen.

18        MR. ANDRADE:  Not to break your train of

19     thought, we've been going for an hour and 45

20     minutes.  We're --

21        MR. PERKINS:  Right.

22        MR. ANDRADE:  That's close to five hours of

23     questioning today.

24        MR. PERKINS:  It's a good time for a break.

25     It's 2:29.  Want to take ten minutes?

```
 1            THE VIDEOGRAPHER:  Going off record.  The
 2       approximate time, 2:30 p.m.
 3            (A break was had.)
 4            THE VIDEOGRAPHER:  On record.  The approximate
 5       time, 2:45 p.m., media unit four.
 6  BY MR. PERKINS:
 7       Q.   All right.  Very good.  Back on the record,
 8  Mr. Dorworth.  On July 15, 2017, did you have your phone
 9  on you the entire time you were with Mr. Morris?
10       A.   Probably.
11       Q.   There was no time that you lost your phone or
12  misplaced the phone absent from your presence?
13       A.   No.
14       Q.   When K█REDACTED█  M█REDACTED█ arrived at the gate at
15  Heathrow at 8:50 p.m. on July 15, 2017, were you at home
16  at that point in time?
17       A.   I don't think so, no.
18       Q.   And when Joseph Ellicott arrived at the
19  Heathrow Master Association gate at 11:16, were you at
20  home at that time?
21       A.   I don't think so.
22       Q.   So you believe you were still at Mr. Morris'?
23       A.   Again, you know, what I can tell you is I have
24  no recollection of seeing or spending any time with any
25  of those people that night.  What I know is that I spent
```

1  the day drinking on the lakes, the chain of lakes and

2  partying with my buddy.  If I did see anybody -- if I

3  went home at all -- whenever I went home, I probably

4  just upstairs.  I don't think I was going to go and be

5  social with anybody.  It was probably lights out, but I

6  have no recollection of seeing any of those people at

7  all that day.

8      Q.   Is there anybody else other than Mr. Morris

9  that can corroborate where you were on July 15th on that

10 afternoon?  Was it just the two of you?

11     A.   Just the two of us.

12     Q.   And nobody else was at his house?

13     A.   No.

14     Q.   Mr. Morris; wife wasn't out there?

15     A.   I think she was out of town too.

16     Q.   Going back to the gate ledger that we were

17 talking about on page five of ten, we're talking about

18 July -- June 22nd, I'm sorry.  There is two Uber entries

19 on that date.

20          Do you see that?

21     A.   Yes.

22     Q.   And then on the next day, June 23, 2017, there

23 is an entry there for 12:25 a.m., and it looks like you

24 are coming in on that day.

25          Do you see that?

```
 1        A.    Very possible, yes.

 2        Q.    And then another Uber at 1:19 a.m.

 3              Do you know where you were coming from on June

 4   23, 2017, at 12:25 a.m.?

 5        A.    No.

 6        Q.    And you have no idea who was in that Uber,

 7   correct?

 8        A.    No.

 9        Q.    REDACTED , does that name ring a bell?

10        A.    Yes.

11        Q.    Is that somebody that you would be affiliated

12   with picking up a friend of your daughter?

13        A.    That's REDACTED who's REDACTED mom.

14   So, yeah, that's her.

15              (Exhibit 111 was marked for identification.)

16   BY MR. PERKINS:

17        Q.    All right.  The next exhibit will be 111.

18        A.    Yeah.

19        Q.    This is the declaration of Mr. Morris.

20              Do you see that up on the screen?

21        A.    I do.

22        Q.    And did you reach out to Mr. Morris for this

23   document?

24        A.    I did not.

25        Q.    Okay.  That was done through Mr. Beltran?
```

1      A.   It was.

2      Q.   Are you aware of any drafts existing of this

3  document?

4      A.   I am not.

5      Q.   When is the last time you had primary contact

6  with Mr. Morris?

7      A.   Primary election night 2018.

8      Q.   And that would have been in August of 2018?

9      A.   Yes, sir.

10     Q.   And you said you had a falling out with

11 Mr. Morris?

12     A.   I didn't have a falling out with Mr. Morris.

13 Mr. Morris just didn't like a project I was doing.  So

14 we stopped -- he just stopped hanging out with me.

15 There's no -- we didn't have like some big fight.  There

16 was not like some -- it was just Randy thought that his

17 great legacy in local government was that he created a

18 rural boundary in the charter of Seminole County; and

19 outside of that rural -- in the rural area, it did not

20 matter if you annexed property into the City of Oviedo

21 or Winter Springs, the only two who were impacted by it.

22 The County maintained control of that land.

23          It was unique in the state of Florida.  There

24 was no other county that had a thing like it.  The

25 closest would be Sarasota County, but there's was a

1  derivation of the rural boundary that Mr. Morris did,

2  and it was done two years later.  And I think honestly

3  had the benefit of sort of seeing all the legal

4  challenge things that could happen, there was a court

5  challenge where Seminole County was sued by Winter

6  Springs again.  That wound up selling it.

7          Anyway, Randy believes that this was like his

8  great achievement in governance and didn't like the fact

9  that I was trying to undue it by having something

10  removed.  I didn't really understand that, but it was

11  very upsetting to Randy that somebody would try to mess

12  with his rural boundary.  And Randy was getting older,

13  and -- you know, it was one of those things, like okay.

14  I tried to hire him and he wouldn't do it and that was

15  it that.

16      Q.   How did you communicate with Mr. Morris on July

17  15, 2017?

18      A.   Probably a text message or a phone call.

19      Q.   Text or phone?

20      A.   He's a slightly older guy, so a phone call is

21  more likely, but Randy -- if you texted Randy, he'd

22  write you back but sometimes it would take a long time.

23      Q.   Going back to the Heathrow master ledger,

24  Exhibit 105, that's in front of you, the paper copy.  On

25  July 16, 2017, which is page six of ten, there's an

1  entry for you coming back at 2:04 p.m.

2          Do you see that?

3      A.   I'm sorry, July what date?

4      Q.   July 16, 2017.

5      A.   Yes.

6      Q.   Do you know where you were coming from at that

7  point in time at 2:04 p.m.?

8      A.   What day of the week was it?

9      Q.   That's Sunday.  The 15th was a Saturday --

10     A.   Very possibly church.

11     Q.   And where do you go to church?

12     A.   St. Andrew's Chapel, Sanford, Florida.

13     Q.   And would you go to church even if Rebekah were

14  out of town?

15     A.   Yes.

16     Q.   Do you know when Rebekah got back from Dallas?

17     A.   I don't.

18     Q.   Would there be any toll roads you'd take to get

19  to church?

20     A.   No.

21     Q.   Would there be any toll roads you would take to

22  get to Mr. Morris' home?

23     A.   No.

24     Q.   Did Mr. Morris have two homes back in the

25  summer of 2017, one on Trotters Drive and another one on

CHRISTOPHER DORWORTH                                    August 06, 2024
DORWORTH V. GREENBERG                                               261

1  Keeneland Pike in Lake Mary?  Are you aware of him

2  having two homes?

3      A.   Well, I remember his house on Keeneland Pike,

4  but, I mean, he moved from that house to West Trotters.

5  So I don't think -- there might have been a period of

6  time for a week or two while he was moving his stuff

7  over there, but it was not -- I think he was renting

8  both houses too.  So I don't believe there was.

9      Q.   So on July 15, 2017, when you went and visited,

10 it was the Trotters Drive residence?

11     A.   Yes.  And by the way, and Randy says in this

12 here which is news to me, that he bought -- I'm sorry, I

13 didn't mean to touch your computer there.  It says above

14 there that he bought the boat in 2015.  That's -- I

15 thought it was -- I thought it was newer than that for

16 this, but...

17     Q.   Yeah, because the letter to the feds says it

18 was a maiden voyage.

19     A.   Yeah.  And I don't know if it was the maiden

20 voyage.  I just remember taking a picture of him on it

21 because he wanted me to do it.  If he bought it in --

22 that just doesn't really pencil mathematically to me,

23 but okay.

24     Q.   You thought it was a new boat when you went out

25 there in July 15, 2017?

1    A.   I don't think he moved out to this place until

2  after 2015.  He moved and got the boat when he was --

3  when he got to his new house.  The guy who helped him

4  was Jay -- he could be right about that, but that's news

5  to me.  I feel like he had the boat for a much shorter

6  period of time.

7    Q.   And you said the guy that helped him was Jay

8  Zimba?

9    A.   Zembower.  He's the county commissioner of

10  Seminole County.

11    Q.   Helped him with purchasing a boat?

12    A.   Yes.  Found the boat for him.

13    Q.   Do you know what boat company he purchased it

14  from?

15    A.   I don't.

16    Q.   In the summer of 2017, you had a keypad on your

17  house, correct?

18    A.   No.

19    Q.   How did people get in and out of the home?

20  Would they need a key?

21    A.   Yes.  I have a keypad now.

22    Q.   You have a keypad now, but you didn't --

23    A.   No.

24    Q.   The only way to get into the home back in the

25  summer of 2017 was with a key?

 1      A.    Yes.

 2      Q.    Unless the house was open and people could come

 3 in --

 4      A.    Yes.  Right.

 5      Q.    Did you leave your doors open, or did you lock

 6 them?

 7      A.    No, I locked my doors.

 8      Q.    Did any of your buddies have a key to your

 9 residence back in the summer of 2017 such as Joel

10 Greenberg?

11      A.    No.

12      Q.    Did Matt Gaetz?

13      A.    No.  I do think that Joel broke into my house

14 one time when I wasn't there, but I can't prove that.

15      Q.    And what facts and circumstances lead you to

16 believe that Mr. Greenberg broke into your house one

17 time when you weren't there?

18      A.    Because some people made jokes about it, about

19 how he did it.  And I asked him, and he denied it.

20      Q.    Who made jokes about it?

21      A.    I don't -- I want -- maybe -- I don't remember.

22 I think maybe B̲REDACTED̲ G̲REDACTED̲.  Somebody did.  I don't

23 know.

24      Q.    When do you believe this took place?

25      A.    After this.  I don't think it was, but.

CHRISTOPHER DORWORTH                                    August 06, 2024
DORWORTH V. GREENBERG                                              264

1      Q.   After June 15, 2017?

2      A.   Yeah.

3      Q.   Was it in 2017?

4      A.   I don't know.  I think it was after that.

5      Q.   Did they do anything to your home, vandalize

6   it?

7      A.    No.  No.  Again, I wasn't really hot and

8   bothered by it, or I probably would have gone and done

9   some more research; but it was just somebody -- I think

10  somebody made some kind of -- you think Joel's never

11  here when you're not here, or something like that.  I

12  was like, what does that mean?

13         (Exhibit 112 was marked for identification.)

14  BY MR. PERKINS:

15     Q.   All right.  Next Exhibit, 112, text messages

16  here that you produced between yourself and Mr. Gaetz

17  from October of 2019 --

18     A.    That appears to be between me and

19  Mr. Greenberg.

20     Q.   Yeah, and then Mr. Gaetz is in there sometimes?

21     A.   Yes.

22     Q.   And you see this 850?

23     A.   Yeah.  By the way, the condom in the trash, I

24  just remembered that now.

25     Q.   I was just going to ask you about that --

CHRISTOPHER DORWORTH                                        August 06, 2024
DORWORTH V. GREENBERG                                                   265

1      A.   Yeah.  That was -- I couldn't remember what it

2  was, but I knew it just something, what is this?  And I

3  think -- it was not a used condom.  It was an unused

4  condom, but it was just, why is this in my trash can?

5      Q.   Yes.  It looks like, I'm in North Carolina, for

6  your daughter's second birthday; and then Greenberg

7  responds, Does that mean your house is unoccupied.

8           Do you see that?

9      A.   Yes -- YEAH.

10     Q.   And then you say, Ollie Bacon and his guys are

11  there.

12     A.   Ollie Bacon was the guy that did renovations on

13  the house.  They did the ceilings and stuff.

14     Q.   And then so he was there doing renovation work?

15     A.   Yes.

16     Q.   Okay.  And it's my understanding there was some

17  serious renovations done after the July 15th gathering

18  at your house?

19     A.   The last seven years there have been some --

20  yeah, I think it was done years later, but yeah.

21     Q.   And what kind of renovations took place?

22     A.   Painted and put a bunch of marble up, redid the

23  bar.

24     Q.   And then you say, And I pretty much have a one

25  strike rule of leaving used condoms in my trash can for

CHRISTOPHER DORWORTH                                    August 06, 2024
DORWORTH V. GREENBERG                                                266

1   the wife to see.

2            What do you mean by that?

3        A.   I think he -- I remember the condom was unused,

4   but I think I might have been just busting his chops on

5   that one.  But he -- again, it was something like an

6   incident where people said, oh, yeah, I think Joel was

7   at your house.  And I asked him, and he was like, no,

8   no, no, one of those things.  At some point in time, a

9   condom was found in the trash can, and we weren't there.

10  So it was like, what is this?  And it was -- my theory

11  was it was Joel.  I have no way of knowing, but he lived

12  in the neighborhood by then.  So there would be no gate

13  guard.  He could just stop by whenever.  If he knew I

14  was out of town like the question here.

15       Q.   And did Rebecca find that condom in the trash?

16       A.   No, I think it was a housekeeper.

17       Q.   And do you, in fact, have a one strike rule?

18       A.   After -- I would never let Joel Greenberg in my

19  home unattended in the first place.  I think I was just

20  being snarky to him right now.  No, Joel you will not be

21  coming by my house when he asked if my home was

22  unoccupied.  I told him there was a construction crew

23  there and said, you know, after that crap, we're not

24  going to do it.  And Joel never admitted to that, so

25  he -- he says I did not leave a condom in your trash

1  can.  So go to the next line.

2      Q.   Go to page six of this exhibit.  Mr. Greenberg

3  writes, Mrs. Dorworth just throwing Joel under the bus

4  last night.  And you respond, What did she do?  And then

5  Mr. Greenberg writes, Told Abby I do Molly at your place

6  all the time.  LOL.  Don't worry about it though.  Not

7  trying to cause problems.

8      A.   And I only remember one time that Joel ever did

9  Molly at my house, and I remember Rebekah ripping his

10 ass for it.  So I'm pretty sure that is probably what

11 it's in reference to, and it's because he told us.  We

12 didn't know what he was doing, but he was just acting

13 weird.  She said, What's wrong with you, Joel?  And he

14 said, I did this or that.

15     Q.   When did that happen?  When did Mr. Greenberg

16 do Molly at your house?

17     A.   When is the time and date of this text message

18 right here?  It was like one time he was acting very

19 weird and slept, and Abby called him and said -- called

20 him and he didn't answer.  Called Rebekah, and she said,

21 He's sleeping here.  And then I think we went to go wake

22 him up and he wouldn't get up.  He was literally kind of

23 out of sorts and I think he said something about doing

24 Molly and I'm pretty sure she just reported that back to

25 Abby.

CHRISTOPHER DORWORTH                                    August 06, 2024
DORWORTH V. GREENBERG                                            268

1      Q.    He said something about doing Molly directly to

2   Rebekah?

3      A.    Yes.

4      Q.    Okay.  And what, if anything, did Rebekah do in

5   response that you saw?

6      A.    Screamed at him, kicked him out of our house.

7      Q.    Has anybody else done Molly at your house other

8   than Mr. Joel Greenberg?

9      A.    That would be news to me.

10     Q.    Has anybody done cocaine at your house?

11     A.    Not that I know of.  Again, I get the

12  impression when people do those drugs, they tend to do

13  them in privacy.  I don't think it's like -- I don't

14  follow people to the bathroom, but I don't think so.

15           (Exhibit 113 was marked for identification.)

16  BY MR. PERKINS:

17     Q.    Next exhibit, 113.

18     A.    Yes.

19     Q.    Text string here again that was produced by

20  you?

21     A.    Yes, sir.

22     Q.    I have questions about page two of this text

23  string.  It looks like this is corresponding with Matt

24  Gaetz?

25     A.    Yes.

```
 1        Q.    Okay.  And you state, If you need my car -- if
 2   you need a car, my key is in the Porsche.  Feel free.
 3             Did I read that correctly?
 4        A.    Yes.
 5        Q.    It's says, Copy, correct?
 6        A.    Yes.
 7        Q.    And then there's some reference here to, The
 8   orange and blue lights are on to troll me, aren't they?
 9             Did you give Mr. Gaetz access to your Porsche?
10        A.    What I'm reading here, I probably said -- well,
11   you read what I wrote.
12        Q.    So that's a yes, you would have given him
13   access to it?
14        A.    Yes.  Not atypical.
15        Q.    And then you asked Mr. Gaetz what he was up to.
16             Do you see that?
17        A.    What day is this?  I don't even see that.
18        Q.    This is on October --
19        A.    Yeah.
20        Q.    Do you see that?
21        A.    Yeah.
22        Q.    Mr. Gaetz, what are you up to?  And then he
23   responds, Pool.  B███.  Vodka.
24             Do you see that?
25        A.    Yes.
```

1     Q.   Was he at your house with B[REDACTED] G[REDACTED]?

2     A.   I have no idea.

3     Q.   It sounds like you were up in North Carolina at

4 this point in time; is that right?

5     A.   Yes.  I mean, if he is asking if my car is

6 there, he might have been there.  He probably was.

7     Q.   You say, Sounds like a lovely Sunday.

8 Mr. Gaetz responds, Yes.  Sad part is B[REDACTED] has a 6:50 bus

9 home?

10    A.   Yes.

11    Q.   At that point in time, B[REDACT] lived in

12 Tallahassee, correct?

13    A.   Sure.  If you say so, but I don't know where

14 she was at that point.

15    Q.   How did you meet B[REDACT]?

16    A.   Through Matt.

17    Q.   Did you understand that B[REDACT] was his girlfriend?

18    A.   Yes.  They lived together.

19    Q.   They lived together in Tally?

20    A.   DC.

21    Q.   DC.  The next entry on page three here says, We

22 are out of 1520.

23         That is your residence, correct?

24    A.   Yes.

25    Q.   But due to the guard gate issues, the Porsche

 1    is at this location, Winn Dixie parking lot.

 2         Do you see that?

 3    A.   I do.

 4    Q.   And then Mr. Gaetz says, On the way to drop B█

 5    and get Botox, right?

 6    A.   Sure.

 7    Q.   Did you have an understanding Mr. Gaetz uses

 8    Botox?

 9    A.   I mean, I have no idea if he uses Botox, but I

10    saw some things during the convention that a lot of

11    people seem to speculate as much.

12    Q.   Do you know what he was referring to here, But

13    due to guard gate issues, the Porsche is at this

14    location, Winn Dixie?

