# EXHIBIT 6

In the Matter Of:

DORWORTH vs GREENBERG

6:23-cv-00871-CEM-DCI

---

**CHRISTOPHER DORWORTH**

*August 07, 2024*

---



800.211.DEPO (3376)
EsquireSolutions.com

1                    UNITED STATES DISTRICT COURT
                       MIDDLE DISTRICT OF FLORIDA
2                           ORLANDO DIVISION

3

     CHRISTOPHER E. DORWORTH,
4
           Plaintiff,
5
     vs.                      Case No: 6:23-cv-00871-CEM-DCI
6
     JOEL MICAH GREENBERG
7    ANDREW W. GREENBERG, SUSAN
     GREENBERG, ABBY GREENBERG,
8    AWG, INC., GREENBERG DENTAL
     ASSOCIATES, LLC, GREENBERG
9    DENTAL & ORTHODONTICS, P.A.,
     GREENBERG DENTAL SPECIALTY GROUP, LLC,
10   AND A.B.,

11         Defendants.

12   _____/

13   VIDEOTAPED/VIDEOCONFERENCE
     DEPOSITION OF:      CHRISTOPHER DORWORTH
14
     DATE:               WEDNESDAY, AUGUST 7, 2024
15
     TIME:               11:21 A.M. - 4:18 P.M.
16
     PLACE:              200 SOUTH ORANGE AVENUE
17                       SUITE 10000
                         ORLANDO, FLORIDA 32801
18
     STENOGRAPHICALLY
19   REPORTED BY:        AMBER PORTELLO

20

21

22

23

24

25



```
 1  A P P E A R A N C E S:

 2  R. ALEX ANDRADE, ESQUIRE
    OF: Moore, Hill & Westmoreland, P.A.
 3      350 West Cedar Street
        Suite 100
 4      Pensacola, FL 32502-4911
        Office: 850-434-3541, Fax: 850-435-7899
 5      Aandrade@mhw-law.com
        APPEARING ON BEHALF OF THE PLAINTIFF
 6

 7
    JASON PERKINS, ESQUIRE
 8  OF: Carlton Fields, PA
        200 South Orange Avenue
 9      Suite 1000
        Orlando, FL 32801-3456
10      Office: 407-244-8250, Fax: 407-648-9099
        Jperkins@carltonfields.com
11      APPEARING ON BEHALF OF THE DEFENDANT ABBY GREENBERG

12  FRITZ WERMUTH, ESQUIRE
    QUINN RITTER, ESQUIRE
13  OF: King, Blackwell, Zehnder & Wermuth, PA
        PO Box 1631
14      Orlando, FL 32802-1631
        Office: 407-422-2472, Fax: 407-648-0161
15      Fwermuth@kbzwlaw.com
        Qritter@kbzwlaw.com
16      APPEARING ON BEHALF OF THE DEFENDANTS ANDREW
        GREENBERG, SUSAN GREENBERG, AWG, INC.
17
    KATIE CHOMIN, ESQUIRE
18  MICHAEL FURBUSH, ESQUIRE
    OF: Dean Mead
19      420 South Orange Avenue
        Suite 700
20      Orlando, FL 32801-4911
        Office: 407-841-1200, Fax: 407-423-1831
21      Mfurbush@deanmead.com
        Kchomin@deanmead.com
22      APPEARING ON BEHALF OF THE DEFENDANT GREENBERG
        DENTAL
23      (Via Zoom)

24  FRITZ SCHELLER, ESQUIRE
    OF: Fritz Scheller, P.L.
25      200 East Robinson Street
        Suite 1150
```



```
 1        Orlando, FL 32801-1970
          Office: 407-792-1285, Fax: 407-649-1657
 2        Fscheller@flusalaw.com
          APPEARING ON BEHALF OF THE DEFENDANT JOEL GREENBERG
 3

 4   JAMES FOSTER, ESQUIRE
     WILLIAM PETERS, ESQUIRE
 5   OF: Wicker, Smith, O'Hara, McCoy & Ford P.A.
          515 East Las Olas Boulevard
 6        Suite 1400
          Fort Lauderdale, FL 33301-4250
 7        Office: 954-847-4800
          Jfoster@wickersmith.com
 8        Wpeters@wickersmith.com
          APPEARING ON BEHALF OF THE DEFENDANT ANDREW AND
 9        SUSAN GREENBERG
          (Via Zoom)
10
     ALSO PRESENT:
11        Fred Gartrell, Videographer
          Abby Greenberg (Via Zoom)
12        Lisa Di Filippo (Via Zoom)
          Melissa Hill (Via Zoom)
13        Angie Price (Via Zoom)

14

15

16

17

18

19

20

21

22

23

24

25
```



```
 1                    I N D E X

 2  TESTIMONY OF CHRISTOPHER DORWORTH

 3      DIRECT EXAMINATION BY MR. WERMUTH              6

 4     FURTHER DIRECT EXAMINATION BY MR. SCHELLER    143

 5     FURTHER DIRECT EXAMINATION BY MS. CHOMIN      179

 6     FURTHER DIRECT EXAMINATION BY MR. ANDREWS     222

 7  CERTIFICATE OF OATH................................233

 8  CERTIFICATE OF DEPOSITION TRANSCRIPT..............234

 9

10                    INDEX OF EXHIBITS

11  EXHIBIT 128     60
    (Original Complaint)
12  EXHIBIT 129     140
    (Politico Article)
13  EXHIBIT 130     174
    (Messages in Chronological Order)
14

15

16

17                       ------

18            S T I P U L A T I O N S

19      It is hereby stipulated and agreed by and between

20  the counsel for the respective parties and the deponent

21  that the reading and signing of the deposition

22  transcript be reserved.

23                       ------

24

25
```



```
 1              P R O C E E D I N G S

 2                   *********

 3         THE VIDEOGRAPHER:  Good morning.  We are now on

 4    the record.  Today is Wednesday August 7, 2024.  The

 5    approximate time is 11:21 a.m.  This is the

 6    continuation deposition of Christopher E. Dorworth

 7    being taken in the matter of Christopher E. Dorworth

 8    versus Joel Micah Greenberg, et al.

 9         Will counsel please identify themselves for

10    record?  After which, our court reporter, Ms. Amber

11    Portello, will administer the oath to the witness.

12         MR. ANDRADE:  Alex Andrade on behalf of the

13    plaintiff, Chris Dorworth.

14         MR. WERMUTH:  Fritz Wermuth on behalf Andrew

15    Greenberg, Susan Greenberg, and AWG, Inc.

16         MR. PERKINS:  Jason Perkins here on behalf of

17    defendant Abby Greenberg.

18         MR. RITTER:  Quinn Ritter here on behalf of

19    Andy Greenberg, Susan Greenberg, and AWG, Inc.

20         MR. SCHELLER:  Fritz Scheller on behalf of Joel

21    Greenberg.

22         MR. ANDRADE:  The parties on Zoom?

23         MS. CHOMIN:  Katie Chomin on behalf of

24    Greenberg Dental defendants.

25         MR. FOSTER:  James Foster with Wicker Smith on
```



1    behalf of Andrew and Sue Greenberg.

2         COURT REPORTER:  Would you raise your right

3    hand, please?

4         Do you solemnly swear or affirm that the

5    testimony you're about to give in this cause is the

6    truth, the whole truth and nothing but the truth?

7         THE WITNESS:  I do.

8  THEREUPON

9                  CHRISTOPHER DORWORTH

10  was called as a witness and, having first been duly

11  sworn, testified as follows:

12                  DIRECT EXAMINATION

13  BY MR. WERMUTH:

14    Q.   Good morning, Mr. Dorworth.  I'll be doing the

15  next line of questioning here, and I just wanted to

16  confirm that you understood the instructions that

17  Mr. Perkins gave you yesterday about the flow of the

18  deposition?

19    A.   Yes, sir.

20    Q.   And are you -- is there any reason today why

21  you can't provide truthful testimony?

22    A.   No.

23    Q.   Are you under the influence of any medication

24  or drugs or alcohol?

25    A.   I woke up with a small sinus infection, but I



1  didn't medicate for it.  So it's...

2      Q.   All right.  Have you ever met Andrew Greenberg?

3      A.   I have.

4      Q.   How many times?

5      A.   A handful.  I can count on one hand.

6      Q.   And when was the last time you spoke?

7      A.   Probably -- I think we went to the Outback with

8  Joel and another partner from Greenberg Dental, and then

9  the next time would be a birthday party for one of

10  Joel's kids.  And I don't remember which one was last,

11  but those were the last two times and about the same

12  period of time too.

13      Q.   Is it safe to say that that was before Joel was

14  indicted?

15      A.   It was.

16      Q.   How far before that?

17      A.   I mean, I -- probably within a year before

18  that.  I mean, six months maybe.  I don't know for sure,

19  but, I mean, that's a -- that would be a ballpark.

20      Q.   Did you discuss anything but pleasantries?

21      A.   Yeah.  The dinner at Outback was about me

22  potentially going to work for Greenberg Dental.

23      Q.   Did that ever going anywhere?

24      A.   No.

25      Q.   Have you ever met Susan Greenberg?



1     A.    Yes.

2     Q.    About how many times?

3     A.    The same.  Basically all the same times except

4  she would be around more frequently with the kids, you

5  know, just hanging out with the grandkids.

6     Q.    Any more than just pleasantries with her?

7     A.    Well, yeah.  I mean, the day that Joel got

8  indicted, I got on the phone with her and sort of walked

9  through the machinations of while he was in jail and

10 getting bailed out and all that stuff about -- I had

11 extensive conversations with her that day.

12    Q.    Was that the last time you spoke with her?

13    A.    I believe so, yes.

14    Q.    Have you ever interacted with AWG, Inc.?

15    A.    Only to the extent that I believe that Joel and

16 Sue and specifically Andy are AWG, Inc.  It's a family

17 holding company.  It's an LLC or whatever the

18 governmental classification of corporation they have for

19 that.  I believe it's an LLC if I'm not mistaken from

20 the lawsuit, but that is there family office.  It's

21 where they have their resources.  It's where they

22 dispatch money.  It's where they pay Joel from his form

23 sixes.  It shows that that's where it came from.  So,

24 you know, I believe it's to be the same thing as Sue and

25 Andy and Joel.



1    Q.   Is your knowledge of AWG just limited to the
2  public records?
3    A.   No.  I had extensive conversations with Joel
4  about it.  I didn't ask him, he would volunteer.
5    Q.   And when did those conversations occur?
6    A.   I mean, basically from the day I met him
7  through the day we stopped talking.  Joel's parents and
8  wealth and the power of Greenberg Dental was very key to
9  his identity, and it was something that he wielded with
10 great frequency.
11   Q.   Do you have personal knowledge of whether Joel
12 was actually associated with AWG, Inc., in 2020?
13   A.   I mean, I have a public record that he attested
14 to under oath that he owned -- I think it was $5.5
15 million of stock in AWG, Inc.  So, yeah, that would
16 be -- I would consider that to be an attestation under
17 oath, and I would view that as evidence that he had $5.5
18 million of stock in AWG, Inc.
19   Q.   Is that the only basis?
20   A.   Well, that and I think extensive conversations
21 with him.  I mean, he would talk about how he had, you
22 know, this much money from his parents.  It was worth
23 this much, but the company was really worth this much.
24 So it should be -- he would -- like this was not the
25 sort of thing you would have to ask.  I do not probe



1   about other people's finances.  It's not really

2   particularly interesting to me, but it is very key to

3   Joel's personality.  Like, he would meet somebody and

4   immediately tell them how rich his parents were, and how

5   rich -- you know, how much money Greenberg Dental had.

6   He would threaten people in politics by saying, If you

7   ever -- I think one time he said to Anna Eskamani who's

8   a State rep in town, Have you ever had a $100 million

9   boot up your ass, referring to what he asserted the

10  value of Greenberg Dental and his parents holdings to

11  be.  And now do I know if that's true or not, do I know

12  if they have that kind of money?  I do not.  I have no

13  idea any what the valuation of it is, but I can tell you

14  that I saw him do it and say it repeatedly and attest to

15  it under oath.

16      Q.   Are you saying that Joel attested to it under

17  oath?

18      A.   Well, yeah, when you filled out your form six,

19  you have to sign something saying this is full,

20  accurate, and complete.  He did it many years.  He did

21  it in 2016 when he ran, 2017 when he -- because you have

22  to do it every year as an elected official, but it's

23  '17, '18, '19, and 2020 he did it again when he filed

24  his form.  And then I think three months after that or

25  four months after that in October, there is a



1  requirement when you withdraw from a campaign that you

2  have to fill a sort of a final thing, the idea being

3  they want to make sure there's not some huge shift in

4  assets and to expose that sort of thing.  And all the

5  sudden Joel's $5.5 million just disappeared.

6      Q.   Now, is it Joel's attestation on this form six

7  forms that you were mentioning, is that the only under

8  oath attestation that you're aware of?

9      A.   I would say yes.

10     Q.   Okay.  And did you ever discuss AWG, Inc., with

11  Andrew Greenberg?

12     A.   I discussed Greenberg Dental, but I don't

13  recall discussing AWG, Inc., with him, no.

14     Q.   Did you ever discuss AWG, Inc., with Susan

15  Greenberg?

16     A.   No.

17     Q.   You have three children, correct?

18     A.   I do.

19     Q.   If you were -- if one of your children were

20  accused of a crime, would you stop communicating with

21  them?

22     A.   I would not stop communicating with them.

23     Q.   If your child was accused of a crime, would you

24  disown them?

25     A.   Well, that depends on the crime.  Probably, but



1  my inclination is no.  It would have to be a very

2  heinous crime probably against one of my other children.

3       Q.   If your children were accused of a crime and

4  needed financial support, would you provide it?

5       A.   Depends.  To some degree.  I wouldn't give them

6  a blank check to try to get everybody else indicted so

7  they could get their prison sentence returned, but I'd

8  do the best that I could to make sure they got a fair

9  defense.

10      Q.   So if they needed help with a lawyer --

11      A.   I mean, I don't know that I would pay $2

12  million in money owed to the County for them or the

13  federal government to try and buy down their sentences.

14  There are limits to what I would do.  And if my kids did

15  something that was bad, I mean, they -- I would expect

16  them to be held accountable for it, but I don't think

17  any parent wants their kids to suffer.  But, you know,

18  you have to realize that the solution to that is not

19  making your kids' problems everybody else's problems

20  when everybody else wasn't doing that.

21      Q.   You'd provide, you know, funds for them to get

22  an attorney; is that correct?

23      A.   Sure.  Again, I mean, you're asking me

24  hypotheticals.  If I mirrored the situation here, I

25  would probably have made sure Joel had -- if my kid was



 1  in Joel's exact position, I would make sure they had

 2  representation, yes.

 3      Q.   So if I understand your testimony from

 4  yesterday correctly, you were aware on the first day

 5  that Joel's indictment was released on June 23, 2020,

 6  that he had been indicted, correct, it was that day?

 7      A.   I'm not following.

 8      Q.   So the day --

 9      A.   I didn't know he was indicted before he got

10  indicted.  Before they unsealed the indicted and

11  arrested him.

12      Q.   The day the indictment was unsealed you became

13  aware of it, correct?

14      A.   I don't -- I'm actually not trying to be -- I

15  think thigh unsealed the indictment, and then a couple

16  days passed, and they went and raided his house.  So to

17  be very specifically accurate, I became aware of him

18  being arrested when Sue and Abby Greenberg called me and

19  said Joel was just arrested.  He got dragged out of

20  here.  So I don't want to say under oath that I was

21  aware of it the day it was unsealed because I think that

22  was a few days before if I'm not mistaken.

23      Q.   But soon after, within a day or two after it

24  was unsealed you --

25      A.   Again, you'd have to check the document, but I



1  believe -- I mean, I'm just going off memory.  I haven't
2  looked at this in a long time.  I think it was a couple
3  days before, but I became aware when the rest of the
4  world became aware.  When the cops showed up at their
5  home, dragged him out, and all that stuff and they
6  called me, that's when I became aware.  I didn't know
7  about it before that.
8      Q.   Now, after Joel's first indictment in June of
9  2020, you have alleged that Joel Greenberg confronted
10 your wife Rebekah at a pool day outing where Abby
11 Greenberg invited Rebekah to the Marriott Resort; is
12 that correct?
13     A.   The JW Marriott Resort, yes.
14     Q.   Were you at the Marriott Resort?
15     A.   No.
16     Q.   When did Rebekah tell you about the
17 conversation she had with Joel Greenberg at the
18 Marriott --
19     A.   From the phone on the way home.
20     Q.   Okay.  So she called you on the way home?
21     A.   Yes.
22     Q.   What did she tell you Joel had said?
23          MR. ANDRADE:  Object to form.
24          THE WITNESS:  I have to answer?
25          MR. ANDRADE:  Yeah, you can answer it.



1      THE WITNESS:  She basically said that Joel has

2   lost his mind.  That Abby had said that he --

3   basically -- and I'll just give you the sort of the

4   rundown for the conversation I would form.  If you

5   want to dial into some part of it.  But she called

6   and said that she had -- on the way in, Abby had let

7   her know that Joel would, in fact, be at the resort,

8   but she said that Joel would be out golfing.

9      Rebekah thought about coming home, and she

10  called me at that point and I said -- she said, you

11  know, whatever.  So she wasn't really expecting what

12  happened to happen.  So she got there, and Joel was

13  there and, you know, very quickly kind of tried to

14  push her aside and went down -- she told me about a

15  bunch of things.

16     First and foremost, she tried to -- he

17  suggested that she should get into the swinger life

18  like he and Abby had where they have sex with other

19  people and have open relationships.  Rebekah was

20  looking at him like what on Earth are you talking

21  about?  She thought he was, you know, probably on

22  some sort of altered state.  I mean, if I -- knowing

23  Joel, probably driven by Adderall I'd bet, but that

24  he was twitchy, menacing.  That he said that --

25  basically threatened Matt and said that, you know,



1        Matt would be in -- Matt would want -- Matt needs

2        this to go away and made these pointed threats to

3        her.

4              And she said on several occasions she tried to

5        get away from him.  Joel, I don't really want to

6        have this conversation.  At one point in time, he

7        got a camera out and started videoing her.  He was

8        acting very erratic to a point where she said she

9        did not feel comfortable, and she called me on with

10       the way home and then she hung up and called Matt

11       and told him the exact same story.

12  BY MR. WERMUTH:

13       Q.   Okay.  So were you the only person on the

14  phone?  You didn't conference anyone in?

15       A.   No.  I had one phone call with her and then one

16  phone call -- she had a phone call with Matt.

17       Q.   Okay.  So you're saying she called you before

18  she called Matt?

19       A.   Yeah.  I believe so.  I mean, I'm 98 percent

20  sure that is the sequence, but, I mean, I wasn't on her

21  phone.  She told me -- at the conclusion of the

22  conversation, I said, You should call Matt.  She said,

23  I'm going to do that.  And then after that, she said, I

24  talked to Matt.

25       Q.   Now, you said that -- did you say that she



 1  called you on the way to the Marriott?

 2      A.   Well, yes.  First, on the way she called me.

 3  She was irritated because Abby had promised that -- that

 4  Joel would not be there.  Rebekah was trying to go be

 5  supportive of her friend.  Rebekah was not a big Joel

 6  fan.  I don't know a single wife anywhere that was a

 7  Joel fan, but she was trying to be supportive of her

 8  friend because she figured Abby would be down in the

 9  dumps because her husband had just been indicted for two

10  felonies and had just resigned his job.  When she got

11  there, she found Abby in a very good mood.  Abby said it

12  was the best her marriage had ever been because she

13  had -- I think the phrase she used was so much hand.

14  She was happy because the Greenbergs would now have to

15  give her money because she had to stay by Joel.

16      Q.   What all did Rebekah tell you about Abby in

17  these two phone calls?

18          MR. ANDRADE:  Object to form.  You can answer.

19          THE WITNESS:  I don't understand the question.

20      What did she tell me?

21  BY MR. WERMUTH:

22      Q.   Well, she reported to you about statements that

23  Abby said or anything?

24      A.   Well, I mean, to be clear, the person who

25  was -- Abby facilitated the threat from Joel, but I



1  don't think -- I'm not -- I never said that Abby

2  threatened Rebekah and said those things.  It was more

3  like, Hey, come down here.  We're going do swim around

4  and try and forget about the horrible things happening

5  in my world.  And instead, she got there, and she was

6  getting confronted by Joel who already by that pint in

7  time had decided that his pathway to salvation went

8  through a presidential pardon.

9      Q.  Did Rebekah take notes on that conversation, on

10  any of the conversations that occurred at the Marriott?

11     A.  I highly doubt she had a notepad at the JW

12  Marriott to do such things.  So I believe the answer to

13  that question is no, although I cannot be 100 percent

14  sure, but I would be very shocked.

15     Q.  Did you take notes of what Rebekah reported to

16  you about the conversations that occurred at the JW

17  Marriott?

18     A.  I don't take those kind of notes, no.

19     Q.  Did Rebekah take notes of what she reported to

20  you about what occurred at the JW Marriott?

21         MR. ANDRADE:  Object to form.

22         THE WITNESS:  I don't believe Rebekah takes

23      notes.  We don't have memos like that in our

24      marriage.  She didn't write it up and share it.

25  BY MR. WERMUTH:



1     Q.   And to your knowledge, you're the first person
2   that she informed about the conversations that occurred
3   at the JW Marriott?
4     A.   I would assume, yes.
5     Q.   Okay.  Do you know whether she talked to
6   somebody else about the conversations that occurred at
7   the Marriott?
8     A.   I don't believe she did, but she very well
9   might have.  Did you ask her?
10    Q.   At least she didn't report that she told other
11  people --
12    A.   I'm unaware of it.
13    Q.   Okay.  Did you gather that Joel mentioned "AB"
14  to Rebekah?
15    A.   I did not.
16    Q.   Did you learn about anything that happened at
17  the Marriott resort at that outing from anybody else?
18    A.   Well, I called Joel and told him I wanted to
19  talk to him in person about it.  So, yeah, from him.
20    Q.   And what did he tell you about the Marriott?
21    A.   Well, he just flipped out when I got there.  I
22  mean, he was just a dude that was -- he was a race car
23  in red, and, you know, I just told him, I said, Don't
24  ever threaten my wife again or DOJ will not be your
25  biggest problem.  I think that was my opening line to



1  him, and he just came unhinged.  You have no idea.  They

2  know about -- and that is the first time I think I ever

3  heard "AB" as a reference or whatever it was in terms of

4  her referred to as a specific person and became aware

5  that he might have a liability issue with the -- with

6  the -- so that would kind of be the first time that it

7  occurred to me that Joel had real problems beyond the

8  two felonies he was already facing.

9      Q.   Okay.  So the conversation you're talking about

10  is the one at the Another Broken Egg Cafe?

11      A.   Yes, sir.

12      Q.   Okay.  I understand that you allege that

13  shortly after the JW Marriott Resort event you had a

14  meeting with Joel at Another Broken Egg Cafe?

15      A.   I did.

16      Q.   And what day was that, or when was that?

17      A.   A couple weeks after the JW Marriott.  I don't

18  have the exact day.

19      Q.   Was it a day or two?

20      A.   I think it was longer than that.  A few days.

21  A week or two, I want to say.

22      Q.   I'll represent to you that you alleged in the

23  complaint that the -- that the JW Marriott event was on

24  July the 19th.

25      A.   Okay.  That would be correct then.



1          MR. SCHELLER:  I'm sorry, did you say the year?

2          MR. WERMUTH:  July 19, 2020.

3          THE WITNESS:  That sounds right.

4          MR. SCHELLER:  Thank you.

5   BY MR. WERMUTH:

6      Q.   And then you -- in response to the -- Andrew

7   and Susan Greenberg's first interrogatories, you

8   identified that the meeting at the Another Broken Egg

9   Cafe occurred in July of 2020.

10     A.   So within the next 12 days.

11     Q.   Okay.

12     A.   Very consistent with two weeks.

13     Q.   What all did you and Joel talk about at Another

14  Broken Egg Cafe?

15     A.   Well, again, the way I would characterize the

16  conversation was I was going to there to let him know,

17  based on this conversation that she had and based on the

18  threats and the things that he said -- Joel had a poorly

19  developed sense of civic understanding of how government

20  really works.  He thought if you were powerful, if you

21  had resources, you just went and told people how it was

22  going to be and they would do it.  He did not understand

23  the machinations of how there is a whole process behind

24  these things.  He just sort of thought if one person

25  says it then it would go.



```
 1            And Joel truly believed in his heart of hearts
 2    that he -- that he was going to be pardoned by Donald
 3    Trump at the request of Matt Gaetz, and if that didn't
 4    work, by employing my lobbying firm, Ballard Partners.
 5    Over the course of that lunch that day, my goal was to
 6    tell him that this was not going to happen.  I thought
 7    at the time I was dealing with somebody who had issues
 8    that were of relating and pertaining to a stalking
 9    charge and the creation of a fake Facebook or Twitter,
10    whatever the social media pages were.
11            I didn't realize I was walking into something
12    or I was going to learn about how Joel had exposure for
13    underage sex trafficking of a minor and that some women
14    were claiming that he had had repeated sex with them,
15    and one of those women was underage.  I walked into the
16    meeting really just wanting to convey to Joel that there
17    was -- that there was no chance in hell he was getting
18    pardoned.  Not by me, Ballard Partners, not by Matt via
19    his relationship with Trump.
20            And again, we argued back and forth about it
21    he.  Got very animated.  He got very amped up, and I
22    think I relayed this conversation, and I'll share it
23    with you again.  But he just kept referencing Roger
24    Stone as an example of a commutation that Donald Trump
25    had given.  I think he said it maybe two or three times
```



 1  at the breakfast.  And I said, Let me stop you right
 2  there, Joel.  I said, That's just a great example of
 3  what we're talking about right now because Roger Stone
 4  has worked with Donald Trump for like 40, 50 years,
 5  since the get-go.  They are personal friends.  They go
 6  to dinner.  They hang out.  They have been friends for a
 7  long time.
 8          Roger Stone was investigated.  The DOJ
 9  investigation of Roger Stone came from an allegation
10  that I think it was Ukrainians somehow affected the U.S.
11  presidential election.  Roger had -- is a very gullable
12  person, said a bunch of things.  I think he threatened a
13  federal judge's dog's life or something like that, and
14  there was some obstruction.
15          There was -- just the charges that ultimately
16  were filed stem from this Ukrainian thing, but it was
17  directly related to Donald Trump's election.  And what I
18  said to Joel and what I think he finally got it when the
19  lights turned on, I said even though they're friends,
20  even though they have worked together for 40 years, even
21  though that Stone is in it because of the investigation
22  that was probably targeting your very election, he let
23  Roger Stone go to trial, get convicted, go through
24  appeal, spend all the money.  Not a cheap thing to do.
25  And then on the day he was supposed to go to jail, he



1  commuted the sentence.

2       So I said, Joel, why the hell would he do

3  anything more than that for you? And I think at that

4  moment in time he immediately dropped the Matt Gaetz

5  thing and turned to me saying Sue and Andy would pay up

6  to $5 million -- 4 or $5 million I would say if we could

7  get a pardon. And I told him that based on even

8  stalking and on the false identification thing alone, I

9  could not go to my boss, Brian Ballard, and say we need

10  to go get this guy a pardon. And the fact that there

11  were more stuff looming on the horizon took the odds

12  even lower, whatever the opposite of zero is. It took

13  him to absolute zero.

14       And that was basically -- I think that was the

15  moment he realized there was not -- I think he tried,

16  and I have read things from the Daily Beast and other

17  things that he tried to hire Roger to get a pardon, but

18  I think none of that stuff happened. He still thought

19  it was the way to go; but for me, I think that was the

20  point he understood that this was not going to happen,

21  and that's when he went to plan B which was to start

22  lying about me and start lying about Matt and start

23  lying about Halsey and other people trying to drag them

24  in. That's the conversation we had.

25  Q.   What specifically did he say about Andrew



```
 1  Greenberg or Susan Greenberg?
 2      A.   That they would spend -- their budget was up to
 3  $5 million if he could get a pardon.
 4      Q.   They would?
 5      A.   They would spend $5 million to get Joel
 6  pardoned out of this stuff.
 7      Q.   Did he say he spoke to them?
 8      A.   Yes.
 9      Q.   Okay.  And what did he say exactly?
10      A.   I mean, I didn't -- it was not this kind of
11  conversation.  He basically said to me that, My parents
12  will do what it takes.  If it's 5 million bucks, they'll
13  do it.  I just said, I don't think it matters.  I mean,
14  like you could have $50 million.  I don't think that it
15  matters.  I think you're confronted with a series of
16  crimes.
17           Again, if you didn't file some 13D because you
18  had more than five percent stock in a company and it was
19  a felony conviction or something like that and you go
20  get pardoned.  I see white collar stuff happen all the
21  time.  I have never seen someone accused of stalking get
22  pardoned out of it.  I have never seen someone accused
23  of faking -- creating fake sort of websites and trying
24  to convince people that they're a pedophile, I have
25  never seen somebody get waived out of those things.  I
```



1  simply -- this was a matter of course.  I can't imagine

2  the circumstance that would drive a president to grant

3  what -- again, what was the line that Gerald Ford had he

4  gave to Richard Nixon?  It was like a full, free, and

5  absolute pardon, and it created a scandal and that was

6  for a president.  Yeah, this is never going to happen

7  for Joel, but Joel's thought was all I've got to do is

8  get this pardon, and I'll be safe.  And it was just the

9  realization that that dog was not going to hunt.

10      Q.   Do you have any personal knowledge of whether

11  Joel spoke with his parents about a pardon?

12      A.   No.

13      Q.   What, if anything, was said about "AB" at this

14  meeting?

15      A.   Just that one of the girls he had dealt with

16  was underage, and that she was talking to the feds.

17      Q.   That's it?

18      A.   That's it.  But he seemed to think there was

19  looming problems on the horizon for himself.  Joel was

20  very much aware of the fact that shit was about to hit

21  the fan.

22      Q.   Okay.  So that's all that was said about "AB"

23  at that meeting?

24      A.   I think so.  I don't remember any other.

25      Q.   Did you take any notes of that conversation



 1  that occurred during that meeting?

 2      A.   I do not.  I don't take notes of conversations.

 3      Q.   Did you make a recording of that meeting?

 4      A.   That would be against the law.  No, I did not

 5  do that.

 6      Q.   Did you help draft the first complaint in this

 7  case?

 8      A.   Yes.

 9      Q.   When did you help draft the first complaint in

10  this case?

11      A.   Before the complaint got filed.

12      Q.   How long in advance?

13      A.   I don't know the answer to that off the top of

14  my head.  It was a work in process.

15      Q.   About how long do you think?

16      A.   I honestly -- I don't know.

17      Q.   Two weeks?

18      A.   Yeah, it was not a long period of time, if

19  that's what you're asking.

20      Q.   Three weeks?

21      A.   You're -- you keep saying that date.  I have no

22  idea.  I don't think it was three weeks.  I think it was

23  processed the last that -- I had to go back and forth

24  sort of with several facts, determine the viability of

25  things, sort of laying things out, showing that the



1  Greenbergs funded the election of Greenberg via AWG,

2  Inc., and I basically had to patch it all together to

3  make sure that I could do it.  So I think that would be

4  the part of time that took the most time, really

5  understanding sort of the way the Greenbergs have gone

6  and put things together in a way of shifting funds away

7  to make sure that Brian Beute couldn't go after them

8  after he clearly -- I think Brian Beute might have gone

9  bankrupt.

10          That's another pelt for the Greenberg family

11  and another person they steamrolled because they

12  transferred the funds away illegally, but that's Brian's

13  issue.  He should have chased that one down himself;

14  but, I mean, that was the real time consuming portion.

15  I just truthfully -- it took some time.  It wasn't like

16  I was doing it 24 hours a day.  I had other things to

17  do.  It took a month or so.

18      Q.   A month?

19      A.   Again, I --

20      Q.   What's your best estimate?

21      A.   I'm not going to make -- that is the best --

22  from the time I first conceived, it went through, I

23  couldn't even estimate that.  I don't know.  It was a --

24  just say a month for the sake of it, but, I mean, the

25  entire information gathering process started a long time



1   ago and I start researching the transfer of, you know,

2   how they transferred away the $5 and a half million

3   shortly after he was indicted for no compensation, but

4   there was stuff I didn't know yet.

5          Like I didn't realize the Greenbergs had

6   created an LLC in Delaware so they could pay a million

7   dollars to Seminole County and funded it.  I didn't

8   realize they showed up with a Department of the Treasury

9   check.  Those are all things I had to learn, but I was

10  trying to figure all the things I could in public

11  record.

