# EXHIBIT 26

Case 6:18-cv-01646-ACC-LHP Document 107-26 Filed 03/29/24 Page 2 of 47 PageID 3492

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**RIVER CROSS LAND**
**COMPANY, LLC,**

          **Plaintiff,**

**v.**                            **Case No: 6:18-cv-1646-ACC-LHP**

**SEMINOLE COUNTY,**

          **Defendant.**

_____

## ORDER

This cause comes before the Court on Seminole County's Motions to determine entitlement to attorney's fees before the District Court (Doc. 63) and the Court of Appeals. (Doc. 73). Plaintiff River Cross Land Company, LLC ("River Cross") filed Responses to the respective Motions opposing an award of attorney's fees and nontaxable costs. (Docs. 65, 76). The Motions are ripe for review.

As explained in detail below, the County was the prevailing party, River Cross failed to establish a prima facie case under the Fair Housing Act for lack of any evidence of causation, and the County indisputably had a legitimate non-discriminatory reason for enforcing the Rural Boundary to avoid urban sprawl. As the Court noted in granting summary judgment: "River Cross disingenuously used the threat of a lawsuit under the federal Fair Housing Act as the fulcrum to urge County Commissioners to approve the entire River Cross proposal for 1.5 million

square feet of commercial space and 1370 densely-grouped residential units." (Doc. 61 at 2). Accordingly, the County is entitled to recover its fees even under the more stringent standard applied to prevailing defendants in civil rights cases, and the Motions for entitlement to fees will be granted.

## I.    BACKGROUND

### A. Brief Summary of Pertinent Facts[1]

In 1991, Seminole County created an urban-rural boundary to protect rural and environmentally sensitive lands from urban sprawl in the eastern part of the County; however, the County's charter was not effective in controlling annexation by cities or in limiting "urban sprawl" into its eastern rural lands.[2] In 2004, the Seminole County voters passed a Charter Amendment establishing the "Rural Boundary" and preempting cities' land use regulation in the eastern "Rural Area" of the County to assure that the County maintained control of the density of development there. The County's efforts were guided by Florida's community planning and growth management regulations which discouraged the proliferation of "urban sprawl," *i.e.*, poorly planned urban developments located in predominantly rural areas. (*See* Doc. 61 at 5, 13). In the eastern "Rural Area" on the County's comprehensive plan—based on feedback from the Florida agency tasked with

---

[1] The Court assumes familiarity with the extensive set of background facts in the Court's June 4, 2021 Order granting summary judgment. (Doc. 61).

[2] *See Seminole County v. City of Winter Springs*, 935 So. 2d 521, 523 (Fla. 5th DCA 2006). The case arose when the City of Winter Springs annexed several parcels of land in the County-designate rural area. *Id.* at 524.

community planning—the County designated the agricultural zoning district for the land in the Rural Area to one-dwelling-per five acres; the surrounding areas had similar low-density agricultural designations or consisted of wilderness preserve. (*Id.*). Following adoption by the County of its "rural character plan" in 2006, the County focused its planning policies to maximize development in the urban areas through its comprehensive planning, transportation planning, and by intentionally creating compact land use patterns to discourage "urban sprawl" and decrease automobile trips. (*See* Doc. 35-2 at 33).

Against this historical backdrop, Plaintiff River Cross Land Company, LLC ("River Cross"), a non-minority private developer, filed an application with the County to develop a very large commercial and residential project on approximately 670 acres of undeveloped property in the "Rural Area" of Seminole County, adjacent to the Econlockhatchee ("Econ") River and within the Econ River Corridor Protection Zone.[3] The proposed development aspired to "cross" the Econ River— classified as an "outstanding water body" and "designated worthy of special protection"—with a new bridge to reach 1.5 million square feet of commercial space, and 1370 residential units comprised of 600 single-family home, 270 townhomes, and 500 multi-family apartment units.[4]

---

[3] (Doc. 35-5 at 9).
[4] (Doc. 35-3 at 153).

## B. Mr. Dorworth's Experience in State and County Government

The driving force behind the River Cross Land Company, LLC, is real estate developer Christopher E. Dorworth,[5] who holds an MBA from Duke University. (Doc. 35-3 at 9, 17).[6] Mr. Dorworth spent "years" on Seminole County's Planning and Zoning Commission, serving as Vice Chairman in 2004, and on the County's Soil and Water Conservation District, serving as Chair in 2006.[7] He was subsequently elected to the Florida Legislature in November 2007, where he served as Vice Chair of both the House Appropriations Committee (2011-2012) and the Finance & Tax Committee (2010-2011), as well as a member of Committees on Economic Affairs; Redistricting; Rules & Calendar; and Government Reorganization. During his time as a state Representative, he sponsored several bills on real estate development, growth management; water and sewage systems; environmental regulation; homestead property; administrative procedures; and transportation and mitigation programs.[8]

---

[5] River Cross Land Company, LLC has three active members: Christopher Dorworth, who is the "sole decisionmaker"; his closely held business, CED Strategies; and his wife, Rebecca Dorworth. (Doc. 35-3 at 17).

[6] *See* "Chris Dorworth," legislative biography, Florida House of Representatives, https://www.myfloridahouse.gov/Sections/Representatives/details.aspx?MemberId=4419&SessionId=57 (visited March 8, 2022) ("Dorworth Bio."). The Court can take judicial notice of facts that (1) are generally known within its territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned. F. R. Evid. 201(b).

[7] *Id.* Notwithstanding his "years" on the Planning and Zoning Commission, Mr. Dorworth testified that "in all the years I was there, the commissioners certainly never cared about what we did. They would happily overturn or confirm . . . I don't think the P and Z [Planning and Zoning Commission] matters at all." (Doc. 35-3 at 261-62).

[8] Dorworth Bio., *supra*.

- 4 -

Mr. Dorworth sponsored one bill regarding real estate developments that made changes to the community planning guidelines for comprehensive plan amendments and the review process; limited the scope of certain recommendations from reviewing agencies; exempted certain proposed developments from review; and revised conditions for local governments to rescind development orders.[9] The bill, most notably, provided a presumption that certain agricultural enclaves did not constitute "urban sprawl" and established exceptions for designated protected areas.[10] Another bill revised and added provisions concerning growth management, local government comprehensive plans, and state, regional, and local planning agencies, and other development approval changes.[11] A third sponsored bill nullified certain administrative rules from many of Florida's regional Water Management Districts.[12] Mr. Dorworth was a successful legislator and "in line to become House speaker" before he "unexpectedly lost a bid for re-election" to the Florida House of Representatives in 2012. (Doc. 35-3 at 7).[13] During that time period, Mr. Dorworth

---

[9] The sponsored bill was signed into law by the governor and became effective on July 1, 2012. *See* https://www.myfloridahouse.gov/Sections/Bills/billsdetail.aspx?BillId=48214 (House Bill 979 (2012)). *See* Dorworth Bio., *supra*.

[10] *Id*.

[11] House Bill 7081. *See* https://www.myfloridahouse.gov/Sections/Bills/bills-detail.aspx?BillId=48992.

[12] House Bill 7029. *See* https://www.myfloridahouse.gov/Sections/Bills/billsdetail.aspx?-BillId=48424.

[13] *Chris Dorworth Resigns From Lobbying Firm As Reports Link Joel Greenberg Probe To Web Of Allied Power Brokers*, ORLANDO SENTINEL (April 9, 2021). *See* https://www.orlandosentinel.com/news/os-prem-ne-gaetz-artiles-scandals-chris-dorworth-20210410-ui4fxe3swbf4dlrizpmgiehhke-story.html. The Court can take judicial notice of generally-known facts from newspaper articles. *See Southeast Clinical Nutrition Ctr. v. Mayo Found. For Med. Educ. & Research*, 135 F. Supp.3d 1267, 1271 (N.D. Ga. 2013) (taking judicial notice of newspaper articles for date when book became available); *see also Staehr v. Hartford*

was also a lobbyist and consultant (*Id*. at 9). He resigned from the lobbying firm in Tallahassee in April 2021.[14]

Mr. Dorworth initially became interested in the Hi-Oaks Ranch pastureland for the River Cross project in 2017 and signed a letter of intent to purchase the property for $35.3 million, contingent on approval from Seminole County to rezone the agricultural land for a planned development. (*Id*. at 15, 18; Doc. 35-6). "In all, Dorworth is likely to spend $780,000 on deposits" from his own funds because he has "no investors or lenders."[15] Mr. Dorworth testified, "It's always sort of been the great remaining piece of land in Seminole County," (Doc. 35-3 at 14). "I don't get [the deposit money] back if I choose not to do the deal. I knew that going into it." (*Id.* at 179-80). Mr. Dorworth has communicated to the *Orlando Sentinel* editors his commitment to the issue: "I will be actively involved in future attempts to amend the [County] Charter [establishing the rural boundary] with legal challenges as the county commission has proven to be an untrustworthy steward of the power they were unconstitutionally given . . . I look forward to permanently righting that wrong."[16]

---

*Fin. Servs. Grp., Inc*., 547 F.3d 406, 425 (2d Cir. 2008) (taking judicial notice of news articles).

[14] *Id*.

[15] *Id*.

