UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

CHRISTOPHER E. DORWORTH,

     *Plaintiff,*

v.

JOEL MICAH GREENBERG,
ANDREW W. GREENBERG,
SUSAN GREENBERG, ABBY
GREENBERG, AWG., INC.,
GREENBERG DENTAL
ASSOCIATES, LLC, GREENBERG
DENTAL & ORTHODONTICS, P.A.,
and GREENBERG DENTAL
SPECIALTY GROUP, LLC,

     *Defendants.*

Case No.: 6:23-cv-871-CEM-DCI

**DEFENDANTS' MOTION FOR ENTITLEMENT
TO ATTORNEY'S FEES, COSTS, AND SANCTIONS**

In 2017, Chris Dorworth—a former state legislator turned lobbyist—reveled in the prestige of connected friends, like Congressman Matt Gaetz, entertaining them with parties featuring illicit drugs and young women. Many women who attended Dorworth's parties were recruited and paid by his new protege, Joel Greenberg, a political novice recently elected to local office. But everything collapsed after Joel was indicted for stalking in June 2020. The ensuing investigation quickly turned to Joel's activities with A.B., a 17-year-old girl he recruited for sex work in summer 2017. Police met and asked A.B. about her activities with Joel, and A.B. quickly identified Joel, Dorworth, and Gaetz, as men she had sex with while age 17.

A.B. then testified before a grand jury. Soon afterward, Dorworth learned that grand jury proceedings involved questions about him, Gaetz, and a July 15, 2017 party at Dorworth's home that A.B. attended while age 17. Betraying his guilt, Dorworth lied to investigators that he did not attend the party at his home and never met A.B. Spinning a tale from a meeting and text exchange with Joel, Dorworth claimed that he was the victim of a conspiracy—that Joel was paying A.B.'s lawyers, controlling her testimony, and punishing Dorworth for refusing to try to convince then-President Trump to pardon Joel. Despite Dorworth's efforts, the investigation became national news in spring 2021, largely because it involved Congressman Gaetz. In early April, the *New York Times* confronted Dorworth with reports that the FBI was investigating whether he had sex with A.B. while she was a minor. Dorworth then quit his lobbying firm and then laid low for two years—only acting after A.B. threatened to sue him for sex trafficking and statutory rape at the end of 2022.

1

In a nearly 1,000 paragraph complaint, Dorworth swore under oath that he was the victim of a vast conspiracy in violation of the Racketeer Influenced and Corrupt Organizations Act (RICO). Dorworth—preposterously—accused Joel's ex-wife, Joel's parents, and dental-practice entities associated with Joel's father, of conspiring with Joel's sex trafficking victim, A.B., to falsely accuse Dorworth and Gaetz of sexual misconduct. This conspiracy's supposed goal was to help reduce Joel's sentence and retaliate for Dorworth's refusing to seek a pardon for Joel. In his complaint, Dorworth lied by claiming that he did not know if A.B. had been to his home and that he never met nor partied with A.B. He then repeated his lies and frivolous theories in a second complaint that he and his wife both verified under oath.

Though Dorworth's accusations were plainly false, it took great expense[1] to investigate and prove them false and baseless through over 16 months of proceedings. First, Dorworth's guest ledger from his gated community revealed that A.B. attended the July 15, 2017 party while she was a minor. A.B. and her friend K.M. then testified that Gaetz and Dorworth were present at that party, that Gaetz had sex with A.B. at the party, and that Dorworth knew Gaetz had sex with A.B. They also testified that nobody influenced their past testimony to investigators or paid their attorney's fees and costs. Thus, notwithstanding Dorworth's effort to deflect and deny wrongdoing

---

[1] Pursuant to LR 7.01(b)(2), Defendants provide their respective fair estimates of the amount of fees and costs sought to be recovered: Andrew and Susan Greenberg and AWG, Inc. have incurred approximately $935,000 in attorney's fees and $1,086.63 in taxable costs. Andrew and Susan Greenberg have incurred an additional $28,810.67 in taxable costs. Abby Greenberg has incurred approximately $360,000 in attorney's fees and $35,844.89 in taxable costs. The Greenberg Dental entities incurred approximately $150,000 in attorney's fees.

by raising an entirely implausible and baseless claim of conspiracy, unrebutted evidence shows exactly why Dorworth became the subject of investigation.

In July 2024, Defendants also obtained Dorworth's cell phone location records, proving that he was present at the July 15, 2017 party. Even faced with these records, Dorworth perjured himself with impunity, swearing he was almost 10 miles away that night. With such proof, Andrew, Susan, and Abby Greenberg served a Rule 11 motion on Dorworth's counsel. Beyond detailing unanimous firsthand testimony disproving any conspiracy, the motion cited new evidence. Most critically, the respected former federal prosecutor that Dorworth said Defendants had paid to secure false testimony from A.B. further refuted Dorworth's theory in a declaration explaining that he met A.B. only once, that he never represented A.B., that he was never paid to meet A.B., and that he was never contacted by any defendant but A.B.

During Dorworth's 21-day Rule 11 safe harbor period, an affidavit by B.G.—who Dorworth claimed would credibly testify to his absence at the July 15, 2017 party—further proved Dorworth's claims false. B.G. confirmed that she attended the party, that Dorworth was present for almost all of the party, and that A.B. was naked in his presence during the party. Two days after B.G. signed her affidavit and five days before the Rule 11 safe harbor period expired, Dorworth finally dismissed his entire case—effectively conceding its frivolousness from the start. Defendants now seek their reasonable attorney's fees under (1) Florida's RICO statute and (2) the Court's inherent powers. Defendants also seek to convert Dorworth's dismissal without prejudice to a dismissal with prejudice as a sanction under the Court's inherent power.

*First*, precisely because treble damages might tempt plaintiffs to improperly assert costly-to-defend RICO claims, Florida's RICO act allows defendants to recover their "attorney's fees and court costs" for claims pursued "without substantial fact or legal support." § 772.104(3), Fla. Stat. A defendant can make this showing even "after a plaintiff's voluntary dismissal of the claim." *Royal Palm Vill. Residents, Inc. v. Slider, Inc.*, No. 8:19-CV-874-CEH-SPF, 2021 WL 4452898, at *5 (M.D. Fla. Sept. 29, 2021); *see also Wardak v. Goolden*, No. 1:19-CV-21121-RAR, 2020 WL 6749171, at *5 n.4 (S.D. Fla. Sept. 8, 2020) (same).

Defendants' burden under § 772.104(3) is far, far lower than it would be under Florida's Rule 11 analogue—§ 57.105, Fla. Stat.—which itself "does not require a finding of frivolousness." *Martin Cnty. Conserv. All. v. Martin Cnty.*, 73 So. 3d 856, 858 (Fla. 1st DCA 2011); *Hartford Ins. of the Midwest v. Miller*, 681 So. 2d 301, 302 (Fla. 3d DCA 1996) (explaining that § 772.104(3)'s standard is "much less strict than that contained in Florida Statute section 57.105(1)"). This "less stringent" standard serves to "discourage frivolous Rico claims … because the stigma and burden of defending such claims is so great." *Miller*, 681 So. 2d at 302. Thus, though they can and will, Defendants need not show that Dorworth's claim was frivolous, that he lied, or that there was a "complete absence of a justiciable issue of either law or fact." *Id.* (citation omitted). As discussed below, Defendants need only show that Dorworth's RICO claim lacked substantial support (considering the evidence as it was when he dismissed)—a point Dorworth effectively conceded in dismissing his whole case to avoid a Rule 11 motion.