15    A.   I remember him leaving the car there one time.

16    I don't remember why.  I don't know.

17    Q.   And then you respond, You have a transponder --

18    A.   Yeah.  I think he was having a tough time

19    getting in through the gate.  My guess is on that one,

20    and I don't know this for sure, a lot of times when you

21    pull up there like the thing was in the right place it

22    was sort of wonky with it.  I think whereas I would get

23    over there and start rattling it, he probably just went

24    and parked it in the parking lot.

25    Q.   And then you had to go to the Winn Dixie

CHRISTOPHER DORWORTH                                August 06, 2024
DORWORTH V. GREENBERG                                          272

1  parking lot to go get the Porsche?

2      A.   I mean, it's like hundreds of yards from the

3  house, but yes.

4      Q.   It's walkable to your house?

5      A.   I probably walked there.

6      Q.   Would Mr. Gaetz park his car at Winn Dixie and

7  walk into the neighborhood?

8      A.   I don't see why he would do that.

9      Q.   Could you do that without getting detected by

10 the guards?  Could you leave your car at Winn Dixie and

11 walk into the neighborhood?

12     A.   Sure.

13     Q.   Do people do that?

14     A.   It's not a particularly close walk.  It would

15 be -- and I guess the closest -- from Winn Dixie it

16 would be a mile.  I mean, if somebody wanted to park and

17 then walk in -- I mean, there is nothing that stops

18 people from walking into Heathrow.  There's a little --

19 yeah, that could happen, but I have never in mine 19

20 years there ever had anyone do that as a practice

21 because I don't know why they would.

22     Q.   Have you ever known Matt Gaetz to do that, to

23 park a vehicle at Winn Dixie and then walk into the

24 Heathrow community?

25     A.   I think he was leaving.  He was saying he was

1    leaving the car there --

2         Q.    Yeah?

3         A.    -- and he was going to drop B▓ on the bus and

4    then get Botox.  My response is, You have a transponder

5    in the Porsche.  Which I would use in context clues

6    would suggest that he was probably having a tough time

7    with that so he would do it.  So the answer to your

8    question is anyone that wants to could park in Winn

9    Dixie and probably walk into Heathrow if they wanted to.

10   I just don't know why anyone would do that.

11        Q.    Do you know how he got to 1520 that day in

12   October, if he had rented a car or had another vehicle?

13        A.    No.  I have no idea.  He's been to my home

14   dozens of times.  I couldn't tell you how he got there

15   any of them.  So it's...

16        Q.    Sometimes he comes with a vehicle?

17        A.    Sometimes he comes with a vehicle.  Sometimes

18   he gets dropped off.  Sometimes he comes and you pick

19   him up at the airport.  Sometimes he gets an Uber to

20   your house.  Again, he has a very full life and always

21   going places.  You know, he is -- he has had staffers

22   come.  It's all manners of things.  Sometimes he has a

23   car, sometimes he doesn't.

24        Q.    Could he have been using the Winn Dixie parking

25   lot because he didn't want to be detected on the gate

1    ledger for Heathrow?

2        A.    I mean, I imagine if he didn't want to be

3    detected on the gate ledger he would probably just ride

4    in the passenger seat in someone's car.  I think that

5    would be a lot of effort to undertake to achieve

6    something that would be equally doable which would be to

7    just sit in the passenger seat of anybody whose car is

8    driving in versus verses a one mile walk through a golf

9    course over to Heathrow.  I still could happen, just

10   doesn't make any sense to me.  I don't know why anybody

11   would do that.

12       Q.    You could just have [REDACTED] [REDACTED] drive the

13   car, and he could be in the passenger seat?

14       A.    I mean, like if the guard gate to be very clear

15   does not take inventory of everybody in the car.  They

16   don't say, what are you kids in the back seat, none of

17   that stuff.  They look who's driving.  I think I've

18   discussed this with them as my part of my initial piece

19   of litigation against them.  Their belief is that they

20   want to know everybody that comes into and leaves

21   Heathrow.  They want to see the transponder.  They want

22   to know -- because if anything happens, if a car gets

23   broken into, someone gets hurt, someone gets raped,

24   something like that, they want to have a full and

25   complete accounting of everybody who is there to be like

 1   what were you doing in this car.  They do not go car by

 2   car.  So if somebody was riding in the passenger seat,

 3   there would be no reflection of that on the guard gate.

 4   Although it's bizarre I sent you, it says I think it has

 5   Mike Fischer and Eric Foglesong.  I truly don't know who

 6   that is.

 7        Q.   Yeah, because the ones you have have that extra

 8   category that says, you know, if there is an Uber

 9   driver, it says who was riding in the car sometimes?

10        A.   But it's not an Uber driver.  In that case, it

11   was either Foglesong driving with Fischer or Fischer

12   driving with Foglesong.  There was no reason why it

13   would be that way.

14        Q.   It looked like to me Mr. Fischer had rented a

15   rental car, and for some reason or another and taken

16   Mr. Foglesong's vehicle?

17        A.   It could have been that.

18        Q.   I think they would say, you had that --

19        A.   We had the crescent moon driveway, so when cars

20   get backed in that does happen with frequency.

21        Q.   And then there is here -- Mr. Gaetz -- you say,

22   You have a transponder with the Porsche.  Gaetz says, No

23   condom wrappers.  Didn't use condoms.  If B███ is

24   pregnant and it's a girl she is Rebekah.  A boy will be

25   Hammond.

CHRISTOPHER DORWORTH                                    August 06, 2024
DORWORTH V. GREENBERG                                             276

1              Did I read that correctly?

2       A.    Yes.

3       Q.    Is that referring to your one strike rule about

4  condoms in the trash?

5       A.    Probably.

6       Q.    Can you bike into the Heathrow neighborhood --

7       A.    Yeah.

8       Q.    -- without going through the guard gate?

9       A.    I mean, you can go through the guard gates.  If

10  you show up in the guard gate, it will tell you it's all

11  about vehicles going into the neighborhood.  So when we

12  go biking, which we do with great regularity, when you

13  come back, they'll open the gate for you.  It's one of

14  those things, but they don't stop you and check your ID

15  or anything.  There is also a pathway in.  So, yeah,

16  there is -- then there is five different gates, of which

17  three of them don't even have residents.  But the point

18  is this:  People wouldn't do that.  They would just go

19  through the gate.  There's no...

20       Q.    You have two manned gates, right, and your

21  testimony is they don't take down the credentials of

22  people who would walk in and they don't take the

23  credentials of people who would bike in and they don't

24  take down the credentials of passengers to the vehicles;

25  is that right?

```
 1        A.   I believe as a general policy of the
 2   neighborhood I have never seen them do that.
 3        Q.   All right.  Going back to the gate ledger for
 4   July 15, 2017, and B REDACTED G REDACTED.  We've kind of been
 5   chatting about her.  At 4:42 your testimony is you were
 6   not at your residence at 4:42 on July 15, 2017, correct?
 7        A.   I don't believe so, no.
 8        Q.   Okay.  When is the last time you have spoken
 9   with Ms. G REDACTED?
10        A.   Probably September of 2020.  September 2020.
11        Q.   And was that the call at FishBones?
12        A.   Yes.
13        Q.   And what led you to no longer have contact with
14   Ms. G REDACTED after September of 2020?
15        A.    I mean, I didn't have frequent contact with
16   Ms. G REDACTED before September of 2020.  She was dating a
17   friend of mine.  When they broke up, you know, I was
18   still nice to her and polite to her.  We got along fine.
19   I think she moved out.  She went and got a job in DOE,
20   Department of Education, in Tallahassee, got a
21   boyfriend.  I saw her, I'd bump into her occasionally
22   just say hello, but I didn't really see her after she
23   and Matt broke up.
24             And then one day I was having dinner with a
25   friend of mine at FishBones, and I received a phone call
```

1    from Matt.  And he said, he's like, Hey, I don't mean to

2    disrupt your day -- this is, mind you, after the

3    conversation we had had with Joel and Abby at the Lake

4    Mary Marriott and then the threats that took place at

5    Another Broken Egg.  And says, I don't mean to ruin your

6    night, but it appears that Joel is indeed trying to

7    follow through on making his problems our problems.

8            I said, What does that mean?  He said, Well, I

9    just got a phone call today.  He did not disclose who it

10   was from, but I do believe it was from B████.  He said

11   that -- because I called B████ shortly thereafter.  He

12   said that, Today there was some grand jury stuff, and

13   apparently your picture and -- your driver's license and

14   my driver's license were put up on the big board for

15   whatever the grand jury thing was.

16       Q.   What is your understanding of the date that

17   Ms. G████████ and Mr. Gaetz broke up?

18       A.   I have no idea.  But as I recall, it was sort

19   of an on again/off again thing.  Like they'd split then

20   they'd get back together for awhile.  It was not -- it

21   was not one definitive thing.  It was more of a we're

22   going in different directions, and...

23       Q.   And you don't recall seeing Ms. G████████ at the

24   home at all on July 15, 2017?

25       A.   I don't remember seeing her that day.

```
 1      Q.   Did you allow and consent to Mr. Gaetz and
 2 Ms. G█████ hanging out at your house in October of 2019?
 3      A.   Sure.
 4      Q.   Like we just watched on this text message?
 5      A.   Sure.
 6      Q.   Is that something you regularly allowed,
 7 Mr. Gaetz access to your house --
 8      A.   I mean, listen, when we would go to a music
 9 festival on the 30A, he would put us up.  Matt is a very
10 generous guy.  I don't remember the last time I paid a
11 tab around him.  He is very good about -- he picks
12 everything else up.  But if Matt was coming into town,
13 he would typically -- like if he had something going on,
14 he'd say, I've got a speech down at Disney.  I'm
15 probably not going to come that way.
16           There was another group of friends, the
17 Pirizolos, that he would go over and stay at their house
18 sometimes and then there was my house.  And a lot of it
19 I think was driven by geography.  If he was -- if there
20 was something near West Orange County or near Disney,
21 he'd probably stay with the Pirizolos.  If it was, you
22 know, anything else probably stick around with me.  But,
23 yeah, I mean, he's -- at that point in time, he was
24 fresh, new in congress who hadn't really made the world
25 aware of he was yet, but he was close with Trump and he
```

 1   was just highly, highly sought after.  I mean, it was

 2   speech after speech after speech.

 3       Q.   Anybody else other than Mr. Gaetz that you gave

 4   access to your house to kind of chill out on a

 5   weekend --

 6       A.   Sure.

 7       Q.   Who would be these other individuals that

 8   you --

 9       A.   Mike Fischer.  I mean, like, it's a big house.

10   These are -- Matt's a U.S. congressman and his

11   girlfriend and a friend there.  It would not be atypical

12   if they said, Hey, can we hang out here and chill?  I

13   would have probably said yes most certainly.  I would

14   not have expected K REDACTED  M REDACTED  and "AB" to ever be at

15   my house.

16       Q.   So other than Mr. Fischer and Mr. Gaetz, what

17   other individuals would you give access to your house

18   to?

19       A.   We can go down the list here.  Brady Benford,

20   Setzer.  He has lived with me several times in between

21   relationships.  John Yapo lived with me for years.

22   Let's see here.  Let's go down the names I see.

23   Foglesong.  Frank Artiles came, and he stayed at my

24   house for several days at a time.  Brady Benford.  David

25   Workman.  I mean, it's -- it's a large home.  These

1  are -- like I said, six bedrooms.  It's got a nice pool.

2  You know, I like to cook.  I like to make food for my

3  friends.

4      Q.   Who invited -- have you been able to discern

5  who invited K`[REDACTED]` M`[REDACTED]` to your house on the evening

6  of July 15, 2017?

7      A.   I cannot glean that, but I can tell you that

8  the only plausible explanation to that would be Joe

9  Ellicott who at the time identified her as his

10 girlfriend.

11     Q.   And do you know who invited "AB" to your

12 residence on July 15th --

13     A.   I just assume it was K`[REDACTED]` M`[REDACTED]`.

14     Q.   So you believe that Joe Ellicott invited M`[REDACTED]`

15 and M`[REDACTED]` invited "B"?

16     A.   I mean, that would be my assumption.

17     Q.   And who invited Ellicott?

18     A.   Well, Joe, again, was one of my clients at

19 Ballard Partners.  He worked for the tax collector's

20 office.  And, again, I wasn't there; but, you know, it

21 would not shock me if -- again, I don't know why he

22 would be getting there at 11:00 at night.  I mean, I

23 don't know where he was.  Truly, I have no idea.  I was

24 not there, so I cannot give you any insight into what

25 was taking place there.  But I would point out too that

1  if you look at this, it says, Not on list, over in tag

2  two which would indicate -- for example, on June 21st

3  where it says -- if you see a tag two --

4      Q.   Right?

5      A.   Where is June 21st?  Where am I here?

6      Q.   Page five would be --

7      A.   Page five.  There is nothing about -- no, I'm

8  sorry.  We're in July.  Yeah, I mean, like "AB,"

9  somebody called them into the list because it doesn't

10  say not on the list.  Joe Ellicott was not on the list.

11      Q.   Right.

12      A.   So again, if it was an all call in or whatever

13  it was, but, I mean, the reality was probably somebody

14  was at the house at the party called them in because I

15  did not call them in.

16      Q.   Somebody at the home called the guard gate and

17  had your code?

18      A.   Yes.

19      Q.   And put a list together?

20      A.   Yes.  If I told you 40 people knew that code it

21  would not be the least bit of exaggeration.  Again, I

22  have young kids.

23      Q.   Have you ever seen Ms. G REDACTED dance with a hula

24  hoop?

25      A.   Yes.

1    Q.   And what can you tell me about that?

2    A.   Well, I mean, she was highly competitive with

3 it.  I have never seen a more expensive hula hoop in my

4 life.  The thing had LED lights that played to music and

5 it would do all this stuff.  It was basically like -- I

6 mean, I believe -- I don't want to overstate this, but I

7 think that she was sort of trying to make it a thing for

8 people when they do like social media stuff and they do

9 the -- whatever things people do.  TikTok or whatever

10 things.  Like her idea was to do sort of hula hoop and

11 sort of provocative dancing hula hoop stuff.  She would

12 do that.

13    Q.   Are you aware of the testimony from Ms. M[REDACTED]

14 and Ms. "B" that Ms. G[REDACTED] was dancing nude with a hula

15 hoop on July 15th?

16    A.   I saw what they said.

17    Q.   Okay.  Did you ever see Ms. G[REDACTED] dance naked

18 with a hula hoop?

19    A.   Yes.

20    Q.   And where did you see that?

21    A.   I think it was on Instagram when she would

22 literally have videos of it.  It was something that --

23 it was like people that want to get into social media

24 and sort of develop their -- I think that is what she

25 was sort of attempting to do to kind of erotic,

1   contemporary hula hoop stuff.

2       Q.   So you have never seen her live dancing naked?

3       A.   I don't think so.  I would remember.

4       Q.   Something she showed a video --

5       A.   I think she showed me the video.

6       Q.   Ms. G█████ showed you?

7       A.   Uh-huh.

8       Q.   And said, Look at me, I'm dancing with a hula

9   hoop?

10      A.   And I'm hanging out here with my hula hoop.

11           (Exhibit 114 was marked for identification.)

12  BY MR. PERKINS:

13      Q.   Next exhibit, 114.  All right.  These are the

14  mandatory initial disclosures that were made by you.

15  And on page two of five here, there is a reference to

16  Ms. G█████ and what she knows about the case.

17           Do you see that there?

18      A.   Yes.

19      Q.   And it says that, She has knowledge that

20  Dorworth did not commit conduct alleged, knowledge

21  regarding "KM", that is K█████ M█████, in testimony and

22  statements to authorities' investigation.

23           Do you see that there?

24      A.   Yes.

25      Q.   Okay.  And what knowledge does Ms. G█████ have

1    about Dorworth not committing the alleged conduct?

2         A.   She would know I wasn't there that night.

3         Q.   And when you say not there, you're referring to

4    the July 15, 2017, party?

5         A.   Yes.

6         Q.   And have you confirmed that with her?

7         A.   I mean, it was -- it is what she said back in

8    the day.  I think it's been pretty consistent ever since

9    then.

10        Q.   When did she say that back in the day?

11        A.   Just years ago.  She just basically said Chris

12   was not there.  Whatever the thing was, and my point was

13   is I don't know these women.  I have never met "AB."  I

14   think I did meet K█████ M█████ one time, but I met her

15   in the context of this and I think my statement there is

16   pretty simple, just that she knows I didn't do that.

17        Q.   When did she say, Chris was not there?

18        A.   I just -- when -- years ago when it first

19   became -- when we became aware of the existence of a

20   party.  I said, I don't think I ever met this woman.  I

21   think B██ said something to the effect, Yeah, Chris

22   wasn't at it.  And I got that secondhand, but, I mean, I

23   believe it to be true.

24        Q.   Where did you get it secondhand from?

25        A.   I believe I heard that from Halsey Beshears.

1    Q.   Any other knowledge she has that you did not

2  commit the conduct alleged?

3    A.   I mean, that one seemed to be conclusive that

4  if I was not there at the party, that would be the

5  evidence I was referring to.

6    Q.   You also mention here that she has knowledge

7  regarding K█████ M█████ and testimony and statement to

8  authorities.

9         What knowledge does she have about --

10   A.   Well, I mean, she was the one who -- so just

11  let's go through that night where Gaetz calls me.  After

12  getting a phone call like that, it's -- when you are

13  truly innocent of something, it's very disturbing.  So

14  the first thing I did is I hang up, finished my dinner,

15  and then I called B██.  And I said, I just got news from

16  Matt, and apparently my name was up on the -- my

17  driver's license or something was up on the board.

18         And her response to me was something to the

19  effect of, Yeah, I wasn't really paying much attention

20  because I don't think you are really the center of it

21  but your name -- your picture was definitely up there.

22  And I took a picture a couple hours later because I was

23  like, oh, this is -- while Joel is trying this stuff,

24  this is just confusion.

25         She called me the next morning.  So I got up,

 1  went to Liam's, lived my normal life, woke up the next

 2  day.  Sitting on my back patio, I get a phone call from

 3  her.  And she says, Hey, I think I got a little bit

 4  more.  She said, I think it has to do with your house

 5  where they might have been.  My response was something

 6  like, I was not there; and I think she said something to

 7  the effect of, I know you weren't, or was just very

 8  affirming in that regard.  She hung up.  Then after that

 9  I called my wife, and then I called Richard Hornsby

10  because obviously Joel was getting to work trying to

11  make his problems my problems.

12          (Exhibit 115 was marked for identification.)

13  BY MR. PERKINS:

14     Q.   Let's talk about this letter from Mr. Hornsby

15  to Mr. Todd Gee dated October 4, 2021.  I'll mark this

16  as Exhibit 115.

17          You're familiar with this letter, correct?

18     A.   Yes.

19     Q.   And it talks about the evening of September 28,

20  2020, correct?

21     A.   Yes.

22     Q.   It says, on that evening, you're having dinner

23  with a friend at FishBones in Lake Mary.