12         So you asking me how long that took, I have

13  been thinking about all the things Joel did since he

14  dragged me into it.  So from the day he threatened me to

15  the day I got my subpoena, I have been keeping track of

16  all the things that Joel did.  So you could say back to

17  that very moment if that is an -- if that is it.  But

18  again, it gets to a certain point that you have to line

19  it up, but I would say the actual construction of it

20  probably around a month.

21  Q.   So you think as far back as right at the

22  Another Broken Egg Cafe is when you started working on

23  this?

24         MR. ANDRADE:  Object to form to the extent it

25     calls for a legal conclusion.



1          THE WITNESS:  I mean, after that, I didn't --
2     first and foremost, when I left that meeting I
3     thought Joel was going to go after Matt.  I thought
4     it was a Matt thing.  I didn't realize he was going
5     to try to lob me into the entire story.  Then
6     about -- I don't know whatever the dates were.
7     Again, I think they're all attached to the
8     complaint.
9          But then I was out at Liam's one night, and I
10    got a text message from Joel, and it was on
11    WhatsApp.  And he said, Hey, everyone is going to
12    need a lawyer.  This is all in there.  And I said,
13    Why would everyone need a lawyer?  He said, Vince
14    said everyone's going to need a lawyer.  Why does
15    everyone need a lawyer?  Oh, they got -- there is a
16    whole exchange back and forth where he is basically
17    telling me -- and I kind of lost it.
18         I was like, Joel, leave me out of your
19    disgusting stuff life.  I don't want to be dragged
20    into this stuff.  I said that to him.  And Joel in
21    this very moment in time says, I know you did
22    nothing wrong.  He actually told the truth at that
23    very moment.  But then a few seconds later, I got
24    that text message from Vince Citro that said, Hey,
25    Joel said everybody wanted a lawyer.



1    Joel was caught in a lie by his own attorney

2    because he told me that Vince said everybody wanted

3    a lawyer and needed a lawyer because of what was

4    going on, and then he told Vince that everyone

5    wanted a lawyer.  I think at that moment in time

6    after that text message I knew Joel was up to no

7    good.

8        And then there was a subsequent conversation

9    with B REDACTED G REDACTED .  And then at that moment in

10   time, one of my names shows up on the board.  I'm

11   like, he's really doing this.  This guy is really

12   doing this.  He's really trying to make this happen.

13   And so, yeah, I mean, from that moment in time I

14   suspected that Joel had decided that his way out

15   especially after he burned all of Abby's stuff and

16   got jailed -- you know, again the story that Abby

17   told Rebekah was that Sue was furious at Andy

18   Greenberg because Andy wanted to try and get Joel

19   bailed out despite the fact that he had destroyed

20   all of Abby's clothes, broken bail, all these

21   things, they still thought that there was juice to

22   squeeze to get him out.

23       And the story that Abby told Rebekah was that

24   Sue said that if he did that, she was going to take

25   Abby and their grandkids and move to California.



CHRISTOPHER DORWORTH                                    August 07, 2024
DORWORTH vs GREENBERG                                              32

1      So, you know, throughout that conversation I become

2      more and more convinced that Joel Greenberg and his

3      family were behind everything.

4  BY MR. WERMUTH:

5      Q.   When did you first contact Mr. Beltran about

6  this case?

7           MR. ANDRADE:  Object to form.

8           THE WITNESS:  I don't know.  Like, we talked

9      about it on and off.  I don't know.  Isn't that

10     privileged information too, but I mean --

11  BY MR. WERMUTH:

12     Q.   The timing of when you first engaged him in

13  this matter.

14     A.   I would have to look at up.  I don't have that

15  information for you, but we talked about it for a few

16  months, and he...

17     Q.   A few months?  Two months?

18     A.   I honestly don't know.  You keep asking me to

19  peg these numbers down.  I don't have a sort of timeline

20  in my head of it.  If I had it for you, I would give it

21  to you.

22     Q.   Was it in 2003 or before?

23     A.   2003?

24     Q.   2023 or before?

25     A.   I filed the lawsuit in 2020.

1    Q.   In April of 2023.  Was it in 2023 that you

2  first spoke to him about this case?

3    A.   I had talked to Mike about another lawsuit for

4  me against Seminole County government that I wound up

5  choosing not to do.  We kind of stayed friendly and

6  stayed in touch.  And then when this came, I -- sorry,

7  I'd love to give it to you.  I'm sure I have signed

8  things to this effect, but I don't know right now.  So

9  it would be purely speculation.

10    Q.   But it was at least a month before you filed

11  the lawsuit, right?

12    A.   Yes.

13    Q.   And it was probably at least two months before

14  you filed the lawsuit --

15    A.   Well, I don't know if I signed anything.  We

16  were friends.  We were friendly.  And at some point in

17  time, I had to pay or give a retainer and sign

18  something, but I don't remember the timing of that.

19  Like for example, it might have been the day we filed --

20  a few days before we filed the suit, it might have been

21  a few weeks.  Like he sent me something, I signed it.

22  The timing of that is not particularly clear to me.

23    Q.   Okay.  Your first complaint in this case

24  included various alleged direct quotations from your

25  meeting with Joel at Another Broken Egg Cafe.



CHRISTOPHER DORWORTH                                    August 07, 2024
DORWORTH vs GREENBERG                                              34

1            Do you know that?

2      A.    Yes.

3      Q.    Where did those direct quotations come from?

4      A.    My memory.

5            MR. SCHELLER:  I'm sorry, what was the answer?

6            THE WITNESS:  My memory.

7  BY MR. WERMUTH:

8      Q.    Can you remember those quotations today?

9      A.    I have jotted them down.  I have read and

10 reviewed this thing.

11     Q.    What are they?

12     A.    I'm not going to do that.  I mean, you have the

13 complaint in front of you.  I'm not going to play this

14 game --

15          MR. ANDRADE:  Object to the form, best

16     evidence.

17 BY MR. WERMUTH:

18     Q.    So you can't?

19     A.    I can't.  I'm not going to.  I provided the

20 complaint for you, and I don't think it's my job in a

21 deposition to jump through a hoop like that for you.  I

22 remember very clearly the conversation with Joel

23 Greenberg at another Another Broken Egg?

24     Q.    Okay.  Recite that conversation, please.

25     A.    No.  You have the complaint, and I'm not going



1  to do that game for you so no.

2      Q.   How would you have come up with direct

3  quotations if you cannot repeat them right now?

4      A.   I can repeat them right now.  I'm not going to

5  do that.  I don't -- like listen --

6      Q.   Are you refusing to answer my question?

7      A.   I am.

8      Q.   You're refusing to tell me the direct

9  quotations --

10      A.   Yes.  I provided the direct quotations to you

11  in the complaint.

12      Q.   I am entitled to know your memory, and you

13  can't --

14      A.   I'm telling you my --

15      Q.   -- sitting here today --

16      A.   I can recall them.

17      Q.   You can recall them right now verbatim?

18      A.   Yes.

19      Q.   Okay.  Tell me verbatim what they are.

20      A.   No.  I told you I'm not -- I have given you a

21  copy of the complaint.  What I'm not going to do is if I

22  get one word off, you're going to try to -- so I'm not

23  going to do that.  I have given you a copy of the

24  complaint.  All the quotes are in it.

25      Q.   I'll give you a mulligan.  If you can just tell



1  me, I'm not going to hold you to like exact terms.  I

2  just want to hear what your best recitation right this

3  moment is of what you alleged in the complaint that are

4  direct quotations regarding the --

5      A.   How many times do I have to say I'm not going

6  to answer this question?

7          MR. ANDRADE:  Object to form, best evidence.  I

8      understand the point you're trying to make,

9      Mr. Wermuth, but I don't believe the manner in which

10     you're asking the -- or attempting to solicit

11     testimony from my client can fully be described as a

12     question at this point.  Ask him to confirm --

13         MR. WERMUTH:  I'm asking you to limit your

14     objections to form, okay?  We're not going to have

15     speaking objections today.

16  BY MR. WERMUTH:

17     Q.   I'll ask you one more time --

18     A.   And I'll tell you one more time.  My

19  complaint -- my words are in the complaint.

20     Q.   Can you please tell me the direct quotations

21  that you have from that meeting in your memory right

22  now?

23     A.   I can do that --

24         MR. ANDRADE:  Object to form.

25         THE WITNESS:  I'm not going to do that.  I've



 1      already told you several times I'm not going to do
 2      it.  I have given you a copy of the complaint.  I
 3      guess -- I don't know what the tactic you're trying
 4      to use here, but I provided the things and I'm not
 5      going try and cite it just to please you.  I've
 6      given you a copy of the complaint.  I have those
 7      quotes in there, and that is what I am going to
 8      answer.
 9  BY MR. WERMUTH
10      Q.   Do you understand that your testimony today is
11  inconsistent with the allegations that you put in your
12  complaint?
13           MR. ANDRADE:  Object to form.
14           THE WITNESS:  I don't agree with that.  I
15      didn't write the entire conversation.  We're talking
16      about different parts of a conversation.  There's
17      not -- in the complaint, I did not enumerate.  It's
18      not like some great speech or anything.  I
19      referenced a few things that Joel said which he did
20      say.
21  BY MR. WERMUTH:
22      Q.   What did he say about "AB"?
23      A.   I have -- listen, you have got the complaint,
24  and I'm not going to play this game.
25      Q.   What did he say he was going to do?



1    A.   If you want to ask another question, I'm happy
2  to answer it, but I'm done with this one.
3    Q.   How did you request that meeting?
4    A.   I don't remember.  Either by phone or text, one
5  of the two.
6    Q.   What did you discuss in that -- in setting the
7  meeting, if anything?
8    A.   I don't think there was much discussion.  Just,
9  I need to talk to you.
10    Q.   Did you pay for breakfast?
11    A.   I don't remember the answer to that question.
12  I think Joel -- I don't know the answer to that
13  question.
14    Q.   Do you eat at Another Broken Egg Cafe often?
15    A.   Yes.
16    Q.   About how often?
17    A.   At the time -- there is two breakfast places up
18  in Heathrow.  I mean, I basically bounce back and forth.
19  Around that time, a couple days a week.  Now not so
20  much.  I'm more back on the Peach Valley side.
21    Q.   After Joel was first indicted, to your
22  knowledge, but before that -- the JW Marriott Resort
23  outing, did you have any communications with Joel?
24    A.   Yes.
25    Q.   Okay.  What were they?



1       A.    At the time, we were just checking in.   How are
2   you doing, buddy?   Everything all right?   You know, I
3   was pissed at Joel because he had put segregationist on
4   the tweet -- or the biography in an attempt to drag me
5   into it, and I had gotten like some random cease and
6   desist letters.   I didn't really know what -- I didn't
7   understand what he was doing, so I was mad at him.   I
8   was like, dude, this is so stupid.   Why would you put
9   that on there?   And, you know, I was irritated.   But at
10  the same time, he had just been indicted twice, lost his
11  job, had to resign.   You know, it was -- I just checked
12  in on him.   It was more of a buddy check than anything
13  else.   And again, a buddy check.   How are you doing?
14      Q.    Did he say anything to you?   Did he tell you
15  anything?
16      A.    Just chugging along.   Generic responses.   I
17  don't think -- nothing insightful that I can recall.
18      Q.    Okay.   How about with Abby Greenberg?   Between
19  the time Joel was indicted and before the JW Marriott
20  event -- I mean, we can exclude the discussion that you
21  had on the day of the indictment or the day it became
22  public, but did you have any conversations with Abby
23  during that period of time?
24      A.    Yeah.
25      Q.    Okay.   Can you tell me about those?



 1    A.   Again, it was general concern for her

 2  wellbeing.

 3    Q.   Nothing other than that?

 4    A.   I mean, the last conversation I had with

 5  Abby -- well, listen, Abby was Rebekah's friend.  They

 6  would speak more, and I think we were just more checking

 7  in on her.

 8    Q.   I'm just zeroed in on that period of time

 9  between the JW Marriott and the indictment.

10    A.   Between the indictment and the JW Marriott?

11    Q.   Yes.

12    A.   I think it was just general concern, like how

13  are you doing?  Is everything all right?  Are your kids

14  okay?  Are you holding up all right?  Abby was doing

15  great.  She was in a great mood.

16    Q.   All right.  And after Joel was first indicted

17  but before the JW Marriott outing, did you talk to Matt

18  Gaetz about matters related to Joel?

19    A.   The timing, again, is between the JW Marriott

20  and Another Broken Egg?

21    Q.   No.  Between the indictment and the JW

22  Marriott.

23    A.   I talked to Matt most days.  So, yeah, we

24  talked, but I don't know if we -- you know, Matt was

25  just sad for Joel, but nobody was surprised that Joel



1  was going through this.  And, you know, all of -- at

2  this point in time, the entire game from Joel became

3  about getting a pardon through Matt.  And Matt didn't

4  really have any interest in talking to Joel basically.

5  I think Joel reached out to him a few times, and he

6  didn't do it.  So the conversation I had with Matt was

7  just about how Joel was -- you know, he thought that

8  Matt could get a pardon.

9      Q.   So you were hearing -- during this period of

10 time between the indictment and the JW Marriott, you

11 were hearing something about Joel seeking a pardon from

12 Matt?

13     A.   Yes.

14     Q.   Okay.  So Matt was reporting to you that Joel

15 was seeking a pardon?

16     A.   Matt was reporting that Joel had sort of

17 circulated the idea that he needed a pardon.

18     Q.   Okay.  But Joel didn't say that to you?

19     A.   Well, Joel said that to me at Another Broken

20 Egg Cafe.  That was the conversation we had.

21     Q.   But in this period of time between the

22 indictment and the JW Marriott, Joel didn't reach out to

23 you about that, you're saying that Matt was reporting

24 that Joel reached out to him?

25     A.   I understand why you're asking the question.



1  The problem with this is the premise of it mistakes the
2  fact that Joel had gotten the subpoena from the federal
3  government.  And like I said, it was this thick and
4  single space and all the other stuff, and I had never
5  seen anything like it.  He brought it to me and said,
6  What do I do about this?

7          And I -- you know, our advice to him was to
8  resign on the spot because clearly, like, when the
9  Secret Service issues a subpoena this long.  So at that
10 very moment in time when Joel was -- from that point, he
11 became very interested in wanting to get a presidential
12 pardon.  Not so much because he was -- I think in his
13 own mind he knew he needed one or he was going to need
14 one or maybe he knew what was going on with the court
15 case beyond what everybody else did, but that sort of
16 became his thing.

17          The actual first time he said the words to me,
18 I need a pardon, I believe -- and again, if I found out
19 that he mentioned it some other time beforehand, I
20 believe that was Another Broken Egg, but he had
21 already -- before he had been indicted but sort of down
22 the road of wanting a presidential pardon.  Like asked
23 me if my firm did presidential pardons and asked exactly
24 what goes into those sort of things.

25          So before he had even been charged with a



 1  crime -- because again, when you get a subpoena from the

 2  Secret Service that's this long and this detailed that

 3  you -- that -- you know, it looked to me that they knew

 4  what they were talking about.  And it was questions

 5  about crypto currency wallets and the tax collector

 6  office and everything else.

 7          And that is why I actually introduced him to

 8  Vince Citro, his first attorney.  I said, you know, you

 9  need to talk to a very serious person who has extensive

10  experience in dealing with federal government agencies

11  and stuff like that.  Ever since that happened, that's

12  when Joel started doing this.  So you asked the

13  question, and surficially, yes, I believe it's a factual

14  statement that the first time he ever said to me, Chris,

15  I need a pardon was probably at Another Broken Egg, but

16  he had already started setting the terrain for that well

17  in advance.

18      Q.  But during this period -- between the time

19  that -- Joel's indictment was unsealed and the time of

20  that JW Marriott event, you had discussions with Matt

21  Gaetz in which he was conveying to you that Joel had

22  asked him for a pardon?

23      A.  I believe -- I believe Matt 's exact wording

24  was something along the lines of, Joel is trying to make

25  his problems everybody's problems unless we get him out



1  of his problems with a pardon.  Something like that.

2      Q.  So you're saying Matt was saying that before

3  the JW Marriott?

4      A.  I mean, the JW Marriott -- well, Matt was of

5  the opinion that Joel was in deep trouble and that --

6  and knew that Joel was going to come looking for a

7  pardon.  Again, this predates -- this goes back to when

8  he got the first mega subpoena from Secret Service.

9  You'd have to ask Matt whether they had -- I don't know

10  if it was somebody else or him directly.  Matt did not

11  share with me exactly what it was.  His statement was

12  something very close to the effect of Joel was trying to

13  make his problems everybody's problems unless we get him

14  out of his problems.

15      Q.  And that was before the JW Marriott that he

16  said that?

17      A.  Yes.  And at that time --

18      Q.  Did he tell you kind of why he thought Joel was

19  in deep trouble?

20      A.  Joel had been charged with two felonies.  He

21  didn't have to tell my why he thought Joel was in deep

22  trouble.  That by its own very definition, I think it

23  meets the straightforward definition of deep trouble.

24  At the time, we thought Joel had problems with stalking,

25  and that we had -- he had problems -- whatever the -- I



1  think stalking is the term they lend to when you send a

2  note to a music teacher at a local private school

3  claiming that he's having anal sex with a middle school

4  student.  He got Brian Beute in trouble with that.  And

5  then they found his fingerprints on it.  And so, you

6  know, he got indicted for that.

7          At the time, we thought he was in plenty of

8  trouble for that.  We weren't aware of the fact that

9  there would be 31 other felony indictments coming along,

10  and we didn't know about that.  We just thought that the

11  initial two felonies consisted of what I would consider

12  to be quite a bit of pain and trouble.  The fact that

13  Joel had had sex with an underage person, and they had

14  Venmo records and all and whatever that was not yet

15  known to us.  That was not part of the conversation.  It

16  was really more centered on the stalking, Brian Beute

17  stuff, the creation of the fake website, whatever the --

18      Q.   You said known to us, do you know what Matt

19  knows during that period of time?

20      A.   I just know what we discussed.  Do I know

21  everything Matt knows during the time, no, I don't.

22  Maybe he knew more, but we were having a conversation

23  about a mutual friend who was trying to -- who was in a

24  bad situation.  So, I mean, I don't know everything.

25  You'd have to ask him what he knew beyond that, but that



 1  was the content of our conversation.

 2      Q.  Yeah, but what all did Matt tell you about the

 3  deep trouble that Joel was in before the JW Marriott?

 4      A.  At the time, the thought was he was in trouble

 5  for doing something against somebody -- against one of

 6  his political adversaries.  That was all we knew about

 7  at this time, but Joel still wanted a pardon when it was

 8  just two felonies.  I mean, it wasn't like he was like,

 9  okay, now there is 20 felonies.  I'm going to start

10  looking for a pardon.

11      Q.  I want it to be clear in my question --

12      A.  Please.

13      Q.  -- when I'm asking you what -- not what Matt

14  knows, I'm asking you what Matt said.

15      A.  I told you what Matt said.  I have shared the

16  extent of the conversation.  There is nothing else that

17  I can think of.

18      Q.  And you don't have personal knowledge of what

19  Matt knows during that period of time?

20      A.  The questions you're asking, I think -- if you

21  try to diagram them, I don't -- I know what Matt told

22  me.  I don't know above and beyond what Matt told me.  I

23  don't think Matt was lying to me.  I don't -- so I know

24  the extent of the conversation I had with Matt.  I

25  don't -- I cannot warrant in some mental level what he



1  does and does not know or what he knew or if he didn't

2  disclose -- I don't know any of that stuff and clearly

3  couldn't know that.  So I don't...

4      Q.   Okay.  During that period of time, did Matt

5  mention that there had been women at your house?

6      A.   No.

7      Q.   Now, after hearing Rebekah's report from them

8  JW Marriott but before you met with Joel at Another

9  Broken Egg Cafe, did you talk to Matt Gaetz about

10 matters related to Joel?

11     A.   Yes.

12     Q.   And what all did you talk about with Matt Gaetz

13 about Joel?

14     A.   The considered opinion of me and Matt at the

15 end of our phone conversation was that Joel did not

16 really understand how presidential pardons work.  He had

17 sort of a whimsical, fantastical, almost childlike view

18 of how one would administer political influence to do

19 something like that, and that he needed somebody to

20 convey to them -- to Joel that this dog is not going to

21 hunt.  You're not going to pardon your way out of this

22 problem.

23         And Matt asked me to make sure I relayed that

24 to him on his behalf, and he thought it was important

25 that I did so on my behalf too because Joel thought that



1  I do so on my behalf too because, again, Joel thought

2  that your clients could stroke a check for $5 million to

3  the Ballard firm, and that we would go procure a pardon

4  for him, and that was never going to happen.

5         And I had to relay to him that Matt not only

6  could not help, would not help, and that I would not

7  even go to my boss with the volunteered offer of $5

8  million because I think it would have gotten me -- if I

9  would have gone to my boss and said, I know this guy,

10 and he wants to pay us $5 million to get preemptively

11 pardoned for stalking and everything else, my boss would

12 have hung up on me and told me I was an idiot.  It would

13 have reflected very poorly on me.

14        So in my conversation with Matt, we discussed

15 that, and I said that I -- he thought that I should make

16 it very clear so that Joel could understand that Matt

17 could not help, would not help, and that I would not

18 even bring it to my boss.  The final part of the

19 conversation was him just begging me to bring it to

20 Brian, saying, Please bring it to Brian.  He just

21 suggested.

22        But by that time, he had already told me that

23 he thought had issues with women that were coming.  I

24 said, Joel, if the odds were .0001 percent before, that

25 .001 percent just sailed with the knowledge that there



 1  might have issues with underage women.  So I said, no,

 2  I'm not doing that.  It's not going to happen.

 3      Q.   Okay.  Well, you transitioned from your

 4  discussion with Matt to your discussion with Joel I

 5  think in the middle of your answer there.  So I want to

 6  know what exactly was the message that Matt conveyed to

 7  you to convey to Joel?

 8      A.   Can you just read that back?  I just gave you

 9  the answer.  I'm not going to restate the answer.  It is

10  what it was.  I have already told you that several times

11  now.

12      Q.   Do you realize --

13           MR. ANDRADE:  He answered.  Object to form.

14  BY MR. WERMUTH:

15      Q.   Do you realize that there is a direct quotation

16  in your --

17      A.   Sure do, buddy.  Absolutely.

18      Q.   All right.  In your first complaint -- and

19  please tell me from memory what exactly Matt Gaetz told

20  you to convey --

21           MR. ANDRADE:  Object to form.

22  BY MR. WERMUTH:

23      Q.   -- to Joel Greenberg?

24      A.   I'm not going to do this.  I have told you I'm

25  not going to do this.



```
 1            MR. ANDRADE:  Object to form.  I was going to
 2       say I need like a second to say Object to form.
 3            THE WITNESS:  Sorry.
 4            MR. ANDRADE:  And if it's okay with you, Fritz,
 5       just for the court reporter's benefit, if Fritz can
 6       finish asking his question before answering it.
 7       That would probably be helpful as well.
 8  BY MR. WERMUTH:
 9       Q.   Did you take notes of your conversation with
10  Matt Gaetz?
11       A.   I have already told you that.  No.
12       Q.   Before meeting with Joel Greenberg, did you
13  have any knowledge -- before your meeting with Joel
14  Greenberg at Another Broken Egg Cafe, did you have any
15  knowledge of "AB" or REDACTED?
16       A.   No.
17       Q.   No knowledge of those names being ever raised?
18       A.   Well, I mean, there is one text exchange that
19  we talked about yesterday; but, I mean, if you look over
20  the -- there was always different things.  I didn't
21  know.  I mean, I was aware that there was somebody named
22  REDACTED.  I knew a story from that because I knew she went
23  to the Bahamas with people, but I didn't know her.  I
24  was sort of aware of it, but I have never met the woman.
25  I still have never met her.  A lot of these people I
```



1   have never met.

2       Q.   So you're aware there was a woman out there

3   named ██████ or "AB," but that's --

4           MR. ANDRADE:   Object to form.

5           THE WITNESS:   In the form -- sorry.  In the

6       form of -- it was K██████ M██████'s -- I believe that

7       Joe Ellicott's girlfriend, K██████, had a roommate

8       named "AB."  And over the course of the testimony

9       from K██████ and "AB," they said they never lived

10      together, but she was described to me in the early

11      days -- not early days, but whenever she came

12      around, and it would have been in 2018 and it was

13      specifically centered around a trip down to the

14      Bahamas that -- where -- I don't think Joel was on

15      that one.

16          I think that was a plane with Matt Gaetz -- I'm

17      sorry, Matt Gaetz flew commercial.  Halsey Beshears

18      flew down with K██████ and "AB," and Halsey was a

19      member of the legislature at the time.  I think that

20      predated his service as DBPR secretary.  And when

21      you're a legislator, it's typically -- you don't

22      lead with, Hey, I'm in the legislature because that

23      can very easily be construed for, I'm trying to seek

24      preferential treatment.

25          But there was a story that I had heard that



1  when Halsey was flying back into the country, he --
2  I guess flying in with two young women, enough to
3  get some customs person to ask questions.  And they
4  basically said -- they said, what do you do for a
5  living?  And the internet would say state
6  legislator, but you only make like $30,000 a year
7  for being a state legislator.
8      So he answered I'm a bike store owner, and that
9  was like enough.  So I knew that story, and that was
10  the context I would be aware of "AB," but I never
11  knew "AB"'s birthday, or I never knew when she was
12  -- there is stuff there that I would be -- I had no
13  idea there was an issue with her age at any point
14  time or when Joel had sex with her or -- and I never
15  met her at my house.
16      So I -- there was -- they would make reference
17  to people that I would hear names.  Like I would
18  hear the name Emma.  I don't know who that is, but
19  Joel loved a girl named Emma.  That was -- the was
20  the one who shortly after he got indicted got in a
21  car crash outside of his house.
22      So that would be the context I was aware of
23  her.  It wasn't until that moment in time -- it
24  wasn't until Another Broken Egg that I realized --
25  and I'm not even -- see, my memory is -- on that



1    is -- I don't know that he ever said -- I believe

2    the first time I ever knew that the fact that the

3    underage girl, the person I now know to be ███████ or

4    "AB," I believe that came when he sent me that

5    nonsensical text message saying V███████ 99.  I said,

6    Who is that?  And he said, ███████.  And I don't

7    know -- I never logged onto that website.  I don't

8    know people's logins.  I don't know ███████.

9   BY MR. WERMUTH:

10       Q.   You were just referencing the August 14, 2020,

11  text?

12       A.   Yes.  I think -- the one where he sent me the

13  thing saying everyone was going to be -- need to be

14  laywered up because his attorney, Vince Citro, said so.

15       Q.   You're saying that is the first time he

16  mentioned "AB" in relation to the criminal

17  investigation?

18       A.   The idea that it was -- the first time Joel

19  Greenberg mentioned it?

20       Q.   To you.

21       A.   I don't -- I think he referenced -- I mean, I

22  was unaware -- the name ███████ -- I'm a loss.  Again, I

23  believe that -- I know at the Another Broken Egg he told

24  me that we had a problem.  That he has a problem.  That

25  there was more -- the language he always used was they



1    got the girls to talk to them.  They got it from my

2    phone records.  He said that in the text exchange too.

3    He -- so I think the first time that I was acutely aware

4    that the person who he had -- but even then when he said

5    ███████, I didn't know who ███████ was.  I had to go find

6    pictures of her down the road.  So, you know, again, it

7    was -- I was aware that he had a specific problem.  I

8    don't know that I had the perfect context for that at

9    that point in time.

10        Q.   So it was -- just to clarify, to your

11   knowledge, is the meeting at Another Broken Egg Cafe the

12   first time Joel mentioned "AB" in relation to the

13   criminal investigation?

14        A.   I believe he did.  I don't know whether he

15   specifically identified her by her name.  He identified

16   the fact he had a problem with a girl.  I don't think

17   he -- and it is very -- I'm having a brain fog on

18   whether or not he specifically said it was that.  I

19   don't think it was.  I don't think he identified her as

20   her -- he identified the existence of the person.  I'm

21   not certain that he identified and tagged the name "AB."

22        Q.   Okay.  What did he say about the person that we

23   now know is "AB"?

24        A.   That they had -- as I just shared with you a

25   second ago, that she was talking to them, that -- and



1    that they had his Venmo or something like that.  He

2    basically shared that the feds had started talking to

3    women, one of them might have an age issue, and they

4    were talking to her and that -- that there was a -- that

5    he had tough things on the horizon.  He didn't say, I'm

6    facing -- he didn't enumerate the crimes he was going to

7    face, but it was basically just that it was something

8    that Matt would want to pay attention to because Matt

9    had met [REDACTED] before.

10        Q.   And that's what he told you at Another Broken

11   Egg Cafe?

12        A.   Yes.

13        Q.   What did Joel say that he was doing at that

14   point?

15        A.   Excuse me?

16        Q.   At Another Broken Egg Cafe, what else did Joel

17   say about the investigation or the girls?

18        A.   Most of our conversation -- let's say the

19   entire meeting lasted 30 minutes.  Probably half of it

20   was spent with me explaining to him the impossibility of

21   ever receiving a pardon from anybody.  You know, he

22   was -- Joel, at this point in time, knew -- he had the

23   weight of the world on his shoulders because he was

24   aware of all the stuff that he knew and that the feds

25   were going to come down.  And, you know, he believed

ESQUIRE
DEPOSITION SOLUTIONS

1   then and he continued to believe even after I had -- he

2   always thought at the end of the day if things got bad

3   enough he could pardon himself out of it.  That was

4   Joel's philosophy.

5           And that breakfast or that meeting at Another

6   Broken Egg Cafe was me telling him that any -- that Matt

7   was not going to try, that I would not be part of any

8   attempt with my firm to try, and that I did not believe

9   that anybody -- because he then moved on -- I believe he

10  asked me about Roger Stone, that he would later go to

11  Roger Stone to try to get him to do the work.

12          But he asked me if -- he said, Can Stone do it?

13  And I said, I don't believe that what you're looking to

14  do can be done.  I don't think there's any single person

15  that -- maybe if you have his kids or his wife who wants

16  it done, but I don't think there is anybody that you can

17  hire, I don't think there is any congressional ally that

18  you can go to that can get you out of your problem right

19  now.

20          And at the time, we didn't know if Trump was

21  going to be reelected or not.  So Joel -- I think Joel

22  thought the play would be that Trump would get

23  reelected; and after Trump got reelected, maybe he could

24  get Matt to go in there and do a pardon.  And then Trump

25  didn't get elected, and that's what I later learned that



1  Joel would go and solicited Roger to go get him a
2  pardon.  I think they were talking about wiring, you
3  know, several hundred thousand dollars of Bitcoin at
4  that point in time.
5          But obviously, just as part of the bigger
6  story, the pardons became a subject of great news
7  interest and media contemplation, and I just remember at
8  some point in time -- and this was not even related to
9  Joel Greenberg.  I was talking to Brian Ballard one day,
10 Just so you know, we're not going to be in the business
11 of pardons because it's just too hot.  And anyone that
12 gets one is going to wind up -- the circumstances are
13 going to be investigated, and it's just not something we
14 want.  And I didn't have anybody like pending, but I was
15 like, okay, sounds good.  I appreciate it.  It was just
16 more of something to be aware of.
17     Q.  So Joel didn't make any specific statements
18 about women in the investigation?
19     A.  I mean, he said -- you take the things I say
20 and then just completely change them.  He said they were
21 talking to the girls, so, no, that's not true what you
22 said.  No, he said they were talking to the girls, and
23 that they had his bank records.
24     Q.  They?  And who is they?
25     A.  The feds.



1    Q.   Okay.  Did he say what he was doing about the
2  girls?
3    A.   No.
4    Q.   Okay.
5    A.   I don't even understand that question.  What
6  does doing about the girls mean?
7    Q.   Did he say anything that he was going to do
8  about the girls?
9    A.   I don't understand the question.  Like what are
10  the options?
11    Q.   About the investigation.
12    A.   Well, I think his attempt to do that was to try
13  to get a pardon.  That was what he was doing.  That was
14  his action step.
15    Q.   Okay.  So you don't recall him saying anything
16  about him taking any actions in relation to any of the
17  women?
18    A.   No.
19         MR. ANDRADE:  Object to form.
20         THE WITNESS:  Off the top of my head, I don't
21      recall any of that.
22  BY MR. WERMUTH:
23    Q.   So you don't have a clear recollection of what
24  he said about any of the --
25         MR. ANDRADE:  Object to form.