[16] *Despite Setbacks, Deeply Invested Dorworth Presses On With River Cross Plan For Rural Seminole*, ORLANDO SENTINEL (July 26, 2021) (additions in the original article). *See* https://www.orlandosentinel.com/news/seminole-county/os-prem-seminole-county-river-cross-dorworth-lawsuit-20210726-2wa4thnjhvf2njzljaumgtfue4-story.html.

In 2018—contemporaneous with River Cross filing its Application to Seminole County to amend the "Rural Boundary Line"—the Florida House of Representatives passed a bill that would have "eliminated rural protections" like Seminole County's "within three miles of a state university," and the University of Central Florida, according to Mr. Dorworth, was within 1.6 miles of the proposed River Cross development "as the crow flies."[17] (Doc. 35-3 at 14, 79-86). The bill was supported by Mr. Dorworth's "friend of 25 years," then-state representative Jason Brodeur (now a senator), but the bill died in the state Senate. (*Id*.). In 2020, another legislator, "got a bill passed that would have allowed cities in Seminole to approve developments inside the rural boundary, effectively overruling the county's charter"; however, the governor vetoed the bill. [18] In an email to the Seminole County attorney, Mr. Dorworth warned in September 2021 that he was "devoting the entirety of [his] professional life to adding more projects currently in the rural area."[19]

In fall 2021, Mr. Dorworth "proposed scaling back the number of homes he would build in his controversial River Cross development and another property

---

[17] County staff testified that the proposed River Cross property is actually nine miles from UCF. (Doc. 35-2 at 26). Mr. Dorworth conceded that, without a bridge over the Econ River, the distance is nine miles. (Doc. 35-3 at 154).

[18] *See also Dorworth Loses River Cross, But Vows To Launch A Forever Development War Inside Seminole's Rural Boundary*, ORLANDO SENTINEL (Sept. 1, 2021). *See* https://www.orlandosentinel.com/opinion/editorials/os-op-dorworth-lawsuit-20210901-rpnblt3xnvhy7dt42jy7qxjpae-story.html. (Referring to State Senator Keith Perry from Gainesville).

[19] *Id.*

within Seminole's rural boundary in his latest attempt to resolve his legal fight against Seminole County."[20] According to an email to Commissioners reviewed by the *Orlando Sentinel*, "[i]f commissioners agreed, Dorworth also would commit to never, 'for the rest of my life,' make or support any more attempts to remove property from the county's development-restricted rural boundary."[21]

In what appears in retrospect to be a multi-pronged effort to apply pressure for the approval of the River Cross development in the Rural Area, in spite of Seminole County voters' passage of the Charter Amendment fortifying the Rural Boundary in 2004, Mr. Dorworth has pursued separate lawsuits against Seminole County in this Court and in the Florida courts. On May 19, 2020, on behalf of River Cross, Mr. Dorworth filed a case in the state circuit court seeking to invalidate the Charter Amendment as "unconstitutionally vague." *See River Cross Land Company, LLC and Christopher E. Dorworth v. Seminole County*, Circuit Court of the Eighteenth Judicial Circuit in and for Seminole County, Case No. 2020-CA-001202.[22] On January 24, 2022, the state circuit court rejected the challenge and ruled that the Charter Amendment is constitutional; Mr. Dorworth filed an appeal of the ruling a week later which remains pending.[23]

---

[20] *'See You In Court'* Article, *supra*.

[21] *Id.*

[22] River Cross filed the new case in state court while this federal FHA case was administratively closed. (Doc. 55). *Circuit Judge Rejects Dorworth's River Cross Lawsuit Against Seminole County,* ORLANDO SENTINEL (January 25, 2022). *See* https://www.orlandosentinel .com/news/seminole-county/os-ne-seminole-county-river-cross-lawsuit-20220125jdyk3tx2tfemd nf7 mdf673x6nq-story.html.

[23] *See* https://courtrecords.seminoleclerk.org/ (visited on March 20, 2022).

On February 1, 2022, Mr. Dorworth withdrew a second, separate development "request to carve 67 acres of farmland out of Seminole County's rural boundary to eventually build two residential communities."[24] "We didn't see a need for a hearing that was only going to lead to more litigation, at this time," Mr. Dorworth reportedly said in a text message to the *Orlando Sentinel*, "We'll see how things shape up and re-evaluate what needs to be done after the [Fifth District Court of Appeals] issues its verdict."[25]

C. **Relevant Procedural History in the Federal Courts**

The Court granted the County's Motion for Summary Judgment, dismissed River Cross's claim, and entered final judgment against River Cross on June 7, 2021. (Docs. 61, 62). On June 21, 2021, Seminole County filed its Motion seeking a ruling on its entitlement to attorney's fees and non-taxable costs. (Doc. 63); River Cross responded on July 5, 2021. (Doc. 65).[26] However, the following day, on July 6, 2021, River Cross filed a notice of appeal of the Court's June 4, 2021 Order granting summary judgment. (Doc. 67; Case No. 21-12300 (11th Cir)). At the Eleventh Circuit Court of Appeals, instead of filing its appeal brief, River Cross filed a Motion

---

[24] *Dorworth Withdraws Request To Remove 67 Acres From Seminole's Rural Boundary*, ORLANDO SENTINEL (February 4, 2022). The farmland is in the Rural Area and limited to one home per five acres or per ten acres. *Id. See* https://www.orlandosentinel.com/ news/seminole-county/os-ne-seminole-county-dorworth-pappys-patch-20220204-lcaqihwpgvckdaji27ler25rxq-story.html.

[25] *Id.*

[26] Seminole County also sought reimbursement of its costs pursuant to 28 U.S.C. § 1920, and these were taxed by the Clerk on the Amended Bill on July 23, 2021. (Doc. 71).

for Voluntary Dismissal on August 30, 2021, the day the brief was due. The Eleventh Circuit entered a dismissal of the appeal the following day. (Doc. 72).

Seminole County filed its Motion for Appellate Fees in the Eleventh Circuit, and, on September 27, 2021, the Court of Appeals transferred consideration of the appellate attorney's fees matter to this Court. (*See* Doc. 73). River Cross filed its Response to the Motion for Appellate Fees on November 8, 2021. (Doc. 76). The matter of entitlement to fees is ripe for review.

## II.   STANDARD OF REVIEW

In the United States, parties are ordinarily required to bear their own attorney's fees absent explicit statutory authority. *See Buckhannon Bd. & Care Home, Inc. v. W. Virginia Dep't of Health & Hum. Res.*, 532 U.S. 598, 602 (2001) (citing *Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 247 (1975)); *Johnson v. Florida*, 348 F.3d 1334, 1350 (11th Cir. 2003) ("[T]he default assumption is that each party is responsible for its own legal fees, and thus fees ordinarily will not be awarded to the prevailing party without express statutory authority."). "Congress has authorized courts to deviate from this background rule in certain types of cases by shifting fees from one party to another," *Fox v. Vice*, 563 U.S. 826, 832 (2011), and "has authorized the award of attorney's fees to the 'prevailing party' in numerous statutes," including the Civil Rights Act of 1964 and the Fair Housing Amendments Act of 1988, 42 U.S.C. § 3601 et seq. *See Buckhannon*, 532 U.S. at 601-02 (recognizing that a "prevailing party" may recover

attorney's fees in an FHA case); *Johnson*, 348 F.3d at 1350 ("Congress has chosen to modify the American Rule in numerous statutes, including the Civil Rights Act of 1964.").

In this case, the County seeks to recover its attorney's fees and non-taxable costs under the FHA, as amended in 1988, which provides:

> In a civil action under subsection (a), the court, in its discretion, may allow the prevailing party . . . a reasonable attorney's fee and costs.

42 U.S.C. § 3613(c)(2). (Doc. 63). Section 3613(c)(2) does not specifically differentiate between prevailing plaintiffs and prevailing defendants, however, courts have applied the more stringent standard for prevailing defendants in civil rights actions set forth in *Christiansburg Garment Co. v. Equal Employment Opportunity Commission*, 434 U.S. 412, 421 (1978), to other anti-discrimination statutes with similar fee-shifting language. *See, e.g.*, *Bruce v. City of Gainesville, Ga.*, 177 F.3d 949, 951 (11th Cir. 1999) (applying *Christiansburg*'s more stringent standard for prevailing defendants to ADA fee shifting statute with the "substantially same" language).