*Second*, this Court has the inherent power to impose sanctions when a party acts in subjective bad faith, *Hyde v. Irish*, 962 F.3d 1306, 1310 (11th Cir. 2020), such as when a party repeatedly lies under oath, *Obukwelu v. Bd. of Trs. Fla. State Univ.*, 837 F. App'x 686, 688 (11th Cir. 2020). Sanctions may include awarding fees. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45 (1991). Beyond fees, the Court's inherent powers include broad "discretion … to fashion an appropriate sanction for conduct which abuses the judicial process." *Id.* at 44–45. On top of awarding fees, the Court should use that power to convert Dorworth's dismissal without prejudice into one with prejudice—something the Court may do even after a notice of voluntary dismissal. *See Zow v. Regions Fin. Corp.*, 595 F. App'x 887, 889 (11th Cir. 2014) (affirming conversion of voluntary dismissal under Rule 41(a)(1)(A)(i) to dismissal with prejudice). Here, Dorworth plainly acted in bad faith when he lied under oath for over 16 months—from his first complaint to his deposition about a month before dismissing this action. Defendants thus meet the standards for this Court to award attorney's fees and impose the sanction of dismissal with prejudice against Dorworth.[2]

## BACKGROUND

### I. On July 15, 2017, Dorworth attended a party at his home featuring illicit drugs and young females, including an underage sex worker.

After Joel was first elected to office in 2016, Dorworth befriended, worked, and socialized with Joel. *See* Doc. 1-1 ¶¶ 211, 213, 222. By summer 2017, Joel was

---

[2] Throughout, "Defendants" refers to the parties bringing this motion: Andrew, Susan, and Abby Greenberg, and AWG, Inc., Greenberg Dental Associates, LLC, Greenberg Dental & Orthodontics, P.A., and Greenberg Dental Specialty Group, LLC.

regularly meeting teen girls and women in their early twenties through a website and recruiting them for sex with himself and others in exchange for compensation. A.B.—a then-homeless 17-year-old high schooler—was one of his recruits. *See* Ex. 1 at 23:2–23, 26:2–8.[3]

On July 15, 2017, A.B. and others attended one of multiple parties at Dorworth's home that involved "alcohol; cocaine; middle-aged men; and young attractive females." Doc. 183-2 ¶ 24; Ex. 2 ¶¶ 16, 19. This party sits at the heart of this case. A.B. testified that Dorworth was at the party. Ex. 1 at 77:11–20. Both "[c]ocaine and molly" were offered, and A.B. did molly and drank alcohol. *Id.* at 84:3–10. A.B. testified that she had sex with Gaetz—who also attended—twice that evening,[4] once on a "pool table or … air hockey table."[5] *Id.* at 107:7–25. A.B. testified that Dorworth saw Gaetz have sex with her on the game table and then laughed and talked about it with other partygoers. *Id.* at 108:10–22. She also testified to dancing naked in Dorworth's presence that evening. *Id.* at 101:13–102:8. In turn, Dorworth testified that A.B.'s

---

[3] Because, though confidentiality designations under the parties' confidentiality agreement, Dorworth has claimed that many of the documents relevant to this motion are subject to protection from disclosure under applicable law, Defendants are contemporaneously filing a motion to seal Exhibits 1, 2, 4, 11, 12, 13, 19, and 27. Defendants do not believe these exhibits should be maintained under seal and ask that the Court deny the motion to seal and permit filing on the open docket. In the interim, however, the Court may access these exhibits as attachments to Defendants' motion to seal.

[4] At his deposition, Dorworth challenged A.B.'s claim that one of these encounters occurred in a guest bedroom overlooking the pool. Ex. 1 at 96:21–25 ("It was upstairs in the bedroom looking at the pool."). Dorworth claimed that no such bedrooms exist. Doc. 183-5 at 347:12–13 ("There is no bedroom in my home other than my room that can see the pool."). But Dorworth's wife, Rebekah Dorworth, testified that "[y]ou can see the pool out of a couple of bedrooms" in the Dorworth home that she would describe as guest bedrooms. Doc. 181-1 at 398:17–20. Though a minor point, it neatly encapsulates Dorworth's refusal to tell the truth under oath.

[5] Ms. Dorworth confirmed the presence of an air hockey table in her house during this time period. Doc. 181-1 at 261:1–9.

testimony about her being naked in his presence was a "100 percent guaranteed lie." Doc. 183-5 at 353:16–18.[6] But B.G., another attendee at that party, confirmed A.B.'s testimony under penalty of perjury. Ex. 2 (Doc.) ¶ 16 ("[O]n July 15, 2017, I observed [A.B.] naked in the presence of Christopher Dorworth at the Dorworth Residence.").[7]

K.M., then-aged 20, also attended the party. *See* Ex. 3 at 6; Doc. 181-1 at 252:23–253:8 (Ms. Dorworth confirming that a July 15, 2017 video depicts K.M. at Dorworth's home). K.M. recounted sex acts with multiple men at the party. Ex. 4 at 27:20–28:3. She also observed Gaetz have sex with A.B. downstairs against an "air hockey or pool" table. *Id.* at 31:3–21. Both K.M. and A.B. swam nude in Dorworth's pool and in Dorworth's view that evening. Ex. 4 at 32:19–33:17. K.M. took molly during the party, *id.* at 38:11–12, and saw a male guest doing cocaine, *id.* at 41:2–5. From her experience that evening, K.M. testified that it was "not possible" that Dorworth was not at the July 15, 2017 party. *Id.* at 318:25–319:3.

## II. Three years later, Joel was indicted and a broader investigation ensued.

In June 2020, Joel was indicted for stalking a political opponent. After further investigation, Joel was charged with and ultimately pleaded guilty to sex trafficking a child (A.B.) and to identity theft, wire fraud, stalking, and conspiracy. *See* Ex. 5 at 1–

---

[6] Dorworth designated his entire deposition transcripts confidential *after* he dismissed this action and *after* those transcripts were filed on the record. He has made no effort to remove those transcripts from the record. Even so, to avoid any accusation that Defendants have somehow violated the parties' confidentiality agreement, Defendants have redacted portions of this motion citing Doworth's deposition transcripts.

[7] Falsely maintaining that he had never met A.B., Dorworth also testified that—had he seen A.B. at his home that night—he surely would have asked for her ID "[b]ecause she looked like she was young." Doc. 183-5 at 352:14–353:15.

2. Soon after his first indictment, Joel allegedly confronted Rebekah Dorworth at a resort, saying "that it would be better for everyone if he got a pardon" and expressing concern that Gaetz and another man might have criminal exposure if people found out they had sex with A.B. Doc. 181-1 at 352:12–18, 354:1–14, 359:16–360:13.

Dorworth, in his verified complaints, recounted meeting Joel soon after that alleged incident. Doc. 1-1 ¶¶ 362–391; *see also* Doc. 62 ¶¶ 91–98. In allegations later contradicted by Dorworth's sworn testimony, Dorworth alleged that Joel's statements at that meeting included that Joel "was concerned about his exposure for sexual misconduct with A.B," Doc. 62 ¶ 91, that Joel "was paying for A.B.'s attorney's fees in an attempt to shape her testimony so that he could avoid charges" and that Joel "and his parents would seek A.B.'s cooperation by 'paying her off,'" *id.* ¶¶ 92–93. [8] Dorworth claimed that, when he refused Joel's request that he help Joel seek a pardon, Joel "threatened to 'make this a problem for everyone' by falsely claiming that Dorworth, … Gaetz, and others were involved in [Joel's] criminal actions." *Id.* ¶ 98.