24          Who was that friend?

25     A.   Kyle Jones.

```
 1      Q.   And does Kyle still live in the area?

 2      A.   No, he never lived there.

 3      Q.   Where does he live?

 4      A.   South Florida.

 5      Q.   What does he do?

 6      A.   He's a warehouse developer.

 7      Q.   And at this dinner with Kyle, you get a call

 8 from Matt Gaetz?

 9      A.   I was wrapping up dinner with Kyle.  I think we

10 had already paid the tab.  We were kind of about to have

11 salutations and part ways, and I think I invited him

12 over to Liam's.  I don't believe he joined, but he might

13 have.  I don't remember if Kyle joined or not, but we

14 were just wrapping up.  I got the phone call, and I

15 believe after that I got on the phone with B[REDACTED].  We had

16 a pretty quick conversation, and then I went on with my

17 life -- well, I don't remember...

18      Q.   Who went to Liam's with you?

19      A.   I know Jason was there, and it might have been

20 Kyle.

21      Q.   I think you have a picture of it.

22      A.   Yeah.  If you can show me the picture, I can

23 tell you.  Kyle was my college roommate's younger

24 brother.

25      Q.   Maybe it's on the other one.  Here we go.
```

1     A.    That's Kyle.

2     Q.    Okay.

3     A.    Really captures my essence.

4     Q.    So you get a call from Mr. Gaetz.  How long was

5  that call?

6     A.    A minute.  It was just, Hey, I don't have any

7  more details than this, but I have got the heads up that

8  your name and my name went up on the board.  It was

9  Matt, because obviously because he was aware of the

10  threats that Joel had made against Rebekah in my

11  presence.  And Matt I think was just informing me that

12  it appeared that Joel and the Greenbergs had actually

13  turned the corner on doing the things that he had

14  promised to do if we didn't get him a pardon.

15     Q.    And then in response to that -- there is a

16  reference here to other people were brought up in the

17  grand jury proceedings as well?

18     A.    Yeah, I don't know.

19     Q.    It says, Mr. Dorworth, Mr. Gaetz, and several

20  other people.

21           Do you know who those other people were?

22     A.    I don't.  I mean, to be very clear, Gaetz did

23  not tell me who the other people were.  He said, Your

24  name and my name.  I think he might have said like among

25  others.

```
 1              (Exhibit 116 was marked for identification.)
 2   BY MR. PERKINS:
 3       Q.   And then we have this phone record from B REDACTED
 4   G REDACTED .  I'm going to mark this as -- this will be
 5   Exhibit 116.
 6             At this point in time, you text Ms. G REDACTED ,
 7   correct?
 8       A.   Yes.
 9       Q.   And you say, Would you please give me a call
10   when you have a moment, right?
11       A.   Yes.
12       Q.   You send that text at 7:57 p.m.?
13       A.   Yes.
14       Q.   And then Ms. G REDACTED looks like calls you back
15   immediately?
16       A.   Yes.
17       Q.   Do you know how long that conversation was?
18       A.   I don't recall it being very long.  B REDACTED -- when
19   I called her, she was more like, I don't think this is
20   really about you, Chris.  I don't really care.  I mean,
21   it was -- if you saw that picture I took just after
22   that, the contents of that phone call were such that I
23   was made to feel that this is not a particularly
24   problematic situation for me.  Like maybe they spent a
25   lot of time on Matt and my pictures went up on the board
```

1   or whatever, but it was -- her response was, Yeah, I

2   didn't really pay much attention because I don't think

3   you're really what they're after here.  And then she

4   called me back the next morning to say that she knew a

5   little more, and that it was about my house.  Basically

6   they were alleging that people had been at my house.

7       Q.   And that's the second call we see on this

8   message here, September 29, 2020, at 10:40 a.m.?  You

9   called B████?

10      A.   She -- that's weird.  She called -- I don't

11  know.  She must have texted me or something else to do

12  that because it was basically her realizing that I

13  had -- that she had more information.  I didn't

14  proactively reach out to her that day.  So maybe I

15  called her back, but, I mean, I was not -- I honestly

16  had sort of put it out of my head.

17          When I woke up that day, I didn't call Hornsby.

18  I was like, we'll deal with this stuff when the time

19  comes.  And when she called back and we talked this

20  time -- and again, I might have called her back, but I

21  think she was the one reaching out to me to say like,

22  Hey, this is...

23      Q.   So she may have texted you to say call me --

24      A.   Something like that.

25      Q.   -- and then you called her back?

1    A.    Uh-huh.

2    Q.    Going back to this Hornsby letter then, it does

3 say that you -- the next day Ms. G REDACTED calls you and

4 says -- it looks like she provides you additional

5 details she had not had mentioned the night before?

6    A.    That's what I said, yeah.  We knew the driver's

7 license from the day before.  It was the fact that it

8 was about my house.  The day before when I called her, I

9 got the impression that she had basically mentioned my

10 name in passing to Matt.  Matt was dutiful in calling me

11 to say, Your name did this.

12         But when I called her, she's like, What are

13 you -- I don't think you're the center of this.  The

14 next morning when we spoke, it was like, Hey, I got

15 more, and it's because they think something happened at

16 your house.

17    Q.    And that would have been on July 15, 2017?

18    A.    I mean, we know that now.  At the time, I did

19 not know that.

20    Q.    And when she says, Something at your house, was

21 that sex with "AB" that was discussed?

22    A.    Excuse me?

23    Q.    When she said, Something happened at your

24 house --

25    A.    No, she never went into the single details of

```
 1  what happened.  Her -- the extent of her details to me
 2  were that the assumption I had in the moment and I think
 3  is still right to this moment in time that they had
 4  talked to either K REDACTED or "A," and basically, they
 5  were -- at the time at least, they were calling and
 6  giving details to B REDACT for whatever this was, and that
 7  she had she had somehow gleaned -- B REDACT had either talked
 8  to them again or figured something else out that said
 9  that the questions -- I guess maybe they talked to "A"
10  or maybe she called them back to get more information.
11  She said that it appears that where Chris Dorworth was
12  involved in this about my driver's license being up
13  there had to do with my house, about the location of
14  where it was.
15      Q.   The location of the gathering on July 15, 2017?
16      A.   I didn't know any of that at this time.  It was
17  just all I got was something happened at your house.
18      Q.   Okay.  So it was very generic?
19      A.   In a terrifying way.  I mean, like, it was
20  like, Hey, this is happening.  I don't really know more
21  details.  And so I called her back and she goes -- Yeah.
22  She was very dismissive of me.  It was like, Chris, this
23  isn't about you.  This is about Matt.  And then the next
24  day when she called me back, she said actually it was
25  about your house.  So it was like she called back to
```

CHRISTOPHER DORWORTH                                    August 06, 2024
DORWORTH V. GREENBERG                                              294

1  tell me that she had -- that there was more details, and
2  she thought that the questions about me had to do with
3  my home.
4      Q.   And were the questions relating to drug use at
5  your home?
6      A.   At the time I didn't know any of that.
7      Q.   What about a minor being at your house on July
8  15th?
9      A.   Well, that was about the time -- I mean, yeah.
10 By that point in time, we were aware -- I was aware that
11 these were the girls that were doing this stuff.  So,
12 yeah, she would have been telling me -- she didn't say
13 that, but she was like, they think something happened at
14 your house.  She did not enumerate one detail past that.
15 And at the time, I didn't know if that -- in fact, I
16 honestly assumed that they had just thought that she was
17 at the house and that it was my home and that sense of
18 the word, I was -- you know, I was supportive of it.  I
19 have never met her.
20     Q.   At that point in time, the superseding
21 indictment came down on Joel Greenberg, correct, in the
22 midst of 2020?
23     A.   If you tell me so.  Again, I don't -- no, was
24 that -- the first one was in June.
25     Q.   Correct.  And then there was a second one in

1    August, correct?

2         A.   That involved the girls.

3         Q.   That involved the girls?

4         A.   If that was in August, you tell me.  That --

5    again, I mean, it was just several months later.  I

6    remember when it came out, but that was -- that came out

7    after I had the meeting -- after Rebekah had gotten

8    threatened by Joel at the JW Marriott and after he and I

9    had an exchange at the Broken Egg.

10        Q.   So July you have -- they have the -- July of

11   2020, Rebekah has the exchange at the JW Marriott in the

12   pool with Joel Greenberg?

13        A.   I don't know what the date was on that one.

14   I'll take your word on that one.

15        Q.   You sat through your wife's deposition,

16   correct?

17        A.   I did.

18        Q.   And we talked about that July event?

19        A.   Yeah.  Again, just from a point of plotting

20   things on a calendar, I don't want to tell you that I

21   know what the date was.  It's all just blocked together,

22   but I know it was before this.

23        Q.   Okay.  Now, the September 19th -- on September

24   29, 2020, did you get the gist from B̲REDACTED̲ that the

25   feds thought that underage -- and underage girl partied

1    at your house at some point in time?

2        A.    I mean, at the time, if it was post superseding

3    indictment, I was probably astutely aware that there was

4    one girl that was the particular subject of this, and I

5    think I had by that point in time figured out -- you

6    know, I had asked somebody, and they told me it's this

7    person.

8            And I looked her up on social media.  I

9    couldn't find her.  I couldn't find like any -- I don't

10   think I was able to find the Instagram or anything like

11   that, and then I found -- I said that.  They said, well,

12   you've got to look under her stage name which was R<sup>REDACTED</sup>

13   R<sup>REDACTED</sup> which is her porn name, and that was an eye

14   opening experience.

15       Q.    When is the first time you looked up R<sup>REDACTED</sup>

16   R<sup>REDACTED</sup>?

17       A.    Whenever someone told me that's who it was.

18       Q.    Would it have been around --

19       A.    I don't know.  You're asking me to speculate on

20   things.  Whenever -- because obviously out of nowhere I

21   got -- Joel had hundreds of these women over a period of

22   years.  One of them happened to be underage.  Joel gets

23   ensnared in that.  He's got all these problems there,

24   but Joel's goal in life was to make it not just Joel's

25   problem.  He wanted this to be a team thing.  Everybody

1    had to be in this together.

2         The problem is I don't think anybody else did.

3    I know I didn't.  I don't think Matt did.  I think that

4    Joel -- I guess Joe Ellicott -- well, that was kind of

5    interesting during their testimony because K[REDACTED] said

6    that she didn't ever have sex with Joe Ellicott and Joel

7    and "AB," but "AB" said that K[REDACTED] had sex with Joe

8    Ellicott and Joel.  It was always very confusing to me

9    because I'm getting -- I'm the one person who never had

10   sex with this person.  I don't think Matt ever did,

11   certainly not as a minor.

12        But that's -- I don't know about that.  But I

13   never met her, and I'm getting sued by the -- I'm

14   getting threatened to be sued when the people who we

15   know now did have sex with her never got sued.  And so

16   it was just very -- I thought that was very compelling

17   evidence that it was being encouraged along by none

18   other than Joel Greenberg.

19   Q.   In this letter from Mr. Hornsby, page two up on

20   the screen, it says, I assume Ms. G[REDACTED] received

21   additional information from Ms. M[REDACTED] after a previous

22   phone call with Mr. Dorworth.

23        Why did -- why was that assumption made that

24   she got that information?

25   A.   Well, she called back the next day to say --

1    Q.   That I talked with K█████ or something?

2    A.   No.  She didn't say that.  She said, I know

3 more, and I didn't know honestly.  At the time there,

4 the indictment before I was nervous when I got the phone

5 call that I was made to feel better by the B██ follow up

6 phone call.  The next morning had the inverse effect.  I

7 was like, my god, they're going to try and say this crap

8 happened at my house.  It didn't.  I don't need this.  I

9 don't want this.  And so she called back and the next

10 day I had that -- and she -- when she called me, she

11 said, I know more.  I remember her saying, I know more.

12 And what she knew differently is that it was centered on

13 my house.

14    Q.   It was centered on your house, and it was

15 centered on a minor being present at your home?

16    A.   The girl that Joel had the problems with.

17    Q.   "AB"?

18    A.   "AB" claiming being at my house at some point

19 in time which was truly news to me.

20    Q.   And you're assuming that was K█████ M█████

21 why?

22    A.   I'm sorry, what?

23    Q.   Why is that assumption made that it came from

24 K█████ M█████?

25    A.   I'm sorry, what are you referring to?

1    Q.   You see where, I assume Ms. G[REDACTED] received

2   additional information from Ms. M[REDACTED]?

3    A.   Yeah.  I mean, I think the gist of the

4   conversation was -- the conversation was between [REDACTED] and

5   K[REDACTED] M[REDACTED], and K[REDACTED] was supposed to be with -- I

6   think K[REDACTED] was the one talking to "AB."  But I --

7   again, I -- I called -- I talked to B[REDACTED].  It was a very

8   brief conversation.  She shared the details of what it

9   was.  I called my wife, told her.  I called my lawyer.

10  That was it.  Joel was doing what he promised he would

11  do.

12   Q.   Page six of this document talks about an

13  affirmative response to Ms. G[REDACTED] 2019 offer to share

14  cocaine she was purchasing?

15   A.   That was nonsense.  There was a text that they

16  said -- and I don't think I ever even saw these texts,

17  but they warranted to Richard that these texts existed.

18  He was just responding to that, but I never purchased

19  cocaine from B[REDACTED] G[REDACTED] nor would she try to sell

20  that to me.  I don't know what that's about.

21   Q.   You have never seen a text message exchange

22  with Ms. G[REDACTED] where she offered cocaine or anything?

23   A.   I think somebody described something talking

24  about white.  I do not -- I don't use cocaine, so I

25  would not be purchasing that.  By the way, 2019, offer

1  to share cocaine she was purchasing for the wild party.

2  I don't know.  Again, this seems to me like this was

3  years after the fact, but I never bought any cocaine

4  from █REDACTED█ █REDACTED█ so I don't --

5       Q.   And you --

6       A.   But the way that conversation happened was

7  Richard called up and said, Hey, you know, we have

8  cooperated with you guys.  We sat through the interview.

9  We turned over large batches of information, and we

10 didn't hear anything from them.  It just kind of went

11 dark.  So Richard after some period of time did a status

12 call with them, and, you know, I remember I was sitting

13 at a Corona Cigar Bar, and he said, You got a second?

14 He said, You might want to step away from the table.

15      And I said, Yeah what's up, man?  He said,

16 Well, they said they have kind of moved on from the

17 sexual component of this, and now they're convinced that

18 there might have been some obstruction of justice going

19 on with all this stuff.  So again, they warranted

20 several things to Richard over the phone.  They never

21 showed us.  They never showed me a copy of the text and

22 everything.  They just said, We have this.  And so

23 that's all I know.  I have never -- they didn't say, We

24 have this.  I don't think the feds do that a lot

25 actually.  So they did not share anything.  So they --

1      Q.   They didn't seize your phone though?

2      A.   No.  My understanding is the only two people

3  who had their phones seized were Matt and B█, and Matt

4  and B█ have one thing in common.  They did not respond

5  to the subpoena from the federal government.  I did.  I

6  just said give me a time to comply with this.  I'm not a

7  U.S. congressman.  I'm not in a position to post up in

8  that battle.

9           My understanding is that the two people who got

10 their phone snatched were B█ and Matt, and they were

11 both done on -- they just come and snatch it.  Basically

12 like, FBI, give me your phone, and then you're gone.

13 And Matt didn't get his back for several years because I

14 think it was encrypted, and I don't know if they ever

15 broke the encryption on it.  I don't even know if Matt

16 got the phone back.  Probably could, but I don't know

17 about B█ phone.  I never talked to her about that.

18     Q.   Did you turn over text messages and emails to

19 the feds?

20     A.   Yeah.  Everything I have, I have given to you.

21     Q.   And you have turned over the same materials to

22 us?

23     A.   Identically.  Again, most of my text messages

24 were wiped out by virtue of the fact that I had a one

25 year rule on my phone that just deleted texts in one

CHRISTOPHER DORWORTH                                      August 06, 2024
DORWORTH V. GREENBERG                                                302

 1  year.

 2      Q.   Going back to the mandatory initial disclosures

 3  that we previously marked.  A few questions about some

 4  of these folks that you have listed on there.

 5      A.   Sure.

 6      Q.   You say Halsey Beshears --

 7      A.   Halsey.

 8      Q.   Always Beshears, contact information unknown,

 9  knowledge regarding similar acts by Greenbergs against

10  Beshears investigation and resulting damages.

11           What is that knowledge regarding similar acts

12  by --

13      A.   Well, Halsey was the secretary of the

14  Department of Professional Regulation under Governor Ron

15  Desantis.  When Covid happened and Florida sort of led

16  the country in terms of its response, Halsey was the guy

17  who was in charge of the agency doing it.  So, you know,

18  Halsey was very high profile, and what Joel wanted to do

19  who Joel wanted to drag whoever he thought could have

20  impact and that would -- if they got prosecuted would

21  be -- sort of please the DOJ so that he could get

22  reductions in sentence.  And he went after Halsey, and

23  Halsey didn't do anything.  I mean, this is all

24  nonsense.  These guys were single, decent looking guys

25  who came from resources, politically prominent.  The

1    idea that they would have to pay for sex is utterly

2    ludicrous to me.

3        Q.   And what's your understanding of how Joel

4    Greenberg came after Mr. Beshears?

5        A.   Trying to suggest that he was -- you know, he

6    had information.  Joel went and gave them all the

7    information which they used to generate the subpoena.

8    And it's the collective wisdom of all of us that

9    basically Joel or his attorneys, Dave Webster, acting on

10   behalf of the Greenbergs and/or Joel, gave a copy of the

11   copy subpoena to the New York Times, and that was the

12   piece of information they used to -- you know, to

13   basically start the ball rolling on Matt.

14       Q.   What activity did Mr. Greenberg suggest

15   Beshears was involved in?  Was it --

16       A.   I believe he suggested they went on some trip

17   down to the Bahamas that was the Man Act trip.

18       Q.   And that trip would have involved "AB" and

19   K REDACTED  M REDACTED ?

20       A.   I believe it was "AB" and K REDACTED  M REDACTED  after

21   they were the age of 18.  But Halsey flew them in his

22   plane.  Matt met them -- I believe Matt flew commercial.

23   I don't know who else -- I think Jason Pirozzolo was

24   there too.  He had an airplane too.  I think that it was

25   his girlfriend.  I was not on that trip.  That would not

CHRISTOPHER DORWORTH                                    August 06, 2024
DORWORTH V. GREENBERG                                              304

1   be the kind of thing I would do.

2        Q.   And you said it was the Man Act trip?

3        A.   Yeah.  I mean, the Man Act is I think the human

4   trafficking -- I think it was white slavery from what I

5   read the history of the act.  Like it used to be called

6   the White Slavery Act.  Now they call it the Man Act,

7   and the way I read it was more or less any time anybody

8   travels or leaves the country for the purpose of doing

9   anything wrong, they kind of use the Man Act.  Although,

10  again, I'm not an attorney.  I believe the only person

11  that's been prosecuted under the Man Act lately is R.