1        THE WITNESS:  Fritz, I find it very

2   unprofessional because what you do is you say things

3   and you restate what I say wrong and you

4   characterize it incorrectly.  I don't agree with

5   anything you just said, no.  You know, Joel -- he

6   talked -- Joel talked a certain way, and he -- he --

7   you know, he kind of had a half hazard

8   misunderstanding of how civics work and the process

9   of being pardoned.  He thought he had a -- basically

10  a blank check from his parents to do whatever it

11  took and wanted to sort of go down the different

12  lanes of what that could be.

13        He did not share his legal strategy with me.

14  He did not share what Vince Citro and he were doing.

15  He made no note of any depositions he was seeking to

16  take or anything like that which I think -- if

17  that's what you're asking, no, he did not do that.

18  But, I mean, the assumption over the course of the

19  conversation was that he had very confident legal

20  counsel at the time in Vince Citro, and then went on

21  to Mr. Sheller.  So that was -- he was not coming to

22  me for my insights or thoughts on the legal case,

23  and, you know, what could be there.  His intention

24  for me was very political.

25        MR. WERMUTH:  Jason, will you do me a favor and



1    pull up exhibit 1.1 -- I'm sorry, the document 1.1.

2    It's the original complaint.

3         MR. ANDRADE:  Are you going to mark it 128?

4         MR. WERMUTH:  Yes.

5         (Exhibit 128 was marked for identification.)

6   BY MR. WERMUTH:

7    Q.   I'm showing you what is the original complaint

8   in this case, the verified complaint.

9         MR. PERKINS:  It should be Exhibit 128.

10  BY MR. WERMUTH:

11   Q.   Do you recognize that document?

12   A.   I do.

13   Q.   If you could jump to page 42.  Do you see this

14  complaint is talking about the JW Marriott event, and if

15  we scroll on to page 43, at paragraph 367, do you see

16  where it says, Greenberg conveyed to Rebekah Dorworth he

17  told Chris Dorworth he was optimistic that the issue

18  could be handled because he was paying for "AB"'s

19  attorneys.

20        Do you see that?

21   A.   Yes.

22   Q.   Is that what he told you during that meeting?

23   A.   I think -- yeah, he did.  I mean, the timing of

24  it is -- yeah, I mean, I know -- he definitely said that

25  to me in a text message.  He said, I'm having to pay her



 1   attorneys.  I think he was more cryptic about it in the

 2   conversation.  Like there's not a direct quote in there.

 3   He basically intimated he was doing everything --

 4   legally that would fall underneath the camp of all that

 5   stuff.  You know, he said that -- I believe he said it

 6   that day.  I recall him saying it that day.  He didn't

 7   say it was for "AB."  It was the person we now know to

 8   be "AB."  But he definitely said it in writing to me in

 9   the text messages he sent just a few weeks later.

10       Q.   And you're alleging here under oath that he

11   conveyed that to Rebekah Dorworth too?

12       A.   Yeah.

13       Q.   At the JW Marriott?

14       A.   Yes.  She also signed this because she had

15   knowledge of that.  So that was why we had her sign the

16   complaint because there is certain portions of the JW

17   Marriott that I did not have firsthand knowledge of.

18   That is why Rebekah signed the complaint.

19       Q.   And you realize that this is the first

20   complaint?

21       A.   Yes.

22       Q.   So she didn't actually verify this one, right?

23       A.   I thought she verified them both, but okay.

24       Q.   Later you had her verify the amended complaint

25   that incorporates this one by reference?



 1    A.    Okay.  Yeah.  Well, I mean --

 2          MR. ANDRADE:  Object to form.

 3          THE WITNESS:  I mean, the --

 4          MR. ANDRADE:  That wasn't a question.

 5          THE WITNESS:  Okay.

 6  BY MR. WERMUTH:

 7    Q.    So in the context of the meeting where Joel was

 8  suggesting why you and Matt Gaetz should be helpful in

 9  obtaining his pardon, Joel mentioned "AB."

10          Is that what you're saying?

11    A.    I do not believe he mentioned her or referenced

12  her specifically by name of "AB".  I believe he said one

13  of the girls was having a problem -- you know, is

14  talking to them.  They have our bank records.  I'm doing

15  what I can.  Obviously Joel was trying to go off and do

16  his things, sort of making it seem like he's got

17  everything under control.  Again, I consider that sort

18  of the legal case.  This has nothing to do with me.  The

19  conversation where he found I could have value to him is

20  was the procurement of a pardon.

21          Joel did send her to an attorney.  He did send

22  her to -- I believe his name was Andrew Searle.  He did

23  send her -- I mean, those things did happen.  There was

24  no bill waiting for her.  She was -- all those things

25  did happen.  He did say that.  But, again, he was



1  intimating things.  I don't think -- based on what I saw

2  in discovery, I don't think that had happened yet.  I

3  think that was something that it might have.  I could

4  get the dates conflated on those things, but Joel was

5  always trying to make it seem like he had everything

6  under control.

7           But, again, he had already been charged with

8  two felonies.  He was already -- take the girls out of

9  this.  He was already facing time in prison.  He had

10 already lost his job.  So the advent of him threatening

11 Rebekah -- and again, you heard from her what she had to

12 say.  And then with when he was coming to me and saying

13 that he -- like he was doing everything he could and

14 that he would try to make the money -- you know, that he

15 would try and make the money problems go away.  And he

16 also said he would give me $5 million if I could get a

17 pardon.

18          These are just parts of the conversation that

19 happened that day.  But it was -- again, it was a half

20 an hour conversation.  You try and take a few excerpts,

21 and say it doesn't happen.  I don't believe that he had

22 ever -- I don't think he told Rebekah that the woman's

23 name is "AB."  I think he said the same thing.  They

24 talked to some of the girls and they have bank records

25 and I have a problem with one of them -- he had a



 1  problem with one of them.

 2      Q.   But that's not what this paragraph says.  This

 3  paragraph, 367, says that you're saying he was paying

 4  "AB"'s attorneys.

 5      A.   Yeah.

 6          MR. ANDRADE:  Object to form.

 7          THE WITNESS:  Well, he did.  He sent her to an

 8      attorney, Andrew Searle -- again, all I'm doing is

 9      just relying on what Joel told me.  You know, he's

10      making intimations.  He spoke in sort of a cryptic

11      manner.  He didn't -- it wasn't entirely

12      prescriptive.  And the way he said -- he's trying

13      to -- he made us aware of the fact that he had a

14      problem.  Again, talking about the fact -- I was

15      introduced to the fact that Joel was right now very

16      freaked out about the fact these things he's already

17      facing, the stalking charge and fake whatever the

18      thing was, that was not even the biggest problem in

19      his universe.  That would be news to me.  That would

20      be new.  But his response was, Hey, listen, I'm

21      doing everything I can do on my end; but, you know,

22      we need to get a pardon to make this go away.

23  BY MR. WERMUTH:

24      Q.   So you don't know at that point whether he had

25  spoken to "AB" about the investigation at all?



1    A.    I mean, all I know is what he told me, and what

2  he told me is what we put in the complaint.  There is

3  nothing more.  Again, I wish I would have asked more

4  questions.  I wish I would have said, Let me get some

5  notes out so I can be really comprehensive.  I have a

6  lot of questions about it, but that is what he did.  And

7  the conversation -- he was trying to sort of -- just so

8  you understand the dynamic of this conversation, it

9  wasn't a nice, pleasant a back and forth.

10         It was him saying -- me saying, Don't ever

11 threaten my wife again.  Him freaking out, him losing

12 his mind telling me that, you know -- and just getting

13 all this stuff off his chest that there's all these

14 other issues.  Me stopping him saying, Listen, buddy,

15 I'm sorry, but you are -- you now have real problems.  I

16 mean, like this is going to get real, and we are not

17 going to be able to pardon you out of this.  It's just

18 not something you can rely on and don't ask because

19 we're not going to try and don't make that part of the

20 strategy.  And Joel thought he had everything worked out

21 up till he didn't.

22    Q.    All right.  I'm just trying to understand what

23 he said during that period of time.

24         Did you take notes on that meeting?

25    A.    No.



1           MR. ANDRADE:  Object to form.

2           THE WITNESS:  How many times have I answered

3     that question for you, Fritz?  Seven?  Eight?

4  BY MR. WERMUTH:

5     Q.   When was the next time -- after Another Broken

6  Egg Cafe, when was the next time you communicated with

7  Joel?

8     A.   I don't think I ever communicated with Joel

9  after that except for the time when he sent me the text

10  messages to tell me that we were -- I believe that was

11  the last official time I talked to him.  He would send

12  me -- by the way, he would send some Signals to me that

13  had like a five-minute expiration time saying things

14  like, Call Stone, he'll explain it all.  Basically

15  trying to -- I never responded to any of those.

16     Q.   Okay.  How many of those did he send?

17     A.   Four or five maybe.

18     Q.   Were they all about Stone or other things?

19     A.   Asking me to -- you know, to -- yes.  They were

20  all directing me to go reach out to Roger Stone.  Stone

21  would tell me what was really going on with stuff, and I

22  just figured that at this point in time Joel was trying

23  to get everybody in trouble, and I just stopped

24  responding to him.

25     Q.   So just so I'm clear, the last time you



1  communicated with Joel was on August 14, 2020, when he

2  sent the text message to you?  So the day he sent that

3  text message is the last time you communicated with him

4  by voice, text, anything?

5      A.   I'm trying -- I'm wracking my brain.  I think

6  that was the last communication we had.

7      Q.   Okay.  Did you talk to him that day?

8      A.   No.  It was all done via text.

9      Q.   How'd you keep that text, by the way?

10     A.   Well, I screenshot it right away.  At that

11 moment in time, it was very clear that Joel was -- what

12 he was doing.  I screenshotted that and the Vince Citro

13 text so I could put them right next to each other to

14 show that he was saying that Vince was telling me that I

15 had to get -- that Vince was saying that we should

16 lawyer up because they're going to ask questions.  And

17 when I call -- again, just one of those small things.  I

18 called Vince right away, and Vince's response to me was

19 that he did not -- he did not answer the phone, but he

20 did send me a text, and said, Hey --

21     Q.   We're kind of getting a little far afield.  I

22 was asking about your last communication with Joel.

23 So --

24     A.   That was the last communication that I can

25 recall.



1    Q.   I understand you claim that Joel's statement
2  was threatening to Rebekah when he was with her?
3    A.   It was.
4    Q.   Okay.
5    A.   That's the way she conveyed it to me.
6    Q.   And he was threatening to you at Another Broken
7  Egg Cafe?
8    A.   He was just unhinged.  Again I -- he was -- he
9  was unhinged.  He was clearly stressed.
10   Q.   Unhinged, stressed, and he threatened your
11 wife?
12   A.   And threatened my wife before.  He did not
13 threaten my wife to me at Another Broken Egg Cafe.  He
14 threatened my wife at the JW Marriott.
15   Q.   Did you report any of those communications to
16 law enforcement soon after they were made?
17   A.   No.
18   Q.   Why not?
19   A.   Excuse me, yeah, we did give a copy of that to
20 law enforcement.  We gave it to the feds.
21   Q.   Did you report it -- I mean, around the time.
22 So, you know, this is July 2020, an unhinged man
23 threatens your wife.
24   A.   I did not.
25   Q.   Did you report it to the police that day?



1    A.   No.

2    Q.   Okay.   How about in August after he sent you

3 the text?  Did you report him to the police at that

4 point?

5    A.   Under what mechanism would I report him to the

6 police?  I quite literally just documented the

7 situation.  Joel was off doing Joel things.  You know,

8 he always...

9    Q.   You didn't say, Hey, police this guy is

10 threatening my wife, sending me threatening texts?

11    A.   What would I say?  That he threatened -- would

12 I call the police and say he threatened my wife that if

13 he didn't get a pardon it would be bad for Matt Gaetz?

14 That doesn't make -- what would I call the cops and say?

15    Q.   Maybe a report of extortion?

16    A.   I'd like to report a conversation in which a

17 political person told me that I had to get a pardon; and

18 if not, another person would be affected.  I would

19 probably get laughed off the phone.  I don't know -- I

20 don't really -- he didn't threaten to kill her.  He

21 threatened a political outcome to somebody else.  That

22 is a distinction that I think law enforcement would find

23 unimportant.

24    Q.   Did you view what he was doing as blackmail at

25 that time?



1    A.    No.

2    Q.    Did you view what he was doing as extortion at

3  that time?

4    A.    Well, what -- can you be specific of what are

5  you saying he was doing at that point?

6    Q.    Was he trying to extort you for a pardon?

7    A.    I don't think I would classify it as an

8  extortion.  I think I would state that he was making me

9  aware of the fact that he faced bigger problems, and

10  that it would be better off -- that his perceptions

11  would be better off for everybody if he could get a

12  pardon and this could all go away.  And then later in

13  those text exchanges, he started talking about how we

14  had to get the U.S. attorney fired.  I mean, so it's --

15  Joel was certainly ambitious in his requests.

16    Q.    After you met with Joel at Another Broken Egg

17  Cafe but before your final text exchange with Joel, did

18  you communicate with Matt Gaetz regarding Joel?

19    A.    Yes.

20    Q.    And what did you talk about with Matt Gaetz?

21    A.    I relayed the subject of the conversation.

22    Q.    Okay.  And what did he say, if anything, about

23  the conversation?

24    A.    I don't have -- I mean, I think he was like,

25  Okay.  There was no great news or that's horrible news.



1    It was just -- I think he said something to the effect

2    of, Joel was going to get himself in a lot of trouble.

3        Q.   Did you discuss the fact that Joel was

4    referencing women and payments and --

5        A.   Yeah.

6        Q.   -- and Matt?

7        A.   Yes.

8        Q.   Okay.  And what did Matt say about that?

9        A.   There is nothing there.  There is no payment

10   there.  It was basically like what is Joel talking

11   about?  I have no payments to this woman.  That's not

12   true.

13       Q.   Okay.  What about the women in general?  Did he

14   say -- did he deny that he knew any of them, Matt?

15       A.   That conversation -- we didn't have that

16   conversation.  He didn't -- it didn't -- it wasn't about

17   that.  The gist of it was that Joel Greenberg having

18   been, you know, entrusted to this campaign and funded

19   his way into office did a ton of things in office, got

20   himself indicted in a political thing, was now out of

21   it, and was now facing potential for claims that he had

22   sex with an underage person.  Joel had a lot of

23   exposure, and Matt said something to the effect of,

24   like, Yeah, he's going to be -- he's got real problems

25   or something like that.  I mean it was...



1    Q.   In that communication -- or did you have like
2  one communication about this between the time -- with
3  Matt between the time of Another Broken Egg Cafe and
4  the --
5    A.   Probably one.
6    Q.   Just one?
7    A.   Probably one.   Maybe two.   Probably one.
8    Q.   And did Matt mention anything he heard related
9  to Joel's investigation during that period of time?
10   A.   I'm sorry, can you ask that question again?
11   Q.   Did Matt Gaetz mention anything he heard about
12  Joel's investigation during that time?
13   A.   Did Matt Gaetz mention anything he learned
14  about Joel's investigation?
15   Q.   I mean, he's an independent person, right.
16  He's out there.   He might be gathering information about
17  Joel's investigation.
18   A.   I don't believe that Matt was out gathering
19  information on Joel's investigation.   That is
20  probably -- again, start from our -- start with the
21  premise that I maintain is that I never met the woman.
22  That Matt had never had any inappropriate sexual
23  relationship with her when she was underage or anything.
24  Joel saying anything to the contrary, if we believe that
25  that is the truth and that is what I believe is the



1  truth, when I'm talking to Joel, I'm not concerned about

2  things he says because it's not true.  I never -- I

3  wasn't at the house when these people were there.  I

4  don't -- it's not -- that's not the way my mind works,

5  and I'm thinking Matt was probably the same way.  But, I

6  mean, you're going to have ask that question to Matt.

7  I'm not in a position to speak for him.  He did not

8  venture any information to me on the status of the

9  investigation and/or prosecution of Joel Greenberg.

10      Q.   Okay.  How about did he mention anything

11  regarding women during that conversation?

12           MR. ANDRADE:  Object to form.

13           THE WITNESS:  Nope.

14  BY MR. WERMUTH:

15      Q.   Joel was indicted for sex trafficking on August

16  19, 2020, which is about, I guess -- my math is

17  terrible.  Like a few days after that the text message

18  you received, right?

19      A.   Those dates sound right to me.

20      Q.   Okay.  How quickly did you become aware of that

21  sex trafficking charge?

22      A.   Could you -- I don't understand the question.

23      Q.   How quickly did you learn that he had been

24  indicted for sex trafficking?

25      A.   Well, I believe the day it was announced, they



1  issued -- I'm not a lawyer, but I think it's called

2  issued a new information or indictment or whatever it

3  was, I got it texted to me from about five or six

4  people.  What the hell?  That kind of stuff.  Like

5  what's happening here?  Like, oh, my god and things like

6  that because while Joel was viewed as being somebody who

7  was certainly reckless and made comments about Muslims

8  and would hire a bunch of friends and would do these

9  crazy deals, I think it was that time that -- human sex

10 trafficking adds a new, complex wrinkle that was not

11 previously kind of thought about Joel.  So just

12 people -- I guess the answer to your question is, you

13 know, I don't think -- I think probably within an hour

14 of it being announced I knew about it, maybe less than

15 that.

16    Q.    Okay.  So after you final text exchange with

17 Joel Greenberg on August 14, 2020, did you communicate

18 with Matt Gaetz about that text exchange?

19    A.    Yes.

20    Q.    When?

21    A.    I don't -- shortly thereafter.  Probably the

22 next day.

23    Q.    And what did you talk about?

24    A.    I would have been very much me just reporting

25 what the text exchange was.  Probably sent it to him.



1    Q.   And did he say anything about the context of

2  the text message?

3    A.   I don't have the text anymore, so I don't

4  remember what his response was.

5    Q.   Oh, you think you texted with him about this?

6    A.   I mean, that or said, Hey, have you seen the

7  Greenberg news or something?  I don't have that

8  communication.

9    Q.   We're talking right now about this August 14,

10  2020, text.  So Joel texted you, right, you had a text

11  exchange with him?

12    A.   Probably.  I don't know.  I'm speculating here,

13  but what I would typically do under that circumstance

14  was screen capture that and probably send it to Matt

15  or -- yeah, that would be what I would do in that.

16    Q.   And I'm asking you, did Matt say anything about

17  th contents of the text to you?

18    A.   And I'm telling you I don't remember.  I don't

19  recall what his response was.

20    Q.   After Joel's superseding indictment for sex

21  trafficking, did you communicate with Matt Gaetz about

22  anything related to that charge?

23    A.   Of course.

24    Q.   Okay.  When did you do that?

25    A.   It would have been probably a phone



1   conversation.

2       Q.   Okay.  And what did you talk about?

3       A.   The fact that Joel had just been indicted for

4   another couple dozen things.

5       Q.   Did Matt Gaetz tell you anything about the

6   person you we are calling "AB" during that discussion?

7       A.   Not that I recall.

8       Q.   Did Matt Gaetz ever tell you that "AB" had been

9   at your house in 2017?

10      A.   He did not.

11      Q.   Did Matt Gaetz -- did you ever ask Matt Gaetz

12  about "AB" being at your house in July of 2017?

13      A.   I would have asked him later when I became --

14  when -- after I found out that she was at my house.

15      Q.   So you did ask him about "AB" being at your

16  house?

17      A.   Down the road when -- I mean, yes, after like

18  before the feds and all this stuff and I found out that

19  she was on my guard gate which I didn't know going into

20  the interview with the feds, and I think his response to

21  me was, I do not recall her being there, but he wasn't

22  on the guard gate that day either.  So I don't have full

23  information as to what was happening there.

24      Q.   Okay.  Tell us when that communication occurred

25  about when you asked Matt Gaetz about "AB" being at your



1  house.  Do you think it was right after you talked to

2  the feds?

3      A.    Probably.

4      Q.    You talked to the feds on May 3, 2021; is that

5  correct?

6      A.    If that's the date you have.  I'm not great

7  with dates, but, yeah.

8      Q.    So you think right about that time you asked

9  Matt Gaetz about "AB" being at your house in July of

10  2021 -- or 2017?

11      A.    I think my statement to Matt Gaetz was, I have

12  never met this girl.  I just left the feds.  They

13  suggested that she's on the guard gate.  I just pulled

14  up the guard gate.  Her name is on there.  Your name is

15  not on there, but B[REDACTED] name is on there.  And at the

16  time, I had just discovered that I had metadata on the

17  lake because I didn't know -- when I went to the feds, I

18  didn't know that she was on the guard gate until I got

19  home, and that took some time.

20          As soon as I figured it out, the first thing I

21  did is cross reference against the photo.  So I said I

22  know -- I don't think I was there for that, and Matt --

23  I think Matt's response was, I don't think -- I don't

24  remember her being at your house or something like that.

25  I don't remember exactly what your his response was.  It



1  was just -- there was nothing like, Oh, yeah, this is

2  that one time that she was there.  That did not happen.

3  There was no -- nothing indicating anything like that.

4      Q.   At that point, Matt Gaetz didn't deny that he

5  was there, right?

6      A.   I didn't -- I mean, he was not on the guard

7  gate.  I'm not sure --

8      Q.   Why would you think to call him if he wasn't on

9  the guard gate?

10     A.   Because he is my friend, and this is the all

11  part of the same Joel Greenberg case.  I mean, Joel was

12  actively trying to make problems for us.  The feds had

13  snatched Matt's phone.  I mean, Fritz, of course we were

14  going to talk about that.  I mean, that wouldn't be

15  worth mentioning.  Of course we were going to talk about

16  that.

17     Q.   So are you saying before you talked to the

18  feds, you didn't go back and look to see who was at --

19  if ⬛REDACTED⬛ had ever been at your house?

20     A.   I didn't not -- I didn't know we had that

21  opportunity.  I didn't know there was a -- I have

22  never -- I got -- the day I got back from the feds is

23  the day I got the thing put on my phone where I can now

24  add people.  I have lived in the house since 2005, and I

25  have always just worked off a phone line until that day



1  in 2021.

2      Q.   Okay.  I understand that on September 28, 2020,

3  you communicated with Matt Gaetz and B█████ G█████

4  while you were eating dinner with a friend at FishBones

5  in Lake Mary, right?

6      A.   I don't know.  You have to provide that

7  communication for me.  Oh --

8      Q.   The September --

9      A.   So the conversation where Matt Gaetz called me,

10  and then I called █████ G█████, yes.

11      Q.   Yeah.  So there was -- I guess the next month

12  after you received Joel's text, correct?

13      A.   If those dates line up, those dates line up.

14      Q.   Okay.  So that was September of 2020.  From the

15  time Joel was first indicted in June up to September 20,

16  2020, had you communicated with B█████ G█████?

17      A.   I don't remember.  I mean, probably.  It's

18  tough for me to recall this because she was dating Matt,

19  and then what kept happening is she got a job in

20  Tallahassee, and then she went to DC and did some --

21  they were together when they were -- and then she moved

22  back.  So I would have talked to B██ when she was with

23  Matt.  I don't know the timing of that.  So it wasn't

24  like I would -- we didn't call up and have long

25  conversations on the phone.  I spoke with B██ in the



 1  context of she was my buddy's girlfriend.  So I don't

 2  remember a whole lot of conversation from that period of

 3  time; but if I found out I was on a -- it wouldn't shock

 4  me.  Not about this, it would have been other things,

 5  just how is life sort of stuff.  But I believe at that

 6  time she and Matt were not together, so it probably

 7  would have been some time.

 8      Q.  So, I mean, I think we both agree that when

 9  Joel Gaetz was -- I'm sorry, Joel Greenberg was indicted

10  for sex trafficking that was big news, right?

11      A.  That was big news.

12      Q.  Real big news; is that correct?

13      A.  Your words.  I mean, it certainly made the

14  news.

15      Q.  Would you agree?

16      A.  Yes.

17      Q.  Okay.  And did you talk to B██REDACTED██ G██REDACTED██ about

18  that -- about that -- about him being indicted for sex

19  trafficking?

20      A.  I don't believe I chatted with B██ about that,

21  no.

22      Q.  Okay.  So is it fair to say that you believe

23  that this discussion you had with B██REDACTED██ G██REDACTED██ on this

24  period of time, September 28th to September 30, 2020, is

25  the first time you talked to her about, you know, issues



1   with Joel since his initial indictment?

2       A.   Yeah.   I mean, I don't -- again, please just

3   take this at face value.   I don't have any recollection

4   of chatting with her about anything else.   If I found

5   out that there was a text that I didn't pay a lot of

6   attention to, it wouldn't shock me.   But I don't -- I

7   don't recall having a conversations with her about that.

8       Q.   From the time that Joel was first indicted in

9   June 2020 up until September 28th when he reached out to

10  you at the FishBones, did he mention anything related to

11  B█REDACTED█ G█REDACTED█ during that period of time?

12      A.   I'm sorry, can you ask that question again?

13      Q.   From the time Joel -- sorry, from the time Joel

14  was first indicted until the time Matt Gaetz reached out

15  to you at FishBones in late September of 2020 to tell

16  you about the conversation with B█REDACTED█ G█REDACTED█, did Matt

17  Gaetz mention anything about B█REDACTED█ G█REDACTED█ in the

18  intervening period of time?

19      A.   I have no idea.   I don't remember.   Again,

20  please note that I would have paid very little attention

21  to anything he would have said on that so I have no clue

22  if he did.   Again, I'm under the impression that at or

23  around that time, they had already split.   They were not

24  together, but they were still friendly.   It wasn't like

25  a bad thing.   It's just they were not together anymore,



 1  and, I mean, like I -- so I don't have -- again, nothing
 2  sticks out to me, but I'm not telling you we didn't.  I
 3  don't think they were together, and I don't think there
 4  would be any reason that we talked about it.
 5       Q.   I'd like to pull up Exhibit 115 for you.
 6  You'll probably recall --
 7            MR. ANDRADE:  This is the one marked 115 in
 8       this case.  Got you.
 9  BY MR. WERMUTH:
10       Q.   It's the Hornsby letter from October 4, 2021.
11  You may recall it.  Now, if we scroll to --
12       A.   It's not on my screen yet, so...
13       Q.   Do you recognize this document?
14       A.   I do.
15       Q.   Okay.  And if we scroll to the second page, do
16  you see where it says, The next day on September 29,
17  2020, at 10:40 a.m., Ms. G[REDACTED] called Mr. Dorworth
18  again providing additional details she had not mentioned
19  the night before specifically that his driver's license
20  had been shown to witnesses, and his house had been
21  brought up during the questioning.
22            So is it true that she said there were multiple
23  witnesses who were shown that picture?
24       A.   I believe the two -- there was no mystery about
25  who the people were.  At that point in time, it was -- I

1  didn't know them, but they were both friends of hers,

2  and they were "AB" and K[REDACTED] M[REDACTED].

3      Q.   So she identified individuals they were shown

4  to you?

5      A.   Yes.

6      Q.   So any other witnesses?

7      A.   I don't know if there is other witnesses.

8  Those are the ones that I was made aware of.

9      Q.   Had B[REDACTED] G[REDACTED] testified before the grand

10 jury at this point?

11     A.   I have no idea.  I read in the news that she

12 did, but that is obviously providential.  I have no idea

13 what she said, and I have not talked to her since then.

14 By this point in time, I don't think she had.  I think

15 she was basically the last one in for that.

16         MR. FOSTER:  And I apologize, just to clarify,

17     this is the October 4th letter?  Is that 110 or 115?

18         MR. PERKINS:  This is the October 4th letter,

19     115.

20         MR. FOSTER:  Okay.  I thought that the October

21     letter was 110 and September 1 was 115.  I just had

22     them backwards.

23 BY MR. WERMUTH:

24     Q.   Okay.  Did she identify who she had spoken

25 with -- sorry, did B[REDACTED] G[REDACTED] identify who she had

```
 1   spoken with about this to get this information?

 2        A.   Yes.

 3        Q.   Who was that?

 4        A.   K REDACTED  and "AB".

 5        Q.   She said that she spoke to "AB" directly?

 6        A.   That's what -- again, I don't recall exactly

 7   what her language was.  I mean, what she warranted to me

 8   is that she had heard from the two of them and that they

 9   had put Matt's picture up there and my picture was up

10   there.

11        Q.   They?  Who is they?

12        A.   Who could it possibly be?  It's "A" and it's --

13        Q.   No, that they put a picture of?

14        A.   It was the grand jury, the feds, the DOJ.

15        Q.   Okay.  So the feds at some previous point were

16   showing -- had received information about you --

17        A.   From Joel.

18        Q.   -- and was showing pictures to the women?

19        A.   That is what was related to me by B REDACTED , yes.

20        Q.   Okay.  And are you aware of -- strike that.

21             In either of the calls that you had with

22   Ms. C REDACTED  during this period of time, you had one the

23   night of the 28th and the next day, the 29th, did she

24   mention anything to you about "AB"?

25        A.   I don't recall exactly.  I mean, I remember I
```



1  talked to Matt Gaetz.  Matt Gaetz told me that two

2  women -- I believe he used their first names when

3  describing them had been brought up.  I hung up with

4  Matt.  Matt just basically called me and said, Hey, just

5  so you know, I don't know anything more than this, but

6  your name, your picture, your driver's license was

7  one -- and mine were both put on the big board at the

8  grand jury today.  That's all he gave me.

9          So I thought, you know, that doesn't make any

10  sense.  It didn't make any sense, but I remember the

11  Joel text, so I thought okay.  So I reached out to her.

12  She called me right away.  Again, I was thinking it

13  might take some time, but she called right away.  And

14  her -- to me she was like, I don't really think that

15  you're the person -- I think this is a Matt thing.  This

16  is a me thing.  I don't think you're very important in

17  it.  That was sort of what she said to me.  She said

18  it -- and I was like, that makes sense, I feel fine.

19  That's good.  Move on.

20          The next day when I spoke to her -- and again,

21  it says on there that I called her, but she must have

22  texted me or there is something.  I don't know.  But I

23  didn't just reach out to her again.  She called me.  She

24  reached out to me to say, Hey, do me a favor, call me.

25  She says, I have got some more information.  It has to



 1   do with your house.  And I said, Well, I have never

 2   met -- my response was, I never met her.  She goes,

 3   Chris, I don't know.  I'm just telling you what I know,

 4   and this is what I know and that was it.

 5       Q.   So you said that B█████ G█████ said, This was

 6   a me thing, in her first conversation?

 7       A.   She was more -- she was less concerned about

 8   Chris Dorworth than she was about Matt and her and their

 9   involvement in the whole thing based on whatever.

10       Q.   Did B█████ G█████ ever inform you that "AB"

11   had been at your house in 2017?

12       A.   She did not.

13       Q.   Did B█████ G█████ ever inform you that K█████

14   M█████ had been at your house in 2017?

15       A.   Again, I think I was aware she had been at my

16   house in 2017 because she was Joe Ellicot's girlfriend.

17   So, you know, I don't know that she would have informed

18   me of that.  That would have been -- she didn't tell me

19   about the July 15th party, if that's what you're getting

20   at.

21       Q.   Okay.  Did B█████ G█████ ever inform you that

22   she had communicated with "AB" after Joel's indictment?

23       A.   I mean, he was already --

24       Q.   So after Joel was --

25       A.   You've got to --



1    Q.   After Joel was indicted --

2    A.   For what?  Which indictment?  He's had a bunch

3 of indictments at this time.  The first time?  The

4 second time?

5    Q.   The first time.

6    A.   After the first time, okay.

7    Q.   So the largest period of time after the

8 indictment, did B**REDACTED** G**REDACTED** ever inform you that she

9 had communicated with "AB" after Joel was indicted?

10    A.   I mean, only to the extent of this phone

11 conversation.  Again, I didn't call her and say, Who did

12 you talk to?  I got that information from Matt.  So, I

13 mean, my assumption is that she was hearing this from

14 K**REDACTED** and "A," but she did not say, I have talked to

15 "A" but she did say that she had heard this from them

16 the day before.  So I -- she did not state whether she

17 had spoken with "A" or just K**REDACTED** or whether she

18 talked to both of them.  I did not ask that.  I mean,

19 she just basically said that at the grand jury, they had

20 put up two driver's licenses, and one was Matt's and one

21 was mine.

22    Q.   I thought you were in fact finding mode at this

23 point though, right?

24    A.   Sure was.

25    Q.   But you didn't ask her any questions about who



1    she talked to?

2        A.   No.  I didn't want to be -- I didn't want -- to

3    be very, very clear with this, I wanted to make it

4    explicitly clear that I did nothing that could be

5    construed as obstruction of justice, and I viewed that

6    as being anything that could have the effect of me

7    trying to get her to change to testify anything.  I got

8    what I got, hung up and called my lawyer -- called my

9    wife, and then I called my lawyer.