All federal Circuits who directly considered the issue have applied the *Christiansburg* standard to § 3613(c)(2) of the FHA in analyzing an award to prevailing defendants, *i.e.*, granting fees only if the plaintiff's case was "frivolous, unreasonable, or groundless, or . . . the plaintiff continued to litigate after it clearly became so.'" *Brooks v. Ctr. Park Assocs.*, 33 F.3d 585, 587 (6th Cir. 1994) (quoting *Christiansburg*, 434 U.S. at 419); *see Bryant Woods Inn, Inc. v. Howard County,*

*Md.*, 124 F.3d 597, 606 (4th Cir. 1997) (applying the *Christiansburg* standard because "[t]he FHA prohibits discrimination because of 'race, color, religion, sex, familial status, or national origin,' as well as handicap . . . [and] draw[s] on the same policies attending Title VII of the Civil Rights Act"); *see also Green v. Mercy Hous., Inc.*, 991 F.3d 1056, 1058 (9th Cir. 2021) ("[W]e join the First, Second, Fourth, and Fifth Circuits, all of which have applied the *Christiansburg* standard in the Fair Housing [Act] context.") (listing cases from sister courts). Additionally, the term "prevailing party" is specifically defined in the FHA, 42 U.S.C. § 3602(o), as "having the same meaning as such term has in [42 U.S.C. § 1988]," and the Supreme Court applied the *Christiansburg* standard in interpreting the "prevailing party" fee-shifting provision of 42 U.S.C. § 1988 in *Hughes v. Rowe*, 449 U.S. 5 (1980) (per curiam); *Brooks*, 33 F.3d at 587 n.2 (discussing *Hughes* adoption of *Christiansburg* standard for § 1988 cases and applying to FHA cases); *see Beach Blitz Co. v. City of Mia. Beach, Fla.*, 13 F.4th 1289, 1297 (11th Cir. 2021) (applying *Christiansburg* to city's § 1988 motion for fees incurred defending constitutional claims against it based on *Hughes*).

"Because Congress intended for prevailing defendants to recover fees only when forced to defend suits 'having no legal or factual basis,' *Christiansburg*, 434 U.S. at 420, a defendant may recover attorney's fees 'only if the District Court finds that the plaintiff's action was frivolous, unreasonable, or without foundation, even though not brought in subjective bad faith' or 'if the plaintiff continued to litigate

after it clearly became so.'" *Beach Blitz*, 13 F.4th at 1297 (quoting *Hughes,* 449 U.S. at 14; *CRST Van Expedited, Inc. v. E.E.O.C.*, 578 U.S. 419 (2016)); *see also Buckhannon,* 532 U.S. at 603-04 (holding that fee-shifting provisions of FHA in § 3613(c)(2) are available to a party who has secured a judgment on the merits or consent decree). "The *Christiansburg* Court's standard for a prevailing defendant to recover fees from a plaintiff . . . reflects a determination to head off unjustified litigation." *E.E.O.C. v. Propak Logistics, Inc.*, 746 F.3d 145, 155 (4th Cir. 2014) (Wilkinson, J., concurring) (affirming award of fees to prevailing defendant). However, "[w]hen a court imposes fees on a plaintiff who has pressed a 'frivolous' claim, it chills nothing that is worth encouraging." *Id.* (quotation omitted).

A defendant is considered to have "prevail[ed] 'whenever the plaintiff's challenge is rebuffed, irrespective of the precise reason for the court's decision'" and "the rejection of the plaintiff's attempt to alter the parties' legal relationship '[is] marked by 'judicial imprimatur.'" *Beach Blitz*, 13 F.4th at 1297 (citations omitted). "Put another way, [the court] conduct[s] a practical examination of whether 'the case [was] resolved in the defendant's favor.'" *Id.* (quoting *CRST*, 136 S. Ct. at 1652).

The United States Supreme Court has also made clear that a litigant's duty to avoid frivolous litigation is a continuing obligation, and advocacy of a claim after it is clearly no longer tenable may subject the plaintiff to attorney's fees even though the complaint was not initially frivolous. *Perry v Orange County*, 341 F.Supp.2d 1197, 1204 (M.D. Fla. 2004) (citing *Christiansburg*, 434 U.S. at 422); *see Hamilton*

*v. Sheridan Healthcorp, Inc.*, 700 F. App'x 883, 885 (11th Cir. 2017) (affirming district court award of attorney's fees to prevailing defendants for plaintiff's frivolous Title VII and § 1981 race discrimination claims applying *Christiansburg* standard).

The award of attorney's fees under these standards is discretionary. *Brooks*, 33 F.3rd at 587 (affirming the district court's discretion to award prevailing-defendant fees on FHA claims but remanding for insufficient factual findings). "Application of these standards requires inquiry into the plaintiff's basis for filing suit. Awards to prevailing defendants will depend on the factual circumstances of each case." *Id*. (citation omitted). Courts have awarded attorney's fees to prevailing defendants where no evidence supported the plaintiff's position or when the defects in the suit are of such magnitude that the plaintiff's ultimate failure is clearly apparent from the beginning or at a significant point in the proceedings after which the plaintiff continues to litigate. "[T]he grant of summary judgment, in and of itself, does not mean that an action is frivolous. *Baker v. Alderman*, 158 F.3d 516, 524 (11th Cir. 1998). Yet, "findings of frivolity have been sustained when . . . a motion for summary judgment . . . has been granted where plaintiffs did not introduce any evidence to support their claim." *Head*, 62 F. 3d at 356.

As the Supreme Court has emphasized, however, the mere fact that allegations prove legally insufficient to require a trial does not, for that reason alone, render a

complaint groundless under *Christiansburg*. 449 U.S. at 16. The court is cognizant

of the Supreme Court's caution that:

> [I]n applying these criteria, it is important that a district court resist the understandable temptation to engage in *post hoc* reasoning by concluding that, because a plaintiff did not ultimately prevail, his action must have been unreasonable or without foundation. This kind of hindsight logic could discourage all but the most airtight claims, for seldom can a prospective plaintiff be sure of ultimate success. No matter how honest one's belief that he has been the victim of discrimination, no matter how meritorious one's claim may appear at the outset, the course of litigation is rarely predictable. Decisive facts may not emerge until discovery or trial. The law may change or clarify in the midst of litigation. Even when the law or the facts appear questionable or unfavorable at the outset, a party may have an entirely reasonable ground for bringing suit.

*Christiansburg*, 434 U.S. at 421-22. As noted by the Eleventh Circuit:

> [T[he district court "must focus on the question whether the case is so lacking in arguable merit as to be groundless or without foundation rather than whether the claim was ultimately successful." *Sullivan v. Sch. Bd. of Pinellas County*, 773 F.2d 1182, 1189 (11th Cir. 1985) (quoting *Jones v. Texas Tech Univ.*, 656 F.2d 1137, 1145 (5th Cir. Unit A Sept. 1981) (footnote omitted)). In the cases in which we have sustained findings of frivolity, plaintiffs have typically failed to "introduce any evidence to support their claims." *Sullivan*, 773 F.2d at 1189. Other factors that may be relevant to this inquiry include "(1) whether the plaintiff established a prima facie case; (2) whether the defendant offered to settle; and (3) whether the trial court dismissed the case prior to trial or held a full-blown trial on the merits." *Id*. The *Sullivan* factors, however, are "general guidelines only, not hard and fast rules," and "[d]eterminations regarding frivolity are to be made on a case-by-case basis." *Id*.

*Cordoba v. Dillard's, Inc*., 419 F.3d 1169, 1176-77 (11th Cir. 2005). "[T]he district

court must focus on the question of whether the case is seriously lacking in arguable

merit." *Walker v. NationsBank of Florida N.A*., 53 F.3d 1548, 1558 & n.15 (11th

Cir. 1995) (applying prevailing-defendant standard in Title VII case) (citing *Sullivan*, 773 F.2d at 1189, as "coterminous" with the legal standard of *Christiansburg*).

"A fee award to a prevailing defendant is also appropriate if the plaintiff brought the case in subjective bad faith." *Brooks*, 33 F.3rd at 587; *P. Mastrippolito & Sons, Inc. v. Joseph*, 692 F.2d 1384, 1386 (3d Cir. 1982) ("[I]f the plaintiff is found to have brought his claim in bad faith, there is even a clearer basis for charging him with his opponent's attorney's fees" under "the standards enunciated" in *Christiansburg*). Moreover, a finding of bad faith—even if not subjective bad faith—constitutes a basis for attorney's fees regardless of *Sullivan*'s three factors. *Torres v. City of Orlando*, 264 F. Supp. 2d 1046, 1050 (M.D. Fla.) (citation omitted), *aff'd*, 88 F. App'x 391 (11th Cir. 2003). [27] In determining whether a claim is frivolous, the Court views the evidence in the light most favorable to the non-prevailing plaintiff. *Beach Blitz*, 13 F.4th at 1297; *Barnes v. Zaccari*, 592 F. App'x 859, 872 (11th Cir. 2015) (citing *Cordoba*, 419 F.3d at 1179).

To the extent the County also seeks an award of appellate fees, its Motion is controlled by the same legal principles. *Young v. New Process Steel, LP*, 419 F.3d 1201, 1206 (11th Cir. 2005) ("The *Christiansburg* rule applies not only to trials in civil rights cases, but also to appeals by plaintiffs in them."). Consistent with fee

---

[27] The Court may also assess attorney's fees on a finding of bad faith based on its inherent power. *Purchasing Power, LLC v. Bluestem Brands, Inc.*, 851 F.3d 1218, 1223 n.4 (11th Cir. 2017) ("The key to unlocking a court's inherent power is a finding of bad faith.").

awards in cases brought under parallel civil rights and disability statutes, courts award nontaxable costs, including expert witness fees, and these similarly would be recoverable under the FHA. *See Hansen v. Deercreek Plaza, LLC*, 420 F. Supp. 2d 1346, 1353 (S.D. Fla. 2006) (awarding prevailing ADA plaintiff nontaxable costs such as expert fees, photocopies, mediation fee, travel, and postage as litigation expenses); *see also Hensley v. Eckerhart*, 461 U.S. 424, 429 (1983) (awarding litigation expenses and costs on civil rights claim under 42 U.S.C. § 1988(b)).