On August 14, 2020—after Dorworth's alleged meeting with Joel—Joel messaged Dorworth, first saying that he wanted the U.S. Attorney investigating him fired. Doc. 62-3 at 2. Referring to A.B. by an alias, Joel then said that he was having to pay for A.B. to retain a lawyer, that investigators wanted her to talk, that he believed

---

[8] At his deposition, despite testifying he recalled Joel's statements verbatim, Doc. 183-6 at 34:3–4, Dorworth gave an entirely different story of the meeting recounted under oath in his complaint. Dorworth testified that Joel only hinted that he was paying A.B.'s attorney by claiming he had things under control. *Id.* at 26:13–24 (the only mention of A.B. at the meeting was "that one of the girls [Joel] had dealt with was underage, and that she was talking to the feds"); *id.* at 62:11–20 (testifying that Joel never mentioned A.B. by name and that Joel was "sort of making it seem like he's got everything under control."). Dorworth gave both stories under oath; at least one was a lie.

"Venmo was the link," and that he needed Dorworth's help. *Id.* Dorworth sharply

retorted, "I have nothing to do with any of this …. Not. Fucking. Cool.," *id.*, to which

Joel protested, "I'm trying to let everyone know who came into contact with these

girls" and "I would think you'd want to at least have a heads up if some chick says she

partied at your house …. ," *id.* Dorworth says this exchange was their last communi-

cation. Doc. 183-6 at 66:25–67:6.

### III.  As Joel and Dorworth exchanged messages, A.B. implicated them both.

Before dismissing this action, Dorworth claimed that Joel's alleged statements

at their last meeting—and in their last exchange—show that Joel (and by extension his

parents and AWG, Inc.) paid a lawyer named Andrew Searle to shape A.B.'s testi-

mony. Dorworth spun this theory from a snapchat exchange between K.M. and Joe

Ellicott and a message from Joel to A.B. *See* Doc. 183-5 at 226:20–228:16; Ex. 6 at 6–

7; Ex. 7 at 11. All evidence (and common sense) stands to the contrary.

At A.B.'s first meeting with a detective on about August 14, 2024, she named

Joel*,* Dorworth, Gaetz, and several others as men she had sex with as a minor. Ex. 1

at 131:7–11. Implicating *both* Joel and Dorworth, A.B. plainly didn't conspire with

anyone to lessen Joel's criminal liability—Joel was indicted days later for sex traffick-

ing A.B., and her report would *support* Joel's indictment and conviction.[9] *See* Ex. 8.

Dorworth's speculation about A.B.'s meeting with Searle is also baseless. *See*

---

[9] Defendants noted this absurdity in Dorworth's theory in their motions to dismiss his claims last year, highlighting that Joel being charged and convicted with sex trafficking A.B. is inconsistent with Dor- worth's claim that Defendants conspired with A.B. to reduce Joel's sentence. Doc. 77 at 7–8; Doc. 79 at 10. Dorworth dismissed his claims while those motions were pending.

Ex. 9 ¶¶ 7–8; *see also* Ex. 1 at 276:19–22; *id.* at 138:11–17. Indeed, before A.B. briefly

met Searle, she had *already* met with a detective and implicated both Joel and Dor-

worth—as reflected in the snapchat exchange on which Dorworth relies, Ex. 6 at 6–7

(K.M. telling Joe Ellicott that A.B. is meeting the detective "now," before Ellicott re-

sponds to give K.M. Searle's number to pass on to A.B.). A.B. never hired Searle and

does not recall communicating with him again. Ex. 1 at 138:16–17, 283:12–14; Ex. 9

¶ 8.[10] Dorworth's own counsel elicited testimony that the Greenbergs never paid A.B.'s

legal fees, Ex. 1 at 254:7–16, and that "no third party has ever paid for any of [her]

legal fees ever," *id.* at 254:18–19. A.B. also testified that Joel never offered to pay her

legal fees, *id.* at 140:25–141:7, or said that Andrew and Susan, Abby, or AWG, Inc.

would pay her fees, *id.* at 143:13–24. Searle confirmed there was no agreement with

any third-party to pay for his meeting with A.B. and that he never was paid. Ex. 9 ¶ 9;

*see also* Ex. 10 at 2, 6, 10 (Greenbergs confirming under oath they never paid A.B.'s

attorney). And Defendants did not even try to pay A.B.'s fees, as no defendant (except

A.B.) ever contacted Searle. Ex. 9 ¶ 10.

　　Rather than conspiring against Dorworth, A.B. hired her own lawyers, Ex. 1 at

138:18–21, cut contact with Joel and "everybody except the girls that were involved,"

*id.* at 141:13–25, and then sat for an FBI interview, *see id.* at 133:7–25. At this point,

Defendants could not possibly have controlled A.B.—much less to the end Dorworth

alleges—as she told the FBI about both the July 15, 2017 sex party at Dorworth's home

---

[10] Similarly, K.M. testified that A.B. "didn't think it was in her best interest" to retain Searle, as she
did not trust a lawyer referred by Joel. Ex. 4 at 280:10–14, 351:8–20.

and an earlier sexual encounter with Dorworth at a Lake Mary hotel, both of which
occurred when she was a minor. *Id.* at 132:1–133:25. Indeed, A.B. told the FBI
"[e]very single detail from when I first met Joel 'til the last time I ever talked to Joel."
*Id.* at 132:20–21. Obviously, that would upend a conspiracy to lessen Joel's criminal
liability, as would A.B. providing the same testimony, as she did, to the grand jury on
September 16, 2020. *Id.* at 375:6–14, 376:1–7. Simply put, it was frivolous for Dor-
worth to allege and maintain his theory about Defendants hiring a lawyer to help A.B.
provide statements and testimony to authorities.

### IV. Dorworth learned investigators were asking about the July 15, 2017 party at his home, then he lied to investigators as part of a cover up.

Soon after A.B. testified to the grand jury, Gaetz and B.G. told Dorworth that
federal prosecutors showed his and Gaetz's driver's licenses to grand jury witnesses.
*See* Ex. 11 at 2; Doc. 183-5 at 292:6–19. Dorworth also learned that investigators asked
about the July 15, 2017 party. *See* Doc. 183-5 at 287:4–11. He says he then knew De-
fendants were falsely accusing him and Gaetz of impropriety with A.B. *See id.* at
287:10–11. For support, he points back to Joel's texts, describing them as falsely ac-
cusing him of knowing A.B. and that she partied at his house. *See* Doc. 183-5 at
320:12–18; *see also* Doc. 1-1 ¶ 520. But Dorworth did, in fact, know A.B. and he was
at the party.

In December 2020, Dorworth received a federal subpoena, Doc. 180 at 7, and
then met with federal investigators in spring 2021. Doc. 183-5 at 36:13–19. He claims
that investigators were focused on Gaetz and his activities at the July 15, 2017 party.

11

*Id.* at 38:7–17. Dorworth (falsely) told investigators, "listen, .... I was not at a party that day, [I] did not meet that girl." *Id.* at 85:17–86:2. Indeed, Dorworth recounted telling them that he had "positively" never met A.B. *Id.* at 37:14–23. In doing so, Dorworth violated 18 U.S.C. § 1001, something he later accused Defendants of doing. Doc. 62 ¶ 473.