12  Kelly.  So, I mean, if you want to know how rare that

13  is, it would be none other than R. Kelly.

14       Q.   Is the Man Act used at least to your

15  understanding if you transport minors across --

16       A.   What was your question?

17       Q.   Go ahead.

18       A.   I'm sorry.  I don't believe that it's exclusive

19  to minors.  I think that the way -- and again, I

20  actually believe this was explained to me from none

21  other than Katie Benner with the New York Times.  She

22  said that when you are 18 years old, there is a

23  different standard for human trafficking than if you

24  were under 18 years old.  I want to make sure I give

25  you -- this is how she explained it to me.

1          She said if you are over 18 years old.  So if
2    the girl -- the woman who is being trafficked is 18 or
3    older, then there is an incumbent burden upon the
4    prosecution or they were suing or whatever to show that
5    there was coercion.  The examples they gave me of those
6    coercion would be like if somebody gave their -- got
7    them hooked on heroin, which I think is done sometimes,
8    or if they had their mother or child and said, We're
9    going to hurt your child unless you prostitute yourself.
10   That would be considered acts of coercion.
11          If you're under the age of 18, all that it
12   requires is that you receive something of value.  And
13   there is even a threshold in there that says -- so I
14   believe that the -- my understanding of at least the way
15   it was explained to me by a journalist who is also not a
16   lawyer was that there was a different threshold for over
17   and under 18.
18          And I think that the standard for what it is,
19   if you had the right to sort of inspect and see -- if
20   you don't look like -- you know, let me see some ID.  I
21   mean, if you have some right to see some people, you
22   have some debt or burden on that.  My understanding was
23   that because she was over the age of 18, there was a
24   trip down there -- I remember when it happened.  Like
25   Halsey came back, and when he got back, he had been a

1    state legislator -- and actually, this was before --
2    this was 2000 -- I don't know when that trip was, but I
3    think it was 2018.  But he was either a member of the
4    legislator, but as a member of the legislator, he also
5    owned a bike shop.
6           So when you fly, when you're a politician,
7    pretty much the worst thing you can do is start dropping
8    knowledge on people about how you're a politician
9    because that gets you in trouble all -- real quickly.
10   When you get pulled over by a cop, you would never say,
11   I'm a member of -- you just don't do that.  You just try
12   to be as non-addressing of that as you can possibly be
13   because it's not terribly hard for people to misconstrue
14   that and take it the wrong way.
15          So when Halsey got back, I think he was flying
16   into the country.  Customs had him, and they said, What
17   do you do for a living?  He's like, I own a bike shop.
18   And they Google quickly and saw that he was a state
19   legislator.  So all of a sudden, there is a discrepancy
20   or something.  They put Halsey into one room and the
21   girls in the other room.  I think K REDACTED was like 20 at
22   the time, I believe.
23          But that had happened, so I remember hearing
24   about that trip.  It was more of a funny thing that they
25   thought that was taking place.  I had no idea that there

1  would later be actually an investigation around human

2  trafficking, but I think Joel tried to -- Joel was not

3  on that trip, and I think he tried to get them to try to

4  say that that was the behavior that, you know, she

5  was -- it was an 18 and 20 year old that flew down with

6  Halsey.  I think it was a different matrix of liability.

7      Q.   Any other misconduct that you're aware of that

8  Joel Greenberg suggested that Mr. Beshears was involved

9  in?

10     A.   No.  I think he basically suggested that he was

11 involved in all of this stuff, and I don't -- if you're

12 referring to the 122 pages or 117 pages -- I really do

13 have to figure that out, whatever it is.  117 or 122, I

14 believe always is mentioned in there in that thing.  I

15 don't remember the context of how he was mentioned.  But

16 I mean basically what Joel did on that was he tried to

17 hit as many people as he possibly could.  I think he

18 went through the paper and said, who do they like to

19 write about.  And so, I mean, I think he basically

20 suggested that he was part of that.  He was -- I'm not

21 going to speak to what other things Joel might have

22 tried to say about Halsey because I don't think Halsey

23 did anything wrong.

24     Q.   The biggest thing that comes to the mind is the

25 trip to the Bahamas?

1    A.   Well, I mean, that's -- I think that was the

2    subject of the greatest area of investigation, and I

3    think they -- again, make no mistake about it, when Matt

4    Gaetz is involved and he's a U.S. Congressman who from

5    time to time finds comfort in going on major news

6    stations and calling out the Department of Justice and

7    the FBI and other things.  So I don't think there was

8    any shortage of people over there that wanted to make

9    sure that he was doing that.  But what I think Joel

10   tried to do was basically paid as many of these people

11   as he possibly could.

12   Q.   You also have a reference there to David

13   Webster.  We talked a little bit about this before.

14   Knowledge regarding the summation of derogatory

15   information about Dorworth.

16   A.   Yes.

17   Q.   What knowledge does Mr. Webster have in that

18   regard?

19   A.   I mean, I don't know.  He's their attorney.

20   I'm not able to do it, but, I mean, I know that I was

21   told I had a David Webster problem, that he's the one

22   out trying to pedal the goods on behalf of the family.

23   He claimed he was not Joel's attorney at the time.  I

24   believe just -- but he was the family attorney, so he

25   was acting on behalf of the Greenbergs and possibly

1  Abby.  But then actually at the moment of Joel pled

2  guilty, Dave Webster added himself as an attorney in

3  Joel's case at that point in time.  So he wasn't Joel's

4  attorney but he became Joel's attorney.  I think that

5  was the way that they tried to get around saying this

6  information came from Joel Greenberg's attorney, but it

7  came from his parents' attorney.

8      Q.   Do you have any information about specific

9  statements that Mr. Webster made --

10     A.   No.

11     Q.   -- that was derogatory towards you?

12     A.   Basically going around telling people that I

13 have all these issues and that Gaetz and I are going

14 down and that Joel's going to get out.  Just basically

15 going around trying to be -- he said something to some

16 judges a few weeks ago up in Seminole County.  Someone

17 said, yeah, Dave Webster was talking about you.  I mean,

18 I think he just continues to do it.

19     Q.   And what judges were those that told you that?

20     A.   Judge Melanie Chase.

21     Q.   Mr. Gaetz maintains that he was not at the July

22 15, 2017, gathering --

23     A.   I have no idea.

24     Q.   You haven't asked him about it --

25     A.   I haven't asked him about it.

```
 1        Q.    It's your testimony though that you did not see

 2   him?

 3        A.    I mean, I was not there, so I don't know.  If

 4   they came there and B█████showed up and Matt was with

 5   them, I was not there to observe it.  I do not know.  I

 6   have not asked Matt.  I have no idea.

 7        Q.    Have you discussed with Matt whether he had sex

 8   with "AB"?

 9        A.    Yes.

10        Q.    And what, if anything, did Matt say in

11   response?

12        A.    He did not have sex with "AB".

13        Q.    Ever?

14        A.    I didn't ask about ever.  I said, is there

15   anything -- he said there is absolutely no truth

16   whatsoever.  I did not say, did you ever sex with her

17   any time?  I don't know.  He didn't say yes; he didn't

18   say no.

19        Q.    You did limit it to when she was a minor?

20        A.    Yeah.

21        Q.    You asked him, did you ever have sex with "AB"?

22        A.    I did.

23        Q.    And what did Mr. Gaetz say --

24        A.    Absolutely not.  Hell no.

25        Q.    Did you ever ask Mr. Gaetz if he had sex with
```

1  K████ M████?

2      A.    No.

3      Q.  Do you know if he had sex with K████ M████?

4      A.    Well, K████ M████ said she had sex with him,

5  but then "AB" didn't seem to know if she had sex with

6  him.  So I -- the thing I didn't really contemplate when

7  this whole thing started was the idea that people would

8  lie themselves into these stories because of Matt's

9  political celebrity.  And having watched the depositions

10  of K████ M████ and "AB," I truly believe that is what

11  happened.  I think that they were trying to sort of

12  write themselves into it somehow for the purpose of, I

13  don't know, getting paid or whatever the deal was.  But

14  they -- very clear they did not know what they were

15  talking about.

16        They did not -- their stories did not jive.

17  There was -- and I think to a certain degree K████ was

18  concerned about implicating herself and the fact that

19  she knew that "AB" was under the age of 18 and was the

20  allegedly going to have sex with people and had sex with

21  her.

22        I mean, that was the testimony from "AB" that

23  she had sex with K████ M████, Joe Ellicott, and Joel

24  Greenberg that first night.  K████, curiously, did

25  not -- omitted that detail saying that she never had sex

1  with "A," but my guess is that's because she never faced

2  charges for human trafficking which by a very standard

3  definition of the law a person who committed the human

4  trafficking would be K REDACTED M REDACTED because she

5  brought -- she brought her.  She invited her, and, you

6  know, she was aware that she was underage and all those

7  things.  And I did not -- it didn't seem to dissuade her

8  at all.

9         Can I have a break in about five minutes?  Just

10 keep going.  I have to use the restroom soon.

11     Q.   Just let me --

12     A.   Just the next time you hit a breaking point.

13 Yeah.

14     Q.   Did you see Mr. Joel Greenberg at all on July

15 15, 2017?

16     A.   I don't think so.

17     Q.   Mr. Foglesong, did you see him at all on July

18 15, 2017?

19     A.   I think Foglesong and Fish were probably --

20 they did some work together on stuff.  And, again, Matt

21 has a thorough dislike for Eric Foglesong.  So if Matt

22 had seen Eric Foglesong, Matt would have left.  He would

23 have said, I'm not doing this, you know, whatever.  But

24 Mike Fischer, he was involved in different pacts and

25 political committees and everything.  I think Eric would

1  use him for various things.

2      Q.   Eric works for his -- historically works for

3  democratic --

4      A.   Yes.  He --

5      Q.   -- candidates?

6      A.   I mean, he ran the democratic caucus for the

7  state of -- State House in Louisiana.  He ran the

8  democratic caucus for the State House in Nevada.  He ran

9  the election of John Bell Edwards -- I believe that was

10 John Bell Edwards who is the democratic governor of

11 Louisiana.  They have a very weird system for electing

12 people there where it's not like Florida where you have

13 a republican, a democrat, and an NPA.  It's like a

14 progressive poll where you've got to like get to a

15 certain percentage.

16         And Eric, he won a governors race there in

17 Louisiana which is incredibly impressive in the south to

18 ever win a governorship these days as a democrat.  It

19 takes a lot.  He ran a U.S. senate race and lost a seat

20 that was -- ultimately went to John Kennedy.  Then Eric

21 went down -- who was the guy?  He was worth like $3

22 billion.  Don't answer that.  But he was the democrat

23 that ran for governor against Ron Desantis, and Eric was

24 his campaign manager -- Jeff Greene.  Jeffrey was his

25 name.  And so he -- Jeff Greene was worth about three or

1   four billion dollars and decided he wanted to come in

2   and be governor and spent all sorts of money.  And

3   Eric -- that didn't happen.  So Eric -- throughout all

4   these things, Eric is a national political consultant

5   who Matt Gaetz would have viewed as highly unwelcome in

6   his presence.

7           MR. PERKINS:  All right.  It's 3:52.  Let's

8       take a break.

9           THE WITNESS:  Thanks.

10          THE VIDEOGRAPHER:  If there are no objections,

11      going off record.  The approximate time, 3:53 p.m.

12          (A break was had.)

13          THE VIDEOGRAPHER:  On record with media unit

14      five.  The approximate time, 4:03 p.m.

15  BY MR. PERKINS:

16      Q.   Back on the record.  Mr. Dorworth, is it

17  possible that you were home when K█REDACTED█ M█REDACTED█ came to

18  your residence on July 15, 2017?

19          MR. ANDRADE:  Object to form.

20          THE WITNESS:  I don't know what time K█REDACTED█

21      M█REDACTED█ came.  I don't know.  No, I think she was

22      later.

23  BY MR. PERKINS:

24      Q.   She came in at 8:50 p.m.

25      A.   No, I don't believe I was there.

1    Q.   And you can state with absolute certainty that
2   you were not at your house at 8:50 p.m. on July 15,
3   2017?
4    A.   I can't state with absolute certainty anything
5   like about that, but I don't believe I was at my house.
6   I think I was at Randy Morris' house drinking.  A couple
7   hours after I was on the boat, and I don't think I was
8   home.  So I believe I got home either later in the night
9   or the next morning, but I do not think I was home by
10   the time she got there.
11    Q.   Okay.  And what about Mr. Ellicott at 11:15
12   p.m. on July 15th --
13    A.   I don't -- again, if I had gotten home at 11:15
14   p.m. if I was there, I would have been in the front door
15   at 11:10 and asleep at 11:12.  I would have gone up the
16   stairs, maybe brushed my teeth if I was lucky, and gone
17   to sleep.  I don't have any recollection of seeing Joe
18   Ellicott or anybody else at 11:15.
19    Q.   Is it possible that you were home at 11:15 p.m.
20   on eastern on 7/15?
21        MR. ANDRADE:  Object to form.
22        THE WITNESS:  Again, I have answered this
23     question repeatedly.  I'm not going to do it again.
24   BY MR. PERKINS:
25    Q.   When you were out on the boat with Mr. Morris,

1    do you recall getting calls from the gate?

2        A.   No.

3        Q.   Do you recall getting any calls from the gate

4    that day, July 15, 2017?

5        A.   I, as a general rule, don't ever recall getting

6    calls from the gate.  That's I get calls from the gate

7    all the time.  The call says, Hi, this is Mike with

8    Heathrow security.  Let them in.  That's how it goes.  I

9    don't have any recollection of talking to anybody, no.

10            (Exhibit 117 was marked for identification.)

11   BY MR. PERKINS:

12       Q.   All right.  Next exhibit will be 117.  This is

13   the initial complaint that was filed in state court and

14   then removed to federal court.

15            Do you see that up on the screen?

16       A.   I do.

17       Q.   Okay.  And there is a reference to "KM" in the

18   complaint.

19            Do you see that?

20       A.   Yes.

21       Q.   And that's K REDACTED  M REDACTED , correct?

22       A.   Yes.

23       Q.   All right.  And it says, Dorworth was aware of

24   the existence of a person with the first name of "AB"

25   via a tax collector employee and friend and former

1    roommate of Joel Greenberg to be dating a "KM".

2        A.   The way I read that statement is that I became

3    aware of that person down the road.  I didn't know "AB"

4    back then, never spent time with her, didn't know her,

5    but became aware of the fact that this person existed --

6    well, through all of this.

7        Q.   And this tax collector employee, that was Joe

8    Ellicott, right?

9        A.   Joe Ellicott, yes.  And, again, there is a

10   little confusion I think on that probably on your end

11   because K REDACTED decided that she -- during her

12   testimony, she said she wasn't dating him.  Believe me,

13   Joe definitely thought they were dating, and they

14   actually referenced that in one of those proffers from

15   the federal government that he thought they were

16   together.  Relationship ended a few weeks later.

17           He was very serious about it, was talking about

18   marrying her, was asking -- you know, I had just -- I

19   had been married before and had a baby on the way, and

20   he was asking my wife girlfriend -- my wife at the time

21   -- well, my wife Rebekah, she's 12 and a half years

22   younger than me.  So he was asking me questions like how

23   do you do that?  How do you kind of make it -- he was

24   very excited about having a potential future with her.

25           So that is the context that I knew of her as

1  this girl who is very young and beautiful and really did

2  it for him, and she seemed to like him too.  And so he

3  was kind of hurdling towards the -- being in a

4  relationship with her.  And then two weeks later, he

5  found out she had several videos of her with other

6  people out doing very graphic things.  I mean, and

7  Joe -- Joe and Joel did a lot of weird sexual things.

8  They were into that stuff.  He was shook by whatever he

9  found.  So, I mean, I think it was pretty -- he's like,

10 I just I can't believe it.  He was really bothered by it

11 all.

12     Q.   It says here that, Dorworth was aware of the

13 existence of a person with the first name of "AB" via a

14 tax collector employee.  Joe Ellicott --

15     A.   A first name of "AB."  I don't -- first name is

16 not "AB."  It was the tax collector employee and

17 friend -- it would be...

18     Q.   Did Joe Ellicott make you aware of "AB"?

19     A.   No.  I mean, I don't know.

20     Q.   Is this an error, paragraph 440 of the initial

21 complaint?

22     A.   What I would do is say I would say that it is

23 a -- I am aware, but I was not aware of it back then

24 that there was that person.  I am aware of it, but I

25 found out about them from Joel, and I knew "AB" as being

```
 1   the best friend and I thought roommate of "KM".  But I
 2   was always under the impression they were roommates,
 3   although her testimony was contrary to that.  But, I
 4   mean, I am still aware of this.  I am aware -- I was
 5   aware.  I don't think back then -- at the time in 2017,
 6   I don't believe I would have known who these people
 7   were, but I would have known that "KM" was there.
 8            So if you take the -- if you read the sentence
 9   in the context of in July or June of 2017 I was aware,
10   that would be incorrect.  If you read it now, I am
11   aware -- I was aware of the existence of such a person
12   like this because of being K█REDACTED█ M█REDACTED█ roommate.
13   That would be accurate.
14       Q.   When is the first time you became aware of a
15   person that existed with the initials "AB"?
16       A.   I don't --
17            MR. ANDRADE:  Object to form.
18            THE WITNESS:  I don't -- the name "A," I think
19       that would have come after Joel was charged with a
20       crime.
21   BY MR. PERKINS:
22       Q.   After August of 2021?
23       A.   Yes.
24       Q.   So it's your testimony the first time you heard
25   the name "AB" was in August of 2020?
```

1    A.    "AB", yes.  I mean, he made reference to ▮REDACTED▮

2 in the text, but I don't know that as "AB."  The first

3 time I found out her name because I went to go find her

4 one weekend, and then I had to go find her by using the

5 name R▮REDACTED▮ R▮REDACTED▮.

6    Q.    And did you do that when you reviewed the

7 August indictment?  Is that when you went digging around

8 for that?

9    A.    Yeah.

10   Q.    Was it sometime in the month of August 2020

11 that you would have done that?

12   A.    I did not ask Joel.  I don't think Joel told me

13 who it was.  He kept trying to sell this thing like ▮REDACTED▮

14 V▮REDACTED▮ 99.  I very much believe that all Joel was doing

15 at that point in time was trying to rope me into things.

16 The text message he sent me was nonsense.  If you read

17 my responses to him right away, I'm like, what are you

18 talking about, and, stop doing this Joel.

19        Joel was not -- again, Joel had -- he has a

20 clever mindset.  He's kind of -- if you think about life

21 hacks, he's one of those people.  He's very impulsive.