10       Q.   Did Matt Gaetz ever inform you that B[REDACTED]

11   G[REDACTED] communicated with "AB" after Joel was first

12   indicted?

13       A.   You mean --

14            MR. ANDRADE:  You mean the subject we're

15       discussing right now?  I don't know if Matt talked

16       to K[REDACTED] -- I'm sorry, I don't know if B[REDACT] talked

17       to K[REDACTED] or if B[REDAC] talked to K[REDACTED] and "A," but

18       I believe that B[REDAC] was warranting that she was

19       speaking on behalf of K[REDACTED] and "A".  I think.  I

20       mean again, those were -- I cannot speak to what she

21       would say in that regard, but that was my

22       impression.

23   BY MR. WERMUTH:

24       Q.   And what's the basis for that belief?

25       A.   I mean, just -- it was my impression.  That is



1  i5.  There was no basis for it.  It's just the

2  impression I got.  If -- and again, it was shared with

3  me from Matt that they had talked -- that they had

4  talked to these two women.

5      Q.   That they?

6      A.   The feds.

7      Q.   Oh.  So Matt was telling you that the feds had

8  talked to these two women?

9      A.   Are you kidding, Fritz?  The entire phone

10 conversation at FishBones was about that, so yes.

11     Q.   Hearing these reports that witnesses before the

12 grand jury were being asked about you in your house, did

13 you report Joel's alleged threatening behavior and text

14 messages to law enforcement at that point?

15     A.   We had already given those texts to law

16 enforcement -- well, no.  No, we had not.  I had not

17 done it at that point in time.  No.

18     Q.   So this is just the month after he texts you,

19 you now are hearing that there was this investigation.

20 You think Joel was setting you up at that point?

21     A.   Yes.

22     Q.   Did you report that to the feds?

23     A.   No.

24     Q.   Did you report that to law enforcement?

25     A.   Yeah, I did report it to the feds when I turned



CHRISTOPHER DORWORTH                                    August 07, 2024
DORWORTH vs GREENBERG                                                90

1  over my stuff.

2      Q.   No, at that point?

3      A.   No, I did not.

4      Q.   Why not?

5      A.   I don't know what I would have said to the

6  feds.  Hey, by the way, he says he wants a pardon, or a

7  friend of mine may not like some -- again, if he had

8  said, Hey, I'm going to kill you, I'm going to put a

9  bullet in your head, I would have called the cops.  If

10 he would have said something acute, I would have called

11 the cops.

12         I don't see what's actionable about him telling

13 me that -- again, it is a ludicrous you need to go get

14 the U.S. attorney fired.  That is not at all a sane or

15 sober thought by a grownup.  That is a -- sort of a

16 delusional thing.  We don't live in the TV show Billions

17 or whatever it is.  I certainly gave over all the

18 information on that to the feds when I submitted it;

19 but, again, I don't -- what he threatened me for -- what

20 he threatened my wife for wasn't a physical harm.  I

21 don't even know what I would say.  Just basically him

22 saying that he wanted to make these other things happen.

23 I did turn that information over, I just didn't do it at

24 this time.  I did it through my lawyer when we submitted

25 all our stuff.

 1      Q.   Okay.   This is in September of 2020, but you

 2 say after this you said that Joel sent you some texts

 3 suggesting that you call Roger Stone?

 4           MR. ANDRADE:   Object to form.

 5           THE WITNESS:   I don't know the dates of those

 6      things.   It might have been in between.   Again, it

 7      was a handful of times.   I don't -- he went to jail

 8      at some point in time and never got out, so I think

 9      it was right after that meeting he basically

10      realized that my -- well, I can't speak for Joel,

11      but my guess would be that he realized that Matt and

12      Chris were not going to be helpful, so he, you know,

13      tried to go to Roger.   And then he kept trying to

14      reach out to me to get me to say things.   And from

15      what I read, he did this to a lot of people.   He'd

16      send these screen captures of responses.   I never

17      responded.

18 BY MR. WERMUTH:

19      Q.   Okay.   Let's shift gears a little bit.   You

20 allege in your amended complaint that Andrew and Sue

21 Greenberg as well as AWG and Greenberg Dental agreed to

22 provide funding to compensate Abby Greenberg and "AB"

23 for providing false reports and testimony to authorities

24 to the grand jury.

25      A.   Yes.



1    Q.   Okay.  Do you have personal knowledge that
2 Andrew Greenberg, Susan Greenberg, or AWG ever agreed to
3 pay "AB" for providing false information to the
4 authorities?

5    A.   I believe the fact that they sent her to an
6 attorney, had no bill, and then she would not answer any
7 questions on that.  My belief is at that point in time
8 that's what got the ball started, and she wouldn't say
9 anything else.  So, yes, I believe that happened.

10   Q.   So you're saying that they sent -- they sent
11 "AB" to an attorney.  I'm asking you personally, do you
12 have any personal knowledge that Andrew Greenberg, Susan
13 Greenberg, or AWG, Inc., ever agreed to pay "AB" for
14 providing false information to the authorities?

15   A.   I believe that's what happened in the course of
16 the -- in the evidence provided, she was given an
17 attorney.  There was no bill present when she met with
18 the attorney.  We tried to ask questions about what they
19 talked about, they called the attorney/client privilege.
20 I need a bathroom break at some point in time, by the
21 way.  They tried to call an attorney/client privilege on
22 that, and they wouldn't answer the questions.

23        So it is my belief that Joel Greenberg who told
24 me he was having to pay the attorneys, who was broke
25 because he had no money, who had given back all his



1 stock and living off his parents used their money to get

2 a lawyer for "AB," and the purpose of that was to get

3 her to file an appropriate claims charges against me and

4 Matt Gaetz for the purpose of getting Joel Greenberg a

5 reduced sentence if we were convicted of a crime.

6     Q.   I'm not asking --

7         MR. ANDRADE:  We've been going for an 4hour and

8     40 minutes.

9         MR. WERMUTH:  Let's just complete this one

10    question.

11 BY MR. WERMUTH:

12    Q.   Sir, I'm not asking your belief.  I'm asking

13 you --

14    A.   I've answered the question.

15    Q.   -- what personal knowledge --

16    A.   I have answered the question three times.  I'm

17 not answering it again.

18    Q.   How did you obtain personal knowledge of any

19 agreement to pay "AB"?

20    A.   I have answered this question.  I have given

21 you all the facts I know.  I pointed out the finances.

22 I pointed out the fact that they took away all of his

23 money.  He lost his job.  They were paying for his legal

24 bills.  They were paying for all of your legal bills.  I

25 mean, they did that all along.  They sent -- Joel said,



1  I have had to get her an attorney.  Joel said repeatedly

2  that he was doing all these other things to, you know,

3  threaten my wife on it, told me that he was trying to do

4  it.  He had no money.  All the money came from the

5  Greenbergs.  All of it.

6         All of it came from Andy and Sue Greenberg.

7  And at that point in time, he had no job.  They had

8  taken away his stock in AWG, Inc., without compensation.

9  They had done all those things.  So it had to be the

10  Greenbergs because there was no money from Joel.  Abby

11  didn't have -- she wasn't employed during that period of

12  time.  Joel didn't have a job.  Joel had to list his

13  financials.  They weren't there.  And yet somebody was

14  out there sending her to the lawyers, and that was all

15  the Greenbergs.  I really need a bathroom break.

16    Q.   Do you have knowledge that "AB" --

17    A.   I've got to --

18    Q.   -- was providing -- do you have knowledge that

19  "AB" was paid to provide false information --

20         MR. ANDRADE:  Can we just take a restroom

21    break --

22         THE WITNESS:  I have to use the restroom.  I'm

23    sorry.

24         MR. ANDRADE:  Can we take a --

25         MR. SCHELLER:  Five-minute break?



1          THE VIDEOGRAPHER:  If there are no objections,
2      going off record.  The approximate time is 1:01 p.m.
3          (A break was had.)
4          THE VIDEOGRAPHER:  On record with media unit
5      two.  The approximate time, 1:34 p.m.
6          THE WITNESS:  I'm sorry about that.  I had to
7      use the restroom.  So whatever your question was,
8      I'm happy to answer it now, but I didn't want to put
9      a puddle in the Carlton Fields conference room.
10  BY MR. WERMUTH:
11     Q.   Let's go onto some new questions.  So remember
12  yesterday when you were testifying about your boat
13  outing at Lake Maitland on July 15, 2017?
14     A.   Yes.
15     Q.   Okay.  And I think you testified -- you
16  mentioned that you have no reason to believe that you
17  didn't have your phone that day; is that correct?
18     A.   When I was on the boat?  I mean, I would not be
19  more removed from my phone than from perhaps it might
20  not be in my pocket, but it would be in the boat with
21  me.  It might not be in my pocket, but it would be
22  there.  I have no recollection of any big separation
23  from my phone that day, no.
24     Q.   And I recently read a Facebook post that you
25  did, and you mentioned geolocation data in that --



1    A.    Yes.

2    Q.    Facebook.

3          What geolocation data are you talking about?

4    A.    The data that came from the picture I took on

5    the lake that had the metadata that we showed we were on

6    Lake Maitland.  I believe that was nine or ten minutes

7    separate minutes than when she came into my gate.

8    Q.    Okay.  So you're positive you had your phone

9    that day and you took that photo on the boat?

10   A.    Yes.

11   Q.    Okay.  And I think you mentioned as well that

12   you're positive that you got home after dark that day?

13         MR. ANDRADE:  Object to form.

14         THE WITNESS:  Yes.

15   BY MR. WERMUTH:

16   Q.    Okay.  Are you aware that Abby Greenberg's

17   counsel has subpoenaed geolocation data from AT&T during

18   the relevant dates in this case in 2017?

19   A.    I am.

20   Q.    Are you aware that AT&T produced that

21   information?

22   A.    I am.

23   Q.    And your counsel has it, right?

24   A.    Yes.

25   Q.    And have you taken a look at that?



1    A.   I couldn't understand it.  I looked briefly,
2 but I have not really.
3    Q.   Okay.  And you know it references, you know,
4 basically the elapsed time of the call, the time of the
5 call, those kind of things?
6    A.   I have not looked at it.  You're telling me
7 that, but I have not spent the time to look at that.
8    Q.   Okay.  Well, I'll represent to you it lists
9 phone transactions on an item by item basis, and there
10 is an item number.
11        You got that?
12    A.   Okay.
13    Q.   And it lists the connection date, the date of
14 the call, and it lists the connection time.
15        Okay.  Are you with me?
16    A.   I'm listening to you.
17    Q.   And it lists the elapsed time, so the amount of
18 time of the call, and it lists the originating number.
19        Are you aware of that?
20    A.   I'm becoming aware of things as you tell me
21 them.  I literally spent ten seconds.  As I said, it
22 looked like you had overlie things, and I just said
23 we're going to find an expert.  I'm not going to...
24    Q.   And it lists the term inating number, so it's
25 the person who is calling, the person who is receiving



 1  the call?

 2      A.    Okay.

 3      Q.    Had that kind of information on it?

 4      A.    Okay.

 5      Q.    And it includes the cell location information?

 6            MR. ANDRADE:  Object to the form.

 7            THE WITNESS:  Is there a question?

 8  BY MR. WERMUTH:

 9      Q.    Well, I'll represent to you that it does.

10      A.    Okay.

11      Q.    And it -- and I'll represent to you as well

12  that this period of time that we're dealing with is

13  daylight savings during this time.

14      A.    Okay.

15      Q.    And although the times are listed on that

16  report in UTC, that's actually four hours ahead of --

17      A.    What is UTC?

18      Q.    It's universal time.  Coordinating to universal

19  time.

20      A.    Okay.

21      Q.    I'm going to go through some of these entries

22  with you, and I'll just describe what they are, and I'd

23  like to talk to you about the events that were

24  transpiring at the time.

25      A.    Okay.  But to be very clear, I have not looked



1  at these, and I'm not at all familiar with them.

2      Q.   Okay.  Well, I think we can get through that.

3      A.   Okay.

4      Q.   I'll represent to you that you received a call

5  from the Heathrow Master Association at 4:41 p.m.

6          Okay?

7      A.   Okay.

8      Q.   That's on July the 15th.  For that call, your

9  phone connected to a cell tower .1 miles west of Lake

10 Maitland and .55 miles southwest of Mr. Morris' house

11 located at 323 West Trotters Drive in Maitland.

12         Okay?

13     A.   Okay.

14     Q.   So that sounds a lot like the area that you

15 represent you were in, correct?

16     A.   That sounds like the lakes, yes.

17     Q.   Assuming it's true, it's probably fair to say

18 that you were out boating at this time; is that right?

19     A.   I have no idea.  Again, his house was right

20 next to the lake.  I'm not a geographic expert, but --

21 so, I mean, I assume, but I don't know.  If you tell me

22 so.

23     Q.   Well, I'll tell you just for -- just for

24 purposes of this conversation, I'm going to mark that as

25 the Lakeland -- Lake Maitland cell tower.  That's a cell



 1  tower located where I just told you where it was -- the

 2  cell tower is .1 miles west of Lake Maitland and .55

 3  miles southwest of Mr. Morris' house.  So it's like

 4  right by Fort Maitland Park.

 5          Do you know where that is?

 6      A.   I don't.

 7      Q.   Do you know where Fort Maitland Park is?

 8      A.   No.

 9      Q.   It's right by 17-92.  It is where the boat ramp

10  is for Lake Maitland.

11          Are you familiar with that?

12      A.   Okay.

13      Q.   Have you seen the boat ramp for Lake Maitland

14  before?

15      A.   I don't think so -- I believe so.  I think when

16  you're on the lake, if you're talking about there's an

17  apartment building there.

18      Q.   Yeah.

19      A.   Yeah, I know where that is.

20      Q.   There's a little boat ramp to the right of the

21  big apartments if you're looking at them?

22      A.   Yeah.  It sounds right, but, I mean, I can't

23  visualize it right now.

24      Q.   Well, I'll just tell you that's Fort Maitland

25  Park.



1      A.    Okay.

2      Q.    The cell tower is very close to that.

3      A.    Okay.

4      Q.    I'll represent to you that you received a call

5  from Matt Gaetz at 5:28 p.m.

6            Okay?

7      A.    Sure.

8      Q.    And that call also connected to the Lake

9  Maitland cell tower?

10     A.    Okay.

11     Q.    And assuming that's true, it's probably fair to

12 say that you were still out of on the boat at 5:28 p.m.,

13 right?

14     A.    Yeah.  I'm just trying to remember what time

15 the photo was taken.

16     Q.    It was 6:04 is what the photo says.

17     A.    What I'm saying is I could have been at Publix

18 or it could have been at Randy's house or it could have

19 been on the boat.  All of those are -- I don't know what

20 time I was on the boat.  I said that yesterday.

21     Q.    Okay.  So you -- I think you said yesterday

22 that you weren't sure when you went out.  You probably

23 would have gone out later.

24     A.    I mean, probably.  Again, every time is

25 different; but, again, my friend, Randy, was -- we'll



1  say he was 27 years old than I was, and, again, I think

2  he -- like the heat of July 15th is -- I would think --

3  again, maybe, but I typically think that we did later

4  ones, but I know I was on there at 6:04 or whatever it

5  was.

6      Q.  All right.  Well, I just represented to you

7  that you received a call from Matt Gaetz at 5:28 p.m.

8  You're with me there, right?

9      A.  Right.

10     Q.  And I'll represent to you that at 5:33 p.m., so

11  by my guess about five minutes later, I'll represent to

12  you that you called the Heathrow Master Association

13  gate?

14     A.  Okay.

15     Q.  And does that refresh your recollection as to

16  where you -- as to whether you added anyone to the guest

17  list at that time?

18     A.  No.  It was seven years ago, man.  I don't have

19  any recollection of any of this.

20     Q.  Okay.  And I'll represent to you that you were

21  still connected to the Lake Maitland cell tower at that

22  time, so five minutes after the previous call from Matt

23  Gaetz and the new call from the Heathrow Master

24  Association --

25         MR. ANDRADE:  Object to form.



 1  | BY MR. WERMUTH:
 2  |     Q.   Okay.  But you were still connected to the Lake
 3  | Maitland cell tower at that time.
 4  |          Are you with me?
 5  |     A.   If you say so.
 6  |          MR. ANDRADE:  Object to form to the extent it's
 7  |     a question.
 8  |          MR. SCHELLER:  You may want to hear this.  Go
 9  |     on.
10  | BY MR. WERMUTH:
11  |     Q.   So it's fair to say you're probably still
12  | boating at 5:33 p.m.?
13  |     A.   Yes.  If I had been out on the boat, yes.  I
14  | don't -- Fritz, you're making a series of assumptions.
15  | I told you, I don't know anything about cell phone
16  | towers.  I'm not all skilled on all these things.  I
17  | know that they exist.  I mean, I know that they are --
18  | and you can tap them.  But I don't know that if you're
19  | sitting at Randy Morris' house at 323 West Trotters if
20  | it connects to that thing, I don't know if we were on
21  | the lake already.  I don't know any of this.  And,
22  | again, I was hanging out with my buddy.  Sometimes we'd
23  | hang out at the house.  Sometimes we take the boat out.
24  | Sometimes we hang out at the house then take the boat
25  | out and come back to the house and go back out.  So I



 1  have no idea where we were at these various points.

 2  You're not at illuminating anything, if that's what

 3  you're asking.

 4      Q.    Okay.   So I'll represent to you that you had

 5  called the Heathrow Master Association at 5:33 p.m., and

 6  I'll represent to you that 45 minutes later at 6:15 "AB"

 7  entered the Heathrow gate.

 8          Okay?

 9      A.    Okay.

10      Q.    So does that refresh your recollection of who

11  you added to the guest list at 5:33 p.m.?

12      A.    It does not.

13      Q.    It appears that you may have added her to the

14  gate --

15          MR. ANDRADE:   Object to form.

16          THE WITNESS:   It could have been an all in.   It

17      could have been -- there is a lot of ways that could

18      go.   It could have been that.   Again, I'm not

19      telling you -- I don't have any recollection, so I

20      don't know.

21  BY MR. WERMUTH:

22      Q.    Okay.   Now, it couldn't have been an all in,

23  right, because --

24      A.    That's right because Joe Ellicott --

25      Q.    -- later you got a call from -- to -- regarding

1  allowing K█████ M█████ in, right?

2        MR. ANDRADE:  Object to form.

3        THE WITNESS:  Well, I don't know about that.

4     Again, you're going to tell me what the cell phone

5     records were, but what I would tell you is this:

6     That all in is not really a thing for Heathrow.  I

7     think she even discussed that for the deposition,

8     and some people just wouldn't do it.  So if -- if

9     you said all in, some of the guards would let

10    everybody in.  Some of the guards would say we still

11    need to call in advance.  So the Joe Ellicott thing

12    at 11:54 would suggest that I might have called all

13    in and said, We're not going to do this for you

14    because you're a big guy.  But I just have no

15    recollection whatsoever of any phones calls made or

16    received that day.  I'm sorry.

17 BY MR. WERMUTH:

18    Q.   And I'll represent to you that these AT&T logs

19 also showed text messages and cell tower information

20 related to text messages.

21    A.   Okay.

22    Q.   And I'll represent to you that you sent a

23 series of text messages to Joel Greenberg, Matt Gaetz,

24 and Mike Fischer at 6:35 p.m.

25        MR. ANDRADE:  Object to form.



```
 1              THE WITNESS:  Okay.
 2   BY MR. WERMUTH:
 3      Q.   Do you recall what those text messages were
 4   about at that time?
 5      A.   I do not.
 6      Q.   Okay.  Do you think you could have told your
 7   friends that you were leaving Mr. Morris' house?
 8      A.   I don't recall any of those conversations.  I'm
 9   not going to hypothesis on what I might have said.  I
10   don't know.
11      Q.   Okay.  Well, I'll represent to you next that
12   your wife called you at 6:40 and you spoke to her for
13   five minutes and 24 seconds.
14              MR. ANDRADE:  Object to form.
15   BY MR. WERMUTH:
16      Q.   You understand that?
17      A.   Do I understand it -- okay.  Sure.
18      Q.   And this call start -- this call with your wife
19   starts at the Lake Maitland cell tower.
20              Okay?
21      A.   Uh-huh.
22      Q.   But later your call connects to a cell tower
23   roughly 4.5 miles north of Lake Maitland and les than .1
24   miles east of I4.
25              MR. ANDRADE:  Object to form.
```



 1              THE WITNESS:  Okay.

 2    BY MR. WERMUTH:

 3        Q.   Do you recall -- do you recall that call with

 4    your wife?

 5        A.   No.

 6        Q.   Could you have been calling to report you were

 7    heading home?

 8              MR. ANDRADE:  Object to form.

 9              THE WITNESS:  I have no recollection, Fritz.

10        I'm not going to speculate.

11    BY MR. WERMUTH:

12        Q.   Okay.  I'll represent to you that you missed --

13    that you received a three-second call from a person

14    named Eric Johan Arroyo at 7:15 p.m.

15              Do you know that person?

16        A.   Yes.

17        Q.   Who is that?

18        A.   I haven't heard the name in a long time, but at

19    the time I believe he was thinking about running for the

20    Florida House.  I want to say he's like the mayor of

21    Sarasota now or city commissioner in Sarasota or was.

22        Q.   Do you recall that call?

23        A.   I don't remember anything about it.

24        Q.   Well, it was only a three-second call.

25        A.   I probably didn't answer it.

1    Q.   Okay.   Nonetheless, I'll represent to you that

2  the AT&T cell phone records show that this call

3  connected to a cell tower in Lake Mary .35 miles east of

4  I4 and about ten miles further eastbound, so north up I4

5  from the end of the call with your wife.

6    A.   Okay.

7         MR. ANDRADE:   Object to form.

8  BY MR. WERMUTH:

9    Q.   So your cell phone is pinging off the tower

10 basically due east of your residence at 7:15 -- at 7:17.

11   A.   You're the expert.   I don't recall that.

12   Q.   Okay.   And I'll represent to you that the tower

13 your phone connected for this call is about 1.8 miles

14 northeast of your house.

15        MR. ANDRADE:   Object to form.

16 BY MR. WERMUTH:

17   Q.   Okay?

18   A.   I don't know how I'm supposed to respond.   I

19 don't -- you're telling me things.   I'm just listening

20 to you.

21   Q.   Okay.   And this is at 7:15?

22   A.   Okay.

23   Q.   So we started with your call to your wife at

24 about 6 -- about 6:40, and about 30 minutes later or 35

25 minutes later, your phone is pinging off of a cell tower



1  1.8 miles from your house.

2           MR. ANDRADE:  Object to form.

3  BY MR. WERMUTH:

4      Q.    I'll represent that to you.

5      A.    Okay.

6      Q.    Is that timing consistent with the further --

7      A.    I have told you repeatedly, Fritz, I have

8  discovered that your tactic is you like to ask the same

9  question a bunch of times.  I don't have any

10 recollection.  I was out drinking with my buddy, Randy.

11 That's what I did that day.  You're asking me these

12 questions.  I don't have any recollection of any phone

13 calls or anything like that.  Bourbon, water, on the

14 boat.  You're telling me things.  I'm listening to you

15 tell a story.  That's all it is.

16     Q.    Okay.  Well, in that story which I'm

17 representing as fact, your phone is traveling north from

18 Lake Maitland leaving about 6:40 and approaching your

19 house about 35 minutes later at 7:17.

20          MR. ANDRADE:  Object to the form.

21 BY MR. WERMUTH:

22     Q.    Are you with me so far?

23     A.    I'm listening to everything you're saying.  As

24 I've told you, I'm not an expert on cell phones, so I'm

25 just learning from you.  I'm hearing your take on



1  things, but I have very little to offer.

2      Q.   Is it possible that you arrived home sometime

3  before 7:17 on July 15, 2017?

4      A.   I don't believe so.  I think I stayed at

5  Randy's.

6      Q.   You think you stayed at Randy's all night?

7      A.   Yeah.

8      Q.   Okay.  But what if your cell tower -- what if

9  your cell phone records indicate that your cell phone

10  was traveling north at that time period?

11     A.   I would listen to you tell me that, and I would

12  tell you that I don't really understand how cell phone

13  towers work, and I'm not going to offer any opinion on

14  something I have no knowledge of.

15     Q.   Okay.  But I'd like to know what you're going

16  to tell me about -- if those are the facts, what are you

17  going to tell me about what was happening at that time?

18     A.   I have no idea.  I'm sorry, I don't understand

19  the question.

20     Q.   Well, what was happening at that time, 7:17?

21  If you're -- if you're located up by your house at 7:17

22  on July 15, 2017, what's happening at that period of

23  time?

24          MR. ANDRADE:  Object to form.

25          THE WITNESS:  I don't understand the question



1       you're asking, Fritz.  I'm not trying to be evasive.

2       I don't how many times I can say this.  I went

3       drinking with my buddy.  We went on a boat.  We hung

4       out.  I don't -- you're telling me all these cell

5       phone things and warranting things to be true.  I

6       just told you up front, I have not reviewed that.  I

7       haven't had a chance to look at it.  I'm not an

8       expert on it.  I guess you are, and that's good, but

9       I, myself am not an expert on it, and I'm not going

10      to opine on what any of that means because I don't

11      know.

12  BY MR. WERMUTH:

13      Q.   I'm not asking you to opine on the cell phone

14  records --

15      A.   I'm just telling you --

16      Q.   I'm asking you to tell me what you're going to

17  tell me what you're doing during that period of time.

18      A.   Drinking bourbon and listening to music and

19  watching TV with Randy Morris or boating --

20           MR. ANDRADE:  Object to the form again.  This

21      is all --

22           MR. WERMUTH:  You have got your objection.

23      That's good.

24           MR. ANDRADE:  Well, I'm getting close to going

25      further about just how much farther we're going to



1    go on this.  This has all been speculative for the

2    past ten minutes.

3         MR. WERMUTH:  I can assure you it's not

4    speculative.  You have the records.  You had the

5    ability to review these records, right?

6         MR. ANDRADE:  I'm not being deposed today,

7    Fritz.

8         MR. WERMUTH:  Okay.  Well, we'll just continue

9    on.

10   BY MR. WERMUTH:

11   Q.   All right.  Next I'll represent that at 7:52

12   p.m. you received text messages one second apart from

13   Joel Greenberg and a number ending at -- in 1,000.

14        Okay?

15        MR. ANDRADE:  Object to form.

16        THE WITNESS:  Okay.

17   BY MR. WERMUTH:

18   Q.   Okay.  And I'll represent to you that for these

19   text messages, your phone connected to a tower about .6

20   miles from the center of your home.

21   A.   Okay.

22   Q.   Is it possible that you were home at 7:52 p.m.

23   on July 15, 2017?

24   A.   That's not what I recall.

25   Q.   Okay.  Is it possible that you were at home at



1   that time?

2       A.   I'm not going to listen to your cell phone data

3   which I repeatedly told you I'm not an expert on that I

4   have never reviewed and arrived at any conclusions based

5   on what you're telling me.

6       Q.   Well, I can assure you you don't need to be an

7   expert about cell tower records to know is it possible

8   that you were home at 7:52 --

9           MR. ANDRADE:   Object to form again.

10          THE WITNESS:   I will say it one more time, and

11      then I'm just not going to answer this anymore.   I

12      don't know.   I believe I was drinking at Randy

13      Morris' house.   That is what he said too in an

14      affidavit.   I took a picture at 6:00, and as I

15      recall I was there.   I did not meet these people.   I

16      was not at that party, so I do not believe I was at

17      my house that evening, sir.

18  BY MR. WERMUTH:

19      Q.   You do not believe that you were at that your

20  house --

21      A.   That's what I have stated repeatedly.

22      Q.   If, in fact, your cell phone was there at that

23  time in that area, then that would be with you, right,

24  the cell phone?

25      A.   Fritz, I have told you repeatedly, I am not



1  going to opine on cell phone data when I don't know

2  anything about cell phone -- you're making the

3  statement, and I'm listening to you.  You're asking me

4  to agree with you, and I'm not doing that.  So we can

5  continue to do this as many times as you want, but, I

6  mean, I am not going to go there.  I don't know.  I do

7  not believe I was there.  I don't know if my computer

8  was there.  I don't know if the other cell phone -- I

9  don't know anything.  There could be a million reasons

10  for that.  I'm just not going to jump into that.  I

11  don't know.

12      Q.   I'm representing to you what the data shows,

13  okay, and I just want to know assuming that the data

14  shows this, that you were -- that you were -- your cell

15  phone was connecting to a tower .6 miles from your house

16  at 7:52 p.m., What were you doing at that time?

17      A.   I believe drinking at Randy Morris' house.

18      Q.   And that would be about 30 minutes drive south

19  from your house?

20      A.   Thirty minutes is an exaggeration.  I live off

21  of mile marker 98.  You would get off at mile marker 90,

22  Maitland Boulevard.  That's eight miles.  So I think

23  maybe 20, 25 minutes but not 30.  I don't think it takes

24  30 minutes to get to my house unless you're in traffic.

25      Q.   So you're saying 30 minutes is an exaggeration



 1  to drive from your house to --

 2      A.   I'm not going to argue with you, Fritz.  If you

 3  think it takes that long, we all drive different speeds.

 4  I thought it was a 20, 25 minute drive, but I don't know

 5  that that even really matters here.  I'm just telling

 6  you, okay, if you say it takes 30 minutes.  It seems

 7  long to me.  I mean, it's eight miles on the interstate,

 8  but okay.

 9      Q.   Okay.  And I'll represent to you that the sun

10  that evening did not set until 8:25 p.m.

11           MR. ANDRADE:  Object to form.

12           THE WITNESS:  Okay.

13  BY MR. WERMUTH:

14      Q.   And I'll represent to you that you called

15  Timothy Brooks at 8:37 p.m. which lasted almost ten

16  minutes.

17           Do you remember that call?

18      A.   I don't know who Timothy Brooks is.  That must

19  be somebody else's phone.

20      Q.   And I'll represent to you this tower -- this

21  call went through a tower .6 miles from your home.

22           Is it possible you were still at home at 8:27

23  p.m.?

24           MR. ANDRADE:  Object to form.

25           THE WITNESS:  (Witness shakes head.)



```
 1  BY MR. WERMUTH:
 2      Q.   And I'll represent to you that you received a
 3  call from the Heathrow Master Association at 8:48 p.m.
 4           Are you with me?
 5           MR. ANDRADE:  Object to form.
 6           THE WITNESS:  Sure.
 7  BY MR. WERMUTH:
 8      Q.   Okay.  Do you recall receiving that call?
 9      A.   Just an umbrella statement, I don't remember
10  any phone calls from that day, so, no, I don't.
11      Q.   And as you know, K[REDACTED] M[REDACTED] entered the
12  Heathrow community two minutes later at 8:50 p.m.
13           Do you recall letting Ms. M[REDACTED] into the
14  community at that time?
15      A.   No.
16      Q.   And you don't recall where you were at 8:48
17  p.m.?
18      A.   No.
19      Q.   And you don't recall where you were at 8:50
20  p.m.
21           MR. ANDRADE:  Object to form.
22           THE WITNESS:  I don't have to answer these
23      questions.  I'm just trying to keep a smile on my
24      face.  I don't remember any of those phone calls or
25      any of those texts.
```



 1  BY MR. WERMUTH:

 2     Q.   And I'll represent that you placed a call to

 3  the Heathrow Master Association at 11L14 p.m. as the

 4  records show.

 5          Okay?

 6     A.   Okay.

 7     Q.   And does this refresh your recollection as to

 8  whether you called to let Joe Ellicott in at around this

 9  time?

10     A.   It does not.

11     Q.   Okay.  And this call connected through the same

12  tower .6 miles from your house.

13          MR. ANDRADE:  Object to form.

14          THE WITNESS:  Okay.

15  BY MR. WERMUTH:

16     Q.   I'll represent that to you.  Is it possible you

17  were home when Joe Ellicott arrived at your house?

18     A.   I don't believe I was.

19     Q.   And I'll represent to you that all of the calls

20  from the time of 8:52 through 11:43 a.m. the next

21  morning connected through the cell tower .6 miles from

22  your home.

23          MR. ANDRADE:  Object to form.

24          THE WITNESS:  Okay.  Is there a question?

25  BY MR. WERMUTH:



1    Q.   I'll represent to you that they -- are you with

2  me?

3    A.   Okay.  You represented that.

4    Q.   And is it possible that you were home during

5  that whole period of time?

6    A.   I think I got back sometime in the middle of

7  the night.  I mean, typically the sun would not rise on

8  me being at Randy's house.  I would usually fall asleep

9  and then wake up and then head home.  That would be it.