## III.   DISCUSSION

### A. The Parties' Arguments

The County argues that it is entitled to fees in this case, even under the more stringent standard applied to prevailing defendants, because River Cross asserted "meritless" claims of discrimination against the County "premised upon its own failed commercial venture" based on the County's denial of the application to convert approximately 670 acres from Rural A-5 zoning to Planned Development zoning. (Doc. 63 at 2). The County contends that River Cross's claims were "legally unfounded and wholly without merit" because River Cross could not guarantee those housing units would be 'affordable' or serve minority residents and [its] claims were ultimately denied . . . . because of these deficiencies." (*Id.* (citing Docs. 61, 62)).

The County further argues that despite being "keenly aware of the insufficiencies of its claims at the time of filing this lawsuit," River Cross "deliberately brought the unfounded claims against the County as an abusive litigation tactic to publicly intimidate and harass the County." (*Id.*). River Cross

advanced its FHA claims, the County contends, in an attempt to intimidate the County into approving its entire commercial/residential development proposal after it became clear that the County's Planning and Zoning Commission intended to recommend denial of Plaintiff's application. (*Id.*). The County points to the portion of the Court's lengthy summary judgment Order summarizing River Cross's use of the FHA—which applied to only 75 multi-family units—to advance the approval for the entire large-scale project of 1.5 million square feet of commercial space and 1370 residential units, which clearly would not have been subsidized as part of an "affordable housing" program. (*Id.* at 3 (citing Doc. 61 at 2)).

The County argues that the Court "should not turn a blind eye to [River Cross's] inappropriate use of the Court's judicial resources in a clear act of intimidation and retaliation against the County." (*Id.*). "Under federal law, [River Cross's] calculated and deliberate scheme to get another bite at its failed commercial development through filing a frivolous lawsuit does not go without repercussions." (*Id.*). The County contends that it is entitled to an award of its reasonable attorney's fees and non-taxable costs in defending the "frivolous" claims brought by River Cross. (*Id.*). The County argues that granting the County's entitlement to an award of attorney's fees and non-taxable costs will act as a deterrent for those "non-minority developers who attempt to use the Fair Housing Act disingenuously." (*Id.* at 5).

River Cross responds that an award of attorney's fees to the County is not warranted in this case because the County "unsuccessfully" moved for a Rule 12(b)(6) dismissal and judgment on the pleadings of River Cross's Complaint (Doc. 18, 30); the parties exchanged thousands of pages of documents in response to discovery requests; retained experts who prepared reports (see Docs. 36-6, 36-7); conducted a total of 15 depositions; and filed "hundreds" of pages of briefing on their respective motions for summary judgment (see Docs. 34, 35, 36, 41, 42, 43, 44, 45, 48, 49).

River Cross also points to the parties' agreement, several months before trial, to stay the case and "potentially resolve th[e] lawsuit without further litigation" based on River Cross's proposed "land swap" (Doc. 50). The Seminole County Board of County Commissioners ("BCC") subsequently rejected the proposed land swap and the litigation resumed. River Cross also argues that, in the June 4, 2021 Order granting the County's Motion for Summary (the "Summary Judgment Order"), the Court "never ruled" or described River Cross's claims as "frivolous, unreasonable, or groundless." (Doc. 61).

River Cross argues that the County is engaged in *post hoc* reasoning and has fixated upon the outcome of the case to support its claim for fees instead of focusing on the question of whether the case was "groundless" or "without foundation" at initiation of the lawsuit. If the Court finds that River Cross's claims were difficult or "meritorious enough to receive careful attention and review," River Cross argues,

then even though the County won on summary judgment, an award of attorney's fees is not warranted. (*Id*. at 7). In addition to the above, River Cross argues that its FHA claims were complex and difficult, as evidenced by the 1,500 hours and half a million dollars in attorney's fees the County spent defending the lawsuit. (*Id*. at 11). The Court now turns to analysis of the three *Sullivan* factors.

## B. Analysis of the *Sullivan* Factors

### 1. River Cross Failed To Establish A Prima Facie Case

River Cross filed suit in this Court against Seminole County alleging that the County violated the FHA by denying its Application to amend the Rural Boundary, which, River Cross argued, had a disparate impact on minorities residing in the County and "perpetuate[d] a history of residential segregation." (Doc. 1 ¶¶ 28–49). River Cross sought actual and punitive damages and a permanent injunction ordering the County to approve the River Cross Application.[28] River Cross specifically alleged:

> 28. Seminole County violated the Federal Fair Housing Act, 42 U.S.C. § 3604(a), by denying the approvals that are necessary for the River Cross Project's completion, which makes unavailable or denies dwellings to persons because of race. Further, Seminole County's actions unlawfully obstructed Plaintiff's right and ability to develop and market the proposed River Cross Project, which included affordable housing.

---

[28] Section 804(a) of the FHA makes it unlawful "[t]o refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin." 42 U.S.C. § 3604(a). River Cross asserted four separate counts, however, the allegations of the two principal counts (Count I and III) were merely re-alleged in the counts seeking injunctive relief (Counts II and IV) rather than money damages for the same conduct. (Doc. 1 at 6-10).

29. Seminole County violated the Federal Fair Housing Act, 42 U.S.C. § 3604(a), by denying Plaintiff's application for an amendment to Seminole County's Comprehensive Plan to amend the Rural Boundary Line to remove the Property from the East Rural Area, which has caused a *segregative effect* in Seminole County, an amendment to Seminole County's Future Land Use Map to remove the Property from the Rural Boundary Line, which has caused a *segregative effect* in Seminole County, and to rezone the Property from Rural-5 to Planned Development zoning, which has caused a *disparate impact* on racial minorities in Seminole County.

30. Seminole County's unwarranted actions, as applied, have the discriminatory effect of adversely impacting racial minorities more than other groups in Seminole County.

31. Seminole County' actions *perpetuate a history of residential racial segregation* in Seminole County.

(Doc. 1 ¶¶ 28-31) (emphasis added). The County moved to dismiss the Complaint for lack of standing under Federal Rule of Civil Procedure 12(b)(1) and for failure to state a claim under Rule 12(b)(6). (Doc. 8).

River Cross premised its FHA claim on the alleged discriminatory effect of the County's denial of its Application. "A plaintiff can demonstrate a discriminatory effect in two ways: it can demonstrate that the decision has a segregative effect or that it makes housing options significantly more restrictive for members of a protected group than for persons outside that group." *See Hallmark Developers, Inc. v. Fulton Cty., Ga.*, 466 F.3d 1276, 1286 (11th Cir. 2006). River Cross specifically alleged that the County's enforcement of the Boundary Line, and the consequent denial of its Application: (1) disparately impacted racial minorities and (2) perpetuated a history of residential racial segregation in the County. (*Id.* at 12).

Disparate-impact claims challenge practices that have a "disproportionately adverse effect on minorities and are otherwise unjustified by a legitimate rationale." *Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*, 135 S. Ct. 2507, 2513 (2015); (Doc. 18 at 12). The Court granted the County's Motion to Dismiss the disparate impact claim because River Cross had failed to present any "facts indicating that the County's implementation and enforcement of the Boundary Line had a discriminatory effect on minorities as opposed to non-minorities." (Doc. 8 at 14). "In fact, River Cross present[ed] no comparative data at all" to demonstrate "a causal connection between the challenged policy and the alleged statistical disparity" as required under the precedential cases. (*Id.* 14-15 (citing *Inclusive Cmtys.,* 135 S. Ct. at 2523-24)).

The Court held that River Cross had not established a prima facie case of disparate impact, therefore, that claim would be dismissed:

> At best, . . . these allegations merely suggest that more racial minorities live outside of the Rural Area. Standing alone, such a statistical disparity is insufficient to raise an inference of liability under the disparate impact theory. *See Inclusive Communities*, 135 S.Ct. at 2523 ("[r]acial imbalance . . . does not, without more, establish a prima facie case of disparate impact") (citation omitted).
>
> Accordingly, River Cross's FHA claims are due to be dismissed to the extent that River Cross alleges that the County's implementation and enforcement the Boundary Line had a disparate impact on minorities residing in Seminole County. *See Oviedo Town Ctr. II, L.L.L.P. v. City of Oviedo, Fla.*, No. 6:16-cv-1005-ORL-37-GJK, 2017 WL 362140, at *1 (M.D. Fla. Aug. 23, 2017), *aff'd*, No. 17-14254, 2018 WL 6822693 (11th Cir. Dec. 28, 2018) (finding developer plaintiffs failed to meet the robust causality requirement where they only presented statistical evidence showing that more racial minorities lived in Oviedo Town

Centre than the rest of Oviedo); *Schwarz v. City of Treasure Island*, 544 F.3d 1201, 1218 (11th Cir. 2008) (affirming the district court's grant of summary judgment on plaintiff's FHA disparate impact claim because plaintiff presented no comparative evidence of discrimination).