Dorworth then perpetuated his lies. In a May 7, 2021 letter to investigators, Dorworth's lawyer, Mr. Hornsby, conceded that A.B. appears on the guest entry log for Dorworth's gated neighborhood at 6:15pm on July 15, 2017, Ex. 13 at 1, but claimed that Dorworth did not recall meeting A.B. *Id.* at 2. He then provided a picture that Dorworth purportedly took of his friend, Mr. Morris, while boating at 6:04 p.m. on the day of the party. *Id.* at 1, 5. Hornsby claimed the picture proved Dorworth was not home at the same time as A.B., concluding that "[w]hat I suspect occurred is that [Joe] Ellicott had asked Mr. Dorworth if [K.M.'s] roommate [A.B.] could come over" while Dorworth was not present at his home. *Id.* at 1–2. And in an October 4, 2021 letter to investigators, Hornsby claimed that Joel demanded that Dorworth secure him a pardon, that Joel texted Dorworth on August 14th, and that Joel was controlling A.B.'s testimony. Ex. 11 at 2–3. From this, Hornsby claimed it was "logical for Mr. Dorworth to assume" the grand jury's interest in him "was the result of [Joel] following through on his previous threats of retribution." *Id.* at 3.

But the grand jury's focus on Dorworth and his home is not evidence of a retributive RICO conspiracy; the grand jury's focus on Dorworth is evidence that investigators received truthful testimony. And that testimony could have come various

12

partygoers outside of the alleged RICO conspiracy—there were at least 6.[11] Ex. 2 ¶ 12; Ex. 4 at 128:20–23.

### V. Using his lies to investigators, Dorworth sues to preempt A.B.'s claims.

In December 2022, the same month Joel was sentenced, A.B. sent Dorworth a demand letter announcing her intention to sue him for sex trafficking and statutory rape. *See* Doc. 62 ¶ 479. On April 7, 2023, Dorworth filed his first verified complaint, seeking a declaration that he never had sex with A.B. or paid her for sex.[12] Doc. 1-1 at 114–15. The verified complaint was also replete with immaterial, impertinent, and scandalous material about Abby Greenberg, that was offered only to malign and embarrass her. Those allegations—which did not support any factual element of any claim against Abby or any other party—were ultimately withdrawn.

But Dorworth went further: across 918 paragraphs, he theorized a RICO enterprise—consisting of Joel, Joel's parents Andrew and Susan, Joel's ex-wife Abby, AWG, Inc., and three Greenberg Dental Entities, *id.* ¶¶ 10–17—claiming they tried but failed to extort him either to seek a pardon for Joel or to have the prosecutor investigating Joel reassigned, *id.* ¶ 3. Defendants, he claims, then conspired to "falsely accuse[] Dorworth of being involved in, among other things, child sex trafficking and

---

[11] All witness who testified about the party reported the presence of more young women—in addition to K.M., B.G., and A.B. Ex. 12 at 49:1–6; Doc. Ex. 1 at 116:2–3 (discussing the presence of "a couple of other young women that I did not know"); Ex. 4 at 128:20–129:7 (discussing unidentified women who were also at the party). Any, or all, of these women could also have, and likely did, testify before the grand jury—as L.P. admits she did. Doc. 183-2 ¶ 30 (L.P. stating that she "testified to a grand jury about the parties at the Dorworth Residence in the Summer and Fall of 2017").

[12] In filings before the Court, Dorworth conceded that A.B.'s claims against him were "a substantial part of the reason that [he] shough [sic] relief in the first place." Doc. 139 at 8.

an illegal ghost candidate scheme" in retribution. *Id.* ¶ 4. To that end, Defendants al-

legedly "compensated" A.B. "to provide false testimony … against" Dorworth, *id.*

¶ 20, by "paying A.B.'s attorney fees," *id.* ¶¶ 800(c), (d). Dorworth further claimed that

the alleged enterprise violated RICO by funding Joel's criminal defense, *id.* ¶¶ 672–74,

and by paying Joel's restitution, *id.* ¶¶ 690–93. Based on these (factually baseless) alle-

gations, Dorworth asserted several claims, including RICO conspiracy.

Dorworth also repeated the false story Hornsby's letter relayed to federal au-

thorities: that Joe Ellicott invited A.B. to Dorworth's house but that Dorworth does

not know whether A.B. ever took Ellicott up on that invitation. *Id.* ¶¶ 440–45; Doc.

183-5 at 86:2–3. Dorworth likewise claimed that he "has never, to the best of his rec-

ollection, met, … , communicated, or interacted in any way with A.B." Doc. 1-1 ¶ 439;

*see also id.* ¶¶ 419, 423 (claiming Dorworth never met A.B. and "never 'partied' with

A.B. at his house"). These allegations were clearly false.

After Defendants removed this case to federal court and filed motions to dis-

miss, Dorworth filed a second verified complaint, incorporating his entire first com-

plaint. Doc. 62 ¶ 348. To it, Dorworth also added a claim for conspiracy under Flor-

ida's RICO statute, § 772.103(4), Fla. Stat., against Andrew, Susan, and Abby Green-

berg, Doc. 62 at 54–55. Across 498 paragraphs, Dorworth attempted to fix his failure

to allege any facts supporting his claim that Defendants agreed to his claimed conspir-

acy—largely through at least 45 allegations based solely on "information and belief."[13]

---

[13] Doc. 62 ¶¶ 9, 26–27, 29, 105, 116, 120–22, 142, 148, 151–54, 161, 168, 173, 177, 212–13, 228, 243, 275, 300, 305, 308, 312–15, 325, 327, 349, 353, 356–58, 368–70, 374, 376, 392, 397.

Dorworth also expanded the conspiracy's alleged goal to obtaining cooperation credit for Joel through false testimony. *Id.* ¶ 7. For support, he devoted an entire section of his second complaint to his strange claim that any assistance Joel's parents provided him "exceeded" "normal or lawful assistance from parents to a son," and Dorworth alleged that Joel's parents paid his restitution and settled potential claims by Seminole County against themselves and Joel. *Id.* at 48, ¶¶ 391–97.

Elsewhere, he claimed that Joel's parents knew of all activity in Joel's case—including what information Joel provided to the government and whether it was true—because they were paying Joel's lawyer. *See id.* ¶¶ 325–26. And perhaps most bizarrely, Dorworth claimed, again upon information and belief, that Joel's parents' support to Abby Greenberg—the suddenly financially vulnerable mother of two of their grand-children—was somehow a bribe for false testimony. *See id.* ¶¶ 314–15. When Defend-ants again moved to dismiss, Joel's parents highlighted the absurdity of these claims, noting that the Florida Bar rules expressly contemplate a third party paying for an-other's attorney, that the Middle District's own website contains instructions on how to pay another's criminal restitution, and that "there is no 'reasonable' limit of support to grandchildren beyond which a presumption of liability arises." Doc. 122 at 7–8.

Dorworth's absurd claims never had a factual basis. Ms. Dorworth, who also verified the amended complaint, began to testify—before being interrupted and coached by the Dorworth family's attorney to not reveal their "legal strategy"—that she and Dorworth made allegations upon information and belief with the hope they would "find out" in discovery. *See* Doc. 181-1 at 309:13–18. Thus, even at this early

15

point in the case, Dorworth's claims lacked fact or legal support *and* were subject to
dismissal. *See, e.g.*, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556–57 (2007) (requiring
"plausible grounds to infer an agreement").