22 He says and does dumb things.  You know, I -- you know,

23 when Joel first made me aware -- when he threatened my

24 wife and we went to Another Broken Egg and he mentioned

25 the existence of "AB," I didn't know who she was.  I

1  went and asked others.  Again, I was just like who is

2  the girl?  And when the -- I think about that time I

3  probably did the research.  Again, I don't know what day

4  I was on my computer.  And then shortly thereafter he

5  was charged, but I don't remember if I checked before

6  that or I checked when the time came.

7          I'm not much of a porn guy.  I just don't -- it

8  is not a part of my life, never has been, and stuff that

9  she does is particularly gross.  So it took some doing

10  for me -- I mean, it was -- there is some really nasty

11  things.  So I had to go identify her and find out who

12  she was just so I can say that I had never met her.

13  There was no question about whether or not I had had any

14  sexual interaction with her.  I just didn't know if I

15  had met her before.

16          It was not wholly impossible that we would have

17  been somewhere, and she would have been at the barstool

18  next to me or something like that or at the bar or table

19  next to us because again, Joel would oftentimes travel

20  in these -- I used to call them entourages, but he used

21  to describe them as people who he knew from his radio

22  show.  And I said, don't -- the radio show was only on

23  for a few weeks.

24          And at the time, I didn't know that his parents

25  had paid for him to buy the block of time.  When I first

1   met Joel, he kind of made it seem like he was a

2   successful radio guy and had gone into the billboard

3   business and did some deal where he was going to get --

4   I'm going to get this wrong, but this is the gist of the

5   way Joel would do it.

6         Let's say you have a radio show slot and it

7   costs this money dollars, costs $200 for a 30-second

8   slot.  Then there's a billboard thing, and they change

9   every ten seconds, and that would cost say $3,000 a

10  month.  You'd have $2,000 a month on the radio show.

11  Somehow he would get more money from doing both of them,

12  and make more money for the billboard.  He had this

13  whole thing.

14        He would describe it as if his radio show was

15  this very large thing.  That's where he met Abby.  You

16  know, she became a sugar baby of his after he was on the

17  show.  I think Joel was sick that day; but, you know,

18  I'm just telling you, there was a huge swath of people

19  that would travel with him.  It was CK and everybody

20  else.  So when I first heard about this, I'm like, I

21  don't know if I know this girl or not.  So my first

22  mission at that point in time was to see like do you

23  know her?  If I had met her before, that's a different

24  fact pattern for me.

25        Q.   Your paragraph 441 says, Dorworth met -- did

1  meet "KM" in her capacity as Joe Ellicott's girlfriend.

2      A.   Yes.

3      Q.   Do you know when that -- what timeframe that?

4      A.   No.  I think it would have been -- well, it was

5  before August 1st because that's when it got dumped.

6  And so I can state affirmatively, but I believe that was

7  at a bar.  I believe that was at Liam Fitzpatrick's.

8      Q.   That you met K██REDACTED██ M██REDACTED██?

9      A.   Yes.

10      Q.   Okay.  You believe you met K██REDACTED██ M██REDACTED██ in

11  the capacity of Joe Ellicott's girlfriend at Liam

12  Fitzpatrick's?

13      A.   I'm not sure about the Liam Fitzpatrick's, but

14  I'm pretty damn sure about that.  I know I met her -- I

15  know I met her at a bar, and I know that Joe was hot to

16  trot and very excited thinking he found the love of his

17  life.

18      Q.   And that would have been before August of 2017?

19      A.   Yes.  I don't know if it was before this party.

20  I don't know if it was before -- I don't know, June,

21  July, I don't know.  I don't think they were together

22  for terribly long based on what I read there; but, I

23  mean, she denies that they were together at all, and he

24  was basically shopping for wedding rings and trying to

25  figure out which way to do it.

```
 1          So I think that there -- I was there at the
 2  time, and I know that Joe was very serious about it, but
 3  I think she was saying as much but then she got busted
 4  cheating and -- or doing whatever she was doing.  I
 5  think at that point time, it was kind of just wash your
 6  hands of it.  But then after that, Joe went and became
 7  good friends with her and like moved her to Colorado
 8  according to her testimony.  So I don't know.  It's a
 9  different kind of world from anything I'm used to.
10      Q.   Paragraph 442 says, On a couple occasions,
11  Mr. Ellicott asked if K[REDACTED] M[REDACTED]'s roommate was
12  welcome to join at social gatherings.
13          Do you see that?
14      A.   Yeah.  I mean, that's the reason I remember
15  thinking it was the roommate thing.  I don't -- again,
16  it was things -- and that's why I asked the question if
17  I ever met her before.  It was always, Hey, can we join
18  this or that and can she bring some friends.  And to be
19  clear, I mean, I don't -- this is identified as
20  girlfriend's roommate.  At the time, it was just
21  K[REDACTED]'s friends.  It was no "AB," there was no "AB,"
22  and K[REDACTED] had other friends.  It wasn't just "A."
23  There was a whole series of these people that would be
24  there.  So again, what I dont' know, it turns out she
25  wasn't the roommate either.  There is a lot of things
```

1    there.

2       Q.   But you said in paragraph 443, Dorworth agreed

3    and said it would be fine --

4            MR. ANDRADE:   Object to form.

5    BY MR. PERKINS:

6       Q.   -- not knowing a single defining characteristic

7    of "AB."

8       A.   All I will tell you is this --

9            MR. ANDRADE:   Object to form.

10           THE WITNESS:   Sorry.  All I will tell you is

11      that I try to be very accommodating to my friends

12      and clients.  If my friend asks if somebody can

13      join, I probably said yes.  I just don't think I

14      ever met her.  I was not at the party that night.  I

15      was not at a hotel room.  It's the two times she

16      claims to have been around me, and I believe both

17      are factually completely not true.

18           The point is Joe was always -- he was very much

19      in love with K<span>REDACTED</span>, and he was trying to bring --

20      and I didn't hang out with Joel all that much, but

21      it was like he sort of thought we were kind of an

22      interesting group of people.  He sort of wanted, you

23      know, hang out with K<span>REDACTED</span> and her friends.  I

24      remember him saying she had friends.  I don't

25      remember ever meeting them.  And again, that's why I

1    had to go identify who it was because I did meet

2    people like C█REDACTED█ C█REDACTED█.  Part of the Joel,

3    Abby entourage.  I did meet those folks, just never

4    "AB."

5  BY MR. PERKINS:

6    Q.   Your testimony is you've never had a Seeking

7  Arrangements account?

8    A.   I have never had a Seeking Arrangements

9  account.

10    Q.   Did you have an understanding it was a sugar

11  daddy/sugar baby relationship type dating app?

12    A.   With --

13    Q.   Seeking Arrangements.

14    A.   Yeah.  I mean, it's -- culturally I'm aware

15  that there was something.  There is an article in the

16  Orlando Sentinel about how UCF was like one of the

17  biggest in the country.  But, I mean, to me, the idea of

18  meeting people online and then somehow establishing a

19  relationship where I give you money and we have this

20  sort of pseudo-prostitutional relationship did not sound

21  at all like anything that I would ever want to have to

22  do with.

23         And honestly, Joel for years -- for years, like

24  to be very clear, for all of this June -- for all of

25  this calendar year, Joel was steadfast in his statement

1  these people, these women, these folks that are around,

2  they all came from my radio show.  He was -- he and Joe

3  were kind of celebrities in that regard, and that's

4  where it came from.  Because I asked him, I was like,

5  Dude, I know a lot of people.  I don't know people that

6  roll around with packs of this stuff.

7           He's like, No, it's all the radio show.  It's

8  all kind of part of what we were.  And I didn't know

9  Joel before and so I -- it struck me as weird because I

10 had never heard of his radio show, and I don't really

11 think of the people that have done radio as having

12 entourages.  It is not really something typical; but,

13 you know, again, by this point in time, I was aware of

14 the fact that Joel had parents that were giving him

15 100,000 bucks a quarter and that he was blowing it on

16 partying.  And does it shock me that a bunch of people

17 want to hang out with a guy who's known to buy bar tabs,

18 no, it doesn't.

19     Q.   Have you ever used somebody else's account on

20 Seeking Arrangements?

21     A.   No, I have never been on Seeking Arrangements.

22     Q.   Was there a point in time that you became aware

23 that Joel Greenberg was meeting these women on Seeking

24 Arrangements?

25     A.   Yes.

1    Q.   Okay.  When was that point in time?

2    A.   Probably about 2018 or '19, later.

3    Q.   How did you become aware of that?

4    A.   Somebody told me.  I don't remember who, but I

5  asked him.  I said, Joel, are these girls -- are they...

6  And he said, Some of them, and he didn't basically own

7  all of them.  He said -- what his statement to me was

8  that he met one or two off of that, of the website.  One

9  or two is my word.  He met a smaller number off the

10 website, and then had sort of met their friends and

11 bought them into the fold.

12       The way -- for the sake of just to illustrate

13 how that would go, I think "AB"'s testimony was that he

14 met "AB" on Seeking Arrangements, and then "AB" brought

15 K█REDACTED█  M█REDACTED█ around to meet Joe.  They had sex, and

16 all the sudden they were dating.  I think it was more

17 like he met a small number -- I don't have a precise

18 number, but I was made to believe that all of these that

19 all these women are not from the website.  A small

20 number are, and I've met a lot of people from that.  If

21 that's true or not, that would be a great question for

22 Joel's deposition.

23    Q.   And you became aware of the Seeking

24 Arrangements connection in 2018, 2019?

25    A.   I think it was 2019; but, again, to be clear,

CHRISTOPHER DORWORTH                                    August 06, 2024
DORWORTH V. GREENBERG                                             329

1  the way that it was explained to me, was not that it was

2  anything prostitutional.  It was more on -- basically

3  these girls want to hang.  They think it's cool.  And

4  I'm like, Joel, you're a married guy with a couple kids.

5  Why do a bunch of college girls want to hang out with

6  you?

7          Well, you know, we -- you know, we make sure

8  it's worth their time.  I'm like, What does that mean?

9  And I didn't press him for details, but, I mean, I just

10  got the impression that Joel was taking his trust fund

11  and blowing the trust fund on women and that Abby knew

12  about it.  And it was not a particular secret.

13          Again, the first time -- I think literally the

14  first time I ever said hello with him, I was like, Hey,

15  how's it going?  How was the drive in?  How is the

16  weather?  By the way, I'm in an open marriage.  I mean,

17  he was very off the top with that, and it was not a

18  source of any stress.  And again, I'm -- it's kind of

19  funny to me at the time because he was -- his wife was

20  pregnant with a kid, and he had just been married for

21  like six or seven months.  It was some person that had

22  been in a long marriage.  It was like they got into it,

23  and they were in that boat.

24      Q.  You're aware that Joel Greenberg met "AB" on

25  Seeking Arrangements?

1    A.    That's what I read in the interrogatories.

2    Q.    And that's what you heard in the testimony as

3 well, correct, from Ms. "B"?

4    A.    Yes.

5    Q.    And you're aware that somebody reported Ms. "B"

6 for being underage on Seeking Arrangements?

7    A.    I have been made aware of that through this

8 court case.

9         (Exhibit 118 was marked for identification.)

10 BY MR. PERKINS:

11    Q.    Okay.  And the next exhibit is 118 which is a

12 picture of Mr. Ralph Anthony Arruzza.

13         Do you know this individual?

14    A.    Never seen him, no.

15    Q.    Did you have an understanding that some of the

16 women that were at your home on July 15, 2017, were paid

17 to be there?  Did that come to your attention at some

18 point in time?

19    A.    It's still not come to my attention.  I think

20 when the asked the girls, they couldn't even say whether

21 they were paid or not as I recall in the testimony.

22 Again, none of it really made sense to me.  It's like

23 where did they come from?  Why are these two women

24 coming -- I don't -- you know, it would be one thing if

25 the scenario of the gate log, that when I look at the

1   gate log -- and again, this is just me imputing things.

2   I mean, I can imagine Joe, maybe he was working and said

3   go meet me there.  I'll pick you up or something like

4   that.  I have no idea why these two people would be

5   there and if it was -- I just don't know.  And Mike

6   Fischer doesn't remember them being there either.

7          So as far as I'm concerned -- I don't know how

8   long they were there.  I have no evidence that they were

9   there for any period of time of course because I was not

10  there.  But the fact that you came into my guard gate

11  at -- let's check this thing one more time.  The fact

12  that you came in the guard gate at 6 -- whatever time it

13  was.

14      Q.   "B" was there at 6:15, and M**REDACTED** was there at

15  8:50 --

16      A.   I don't know if they were there.  I mean,

17  again, I'm sure you have your means of going and pulling

18  cell phone stuff.  I just don't know that they were

19  there for more than ten minutes.  I don't know, maybe

20  K**REDACTED** got there and left.  So I'm not going to

21  speculate on any of that because I don't know.  The fact

22  is, I mean -- and the context of would you have let

23  Joe -- if Joe Ellicott had said, Hey, my girlfriend

24  wants to bring your roommate over.  Is it cool?  I said,

25  Hey, I'm not going to be there but sounds good.  That is

1  probably the conversation I had.  I don't remember that

2  going that way at all, but I just remember very

3  seriously understanding that Joe was in deep love with

4  this K[REDACTED] woman, and he was ready to go.  He was like

5  reedy to make the move.  He saw his unborn children in

6  her eyes, white picket fences, and the dream.

7      Q.    You sat through the deposition of K[REDACTED]

8  M[REDACTED], correct?

9      A.    I did.

10     Q.    And when I asked her about when she first got

11 to the house and she said she was given a tour by Matt

12 Gaetz and they went upstairs and looked at a room that

13 had a tanning bed in it and then had sex.

14         Do you recall that?

15     A.    I do.

16     Q.    Okay.  Back in the summer of 2017, you did, in

17 fact, have a tanning bed on the second floor, correct?

18     A.    It wasn't plugged in.  Someone paid me --

19 someone owed me money.  And instead of paying me, they

20 gave me a tanning bed because you can tell by my

21 complexion I'm not much to tan.  So we never plugged it

22 in.  It required a fancy electrician plug, and I winded

23 up giving it away.

24     Q.    But it did exist in the summer of 2017?

25     A.    I think so.

1      Q.   Are you contesting that K█REDACTED█ M█REDACTED█ was at

2   your house?

3      A.   No.

4      Q.   You believe she was there?

5      A.   K█REDACTED█ M█REDACTED█ was the girlfriend Joe Ellicott.

6   It is entirely plausible to me if Joe would have said,

7   Hey, you know, I'm going to come by later.  Is it cool

8   if she goes to hang at your house if Matt was there, if

9   Matt's not there, whatever the circumstance was.  I

10  mean, I probably would not have said no, you can't do

11  that.  I treat my friends and their women like family.

12  I'm very warm and welcoming.  I don't -- there would

13  have been no part of me that would have said no.

14          Now, I would never have expected that that

15  woman would have come off a website -- or I guess

16  K█REDACTED█ didn't off the website, but that she would be

17  traveling with an underaged whatever Judge Presnell

18  called them.  Essentially a prostitute, you know, going

19  around having sex for money.  That I -- I hate to say

20  this, but if you're using your -- sort of forecasting

21  what bad things can happen, it's kind of tough to

22  imagine that.  I don't...

23          (Exhibit 119 was marked for identification.)

24  BY MR. PERKINS:

25      Q.   All right.  Back to K█REDACTED█ M█REDACTED█, next

```
 1   exhibit, 119.
 2           You have seen this video before, Mr. Dorworth?
 3      A.   Yes, going through your discovery.
 4      Q.   When is the first time that you saw that?  Was
 5   it through my subpoena to Ms. M█████████?
 6      A.   Yes.
 7      Q.   The government never showed you this?
 8      A.   No.
 9      Q.   I'll play you this clip here.  That's your
10   house, correct?
11      A.   Yes.
12      Q.   Are you contesting the authenticity of that
13   video at all?
14      A.   No.
15      Q.   Do you believe that Ms. M█████████ was in your home
16   at that time going down from the second story to the
17   first story?
18      A.   I mean, it predates AI.  And, I mean, again,
19   the context of this is this my friend -- and, again, Joe
20   and I, we became friends.  Like he -- when he discovered
21   that Ms. M█████████ was involved in some less than
22   heartwarming sexual things, he called me to come make
23   sure that -- to seek my advice and counseling.  He was
24   basically crying at the table.  He was devastated.  So,
25   yeah, if he would have said, Hey, is it cool with you if
```

1  my girlfriend comes and hangs out with him -- and,

2  again, I don't know why -- the things I don't know the

3  answer to because I wasn't there.  I don't know where he

4  was until 11:15.  I don't know -- I mean, I don't know

5  what the deal is with that.

6          It's kind of a late time, and it wasn't like he

7  worked at a movie theater or something like that where

8  he would get off at that time.  I don't know what was

9  going on there.  And, again, I don't know.  I had a

10 tough time believing that if Eric Foglesong was there

11 Matt Gaetz was there, but Fish said -- maybe Fish -- but

12 then they claimed things happened with Eric Foglesong.

13 So, again, there is just no scenario in the world where

14 I believe that Matt Gaetz and Eric Foglesong were both

15 there doing these things at the same time because they

16 would stay far the hell away from each other.

17     Q.   Have you discussed the July 15th gathering with

18 Mr. Foglesong?

19     A.   I don't think so.

20     Q.   Do you recall in the course of the deposition

21 of K[REDACTED] M[REDACTED] where she was discussing some alone

22 time with you?

23     A.   Yeah, I have never --

24     Q.   And she said that you flirted?

25     A.   Well, first things first, she did her

1    interrogatory where the -- Laura Wolf and Chris, they

2    sent a PI out to talk to her.  She gave an accounting

3    for how that went.  That was not mentioned anywhere in

4    that document.  Then she comes in here, and I don't know

5    if she was just feeling the crowd or whatever, but

6    claimed that I did that.  I most certainly would not

7    have grabbed the crotch or anything like that of one of

8    my buddy's and client's girlfriend.  It did not happen.

9    It never happened.

10            I have never laid a finger, pinky finger, or

11   anything else anywhere on the body of K[REDACTED] M[REDACTED]

12   ever.  There is no -- nothing -- I don't think we ever

13   even shook hands.  Maybe a side hug to say hello or

14   goodbye, but there would be -- there was no physical

15   contact with her whatsoever.  And if I would have seen

16   somebody doing that to my buddy's girlfriend, I would

17   have thrown that person out of the party.  That is not

18   how I roll, and that would never take place.  Again,

19   mind you, in his mind this is the future Ms. Joseph

20   Ellicott, just a matter of getting a registry complete

21   and everything else.  He did not know that two weeks

22   later he would find --

23       Q.   Do you think that was a case of mistaken

24   identity with Ms. M[REDACTED] being confused about you and

25   Mr. Ellicott?

1    A.   I think Ms. M[REDACTED]'s just lying.  I think she

2    pointedly lied.  I think she lied a lot of that stuff.