10 On this particular one, I don't have any transponder

11 things to show that I entered the neighborhood, and they

12 did check you every time.  That doesn't exist.  That

13 Mike Fischer, who was at the house that night that said

14 I wasn't there.  So I don't know what to tell you.

15      I have an affidavit from Randy Morris that says

16 we hung out at his house.  So you're presenting a bunch

17 of data not really with a question just to sort of

18 rattle it off and then sort of assert it, but the

19 reality is I think I got home sometime in the middle of

20 the night.  I did not meet "AB."  I did not walk in on

21 "AB" having sex with Matt Gaetz.  I did not have any

22 conversation with K█REDACTED█ M█REDACTED█ that she detailed in

23 her deposition but did not detail in her other

24 investigation.  You know, I believe that I sent a

25 picture from there.  I think I went and had drinks with



 1  my buddy as he said, I think we hung out, and I think I

 2  got back sometime probably in the early morning hours.

 3  That would be my best bet.  But, I don't -- again, I

 4  unfortunately --

 5      Q.   I'm asking you though, sir, if these facts that

 6  I represented to you are true, what are you going to

 7  tell me about what you were doing during this period of

 8  time?

 9           MR. ANDRADE:  Object to form.

10           THE WITNESS:  I'm going to -- I don't -- you

11      have papers in front of you, and I'm happy very

12      happy for you in that regard.  I'm telling you that

13      I was not at that party.  So if you believe those

14      numbers somehow impute that I was or that they make

15      it just undeniable, then that is certainly your

16      belief and I'm sure a judge and jury will look

17      forward to hearing that.

18           It is my warranty and backed up by witnesses

19      and affidavits that I was not at the house that

20      evening.  So, sir, I have nothing else to say to you

21      on this other than to tell you I am not an expert.

22      I have heard what you've had to say, but I do not in

23      any way add any credence to it.

24  BY MR. WERMUTH:

25      Q.   Why don't you show up on the gate logs in the



1    early morning on --

2         A.   I don't know.  That's a good question.

3         Q.   -- the Heathrow Master Association.

4         A.   I don't know.  I don't control the Heathrow

5    Master Association.

6         Q.   But you were just referencing your absence from

7    them, and --

8         A.   I'm just telling you there would be -- I got

9    home at some point in time.  It was seven years ago.  I

10   don't recall.  I was drinking that day.  It was a very

11   deliberate boating day and drinking day.  You're asking

12   me questions that took place seven years ago that I

13   don't control.  So I don't know, but I do know that I

14   was not at a party with Joel Greenberg or "AB" or

15   K█REDACTED█ M█REDACTED█ that evening.

16        Q.   How do you know that?

17        A.   What's that?

18        Q.   You can't remember what you were doing, can

19   you?

20        A.   I don't -- you've got to be kidding me, Fritz.

21   I have --

22             MR. ANDRADE:  Object to form.

23             THE WITNESS:  I have stated repeatedly that I

24        was at Randy Morris' house drinking and boating.  I

25        showed photos of it.  There is affidavits of it.



1     There are witnesses here.  I mean, it is -- if I

2     can't -- if that's not enough for me to convey to

3     you what I was doing that evening, I don't know what

4     is, but I don't know what I was doing that evening.

5  BY MR. WERMUTH:

6     Q.   All right.  Mr. Dorworth, you posted about this

7  case on Facebook this past week, didn't you?

8     A.   I did.

9     Q.   And I want to ask you some questions about the

10 statements you made in that post.

11    A.   Certainly.

12    Q.   You say, Witnesses testified to my absence from

13 the alleged locations.

14         What are you referring to there?

15    A.   Mike Fischer saying that he was at the party

16 and I was not.  He was at the event, and I was not.

17    Q.   Anybody else?  Who is -- you said plural

18 Witnesses.  Witnesses testified to my absence.

19    A.   I was not there.  Randy Morris testified to the

20 fact that we were partying at his house for that day.

21 So, I mean, it's multiple witnesses.  So I was not at

22 that party.

23    Q.   And I think we covered this before, but you

24 said the geo data from my phone confirmed my

25 whereabouts.



 1          What are you referring to there?

 2     A.    I have already told you.  I've already asked

 3  that question.  I'm not going to answer it again.

 4     Q.    The geo data was reliable that you were on Lake

 5  Maitland, right?

 6     A.    Right.

 7     Q.    Okay.  The same geo data that I'm talking

 8  about?

 9     A.    Well, no --

10          MR. ANDRADE:  Object to the form.

11          THE WITNESS:  I'm talking about -- those are

12     different pieces.  This is a photo that I have given

13     to the federal government that we've reviewed that

14     says Lake Maitland nine minutes apart from when "AB"

15     claims she got to my house.  In "AB" testimony, she

16     offered that I was there when she got to the house.

17     That was not true.  I was even -- by your own cell

18     phone theory, I was not there for that.  She claimed

19     that I was part of all these conversations.  It's

20     simply not true.  I was -- we were on a boat.  I was

21     in a house.  I had a lot to drink, and I was not

22     there that evening.  And whether it's Randy or it's

23     Mike Fischer, it is -- I was not at the party that

24     evening I was not there.

25  BY MR. WERMUTH:



1      Q.   You say that you provided comprehensive

2   evidence demonstrating that I was not present at the

3   places and times claimed by these lawyers.

4           What evidence are you referring to?

5      A.   Fritz, if -- we have just gone over it.  Number

6   one, on that occasion -- and the second thing, I just

7   never -- I have never went to a hotel with "AB."  They

8   have conflicting testimony.  Joel says that he and I

9   were drinking at Gator's Dockside, and she said I just

10  came from an event.  It is just all a total fictional

11  lie, and the only people -- the only people who would

12  testify to that is one guy who is already in prison for

13  lying about the political rival of his having sex with

14  an underage person and the other one is somebody who

15  lied repeatedly throughout the course of her deposition

16  who is no longer in this lawsuit and who I have never

17  met in my entire life who lied when she said that there

18  was -- that she had never consulted an attorney that was

19  paid for by the Greenbergs until she was given Andrew

20  Searle and who is no longer in this case.  So I believe

21  I have given comprehensive evidence of that, sir.

22     Q.   And you say that you believe Matt Gaetz is

23  innocent as well.

24          Why do you believe that?

25     A.   Because I think Joel Greenberg and this whole



1  operation that you guys have here are designed for the

2  purpose -- and Mr. Scheller went to the press and said

3  it himself.  He said that the Greenbergs and he were --

4  I believe he said the Greenbergs, but he certainly said

5  his client and he were very upset that more people were

6  not prosecuted for crimes, and Joel thinks that they

7  should be prosecuted for crimes.

8           I think it was either the same article or a

9  separate article that Mr. Scheller went back and said

10 that they were going to go back every year and ask for a

11 reduction in terms -- in prison sentence because --

12 because of more convictions.  I believe that -- and

13 Mr. Scheller also went to the press and said, I bet

14 somewhere Matt Gaetz is having a horrible day.  I was

15 threatened by Joel Greenberg.  I was told that he was

16 going to do all these things.  I feel like I have got a

17 little bit of information here that suggests that this

18 is being done.  So I don't know what you're -- I think

19 it's pretty comprehensive, sir.

20      Q.   There is millions of dollars that his -- and

21 that Joel's parents have sent to protect him -- have

22 spent to protect him and minimize his much deserved

23 sentence is disturbing, but the idea that they would

24 seek to implicate myself and congressman Matt Gaetz to

25 get their degenerate son out of prison faster is a true



1  abuse of wealth and power.

2      A.   Well said.

3      Q.   That is what's happening still.

4      A.   Yes.

5      Q.   And this is a reference to the allegations in

6  your complaint, right?

7      A.   Yeah.  I mean, specifically they spent -- I

8  mean, again, it's all discovery you all provided that

9  after they took all Joel's stock and didn't compensate

10 him for it, when Mr. Scheller worked out a deal for him,

11 part of it was he had to compensate Seminole County, and

12 they did that.  They didn't just do it some

13 straightforward way.  They said they went and founded an

14 LLC out of Delaware and then funded it directly from

15 Greenberg money and paid it up there.

16          And they also paid the Department of Treasury

17 with a cashier's check.  So it doesn't even show where

18 it comes from.  So the Greenbergs paid over -- about $2

19 million at that point, and I think they got Brian

20 Applegate to show up in court.  I think Brian Applegate

21 showed up in court and said that you had been -- that

22 all of Joel's debts to the County and the feds had been

23 paid.  That's millions of dollars.  They were doing it

24 to minimize his sentence.  All of this, the stuff

25 that -- the allegations.  The ridiculous lies and



1  allegations that you guys put forward are all

2  designed -- and again I don't have to wonder because I

3  have read it from the lawyer himself -- designed to try

4  and get us in there, and I think they're definitely

5  trying to do that to Matt.  Joel told me he was going to

6  do that to Matt.  Joel told Rebekah he was going to do

7  that to Matt.  Joel did this, and so -- and he did this

8  from behind prison bars with the assistant of Sue and

9  Andy Greenberg and their resources.

10     Q.   So I'm focused in though on this statement that

11  you said in your Facebook post.  And so this is a

12  reference to the allegations in your complaint, right?

13     A.   Yes.

14     Q.   Okay.  And you're saying those allegations are

15  true, right?

16     A.   Yes.

17     Q.   And that the Greenbergs, in fact --

18     A.   Can we get whoever is --

19          MR. PERKINS:  Do you have the master?

20          MR. ANDRADE:  It looks like Furbush.

21          THE WITNESS:  Mike Furbush, can you mute your

22     phone, please?

23          MR. FURBUSH:  Sorry about that.  I don't know

24     how it got turned back on.

25          THE WITNESS:  Can you repeat the question,



1    please?

2  BY MR. WERMUTH:

3    Q.   I was saying that the -- that the Greenbergs --

4  that Joel Greenberg's parents, in fact, are out to

5  implicate you and congressman Gaetz; is that correct?

6    A.   Yes.

7    Q.   All right.  And you're saying that in an out of

8  court statement, right?

9    A.   Yes.  I might point out that because of the

10  damage they've done, I have no choice but to go defend

11  my reputation because of the lies being perpetrated by

12  Joel Greenberg and the Greenberg family.

13    Q.   Outside of court?

14    A.   Sir, I'm not a lawyer.  As you can see, I'm

15  taking these down pretty quickly.  So in like 20

16  minutes, I just want to give you a heads up, can I go

17  and take a quick, two-minute bathroom break in maybe

18  like ten, 15 minutes would be --

19    Q.   Do you want to go right now?

20    A.   I'm okay right now, but I feel it's coming on.

21  Last time it took a little while.

22    Q.   Why don't we do it now?

23        THE VIDEOGRAPHER:  If there are no objections,

24    going off record.  The approximate time is 2:10 p.m.

25        (A break was had.)



1          THE VIDEOGRAPHER:  On record.  The approximate

2     time is 2:16 p.m.

3   BY MR. WERMUTH:

4     Q.    Okay.  Let's go back to the time when you

5   received a federal subpoena, and that is in I think

6   December of 2020; is that correct?

7     A.    Sounds right.

8     Q.    Okay.  And I think you mentioned a few of your

9   friends:  Halsey Bashears and Matt Gaetz and Joe

10  Ellicott got subpoenas during that time; is that

11  correct?

12    A.    Yes.

13    Q.    Okay.  And you gathered information in response

14  to that document?

15    A.    Yes.

16    Q.    What were the documents that you produced to

17  the government?

18    A.    I'm sorry, you'll -- whatever we -- I think we

19  gave it to you if I'm not mistaken.  But they requested

20  things, and whatever they asked for we gave.  I don't

21  exactly remember off the top of my head what it was, but

22  I know it was like communications -- and by the way,

23  just so everyone knows, I'm not chewing on gum.  I have

24  a throat lozenge in.  But, I mean, like, yeah, they

25  asked for all communications, so I just endeavored to



1  comply with whatever they asked for in the request.

2      Q.   Did those documents that were produced to the

3  government include the final text messages that you had

4  with Joel Greenberg on August 14th?

5      A.   Yes.

6      Q.   Did they include the gate logs or anything of

7  that nature?

8      A.   I didn't know we had the opportunity to get

9  gate logs until after I turned that in -- they didn't

10 ask for that, first of all.  I don't believe.  And if

11 they did, I didn't -- I mean, I didn't know you could do

12 that.  I mean, like I moved into Heathrow in 2005.  I

13 don't believe that technology existed at that point in

14 time.  So between 2005 and 2020, obviously they did some

15 technology upgrades that allowed the residents to do

16 other things.

17        I was marginally aware of this, but it just

18 wasn't a terribly difficult thing to do.  All you would

19 do is just dial -- I think it was (407) 333-1313.  The

20 phone would ring once, and it would say, Please enter

21 your passcode.  I'd type in 14 -- my passcode was 1424.

22 The next thing you know, you could just do anybody on

23 there.  I never did that.

24        So after I had my interview with DOJ and the

25 FBI, when they mentioned that we have the gate logs



1  which I at the time did not know were available, I then

2  went home and endeavored to do that.  So to answer your

3  question, no, I would not have provided those because I

4  didn't know they existed.  I found out from them that

5  they existed.  I -- again, I don't -- I don't think -- I

6  don't think any log request -- I don't think it's like

7  get gate logs for us.  I think they just did that

8  directly.  It was not like I was asked for it and didn't

9  do it.  I don't think it even occurred to me as a

10  possibility.

11      Q.   Okay.  And around that time that you received

12  this subpoena, did you reach out to Halsey Beshears and

13  talk to him about it?

14      A.   Well, other way around.  He had gotten -- he

15  had gotten subpoenaed before I did, and he called me

16  just a couple of days later and said, Hey, did you get a

17  knock on the door?  And I said, I don't know what that

18  means.  He said, I got a subpoena.  And I said, For

19  what?  And he said, From the feds, and he just said

20  something to the effect of -- he didn't read me the

21  deposition -- didn't read me the subpoena I don't think,

22  but he just basically said it was asking for

23  communications with Joel, me, Joe Ellicott, Matt.  I'm

24  trying to remember everybody.  Again, I provided it all

25  to you.



1      But asked for that and I think asked for some
2   other communication logs and things like that.  It
3   wasn't a particularly long and onerous one.  It
4   wasn't -- let me put it this way, the one that Joel got
5   was several pages long, single -- this was just, you
6   know, a bunch of information.  He called to give me a
7   heads up about it.
8      And when he called me and told me that, I said,
9   Okay, I'm call my attorney Richard Hornsby.  Called
10  Richard, let him know that he'd gotten that, and I was
11  on there as well.  That was one of the names that had
12  been requested.  And at that moment in time, my
13  attorney, Richard Hornsby, got on the phone with --
14  called I believe -- he called somebody from the FBI.  I
15  don't remember if he talked to the FBI agent, or if he
16  talked to -- I want to say -- and again, I'm not
17  positive of this because he relayed it to me.
18      But basically first I believe he called the FBI
19  agent, and then I think after that he spoke to Todd Gee
20  after that I think.  And the Todd Gee conversation was
21  pretty short at that point in time.  It was more just
22  get us the information we need, we'll be in touch.  And
23  so that was the -- so when I called Hornsby to let him
24  know, he proactively reached out, and they just sent us
25  the subpoena via Hornsby.  Like I never got served with



1  a subpoena, never got a, quote, knock on my door.

2      Q.   Okay.  And going back to that call with Halsey

3  Bashears, he's calling you, did you guys talk about any

4  women they met -- any women that were being inquired

5  about in the subpoena?

6      A.   No.  We didn't really talk about the bulk of

7  the subpoena.  He just called to ask me if I had gotten

8  one.  And I said, what's it for?  And he said basically

9  the feds want text communications and whatever we have

10 between -- rattled off a few people.  That was it.  And

11 then I went and got my own via Richard.  I had Richard

12 call, and they took care of it from there.

13     Q.   So is it your testimony you didn't have any

14 conversations with Halsey Beshears about --

15     A.   No.

16     Q.   -- interactions with women?

17     A.   I did not.  I did not have any.

18     Q.   How about with Matt Gaetz?  He received a

19 subpoena as well, correct?

20     A.   He did receive a subpoena.  I don't know what

21 his looked like.  He didn't comply with it.

22     Q.   Okay.  Did you talk about -- when he got it,

23 did he call you?

24     A.   I don't think he called me when he got it.  I

25 mean, I don't think it was like, Hey, I just got my



 1  subpoena.  But at some point in time, he relayed that he

 2  had -- he would -- he had just gotten it, and I

 3  didn't -- we didn't have any meaningful conversation.

 4  And I remember that because I was kind of surprised

 5  later.  I think all of us -- and again, I can't speak

 6  again for Joe Ellicott.  I can't speak for Joel.

 7          I mean, Joel was probably doing other stuff.

 8  He had other things going on.  I mean, the only

 9  conversation we had was do you have a lawyer?  Are you

10  doing okay?  And then I found out from Matt that he and

11  B REDACTED did not respond to it, whereas I was given a

12  deadline, told I had to go turn these documents over,

13  perform my duty as a citizen when being investigated.

14          Matt and B REDACTED , I just don't think they

15  complied.  They didn't respond to the subpoena, and you

16  can do what you want.  And the next conversation I had

17  about this where I learned that Matt did not reply to

18  the subpoena.  I didn't know that affirmatively until he

19  texted me a new cell phone number because his old cell

20  phone, the FBI had -- I want to say B REDACT was walking out

21  of her employment at the Department of Education in

22  Tallahassee.

23          And they came up and said, B REDACTED C REDACTED ; yes.

24  And, again, this was the story he told me.  I've never

25  hear this from B REDACT .  They took her phone, put it in a



 1  bag, and left.  And then I think they got Matt the same

 2  day, the same way.  It's one of those things, they come

 3  up, and get you real fast.  And I just remember saying,

 4  Why'd they do that?  Why would they come get your phone

 5  like that?  He said, We didn't respond to the subpoena.

 6  There was no response to that.  So that is was the next

 7  conversation I would have about that with Matt.

 8      Q.   Okay.  So when you received your subpoena, did

 9  you call him and -- did you call Matt Gaetz --

10      A.   No.

11      Q.   -- and report that you received one?

12      A.   No.

13      Q.   Even though it referenced him?

14      A.   I think by that point in time I'm pretty sure

15  Halsey did.  Halsey had gotten the first subpoena.  And,

16  I mean, I believe that Halsey -- I don't think I was the

17  only phone call.  I'm sure he called everybody else on

18  the list he was friends with that knew him.  So, no, I

19  did not call.  I did not call Matt after that.

20      Q.   So when was the first time you disclosed to

21  Matt that you -- Matt Gaetz that you received a subpoena

22  referencing him?

23      A.   Probably the next time we talked.  I mean, it

24  was -- you asked me the question, did I call him?  NO.

25  But the next time we chatted, it probably came up.  And



 1   I don't know when that was.  Probably a couple days.

 2       Q.   Okay.  And you think the first time you talked

 3   to him about the subpoena, he said I didn't comply with

 4   it, or I'm not going to comply with it?

 5            MR. ANDRADE:  Object to form.

 6            THE WITNESS:  That's not what I said.  I said I

 7       was surprised because -- you know, again, contrary

 8       to what you may believe, it's not like the only

 9       thing we talk about is this stuff.  It's very

10       limited.  It's not really something that he wanted

11       to do.  I had received the subpoena and talked --

12       and consulted with my attorney, and we had decided

13       that the best course of action was to comply with

14       it, was to go give them all the information that we

15       could give.

16            You know, they asked for reasonable things.  It

17       wasn't like it was horribly invasive.  It was just

18       communications with everybody.  So, you know, the

19       thing that kind of makes it a pain is when you have

20       to go through your cell phone and you have thousands

21       of pictures and they're saying, Make sure you comply

22       with this.  It's kind of stressful because the last

23       thing I want to do is not include something in

24       something.  So I had to go through picture after

25       picture after picture week after week starting when



1    I met Joel.  So there was -- it was cumbersome, but

2    I didn't -- there was nothing about the subpoena

3    that I thought was like mind blowing.  It was just

4    basically trying to figure out what the

5    communication was.

6        Matt did not share with me that he was going to

7    go a different path.  If he had shared that, I don't

8    think I would have changed my outcome.  I still

9    would have complied and done all the things I did,

10   but Matt chose not to.  I think Matt's belief was

11   that the prosecution was brought about by false

12   testimony from Joel, and that the -- listen, it's no

13   secret, Matt spends a lot of time on TV, Fox News,

14   and talking about intelligence agencies and failures

15   and I think the guy's name was Peter Strzok and Lisa

16   Page and he's always -- Matt has made a hallmark of

17   his career in congress out of calling out law

18   enforcement, DOJ, Department of justice.  You know,

19   he's taken them to task, constantly doing that.  He

20   has going down and taking on the January 6th people.

21       So Matt, his view was this was purely

22   political, that there was no truth to it, that he

23   was not going to start jumping through hoops just to

24   make sure that Joel Greenberg and his parents could

25   be happy that there was going to be other people



1    prosecuted.  So he refused to do it.  And, again,

2    you can ask him about that.  He didn't tell he was

3    doing that affirmatively.  He just did it.

4         And when I found the story behind me finding

5    out how he was going to handle that was, again, they

6    came and took his cell phone, and I think they had

7    it for a couple years.  So the number he had which

8    was (850) 240-3778 was now in the possession of the

9    feds.  So I got a text message from him saying, Hey,

10   just FYI, this is now the case.  And I said, Why do

11   you have a new phone number?  It was one of those

12   things.  And his response to me over the phone was

13   something like, The feds grabbed it.

14 BY MR. WERMUTH:

15   Q.  And when was this?

16   A.  I don't know.  Again, I told you it was a

17 couple -- it wasn't immediate.  And, again, from the

18 time I got the subpoena, I want to say we had a pretty

19 substantial -- I mean, it wasn't a lot of time, but it

20 wasn't like you have to have all this stuff to us within

21 three days.  I mean, it was more of a long burn, and

22 like you had a month or two to go gather it all, and

23 whatever.  I think it was 30 days maybe.

24        But the point was I didn't have -- it wasn't

25 such an overwhelming amount of information that I



1  couldn't easily get my hands on it with the exception of

2  going through things like text messages, and they're

3  just purely time consuming.  Like I couldn't search a

4  photo base for every time -- I guess there is ways to do

5  that; but, I mean, I had to go through and do it all.

6  So, I mean, most of the compliance was mindless drone

7  work of just going through and checking through all the

8  photos on my iPhone and checking through text messages

9  and everything else.

10          I assumed at the time that Matt was doing the

11 same because I didn't really know it was an option to

12 just reject DOJ's subpoena.  I didn't know that that

13 was -- again, as a non-attorney and someone who is

14 fortunately not terribly familiar with that process, I

15 didn't know you kind of had the option to do that.  I

16 sort of thought like -- it was kind of like when you get

17 pulled over and you refuse to blow on the side of the

18 road you lose your license for -- I just thought you had

19 to comply.  Matt --

20     Q.   You do realize I asked you about a time

21 question there --

22     A.   Yeah, I don't know --

23     Q.   Just if you could kind of limit it when I ask

24 you for a time, and you say, I don't know, or maybe

25 we'll talk about when, but not a diatribe because we --



 1 | I think your lawyer wants to --

 2 |     A.   Well --

 3 |     Q.   -- end this at a reasonable time.

 4 |     A.   You're asking questions, and I'm simply trying

 5 | to give you as much context as I can.  I'm trying to

 6 | help you with the information I have.  And what I'm

 7 | telling you is I don't remember.  It would be some

 8 | period of time.

 9 |     Q.   Okay.  Did you communicate with Mike Fischer

10 | about the subpoena or any of the issues it asked about?

11 |     A.   I don't think Mike Fischer was mentioned in

12 | that subpoena if I'm not -- I don't think he was in it.

13 | If he was then, I guess I would have reached out to him.

14 | I can't remember if he was in it or not.  At first blush

15 | right now, I don't recall him being there, but he might

16 | have been.  I didn't have any talks with Fish about

17 | that, no.  I didn't call him.

18 |     Q.   Did you let at anyone at Ballard Partners know

19 | that you received a grand -- a federal subpoena.

20 |     A.   Yes.

21 |     Q.   Who?

22 |     A.   Brian.

23 |     Q.   Okay.  Right when you received it?

24 |     A.   Shortly -- maybe not the same day but the next

25 | time I saw him.  It was an in-person conversation.



1      Q.    Okay.  And what did you talk about?

2      A.    That I received the subpoena from the federal

3   government.

4      Q.    And what did he say?

5      A.    It was kind of interesting.  Usually Brian

6   would be very -- he would ask a lot of questions and

7   sort of quantify.  It was really, I don't want to have

8   anything to do with this.  Just please keep it at arms

9   length and just let me know if anything develops on it.

10  So I said, Okay, just making you aware.  I don't want to

11  surprise you if it comes out later.

12          MR. WERMUTH:  Can you pull up item 14, but it's

13      April 12th?

14          (Exhibit 129 was marked for identification.)

15  BY MR. WERMUTH:

16     Q.    I want to show you this article.  WhatsApp

17  Shows Gaetz Allies Scrambling to Contain Fall Out.

18          Do you see this article?

19     A.    Yes.

20     Q.    This is an article that you produced in this

21  case; and in it, it references the text exchange between

22  you and Joel.

23     A.    Yes.

24     Q.    On August the 14th.  You're aware of that?

25     A.    Okay.  Sure.



1    Q.    Are you the person who provided this
2  information to the press?
3    A.    Yes.
4    Q.    Okay.  So had there been any mention of REDACTED or
5  anything like that in the press before this date?
6    A.    I don't know.  I'm not a search engine.  I have
7  no idea.
8    Q.    Okay.  But you would have known if you were
9  being -- if there was a reference to you being
10  implicated in the press about sex, right?
11    A.    I do not know the answer to your question.  I
12  don't know if there was press before this.  I don't
13  recall.
14    Q.    Okay.  But you're the source for this article?
15    A.    I provided the article.  Again, the article
16  speaks for itself, and the word got out that there was a
17  threat.  I think -- I believe this article was written
18  by Mark Caputo if I'm not mistaken, and he called me and
19  I don't know where he got it.  But he said, I heard that
20  there was a series of texts where you had been
21  threatened by Joel; and I said, yeah.  He said, Well, do
22  you mind sharing them with me?  And I called Hornsby and
23  I said, Mark Caputo would like to do this.  He said,
24  Well, you know, it is a legal strategy but part of it is
25  you have to stay ahead of this.  And so he said, you



 1  know, he says, I'm not going to stop you from doing it,

 2  so I provided the texts.

 3      Q.   Okay.  And, well, that's interesting.  So Mark

 4  Caputo reached out to you from Politico?  Is that who

 5  he's with?

 6      A.   Mark has been with NBC News, Politico, and now

 7  at a place called The Bulwark.  I don't have spatial

 8  intelligence in terms of when he -- where he was; but, I

 9  mean, this one appears to be a Politico article based on

10  the general aesthetic.  So I believe he was there at the

11  time -- well, it's got Matt Dixon too, so it was a

12  Politico.

13      Q.   Do you know where they got the text message

14  from before you?

15      A.   No.  They didn't have the text messages, by the

16  way.  They were aware of the existence of them.  So I...

17      Q.   Do you know how they became aware of it?

18      A.   That's what I -- I just said no, I don't know.

19  Journalists don't always disclose their sources

20  obviously.

21      Q.   So he didn't disclose any sources to you?

22      A.   No.  He said, Hey, I heard you got threatened

23  by Joel or he wanted to fire the U.S. attorney or

24  something.  I said, Yeah, those are real.

25      Q.   Now, my understanding and I just want



 1  confirmation from you is that after this news article

 2  came out in April of 2021, April 12, 2021, it is after

 3  that that you first did you4 proffer to the government.

 4          Does that sound right to you?

 5      A.   I don't recall the dates, but I believe I was

 6  out of my job by the time I did the interview with the

 7  FBI.

 8      Q.   Okay.  And did you only do one interview with

 9  the FBI?

10      A.   Yeah.

11          MR. PERKINS:  And this exhibit will be marked

12      as 129?

13          MR. WERMUTH:  129, yes.  Can we take like a

14      two-minute break?

15          THE VIDEOGRAPHER:  If there are no objections,

16      going off record.  The approximate time is 2:35 p.m.

17          (A break was had.)

18          THE VIDEOGRAPHER:  On record.  The approximate

19      time is 2:43 p.m.

20          MR. WERMUTH:  At this time, I'm going to yield

21      the rest of the questions to other counsel who are

22      present in the interest of time.

23          THE WITNESS:  Okay.

24                  FURTHER DIRECT EXAMINATION

25  BY MR. SCHELLER:



1      Q.    Thank you.  Am I coming through now?  Okay.

2   Good afternoon, Mr. Dorworth.

3      A.    Good morning, sir -- or afternoon, sir.

4      Q.    In your last testimony with Mr. Wermuth, you

5   said that the Greenbergs sent a treasury check to the

6   government, right?

7      A.    Yes.

8      Q.    Okay.  And you were saying Sue and Andy

9   Greenberg sent that check?

10      A.    I mean, it was as part of Mr. Greenberg's

11   things, they turned over different transactions that

12   were made I believe.  I could be wrong about that, but

13   there was a check that was to the Department of Treasury

14   that has no author because it's a cashier's check, and

15   then they had the other one they did was via a Delaware

16   company but I --

17      Q.    Okay.  So a treasury check that went to the

18   Department of Justice, you said that you had done -- you

19   took a couple of weeks or a few weeks to work on this

20   and do your investigation before this complaint was

21   filed, correct?

22      A.    Yes.

23      Q.    Okay.  And that treasury check was actually

24   from the sale of Joel Greenberg's house that was seized

25   by the government; isn't that correct?



1      A.   I have no idea --

2           MR. ANDRADE:  Object to form.

3           THE WITNESS:  I never heard that before.

4   BY MR. SCHELLER;

5      Q.   You don't know.  So you didn't do that

6   research?

7      A.   Well, I mean, I know that the house was only

8   like $600,000, and they had a mortgage on it, I believe.

9   I don't know, so I --

10     Q.   So what evidence do you have that Andy and Sue

11  Greenberg paid that check?

12     A.   Well, they --

13          MR. ANDRADE:  Object to form.

14          THE WITNESS:  They gave a million dollar check

15     to the -- via the Delaware LLC.

16  BY MR. SCHELLER:

17     Q.   Okay.  What evidence do you have that Andy and

18  Sue Greenberg paid a check to the Department of Justice

19  on behalf of Joel Greenberg?

20     A.   I thought it was --

21          MR. ANDRADE:  Object to form.

22          THE WITNESS:  I thought it was just commonly

23     accepted and stipulated.  I mean, I believe that

24     that is -- I thought that was actually part of the

25     discovery that we had here, if I'm not mistaken.



1  BY MR. SCHELLER:

2      Q.   So you don't have any independent facts other

3  than the discovery?

4      A.   Yes.

5      Q.   Okay.

6      A.   I mean, how would I?

7      Q.   How did you know Vince Citro?

8      A.   In 2004, I was the chairman of Bush Cheney for

9  Seminole County, and one day we met -- met the president

10  at Air Force One.  Vince was an embedded U.S. attorney

11  at the time.  The bus driver, when I got on the bus, was

12  drunk, so I went up to the guy.  He was very kind of

13  sloppy, so I said, I don't think you should be driving

14  this bus.  There's people on it, and we're going to go

15  high speeds.  He got mouthy with me, and Vince came over

16  with a badge, introduced himself as an assistant U.S.

17  attorney and said I'll be driving the bus.

18      Q.   Okay.  So would you describe yourself as having

19  a friendship with Mr. Citro?

20      A.   I mean, I had dinner with him and his now

21  deceased wife once with my first wife probably 15 years

22  ago, but I was friendly with him.  I referred Joel to

23  him.  I thought he did a good job.  I think he had a

24  good reputation, so, I mean, I would say we were

25  friendly yes.



1    Q.   Okay.  And you thought he was an honest person,
2  right?
3    A.   Yes.
4    Q.   Okay.
5    A.   I had no reason to doubt his honesty and still
6  don't.
7    Q.   And were you aware since you have a
8  relationship with Mr. Citro that he was the one that
9  referred "AB" to Andy Searle?
10         MR. ANDRADE:  Object to form.
11         THE WITNESS:  No, I wasn't aware of that.
12  BY MR. SCHELLER:
13    Q.   You didn't know that?  Did you do any research
14  on Andy Searle?
15    A.   No -- yeah, I have since then.  I mean, he's in
16  the same office as Brian Phillips; but at the time, I
17  can't go asking for copies of, you know, who paid for
18  what.  That wouldn't give that to me.
19    Q.   Okay.  So were you aware that he was a federal
20  prosecutor with Mr. Citro?
21    A.   I did not know that.  But it seems to me like
22  if Joel's attorney is sending "AB" to Mr. Searle and
23  with the warranty and the K⬛REDACTED⬛ M⬛REDACTED⬛ text that there
24  would be no bill at the end of it that it was Joel via
25  his attorney setting her up with somebody which I think



1   kind of makes the point well, don't you?