(*Id.*). Accordingly, the Court dismissed the disparate impact claim for lack of comparative statistical data showing disparate impact and "robust causality." (Doc. 18 at 13-14) ("River Cross presents no facts indicating that the County's implementation and enforcement of the Boundary Line had a disparate effect on minorities as opposed to non-minorities. In fact, River Cross presents no comparative data at all.").

The County successfully challenged the disparate impact claim brought by River Cross; however, the County did not directly address the "far more elusive"[29] theory of discriminatory effect under the FHA. The County did not specifically move for dismissal of the less frequently invoked theory of discriminatory effect, "segregative effect" allegedly caused by the County. As a result, the Court did not address the sufficiency of those allegations. Following dismissal of the disparate impact claim, River Cross opted not to file an amended complaint and, consequently, the segregative effect claim as pleaded in the Complaint moved forward through discovery.

---

[29] Robert G. Schwemm, *Segregative-Effect Claims Under the Fair Housing Act,* 20 N.Y.U. J. LEGIS. & PUB. POL'Y 709, 711 (2017). Professor Schwemm attributes the "elusiveness" of the segregative-effect theory to the lack of a clear analog in Title VII disparate impact employment discrimination law and the Supreme Court's lengthy analysis of disparate impact in the 2015 *Inclusive* Communities decision. *Id.*

On March 19, 2019, the County filed its Answer (Doc. 22) and subsequently filed a Motion for Judgment on the Pleadings, arguing that the Complaint failed to adequately allege the requisite "segregated housing patterns" or that the County's practices had a "causal effect" on segregated housing. (Doc. 26). The County's Motion was denied on the purely procedural finding that the County could not properly assert in its Rule 12(c) Motion for Judgment on the Pleadings an argument that it had not raised originally in its Rule 12(b) Motion to Dismiss. (Doc. 30 at 6). "[A] party's motion for judgment on the pleadings is not an opportunity for the party to re-argue the same issue it has . . . waived in a prior order" because allowing parties to do so "would undermine judicial economy." (*Id*. (citations omitted)). Thus, the Court denied the County's Motion for Judgment on the Pleadings but noted that the County was free to seek summary judgment on the issue:

> [I]n this case the County attempts to re-argue the issue—violation of the FHA causing a "segregative effect"—that it failed to properly support in its previous Motion to Dismiss, which led to the Court's denial. Judicial economy would indeed be undermined by allowing parties to revisit the issues they explicitly raised or necessarily should have addressed in a previous Rule 12(b)(6) motion. *Moreover, the County is not precluded from seeking summary judgment under Rule 56 on River Cross's* allegations that the County violated the FHA by implementing and enforcing the Boundary Line and denying its Application, which caused a segregative effect adversely impacting racial minorities more than other groups in Seminole County.

(*Id*. at 8 (emphasis added)). Thus, because the Motion was denied based on a purely procedural issue, the Court's decision did not address the merits of whether River Cross stated a prima facie case for segregative effect. "A claim may be frivolous

even if it survived a motion to dismiss, as although in some instances a frivolous case will be quickly revealed as such, it may sometimes be necessary for defendants to blow away the smoke screens the plaintiffs have thrown up before the defendants may prevail." *Introcaso v. Cunningham*, 857 F.2d 965, 967 (4th Cir. 1988) (internal quotation omitted). As the Court explained in detail in the Order granting summary judgment, because River Cross failed to establish the "robust causality" element— which applies equally to both disparate impact and segregative-effect claims, the County would have been entitled to dismissal on both discriminatory-effect claims at the Motion to Dismiss stage.

Even so, at the summary judgment stage, the County raised the issue of lack of causation and the Court found that River Cross had failed to establish a prima facie case because it had failed to produce *any* evidence of the County's "perpetuation" or "reinforcement" of segregative effect. (Doc. 61 at 57-86). In a lengthy discussion of the relevant Census data, the Court found that River Cross had not established the County's enforcement of the Boundary Line "perpetuated" or "reinforced" segregation because the data showed that the Rural Area had indisputably become more integrated from 2000 to 2018, even though the population in the area was declining. (*Id*. at 86). The Court discussed the Census data:

> Dr. Cowan [River Cross's expert] specifically does not contend that the Boundary Line "caused" the segregative effect in the Rural Area, and he concedes that "diversity" or integration has increased in the Rural Area. The only evidence River Cross can point to is the Census data that River Cross admits shows that the Rural Area is integrating and becoming more diverse . . . . Based on the 2010 Census data, the Rural

Area . . . was 90% white and 10% non-white. Eight years later at the time River Cross filed this lawsuit, based on 2018 ESRI figures, both Seminole County as a whole and the Rural Area had become less segregated and more integrated since 2000 (before implementation of the Boundary Line). The percentage of white residents in Seminole County overall has fallen to 75%, even as the overall population is estimated to have increased to 464,616 in 2018. (Doc. 35-15 at 10). The Rural Area has also become more integrated as the percentage of white residents in the Rural Area has decreased . . . despite implementation of the Boundary Line in 2004. (*Id.*)

According to Dr. Fishkind's Report [the County's expert] based on Census data from 2000 to 2018, the absolute level of white population in the Rural Area declined . . . . By contrast, the black population increased . . . . [and] the trend is also true for other minority groups, in that the Asian and Hispanic populations nearly doubled . . . even while the total population in the Rural Area was falling.

(Doc. 61 at 84-85 (citing Doc. 35-15 ¶ 36 (Fishkind Report)). Mr. Dorworth was asked at his deposition in reference to the statistician's report: "So you thought you had a segregative effect lawsuit, but [the statistician] did a report talking about the disparate impact, right?" He responded that, in his view, "[I]t's a distinction without a difference, in my mind. . . . I originally presented it at the county, but, again, I think that they thought this was a disparate impact lawsuit, and hence, blew off . . . *Dews v. Town of Sunnyvale* . . . But . . . at that moment I knew that [they] did not know the direction this lawsuit was going to go." (Doc. 35-3 at 253).

As the Court previously pointed out, the statistics River Cross cited simply showed that there were differing levels of diversity, in that more minorities lived in the western, more urban area of the County than the eastern Rural Area. (*See* Doc. 61 at 79, 82). Dr. Cowan testified that he did not analyze causation and he did not

look at whether the Boundary Line "caused" or perpetuated the segregative effect in the Rural Area. (*Id*. at 78, 83; Doc. 34-5 at 29, 97-98, 170). Therefore, the Court granted summary judgment to the County based on River Cross's failure to establish a prima facie case. (*Id*. at 82).

Moreover, even though River Cross's claim for segregative effect survived the Motion for Judgment on the pleadings on a procedural basis, Mr. Dorworth undoubtedly knew that the County had a legitimate non-discriminatory reason for enforcing the Rural Boundary. Thus, Mr. Dorworth's *continued pursuit* of the FHA segregative effect claim in this case—given his extensive experience with the County's planning and zoning guidelines, with the state of Florida's community planning goal of avoiding "urban sprawl," and with Florida's growth management restrictions—was "unreasonable" and "groundless."

Mr. Dorworth knew from his "years" on the Seminole County Planning & Zoning Commission, and as Vice Chair in 2004 when the Boundary Line was added to the County Charter, that the County's enforcement of the Rural Boundary and rejection of the extremely large commercial and dense residential project—where there was zero infrastructure in place—was unquestionably a "substantial, legitimate, *nondiscriminatory* interest" based on Seminole County's desire to avoid "urban sprawl." (Doc. 61 at 87). The County staff presented a slew of issues to River Cross early in the Application process at the Development Review Committee

("DRC"), on May 24, 2018, and again at the Planning and Zoning Commission meeting, on July 11, 2018. The Court summarized the issues:

> As the County staff identified, there were a significant number of issues with conversion of the rural-agricultural land to the proposed commercial and dense residential development: the lack of required central water and sewer services to the agricultural land, substantial obstacles to crossing the [Econ] River (and other natural resources protection areas); lack of existing transportation and explanation of plans to fund road expansion and improvements; the lack of transitions or buffer areas around the development; and the incompatibility of the project with surrounding agricultural and rural areas.

(*Id.* at 88; *see id*. at 18-22 (citing Doc. 35-5 at 5-11; Doc. 35-8)). River Cross did not respond to the issues raised by staff in the DRC Comments and instead requested to move forward the public hearing process; the staff raised the identical concerns with the River Cross project in front of the Planning and Zoning Commission. (*Id*. at 18, 23 (citing Doc. 35-5 at 11, 16)). The staff detailed the County's three-decade history of placing limits on "urban sprawl," which culminated in the voters passing the Charter Amendment in 2004. (*Id*. at 14-16 (citing Doc. 35-2 (BCC Tr.) at 26-36 (Presentation by R. Hammock, Planning and Dev. Div. Mgr.)). The Court summarized these legitimate, nondiscriminatory factors—every one of which would have been known to a former member of the County's Planning and Zoning Commission and state legislator like Mr. Dorworth:

> Since 1991, in order to avoid "urban sprawl," Seminole County's urban-rural boundary line has restricted development of commercial projects like the River Cross proposal to the western two-thirds of the County where there is sufficient infrastructure and vacant land. Undeveloped land in the County to the east of the [Econ] River Basin lacks the adequate infrastructure to support commercial and dense

- 28 -

residential developments, and is comprised primarily of parks, conservation area, agricultural land, and timberland. Single-family residences on five- and ten-acre lots—completely dependent on well-water and septic tanks— constitute the other fifth of the rural area. At the time the County considered the River Cross proposal in 2018, a significant amount of land in the urban area was vacant and still available for development of commercial and multi-family projects, with the concomitant infrastructure already in place. Seminole County has more than 5,000 affordable housing units located in this urban area close to transportation and employment.