### VI. After lying in his complaints, Dorworth repeatedly lies during discovery.

After twice verifying allegations that he never met or partied with A.B., Dor-
worth had to maintain that fiction to pursue this case. So Dorworth lied repeatedly in
discovery about his location on July 15, 2017. To a request for admission, Dorworth
again repeated his story from Hornsby's letter, concluding that he "cannot admit or
deny whether A.B. was present at his home" on July 15, 2017. Ex. 14 at 1–2. Un-
prompted, Dorworth also produced a July 1, 2024 declaration from his friend, Morris,
averring he "understand[s]" the picture of him that Dorworth provided to authorities
was taken on July 15, 2017. Ex. 15 ¶ 11. Morris otherwise averred in generalities that
he and Dorworth would go boating "usually late afternoon until sunset," that he and
Dorworth would celebrate their birthdays together in mid-July, that—after boat trips—
he and Dorworth would "invariably socialize well into the evening and night," and
that he believes Dorworth "is a good person." *Id.* ¶¶ 4–14.

Defendants also asked Ms. Dorworth about the July 15th party. She testified
that she was in Texas at the time. Doc. 181-1 at 383:25–384:2; *see also* Ex. 16 at 3. Still,
Ms. Dorworth testified that Dorworth was not home the night of July 15, 2017 because
he spent the night at Morris's house. Doc. 181-1 at 234:15–17, 241:4–9, 457:9–10.
Dorworth watched his wife give that testimony, Doc. 183-5 at 295:15–17, and despite
knowing it was false, took no action to correct it. He also likely induced said testimony.

*Id.* at 56:13–14 ("I prepped with my husband and with my attorney separately.").

Then, Dorworth testified that he went boating around when he took the picture of Morris. Doc. 183-5 at 177:1–2 ("[M]y photo was probably right about the time when we got on the boat."). After that, he said that he probably enjoyed bourbon and fried chicken, then went back to Morris's house to listen to records. *Id.* at 177:3–12, 242:11–12, 244:1–245:2. Then Dorworth committed to his earlier lies with fabricated equivocation, claiming that he did not really remember the details of what happened after boating with Morris but that he typically would fall asleep at Morris's house and—"if [he] went home at all," *id.* 256:2–3—he did so sometime after midnight between 1 and 3 a.m. and went straight upstairs to sleep,[14] not knowing what occurred at his home that evening because he "was not there." *Id.* at 156:17-23, 244:5–12, 245:12–14, 281:17-25, 285:2-5, 309:21-310:6; Doc. 183-6 at 121:19-22, 122:11-24, 209:18-24, 217:13-16, 218:10-17.

These sworn statements are demonstrably false. Besides A.B., K.M., and B.G.'s sworn statements, all placing Dorworth at the July 15, 2017 party, objective cell-tower data shows Dorworth was home the night of July 15, 2017—far from Morris' house.

**VII. Objective cell-tower records confirm that Dorworth lied under oath.**

Defendants obtained Dorworth's cell phone records, which show the location of the cell tower(s), and the side of the cell site antenna, used to transmit calls and texts to and from Dorworth's cell phone. Defendants retained an expert, Aaron Weiss, to

---

[14] *Id.* at 86:6–87:4, 245:3–22; 247:11–24, 248:19–24; 255:14–256:7, 247:11–16; *see also* Doc. 183-6 at 96:11–14; 110:2–7; 114:12–17; 118:6–14; 209:21–22; 211:2–8.

examine this data. *See generally* Ex. 17. At his deposition, Dorworth repeatedly testified that his cell phone was with him throughout July 15, 2017 and even ruled out that his phone was ever "lost . . . misplaced[, or] absent from [his] presence." Doc. 183-5 at 255:7–13; Doc. 183-6 at 95:15–23, 96:8–10. But Dorworth's cell phone records cannot be reconciled with his testimony regarding his location during the July 15th party.

Most relevant here, between 5:28 p.m. and 6:35 p.m., Dorworth's phone sent and received multiple calls and texts using a cell tower next to Lake Maitland, where he boated that afternoon with Morris. Ex. 17 at 8. Then, at 6:40 p.m., Dorworth spoke with his wife for five minutes, 24 seconds. *See id.* at 9. This call first connected to the Lake Maitland cell tower but switched to a cell tower roughly 4.5 miles north of Lake Maitland and less than 0.1 miles East of I-4. *Id.* This began a series of cell-tower connections that "indicate[] travel from the Lake Maitland … area at approximately 06:45 PM to the Heathrow area at approximately 07:17 PM." *Id.* at 10. That period tracks the roughly 30-minute drive from Lake Maitland to Dorworth's home in Heathrow— a time estimate his own lawyer gave to investigators. Ex. 13 at 1; *see also* Ex. 17 at 10.

Then, from 7:52 p.m. that night until 11:05 a.m. the next morning, "all cell site connections are to [a tower], . . . 0.6 miles S/SW from Dorworth's house." Ex. 17 at 10 (labeling this tower the "Home Tower"). On other days and times when gate records show Dorworth at home, Dorworth's phone consistently connected to the Home Tower. *Id.* at 11. The Home Tower is nine miles from Morris's house and Dorworth's calls connected to the North-facing side of the tower—pointed *away* from Morris's house and *towards* Dorworth's nearby home. *Id.* at 10. "[T]here are at least 37 cell sites

18

in closer proximity to Morris' house than" this tower. *Id.* There are also geologic ob-
stacles between the Home Tower and Morris's house that would impede connection.
*Id.* Based on this information, Defendants' cell records expert concluded that "Dor-
worth arrived at []his home within a few minutes after 07:17 PM and remained there
until at least 11:05 AM on 7/16/2017" and "it is doubtlessly not feasible for Dor-
worth's phone to connect to the Home Tower while at Morris's house." *Id.* at 11. Alt-
hough Dorworth said he would retain an expert to examine the cell phone data, Doc.
183-6 at 97:20–23, he did not do so. His expert deadline of September 3, 2024, came
and went without any expert disclosures. Doc. 51 at 2.

This unrebutted, objective evidence places Dorworth at home during the party,
showing both that Dorworth lied to investigators about his whereabouts on July 15th
and that Dorworth has repeatedly maintained that lie under oath in this case.[15]

## VIII. Facing a Rule 11 motion and overwhelming evidence he lied under oath, Dorworth dismissed this action—but not before deposing Andrew and Susan Greenberg in bad faith.

On August 17, 2024, Andrew, Susan, and Abby Greenberg and AWG, Inc.
served a Rule 11 motion on Dorworth, giving him until September 10, 2024 to avoid
a Rule 11 motion by dismissing his frivolous claims. Ex. 18. Further, on September 3,
2024, B.G. signed an affidavit—cited above—stating that "Mr. Dorworth was present

---

[15] This evidence fits other evidence that Dorworth knew—in direct contrast with his sworn allega-
tions—exactly who A.B. was long before Joel was indicted. For example, an April 3, 2020 text chain
produced in discovery shows that Joel sent Dorworth a link to A.B.'s adult entertainment website
stating, "[A.B.] was destined for greatness," to which Dorworth responded "lol." Ex. 19. This would
be an odd response for someone receiving a link to an adult website with no idea who A.B. is, but it
tracks with Dorworth recalling his earlier interactions with A.B. discussed above.

at the July 15, 2017 gathering at the Dorworth Residence for the vast majority of the

gathering" and that "on July 15, 2017, I observed [A.B.] naked in the presence of

Christopher Dorworth." Ex. 2 ¶¶ 13, 16. Dorworth had earlier testified that B.G.