3    I think she tried to back up her best friend who says

4    she's been best friends with since she was 14 or 15

5    years old.  I think that K[REDACTED] has more exposure in

6    this than any other person because she admitted to doing

7    all those things.  I think she would say and do whatever

8    her best friend asked her to do, and I just think it's a

9    straight up lie.  And the fact that her own testimony

10   conflicted with "AB"'s, it just -- these are women who

11   are -- for not noble reasons are trying to write

12   themselves into a history that did not exist.

13   Q.   Going back to that October 4, 2021, Mr. Hornsby

14   letter, we talked about this earlier.

15        Do you recall that?

16   A.   Yes.

17   Q.   On page four of 28, it says, You provided me

18   with a number of text messages between Mr. Dorworth and

19   Joe Ellicott that show Mr. Ellicott texting Mr. Dorworth

20   at 11:14 p.m. on July 15, 2017, asking to be let into

21   the community, and Mr. Dorworth responding he notified

22   the gate house.

23   A.   I have never seen this.  He says he provided

24   it, but I -- again, my understanding of this phone

25   conversation was that when Richard Hornsby called to

1  say, Hey, it's been months and we have not heard

2  anything from you guys.  Is there anything else?  And

3  they said, We've moved on from believing that

4  Mr. Dorworth was involved sexually -- but I'm not trying

5  to paraphrase them.  I was not on this phone call.

6        But the gist that Richard gave to me was that

7  they said, Hey, we're not looking at your guy anymore

8  for doing anything inappropriate sexually.  Now we have

9  moved on to potential justice by an obstruction.  On

10  that phone call -- and, again, Richard, you know, I

11  asked him, I said, Did you see any of this stuff?  He

12  said, I didn't see anything of these things.  They

13  didn't provide us copies of it.  It was him talking to

14  Todd Gee, and Todd Gee warranted a few things to happen.

15        So I have not seen them.  I don't know about

16  this.  I have no -- all this means to me is the feds

17  said, oh, yeah there was texts between -- and again,

18  very possibly maybe he called me and said, can you let

19  me in?  Again, if Joe Ellicott asked me to be let in the

20  neighborhood I would do it.  And if he called me up and

21  said, Hey -- if I'm awake, I would have done that.

22  There is no part in my mind that thinks that I wouldn't

23  have done that.  I just don't know.

24     Q.  Did you, in fact, text with Mr. Ellicott on the

25  evening of --

```
 1      A.   That's what I'm telling you.  I have no
 2 recollection of it.
 3      Q.   Is it possible?
 4      A.   Sure.  Again, I just told you.  It's very, very
 5 possible.  If I would have gotten a phone call from Joe
 6 Ellicott or a text message saying, just trying to go
 7 through your gate because you didn't answer the phone, I
 8 would have said, give me one second.  I'll add you onto
 9 the gate.  That is how I would have responded to that
10 situation.
11           (Exhibit 120 was marked for identification.)
12 BY MR. PERKINS:
13      Q.   Next exhibit will be 120.  This is a text
14 message -- or a Snapchat message that we've discussed
15 previously in some depositions including Mike Fischer
16 and K█████ M██████
17           Do you recall that?
18      A.   Yep.
19      Q.   And that's a picture of Joe Ellicott, correct?
20      A.   Correct.
21      Q.   At the top.  And it appears Mr. Ellicott's
22 saying, I'm going to try to hook Fish up for later right
23 now.  Gonna see what I can do.
24      A.   I have seen this before.  I have never had
25 Snapchat, first of all.  I don't see where -- I don't
```

1  believe I ever had this conversation.  I have never paid

2  for any guy to have sex.  Not no friend of mine, no

3  friend ever.  Mike Fischer makes a nice living.  I'm

4  also not -- I don't want to violate the man's privacy,

5  but I think he had like this severe whole hip

6  replacement which at his age and health, I'm not even

7  positive that's on there.

8          At no point in time did I try to have any of

9  these conversations.  And the fact that -- I don't even

10  know what that is.  It looks like a conversation, but

11  what even says it's from me.  It's just him, and that's

12  not even totally clear to me how he did this because I

13  Snapchat the whole thing was that you make it disappear.

14  So I don't know.  I don't see anything on there that

15  indicates that I did any -- it just -- and that's July

16  18th.

17      Q.   Well, this is July 16th.  You see that right

18  there?

19      A.   So that one's -- yeah.  But again --

20      Q.   So the next day --

21      A.   My question is this:  I have never had

22  Snapchat, but my understanding is the things disappear

23  in a day.  How does he have a text four years later?

24      Q.   Well, K REDACTED   M REDACTED  produced this.

25      A.   Right, but, I mean, how?  Did she screen

1    capture it.

2        Q.    It looks like a screenshot.  I think that's

3    what she testified to.

4        A.    Again, I believe that K̲REDACTED is not the most

5    honest person in the world, but I'm just telling you

6    right now that there is nothing in that says I ever did

7    this nor would I.  Again, if I would have said, Hey,

8    Mike Fischer, let me do this for you, do this kind of

9    thing, it would have been a very uncomfortable, negative

10   energy.  That did not happen.  That did not happen.  And

11   I don't -- listen, it's not clear to me here because it

12   looks to me and I just call BS on it because I know for

13   a fact that you've already seen in the things that I've

14   turned over, Joe believed that she was his girlfriend.

15   Why would he be calling the girl he wanted to marry and

16   say that I was willing to pay 500 bucks to have sex --

17   for her to have sex with Mike Fischer?  I just -- the

18   whole thing just defies any sort of --

19       Q.    Are you saying that you did not respond to it,

20   I'll cover 100 percent --

21       A.    Yes, I did not ever --

22       Q.    You're saying that's not your text?

23       A.    No.  I did not do that.

24       Q.    Have you ever offered to pay a woman to have

25   sex with a third party?

1     A.    No.

2     Q.    Have you ever offered to pay a woman for sex

3 for yourself?

4     A.    No.  I've never paid for sex unless you count

5 alimony.

6     Q.    Let's talk about the deposition testimony of

7 Ms. "B."  You sat through that testimony.  Ms. "B"

8 talked about a volcano bong.

9           Do you recall that?

10    A.    Yes.

11    Q.    Do you have a volcano bong?

12    A.    I do.  It's not exactly a secret though.  I

13 mean, I'm sort of like the -- I mean, I'm big -- you

14 know, I've had it for a long time.  I've had it since

15 when I got out of the legislator in 2012 or 2013.  So, I

16 mean, when she said I was big into -- that doesn't

17 pencil because that is something I have had for four or

18 five years, and she described it as new.  I just thought

19 that people are aware of the fact that -- probably Joel

20 said, he's got a volcano on his back patio, and that's

21 all they needed to try to make that seem like it was

22 anything.

23    Q.    So you had that volcano bong in the summer of

24 2017, correct?

25    A.    It's not a volcano bong.  It's a volcano

CHRISTOPHER DORWORTH                                    August 06, 2024
DORWORTH V. GREENBERG                                              343

1  vaporizer.

2       Q.    Vaporizer?

3       A.    The technology behind it is if you burn in a

4  bong, a traditional bong, you would burn the flower, and

5  that would create all of the things that you suck down

6  into your lungs and all of those things.  A vaporizer

7  lifts the THC off the leaf, and then the volcano then

8  uses the air flow to blow it into a balloon which makes

9  it much smoother and easier to use.  It is pretty widely

10  accepted to be that sort of preeminent means by which

11  somebody can smoke marijuana -- or vape marijuana I

12  guess would be...

13       Q.    When I was going through your Wells Fargo Bank

14  records on page 15 of 19, I noticed that there was a

15  purchase there from Apothecary for Marijuana for

16  $348.68.

17       A.    Which one?  Where is this one?

18       Q.    Let me pull it up here.

19       A.    I'm sorry, 348, yeah.  Sure.

20       Q.    Right.  $348.68, was that for marijuana?

21       A.    No.  It's for a little -- an apothecary makes

22  these -- they made a little thing.  It's called a

23  candor.  It has little jars, and it's a device.  It's a

24  place where you keep ground up flower and rolling papers

25  and anything else you might want.  I don't know how

1  exactly you would purchase that online.

2      Q.   Do you ever have memory loss from the use of

3  marijuana?

4      A.   No.

5      Q.   What about from the use of alcohol?

6      A.   Define memory loss.  Do I ever have too much

7  one night and forget, I'm pretty good about that.

8  I'm -- my wife what not call me a -- whatever she called

9  me, however she referred to my drinking skills.  I have

10 a good memory.  Has it ever happened in my life?

11 College, I imagine, but I don't black out if that's what

12 you're asking.

13     Q.   What about fuzzy memories after a night of

14 drinking?  Do you ever have that --

15     A.   I have a pretty acute memory.  As you can see,

16 I don't equivocate on my words.  I know what it was, and

17 I'm not saying it's -- I have never had that happen.

18 I'm saying that I cannot sitting here right now think of

19 an example of that that would fit the four corners of

20 what you just described.

21     Q.   Would you agree with your wife that you're a

22 world class drinker?

23     A.   Those are her words, not mine.  I think what

24 she means by that, my wife was raised in a very devout

25 Southern Baptist home.  She was thought at alcohol is

1  just fundamentally evil, and it causes people to do bad

2  things.  In her childhood, you weren't not allowed to go

3  over to a friend's house if they had open bottles of

4  alcohol out.  So much of when I first met her, she told

5  me, I don't drink much.  I said, It's okay, I'm not

6  looking for a drinking buddy.

7        But, you know, she -- so part of what it is

8  obviously, I -- anybody who has ever been married before

9  and in a relationship before knows that oftentimes your

10 wife or your girlfriend might have an opinion on what

11 you're drinking was.  With Rebekah it was just always

12 that she noticed that I do not have a change in

13 personality.  I don't get violent.  I don't get sloppy.

14 I don't get drunk.  I don't walk out on my bar tab.  I

15 don't get in fist fights.  I don't yell at my kids.  I

16 don't yell at my wife.  I mean, I'm just a very level

17 personality type.  I've always been that way.  And those

18 people, if I drank -- you know, if I spent all day at a

19 Twin Peaks or a Liam's and had a $300 bar tab, I doubt

20 you could probably tell.  I mean, I don't -- there is

21 very little personality change.  There is just very

22 little --

23      Q.   Do you ever have hangovers?

24      A.   The older you get, the more they come.  I --

25 what I have -- when I get a hangover I don't sleep well.

CHRISTOPHER DORWORTH                                    August 06, 2024
DORWORTH V. GREENBERG                                                 346

1  So the answer to your question is I don't get hungover,

2  but if I drink alcohol to excess, the idea that I'm

3  going to get any sort of rim sleep that night is low, so

4  I tend to be tired the next day which dissuades me from

5  drinking as much as I used to.

6       Q.   And is your drink of choice bourbon?

7       A.   Bourbon and water or vodka.

8       Q.   And let me try to play this clip of Ms. "B."  I

9  know we had some technical difficulties last time

10 because I think this was on.  Right?  If I press this,

11 and I'm going to play this clip here where she's

12 describing the interior of your home.  Let's see if it

13 works.

14           (A video clip was played.)

15           (Exhibit 121 was marked for identification.)

16 BY MR. PERKINS:

17      Q.   All right.  Were you able to hear that

18 testimony --

19      A.   I was.

20      Q.   -- from Ms. "B."  And I'll mark for the record

21 as Exhibit 121, and she described your house as she saw

22 it on July 15, 2017.

23           In the summer of 2017 was there a bathroom near

24 the pool?

25      A.   There is --

1           MR. ANDRADE:  Object to form.

2           MR. PERKINS:  Go ahead.

3           MR. ANDRADE:  Yeah.  Object to form.  I don't

4     believe she testified the date that she was there

5     exactly what she was describing other than the

6     house.

7           THE WITNESS:  I don't have a screened glass

8     door at my house.  I don't know what she's talking

9     about.  That description of my house does not

10    particularly match how it is, no.  There is a --

11    there was a gym upstairs.  That was established.

12    There is no bedroom in my home other than my room

13    that can see the pool.  So you would have to be

14    taller than -- you would have to be taller than me

15    to look over and see out into it because it's just

16    most of them have -- there is like a window that's

17    up high.  So I disagree with that characterization

18    of the house.

19          You know, we had two chairs facing each other,

20    a piano.  There is a -- there is no sliding glass

21    door, but on the far side of the house there is a

22    door that goes outside but it's not sliding.  It's

23    an open and shut door.  There is a pool table in the

24    living room and was at that point in time.  There is

25    a full bar in that living room, and it is -- I

1    bought John Morgan, the trial lawyer's, old house.

2    He built the bar.  I can assure you because I think

3    it's a ten by ten -- it's a very large bar with

4    dozens of things there.  There is a TV in the living

5    room.  So, I mean, her characterization of the place

6    is not --

7  BY MR. PERKINS:

8    Q.   Was there an air hockey table in 2017?

9    A.   There was an air hockey, but it was not in the

10 living room.  That was in a side room.

11   Q.   And there was a gym upstairs, correct?

12   A.   There was a gym, yes.

13   Q.   And your testimony is that you could not see

14 the pool from the upstairs bedroom except for the master

15 bedroom?

16   A.   Yes.  I mean, you could do it.  You would have

17 to be very tall.  You would have to probably get

18 something to step on to look through a window to go

19 down.  When I hear this, I have this overlooks things.

20 There is no view --

21   Q.   Could you stand on a bed and see it?

22   A.   The beds are never against the wall.  So I

23 guess if you shoved the bed over there, you might be

24 able to do that.  But the beds in my house were all

25 centered against the wall.  There is none up against the

1  wall.  There might be one room where there is like --

2  again, you know, I would have to go check it out, but I

3  don't think of any of the rooms in my house as being

4  particularly conducive to looking at the pool.  I mean,

5  so I don't really know what she's talking about.

6      Q.  Do you think Ms. "B" was in your house on July

7  15, 2017?

8      A.  I think she was on the guard gate.  I won't go

9  any further than that.  Mike Fischer didn't see her

10  there.

11      Q.  How would she know there was a gym --

12          MR. ANDRADE:  Object to form.

13          THE WITNESS:  K[REDACTED] M[REDACTED].  K[REDACTED] M[REDACTED]

14      said that too.  For that matter, you know, the

15      volcano, that could be Joel.  I mean, these are

16      not -- the woman couldn't tell me what my vocal

17      accent sounded like, if I talked fast, if I talked

18      like a southerner.  She couldn't name any of those

19      things.  She kind of miss-described my home.  She

20      described a sliding glass door that never existed.

21          You know, do I think that she was at the guard

22      gate, she was on the guard gate that day.  Do I

23      think if she came in the house?  Well, Mike Fischer

24      during his testimony said no.  K[REDACTED] M[REDACTED] I

25      believe to be a liar and has lied extensively, and I

```
 1        have had nobody else confirm to me that she was

 2        there.  So again, I don't know if "AB" was at my

 3        house.  I know she is on the guard gate.

 4   BY MR. PERKINS:

 5        Q.   And M█REDACTED█ said she was there, Greenberg said

 6   she was there, correct?  Ms. "B" said she was there --

 7        A.   I've never heard Joel say that.

 8        Q.   Well, you've seen his interrogatories --

 9        A.   Well, I mean, I believe he said that, but I

10   don't think Joel was there.  Joel was never on the guard

11   gate.  Joel didn't live in the neighborhood at the time.

12   So, I mean, if Joel said she was there, how do you prove

13   Joel was there?  Joel lived -- at the time, he lived in

14   a townhome with Abby.  His road backed up to Orange

15   avenue in a townhome in the back of the neighborhood.

16   Every time he went through the guard gate he had to

17   throw a driver's license down and everything else.  He

18   didn't that day.  So I don't know that Joel was there.

19        So I'll disqualify that one as saying I don't

20   know how that you can prove that Joel was there because

21   there is nothing on there.  I know that Mike Fischer

22   gave you testimony that he did not see those girls.  You

23   asked them every which way you could ask him.  Is it

24   possible he was asleep?  Could he be somewhere else?

25   Things like that.  I don't -- I think Mike Fischer was
```

1   at my house.

2          And, again, as far as these whether these

3   women, I have not heard from E[REDACTED] G[REDACTED] on that one.

4   But, you know, as far as I'm concerned, the source on it

5   right now is Joel who wasn't even there and K[REDACTED] who,

6   you know, knew that she was underage and was ostensibly

7   going places to watch her have sex or to engage in that

8   which is the very pure definition of human trafficking.

9   So between a human trafficker, a convicted human

10  trafficker, and Joel, those are the only people that are

11  saying she was at my house that day.  Other than the

12  guard gate who said that she went through the gate.

13      Q.   A guard gate that shows a tag that is

14  affiliated with her mother's vehicle, right?

15      A.   It's her name.  It's her driver's license.

16  They don't take your word on it.  I have had

17  circumstances with a friend of mine, Scott Plakon, who

18  was a State rep.  He drove over to my house, he got an

19  RV, he wrapped the entire damn thing in his face.  Scott

20  Plakon for Florida House.  Big picture of Scott's face

21  ten feet wide.  And he pulls up to the guard gate and he

22  was driving his RV so he didn't bring his driver's

23  license.  They made me drive -- they made me go up

24  there, jump in the car, and drive him through the gate.

25  These are -- they are -- the Heathrow -- they are very

1   serious about their job.

2           So, yeah, I mean, she went through the guard

3   gate.  They do not show you a picture of her driver's

4   license.  Are you aware that this person is going in

5   here which I think you asked questions about that.  Like

6   did they show the real driver's license?  I have a high

7   level of confidence that "AB" went through the guard

8   gate.  You asked me if she was at my house, how long she

9   was at my house, do I think she did anything at my

10  house?  I have a picture of K REDACTED  M REDACTED  at the house,

11  but I don't have an issue with K REDACTED  being at the

12  house because K REDACTED  was dating Joe Ellicott who came

13  over later that day.

14          And, again, I don't know the circumstance, but

15  my guess is probably Joe had something going on.  He

16  said, is it cool if she goes over there and hangs out

17  until I get back?  That would make sense.  Nothing else

18  makes sense.  And whether or not "AB," I do not know, I

19  would not be okay with that.  If I would have seen the

20  woman who was reflected on that screen, if she would

21  have been at my house, I would have seen her and said,

22  Hey, listen, I don't mean to be rude here, but if you're

23  going to drink, can I see some ID?

24          I did not do that.  I did not se her.  I never

25  met her.  I don't know why she was there, and who got

1  her there.  Makes sense under one scenario, and that is

2  that Joe Ellicott who stated and as you can read in

3  those -- the proffers, I mean, like he thought she was

4  his girlfriend.  So I don't have any objection, I have

5  no guilt, no reservation, no hesitation about saying

6  that K█REDACTED█ M█REDACTED█ can be at my house.  It's very

7  possible because she was --

8       Q.   Why would you have asked for Ms. "B's" --

9       A.   Because she looked like she was young.  The way

10  they describe this woman, at the time she used to have

11  braces and everything.  If there had been a woman at my

12  house trying to drink or -- like who had braces on.