2       Q.   No.   So Mr. Citro is the attorney we're talking

3   about that had the conversation with Mr. Searle about

4   representing "AB."

5           So do you think Mr. Searle is part of this

6   conspiracy and this enterprise?

7           MR. ANDRADE:   Object to form.

8           THE WITNESS:   I didn't say that.   What I said

9       was in a text message from K█████ M█████ -- or

10      to -- I believe it was -- it was somebody.   I

11      honestly don't remember who it was, but it was

12      somebody saying, Listen, you need to go see this

13      lawyer telling "AB" to go see Andrew Searle saying

14      that the bill is already paid.   You just feed to go.

15      We got you a lawyer.

16  BY MR. SCHELLER:

17      Q.   Did that text say actually say the bill is

18  already paid.

19          MR. ANDRADE:   Object to form.

20          THE WITNESS:   Yeah, they said there won't be a

21      bill, the one -- the K█████ M█████ one, yes.

22  BY MR. SCHELLER:

23      Q.   Are you sure?

24          MR. ANDRADE:   Object to form.

25          THE WITNESS:   I might be paraphrasing, but it



```
 1      said there would be no bill.
 2  BY MR. SCHELLER:
 3      Q.   Well, I thought you said you had a very good
 4  memory --
 5      A.   I do.
 6      Q.   -- and you don't have to take notes --
 7           MR. ANDRADE:  Object to form.
 8           MR. SCHELLER:  Can I -- can I finish the
 9      question before you object?  All right?
10           MR. ANDRADE:  There is --
11  BY MR. SCHELLER:
12      Q.   You said you have a good memory?
13      A.   I have a good memory.
14      Q.   But you -- so it's your memory that that text
15  says, the bill's already paid?
16      A.   I told you now two times I might be
17  paraphrasing, that there is something in the discovery
18  where she said -- she was told to go see Andrew Searle,
19  and the bill would already be handled.
20      Q.   Okay.  And in that message exchange, wasn't
21  there also something about Andy Searle said that "AB"
22  would have to get immunity?
23           MR. ANDRADE:  Object to form.
24           THE WITNESS:  I did not see that.
25  BY MR. SCHELLER:
```



1    Q.   You didn't see that?

2    A.   No, I have never seen that.

3    Q.   Have you looked at this discovery?

4    A.   I have looked at the discovery, yeah.

5    Q.   And you're talking about the K[REDACTED] M[REDACTED]

6 text?

7    A.   Yes.

8    Q.   Right?

9    A.   Uh-huh.

10    Q.   And that you don't recall that "AB" in this

11 text exchange said that Andy Searle said --

12    A.   Oh, yes.  Yes.

13    Q.   Stated that she would have to talk to the

14 government?

15    A.   I mean, you're expanding out what I read about

16 that; but I do remember that text, yes.

17    Q.   Okay.  So "AB" talking to the government was

18 part of the conspiracy?

19    A.   Sure --

20    MR. ANDRADE:  Object to form.

21 BY MR. SCHELLER:

22    Q.   Did Andy Searle ever get paid?

23    A.   I would have no way of knowing that.

24    Q.   Okay.  Were you aware that he was never paid?

25    MR. ANDRADE:  Object to form.



CHRISTOPHER DORWORTH                                August 07, 2024
DORWORTH vs GREENBERG                                           151

1          THE WITNESS:  That would be the same answer
2      that I just gave you seconds ago, but I would have
3      no way of knowing that.
4   BY MR. SCHELLER:
5      Q.   Were you aware -- do you have any knowledge
6   that Andy Searle talked to Joel Greenberg?
7      A.   No.
8      Q.   Do you have any knowledge that Andy Searle
9   talked to Sue Greenberg?
10     A.   No.
11     Q.   Do you have any knowledge that Andy Searle
12  talked to Andy Greenberg?
13     A.   No.
14     Q.   Mike Shirley gave you some documents in this
15  case, right?
16     A.   Correct.
17     Q.   Do you remember when that was?
18     A.   Well, whatever day I turned them over to you
19  would probably be a day or two after that.
20     Q.   So you turned them over in May?
21     A.   Right.
22     Q.   Mike Shirley had to go to prison in February.
23     A.   No, he didn't.
24     Q.   You don't remember that?
25     A.   I mean, I gave these to my attorney, and I



1  believe we provided them right away.  He was already

2  convicted when I met him at Grafton Street, but he had

3  not been sentenced yet.

4      Q.   Wasn't he sentenced in February?

5           MR. ANDRADE:  Object to form.

6           THE WITNESS:  I don't -- I think there was an

7      appeal.  I'm not an expert on Mike Shirley case, so

8      I'm not going to answer those questions.  I don't

9      know.  I know I met with him at Grafton Street.  I

10     got all the data.  I gave them over to Michael

11     Beltran and to Anastasia Wagner the next day.

12     That's what I know.  I don't have it on the

13     calendar --

14  BY MR. SCHELLER:

15     Q.   Was this before his sentencing or after?

16     A.   I don't remember about the sentencing.  It was

17  after the conviction.  I don't remember that -- I think

18  he was actually down here for the sentencing.

19     Q.   Right.

20     A.   It was like a few days before the sentencing.

21     Q.   He was sentenced on February 27, 2024.

22     A.   Okay.

23     Q.   Okay?

24     A.   Yes.

25     Q.   You want to see his docket to refresh your



 1  recollection?

 2     A.   I'm not challenging what you're saying.  I'm

 3  telling you --

 4     Q.   And the documents were turned over in May of

 5  2024.

 6          MR. ANDRADE:  Object to form.

 7          THE WITNESS:  I --

 8          MR. SCHELLER:  What's the objection?

 9          MR. ANDRADE:  Specifically the predicate hasn't

10     been laid.  You're --

11  BY MR. SCHELLER:

12     Q.   Okay.  So when did -- were you aware that

13  Mr. Beltran turned over the documents on the eve of Joel

14  Ellicot's deposition in May of 2024?

15     A.   I'm not aware of that.

16     Q.   Okay.  So what -- you said that you provided

17  them to Mr. Beltran?

18     A.   Yes.  I literally got home from Grafton Street

19  and said, I got these, I've got to get them over to you,

20  and sent them over the same day or maybe the next

21  morning.  Because he texted them to me, so I had to get

22  a way to get them out.

23     Q.   And what documents did he give you?

24     A.   Everything he gave me I gave to you.  I -- you

25  said you want this one -- I did not have some list.  He



CHRISTOPHER DORWORTH                          August 07, 2024
DORWORTH vs GREENBERG                                      154

1  just said this will be good for you, this will be good

2  for you, this will be good for you.

3       Q.   Did he give you Joel Greenberg's proffer?

4       A.   If I turned it over -- I don't remember the

5  Greenberg proffer.  I don't believe I saw that, but...

6       Q.   Do you know what lawyer was present during the

7  Greenberg proffers when yours or Mr. Gaetz' name came

8  up?

9       A.   I do not.  Maybe you or Vince Citro.

10      Q.   The latter.

11      A.   Okay.

12      Q.   Who's your friend, right?

13           MR. ANDRADE:  Object to form.

14           THE WITNESS:  I mean, I haven't talked to him

15      in three or four years.  The last time --

16  BY MR. SCHELLER:

17      Q.   Well, I want to make sure.  You're not saying

18  that Mr. Citro is part of this RICO enterprise, are you?

19      A.   Well, I mean, Mr. Citro recused himself from

20  the case and gave it to you, so I think Mr. Citro was

21  probably uncomfortable with what was going on but I have

22  no way of knowing because --

23      Q.   Sir, don't speculate.  That's not what

24  happened, don't speculate.

25      A.   I'll answer my questions how I want to, sir.



1  Thank you very much.

2       Q.   Did Mr. Citro tell you that?

3       A.   No.

4            MR. ANDRADE:  Object to form.

5  BY MR. SCHELLER:

6       Q.   Again, what's that based on?

7       A.   What's the question?  What is what based on?

8       Q.   That Mr. Citro recused himself?

9       A.   I mean, he's no longer the lawyer.  I don't

10 know.  Again, somehow he was the lawyer, and now he's

11 not -- and then he wasn't the lawyer.  You were the

12 lawyer.  So something happened there.

13      Q.   Okay.  You understand what recuse means, right?

14           MR. ANDRADE:  Object to form.

15           THE WITNESS:  I --

16 BY MR. SCHELLER:

17      Q.   You used the term --

18           MR. SCHELLER:  What's the objection?

19           MR. ANDRADE:  Specifically it just feels

20      argumentative.  I'm not 100 percent sure why you're

21      asking a legal conclusion essentially.

22           MR. SCHELLER:  He used the term recuse, and I

23      want to -- can I ask what is your understanding of

24      the term recuse?

25           MR. ANDRADE:  That's much better.



1          THE WITNESS:  Well, recuse would be like in a

2     more formal capacity like a judge might recuse them

3     self if there was something there, but a lawyer who

4     is your lawyer one day decides not to be your lawyer

5     anymore, maybe that's the -- maybe that was Joel's

6     decision.  Maybe that was Vince's decision.  I dont'

7     know who it was; but, I mean, at that point in time,

8     he said sets himself, he recuses himself as the

9     attorney.  And I'm not an attorney, so if that is

10    not a -- if there is another word for it, that is

11    the word -- that is how I use the word.

12 BY MR. SCHELLER:

13    Q.   So you don't know why Mr. Citro dropped out of

14 the case?

15    A.   No.

16    Q.   Joe Ellicott, do you have any knowledge that

17 the Greenbergs paid for Joe Ellicott's attorney in this

18 case?

19    A.   I don't know that, but I suspect it but I don't

20 know that.

21    Q.   Do you know who the attorney was?

22    A.   I don't.

23    Q.   Do you have any information that the

24 Greenbergs -- besides speculation, do you have any facts

25 establishing that the Greenbergs paid Joel Ellicot's



1   lawyer?

2       A.   I just said I've never -- I don't have -- I

3   suspect he did, but I don't have any facts on that, no.

4       Q.   When did you first meet B̲REDACTED̲ G̲REDACTED̲?

5       A.   A couple years -- 2017ish.  Right before -- she

6   was dating Matt.

7       Q.   And when -- do you know who J̲REDACTED̲ S̲REDACTED̲ is?

8       A.   I do not.

9       Q.   You do not?

10      A.   I do not know J̲REDACTED̲ S̲REDACTED̲.

11      Q.   So you don't recall meeting   REDACTED   and

12  J̲REDACTED̲ S̲REDACTED̲ at the same time?

13      A.   She had a friend.  If that's J̲REDACTED̲, that's

14  helpful.

15      Q.   Okay.  She had a friend.  Okay, and where did

16  you meet Ms. G̲REDACTED̲ and this friend?

17      A.   At the house.  They were -- they were set up

18  with Matt.  Joe was setting her up with Matt.

19      Q.   And she brought her friend, J̲REDACTED̲ S̲REDACTED̲?

20      A.   Yes.

21      Q.   Okay.  And this was in February of 2017?

22      A.   I don't know the date.  You told me that.  I

23  don't know what the date was.

24      Q.   Was it 2017?

25      A.   I believe it was 2017, yes -- well, it would be

1   before July 2017, and it wasn't in 2016.

2       Q.   Just to clarify, when B REDACTED C REDACTED was

3   repeating information to you on these telephone calls,

4   just to clarify, was this information from K REDACTED

5   M REDACTED 's grand jury testimony?

6       A.   I don't know.  I mean, you're talking about

7   when she called Matt, and they told me about the

8   driver's license?

9       Q.   Yes.

10      A.   Yes.

11      Q.   That was a grand jury testimony?

12      A.   That's what I was told at the time.  I have no

13  way of verifying that independently.

14      Q.   Who told you that?

15      A.   I think B REDACT .

16      Q.   So B REDACT went to the grand jury, and then how

17  far -- let's --

18      A.   No, no, no.  B REDACT did not -- at that time, B REDACT

19  did not go to the grand jury.  That was K REDACTED and I

20  believe "AB" going to the grand jury.  I think B REDACT went

21  to the grand jury many, many years later.  She was -- I

22  think there was a -- she got immunity or whatever, and

23  then she went there and it was in the news that B REDACT was

24  going to the courtroom that day.  And so, I mean, it

25  made the news.  That is how I discovered that B REDACT was



1   going before the grand jury.  But back then, the subject

2   of that September 2020 phone call was not -- it was not

3   B█████ going to the grand jury.  It was that some

4   combination of K█████ and/or █████ had gone and were

5   like reporting in to B███, and I got a courtesy heads up

6   because my name went up there too.

7        Q.   Did █████ -- did you have any information that

8   █████ or K█████ M█████ knew that B█████ G█████ was

9   repeating this information to you?

10       A.   No.

11       Q.   Did they authorize -- well, strike that.

12            Do you know L█████ P█████?

13       A.   I do not.

14       Q.   Never met L█████ P█████?

15       A.   I mean, you would have to show me a picture of

16   her.  I don't think so.

17            MR. SCHELLER:  Do we have a picture of L█████

18   P█████?

19            MR. ANDRADE:  Exhibit 122.

20            MR. PERKINS:  Yeah, it's 122.  Give me a

21   second.

22            THE WITNESS:  Yeah, I don't -- she looks

23   familiar.  I feel like she might have -- she looks a

24   lot like this other person, Candice.  A different

25   physique but a similar face I think.



```
 1  BY MR. SCHELLER:
 2      Q.   You're referring to C█████ H█████?
 3      A.   Kind of, yeah.  I think that's --
 4      Q.   Do you recall meeting her at Jason Pirpzzolo's
 5  house?
 6      A.   I do not.
 7      Q.   Do you recall her being a friend of M█████
 8  Z█████?
 9      A.   If you say so.  I don't recall.
10      Q.   I'm asking if you recall?
11      A.   No, I don't know that.  No.
12      Q.   You talked about Venmo payments.  Since you
13  talked to Matt Gaetz, do you have any reason -- do you
14  have any knowledge why he sent M█████ Z█████ $1,938.45
15  over Venmo?
16      A.   Is that once or multiple times?  I have no
17  idea.
18      Q.   You have no idea?
19      A.   I mean, she said one time for 1,900 --
20      Q.   A total of 1,938.45.
21      A.   I have no idea.  No idea whatsoever.
22      Q.   What about a woman named A█████ P█████?  Did
23  you ever meet her?
24      A.   I don't think I know A█████ P█████.
25      Q.   You don't know her?
```



```
 1      A.   I don't think so.  Do you have a picture of
 2  her?  Again, I don't -- there is a lot of names here.
 3  So it's helpful if we can reference by sight.
 4      Q.   Do you know why Matt Gaetz would send $1,500 to
 5  K[REDACTED] M[REDACTED]?
 6      A.   I do not.
 7      Q.   No, excuse me, $3,500 to K[REDACTED] M[REDACTED].
 8      A.   Doesn't change my answer.  I do not.
 9      Q.   Okay.  What about Gaetz sending $4,025.27 to
10  K[REDACTED] S[REDACTED]?
11      A.   I have no idea.
12      Q.   Do you know why he sent B[REDACTED] G[REDACTED]
13  24,011.84?
14      A.   I mean, I know he lived with B[REDACTED] G[REDACTED].  I
15  think they were -- they lived together in DC for at
16  least one summer, so I would assume that they were --
17  they were in a relationship dating.  I mean, it was --
18  he took her to State department dinners and everything.
19  So I can only assume that they were expenses associated
20  with that.
21      Q.   Do you know how he met her?
22      A.   I do not.  I'm sorry, do I know who how he met
23  who?
24      Q.   B[REDACTED] G[REDACTED].
25      A.   Do I know how -- yeah, Joel introduced Matt to
```

1    B REDACTED  G REDACTED .

2        Q.   You mentioned Halsey Beshears?

3        A.   I did.

4        Q.   Do you know why he sent $1,346.80 to A REDACTED

5    P REDACTED ?

6        A.   I do not.

7        Q.   Do you know why he sent $987.50 to "AB"?

8        A.   I do not.

9        Q.   Do you know why he sent and $387.50 to K REDACTED

10   M REDACTED ?

11       A.   I do not.

12       Q.   Do you know why he sent $1,000 A REDACTED  L REDACTED ?

13       A.   I do not.

14       Q.   You mentioned something, a letter from St.

15   Louis yesterday?

16       A.   I did.

17       Q.   And I think the first name is --

18            MR. PERKINS:  Vladimir.

19            THE WITNESS:  Vladimir.

20   BY MR. SCHELLER:

21       Q.   Excuse me, Vladimir.  How did you obtain that

22   letter?

23       A.   Matt Gaetz.

24       Q.   What else did Matt Gaetz provide you?

25       A.   A copy of a letter that he sent to Joel



 1  Greenberg -- or that Joel Greenberg sent him from

 2  prison.

 3      Q.   Okay.  What else?

 4      A.   Those two things.

 5      Q.   Those are the only two things that Matt Gaetz

 6  gave you?

 7      A.   Yes.

 8      Q.   Okay.  Excuse me, let me rephrase that.  Those

 9  are the only documents that Matt Gaetz gave you?

10      A.   Yes.

11      Q.   And I'm referring to documents, just to clarify

12  I'm referring to photographs, text messages, emails,

13  writings.  I'll use that broad category of documents.

14      A.   Okay.

15      Q.   And I'm sorry, I'm trying to move fast --

16      A.   No, you're doing great.

17      Q.   Your lawyers put time limits on me.

18      A.   Well, I think 11 hours is a lot of time.

19           MR. ANDRADE:  I think the federal rule put time

20      limits on us, but, yeah.

21           MR. SCHELLER:  Well, I think it's not as --

22      well, I'm not going to get into it with you.

23  BY MR. SCHELLER:

24      Q.   All right.  So that's the only two things

25  related -- the only two pieces of evidence related to



1  this case that he has provided to you?

2      A.   I think so.  I mean, nothing else comes to

3  mind.  I'm not trying to elude this.  I believe when he

4  got the jailhouse letter, he didn't -- he told me about

5  it.  And then the letter from -- yeah, I'm drawing a

6  blank.  If I'm forgetting something, I apologize.  I can

7  think of nothing else he's gave me.

8      Q.   When is the last time you spoke to Matt Gaetz?

9      A.   Last week.

10     Q.   When's last week?

11     A.   What?

12     Q.   What day last week?

13     A.   I don't remember.  Actually, probably this

14  weekend.  He's looking at piece of properties.  He's

15  looking at different house and trying to figure out

16  which one he wants to buy.

17     Q.   You said that a New York Times reporter

18  informed you that somebody close to the Greenberg family

19  was providing the New York Times with information?

20     A.   I don't think I said it that way.  I asked her,

21  I said, did this come from the -- was it like a leak

22  from DOJ or something.  I was curious to know the nature

23  of it.  She goes, No, it's from people around the case,

24  and that was her response.

25     Q.   She said people around the case?



1      A.   Yes, something -- I can't remember her exact

2  phraseology on that one, but it was -- it's not from a

3  leak in DOJ.  It's from people around -- who are in and

4  around the case.

5      Q.   Okay.  So she didn't actually say the

6  Greenbergs?

7      A.   No.

8      Q.   You spoke about a Lincoln dinner.  Was that in

9  2019?

10     A.   I think so.  I believe that's what the

11 commercial said.

12     Q.   And was that around the Westgate Resort?

13     A.   Yes.

14     Q.   And did you attend an event or a party after

15 the event at the Westgate Resort?

16     A.   Three or four couples were together.

17     Q.   Who were the three or four couples?

18     A.   Myself and Rebekah, Matt and M⬛REDACTED⬛ Z⬛REDACTED⬛,

19 Joel and Abby, and I believe Randall Hunt.  I can't --

20 this one I'm not -- he was at the dinner with us.  I

21 think he came back.  I don't know when he left the after

22 party.  I don't know if he -- I think he was there for

23 some period of time, but a guy named Randall Hunt who

24 was a future secretary of the lottery and his wife.

25 Actually Stevie was not there.  I think it was just



CHRISTOPHER DORWORTH                                     August 07, 2024
DORWORTH vs GREENBERG                                               166

1  Randall there.  I don't think Stevie joined us that

2  night.

3      Q.   Who rented the rooms?

4      A.   I have no idea.  They weren't my rooms.

5      Q.   Did --

6      A.   Although, I mean -- - again, I think usually if

7  you speak at a Lincoln Day dinner, typically the party

8  gives you a room as part of it to say that you are a

9  speaker.  That's typically sort of something that would

10 happen that goes along with you agreeing to be the

11 speaker of it.  So my lifelong experience with the

12 republican party says nobody.  It was probably given to

13 them by somebody.  If I found out somebody else rented

14 it, I just have no idea but typically it would be done

15 by the party itself.

16     Q.   And I'm going to refer just for the next few

17 questions, I'm going to talk the Lincoln dinner as the

18 event.

19     A.   Okay.

20     Q.   All right.  And I'm going to call it whether

21 it's a party or a gathering, I'm going to call that the

22 party.

23     A.   Okay.

24     Q.   Was Nikki Fried at the event, the Lincoln Day

25 event?



1    A.   That would not pencil because Nikki was a

2  statewide elected democrat who was the Ag commissioner.

3  So I do not recall her being there, and I would tell you

4  that just surficially that would not pass the smell test

5  because that would be somewhat scandalous and

6  catastrophic figure if a democratic statewide elected

7  person was there.   So I don't think so.

8    Q.   Thank you for that long answer.   Really the

9  next question was more -- was Jason Bergman at the

10 event?

11   A.   Who is that?

12   Q.   He was a lobbyist for the marijuana industry.

13   A.   I don't -- what's his name one more time?   I'm

14 sorry, I don't believe I know that person.

15   Q.   You dont' know a Bergman?

16   A.   Jake Bergman.

17   Q.   Jake Bergman?

18   A.   I don't -- Jake is -- Jake is Nikki's long time

19 fiance, and I don't think -- I don't believe Jake was

20 there either.

21   Q.   You don't remember him giving a $25,000 check

22 to Matt Gaetz that night?

23   A.   I don't.   I wasn't there for that.   I mean,

24 there is all manners of things that happen all day.

25   Q.   You referred to a family that you were saying



1  you were doing lobbying yesterday for the marijuana

2  industry.  I may have misheard.  Who was the family that

3  you were referring to, the name?

4      A.   Can you help me just -- what was the context?

5      Q.   You were talking about doing some lobbying for

6  a company for the marijuana industry?

7      A.   I was?

8      Q.   Yes.

9      A.   Yeah.  I mean, I have represented several

10  marijuana companies.

11      Q.   Okay.  What companies have you represented?

12      A.   MedMen, now defunct.  They were my client for

13  awhile.  I have now represented Trulieve on and off

14  which is I think the biggest medical marijuana company.

15  And --

16      Q.   Who's the majority owner of Trulieve?

17      A.   I believe Ken Rivers.

18      Q.   Ken Rivers?

19      A.   Yeah.

20      Q.   What interest does Halsey Beshears have in

21  Trulieve?

22      A.   I don't think he has any interest.  I think his

23  brother has interest in it and father.

24      Q.   How much?

25      A.   I have no idea.  I never knew that.



1    Q.   Have you ever attended any events at Jason

2  Pirozollo's house?

3    A.   Sure.

4    Q.   Do you recall being at Jason Pirozollo's house

5  at the same time as M▮▮▮▮ Z▮▮▮▮?

6    A.   I do not.

7    Q.   K▮▮▮▮ M▮▮▮▮?

8    A.   I do not.

9    Q.   E▮▮▮▮ D▮▮▮▮?

10   A.   I don't know who that is.

11   Q.   You don't know who E▮▮▮ D▮▮▮ is?

12   A.   I don't think so.  Is that the one --

13   Q.   You just testified about her earlier today

14  being outside of Joel Greenberg's house?

15   A.   I said that's the one I think that got in the

16  car crash.  I don't know her.

17   Q.   So you don't know E▮▮▮ D▮▮▮?

18   A.   No.

19   Q.   Well, let's go back to that testimony then.

20  You said that you saw -- what did you testify?

21   A.   There was some news article, something on

22  twitter or something that said that just days after Joel

23  got arrested, he -- there was a 911 call where a woman

24  was in a car crash in his neighborhood, and it appeared

25  that she had been hurt and that Joel got on the phone



1  and said there is no reason for anyone to come here.

2  And I remember just for some reason that stuck in my

3  head that I thought that person's first name was Emma.

4      Q.   All right.  So you don't know who she is?

5      A.   I don't know who she is.

6      Q.   Yesterday you testified about looking at

7  "AB"'s, for lack of a better term, porn images.

8      A.   Yes.

9      Q.   And that they were disgusting.

10     A.   Very disgusting.

11     Q.   When did you look at those images?

12     A.   A couple weeks ago.

13     Q.   A couple weeks ago.  And why did you?

14     A.   At the request of Michael Beltran.

15     Q.   Yesterday you mentioned that Todd Gee referred

16 to some text messages, and you don't know if -- he

17 didn't show you the text messages?

18     A.   He didn't show Richard the text messages.

19     Q.   So when Richard says he provided me with

20 messages, he didn't actually physically give him

21 messages?

22     A.   No, sir.

23     Q.   Okay.  Did he show him the messages during that

24 time?

25     A.   No, sir.



1    Q.   Okay.  Do you think Todd Gee was lying about
2   those messages?
3    A.   I think people take all manners -- I mean, I
4   think that if you look at the Joe Ellicott text message
5   or the K<span>REDACTED</span> M<span>REDACTED</span> one, they were probably
6   referencing that, but I just -- I have never had
7   Snapchat.  I never agreed to that, so -- but, I mean, I
8   never did that.
9    Q.   Okay.  We were talking -- yesterday you were
10   referring to researching the Man Act, right?
11   A.   Yes.
12   Q.   When did you research the Man Act?
13   A.   I mean, it was part of the discussion -- I
14   think that's what Halsey and Matt were being
15   investigated for.  They asked me about if the -- during
16   my interview with the DOJ, they asked me if I knew
17   anything about the trip, and I didn't, but I think there
18   was some subsequent journalism pieces that came out
19   about how one of the areas of investigation is the Man
20   Act.  And the Man Act is what I think they were looking
21   at Halsey for, so I just looked it up.  I was just
22   curious because I had some friends that were being
23   affected by tangental things.
24   Q.   Well, then I think you also referred to a
25   liability for having sex with a minor who is traveling,



 1  right?

 2      A.   Yeah.  I mean, again --

 3      Q.   I'm sorry, let me -- did you look that up too?

 4      A.   Again, what I -- I don't think I looked that

 5  up.  What I looked up was basically -- because the

 6  allegations that they traveled with "AB" were that she

 7  was 18 years old.  And to me, that was -- I said, well,

 8  you know -- I mean it's against the law to fly some

 9  place with like -- I didn't really understand that.  And

10  I'm not being falsely obtuse here, but I read something

11  or saw something that basically said that the difference

12  is that when somebody's over the age of 18, you have to

13  demonstrate coercion which I think the example they gave

14  was like, you know, people have pictures of someone's

15  daughter or mom or they get them hooked on drugs or

16  something like that that there's basically you have to

17  demonstrate that.  If they're under the age of 18, it's

18  that you just provided them anything sort of value, and

19  that was my -- that was what I read about that.  But,

20  you know --

21      Q.   I'm sorry, so let me just repeat the last part

22  just so I don't miss it.  If they travel over state

23  lines and they're over 18, you have to give them

24  something of value for sexual purposes?

25      A.   That's not what I said.



```
 1      Q.   I just want to -- I got confused there.
 2      A.   Again, I'll just be real clear on this one is
 3  that --
 4      Q.   I'm sorry.  I didn't understand.
 5      A.   The situation that Halsey and Matt were being
 6  investigated for about the Man Travel Act, the stuff
 7  going to -- I think it was the Bahamas, if I'm not
 8  mistaken, you know, at the age "AB" was over the age of
 9  18 and K REDACTED was over the age of 18.  And just reading
10  about the Man Act, the question was what exactly is
11  this?  You have adults going on a private plane to go on
12  a party weekend in the Bahamas.  Like what is there to
13  investigate on those fronts?  That was just the research
14  I did.  I wasn't on the trip.  I didn't have anything to
15  do with it.  It was just something affecting a few of my
16  friends, so I took some time and did some internet
17  research.
18      Q.   You just did it for your own interest, they
19  didn't ask you --
20      A.   No.  No.  I'm not a lawyer --
21      Q.   I'm sorry.  Let me -- I'm trying to go too
22  fast.  You just didn't do it -- you just did it for your
23  own interest, your own curiosity?
24      A.   I read an article that my friends were -- there
25  was an investigation of the Man Act, so I thought I
```



1  would familiarize myself with whatever I could on that.

2  I employed Wikipedia and whatever other internet tools

3  that are available.

4      Q.   You mentioned -- yesterday you said you could

5  not -- Mr. Perkins showed you a picture of a woman named

6  J REDACTED  C REDACTED , and you said you didn't recognize

7  her.

8           Do you recall that?

9      A.   I do.  Could you please put her picture back up

10 though?

11          Yeah, I don't know that person.

12          MR. PERKINS:  All right.  The next exhibit is

13     130.

14          (Exhibit 130 was marked for identification.)

15 BY MR. SCHELLER:

16     Q.   I'm going to hand you what has been identified

17 as -- marked as Exhibit 130 for identification purposes.

18 Can you guys share?  I'm sorry.

19     A.   Okay.

20     Q.   Do you recognize this?

21     A.   I do.

22     Q.   So it says -- this is at the top there, it says

23 Chris Dorworth, do you see that?  Is that your phone

24 number?

25     A.   Yes.



1      Q.   And you say, Greenberg and Rudisill, Joel

2   believes you owe him -- I don't have my reading glasses,

3   but thank you.

4           MR. PERKINS:  One second.  Let me see if I can

5      get this up.

6   BY MR. SCHELLER:

7      Q.   So Greenberg and Rudisill, Joel believes you

8   owe him a thank you.  This is on 6/16/2020?

9      A.   Okay.

10      Q.   And you say, I agree.  So what was the thank

11   you for?

12      A.   I mean, I don't remember, but I could use

13   context clues.  It would appear from reading this that

14   Joel had hooked up Mike Rudisill with somebody, I guess.

15   I don't see anything identifying it as J██, but -- well,

16   I guess --

17      Q.   Why don't we go down?

18      A.   I don't see anything.  There you go.

19      Q.   This is the night after the dinner at Bonefish,

20   correct?

21      A.   I don't think so.

22      Q.   You don't think so?  You don't remember J██ and

23   L██████?

24      A.   I don't, but I think that your dates are wrong.

25   I think there was a gap because as I recall, I was



1  leaving for North Carolina on that one, and this -- this
2  was some period of time later I think.
3      Q.   So this was later?
4      A.   Yeah.
5           MR. SCHELLER:  So do you know -- can you go up
6      a little bit, Jason?  No, no, I'm sorry.  Go back.
7  BY MR. SCHELLER:
8      Q.   Help with rent goes a long way.
9      A.   I didn't say it.
10     Q.   No, Joel Greenberg said it, but you're on this
11 chain.
12     A.   I mean, I am not the Joel Greenberg keeper.  He
13 said all sorts of outlandish, crazy stuff all the time.
14     Q.   But you didn't answer LOL on this one, did you,
15 when he sent something crazy?
16          MR. ANDRADE:  Object to form.
17          THE WITNESS:  Well, I don't know that it's
18     crazy.
19          MR. SCHELLER:  What's the objection?
20          MR. ANDRADE:  Again, that feels argumentive.
21     It's not --
22 BY MR. SCHELLER:
23     Q.   Well, you said yesterday -- you testified
24 yesterday if he said something crazy, you would
25 respond -- the best way to respond is LOL, right?