(*Id.* at 3).

During the time period that Mr. Dorworth chaired the Planning and Zoning Commission (2004) and the Soil and Water Conservation District for Seminole County (2006), a "battle" was being fought between Seminole County and municipalities over the authority to regulate land development. Mr. Dorworth undoubtedly knew that (1) in 2004, voters passed the Charter Amendment giving the County preemptive authority over cities to prioritize growth in the urban area and control "urban sprawl"; and (2) the Charter Amendment's validity was upheld in May 2006 by Florida's Fifth District Court of Appeal. *Seminole County v. City of Winter Springs*, 935 So.2d 521, 523-24 (Fla. 5th DCA 2006) (Lawson, J.[30]). "[T]he voters of the County passed a Charter Amendment to solidify the County's preemptive authority to decide which projects would be developed on the eastern side of the Boundary Line [and] there would be no future high-density development

---

[30] Hon. Alan Lawson wrote the opinion for the three-judge panel of the Fifth District Court of Appeal; he was appointed to the Florida Supreme Court in 2016.

in the rural area until the vacant land in the urban area was depleted." (Doc. 61 at

88-89). Mr. Dorworth described this so-called "battle" in his own words:

> [T]here were two cities—the City of Oviedo and the City of Winter
> Springs—who were desirous to annex and sort of grow their base. And
> so it created—we'll call it the initial battle. Sort of sounds like Beowulf
> and Grendel. But I mean, like, it sort of set up the initial battle lines for
> the—for the rural boundary to come together. In 2004, they took it a
> step further by the county commission offering up language that
> would—and they call it a rural boundary, but really what the rural
> boundary is a county preemption of local government land use control
> within a certain boundary. And they inserted that in the constitution—
> I'm sorry—they inserted that in the charter via a vote, I want to say
> about a month before that.· And I was actually there for this. This was
> not a history-book exercise for me . . . I was living it.

(Doc. 35-3 at 24-25). Moreover, "[w]ithout question," a Florida county's denial of a

rezoning application to protect the area from "urban sprawl" is a legitimate

government goal. (*Id*. (quoting *Dibbs v. Hillsborough Cty., Fla.*, 625 F. App'x 515,

517 (11th Cir. 2015) (affirming grant of summary judgment to county on developer's

due process claim because "[i]t is well settled that the maintenance of community

aesthetics is a legitimate government purpose")).

The most significant and undeniable fact in support of the Court's finding Mr.

Dorworth's pursuit of the segregative effect claim was "unreasonable" is that he

*conceded* at his deposition that Seminole County had a legitimate interest in limiting

urban sprawl. He testified:

> Q. Do you recognize that the county has a legitimate goal to limit urban
> sprawl?
> A. Yes.
>     * * *

Q. [D]o you think that designation of urban and rural land is a legitimate government function in combating urban sprawl?

A. I think identifying them, yes.

(Doc. 35-3 at 253-54). Mr. Dorworth further testified:

Listen, it would be one thing *if this was a rural area* . . . . *We would not be in this lawsuit now if I would have gotten anything close to a fair shake in this application.* . . . [T]he rural boundary is a billy club that is used by a county commission and a bunch of angry neighbors to beat that property rights attempt in a certain geographic area. I find it very offensive.

(*Id*. at 254-55(emphasis added)). Mr. Dorworth testified that, because the Rural Boundary limited zoning to one-home per five or ten acres, he felt it contributed to the lack of diversity in the Rural Area. (*Id*. at 196). When the County's counsel asked him, "[W]hy wouldn't that apply to every single decision that a county ever makes *not* to zone more urban?" Mr. Dorworth explained his own theory of a "*de*segregative" effect, which was essentially to allow more intense development by cities, without regard to the Boundary Line. (*Id.*). He testified:

[T]wo cities—Winter Springs and Oviedo—that have [] sued for the right to annex and control their own land use density there.·. . . [T]hey would, as a function of that, want to be more intense than the three, five, or ten acre [lots] . . . And that [] greater density that they bring about . . . [in] an apartment complex, townhomes, single-family homes, would have the effect of converting . . . those three-, five-, and ten-acre lots, *which are highly likely to have only -- only white residents and would lead to a desegregative effect because it would allow for just natural development patterns, with the cities using their own police powers.* Instead of being preempted [by] the county, which is the case here, *you would allow the cities to do the desegregate[ing]—to have the desegregative effect.* . . .[Y]ou said, "well, why -- why would that not be true for everything?" Because usually if there's a piece of land that's three, five, or ten acres, there's nothing written in the law that says, even if you annex this to a city, they don't get to choose it anymore. It

stays this way.· . . . And, "Oh, look, the way we do it is to say we are never going to move this [rural boundary]." So it's basically, you know -- these county commissioners, they sign. They go to the paper and say they are not going to vote for it. One of them signed a petition during the -- during the election . . . that said she would never remove the rural boundary.· So as a result -- they've already said they're not going to do that. . . . [Y]ou combine with the fact that . . . *the county forcing these things to stay three, five, and ten acres versus letting a city go in there and do that, I think does promote a segregative effect.*
\* \* \*
But what I think they definitely did was slow down growth in the county by voting against all the growth for a long period of time, you know, dating back to, you know, the early '90s, when they—they started— when the commission wouldn't take up and do the final adoption on this through the creation of a rural area through the ultimate rural boundary being formed. They were not exactly signing things up. And as evidence that it was heading that way, they created the boundary to stop Winter Springs and Oviedo from being able to do it. Because it's my contention that the great "densifier" [sic] of that area is not the county; it's always going to be the cities.

(*Id.* at 196-98, 204) (emphasis added). To that end, Mr. Dorworth testified that he had discussions "about annexing the property" with the city manager and mayor of the City of Oviedo, who said they "would be interested" in annexation and "open to" installing "a bridge" to alleviate traffic because "it would be better for the city." (*Id.* at 198-99).

However, according to Mr. Dorworth, the City officials would not engage in even "preliminary negotiations" about the project because "the city had spent too much time and money fighting" the County "over inter-local agreements" and "transition areas" so they told him, "when you get that [approval] done," they would "definitely be interested." (*Id.* at 200). There was an additional hurdle to annexation into the city for River Cross, but one he had plans to overcome. Because the River

Cross property was not contiguous to the City of Oviedo and therefore not eligible for annexation, Mr. Dorworth had approached another landowner about purchasing his 88-acre cattle ranch that *was* contiguous to the City. As a second alternative, Mr. Dorworth said he knew there were "other combinations of property that you can buy to get to the city," even through a "forced" annexation. (*Id*. at 201). Mr. Dorworth did not think the proposed River Cross land in the Rural Area was "necessarily rural" but believed that it had been "forced rural" for "the last 25 years, [since the 1990s] because you can't do anything with it." (*Id.* at 202).

By conceding that the County had a legitimate interest in limiting urban sprawl and in following Florida's legislatively developed community planning guidelines, Mr. Dorworth knew that the FHA "segregative effect" claim could not possibly succeed. Therefore, the Court finds that River Cross's filing of the "segregative effect" claim was "unreasonable" and "groundless." Furthermore, Mr. Dorworth is extremely well versed in Florida's laws governing growth management, real estate development, and containment of "urban sprawl," from his years writing and sponsoring such legislation in the Florida Legislature. He served as vice chair for the House Appropriations and Finance and Tax Committees and sponsored numerous bills on these exact topics. Since Mr. Dorworth left the Florida House of Representatives, he has spent an additional nine years working as a lobbyist. He testified that he "represents affordable housing clients. . . . [and] served as a legislator":

I was on the committees that oversaw growth management laws. I would . . . with some frequency . . . amend those things. I worked with the Florida Housing and Finance Corporation. I'm *intimately familiar* with the application process by which people proceed to get federal funding, whether it be Section 8, whether it be [sale] money, ship money, whether it be the tax bonds, you know, four-and-a-half percent, nine percent.·. . . *I have a pretty high level of understanding of the affordable house universe;* how it works; how the *application process is scored*; the different venues by which tax credits can be procured. The requirements that would go along with that--you know, to cite a simple example of that is, you mentioned *transit* earlier. That some proximity–like if you were a certain distance within a bus stop, that you're more likely to, you know, get—score points on that. So, yeah. I mean, I have done a fair amount of lifelong research on that, but I didn't have to go back and, you know, augment that for the purpose of this application.

\* \* \*

[I]t is sort of a well-accepted axiom that -- that the – that an affordable housing development community would likely have a diversifying effect .·. . [based on] [m]y experience doing applications and working with developers; understanding the product blend;·understanding what the actual applications consist of; understanding -- and just really having gone through the process many, many times on behalf of others [and] [o]bserving the process at the Florida Housing and Finance Corporation.