"would know I wasn't there that night" and that "I think [she has] been pretty con-

sistent" in that regard. Doc. 183-5 at 285:2–9. Thus, by September 3, 2024, Dorworth

was facing a Rule 11 motion based in large part on objective cell phone location evi-

dence disproving his sworn testimony and an affidavit from an admittedly independent

third party confirming his presence during the July 15, 2017 party.

Even so, on September 4th and 5th, Dorworth's counsel deposed Andrew and

Susan Greenberg, respectively. And at 7:27 p.m. the night before Andrew's deposition,

Dorworth's counsel emailed counsel for the Greenbergs stating, "I just filed a … cross

notice of deposition in the state court fraudulent transfer case for the deposition to-

morrow." Ex. 20 at 1. The cross notice called for deposing Andrew Greenberg on top-

ics for Dorworth's separate, state court fraudulent transfer action—which had not yet

been served on any defendant. *Compare* Ex. 21 (state court notice), *with* Ex. 22 (federal

notice). Plainly—already planning to dismiss to avoid sanctions—Dorworth pressed

ahead with the Greenbergs' depositions to support an equally-frivolous state court ac-

tion before that complaint was served and before discovery had opened in that case.

Indeed, on September 5th, Dorworth voluntarily dismissed this action. Doc. 185.

On September 9, 2024, Dorworth amended his state court case—adding claims

for false report of criminal conduct, witness tampering, defamation, and conspiracy.

*See generally* Ex. 24. Dorworth's new complaint abandons all claims against Abby

Greenberg and the Greenberg Dental entities and also abandons his Florida RICO claims in their entirety. Still, incredibly, Dorworth *continues* to claim "[u]pon information and belief" that the Greenbergs paid A.B.'s attorney's fees and goes so far as to claim *his* attorney's fees in this action as damages. *Id.* ¶¶ 78–79.

That Dorworth continues to assert a debunked theory on "information and belief" that has been disproven through 16 months of litigation, eight depositions, approximately 75 non-party subpoenas, extensive written discovery, and thousands of documents emphasizes that he possesses *zero* evidence that Andrew and Susan Greenberg did *anything* other than pay their child's attorney's fees—something even Dorworth said he would do were he in their position. Doc. 183-6 at 12:21–13:2 ("[I]f my kid was in Joel's exact position, I would make sure they had representation, yes.").[16]

In sum, Dorworth pleaded that Andrew and Susan Greenberg (i) agreed to pay A.B., Doc. 62 ¶¶ 27, 29, 92–93, 105, 126, 154, 294, 299–300, 312, 324 (ii) had knowledge of the content of Joel's proffers, *id.* ¶¶ 140–43, 308–09, 325, (iii) paid Joel's restitution for some nefarious purpose, *id.* ¶¶ 232, 388–97, and (iv) bribed Abby for false testimony, *id.* ¶¶ 126, 154, 294, 312, 324. But Dorworth has discovered zero

---

[16] There was also affirmative evidence demonstrating that Abby Greenberg never conspired against Dorworth. For example, Abby Greenberg attested in interrogatory answers that she never met A.B. and has never spoken to A.B. A.B. likewise testified that she has never met or communicated with Abby Greenberg. *See* Ex. 1 at 29:2–6. Abby Greenberg also attested that she never testified before a grand jury. And on the two occasions that Abby Greenberg spoke to law enforcement investigating Joel Greenberg, Abby never discussed: (a) A.B.; (b) Christopher Dorworth; (c) any interactions that may have occurred between A.B. and Christopher Dorworth before the July 15, 2017 party at the Dorworth Residence; and (d) any facts and circumstances arising out of and/or relating to the July 15, 2017 party at the Dorworth Residence. *See* Ex. 23 at 35. In turn, because Abby never provided the government with the testimony Dorworth claims she did, Andrew and Susan's payments to her were not bribes for false testimony.

evidence that Andrew or Susan agreed with anyone to obstruct justice.[17] Dorworth has

discovered zero evidence that Anderw or Susan sought to influence anyone's testi-

mony—either by paying A.B.'s attorneys either directly or indirectly, by paying Joel's

legal fees or restitution, or by providing financial support to Abby (and their grandchil-

dren). Dorworth has discovered zero evidence that Defendants knew of Joel's proffers

relating to Dorworth or of AB's existence. Dorworth has discovered zero evidence that

Defendants agreed with anyone to extort Dorworth through any means. And Dor-

worth has discovered zero evidence that Defendants agreed to or sought to provide

*any* false information about Dorworth to *anyone* at *any* time, or even had knowledge

of *anyone* doing so. Dorworth's claims were frivolous both when he filed and now.

Defendants thus seek a finding of entitlement to attorney's fees and costs and sanctions

against Dorworth.

## MEMORANDUM OF LAW

Through two salaciously abusive complaints, Dorworth sought millions in tre-

ble damages based on conspiracy theories and lies. Then, facing irrefutable evidence

---

[17] While hard to believe, Dorworth's RICO conspiracy claims against the Greenberg Dental entities
are even more contrived than his claims against the other Defendants. He alleges that "any funding
required for" actions taken by Andrew and Susan Greenberg "came from AWG and/or Greenberg
Dental with the knowledge of what the funding would be used for." *See* Doc. 62 ¶¶ 25, 308; *see also*
Doc. 183-6 at 182:6–8 ("I'm saying all those companies together were acting on behalf of the Green-
berg family, using their resources, trying to get their son out of prison."). However, Dorworth has
adduced no evidence at all to support his allegations that Greenberg Dental has any connection what-
soever to Joel Greenberg besides the name "Greenberg" or that Greenberg Dental ever paid any
money to facilitate Joel Greenberg's defense in his criminal case. Doc. 183-5 at 187:2-6, 192:6-14,
193:5-8, 195:24-25. Additionally, there is no record evidence that anyone acting on behalf of Green-
berg Dental ever conspired with anyone to do anything that injured Dorworth in any way.

of his lies (presented in a Rule 11 motion) Dorworth dismissed his entire frivolous case
and RICO claims. Defendants are thus entitled to their reasonable fees and costs under
at least two fonts. *First*, Andrew, Susan, and Abby Greenberg are entitled to fees under
Florida's RICO statute. *Second*, Defendants are entitled to fees as a sanction under the
Court's inherent power. Finally, Defendants are entitled to a dismissal with prejudice
as a sanction under the Court's inherent power.

## I. Andrew, Susan, and Abby Greenberg are entitled to fees under Florida's RICO statute as Dorworth's claim lacked substantial fact or legal support.

Count IV of Dorworth's amended complaint asserted a Florida law RICO con-
spiracy theory against "all individual Defendants." Doc. 62 at 54–55. Florida's RICO
statute entitles defendants to fees and costs when a plaintiff brings a claim "without
substantial fact or legal support." § 772.104(3), Fla. Stat. This "less stringent standard"
serves to "discourage frivolous Rico claims." *Miller*, 681 So. 2d at 302. To award fees
and costs under § 772.104(3), the Court need not "find a complete absence of a justi-
ciable issue of either law of fact." *Id.* at 302 (quotation omitted). Rather, the Court
need only find that Dorworth's claim lacked substantial fact or legal support.

Further, Defendants need not rebut the possibility that future evidence *could have*
substantially supported Dorworth's claims, as the absence of support is measured from
the point of dismissal. *See Nodal v. Infinity Auto Ins. Co.*, 50 So. 3d 721, 724 (Fla. 2d
DCA 2010) (applying an identical standard and stating, "[i]f … a plaintiff chooses to
voluntarily dismiss its suit at a point when no record evidence supports the factual or
legal basis [for the claim], then a defendant is entitled to recover attorney's fees and

costs expended in challenging the action.").