13  Trust me, I've been in elected office.  I know how this

14  thing can go.  I would not have been okay with that.  I

15  would have been very proactive in combatting that.

16       Q.   Did you hear Ms. "B"'s testimony that you

17  observed her dancing naked?

18       A.   It's all 100 percent guaranteed lie.  I didn't

19  meet her.  She said I was here.  You know there is

20  metadata to the contrary.  I mean, all those things that

21  she said happened, it's just all lies.  She's making

22  this stuff up; and, again, I get it -- under the theory,

23  under the notion that maybe it's somebody else, well,

24  was Joe there?  Did he come back later?  How'd that go

25  down?  I don't really understand.  I wasn't there.  I

1  can't -- it would be speculating.  I mean, I'd be trying

2  to come up with stuff that is -- it would just be me

3  trying to figure out how to fit all the pegs in a hole.

4  The reality is that I would not have been okay with a

5  person young -- that young looking who had braces going

6  around my house drinking or anything else.  If nothing

7  else, from an insurance point of view.

8        If something like that happens and something

9  happens to her, then we could be sued, and that would

10  not be a good lawsuit to have.  So, I mean, that would

11  have been very unsettling to me if I had seen someone

12  who -- again, she doesn't have braces anymore, but

13  through some of her film work, she had -- I don't know

14  when she got the braces.  I don't know if she had braces

15  back then.  I have no clue.

16     Q.  And you heard her testimony that she said that

17  you observed her and Matt Gaetz having sex on the air

18  hockey table?

19        MR. ANDRADE:  Object to form.

20        THE WITNESS:  It's a total absolute lie.  At no

21     point in time did that happen.  First of all, if

22     that did happen -- for that to happen, I would have

23     to have had to walk into a back room and known they

24     were back there.  And then according to her, I made

25     some jokes about it when I didn't do any of that.

```
 1        It's nonsense.  It's just her lying her way into a
 2     story to try to make it seem like something happened
 3     but it's just not true.  I never saw -- I have never
 4     seen Matt Gaetz have sex with "AB" or anybody else.
 5     So you can -- you can -- of that we can be very
 6     comprehensive with our answer there.
 7            (Exhibit 122 was marked for identification.)
 8  BY MR. PERKINS:
 9     Q.   All right.  Next exhibit is some photographs of
10  some females that I have been showing to these
11  witnesses, Exhibit 122.
12            And we talked about that July 22nd party at
13  your house?
14     A.   Yes.
15     Q.   Do you recall that?
16     A.   Yes.
17     Q.   And K[REDACTED] L[REDACTED] is at page 11.
18            Do you recognize K[REDACTED]?
19     A.   Honestly, that's not what I thought K[REDACTED] L[REDACTED]
20  looked like; but, yeah, she looks familiar.  I think I
21  have met that person before.
22     Q.   And it's your understanding she took Brady
23  Benford's phone at that party?
24     A.   That is my understanding thinking it was Joel
25  Greenberg's.
```

1    Q.   And there was also discussion about L█████

2    P█████.

3         Do you see that blonde, page 13 of 20 of this

4    exhibit?

5    A.   She looks like somebody I went to college with

6    at the University of Florida with, but I don't think I

7    know her in this context.

8    Q.   Was she ever at your house in the summer of

9    2017?

10   A.   That would be news to me.  You described a --

11   was that in 2017 that she got in a fight with K█████

12   L███?

13   Q.   July 22, 2017, there was a fight between a

14   brunette and a blonde, K█████ L█████ and L█████ P█████,

15   and they knocked over a vase and Brady Benford's phone

16   was taken.

17   A.   It sounds like quite a night.  I have no

18   recollection of a broken vase.  Certainly wouldn't have

19   been an expensive vase or anything.  It might have been

20   something from like -- but I don't remember that, and I

21   don't know that person.  I don't know L█████.  I mean, I

22   might have met her at some point.  She might have been

23   somebody who was around, but I don't have -- let me put

24   it this way, I cannot tell you a defining

25   characteristic.  I could not say, like, I know where she

 1   is from.  Her face does look familiar, but that might be

 2   from a University of Florida thing.  I don't know.

 3        Q.    Do you know who invited K[REDACTED] L[REDACTED] to your

 4   house?

 5        A.    No. That would have been on the 22nd, right?

 6        Q.    Yep.

 7        A.    Well, nobody on that list makes a ton of sense.

 8   I don't know.

 9        Q.    You've got Frank Artiles, Jason Brodeur.

10        A.    She was part of the people who Joel would

11   detail as being his friends from the radio show.  Most

12   of these people were that.  Because, you know, when you

13   meet somebody new and they're married and they have got

14   young kids and they're hanging out with all these

15   people, you're like who are they?  What's going on here?

16   Are these family members?  Friends?  Are you guys in

17   some toastmasters?  What's going on?  Where are these

18   people coming from?  And his answer was always, Oh, no,

19   these are people who worked on my radio show.  And then

20   he gave them all jobs at the tax collector's office.  So

21   they were sort of introduced in the greater context of

22   that.

23            (Exhibit 123 was marked for identification.)

24   BY MR. PERKINS:

25        Q.    Moving onto the next exhibit will be 123.

```
 1   These are Lyft records that we were able to subpoena,
 2   and there is a reference there to K        L      .
 3          Do you see that?
 4      A.    Yes.
 5      Q.    And it was on the morning of July 23rd.
 6          Do you see that?
 7      A.    Sure.
 8      Q.    And it says 1545 Whitstable Court.
 9          Do you see that?
10      A.    That is not my address.
11      Q.    Do you recognize that address as being a
12   neighbor?
13      A.    Yes.
14      Q.    And who is that neighbor?
15      A.    I don't know.
16      Q.    Do you know their names?
17      A.    I don't know which house that is.  I don't know
18   if that's the one next door to me or across the -- I'm
19   1520, so how do you get to 1545?  I guess it would be
20   probably on the other side of the street because I think
21   one is even, and one is odd.  So I'm going to guess it's
22   either one of the other houses on the other side of the
23   street.  Sort of peculiar because you wouldn't -- if you
24   went to 1545 Whitstable Court, you wouldn't be able to
25   get in the gate.
```

1        So let's say the Uber gets there and they're

2   picking somebody up, they'd say, Hey, I'm going to 1520

3   Whitstable Court, and that would be for Dorworth.  And

4   then it's not clear to me -- again, I'm not an expert on

5   this, but I don't know how all these people kept going

6   to 1545.  If they did that, they wouldn't be able to go

7   into the neighborhood.  So it's kind of weird.

8        Q.  Yeah.  We issued a subpoena to Lyft for a

9   quarter mile radius of your house, and this is what we

10  got in response.  But it looks like the requested

11  address for pickup was 1545 Whitstable Court.

12       A.  Again, I don't -- that's the part -- but,

13  again, if they would have done that, they -- I have no

14  idea of how this works or how the internal GPS systems

15  for these things work, but it would just strike me as

16  odd because getting to 1520 Whitstable -- maybe not.  I

17  guess if these people are in the car picking them up,

18  the ride says finished, so they're being dropped off.

19  Maybe they said, Hey, just drop me right here, I guess.

20  But, I mean, they would have all requested 1520.  So

21  that doesn't make a lot of sense.  Again, just -- I

22  wouldn't -- nobody would have access to the 1545 thing

23  to let people in or not.  And if Jason Perkins is coming

24  over and he's going to 1545 and I call 1520, that's not

25  going to connect.  But, I mean, Frank Artiles.  I don't

 1   know what Owner Foglesong.  I know Eric Foglesong, and,

 2   again...

 3        Q.   M[REDACTED] Z[REDACTED], she appears on that log on July

 4   22, 2017.  You know Ms. Z[REDACTED], correct?

 5        A.   I do.

 6        Q.   How do you know Ms. Z[REDACTED]?

 7        A.   We've become -- over the years, she dated Matt

 8   for awhile, and she -- you know, she's -- she can wind

 9   up -- like when Matt made his -- Matt, they made a movie

10   about Matt.  It was like him and two other people, like

11   Drain the Swamp or something like that, some deal along

12   those lines, and she -- I think she and her fiance came

13   over.  I mean, they've been -- like Matt dated her for

14   awhile on and off, and then she got a boyfriend for

15   awhile and came back but now she's a with guy, and I

16   think they're either married or had a kid.  We bumped

17   into them at an ice cream shop a couple years ago.

18        Q.   When is the last time you had contact with

19   Ms. Z[REDACTED]?

20        A.   It was at the ice cream shop.  It was like,

21   Hey, how's it going?  I think she was pregnant at the

22   time.  We really didn't talk about anything, if that's

23   what you're asking.

24        Q.   Was she at your house on July 22, 2017?

25        A.   Again, that was the night -- I never saw her

1    there.  I never met her that night.

2        Q.   You think you had retired for the evening?

3        A.   Yeah.  But she got there very late.  I think I

4    woke up at something like 2:00 or 3:00 in the morning,

5    whenever K█████ L█████ was leaving.

6        Q.   Because there was a bunch of ruckus associated

7    with K█████?

8        A.   Well, I believe that the thing that actually

9    got me up was Brady who was pissed off that somebody had

10   stole his phone thinking it was Joel's phone.  I don't

11   ever recall having any sort of conversations.  I think I

12   met K█████ like, Nice to meet you.  She was introduced as

13   being part of something they were -- like something they

14   worked on together as friends.  And later we would find

15   out that she was deeply in love with Joel.  So that

16   was --

17       Q.   K█████ L█████?

18       A.   Yeah.

19       Q.   Have you ever seen M█████ Z█████ naked?

20       A.   No.

21       Q.   Have you ever seen her topless?

22       A.   No.

23       Q.   Have you ever seen her do any drugs?

24       A.   No.

25       Q.   Do you have any reason to believe that Matt

1  Gaetz had sex with M█████ Z███████?

2      A.   They dated.  I would not be -- I don't have

3  direct knowledge of that, but I believe they were --

4  like they would -- they were -- they were dating.

5      Q.   Have you ever had any type of sexual relations

6  with Ms. Z███████?

7      A.   No.

8           (Exhibit 124 was marked for identification.)

9  BY MR. PERKINS:

10     Q.   All right.  The next exhibit here will be 124.

11 This is an April 3, 2020, text string between you and

12 Mr. Greenberg.

13          Do you see that?

14     A.   I do.

15     Q.   All right.  And it looks like Mr. Greenberg

16 texts some Pornhub address there?

17     A.   That's what it looks like to me.

18     Q.   Is it ses, █████ was destined for greatness; and

19 you respond, LOL; is that right?

20     A.   Yes.  I don't think I ever even clicked on the

21 link, by the way.  I think he just sent it.

22     Q.   Why did you respond LOL?

23     A.   That's about the most benign response you can

24 have.  Joel would send a lot of weird things.  I mean,

25 he, as a person, would sort of inundate you and just

1    find things -- the best way to deal with him was not to
2    try to like, Joel.  You just sort of move on because if
3    he thought he was getting any sort of response, he'd
4    sort of -- he'd keep texting.  So, I mean, I think that
5    was probably my way of just saying I have no interest of
6    talking about this, Joel.  Let's move onto other things.
7    As you could see, I said, LOL, and five hours and 53 --
8    five minutes later, moved onto other stuff about
9    politics.
10       Q.   Why didn't you respond, Who's [REDACTED]?
11       A.   Because I don't care who [REDACTED] is.  I didn't
12   know who she was.  He posted her up there.  I didn't
13   know if that was for my benefit or Matt's.  When
14   somebody posts a link to a porn star and says, I knew
15   they'd be a star or whatever, whatever the thing was, I
16   mean, that's an LOL.
17       Q.   Is it your testimony that at the time this text
18   was sent by Mr. Greenberg on April 3, 2020, you did not
19   know who [REDACTED] was?
20       A.   No.  No.  I mean, by April 3, 2020, I became
21   aware of the fact that -- I just didn't know it was --
22   there was an "AB".  I knew her as V[REDACTED] 99, but I
23   knew -- for example, I told you the story about how
24   Halsey Beshears had gone to the Bahamas and got stopped
25   on the way back.  I knew it was K[REDACTED] -- K[REDACTED]

1  M█████'s -- I thought was roommate.  But, you know, I

2  thought it to be the same person.  I could not have told

3  you her name was "AB."  I could not have told your her

4  name was "A."  I could not have told you her last name

5  "B." I couldn't tell you her nickname was █████.  I sure

6  as hell couldn't have told you what her thing was, the

7  V█████ 99 thing that he tried to text me when he was

8  trying to get us all lawyered up because he had started

9  doing that stuff.  Again, I --

10      Q.   So you knew this person existed in April of

11 2020?

12      A.    I probably couldn't have spotted her out of a

13 lineup, never had any dealings with her, but I knew that

14 K█████ M█████ had a roommate, and I think -- I was at

15 least aware of the story about when they went to the

16 Bahamas.

17      Q.   And did you know that she was a minor in the

18 summer of 2017?

19      A.    I don't think so.  I don't know how I would

20 know that, no.

21          (Exhibit 125 was marked for identification.)

22 BY MR. PERKINS:

23      Q.    Next exhibit, 125.  This is the link that was

24 connected to that text message, █████ destined for

25 greatness, and you see R█████ R█████ there?

1    A.   Yes.

2    Q.   And that is "AB," correct?

3    A.   That looks like the one -- like I said, she had

4  a cardigan on when she was here, but same general

5  aesthetic.

6    Q.   And have you investigated R̲[REDACTED]  R̲[REDACTED]?

7    A.   Yes.

8    Q.   And what did your investigation entail?

9    A.   Well, with my previous counsel, he didn't -- he

10  was not comfortable with looking at this stuff.  So he

11  said, Do me a favor, just run through the videos -- and

12  the other one he worked with was a female and didn't

13  feel comfortable with that.  So he asked me if I

14  wouldn't mind going through the videos -- mind going

15  through the videos just to see what was in there.

16    Q.   When Greenberg sent you the link, its your

17  testimony you didn't click on that?

18    A.   I don't think so, no.

19    MR. ANDRADE:  Just really quick, about how much

20    more time do we have?  What record time are we at

21    right now?

22    THE VIDEOGRAPHER:  A little over 58 minutes

23    since we have gone back on the record.

24    MR. ANDRADE:  So like 15 more minutes?

25    MR. PERKINS:  We can stop at 5:20.  Does that

1     work?

2   BY MR. PERKINS:

3     Q.   Okay.  So when Greenberg sent you the link,

4   it's your testimony you don't recall clicking on it?

5     A.   Again, as a general policy I do not click on

6   porn links.  Again, I don't -- one, I have an

7   understanding again -- remember, I used to work for

8   Ballard Partners, and the -- we were very keen on the

9   fact that we would represent nations and were a frequent

10  victim of cyber hacking.

11          And one of the key lessons of that was that you

12  would not want to click on anything that was a porn link

13  because those things basically all had nasty, little

14  tentacles and the things you do not want to have.  The

15  best case scenario is you would have what I think they

16  call a cookie or something like that that would be a

17  tracking thing on there.  So I, as a general rule,

18  just -- you know, if someone sends me a link from

19  Pornhub, I don't open it.

20    Q.   In August after Joel was indicted for

21  activities with these women, is that the first time that

22  you went online and searched for --

23    A.   The first time I actually -- I found her

24  before, but I had never watched the videos.  It wasn't

25  until Michael Beltran asked me to do it that I did that.

```
 1        Q.    Okay.  So you found her in August of 2020?
 2        A.    Yes.
 3        Q.    And you got her stage name, REDACTED REDACTED, in
 4   August of 2020?
 5        A.    Well, I mean, apparently Joel had given me all
 6   this stuff to the point is I -- that text message was a
 7   total nonfactor in my day.  You just read, LOL, move
 8   right on.  This is just Joel doing what he does.  I
 9   would have paid no attention to -- I would have not had
10   any reason to care about her.  I would not have known --
11   there would not be one part of me that though, Oh, wow,
12   this is the one who -- I mean, I didn't know that Joel
13   had sex with anyone who was underage.  I didn't know
14   that Joe had sex with her when she was underage.
15             I didn't know any of that stuff.  But, you
16   know, when I watched it, I just went on there and just
17   found some truly disturbing stuff.  I mean, it was not
18   like Cinemax, like some light point.  It's really
19   graphic, horrible things.  And I'm not a porn guy, but
20   my understanding from the research I did there with that
21   stuff is that she does the stuff that's like wet work,
22   and then she will frequently do things that are just
23   utterly repulsive.  Like she will put milk in her butt,
24   and then have an enema on top of cereal and take a video
25   of it.
```

1          And I was -- remember reading it, and I would

2   see these people saying -- in the comments on her social

3   media saying, You go, girl.  You know, Earn -- it was

4   just a very unsettling, very unpleasant thing.  You

5   know, I mean, she -- it was just -- this human being --

6   you know, like I said, it's not some sin-a-max after

7   dark kind of thing.  It is a -- it is very gratuitous,

8   hard core pornography.

9          (Exhibit 126 was marked for identification.)

10  BY MR. PERKINS:

11     Q.   All right.  The next exhibit will be Abby

12  Greenberg's answer to interrogatories, Exhibit 126.

13          You see those up on the screen?

14     A.   I do.

15     Q.   I'm going to ask you a couple questions here.

16  There is a discussion here on June 4, 2020, do you see

17  that, about Abby Greenberg having a girls night dinner

18  at the Vineyards at Lake Mary.  Came over to Liam

19  Fitzpatrick's with Anne Pham.

20     A.   Yeah.

21     Q.   And it was Anne Pham and Ms. Greenberg, and

22  they ran into you at Liam's and then you talk about a

23  party and took them home.

24          Do you recall that?

25     A.   I remember taking them home -- I remember I

1  drove the two of them home.  I don't remember going to
2  any party.
3      Q.   Do you remember dropping off Anne Pham?
4      A.   I do, and then Abby just like ten seconds
5  later.  They lived on the same street.
6      Q.   Did you take Abby back to your house first?
7      A.   Yeah, I read this.  I don't know what she's
8  talking about.  There was no party at my house.  There
9  would be no party at my house.  I don't -- it doesn't
10 really -- I almost -- I don't know what this is about.
11 I never had any kind interaction like that with Abby.
12     Q.   Okay.  It's your testimony that you did not
13 take Abby Greenberg to your house at 1520 --
14     A.   No.
15     Q.   -- on June 4, 2020?
16     A.   I don't remember June 4, 2020.  I don't know
17 what day that was.  There was one day that I ran into
18 Abby and Anne Pham, and they were with like ten other
19 people.  And the other girls -- I don't remember what
20 the circumstance was; but for some reason Abby and Anne
21 were done for the day, and I think the other ones were
22 maybe going out.  Whatever it was, they asked me if they
23 could get a ride home.  I said sure.  And I just -- I
24 said there was a party at my house, we went back there
25 and Abby requested -- I don't -- it doesn't really...