1    A.   Fritz, I didn't say that that's the only thing
2  you ever say.  In this particular case, my friend, Mike
3  Rudisill, had just gotten left by his wife and was
4  single and apparently Joel hooked him up.  I don't
5  remember the circumstances.
6    Q.   If you can go back up to the very first part --
7    A.   I dont know what you want me to say about that.
8  It happens every day in America.
9    Q.   Okay.  Go down a little bit.  Did you ever talk
10 to Mike Rudisill about this?
11   A.   I have not.
12   Q.   Did you ever talk to him after this?
13   A.   Mike Rudisill, yes.
14   Q.   No, excuse me, let me just rephrase that.  It
15 was a bad question.
16        Did you ever talk to him about his night with
17 this woman, J██?
18   A.   I have no idea.  I have no idea.  I don't
19 think -- and to further that thought, I have known most
20 of the women that Mike's dated since he was 18 years
21 old.  I don't ever remember meeting that woman in the
22 context of dating him.
23   Q.   So you don't know if he helped her with her
24 rent?
25   A.   I highly doubt he did.



```
 1      Q.   Okay.  And you don't -- you were referring to
 2  having drinks with a circuit court judge.  And I'm not
 3  saying this is the same night, but you were saying you
 4  were having a drink, and that would be Mike Rudisill?
 5      A.   Same one.
 6      Q.   You would go to Bonefish or --
 7      A.   FishBones.  Again, I've been friends -- we were
 8  college roommates for two years in college.  I have
 9  known Mike for a very, very long time.  At this
10  particular point in time, I think it was January of that
11  year his wife had left him -- and he had gone to rehab
12  in Iowa for alcohol and come out of it and his wife left
13  him.  So he had had a rough couple of months.  And he
14  was very much out and trying to hang out.  So I suspect
15  it was being a buddy with him and hanging out with it.
16  I don't know if he -- I mean, by reading this, it would
17  seem that he spent some time with J██.  When I said, You
18  owe him, I don't know how they were set up.  I don't
19  know anything about it.  I don't know if they went out,
20  but I don't think that the dates line up from what
21  you're saying.  I think that they might have met
22  somehow; but, again, I wasn't there.
23      Q.   Do you know if that was J██ -- you don't know
24  if that is J██ G REDACTED or not?
25           MR. SCHELLER:  Do you want to answer for him?
```



1      I thought he was answering.

2            MR. ANDRADE:  I don't --

3  BY MR. SCHELLER:

4      Q.   You don't know if it's J██ OREDACTED?

5      A.   I have no idea.

6            MR. ANDRADE:  I'm sorry, go back.  What was the

7      question to me?

8            MR. SCHELLER:  No, you're nodding your head no.

9      I didn't know if you were answering the question.  I

10     was just trying to clarify.

11           MR. ANDRADE:  For the record, I didn't --

12           MR. SCHELLER:  Let me repeat the question.

13           MR. ANDRADE:  -- nod my head or anything.  I

14     looked up from my computer.

15 BY MR. SCHELLER:

16     Q.   So you don't if that is J██ OREDACTED?

17     A.   I have no idea.

18           MR. SCHELLER:  All right.  I think that's it.

19           MS. CHOMIN:  All right.  Am I up?

20           MR. PERKINS:  Yeah.  Greenberg Dental.

21              FURTHER DIRECT EXAMINATION

22 BY MS. CHOMIN:

23     Q.   Okay.  Give me one second.  Hi, Mr. Dorworth.

24 I'm Katie Chomin.  I'm the attorney for Greenberg

25 Dental?



```
 1      A.   All right.

 2      Q.   So you sued three Greenberg Dental entities.

 3           Why did you sue these three entities?

 4      A.   Because I was -- had -- I had heard something

 5 to the effect of that the Greenbergs were trying to

 6 restructure their assets away, and so I thought that I

 7 would sue all of them.

 8      Q.   And who did you hear that from?

 9      A.   I -- you hear a lot of these things.  I'm

10 trying to remember the source of that.  I -- if I could

11 think of that -- right now it does not come to my mind,

12 but I could probably jog my memory on that one.  But, I

13 mean, to answer the question, I mean, post Joel getting

14 indicted, they took a bunch of actions to -- you know,

15 to take money away from AWG, Inc.  You know, I had

16 gotten to know Dr. Katsur's son, Josh, real well, and we

17 had extensive, you know, conversations, and I was just

18 of the opinion and I still am that the Greenbergs, you

19 know, took that money away from Joel and gave it back to

20 themselves and reinvested it different places and that

21 Greenberg Dental, the different entities are by and

22 large the same people doing the same things.  So I sued

23 them all.

24      Q.   Okay.  So you just said that you're of that

25 opinion?
```



 1     A.   I mean, yes.

 2     Q.   Okay.  Are you alleging that each entity did

 3  the same thing, or are you alleging that each did

 4  different things?

 5     A.   I'm alleging that they all -- that they're all

 6  part of the same thing.  It's the same people.  It's

 7  the -- you know, just in a different LLC shuffling

 8  resources around, shuffling money around, and it's -- so

 9  instead of targeting one and finding out the Greenbergs

10  had been successful in shuffling money away, I sued them

11  all.

12     Q.   Okay.  Are you claiming Greenberg Dental

13  Associates, LLC, did anything wrong?

14     A.   Again, I will say that I believe the people who

15  were involved in those things are Andy Greenberg and

16  Dr. Katsur, and I think that Joel Greenberg -- what I

17  don't know because nobody will answer the question, but

18  I don't know what the structure was from in terms of

19  what AWG owed because we haven't been able to depose

20  them yet but we'll get there soon enough.  But the

21  reality is just because I think they were already

22  demonstrating high tendencies to shuffle assets around,

23  I was comprehensive in my litigation.

24     Q.   Okay.  So that's not really what I asked you.

25  I'm asking what are you claiming Greenberg Dental



 1  Associates, LLC, did wrong?

 2      A.   I am saying that the actions of the people who

 3  are the head of those companies reflect over all of the

 4  companies that is the point.  So I'm not saying that it

 5  was Greenberg Dental Associates did one particular

 6  thing.  I'm saying all those companies together were

 7  acting on behalf of the Greenberg family, using their

 8  resources, trying to get their son out of prison -- get

 9  Joel Greenberg out of prison by getting other people

10  convicted.

11      Q.   Okay.  What are you claiming Greenberg Dental

12  and/or Orthodontic, PA, did wrong?

13      A.   It's there same answer as the last one, ma'am.

14      Q.   What are you claiming Greenberg Speciality

15  Group, LLC, did wrong?

16      A.   Same answer as the last one, ma'am.

17      Q.   The complaint you verified alleges that

18  Greenberg Dental was part of a racketeering conspiracy.

19      A.   That's right.

20      Q.   Do you have any evidence to support the

21  allegations that Greenberg Dental was part of a

22  racketeering conspiracy?

23      A.   Well, I mean, yes, I think I have detailed

24  those extensively over the course of my complaint.

25      Q.   Okay.  Well, I'm asking you, do you have



1   evidence, yes or no?

2       A.   Well, yes, I have presented it to you.

3       Q.   Okay.  Well, what is that evidence?

4       A.   I mean, it's in the complaint.

5       Q.   I'm not asking you to tell me where in the

6   complaint, I'm asking you what evidence --

7       A.   I believe that the Greenbergs at Greenberg

8   Dental -- I think that Joel Greenberg -- I think that

9   Andy Greenberg was the president of Greenberg Dental.  I

10  think Joel Greenberg had about $5.5 million worth of

11  stock in Greenberg Dental.  I think Joel Greenberg would

12  often go around talking about the power and authority he

13  had based on the -- his ownership interest in Greenberg

14  Dental.

15          I think that when all these things started

16  happening, all of the sudden, I become friends with

17  Dr. Katsur's son who shows up out of nowhere, befriends

18  me, hires my lawyer on something else to try to get the

19  other folks out of the way, stays very, very close to

20  me.  All the while, Joel was out there doing these

21  things.

22          And by the way, he told me he was directed to

23  be friends by his father, Dr. Katsur, who is now the

24  majority owner of it.  I was offered a chance to start

25  an insurance company with these folks.  I was trying --



1  they tried to keep me very close to it.  I went so far

2  as to meeting with Greenberg Dental -- I think it's

3  their -- it was described as Dr. Katsur's attorney.  I

4  thought he might be the GC of it as well.

5          I think there is extensive evidence that they

6  were highly involved in trying to make -- to find out

7  exactly what was going on so that Joel could get out of

8  jail which is what I alleged.  Andy was the president.

9  You know, Joel had $5 million of stock.  He would

10 frequently evoke the name of Greenberg Dental as

11 something that would be used against his political

12 enemies.  So I guess for you -- I don't have it on a

13 business card, but that seems like a lot of evidence to

14 me.

15      Q.   Okay.  So this evidence that you are presenting

16 came from Joel Greenberg?

17      A.   Some of it.  Some of it came from josh Katsur.

18      Q.   When do you contend the conspiracy started?

19      A.   Well, I mean, the conspiracy to defraud started

20 back when the Greenbergs took a kid -- took a guy that

21 had severe, lifelong issues with drug addiction and had

22 failed radio shows and as a child had sexual issues,

23 thrown out of schools because he was accused of having

24 sex with a dog at Orangewood Presbyterian.  There's just

25 all manners of things as kind of part of the story on



 1  Joel Greenberg, and yet the Greenberg family took his

 2  $5.5 million of AWG stock which owned Greenberg Dental,

 3  gave him money for --

 4      Q.   Okay.  I don't mean to cut you off, but I'm

 5  limited on time.  I'm asking you for a date.  What year

 6  do you contend that the conspiracy that you sued

 7  Greenberg Dental --

 8      A.   I just answered that.

 9      Q.   -- started.  No, you did not.  You did not give

10  me a date or a time.  You went on a rant about Joel

11  Greenberg's life.

12          MR. ANDRADE:   Object --

13  BY MS. CHOMIN:

14      Q.   I'm looking for a date.

15          MR. ANDRADE:   Object to form.

16          THE WITNESS:   I would say the date was when

17      they decided to support him for tax collector and he

18      qualified and they gave all the money.  That's when

19      it began.

20  BY MS. CHOMIN:

21      Q.   And what year was that?

22      A.   I guess that would be 2016, I guess.  I don't

23  know.

24      Q.   When do you contend the conspiracy ended?

25      A.   Who said the conspiracy ended?



CHRISTOPHER DORWORTH                                    August 07, 2024
DORWORTH vs GREENBERG                                            186

1       Q.   So you say it's still going on?

2       A.   I do.  I think that's why we're here right now.

3       Q.   Who do you contend agreed to the conspiracy on

4  behalf of Greenberg Dental?

5       A.   I mean, that would be the president, Andrew

6  Greenberg.

7       Q.   What evidence do you have of that?

8       A.   Well, I mean that is all detailed in the

9  complaint, ma'am.  It's --

10      Q.   I'm asking you right now.

11      A.   Well, we detail a series of circumstances which

12  I just did.  So I can answer that question again, but I

13  know how precious the time is.

14      Q.   Okay.  Well, I'm not sure if you understand how

15  a deposition works, but I'm not asking you to tell me

16  what's in your complaint.  I'm asking you right now

17  based on your knowledge what you have.

18           So who do you contend agreed to the conspiracy

19  on behalf of Greenberg Dental?  You told me Andy

20  Greenberg.  What evidence do you have that Andy

21  Greenberg agreed to a conspiracy on behalf of Greenberg

22  Dental?

23      A.   I mean, I believe he was the president and

24  owner of Greenberg Dental.  I think he used the

25  resources from Greenberg Dental.  That is why I think



1 | that.

2 |    Q.   Okay.  So you don't have any evidence to

3 | support that he agreed on Greenberg Dental's behalf to

4 | engage in a conspiracy?

5 |        MR. ANDRADE:  Object to form.

6 |        THE WITNESS:  I do not.

7 | BY MS. CHOMIN:

8 |    Q.   Thank you.  What acts do you contend Greenberg

9 | Dental committed in furtherance of the conspiracy?

10 |    A.   Well, I mean, I believe all the actions that

11 | took place when Joel had been arrested for burning

12 | Abby's stuff.  Dispatching Josh.  Attempting to, you

13 | know, tie me into business deals with insurance

14 | companies with them as a provider.  It's pretty clear

15 | that that's what they were doing.  So that's when I --

16 | that's when it really dawned on me.  And of course after

17 | the indictment -- after all the news broke, I never

18 | heard from Josh again.  So Dr. Katsur who I guess now is

19 | the majority owner based on his testimony dispatched his

20 | son to go handle it.  And once the Greenbergs and all

21 | their -- they got all the benefit that they were going

22 | to get, at that point in time, there was no point in

23 | continuing those conversations and they all stopped.

24 |    Q.   Okay.  So you haven't really given me any acts

25 | that are in furtherance of a conspiracy, but we'll move



 1 | move on.
 2 |        Who at Greenberg Dental do you believe
 3 | committed these acts in furtherance of a conspiracy?
 4 |        MR. ANDRADE:  Object to form.
 5 |        THE WITNESS:  I'm sorry about that, Andrew
 6 |    Greenberg.
 7 | BY MS. CHOMIN:
 8 |    Q.   And what evidence do you have of that?
 9 |    A.   I mean, again, I have detailed all the things I
10 | think and know, and that just applies to this as well.
11 |    Q.   Okay.  So you don't have any evidence?
12 |        MR. ANDRADE:  Object to form.
13 |        THE WITNESS:  Those are your words, ma'am.
14 | BY MS. CHOMIN:
15 |    Q.   Well, that was your -- your words actually when
16 | I asked before if you have any evidence that Andrew
17 | Greenberg agreed on behalf of Greenberg Dental, you said
18 | no.
19 |        MR. ANDRADE:  Object to the form.
20 |        THE WITNESS:  Well, I said he was the president
21 |    of the company.  I said he was the --
22 | BY MS. CHOMIN:
23 |    Q.   No.  You said no.  Okay.  So we're going to
24 | move on.  The complaint --
25 |    A.   If that's how you want to go.



1    Q.    -- Joel Greenberg worked at Greenberg Dental.

2          What facts are you basing that allegation on?

3    A.    Well, the fact that I met with Joel and Andy

4    Greenberg.  They identified him as a shareholder.  They

5    were discussing whether or not Ballard Partners and I

6    should represent the firm on something having to do with

7    Medicaid for dentists.  I don't remember what the issue

8    was.

9    Q.    So Joel represented to you that he worked at

10   Greenberg Dental?

11   A.    Joel and his dad and I and another partner from

12   Greenberg Dental met, sat down, and Joel was introduced

13   as someone who owns substantial amounts of stock and was

14   involved in the company.

15   Q.    Okay.  Is Joel a dentist?

16   A.    I don't think you have to be a dentist to own a

17   dental firm in the state of Florida, ma'am.

18   Q.    I'm not asking if you have to be a dentist to

19   own a dental firm.  I'm asking you is Joel a dentist?

20   A.    I don't think Joel has a college degree, so no.

21   Q.    Okay.  Is Joel a dental hygienist?

22   A.    Not that I know of.

23   Q.    Okay.  Is Joel a member of the board for

24   Greenberg Dental?

25   A.    We don't know -- I don't think he was on the



 1  board of Greenberg Dental, but I think he owned $5

 2  million of stock in the company.

 3      Q.   Okay.  So the answer is no?

 4      A.   If you say so, ma'am.

 5      Q.   You don't know one way or the other if Joel had

 6  any stock in Greenberg Dental, do you?

 7      A.   Because your client wouldn't answer the

 8  question, we do not.

 9      Q.   Okay.  So do you know if Joel was telling you

10  the truth about these things in his relations to

11  Greenberg Dental?

12      A.   I don't know.  Listen, I have told you -- he

13  didn't just say it to me, ma'am.  He said it to a lot of

14  people.  This is not just a Chris thing.  There's a lot

15  of folks, and I don't know if Joel's telling the truth

16  or not.  I'm just telling you he said it an awful lot.

17  He said a lot of things in the presence of his dad who

18  was the president and certainly seemed like he was all

19  plugged in on things.  I don't know if he filled out

20  paperwork and was on the payroll or not.  I can say that

21  he was getting $400,000 from AWG which all came from the

22  dental stuff.

23      Q.   Okay.  So you don't know if he worked there or

24  not.  That's the answer to that.  You don't know if he

25  was making it up.  You know it came from him, but you



1  don't know if it's the truth or not?

2      A.   I mean, I believe it is.

3      Q.   Okay.  But you verified in your complaint that

4  all the facts that you were alleging were true, and you

5  alleged that Joel Greenberg worked at Greenberg Dental

6  as true?

7      A.   Well, I mean, Joel Greenberg sat there and told

8  me at dinner in front of his father, the president, that

9  he was involved in the company's operations, and that is

10  what I think of as working there.  So, yeah.

11      Q.   And so you told us yesterday that Joel

12  Greenberg is a liar, you don't think anybody should ever

13  believe him or anything that comes out of his mouth, but

14  you're telling us now that you believed him and that we

15  should trust that you believed him whenever he told yo

16  that he was employed by Greenberg Dental?

17          MR. ANDRADE:  He said it in front of his

18      father.

19          THE WITNESS:  He said it in front of his father

20      who was the president; and his father didn't say,

21      That's not true, Joel.  I mean...

22  BY MS. CHOMIN:

23      Q.   All right.  We're going to move on.

24      A.   All right.

25      Q.   The complaint you verified also alleges that



 1  Greenberg Dental agreed to provide and Abby Greenberg
 2  and "AB" agreed to accept compensation in exchange for
 3  participating in the process crimes intended to falsely
 4  implicate Dorworth and others.
 5       A.   Right.
 6       Q.   Are you aware of any direct payments from
 7  Greenberg Dental to Abby Greenberg?
 8       A.   I don't think the payments are direct, ma'am.
 9  I never said they were direct.
10       Q.   Okay.  So the answer is no?
11       A.   Yes, I never said that.
12       Q.   Are you aware of any direct payments from
13  Greenberg Dental to "AB"?
14       A.   No.
15       Q.   What evidence do you have that Greenberg Dental
16  made any payments to Abby Greenberg or "AB" in exchange
17  for anything?
18       A.   Well, again, ma'am, we have spent hours talking
19  about this, but the fact is that Greenberg Dental takes
20  the money.  Even Dr. Katsur explained this.  The money
21  then flows down to the other companies; and at that
22  point in time, he doesn't know -- he said that he didn't
23  know what's going on.  I don't really believe that.  I
24  think that it's they know very much what it is.  But
25  I've always said it was an indirect thing, but the money



 1  all came -- started from Greenberg Dental.  The money

 2  came from Greenberg Dental.  It was -- the president of

 3  the company was Andrew Greenberg was doing this.  So

 4  those are the fact that I'm offing.

 5      Q.   Right, but you don't have any evidence that

 6  there is any direct payments from Greenberg Dental to

 7  these parties?

 8      A.   No.

 9      Q.   Okay.  The complaint you verified states and

10  Andrew and Sue Greenberg as well as AWG and Greenberg

11  Dental agreed to provide funding to compensate Abby

12  Greenberg and "AB" for providing false reports and

13  testimony to the authorities and the federal grand jury.

14  You just confirmed to me that you have no evidence that

15  Greenberg Dental made any direct payments to Abby

16  Greenberg or "AB", correct?

17      A.   Ma'am, the money comes from Greenberg Dental

18  and --

19      Q.   It's a yes or no.

20      A.   It is for you, but it is not a yes or no for

21  me, ma'am, so I guess we'll have to agree to disagree --

22      Q.   No, no, no.

23      A.   -- with those questions.

24      Q.   It's a yes-or-no question.

25      A.   Okay.



CHRISTOPHER DORWORTH                                    August 07, 2024
DORWORTH vs GREENBERG                                              194

1    Q.   It's do you have any -- you just told me you

2  have no evidence that there is direct payments.  -

3    A.   No, I did not.  I offered you several pieces of

4  evidence that you said it wasn't evidence.  I guess we

5  can just agree to disagree.  I'm not trying to be

6  argumentative with you.  I promise.

7    Q.   We can get her to read the transcript back --

8    A.   Go for it.

9    Q.   -- that you're telling me no.

10   A.   Ma'am, I rattled off several times all the

11 different fact patterns that I thought was going on

12 here --

13   Q.   You have been rattling.  That's for sure.

14   A.   Well, listen you're very unprofessional --

15       MR. ANDRADE:   Object to form.

16       THE WITNESS:   -- in the way you said that, but

17   I guess you knew that.  Listen, I have detailed this

18   repeatedly, and, you know, get a few -- and then

19   after I'm done, you say, so you have no evidence.

20   So I give evidence, and you reject it as evidence

21   and I don't find that particularly productive, and I

22   don't agree with your characterization.

23 BY MS. CHOMIN:

24   Q.   Okay.  Let's move on.  No direct payments from

25 Greenberg Dental to Abby Greenberg or "AB", correct?



1      A.    Correct.

2      Q.    The complaint you verified alleges that

3  Greenberg Dental paid Joel Greenberg to facilitate his

4  defense.

5            What facts are you basing that allegation on?

6      A.    The fact that all the money they have from

7  Greenberg Dental goes through AWG and was derived from

8  that.

9      Q.    Okay.  But do you have any evidence that there

10 was direct payments from Greenberg Dental to anybody to

11 facilitate Joel Greenberg's defense?

12     A.    Again, I claim that they're indirect.  So, I

13 mean, I don't -- you keep inserting that direct thing.

14 I have never said that the check went straight from

15 there.  I said they directed it, the money went there,

16 and then it got to where it needed to be.

17     Q.    Okay.  Your verified complaint states that

18 according to the Greenbergs, Andrew and Sue Greenberg

19 and Greenberg Dental and AWG also agreed with Joel

20 Greenberg and Abby Greenberg to pay any amounts

21 necessary to obtain a pardon or firing of the

22 prosecutor.  Joel Greenberg was attempting to extort

23 Dorworth and Gaetz on his -- to seek on his behalf.

24            So what evidence do you have that Greenberg

25 Dental agreed to pay any amounts necessary to obtain a



 1  pardon for Joel?

 2      A.   That would be directly from Joel's mouth at

 3  Another Broken Egg Cafe.

 4      Q.   Okay.  Joel told you that, Greenberg Dental was

 5  going to pay this for me?

 6      A.   He said his parents would.

 7      Q.   His parents, not Greenberg Dental?

 8      A.   I actually think Joel might have invoked the

 9  name Greenberg Dental at that point, but I can't be 100

10  percent positive.

11      Q.   Okay.  What evidence do you have that Greenberg

12  Dental agreed to pay any amounts necessary to get a

13  prosecutor fired?

14      A.   I mean, again, his words to me.  That, he --

15  they were willing to -- the Greenberg -- he represented

16  that the Greenbergs were willing to spend whatever it

17  cost to get him out of this problem.  He said that

18  the -- he quoted the value of the business which he

19  thought was substantially high and said that at the end

20  of the day, whatever the number was, he could get it

21  done via Greenberg Dental and via his parents.

22      Q.   Okay.  The complaint you verified also states

23  that the Greenbergs used monies from Greenberg Dental to

24  fund their lifestyle.  You have told us now a couple

25  times that you think Andy is the president of Greenberg



 1  Dental, correct?

 2      A.   He was.  He was in 2021 when this was all going

 3  down.  He's not anymore.

 4      Q.   Okay.  So he used money from his job to support

 5  himself and his family, correct?

 6      A.   And a lot more than that, ma'am.

 7      Q.   Okay.  You testified earlier that you have an

 8  LLC for your consulting work, correct?

 9      A.   I do.

10      Q.   And do you use the income you receive from your

11  ownership in that company to support your family and

12  yourself?

13      A.   I do.

14      Q.   Okay.  Is there anything illegal with that?

15      A.   No.

16      Q.   Okay.  The complaint you verified upon states

17  upon information and belief, each payment by AWG and/or

18  Greenberg Dental was not a bona fide payment of salary,

19  compensation, dividends, or distributions but was a

20  specific payment made for the benefit of Joel Greenberg,

21  Abby Greenberg, or "AB" with knowledge that the payments

22  were to facilitate improper or illegal contact.

23           What evidence do you have to support that

24  statement?

25      A.   I have already detailed it, ma'am.  Again, we



1  have gone over this several times now.  We have covered

2  this for like 12 hours now.  Again, there is ample

3  evidence, all the attorneys' fees.  She went to an

4  attorney.  He told me that he was paying her attorney's

5  fees.  She's denied it.  So, I mean, again, it's just

6  all of the totality of what we discussed here, and again

7  I --

8      Q.   Who is she?

9      A.   What's that?

10     Q.   Who is she?  You're saying they paid for her

11 attorney's fees.  Who is she?

12     A.   Well, I mean, they sent her to Andrew Searle

13 and let her know --

14     Q.   Who is her though?

15     A.   "AB."  They sent her -- they sent "AB" to

16 Andrew Searle and said there would be no bill.  And

17 Mr. Scheller just said, well, maybe there was no payment

18 ever got made, and that could be the case.  But, again,

19 Joel Greenberg in writing said, Hey, we're paying her

20 fees, and we're going to -- we have got this.  My

21 parents are all over it.

22     Q.   Okay.  So how much did Greenberg Dental pay for

23 "AB"'s legal fees?

24     A.   I have no idea.  They wouldn't tell me.

25     Q.   When did Greenberg Dental pay for AB's legal



1  fees?

2     A.   I don't -- your boss wouldn't tell us during

3  the -- he just said it was private.  He wasn't going to

4  share that.

5     Q.   Have you seen any records of payments made by

6  Greenberg Dental for legal fees?

7     A.   No.

8     Q.   Okay.  So I just want to be clear about some of

9  the things that you just said.  The facts that you have

10 alleged in your complaint and that you verified to be

11 true are based off statements that were told to you by

12 Joel Greenberg, someone who you consider to be a liar

13 and that nobody should trust?

14    A.   Joel Greenberg, Josh Katsur who I don't that a

15 liar and no one should trust, the general counsel who --

16 I'm sorry, I can't remember his name right now, but he

17 was at a -- had a real bad car crash, and I think he's

18 quadriplegic, but I had numerous conversations with

19 those people.

20    Q.   Okay.  And so you said something earlier about

21 that Josh Katsur was involved -- that you think the

22 Greenbergs sent him to befriend you, correct?

23    A.   I think Greenberg Dental sent him to befriend

24 me.  I don't know if that was the Greenbergs or if that

25 was his dad, but I do think that he was sort of sent



1  into my life to keep a close tie on things while Joel

2  was in jail lying about things, ma'am.

3      Q.   What would their intentions be behind having

4  Josh befriend you?

5      A.   Well, I mean, I just shared that with you

6  several times now.  I think that the goal -- they knew

7  that Joel was in jail lying for the purpose of trying to

8  lower his jail sentence.  They knew this.  And so while

9  he was in there doing these things, all of a sudden out

10 of nowhere, a friend calls me up and says, Hey, you've

11 really got to meet this person.  He's great.  You're

12 going to love him, and I get there and find out that

13 it's Josh Katsur, and that Josh Katsur's dad was the --

14 was a partner of Andy Greenberg's.

15          He was like, Hey, listen, you know, with all

16 this stuff, we just wanted to reach out and make sure

17 that you knew that there was no issue there.  Basically

18 forged a friendship, tried to encourage me to do a bunch

19 of business with him, all these things, again, I presume

20 to keep him close.  He threw a party at his house for us

21 one time, hired a DJ.  I mean, there was quite a bit of

22 interaction, ma'am.  So I don't really agree with your

23 characterization.

24     Q.   Well, I'm just a little confused.  You're not

25 really making the point of like what did you have to



1  offer them?  What were the reasons behind this

2  friendship?  It's not really very clear.  You just keep

3  saying his dad sent him in here to befriend you because

4  of Joel, but you're not making it clear.  Like what did

5  you have to offer?  Why would they set you up?

6      A.   Again, I believe I just said this.  So I'll say

7  it again.

8      Q.   Okay.

9      A.   And it is that I believe they knew -- I never

10  met Josh.  There was never any relationship or

11  preexisting thing as long as Joel was still on the

12  streets.  But once Joel went to jail and the whole

13  conversation took place with Rebekah and Abby talked

14  about Sue and Greenberg saying, If you get Joel out of

15  jail, I'm taking the kids and moving to California, I

16  think that after that the entire game became about --

17  and, again, I don't have to guess this because Mr.

18  Scheller shared it.  He went and said that our goal was

19  to lower the prison sentence as much as we could by

20  getting other people who have done wrong in this thing

21  to -- you know, in trouble.  And once they get

22  prosecuted, we intend to go back every year to seek more

23  time off on Joel's schedule.  He just said this, ma'am.

24  And again, it's -- that was there.

25      Q.   Okay.  So you're kind of speculating about



 1  Josh's involvement in all of this.  Mr. Scheller never

 2  said that Josh was involved in anything that he said, so

 3  that's -- there is really no evidence behind that.

 4      A.   That's certainly your opinion, ma'am, and

 5  you're entitled to it.

 6      Q.   And it's also your opinion for what you just

 7  expressed as well?

 8          MR. ANDRADE:  Object to form.

 9  BY MS. CHOMIN:

10      Q.   Okay.  So you testified earlier that you're

11  involved with lobbying for medical marijuana clients,

12  correct?

13      A.   Not at the moment.

14      Q.   You were in the past?

15      A.   In the past I have been, yes, ma'am.

16      Q.   Okay.  Have you ever been lobbying for someone

17  named Stanley Harris?

18      A.   I don't know who that is.

19      Q.   Have you ever done any lobbying for Spring Oaks

20  Nursery?

21      A.   Oh, yes.  I was the -- that -- we were the --

22  yes.  We -- I had ten percent of Spring Oaks Nursery.

23  That was the marijuana deal that we talked about

24  yesterday, and I negotiated the settlement between --

25  it's a somewhat -- I mean, it's kind of a complicated



1  story, but I'll simplify it as much as I can.  When they

2  awarded the original permits, I think there was supposed

3  to be five, but there were some imperfections in the

4  process.  So there were times where maybe awards weren't

5  done properly, and I think there was -- it was sent to

6  the 120 hearings I think they're called where they do

7  the administrative stuff.

8        There was a handful -- I think there was eight

9  total license holders that were just sort of on the

10 sidelines.  They thought they should win.  They thought

11 there was something imperfect and they were sort of

12 created in some limited class of like -- it was like

13 eight different permits.  At the time, I think there was

14 like maybe 25 or -- 20 or 25 permits sort of available

15 to be issues.  So they had not done that yet.  So I

16 negotiated a settlement with Joe Jacquot who was the

17 governor's general counsel, and our client, that

18 nursery.  And then once we came to terms and I went and

19 got the other seven people to execute it.  So, yeah, I

20 did lobby for them.

21    Q.   Okay.  Was that when you worked at Ballard

22 Partners?

23    A.   It was.

24        THE VIDEOGRAPHER:  Excuse me, counsel.  I hate

25     to interrupt, but can we go off the record



 1    momentarily?

 2         MS. CHOMIN:  Sure.

 3         THE VIDEOGRAPHER:  Going off record.  The

 4    approximate time, 3:44 p.m.

 5         (A break was had.)

 6         THE VIDEOGRAPHER:  On record with media unit

 7    three.  The approximate time is 3:51 p.m.

 8  BY MS. CHOMIN:

 9    Q.   Okay.  So we were just discussing your lobbying

10  work with Spring Oaks Nursery?

11    A.   Yes.

12    Q.   Did you earn any fees for your lobbying work on

13  their behalf?

14    A.   I don't think they paid me fees.  I own ten

15  percent of the company.

16    Q.   Okay.  And you own ten percent of Spring Oaks

17  Nursery; is that it?

18    A.   Yes.  Spring Oaks Nursery sold -- I own ten

19  percent of the nursery, and the nursery sold to a

20  Canadian marijuana company by the name of Green Growth

21  Brands.

22    Q.   Okay.  So now back to this lawsuit.  Are you

23  seeking the same damages from all defendants?

24    A.   That's an -- I'm not -- I'm not a lawyer.

25    Q.   You're not sure?



CHRISTOPHER DORWORTH                                    August 07, 2024
DORWORTH vs GREENBERG                                              205

1       A.    I'm not going to answer that question.

2       Q.    Okay.  Do you know what damages you're seeking?

3       A.    I do.

4       Q.    What are they?

5       A.    They're in the complaint.  I had this with

6  Mr. Wermuth earlier.  He asked for lost wages and the

7  impact of damage to reputation.  So they're all in there

8  for you.

9       Q.    And what specifically are you asking for from

10  Greenberg Dental?

11      A.    I mean, asking everybody to be held

12  accountable, ma'am.  I'm not an attorney, so I don't

13  know how -- I'm not prepared to answer that question in

14  a legal way.  I want the people to do this who have done

15  this to stop doing this.  I want them to be held

16  accountable for doing this, and I think that this idea

17  that they could just bully people, it's not okay with

18  me, and I think they have lied about me.  They have

19  damaged me.  They've damaged my reputation.  They have

20  damaged my friend's reputation all because they want one

21  guy to get out of jail.  We didn't do these things, so

22  that's it.