(Doc. 35-3 at 205-07) (emphasis added). However, he admitted that he had "never developed in the rural lands before," he "had not studied any affordable housing projects in rural areas," and he had "no direct causation of what would happen there." (*Id*. at 207). However, he believed the area was "substantially underrepresented" and based on a "simple functional algebra equation" he could say that River Cross "would theoretically uplift the diversification of the area and would reduce" what he characterized as "the segregative effect" primarily because "the very idea of making River Cross there was [that] it was not going to be in the rural area anymore"

because, once the bridge he planned was built, River Cross would be (in his estimation) "only 1.6 miles away" from the urban area. (*Id*. at 208-09). He also conceded that "*there was no way to know whether*" the affordable housing would be approved at the state level; it was "conditional" and it "might be a year [or] two before they even have a chance to rule" on the applications. (*Id*. at 211-13 (emphasis added).

Since the Supreme Court decided *Inclusive Communities* in 2015—three years before Mr. Dorworth brought suit against the County—plaintiffs in segregative effect cases have been required to establish "robust causality" with the Supreme Court setting "safeguards" to protect zoning officials against "abusive" claims, giving them latitude to make decisions affecting a community's "quality of life" based on "a mix of factors, both objective (such as cost and traffic patterns) and, at least to some extent, subjective (such as preserving historic architecture)." 135 S.Ct. at 2522. "These factors contribute to a community's quality of life and are legitimate concerns for housing authorities." *Id.* An FHA discriminatory-effect claim that relies on a statistical disparity" or "racial imbalance" does not, without more, establish a prima facie case" and "must fail if the plaintiff cannot point to a defendant's policy or policies causing that disparity." *Id*. at 2523.

The Court finds that it was "unreasonable" of Mr. Dorworth, as River Cross Land Company's sole decisionmaker to pursue Fair Housing Act claims—in spite a lack of evidence of "disparate impact" or causation of a "segregative effect" by the

County and no firm plan for "affordable housing" to serve minority population—all in an attempted end-run around the Charter Amendment's preemption of city-annexation in the Rural Area. This is evident in his admission that he had no familiarity with any affordable housing being built in a rural area, that he simply relied on the general "axiom" that affordable housing "would likely have a diversifying effect," but he had no actual data for his particular proposal,[31] and no evidence of any "segregative effect" other than a larger minority population resided on the urban side of the Rural Boundary. This is a far cry from "segregative-effect cases in which municipalities were accused of using their land-use powers to block non-profit integrated housing developments in certain neighborhoods, towns and villages which were virtually all-white communities." (*See* Doc. 61 at 59-60 (citing, *e.g.*, *Huntington,* 844 F.2d at 937-41; *Arlington Hts.,* 558 F.2d at 1286-87, 1291)).

Moreover, the FHA does not apply in cases in which non-minority real estate investors allege damages from zoning board denials of their applications for what is essentially a business or commercial venture—even if the property itself fits the definition of a "dwelling" under the FHA—where they had no intention of residing in the property and were not suing on behalf of the protected class members who would reside there. In the case of River Cross, Mr. Dorworth testified he had no evidence of who would reside in the affordable housing units, he was operating on

---

[31] River Cross did not dispute that its proposal failed to include any demographic information for the individuals who would be expected to move into the River Cross Project.

the basis of an "axiom" that the residents would be more diverse. (*Id*. at 55-56 (citing cases in which there was solid evidence from waiting lists at neighboring properties or federal FHA programs)).

Mr. Dorworth, based on his own testimony, was well aware that the County had a legitimate interest in limiting "urban sprawl," that Florida community-planning statutes sought to avoid "urban sprawl," and he was "intimately familiar" with growth management legislation as well as affordable housing guidelines. Additionally, based on his experience as a consultant on clients' affordable housing projects, it was "unreasonable" for Mr. Dorworth to believe he stated a claim for segregative effect under the FHA when the vast majority of the proposed project was a very large commercial venture with only 5% of the total proposed residence (75 of 1370) proposed as affordable housing[32]—that would take one to two years to receive approval, and under prevailing state affordable housing guidelines, would almost certainly never be approved in a rural area with no transportation, no jobs, and an extremely bad index score for a lack of "affordability."[33] Moreover, based on his previous County zoning experience, he would have known that there was sufficient

---

[32] Mr. Dorworth stated at his deposition in 2019 that the number of units he "earmarked" for affordable housing was "205" or 15% of 1370 (Doc. 35-3 at 209), when the proposal to the BCC actually said "15% of the multi-family units" which was 15% of 500, a far smaller number, 75 units.

[33] A "good score" should not "exceed 45 to 50 percent" of a resident's income. (Doc. 35-2 at 46). The River Cross proposed site was in an area with a high number, "between 78 and 87 percent of any household in this area's income could be devoted to both transportation and housing costs, and that's because of its distance away from transit, bus services, things of that nature, which could cause a significant strain for households that have a limited income source." (*Id*. at 46-47).

urban land still available for affordable housing in areas with better index scores near transportation and jobs.

Given his extensive experience in County planning roles and in the state Legislature, it was furthermore "unreasonable" for Mr. Dorworth to use that relatively tiny number of units—which were virtually certain not to be approved as "affordable housing" in the rural area—in order to threaten the County at the well-attended BCC hearing with a federal Fair Housing Act lawsuit [34] alleging "segregation" and "discrimination" in an attempt to pressure the County into approving the large and mostly commercial project. "At the public hearing, River Cross raised the specter of litigation under the federal Fair Housing Act unless the County was willing to 'move the rural boundary' to accommodate the entire River Cross proposal and 'bring the rural boundary into greater compliance with the federal Fair Housing Act.'" (*Id.* at 3 (quoting Doc. 35-2 at 91-92)). The Court previously noted the last-minute[35] addition of "affordable housing" shortly before the BCC hearing:

> River Cross decided to add the "affordable housing" provision to its
> application at the last minute, just two days before the County
> Commission meeting and after it became clear that County staff and the

---

[34] The publicity surrounding the River Cross Application instead had the opposite effect and met resistance from County residents, many of whom spoke at the BCC meeting or contacted Commissioners.

[35] Although River Cross argues that it had raised the issue and cites to a prior mention of the phrase "affordable housing" in its proposal before May 2018, there was no specific description or consistent plan. See Doc. 65-1 at 19 (May 1, 2018 Report of Consultant S&ME stating River Cross "will dedicate 15% of project's housing units-rental or owner occupied to workforce/affordable housing offerings within the mixture of housing products"). The DRC comments noted that the proposal failed to state what income level would be served, whether it would be subsidized, and the definition of "affordable housing" for the project. (Doc. 65-2 at 100.

[planning and] zoning commission would recommend denial of the
River Cross application. During the County Commission meeting,
although River Cross represented that it intended to develop what it
characterized as one of "the best premier communities" in Seminole
County, River Cross disingenuously used the threat of a lawsuit under
the federal Fair Housing Act as the fulcrum to urge County
Commissioners to approve the entire River Cross proposal for 1.5
million square feet of commercial space and 1370 densely grouped
residential units.

(Doc. 61 at 2-3). As another district court explained three decades ago, civil rights-

oriented statutes were enacted to assist "historically disadvantaged" persons or their

representatives,[36] and not "sophisticated businessmen" who are disappointed with

denials for their commercial projects:

It is clear that "while Congress wanted to clear the way for suits to be
brought under the [Civil Rights] Act, it also wanted to protect
defendants from burdensome litigation having no legal or factual
basis." [*Christiansburg*] at 420. The general assumptions implicit in the
"equitable considerations" about the typical civil rights plaintiff, *i.e.*, an
oppressed and financially disadvantaged and perhaps unsophisticated
individual as well as the "important policy objectives" are not squarely
presented here. The civil rights laws were intended to secure to
historically disadvantaged persons the rights and privileges enjoyed by
the majority class and to provide a federal remedy when state and local
means of redress were foreclosed to any person. Here, the plaintiff real
estate developer, who may reasonably be presumed to possess a

---

[36] The typical FHA plaintiffs are tenants or non-profit groups committed to integrating the
housing available in historically racially segregated communities (as in *Huntington*) or providers
of housing for the disabled, or elderly. *See, e.g., Coleman v. Cranberry Baye Rental Agency*, 202
F.R.D. 106 (N.D.N.Y. 2001) (prospective renters alleged rental agency wrongfully refused to rent
to them because of their race in violation of the FHA); *United Farmworkers of Florida Housing
Project Inc. v. City of Delray Beach, Fla.*, 493 F.2d 799 (5th Cir. 1974) (farm workers organization
suing under the FHA for city's refusal to provide tor farmworkers' housing project water and sewer
services that it had provided to whites); *Cohen v. Twp. of Cheltenham, Pennsylvania*, 174 F. Supp.
2d 307 (E.D. Pa. 2001) (proposed group home operators sued township and zoning board under
FHA for claims arising out of denial of application to open home for handicapped children); *but
see Nasser v. City of Homewood*, 671 F.2d 432, 437–438 (11th Cir. 1982) (developer did not have
standing to sue under the FHA where he alleged a purely economic injury without any specific
plans to build a development that would demonstrably house minority tenants).

sophistication in business and other matters as well as the means or talents to secure financial resources, complained . . . that private defendants conspired with local government officials and assumed certain governmental powers to deprive the "out of town" land developer plaintiff of equal protection and due process rights. Nowhere did it appear that plaintiff was either a historically disadvantaged person or had been foreclosed from pursuing an adequate state remedy.