Importantly, Defendants can make this showing even after a voluntary dismissal. As a matter of federal law, the Court has jurisdiction to consider this motion. *See Cooter & Gell v. Hartmax Corp.*, 496 U.S. 384, 395–96 (1990) (explaining that "it is well established that a federal court may consider collateral issues after an action is no longer pending," including awarding costs and attorney's fees); *Shelton v. Schar*, No. 5:17-CV-86-OC-PGBPRL, 2018 WL 3636698, at *1–3 (M.D. Fla. Apr. 23, 2018) (citing *Cooter & Gell* and rejecting argument that the Court lacked jurisdiction to consider a post notice of voluntary dismissal motion for fees under § 772.104(3)). Separately, as a matter of Florida law, Defendants can show that Dorworth's claim lacked support even "after [Dorworth's] voluntary dismissal of the claim." *Royal Palm Vill.*, 2021 WL 4452898, at *5.

With that in mind, Dorworth's RICO conspiracy claim plainly lacked substantial fact or legal support and would have failed under almost any standard. Most basically, Dorworth premised his case on a perjurious lie: that he was not home on the night of July 15, 2017 and that he had never met or partied with A.B. In response to this motion, Dorworth will likely assert that factual disputes exist as to whether his statements were false—they don't. But for argument's sake, straining to give Dorworth's testimony a non-perjurious interpretation, the best he can offer is that he does not believe he was at the July 15, 2017 party and does not know if A.B. was there. That would not constitute a substantial factual basis supporting his claim. Nor would Dorworth's self-serving amnesia rebut the testimony of the young women that have

24

sworn he was there and did meet A.B.

Still, that question should not distract the Court from the larger issue under Florida's RICO statute: whether there was a substantial fact or legal basis for Dorworth's claim. Even if Dorworth did not attend the party (objective evidence shows he did) and even if he never met A.B. (he did), there is still no evidence supporting his RICO claim. Nothing shows that Defendants bribed A.B.—indeed, unrebutted evidence shows that she implicated Dorworth and Joel simultaneously *before* she met the attorney Dorworth claims Defendants paid. Nothing shows that Defendants bribed Abby. Nothing shows that Defendants had any knowledge regarding the content of Joel's proffers. And nothing shows that Defendants agreed to anything. In other words, Defendants ask that the Court not miss the forest for the trees. The simple fact is that there was never evidence supporting Dorworth's RICO claims.

To prove a RICO conspiracy, a plaintiff must prove that the defendants either "agreed to the overall objective of the conspiracy" or "agreed to commit two predicate acts." *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1293 (11th Cir. 2010).[18] Over almost a year and a half of discovery—wherein Plaintiff served over 40 separate sets of written discovery requests across all defendants and deposed 4 alleged members of the conspiracy—Dorworth discovered zero evidence that any defendant agreed to make false statements about Dorworth, to bribe or encourage any other defendant to make false statements about Dorworth, or to finance any other Defendant's efforts to

---

[18] *See Omnipol, A.S. v. Multinational Def. Servs., LLC*, 32 F.4th 1298, 1308 (11th Cir. 2022) ("[T]he analysis of both the federal and state RICO claims is the same.").

make false statements about Dorworth. Indeed, all Dorworth could ever hang his hat
on was his claim that Defendants paid Searle to guide A.B.'s testimony. But that evap-
orated when Searle confirmed that he met A.B. once, that he was never paid for that
meeting, and that he was never contacted by any defendant other than A.B. Ex. 9 ¶¶ 7–
10. Indeed, Dorworth conceded that—at the time he dismissed this action—he lacked
any evidence supporting his claim that the Greenbergs bribed A.B. when he again al-
leged that they did so "[u]pon information and belief" in his post-dismissal state court
complaint. Ex. 24 ¶ 79. Dorworth similarly conceded his entire RICO conspiracy
claim had no basis in fact or law when he dismissed this action in the face of a pending
Rule 11 motion and then dropped any allegation that Defendants violated Florida's
RICO act when repleading his claims in state court. *See generally* Ex. 24; *cf. Derek Run-
ion v. Bernard*, No. 2:20-CV-718-JLB-MRM, 2022 WL 18492498, at *5, *7 (M.D. Fla.
Jan. 17, 2022) (finding fee entitlement under an identical standard when the plaintiff
"abandoned [the] claim in response to Defendants' motion to dismiss the amended
complaint"). He further conceded the frivolity of his claims against the Greenberg
Dental entities and Abby Greenberg when he dropped them from his new action com-
pletely. *See* Ex. 24.

   And rather than suggesting conspiracy, unrebutted testimony shows that inves-
tigators targeted Dorworth when A.B. independently implicated him and Joel and oth-
ers in having sex with her as a minor; then, the dominoes continued to fall when a host
of young women testified about a July 15, 2017 sex party at Dorworth's home. Objec-
tive, unrebutted, evidence shows that Dorworth and then-age-17 A.B. were present at

that party at Dorworth's home on July 15, 2017; that Dorworth (reflecting his guilt) obstructed the investigation into his and Gaetz's misconduct by lying to investigators, falsely claiming that he was not home for the July 15th party and that Joel paid witnesses to implicate him. Then, repeating the same lies he told investigators, Dorworth filed this suit in bad faith to preempt a potential lawsuit from A.B. for sex trafficking and statutory rape. Because Dorworth's claim was without substantial basis in fact or law, Andrew, Susan, and Abby Greenberg are entitled to their reasonable fees under § 772.104(3), Fla. Stat.

## II. Defendants are entitled to fees and dismissal with prejudice under this Court's inherent powers because Dorworth brought and maintained this action in bad faith.

Under its inherent powers, the Court may impose sanctions for "bad faith," vexatious, wonton, or "oppressive" behavior, *Chambers*, 501 U.S. at 44–46, even after a voluntary dismissal of the underlying case, *see Irish*, 962 F.3d at 1310 ("[A] district court may address a sanctions motion based on its inherent powers … even if it lacks jurisdiction over the underlying case."); *Haviland v. Specter*, 561 F. App'x 146, 150 (3d Cir. 2014); *see also Fid. Land Tr. Co., LLC v. Mortg. Elec. Registration Sys., Inc.*, No. 6:12-CV-1367-ORL-37, 2012 WL 6720994, at *3 (M.D. Fla. Dec. 4, 2012) (recommending that the court grant a motion for sanctions under the Court's inherent power filed *after* a notice of voluntary dismissal). To impose such sanctions, the Court must find that the sanctioned party acted in "subjective bad faith." *Irish*, 962 F.3d at 1310 (emphasis deleted). Permissible sanctions include fees and dismissal with prejudice. *Chambers*, 501 U.S. at 45–46 (fees); *Obukwelu*, 837 F. App'x at 687–88 (dismissal). Relevant here,

27

even when a party has voluntarily dismissed their claim, the Court may convert that dismissal into one with prejudice as a sanction because doing so does "not require a determination on the merits." *Zow*, 595 F. App'x at 888.[19]

The Court should sanction Dorworth under its inherent power because the "record demonstrates that [he] acted willfully and in bad faith" by failing, "multiple times, to truthfully respond in interrogatories[,] … sworn depositions," and verified complaints. *Obukwelu*, 837 F. App'x at 689.[20] In two verified complaints, a response to a request for admission, two days of deposition testimony, and an unverified interrogatory response, Dorworth lied that he was not home the night of July 15, 2017 and that he had never met A.B. Worse still, those lies represented a continuation of lies that Dorworth made to the FBI in an attempt to obstruct a criminal investigation.[21]

Dorworth further lied when he claimed, for example, that he had never met L.P. *Compare* Doc. 183-5 at 356:10 (Dorworth testifying that it "would be news to me" if L.P. was at his house in the summer of 2017), *with* Doc. 183-2 ¶¶ 24–27 (L.P. averring that she attended multiple parties at the Dorworth Residence in the summer of 2017,

---

[19] On its own motion, the Court could also order Dorworth to show cause under Federal Rule of Civil Procedure 11(c)(3) why his voluntary dismissal should not be converted to a dismissal with prejudice as a non-monetary sanction under Federal Rule of Civil Procedure 11(c)(4). *See Johnson v. 27th Ave. Caraf, Inc.*, 9 F.4th 1300, 1315 (11th Cir. 2021) ("[W]here the client has made a knowing factual misrepresentation or is the mastermind behind the frivolous case, [Rule 11] sanctions against a client are appropriate." (quotations omitted)).