1    Q.    But your testimony is you dropped them both off

2  at their individual residences?

3    A.    Yes.  Was that June 4, 2020?

4    Q.    Correct.

5    A.    So that would have been like the week before

6  Joel got indicted.

7          (Exhibit 127 was marked for identification.)

8  BY MR. PERKINS:

9    Q.    All right.  The next exhibit, these were some

10 texts that were discussed in the deposition of

11 Ms. Dorworth.

12         Do you recall that?

13   A.    I do.

14   Q.    And I wanted to ask you about page seven of

15 eight of this text string.

16   A.    This is where you guys forgot to put the matzo

17 ball -- omitted the slide.  I remember that.  It was

18 very dramatic.

19   Q.    And specifically I wanted to talk about this

20 reference to J█ an L REDACTED .

21   A.    I want to go back on this thing because I

22 remember reading this when the time came.  It is very

23 clear that I want to go out and hang out with my friends

24 at FishBones.  I even say to Joel, my wife is out of

25 town, I don't want to -- I don't want to...  And so he

1  keeps trying to talk about this when I have no idea --
2  like who?  I don't know who they are.  I have never met
3  them.  I don't if it's J█ and it's that L REDACTED that
4  you -- I don't know who that is.  Nobody is on my guard
5  gate, and I was -- I got back at 11:30.  I was with a
6  sitting circuit court judge.  There were no girls there,
7  none of that stuff.  So I don't even know what this is
8  trying to intimate.  If you read the entire thing, it is
9  me being like, what are you talking about?  The girls.
10  I have no idea what he's talking about.  I went out, I
11  was driven by a judge, hung out with a judge, got driven
12  home by a judge.  There was no -- none of this stuff
13  happening that day.
14      Q.   Okay.  And so -- I just want to be clear, we're
15  on page seven of 18 of Exhibit 127.  Mr. Greenberg says,
16  Five minutes until they're here.  Go get the girls from
17  the front.  You respond, What girls?  Mr. Greenberg
18  responds, J REDACTED and L REDACTED.
19      A.   You need to understand that Joel would send
20  weird stuff all the time.  When you write LOL and things
21  like that, I had -- like if you go back and read the
22  entire chain which you made Rebekah do except for that
23  one page that had the stuff about the matzo balls.  I
24  mean, like if you read the entire thing, Hey, we're do
25  doing this, I don't know what he -- I don't know if J█

1  and L█████ are here.  Although, if you read a text

2  message, if you go down there, it references a text --

3  well, at least in the way that I read the file, it

4  looked like it was a text from Katrina Shadix who I

5  think we had a drink with that night.  I don't know.  I

6  don't remember if it was there or Liam's.

7          Katrina Shadix was a big activist.  She ran a

8  candidate for county commission in Seminole County a

9  couple of times, ran as a democrat.  Came close to

10  winning once, lost the next time pretty badly.  But, you

11  know, she was an adversary of mine, and I had met her

12  through Joel.  That is -- that night, as I recall, I

13  think it was either there or Liam's.  I was out with my

14  judge buddy.  We were just having a good time.  There

15  was no involvement in all this whatever Joel is trying

16  to say here.  This was also about a week before he got

17  indicted.  And you should know that by this point in

18  time, the whole world knew Joel was going to be

19  indicted.  So, again, he is -- I have no idea what kind

20  of crap he is talking about here, but --

21      Q.   Is it your testimony there was no J██ and

22  L█████ at FishBones --

23      A.   There was no J██ and L█████, no.  Just me and

24  my judge buddy hanging out.  A circuit court judge.  No

25  J██, no L█████.  Also in that text exchange, he says,

1  Oh, you know -- I don't know who he's talking about.

2  Joel, he also described himself as being wasted in that

3  thing.  So my guess is that Joel was probably at his

4  house on a bunch of Adderall and drugs and boos and just

5  texting nonsensically.

6      Q.   Going back to the photographs of the different

7  women that have been involved in some of these

8  documents, we've seen.  There is a picture there, do you

9  see J REDACTED  C REDACTED?

10     A.   Yes.

11     Q.   Do you recognize Ms. C REDACTED?

12     A.   I don't believe I have ever met that person in

13  my life.

14     Q.   In Abby Greenberg's interrogatory answers, she

15  referenced a June 23, 2020, telephone call between you

16  and yourself.

17          Do you recall having that conversation shortly

18  after Mr. Greenberg was indicted on June 17, 2020?

19     A.   I do.

20     Q.   And what can you tell me about that

21  conversation?

22     A.   I mean, I can tell you that I was in North

23  Carolina.  I received a phone call from Abby, Abby's

24  phone.  I answered the phone.  I said, Hey, Abby, what's

25  up?  She was sobbing.  Sue was sobbing.  They said Joel

1  had been arrested.  They gave me the details, the run

2  down as to kind of how all went down, and it was a lot

3  of detail.  Like Abby had said that the cops had showed

4  up and they put her in another room.  I think they drag

5  her out of bed, and she had to use the restroom, so they

6  made her use the restroom in front of them to make sure

7  they weren't going to dispose of things.  But they were

8  like very serious about the fact that they thought that

9  she might have some information.  They were all over it.

10        They more or less raided the house for a period

11  of hours, took Joel off, and then left them.  And I

12  don't -- I'm sure they called -- I don't know how -- for

13  example, I don't know how Sue came to find that Abby

14  was -- I dont' know if Abby was there all by herself and

15  Sue came by.  I have no idea how that went down.

16        But by this point in time, they were on the

17  same phone together.  I don't know if they were in the

18  same place or not, but they called me.  And I just said,

19  Okay, well, you know, let me -- I'll just try to take

20  some burden off on my end.  And after that, I just

21  started calling through things.  I called Joel's PR

22  person, Michelle Oertel, who sort of ran the office for

23  him, and I let her know.  She got the necessary comments

24  up together.  I called Governor Desantis' office and I

25  let the chief of staff, Shane Strum, know that Joel had

1  been arrested, that it was -- and that, you know, there

2  was no need -- now, mind you, at the time we didn't have

3  any details.  I didn't know that there was going to be

4  issues with -- at the time, I just thought it was about

5  this one stocking thing.

6          And when I first found out about it, when I got

7  the sordid details, it turned out that of all things

8  that he had put segregationist in there in an attempt to

9  get me basically in trouble for this stuff, I was not

10 particularly amused with Joel at this point in time.  I

11 was just trying to help his wife and mother who were

12 dealing with it and processing things.

13         And then when Joel got out, he got on the phone

14 with me, and he called -- he was with Vince Citro, and

15 he asked me what I thought.  And I said, Joel, if you

16 don't retire -- if you don't resign from your office

17 right now, you will be removed in a very short period of

18 time.  He said, Well, how short?  And I said, if -- you

19 know, like the next time I call them and I don't say

20 you're going to quit and if they don't hear from me

21 tonight, by the morning you'll be suspended.  You'll be

22 gone.  And then for the rest of your life -- and, again,

23 mind you, this is before we knew that Joel was going to

24 be charged with 31 more felonies and plead guilty to six

25 of them.

1          At the time, there was just some bizarre stuff

2    that he denied and said, I didn't do this, you know,

3    trying to get Brian Beute in trouble for all the stuff

4    he did there.  So my conversation -- that would have

5    been, whatever that was, I had spoken to Abby the week

6    before extensively because Abby is very politically

7    ambitious, and she was desirous of running for the

8    county commission.

9          And Joel -- we had -- Matt and I had begged,

10   threatened Joel and told -- we had told Joel that he

11   could not run for office.  If he did he would certainly

12   be indicted soon.  We said it in front of his wife.  We

13   said it -- it was very obvious.  He had come to my house

14   like nine months before and had with him, he says, Hey,

15   what do I do with this?  And he hands it to me.  It is

16   about this thick.  I mean, it was a thick guide, and it

17   was a Secret Service subpoena for Joel Greenberg.  And

18   I -- that's when I introduced him to Vince Citro, his

19   attorney.

20         I said, Joel, I've seen some subpoenas in my

21   day.  I've never seen one like this.  It was line after

22   line of, you know, please disclose the contents of --

23   you know, how these crypto wallet things are XJL953

24   blah, blah, like this whole thing.  It is just page

25   after page of single space.  And I'm like, Joel, you're

1  in deep shit.  Let me give you some honest advice right

2  now.  I don't know what you're doing, but stop it.  And

3  I told him, just resign.  Like, you know, this is not

4  good.  And of course Joel said, I didn't do anything.

5  It's all BS.  It's a misunderstanding.

6        I said, Well, Joel, the Secret Service is the

7  group that protects the president of the United States.

8  They are in charge of this cyber currency stuff.  They

9  have sent you a very girthy little discovery document

10  here, and it asked you for all manners of things.  What

11  I would do if I was you, I would quit my job as tax

12  collector.  I would try to stay off the radar of the

13  DOJ.  I would go back to being a radio guy, and I would

14  get out of this stuff right away.

15        He probably took that and went and hired Vince

16  Citro and then road it out.  And so Matt Gaetz and I got

17  very, very, very aggressive with Joel.  He was trying to

18  get a campaign donation.  I said, Joel, you're just --

19  this is such a bad idea for you.  You know, you just

20  can't do this stuff.  So then the beginning of that

21  qualifying week would have been whatever the week --

22  whatever day he got indicted, the week before was

23  qualifying --

24        Q.   June 17, 2020 is when he was actually indicted.

25        A.   So the week before, whenever that was, he

CHRISTOPHER DORWORTH                                    August 06, 2024
DORWORTH V. GREENBERG                                                378

1  called me or he texted.  He did something.  We had some

2  communication where he told me that Vince had told him

3  everything was fine and that he would have no issues

4  moving forward.  And, again, I called BS, but, I mean,

5  the thing about attorney/client it makes it very hard to

6  validate that sort of advice.  But he said that he was

7  told that everything was fine.

8          So then Abby decided that she wanted to run for

9  county commission.  She wanted to run for the county

10 commission district five seat.  It was an open seat.

11 Brenda Carey had been there for years.  Joel had been

12 big rivals with Brenda Carey, and they had -- I think

13 Brenda was the one that ultimately got the investigation

14 started that got Joel in trouble.

15         And so Abby was highly desirous of running, and

16 so she and I texted, had a few conversations that week.

17 The general subject of which was just how much money

18 would the Greenbergs give.  And she had thought -- Abby

19 was of the impression that Joel's parents would give a

20 fair amount of money when Joel wasn't going to run.  I

21 think that they had sort of gotten a taste for what it

22 was like to have -- you know, be in political office.

23         And so Matt and I were supportive of that.  We

24 said, listen, Abby would be much better than Joel.  Get

25 the hell out of there.  He came and said that he

CHRISTOPHER DORWORTH                                    August 06, 2024
DORWORTH V. GREENBERG                                               379

1  received an all clear.  So, again, with that very

2  obvious lie as demonstrated by virtue of the fact that

3  he would be indicted less than two weeks later, there's

4  not much more we could say.

5          I just said, Joel, you're not a public

6  official.  If I was on a scale of one to ten mean to

7  Joel about this, ten being the worst, I was probably an

8  eight.  Matt was a ten.  He's like, You're not fit for

9  public service.  You're a horrible public servant.

10 You're mentally ill.  You have drug addiction issues.

11 Your family, you know, continues to fit the bills.  And

12 we were just very harsh in the idea that Joel did not

13 need to do that.  And not to be surprised at all, the

14 next week is -- after he qualified, guess what, he got

15 indicted.

16          MR. ANDRADE:  So we're at 5:18.  Given the

17      length of my client's answers, this will probably be

18      the last question, just FYI.

19 BY MR. PERKINS:

20     Q.   All right.  The JW Marriott, you believe

21 that -- it sounds like you believe that Abby Greenberg

22 did something wrong at the JW Marriott.

23     A.   No.  I think that Abby Greenberg was dishonest

24 with my wife about to get her there under the pretenses

25 that Joel was not at the JW Marriott.  My wife is a good

1 friend to her friends.  And, you know, when this

2 happened, you know, Abby -- I don't know.  I think most

3 people would assume that something like that happens,

4 you're going to be crest fallen and stressed and

5 everything.  And so Rebekah wanted to go check on her,

6 and she said, you know, I really don't want to see Joel.

7          She said, Joel's not here.  Rebekah I remember

8 gets in the car, she calls me and says, Joel's there but

9 he's golfing.  I said, Rebekah, do what you want to do,

10 but, I mean, Joel, he's -- Joel is going to do this.  I

11 don't -- whether Abby lied and thought he wasn't there

12 or whether the circumstances changed, I don't have an

13 opinion on that.  I don't know -- you know, I do know

14 that when she got there, she told my wife and my wife

15 shared with me that Abby said her marriage had never

16 been better because now she had -- the word she used

17 reminded me of -- I think it was Seinfeld maybe that it

18 was she had hand.  She had more hand in her relationship

19 than she'd ever had, and now the Greenbergs basically

20 had to do whatever she said because she controlled their

21 grandkids.

22     Q.   And did you ever discuss the JW Marriott WITH

23 Abby Greenberg?

24          MR. ANDRADE:  We're at 5:20.  Yeah, we're at

25     5:20.

 1  BY MR. PERKINS:

 2     Q.   Did you ever discuss the JW Marriott visit with

 3  Abby Greenberg?

 4     A.   I don't know that I ever talked to Abby

 5  Greenberg after that.  Do believe that the last -- I

 6  mean, I remember talking to her extensively during the

 7  week where she was there -- when she was thinking about

 8  qualifying.  The last conversation I had with her was on

 9  Thursday.  I said, You need to get a hard number from

10  the Greenbergs that will be the amount of money that you

11  will be able to spend on this, and she didn't qualify

12  the next day.

13         And I think I sent her a text message something

14  to the effect of I guess that didn't go well or

15  something like that.  I don't remember her response, but

16  there was some superficial communication like that.  And

17  then after that, the next time I would hear from her

18  would be when she called me crying the next week.

19          MR. ANDRADE:  Have a great day, guys.

20          MR. PERKINS:  All right.  That's my seven

21      hours.  I'll reserve.  You know, other people are

22      going to ask some questions.  I have some questions

23      left, but I'll let everybody else have a chance.

24          THE WITNESS:  Give you this back?

25          MR. PERKINS:  We're done for the day.

1          THE VIDEOGRAPHER:  If there are no objections,

2    going off record.  The approximate time is 5:21 p.m.

3          (The deposition was continued at 5:21 p.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                         CERTIFICATE OF OATH

 2

 3   STATE OF FLORIDA:

 4   COUNTY OF ORANGE:

 5

 6       I, AMBER PORTELLO, Notary Public, State of Florida,

 7   do hereby certify that CHRISTOPHER DORWORTH personally

 8   appeared before me on August 6, 2024, and was duly sworn

 9   and produced a Florida driver's license as

10   identification.

11       Signed this 14th day of August, 2024.

12

13

14

15

16   _____

17       AMBER PORTELLO

18       Notary Public, State of Florida
         My Commission No.:  HH124775
19       Expires:  MAY 4, 2025

20

21

22

23

24

25
```

CHRISTOPHER DORWORTH                                    August 06, 2024
DORWORTH V. GREENBERG                                              384

```
 1                      CERTIFICATE OF REPORTER

 2   STATE OF FLORIDA:

 3   COUNTY OF ORANGE:

 4

 5       I, AMBER PORTELLO, Notary Public, State of Florida,

 6   certify that I was authorized to and did

 7   stenographically report the deposition of CHRISTOPHER

 8   DORWORTH; that a review of the transcript was requested;

 9   and that the foregoing transcript, pages 8 through 382,

10   is a true and accurate record of my stenographic notes.

11       I further certify that I am not a relative,

12   employee, or attorney, or counsel of any of the parties,

13   nor am I a relative or employee of any of the parties'

14   attorneys or counsel connected with the action, nor am I

15   financially interested in the action.

16

17       DATED this 14th day of August, 2024.

18

19

20   _____

21       AMBER PORTELLO

22

23

24

25
```

CHRISTOPHER DORWORTH                                    August 06, 2024
DORWORTH V. GREENBERG                                            385

```
 1   Reference No.: 11551616

 2

 3   Case:  DORWORTH V. GREENBERG

 4

       DECLARATION UNDER PENALTY OF PERJURY
 5
         I declare under penalty of perjury that
 6   I have read the entire transcript of my Depo-
     sition taken in the captioned matter or the
 7   same has been read to me, and the same is
     true and accurate, save and except for
 8   changes and/or corrections, if any, as indi-
     cated by me on the DEPOSITION ERRATA SHEET
 9   hereof, with the understanding that I offer
     these changes as if still under oath.
10

11        _____

12             Christopher Dorworth

13

14             NOTARIZATION OF CHANGES

15                  (If Required)

16

17   Subscribed and sworn to on the _____ day of

18

19   _____, 20_____ before me,

20

21   (Notary Sign)_____

22

23   (Print Name)                    Notary Public,

24

25   in and for the State of _____
```

1  Reference No.: 11551616
   Case:  DORWORTH V. GREENBERG
2

3  Page No._____Line No._____Change to:_____

4  _____

5  Reason for change:_____

6  Page No._____Line No._____Change to:_____

7  _____

8  Reason for change:_____

9  Page No._____Line No._____Change to:_____

10 _____

11 Reason for change:_____

12 Page No._____Line No._____Change to:_____

13 _____

14 Reason for change:_____

15 Page No._____Line No._____Change to:_____

16 _____

17 Reason for change:_____

18 Page No._____Line No._____Change to:_____

19 _____

20 Reason for change:_____

21 Page No._____Line No._____Change to:_____

22 _____

23 Reason for change:_____

24

   SIGNATURE:_____DATE:_____
25 Christopher Dorworth

CHRISTOPHER DORWORTH                                    August 06, 2024
DORWORTH V. GREENBERG                                              387

```
 1    Reference No.: 11551616
      Case:  DORWORTH V. GREENBERG
 2

 3    Page No._____Line No._____Change to:_____

 4    _____

 5    Reason for change:_____

 6    Page No._____Line No._____Change to:_____

 7    _____

 8    Reason for change:_____

 9    Page No._____Line No._____Change to:_____

10    _____

11    Reason for change:_____

12    Page No._____Line No._____Change to:_____

13    _____

14    Reason for change:_____

15    Page No._____Line No._____Change to:_____

16    _____

17    Reason for change:_____

18    Page No._____Line No._____Change to:_____

19    _____

20    Reason for change:_____

21    Page No._____Line No._____Change to:_____

22    _____

23    Reason for change:_____

24
      SIGNATURE:_____DATE:_____
25    Christopher Dorworth
```