23      Q.    Okay.  Let's move on.  So the party at your

24  house on July 15, 2017, my next couple questions are

25  going to be about that just so that you have a



 1  reference.

 2         What time did you leave your home on July 15,

 3  2017, to go to Randy's?

 4     A.   I don't know.

 5         MR. ANDRADE:   Object to form.

 6  BY MS. CHOMIN:

 7     Q.   Was it early morning?   Early afternoon?   Late

 8  afternoon?

 9     A.   Ma'am, this has been covered here.  I don't --

10  I think we discussed it yesterday.  My wife flew out

11  that day.  I don't know what time her flight was, so I

12  probably took her there, and then -- again, it might

13  have been early in the morning, and she did.  But I

14  probably went to Randy's but I don't have that level of

15  detail about what time I went over there on that day.

16     Q.   Was there anyone at your house on July 15,

17  2017, when you left?

18     A.   I don't recall, ma'am.

19     Q.   Did anyone tell you that they were going to

20  have a party at your house that day?

21     A.   I mean, again, I challenge your use of the word

22  party.  It was more --

23     Q.   Did anybody tell you that they were going to

24  have people over to your house that day?

25     A.   Very possibly, ma'am.  I do not recall because



1  it was seven years ago.  And, again, it was just that

2  whole week people were in and out of my house.  It was

3  kind of -- it was that kind of week.

4      Q.   Okay.  Well, who was in and out of your house

5  that week?

6      A.   We have detailed guest logs that show all the

7  people in and out.  I had different friends coming

8  different days.  It was my birthday that week, so, I

9  mean, again, people came and went.

10     Q.   Did anyone tell you that there would be a party

11  at your house where people would be doing drugs that

12  day?

13     A.   No.

14     Q.   Did anyone tell you that there would be a party

15  at your house where they were inviting girls over?

16     A.   Other than potentially if somebody said they

17  were bringing their girlfriend, I don't -- I was unaware

18  that any unattached women would be at the house that

19  day.

20     Q.   What time did you get home from Randy's on July

21  15, 2017?

22     A.   Well, ma'am, you obviously have not been

23  watching -- I did several hours of this especially with

24  Mr. Wermuth about this, and I have said that I believe

25  I --



1      Q.   But you never answered him though.  So --

2      A.   I sure -- I certainly did, ma'am, and that --

3  your characterization of these things is not accurate.

4  What I told him was that I went out there, I drank with

5  Randy.  As was often the case with Randy, I would stay.

6  We would -- he would play like vinyl music.  We would

7  watch -- maybe watch a movie or something like that,

8  drank bourbon.  That was what we did.  Usually we would

9  do that until about midnight or 1:00 in the morning,

10  fall asleep, wake up 1:00, somewhere in there, and go

11  home.  That's what I believe happened.

12      Q.   So you don't know for sure what time that you

13  got home?

14      A.   No.  I do not.

15      Q.   You were shown a photo of Randy on his boat

16  that you took of him on July 15, 2017, correct?

17      A.   Correct.

18      Q.   And you used your phone to take that picture,

19  correct?

20      A.   Correct.

21      Q.   Do you still have that photo on your phone?

22      A.   I do.

23      Q.   Did you produce that photo in native format

24  with the metadata to us?

25      A.   I believe there was -- I gave it the first way,



1   and it didn't work.  I spent a fair amount of time

2   working it to make sure I had something.  So my

3   understanding is that you were given it with all the

4   metadata was my understanding from Michael Beltran, my

5   old attorney.

6        Q.   But if we don't have it, you still it have it

7   so you could get it to us?

8        A.   Yes.  Yes, ma'am.

9        Q.   The timestamp on the photo of Randy says it was

10  taken at 6:04 p.m.?

11       A.   Correct.

12       Q.   Okay.  So you had your phone with you at

13  Randy's at 6:04 p.m., correct?

14       A.   Correct.

15       Q.   Okay.  How did your phone get to your house at

16  7:17 p.m. if you were still at Randy?

17            MR. ANDRADE:  Object to form.

18            THE WITNESS:  I challenge the entire premise as

19       I did with Mr. Wermuth earlier.  He rattled off a

20       bunch of cell phone data.  I am not in any way an

21       expert on that stuff.  I was not at my house.  My

22       phone was not my at house.  So whatever data he

23       provided is not -- could not confirm that because I

24       was not there.

25  BY MS. CHOMIN:



 1      Q.   So you're disputing that the records are

 2   correct?

 3      A.   I'm disputing that I was not at the house that

 4   day.  Again, I am not -- I have not really reviewed

 5   those records.  I have no experience whatsoever in cell

 6   phone towers.  I have never -- I have never done that.

 7   I don't really know how to make that work.  So as far as

 8   I'm concerned, he read a bunch of information to me.  I

 9   know that I was not at a house.  I did not meet "AB."  I

10   did not have a conversation with --

11      Q.   Did anybody come to Randy's house and take your

12   phone from you?

13      A.   I don't know.  I don't think so.

14      Q.   You don't think so?

15      A.   No.

16      Q.   Isn't that something you would know?

17      A.   I mean, it's certainly seems like something I

18   would know, but I didn't say that happened.  So, I mean,

19   you asked a question.  I said, I don't think so.

20      Q.   Who was at your house when you got home that

21   day?

22      A.   I don't think -- personally, I don't think I

23   got home that day.  I think I got home the next day,

24   first of all.

25      Q.   And so --



1       A.    I don't believe --

2       Q.    So who was at your house when you got home?

3       A.    I don't believe I talked to anybody.   I

4   probably walked upstairs and went to bed.   I don't think

5   there was any conversation with anybody at the house;

6   and if it was after midnight, I'm sure people were

7   asleep.   I don't think it was -- I don't recall any sort

8   of communication that day.

9       Q.    Is there a reason why you can't remember all

10  this stuff?

11          MR. ANDRADE:   Object to form.

12          THE WITNESS:   Because it was seven years ago,

13      ma'am.   Do you know what you were doing July 15,

14      2017?   I mean, where were you?

15  BY MS. CHOMIN:

16      Q.    You just told Mr. Scheller that you had a good

17  memory.

18      A.    I mean, again --

19          MR. ANDRADE:   Object to form.   Object to form.

20          THE WITNESS:   I mean, I think I do have a good

21      memory.   I didn't say it was photographic and that I

22      could see -- I could remember every book I'd ever

23      read or anything like that.   I mean, I have a good

24      memory.   I have a good recall for things.

25  BY MS. CHOMIN:



1      Q.   When we looked at your gate records and they

2   showed you all these people who were there, who let them

3   into the gate?

4      A.   Ma'am, again, it would really have been helpful

5   if you could have paid attention to the whole

6   deposition.  But, again, I believe there was a couple

7   ways that could have gone.  One, I could have called

8   them.  Two, they could have -- I could have called the

9   gate and said, Please let these people in.  Two, I could

10  have called the gate and said, All in.  If I say, All

11  in, not all the guards do that.  Some of them say, Hey,

12  we can't do that.  Some of them just wave you on in.  So

13  it could have been that way.  I could have gotten a

14  phone call, and they could have shown up to the gate and

15  someone said, Hey, so and so is here, would you let them

16  in?  And I would have probably said, Yes.  So I don't

17  know the answer to that question.  Mr. Wermuth --

18     Q.   Was anybody staying at your house with you the

19  weekend of July 15, 2017?

20     A.   I mean, it was a whole week, and people were in

21  and out throughout the course of the week, ma'am.

22     Q.   I'm asking you about the weekend specifically.

23     A.   I cannot break it down for you that much.  I

24  just remember it as a week.  I don't remember a day by

25  day breakdown of that.



1    Q.   Okay.  And who was staying with you that week?

2    A.   Ma'am, it's all over the gate logs.

3    Q.   I'm not asking you for the gate logs.  I'm

4    asking you to give me names of people that were staying

5    with you that week.

6    A.   I think throughout the course of the week, Matt

7    was there for some of it.  Mike Fischer was there.  My

8    friend Frank Artiles was there.  Eric Foglesong came

9    over.  I don't know if he stayed.  He probably wouldn't

10   have.  I mean, again, there is just -- it was a week

11   of -- you know, middle of summer, and I was often

12   cooking barbecues and other stuff at my house.  I do not

13   have a daily guest log, or it's not a hotel where there

14   is some check in.

15   Q.   In 2017, who had keys to your home?

16   A.   Myself and my wife and my teenage children.

17   Q.   How did these people get into your house on

18   July 15th if you weren't there?

19   A.   They probably were already there, or I might

20   have left the side door open.  Again, I don't know.  I

21   don't have the specifics of that day.  I don't recall.

22   If somebody was at the house, I probably wouldn't just

23   have locked the door.

24   Q.   Did you give anyone permission to have a party

25   at your house?



 1      A.   No.

 2      Q.   Who hosted --

 3      A.   By the way, I don't agree with the

 4 characterization that it was a party.  There's more

 5 people in this room --

 6      Q.   I understand you don't agree.  I'm calling it a

 7 party --

 8      A.   You can call it a party if you want to.

 9      Q.   Who hosted this party?

10      A.   I don't believe it was a party, so I'm not

11 going to agree to the question.

12      Q.   All right.  Who hosted the gathering at your

13 house on July 15, 2017?

14      A.   I don't know that there was a gathering at my

15 house on July 15, 2017, ma'am.

16      Q.   Yes, you do.

17      A.   No, I don't.

18      Q.   You saw the gate logs.  You saw all these

19 people at your home.

20           What would you call it then, and I'll use your

21 word?

22      A.   Over the course of the day I saw people come

23 and go.  It's not some critical mass of people that

24 looked like a party to me, ma'am.  I'm sorry we do not

25 agree.



1    Q.   Okay.  So who invited all these people that

2  came and went from your house that day?

3    A.   I don't know the answer to that question.

4  Again, I don't know that it was one person either.

5    Q.   Okay.  That's a little weird that you have all

6  these people coming and going from your house, you even

7  said that yesterday, that it would be very weird for

8  people to be at your house partying without you there,

9  but clearly there was people at your house without you

10  there.

11        MR. ANDRADE:  Object to form.  Is there a

12     question?

13        THE WITNESS:  I don't think there was a

14     question with that, ma'am.

15  BY MS. CHOMIN:

16    Q.   Okay.  When did you find out that all these

17  people came and went from your house on July 15, 2017?

18    A.   After the -- after the interview with the

19  Department of Justice.

20    Q.   Were you completely shocked to find out about

21  this party?

22    A.   I was.  And, again, I don't think it was a

23  party, ma'am.

24    Q.   Were you upset with your friends that had all

25  these people at your house when you weren't there?



1    A.   I was certainly very confused by that, yes.

2    Q.   Are you still friends with Matt Gaetz?

3    A.   Very close friends with Matt Gaetz.

4    Q.   Are you still friends with Mike Fischer?

5    A.   Very close friends with Mike Fischer.  Of

6    course, Mike Fischer -- by the way, Mike Fischer

7    testified those girls weren't there.  So, again, you

8    apparently only believe them and don't believe the other

9    people, the ones who were not -- you know...

10    Q.   Let's get into that.  You said that Mike

11   Fischer is the only person that testified that those

12   girls weren't at your house, correct?

13    A.   He said that the entire time -- he said he was

14   there.  He said he did not see those girls.  Those girls

15   say they were there.  They said they did not see him.

16   The one person I know was there was Mike Fischer.  Mike

17   Fischer was my friend.  He was in town for my birthday.

18    Q.   So you saw photos of K█REDACTED█ M█REDACTED█ in a video

19   of her at your house.

20    A.   At the time, ma'am, she was dating -- she was

21   considered -- she was considered the girlfriend of Joe

22   Ellicott who was a top lieutenant in the tax collector's

23   office and a client of me.

24    Q.   So Mike Fischer's statement that she wasn't

25   there isn't truthful.



```
 1      A.   Well --
 2           MR. ANDRADE:  Object to form.
 3           THE WITNESS:  First of all, you have to view
 4      time as the entire scope of the day.  I don't know
 5      when she was there.  I don't know when Mike Fischer
 6      was there.  I know that Mike Fischer said he never
 7      saw her; and if she had a picture there -- and,
 8      again, I don't know what time of the day that thing
 9      was.  All I'm telling you is this --
10 BY MS. CHOMIN:
11      Q.   So it's you're belief that K[REDACTED] M[REDACTED] and
12 "AB" are lying about being there, correct?
13      A.   I don't know how long they were there.  I know
14 they're lying about everything that they said that I was
15 involved in.  So, yeah, I don't view that as a -- very
16 possibly they're just lying about it.  I was not there.
17 I did not talk to them.
18      Q.   What proof do you have that your friend, Mike
19 Fischer, isn't lying for you?
20      A.   I mean, he is not a -- he was never called
21 essentially a prostitute by a federal judge.  He didn't
22 admit to having -- to knowing that somebody was 17 years
23 old and going around having sex for those things.  I
24 mean, he is an honest person.  He is a good human being.
25 You know, he's been successful in his track, and I think
```



1  he was under oath and told the truth, ma'am.

2      Q.   So it's your testimony that you were not home

3  when this party occurred at your house July 15, 2017; is

4  that correct?

5      A.   Correct.

6      Q.   And how do you explain your phone pinging at a

7  cell phone tower a half mile from your house if you

8  weren't there?

9          MR. ANDRADE:  Object to form.

10         THE WITNESS:  Ma'am, I have already answered

11     this question repeatedly.  I'm not an expert on

12     that.  I do not know anything about that.  I don't

13     know anything about that stuff, and I was not there.

14     So whatever information you're producing and

15     claiming to know, then you know it.  I do not know

16     it, and we will find an expert to learn all that,

17     but now I do not know.

18  BY MS. CHOMIN:

19     Q.   Okay.  Have you ever been to counseling?

20     A.   Yes.

21     Q.   Okay.  When?

22     A.   Like marital counseling or like regular --

23     Q.   Any type.

24     A.   Yeah.  I went to marital counseling with my

25  first wife a couple times, and Rebekah and I do just a



 1  periodic checkup.  It's not like a -- we just -- we call
 2  it proactive management.  We have done it for a awhile,
 3  ma'am.
 4      Q.   Where did you go to marital counseling with
 5  your first wife?
 6      A.   It was next to Orangewood Presbyterian Church.
 7  I don't remember the woman's name.
 8      Q.   It was a female?
 9      A.   Yes.
10      Q.   And where do you and Rebekah go for counseling?
11      A.   We go with a woman name Catherine Gibson who
12  is -- her office is off of -- it's in Winter Park off of
13  Howell Branch Road or whatever that road.  I think it
14  might change, the name, but Howell Branch Road near Lake
15  Howell.
16      Q.   When is the first time you started going to
17  counseling with Rebekah?
18          MR. ANDRADE:  Object to form.
19          THE WITNESS:  Well, I mean, we actually went
20      to -- we had a few sessions with our pastor, longer
21      sessions.  And then he recommended that we just find
22      someone who could sort of talk through the
23      challenges of life.
24  BY MS. CHOMIN:
25      Q.   Who is your pastor?



1     A.    Burke Parsons.

2     Q.    Where do you go to church?

3     A.    St. Andrews Chapel.

4     Q.    And when did you first start meeting with your

5  pastor?

6     A.    For what?

7     Q.    I'm sorry, I didn't hear that.

8     A.    I didn't understand the question.  When did I

9  start meeting with my pastor?

10     Q.    Yeah.  When did you start meeting with your

11  pastor for counseling?

12     A.    We only did that two or three times.

13     Q.    When was that?

14     A.    I don't remember.  I mean, years ago.

15     Q.    Okay.  And when did you start going to see this

16  other woman, Catherine Gibson?

17     A.    Last year I want to say.  Maybe a earlier this

18  year.  Recently.  Not very recently, but it's been a

19  while now.

20     Q.    I'm almost done.  I just have a few more.  Did

21  Greenberg Dental invite a 17-year-old sex worker to your

22  home?

23     A.    Very possibly Joel did.

24     Q.    That wasn't my question.  Did Greenberg Dental

25  invite a 17-year-old sex worker to your home?



CHRISTOPHER DORWORTH                                   August 07, 2024
DORWORTH vs GREENBERG                                                221

1     A.   I do not know.  The 17-year-old sex worker said

2   that -- they had competing testimony, so I really don't

3   know the answer.  I don't know who invited her to my

4   home.

5     Q.   Did Greenberg Dental provide drugs to a

6   17-year-old sex worker at your house?

7     A.   No.

8     Q.   Did Greenberg Dental say you got oral sex from

9   a 17 year old at a hotel?

10     A.   Well, Joel Greenberg did say that, and he owned

11   $5 million of stock in Greenberg Dental and was put out

12   to be a member --

13     Q.   I'm not asking what Joel Greenberg said.  I'm

14   asking you if Greenberg Dental said that?

15     A.   I'm answering to you Joel Greenberg did things

16   and warranted publicly and privately that he was a

17   member of Greenberg Dental.  So, I mean, again, I

18   don't -- does there have to be a corporate resolution

19   authorizing this behavior, or does that suffice because

20   I suggest it does.

21     Q.   Okay.  Did Greenberg Dental say that your

22   friend Matt Gaetz had sex with a 17 year old at your

23   home?

24     A.   I don't know.  I have no idea if they said

25   that.



1    Q.   Did Greenberg Dental say you were in involved

2  in a ghost candidate scheme?

3    A.   Again, you continue -- I have answered this

4  question, but I believe that Greenberg Dental did all of

5  those things via the fact that Joel Greenberg did them.

6  So, I mean, yeah.

7    Q.   So everything that you are basing Greenberg

8  Dental on, you're basing on it the through Joel

9  Greenberg and his statements, correct?

10    A.   Not everything, but a good portion of it.

11        MS. CHOMIN:  Okay.  That's all I have.  Thanks.

12        MR. ANDRADE:  All right.  We've got about ten

13     minutes left.

14        MR. FOSTER:  You said ten minutes?

15        MR. ANDRADE:  Yeah.

16             FURTHER DIRECT EXAMINATION

17  BY MR. FOSTER:

18    Q.   All right.  Mr. Dorworth, good to meet you.  My

19  name is James Foster.

20    A.   You too.

21    Q.   I'm going to be brief because I have no choice,

22  but just ask that you listen to my question.  Please do

23  not interrupt me, and do your best to answer the

24  question directly.

25        Okay?



1      A.    Sure.

2      Q.    So the first thing I want to ask is that you

3   preserve this photograph that we have been discussing of

4   your friend on the boat and obviously the phone that is

5   with it.

6      A.    Yes, sir.

7      Q.    And that goes without saying, but I wanted in

8   black and white.  Ms. Chomin asked you about damages,

9   and you indicated they're in the complaint and you said

10  lost wages and damage to reputation; is that right?

11     A.    Again, please remember, sir, I'm not an

12  attorney.  I don't have a legal education.  I know we

13  filled out some forms where I had to define what my

14  damages were.  If that is part of the complaint or if

15  that is separate from the complaint, please just accept

16  my legal education being -- or lack there being the

17  cause of that, but I know I had to articulate those.

18  And I know we did articulate -- we did say that there

19  was lost wages because I lost my job because of this

20  stuff, and it's had an impact on real estate deals.

21  It's had an impact on my marriage.  It's had an impact

22  on my reputation.  Listen, it's had a far ranging

23  impact.

24     Q.    Anything else?

25     A.    That's my answer.



CHRISTOPHER DORWORTH                                    August 07, 2024
DORWORTH vs GREENBERG                                                 224

1    Q.   These lost wages, do you know how much?

2    A.   Well, I mean, I probably undershoot quite a

3   bit.  I think it's a lot more; but, again, that was

4   going into my prime years with the Desantis

5   administration, and I think, you know, every year would

6   have been, you know, probably pretty fantastic.  And

7   because of the timing of it, it was very damaging.

8    Q.   All right.  My question is how much?  Give me a

9   number.

10   A.   I mean, I would estimate -- just the number

11   that pops into my head is 10 or $15 million that they

12   have cost me.

13   Q.   Is that just an estimate?

14   A.   Yes.

15   Q.   Have you consulted with any experts or

16   professionals to reach that number?

17   A.   Well, it's a little -- it's not like if you're

18   a doctor or if you have some fixed salary where you just

19   miss that number of years.  For me, it's a function of

20   fee credits, land deals that I'm able to do, funding

21   that I'm able to get for those things.  It's a great

22   many things.  It's not -- I don't know what expert is

23   going to there and say, Chris, you would have had the

24   following clients that would have paid you the following

25   amounts of money.  But, you know, again, I was a highly



1  regarded member of the lobby core who was known to be

2  close to Ron Desantis and his administration.

3      Q.   So the answer is no, you have not discussed

4  this with any experts or professionals, correct?

5      A.   I just don't know that such an expert exists.

6      Q.   So the answer is no, am I correct?

7      A.   Sure.

8      Q.   Talking about the damage to your reputation, I

9  think you've explained that over the last however many

10 hours we've been here.  Is there anything else that you

11 haven't discussed in this deposition pertaining to your

12 claim of damage to your reputation?

13     A.   I mean, again, when someone comes and says that

14 you were engaged in a statutory rape with someone you

15 never met before and you have to go and resign from your

16 job, talk to your clients, talk to your children,

17 explain that these things didn't happen, get polygraph

18 tests, be investigated, go through all these things when

19 it's just all BS, it's a horrendous experience.  So

20 there has been an amount of damage that's been done to

21 me, sir.

22     Q.   Those things that you just mentioned, who said

23 those things?

24     A.   Which things are you referring to?

25     Q.   That you slept with an underage girl?



```
 1      A.    Joel Greenberg.

 2      Q.    Anyone else?

 3      A.    Again, I think that Joel Greenberg was the one

 4 who officially said it.  I think that "AB" had made

 5 that -- you know, she made a claim.  With our lawsuit

 6 and the resolution of that, we didn't agree to a

 7 different set of facts, but she certainly -- again, I

 8 got a phone call from -- we got an e-mail from her on

 9 like the last day of the year saying, We're going to sue

10 you.  I have never met you before.  So, again -- again,

11 it's been a long day.  I'm not particularly feeling

12 good.  I'm sorry, my sinus infection.  So forgive me if

13 I don't exactly hit the answer exactly as you want it.

14 But the reality is, a lot of damage was done.

15      Q.    Anyone else besides Joel Greenberg and "AB"?

16      A.    Not -- I mean, I'm just debating on how to

17 answer this question because I guess K[REDACTED] M[REDACTED] said

18 that she heard about it, but I don't know that she ever

19 said -- I'm not positive that she ever firmly made the

20 statement that it happened, but I think she said that

21 that's what "AB" told her.  So I don't know if that

22 would fall into your consideration.  I guess it would.

23      Q.    Did Andy Greenberg ever make that statement?

24      A.    Not to me.

25      Q.    Did Sue Greenberg ever make that statement?
```



1      A.    Not to me.

2      Q.    I may have misheard, but did you testify either

3   yesterday or this morning that you went to church on

4   July 16, 2017?

5      A.    No.  They asked me where I was, and I said I

6   don't know.  But I asked what day of the week it was,

7   and they said it was Sunday.  So I said, Well, I might

8   have gone to church.  I don't know.  We are habitual --

9   I mean, we go to church every weekend.  It's not

10  something that we miss.

11     Q.    And that would have been at St. Andrews Chapel

12  in Sanford?

13     A.    Yes.

14     Q.    When you go to church, are you -- is it your

15  habit to tithe each Sunday?

16     A.    No.

17     Q.    Do you know if there is any evidence that

18  exists that would have shown whether you did or did not

19  go to church on July 16, 2017?

20     A.    I am unaware of that.  I don't -- I mean,

21  again, I don't know.  I guess the one theoretical thing

22  might be if you sign in, but I don't sign every week.

23  In fact, usually I don't.  I mean, my wife might.  My

24  kids might, but I don't.  We do sometimes, but it's not

25  an every time thing.



1    Q.   All right.  I'm going to wrap up with some
2  questions similar to Ms. Chomin from your complaint.
3  Paragraph 25, you state that when referring to acts
4  performed by Andrew Greenberg and Sue Greenberg any
5  funding required for those acts came from AWG or
6  Greenberg Dental with the knowledge of what the funding
7  would be used for.
8         Do you have any evidence to support that Andy
9  or Sue Greenberg had knowledge of what these funds would
10 be used for?
11   A.   I'm sorry, not to be -- can you -- what funds
12 are you specifically referring to again there?
13   Q.   This is paragraph 25 of your complaint.
14   A.   I don't have it in front of me right now.
15   Q.   Do you have any evidence to support the
16 allegation that either Andy or Sue Greenberg had
17 knowledge that any funds they would have given to their
18 son would have been used for illegal activity?
19   A.   Well, I mean, certainly they were clued in on
20 the fact along the way.  I mean, it's not like this was
21 a single individual thing.  Joel did stupid things all
22 the time.  He invested tax collector money in Bitcoin
23 machines and lost a bunch of money, and then the
24 Greenbergs would come and bail him out and write checks
25 for several hundred thousand dollars I think, to make --



 1      Q.   Sir, I asked you in the beginning, please try
 2   to answer my question.
 3      A.   I'm just trying to follow what you want.  I
 4   don't know.  I guess I don't understand the question
 5   then.
 6      Q.   So Mr. Perkins was kind enough to pull it up to
 7   make it easier for you.  Paragraph number 25, what
 8   evidence do you have, if any, that Andy or Sue Greenberg
 9   had knowledge of what the funding would be used for?
10      A.   I mean, again, I just gave you example.  The
11   answer is throughout the course of my friendship with
12   Joel, he and Abby and would talk about things that he
13   had done and the way they would come out.  So that is my
14   evidence.
15      Q.   So it's statements from Joel, right?
16      A.   Yes.
17           MR. ANDRADE:  And, James, I'm sorry, we're
18        coming up on time.  I think this is probably the
19        last question.
20           MR. FOSTER:  Well, I'm going to keep going.  If
21        you want to shut it down, then that's certainly --
22           THE WITNESS:  Cool.
23           MR. FOSTER:  -- your right, but I'm going to
24        keep going.
25   BY MR. ANDRADE:



CHRISTOPHER DORWORTH                                August 07, 2024
DORWORTH vs GREENBERG                                            230

1      Q.   So, sir, paragraph 81 states Susan and Andrew
2  Greenberg were paying Abby Greenberg and compensating
3  her in exchange for cooperation in performing improper
4  acts.
5           What evidence do you have aside from I guess
6  what Joel Greenberg told you that --
7      A.   And --
8      Q.   Go ahead.
9      A.   And Abby Greenberg.  And she --
10     Q.   What evidence --
11     A.   She said they were paying her to keep her
12  there.  I mean, that's what she said to my wife.
13          THE WITNESS:  All right.  We're done?
14  BY MR. FOSTER:
15     Q.   So you were aware --
16          MR. ANDRADE:  So pursuant to federal rule of
17     civil procedure the 3D1 -- or D31, I'm going to have
18     to conclude this deposition now and ask you to seek
19     leave of court to continue deposing my client if you
20     would like to have further deposition time with my
21     client.
22          MR. FOSTER:  Absolutely.  I'm going to reserve
23     my right to come back.
24          MR. PERKINS:  And defendant Abby Greenberg
25     reserves her right as well.  Let the record reflect



 1  it's 4:16.

 2       MR. WERMUTH:  Andrew Greenberg, Susan

 3  Greenberg, and AWG, Inc., also reserve their right

 4  and have been cut short and haven't had responses to

 5  our questions and answers.

 6       MR. SCHELLER:  Joel Greenberg reserves his

 7  right --

 8       MS. CHOMIN:  Greenberg Dental reserves their

 9  right.

10       MR. SCHELLER:  -- for your additional time to

11  depose.

12       MS. CHOMIN:  Sorry, Fritz.  Same for Greenberg

13  Dental.

14       MR. PERKINS:  All right.  It appears all

15  defendants have reserved their right for more time,

16  and so we'll conclude then for the day.

17       MR. ANDRADE:  Thanks guys.

18       THE VIDEOGRAPHER:  Going off record.  The

19  approximate time, 4:17 p.m.

20       THE COURT REPORTER:  I assume you would like

21  him to read?

22       MR. ANDRADE:  Yes, please.

23       MR. PERKINS:  I will order for Abby Greenberg,

24  and I'll need it expedited as well.

25       MR. WERMUTH:  I will order --



 1          MR. FOSTER:  I will order a copy for Andy and

 2     Sue Greenberg.  William Peters is the noticed

 3     attorney from Wicker Smith.

 4          (The deposition concluded at 4:18 p.m.)

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



```
 1                        CERTIFICATE OF OATH

 2

 3   STATE OF FLORIDA:

 4   COUNTY OF ORANGE:

 5

 6       I, AMBER PORTELLO, Notary Public, State of Florida,

 7   do hereby certify that CHRISTOPHER DORWORTH personally

 8   appeared before me on August 7, 2024, and was duly sworn

 9   and produced a Florida driver's license as

10   identification.

11       Signed this 15th day of August, 2024.

12

13

14

15

16               _____

17               AMBER PORTELLO

18               Notary Public, State of Florida
                 My Commission No.:  HH124775
19               Expires:  MAY 4, 2025

20

21

22

23

24

25
```



```
 1                    CERTIFICATE OF REPORTER

 2   STATE OF FLORIDA:

 3   COUNTY OF ORANGE:

 4

 5       I, AMBER PORTELLO, Notary Public, State of Florida,

 6   certify that I was authorized to and did

 7   stenographically report the deposition of CHRISTOPHER

 8   DORWORTH; that a review of the transcript was requested;

 9   and that the foregoing transcript, pages 6 through 232,

10   is a true and accurate record of my stenographic notes.

11       I further certify that I am not a relative,

12   employee, or attorney, or counsel of any of the parties,

13   nor am I a relative or employee of any of the parties'

14   attorneys or counsel connected with the action, nor am I

15   financially interested in the action.

16

17       DATED this 15th day of August, 2024.

18

19

20   _____

21       AMBER PORTELLO

22

23

24

25
```



```
 1   Reference No.: 11551620

 2

 3   Case:  DORWORTH vs GREENBERG

 4

         DECLARATION UNDER PENALTY OF PERJURY
 5
         I declare under penalty of perjury that
 6   I have read the entire transcript of my Depo-
     sition taken in the captioned matter or the
 7   same has been read to me, and the same is
     true and accurate, save and except for
 8   changes and/or corrections, if any, as indi-
     cated by me on the DEPOSITION ERRATA SHEET
 9   hereof, with the understanding that I offer
     these changes as if still under oath.
10

11         _____

12              Christopher Dorworth

13

14              NOTARIZATION OF CHANGES

15                   (If Required)

16

17   Subscribed and sworn to on the _____ day of

18

19   _____, 20_____ before me,

20

21   (Notary Sign)_____

22

23   (Print Name)                    Notary Public,

24

25   in and for the State of _____
```



CHRISTOPHER DORWORTH                                    August 07, 2024
DORWORTH vs GREENBERG                                              236

```
 1   Reference No.: 11551620
     Case:  DORWORTH vs GREENBERG
 2

 3   Page No._____Line No._____Change to:_____

 4   _____

 5   Reason for change:_____

 6   Page No._____Line No._____Change to:_____

 7   _____

 8   Reason for change:_____

 9   Page No._____Line No._____Change to:_____

10   _____

11   Reason for change:_____

12   Page No._____Line No._____Change to:_____

13   _____

14   Reason for change:_____

15   Page No._____Line No._____Change to:_____

16   _____

17   Reason for change:_____

18   Page No._____Line No._____Change to:_____

19   _____

20   Reason for change:_____

21   Page No._____Line No._____Change to:_____

22   _____

23   Reason for change:_____

24
     SIGNATURE:_____DATE:_____
25   Christopher Dorworth
```



CHRISTOPHER DORWORTH                          August 07, 2024
DORWORTH vs GREENBERG                                      237

```
 1    Reference No.: 11551620
      Case:  DORWORTH vs GREENBERG
 2

 3    Page No._____Line No._____Change to:_____

 4    _____

 5    Reason for change:_____

 6    Page No._____Line No._____Change to:_____

 7    _____

 8    Reason for change:_____

 9    Page No._____Line No._____Change to:_____

10    _____

11    Reason for change:_____

12    Page No._____Line No._____Change to:_____

13    _____

14    Reason for change:_____

15    Page No._____Line No._____Change to:_____

16    _____

17    Reason for change:_____

18    Page No._____Line No._____Change to:_____

19    _____

20    Reason for change:_____

21    Page No._____Line No._____Change to:_____

22    _____

23    Reason for change:_____

24
      SIGNATURE:_____DATE:_____
25    Christopher Dorworth
```