*Vito v. Bray*, 1994 WL 249783, *1 n.3, Civ. A. No. 89-8722 (E.D. Pa. June 3, 1994)

(applying the *Christiansburg* standard on remand where real estate developer's civil

rights lawsuit was dismissed). River Cross's lack of standing to assert an FHA claim,

failure to establish a prima facie case, and acknowledgement that the County had a

legitimate non-discriminatory reason for enforcing the Rural Boundary weigh in

favor of finding the FHA claims were "unreasonable and groundless."

## 2. The County Made No Offer To Settle The Case

River Cross argues that the County entered into a "negotiated settlement plan"

"to potentially resolve this litigation" two months ahead of trial, and the timing

"comports with a finding that [River Cross's] claims had merit." (Doc. 65 at 14-15).

River Cross further argues that if its claims were "frivolous" then the County" would

never have agreed to any settlement plan short of [River Cross] dismissing its claims

with prejudice." (*Id*. at 16). In contrast, the County contends that it did not offer to

settle the case by serving an offer of judgment or proposal for settlement on River

Cross. (Doc. 63 at 10).

River Cross mischaracterizes the County's role in the "settlement plan,"

which merely froze the case in place to allow River Cross to present *its own* proposal

to the County—not a settlement offer *from* the County. On January 24, 2020, River Cross served the County with a settlement offer that included the opportunity for River Cross to resubmit an application for the County's review. (Doc. 63 at 11). The County contends that the opportunity for River Cross to resubmit its application was not contingent on its FHA claim in this lawsuit and the County "has consistently held the position that [River Cross's] claims in this action are frivolous." (*Id.*). The County maintains that it "initially accepted [River Cross's] Settlement Offer to re-submit its application for potential approval contingent on [it] addressing the County's issues and comments in the initial denial and showing its ability to meet the standards that the County requires." (*Id.*)

On February 10, 2020, the Court administratively stayed the case at the parties' request until the time of the BCC's August 2020 meeting to allow time for River Cross to submit its "land swap" proposal to the County for it to be considered through the County's administrative process. (Doc. 50). The County, unlike a private party litigant, has certain steps it must follow in considering development applications as a local government entity that faces due process concerns. The County—unlike a for-profit private corporation who could have stood fast to reject all settlement overtures—had a heightened obligation to consider River Cross's resubmission. Nonetheless, River Cross's land swap proposal was not accepted. On April 28, 2020, the Seminole County Board of County Commissioners met and voted—four months early—to terminate any further consideration of the River Cross

proposal for the land swap. (Doc. 54 (May 7, 2020 Status Report)). No further settlement discussion or overtures occurred after that.

On August 14, 2020, the parties jointly moved to lift the administrative stay in this Court (Doc. 56) and reactivate the parties' dispositive and *Daubert* Motions (Docs. 34, 35, 36) without additional briefing of the issues on the segregative-effect claim. On January 26, 2021, the Court granted the Joint Motion to Reopen and Lift Stay (Doc. 56), set the case for trial, and reactivated the parties' dispositive Motions. (Doc. 60).

On April 1, 2021, Mr. Dorworth emailed another revised proposal from River Cross to the County attorney seeking approval for development of a significantly reduced commercial space of "200,000 square feet of space for offices, stores, and restaurants" and "1338 residential units."[37] However, the County Commissioners voted against this modified proposal just two weeks later.[38] The County's failure to make any settlement offer weighs in favor of finding the FHA claims were frivolous.

### 3. The Case Was Dismissed Before Trial

Early in the case, the Court granted the County's Motion to Dismiss River Cross's disparate impact claim. *See Beach Blitz*, 13 F.4th at 1299 (dismissal for

---

[37] *Dorworth Pitches New Proposal for River Cross Property*, ORLANDO SENTINEL (April 7, 2021). *See* https://www.orlandosentinel.com/news/seminole-county/os-ne-seminole-river-cross-dorworth-new-plan-20210407-jp37dvle5fgpddoioywlhczfsi-story.html.

[38] *Seminole Commissioners Reject Dorworth's Latest River Cross Proposal After Closed-Door Meeting*, ORLANDO SENTINEL (April 21, 2021). *See* https://www.orlandosentinel.com/-news/seminole-county/os-prem-seminole-county-river-cross-dorworth-meeting-20210421-b4xhwc2e5nbg7b2aa2ah2va2u4-story.html.

failure to state a claim under Rule 12(b)(6) is considered a "judgment on the merits") (citations omitted). Following dismissal of the disparate impact claim, River Cross's only remaining claim[39] alleged that the County's actions in denying its application and "implementing and enforcing" the Boundary Line "reinforced" or "perpetuated" a segregative effect in violation of the Fair Housing Act. The Court subsequently granted summary judgment to the County on River Cross's segregative effect claim. Therefore, the County is the prevailing party in this Court. *See Head v. Medford*, 62 F.3d 351, 355 (11th Cir. 1995) (a defendant who obtains summary judgment in its favor is the prevailing party).

"Generally, a party that is entitled to an award of attorneys' fees in the district court is also entitled to an award of attorney's fees on appeal." *Legal Voice v. Stormans Inc.*, 757 F.3d 1015, 1016 (9th Cir. 2014) (awarding § 1988 attorney's fees on appeal when the plaintiff won on the merits in the district court and on appeal). River Cross filed a notice of appeal in this Court, however, on appeal at the Eleventh Circuit River Cross opted to voluntarily dismissed its appeal on the day its brief was due. Where a plaintiff voluntarily dismisses a claim that the court later determines is "frivolous," and the plaintiff withdrew the claim "to avoid a disfavorable judgment on the merits," a fee award to the "prevailing defendant" is warranted. *See Dean v. Riser*, 240 F.3d 505, 508 (5th Cir. 2001); s*ee also Evans v. Monroe County Sheriff's*

---

[39] River Cross asserted separate but duplicative counts for money damages and injunctive relief under the same provision of the FHA; the two counts were based on the same actions by the County. (Doc. 1 at 6-10).

*Dept.*, 148 F. App'x. 902, 903 (11th Cir. 2005) (affirming award of fees under *Christiansburg* where plaintiff voluntarily dismissed "frivolous" § 1983 claims). Thus, the County was also the "prevailing defendant" on appeal in this case where River Cross filed a notice of appeal of the Court's determination that the developer had failed to state a prima facie case under the FHA. River Cross's decision to file the notice of appeal *and* then allow the full briefing period to run before dismissing the appeal on the day its brief was due required the County to prudently begin researching and drafting its response brief. Under the facts of this case, the Court finds that River Cross's voluntarily dismissal of its appeal was "to avoid a disfavorable judgment on the merits" and an award of fees to the County for the appeal is warranted. *See Dean*, 240 at 508 ("Upon the defendant's motion, the court must determine that the plaintiff's case was voluntarily dismissed to avoid judgment on the merits."); *Schere v. School Bd. of Miami-Dade County, Fla.*, No. 06-22653-CIV-UNGARO, 2007 WL 9705866, *6-8 (S.D. Aug. 30, 2007) (awarding "prevailing defendants" attorney's fees under § 1988 where certain claims had been voluntarily dismissed; discussing similar cases where fees were awarded to "prevailing defendants" in cases with voluntary dismissals). This factor weighs in favor of finding the FHA claims were "unreasonable."

## IV.   CONCLUSION

All three *Sullivan* factors weigh in favor of finding that River Cross's FHA claims were "unreasonable and groundless." River Cross lacked standing to assert a

segregative-effect claim and failed to establish a prima facie case having no evidence of causation by the County. Mr. Dorworth conceded that the County had a legitimate non-discriminatory reason to enforce the Rural Boundary, and he was well aware of Florida's guidelines to avoid "urban sprawl." In addition, the County's failure to make any settlement offer as well as the Court's dismissal of River Cross's claims before trial also weigh in favor of finding the FHA claims were "unreasonable and groundless." Mr. Dorworth's unrelenting attempts to invalidate the Rural Boundary—using a last-minute, unfounded claim of violation of the federal FHA—when he knew that he had no evidence of "robust causation" by the County zoning board he previously chaired was completely unreasonable, groundless, and bordering on bad faith. Accordingly, the County is entitled to recover its reasonable attorney's fees and nontaxable costs.

Based on the foregoing it is **ORDERED** as follows:

1. Seminole County's Motion for Entitlement to Attorney's Fees in the District Court (Doc. 63) is **GRANTED**.

2. Seminole County's Motion for Entitlement to Attorney's Fees in the Court of Appeals (Doc. 73) is **GRANTED**.

3. Pursuant to Local Rule 7.01(c), Seminole County is **ORDERED** to file a supplemental motion within 45 days of the date of this Order.

**DONE** and **ORDERED** in Chambers, in Orlando, Florida on March 29, 2022.

ANNE C. CONWAY
United States District Judge

Copies furnished to:

Counsel of Record