[20] As further evidence of Doworth's bad faith, Defendants note that this frivolous action is part of a ongoing pattern of abusive litigation. In a separate case before the Court, Judge Conway found that Dorworth's claims were "completely unreasonable, groundless, and bordering on bad faith." Ex. 26 at 45.

[21] For the Court's benefit, Defendants have also created a compendium of Dorworth's false statements. Ex. 27.

one of which included a sexual encounter with Dorworth). And even after receiving a

Rule 11 letter, Dorworth then served interrogatory responses doubling down on his

lies. *See* Ex. 25. Dorworth also caused his wife to verify false statements under oath in

his amended verified complaint. *See* Doc. 181-1 at 33:18–24. And he watched without

intervening when she repeated those lies during her deposition.

Even still, faced with irrefutable evidence that he had perjured himself, Dor-

worth refused to abandon his crusade against Andrew and Susan Greenberg. Recy-

cling many of his original allegations, Dorworth's new state court complaint incredibly

*continues* to allege that the Greenbergs are liable to him because they financed false

testimony against him—though now apparently alleging in the alternative that such

aid may have been negligent. Ex. 24 ¶¶ 38–55. *But see Carney v. Gambel*, 751 So. 2d 653,

654 (Fla. 4th DCA 1999) ("No Florida decision has imposed liability upon the parents

of an adult child for intentional acts simply because the child may be financially de-

pendent on … his or her parents."). Elsewhere, Dorworth suggests that campaign do-

nations may give rise to liability. Ex. 24 ¶ 41. But the former speaker designate of the

Florida House, Doc. 1-1 ¶ 6, surely knows that such contributions are constitutionally

protected, *see McCutcheon v. Fed. Election Comm'n*, 572 U.S. 185, 191 (2014) (noting the

First Amendment guarantees "[t]he right to participate in democracy through political

contributions"). Perhaps most incredibly, Dorworth *again* alleges "[u]pon information

and belief" that the Greenbergs paid A.B.'s attorney's fees, *id.* ¶ 79, and goes so far as

to claim *his* fees from this action as damages, *id.* ¶ 78, and claims entitlement to puni-

tive damages, *id.* ¶ 81.

Dorworth has demonstrated total contempt for the judicial system. At the outset of the government's investigation into Joel, Dorworth lied to the FBI to protect himself and his friends. Then, seeking millions of dollars in damages, he turned those same lies against the Greenbergs. After lying in his very first filing, Dorworth went on to lie at every stage of this litigation. And when finally confronted with irrefutable evidence that he lied, Dorworth simply dismissed this action and is now *repeating* his false allegations in another court. Dorworth's actions epitomize subjective bad faith. The Court should now act to ensure that bad faith litigants like Dorworth cannot freely twist the Court's power to his own illegitimate ends—defiling "the very temple of justice"—and then get away with impunity. *Chambers*, 501 U.S. at 46. The Court should therefore employ its inherent power to defend the judicial process's legitimacy by ordering Dorworth to pay Defendants' fees incurred in defending this frivolous action and by converting his dismissal without prejudice into one with prejudice.

## CONCLUSION

For the above reasons, the Court should grant the Defendants' motion for entitlement to fees and costs and convert Dorworth's dismissal into one with prejudice.

## LOCAL RULE 3.01(g) CERTIFICATION

Counsel for the Greenbergs conferred with counsel for Dorworth regarding this motion by video teleconference on September 13, 2024 and by email on September 18, 2024 and September 19, 2024. Plaintiff opposes the requested relief.

Dated: September 19, 2024                    Respectfully submitted,

                                             /s/ Frederick S. Wermuth
                                             Frederick S. Wermuth (Lead Counsel)
                                             Florida Bar No. 0184111
                                             Dustin Mauser-Claassen
                                             Florida Bar No. 0119289
                                             Quinn Ritter
                                             Florida Bar No. 1018135
                                             KING, BLACKWELL, ZEHNDER
                                               & WERMUTH, P.A.
                                             P.O. Box 1631
                                             Orlando, FL 32802-1631
                                             Telephone: (407) 422-2472
                                             Facsimile: (407) 648-0161
                                             fwermuth@kbzwlaw.com
                                             dmauser@kbzwlaw.com
                                             qritter@kbzwlaw.com

                                             *Attorneys for Defendants Andrew Greenberg, Susan
                                             Greenberg, and AWG, Inc.*

                                             William E. Peters, Jr.
                                             Florida Bar No. 50230
                                             WICKER SMITH O'HARA MCCOY &
                                             FORD, P.A.
                                             515 E. Las Olas Boulevard
                                             SunTrust Center, Suite 1400
                                             Ft. Lauderdale, FL 33301
                                             Telephone: (954) 847-4800
                                             Facsimile: (954) 760-9353
                                             WPeters@wickersmith.com

                                             *Attorney for Defendants*
                                             *Andrew Greenberg and Susan Greenberg*

                                             /s/ Jason A. Perkins
                                             Jason A. Perkins, Esq.
                                             Florida Bar No. 0610852
                                             CARLTON FIELDS, P.A.
                                             200 S. Orange Avenue, Suite 1000
                                             Orlando, Florida 32801
                                             Phone: (407) 849-0300

Fax: (407) 648-9099
jperkins@carltonfields.com (primary)
mbryan@carltonfields.com (secondary)
dcarlucci@carltonfields.com (secondary)

*Attorney for Defendant, Abby Greenberg*

/s/ *Michael J. Furbush*
Michael J. Furbush
Florida Bar No. 70009
Michaela N. Kirn
Florida Bar No. 1018863
Kaitlyn Chomin
Florida Bar No. 1026114
Dean Mead, Egerton, Bloodworth, CA-
POUANO & Bozarth, P.A.
420 S. Orange Avenue, Suite 700
Orlando, FL 32801
Tel: 407-841-1200
Fax: 407-423-1831
mfurbush@deanmead.com (Primary)
mkirn@deanmead.com (Primary)
kchomin@deanmead.com (Primary)
mgodek@deanmead.com (Secondary)

*Attorneys for Greenberg Dental Associates, LLC,
Greenberg Dental & Orthodontics, P.A., and
Greenberg Dental Specialty Group, LLC*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on September 19, 2024 I electronically filed the fore-

going with the Clerk of the Court by using the CM/ECF system, which will send a

notice of electronic filing to all counsel of record.

/s/ *Frederick S. Wermuth*
Frederick S. Wermuth
Florida Bar No. 0184111